```
 1                    UNITED STATES DISTRICT COURT
                       DISTRICT OF MASSACHUSETTS
 2

 3

 4    KAREN READ,
                         Plaintiff,        )
 5                                         )  Civil Action
                                           )
 6    vs.                                  )  No. 25-10399-FDS
                                           )
 7                                         )
      NORFOLK COUNTY SUPERIOR COURT        )
 8    and                                  )
      MASSACHUSETTS ATTORNEY GENERAL,      )
 9                         Defendant.      )

10

11    BEFORE:  CHIEF JUDGE F. DENNIS SAYLOR

12

13                         MOTION HEARING

14

15

16            John Joseph Moakley United States Courthouse
                           Courtroom No. 10
17                         1 Courthouse Way
                           Boston, MA 02210
18

19

20                         March 5, 2025
                            9:30 a.m.

21

22

23                       Valerie A. O'Hara
                       Official Court Reporter
24       John Joseph Moakley United States Courthouse
                         1 Courthouse Way
25                       Boston, MA 02210
                    E-mail: vaohara@gmail.com
```

1     APPEARANCES:

2     For the Petitioner:

3          Martin G. Weinberg, PC, by MARTIN G. WEINBERG,
      ESQ., 20 Park Plaza, Suite 1000, Boston, Massachusetts
4     02116;

5          Michael Pabian Law Office, LLC, by MICHAEL PABIAN,
      ESQ., 20 Park Plaza, Suite 1000, Boston, Massachusetts
6     02116;

7          Werksman Jackson & Quinn LLP, by ALAN J. JACKSON,
      ESQ., 888 West Sixth Street, Fourth Floor
8     Los Angeles, California 90017;

9          DAVID R. YANNETTI, ESQ., 44 School St., Suite 1000A
      Boston, Massachusetts 02108;

10    For the Respondent:

11
           Norfolk District Attorney's Office, by CALEB J.
12    SCHILLINGER, ESQ., 45 Shawmut Road, Canton,
      Massachusetts 02021;

13
           Office of the Attorney General, by THOMAS E.
14    BOCIAN, ESQ., One Ashburton Place, Boston, Massachusetts
      02108.

15

16

17

18

19

20

21

22

23

24

25

<u>PROCEEDINGS</u>

THE CLERK:  All rise.  Court is now in session in the matter of Karen Read vs. Norfolk County Superior Court, et al, Civil Action Number 25-10399.

Would counsel please identify themselves for the record, starting with the petitioner.

MR. WEINBERG:  Good morning, your Honor, Martin Weinberg on behalf of the petitioner Karen Read, who sits two seats to my left, along with co-counsel, Michael Pabian, David Yannetti, and Alan Jackson.

THE COURT:  Good morning, all.

MR. SCHILLINGER:  Good morning, your Honor, Caleb Schillinger for respondent Norfolk County Superior Court.

MR. BOCIAN:  Good morning, your Honor, Thomas Bocian for the Massachusetts Attorney General and the Norfolk Superior Court.

THE COURT:  Good morning, all.  All right.  This is a hearing on a petition for habeas corpus.  I read the filings.  I want to make sure that we're in agreement on the basic framework, which I think we are.

This is a petition under Section 2241.  The petitioner has been released on her own recognizance by the state court, which is a form of custody.  She's not in custody pursuant to a judgment of a state court, so the

1    2254 doesn't apply, we're under 2241.  The Court has

2    subject matter jurisdiction.  The petitioner has exhausted

3    her state court remedies, and none of the extension

4    doctrines, such as *Younger v. Harris* apply, so it presents

5    basically the federal constitutional question of whether

6    her retrial would violate The Fifth Amendment right to

7    avoid double jeopardy as incorporated in the Fourteen

8    Amendment that apply to the states.

9         That is a legal question that I am to consider

09:32AM 10   de novo, all that by way of again trying to make sure we

11   are in agreement on those points.

12        Mr. Weinberg, are you taking the lead here?

13        MR. WEINBERG:  Yes, I am, your Honor.

14        THE COURT:  Do you disagree with the way I've

15   framed the question?

16        MR. WEINBERG:  I agree with the entirety of the

17   way you framed the question, your Honor.

18        MR. SCHILLINGER:  Respondent also agrees, your

19   Honor.

09:32AM 20        THE COURT:  With that, Mr. Weinberg, I'll hear

21   from you.

22        MR. WEINBERG:  Thank you, may I address you from

23   the podium?

24        THE COURT:  Yes.

25        MR. WEINBERG:  Thank you.  This petition presents

1    to your Honor two legal challenges to the state court

2    decisions by both the trial court and later by the Supreme

3    Judicial Court.

4         The first legal challenge is whether or not there

5    was manifest necessity for the trial court's sui sponte

6    declaration of a mistrial, and we contend, and I'll argue

7    that second, with your Honor's permission, that that

8    decision conflicts with clear-cut First Circuit

9    jurisprudence, which requires a consideration of viable

09:33AM 10   alternatives and requires a trial court to consult and give

11   the opportunity to all counsel to be heard before any

12   mistrial order occurs and requires some evidence that the

13   constitutional right of a defendant before the trial court

14   to have a first jury decide whether or not there was or

15   there was not sufficient evidence to convict or acquit

16   needs to be demonstrated on the record, and the record of

17   that case demonstrates no consideration of Ms. Read's

18   double jeopardy interests, but I want to start with the

19   second argument where there is little precedent, but I

09:34AM 20   believe strongly that the Court should establish precedent

21   that a right to a post-trial voir dire is an essential part

22   of the double jeopardy clause protections that center on

23   the right of a defendant, or, in this case, the petitioner,

24   not to be subjected by the same sovereign to prosecute for

25   the same offense for which a prior jury has unanimously

1    determined that the state failed to prove their case, that

2    in this case, that right dates back, and I'm not going to

3    burden the Court with the history, but

4    *Arizona v. Washington* has a footnote talking about how the

5    history of double jeopardy centers on people's right to

6    avoid multiple prosecutions, that that's more at the core

7    of double jeopardy than even the right to avoid multiple

8    punishments, that it dates back to an era in British

9    history where the *Steward* case would have a practice of

09:35AM 10    starting trials, and if the evidence wasn't good enough,

11    they would abort the trial and reserve it for future times,

12    and the British responded to that, and that the colonists

13    and later the framework of the Fifth Amendment double

14    jeopardy clause built up that foundation and that history,

15    and that's been repeated by the Supreme Court several times

16    and most recently in footnote 23 in *Arizona V. Washington*.

17        What is indisputable here is that the petitioner

18    has carried her burden of production.  It's virtually

19    unprecedented.  We've not found any federal precedent where

09:36AM 20    four jurors have directly represented to defense counsel

21    and the state court has accepted defense counsel's

22    representations as being reliable in terms of providing a

23    factual predicate for the decision-making.

24        Four jurors have directly informed trial counsel,

25    my co-counsel in this case, that there was a mistake made,

1    that they unanimously had come to a decision to find

2    Ms. Read not guilty on two of the three counts against her

3    and that the impasse that was documented in the final,

4    actually in the several notes but the final note that

5    Judge Cannone relied on related not to all three counts but

6    instead to the multiple charges that included lesser

7    included offenses within the manslaughter count, Count Two.

8            There were two reasons advanced by the

9    Commonwealth as to why a voir dire should not be ordered,

09:37AM 10   and the voir dire could establish whether the voir dire was

11   conducted by your Honor.  I think your Honor has the power

12   as part of this habeas corpus proceeding to order a

13   voir dire.

14           THE COURT:  Let me pause you there.  Is that

15   correct?  In other words, if I find that there was no

16   manifest necessity for the declaration of a mistrial or I

17   find that she was acquitted, I order her released from

18   custody, whatever that means in this context --

19           MR. WEINBERG:  Yes.

09:37AM 20           THE COURT:  -- but that standard habeas relief.

21   But the voir dire, do I have the power to do that, and if

22   so, from what source does it derive because that's not

23   habeas relief, that's not releasing her from custody,

24   that's conducting an investigation?

25           MR. WEINBERG:  Yes, it would be the power to

1    conduct an evidentiary hearing would be the power to make

2    fact findings as to whether or not the jury unanimously

3    Ms. Read.  It would be part of the Court's powers ancillary

4    to the constitutional decision of was there an acquittal,

5    what constitutes an acquittal, and how do I know whether

6    there was an acquittal?

7        And I'm not asking the Court to simply take the

8    four declarations and the fifth one who directly

9    communicated to Mr. Yannetti but to use that as a basis to

09:38AM 10    find that the petitioner satisfied her burden of

11    production.

12        I mean, we have many examples, you know, where the

13    burden of production that results in voir dires, both

14    federal and state, occur from a single juror's declaration

15    that there was ethnic bias, bias against Hispanics, a

16    racial bias, so when there's an allegation of external

17    contact, an allegation that extrinsic information somehow

18    permeated the jury's decision-making.

