UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS

ESTATE OF ROBERT JOSEPH MILLER,
by and through IAN MILLER, personal
representative of the Estate,
     Plaintiff,

          v.

SEAN ROYCROFT and SPENCER
JACKSON, in their individual capacities
and the TOWN OF BARNSTABLE,
MASSACHUSETTS,
     Defendants

Case No. 1:21-cv-10738-AK

---

**STATEMENT OF MATERIAL FACTS
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT BY DEFENDANTS**

---

For purposes of this motion only, the defendants state the following facts are undisputed and material:

1. The plaintiff, Ian Miller, is the son of Robert Miller, the plaintiff's decedent, and was appointed as personal representative of the Estate of Robert Miller on March 10, 2021. (Compl. ℙ 5).

2. At the time of his death on April 16, 2019, Robert Miller ("Miller") was sixty-three years old and a resident of Hyannis, Massachusetts. (Compl. ℙ 1, 5; Ex. 1).

3. The Town of Barnstable is a duly organized town under the laws of the Commonwealth of Massachusetts. (Compl. ℙ 6).

4. In April 2019, the defendants, Sean Roycroft and Spencer Jackson, were duly appointed police officers in the Barnstable Police Department ("BPD"). (Compl. ℙ 6).

5. At 7:03:56 P.M. on April 16, 2019, BPD dispatch received a 911 call from Anderson that was logged into the BPD computer system as a "mental health emergency," stating, "we need the police," that Miller was "very delusional," "need[ed] a psych evaluation" and that "it [was] very frightening;" Anderson then abruptly disconnected the call. (Ex. 2, BPD Dispatch Log; Ex. 19, BPD 911 Call and Radio Transmissions at 0:00:00).

6. At 7:06 P.M., dispatch entered the following description of the call into the BPD computer system: "RP[1] stated husband having a psychotic break. Very short on phone. Caller disconnected, no further info." (Ex. 2).

7. The individual who made the call to 911 was Amy Anderson, Miller's long-time girlfriend who lived with him at 45 Elm Street. (Ex. 6 at ℙ 2).

8. Roycroft was dispatched to 45 Elm Street at 7:07:37 P.M. and arrived at the scene at 7:09:29 A.M. (Ex. 2).

9. Jackson was dispatched to 45 Elm Street at 7:07:47 P.M. and arrived at the scene at 7:10:36 P.M. (Ex. 2).

10. Prior to his arrival at the scene, Roycroft knew the call was labeled as a "mental health emergency," that the caller's husband was experiencing a psychotic break, that the caller had been short on the phone and that the call had disconnected. (Ex. 4 at 169-171).

11. As a police officer, Roycroft had responded to domestic disturbance calls where the 911 call was disconnected because the abuser took the phone from the caller. (Ex. 4 at 171).

12. Roycroft's awareness that the call was labeled an "emergency" and had been disconnected added additional layers of concern to the call. (Ex. 4 at 170, 182).

---

[1] The abbreviation "RP" is generally used by police to refer to "reporting party."

13. Roycroft radioed into dispatch that he was heading to the scene, and heard Jackson indicate over the radio that he was responding to the scene, as well. (Ex. 5 at ¶ 12).

14. While en route to the scene, Roycroft used his lights and sirens to "get there as fast as [he] could," and mentally prepared himself for a mental health situation in which the 911 call had been disconnected, and considered safety issues.  (Ex. 4 at 97:17-20; 96:8-97:7).

15. Roycroft was trained to follow BPD guidelines in responding to calls involving mentally ill individuals that instruct officers to prioritize performing a quick assessment of the scene and to secure the scene. (Ex. 3 at 38; Ex. 5, ¶ 19).

16. Given the likelihood that the caller was in fear of her own safety, Roycroft understood that securing the subject should be prioritized. (Ex. 5, ¶ 13).

17. Roycroft logged his arrival time while approaching the scene. (Ex. 5, ¶ 23).

18. It took Roycroft approximately 30 seconds to park his police cruiser and arrive at the front door of 45 Elm Street.  (Ex. 5, ¶ 24-25; Ex. 9, MASP Interview of Sean Roycroft at 9:20-10:11).

