# In the Matter of:

*Estate of Robert Miller vs*

*Sean Roycroft et al.*

*Sean Roycroft*

*March 30, 2022*

*68 Commercial Wharf • Boston, MA 02110*
*888.825.3376 - 617.399.0130*
*Global Coverage*
*court-reporting.com*



A MAGNA LEGAL SERVICES COMPANY

Page 3

APPEARANCES VIA VIDEOCONFERENCE: (Continued.)

LOUISON, COSTELLO, CONDON & PFAFF, LLP

By Alexandra "Sasha" Gill, Esq.

101 Summer Street

4th Floor

Boston, Massachusetts 02110

(617) 439-0305

SGill@lccplaw.com

For the Defendants.

ALSO PRESENT: Carmen Guhn-Knight - Paralegal

---

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - x

ESTATE OF ROBERT JOSEPH MILLER, by and through IAN MILLER, personal representative of the Estate,

　　　　　　Plaintiff,

v.

　　　　　　Civil Action

　　　　　　No. 21-10738-AK

SEAN ROYCROFT and SPENCER JACKSON, in their individual capacities, and the TOWN OF BARNSTABLE, MASSACHUSETTS,

　　　　　　Defendants.

- - - - - - - - - - - - - - - - - - - - - - - x

RECORDED VIDEOCONFERENCE DEPOSITION OF

　　　SEAN ROYCROFT

　　　Conducted Remotely

　　　6644 Dennison Avenue

　　　North Port, Florida

　　　March 30, 2022

　　　10:00 a.m.

Julie A. Mercier, RPR and Notary Public

---

Page 2

APPEARANCES VIA VIDEOCONFERENCE:

LAW OFFICES OF HOWARD FRIEDMAN, PC

By Howard Friedman, Esq.

1309 Beacon Street, Suite 300

Brookline, Massachusetts 02446

(617) 742-4100

hfriedman@civil-rights-law.com

and

WIESNER McKINNON LLP

By Jeffrey Wiesner, Esq.

By Jennifer McKinnon, Esq.

90 Canal Street

Boston, Massachusetts 02114

(617) 303-3940

jwiesner@jwjmlaw.com

jmckinnon@jwjmlaw.com

For the Plaintiff.

---

Page 4

INDEX

Deposition of:　　Direct　Cross　Redirect　Recross

SEAN ROYCROFT

By Mr. Friedman　7　　　　　186

By Ms. Gill　　　　164

EXHIBITS

No.　　　　　　　　　　Page

Exhibit 1　Answers to Interrogatories　6

Exhibit 2　Supplemental Answers to Interrogatories　6

Exhibit 3　State Police Interview of Officer Sean Roycroft　6

Exhibit 4　First draft of Roycroft Narrative　6

Exhibit 5　Supplemental Narrative for Roycroft　6

Exhibit 6　Response to Resistance Report　6

Exhibit 7　Policy and Procedure 502 Response to Resistance　6

Exhibit 8　Policy and Procedure 1106 Mental Illness　6

Exhibit 9　Mental Health First Aid USA Program Overview　6

Exhibit 10　Diagram of house layout　6

Exhibit 11　Photograph - back deck　6

Exhibit 12　Photograph - dining room　6

Estate of Robert Miller vs
Sean Roycroft et al.

Sean Roycroft
March 30, 2022

Page 5

EXHIBITS
No.                    Page

Exhibit 13 Photograph - dining room/office
    area                6
Exhibit 14 Photograph - office area    6
Exhibit 15 Barnstable Police Department
    Dispatch Call Log       6

Exhibit 16 Audio of 911 radio transmission 6

Exhibit 17 Image of restraint hold      6

Exhibit 18 Image of restraint hold      6

Page 6

PROCEEDINGS
(Exhibits 1 through 18 premarked
    for identification)
THE STENOGRAPHER: This is Julie
Mercier. I'm a Registered Professional
Reporter, and I'm a Notary Public in the
Commonwealth of Massachusetts.
    This deposition is being taken
remotely. This witness is appearing remotely
from 6644 Dennison Avenue, North Port, Florida.
    The attorneys participating in this
proceeding acknowledge their understanding that
I am not physically present in the proceeding
room, nor am I physically present with the
witness and that I will be reporting this
proceeding remotely. They further acknowledge
that, in lieu of an oath administered in person,
the witness will verbally declare his testimony
in this matter under the pains and penalties of
perjury. The parties and their counsel consent
to this arrangement and waive any objections to
this manner of proceeding.
    Please indicate your agreement by
stating your name and your agreement on the

Page 7

record, after which I will swear in the witness
and we may begin.
    MR. FRIEDMAN: Howard Friedman for
plaintiffs.
    MS. GILL: Alexandra Gill for the
defendants, and I agree.
    MR. FRIEDMAN: And we both assent.
    Now, before we begin, can we agree to
stipulate that we will reserve all objections,
except as to the form of the question until
time of trial, including motions to strike?
    MS. GILL: Yes, I can agree to that.
Thank you.

    SEAN ROYCROFT,

a witness called for examination by counsel for
the Plaintiff, being satisfactorily identified by
the production of his driver's license, being
first duly sworn, was examined and testified as
follows:
    DIRECT EXAMINATION
BY MR. FRIEDMAN:
    Q. Will you state your name for the

Page 8

record, please?
    A. Sean Joseph Roycroft.
    Q. Have you ever been deposed before?
    A. It's been some time. Yes, once before.
    Q. What was that case about?
    A. It was a traffic accident.
    Q. So let me just go over the rules.
Obviously you need to answer with words. Shaking
your head isn't enough, even though this is being
recorded. Okay?
    A. I understand.
    Q. If you do not understand any question I
ask, please let me know and I will rephrase it.
Okay?
    A. I understand.
    Q. If -- if you answer the question, I'm
going to assume you did understand it; is that
acceptable?
    A. Yes.
    Q. Okay. We have reserved all objections
until the time of trial, so if there's an
objection, you can still answer, unless your
attorney instructs you not to answer; is that
understood?

Page 9

A. Yes.

Q. And while you're being questioned, you can't ask your attorney for advice or look at your cell. phone or phone a friend. You need to answer from your own knowledge at that time. Is that acceptable?

A. Yes.

Q. If you need a break, unlike, say, if you were in court, you can ask for a break, and you can have one so long as there is no question pending before you; is that okay?

A. Yes.

Q. Now, when did you move to Florida?

A. Right after Christmas. Around December 27th.

Q. Of what year?

A. This past year, '21.

Q. Okay. That explains why you still have a Massachusetts driver's license?

A. Yes. I still have my property. I still have my house in Massachusetts, also.

Q. So are you living in both states at this point?

A. Yes.

Page 10

Q. Okay. So during the colder weather up here, you're going down to Florida; is that the idea?

A. Well, we're going to play it by ear. It'll depend on what's happening at that time.

Q. Okay. What have you done to prepare for this deposition?

A. Spoken with my attorney. And I've reviewed my reports.

Q. Okay. Did you get copies of the exhibits that are going to be used in this deposition?

A. I have copies of exhibits. I believe that they're the ones that will be used here. We'll find out as we go along, I guess.

Q. Have you looked at them?

A. I have.

Q. Okay. Good. And you know that your attorney, Sasha Gill also represents Officer Jackson, Officer Ruggieri, Officer Shaw and Officer Mellyn?

A. I don't know Officer Mellyn.

MS. GILL: Mellyn.

THE WITNESS: Oh, Mellyn. Oh, okay.

Page 11

There we go. Okay.

Q. And did you know she also represents EMT Vicki Yefko, and she also represents Kenyon Pike and Emily Higgins; did you know that?

A. Yes.

Q. Have you had any discussions about this incident since the lawsuit was filed with Officer Jackson?

A. Yes.

Q. What conversations have you had?

A. We had conversations preparing to write our reports. I guess it would be conversations, you know, about the incident. And I have not talked to him since he was deposed.

Q. Have you talked to him since the lawsuit was filed?

A. Yes.

Q. What conversations did you have?

A. Different conversations. Conversations, you know, about our personal lives, things that are going on, day-to-day conversations, general conversations. I can't -- I mean there were general conversations. I can't remember exactly what was said, but there were

Page 12

some conversations about -- about the incident.

Q. Okay. What conversations did you have with regard to the incident?

A. As to, you know, the lawsuit being filed. That -- how things, you know, were going to proceed moving forward. Those kinds of conversations.

Q. Okay. You read the Complaint in this case?

A. Yes.

Q. And did you find things in there that you thought were not true?

A. Yes.

Q. What did you see that wasn't true?

A. The one that really sticks in my mind is the -- where Mr. Miller said that during the incident that he could not breathe.

Q. You saw that in the Complaint?

A. I thought that was in the Complaint.

Q. Okay. To anything else that you thought was in the Complaint that you thought was not accurate?

A. I can't remember exactly, no.

Q. And your educational background, you

Estate of Robert Miller vs
Sean Roycroft et al.

Sean Roycroft
March 30, 2022

Page 13

graduated from Barnstable High School in 1983, correct?

A. Yes, I did.

Q. And then you went from there straight into the army, right?

A. That's correct.

Q. Okay. And from that you say you did carpentry work. Who were you working for as a carpenter?

A. Different people. I -- there was a period of time where I was registered out of the Boston Carpenters Local. I was re-decking bridges on the Mass. Pike for a short period of time. I worked for a man named Bob Glazer doing form work on the Cape.

Q. And then in terms of you haven't had any college education; is that correct?

A. No.

Q. Is it correct, have you had any?

A. Have I had any?

Q. Education in college, junior college, college, that sort of thing.

A. No.

Q. Okay. But you've had in-service

Page 14

training to be a police officer?

A. That is correct.

Q. And you were also a police officer in the army, right?

A. I was an MP, yes.

Q. Military police?

A. That is correct.

Q. Okay. Now, in the interrogatory, we asked about your use of social media, and you said you had work, a social media but no posts. What do you mean by that?

A. I never posted anything on my fake Facebook account that I had.

Q. So what do you use the fake Facebook account for?

A. To be able to monitor information that's going on around my town, investigations, things of that nature.

Q. So would you be friends with people through that account?

A. Yes.

Q. I don't use Facebook, so people would accept you as a friend, even though it's a fake name, and they have no idea who you are?

Page 15

A. Yes, they would.

Q. Okay. Now, I know you reviewed the answers to interrogatories because you provided a supplement, right?

A. Yes.

Q. Okay. And that corrected some errors and also included the fact that you had moved to Florida; is that right?

A. Yes.

Q. Okay. Now, are you working in Florida?

A. I have a -- it's a brief job during spring training where I'm working as a parking attendant for the Tampa Bay Rays. Not as exciting as it sounds.

Q. Do you get to watch the game?

A. I do get to watch the games, yes. That's probably the only perk to the job.

Q. Are you looking for work? Have you applied for any other jobs?

A. I have not.

Q. When you retired from the Barnstable Police Department, was there any particular reason for retiring?

A. I was past my maximum service that I

Page 16

needed to reach my full retirement, and I had spent some time down here in Florida, and I had just come to that time in my life where I felt it was time for me to retire, that I could retire and be happy in retirement.

Q. So you haven't been applying for any other jobs?

A. No, I have not.

Q. Did you review -- we have your answers to interrogatories, which you did in 2021 are Exhibit 1. And Exhibit 2 are your supplemental answers. And those, I assume, are now completely accurate; is that right? Are you having trouble hearing me at all?

A. I'm just -- I'm just trying to follow your question.

Q. Okay. I just want to make sure that you read over the interrogatories and the supplement, which I think you just did a few days ago, and that those are accurate? Yes?

A. Yes.

Q. Okay. So you don't need to make any changes in those, right?

A. No.

Estate of Robert Miller vs
Sean Roycroft et al.

Sean Roycroft
March 30, 2022

Page 17

Q. Good. Okay. Have you read over your state police interview?

A. Yes, I have.

Q. And that would be Exhibit 3. Did you see anything there that you thought was inaccurate or anything you needed to add, that sort of thing?

A. No, I don't believe so.

Q. Now, the next exhibits that we have here that you've already reviewed are, there's Exhibit 4 which is your first draft of the police report and then Exhibit 5 which is your final draft.

A. Okay.

Q. What was the process that you went through before you reached your final draft?

A. The process that I went through?

Q. Yes.

A. Was the first draft, the initial draft that I -- that you have. I -- I'm not -- I'm not sure I understand.

Q. Okay.

A. The process that I went through is, I wrote a report.

Q. Okay. And that's perfect. If you

Page 18

don't understand, let me know. That's what I asked for at the beginning.

So when did you write your first draft?

A. It was a few days after -- after the call.

Q. And that's typically when you would write -- typically you'd write a report either that night or within a few days, correct?

A. It depends on the situation. It depends on the call. Obviously there was some significance to this call, and I needed to process before I put pen to paper, so to speak.

Q. What do you mean by saying you needed to process before putting pen to paper?

A. Needed to go over the call, what had happened, what had taken place.

Q. What did you do to process that?

A. I sat down and went through the call in my head, what had happened, what had taken place.

Q. Did you look at any documents to process it?

A. I had looked at the -- the call screen document, the dispatch document.

Q. All right. That's Exhibit 15 in this

Page 19

case?

A. If you say so. I don't have it right here in front of me.

Q. So you looked at the dispatch log. Anything else you looked at to process this?

A. Not that I can recall.

Q. Okay. So within a few days, you prepared your initial report, right?

A. Yes.

Q. And ordinarily that's when a report should be filed, correct?

A. Yes.

Q. And, in fact, early in your career, back in 1996, you had been disciplined for filing a late report; do you recall that?

A. I do not recall that, no.

Q. Chief Nightingale was the chief at the time, and there was a vehicle break-in at Vehicle Vibes in Hyannis, and your report was -- on the incident, I guess, was on September 2nd, and you didn't file a report until October 8th or 9th; do you recall that?

A. I have no recollection of that.

Q. The chief gave you an oral reprimand;

Page 20

you don't recall that either?

A. I do not.

Q. Well, did you understand that, in general, reports should be filed within a few days of an incident?

A. Like I said, it depends on the incident. And, like I said, that case there, I have no recollection of that incident.

Q. Well, this incident -- this incident was April 26th and your report wasn't entered until the end of May; do you recall that?

A. Which incident are we talking about? Are we back on --

Q. The one -- back on Miller, yes.

A. Okay. So could you ask that question again, please?

Q. The incident was on April 16, 2019, and the report was finally entered about May 28th of 2019; does that sound about right?

A. From what I've seen, yes, that sounds about right. Entered but -- so my initial report was done, but entered into the IMC. I believe that's the time and date stamp that you're looking at.

Estate of Robert Miller vs
Sean Roycroft et al.

Sean Roycroft
March 30, 2022

Page 21

Q. And that's because --

A. Which doesn't mean that my report -- I just want to be clear, that doesn't mean that my report was not done. My report was done, so I just wanted to be clear on that.

Q. It was in draft form though apparently?

A. I guess you could term it as a draft form, yes.

Q. Because your supervisors were sending you suggested changes, correct?

A. There were, yes, grammatical changes, you know, things of that nature.

Q. And then there was, what I would call, substantive changes as well. The word -- you had used the word "punched" to describe what Officer Jackson had done to Mr. Miller, correct?

A. I believe so, yes.

Q. And based on what your supervisor said, you changed that to "hand strike," correct?

A. Yes.

Q. Did you have a discussion with them with regard to that change?

A. I believe the discussions were through e-mails. They could have been -- I can't remember

Page 22

if I had a face-to-face discussion with them. I believe I did at some point. I can't say exactly when. It -- the end result is it was just a descriptive change, whether you want to call it a "punch" or a "strike." In my mind, it's the same thing.

Q. Did you send e-mails back to your supervisors with regard to changes in the report or was it only them sending you e-mails?

A. I can't remember to be honest with you.

Q. Did you have meetings with your superiors about the report?

A. There -- there were conversations at different -- at a few different times.

Q. What did they tell you?

A. Can't remember exactly what was said. I know that there were, you know, some conversations about the -- about the hand strike or punch. I really -- I can't remember anything beyond that.

Q. Did anyone discuss the concern that either you might be sued or there might be some further investigation into the death of Robert Miller?

Page 23

A. Well, I mean in a situation like this, I think anyone in my position would be concerned that something could happen at some point, and especially where the feelings in the country were and are at the time about police officers. And things in the news, of course, there was -- you know, there's definitely a concern there.

Q. So was there a discussion of concern that this might bring about some kind of civil or other sort of litigation?

A. I can't remember if, you know, it was exactly worded that way. I can't even remember if there was talk with my supervisors, you know, specific to that, whether there would be a lawsuit or not. Like I said, of course, you know, in my own mind, yeah, I did think that at some time there could be something that would happen.

Q. So in your mind you thought possibly you could be sued as a result of this incident?

A. Yes.

Q. Okay. Now, I don't know if you looked at Exhibit 6, which is a Response to Resistance Report, and that was written by Officer Jackson; did you see that?

Page 24

A. Yes, I did.

Q. So I'm not going to put it up on the screen for you then. Did you file a similar Response to Resistance Report?

A. Yes, I did.

Q. Do you have a copy of it?

A. I do not.

Q. When did you file it?

A. When I filed my report.

Q. Would you say that you used the form that Officer Jackson used?

A. Yes. We all used the same form.

Q. Okay. And you filed it with the police department?

A. Yes.

Q. At the same time you filed your report?

A. Yes.

Q. Are you aware that they have no record of that report?

A. I am.

Q. Can you explain that?

A. I cannot.

Q. When you say you filed it, is this -- is this something you file electronically or in

Estate of Robert Miller vs
Sean Roycroft et al.

Sean Roycroft
March 30, 2022

Page 25

person?

A. It was a handwritten form.

Q. Okay. And so you took the handwritten form and gave it to someone in the police department?

A. I handed it to my supervisor.

Q. Who would that have been?

A. Lieutenant Murphy.

Q. What did the report say?

A. It would have said basically the same thing as what's in Officer Jackson's and then referred to my narrative, the body of my report.

Q. Well, this is -- included in this report is whether there were any injuries to you. Did you describe in your Response to Resistance Report any injuries to you?

A. Yes. The injury to my -- the area of my knee. My watch -- the watchband that broke, all of that's not an injury to me, but...

Q. Are those included in your report?

A. Yes.

Q. In your police report?

A. I believe they are, yes.

Q. Okay. And how did you sustain your

Page 26

injuries?

A. It was during the struggle.

Q. What treatment did you receive for your injuries?

A. I didn't receive any treatment.

Q. Who took the photographs of your injuries?

A. I think it was Detective Sergeant York, but I'm not 100 percent sure on that answer.

Q. Would those photographs have gone with the Response to Resistance Report?

A. I -- I didn't get personal copies of those photographs. Whoever would have taken the photographs, it would have been their responsibility to enter them.

Q. You filled out that sort of form before, correct, Response to Resistance Reports?

A. Yes, I have.

Q. Have you ever had any of the reports you filed with the Barnstable Police Department go missing other than this one?

A. Yes. It's not the first time.

Q. What are the other times?

A. I can't remember exactly. I do

Page 27

remember one report that was entered into the system, and you have to -- please bear with me because I'm not technical here. I'm going to try to describe what happened, as I understood it.

It was entered into the system, and it was somehow lost in the system. And it took some time, and it was one of the secretaries in the department that somehow, I can't explain how, but somehow was able to find the report. And the report was found, but it did take some time.

Q. From the time of this incident --

A. This report -- if I could explain.

Q. Please.

A. It's just a little bit as far as this Response to Resistance Report. This is not -- this is not a computer-generated report. This is -- it's a form that is filled out by hand. I physically handed that report to Lieutenant Murphy, and that was the end of my handling of that physical piece of paper.

Q. You wouldn't understand the way the computer system worked back then as to whether they scanned your report; am I right?

A. I wouldn't even understand that today,

Page 28

sir.

Q. Okay. Have you had training in the martial arts?

A. Yes, I have.

Q. Did you ever take training in Krav, K R A V, Maga, M A G A?

A. I think is it --

Q. I may not be mispronouncing it right, but --

A. Krav Maga?

Q. Yes, Krav Maga.

A. I have not.

Q. Okay. Do you know if Officer Jackson had some training in that and it was taught by another Barnstable police officer? Not as part of the official training.

A. I did not know that.

Q. Okay. Have you ever had training in Judo, Karate, Jiu Jitsu, Mixed Marital Arts, anything like that?

A. Jiu Jitsu.

Q. And where did you get that training?

A. Juniko, which is a gym in Hyannis.

Q. And that was for your personal

Estate of Robert Miller vs
Sean Roycroft et al.

Sean Roycroft
March 30, 2022

Page 29

enjoyment?

A. Yes.

Q. Did you get training in the martial arts to be a military police officer?

A. I did not.

Q. As a military police officer, were you trained in any kind of takedown holds, that sort of thing?

A. That was a long time ago. I'm sure that there was. I -- I honestly can't remember exactly what was trained back then.

Q. As a military police officer, did you have some of the same functions as a police officer in Barnstable as in taking people into custody?

A. Yes.

Q. And can you recall ever having to use a takedown maneuver of any kind to take someone into custody as a military police officer?

A. No, I can't.

Q. Okay. As a Barnstable police officer, were you trained in any methods of taking down a prisoner -- a person in your custody?

A. Yes.

Page 30

Q. What were you taught?

A. We were -- we've been taught several different -- there's arm bar techniques. There's arm bar takedowns.

Q. Leg sweep?

A. There are leg sweeps.

Q. Any other takedown methods you can recall being taught?

A. I can't remember. There probably were, but I can't remember.

Q. As a Barnstable police officer, were you ever taught to use a so-called seatbelt hold?

A. Specifically, no. Seatbelt hold, no.

Q. Were you taught to do the maneuver that you used on Mr. Miller that you referred to as a seatbelt hold?

A. I was not taught, but it is -- every situation like that -- what happened that day is different, and even though there were techniques that -- that I was taught and trained and sanctioned by the department as far as training goes, it -- they're there, but in that situation there, the seatbelt hold is -- it's a descriptive to be able to -- to be able to describe how my

Page 31

arms were positioned when I did -- when I did go hands on with Mr. Miller.

Q. And did you know that the seatbelt hold is what New York City police officers said they used which ended up in the death of Eric Garner?

A. I had no idea.

Q. And did you know that -- you say you were never trained in the seatbelt hold, correct?

A. Correct.

Q. But the hold you used happens to be taught in martial arts as the seatbelt hold; did you know that?

A. I did not.

Q. And did you know that when they teach the seatbelt hold, it's not recommended for law enforcement because it could easily become a chokehold?

A. I did not know that either. I don't see how it could become a chokehold.

Q. Okay.

MR. FRIEDMAN: Carmen, can we show a picture? Let's start with, number one, of a -- someone using a seatbelt hold.

Q. Okay. Do you see this?

Page 32

A. Yes.

Q. And is that the sort of the hold that you used?

A. It is -- it is very similar. It's not the same position that I was in.

Q. Okay. What position were you in?

A. I was more to his side, which would have been to his left side. As you're looking -- so if I'm looking -- if I'm the man behind...

Q. The man in the dark t-shirt?

A. Yes, the man in the dark t-shirt. If I'm him, I would be not directly behind him. I would be more to -- a little bit more to his left side.

Q. Why did you do that?

A. It was just the position that -- from -- because the position that Mr. Miller was in at the time.

Q. Well, he was directly -- you were directly behind him, correct?

A. Like I said, I was not directly behind him as you have pictured here, no.

Q. What prevented you from standing directly behind Mr. Miller?

Page 33

A. I -- I don't know.

Q. Well, as I understand it, so he was, I think you used the word "foraging" on the table; is that right?

A. That's correct.

Q. And so you came up from behind, correct?

A. Behind and off to his left. Because he was reaching over the table, I -- I would not -- I wouldn't have been able to reach -- to reach him. And before I even went to the seatbelt hold, I attempted to -- I put my hands on his arm. I think I used in my term, I grabbed his arm --

Q. Yes.

A. -- in an -- in an attempt to get his attention that way.

Q. I understand that. I hate to interrupt you. I want to focus on the seatbelt hold part. We're going to discuss the holdings on later, but, sir, we're looking at this photograph --

A. Well, I was just -- I'm trying to describe how -- you said that I was directly behind him. I wasn't directly behind him, and I was trying to -- you asked me to explain how --

Page 34

why I wasn't directly behind him.

Q. Okay. Explain that. Please explain.

A. Yeah. So I was -- I first -- I grabbed him by his arm. He reached over onto the table, and I would not have been able to get leverage on him. I wouldn't have been able to reach around him directly from behind, so that's why I was a little off to his side.

Q. I hear you say that you weren't able to get directly behind him, but from your words, I still don't understand why that was. Can you explain it so that I can understand it?

A. Because of the position that he was in reaching on the table. I mean if I -- I suppose I would have been able to stand directly behind him, but looking at it now, that wasn't -- that wouldn't -- would not have been a good position for me to be in.

Q. Why is that?

A. Because I wouldn't have been able to -- I was trying to stop him from -- whatever he was reaching for on the table. I didn't know what he was reaching for on the table.

Q. And, in fact, you never saw what was on

Page 35

the table until after -- after Mr. Miller died, right?

A. Yes.

MS. GILL: Objection.

Q. Now, we're looking, again, at this photograph, and I suppose we should mark this as Exhibit 17. In this case, the man in the black t-shirt has his elbow sort of above the right shoulder of the bald man, correct?

A. That's correct, in this picture.

Q. So my next question, where was your elbow?

A. I can't say exactly at that time. I wasn't focused on my elbow.

Q. Okay. One of the problems that trainers discuss with regard to the seatbelt hold is that it can turn into something of a chokehold.

MR. FRIEDMAN: Can we look at the next photo, which we're going to mark as Exhibit 18? Carmen, please.

Q. Okay. Do you see what happens if a person starts to move and you have that kind of hold, it can turn into the arm possibly touching the neck?

Page 36

A. These pictures are not -- these pictures -- this picture here is not an accurate description as to what happened, so I'm not going to agree to say that these pictures are what I did on that day.

Q. Okay.

MR. FRIEDMAN: Let's take the photo down, Carmen.

Q. My point is that if you put somebody in the seatbelt hold, the arm that's going over the shoulder could, as people move, unintentionally apply pressure to the individual's neck; do you understand that?

A. I understand that's what you're saying.

Q. Yes.

A. That's -- that's not what happened.

Q. Okay. And that couldn't happen, is that your opinion?

A. Well, no, that's not what I'm saying.

Q. Okay. So --

A. I'm saying that in -- in -- in the incident with Mr. Miller on that particular day, the picture that you just showed of that seatbelt hold moving into a choke position did not happen.

Page 37

And I was -- I was absolutely in my own mind, I was consciously thinking about that --

Q. So --

A. -- and --

Q. Okay. I'm sorry.

A. No, I was consciously thinking that I -- with everything in the news at that particular time, that I -- I have to be aware that I cannot -- I can't get into a choke position with this man.

Q. So you were aware that there was a danger of that, and you were aware of trying to prevent that, correct?

A. I did prevent that.

Q. Okay. Why didn't you use any of the maneuvers that you had been taught at the Barnstable Police Academy and that were authorized by your police department?

A. Like I said before, every incident like that, it -- those maneuvers don't always fit into every scenario. This happened fast. I reacted, and it was -- like I said, the seatbelt hold for me was a position of leverage. It did work because I was able to at one point pull him off of

Page 38

the table, so I -- I can't say exactly why I didn't go to any specific techniques that I was trained in by the police department.

Q. Well, when you're a police officer, part of your job is to deal with situations that are rapidly evolving, they're happening quickly, correct?

A. Yes.

Q. And that's why you receive training so that you will be able to rely on your training as opposed to trying to figure something out when you have only seconds, correct?

A. Like I said, not every situation is the same. There have been situations in the past where specifically trained techniques work and fit into that scenario. This particular one, it did not. And my intent at that point was to just keep Mr. Miller from searching for whatever he was searching for on the table. I felt as though that he was looking for some kind of a weapon or something that was on the table, so that's what my mindset was at that time, trying to keep him from harming himself.

Q. Had you ever done a takedown before

Page 39

this?

A. Yes.

Q. Okay. Had you ever used the techniques you were trained to use or are all the situations different, so you can't actually use the training?

A. No, you can use the training. And I have used the training, yes.

Q. Did you consider any other maneuvers before you chose the seatbelt hold?

A. There was no time to consider. It was just -- it was a reaction. And that's all it was. The only -- the one thought that I do remember is that I could not choke him.

Q. Okay. But other than that, you decided you didn't need to focus on the training but rather what you felt you could do right at that moment?