19        Here we have five, four direct, one indirect

09:39AM 20    declarations.  I think it's indisputable that Ms. Read has

21    met a burden of production, and the real issue is should

22    she have the opportunity to convert that burden of

23    production into proof that the jury unanimously and finally

24    and unconditionally acquitted her of charges, including the

25    most serious charge that she's facing on re-prosecution,

1     that being murder.

2          And the Commonwealth, I think their position when

3     you penetrate the arguments, comes down to two points, and

4     I want to address each of them.

5          Point one is that they believe, they argue that

6     even if 12 jurors came into whether this court or

7     Judge Cannone's court, and your Honor would have the

8     option, I contend, to order a voir dire, you know, with

9     Judge Cannone as part of a fact-finding to determine if

09:40AM 10    there was an acquittal.

11          If 12 jurors each, reliably credibly answered

12    questions that are not inconsistent with questions that a

13    Trial Judge like yourself might use to poll a jury, you

14    know, did you find, did you reach a decision on Count Two?

15    Was it unanimous?  Was it final?  What was your decision?

16          If 12 jurors credibly say we did make that

17    decision, it was final, it wasn't reconsidered, it was to

18    vote not guilty, then the state's position is we should

19    somehow create a procedural wall that prevents those facts

09:41AM 20    from being heard and those facts to crystallize the

21    decision about what constitutes an acquittal.

22          And we, of course --

23          THE COURT:  I'm sorry.

24          MR. WEINBERG:  We, of course, contend that that

25    kind of finding by a jury, which we believe was made by the

1    jury but not disclosed by the jury in the notes, you know,

2    is an acquittal, that the acquittal is not the

3    announcement, it's not the formality of a verdict, it's a

4    decision by a jury that's unanimous.  It's the heart of a

5    jury trial right.

6         I mean, the Sixth Amendment right to an unbiased

7    jury is really in part predicated on a defendant's right to

8    an acquittal from an unbiased jury, and here we have

9    powerful evidence, compelling evidence that jury reached a

09:42AM 10    final decision to acquit Ms. Read, and the state's position

11    is so what?  We have a right to re-prosecute, who cares?

12         They didn't come out.  A mistake was made.  The

13    jury didn't announce the verdict.  They didn't write a

14    footnote to their impasse note.  A mistake might have been

15    made by the trial court, which I'll contest when we discuss

16    manifest necessity not to ask the jury whether or not the

17    note reflected an impasse on all rather than just a subset

18    of charges, but the request for a voir dire is to make sure

19    that there is hard proof, reliable proof.

09:42AM 20         If it's not there, then there wasn't an unanimous

21    acquittal, but if it was there, if there was an unanimous

22    finding by the jury, it's entitled to respect.

23         THE COURT:  So let me ask you this.  Let's assume

24    that you are correct, how do you reconcile that with the

25    Supreme Court's decision in *Blueford v. Arkansas*, which is

1    a 2012 decision?  The foreperson of the jury comes back and

2    says we have unanimously voted to acquit, not just murder,

3    capital murder, and to acquit on first-degree murder, but

4    we are deadlocked on manslaughter, and the Supreme Court

5    said for double jeopardy purposes, that's not an acquittal.

6    How do you reconcile your argument with that case?

7         MR. WEINBERG:  Yes.  The majority opinion was

8    relying on two factors that are different than the factors

9    before the Court.  First was the idiosyncrasies of Arkansas

09:43AM 10   law that required either an acquittal on everything or a

11   conviction, but it doesn't allow for the kind of partial

12   verdicts that are part of federal law and are part of

13   Massachusetts law, but even more important, the Trial Judge

14   right or wrong in the Arkansas case sent the jury back to

15   deliberate, and the majority was very clear that they were

16   predicating their decision that there was not an acquittal

17   on the charges that the jury foreperson, you know, informed

18   the Court based on the lack of finality of those decisions,

19   based on the fact that jurors have a right to reconsider,

09:44AM 20   based on the fact that there was known to be deliberation

21   that continued after that announcement.

22         In this case, we don't have that record.  There is

23   no factual basis.  None of the other seven jurors, despite

24   the media in this case, despite the length of their jury

25   service, despite the notes that said we have a principal

1    disagreement with other jurors.  None of the seven have

2    said to anyone, not to the prosecution, not to the court

3    officers, not to Judge Cannone, not to the media, not

4    unanimously that we disagree with what the five jurors, who

5    are saying we unanimously reached a decision to acquit

6    Ms. Read of murder.

7         After two months, I think you can infer or expect

8    the likelihood that at least one of those jurors

9    anonymously, at least, would Tweet, would reach a media,

09:45AM 10   would reach the Court, would reach the State Police, would

11   reach the court's officers and say, wait a second, that's a

12   misrepresentation of what happened in that jury room, that

13   wasn't a final vote, that wasn't a vote to acquit, that was

14   just preliminary, but there's absolutely nothing in this

15   record, despite the large publicity that featured the

16   filing of the original motion to dismiss and the affidavits

17   of counsel and the declarations of the jurors that

18   conflicts with it.

19        There's a likelihood here, Judge, that if you

09:46AM 20   ordered a voir dire, we would end up with proof that would

21   essentially extinguish all of the state's concerns that,

22   like *Blueford,* this wasn't just a final vote, this was just

23   a preliminary vote, that we can infer that the jury has a

24   right to reconsider, yes, the jury a right to reconsider,

25   but there's no evidence in this record that they did

1    reconsider, that that wasn't the final vote, that they ever

2    thought of it as anything other than a final,

3    unconditional, unambiguous acquittal.

4        And, again, a mistake was made perhaps because the

5    trial instruction said that you need to reach a verdict on

6    each of the counts, the jury notes reflect, or at least we

7    contend they reflect an impasse on Count Two but not

8    Counts One and Three.

9        THE COURT:  I'm sorry to interject.  If I hear you

09:47AM 10   correctly, my power to conduct such a voir dire or to order

11   that it be conducted is ancillary to the habeas

12   jurisdiction?

13       MR. WEINBERG:  Yes, it would be as if the Court

14   was, you know, doing a habeas on an incompetence of

15   counsel.  Your Honor would be empowered to take evidence

16   and to decide did counsel have a conflict, were they asleep

17   at the table, were they drinking during a trial.

18       You know, federal courts on habeas can take

19   evidence, and there's nothing in the habeas rules that

09:47AM 20   would prevent you if you believed that you needed the voir

21   dire to make a final determination whether there was a

22   unanimous and final acquittal to take evidence, and,

23   therefore, there's nothing to prevent the Court from

24   determining that the jurors should be called, they should

25   be seated anonymously.  It's better in this courtroom where

1   there's no cameras in terms of protecting the privacy

2   rights and getting credible evidence.

3          You know, we know from the First Circuit's

4   decision in *Tsarnaev* where nine years later, the

5   First Circuit ordered Judge O'Toole to have a voir dire.

6          Voir dires are not extraordinary.  In fact, the

7   First Circuit has said in the *Zindi* case, which was adopted

8   *by the Tsarnaev* case, that we can't have a dogmatic rule

9   against voir dires.  We have duties when there's credible

09:48AM 10   evidence.

11          THE COURT:  But what *Tsarnaev* is the federal court

12   examining its own jury.  You're essentially asking the

13   federal court here to examine what happened in state court.

14   It may be no different.  I'm not expressing an opinion, but

15   it feels different to me.  Maybe that matters, maybe it

16   doesn't.  Is there precedent for a federal court to require

17   a voir dire of a state court jury?

18          MR. WEINBERG:  There's no precedent that I know of

19   where any court judge, any federal court, has dealt with

09:49AM 20   the voir dire for an acquittal issue.  This comes to you on

21   a pretrial basis, which is what is unique about double

22   jeopardy.

23          The other cases where the state court has

24   voir dires on a regular basis, and the federal court has

25   voir dires on a regular basis when any juror declares there

1    was external contact, there was bias in the jury room,

2    there was prejudice against a Hispanic defendant, and, you

3    know, what we're arguing is that those are Sixth

4    Amendment-based voir dires, but the values that are

5    represented by the double jeopardy clause are just as

6    important as the value of an impartial jury.

7        And it's only that there's no precedent.  What

8    jurors haven't said, wait, you know, we acquitted the

9    defendant, and the Judge didn't listen.  You know, we

09:50AM 10    provided the Court with two circuit court opinions, the

11    *Dotson* case, and out of the Fifth Circuit, the *Stauffer*

12    case.

13        In *Dotson*, two of the jurors hearing the verdict

14    read in court said, wait a second, that misrepresents our

15    unanimous decision to acquit the defendant on one count.  I

16    think it was an extortion case, Count Ten.