19. Upon arrival at the residence, Roycroft was met at the front door by Anderson, who Roycroft perceived to be waiting there for him; she also appeared to be in fear, due to her demeanor, shaky voice, and the fact that she was urgently whispering to him through a partially-open front door and a closed screen door, "He's out back. He's out back." (Ex. 4 at 86:12-13; Ex. 6 at 4; Ex. 7 at ¶ 41; Ex. 8 at 36:7-12; Ex. 5 at ¶ 27; Ex. 4 at 82:6-13; Ex. 9 at 10).

20. Anderson told Roycroft that Miller was her husband, was hallucinating and talking to people who were not there and had not taken his medications or slept in days; she urged

Roycroft to go around the side of the house toward the back deck where Miller was. (Ex. 7 at 42-43; Ex. 4 at 83; Ex. 9 at 11:1-4).

21. Anderson does not recall other details of this conversation with Roycroft. (Ex. 7 at ₱ 42-43).

22. Ms. Anderson was frightened due to Miller's heightened mental and physical state and she was concerned for her own safety as well as Miller's, and that Miller might be adversarial with Roycroft. (Ex. 8 at 12:18-24, 13:1-11; Ex. 7 at ₱ 40).

23. Anderson told Roycroft that she was very concerned that Miller would be angry at her for calling the police, and Roycroft recognized that Miller might become angry if he came upon Roycroft speaking with Anderson. (Ex. 4 at 84:14-18; Ex. 5 at 40).

24. Roycroft knew Miller was outside the home and asked Anderson if she felt comfortable staying inside the home. (Ex. 4 at 86).

25. Based on her facial expressions and mannerisms, Roycroft believed Anderson to be fearful and "in fear" regarding Miller's behavior. (Ex. 4 at 86: 6-13, 87:11-24, 88:1-2; Ex. 6 at 4; Ex. 9 at 11:3-5; Ex. 5 at ₱ 28, 34).

26. Anderson was checking behind her as if to see if someone was approaching her from behind, and Roycroft perceived based on her tone and demeanor that she urgently wanted him to go around back to check on Miller.  (Ex. 7 at ₱ 45; Ex. 4 at 86:11-13; Ex. 5 at ₱ 34-35).

27. While Anderson's urging did not dictate Roycroft's response, her frantic demeanor confirmed his earlier understanding that ensuring Miller was secure should be prioritized. (Ex. 5 at ₱ 36).

28. Roycroft could hear Miller yelling but was unable to decipher what he was yelling about. (Ex. 6 at 4).

29. From where Roycroft and Anderson stood, neither of them could see exactly where Miller was or what he was doing. (Ex. 7 at ¶ 44).

30. Roycroft balanced the interest in continuing to obtain information from Anderson with the interest in assessing Miller. (Ex. 4 at 182:13-183:15).

31. Roycroft knew Jackson would be arriving at any moment, and made the decision to defer obtaining any additional information from Anderson until after he could get eyes on Miller and ascertain his status.  (Ex. 4 at 182:13-183:15).

32. Anderson and Roycroft discussed the best way for him to approach Miller; Anderson indicated that Roycroft should go around the right side of the house, rather than through the house. (Ex. 6 at 4).

33. Roycroft asked Anderson whether she felt safe staying inside the house while he went to check on Miller, and she indicated that she felt comfortable staying inside the house. (Ex. 4 at 59: 20-60:2; 86:6-13, 87:11-24, 88:1-2, Ex. 6 at 4).

34. Roycroft asked Anderson what her husband's first name was to help him to establish a rapport with Miller, and she replied that it was Robert.  (Ex. 5 at ¶ 38; Ex. 6 at 4).

35. Anderson's direction to Roycroft to go around the side of the house was consistent with Roycroft's experience that people who are afraid of another individual within their home (Ex. 5 at ¶ 43).

36. With the information he obtained from Anderson and the original information he had received from dispatch in mind, Roycroft proceeded around the side of the house to the

back in order to observe Miller and assess the situation. (Ex. 4 at 104:4-7, 103:20-21, Ex. 6 at 4).