A. I mean --

MS. GILL: Go ahead and answer.

A. Okay. Like I said, I -- to actually -- to actually be able to process those kinds of thoughts in that -- in that scenario, there was no time for that. There was no time to sit there and say, "Well, I have to go through, you know, this

Page 40

technique, that technique. Does this technique fit in here? Does that technique..." Mr. Friedman, you know as well as I do, it doesn't work like that, sir. It doesn't.

Q. So what you're saying is that you put yourself in a position where you had to make a decision so quickly --

A. I didn't put myself in a position to make that decision. Mr. Miller put himself in that position that I had to make decisions.

MS. GILL: Sean, just let Attorney Friedman question --

MR. FRIEDMAN: I'm sorry, Sasha, I cannot hear you.

THE STENOGRAPHER: Yes. Sometimes you kind of blank out a little bit.

MS. GILL: I'm sorry. Is my audio okay?

MR. FRIEDMAN: A little better now, yeah.

THE WITNESS: I can hear you.

MS. GILL: Just try to let Attorney Friedman finish the question so we can keep a clean record.

Estate of Robert Miller vs
Sean Roycroft et al.

Sean Roycroft
March 30, 2022

Page 41

THE WITNESS: Okay.

A. I apologize for that.

Q. So it was Mr. Miller that put himself in a position where you had to act so quickly that you didn't have time to consider your training; does that accurate -- accurately describe what you said?

A. I'm sorry. Can you say that again, please?

Q. What you're saying is, it was Mr. Miller's fault that he put you in a position where things were happening so quickly that you weren't able to think about and consider alternative holds right at that moment?

A. There was no time. It was -- it was -- it was a reaction. Like I said, in that moment in time, to try to go through the different techniques that I've been trained, that a police officer is trained to do, it was -- it was too fast to -- it's impossible to be able to go through and say, "All right. You know, this technique applies to this." "This technique applies to that."

Q. Okay. After you had him in a choke --

Page 42

in a seatbelt hold, what was your plan of what you were going to do next?

A. My plan?

Q. Yes.

A. I was trying to keep him from getting onto the table, from harming himself, that's what my plan was.

Q. Okay. Did you have -- was it your goal to ultimately enact a takedown maneuver?

A. It -- it was going to depend on where it went from there. If I was able to get him away from the table and if Mr. Miller was to become cooperative, then we would have -- I would have approached it as that dictated.

Q. At the time of this incident -- I know you at some points worked out in a gym. Were you in good physical condition?

A. Yes.

Q. You worked out regularly?

A. Yes.

Q. Okay. And at the time of the incident, what was your weight?

A. At somewhere around 190 pounds.

Q. Had you practiced any takedown

Page 43

maneuvers in the police department during your in-service before this incident?

A. During our yearly in-service, yes.

(Reporter clarification.)

THE WITNESS: In-service training.

MR. FRIEDMAN: He said, "Yearly in-service training."

Q. Okay. And did you practice -- you practiced arm bar techniques?

A. Yes.

Q. Leg sweeps?

A. Yes.

Q. And they never mentioned the seatbelt hold during your training, right?

A. No, they did not.

Q. Now, before this incident, you understood that a civilian can swear at a police officer and it's supposed to just roll off your back, right?

A. I'm sorry. Say that again.

Q. A civilian can swear at you, they can say, "Fuck you." "I'm not talking to you," and that's not supposed to -- it's supposed to roll off your back, not cause you any particular upset,

Page 44

right?

A. Yes.

Q. And you can't arrest somebody for swearing at you, right?

A. No, you cannot.

Q. And you can't use force on them because they swear at you, right?

A. That's correct.

Q. Now, I'm going to ask you some questions now about the use of force. Are you familiar with the standard of objective reasonableness as it applies to use of force by a police officer?

A. I do understand. I've not -- I'm not familiar with -- I am familiar with, but I don't have -- how can I say it? The exact terminology.

Q. Okay. What was your understanding back in 2019 of when you could use force on an individual?

A. If they are actively resisting to -- if there are -- in protection of myself, protection of others.

Q. What does "actively resisting" mean?

A. If -- if they are not -- if they are

Estate of Robert Miller vs
Sean Roycroft et al.

Sean Roycroft
March 30, 2022

Page 45

not adhering or following my verbal commands. If they are -- if -- for example, if I -- if I'm going to place somebody in handcuffs and they physically pull away, they fight.

Q. And how much force are you allowed to use as a police officer on a civilian?

A. The minimum amount necessary.

Q. And do you understand that's judged by an objective standard as opposed to a subjective standard? That may be legal. Did you understand those terms?

A. I'm -- I'm trying to follow along with some of that stuff. I -- it is -- yeah, I do -- I believe I do understand.

Q. Okay. I'll just be clear. It's lawyer language. "Objective" means an objective third person, not the person involved looking at it would say that's reasonable. "Subjective" would be the subject or feelings of the person doing it.

A. Yes, I agree with that.

Q. So you understand that it's supposed to be an objective standard of reasonableness?

A. Yes.

Q. Okay. Now, you had taken a course in

Page 46

mental health first aid. I believe it was taught by Barnstable officers, Jennifer Parkas, P A R K A S, Ellis and Jason Sturgis, S T U R G I S; do you recall that?

A. I do.

Q. And you took it, I guess, February 11th, 2016, and it was supposed to be -- you were certified for three years up until, I guess, February 2019; do you recall that?

A. I don't recall exactly, but it -- it makes sense, yes.

Q. Okay. And then on January 10, 2019, you went to an in-service training done by the Yarmouth Police Department on Police Interactions With Persons With Mental Illness, Part II; do you recall that?

A. Not exactly, no.

Q. Okay. Would you like to see your training sheet to refresh your memory?

A. Yes, please.

Q. Okay.

MR. FRIEDMAN: Carmen, can we pull up the training sheet, please?

A. Do you have the instructor for that

Page 47

class, sir?

THE WITNESS: I'm sorry.

MS. GILL: I'm wondering if this is an exhibit?

MR. FRIEDMAN: It is not an exhibit.

MS. GILL: Okay. That's fine.

MR. FRIEDMAN: I just wondered if this would refresh his memory. It was in the materials of course that you provided to us.

A. Do you have the instructor's name, sir?

Q. I do. I thought I -- let me see...
It's Yarmouth Police. I guess on this one, we don't have an instructor's name. This was a course by the Mass. Police Training Council. You can see here, this is your training history from the Municipal Police Training Committee. They keep changing their name but keeping the initials. So you can see where it says -- I think there's a cursor there, "In-Service Police Interactions With Persons With Mental Illness, Part II, Yarmouth Police." Your name, of course, is up at the top in the right-hand corner.

A. Yes. Okay.

Q. So this would indicate that you took

Page 48

that course in January of 2019, about three months before this incident, right?

A. Yes.

Q. Okay. And we'll go over some of the policies, but before I show that to you, what was your general understanding of how you were to behave when dealing with people who you knew were mentally ill, particularly people who were suffering from psychosis?

A. Remain as calm as possible. Try to engage them in a conversation coming from an area that -- of concern. Assuring them that, you know, that we're there to help. I'm not sure if it's the right way to describe it, but to -- to be a friendly voice, if that -- if that helps with a description.

Q. Do you try to de-escalate?

A. Well, like, that depends on the situation. Not -- I don't think that every -- every call related to a mental health issue has to be de-escalated. It depends on the level or where the person is, where they're at, who you're dealing with.

Q. Well, in your training when you were

Page 49

taught how to deal with people who were mentally ill, do you recall discussing the concept of de-escalation?

A. I do.

Q. And what does that mean to you?

A. It means to try to bring the situation, the person, to try to bring them down to a calmer level, if they're excited.

Q. Now, have you looked at Exhibit 7, the Barnstable Police Policy with regard to Response to Resistance?

A. I have looked at it, yes.

Q. Okay. And you would agree that it says that you should use proper judgment, restraint and competence when you use force?

A. Yes.

Q. And it says, "When you use restraint techniques to take down and/or control a person, you are to use the techniques 'as trained'"; do you recall that?

A. I don't recall that one exactly. I don't have it memorized.

Q. Okay. Did you understand that — so you don't — you're not sure that's what you were

Page 50

taught, you must use the techniques "as trained"?

A. It actually says, "You must use"?

Q. It says you're supposed to use "trained techniques." Do you think --

A. Is there any other -- is there a disclaimer in there? Not a disclaimer. Is there another explanation that also says that it depends on the situation. Not every situation is the same.

Q. And that's why we have training, correct? It certainly says, "The degree of use of force is dependent upon the facts and circumstances surrounding the situation an officer faces"?

A. Yes.

Q. Okay. So that part you agree with?

A. That I do.

Q. But you don't recall your own policy saying you should use techniques "as trained"?

A. I -- that seems very definitive.

Q. Well --

A. I mean it...

Q. I mean while you say every situation is different, there's police training to teach you

Page 51

how to handle situations, including situations where things are happening rapidly because that's -- when you have to use force, often that's the case, correct?

A. It is, but not every situation is a round peg, round hole. And I know that the -- I know that the policies that are written, they -- I know that they don't say, "Well, if someone is pulling away from you that you have to use an arm bar takedown on him." It's not that specific.

Q. Did you feel your training was deficient, that you weren't trained in enough takedown techniques?

A. I'm not going to say that my training was deficient, but I'm also -- I'll also say that we could always use more training.

Q. Sure. When you were in the military and military police, were you allowed to use whatever techniques that you felt were necessary because things were moving rapidly or were you trying to follow specific rules?

A. We had -- we had rules that we had to follow, specific rules, yes, but I'm going to go back to every situation is different.

Page 52

Q. And you're trained to deal with different situations, correct?

A. I am trained to deal with different situations, but you can't -- you can't train for every situation that can happen in this world. That -- that would be impossible.

Q. Because every situation might be slightly different?

A. Exactly. Or significantly different. Who knows.

Q. So --

A. This is why we go back -- this is why we go back. If I may, you take the school -- you know, school shootings, for example. It used to be that we wouldn't enter -- an active shooter in a school or a building or mall, that we wouldn't enter until we had other officers with us. You wouldn't go in by yourself. That has changed. If I'm the first one showing up at a -- and I'll use the example of a school shooting, I don't wait. I don't wait for other officers to arrive. I go in and make every attempt to engage the shooter, so we've learned -- we've learned from that. It's changed.

Page 53

Q. Correct. So what you're telling me is that training changes and sometimes a department and police across the country both say, "That technique that we've been using, we're not going to use anymore," right?

A. Yes.

Q. So, for example, police officers used to shoot at moving motor vehicles, and now most departments say, "Don't do that because you're not going to stop the motor vehicle. It could be a ricochet." If you do manage to hit the driver, now there's a vehicle that's moving with no driver and it's a danger, so now most departments say, "Don't shoot at moving vehicles," right?

A. Yes.

Q. Okay. And so when the training was, if you come to a school shooting, wait for sufficient force. An officer was supposed to follow the rules and wait for sufficient force at that point, correct?

A. Yes.

Q. You couldn't go and say, "Well, I'm going to just rush in." Even though now that's the case, while that was not the policy, you're

Page 54

supposed to wait until you have sufficient force because that was what your department had trained you to do because they thought that was the best way to handle it at that time, right?

A. Yes.

MS. GILL: Objection.

Q. Okay. And so the way it works in police departments and the military is you're supposed to follow your orders and your training. Sometimes it will change, but you're not supposed to change it all on your own, correct?

A. Yeah, I -- I -- I don't feel comfortable answering that question the way that you worded it. I get a sense of where you're trying to go with this, and that's -- that's not what happened here, sir. I don't just disregard rules and regulations. I don't. And I don't -- what I'm trying to -- we keep -- every situation -- I mean every situation that a police officer deals with, there are similarities and calls and things like that, but every situation, even back in the military, there are differences, and you have to make split-second decisions. And I mean I'm not -- I'm not going to say that -- that I

Page 55

make up my own -- my own personal plan when it comes to dealing with different situations. I do my best to follow the rules and regulations, the policies and procedures, to adhere to them and -- but there are times where it doesn't -- it just -- it's not going to work.

Q. I hear you. I think you're saying that this situation was unusual and beyond anything you had been trained to do. You had to do something quickly, and that's why you did what you did?

MS. GILL: Objection.

A. Yeah.

Q. Yeah? You have to answer even though she's objected.

A. Okay. Yeah, I'm not going to agree with that. I'm not going to say that it was beyond my training.

Q. Okay. Well, let's look at some of your training then. You've looked at, I guess, it's Exhibit 8, the policy on mental illness?

A. Yes.

Q. Okay. And if you look at the chart that they have there, it says, "How to Handle a Situation." It's on the second page. If you'd

Page 56

like, we can put it up on the screen for you.

A. Can you put it up on the screen, please?

Q. Sure.

MR. FRIEDMAN: Carmen, can you please put that up, The Intervention Guidelines? Make it a little larger, please, Carmen.

Q. Okay. You see this block of information. Are you familiar with this?

A. Yes, I am.

Q. Okay. And this is telling you how an officer who's involved with someone who displays signs of mental illness, how you should handle it, correct?

A. Yes.

Q. For instance, you assess the situation, correct?

A. Yes.

Q. And then it says you should request backup assistance, as appropriate, correct?

A. That's what it says, yes.

Q. Okay. And --

MS. GILL: Objection. Sorry, Howard. I'm just objecting to the way you characterized

Estate of Robert Miller vs
Sean Roycroft et al.

Sean Roycroft
March 30, 2022

Page 57

what it says in Steps 1 and 2.

MR. FRIEDMAN: I'm sorry. Are you saying that I misread what this policy says?

MS. GILL: Well, you said first it says, "Assess the situation," and then it says, "Request backup assistance, as appropriate," but you left out the "and secure the scene."

MR. FRIEDMAN: I left out what? Oh, I'm sorry. Well, that's Step No. 1. It says, "Assess the situation and to secure the scene." Okay. Thank you, Sasha.

Q. What does, "Secure the scene" mean?

A. I take it you're asking me that question?

Q. Yes. No, I don't question Attorney Gill.

A. Okay. Just -- it's exactly what it says it is, secure the scene. You know, look for weapons. Look for, you know, anything that could be a danger to me or the person that we're dealing with.

Q. Okay. So taking it to Mr. Miller's case, what did you do to secure the scene?

A. Well, first of all, I positioned myself

Page 58

on the back corner of the house where I could see him and where at first he couldn't see me. That would be -- that would be part of it.

Q. Okay. Let's go to Step 2 would be, "Request backup assistance, as appropriate." After you -- after you saw Mr. Miller -- first of all, the call was that he was having a psychotic break, correct?

A. Yes, it was.

Q. And when you saw him, it looked like he was having a psychotic break, didn't it?

A. Yes, it did.

Q. Did you see a need to request backup assistance?

A. I knew backup was already on its way.

Q. Okay. Any reason not to wait for backup to arrive?

A. Well, I hadn't approached Mr. Miller at that time. I was observing him. And part of that was like Step 1 says, to secure the scene, but also to give my backup time to get there.

Q. Did you give your backup time to get there?

A. I gave time, but if you're asking --

Page 59

well, I'm not going to ask -- I'm not going to ask myself a question, but...

Q. Well, Officer Jackson arrived within about a minute, correct?

A. Yes.

Q. Was there any reason that you could not have waited one minute before you began to interact with Mr. Miller?

A. Is there any reason why... Well, as -- as -- as part of Step 1 says, "Quickly assess the situation and secure the scene," that's why I walked out from the corner of the house to better view the area where he was -- I'm sorry? Oh, I thought somebody said something.

Q. I didn't hear it.

A. Okay. To better see the area where he was on the deck. And, as I stepped out, that's when he turned to me and that's -- that's when the conversation started with him.

Q. Okay. Did you consider securing the scene by asking Amy Anderson not to stay inside the home?

A. I had a conversation with her about that, and I asked her if she felt comfortable

Page 60

staying where she was where Robert was outside, and she said she did.

Q. And you felt that was acceptable?

A. Where she was in the house, yes.

Q. And so No. 3, you asked questions of Amy to learn about information, correct?

A. Yes.

Q. Step 5 would be to try to keep, in this case, Mr. Miller calm and quiet, and show that you would help -- you would protect and help him, correct?

A. Yes.

Q. You were to act with respect, No. 6?

A. Yes.

Q. And No 7, "Attempt to gain voluntary cooperation," right?

A. Yes.

Q. And now let's look at the things you learned in your mental health first aid course. It was taught my officers in your department. So this is Exhibit 9. Have you had a chance to look at this?

A. I have.

Q. Okay.

Page 61

MR. FRIEDMAN: So can we go to the Action Plan, Carmen, please?

Q. So you understood that you were supposed to follow these five steps in an Action Plan, assess for risk of suicide or harm, listen non-judgmentally, give reassurance and information, encourage professional help and encourage self help?

MS. GILL: Encourage self help?

Q. And other support strategies.

A. Are you asking me if that's what that says there?

Q. Yes.

A. That's what it says there, yes.

Q. And you understood that's one of things that you should do in dealing with somebody like Mr. Miller who was having a psychotic break, correct?

A. That's what I was doing.

Q. Okay.

MR. FRIEDMAN: Why don't we go next, Carmen, to the Try to De-escalate the Situation.

Q. Okay. Do you see these points and how

Page 62

to de-escalate a situation?

A. Yes, I do.

Q. And among the things it says is not to restrict the person's movement, correct?

A. It does say that.

Q. And it says that you should try to be aware of what might exacerbate the person's fear and aggression, correct?

A. That's what it says, yes.

Q. And that means you shouldn't say things that might make the person upset or angry, correct?

A. That's -- that's how I understand it, yes.

Q. And that's something you should have done, correct?

MS. GILL: Objection.

A. That's what I did. I did do that.

Q. Okay. What did you do to try not to exacerbate or make worse Mr. Miller's fear and aggression?

A. I didn't know that there was fear and aggression when I first approached him. I was still -- at that point, I was still evaluating. I

Page 63

didn't know what level Mr. Miller was at.

Q. We're going to get back to that, I think, a little bit later. Let's go on to the section on Listen Non-Judgmentally.

There's some things here to try to do. One of them is to empathize with how the person is feeling about his or her beliefs and experiences, right?

A. That's what it says, yes.

Q. Were you taught that you needed to be -- while you should empathize, that you should be truthful with the person?

A. I'm sorry. Say that again.

Q. Were you trained that if there's a person -- particularly a person having a psychotic break, that you should --

A. There's some background noise. I'm not sure.

MS. GILL: I'm hearing it as well.

MR. FRIEDMAN: I don't know. Not on my end.

MS. GILL: It's like when somebody is talking it seems.

MR. FRIEDMAN: I'm hearing it. I

Page 64

don't see it across here, but...

Q. While you're supposed to empathize with how the person is feeling, were you trained that you are to be not -- to be honest with the person, to tell the truth?

A. I mean, I don't -- I don't remember that exactly, being worded that way.

Q. And you were, going down that list, not to use patronizing statements, correct?

A. Yes. I see that there.

Q. Not to make judgements about the content of the person's belief or experiences, right?

A. Yes. That's what it says there.

Q. Okay. Okay. That's all with this exhibit.

MR. FRIEDMAN: Carmen, you can take that off the screen.

Q. Now, what are "defusing techniques"?

A. I'm sorry. Say that again.

Q. What are "defusing techniques"?

A. I'm still hearing background noise here. I'm not sure what it is.

Q. I'm hearing it, too.

Estate of Robert Miller vs
Sean Roycroft et al.

Sean Roycroft
March 30, 2022

Page 65

MR. FRIEDMAN: Does anyone have a speaker?

A. There it is again.

Q. Yeah, I don't -- I can't explain it.

MS. GILL: I think I'm only hearing it when you say something, Howard, but I could be wrong. We can keep going and see if -- Sean, if it's distracting to you, let us know, and we'll figure it out.

MR. FRIEDMAN: It is distracting. I don't have -- this is the same setup I've used for, you know, two years now. So let's see if we can go on.

Q. Have you heard the term "defusing techniques"?

A. Defusing techniques? I don't know if -- I don't know if I -- I don't remember that exact term.

Q. How about "active listening skills"?

A. I -- I am aware of that term, yes.

Q. What does that mean to you?

A. It means whoever you're talking with or trying to engage in conversation, that you do so intently. That you make -- you try to make eye

Page 66

contact. Those -- you know, those types of things.

Q. Did you learn in your in-service training the signs of somebody being -- suffering from psychosis?

A. Yes, I believe I did.

Q. What's your understanding of the way a person suffering from psychosis would behave?

A. It's not what I would consider normal behavior. They could be talking or trying to converse with someone or something that's not there.

Q. So that would be, like, hearing voices, hallucinations, that sort of thing?

A. Yes.

Q. And you'd say a person having psychosis would be out of touch with reality, correct?

A. Yes.

Q. They might have disordered thinking?

A. Yes.

Q. Could be paranoid?

A. Yes.

Q. Could be irritable and agitated?

A. Yes.

Page 67

Q. Did you understand that if a person was undergoing a psychotic break, that they would be out of touch with reality, and, therefore, unlikely to be able to follow commands?

A. I'm -- I'm getting this -- I think it's an echo from you, Mr. Friedman. I'm not sure.

Q. Yeah. No, I've tried to move my microphone further away because sometimes people say they can't hear me.

MS. GILL: If you want to try your -- try to turn your volume down, if you have it all the way up. That worked for me once before.

MR. FRIEDMAN: I can turn my own speaker's volume down. Let's see if that helps. Okay.

Q. So my question is, did you understand that a person who is having a psychotic break and is out of reach with reality, having hallucinations, would not be expected to follow orders or commands?

MS. GILL: Orders or...

MR. FRIEDMAN: Commands.

A. Orders or commands. It -- yes, that is

Page 68

-- that is something that can happen, yes. I don't believe that that's every situation.

Q. If a person is psychotic and is out of touch with reality, they might not even recognize that you're a police officer, correct?

A. I mean I can't say definitively that that's correct, but I believe it's possible, yes.

Q. Well, can a person talk to nature?

A. That's -- I mean...

MS. GILL: I'm going to object to that question.

A. It -- I think -- hmm. I might be -- I don't know. I might be thinking too much about the question as to -- as to how you're phrasing it. I mean I think just about everybody in the world, I think they talk to themselves. I think there are times when you might get into your own thoughts and you're having conversations. I know I've had conversations with my father since he's passed, those type of things, so, you know, to have a conversation, you know -- I don't know, maybe somebody will say, you know, there's something wrong with me. I don't know, but, you know, you see -- you see a bird land in a tree or

Estate of Robert Miller vs
Sean Roycroft et al.

Sean Roycroft
March 30, 2022

Page 69

something like that near you. You say, "Hey, Mr. Bird" or something like that. Have I done that? Yeah, I've done that, so...

Q. Okay. Well, let me ask a different question. Is it correct that when you spoke to Amy Anderson, she told you that Mr. Miller was hallucinating and talking to people who did not exist?

A. She did say that, yes.

Q. And that's before you first encountered Robert Miller, right?

A. Yes.

Q. So he met at least one criteria for psychosis, he was hallucinating, correct?

A. Well -- yes. That's what she said.

Q. And were you able to confirm that when you observed him?

A. It appeared that he was hallucinating, yes.

Q. Would you expect someone who is hallucinating to also be able to follow commands of a police officer?

A. Would I expect? I don't know if -- I would say it's possible.

Page 70

Q. Back in 2019, had you ever heard the term "excited delirium"?

A. I had not heard that term at that time, no.

Q. Do you know what it is now?

A. I have an idea of what it is.

Q. What is your idea?

A. That when somebody is having a psychotic episode, that -- that it can turn into a medical episode. I don't have a better description of that.

Q. And would certain factors cause it to turn into a medical episode?

A. I'm not -- yeah, I don't know. I don't know how to answer that question.

Q. Okay. When you handcuff a person who is face down on the floor, what were you trained to do next?

A. When we handcuff somebody that's down on the floor, what were we trained to do next?

Q. Yes.

A. It depends on the situation.

Q. How so?

A. Well, if the person is still actively

Page 71

fighting just because they're handcuffed doesn't mean that they're secure, so that -- it depends on that situation.

Q. Were you trained how long you should leave a person handcuffed, hands behind their back, face down on the floor?

A. I can't recall any specific training as far as that goes.

Q. What's the recovery position?

A. Would be on their side.

Q. Why do you do that?

A. It's -- it's a more comfortable position. There is less -- less pressure, depending on the size of the person.

Q. When do you put a person in the recovery position?

MS. GILL: Objection.

A. Depends on the situation.

Q. What do you mean by that?

A. Well, like I explained, if the person is still kicking, fighting, resisting, you're not going to -- unless they -- unless they so choose, you're not going to get them in the recovery position. If somebody is agreeable to be moved

Page 72

into the recovery position, then you can remove -- you can move them to the recovery position. That's more for medical reasons is my understanding of the recovery position, not -- not something to do with handcuffing specifically.

Q. Can you define "positional asphyxiation"?

A. I cannot.

Q. Okay. Did you understand back in 2019 that a person could experience breathing problems if they're positioned on their stomachs and there's any weight put on their back?

A. Did I understand that -- yeah, that is a possibility.

Q. Were you trained in ways to reduce or prevent that problem of -- a breathing problem when you have a prisoner who is on their stomach?

A. I'm sorry. Can you say that again, sir?

Q. How would you reduce or eliminate --

A. There's that background noise again. I...

Q. Okay. How would you reduce or eliminate breathing problems when you have

Page 73

somebody on their stomach?

A. You'd get them off of their stomach.

Q. Do you know what "agonal breathing" is?

A. I've heard the term.

Q. Could the fact that a person is obese make that person more susceptible to positional asphyxiation after a struggle?

A. I can't answer that question. I don't know.

Q. When you're dealing with an individual and there's more than one officer, how many officers should be issuing verbal commands?

A. Well, like, once, again, it depends on the situation. If different officers see different things happening, then you would have multiple officers. For instance, if I were to see -- if I couldn't see -- if I started the verbal commands or the talking and the other officer that was with me, if there were two of us, and he saw a weapon or something like that, he has to speak up and say something, so you would have multiple.

Q. Are you finished with the answer?

A. Yes.

Q. Were you trained at all in recognizing

Page 74

breathing difficulties?

A. Yes.

Q. What was that training?

A. It was my first aid training.

Q. Okay. And what did you learn about breathing difficulties?

A. If -- you look -- depending on the situation, you look for a normal air exchange, breathing in, breathing out, the rise and fall of a chest. Sometimes you can hear it -- you can hear somebody breathing.

Q. And how were you trained to recognize breathing difficulties?

A. The same way. If it doesn't sound normal to you, then -- then you need to look further.

Q. And did you have training to identify what you would say is breathing that does not "sound normal"?

A. Did I have training as far as that goes?

Q. Yes.

A. I believe it was part of the first aid. Like I said, if you -- if you can tell that

Page 75

someone is not having a normal air exchange, then, yes, they're having difficulty breathing.

Q. Were you ever taught about a tactical plan?

A. Was I ever -- tactile plan? I don't have any direct recollection of any training as far as -- I mean we were taught tactics.

Q. Were you taught to have a plan before beginning interacting in incidents?

A. If you're able to, yes.

Q. In confronting a person who's mentally ill, were you taught to use time and distance?

A. Once, again, it depends on the situation.

Q. Were you taught about using time and distance as a tactic with regard to people who are mentally ill?

A. I was taught time and distance. It doesn't have to be somebody that's mentally ill. It's -- it's really -- it could be any situation.

Q. Were you taught if a person is suffering from psychosis, to keep your distance from the person, not get too close?

A. I don't recall that specifically, no.

Page 76

Q. What's a "contact officer"?

A. Just exactly what it says, it's the person -- the officer that's going to make contact.

Q. What's a "cover officer"?

A. Exactly what it says, cover. He's going to provide cover to that officer.

Q. Were you taught how to do a team takedown?

A. Team takedown, two or more people involved in the takedown, is that what the question is? I mean I -- I don't remember specifically being taught a team takedown. I don't recall that term.

Q. Okay. Had you ever encountered a person who was having a psychotic break like Mr. Miller before this in your career as a Barnstable police officer?

A. I have. I'm -- I'm not a doctor, so to be able to put a medical term on it like that, no, but I'm also -- I'm able to understand when someone is not normal behavior, I guess is what -- how I feel comfortable terming it.

Q. Well, you were trained even to

Estate of Robert Miller vs
Sean Roycroft et al.

Sean Roycroft
March 30, 2022

Page 77

determine someone who's having psychosis, and we went through some of those symptoms, like, having hallucinations?