17        The Judge called the foreperson, the foreperson

18    executed an affidavit, and the Judge reversed that part of

19    the verdict slip.

09:50AM 20    In *Stauffer*, it was cause to defense counsel.

21    That's as close as the precedence give us to what's

22    occurred in this case, and it's why I wanted to start the

23    argument here because the manifest necessity has been the

24    subject of an enormous amount of opinions and some pretty

25    clear First Circuit guidance and Supreme Court guidance,

but we're here in a bit of a legal wilderness where your

Honor has less bench post, less precedential bench post,

and more needs to make a decision about right or wrong,

whether or not given the level of proof that there was a

unanimous finding of not guilty, whether we should just

insulate it, and, to me, not honor the services of those

jurors who spent two months sitting and listening to

evidence and we contend came to the conclusion that the

evidence didn't prove Ms. Read was a murderer, didn't prove

she left the scene to avoid, but they were hung on whether

or not there was some level of manslaughter, one of the

lesser includes regarding alcohol, there's a number of

different state court alternatives that Judge Cannone

instructed the jury on.

The state's argument, I think, says you can't have

an acquittal without announcing it, and the state's other

argument is under 606(b), how do you conduct a voir dire

without, you know, intruding into the deliberative process,

and let me take both of those on.

The most recent Supreme Court case that has dealt

with just what constitutes an acquittal is *McElrath v.*

*Georgia*.  In Georgia, they had a state court law that says

if there were inconsistent verdicts, that the state court

was empowered to invalidate an acquittal, and the

Supreme Court said it is well established that whether an

1    acquittal has occurred for purposes of the double jeopardy

2    clause is a question of federal, not state law.  An

3    acquittal occurs when there has been a ruling relating to

4    the ultimate question of guilt or innocence.  Labels,

5    including those provided by state law, do not control our

6    analysis.

7         Thus, it is not dispositive whether a fact-finder

8    recanted the word "acquit."  Instead, an acquittal has

9    occurred if the fact-finder, meaning the jury, acted on its

09:53AM 10   own view that the prosecution failed to prove its case.

11        The ultimate question is whether the double

12   jeopardy clause recognizes an event as an acquittal.  In

13   making that determination, we ask whether or not given the

14   operation of state law, there's any ruling that the

15   prosecution's proof is insufficient to establish criminal

16   liability.  The double jeopardy clause prohibits second

17   guessing of an acquittal for any reason.

18        The *Candelario* is a case that looks beneath the

19   label, beneath the procedure to determine whether or not

09:54AM 20   the substance, the finding, the event, in this case, the

21   jury decision, was an acquittal.

22        In *Blueford vs. Arkansas,* the dissenting opinion

23   from Justice Sotomayor, but this was just a prelude to it,

24   the context of her disagreement about whether or not they

25   should honor what the jury foreperson said.  It says,

1    "In ascertaining whether an acquittal has occurred, form is

2    not to be exalted over substance, rather we ask whether the

3    fact-finder has made a substantive determination that the

4    prosecution has failed to carry its burden."

5         "Jurisdictions have different procedures

6    respecting the announcement of verdicts and the entry of

7    judgments, but that diversity has no constitutional

8    significance.  Jeopardy terminates upon a determination

9    however characterized that the evidence is insufficient to

09:55AM 10   prove a defendant's factual guilt."

11    *U.S. vs. Martin Linen Supply Company*, the

12    Supreme Court again said, "The development of the double

13    jeopardy clause from its common law origin suggests it was

14    directed as a threat to the threat of multiple

15    prosecutions."

16         At the heart of the policy is the concern that

17    permitting the sovereign, in this case, the Norfolk D.A.,

18    freely to subject the citizen, Ms. Read, to a second trial

19    for the same offense would arm the government with a potent

09:56AM 20   instrument of oppression.

21         The following comes from *Green vs. United States*,

22    a historic opinion on double jeopardy.  The clause

23    therefore guarantees that the state shall not be permitted

24    to make repeated attempts to convict the accused, therefore

25    subjecting him or her to embarrassment, expense, ordeal,

1    compelling them to live in a constant state of anxiety and

2    insecurity, and, most important, as well as enhancing the

3    possibility that even though innocent, he or she may be

4    found guilty.

5         So the contention, Judge, here is that there was

6    an acquittal, it wasn't announced, but that Ms. Read is

7    entitled to prove that.  In fact, the four or five jurors

8    that have come forward with no contradiction are accurately

9    representing what occurred in that jury room and that there

09:57AM 10   was a finding of insufficient evidence, a finding to acquit

11   her, and that she should not, therefore, be subjected to a

12   second trial for murder when a first jury has unanimously

13   made a finding that she was not guilty.

14        And the vehicle, if you will, the evidentiary

15   vehicle to prove that to your Honor would be to bring the

16   12 jurors in anonymously outside the public, outside the

17   media, and to ask them the questions that you would

18   similarly ask to a jury if you had decided to determine was

19   there a partial verdict, should I poll the jury?

09:57AM 20        We don't have to intrude into the juror's mental

21   process, why they reached a verdict, what was the

22   conversation that led to a verdict.  Questions can be asked

23   that would be outside the boundaries of Rule 606(b), but

24   even if we were at the boundary, even if we were at the

25   boundary, Judge Saris sitting on the First Circuit in

1    *United States vs. Villar* in 2009 where there was an issue,

2    and this is 15 years ago, regarding whether or not there

3    was bias against a Hispanic defendant said the appellant's

4    more powerful argument is the application of Rule 606(b) to

5    prevent juror testimony about racial or ethnic statements

6    made in jury deliberations is unconstitutional as applied,

7    yet it violates a defendant's right to due process to a

8    trial by an impartial jury.

9        And so, yes, we're dealing with a different

09:58AM 10    constitutional clause, but the reasoning is the same that

11    you can't use an evidentiary rule to prevent proof of a

12    constitutional violation.

13        There's nothing more important in the double

14    jeopardy clause than the bar on multiple prosecution.  And

15    in this case, it cries out for some decision-making, your

16    Honor, in an area that hasn't had a great deal of

17    decisions, which is that there is no rule to prevent your

18    Honor from hearing from the jurors and making a

19    determination whether or not the burden of proof has been

09:59AM 20    met, whether the burden is on the prosecution, as the

21    double jeopardy cases say, whether the burden is on us in

22    this area of trying to prove that the jury, in fact,

23    acquitted that the appropriate procedural vehicle should be

24    a voir dire post-trial, a reliable voir dire.

25        We asked Judge Cannone to conduct one within days

1    of the end of the first jury trial, and that led to her

2    decision against it and the Court of Appeals, but with all

3    due respect to the courts that have correctly required

4    voir dires when there's evidence of racial conversation in

5    a jury, and I submit a conversation and a Hispanic

6    conversation, the double jeopardy right is just as

7    important and gets vindicated through the same procedure,

8    which is we determine, we don't ignore, we determine what

9    happened in that jury room, and that's where I go back to

10:00AM 10    *Dzhokhar Tsarnaev*, which had that language about when

11    there's credible abrogation of a constitutional violation,

12    we don't -- we have a duty to investigate, and I think

13    consistent with that duty is to investigate by voir diring

14    the jurors.

15           Alternatively, your Honor could find, as the

16    Attorney General has recommended, that if you're going to

17    order a voir dire, it could be done by Judge Cannone, but I

18    think it's perfectly appropriate to do it in this courtroom

19    in this habeas case before a Judge as experienced as your

10:01AM 20    Honor, and then your Honor would make credibility findings,

21    your Honor would determine whether or not there's any

22    reason to be skeptical of the declarations of the four or

23    five jurors, and if there was no reason to be skeptical,

24    then your Honor would then have the legal issue of

25    determining whether or not a finding by a jury, a final

1    decision by a unanimous jury, is entitled to stop the

2    re-prosecution of Ms. Read for the very same offense that

3    the first jury acquitted her on.

4    THE COURT:  Let me ask you a question about the

5    factual record as it now exists, putting to one side the

6    voir dire question.  There are certain facts that I think

7    are not in dispute, the transcript of what happened in the

8    court, the three jury notes, I think at this stage the

9    affidavits are not controverted.

10:02AM 10    Was there fact-finding by the Superior Court or

11    for that matter the SJC to which I am required to give

12    deference?  I guess two questions, am I required to give

13    deference, but even before we get to that point, are there

14    additional facts in the record or fact-finding that would

15    even raise the question of deference, again, putting the

16    voir dire to one side?

17    MR. WEINBERG:  No, I believe, Judge, that when we

18    go to manifest necessity and the issues connected thereto,

19    those are rulings of law, those are conclusions of law that

10:03AM 20    there were no viable alternatives that the defense had an

21    opportunity to object or to find that rulings of law --

22    that are to find the factual record is the notes, the

23    factual record is perhaps the, you know, the sequence of

24    events that occurred, where you have note 1 and defense

25    counsel and the prosecutor, you know, were provided an

1   opportunity to read note 1, they made an argument that the

2   defense wanted a *Tuey* charge, the government did not.  The

3   second note, the same practice.