37. Anderson retreated into the front interior of the house and did not hear or see any of the exchange between Miller and Roycroft until they entered the house. (Ex. 7 at ¶ 47).

38. When Roycroft reached the backyard, Miller was standing on the back porch, and talking and gesturing to the sky. (Ex. 4 at 104:11-14; Ex. 6 at 4).

39. Roycroft was still unable to understand what Miller was saying. (Ex. 4 at 104:15-17).

40. Miller was disheveled, wearing only sweatpants, and was sweating. (Ex. 4 at 114:8-10, 105:9-12; Ex. 6 at 4-5).

41. Roycroft saw that Miller looked frazzled, had an empty and unfocused stare, and his eyes were bloodshot. (Ex. 5 at ¶ 47-48; Ex. 6 at 4-5).

42. Roycroft had received training to respond to calls involving individuals experiencing mental health crises in a calm, friendly and non-threatening manner. (Ex. 5 at ¶ 15).

43. Roycroft sought to approach Miller in a calm and friendly manner, asking him "What's going on, Robert?" or "Hi, Robert, how're you doing?" or "How's it going?," in order to give Miller a sense of calm and that Roycroft was not there to hurt him. (Ex. 4 at 105:20-23, 106:1-3; Ex. 6 at 5).

44. Miller replied that he was conversing with nature, to which Roycroft responded, "I do that sometimes" or "I do that from time to time, absolutely nothing wrong with that. That's great." and asked Miller, "Can I have a conversation with you?" or "What do you think about you and I having a conversation?  Can we have—can we have a conversation here?" Ex. 6 at 5; Ex. 9 at 13:7-15; Ex. 5 at ¶ 50).

45. Miller responded, "Sure, we can" and either invited or gave Roycroft the impression that he was welcome to come up onto the deck to continue the conversation. (Ex. 4 at 111:1-6; Ex. 6 at 5; Ex. 9 at 13:14-15).

46. Roycroft stepped onto the deck, keeping several feet of distance between them and noting a broken flower pot or figurine and some dumbbells nearby. (Ex. 6 at 5; Ex. 9 at 13:16-24; Ex. 5 at ℙ 51).

47. Roycroft began the conversation with Miller by stating that his wife had called because she had some concerns about him. (Ex. 4 at 111:18-23; Ex. 6 at 5; Ex. 5 at ℙ 52).

48. Upon hearing this, Miller's demeanor appeared to shift; he stared at the ground and turned suddenly toward the house and approached the broken ceramic pieces on the deck. (Ex. 4 at 112:6-11; Ex. 5 at ℙ 55).

49. It appeared as if Miller "flipped a switch" and became angry as he moved. (Ex. 4 at 115:10-13, Ex. 6 at 6; Ex. 9 at 14:7-13).

50. Roycroft stayed close to Miller, who stopped as he reached the house, grunting and shaking his fists in an angry way, and said, "Fuck you I'm not talking with you get the fuck away from me," or "Fuck you. I don't want to fucking talk to you anymore. Fuck this," and "bee-lined" and "hurried towards the sliding door leading into the house." (Ex. 6 at 5; Ex. 9 at 14:11-17; Ex. 5 at ℙ 58).

51. Roycroft asked Miller to stop and issued multiple verbal commands for Miller to stop, because Miller was shaking his fists and grunting, and appeared to him to be on a mission to arm himself and seek out Anderson inside the house. (Ex. 6 at 5; Ex. 5 at 56-60).

52. By this point, Roycroft believed Miller's delusional state and erratic behavior necessitated hospitalization so as not to create a likelihood of serious harm by reason of his mental illness. (Ex. 5 at ¶ 61).

53. Roycroft perceived Miller to be experiencing a serious psychiatric event and perceived a dramatic shift in Miller's demeanor from his previous, relatively calm state. (Ex. 5 at ¶ 54-56, 61).

54. Roycroft issued repeated verbal commands for Miller to slow down as the two of them approached the house, but Miller did not comply. (Ex. 5 at ¶ 62-65; Ex. 6 at 5).