A. We did.

Q. Okay. Have you had other incidents where you were dealing with somebody having hallucinations, that sort of thing?

A. Yes.

Q. Did you handle the situation just by yourself or did other officers assist?

A. I can't remember each and every one off the top of my head here. There was an incident where the -- I did -- I pulled up on the scene. It was in front of a pizza shop, and I did have -- I did have conversation with a woman. I knew backup was in route, and I had conversation with her. So I was by myself. I'm not sure of the exact time until backup arrived.

MR. FRIEDMAN: Okay. Why don't we take a break here. I think it's a good time for a bathroom break, maybe ten minutes, and then we can come back, and I think we'll begin to talk about the incident.

MS. GILL: All right.

Page 78

(Recess taken.)

BY MR. FRIEDMAN:

Q. Okay. Mr. Roycroft, we are back from the break, and I want to go back and ask you about your experience with Jiu Jitsu.

Do you do Brazilian Jiu Jitsu?

A. Yes.

Q. And do you have a belt?

A. I have a blue belt.

Q. What level is blue?

A. So the level's white -- white is your starting belt, then blue, purple, brown and black.

Q. Do you ever compete in competitions?

A. One time.

Q. When was that?

A. I can't remember exact. It might have been around 2017, thereabouts.

Q. Where was the competition?

A. Boston. I didn't do well.

Q. Sorry to hear that.

So who was your trainer?

A. Juliano Coutinho.

Q. And is Juliano still training on the Cape?

Page 79

A. I believe he is.

Q. How long did you train in Jiu Jitsu?

A. Maybe a little over two years.

Q. Did any other Barnstable police officers work out at the same studio as you?

A. Yes.

Q. Who else worked there?

A. Let's see... Joe Green -- Sergeant Green, Anthony D'Angelo. He's also a sergeant now. I can't remember -- I can't think of anybody else off the top of my head.

Q. The hold that you refer to as a seatbelt hold --

A. Yes.

Q. -- there's a hold like that that is used in Jiu Jitsu, correct?

A. It's -- it is, yes, the same description is the word I'm looking for.

Q. Okay. But it's used differently, is that right, than --

A. Well, it depends. Yeah, it depends -- it depends on the situation. I mean if we're talking about Jiu Jitsu training, it's -- it depends on the situation that you're training at

Page 80

that time.

Q. What do you mean by that?

A. Well, it -- it depends on the -- the techniques that you are training at that particular time. Whether you -- the seatbelt hold or what would be described as the seatbelt hold in Jiu Jitsu is -- it's a starting point. You transition from there to -- you can transition from there to different holds.

Q. What do you mean by that?

A. Well, you could -- you could transition from the seatbelt hold to a rear choke in Jiu Jitsu. There are other holds that you could -- that you could go to from there. You can -- there's a term that we use if you're in a seated position and you have somebody in that descriptive seatbelt position, you want to try to get your hooks in. What they mean by that is, you want to get your heels and ankles inside their legs to be able to limit the movement of their legs and their hips.

Q. You mentioned the rear choke. You go from a seatbelt hold to a choke and cut off circulation until the person taps out, is that one

Page 81

thing that you can do?

A. In Jiu Jitsu? Yes.

Q. And would you say that things that you can do in Jiu Jitsu, you can't do as a police officer, correct?

A. Correct.

Q. Do you still practice at all in Jiu Jitsu?

A. I haven't in two years, and that was because of Covid, things like that.

Q. Okay.

A. And my move to here, here to Florida.

Q. So you practiced up until Covid hit, I guess?

A. Yes.

Q. Now, I promised we'd get to the incident, and I will.

Before this incident, did you know Robert Miller?

A. I did not.

Q. Did you know Amy Anderson?

A. I did not.

Q. Had you ever been to 45 Elm Street in Hyannis before?

Page 82

A. Not that I can recall.

Q. The only information you had when you got there was the information that was transmitted to you by dispatch, correct?

A. Yes.

Q. And when you arrived, you met Amy Anderson?

A. Yes.

Q. Okay. Was she outside, inside when you first arrived?

A. She was inside the front door.

Q. She was looking for you to arrive?

A. Yes.

Q. Okay. And you had some conversations with her, correct?

A. Yes.

Q. Did she answer all of your questions?

A. I believe she did.

Q. Did you have any additional questions for her?

A. I don't recall.

Q. Did you ask her whether there were any other people in the house?

A. I can't remember if I asked that or

Page 83

not.

Q. Would that be a concern of yours, that there might be other people inside the house?

A. I guess it would be a concern, yes.

Q. Was there any reason you didn't ask her that question?

A. I don't know. I don't know if I did or if I didn't.

Q. Okay. When you were talking to Amy Anderson, at that point was it your view that there was an emergency that you needed to take immediate action?

A. I don't know if I would term it as an emergency. There was definitely concern when I could hear -- I could hear Robert out on the deck.

Q. Did you ask her how long he had been in this psychotic state?

A. I can't -- I know that there was conversation about medications and things like that. I believe she said that she believed that he hadn't taken his medication in, I would term it as several days. I think she also made reference that he hadn't slept in several days.

Q. But you didn't learn how long he had

Page 84

been in the psychotic state?

A. No. Not exactly, no.

Q. Did you assume from what she said that if he hadn't taken his medication or been sleeping for several days, that he'd probably been in a psychotic state for several days?

A. I think that's a proper assumption.

Q. As we said before, she told you that Mr. Miller was hallucinating and talking to people that didn't exist, right?

A. Yes.

Q. And you could hear Mr. Miller yelling?

A. Yes.

Q. And one of the things she told you was that she was very concerned that Robert Miller would be angry at her for calling the police, correct?

A. Yes.

Q. So having heard that, you'd know that it probably wouldn't be a good idea to tell Robert Miller that you were there because Amy Anderson called the police, right?

A. Well, not necessarily, no.

Q. Well, you didn't want to have Robert

Estate of Robert Miller vs
Sean Roycroft et al.

Sean Roycroft
March 30, 2022

Page 85

Miller become angry at Amy Anderson, correct?

A. No, I did not. I didn't want Robert Miller to become angry with anyone.

Q. And Amy felt like if he learned that she was the one to call the police, he would become angry at her?

A. I remember that there was conversation about that, yes.

Q. Now, you say in your report that you briefly considered the best way to approach him. Is it the fact that you asked if you could go through the house and she said no?

A. I don't know if it was termed exactly like that. There was conversation about that.

Q. Well, did you suggest going through the house?

A. I might have asked if going through the house or going around the outside.

Q. And what did she say?

A. She directed me around the outside of the house.

Q. And that would be consistent with her not wanting Robert Miller to know that she had let police officers into the house and called police,

Page 86

right?

A. You'd have to ask her that question.

Q. Now, you say in your report that before you left her, you made sure she felt safe staying inside the house. Can you explain what you said?

A. That's exactly what -- I believe that's exactly what I asked her. I don't know if it was word -- it's not word for word, I don't believe, but if she felt comfortable staying in the house or if she wanted to come out.

Q. Why did you ask that question?

A. Because she appeared to be afraid. I knew he was out on the back deck.

Q. Did you consider asking her to, for example, go to a neighbor's home?

A. I can't remember if I asked that specifically.

Q. Did you ask things to indicate that it might be better if she were removed from the scene completely?

A. I don't -- I don't know if -- I don't remember having that kind of conversation with her.

Q. In your conversation with Amy Anderson,

Page 87

she did not say to you, "I'm afraid of Robert Miller," correct?

A. Not verbally.

Q. Well, she didn't -- so the answer to that, when you say, she did not say she was in fear of Robert Miller, your answer is, she did not say that, right?

A. My answer is that she verbally didn't say that.

Q. Okay.

A. But from her demeanor, she was -- I felt as though she was afraid.

Q. Okay. I'm not asking what you felt from her demeanor. I'm asking the words that she said. Am I correct she did not say, "I'm afraid of him," "I think he might hurt me" or anything like that?

A. Those exact words, but you -- conversation is both verbal and nonverbal, and her nonverbal was that she was afraid of him, and that's what -- that was my understanding and that's how I felt at that time, that she was afraid of him.

Q. Now, she appeared to be frightened,

Page 88

correct?

A. Yes.

Q. And if a person you love is hallucinating and is no longer in the mental state that you've known him to be in, that's frightening, isn't it?

A. I've never -- I've never been there myself personally, so...

Q. Let me ask you personally, have you ever seen a person having a seizure, like, an epileptic seizure?

A. Yes.

Q. It's frightening, isn't it?

A. I -- I -- I guess that would be -- it would depend on the person that's looking at it, that's doing it.

Q. Well, if you see a loved one having an epileptic seizure, you're seeing somebody that you love who's now out of control and they're moving, they're not in control of their motions, and if it's a person you love, that's frightening, wouldn't you agree?

A. Yes. I guess somebody having an epileptic seizure would be frightening to somebody

Page 89

that cares about that person, yes.

Q. And seeing somebody who's psychotic and having hallucinations would be frightening to someone who loves that person, correct?

A. I guess it would be, yes.

Q. And the only fear she had was that if Robert knew she had contacted the police, he would be angry with her, that's what she said, right?

MS. GILL: Objection.

Q. I'm sorry. I thought I was reading from your police report. Is that what you put in your -- I mean from your interrogatories. Did you say in your interrogatories, Amy Anderson was very concerned that he, referring to Robert, would be angry at her for calling the police?

A. I believe I did.

Q. Okay.

A. I don't have it in front of me.

Q. But that's the only thing she said about fear or anger, she was worried if Robert knew she contacted the police, he would be angry, right?

A. I -- I'm not sure if that's the only thing that she said. I remember her saying

Page 90

something along those lines.

Q. Well, in this case you took a month and a half to write your report, correct?

A. No.

Q. Well, you wrote it and then it was going through editing with your superiors; am I right?

A. Well, it -- it's my understanding it took -- it took that time to -- for it to be entered into the IMC. Not to write the report, no.

Q. You weren't getting e-mails back and forth up until shortly before it was finally entered?

A. I believe that I was. There were -- there were e-mails, yes, there were, but the way I just took your question was, that it was definitive, that I waited a month and a half to write my report. No.

Q. And at some point you were interviewed by the state police, right?

A. Yes.

Q. Okay. And you answered interrogatories, right?

Page 91

A. Yes.

Q. Are you saying now that you didn't include all the important facts in any of those documents, the things that you think you may have forgotten?

A. I'm sorry. Say that again, please.

Q. Well, you're saying you're not sure whether perhaps you said something and I'm asking you, there's nothing in any of the -- in your report, your interview with the state police, your interrogatory answers that would indicate she said anything else other than she was afraid Robert would be angry with her if he learned she had contacted the police; is that correct?

A. Yes.

Q. She didn't say, "I'm afraid of Robert," correct?

A. I don't know if she did or she didn't. I don't remember if she did or she didn't say that.

Q. If she said, "I'm afraid of him," would you have written that in your report, mentioned it to the state police or included it in the answers to interrogatories?

Page 92

A. Well, she said that she was afraid and I --

Q. She said she was afraid?

A. She said she was afraid that if -- if -- if -- not only -- I took it that not only if she knew that she had -- if Robert knew that she was the one that called the police, but that she was also -- that she was afraid of him. I don't remember if she said that she was afraid of Robert directly or not. I don't.

Q. Well, did you remember it when you wrote your police report?

A. I don't know. That, I don't know.

Q. Okay. Well, did you remember it when you spoke to the state police?

A. I -- I don't remember the state -- I don't know if the state police asked that question.

Q. You don't believe they asked you?

A. I don't -- I don't remember if they asked me that question about whether she was afraid or not.

Q. Okay. So now you think she might have said she was afraid, even though --

Estate of Robert Miller vs
Sean Roycroft et al.

Sean Roycroft
March 30, 2022

Page 93

A. No, that's not -- no, sir, that's not what I said.

Q. Well, do you think she said it?

A. I -- I don't know if she said it or she didn't say it. I don't know.

Q. Okay. But if she said it, that would be the kind of thing you should write in your police report, correct?

MS. GILL: Objection.

Q. Her objection is to the form of the question. I'm not quite sure what she thinks is wrong with it, but you can still answer it.

A. I don't know.

Q. Well, you said earlier that you spent more time writing this report because you understood that it was important and there might even be further legal proceedings, correct?

A. I don't know if it was termed exactly like that.

Q. You knew this was an important report, it was important to get it correct, to get it right, am I correct in saying that?

A. Well, every report that I've -- I've ever written is important, and it is. It's

Page 94

important to get -- to get the facts straight.

Q. If the result of the interaction, a person dies, it would be important to be very careful in your report and make sure you've included everything that happened, right?

A. Well, to say -- the way I take that question is that, this was, you know -- that -- that I wouldn't have put the same care and time into writing my report if Mr. Miller didn't die.

Q. Well, most of your reports you write, it doesn't take as long as it took for this report to be finally put into the system, correct?

A. There have been reports in the past that have been entered into the system this way. This -- this -- writing my report the way that I did in Microsoft Word first is that that was instructed by my supervisors. That's why that report was done this way.

Q. Well, you talked earlier about when you were there dealing with Mr. Miller, you felt you had to make split-second decisions, didn't have time to evaluate, right? Remember that?

A. Well, I made split-second decisions. I -- I don't recall saying I didn't have time to

Page 95

evaluate.

Q. Okay. So now you did have time to evaluate and --

A. No, that's -- no. No, no, no. No. No.

Q. Okay. I'm confused.

A. No, sir. I'm confused, too. I don't remember saying that I didn't have time to evaluate. Even -- the entire time, my entire contact at the scene from when I arrived or even from the time I was dispatched, I was evaluating, so to say that --

Q. Okay. Well, I was only saying that to contrast it here with this. You had as much time as you needed to write your report, correct?

A. Yes.

Q. And when edits were coming back from your superiors, if you read it over and thought, "Gosh, I remember something else," you could have put it in the report, correct?

A. Yes. I also remember in one of those e-mails, one of my superiors didn't like the term "seatbelt," but I was insistent on leaving it in there, so there's --

Q. Okay. Deputy Chief Balcom didn't like

Page 96

the term "seatbelt"?

A. Yes. I believe it was him, yes.

Q. In fact, what he said was he had never heard of that hold; isn't that correct?

A. That sounds correct, yes. I don't know if that's -- if he had said if he had never heard of it. I don't...

Q. Okay. Now, go back a bit because you just said on your way to the scene, you were evaluating the situation. Can you tell me what process you had while you were driving to 45 Elm Street?

A. I -- every call that I'm dispatched to, I try to, in my mind, get myself mentally prepared for whatever I'm going to see or could possibly see. You can't cover everything obviously, but getting my mindset that, "All right. This is a mental health situation. I need to -- I need to be prepared and -- so that I -- I -- I can approach this in the way that we're supposed to approach it, the way that we've been trained to approach."

Q. Okay. What else were you thinking as you were on the way to the scene?

Page 97

A. I'm thinking safety issues, that -- that the phone call was disconnected. When Amy -- and, forgive me, I forget her last name.

Q. Anderson.

A. Anderson. Ms. Anderson, that the -- that the call was disconnected and so there's some concern there as to why the call was disconnected.

Q. Did you ask Amy Anderson, "Why did you disconnect from the call"?

A. I -- I don't know if I -- if I got to that or not to be honest with you. I don't remember asking that specific question, but I'm not sure.

Q. Well, in your mind you were concerned about the call being disconnected, correct?

A. Yes.

Q. What did you do as a result of that concern?

A. I -- I ran lights and siren to the call to get there as fast as I could.

Q. Okay. So you had your siren on when you got to the house?

A. Not when I got there, no. No, I had shut my siren. So Winter Street is the main road

Page 98

heading into Elm, and I shut my siren down.

Q. Why did you shut your siren down?

A. Because I knew I was approaching the house, and I didn't need to have the siren on, because if I remember correctly, the traffic didn't -- I didn't need my siren on. And I had shut --

Q. Was -- go ahead.

A. I had shut my blue lights off as I turned onto Elm Street.

Q. Was it because you didn't want a person who might be having a psychotic break to hear the police coming?

A. I don't know if I had that thought.

Q. Did Amy tell you that Robert had ever assaulted her?

A. I don't know if -- I don't believe we had that conversation at the door -- at the front door. I don't think she ever -- I don't think she said that he had ever assaulted her. Not at that time, no.

Q. At any point did she say that Robert had assaulted her?

A. Not -- not that I can recall with my

Page 99

interaction with her at that time at the door.

Q. At any time did she say that Robert had ever assaulted her?

A. I do remember some -- a conversation. I can't remember who it was with at the scene. I do remember hearing part of a conversation involving something like that, and there was something -- it was about a previous incident with Robert where -- and I remember that she had relayed that he was admitted to the psych. center at Cape Cod Hospital at one time.

Q. And this took place after Robert died, correct?

A. I -- I believe it was. I don't know if I had -- it was at the house. I don't know if -- I think it was before I was notified myself that Robert had passed.

Q. Well, you knew that he had no pulse and he wasn't breathing on his own, correct?

A. I knew that there was no pulse, and I knew that, you know, that we had performed CPR. And I knew that the Hyannis Fire Medical personnel had taken over his care, as far as that goes. Once he was taken from the house to the ambulance,

Page 100

I -- I don't know.

Q. You knew that when the police defibrillator was applied, it advised no shock, correct?

A. Yes.

Q. And do you understand what that means?

A. It means no shock. No shock advised.

Q. Do you know why it would advise no shock?

A. No, I don't.

Q. Okay. Had you ever learned about PEA or Pulseless Electrical Activity?

A. I don't believe so.

Q. Did you know that his heart wasn't in a rhythm where a shock would be able to restart it?

A. I just know that with the AED, no shock advised, it's no shock advised.

Q. Let's go back on track here. Because when you first -- I'm sorry.

When you first encountered Amy Anderson, she did not tell you that Robert had assaulted anyone, correct?

A. She did not, no.

Q. Thank you. And you understood before

Page 101

you got there that this wasn't a call for a criminal situation, for an arrest. It was a call to provide medical help for a person who was having a psychotic break, correct?

A. Yes. That's how the call was dispatched.

Q. And you understood that Amy Anderson wanted to get help for Robert Miller, correct?

A. Yes.

Q. And the call remained a medical call throughout, correct?

A. No, I would -- I wouldn't say that it remained a medical call throughout. It also became a concern of safety at one point.

Q. Would you say that --

A. Safety for Amy inside the house.

Q. Did it move from a call for medical help to a criminal call calling for an arrest?

A. No. I don't believe -- not at that time, no.

Q. At any time were you thinking, "I'm going to make an arrest"?

A. I mean, no, I never had that -- I never had time to have a thought like that. I didn't --

Page 102

it was -- it was a call regarding Mr. Miller's mental health, his mental health status at that time that evolved into -- well, it didn't -- there's always a safety concern on any call you go to, but this one here with -- with some of his actions that heightened my concern as to my safety, her safety and also his safety.

Q. Okay.

A. Did I specifically have a thought to -- that -- that I was going to arrest Mr. Miller? No, I didn't have any -- there were no charges to arrest him for.

Q. So you spoke to Amy Anderson, you asked her questions, she answered your questions, correct?

A. Yes.

Q. And you had time to ask her further questions, but you felt you had enough information to go round back, correct?

A. Well, you -- I feel as though you're putting words in my mouth with how you're -- you're putting these questions to me.

Q. Have you been cross examined before?

A. Yes. Many times.

Page 103

Q. Okay. So you know all I'm asking you to do is answer my questions, you know, and just answer them truthfully. That's all that you can do.

A. And that's -- yes, sir, that's exactly what I'm doing here.

Q. Okay.

A. So --

Q. Go ahead.

A. So if you could just repeat that last question one more time.

Q. Sure. You felt that you had all the information you needed from Amy Anderson when you decided to go round back, correct?

A. I never had that conscious thought, no. I -- from him yelling, she -- she had a concern about her that -- that "He's out on the deck." He's -- you know, "He's out the deck. You can hear him yelling," and I could hear him yelling, so I went to a place at the corner of the house, like I said, where I could first observe. And that's -- that's exactly what I did.

Q. I know that. But what I'm asking is, did you feel that you had the information that you

Page 104

needed from Amy, you had no more questions to ask her, you were now ready to go round back?

A. I mean to say that I -- no, I did not ask her more questions. And, yes, I did make my way to go around to the back, and I actually didn't go to the back. I went to the side of the house.

Q. You went to the side and the rear of the house, correct?

A. At -- at the corner, yes.

Q. And from the corner you saw Mr. Miller was on the deck, and what was he doing at that point?

A. He was talking, looking up in the sky. I couldn't understand exactly what he was saying, but he was -- he was speaking words. Like I said, I don't know what he was saying.

Q. Okay. Was he threatening anyone at that time?

A. There was no one else there.

Q. Was there an emergency that required you to move in without waiting for Officer Jackson to arrive?

A. I would -- no, there was no emergency.

Estate of Robert Miller vs
Sean Roycroft et al.

Sean Roycroft
March 30, 2022

Page 105

Q. Okay. So you first see him from the corner. What happens next?

A. I watched him for, I can't say how long it was, and I walked out from the corner of the house and started walking towards him a little bit, and that's when he saw me, I guess, and turned in my direction.

Q. Okay. And what did -- how did he look?

A. He was only wearing sweatpants. He didn't have -- he didn't have shoes or shirt. His -- he looked dishevelled. His hair was a mess. He was sweating.

Q. So what did you conclude from that?

A. I don't know that I had an exact conclusion at that point. He looked at me and so when he looked at me, I believe, I said something along the lines as, "Hi Robert. How ya doing" or something along those lines.

Q. And what happened then?

A. He answered. He said -- I might have -- I might have said, "What's going on today" or "How's it going" or something like that. He said, "I'm just having a talk with nature."

(Reporter clarification.)

Page 106

THE WITNESS: He said, "I'm having a conversation with nature" or "a talk with nature," something along those lines.

Q. Okay. What happened then?

A. So I said something along the lines that, "I do that from time to time. I'll have a conversation with nature."

Q. Is that true?

A. Yeah, absolutely.

Q. You talk to nature?

A. And -- well, here -- here we go again. I mean -- yeah. I mean, like I said before, you know, if I'm driving down the road and, you know, a thought enters my mind or something like that, you might, you know, in your own mind -- for me, it's more of a conversation with myself. To have a direct conversation with nature in the same way that I felt Robert Miller was having a delusional conversation with nature, no.

Q. So you wouldn't be having a conversation in the same manner he was?

A. Say that again.

Q. You would not converse with nature the same way he was?

Page 107

A. Delusional, no.

Q. How could you tell that his was delusional?

A. Just the way that he was talking. He -- I think -- I think -- my feeling was that he believed somebody was there.

Q. What do you mean by that? Somebody was where?

A. That somebody was there. That whatever it was, an animal, a person, something. I felt that he -- he was convincing that he was having some kind of conversation with nature. Whatever that nature was, I don't know.

Q. And when you first saw him, you could tell that he was not well, correct?

A. Right. He didn't look well.

Q. And the first thing you said to him was, "Hey Robert, what's going on, pal," correct?

A. I don't know if that's how I worded it. I can't remember. It could be.

Q. Is that what you told the state police?

A. It -- I believe that that is in the report with the state police. Like I said, I don't know if that's exactly what was said when I

Page 108

approached. I don't believe that that is in -- in my report.

Q. But it is in your answer to Interrogatory 9, correct?

A. I'd have to see it. I don't know if it's nine or not. I'm sorry. I don't know.

Q. Do you want to take a look?

MR. FRIEDMAN: Carmen, do you want to show his answer to Interrogatory No. 9?

Q. Where I believe it says that you said something to the effect of, "Hey Robert, what's going on, pal?" Do you see that?

A. I do see that.

Q. Okay. You said, "What's going on, pal?"

A. Well, that's what I said there.

Q. Okay.

A. I don't remember that being what was said, you know, when I -- when I approached him.

Q. Okay. Now, so earlier when I asked whether you read the answers to interrogatories and they were accurate, you're not sure this is accurate?

A. That could be, and I'm -- that could be

Estate of Robert Miller vs
Sean Roycroft et al.

Sean Roycroft
March 30, 2022

Page 109

how I worded it when the question was posed to me at that point. I feel as though my report is a more accurate depiction of what I said when I approached him -- when I approached Mr. Miller when he was on the deck.

Q. Why would that be?

A. Why would what be?

Q. Why would the report be more accurate than the interrogatories which you signed under the penalties of perjury? And you signed this interrogatory September 21, 2021.

MS. GILL: Objection.

A. Well, it's -- it's -- for me, it's the same meaning, whether I said "pal" or, you know, if I had walked up to him and said, you know, "Hey friend," "Hey buddy," something like that. It -- it all has the same meaning to me. The word might be a little bit different.

Q. Okay. So you might have said, "Hey pal," "Hey friend" or "Hey buddy," right? Words to that effect?

A. Something, "Hey Robert. What's going on today? How you doing?" Something along those lines.

Page 110

Q. Let me be clear. Robert was not your pal, your friend, your buddy, right?

A. Robert was not my friend, my pal or my buddy. That's a term of endearment that I use when I approach anyone, when I meet somebody on the street. It's a term that I use here with my job parking cars for the Tampa Bay Rays when somebody pulls up to pay their $10 to go park.

Q. You say, "Hey buddy" or "Hey pal"?

A. I could. I have. It's a term -- for me, it's a term of endearment.

Q. No one has suggested it might also be condescending when it's not true?

A. Nobody has ever said that to me. And I was in no way being condescending when I approached Robert. And whenever I've used that term with anybody, I was not being condescending.

Q. Okay. And after you said that, what did you say to Robert Miller?

A. I think it was something along the lines of, you know, "I do that from time to time, too. I can have a conversation with nature."

Q. Okay. What did you say after that?

A. I think -- it was something along the

Page 111

lines of, "Robert, could we have a conversation?"

Q. Okay. And then he said, "Sure. Come up on the deck"?

A. Something along those lines, yes.

Q. Okay. And what happened then?

A. I stepped up onto the deck.

Q. Okay. And after that?

A. I think he -- at that time I think he just was staring at the ground. I can't remember. I don't know if he was saying anything.

Q. When you first talked to him, his voice was calm, correct?

A. Yes.

Q. And then he had an empty stare?

A. Yes.

Q. He was looking at the ground, right?

A. Yes.

Q. And then you said, "Your wife called because she has some concerns about you," right?

A. Yes.

Q. And that's when he stared at the ground and then turned away from you, correct?

A. Correct.

Q. His demeanor changed once you told him

Page 112

that his wife had called because of concerns about him; isn't that right?

A. I can't say if it was right away that he turned right after I said that. It was, you know, not long.

Q. Okay. And what happened then?

A. That's when he turned and walked away from where we were standing towards the house. There was a broken plant pot that was -- I believe it was ceramic that was in pieces on the deck, and he walked over and stood over that.

Q. You say he stood over it?

A. He was standing right there, yes.

Q. Okay. Did you say he stood over it in your report or your answers to interrogatories or your interview with the state police?

A. I'm sorry. Say that again.

Q. Did you say he stood over the broken pieces of pot in your --

A. I might have worded it that he stood near it.

Q. Okay. Is this the same as the broken figurine?

A. Could be the figurine, yes. I just

Estate of Robert Miller vs
Sean Roycroft et al.

Sean Roycroft
March 30, 2022

Page 113

remember it was a ceramic -- a ceramic piece that was broken into pieces.

Q. Did Robert ever pick up any piece of a broken figurine or pot or anything like that?

A. No, he did not.

Q. And you -- you've tried to stay close to Robert; isn't that correct?

A. Yes.

Q. Why were you trying to stay so close?

A. Because I knew Amy was in the house. And also that I wasn't sure if he was going to try to pick up a piece of that figurine.

Q. What led you to think he might pick up a piece of the figurine?

A. Because he walked towards it.

Q. Is there anything else that made you think that?

A. His behavior, his state of mind, where -- where he was at in a mental health episode.

Q. Could you explain that?

A. It's exactly what we've been talking about, his -- his talking to nature, his -- his behavior, his appearance.

Q. Why don't we take a look at a

Page 114

photograph of the deck. It's been marked as Exhibit 11. Okay. Does this show the deck that you saw that night or that day?

A. It is, yes.

Q. Okay. And we see there's, like, a dumbbell over to the left, there's a pizza box, correct?

A. I see those, yes.

Q. Were they there when you were there?

A. I believe they were.

Q. Okay. And we can see in the far right, I believe, we see a slider that's on the deck, correct?

A. I can't -- yeah, I see something there.

Q. Do you see like a white line there?

A. I do.

Q. Okay. Is that the slider or not or you can't tell?

A. It looks like -- it looks like it is part of a slider, yes.

Q. Now, this is the only photo we have of the deck. Can you tell looking at this where this broken figurine was?

A. It -- so if you look at the back door,

Page 115

I think, that's a garden hose that's there. It would have been over on that side of the door between the railing and the door.