4        The proper practice, reading the note to counsel

5   in the absence of the jury, hearing from counsel, and in

6   that case, the Court decided to make a *Tuey*.  I think those

7   are all facts.  You know, I infer from those facts,

8   recommend or contend that the Court should as well.  The

9   result of those two discussions is a demonstration the

10:04AM 10   defense wanted a verdict from this jury.

11        My guess is that I know in my experience, my guess

12   is in the courts that when jurors say they're at an impasse

13   after days of deliberation, many times defense lawyers ask

14   for a mistrial, they object to an *Allen* charge.  Here, we

15   have the reverse.  We have the government not wanting an

16   *Allen* Charge, we have the defense asking for a Tuey charge,

17   the state analog to the *Allen* charge because they wanted

18   this case to conclude before this jury.  They wanted a

19   verdict.

10:04AM 20        And then when you go to the third note, the

21   practice of Judge Cannone somehow was varied, abandoned.

22   She didn't read the note to defense and the government.

23        THE COURT:  All right.  I think we're basically

24   talking about manifest necessity.

25        MR. WEINBERG:  Yes.

1        THE COURT:  Go ahead.

2        MR. WEINBERG:  The respondent correctly says that

3   the Supreme Court has no mechanical test and that any

4   single factor does not dictate a decision, but what's true

5   in this case, Judge, is that every factor the Supreme Court

6   looks to for determining whether they manifest necessity,

7   every factor weighs in favor of finding no manifest

8   necessity.

9        Was the decision by the trial court made in haste?

10:05AM 10  Was it precipitous?  Well, yes, between the time of the

11   reading of the note, it was 30 seconds until the jury came

12   in and then about a minute reading the note to the jury and

13   then an immediate decision to sui sponte to declare a

14   mistrial.  That's precipitous.

15        Second factor, did the Judge query defense counsel

16   before making the decision about their thoughts and

17   opinions, and there was no opportunity given to the defense

18   counsel to read the note, to follow past practice, to

19   follow state law, which requires, quote, "a full

10:06AM 20  opportunity of the defense to be heard."

21        Third, did the Judge give the prosecutor, who

22   bears the burden of proof, *Arizona v. Washington* and the

23   First Circuit says it's a heavy burden of proof.

24        Judge Cannone did not ask the prosecutor what

25   their judgments were, what their views were, what their

1    opinions were as to whether or not there were alternatives

2    to a declaration of mistrial.

3            Fourth, is there evidence that the Judge

4    considered viable alternatives?  And here there's no

5    evidence in the record of the case to demonstrate

6    Judge Cannone's consideration of viable alternates before

7    declaring a mistrial in the record of the trial.

8            THE COURT:  And at this stage, what were those

9    alternatives?  Again, we have the state statute about what

10   happens when the jury reports for the third time that

11   they're deadlocked effectively, what were her alternatives

12   at that point?

13           MR. WEINBERG:  I think she had two or three

14   alternatives, Judge.  The first alternate is to ask the

15   jury whether or not there was a unanimous decision, a

16   verdict, a finding on any of the three counts.  It was to

17   read the note, not as conclusive that there was no finding,

18   which we now know is inconsistent with the beliefs of at

19   least four and maybe five jurors, but that was a viable

20   alternative.

21           The advisory notes to state Rule 27B, which is not

22   dissimilar from Federal Rule 31(b) say it's mandatory when

23   you're going to order a mistrial, you have to ask the jury

24   whether or not there was any partial verdict, but intrinsic

25   in having a rule that allows partial verdicts is that a

1    court has to at least consider, if not in fact seek, some

2    guidance from the jury whether or not the impasse relates

3    on all or rather just a subset of the charges before her.

4    That was a viable alternative.

5        The *Tuey* statute in the state, 234, contains an

6    alternative, which is there could be no further

7    deliberations unless the jury consents to deliberations,

8    and so intrinsic in that is a court has an alternative to

9    ask the jury whether they want to limit their continuing

10:09AM 10    deliberations to one or another of the counts or whether

11    the note reflects an impasse on all counts.

12        The Judge had a right to poll the jury and ask

13    them the questions that I request of this court ask on a

14    post-trial voir dire.  They were all alternatives.  None

15    appeared to have been considered by Judge Cannone, who

16    immediately read the note and told the jury I'm going to

17    grant your wish, and I'll be seeing you in a few minutes.

18        THE COURT:  Does that argument require that I

19    effectively ignore what happened with the first and second

10:09AM 20    note, in other words, is all we're examining is what

21    happened in isolation on the third note?

22        MR. WEINBERG:  Well, you know, I don't want to lob

23    off, I think the Court can consider the history, but I

24    believe that cuts in favor of several things.  One is that

25    the defense wanted the verdict.  Two is that the issue

1    being discussed in the first and second note was not

2    whether or not to issue, to order a mistrial, and,

3    therefore, extinguish or at least appear to extinguish

4    Ms. Read's double jeopardy rights, but whether or not to

5    issue a supplemental instruction.  The defense never asked

6    for a mistrial.

7        The word "mistrial" was never mentioned during the

8    discussions of notes 1 and 2, and so everything that the

9    dialogue regarding notes 1 and 2 showed the defense wanted

10:10AM 10    the verdict, and, moreover, it demonstrated to the defense

11    what the practice that Judge Cannone was using, which is

12    the proper practice, the practice advocated in the state

13    court, which is that when a jury has a note, you read it to

14    defense counsel before making decisions, you read it to

15    defense counsel before calling the jury.

16        So, yes, I think your Honor can consider that, but

17    I don't think that interactions provides a bases for a

18    determination of manifest necessity or a bases of inferring

19    that the defense would not object to a mistrial or that

10:11AM 20    they wanted a mistrial, I think it infers just the

21    opposite.

22        So the Supreme Court also talks about

23    precipitousness and whether or not each party was given an

24    opportunity to register their views and whether the Court

25    considered viable alternatives, whether the Judge made

1    findings.  Again, not one of these are absolutely

2    mechanically required as a precondition to either a

3    mistrial order or to the reversal of a mistrial order.

4         Also, whether the Judge gave consideration in

5    weighing the central values in the defendant having the

6    right to avoid a successive prosecution is another factor

7    that the Supreme Court weighs, and here there was no

8    consideration evidenced in the record given to Ms. Read's

9    fundamental constitutional rights not to have to go through

10:12AM 10   this ordeal a second time, and as *Green* said, not to face

11   the risk that an innocent person being re-prosecuted could

12   well face a second jury.  Having to win twice is very

13   different than proving a not guilty once.

14        But the First Circuit jurisprudence I contend is

15   even clearer regarding what's required as a condition

16   precedent to a declaration of a mistrial.  It starts

17   U.S. v. *Ramirez -- and all of these cases are cited in our*

18   *petition, Judge.  It says, quote, "In U.S. vs. Pierce,"*

19   which is a 1979 First Circuit decision, "we held --" that's

10:12AM 20   a holding -- "that in determining whether there was a

21   manifest necessity for a mistrial, our first inquiry must

22   be whether the Court gave adequate consideration to the

23   existence of any less drastic alternative."  We stress the

24   importance of giving counsel an opportunity to be heard

25   before declaring a mistrial.

1          Years later, in *U.S. vs. Toribio-Lugo*, the Court

2     said, "Where there's a viable alternative to a mistrial,

3     the District Court fails adequately to explore it, a

4     finding of manifest necessity, quote, 'cannot stand.'"

5     That's a 2004 First Circuit case that we've written about.

6          *U.S. vs. Candelario-Santana*, another 2020 case,

7     it's the same.  "At the very least," quote, "we require the

8     District Court to consider other options to ensure that a

9     jury is genuinely deadlocked before discharging it."

10:14AM 10          And then my fourth case, which is a panel from

11    1981 that was shared by Judge Wyzanski, I'm old enough to

12    remember Judge Wyzanski's tenure on the District Court and

13    Judge Breyer, Justice Breyer sitting First Circuit 1981,

14    "whether or not the record indicates the trial court has

15    considered alternatives to a mistrial is significant."

16          Also, of major importance is affording counsel an

17    opportunity to be heard.  A precipitous decision reflected

18    by a rapid sequence of events culminating in a declaration

19    of a mistrial would tend to indicate insufficient concerns

10:14AM 20    for the defendant's constitutional rights.

21          And that panel properly said that a trial court

22    must temper a decision whether or not to abort the trial by

23    considering the importance to the defendant of being able

24    once and for all to conclude his confrontation with society

25    through the verdict of a tribunal he might believe to be

1    favorably disposed to his fate.