55. Miller pulled, ripped or threw open the slider door leading to the back of the house and stepped inside; a dining room table was positioned in front of the slider door. (Ex. 9 at 14:20-21; Ex. 5 at ¶ 63; Ex. 10 at 10; Ex. 4 at 118).

56. Roycroft stayed directly behind Miller because he knew Anderson was inside the house, believed Roycroft was looking for her, and was concerned for her safety. (Ex. 9 at 14:17-21; Ex. 6 at 5; Ex. 5 at ¶ 64).

57. Miller continued to ignore all verbal commands and pulled away from Roycroft toward the table. (Ex. 4 at 176:15-177:3, Ex. 6 at 5).

58. Roycroft grabbed Miller by the arm to get his attention and stop him from proceeding further into the house. (Ex. 9 at 14:22-15:5; Ex. 6 at 5. Ex. 4 at 120:11-121:6).

59. Miller pulled his arm away from Roycroft and began "foraging" over a table that was situated just inside the slider door, appearing to Roycroft to be trying to arm himself. (Ex. 9 at 14:22-15:5; Ex. 6 at 5-6; Ex. 4 at 18:5-7; 120:13-14; Ex. 5 at ¶ 65-66).

60. Roycroft could tell that the table was cluttered with various objects, but could not see exactly what was on it. (Ex. 6 at 5-6; Ex. 9 at 14:22-15:5; Ex. 5 at ¶ 67-74).

61. Roycroft's police training informed him that ensuring a subject's hands were clear of any objects that could be used as a weapon was paramount, and Roycroft was unable to see Miller's hands. (Ex. 5 at ‖ 68; Ex. 4 at 128-130).

62. Miller ignored multiple commands by Roycroft to back away from the table. (Ex. 6 at 5-6; Ex. 5 at ‖ 69).

63. Roycroft was unable to see Miller's hands and was therefore unable to determine if Miller was holding anything or picked anything up. (Ex. 4 at 128:5-24, 129:1-4, 130:6-10; Ex. 6 at 5-6).

64. By this point, Roycroft had become increasingly concerned about Anderson's, Miller's and his own safety. (Ex. 4 at 101:12-16, 102:1-7; Ex. 6 at 5-6).

65. Officer Roycroft immediately weighed the interest of not using any force in this situation with the interest of using a minimal amount of force in order to ensure that Miller had not already armed himself and did not arm himself. (Ex. 5 at 69-75).

66. Standing behind Miller in the confined space between the slider and the dining room table, Roycroft made the decision to attempt to grab hold of Miller from behind: Roycroft reached his arms around Miller's front, putting his left arm under Miller's left arm and his right arm over Miller's right shoulder, connecting his hands at Miller's chest. (Ex. 6 at 6; Ex. 5 at ‖ 75).

67. Roycroft described this hold as a "seatbelt hold," indicating the positioning of the diagonal cross-body strap of a seat belt. (Ex. 9 at 15:6-24; Ex. 10 at 14; Ex. 6 at 6).

68. By applying this hold to Miller, Roycroft was able to pull Miller back, away from the table. (Ex. 9 at 15:11; Ex. 6 at 6).

69. Miller did not acquiesce, and continued to grab for the table while failing to comply with Roycroft's continued verbal commands, including "Robert, you need to stop. You need to stop. You need to put your hands behind your back." (Ex. 9 at 16:9-11; Ex. 5 at ⁋ 77).

70. Miller continued to fight and pull, and then, using the table as leverage, shoved himself and Roycroft backward, away from the table and against the slider door, knocking the slider door out of its frame and causing it to crash onto the ground. (Ex. 9 at 15, 16:11-16: Ex. 5 at ⁋ 77-80; Ex. 11 at 60:12-16; Ex. 4 at 123; Ex. 5 at ⁋ 77-80).

71. It appeared clear to Roycroft that Miller had intentionally shoved them both backward from the table in an attempt to disengage Roycroft from his back. (Ex. 5 at 77-80).

72. Anderson, who had been unable to hear or see any of the exchange between Roycroft and Miller up until this point (since Roycroft had left her at the front of the house), was again able to witness some of their interactions right around the time she heard them crash against the slider door. (Ex. 7 at ⁋ 48; Ex. 8 at 52).