Q. So it's not -- it should be in this picture but it's been removed apparently?

A. I don't -- I don't see it there.

Q. Okay. That's enough with this picture. So you're staying close to Robert and he gets to the slider door, and then what happens?

A. Well, it -- when he was standing at the -- at the broken ceramic pieces there, that's when I think I used the term, he "flipped a switch" and that's when everything changed. He became angry, and he said -- he said, "Fuck you." Something along the lines, "I'm not fucking talking to you," and he just turned and moved quickly --

Q. Okay.

A. -- towards that slider.

Q. And he said that after you had said your wife called because she has some concerns about you, correct?

A. I'm sorry. Say that again, please.

Q. Sure. Just before he went to the figurine and then went to the door, you had said

Page 116

the following things, I'm reading from your police report: "Your wife called because she had some concerns about you. I asked again if we could talk." And that's -- after that is when this process began where he "flipped the switch"?

A. No. Not at that -- not at that exact time, no.

Q. How much time went by from the time you said that until the switch was flipped?

A. I'm not sure exactly. It would have been -- I would say probably less than a minute because he turned, he walked over towards where the ceramic pieces were on the deck. He was there -- stood there for several seconds, I would say, and it was after that that the switch flipped.

Q. Okay. Now, his demeanor had changed from calm to angry?

A. Yes.

Q. Could you see anything that might have caused him to become angry?

A. Nothing specifically, no.

Q. Okay. And after he said, "Fuck you. I'm not talking with you. Get to fuck away from me," did you try to get away from him?

Page 117

A. Did I try? No, I did not try to get away from him.

Q. You got closer to him?

A. At that time, no. I was -- I didn't move. I didn't move closer than I was.

Q. Okay. What happened then?

A. He was making fists and clenching his fists, and he just turned and moved quickly towards the slider, towards the door.

Q. When you say, "He was making fists," did you think he was going to try to punch you?

A. I didn't know what he was going to do.

Q. What was he doing with his fists?

A. Shaking his fists.

Q. You don't know what he was going to do because he was out of touch with reality, correct?

A. I can't answer that question.

Q. Okay. He began to go into the house and grab the handle of the door?

A. Yes.

Q. And you asked him to stop?

A. I did.

Q. That wasn't effective, correct?

A. It was not.

Page 118

Q. And then you told him that more than once, correct?

A. Yes.

Q. Okay. And what happened at that point?

A. He pulled the slider open, stepped -- immediately stepped into the house and went right for the dining room table.

Q. That dining room table was directly in front of the slider door, correct?

A. Yes.

Q. Okay. Did he say anything to you at that point?

A. No.

Q. Let's make it easy. After -- after he said to you --

A. I'm sorry. I didn't hear what you said.

Q. After he said to you --

A. No, there was something before that, sir. I'm sorry.

Q. Well, I'm rephrasing the question.

A. Okay.

Q. New question. After Robert Miller said to you, "Fuck you. I'm not talking with you. Get

Page 119

the fuck away from me," did you ever hear him say anything else?

A. No.

Q. So when he was on the table, you didn't know from him what he was trying to do, did you?

A. I didn't know exactly, no. He was reaching on the table.

Q. And you didn't see what was on the table until after Mr. Miller had left in the ambulance, correct?

A. Correct.

Q. But once -- once someone is inside their home, virtually anything in the home could be a weapon, correct?

A. Yes.

Q. At that point did you know where Amy Anderson was?

A. I can't remember if it was exactly at that point, but it was very close to that time, I did catch a glimpse of her out of the corner of my eye, and she was off to the left. I can't remember if it was -- it was during -- it was during the struggle that I noticed her.

Q. Have we gotten to the struggle part

Page 120

yet?

A. As soon as he went onto the table, that's -- that's when it started.

Q. As soon as he went on the table, that's when you did the seatbelt hold?

A. It was actually before. As soon as we stepped inside, that's when I grabbed him by his arm. He pulled away, dove onto the table. Not on top of the table but reached over the table and that's...

Q. You grabbed his arm. What was your purpose in grabbing his arm?

A. To get his attention because he wasn't listening.

Q. So it wasn't to stop him from going inside the home?

A. He was already inside the home.

Q. Were you trying to get him to go out -- the other direction back out on the deck?

A. I was -- I was trying to get his attention at that time to see if -- with physical contact, if I could get his attention because he wasn't listening to my words.

Q. In your police report, did you say, "I

Page 121

grabbed him by the arm to stop him"?

A. It could have been what I put in the report, yes.

Q. Is that why you grabbed his arm, to stop him?

A. To stop him and to get his attention.

Q. Okay. Why don't we look at Exhibit 12, a photograph of the dining room and slider. Okay. So this photograph is from inside, and we can see that open gap on the right is where the slider was; is that correct? I'm sorry. On the right. Do you see that?

A. I do. Yeah, it's just -- it's the open door, and it looks like I can see a corner of part of the sliding door that's laying on the deck.

Q. Okay. Now, is the position the table is in in this photograph where it was when you first entered?

A. I'm sorry. There was background noise again.

Q. I'll rephrase.

Was the table moved from when you first entered? Is, in other words, what's shown here different from when you first entered?

Page 122

A. It might have been moved a little bit. It was definitely moved during the struggle.

Q. Okay.

A. I believe that the table was more towards the middle of the floor, not as close to the wall where it shows under the window there.

Q. Okay. If you look at the table, there's two curved parts. There's a sectional part in the middle. Was that pushed in when you and Robert were on the table?

A. I can't -- I don't know, sir.

Q. Okay.

MR. FRIEDMAN: Carmen, you can take back the photograph now.

Q. How long were you on the table?

A. It would have been seconds.

Q. Okay. At the time that you and Robert were on the table, how long had you been at 45 Elm Street?

A. It would be minutes. I'm not sure exactly how long.

Q. You think it was more than one minute?

A. Yes.

Q. Did you learn that Officer Jackson was

Page 123

present while you and Robert were still on the table?

A. I'm sorry?

Q. Did you learn that Officer Jackson was present while Robert was still on the table?

A. No.

Q. Okay. After the seconds when you first put Robert in the seatbelt hold, what happened next?

A. I pulled back to get him off the table.

Q. Okay. What happened then?

A. I didn't -- I didn't even realize at that time that when we pulled back off the table, that at some point, and I'm not sure exactly when, that we hit the slider and knocked the slider out of the frame because immediately from there, Robert was dragging me across the floor moving forward.

Q. He was moving forward?

A. I was trying to hold him back, and he was pulling me forward.

Q. Okay. He was heading towards the office area?

A. From the diagrams, yes, that's -- that

Page 124

I remember looking at, it was, yeah, what they call the little office area.

Q. Okay. And I think that's our next photograph. Why don't we look at Exhibit 13. So this -- this shows the table is off to the right and then forward from that there's a railing and then one step and that would be the office area?

A. Yes.

Q. And you say that Robert was pulling you in that direction?

A. Yes.

MR. FRIEDMAN: Okay. We can take this photo down, Carmen. Thank you.

Q. Did you attempt any techniques to take Robert down before he got to the office area?

A. I don't believe so.

Q. Did you know that after the slider fell, Officer Jackson was on scene?

A. I didn't even know the slider fell until -- until much later.

Q. When did you learn Officer Jackson was present?

A. When he announced his presence.

Estate of Robert Miller vs
Sean Roycroft et al.

Sean Roycroft
March 30, 2022

Page 125

Q. When was that?

A. I don't know the time, but when I was -- Robert and I had already gone to the floor.

Q. Okay. So Robert, you say, is pulling you. Did you consider using any leg sweep or technique to take him off his feet and get him to the ground?

A. I -- I don't know if I considered it. I just know that my thought process at that time was to stop him from pulling me forward. I could see golf clubs over there. I could actually see a golf club on the floor that I remember had concerned me, and I was trying to keep him from getting to that -- to those items, those golf clubs.

Q. So Robert is in front of you. You've got him in the bear -- the bear. The seatbelt hold so that your left arm is coming up from under his left side, right?

A. Yes.

Q. Okay. And so he's now dragging you towards the office area, correct?

A. We're -- we're moving towards the office area. He -- I was not able to -- I'll term

Page 126

it that I was not able to stop his forward progress.

Q. Okay. And while you had him in the seatbelt hold, you were able to look over him, into the office area, down to the floor and see a golf club there?

A. I didn't look over him. I was looking around him.

Q. Okay. You looked around him?

A. And, yes, I could see -- I could see the golf club, yes.

Q. And Robert hadn't threatened you or said he wanted to hit you at any point, correct?

A. He didn't say anything.

Q. Okay. When you put Robert in the seatbelt hold, did you consider how you would get him to the ground without having your left arm trapped underneath his body?

A. No. I never had a conscious thought about that at that time, no.

Q. While you were heading towards the office area, did you see Amy Anderson?

A. It was, like I said before, there was a point in time when I did catch her out of the

Page 127

corner of my eye. It was very brief. And I'm not sure exactly when that was. I just -- I remember seeing her.

Q. What happened when you got to the office area?

A. There's a stepdown in the levels of the floor, and I think it was more as a result of reaching that stepdown that caused us to go to the floor. A tripping -- a tripping -- I guess, a trip would be a proper way to describe what happened.

Q. Okay. And, first, why don't we look at Exhibit 14, which is a photograph of the office.

MR. FRIEDMAN: Okay. Thank you, Carmen.

Q. Does this show the golf club in the position that it was in when you and Robert ended up in that office area?

A. I don't know if that's the exact position that it was in. I want to say it was more towards the break in the railing towards the middle of the floor.

Q. Okay. Before you got to the office area, Robert never had a golf club in his hand,

Page 128

correct?

A. No.

MR. FRIEDMAN: Carmen, you can take this photo down. Thank you.

Q. And before you got to the office area, you never saw anything in Robert's hands, correct?

A. I couldn't see his hands.

Q. So you never saw anything in his hands, correct?

A. Well, if I couldn't see his hands, I couldn't see what's in his hands.

Q. Okay. And when he was outside on the deck, he had nothing in his hands, correct?

A. Correct.

Q. Okay. And he was on the dining table for seconds, correct?

A. Yes.

Q. Did you have any factual reason to think he had something in his hands?

A. Factual reason?

Q. Yes.

A. I didn't have any factual reason to think that there wasn't anything in his hands.

Q. Well, what led you to conclude that he

Estate of Robert Miller vs
Sean Roycroft et al.

Sean Roycroft
March 30, 2022

Page 129

might have something in his hands?

A. Well, I didn't conclude that he had something in his hands. I didn't know whether he had something in his hands or not.

Q. Okay. And as a police officer, you don't know someone -- whether or not someone has something in his hands, is it the case you assume he does have something in his hands that could be used as a weapon?

A. I'm sorry. You're going to have to say that question again, please.

Q. As a police officer, if you don't know whether or not someone has something in his hands, do you assume the person does have something in his hands?

A. If you can't see their hands, yes, I would assume that -- if -- but it all depends on the situation, sir. The whole reason why I had that thought process is because he was reaching on the table before that, and then I couldn't see his hands after that, so I think that's perfectly reasonable to think that maybe he grabbed something from the table. Who knows. It could have been any item on that table that could be

Page 130

used as a weapon. I didn't know.

Q. And just to go forward quite a bit, did Robert ever have anything in his hands?

A. Did he ever have anything in his hands?

Q. During the course of this incident.

A. Not that I know of, no. But, like I said, there were times where I couldn't see his hands. I don't know if he had dropped something on the floor there. You know, there's several items on the floor. You know, I don't know.

Q. Did you ever tell Officer Jackson, "I think he has something in his hands"?

A. I don't know if I worded it like that. I know that there was conversation about that. I might have said, "I don't know if he has anything in his hands. I can't see his hands," something along those lines. I don't believe I ever said, "He has something in his hands."

Q. Well, did you ever say, "I think he has something in his hands"?

A. It's entirely possible. I don't know for sure.

Q. Now, once the two of you are on the ground, what happened?

Page 131

A. It was -- it was -- I'm not sure exactly how long it was after we went to the ground that Officer Jackson came in, said something to the effect that, "Sean. I'm right here." And I said, "He's got his hands underneath. I can't see his hands." And I was -- my arm -- my right arm was still over his back. My hands were not connected underneath him at that time, but my left arm, he was -- how can I word it? He was pinching my left arm. I can't remember exactly how I word it in the report, but he was pinching my arm, applying pressure on my arm and holding it underneath him. I was trying to pull my left arm out from under him, and he wouldn't let go of my left arm.

Q. When you say, "He was pinching," can you explain what you mean by that?

A. He was collapsing with pressure, it would have been his left arm, onto my left arm, keeping it pinned underneath him.

Q. So let me see if I understand. His left arm would be on the floor; is that right?

A. His left arm was tucked underneath him. My arm -- my arm was up through his armpit area.

Page 132

My left arm was up through his armpit area, and he was collapsing down on my left arm.

Q. Can you explain what you mean by, "He was collapsing down"?

A. Like I said, he was applying pressure with his arm to trap my arm so that I couldn't pull my arm out.

Q. I'm going to go through it. So there's the floor and on the floor, the first thing on the floor would be your left arm or would it be his left arm?

A. His left arm was wrapped around my left arm, so there might have been part of my arm that was touching the floor and his arm was under.

Q. Okay. When you say, it was wrapped around your left arm, you had placed your left arm so that it was now between his body and his left arm, correct?

A. That's where my arm was as far as -- as far back from my first point of contact with him on the table, that's where my arm was.

Q. And the floor, if we're going to talk about it as a sandwich, there's his arm, then there's your arm, and then there's his body?

Estate of Robert Miller vs
Sean Roycroft et al.

Sean Roycroft
March 30, 2022

Page 133

A. My arm was between his arm and his body, yes.

Q. And you were pushing down on his body?

A. I had my right arm over his back as he was trying to lift his chest, and at the same time he was using a -- that -- that pinching motion, that collapsing motion to hold my arm tight. I was trying to keep him from creating that space so that he could get what I felt was more pressure on my arm to pull me over.

Q. You said a lot there. Let's break it down.

A. Okay.

Q. He was -- he was pushing up?

A. He was -- he was -- yes, he was trying to push up. His chest was -- his back was coming up, and he was trying to lift up a bit. And at the same time, he would be using his left arm to make it tighter.

Q. You didn't want him to push up; is that correct?

A. Well, I mean, I don't think I had a conscious thought of that, as far as that goes. I was reacting to him.

Page 134

Q. Okay. So when he was pushing up, you pushed back down?

A. Yes. Yeah, to keep him from creating that space so that he could tighten his grip.

Q. And you said before, you didn't want him to get leverage by pushing up?

A. Yes. Correct.

Q. Were you saying anything to him at this time?

A. I was pleading with him to -- to stop, to let go.

Q. What was he going to let go of?

A. My arm.

Q. You were -- he was on the ground. You were on top of him. How was he going --

A. I wasn't on top of him, sir. No.

Q. What position were you in?

A. I was on his left side. I was -- I was more to his left side. It was my right arm that was draped over his shoulder between his shoulder blades.

Q. Okay. So your right arm pushing him down and you're trying to --

A. Sir, it's hard to -- it's hard to

Page 135

describe.

Q. Okay.

A. And you want -- it seems like you want -- I know that you're -- you're searching for the exact description here, and it's hard for me to explain the -- the exact position. I was on his left side with my left arm trapped underneath. I was more on my left hip with my right leg over his left -- would have been over the back of his left leg with my right arm draped between his shoulder blades. It wasn't my full body on top of his back.

Q. Okay. So that's why you had to use pressure from your arm to push down so he wouldn't rise up and get leverage?

A. That's what I was trying to do, yes.

Q. Because you feared he was trying to, like, flip over, is that --

A. I felt -- well, I felt that he -- he was trying to move to get himself in a dominant position. That's what I felt.

Q. You've seen the diagram that we have of the first floor? It would be Exhibit 10.

A. I've -- I've seen a couple different

Page 136

exhibits here of the floor.

Q. Have you printed out that diagram?

MS. GILL: Did you ask? I didn't know that you wanted him to. We can take a break, if we need to.

MR. FRIEDMAN: Okay.

Q. Do you have the ability to print the diagram?

A. Are you asking -- yes, I do.

Q. Okay. Why don't we take a break, and you can do that. I'm trying to -- it's hard to explain. I know you're having trouble and what you said was right. I want to understand the position, so we'll see whether using a diagram will help.

A. Okay.

Q. Is that okay? So if you could print that out, we'll take --

MR. FRIEDMAN: Sasha, what, five minutes?

MS. GILL: Yeah. Hopefully five minutes to print. We'll be back on shortly.

MR. FRIEDMAN: Sounds good.

(Recess taken.)

Estate of Robert Miller vs
Sean Roycroft et al.

Sean Roycroft
March 30, 2022

Page 137

BY MR. FRIEDMAN:

Q. Mr. Roycroft, do you have the diagram that you printed out?

A. I'm trying to show it.

Q. Okay.

A. Is that -- is that what we're talking about?

Q. That's what we're talking about, yes.

A. Okay.

Q. So I guess our focus is, if you could show the position that you were in, that Mr. Miller was in and that Officer Jackson was in so we can understand it. It's getting a little confusing.

A. Okay.

MS. GILL: I'm just going to note my objection here.

I presume this is Exhibit 10, is that right?

A. Yes.

MR. FRIEDMAN: That is correct.

MS. GILL: I'm objecting just on the basis of the accuracy of the diagram.

MR. FRIEDMAN: Your objection is duly

Page 138

noted.

A. I'm going to do my best to make it as accurate as possible, and I can tell you right off the bat, it's going to be very crude.

Q. And if a blank piece of paper is better, you can use that. I know it's a small area. Whatever you can do, you're right, we're trying to understand it, and it's hard. So if that will help, that would be great.

(Witness marking on diagram.)

A. All right. I don't know how well this is going to work, so -- but I'll go right -- see if I can get it right on the office. Can you see?

Q. Yes, hold it right there. Yes, I can see there's two stick figures and an X.

A. The X would be somewhere about where Officer Jackson was. And hang on one second. So as you're looking at that, the bottom stick figure is me and then the one in the middle, the closest to the X, that would have been Mr. Miller.

Q. Okay. So you are on your left side and Mr. Miller, you have the sticks with the arms straight out and he would be face down?

A. And, like I said, that's --

Page 139

Q. It's not to scale.

A. No, please understand that it's -- it's really -- it's probably not accurate at all, but it's the best I can do with what I have here.

Q. Okay. So your left arm is under Mr. Miller?

A. My hips are turned. And this is -- this is what makes it hard to describe, and I understand your frustration here with my answers because it is hard to describe the physical position like that just from a description with no pictures, so I am -- I'm kind of -- at that point I was on my left hip kind of with my right leg -- like my right leg was over the back of what would have been his left leg, Mr. Miller's left leg with my left arm up through his armpit. Maybe somewhere around my elbow, just below my elbow is where he was able to trap my arm using his arm.

Q. I know you said that he was trapping. Was your arm --

A. Applying pressure.

Q. Sir, he was, like, squeezing in on his arm?

A. Correct. Pulling his -- pulling his

Page 140

left arm into his body with my arm in between his arm and his body.

Q. Are you saying anything to him at this point?

A. I'm telling him to "Please stop." "Let go."

Q. And at this point, Officer Jackson is there?

A. Yes.

Q. And what is Officer Jackson doing?

A. He -- he tells me that he's right behind me. I -- I told him that I couldn't see his hands. I didn't know if he had anything in his hands or not. At some point Officer Jackson asked if I wanted him to deploy his taser, and I said, "No, not -- not at this time." Something along those lines. I said, "No."

Q. Was that because your arm was still trapped under him?

A. My arm was trapped underneath him, yes.

Q. Other than that, did you and Officer Jackson have any discussions about how you were going to handle the situation?

A. We -- we didn't really -- we didn't

Page 141

need to have a verbal conversation at that time. We did talk about -- because I was on his left side, I knew that he would -- that Officer Jackson would go to Mr. Miller's right side.

Q. Okay. Was there a discussion about why the taser wouldn't be a good idea?

A. I -- I just felt at that time where he was there that we didn't need to -- we didn't need to escalate our use of force.

Q. What was Officer Jackson doing? And I know he asked about using the taser. Was he also touching Mr. Miller in some ways?

A. He was. I couldn't -- I -- I -- I didn't see exactly what he was doing. I know that he was -- he was trying to manipulate his right arm and get his right arm free.

Q. Where was -- his right arm was also underneath his body?

A. Yes.

Q. So both of his arms are underneath his body?

A. Yes.

Q. And the problem is that one of your arms is also underneath his body?

Page 142

A. Yes.

Q. So that makes it -- you can't really execute maneuvers with only one arm?

A. I mean it's -- it's a concern definitely where my arm was trapped, but I -- like I said, I also felt that with Officer Jackson there, that it -- we would eventually -- we would eventually be able to secure Mr. Miller.

Q. Did you have any discussion with Officer Jackson about the golf club?

A. I believe I told him that the golf club -- there's a golf club right underneath him. I did make him aware that the golf club was there.

Q. Given the position --

MS. GILL: Howard, it's 1:30.

Q. Given the position you all were in, was there any way for Mr. Miller to grab hold of that golf club?

MS. GILL: Objection.

A. At that point I didn't know if he had already had it in his right hand or not. There's information that I didn't have. I didn't know. I couldn't see. With him trying to lift his chest up and make movement there, I didn't know if he

Page 143

was trying to move in a position where he could use the golf club.

Q. So it's important to you that his chest not be coming up? You needed to keep it on the ground so he wouldn't get leverage on you?

A. Well, it was important -- it's a moving situation, and I'm reacting to his movements, what he was trying to do, what I felt like he was trying to do in creating his own leverage. And my actions at that time were mainly in response to him because he did have my left arm trapped, and that is an obvious concern at that point. I'm -- I'm not in a dominant position at that point, so it was -- it was important for me to try to get my arm out.

Q. So you wanted to get into a dominant position --

MS. GILL: Excuse me, Howard. Howard, excuse me. We need to take a break.

MR. FRIEDMAN: Okay. We'll take a break now.

MS. GILL: We'll be back on around 2:00. Okay?

MR. FRIEDMAN: Yes. Maybe a little

Page 144

after 2:00, just to make sure everybody gets something to eat.

MS. GILL: Okay.

MR. FRIEDMAN: Thank you.

(Lunch recess taken.)

AFTERNOON SESSION

BY MR. FRIEDMAN:

Q. Okay. Mr. Roycroft, we are back on the record after a break. You're still under oath.

A. Yes, sir.

Q. First, I have a question for you about Brazilian Jiu Jitsu.

A. Okay.

Q. If you're doing Jiu Jitsu and your arm is trapped, are there techniques that you have learned how to get the arm out from under somebody?

A. There are. There's different things that you can do, yes.

Q. What are they?

Page 145

A. It's position. It's -- it's more or less in response to the -- how can I word it? The pressure that you're receiving from your opponent. In Jiu Jitsu, you're allowed obviously a lot more latitude than you are as a police officer in doing different things, different techniques.

Q. What do you mean by that?

A. I mean as a police officer I'm -- for instance, I'm restricted to -- I'm not allowed to choke people. In Jiu Jitsu, I am allowed to choke people. That's actually a position that you try to -- you try to get yourself into. So I mean that's -- that's how I lost the one Jiu Jitsu match that I was in is, I got choked out.

Q. Is that how most of them end?

A. No, I don't think it's -- I mean, you know -- I mean I've watched, you know, the UFC and things like that on TV, and, no, it's not -- it all depends. Some of it is submissions. You know, you might get somebody in some kind of an arm bar or Kimura or something like that, and somebody will tap out as a result of pain.

Q. Okay. Now, I know you've done your diagram. When Officer Jackson came in, what

Page 146

position was he in?

A. It would have been to -- well, both of ours, Robert's right side. Somewhere along his right side.

Q. And I know you discussed use of a taser with Officer Jackson. Did you have any other discussions with Officer Jackson about what technique you might use with Robert?

A. Discussions about techniques?

Q. Did you say anything to him, like, "You do this," "You do that"?

A. I don't believe so. I don't know if -- I don't remember any specific discussion about it, no.

Q. Okay. Did you see him punch Robert?

A. Did I see him punch Robert?

Q. Yes.

A. I knew that he had -- that he had punched him. I could actually -- I could feel Robert's reaction when he -- when he was hit.

Q. How did he react?

A. Like a little -- I guess I'd describe it as kind of a grunt noise. A (demonstrating noise), you know, that kind of...

Page 147

Q. Did the punches have any other effect?

A. Not that I could tell.

Q. And did he have that grunt noise after each time he was punched?

A. I believe he did.

Q. Now, did you ever hear Amy Anderson ask you or Officer Jackson, "Can he breathe?"

A. No, I did not.

Q. Did you hear anyone tell her that if he can say, "I can't breathe," that means he can breathe?

A. I did not.

Q. Did you ever hear Robert say, "Help me" or "Amy, help me"?

A. I did not. He didn't say anything.

Q. If he had said — you had heard him say, "I can't breathe," what would you have done in reaction to hearing that?

A. I would have done something to help him so that he could breathe, but in -- in the struggle, I had no reason to believe that he couldn't breathe because of the way that he was, and I'll term it, as fighting with us.

(Reporter clarification.)

Page 148

Q. You used the word "fighting." What was Robert doing that you have described as fighting?

A. He had my arm trapped underneath him and wouldn't let it go. He wouldn't -- he would not release the pressure for me to get my arm out. It took me some time to work to be able to get my arm out.

Q. What else was he doing that you would describe as fighting?

A. He -- he was -- he was moving around. How can I describe it? He was -- he was moving in ways that I felt were to stay in the position that he was in. If I -- if I tried -- you know, I tried to move, he'd respond to my movements just like I was trying to respond to his movements to create some space where I would be able to get my arm out.

Q. Anything else he did that you would call "fighting"?

A. I can't -- I can't remember. I can't remember anything.

Q. Did he punch anybody?

A. No, not that I know of.

Q. Did he kick anybody?

Page 149

A. He was kicking. He -- I don't know if he -- he didn't strike me with any kicks.

Q. How long did it take before you were able to handcuff Mr. Miller from when you get into the office area until he's cuffed?

A. It was a minute.

Q. How were you ultimately able to handcuff him?

A. I think Officer Jackson was able to get his right arm somewhat released, and when he did that, I just remember I was able to free up my left arm and move it out enough. And then as I did so, I was able to bring his left arm with me and was able to get him handcuffed.

Q. Okay. Whose handcuffs did you use?

A. I think it was Officer Jackson.

Q. Okay. And they were double locked with a key?

A. Yes.

Q. Who did that?

A. I believe it was Officer Jackson.

Q. Okay. So after he was handcuffed, he was still face down on his stomach, now his hands are cuffed behind his back?

Page 150

A. He was face down, yes.

Q. Okay. And after that, do you know what Officer Jackson did after the handcuffing was complete?

A. I think he stepped away to talk with Amy. I know that I immediately reached down to help Robert to get to his knees to his feet.

Q. Did you say Officer Jackson stepped and went to talk to Amy?

A. I believe so.

Q. Okay. Did you hear any of that conversation?

A. I did not.

Q. Okay. You say you were going to help Robert get up?

A. Yes.

Q. What did you do?

A. I reached down and I put my right hand on his left arm, on his triceps area to feel which way he was going to move to get him to his feet. As I did so, I -- it just -- I felt like he was being passively resistant at that time. I said, "Robert, we're going to get you to your feet," something along those lines.

Page 151

Q. Okay. And what happened then?

A. Like I said, I thought he was being passively resistant and so I knelt down next to him. The right side of his face was down on the floor, so I lifted up his -- his eyes were closed. I lifted his left eye. Sometimes when you have someone who is passively resisting, you can open their eye and if you go to poke them in the eye, it's an involuntary reaction to close your eye. I did not get any reaction from him, and so I knew that there was something wrong.

Q. What did his pupils look like?

A. It was just -- I guess the best way I could describe it is they were fixed. His eyes were not -- someone that is conscious, they'll move around. You know, their eyes will move. His eyes were not moving at all.