2         The *Brady* case, and that was a habeas case, *Brady*

3    *vs. Samaha*, S-a-m-a-h-a.  It included two other procedural

4    points.  One is that the burden is on the Commonwealth, not

5    on the defense to justify re-prosecution.  Neither of the

6    state courts put that burden on the state when making the

7    trial court's opinion and the SJC opinion.  And, second,

8    that although there's some deference to trial courts, you

9    know, discretions, that deference is extinguished when the

10:15AM 10   record of the case does not demonstrate a sound and careful

11   exercise of discretion, such as we contend did not occur in

12   this case.

13         THE COURT:  To the extent that those First Circuit

14   cases, like *Toribio-Lugo*, were written before the

15   Supreme Court's decision in *Renico* and *Blueford*, if they

16   cannot be harmonized with *Renico and Blueford*, do you agree

17   that they are superseded by *Renico and Blueford*?

18         So, in other words, to the extent that they

19   suggest there is a checklist, you must do one or two or

10:16AM 20   three things, there is no checklist, and I think *Renico* at

21   some length says that considerable deference is to be given

22   to the trial judge.

23         MR. WEINBERG:  And, you know, two answers to that.

24   *Renico, of course,* was a 2254 case, not a 2241 case.

25         THE COURT:  Let me pause you there, but for

1  2254 cases, there's this two-part inquiry, was there

2  clearly established federal law, paraphrasing the

3  statute --

4          MR. WEINBERG:  Yes.

5          THE COURT:  -- clearly established federal law as

6  established by the Supreme Court, and then was the state

7  court decision unreasonable in light of that, so it's a

8  very deferential standard, which is not applicable here?

9          MR. WEINBERG:  Yes.

10:17AM 10          THE COURT:  But on the first part inquiry, what is

11  clearly established federal law, that does apply here,

12  right?

13          MR. WEINBERG:  Yes, your Honor.

14          THE COURT:  This is federal law?

15          MR. WEINBERG:  Yes, that's why I said the

16  Supreme Court, and including *Renico*, did not have a

17  mechanical test, but it doesn't conflict with the

18  First Circuit.

19          I'm not arguing that there's a mechanical test in

10:17AM 20  the First Circuit, I'm arguing that when each of the

21  principal four factors looked to by the series of

22  First Circuit decisions:

23          Were there viable alternatives that were carefully

24  considered?  No.

25          Was counsel, either counsel, given an opportunity

1    to be heard?  No.

2          Was the decision precipitous and made in haste?

3    Yes.

4          And, most important, was there any evidence in the

5    record of a careful consideration of the defendant's

6    constitutional right as protected by the double jeopardy

7    clause not to be subjected to re-prosecution?  Not a word

8    in the record of the state court.

9          So that's -- the Supreme Court, they look to multi

10   factors, but *Arizona v. Washington* says you only give

11   deference, you only apply an abusive discretion standard

12   when there's a demonstration of an exercise of careful

13   discretion.  That all goes back to a case called Perry --

14   *Perez*, I'm sorry, which is an ancient Supreme Court case,

15   which talks about urgency and talks about, you know, how

16   important the double jeopardy right is and how it only gets

17   extinguished when there's essentially no other

18   alternatives, and here I recommended that there's just no

19   demonstration that Judge Cannone believed that there were

20   alternatives to consider.

21         She made a mistake.  She misunderstood the jury

22   note if those four or five jurors and the first one

23   reported the mistake the very next day are correct, and,

24   therefore, there was no manifest necessity for the

25   declaration of a mistrial as to two or three counts.

1          The state says, Well, it would be coercive to, you

2     know, for Judge Cannone to ask the jury any questions once

3     they delivered the note, but there's nothing coercive about

4     asking the jury whether or not the note relates to all

5     counts, whether or not their decision, you know, they're at

6     an impasse includes all counts, whether or not they've

7     reached a decision on any one of the counts.

8          The cases relied on, including the state court

9     case, were all single count charges, not multiple count

10:20AM 10    charges.  When you have Rule 27B or in this court 31(b),

11     it's inherent that if we're going to determine whether

12     there's a partial verdict, a court has the power to ask the

13     jury in a noncoercive fashion whether or not they've

14     reached a consensus, a unanimous verdict on any one count.

15          Had she done that, it is predictable and probable

16     that the jury would have said we're at an impasse on

17     Count Two, and it's a failure of the Judge to ask that to

18     the jury, respectfully to Judge Cannone, who is an

19     experienced State Court Judge.  She made a mistake.  She

10:21AM 20    should have consulted counsel.  She didn't consult counsel.

21          There's no evidence here counsel consented to a

22     mistrial by asking for a *Tuey* instruction, which is what

23     she found in her opinion, but the SJC did not adopt or rely

24     on any allegation of consent.

25          We have here is whether under the Supreme Court

1    factors, which admittedly are not a mechanical test, and,

2    again, *Blueford* is distinguishable, and the dissent that I

3    read to the Court did not dissent with the holding that

4    *Blueford* is a case that demonstrated the importance of

5    finality, and they even talked about, if I can find it in

6    this blizzard of paper, if your Honor would give me one

7    second.

8         They talked about in the *Blueford* case that

9    they're relying on the lack of finality to the judgment

10:22AM 10    rather than, you know, whether or not the judgment had to

11    be announced in any particular formal way.

12         So there is -- it says, The foreperson's report

13    prior to the end of deliberations lacked the finality

14    necessary to amount to an acquittal on those offenses,

15    quite apart from any requirement that a formal verdict be

16    reached.

17         I contend that there's nothing inconsistent in

18    *Blueford* and nothing inconsistent in the 2010, 2254 case,

19    the *Renico vs. Lett* that is inconsistent with the

10:23AM 20    First Circuit jurisprudence, if the First Circuit's

21    continuous jurisprudence as read as a multi-factor test.

22         Here, none of the factors weigh in favor of the

23    mistrial order.  I don't have to rely on just the lack of

24    consideration, a viable alternatives, just a lack of

25    opportunity for the defense to be heard, just the absence

1  of any evidence in the record that double jeopardy was

2  considered.

3         Here, all of the factors weigh in favor of a

4  federal court reversing the state court decision and

5  finding that the jurisprudence of this circuit, which

6  includes jurisprudence in *Brady* in a 2241 case compels a

7  judicial determination that there is no manifest necessity.

8  Manifest necessity are important words.  It wasn't

9  necessary, it certainty wasn't manifest necessity for that

10:24AM 10  trial court to sui sponte declare a mistrial without

11  hearing from counsel, without considering alternatives, and

12  without weighing Ms. Read's double jeopardy rights.  Thank

13  you, sir.

14         THE COURT:  Thank you, Mr. Weinberg.  Let's take a

15  just a moment, stretch our legs, and then I'll hear from

16  the Commonwealth.

17         (Pause)

18         MR. SCHILLINGER:  I'd like to start by addressing

19  your Honor's question.  There were factual findings made

10:25AM 20  here, your Honor, both by the trial judge and the SJC that

21  are significant.

22         I will try to address those in the context of the

23  specific issues that we're talking about.  Those factual

24  findings are owed deference in this habeas action, as set

25  forth in the *Marshall* case that we cite in our brief and

1    also reaffirmed later by the First Circuit in *Powell vs.*

2    *Tompkins.*

3         Importantly, your Honor, there were also

4    determinations of state law made by the SJC in the opinion

5    below.  Those are also binding in this federal habeas

6    action.

7         THE COURT:  I agree that they're binding.  I'm

8    struggling with how they intersect with federal habeas

9    constitutional law.

10:25AM 10    MR. SCHILLINGER:  Yes, your Honor, and I'll try to

11    weave that in the context of the mistrial or the acquittal

12    or the post-trial inquiry.

13         I do have one example just to preview on the

14    mistrial issue.  Petitioner continues to argue based on the

15    reporters's notes to Rule 27, Massachusetts Rule of

16    Criminal Procedure 27 that some sort of inquiry of a

17    partial verdict was required or mandatory of the Judge.

18         The SJC flatly rejected that argument, noted that

19    it's discretionary, went on to determine as a matter of

10:26AM 20    state law making such an inquiry would be improperly

21    coercive.  Those determinations cannot be relitigated here

22    in this federal habeas action, and I think that's what's

23    significant, your Honor.

24         So, turning to first the mistrial issue and

25    manifest necessity, as your Honor noted, we have clear

1   Supreme Court precedent here, and there is no required

2   checklist that the Judge must go through before declaring a

3   mistrial.  She's not required to inquire individually of

4   the jurors, she's not even required to confer with counsel

5   before doing so, as set forth in *Renico* and *Blueford*.