73. Anderson described the hold Roycroft applied to Miller as a "bear hug," wherein Roycroft's arms were around Miller's arms. (Ex. 8 at 1114: 14-17, 114: 23-24, 225:1-3).

74. Anderson has no specific memory as to the positioning of Roycroft's arms or hands, but heard Roycroft issue many verbal commands to try to get Miller to stop or comply and put his hands behind his back. (Ex. 4 at 141:16-24, 142:1-5; Ex. 7 at ⁋ 49; Ex. 8 at 56-57).

75. The two began shuffling forward, with Miller "leading with force" and succeeding in dragging Roycroft forward across the floor, and Roycroft trying to keep Miller from making forward progress into the house. (Ex. 5 at 81-84; Ex. 7 at ⁋ 52-53; Ex. 8 at 53).

76. Jackson arrived at 45 Elm Street and was approaching the house when he heard a loud crash resulting from Miller slamming Roycroft back against the slider. (Ex. 12 at 22:20-22; Ex. 6 at 2; Ex. 6 at 6).

77. With Roycroft still holding onto Miller from behind and attempting to hold Miller back, Miller continued dragging Roycroft across the floor, Roycroft realized that his left arm was being pinned under Miller's left armpit and that Miller was clamping down on it. (Ex. 4 at 123:11-21; 124:10-12; Ex. 6 at 6; Ex. 5 at ⁋ 82).

78. Anderson was attempting to watch Roycroft and Miller while peering from another room, but was unable to see all of it. (Ex. 7 at ⁋ 53).

79. Roycroft was aware that Anderson was located at the front of the house, but did not know at the time he made physical contact with Miller exactly where Anderson was situated in the house. (Ex. 5 at ⁋ 81-82, 86-87; Ex. 6 at 6).

80. Roycroft observed a set of golf clubs that was in a recessed office area at the front of the house, perceived Miller to be focusing on reaching them, and was continuing to issue verbal commands and hold onto Miller to prevent him from making forward progress toward the clubs or toward Anderson. (Ex. 4 at 125:4-15; Ex. 6 at 6; Ex 5 at ⁋ 81-84).

81. Roycroft was unable to prevent Miller from making further progress toward the office area. (Ex. 4 at 125:21-126:2; Ex. 6 at 6; Ex. 7 at ⁋ 50).

82. As Jackson approached the residence, he heard a second loud crash from inside the rear left side of the house due to the slider having been knocked out of its housing due to the force of the impact from Miller's push. (Ex. 6 at 2; Ex. 12 at 22-23; Ex. 11 at 60; Ex. 12 at 23; Ex. 13 at 23).

83. Upon reaching the deck, Officer Jackson observed that the glass slider had been knocked out of its frame and fallen on the rear deck of the house. (Ex. 6 at 2).

84. Jackson entered the house through the dislodged slider entrance point. (Ex. 12 at 131:3-6; Ex. 11 at 69:14-16, Ex. 6 at 2).

85. Upon entering the house, Jackson observed Roycroft and Miller, moving together, take three to four steps toward the front of the house and fall face-forward into a recessed office area.  (Ex. 11 at 62:1-4, 64:21-23).

86. Roycroft was able to look around Miller at some point as the two were progressing toward the office area, and observed a single golf club on the floor. (Ex. 4 at 126:3-11; Ex. 6 at 6).

87. Roycroft believed, based on Miller's attempt to disengage him by knocking him back against the slider, on Miller's failure to comply with his repeated verbal commands, and based on Miller's apparent attempt to pin Roycroft's arm, that Miller's objective was to reach the golf club. (Ex. 9 at 16:19-17:2; Ex. 6 at 6; Ex. 5 at ℙ 84).

88. Roycroft did not attempt any other use-of-force techniques to take Miller down before they reached the step down to a small, recessed office area at the front of the house. (Ex. 4 at 124:15-17; Ex. 6 at 6; Ex. 5 at ℙ 81-85).

89. As Miller and Roycroft reached the step-down, they both fell to the floor and landed on top of the single golf club. (Ex. 6 at 6; Ex. 9 at 17:3; Ex. 4 at 127:4-11).