Q. Once you saw that, what did you do next?

A. Next I -- I believe it was at that time that I moved him onto his right side in what would be considered a recovery position. I called to Officer Jackson to make him aware that something was going on. He stepped towards me where we were

Page 152

located, Robert and myself, and it was right around that time that I checked for a pulse, a carotid pulse, and I didn't feel a pulse. And I said to Officer Jackson, "We need to take the handcuffs off of him." I was trying -- I knew Amy was there, so I was trying to be respectful of her being there, to not upset her. And I think Officer Jackson said something to the effect that, "He's going to fight with us again if we take the cuffs off." That's when I --

Q. I just --

A. I'm sorry?

Q. I just want to stop you for a second because you covered a lot of material. Let's first go to the -- when you said, "We got to get the cuffs off of him," where was Officer Jackson?

A. He -- I believe he was over near where Amy was standing. It wasn't but a few steps away.

Q. This is a very small house, right?

A. It's a very small house, yes.

Q. And she was in the living room and you could see her through the doorway?

A. I think she was in the doorway that leads to the dining area, the office area, that

Page 153

door -- that opening that's there.

Q. And when you say -- you were on his left side and so you picked his left side up so he would be in a recovery position on his --

A. So he wouldn't be face down, yes.

Q. So he wouldn't be face down. Okay. And you put him in a recovery position without, at that point, Officer Jackson's assistance?

A. Yes.

Q. And he had no pulse. Did you see any signs that he was breathing?

A. No signs that he was breathing, no.

Q. And after he's in the recovery position, what happened?

A. That's when I called to Officer Jackson and said that we need to take the handcuffs off of him.

Q. Okay. And then what?

A. The handcuffs were taken off of him, and I can't -- I'm trying to remember if it was myself or Officer Jackson. One of us I know radioed dispatch to let them know that we were starting CPR and to get rescue to our location. And we began CPR.

Page 154

Q. Okay. And then who was the next police officer to arrive?

A. I can't remember if Officer Ruggieri or Officer Shaw showed up first.

Q. Okay. What did they do?

A. When -- I remember both of them being there because I said, "Somebody go get the" -- go get their first aid bag, and, I believe, it was Officer Ruggieri. I know that he's the one that set up the AED, but I believe he was the one that left to go get to the first aid bag.

Q. Did you tell Officer Shaw or Officer Ruggieri all about what had happened earlier with regard to Mr. Miller?

A. I can't remember exactly what was said. It was -- I did explain, you know, that we were in a physical altercation and that we ended up here. And that we needed to -- we needed to get the AED hooked on him and continue CPR.

Q. Okay. And eventually the EMTs came? I guess firefighter EMTs, paramedics in Barnstable?

A. Yes.

Q. And did you speak to them?

A. Briefly.

Page 155

Q. Who did you speak to?

A. I don't remember which ones.

Q. Okay. Did any -- did Officer Jackson speak to any of the EMTs?

A. He could have. I don't know.

Q. And you understood that when emergency medical personnel show up, for them to provide treatment, it is important for them to know what happened before they got there, right?

A. Yes. There was a conversation. I did explain to them that we were -- that there was a physical -- a physical struggle between us, and that once he was handcuffed, I realized that he was not breathing and that there was no pulse when I checked for a pulse and that we had started CPR. That was...

Q. Okay. And did they come straight to you or you were right there with Mr. Miller?

A. They came right straight into where I was, yes.

Q. Okay. And are you aware of what the Hyannis Pre-Hospital Care Report written by Paramedic Vicki Yefko said?

A. I am not.

Page 156

Q. Okay. Let me read you a part of it. It says, "Officers" -- and then it says, "STS," which I think means states. "We were here for mental health evaluation, and patient was calm and cooperative at first. He got angry and went for a golf club, and we took him down and cuffed him. He was talking, and we stood him up and started to walk out and he collapsed. We immediately started CPR and applied AED." Is any of that true?

A. Who said that?

Q. Well, apparently it's an officer who was speaking to an EMT in Mr. Miller's home.

A. I didn't hear any of that conversation.

Q. You didn't say that, right?

A. I did not say that, no.

Q. Because that's not true, correct?

A. No, that is not -- that -- what she just said in her report is absolutely not true.

Q. You didn't say that to anybody who arrived later, did you?

A. No, I did not.

Q. Because you never were able to get him up, he wasn't talking and suddenly collapsed, correct?

Page 157

A. Correct.

Q. And if he had been up walking and suddenly collapsed, did you know that would indicate a different kind of physical problem? That would be a sign of a heart attack?

A. I didn't know that, no. Not specifically like that, no.

Q. Okay. I noticed, both I could see today and in your interrogatories that you have a tattoo on your right arm that says, "We The People"?

A. Yes, sir.

Q. Could you show that to us?

A. (Indicating.) I don't think I had it at the time of this incident.

Q. Okay. You can put that down. When did you get that tattoo?

A. It was probably two years ago.

Q. Okay. What caused you to get that tattoo two years ago?

A. What caused me to get it?

Q. Yes. Why did you decide to get a "We The People" tattoo?

A. Because I wanted the "We -- I saw it,

Page 158

and I wanted the "We The People" tattoo.

Q. Did you understand its significance in today's society?

A. I absolutely understand it.

Q. What's your understanding?

A. Of "We The People"?

Q. Yes.

A. It is -- it's -- it's our Constitution. It's what our country stands for. It's why I served my country in the military.

Q. Have you heard of the 3 Percenters?

A. The 3 Percenters? I've heard of 1 Percenters. I have not heard of 3 Presenters.

Q. Okay. Did you know that 3 Percenters, which is a right wing group that protects, I guess, other right wing groups, that they -- I guess they want to -- they support the Constitution, but they say 1776 and they want to have another revolution like essentially our current Government would be the British and they would be the Revolutionaries; did you know about that?

A. This is all new to me, sir. I don't know anything about that. My -- my tattoo there

Page 159

has absolutely nothing to do with any of that.

Q. Okay. I just had to ask you that.

A. I get you had to ask, and I have to -- I have to -- I have to defend that because it's -- it's the complete opposite as to why I have that on my arm.

Q. And I'll just break and tell you that if you Google, you will discover that at least one police officer was suspended from his department for having such a tattoo because of its connection to people who are really not supporting our Government, but let's move on.

Let me ask you, did you have any conversations with Amy, you know, after, you know, Robert passed away?

A. I don't think I had anything directly because there were -- now there were more supervisors on scene. There were detectives on scene, so -- and not to mention, the EMT medical personnel, so, no, I did not.

Q. Did you ever learn anything about Robert's family?

A. I did.

Q. What did you learn?

Page 160

A. I learned that Mr. Miller has been -- had been suffering from mental illness for some time, and that that was the main reason why he really didn't have any contact with his children.

Q. Where did you learn that from?

A. It was a conversation that Amy was having, and I want to say it was Lieutenant Mellyn at the time that was having a conversation with her.

Q. What was Amy's demeanor after Robert, you know, was taken from the home on a stretcher?

A. I -- I don't remember if I even saw her when she left -- when she left the house to go to the hospital.

Q. Okay. While EMTs were working on Robert Miller, what was Amy's demeanor?

A. I -- I don't know. I -- I really wasn't paying attention to her.

Q. At some point did people tell her when they were doing the DFib, that she should probably not look?

A. I don't know.

Q. Did it seem to you that Amy was relieved when Robert Miller left the building?

Estate of Robert Miller vs
Sean Roycroft et al.

Sean Roycroft
March 30, 2022

Page 161

A. When he left the building?

Q. Yes. When he was -- in other words, after he went off on the stretcher, did she seem to be relieved, you know, that --

A. I didn't -- I don't know. I didn't -- I didn't really see her at that time. I don't know.

Q. At any point while you were in the building with Amy, did she appear to be upset or sad about the fact that her partner of over eight years had stopped breathing and looked like he was probably dead?

A. Well, I mean, you know, I don't know how it appeared to her. I know that rescue personnel were working on her -- I mean on Robert, and, you know, I don't know what her thought process was at that time. I -- I can't -- I can't give you a -- I can't give you an answer to that.

Q. When the medical personnel began working on Robert, what did you do?

A. I stood clear so that they -- they could -- they could perform their duties. I believe I even helped them because it was such a tight space and where I was at first, I helped

Page 162

them attach the LUCAS machine, which is the machine that is a mechanical -- it does the -- how can I word it? Mechanical compressions, chest compressions.

Q. Did you stay in that little office area while they were working on him?

A. I stayed there for a period of time but then as more personnel arrived, that space shrunk very quickly, and I can't remember how I got out of there, if I climbed over a railing, but I got out of the way to make room for the medical personnel to do their job.

Q. And did you speak to anybody when you moved away from the area where Robert was?

A. I don't believe so. I don't remember having a conversation with anybody there.

Q. Did you discuss the death of Mr. Miller with Officer Jackson?

A. There was a point in time that we did, yes, when we were notified -- when Sergeant Tynan notified us. We were out in the front yard at Elm Street, and Sergeant Tynan, he received that information and he told us.

Q. What conversation did you have?

Page 163

A. Sergeant Tynan just came over to both of us and said that Robert had died. And then I'm not going to speak for Sergeant Tynan, but it felt like he gave us a minute or two to digest what -- what was just told to us. And then he said that we need to get back to the -- both of us, pointing to both Jackson and I, we need to get back to the station.

Q. Okay. Did you and Jackson speak while you were still at the scene?

A. If we did, I don't recall. I don't recall the gist of the conversation. I don't remember. I don't remember if we did or we didn't.

Q. Did you and Officer Jackson ever discuss whether you could have done something differently to have a different outcome?

A. We -- we did. We -- we have had discussions about that.

Q. What were those discussions?

A. We both said that I wouldn't -- I wouldn't have handled what I did any differently. I'm -- yeah. I'm sorry. I am so sorry that Mr. Miller is dead, but if I were placed in that

Page 164

same situation today, I would not handle things differently. The only thing that would be different is I wish that Mr. Miller was still here today. That's the only difference.

Q. Did any of your supervisors discuss things that could have been done differently?

A. No.

Q. I'll just take one second. I have no further questions.

MR. FRIEDMAN: Sasha, you can inquire.

MS. GILL: Thank you. I have a few questions. I'll try to be quick.

CROSS EXAMINATION
BY MS. GILL:

Q. Officer Roycroft, you were asked earlier about certain types of holds that you were trained in by the department; do you remember that?

A. Yes, I do.

Q. And do you remember testifying that some types of positions of holds are not specifically trained by the department?

A. Yes.

Estate of Robert Miller vs
Sean Roycroft et al.

Sean Roycroft
March 30, 2022

Page 165

Q. Are you aware of any policy that the Barnstable Police Department had that required you to use only the holds that you were trained in?

A. I'm not aware of any policy that says you can only use holds, restraints or anything that you're trained in. Like I've said before, every situation -- the situation itself is going to dictate.

Q. So if you're in a situation where any hold you had trained on by the department -- with the department would not accomplish whatever you were trying to do --

A. I'm sorry. I lost you for a second.

Q. If you were in a situation where a hold that you were trained on with the department would accomplish what you were trying to do, would it be your preference to use that hold in that moment?

MR. FRIEDMAN: Objection.

A. Absolutely.

Q. And you were asked about a department policy by Attorney Friedman that I don't believe you were shown, but when you were asked about it, it was with specific reference to a portion of the policy that says, officers are to use techniques

Page 166

as trained; do you remember that?

A. I do.

Q. And in your mind would a policy that says officers are to use department techniques "as trained" mean that when using the techniques they were trained on, they were supposed to use them in the way that they were trained to use them?

MR FRIEDMAN: Objection.

A. Yes, that's what I believe.

Q. So in your mind if that policy, again, that we didn't look at, but if that policy does say officers are supposed to use techniques, "as trained," that doesn't mean that you're prohibited from using a maneuver that you're not trained in?

MR FRIEDMAN: I'm sorry. I couldn't hear the last piece of that.

Q. Does that prevent you from using a maneuver that you're not trained in?

MR FRIEDMAN: Objection.

A. It does not prevent you from that, no.

Q. Can you use other holds that you're not trained in by the department if they're necessary, provided you use a balancing test between the need for the use of force and concerns for safety?

Page 167

MR FRIEDMAN: Objection.

A. Yes. Like I stated earlier, when we were talking about the round peg and the round hole, it's a great concept. And in a perfect world, it works all the time, but in a moving situation like this, it doesn't always work. I mean...

Q. Were you authorized to use this particular hold under these particular circumstances with Mr. Miller?

MR FRIEDMAN: Objection.

A. Yes, I was.

Q. Part of your training with the department as an officer includes training on certain types of situations that can arise, right?

A. Yes.

Q. Are you also trained sometimes that techniques you've been trained on might not be applicable in certain situations?

A. Yes.

Q. And part of your training as an officer is to make split-second decisions and how to make them; is that -- is that accurate?

A. To be specifically trained in making

Page 168

split-second decisions, I don't think there's any way to train. You try to train so that you are prepared to make those split-second decisions, but every split-second decision that is made is individual to that situation, so...

Q. If you find yourself -- if you find yourself in a situation where a baby is at your feet and you're trying to restrain a subject, would you use a technique in that situation that would cause the person to fall to the ground?

MR FRIEDMAN: Objection.

A. So that I wouldn't fall on the baby, yes, I would try to do something so that the baby would not be injured.

Q. After Mr. Miller was taken to Cape Cod Hospital on April 16, 2019, were you aware it was a serious result and that the call had an unexpected outcome?

MR FRIEDMAN: Objection.

A. Well, in my experience when the LUCAS machine is used, it is -- it's definitely a serious situation, so...

Q. Would you describe the outcome with respect to Mr. Miller as expected or unexpected?

Estate of Robert Miller vs
Sean Roycroft et al.

Sean Roycroft
March 30, 2022

Page 169

MR FRIEDMAN: Objection.

A. The fact that Mr. Miller passed? That would be unexpected.

Q. You testified earlier that you were aware of the fact that --

(Reporter clarification.)

Q. -- you were aware of the fact that an unexpected outcome might lead to litigation; do you remember that?

A. I remember something along those lines, yes.

Q. Did anything you wrote or said in your reports, in your reports to others regarding this matter after these events, was any of that guided by your awareness that litigation might result?

A. Not at all.

Q. I want to talk about the purpose of the call, as far as you knew. When you received information from dispatch that a response was needed at 45 Elm Street, you were aware -- were you aware that the call was for mental health assistance?

A. Yes, I was.

Q. And were you also aware that the call

Page 170

was disconnected by the caller?

A. I don't know if it was -- I just know it was disconnected. I didn't know if it was disconnected by the caller. I didn't know the reason for it being disconnected.

Q. And were you also aware that the caller had been short on the phone or very short on the phone?

A. There were some notes, I believe, on the call screen regarding that.

Q. And you have access to a call screen in your cruiser?

A. Yes.

Q. So by the time you arrived to the call, do you think you were aware of what the dispatch call sheet said about the call?

MR FRIEDMAN: Objection.

A. Yes.

Q. In your experience as an officer, if somebody calls dispatch through the 911 line and hangs up, is there an extra layer of concern that attaches to that call?

A. Yes, there is.

Q. And what is the reason for that extra

Page 171

concern when a call is disconnected prematurely?

A. You don't know why the call was disconnected prematurely. It could be an assailant that caused that call to be disconnected. I've responded to domestic disturbance calls where the call is disconnected because the husband/boyfriend takes the phone and does not allow the person to continue their call. There's several reasons why.

Q. So if you were aware that the call had been disconnected, did that cause you to want to act quickly --

A. Yes.

Q. -- with respect to 45 Elm Street?

A. Absolutely.

Q. And did it also cause you to want to get to the scene and figure out how you could help?

A. Yes. Absolutely.

Q. And when you encounter Anderson at the front of her house, it was at that time you learned that she was frightened?

MR FRIEDMAN: Objection.

Q. You perceived --

Page 172

A. I don't know if it was exactly at that time, but I definitely understood at that time when I was talking with her that she -- she definitely appeared frightened, and also by some of her statements.

Q. What did you notice about her, apart from her statements, that indicated to you she was frightened?

A. She had a shaky voice. She was -- she seemed as if she was trying to move things along quickly.

Q. Did she have a sense of urgency about her?

A. She definitely had a sense of urgency about her. It's...

Q. You were asked earlier about some questions that you asked Ms. Anderson on your arrival, and I believe you testified that that would be the kind of interaction that would fall within Step 3 of the Mental Health Intervention Guidelines that we discussed earlier; do you remember that?

A. I do.

Q. And if you think about the Mental

Page 173

Health Intervention Guidelines, do they always play out in the perfect numerical order in which they're listed in the chart?

A. No, not always. It -- once, again, it depends on the situation as -- as it's evolving, as it's going through. I mean if Officer Jackson and I had arrived at the same time, it -- that information might have been different. One of us might have gone to make -- try to make contact with Robert while the other is still getting more information from Amy. It -- it depends -- it depends on that call, that situation at that time.

Q. And if no family members or friends are available, can you even get to Step 3?

A. Not unless the person that you're dealing with at that time is able to provide information.

Q. In this case, as you look back on it, would you say that you finished Step 1 of the Mental Health Guidelines?

A. Finished it?

Q. Yes. Did you complete Step 1 which would be to quickly assess and secure the scene?

A. It was -- it was still in the process

Page 174

when I made my way -- even when I made my way to the backyard, that was still part of the Step 1 process.

Q. You were shown a slide from a mental health training presentation that you were given as an officer in the Barnstable Police Department earlier. The slide that was entitled, Try to De-escalate Situation; do you remember?

A. Yes.

Q. And what in your mind is the meaning of "Try"? When the slide says, "Try to De-escalate Situation," what do you remember about the training in relation to the word "Try"?

A. You do what you can in that situation and -- but if you have -- if you have somebody that's not receptive to your offerings, it's not going to work.

Q. In an ideal situation, would you try to use those methods if you're dealing with someone who's agitated and could get violent?

A. Absolutely.

Q. And in your experience responding to mental health calls, is there a spectrum of safety concerns? In other words, are some mental health

Page 175

calls very concerning from a safety standpoint and other mental health calls are not much -- are not very concerning at all from a safety standpoint?

A. I would never go as far as to say it's never concerning. You always have to have that concern, that baseline, but there are some calls, yeah. I've handled some mental health calls in the past where, you know, the person asked if they could -- if they could give me a hug, and I've accommodated. I've done that. It -- like I said, every situation, especially with mental health, is -- it's all different.

Q. I believe we discussed earlier that people experiencing psychosis may be unpredictable. Is that something that you agree with?

A. I would agree with that, yes.

Q. And I remember you being asked whether or not you would expect a person experiencing psychosis to be able to follow your commands, and what I'm curious to know is, have you been trained that people experiencing psychosis can be unpredictable?

A. I do remember that being part of the

Page 176

training, being unpredictable, but to go back to your term "Try," I don't know for sure if I don't try. It -- it may be something, you know, that I say or my actions might cause that person to calm down a little bit and to come down out of that psychosis, at least to a point where they do understand and can respond to my conversation, whatever that is.

Q. Does issuing a command involve any use of force?

A. Not necessarily, no.

Q. And does putting your hands on somebody or engaging in what's called "soft restraint," is that considered a use of force?

A. I would say that it can fall into the use of force, but in the situation that happened here, the first time that I put my hands on Robert was more of a way to try to get his attention and to feel where he was going from there. And I knew right away that -- that he was -- he was trying to make his way to the dining room table.

Q. Why did you issue a verbal command to him before putting your hands on Mr. Miller?

A. In hopes that he would respond to my

Estate of Robert Miller vs
Sean Roycroft et al.

Sean Roycroft
March 30, 2022

Page 177

verbal command, so that I wouldn't have to put hands on him. If he had stopped, I wouldn't have had to put hands on him.

Q. And in that situation when you encountered Mr. Miller on April 16th, did you have a taser with you?

A. I did.

Q. Did you have pepper spray?

A. I did.

Q. Did you have a gun?

A. I did.

Q. Could you have used hand strikes?

A. At -- when we reached a certain point, yes, I could have -- I could have used hand strikes.

Q. Did you use any of those?

A. I did not.

Q. You were asked earlier whether it's important to keep a distance or not to get too close to a person experiencing psychosis, and I'd like to know if there are any scenarios you can think of where it's important not to give a distance to somebody experiencing psychosis?

A. I think in -- in this situation here

Page 178

with Mr. Miller, if we -- if there was no one else around, if we were out in the woods somewhere or something like that, then I -- I probably would not have closed the distance. He hadn't armed himself at that time. I wasn't sure if he was going to arm himself with a piece of the broken ceramic figurine/pot, whatever it was on the -- on the deck, but if he had -- if he had gone for that, then I would have -- I definitely would have put hands on him at that point.

There was -- I understand that it says, you know, and I believe that it does -- it does work to give someone distance when it comes to that, and especially if they're asking for that too, but he wasn't asking. There was no conversation about that, but, like I said, in that situation, I felt it was -- it was better to close the gap and to stay closer as a safety point of view, if I use that term, instead of -- instead of allowing the distance. Where if I could keep him from arming himself was my -- that was my intent, if that's what he was trying to do. I don't know if I explained that right.

Q. Regardless of whether or not you've

Page 179

been trained on certain medical terms describing when people are having trouble breathing, have you been trained to recognize signs and symptoms that a person is having trouble breathing or is unable to breathe?

A. Yes.

Q. And what are some signs that you were aware of on the evening of April 16, 2019 that would indicate to you either a person is unable to breathe or having difficulty breathing?

A. What were the signs?

Q. What are some of the signs that you had been trained to recognize.

A. Oh, that I've been trained. I mean you listen for breathing. Look, listen and feel. You watch for the rise and fall of the chest, those kinds of things. If -- if those aren't there, if you notice that those aren't there, then there's usually a problem with breathing. Coloring of the face. You know, change in color of the face, the lips, things like that.

Q. Do gasping sounds also have the potential to indicate somebody is having trouble breathing?

Page 180

A. I would definitely say that gasping sounds indicate that.

Q. Does an absence of breath sounds also have the potential to indicate somebody is unable to breathe or having trouble breathing?

A. Yes. It's part of look, listen and feel.

Q. And can people also indicate verbally or with gestures that they're having trouble breathing?

A. Yes.

Q. Did you observe any of those signs or symptoms that a person is having difficulty breathing or unable to breathe in Robert Miller at any point that night?

A. I did. When -- when I went to help him get to his feet after he was handcuffed, that was the first indication that I had that there was now a medical problem. And I went through, like I had explained, my process to -- to show that he was having a medical issue.

Q. Going to the information that's in the dispatch log, did you see on the screen that the call from Ms. Anderson to 911 was dispatched as a

Page 181

mental health emergency?

A. I believe I did, yes.

Q. And is that a label given to the call by dispatch at the time the call comes in?

A. Yes.

Q. Does that label always give a comprehensive description of all of the issues a call involves?

A. It's -- it's a very general term. It does not give you any specifics, but in the Note section, there was -- there was some more information as to what was going on.

Q. Have you seen a dispatch log, for instance, if somebody steals a car and hits a stop sign, a call might only be listed as stolen -- a stolen car as opposed to stolen car and destruction of property?

A. If that's -- if that's the information that the dispatcher receives when the call comes in, that they only have the stolen car part of it at that time, that's all you would see. The property damage you would find out later on, I guess, through your investigation.

Q. And have you noticed that it's

Page 182

sometimes the case that dispatch doesn't include every possible criminal issue that could be in play when they receive a 911 call?

A. It does happen that -- you know, that in some situations, some information is not in the call itself at that time.

Q. And here, as you said, the term "emergency" also indicated some level of urgency with respect to this particular call?

MR FRIEDMAN: Objection.

A. Yes, it did. And the fact that the call had been disconnected.

Q. After you got to the scene and spoke briefly with Ms. Anderson, was your decision to go around the side of the house towards where Mr. Miller was a judgment call that you made?

A. Yes, it was.

Q. And did you balance your interest in obtaining information from Ms. Anderson versus getting to Mr. Miller, who's the person you were told was experiencing the mental health emergency?

A. It was -- that was all definitely part of it. It was to get more information as to where Mr. Miller was mentally. I know the information

Page 183

that I had from Amy at that time was limited, and there were other things that -- that I thought about also. I knew that both Officer Jackson and I were both dispatched, and I knew that -- I know Officer Jackson, and I knew that he would -- he wouldn't be taking his time to get to the call, especially where I signed off on the call before he did, so I knew that he was coming. And, you know, when I made the decision to go around the side of the house and then when I ultimately made the decision to encounter Robert, I -- I did that to get more information as to, you know, the severity of his mental health at that time and also to keep an eye on him out of concern for Amy's safety at that time.

Q. You were asked about the struggle that you and Mr. Miller had, and then later that you and Officer Jackson and Mr. Miller had. And you described your right arm pushing at Mr. Miller's back at some point; do you recall that?

A. Yes.

Q. Was that a natural part of the struggle?

MR FRIEDMAN: Objection.

Page 184

Q. In other words, as you described the mechanics of what you were doing with respect to Mr. Miller during the struggle --

A. It was a reaction to Mr. Miller's actions. Like I said, he was -- I felt as though he was trying to create some space to be able to tighten his clamp down on my arm, and so by using my arm, I was just trying to not allow him to create that space.

Q. Would you describe your movements with respect to Mr. Miller during that struggle as reactive movements you were making in relation to his movements?

A. I would say that they were definitely more reactive movements at that time because he had my arm trapped. My movements were limited, and, you know, it wasn't until I was able to get my arm out and get free that we were able to get handcuffs on and secure, so probably right up until that point, yeah, it was probably a lot of it was reactive.

Q. So did you actually have the thought process of, "Okay. Now, I'm going to use this arm to push down on Mr. Miller's back" or was it all

Estate of Robert Miller vs
Sean Roycroft et al.

Sean Roycroft
March 30, 2022

Page 185

just a natural part of your movements during the struggle?

MR FRIEDMAN: Objection.

MS. GILL: What's your objection, Howard?

A. Should I answer that now?

MR FRIEDMAN: Sure.

A. Okay. It -- it definitely was. In a situation like that, you're not -- you don't have the thought process to think of every little thing that you're going to do. I felt him move, I reacted to his movement, I guess, is the best way for me to describe it.

Q. I'm just looking to make sure I don't have anything else. Just bear with me one moment, please.

(Pause.)

Q. I don't have anymore for you, Officer. Thank you.

A. Thank you.

MR FRIEDMAN: I have some more questions, sir. Sorry, you're not done.

Carmen, could you put up Exhibit 15 and show the narrative down at the bottom?

Page 186

REDIRECT EXAMINATION
BY MR. FRIEDMAN:

Q. Okay. Mr. Roycroft, can you see the Narrative that's at the very bottom here?

A. Yes, I can.

Q. And is that the information you had on your computer screen?

A. I believe it is, yes.

Q. Did you have any further information before you got to the home on Elm Street?

A. I'm trying to remember if there was a radio transmission that the dispatcher tried to call the number back with no success.

Q. Did you write that in any of your reports?

A. No, I did not write that in my reports, no.

Q. Okay.

MR. FRIEDMAN: Carmen, you can take that down.

Q. Mr. Roycroft, did you ask Amy why the call was -- why she disconnected the call or why the call was disconnected?

A. I don't know if we ever got to that. I

Page 187

don't -- I don't believe I did.

Q. When you say you don't know if you got to that, was there -- I think what you said before, it wasn't an emergency to go out and see Mr. Miller, correct?

A. Well, you'd have to define "emergency."

Q. Well, you could continue talking to Amy Anderson and get further information that was necessary before going out back, right?

A. I -- I -- I guess I could have, but in that also, I didn't -- I didn't know if Robert was going to try to harm himself. That's -- that's also part of my concern and the reason why I went.

Q. Okay. I just want to know, had anyone indicated at any point that Robert Miller was thinking of harming himself?

A. Well, he was in a psychotic break. I mean to say those words specifically, I don't think it's -- I don't think it's unfair of me to have that thought that somebody in a psychotic break might try to hurt themselves.

Q. So the actions you took that day, you were trying to prevent Robert Miller from hurting himself; is that right?

Page 188

A. Well, that was part of it, yes.

Q. And Amy Anderson didn't tell you, "I don't want to talk to you anymore" or abruptly end your conversation, correct?

A. Not abruptly, no.

Q. She answered all the questions you asked, right?

A. As best I can remember, yes, she did.

Q. Now, Ms. Gill asked you questions about whether you could use techniques that were not taught at your department. You, for example, were taught Brazilian Jiu Jitsu, right?

A. I trained in Brazilian Jiu Jitsu, yes.

Q. So would it have been appropriate for you to use Brazilian Jiu Jitsu techniques on Robert Miller?

A. I'm sorry. Say -- would it have been --

Q. Would it have been appropriate for you to use Brazilian Jiu Jitsu techniques on Robert Miller?

MS. GILL: Objection.

You can answer.

A. I don't know that I did use. I don't

Page 189

believe I did.