6          As your Honor also noted, you know, the discussion

7   of what federal double jeopardy jurisprudence does or does

8   not require in *Renico* was based on federal precedent,

9   separate and apart from application of that precedent under

10  the deferential standard of a Section 2254 habeas action.

11         To the extent there is any lingering uncertainty

12  about that, I would point the Court to footnote 2 in

13  *Blueford* also referred by Chief Justice Roberts where he

14  noted that the dissent similarly tried to distinguish

15  *Renico* on the grounds that it was a habeas action, and,

16  quote, "has little to say about a trial judge's

17  responsibilities," but went on to note that Renico's

18  discussion of the applicable legal principles concerns just

19  that.

20         So that discussion is on point, your Honor, it is

21  binding, and it makes clear that there's no set checklist

22  here.

23         Massachusetts law, in comparison, arguably imposes

24  a more exacting standard as it does require a trial judge

25  to explore alternatives to a mistrial and give counsel a

1    full opportunity to be heard.

2           THE COURT:  I'm sorry to interrupt.  Can I get you

3    to move the microphone a little bit closer?

4           MR. SCHILLINGER:  Certainly.  Just on the last

5    point to repeat it, your Honor, Massachusetts law does

6    arguably impose a more exacting standard.  It does require

7    judges to give consideration to alternatives and to give

8    counsel a full opportunity to be heard, but the SJC found

9    as a matter of Massachusetts law that the Trial Judge here

10   did that, she did consider alternatives, namely in response

11   to the first note, she did not simply declare a mistrial or

12   rush to declare a mistrial, she rather encouraged consensus

13   and tried to encourage the jury to reach a verdict by

14   instructing them to continue their deliberations.

15          In response to the second note, which as the SJC

16   emphasized, had even more emphatic or definitive language,

17   and even though defense counsel at that point was telling

18   the Judge the jury is hopelessly deadlocked, they've

19   exhausted all matter of compromise and persuasion, the

20   Judge still did not rush to declare a mistrial, instead she

21   gave the *Tuey-Rodriguez* charge again and to get the jury to

22   reach a verdict if they're able to do so.

23          It was only when the third note arrived containing

24   even more emphatic language yet and made clear, your Honor,

25   that the jury was deadlocked on all of the charges, would

1    not consent to further deliberate, and that if they were

2    forced to continue to deliberate, any verdict that they

3    might reach would not be a just judgment but rather would

4    be the product of compromising their deeply-held beliefs,

5    which is exactly what *Tuey-Rodriguez* tells the jurors we

6    don't want you to do, it was at that point that she

7    declared a mistrial, and I think it's significant the trial

8    judge found she had no doubt based on the jury's three

9    notes that they were unable to reach a unanimous verdict

10:29AM 10  and that there was no, quote, "inkling" of an agreement as

11   to any of the charges anywhere in the notes.

12          And the SJC similarly found, your Honor, that

13   based on the record presented, nothing suggests that the

14   deadlock was limited to a specific charge, on the contrary,

15   the notes contained no inkling of agreement, and the third

16   note implied that the jury was deadlocked on all charges.

17          So looking to the circumstances that would inform

18   the Judge's exercise of her discretion in declaring a

19   mistrial, on one side of the scale, there was no need or

10:30AM 20  reason for her to go farther and inquire of the jurors.

21          In her mind, and as the SJC found, there was no

22   indication here that there might be a partial agreement as

23   to some of the charges.  At the same time, your Honor, the

24   jury had made it clear, and the Judge found that it was

25   clear to her, they wouldn't consent to continue

1    deliberating, so under the Massachusetts statute, 234A,

2    68C, they were precluded from being ordered to further

3    deliberate.

4         On the other side of the scale, there were strong

5    reasons that militated against making any sort of further

6    inquiry, including the alternatives that the petitioner

7    continues to suggest, which was the very real and evident

8    prospect of improper coercion, as the SJC found.

9         There was also defense and strategic

10:31AM 10   considerations, your Honor, which is something the trial

11   judge explicitly noted in her order denying the motion to

12   dismiss and that the SJC also noted in footnote 12 of its

13   opinion, which is for a trial judge of their own accord to

14   start making this sort of inquiry runs the risk of

15   extracting a guilty verdict as opposed to a mistrial across

16   the board, and competent defense counsel would not want the

17   Judge to make such an inquiry and run that risk.

18         I suggest that that consideration was all but

19   stronger here in this case given the nature of the

10:32AM 20   petitioner's defense, your Honor.  This wasn't a case where

21   the petitioner had different discrete defenses to different

22   charges, her defense across the board was that she did not

23   cause the victim's death but supposedly had been framed.

24   If the jury were to come back with a guilty verdict on any

25   of the three charges or the two lesser included offenses,

1    they would have necessarily had to have found that she did

2    cause the victim's death, and it would be a rejection of

3    that defense and public narrative.

4         Taking into consideration those circumstances, on

5    the one hand, your Honor, there was no need, no reason to

6    make further inquiry.  There were very strong reasons not

7    to do so, namely, the prospect of improper coercion,

8    defense's strategic considerations.  It wasn't an abuse of

9    discretion here, and federal constitutional law does not

10:32AM 10   require or mandate that a judge plow forward with such an

11   inquiry in the face of the SJC's determination that doing

12   so would be improperly coercive.

13        THE COURT:  Well, that's one of the complicated

14   questions here, that is, what is -- I'm required to accept

15   the SJC's determination of Massachusetts law.  That's

16   final.  I can't revisit that.

17        To the extent there were factual findings, I'm

18   required to give deference to them, but I can revisit them

19   under appropriate circumstances, and federal law, I address

10:33AM 20   de novo.

21        How those three things intersect and how the SJC

22   findings affect my decision is somewhat fuzzy to me.  The

23   SJC said that this is all appropriate under state law,

24   whether the statute or Rule 27, whatever, perhaps the

25   Massachusetts Declaration of Rights, I can't remember

1    whether there was an issue or not, but, regardless, it

2    didn't violate Massachusetts law.  To what extent does that

3    inform or not inform my decision?

4         MR. SCHILLINGER:  The way I view it, your Honor, I

5    think about it is there be a typical custom or practice in

6    federal court to make the sort of inquiry or take these

7    additional steps.

8         THE COURT:  Forget about the voir dire, the

9    additional factual finding.

10:34AM 10         MR. SCHILLINGER:  I'm sorry, your Honor, correct,

11    exactly, where a jury comes back and says we're deadlocked.

12    There may be a custom and practice in federal court to that

13    inquiry individually of the jurors, are you truly

14    deadlocked or can you reach agreement on any of the

15    charges, something along those lines, which is what the

16    petitioner is suggesting should have been done here.

17         But where a state court has looked at under state

18    law and said to do so would improperly coerce a verdict,

19    and it's significant because this is something that

10:35AM 20    protects defendants as well, your Honor, right, if the

21    Judge were to do this and the jury came back with a guilty

22    verdict, just as the SJC noted, the petitioner would be

23    making a very strenuous and potentially meritorious

24    argument that it was improper for the Judge to have done

25    that.

1          Where you have that determination, state law by

2     the SJC, there would need to be a clear constitutional

3     command that notwithstanding that, the Judge needed to have

4     done that here, and there is no such mandate, there is no

5     such command.

6          Federal practice might be different.  It might be

7     a different custom, what is typically done, but in the

8     absence of a clear constitutional command, the double

9     jeopardy clause requires before declaring a mistrial based

10:35AM 10     on jury deadlock for manifest necessity, you must take

11     these following steps.

12          I think that the SJC's determination under state

13     law that it would be improper to do that controls.  That's

14     how I think of it or view it, your Honor.  I think with all

15     of these issues, it is a question of what does the Federal

16     Constitution require or mandate under these circumstances,

17     and certainly as to that, your Honor's review is de novo or

18     plenary.

19          State law obviously cannot impose a requirement

10:36AM 20     that runs afoul of the Federal Constitution.  We're not

21     suggesting that, but we are suggesting that the SJC's

22     determinations of state law should be controlling here

23     absent a clear command that the Federal Constitution

24     mandates more.

25          THE COURT:  Okay.  Continue.

1         MR. SCHILLINGER:  Unless your Honor has any other

2    questions concerning the issue of the mistrial or manifest

3    necessity, I'll switch to the alleged acquittals, and here

4    there are three Supreme Court precedence I want to point

5    out.  Two have already been mentioned by counsel.  One is

6    *McElrath*, which I think is significant because it

7    acknowledges that in deciding or determining whether a jury

8    has acted on their view that the prosecution failed to

9    prove its case, that determination is informed by the

10:37AM 10   operation of state law.