90. Roycroft fell to the left of Miller, and Roycroft's hands, which had previously been connected around the front of Miller's chest, became disengaged. (Ex. 4 at 131:8-10).

91. Miller was facing the ground, with both his arms underneath his body. (Ex. 11 at 64:22-23, 75:4-6, 75:7-10; Ex. 4 at 131:1-15; Ex. 5 at ℙ 86-87).

92.  Roycroft fell to Miller's left side with his left arm trapped underneath Miller and between Miller's left arm and the left side of Miller's body, and his right arm draped between Miller's shoulder blades. (Ex. 4 at 134:18-21, 135:6-12; Ex. 5 at ₽ 86-87).

93. Roycroft attempted to pull his left arm out from underneath Miller, but Miller appeared to be trying to winch or pinch it further underneath him, which Roycroft recognized as a wrestling tactic. (Ex. 4 at 131:13-15, Ex. 6 at 6; Ex. 5 at ₽ 91-92).

94. Jackson approached and observed that Roycroft had fallen off to Miller's left side with his left arm trapped underneath Miller's torso and a portion of his (Roycroft's) chest and right forearm on top of Miller, while Miller's arms were tucked underneath him. (Ex. 11 at 66:17-19; Ex. 14 at ₽ 13.

95. Jackson announced his arrival on the scene to Roycroft. (Ex. 6 at 2, 7; Ex. 4 at 131:3-6; Ex. 11 at 69:14-16; Ex. 13 at 7-8).

96. Roycroft told Jackson that Miller might have something in his hands, or that he couldn't see his hands. (Ex. 6 at 2, 6; Ex. 4 at 140; Ex. 11 at 10:14-11:8; Ex. 13 at 7-8).

97. Jackson observed Anderson standing inside another room, away from the doorway connecting the two rooms. (Ex. 11 at 68:3-12).

98. Jackson observed what looked to be a golf club directly underneath Miller's body. (Ex. 12 at 12; Ex. 14 at ₽ 16).

99. Roycroft's left arm remained trapped under Miller.  (Ex. 5 at ₽ 96).

100.      Jackson was unable to see Miller's hands and was therefore unable to determine if Miller was holding anything or if he had picked anything up. (Ex. 11 at 69:3-6, Ex. 6 at 2).

101.      Roycroft, whose left arm was pinned underneath Miller, continuously tried to pull his (Roycroft's) left arm out from under Miller, who was continuously pinching and/or

applying pressure to and/or collapsing down on his left arm and holding it underneath him. (Ex. 4 at 131:10-15; 132:1-7).

102.    Roycroft recognized this as a technique used in wrestling and had a clear understanding that Miller was using this "pinching" or "winching" technique to gain further leverage over and control of his (Roycroft's) left arm. (Ex. 4 at 133:4-10; Ex. 5 at ₱ 92-95).

103.    Miller was actively resisting both officers' attempts to restrain him. (Ex. 11 at 103; Ex. 4 at 44-45; Ex. 6).

104.    Roycroft was on Miller's left side, "more on his left hip," with his right leg over Miller's left leg and his right arm draped between Miller's shoulders and his left arm trapped underneath Miller. (Ex. 4 at 135:3-12, 131:10-13, Ex. 6 at 7).

105.    Roycroft and Jackson issued repeated, verbal commands to Miller to stop, to let go, and to stop resisting. (Ex. 4 at 134:10-13; Ex. 14 at ₱ 19; Ex. 13 at 7).

106.    Jackson asked Roycroft if he should use his taser on Miller, but Roycroft directed him not to. (Ex. 4 at 140:14-17, Ex. 11 at 70:1-2, 71:8-10, Ex. 6 at 2; Ex. 14 ₱ 25).

107.    Roycroft believed that he and Jackson would be able to restrain Miller without escalating the level of force used with respect to Miller. (Ex. 4 at 140:14-17, 141:5-9; Ex. 9 at 18:4-15; Ex. 5 at ₱ 96-101).