Q. I'm asking if it would have been appropriate if you felt like that was a thing you wanted to do, you're not trained by the department in it, but you happen to know that technique, would that have been okay?

A. If that's what was available to me, yes.

Q. When you say, if that's available, are you feeling like if there's only one technique left that's available to work or just it's available in that it's one of the many possibilities that's available?

A. Well, it depends on -- once, again, it depends on the situation, and it's that round peg in the round hole that seems like people want to say, "Well, this is what it says in your policies and procedures. This is what you have to do." It's not that way at all. It's a preferred way. It's definitely the preferred way, but sometimes that's not going to work. It depends on the size, the strength of the person -- the people involved. There's so many factors that go into it and to put a simple answer on it, you know, a few words, it

Page 190

doesn't do it justice.

Q. Would you agree --

A. Not fair.

Q. Would you agree that the technique you used didn't work?

A. Would I agree that the technique I used didn't work?

Q. Yes, the seatbelt hold.

A. No, I would not agree with that.

Q. When you spoke to Amy, did you understand that she had been in a long-term loving relationship with Robert Miller?

A. When I spoke with her at the front door?

Q. Yes.

A. No.

Q. Did you learn that later?

A. I don't know if I ever learned that, to be honest with you.

Q. Did you in speaking to Robert Miller, were you trying to calm him down?

A. I was trying to calm him down, yes.

Q. Some of the reasons you behaved the way you did was for your concern for Amy Anderson and

Page 191

her safety; is that correct?

A. Yes.

Q. And did you ask her whether she could go next door to a neighbor's or go someplace else where she would not be in any danger?

A. I think we covered that earlier, but I -- I don't remember asking her that specific question. I asked her if she felt comfortable staying in the house, I believe, is how I termed it.

Q. And her answer was acceptable to you?

A. Yes.

Q. Okay. I have no other questions.

MS. GILL: I don't have any.

Julie, do you need any spellings before Officer Roycroft signs off?

THE STENOGRAPHER: I don't think so, but can I ask on the record if you want to order a copy of the transcript?

MS. GILL: Yes. May I please have just an electronic copy, the full and a mini pdf? Thank you so much.

Officer Roycroft, you can sign off.

THE WITNESS: Okay. Thank you, Sasha.

Page 192

(Whereupon, the deposition concluded at 3:16 p.m.)

Estate of Robert Miller vs
Sean Roycroft et al.

Sean Roycroft
March 30, 2022

Page 193

CERTIFICATE

Commonwealth of Massachusetts

Suffolk ss.

I, Julie A. Mercier, Registered Professional Reporter and Notary Public in and for the Commonwealth of Massachusetts, do hereby certify that SEAN ROYCROFT, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is transcribed to the best of my ability.

I further certify that I am neither related to or employed by any of the parties in or counsel to this action, nor am I financially interested in the outcome of this action.

In witness whereof, I have hereunto set my hand and seal this _____ day of _____, 2022.

*Julie A. Mercier*

Notary Public

My commission expires:

September 2, 2022

Page 194

ERRATA SHEET DISTRIBUTION INFORMATION

DEPONENT'S ERRATA SHEET & SIGNATURE

INSTRUCTIONS

ERRATA SHEET DISTRIBUTION INFORMATION

The original of the Errata Sheet has been delivered to Alexandra Gill, Esq.

When the Errata Sheet has been completed by the deponent and signed, a copy thereof should be delivered to each party of record and the ORIGINAL forwarded to Howard Friedman, Esq. to whom the original deposition transcript was delivered.

INSTRUCTIONS TO DEPONENT

After reading this volume of your deposition, please indicate any corrections or changes to your testimony and the reasons therefore on the Errata Sheet supplied to you and sign it. DO NOT make marks or notations on the transcript volume itself. Add additional sheets if necessary. Please refer to the above instructions for errata sheet distribution information.

Page 195

PLEASE ATTACH TO THE DEPOSITION OF SEAN ROYCROFT

CASE: MILLER v. ROYCROFT

DATE TAKEN: MARCH 23, 2022

ERRATA SHEET

Please refer to page 194 for errata sheet instructions and distribution instructions.

PAGE    LINE   CHANGE    REASON

_____

_____

_____

_____

_____

_____

_____

I have read the foregoing transcript of my deposition and except for any corrections or changes noted above, I hereby subscribe to the transcript as an accurate record of the statements made by me.

Executed this _____ day of _____, 2022.

_____

SEAN ROYCROFT

Estate of Robert Miller vs
Sean Roycroft et al.

Sean Roycroft
March 30, 2022

**Exhibits**

**1 Roycroft Answers to Interrogatories**
4:9 16:11
**2 Roycroft Supplemental Answers to Interrogatories**
4:10 16:11
**3 Roycroft State Police Interview Transcript**
4:11 17:4
**4 Roycroft first draft of report**
4:13 17:10
**5 Roycroft Incident Report**
4:14 17:11
**6 Resp to Resistance Report**
4:16 23:22
**7 Policy 502 Response to resistance**
4:17 49:9
**8 Policy 1106 Mental Illness**
4:18 55:20
**9 Mental Health First Aid training**
4:20 60:21
**10 diagram of first floor**
4:21 135:23
137:18
**11 photo - deck**
4:22 114:2
**12 photo - dining room and slider**
4:23 121:7
**13 photo - office area with 2 doorways and table**

5:2 124:4
**14 photo - office**
5:4 127:13
**15 Dispatch call log**
5:5 18:24
185:23
**17 image of restraint hold**
5:7 35:7
**18 image of restraint hold**
5:8 35:19

**$**

**$10**
110:8

**1**

**1**
6:2 16:11
57:1,9 58:20
59:10 158:12
173:19,22
174:2
**10**
46:12 135:23
137:18
**100**
26:9
**11**
114:2
**11th**
46:7
**12**
121:7
**13**
124:4
**14**
127:13
**15**
18:24 185:23
**16**
20:17 168:16
179:8
**16th**
177:5
**17**
35:7

**1776**
158:18
**18**
6:2 35:19
**190**
42:23
**1983**
13:1
**1996**
19:14
**1:30**
142:15

**2**

**2**
16:11 57:1
58:4
**2016**
46:7
**2017**
78:17
**2019**
20:17,19
44:18 46:9,12
48:1 70:1 72:9
168:16 179:8
**2021**
16:10 109:11
**21**
9:17 109:11
**26th**
20:10
**27th**
9:15
**28th**
20:18
**2:00**
143:23 144:1
**2nd**
19:20

**3**

**3**
17:4 60:5
158:11,12,13,
14 172:20
173:14
**3:16**
192:2

**4**

**4**
17:10
**45**
81:23 96:11
122:18 169:20
171:14

**5**

**5**
17:11 60:8

**6**

**6**
23:22 60:13
**6644**
6:10

**7**

**7**
49:9 60:15

**8**

**8**
55:20
**8th**
19:21

**9**

**9**
60:21 108:4,9
**911**
170:20 180:24
182:3
**9th**
19:21

**A**

**ability**
136:7
**abruptly**
188:3,5
**absence**
180:3
**absolutely**
37:1 106:9
156:18 158:4

159:1 165:19
171:15,19
174:21
**Academy**
37:17
**accept**
14:23
**acceptable**
8:18 9:6 60:3
191:11
**access**
170:11
**accident**
8:6
**accommodated**
175:10
**accomplish**
165:11,16
**account**
14:13,15,20
**accuracy**
137:23
**accurate**
12:22 16:13,
20 36:2 41:6
108:22,23
109:3,8 138:3
139:3 167:23
**accurately**
41:6
**acknowledge**
6:12,16
**act**
41:4 60:13
171:12
**action**
61:2,4 83:12
**actions**
102:6 143:10
176:4 184:5
187:22
**active**
52:15 65:19
**actively**
44:20,23
70:24
**Activity**
100:12
**add**
17:6
**additional**
82:19

**adhere**
55:4
**adhering**
45:1
**administered**
6:17
**admitted**
99:10
**advice**
9:3
**advise**
100:8
**advised**
100:3,7,17
**AED**
100:16
154:10,18
156:9
**afraid**
86:12 87:1,12,
15,20,23
91:12,16,21
92:1,3,4,8,9,
22,24
**AFTERNOON**
144:10
**aggression**
62:8,21,23
**agitated**
66:23 174:20
**agonal**
73:3
**agree**
7:6,8,12 36:4
45:20 49:13
50:16 55:15
88:22 175:15,
17 190:2,4,6,9
**agreeable**
71:24
**agreement**
6:23,24
**ahead**
39:19 98:8
103:9
**aid**
46:1 60:19
74:4,23 154:8,
11
**air**
74:8 75:1

**Alexandra**
7:5
**allowed**
45:5 51:18
145:4,9,10
**allowing**
178:20
**altercation**
154:17
**alternative**
41:14
**ambulance**
99:24 119:10
**amount**
45:7
**Amy**
59:21 60:6
69:6 81:21
82:6 83:9
84:21 85:1,4
86:24 89:13
97:2,8 98:15
100:20 101:7,
16 102:13
103:13 104:1
113:10 119:16
126:22 147:6,
14 150:6,9
152:5,18
159:14 160:6,
23 161:9
173:11 183:1
186:21 187:7
188:2 190:10,
24
**Amy's**
160:10,16
183:15
**and/or**
49:18
**Anderson**
59:21 69:6
81:21 82:7
83:10 84:21
85:1 86:24
89:13 97:4,5,8
100:21 101:7
102:13 103:13
119:17 126:22
147:6 171:20
172:17 180:24
182:14,19
187:8 188:2

190:24
**anger**
89:20
**angry**
62:11 84:16
85:1,3,6 89:8,
15,21 91:13
115:13
116:17,20
156:5
**animal**
107:10
**ankles**
80:19
**announced**
124:24
**answering**
54:13
**answers**
15:3 16:9,12
91:11,23
108:21 112:15
139:9
**Anthony**
79:9
**anymore**
53:5 185:18
188:3
**apologize**
41:2
**apparently**
21:6 115:5
156:11
**appearance**
113:23
**appeared**
69:18 86:12
87:24 161:14
172:4
**appearing**
6:9
**applicable**
167:19
**applied**
15:19 100:3
156:9
**applies**
41:22,23
44:12
**apply**
36:12

**applying**
16:6 131:12
132:5 139:21
**approach**
85:10 96:20,
21,22 110:5
**approached**
42:14 58:18
62:23 108:1,
19 109:4
110:16
**approaching**
98:3
**April**
20:10,17
168:16 177:5
179:8
**area**
25:17 48:11
59:13,16
123:23 124:2,
8,16 125:22,
24 126:5,22
127:5,18,24
128:5 131:24
132:1 138:7
149:5 150:19
152:24 162:5,
14
**arise**
167:15
**arm**
30:3,4 33:12,
13 34:4 35:23
36:10 43:9
51:9 120:8,11,
12 121:1,4
125:18 126:17
131:7,9,10,12,
13,14,15,19,
22,23,24
132:1,2,6,7,
10,11,12,13,
14,16,18,19,
21,23,24
133:1,4,7,10,
18 134:13,19,
22 135:7,10,
14 139:5,16,
18,20,23
140:1,2,18,20
141:16,17
142:3,5

143:11,15
144:18,20
145:21 148:3,
5,7,17 149:10,
12,13 150:19
157:10 159:6
178:6 183:19
184:7,8,16,18,
23
**armed**
178:4
**arming**
178:21
**armpit**
131:24 132:1
139:16
**arms**
31:1 138:22
141:20,24
**army**
13:5 14:4
**arrangement**
6:21
**arrest**
44:3 101:2,18,
22 102:10,12
**arrival**
172:18
**arrive**
52:21 58:17
82:12 104:23
154:2
**arrived**
59:3 77:18
82:6,10 95:9
156:20 162:8
170:14 173:7
**arts**
28:3,19 29:4
31:11
**asphyxiation**
72:7 73:7
**assailant**
171:4
**assaulted**
98:16,20,23
99:3 100:22
**assent**
7:7
**assess**
56:16 57:5,10
59:10 61:5

Estate of Robert Miller vs
Sean Roycroft et al.

Sean Roycroft
March 30, 2022

173:23

**assist**
77:10

**assistance**
56:20 57:6
58:5,14 153:8
169:22

**assume**
8:17 16:12
84:3 129:7,14,
17

**assumption**
84:7

**Assuring**
48:12

**attach**
162:1

**attaches**
170:22

**attack**
157:5

**attempt**
33:15 52:22
60:15 124:15

**attempted**
33:12

**attendant**
15:13

**attention**
33:16 120:13,
21,22 121:6
160:18 176:18

**attorney**
8:23 9:3 10:8,
19 40:11,22
57:15 165:21

**attorneys**
6:11

**audio**
40:17

**authorized**
37:17 167:8

**Avenue**
6:10

**aware**
24:18 37:8,11,
12 62:7 65:20
142:13 151:23
155:21 165:1,
4 168:16
169:5,7,20,21,
24 170:6,15

171:10 179:8

**awareness**
169:15

———
**B**
———

**baby**
168:7,12,13

**back**
19:14 20:13,
14 22:7 27:22
29:11 43:19,
24 44:17
51:24 52:12,
13 54:21 58:1
63:2 70:1 71:6
72:9,12 77:22
78:3,4 86:13
90:12 95:16
96:8 100:18
102:19 103:14
104:2,5,6
114:24 120:19
122:14
123:10,13,20
131:7 132:20
133:4,16
134:2 135:9,
12 136:22
139:14 143:22
144:12 149:24
163:6,7
173:18 176:1
183:20 184:24
186:13 187:9

**background**
12:24 63:17
64:22 72:21
121:19

**backup**
56:20 57:6
58:5,13,15,17,
21,22 77:16,
18

**backyard**
174:2

**bag**
154:8,11

**balance**
182:18

**balancing**
166:23

**Balcom**
95:24

**bald**
35:9

**bar**
30:3,4 43:9
51:10 145:21

**Barnstable**
13:1 15:21
26:20 28:15
29:14,21
30:11 37:17
46:2 49:10
76:18 79:4
154:21 165:2
174:6

**based**
21:18

**baseline**
175:6

**basically**
25:10

**basis**
137:23

**bat**
138:4

**bathroom**
77:21

**Bay**
15:13 110:7

**bear**
27:2 125:17
185:15

**began**
59:7 116:5
117:18 153:24
161:19

**begin**
7:2,8 77:22

**beginning**
18:2 75:9

**behave**
48:7 66:8

**behaved**
190:23

**behavior**
66:10 76:22
113:18,23

**belief**
64:12

**beliefs**
63:7

**believed**
83:20 107:6

**belt**
78:8,9,12

**bird**
68:24 69:2

**bit**
27:14 32:13
40:16 63:3
96:8 105:6
109:18 122:1
130:2 133:17
176:5

**black**
35:7 78:12

**blades**
134:21 135:11

**blank**
40:16 138:5

**block**
56:8

**blue**
78:9,10,12
98:9

**Bob**
13:14

**body**
25:12 126:18
132:17,24
133:2,3
135:11 140:1,
2 141:18,21,
24

**Boston**
13:12 78:19

**bottom**
138:18 185:24
186:4

**box**
114:6

**Brazilian**
78:6 144:16
188:12,13,15,
20

**break**
9:8,9 58:8,11
61:17 63:16
67:2,18 76:16
77:20,21 78:4
98:12 101:4
127:21 133:11
136:4,10

143:19,21
144:13 159:7
187:17,21

**break-in**
19:18

**breath**
180:3

**breathe**
12:17 147:7,
10,11,17,20,
22 179:5,10
180:5,14

**breathing**
72:10,16,24
73:3 74:1,6,9,
11,13,18 75:2
99:19 153:11,
12 155:14
161:11 179:2,
4,10,15,19,24
180:5,10,14

**bridges**
13:12

**briefly**
85:10 154:24
182:14

**bring**
23:9 49:6,7
149:13

**British**
158:20

**broke**
25:18

**broken**
112:9,18,22
113:2,4
114:23 115:11
178:6

**brown**
78:12

**buddy**
109:16,20
110:2,4,9

**building**
52:16 160:24
161:1,9

———
**C**
———

**call**
18:5,10,11,15,
18,22 21:13
22:4 48:20

58:7 85:5 96:13 97:2,6, 7,9,15,19 101:1,2,5,10, 13,17,18 102:1,4 124:2 148:19 168:17 169:18,21,24 170:10,11,14, 16,22 171:1,2, 4,6,8,10 173:12 180:24 181:3,4,8,15, 19 182:3,6,9, 12,16 183:6,7 186:13,22,23

**called**
7:17 84:22 85:24 92:7 111:18 112:1 115:20 116:2 151:22 153:15 176:13

**caller**
170:1,4,6

**calling**
84:16 89:15 101:18

**calls**
54:20 170:20 171:6 174:23 175:1,2,6,7

**calm**
48:10 60:9 111:12 116:17 156:4 176:4 190:21,22

**calmer**
49:7

**Cape**
13:15 78:24 99:11 168:15

**car**
181:14,16,20

**care**
94:8 99:23 155:22

**career**
19:13 76:17

**careful**
94:4

**cares**
89:1

**Carmen**
31:21 35:20 36:8 46:22 56:5,7 61:2,22 64:17 108:8 122:13 124:14 127:15 128:3 185:23 186:19

**carotid**
152:3

**carpenter**
13:9

**Carpenters**
13:12

**carpentry**
13:8

**cars**
110:7

**case**
8:5 12:9 19:1 20:7 35:7 51:4 53:24 57:23 60:9 90:2 129:7 173:18 182:1

**catch**
119:20 126:24

**caused**
116:20 127:8 157:19,21 171:4

**cell**
9:4

**center**
99:10

**ceramic**
112:10 113:1 115:11 116:13 178:7

**certified**
46:8

**chance**
60:21

**change**
21:22 22:4 54:10,11 179:20

**changed**
21:19 52:18, 24 111:24 115:13 116:16

**changing**

47:17

**characterized**
56:24

**charges**
102:11

**chart**
55:22 173:3

**checked**
152:2 155:15

**chest**
74:10 133:5, 16 142:23 143:3 162:3 179:16

**chief**
19:17,24 95:24

**children**
160:4

**choke**
36:24 37:9 39:13 41:24 80:12,22,23 145:10

**choked**
145:14

**chokehold**
31:17,19 35:17

**choose**
71:22

**chose**
39:9

**Christmas**
9:14

**circulation**
80:24

**circumstances**
50:13 167:10

**City**
31:4

**civil**
23:9

**civilian**
43:17,21 45:6

**clamp**
184:7

**clarification**
43:4 105:24 147:24 169:6

**class**
47:1

**clean**
40:24

**clear**
21:3,5 45:15 110:1 161:21

**clenching**
117:7

**climbed**
162:10

**close**
75:23 113:6,9 115:8 119:19 122:5 151:9 177:20 178:17

**closed**
151:5 178:4

**closer**
117:3,5 178:18

**closest**
138:19

**club**
125:12 126:6, 11 127:16,24 142:10,11,12, 13,18 143:2 156:6

**clubs**
125:11,15

**Cod**
99:11 168:15

**colder**
10:1

**collapsed**
156:8,23 157:3

**collapsing**
131:18 132:2, 4 133:7

**college**
13:17,21,22

**color**
179:20

**Coloring**
179:19

**comfortable**
54:13 59:24 71:12 76:23 86:9 191:8

**command**
176:9,22 177:1

**clean**
40:24

**commands**
45:1 67:4,21, 23,24 69:21 73:12,18 175:20

**Committee**
47:16

**Commonwealt
h**
6:7

**compete**
78:13

**competence**
49:15

**competition**
78:18

**competitions**
78:13

**Complaint**
12:8,18,19,21

**complete**
150:4 159:5 173:22

**completely**
16:12 86:20

**comprehensive**
181:7

**compressions**
162:3,4

**computer**
27:22 186:7

**computer-
generated**
27:16

**concept**
49:2 167:4

**concern**
22:21 23:7,8 48:12 83:2,4, 14 97:7,18 101:14 102:4, 6 103:16 142:4 143:12 170:21 171:1 175:6 183:14 187:13 190:24

**concerned**
23:2 84:15 89:14 97:14 125:13

**concerns**
111:19 112:1

115:20 116:3 166:24 174:24

**conclude** 105:13 128:24 129:2

**concluded** 192:1

**conclusion** 105:15

**condescending** 110:13,15,17

**condition** 42:17

**confirm** 69:16

**confronting** 75:11

**confused** 95:5,6

**confusing** 137:14

**connected** 131:8

**connection** 159:10

**conscious** 103:15 126:19 133:23 151:15

**consciously** 37:2,6

**consent** 6:20

**considered** 85:10 125:8 151:22 176:14

**consistent** 85:22

**Constitution** 158:8,18

**contact** 66:1 76:1,4 95:9 120:22 132:20 160:4 173:9

**contacted** 89:7,21 91:14

**content** 64:12

**continue** 154:19 171:8 187:7

**contrast** 95:13

**control** 49:18 88:19, 20

**conversation** 48:11 59:19, 23 65:23 68:21 77:15, 16 83:19 85:7, 14 86:22,24 87:19 98:18 99:4,6 106:2, 7,16,17,19,21 107:12 110:22 111:1 130:14 141:1 150:12 155:10 156:13 160:6,8 162:16,24 163:12 176:7 178:16 188:4

**conversations** 11:10,11,12, 18,19,20,22, 23 12:1,2,7 22:13,18 68:18,19 82:14 159:14

**converse** 66:11 106:23

**convincing** 107:11

**cooperation** 60:16

**cooperative** 42:13 156:5

**copies** 10:10,13 26:12

**copy** 24:6 191:19, 21

**corner** 47:22 58:1 59:12 103:20 104:10,11 105:2,4 119:20 121:14 127:1

**correct** 13:2,6,17,19 14:2,7 18:8

19:11 21:10, 16,19 26:17 31:8,9 32:20 33:5,7 35:9,10 37:13 38:7,12 44:8 50:11 51:4 52:2 53:1,20 54:11 56:14,17,20 58:8 59:4 60:6,11 61:18 62:4,8,12,16 64:9 66:17 68:5,7 69:5,14 79:16 81:5,6 82:4,15 84:17 85:1 87:2,15 88:1 89:4 90:3 91:14,17 93:8, 17,21,22 94:12 95:14, 19 96:4,5 97:15 99:13, 19 100:4,22 101:4,8,11 102:15,19 103:14 104:9 107:15,18 108:4 111:12, 22,23 113:7 114:7,13 115:21 117:16,23 118:2,9 119:10,11,14 121:11 125:22 126:13 128:1, 6,9,13,14,16 132:18 133:21 134:7 137:21 139:24 156:16,24 157:1 187:5 188:4 191:1

**corrected** 15:6

**correctly** 98:5

**Council** 47:14

**counsel** 6:20 7:17

**country** 23:4 53:3 158:9,10

**couple** 135:24

**court** 9:9

**Coutinho** 78:22

**cover** 76:5,6,7 96:16

**covered** 152:14 191:6

**Covid** 81:10,13

**CPR** 99:21 153:23, 24 154:19 155:15 156:9

**create** 148:16 184:6, 9

**creating** 133:8 134:3 143:9

**criminal** 101:2,18 182:2

**criteria** 69:13

**cross** 102:23 164:14

**crude** 138:4

**cruiser** 170:12

**cuffed** 149:5,24 156:6

**cuffs** 152:10,16

**curious** 175:21

**current** 158:20

**cursor** 47:19

**curved** 122:8

**custody** 29:15,19,23

**cut** 80:23

**D**

**D'ANGELO** 79:9

**damage** 181:22

**danger** 37:12 53:13 57:20 191:5

**dark** 32:10,11

**date** 20:23

**day** 30:18 36:5,22 114:3 187:22

**day-to-day** 11:21

**days** 16:19 18:4,8 19:7 20:4 83:22,23 84:5, 6

**de-escalate** 48:17 61:22 62:1 174:8,11

**de-escalated** 48:21

**de-escalation** 49:3

**dead** 161:12 163:24

**deal** 38:5 49:1 52:1,3

**dealing** 48:7,23 55:2 57:20 61:16 73:10 77:6 94:20 173:16 174:19

**deals** 54:20

**death** 22:23 31:5 162:17

**December** 9:15

**decide** 157:22

Estate of Robert Miller vs
Sean Roycroft et al.

Sean Roycroft
March 30, 2022

decided
39:14 103:14
decision
40:7,9 168:4
182:14 183:9,
11
decisions
40:10 54:23
94:21,23
167:22 168:1,
3
deck
59:17 83:15
86:13 103:17,
18 104:12
109:5 111:3,6
112:10 114:1,
2,12,22
116:13 120:19
121:15 128:13
178:8
declare
6:18
defend
159:4
defendants
7:6
defibrillator
100:3
deficient
51:12,15
define
72:6 187:6
definitive
50:20 90:18
definitively
68:6
defusing
64:19,21
65:14,16
degree
50:11
delirium
70:2
delusional
106:18 107:1,
3
demeanor
87:11,14
111:24 116:16
160:10,16
demonstrating

146:23
Dennison
6:10
department
15:22 24:14
25:5 26:20
27:8 30:21
37:18 38:3
43:1 46:14
53:2 54:2
60:20 159:9
164:18,23
165:2,10,11,
15,20 166:4,
22 167:14
174:6 188:11
189:4
departments
53:9,13 54:8
depend
10:5 42:10
88:15
dependent
50:12
depending
71:14 74:7
depends
18:9,10 20:6
48:18,21 50:7
70:22 71:2,18
73:13 75:13
79:21,22,24
80:3 129:17
145:19 173:5,
11,12 189:14,
15,21
depiction
109:3
deploy
140:15
deposed
8:3 11:14
deposition
6:8 10:7,12
192:1
Deputy
95:24
describe
21:15 25:15
27:4 30:24
33:22 41:6
48:14 127:10
135:1 139:8,

10 146:22
148:9,11
151:14 168:23
184:10 185:13
describing
179:1
description
36:3 48:16
70:11 79:18
135:5 139:11
181:7
descriptive
22:4 30:23
80:16
destruction
181:17
Detective
26:8
detectives
159:18
determine
77:1
DFIB
160:20
diagram
135:22 136:2,
8,14 137:2,23
138:10 145:24
diagrams
123:24
dictate
165:8
dictated
42:14
die
94:9
died
35:1 99:12
163:2
dies
94:3
difference
164:4
differences
54:22
differently
79:19 163:17,
22 164:2,6
difficulties
74:1,6,13
difficulty
75:2 179:10

180:13
digest
163:4
dining
118:7,8 121:8
128:15 152:24
176:21
direct
7:22 75:6
106:17
directed
85:20
direction
105:7 120:19
124:11
directly
32:12,19,20,
21,24 33:22,
23 34:1,7,10,
15 92:10
118:8 159:16
disciplined
19:14
disclaimer
50:6
disconnect
97:9
disconnected
97:2,6,7,15
170:1,3,4,5
171:1,3,5,6,11
182:12
186:22,23
discover
159:8
discuss
22:21 33:19
35:16 162:17
163:16 164:5
discussed
146:5 172:21
175:13
discussing
49:2
discussion
21:21 22:1
23:8 141:5
142:9 146:13
discussions
11:6 21:23
140:22 146:7,
9 163:19,20

dishevelled
105:11
disordered
66:19
dispatch
18:23 19:4
82:4 153:22
169:19
170:15,20
180:23 181:4,
13 182:1
dispatched
95:10 96:13
101:6 180:24
183:4
dispatcher
181:19 186:12
displays
56:12
disregard
54:16
distance
75:12,16,18,
22 177:19,23
178:4,13,20
distracting
65:8,10
disturbance
171:6
doctor
76:19
document
18:23
documents
18:20 91:4
domestic
171:5
dominant
135:20
143:13,16
door
82:11 98:18,
19 99:1
114:24 115:2,
3,9,24 117:9,
19 118:9
121:14,15
153:1 190:14
191:4
doorway
152:22,23
double

149:17
**dove**
120:8
**draft**
17:10,12,15,
18 18:3 21:6,7
**dragging**
123:17 125:21
**draped**
134:20 135:10
**driver**
53:11,12
**driver's**
7:19 9:19
**driving**
96:11 106:13
**dropped**
130:8
**duly**
7:20 137:24
**dumbbell**
114:6
**duties**
161:22

___

### E

**e-mails**
21:24 22:7,9
90:12,16
95:21
**ear**
10:4
**earlier**
93:14 94:19
108:20 154:13
164:17 167:2
169:4 172:16,
21 174:7
175:13 177:18
191:6
**early**
19:13
**easily**
31:16
**easy**
118:14
**eat**
144:2
**echo**
67:6
**editing**
90:6