11        Certainly where a jury has returned a verdict of

12   acquittal and it's been accepted by the trial judge, and I

13   say accepted, your Honor, because there's Justice Alito's

14   concurrence where he notes there may be situations where

15   trial judges refuse to accept inconsistent verdicts and

16   send the jury back to further deliberate, and the court

17   hasn't spoken about whether that runs afoul of double

18   jeopardy or not, but where this verdict was returned and

19   accepted of acquittal, it's inviolate, it is an acquittal,

10:37AM 20   and it can't be thrown out or set aside on the grounds that

21   it may have been inconsistent with other verdicts, which

22   was the issue with the repugnancy doctrine under Georgia

23   law.  We don't dispute that.

24        Similarly, there's no question that labels are not

25   dispositive, so in the case of a judicial action or ruling,

1   it doesn't matter that state law might characterize a

2   particular ruling as procedural if, in fact, it is a

3   determination on the merits that the prosecution failed to

4   prove its case, that is an acquittal.

5         But neither of those go so far as to suggest that

6   in the first instance, a state cannot prescribe what

7   constitutes a final ruling or determination by a jury, and

8   that's the crux here, your Honor.

9         And the third case, which I'll skip to because

10:38AM 10   it's important, it wasn't mentioned by counsel is *Smith vs.

11   Massachusetts*.  This is at 543 U.S. 462.  I direct your

12   Honor specifically to the discussion on pages 470 to 474.

13         This is a case the petitioner cites.  The Court

14   specifically noted that a state can impose a rule of

15   nonfinality, that a judgment of acquittal or directed

16   verdict is only tentative and can be reconsidered up until,

17   for example, it's signed and entered on the docket or a

18   formal order has issued.

19         So the particular issue in that case, your Honor,

10:39AM 20   was a judge granted a motion for a required finding of not

21   guilty because the prosecution had failed to prove or

22   introduce evidence that a fire wall had a barrel less than

23   16 inches.

24         Upon being given further, you know, case law

25   authority by the prosecutor, the Judge wanted to reconsider

1    that ruling and reverse it, and the Supreme Court said the

2    Judge couldn't do so.  At that point, it constituted an

3    acquittal because the state hadn't imposed any rules,

4    whether by Rules of Criminal Procedure, statute, or case

5    authority that would allow a judge to do that, but it

6    recognizes state law has the ability to prescribe when

7    something is truly final, as opposed to tentative, and

8    that's the issue here, your Honor, is that Massachusetts

9    state law does have such a requirement for jury verdicts,

10:39AM  10    and it's a requirement that the verdict be returned,

11    announced, and confirmed in open court, and it provides

12    essential safeguards for the reasons that the SJC explained

13    in its opinion, it ensures unanimity, it ensures that no

14    juror's vote or position has been coerced or

15    misrepresented.

16         The double jeopardy clause does not go so far as

17    to say that the state cannot impose that requirement, and

18    here, given that requirement, there were no acquittals.

19    It's undisputed that no verdicts were returned by the jury.

10:40AM  20         Even separate and apart from that, if you accept

21    the petitioner's premise that there's such a thing as an

22    acquittal in substance, not form, which is the argument

23    advanced in *Blueford*, it still lacks the finality here,

24    your Honor, to be an acquittal for the reasons that were

25    set forth in *Blueford.*

1          And I think counsel mentioned two grounds that

2     they contend it's distinguishable:  First, by virtue of

3     Arkansas law.  In fact, I think it was the dissent that

4     tried to argue that because Arkansas was a hard transition

5     state where you could not proceed to consider any lesser

6     included offense until there was a finding of not guilty as

7     to the greater offense, the foreperson's report should be

8     treated as an acquittal, and the majority rejected that and

9     said no, it doesn't matter that it's a hard transition

10:41AM 10     state, juries are still free to go back and reconsider a

11     prior vote because that's what they do.

12          And it's the same issue here, your Honor, as to

13     why there's no lack of finality.  These juror statements

14     don't indicate anywhere at what point during the

15     deliberations the jury supposedly reached this unanimous

16     agreement.  They can't rule out the possibility that it may

17     have been a very initial straw vote or poll and that the

18     jury continued to deliberate subsequent to that, and a

19     juror might have changed their mind.

10:42AM 20          I know the petitioner says it's purely

21     hypothetical that a juror did change their mind.  That's

22     exactly what the Court in *Blueford* said, it's unjustified

23     to assume no juror might have changed their mind.  In other

24     words, that hypothetical is significant and should be taken

25     into account.

1         On top of that, even if at the end of their

2    deliberations when the mistrial was declared, the jurors

3    might have been unanimous on those two counts, the jurors

4    still had the ability to change their mind right up until

5    the point that the verdict is affirmed, announced, and

6    recorded in court, and it has happened under Massachusetts

7    law.

8         They could have voted not guilty or guilty in the

9    jury room, filled out the verdict slip, walked into court,

10:42AM 10   and at that point a juror was still free to change her mind

11   and say you know what, I think the petitioner actually is

12   guilty, it's important that we continue to deliberate.

13   They can't rule out that possibility, your Honor, and

14   that's what deprives these statements of the finality that

15   would be required even if you accept their premise that

16   there can be an acquittal in substance, not form.

17        Then just lastly, your Honor, on the issue of the

18   post-trial inquiry, I'm not aware of authority in either

19   direction to suggest that the Court has the ability to

10:43AM 20   conduct this type of voir dire and whether it might be

21   ancillary to the Court's powers.

22        THE COURT:  I don't think it's -- as Mr. Weinberg

23   has pointed out, I don't think there's any question that I

24   would have that ancillary power in a 2255 in a federal

25   case.  Ineffective assistance of counsel sometimes we do

1    conduct these inquiries.

2         MR. SCHILLINGER:  Right.

3         THE COURT:  What is at least facially troublesome

4    to me is the notion that I'm either stepping into the shoes

5    of the state court or telling them to do something, and

6    maybe I have that authority, maybe I don't, but I feel more

7    comfortable with some precedent one way or the other, and

8    you agree, I think, with Mr. Weinberg, there is no

9    precedent, at least none you've found on that subject?

10:44AM 10        MR. SCHILLINGER:  None that we found, your Honor,

11   exactly, and we do argue that in the interest of comity, if

12   there were to be such a post-trial inquiry in the first

13   instance, it would be appropriate to have the state court

14   do that, but we contend, obviously, that conducting such an

15   inquiry would be inappropriate and is not required here.

16        I mean, in one sense, you know, counsel speaks to

17   their having satisfied their burden of production.  I mean,

18   the acknowledgement that more is needed to actually

19   establish that there was an acquittal and that the record

10:44AM 20   as it currently stands doesn't do so I think is an

21   acknowledgement there was in fact no acquittal and there

22   shouldn't be further inquiry, but the real crux of the

23   issue is what that inquiry goes to.

24        Certainly the Fifth Amendment right with respect

25   to double jeopardy is a bedrock principle.  It's

1    significant, as is the Sixth Amendment right to counsel and

2    other constitutional rights.  That's not the issue.

3        The distinction is the inquiry that they want to

4    conduct here goes to the deliberations themselves.  It is

5    internal.  It goes right to what the jurors said, what they

6    did, how they voted, why they voted the way that they did.

7    It's not simply limited on an external issue that has been

8    held to be appropriate in other circumstances.

9        THE COURT:  External issue, like racial bias, that

10   sort of thing?

11       MR. SCHILLINGER:  Exactly, your Honor extraneous

12   influence or racial bias.  It goes to the very heart of the

13   deliberations, and they cannot get around it, no matter how

14   they try to portray the question.  You can't ask a yes or

15   no question to get to where they want to get to.

16       For one thing, this is not how we ask jurors to

17   make decisions.  We don't ask them to hold up placards that

18   say yes or no or to submit an affidavit that suggests how

19   they voted on an issue.  We ask jurors to reach a verdict

20   through collaborative discussion, consideration of the

21   evidence.

22       For another thing, you know, as we point out in

23   our brief, this type of yes, no inquiry doesn't give any

24   juror the ability to explain the nuance that might have

25   been part of their position.  They may have tentatively

1    agreed in favor of not guilty on a particular charge, but

2    it was subject to further deliberation on the other

3    charges, how the jury came out on those charges, maybe

4    further discussion of particular pieces of evidence.

5          You simply call the jurors back in and say I don't

6    want to hear anything about your deliberations, I don't

7    want to hear anything about your thought process, just tell

8    me yes or no, did you vote this way.  It doesn't give that

9    juror any opportunity to explain that their position was

10:46AM 10   far more nuanced than simply yes or no, and that's the

11   issue here, your Honor.

12         Also, too, the petitioner wants to focus simply on

13   the end result, but you can't ignore the jury's notes and

14   what they publicly reported.  You couldn't have any

15   confidence that this alleged unanimous agreement was, in

16   fact, reached without reconciling, well, why is it that you

17   send a note saying that you were at an impasse on the

18   charges?