108.    Roycroft reacted to prevent Miller from further covering and controlling his pinned left arm by attempting to prevent Miller from creating space between his (Roycroft's) arm and Miller's body that would allow Miller to winch more of Roycroft's arm underneath him and gain a dominant position and/or leverage in the struggle. (Ex. 4 at 133:4-10, 148:10-17, 143:6-15;

109.    During the struggle, Miller was moving around in ways that, to Roycroft, demonstrated an intent to stay in the position he was in and gain a dominant position over Roycroft. (Ex. 4 at 148:10-17; 135:19-21).

110.    Roycroft understood Miller to be pushing up at him so that he (Miller) could tighten his grip on Roycroft's arm. (Ex. 4 at 133:15-19, 134:3-7).

111.    Miller disregarded verbal commands and kicked and flailed his legs as he was on the floor. (Ex .11 at 80:7-14, 103:17-22, Ex. 6 at 2).

112.    Roycroft was concerned for his own safety because his left arm was trapped underneath Miller. (Ex. 4 at 143:6-15).

113.    Throughout the struggle, Jackson was concerned about Anderson's safety, the potential for someone to come up behind him, and anything else that could happen in such a situation; he also feared Miller was holding a weapon. (Ex. 11 at 146:6-11; Ex. 6 at 2).

114.    Jackson delivered a half-strength hand strike to the right side of Miller's body, the purpose of which was to distract Miller in order to gain control over his hands for handcuffing. (Ex. 6 at 2, 7; Ex. 11 at 74:13-17, 75:2-6).

115.    Immediately after this half-strength strike, Jackson was able to partially remove Miller's right arm from underneath his body. (Ex. 6 at 2; Ex. 11 at 74-76).

116.    Miller then wrenched his body toward Roycroft and yanked his arm back underneath his body. (Ex. 6 at 2; Ex. 12 at 15:13-19).

117.    Roycroft's microphone inadvertently transmitted a signal during the ongoing struggle. (Ex. 19 at 1:55; Ex. 6 at 2; Ex. 14 at ℙ 30-32).

118.    Officer Jackson radioed dispatch that he and Officer Roycroft were fighting with the subject. (Ex. 6 at 2; Ex. 19 at 2:20; Ex. 14 at ℙ 30-32).

119.   Jackson told dispatch they were fighting with the subject, and that "we'll take another car." (Ex. 12 at 17:3-6).

120.   Jackson then delivered another half-strength hand strike in the same area of Miller's body and was able to pull Miller's right hand out from underneath him (Miller). (Ex. 6 at 2; Ex. 14 at ¶ 33-35).

121.   For the first time, Jackson observed Miller's right fist to be clenched, with nothing protruding from it; at all times during the physical counter, Roycroft also could not see Miller's hands. (Ex. 6 at 2; generally; Ex. 5 at ¶ 129).

122.   Miller made groaning noises after each empty hand strike, but made no other verbal statements. (Ex. 11 at 76:21-23, 82:9-11; Ex. 4 at 146:22-24, 147:3-5; Ex. 12 at 15:10-14, 17:16-22).

123.   Jackson managed to pull Miller's right hand out from under his body and place handcuffs on Miller's right wrist. (Ex. 11 at 82:11-16, Ex. 6 at 2, 7; Ex. 12 at 15:10-14, 17:16-22).

124.   Roycroft was able to remove Miller's left hand from underneath him immediately after Miller's right arm was under control. (Ex. 12 at 17:16-22).

125.   Jackson double-locked the handcuffs on Miller. (Ex. 4 at 149:9-14; Ex. 11 at 82:23-24, 83:1-2; Ex. 6 at 7, 2; Ex. 12 at 17:22-24).

126.   Throughout the entirety of his physical encounter with Miller, neither Roycroft nor Jackson heard Miller gasp for air, heard him say he could not breath, observed any signs that Miller was in respiratory distress or unable to breathe, or observed anything about Miller's behavior that indicated he was experiencing a medical event. (Ex. 4 at 147:6-8, 147:16-23; Ex. 5 at ¶ 131, generally; Ex. 14 at ¶ 39, generally).