**edits**
95:16
**education**
13:17,21
**educational**
12:24
**effect**
108:11 109:21
131:4 147:1
152:8
**effective**
117:23
**elbow**
35:8,12,14
139:17
**Electrical**
100:12
**electronic**
191:21
**electronically**
24:24
**eliminate**
72:20,24
**Ellis**
46:3
**Elm**
81:23 96:11
98:1,10
122:18 162:21
169:20 171:14
186:10
**emergency**
83:11,14
104:21,24
155:6 181:1
182:8,21
187:4,6
**Emily**
11:4
**empathize**
63:6,11 64:2
**empty**
111:14
**EMT**
11:3 156:12
159:19
**EMTS**
154:20,21
155:4 160:15
**enact**
42:9

**encounter**
171:20 183:11
**encountered**
69:10 76:15
100:20 177:5
**encourage**
61:7,8,9
**end**
20:11 22:3
27:19 63:21
145:15 188:3
**endearment**
110:4,11
**ended**
31:5 127:17
154:17
**enforcement**
31:16
**engage**
48:11 52:22
65:23
**engaging**
176:13
**enjoyment**
29:1
**enter**
26:15 52:15,
17
**entered**
20:10,18,21,
22 27:1,5
90:10,14
94:14 121:18,
23,24
**enters**
106:14
**entire**
95:8
**entitled**
174:7
**epileptic**
88:11,18,24
**episode**
70:9,10,13
113:19
**Eric**
31:5
**errors**
15:6
**escalate**
141:9

**essentially**
158:19
**evaluate**
94:22 95:1,3,8
**evaluating**
62:24 95:10
96:10
**evaluation**
156:4
**evening**
179:8
**events**
169:14
**eventually**
142:7,8
154:20
**evolved**
102:3
**evolving**
38:6 173:5
**exacerbate**
62:7,20
**exact**
44:16 65:18
77:18 78:16
87:18 105:14
116:6 127:19
135:5,6
**examination**
7:17,22
164:14 186:1
**examined**
7:20 102:23
**exchange**
74:8 75:1
**excited**
49:8 70:2
**exciting**
15:13
**excuse**
143:18,19
**execute**
142:3
**exhibit**
16:11 17:4,10,
11 18:24
23:22 35:7,19
47:4,5 49:9
55:20 60:21
64:16 114:2
121:7 124:4
127:13 135:23

137:18 185:23
**exhibits**
6:2 10:11,13
17:8 136:1
**exist**
69:8 84:10
**expect**
69:20,23
175:19
**expected**
67:20 168:24
**experience**
72:10 78:5
168:20 170:19
174:22
**experiences**
63:7 64:12
**experiencing**
175:14,19,22
177:20,23
182:21
**explain**
24:21 27:8,12
33:24 34:2,12
65:4 86:5
113:20 131:17
132:3 135:6
136:12 154:16
155:11
**explained**
71:20 178:23
180:20
**explains**
9:18
**explanation**
50:7
**extra**
170:21,24
**eye**
65:24 119:21
127:1 151:6,8,
9 183:14
**eyes**
151:5,14,16,
17

___

### F

**face**
70:17 71:6
138:23 149:23
150:1 151:4
153:5,6

179:20
**face-to-face**
  22:1
**Facebook**
  14:13,14,22
**faces**
  50:14
**fact**
  15:7 19:13
  34:24 73:5
  85:11 96:3
  161:10 169:2,
  5,7 182:11
**factors**
  70:12 189:23
**facts**
  50:12 91:3
  94:1
**factual**
  128:18,20,22
**fair**
  190:3
**fake**
  14:12,14,23
**fall**
  74:9 168:10,
  12 172:19
  176:15 179:16
**familiar**
  44:11,15 56:9
**family**
  159:22 173:13
**fast**
  37:21 41:20
  97:20
**father**
  68:19
**fault**
  41:11
**fear**
  62:7,20,22
  87:6 89:6,20
**feared**
  135:17
**February**
  46:7,9
**feel**
  51:11 54:12
  76:23 102:20
  103:24 109:2
  146:19 150:19
  152:3 176:19

179:15 180:7
**feeling**
  63:7 64:3
  107:5 189:10
**feelings**
  23:4 45:19
**feet**
  125:6 150:7,
  20,23 168:8
  180:17
**fell**
  124:19,20
**felt**
  16:3 38:19
  39:16 51:19
  59:24 60:3
  85:4 86:4,9
  87:12,13,22
  94:20 102:18
  103:12 106:18
  107:10 133:9
  135:19,21
  141:7 142:6
  143:8 148:12
  150:21 163:3
  178:17 184:5
  185:11 189:3
  191:8
**fight**
  45:4 152:9
**fighting**
  71:1,21
  147:23 148:1,
  2,9,19
**figure**
  38:11 65:9
  138:18 171:17
**figures**
  138:15
**figurine**
  112:23,24
  113:4,12,14
  114:23 115:24
**figurine/pot**
  178:7
**file**
  19:21 24:3,8,
  24
**filed**
  11:7,16 12:5
  19:11 20:4
  24:9,13,16,23
  26:20

**filing**
  19:14
**filled**
  26:16 27:17
**final**
  17:11,15
**finally**
  20:18 90:13
  94:12
**find**
  10:15 12:11
  27:9 168:6
  181:22
**fine**
  47:6
**finish**
  40:23
**finished**
  73:22 173:19,
  21
**Fire**
  99:22
**firefighter**
  154:21
**fists**
  117:7,8,10,13,
  14
**fit**
  37:20 38:15
  40:2
**fixed**
  151:14
**flip**
  135:18
**flipped**
  115:12 116:5,
  9,15
**floor**
  70:17,20 71:6
  122:5 123:17
  125:3,12
  126:5 127:7,9,
  22 130:9,10
  131:22 132:9,
  10,14,22
  135:23 136:1
  151:5
**Florida**
  6:10 9:13 10:2
  15:8,10 16:2
  81:12
**focus**

33:18 39:15
  137:10
**focused**
  35:14
**follow**
  16:15 45:12
  51:21,23
  53:18 54:9
  55:3 61:4
  67:4,20 69:21
  175:20
**foraging**
  33:3
**force**
  44:6,10,12,18
  45:5 49:15
  50:12 51:3
  53:18,19 54:1
  141:9 166:24
  176:10,14,16
**forget**
  97:3
**forgive**
  97:3
**forgotten**
  91:5
**form**
  7:10 13:14
  21:6,8 24:10,
  12 25:2,4
  26:16 27:17
  93:10
**forward**
  12:6 123:18,
  19,21 124:6
  125:10 126:1
  130:2
**found**
  27:10
**frame**
  123:16
**free**
  141:16 149:11
  184:18
**Friedman**
  7:3,7,23 31:21
  35:18 36:7
  40:3,12,13,19,
  23 43:6 46:22
  47:5,7 56:5
  57:2,8 61:1,21
  63:20,24
  64:17 65:1,10

67:6,14,23
  77:19 78:2
  108:8 122:13
  124:13 127:14
  128:3 136:6,
  19,23 137:1,
  21,24 143:20,
  24 144:4,11
  164:10
  165:18,21
  166:8,15,19
  167:1,11
  168:11,19
  169:1 170:17
  171:23 182:10
  183:24 185:3,
  7,21 186:2,19
**friend**
  9:4 14:23
  109:16,20
  110:2,3
**friendly**
  48:15
**friends**
  14:19 173:13
**frightened**
  87:24 171:22
  172:4,8
**frightening**
  88:6,13,21,24
  89:3
**front**
  19:3 77:14
  82:11 89:18
  98:18 118:9
  125:16 162:21
  171:21 190:13
**frustration**
  139:9
**fuck**
  43:22 115:14
  116:22,23
  118:24 119:1
**fucking**
  115:15
**full**
  16:1 135:11
  191:21
**functions**
  29:13

**G**

gain
  60:15
game
  15:15
games
  15:16
gap
  121:10 178:18
garden
  115:1
Garner
  31:5
gasping
  179:22 180:1
gave
  19:24 25:4
  58:24 163:4
general
  11:22,23 20:4
  48:6 181:9
gestures
  180:9
Gill
  7:5,12 10:19,
  23 35:4 39:19
  40:11,17,22
  47:3,6 54:6
  55:11 56:23
  57:4,16 61:9
  62:17 63:19,
  22 65:5 67:10,
  22 68:10
  71:17 77:24
  89:9 93:9
  109:12 136:3,
  21 137:16,22
  142:15,19
  143:18,22
  144:3 164:11,
  15 185:4
  188:9,22
  191:14,20
gist
  163:12
give
  58:21,22 61:6
  161:18 175:9
  177:22 178:13
  181:6,10

Glazer
  13:14
glimpse
  119:20
goal
  42:8
golf
  125:11,12,14
  126:6,11
  127:16,24
  142:10,11,12,
  13,18 143:2
  156:6
good
  10:18 17:1
  34:17 42:17
  77:20 84:20
  136:23 141:6
Google
  159:8
Gosh
  95:18
Government
  158:20 159:12
grab
  117:19 142:17
grabbed
  33:13 34:3
  120:7,11
  121:1,4
  129:22
grabbing
  120:12
graduated
  13:1
grammatical
  21:11
great
  138:9 167:4
Green
  79:8,9
grip
  134:4
ground
  111:9,16,21
  125:7 126:17
  130:24 131:3
  134:14 143:5
  168:10
group
  158:15
groups

158:16
grunt
  146:23 147:3
guess
  10:15 11:12
  19:20 21:7
  46:6,9 47:12
  55:19 76:22
  81:14 83:4
  88:14,23 89:5
  105:6 127:9
  137:10 146:22
  151:13 154:21
  158:16,17
  181:23 185:12
  187:10
guided
  169:14
Guidelines
  56:6 172:21
  173:1,20
gun
  177:10
gym
  28:23 42:16

**H**

hair
  105:11
half
  90:3,18
hallucinating
  69:7,14,18,21
  84:9 88:4
hallucinations
  66:14 67:20
  77:3,7 89:3
hand
  21:19 22:18
  27:17 127:24
  142:21 150:18
  177:12,14
handcuff
  70:16,19
  149:4,8
handcuffed
  71:1,5 149:14,
  22 155:13
  180:17
handcuffing
  72:5 150:3

handcuffs
  45:3 149:15
  152:5 153:16,
  19 184:19
handed
  25:6 27:18
handle
  51:1 54:4
  55:23 56:13
  77:9 117:19
  140:23 164:1
handled
  163:22 175:7
handling
  27:19
hands
  31:2 33:12
  71:5 128:6,7,
  8,10,11,13,19,
  23 129:1,3,4,
  7,8,13,15,16,
  21 130:3,4,8,
  12,16,18,20
  131:5,6,8
  140:13,14
  149:23
  176:12,17,23
  177:2,3
  178:10
handwritten
  25:2,3
hang
  138:17
hangs
  170:21
happen
  23:3,17 36:17,
  24 52:5 68:1
  182:4 189:5
happened
  18:16,19 27:4
  30:18 36:3,16
  37:21 54:16
  94:5 105:19
  106:4 111:5
  112:6 117:6
  118:4 123:8,
  11 127:4,11
  130:24 151:1
  153:14 154:13
  155:9 176:16
happening
  10:5 38:6

41:12 51:2
  73:15
happy
  16:5
hard
  134:24 135:5
  136:11 138:8
  139:8,10
harm
  61:5 187:12
harming
  38:23 42:6
  187:16
hate
  33:17
head
  8:9 18:19
  77:12 79:11
heading
  98:1 123:22
  126:21
health
  46:1 48:20
  60:19 96:18
  102:2 113:19
  156:4 169:21
  172:20 173:1,
  20 174:5,23,
  24 175:2,7,11
  181:1 182:21
  183:13
hear
  34:9 40:14,21
  55:7 59:15
  67:9 74:10,11
  78:20 83:15
  84:12 98:12
  103:19 118:16
  119:1 147:6,9,
  13 150:11
  156:13 166:16
heard
  65:14 70:1,3
  73:4 84:19
  96:4,6 147:16
  158:11,12,13
hearing
  16:14 63:19,
  24 64:22,24
  65:5 66:13
  99:6 147:18
heart
  100:14 157:5

Estate of Robert Miller vs
Sean Roycroft et al.

Sean Roycroft
March 30, 2022

heels
  80:19
heightened
  102:6
helped
  161:23,24
helps
  48:15 67:16
Hey
  69:1 107:18
  108:11
  109:15,16,19,
  20,22 110:9
Higgins
  11:4
High
  13:1
hip
  135:8 139:13
hips
  80:21 139:7
history
  47:15
hit
  53:11 81:13
  123:15 126:13
  146:20
hits
  181:14
hmm
  68:12
hold
  30:12,13,16,
  23 31:3,8,10,
  11,15,23 32:2
  33:11,18
  35:16,23
  36:10,24
  37:22 39:9
  42:1 43:14
  79:12,13,15
  80:5,6,12,23
  96:4 120:5
  123:8,20
  125:18 126:4,
  16 133:7
  138:14 142:17
  165:10,14,17
  167:9 190:8
holding
  131:13
holdings

33:19
holds
  29:7 41:14
  80:9,13
  164:17,22
  165:3,5
  166:21
hole
  51:6 167:4
  189:16
home
  59:22 86:15
  119:13
  120:16,17
  156:12 160:11
  186:10
honest
  22:10 64:4
  97:11 190:19
honestly
  29:10
hooked
  154:19
hooks
  80:18
hopes
  176:24
hose
  115:1
hospital
  99:11 160:14
  168:16
house
  9:21 58:1
  59:12 60:4
  82:23 83:3
  85:12,16,18,
  21,24 86:5,9
  97:22 98:4
  99:15,24
  101:16 103:20
  104:7,9 105:5
  112:8 113:10
  117:18 118:6
  152:19,20
  160:13 171:21
  182:15 183:10
  191:9
How's
  105:22
Howard
  7:3 56:23 65:6
  142:15 143:18

185:5
hug
  175:9
hurt
  87:16 187:21
hurting
  187:23
husband/
boyfriend
  171:7
Hyannis
  19:19 28:23
  81:24 99:22
  155:22

——————
    I
——————

idea
  10:3 14:24
  31:6 70:6,7
  84:20 141:6
ideal
  174:18
identification
  6:3
identified
  7:18
identify
  74:17
II
  46:15 47:20
ill
  48:8 49:2
  75:12,17,19
illness
  46:15 47:20
  55:20 56:13
  160:2
IMC
  20:22 90:10
immediately
  118:6 123:16
  150:6 156:8
important
  91:3 93:16,20,
  21,24 94:1,3
  143:3,6,14
  155:8 177:19,
  22
impossible
  41:20 52:6
in-service
  13:24 43:2,3,

5,7 46:13
  47:19 66:3
inaccurate
  17:5
incident
  11:7,13 12:1,
  3,17 19:20
  20:5,7,8,9,12,
  17 23:19
  27:11 36:22
  37:19 42:15,
  21 43:2,16
  48:2 77:12,23
  81:17,18 99:8
  130:5 157:15
incidents
  75:9 77:5
include
  91:3 182:1
included
  15:7 25:13,20
  91:23 94:5
includes
  167:14
including
  7:11 51:1
Indicating
  157:14
indication
  180:18
individual
  44:19 73:10
  168:5
individual's
  36:12
information
  14:16 56:9
  60:6 61:7
  82:2,3 102:18
  103:13,24
  142:22 162:23
  169:19 173:8,
  11,17 180:22
  181:12,18
  182:5,19,23,
  24 183:12
  186:6,9 187:8
initial
  17:18 19:8
  20:21
initials
  47:17

injured
  168:14
injuries
  25:14,16 26:1,
  4,7
injury
  25:17,19
inquire
  164:10
inside
  59:21 80:19
  82:9,11 83:3
  86:5 101:16
  119:12 120:7,
  16,17 121:9
insistent
  95:22
instance
  56:16 73:16
  145:9 181:14
instructed
  94:17
instructor
  46:24
instructor's
  47:10,13
instructs
  8:23
intent
  38:17 178:21
intently
  65:24
interact
  59:8
interacting
  75:9
interaction
  94:2 99:1
  172:19
Interactions
  46:14 47:19
interest
  182:18
interrogatories
  15:3 16:10,18
  89:12,13
  90:24 91:24
  108:21 109:9
  112:15 157:9
interrogatory
  14:8 91:11
  108:4,9

109:11

**interrupt**
33:17

**Intervention**
56:6 172:20
173:1

**interview**
17:2 91:10
112:16

**interviewed**
90:20

**investigation**
22:23 181:23

**investigations**
14:17

**involuntary**
151:9

**involve**
176:9

**involved**
45:17 56:12
76:11 189:22

**involves**
181:8

**involving**
99:7

**irritable**
66:23

**issue**
48:20 176:22
180:21 182:2

**issues**
97:1 181:7

**issuing**
73:12 176:9

**item**
129:24

**items**
125:14 130:10

───────
**J**
───────

**Jackson**
10:20 11:8
21:16 23:23
24:11 28:13
59:3 104:22
122:24 123:4
124:19,22
130:11 131:3
137:12 138:17
140:7,10,14,
22 141:3,10

142:6,10
145:24 146:6,
7 147:7 149:9,
16,21 150:3,8
151:23 152:4,
8,16 153:15,
21 155:3
162:18 163:7,
9,15 173:6
183:3,5,18

**Jackson's**
25:11 153:8

**January**
46:12 48:1

**Jason**
46:3

**Jennifer**
46:2

**Jitsu**
28:19,21 78:5,
6 79:2,16,23
80:7,13 81:2,
4,8 144:16,18
145:4,10,13
188:12,13,15,
20

**Jiu**
28:19,21 78:5,
6 79:2,16,23
80:7,12 81:2,
4,7 144:16,18
145:4,10,13
188:12,13,15,
20

**job**
15:11,17 38:5
110:7 162:12

**jobs**
15:19 16:7

**Joe**
79:8

**Joseph**
8:2

**judged**
45:8

**judgements**
64:11

**judgment**
49:14 182:16

**Judo**
28:19

**Juliano**

78:22,23

**Julie**
6:4 191:15

**Juniko**
28:23

**junior**
13:21

**justice**
190:1

───────
**K**
───────

**Karate**
28:19

**keeping**
47:17 131:20

**Kenyon**
11:3

**key**
149:18

**kick**
148:24

**kicking**
71:21 149:1

**kicks**
149:2

**Kimura**
145:21

**kind**
23:9 29:7,18
35:22 38:20
40:16 86:22
93:7 107:12
139:12,13
145:20
146:23,24
157:4 172:19

**kinds**
12:6 39:21
179:17

**knee**
25:18

**knees**
150:7

**knelt**
151:3

**knew**
48:7 58:15
77:15 86:13
89:7,21 92:6
93:20 98:3
99:18,20,21,
22 100:2

113:10 141:3
146:18 151:10
152:5 169:18
176:19 183:3,
4,5,8

**knocked**
123:15

**knowledge**
9:5

**Krav**
28:5,10,11

───────
**L**
───────

**label**
181:3,6

**land**
68:24

**language**
45:16

**larger**
56:7

**late**
19:15

**latitude**
145:5

**law**
31:15

**lawsuit**
11:7,16 12:4
23:14

**lawyer**
45:15

**layer**
170:21

**laying**
121:15

**lead**
169:8

**leads**
152:24

**learn**
60:6 66:3 74:5
83:24 122:24
123:4 124:22
159:21,24
160:5 190:17

**learned**
52:23 60:19
85:4 91:13
100:11 144:20
160:1 171:22
190:18

**leave**
71:5

**leaving**
95:22

**led**
113:13 128:24

**left**
32:8,13 33:8
57:7,8 86:4
114:6 119:9,
21 125:18,19
126:17 131:9,
10,14,15,19,
22,23 132:1,2,
10,11,12,16,
17 133:18
134:18,19
135:7,8,9
138:21 139:5,
13,15,16
140:1 141:2
143:11
149:12,13
150:19 151:6
153:3 154:11
160:13,24
161:1 189:11

**leg**
30:5,6 43:11
125:5 135:8,
10 139:13,14,
15

**legal**
45:10 93:17

**legs**
80:19,20

**level**
48:21 49:8
63:1 78:10
182:8

**level's**
78:11

**levels**
127:6

**leverage**
34:5 37:23
134:6 135:15
143:5,9

**license**
7:19 9:19

**lieu**
6:17

**Lieutenant**
25:8 27:18
160:7

**life**
16:3

**lift**
133:5,17
142:23

**lifted**
151:5,6

**lights**
97:19 98:9

**limit**
80:20

**limited**
183:1 184:16

**lines**
90:1 105:17,
18 106:3,5
109:24 110:21
111:1,4
115:15 130:17
140:17 150:24
169:10

**lips**
179:21

**list**
64:8

**listed**
173:3 181:15

**listen**
61:5 63:4
179:15 180:6

**listening**
65:19 120:14,
23

**litigation**
23:10 169:8,
15

**lives**
11:20

**living**
9:22 152:21

**Local**
13:12

**located**
152:1

**location**
153:23

**locked**
149:17

**log**
19:4 180:23
181:13

**long**
9:10 29:9 71:4
79:2 83:16,24
94:11 105:3
112:5 122:15,
18,21 131:2
149:3

**long-term**
190:11

**longer**
88:4

**looked**
10:16 18:22
19:4,5 23:21
49:9,12 55:19
58:10 105:11,
15,16 126:9
161:11

**lost**
27:6 145:13
165:13

**lot**
133:11 145:4
152:14 184:20

**love**
88:3,19,21

**loved**
88:17

**loves**
89:4

**loving**
190:11

**LUCAS**
162:1 168:20

**lunch**
144:5

---

**M**

---

**machine**
162:1,2
168:21

**made**
83:22 86:4
94:23 113:16
168:4 174:1
182:16 183:9,
10

**Maga**
28:6,10,11

**main**
97:24 160:3

**make**
16:17,22 40:6,
9,10 52:22
54:23 55:1
56:6 62:11,20
64:11 65:24
73:6 76:3
94:4,21
101:22 104:4
118:14 133:19
138:2 142:13,
24 144:1
151:23 162:11
167:22 168:3
173:9 176:21
185:14

**makes**
46:11 139:8
142:2

**making**
117:7,10
167:24 184:12

**mall**
52:16

**man**
13:14 32:9,10,
11 35:7,9
37:10

**manage**
53:11

**maneuver**
29:18 30:14
42:9 166:14,
18

**maneuvers**
37:16,20 39:8
43:1 142:3

**manipulate**
141:15

**manner**
6:22 106:21

**Marital**
28:19

**mark**
35:6,19

**marked**
114:1

**marking**
138:10

**martial**

**28:3 29:3**
31:11

**Mass**
13:13 47:14

**Massachusetts**
6:7 9:19,21

**match**
145:14

**material**
152:14

**materials**
47:9

**matter**
6:19 169:14

**maximum**
15:24

**meaning**
109:14,17
174:10

**means**
45:16 49:6
62:10 65:22
100:6,7
147:10 156:3

**mechanical**
162:2,3

**mechanics**
184:2

**media**
14:9,10

**medical**
70:10,13 72:3
76:20 99:22
101:3,10,13,
17 155:7
159:19 161:19
162:11 179:1
180:19,21

**medication**
83:21 84:4

**medications**
83:19

**meet**
110:5

**meetings**
22:11

**Mellyn**
10:21,22,23,
24 160:7

**members**
173:13

**memorized**
49:22

**memory**
46:19 47:8

**mental**
46:1,15 47:20
48:20 55:20
56:13 60:19
88:4 96:18
102:2 113:19
156:4 160:2
169:21
172:20,24
173:20 174:4,
23,24 175:2,7,
11 181:1
182:21 183:13

**mentally**
48:8 49:1
75:11,17,19
96:14 182:24

**mention**
159:19

**mentioned**
43:13 80:22
91:22

**Mercier**
6:5

**mess**
105:11

**met**
69:13 82:6

**methods**
29:22 30:7
174:19

**microphone**
67:8

**Microsoft**
94:16

**middle**
122:5,9
127:22 138:19

**military**
14:6 29:4,6,
12,19 51:17,
18 54:8,22
158:10

**Miller**
12:16 20:14
21:16 22:24
30:15 31:2
32:17,24 35:1
36:22 38:18

40:9 41:3
42:12 58:6,18
59:8 60:9
61:17 63:1
69:6,11 76:17
81:19 84:9,12,
15,21 85:1,3,
23 87:2,6
94:9,20 101:8
102:10 104:11
106:18 109:4
110:19 118:23
119:9 137:12
138:20,22
139:6 141:12
142:8,17
149:4 154:14
155:18 160:1,
16,24 162:17
163:24 164:3
167:10
168:15,24
169:2 176:23
177:5 178:1
180:14
182:16,20,24
183:17,18
184:3,11
187:5,15,23
188:16,21
190:12,20

**Miller's**
41:11 57:22
62:20 102:1
139:15 141:4
156:12 183:19
184:4,24

**mind**
12:15 22:5
23:16,18 37:1
96:14 97:14
106:14,15
113:18 166:3,
10 174:10

**mindset**
38:22 96:17

**mini**
191:21

**minimum**
45:7

**minute**
59:4,7 116:11
122:22 149:6

163:4

**minutes**
77:21 122:20
136:20,22

**mispronouncin
g**
28:8

**misread**
57:3

**missing**
26:21

**Mixed**
28:19

**moment**
39:17 41:14,
16 165:17
185:15

**monitor**
14:16

**month**
90:2,18

**months**
48:1

**motion**
133:6,7

**motions**
7:11 88:20

**motor**
53:8,10

**mouth**
102:21

**move**
9:13 35:22
36:11 67:7
72:2 81:12
101:17 104:22
117:5 135:20
143:1 148:14
149:12 150:20
151:16 159:12
172:10 185:11

**moved**
15:7 71:24
115:16 117:8
121:22 122:1,
2 151:21
162:14

**movement**
62:4 80:20
142:24 185:12

**movements**
143:7 148:14,

15 184:10,12,
13,15,16
185:1

**moving**
12:6 36:24
51:20 53:8,12,
14 88:19
123:17,19
125:23 143:6
148:10,11
151:17 167:5

**MP**
14:5

**multiple**
73:16,21

**Municipal**
47:16

**Murphy**
25:8 27:19

_____

**N**
_____

**named**
13:14

**narrative**
25:12 185:24
186:4

**natural**
183:22 185:1

**nature**
14:18 21:12
68:8 105:23
106:2,3,7,10,
17,19,23
107:12,13
110:22 113:22

**necessarily**
84:23 176:11

**neck**
35:24 36:12

**needed**
16:1 17:6
18:11,13,15
63:10 83:11
95:14 103:13
104:1 143:4
154:18 169:20

**neighbor's**
86:15 191:4

**news**
23:6 37:7

**night**
18:8 114:3

180:15

**Nightingale**
19:17

**noise**
63:17 64:22
72:21 121:19
146:23,24
147:3

**non-
judgmentally**
61:6 63:4

**nonverbal**
87:19,20

**normal**
66:9 74:8,15,
19 75:1 76:22

**North**
6:10

**Notary**
6:6

**note**
137:16 181:10

**noted**
138:1

**notes**
170:9

**notice**
172:6 179:18

**noticed**
119:23 157:8
181:24

**notified**
99:16 162:20,
21

**number**
31:22 186:13

**numerical**
173:2

_____

**O**
_____

**oath**
6:17 144:13

**obese**
73:5

**object**
68:10

**objected**
55:14

**objecting**
56:24 137:22

**objection**
8:22 35:4 54:6

55:11 56:23
62:17 71:17
89:9 93:9,10
109:12
137:17,24
142:19 165:18
166:8,19
167:1,11
168:11,19
169:1 170:17
171:23 182:10
183:24 185:3,
4 188:22

**objections**
6:21 7:9 8:20

**objective**
44:11 45:9,16,
22

**observe**
103:21 180:12

**observed**
69:17

**observing**
58:19

**obtaining**
182:19

**obvious**
143:12

**October**
19:21

**offerings**
174:16

**office**
123:23 124:2,
8,16 125:22,
24 126:5,22
127:5,13,18,
23 128:5
138:13 149:5
152:24 162:5

**officer**
10:19,20,21,
22 11:7 14:1,3
21:15 23:23
24:11 25:11
28:13,15 29:4,
6,12,14,19,21
30:11 38:4
41:19 43:18
44:13 45:6
50:13 53:18
54:19 56:12
59:3 68:5

69:22 73:11, 18 76:1,3,5,7, 18 81:5 104:22 122:24 123:4 124:19, 22 129:5,12 130:11 131:3 137:12 138:17 140:7,10,14, 21 141:3,10 142:6,10 145:5,8,24 146:6,7 147:7 149:9,16,21 150:3,8 151:23 152:4, 8,16 153:8,15, 21 154:2,3,4, 9,12 155:3 156:11 159:9 162:18 163:15 164:16 167:14,21 170:19 173:6 174:6 183:3,5, 18 185:18 191:16,23

**officers**
23:5 31:4 46:2 52:17,21 53:7 60:20 73:12, 14,16 77:10 79:5 85:24 156:2 165:24 166:4,12

**official**
28:16

**open**
118:5 121:10, 13 151:7

**opening**
153:1

**opinion**
36:18

**opponent**
145:3

**opposed**
38:11 45:9 181:16

**opposite**
159:5

**oral**
19:24

**order**
173:2 191:19

**orders**
54:9 67:21,22, 24

**ordinarily**
19:10

**outcome**
163:17 168:18,23 169:8

---

**P**

**p.m.**
192:2

**pain**
145:22

**pains**
6:19

**pal**
107:18 108:12,15 109:14,20 110:2,3,9

**paper**
18:12,14 27:20 138:5

**Paramedic**
155:23

**paramedics**
154:21

**paranoid**
66:21

**park**
110:8

**Parkas**
46:2

**parking**
15:12 110:7

**part**
28:15 33:18 38:5 46:15 47:20 50:16 58:3,19 59:10 74:23 99:6 114:20 119:24 121:14 122:9 132:13 156:1 167:13,21 174:2 175:24 180:6 181:20 182:22 183:22

185:1 187:13 188:1

**participating**
6:11

**parties**
6:20

**partner**
161:10

**parts**
122:8

**passed**
68:20 99:17 159:15 169:2

**passively**
150:22 151:3, 7

**past**
9:17 15:24 38:14 94:13 175:8

**patient**
156:4

**patronizing**
64:9

**Pause**
185:17

**pay**
110:8

**paying**
160:18

**pdf**
191:22

**PEA**
100:11

**peg**
51:6 167:3 189:15

**pen**
18:12,14

**penalties**
6:19 109:10

**pending**
9:11

**people**
13:10 14:19, 22 29:14 36:11 48:7,8 49:1 67:8 69:7 75:16 76:10 82:23 83:3 84:9 145:10, 11 157:11,23

158:1,6 159:11 160:19 175:14,22 179:2 180:8 189:16,22

**pepper**
177:8

**perceived**
171:24

**percent**
26:9

**Percenters**
158:11,12,13, 14

**perfect**
17:24 167:4 173:2

**perfectly**
129:21

**perform**
161:22

**performed**
99:21

**period**
13:11,13 162:7

**perjury**
6:20 109:10

**perk**
15:17

**person**
6:17 25:1 29:23 35:22 45:17,19 48:22 49:7,18 57:20 62:11 63:6,12,15 64:3,4 66:8,16 67:1,18 68:3,8 70:16,24 71:5, 14,15,20 72:10 73:5,6 75:11,21,23 76:3,16 80:24 88:3,10,15,21 89:1,4 94:3 98:11 101:3 107:10 129:14 168:10 171:8 173:15 175:8, 19 176:4 177:20 179:4, 9 180:13

182:20 189:22

**person's**
62:4,7 64:12

**personal**
11:20 26:12 28:24 55:1

**personally**
88:8,9

**personnel**
99:22 155:7 159:20 161:15,19 162:8,12

**Persons**
46:15 47:20

**phone**
9:4 97:2 170:7,8 171:7

**photo**
35:19 36:7 114:21 124:14 128:4

**photograph**
33:20 35:6 114:1 121:8,9, 17 122:14 124:4 127:13

**photographs**
26:6,10,13,14

**phrasing**
68:14

**physical**
27:20 42:17 120:21 139:10 154:17 155:12 157:4

**physically**
6:13,14 27:18 45:4

**pick**
113:3,12,13

**picked**
153:3

**picture**
31:22 35:10 36:2,23 115:5, 7

**pictured**
32:22

**pictures**
36:1,2,4 139:12

Estate of Robert Miller vs
Sean Roycroft et al.