19         In addition, why is it that one of these five

10:47AM 20   purported jurors said it was not guilty on Count One but

21   doesn't say it was not guilty on Count Three when the other

22   four say it was as to both charges?  In addition, why do

23   three different purported jurors have different

24   recollections of the vote count as to Count Two, all of

25   which goes to, your Honor, jurors may have different

1    memories, different understandings of what occurred during

2    the deliberations, and that's why it's critical rather than

3    guessing, rather than calling jurors in and interrogating

4    them to try and construct a verdict that is never returned,

5    we insist upon the return and affirmance of a verdict in

6    open court because that ensures the unanimity of the jury

7    and the finality of the deliberations, and it's an

8    important rule that protects criminal defendants.

9        Change the hypothetical here.  Imagine a mistrial

10:48AM 10   is declared, and after the fact, a juror comes forward and

11   says, hold on a second, we all took a vote, and we agreed

12   that the defendant was guilty of murder.

13       If the Commonwealth were to come forward and say

14   they found her guilty, that should be given legal effect.

15   There can't be any serious doubt she would argue

16   strenuously, that is not a valid verdict, shouldn't be

17   given any legal effect, and she would be correct because

18   it's not, so the same rule should pertain here, your Honor.

19       If I could have one moment, your Honor, just to

10:48AM 20   confer?

21       THE COURT:  Yes.

22       MR. SCHILLINGER:  Your Honor, unless you have any

23   questions or if there's anything that I could address that

24   would be helpful to the Court, we'll rest on the remaining

25   arguments in our brief.

1          THE COURT:  All right.  Mr. Weinberg, quick

2    response.

3          MR. WEINBERG:  Thank you, Judge.  First I want to

4    address the state's position that state findings somehow

5    diminish the decision-making that's before your Honor.  It

6    may be that the SJC's interpretation of 27B is correct, but

7    it doesn't --

8          THE COURT:  Whether it's correct or not correct,

9    it's binding on me as a matter of state law, yes.

10:49AM 10          MR. WEINBERG:  And I'm not asking your Honor to

11   reverse a state law decision by the SJC, but it doesn't

12   preclude your Honor from determining that the values that

13   are represented by 27B constitute a viable alternative that

14   the Judge didn't carefully consider.

15          When the state talks about defense counsel would

16   want a mistrial, I mean, that's speculative, and, yes,

17   there was some speculation in Justice Georgia's decision,

18   but that doesn't bind the Court from looking at this record

19   and determining that the record of how defense responded to

10:50AM 20   notes 1 and 2 was the antithesis of that speculation that

21   the defense wanted a verdict for this jury and never asked

22   for a mistrial and urged the *Tuey* instruction, which

23   oftentimes defense lawyers don't seek because they don't

24   want a verdict.

25          When the state court talks about it would have

1    been improperly coercive, there's simply no basis.  It

2    misunderstands how a judge can frame questions without

3    being coercive, and that's, again, a federal decision

4    whether or not this jury could on a post-trial voir dire be

5    asked questions that would not trigger or not catalyze some

6    disclosure of their mental processes is something that your

7    Honor has the experience to determine.

8         There can be many questions to the jury that would

9    answer many of the state's concerns about, you know, did

10:51AM 10   the jury reconsider, was this a tentative vote?

11        Your Honor can ask a juror whether you ever

12   discussed Count Two again, whether you ever reconsidered

13   your decision on Count Two, whether you considered it a

14   final vote.  Those are all questions that are either at or

15   outside the boundaries of 606(b), which itself literally

16   applies to asking the jury to impeach a verdict but does

17   not literally apply to this unique circumstance where

18   jurors have disclosed an acquittal that remained

19   undisclosed because the jurors didn't announce it and the

10:52AM 20   Judge didn't seek it.

21        And then, of course, we have the constitutional

22   issue that I referenced from the *Villar* that Judge Saris

23   wrote about while sitting on the First Circuit, which is

24   whether or not the Constitution trumps Rule 606(b), whether

25   or not the values and interests at the heart of there, the

1    right to a jury trial before an unbiased jury, and here we

2    argue the right to the benefit of a jury trial, which then

3    flows into double jeopardy historic and valued protection

4    against the right not to be put to trial a second time

5    would require some fact-finding, would require an

6    opportunity to prove it.

7         The state argues, well, if four people aren't

8    enough, but the burden's on the state, and they should be

9    supporting a voir dire because your Honor could find an

10   acquittal based on the four jurors could find that the

11   state has not met their quote, "heavy burden," to prove

12   that a re-prosecution is viable with the state opposing a

13   procedure that could illuminate for the Court whether or

14   not those four jurors, you know, who are not contradicted

15   or the five jurors that were not contradicted were

16   representing that there was a final unanimous

17   unconditional, unreconsidered verdict to acquit.

18        The language from *Smith* is dicta, it's not a

19   holding, and the final point I wanted to make unless the

20   Court has questions is that the *Renico* case relied on by

21   the state where the Supreme Court made very clear in its

22   introduction and then in its holding that it could well

23   have reached a different decision to invalidate the state

24   mistrial order if it was a 2241, where 2254 only allows for

25   a reversal if it's clearly a misapplication of known

1    Supreme Court precedent, not First Circuit precedent, or in

2    that case, I believe it was Sixth Circuit precedent is a

3    very different case, but within the case, they talk about

4    the decision to declare a mistrial is left to the quote,

5    "sound discretion of the Judge," but the power, this is the

6    from the majority opinion.

7         THE COURT:  Is that *Renico?*

8         MR. WEINBERG:  Yes, ought to be used with the

9    greatest caution under urgent circumstances and for very

10   plain and obvious causes.

11        *Renico likely would have reversed Judge Cannone's*

12   *decision under the Perez* case, under the Supreme Court's

13   multi-factor test had it been a 2241.  Over and over, they

14   talk about the AEDPA prevents defendants from using federal

15   habeas as a vehicle to second guess reasonable decisions of

16   state courts whether or not the Michigan Supreme Court

17   opinion reinstating Lett's conviction in this case was

18   correct, it was clearly not unreasonable.

19        And the language in *Renico* is consistent with your

20   Honor's decision that we urge and which we, of course,

21   contend should be to reverse the state court decision

22   because of the absence of manifest necessity.

23        Lastly, *McElrath*, which is the most recent 2024,

24   there again, there was a Georgia law, a Georgia ruling, a

25   Georgia procedure invalidating jury findings based on the

1    idiosyncrasies of state law that said the acquittal needed

2    to be consistent with other counts.

3        And I think that's a clear example of the fact

4    that state law doesn't govern when state law conflicts with

5    the federal constitutionals double jeopardy clause.  In

6    this case, we strongly contend it does for two reasons,

7    first, that there was a unanimous verdict to acquit to find

8    the state's case insufficient to vote not guilty; second,

9    that there was no manifest necessity under any of the

10:56AM  10    factors that either the Supreme Court or First Circuit look

11    at to justify the precipitous sui sponte ruling by

12    Judge Cannone.  Thank you very much.

13        THE COURT:  Mr. Schillinger, last word.

14        MR. SCHILLINGER:  Nothing further, your Honor,

15    unless you have any questions.  Thank you.

16        THE COURT:  Thank you.  It was well briefed and

17    well argued on both sides.  I am quite conscious of what I

18    understand is an April 1st retrial date, and I want to try

19    to issue an opinion to give whichever side is or both sides

10:57AM  20    if they're both unhappy with my decision an opportunity to

21    do an expedited appeal, so I'm going to put this opinion

22    out as quickly as I can under the circumstances.

23        There's quite a lot to consider here.

24    Mr. Weinberg says it was a wilderness, it's a thick forest

25    anyway, if not an actual jungle, but I'm going to pick my

1    way through it the best I can, render my decision as

2    quickly as I can under the circumstances, which, you know,

3    if I had a year to write this opinion might be more

4    scholarly, but I'm going to make the best decision I can,

5    so, again, there's an opportunity to appeal before the

6    retrial commences.  Thank you, and we'll stand in recess.

7         THE CLERK:  All rise.

8         (Whereupon, the hearing was adjourned at

9    10:57 a.m.)

10                   C E R T I F I C A T E

11   UNITED STATES DISTRICT COURT )

12   DISTRICT OF MASSACHUSETTS ) ss.

13   CITY OF BOSTON )

14        I do hereby certify that the foregoing

15   transcript, Pages 1 through 58 inclusive, was recorded

16   by me stenographically at the time and place aforesaid

17   in Civil Action No. 25-10399-FDS, KAREN READ vs. NORFOLK

18   COUNTY SUPERIOR COURT and MASSACHUSETTS ATTORNEY

19   GENERAL, and thereafter by me reduced to typewriting and

20   is a true and accurate record of the proceedings.

21        Dated March 6, 2025.

22                        s/s Valerie A. O'Hara

23        _____

24                   VALERIE A. O'HARA

25                   OFFICIAL COURT REPORTER