127.    While on the floor and until the handcuffs were applied, Miller's hands had remained tucked underneath his body, out of sight, despite both officers' attempts to free his hands from underneath his torso. (Ex. 4 at 128:3-129:4, 130-142; Ex. 9 at 17:8-12; Ex. 5, generally).

128.    Neither Roycroft nor Jackson heard Miller or Anderson say anything throughout the struggle, beginning the moment Miller entered the house. (Ex. 4 at 126:12-14; Ex. 5 at ℙ 130-132; Ex. 14 at 39, generally).

129.    Anderson's memory is unclear as to the sequence of events or how anyone was positioned at any given moment. (Ex. 7 at ℙ 54-55, generally; Ex. 8 at 126, generally).

130.    Anderson remembers Miller saying, "I can't breathe," and "Help me, Amy" "only a few seconds" before Roycroft and Jackson began to administer life-saving measures. (Ex. 7 at ℙ 59-66).

131.    Roycroft and Jackson only heard Miller make a responsive grunt following the distractionary strikes. (Ex. 4 at 119:1-3, Ex. 11 at 61:20-22, 64:11-13).

132.    Once Miller was handcuffed, Jackson got up to speak with Anderson and to obtain information from her about Miller. (Ex. 11 at 84:2-5; Ex. 6; Ex. 14).

133.    As soon as the handcuffs were on Miller, Roycroft told him he was going to help him to his feet. (Ex. 4 at 150:6-7, 150:14-24; Ex. 6 at 7).

134.    When Miller did not respond to Roycroft's prompts, Roycroft checked Miller's involuntary responses. (Ex. 6 at 7; Ex. 5 at ℙ 118-123).

135.    Roycroft immediately notified Jackson that Miller might be experiencing a medical event and the handcuffs were removed from his wrists. (Ex. 4 at 151:20-24, 152:1-5; Ex. 6).

136.     Miller was placed in a recovery position and CPR/resuscitative measures were started immediately by Jackson and Roycroft until emergency medical services arrived on scene and assumed care of Miller. (Ex. 6 at 2, 7; Ex. 5 at ‖ 121-128; Ex. 14 ‖ 43).

137.     Roycroft's watch band broke, his uniform was torn, and he suffered an injury to his knee during the struggle with Miller. (Ex. 6 at 7-8).

138.     Jackson estimates that 60 seconds elapsed from the time he arrived on scene until Miller was in restraints. (Ex. 12 at 18:12-15).

139.     Anderson is unable to recall where Miller was located or in what position he was in when he stated that he could not breathe. (Ex. 8 at 119:9-13, 120:14-23).

140.     Neither Roycroft nor Jackson recall Anderson asking them a question or either one of them responding to her. (Ex. 4 at 147:6-15; Ex. 11 at 85:18-20.

141.     Anderson also observed Miller stop kicking his legs and heard one of the officers ask, "Did he go out?" (Ex. 15 at 9).

142.     The time of Miller's death is listed as 8:00 P.M. and the manner of death was deemed "natural." (Ex. 1).

143.     BPD officers are trained to use a support knee when handcuffing subjects in the prone position. (Ex. 5 ‖ 109-114).

144.     Anderson recalls one of the officers placing his knee on Miller's back for the purpose of creating a leverage point for getting the handcuffs on Miller. (Ex. 7 at ‖58).

145.     It took no more than 10 seconds for the handcuffs to be applied to Miller's wrists once his hands were freed from underneath him. (Ex. 14 at ‖ 108).

146.     Jackson was in a lunge position the entire time he and Roycroft were attempting to free Miller's hands. (Ex. 14 ‖ 36).

The Defendants,

SEAN ROYCROFT and
SPENCER JACKSON

By their attorneys,

/s/ Alexandra M. Gill
Douglas I. Louison, BBO 545191
dlouison@lccplaw.com
Alexandra M. Gill, BBO 663040
sgill@lccplaw.com
LOUISON, COSTELLO, CONDON & PFAFF, LLP
10 Post Office Square, Suite 1330
Boston, MA 02109
(617) 439-0305

**CERTIFICATE OF SERVICE**

I, Alexandra M. Gill, certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

/s/ Alexandra M. Gill
Alexandra M. Gill

Dated:  May 22, 2023