Sean Roycroft
March 30, 2022

**piece**
27:20 113:1,3,
12,14 138:5
166:16 178:6
**pieces**
112:10,19
113:2 115:11
116:13
**Pike**
11:4 13:13
**pinching**
131:10,12,16
133:6
**pinned**
131:20
**pizza**
77:14 114:6
**place**
18:16,19 45:3
99:12 103:20
**Plaintiff**
7:18
**plaintiffs**
7:4
**plan**
42:1,3,7 55:1
61:2,5 75:4,5,
8
**plant**
112:9
**play**
10:4 173:2
182:3
**pleading**
134:10
**point**
9:23 22:2 23:3
36:9 37:24
38:17 53:19
62:24 80:7
83:10 90:20
98:22 101:14
104:13 105:15
109:2 118:4,
12 119:16,19
123:14
126:13,24
132:20 139:12
140:4,7,14
142:20
143:12,13
153:8 160:19
161:8 162:19

176:6 177:13
178:10,18
180:15 183:20
184:20 187:15
**pointing**
163:6
**points**
42:16 61:24
**poke**
151:8
**police**
14:1,3,6 15:22
17:2,10 23:5
24:13 25:4,22
26:20 28:15
29:4,6,12,13,
19,21 30:11
31:4 37:17,18
38:3,4 41:18
43:1,17 44:13
45:6 46:14
47:12,14,16,
19,21 49:10
50:24 51:18
53:3,7 54:8,19
68:5 69:22
76:18 79:4
81:4 84:16,22
85:5,24 89:7,
11,15,21
90:21 91:10,
14,23 92:7,12,
15,17 93:8
98:13 100:2
107:21,23
112:16 116:1
120:24 129:5,
12 145:5,8
154:1 159:9
165:2 174:6
**policies**
48:5 51:7 55:4
189:17
**policy**
49:10 50:18
53:24 55:20
57:3 165:1,4,
21,24 166:3,
10,11
**Port**
6:10
**portion**
165:23

**posed**
109:1
**position**
23:2 32:5,6,
16,17 34:13,
17 36:24 37:9,
23 40:6,8,10
41:4,11 71:9,
13,16,24 72:1,
2,4 80:16,17
121:16
127:17,20
134:17 135:6,
21 136:14
137:11 139:11
142:14,16
143:1,13,17
145:1,11
146:1 148:12
151:22 153:4,
7,14
**positional**
72:6 73:6
**positioned**
31:1 57:24
72:11
**positions**
164:22
**possibilities**
189:13
**possibility**
72:14
**possibly**
23:18 35:23
96:15
**posted**
14:12
**posts**
14:10
**pot**
112:9,19
113:4
**potential**
179:23 180:4
**pounds**
42:23
**practice**
43:8 81:7
**practiced**
42:24 43:9
81:13
**Pre-hospital**

155:22
**preference**
165:17
**preferred**
189:19,20
**premarked**
6:2
**prematurely**
171:1,3
**prepare**
10:6
**prepared**
19:8 96:14,19
168:3
**preparing**
11:11
**presence**
124:24
**present**
6:13,14 123:1,
5 124:23
**presentation**
174:5
**Presenters**
158:13
**pressure**
36:12 71:13
131:12,18
132:5 133:9
135:14 139:21
145:3 148:5
**presume**
137:18
**prevent**
37:13,14
72:16 166:17,
20 187:23
**prevented**
32:23
**previous**
99:8
**print**
136:7,17,22
**printed**
136:2 137:3
**prisoner**
29:23 72:17
**problem**
72:16 141:23
157:4 179:19
180:19

**problems**
35:15 72:10,
24
**procedures**
55:4 189:18
**proceed**
12:6
**proceeding**
6:12,13,16,22
**proceedings**
93:17
**process**
17:14,16,22
18:11,14,17,
21 19:5 39:21
96:11 116:5
125:9 129:19
161:17 173:24
174:3 180:20
184:23 185:10
**production**
7:19
**professional**
6:5 61:7
**progress**
126:2
**prohibited**
166:13
**promised**
81:16
**proper**
49:14 84:7
127:10
**property**
9:20 181:17,
22
**protect**
60:10
**protection**
44:21
**protects**
158:15
**provide**
76:7 101:3
155:7 173:16
**provided**
15:3 47:9
166:23
**psych**
99:10
**psychosis**
48:9 66:5,8,16

69:14 75:22
77:1 175:14,
20,22 176:6
177:20,23
**psychotic**
58:7,11 61:17
63:15 67:2,18
68:3 70:9
76:16 83:17
84:1,6 89:2
98:12 101:4
187:17,20
**Public**
6:6
**pull**
37:24 45:4
46:22 131:14
132:7 133:10
**pulled**
77:13 118:5
120:8 123:10,
13
**pulling**
51:9 123:21
124:10 125:4,
10 139:24
**pulls**
110:8
**pulse**
99:18,20
152:2,3
153:10
155:14,15
**Pulseless**
100:12
**punch**
22:5,19
117:11
146:15,16
148:22
**punched**
21:15 146:19
147:4
**punches**
147:1
**pupils**
151:12
**purple**
78:12
**purpose**
120:12 169:17
**push**

133:16,20
135:14 184:24
**pushed**
122:9 134:2
**pushing**
133:3,14
134:1,6,22
183:19
**put**
18:12 24:2
33:12 36:9
40:5,8,9 41:3,
11 56:1,2,6
71:15 72:12
76:20 89:11
94:8,12 95:19
121:2 123:8
126:15 150:18
153:7 157:16
176:17 177:1,
3 178:10
185:23 189:23
**putting**
18:14 102:21,
22 176:12,23

_____

**Q**

_____

**question**
7:10 8:12,16
9:10 16:16
20:15 35:11
40:12,23
54:13 57:14,
15 59:2 67:17
68:11,14 69:5
70:15 73:8
76:12 83:6
86:2,11 90:17
92:18,21
93:11 94:7
97:12 103:11
109:1 117:17
118:21,23
129:11 144:15
191:8
**questioned**
9:2
**questions**
44:10 60:5
82:17,19
102:14,18,22
103:2 104:1,4

164:9,12
172:17 185:22
188:6,9
191:13
**quick**
164:12
**quickly**
38:6 40:7
41:4,12 55:10
59:10 115:16
117:8 162:9
171:12 172:11
173:23
**quiet**
60:9

_____

**R**

_____

**radio**
186:12
**radioed**
153:22
**railing**
115:3 124:7
127:21 162:10
**ran**
97:19
**rapidly**
38:6 51:2,20
**Rays**
15:13 110:7
**re-decking**
13:12
**reach**
16:1 33:10
34:6 67:19
**reached**
17:15 34:4
120:9 150:6,
18 177:13
**reaching**
33:9 34:14,22,
23 119:7
127:8 129:19
**react**
146:21
**reacted**
37:21 185:12
**reacting**
133:24 143:7
**reaction**
39:11 41:16
146:20 147:18

151:9,10
184:4
**reactive**
184:12,15,21
**read**
12:8 16:18
17:1 95:17
108:21 156:1
**reading**
89:10 116:1
**ready**
104:2
**reality**
66:17 67:3,19
68:4 117:16
**realize**
123:12
**realized**
155:13
**rear**
80:12,22
104:8
**reason**
15:22 58:16
59:6,9 83:5
128:18,20,22
129:18 147:21
160:3 170:5,
24 187:13
**reasonable**
45:18 129:22
**reasonableness**
44:12 45:22
**reasons**
72:3 171:9
190:23
**reassurance**
61:6
**recall**
19:6,15,16,22
20:1,11 29:17
30:8 46:4,9,
10,16 49:2,20,
21 50:18 71:7
75:24 76:14
82:1,21 94:24
98:24 163:11,
12 183:20
**receive**
26:3,5 38:9
182:3
**received**

162:22 169:18
**receives**
181:19
**receiving**
145:3
**receptive**
174:16
**recess**
78:1 136:24
144:5
**recognize**
68:4 74:12
179:3,13
**recognizing**
73:24
**recollection**
19:23 20:8
75:6
**recommended**
31:15
**record**
7:1 8:1 24:18
40:24 144:13
191:18
**recorded**
8:10
**recovery**
71:9,16,23
72:1,2,4
151:22 153:4,
7,13
**REDIRECT**
186:1
**reduce**
72:15,20,23
**refer**
79:12
**reference**
83:22 165:23
**referred**
25:12 30:15
**referring**
89:14
**refresh**
46:19 47:8
**regard**
12:3 21:22
22:8 35:16
49:10 75:16
154:14
**registered**
6:5 13:11

Estate of Robert Miller vs
Sean Roycroft et al.

Sean Roycroft
March 30, 2022

**regularly**
42:19
**regulations**
54:17 55:3
**related**
48:20
**relation**
174:13 184:12
**relationship**
190:12
**relayed**
99:10
**release**
148:5
**released**
149:10
**relieved**
160:24 161:4
**rely**
38:10
**Remain**
48:10
**remained**
101:10,13
**remember**
11:24 12:23
21:24 22:10,
16,19 23:11,
12 26:24 27:1
29:10 30:9,10
39:12 64:6
65:17 76:12
77:11 78:16
79:10 82:24
85:7 86:16,22
89:24 91:19
92:9,11,14,16,
20 94:22 95:7,
18,20 97:12
98:5 99:4,5,6,
9 107:20
108:18 111:9
113:1 119:18,
22 124:1
125:12 127:2
131:11 146:13
148:20,21
149:11 153:20
154:3,6,15
155:2 160:12
162:9,15
163:13
164:18,21

166:1 169:9,
10 172:22
174:8,12
175:18,24
186:11 188:8
191:7
**remotely**
6:9,16
**remove**
72:1
**removed**
86:19 115:5
**repeat**
103:10
**rephrase**
8:13 121:21
**rephrasing**
118:21
**report**
17:11,23 18:7
19:8,10,15,19,
21 20:10,18,
21 21:2,4
22:8,12 23:23
24:4,9,16,19
25:9,12,14,16,
20,22 26:11
27:1,9,10,12,
15,16,18,23
85:9 86:3
89:11 90:3,10,
19 91:10,22
92:12 93:8,15,
20,23 94:4,9,
11,15,18
95:14,19
107:23 108:2
109:2,8
112:15 116:2
120:24 121:3
131:11 155:22
156:18
**reporter**
6:6 43:4
105:24 147:24
169:6
**reporting**
6:15
**reports**
10:9 11:12
20:4 26:17,19
94:10,13
169:13

186:15,16
**represents**
10:19 11:2,3
**reprimand**
19:24
**request**
56:19 57:6
58:5,13
**required**
104:21 165:2
**rescue**
153:23 161:14
**reserve**
7:9
**reserved**
8:20
**Resistance**
23:22 24:4
25:15 26:11,
17 27:15
49:11
**resistant**
150:22 151:3
**resisting**
44:20,23
71:21 151:7
**respect**
60:13 168:24
171:14 182:9
184:2,11
**respectful**
152:6
**respond**
148:14,15
176:7,24
**responded**
171:5
**responding**
174:22
**response**
23:22 24:4
25:15 26:11,
17 27:15
49:10 143:10
145:2 169:19
**responsibility**
26:15
**restart**
100:15
**restrain**
168:8

**restraint**
49:14,17
176:13
**restraints**
165:5
**restrict**
62:4
**restricted**
145:9
**result**
22:3 23:19
94:2 97:17
127:7 145:22
168:17 169:15
**retire**
16:4
**retired**
15:21
**retirement**
16:1,5
**retiring**
15:23
**review**
16:9
**reviewed**
10:9 15:2 17:9
**revolution**
158:19
**Revolutionarie
s**
158:21
**rhythm**
100:15
**ricochet**
53:11
**right-hand**
47:22
**rise**
74:9 135:15
179:16
**risk**
61:5
**road**
97:24 106:13
**Robert**
22:23 60:1
69:11 81:19
83:15 84:15,
20,24 85:2,23
87:1,6 89:7,
14,20 91:12,
16 92:6,9

98:15,22 99:2,
9,12,17
100:21 101:8
105:17 106:18
107:18 108:11
109:22 110:1,
3,16,19 111:1
113:3,7 115:8
118:23
122:10,17
123:1,5,8,17
124:10,16
125:3,4,16
126:12,15
127:17,24
130:3 146:8,
15,16 147:13
148:2 150:7,
15,23 152:1
159:15
160:10,16,24
161:15,20
162:14 163:2
173:10 176:17
180:14 183:11
187:11,15,23
188:16,20
190:12,20
**Robert's**
128:6 146:3,
20 159:22
**roll**
43:18,23
**room**
6:14 118:7,8
121:8 152:21
162:11 176:21
**round**
51:6 102:19
103:14 104:2
167:3 189:15,
16
**route**
77:16
**Roycroft**
7:15 8:2 78:3
137:2 144:12
164:16 186:3,
21 191:16,23
**Ruggieri**
10:20 154:3,9,
13

**rules**
8:7 51:21,22,
23 53:19
54:17 55:3
**rush**
53:23

___

**S**

**sad**
161:10
**safe**
86:4
**safety**
97:1 101:14,
16 102:4,7
166:24 174:23
175:1,3
178:18 183:15
191:1
**sanctioned**
30:21
**sandwich**
132:23
**Sasha**
10:19 40:13
57:11 136:19
164:10 191:24
**sat**
18:18
**satisfactorily**
7:18
**scale**
139:1
**scanned**
27:23
**scenario**
37:21 38:16
39:22
**scenarios**
177:21
**scene**
57:7,10,12,18,
23 58:20
59:11,21
77:13 86:19
95:9 96:9,24
99:5 124:19
159:18,19
163:10 171:17
173:23 182:13
**school**
13:1 52:13,14,

16,20 53:17
**screen**
18:22 24:3
56:1,2 64:18
170:10,11
180:23 186:7
**Sean**
7:15 8:2 40:11
65:8 131:4
**searching**
38:18,19
135:4
**seatbelt**
30:12,13,16,
23 31:3,8,11,
15,23 33:11,
18 35:16
36:10,23
37:22 39:9
42:1 43:13
79:13 80:5,6,
12,17,23
95:22 96:1
120:5 123:8
125:17 126:4,
16 190:8
**seated**
80:15
**seconds**
38:12 116:14
122:16 123:7
128:16
**secretaries**
27:7
**section**
63:4 181:11
**sectional**
122:8
**secure**
57:7,10,12,18,
23 58:20
59:11 71:2
142:8 173:23
184:19
**securing**
59:20
**seizure**
88:10,11,18,
24
**send**
22:7
**sending**
21:9 22:9

**sense**
46:11 54:14
172:12,14
**September**
19:20 109:11
**sergeant**
26:8 79:8,9
162:20,22
163:1,3
**served**
158:10
**service**
15:24
**SESSION**
144:10
**set**
154:10
**setup**
65:11
**severity**
183:13
**Shaking**
8:8 117:14
**shaky**
172:9
**Shaw**
10:20 154:4,
12
**sheet**
46:19,23
170:16
**shirt**
105:10
**shock**
100:3,7,9,15,
16,17
**shoes**
105:10
**shoot**
53:8,14
**shooter**
52:15,22
**shooting**
52:20 53:17
**shootings**
52:14
**shop**
77:14
**short**
13:13 170:7
**shortly**
90:13 136:22

**shoulder**
35:9 36:11
134:20 135:10
**show**
31:21 48:5
60:9 108:9
114:2 127:16
137:4,11
155:7 157:13
180:20 185:24
**showed**
36:23 154:4
**showing**
52:19
**shown**
121:23 165:22
174:4
**shows**
122:6 124:5
**shrunk**
162:8
**shut**
97:24 98:1,2,
7,9
**side**
32:7,8,14 34:8
71:10 104:6,8
115:2 125:19
134:18,19
135:7 138:21
141:3,4 146:3,
4 151:4,21
153:3 182:15
183:10
**sign**
157:5 181:15
191:23
**signed**
109:9,10
183:7
**significance**
18:11 158:2
**significantly**
52:9
**signs**
56:13 66:4
153:11,12
179:3,7,11,12
180:12 191:16
**similar**
24:3 32:4
**similarities**

54:20
**simple**
189:24
**sir**
28:1 33:20
40:4 47:1,10
54:16 72:19
93:1 95:6
103:5 118:20
122:11 129:18
134:16,24
139:22 144:14
157:12 158:23
185:22
**siren**
97:19,21,24
98:1,2,4,6
**sit**
39:23
**situation**
18:9 23:1
30:18,22
38:13 48:19
49:6 50:8,13,
23 51:5,24
52:5,7 54:18,
19,21 55:8,24
56:16 57:5,10
59:11 61:23
62:1 68:2
70:22 71:3,18
73:14 74:8
75:14,20 77:9
79:22,24
96:10,18
101:2 129:18
140:23 143:7
164:1 165:7,9,
14 167:6
168:5,7,9,22
173:5,12
174:8,12,14,
18 175:11
176:16 177:4,
24 178:17
185:9 189:15
**situations**
38:5,14 39:4
51:1 52:2,4
55:2 167:15,
19 182:5
**size**
71:14 189:21

skills
65:19
sky
104:14
sleeping
84:4
slept
83:23
slide
174:4,7,11
slider
114:12,17,20
115:9,18
117:9 118:5,9
121:8,10
123:15
124:18,20
sliding
121:15
slightly
52:8
small
138:6 152:19,
20
so-called
30:12
social
14:9,10
society
158:3
soft
176:13
someplace
191:4
sort
13:22 17:6
23:10 26:16
29:7 32:2 35:8
66:14 77:7
sound
20:19 74:14,
19
sounds
15:14 20:20
96:5 136:23
179:22 180:2,
3
space
133:8 134:4
148:16 161:24
162:8 184:6,9
speak

18:12 73:20
154:23 155:1,
4 162:13
163:3,9
speaker
65:2
speaker's
67:15
speaking
104:16 156:12
190:20
specific
23:14 38:2
51:10,21,23
71:7 97:12
146:13 165:23
191:7
specifically
30:13 38:15
72:5 75:24
76:13 86:17
102:9 116:21
157:7 164:23
167:24 187:18
specifics
181:10
spectrum
174:23
spellings
191:15
spent
16:2 93:14
split-second
54:23 94:21,
23 167:22
168:1,3,4
spoke
69:5 92:15
102:13 182:13
190:10,13
Spoken
10:8
spray
177:8
spring
15:12
squeezing
139:22
stamp
20:23
stand
34:15

standard
44:11 45:9,10,
22
standing
32:23 112:8,
13 115:10
152:18
standpoint
175:1,3
stands
158:9
stare
111:14
stared
111:21
staring
111:9
start
31:22
started
59:19 73:17
105:5 120:3
155:15 156:7,
8
starting
78:12 80:7
153:23
starts
35:22
state
7:24 17:2
83:17 84:1,6
88:4 90:21
91:10,23
92:15,16,17
107:21,23
112:16 113:18
stated
167:2
statements
64:9 172:5,7
states
9:22 156:3
stating
6:24
station
163:8
status
102:2
stay
59:21 113:6,9
148:12 162:5

178:18
stayed
162:7
staying
60:1 86:4,9
115:8 191:9
steals
181:14
STENOGRAP
HER
6:4 40:15
191:17
step
57:9 58:4,20
59:10 60:8
124:7 172:20
173:14,19,22
174:2
stepdown
127:6,8
stepped
59:17 111:6
118:5,6 120:7
150:5,8
151:24
steps
57:1 61:4
152:18
stick
138:15,18
sticks
12:15 138:22
stipulate
7:9
stolen
181:15,16,20
stomach
72:17 73:1,2
149:23
stomachs
72:11
stood
112:11,12,14,
18,20 116:14
156:7 161:21
stop
34:21 53:10
117:21 120:15
121:1,5,6
125:10 126:1
134:10 140:5
152:13 181:14

stopped
161:11 177:2
straight
13:4 94:1
138:23
155:17,19
strategies
61:10
street
81:23 96:12
97:24 98:10
110:6 122:19
162:22 169:20
171:14 186:10
strength
189:22
stretcher
160:11 161:3
strike
7:11 21:19
22:5,18 149:2
strikes
177:12,15
struggle
26:2 73:7
119:23,24
122:2 147:21
155:12
183:16,23
184:3,11
185:2
STS
156:2
studio
79:5
stuff
45:13
Sturgis
46:3
subject
45:19 168:8
subjective
45:9,18
submissions
145:19
substantive
21:14
success
186:13
suddenly
156:23 157:3

**sued**
22:22 23:19

**suffering**
48:9 66:4,8
75:22 160:2

**sufficient**
53:17,19 54:1

**suggest**
85:15

**suggested**
21:10 110:12

**suicide**
61:5

**superiors**
22:12 90:6
95:17,21

**supervisor**
21:18 25:6

**supervisors**
21:9 22:8
23:13 94:17
159:18 164:5

**supplement**
15:4 16:19

**supplemental**
16:11

**support**
61:10 158:17

**supporting**
159:11

**suppose**
34:14 35:6

**supposed**
43:18,23
45:21 46:7
50:3 53:18
54:1,9,10 61:4
64:2 96:20
166:6,12

**surrounding**
50:13

**susceptible**
73:6

**suspended**
159:9

**sustain**
25:24

**swear**
7:1 43:17,21
44:7

**swearing**
44:4

**sweating**
105:12

**sweatpants**
105:9

**sweep**
30:5 125:5

**sweeps**
30:6 43:11

**switch**
115:12 116:5,
9,15

**sworn**
7:20

**symptoms**
77:2 179:3
180:13

**system**
27:2,5,6,22
94:12,14

--- **T** ---

**t-shirt**
32:10,11 35:8

**table**
33:3,9 34:4,
14,22,23 35:1
38:1,19,21
42:6,12 118:7,
8 119:4,7,9
120:2,4,8,9
121:16,22
122:4,7,10,15,
18 123:2,5,10,
13 124:5
128:15
129:20,23,24
132:21 176:21

**tactic**
75:16

**tactical**
75:3

**tactics**
75:7

**tactile**
75:5

**takedown**
29:7,18 30:7
38:24 42:9,24
51:10,13 76:9,
10,11,13

**takedowns**
30:4

**takes**
171:7

**taking**
29:14,22
57:22 183:6

**talk**
23:13 68:8,16
77:23 105:23
106:2,10
116:4 132:22
141:2 150:5,9
169:17 188:3

**talked**
11:14,15
94:19 111:11

**talking**
20:12 43:22
63:23 65:22
66:10 69:7
73:18 79:23
83:9 84:9
104:14 107:4
113:21,22
115:15 116:23
118:24 137:6,
8 156:7,23
167:3 172:3
187:7

**Tampa**
15:13 110:7

**tap**
145:22

**taps**
80:24

**taser**
140:15 141:6,
11 146:5
177:6

**tattoo**
157:10,17,20,
23 158:1,24
159:10

**taught**
28:14 30:1,2,
8,12,14,17,20
31:11 37:16
46:1 49:1 50:1
60:20 63:10
75:3,7,8,12,
15,18,21 76:8,
13 188:11,12

**teach**
31:14 50:24

**team**
76:8,10,13

**technical**
27:3

**technique**
40:1,2 41:22
53:4 125:6
146:8 168:9
189:5,10
190:4,6

**techniques**
30:3,19 38:2,
15 39:3 41:18
43:9 49:18,19
50:1,4,19
51:13,19
64:19,21
65:15,16 80:4
124:15 144:19
145:6 146:9
165:24 166:4,
5,12 167:18
188:10,15,20

**telling**
53:1 56:11
140:5

**tells**
140:11

**ten**
77:21

**term**
21:7 33:13
65:14,18,20
70:2,3 73:4
76:14,20
80:15 83:13,
21 95:21 96:1
110:4,6,10,11,
17 115:12
125:24 147:23
176:2 178:19
181:9 182:7

**termed**
85:13 93:18
191:9

**terming**
76:23

**terminology**
44:16

**terms**
13:16 45:11
179:1

**test**
166:23

**testified**
7:20 169:4
172:18

**testifying**
164:21

**testimony**
6:18

**thereabouts**
78:17

**thing**
13:22 17:6
22:6 25:11
29:8 66:14
77:7 81:1
89:19,24 93:7
107:17 132:9
164:2 185:10
189:3

**things**
11:21 12:5,11
14:18 21:12
23:6 41:12
51:2,20 54:21
60:18 61:15
62:3,10 63:5
66:2 68:20
73:15 81:3,10
83:19 84:14
86:18 91:4
116:1 144:22
145:6,18
164:1,6
172:10
179:17,21
183:2

**thinking**
37:2,6 66:19
68:13 96:23
97:1 101:21
187:16

**thinks**
93:11

**thought**
12:12,19,21
17:5 23:18
39:12 47:11
54:3 59:14
89:10 95:17
98:14 101:24
102:9 103:15
106:14 125:9