UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS

ESTATE OF ROBERT JOSEPH MILLER,
by and through IAN MILLER, personal
representative of the Estate,
     Plaintiff,

       v.

SEAN ROYCROFT and SPENCER
JACKSON, in their individual capacities
and the TOWN OF BARNSTABLE,
MASSACHUSETTS,
     Defendants

Case No. 1:21-cv-10738-AK

---

**AFFIDAVIT OF SEAN ROYCROFT**

---

I, Sean Roycroft, hereby swear and depose that the following statements are based on my personal knowledge and true:

1. I was an Officer with the Barnstable Police Department for more than 34 years. I started as a Summer Officer for the Barnstable Police Department in June of 1988, and retired in January 2022.

*Background and Training*

2. Throughout my time as a member of the Barnstable Police Department, I continued my education and training through coursework and seminars.

3. I was first trained as a First Responder in 1989 and received re-training in this area at regular intervals throughout my career in law enforcement.

4. I became a certified K-9 Officer during my tenure with the Barnstable Police Department.

5. Throughout my career with the Barnstable Police Department, I also received annual training in the areas of non-deadly use of force, defensive tactics, distraction techniques, ground defense, handcuffing techniques, restraint/use of force, CPR, criminal procedure, and mentally-ill and disturbed persons.

6. In 2016, I received specialized training on handling individuals suffering from mental illness, including how to approach and connect with individuals suffering from mental illnesses, including psychosis.

7. Throughout my career with Barnstable Police Department, I was actively involved in the community and provided training to residents' associations regarding safety and security, led "Kids' Days," participated in the Falmouth COPS and KIDS Program geared toward teaching children about police work and ways to stay safe, and participated in D.A.R.E. trainings for youth across the Commonwealth.  I received letters of commendation and recognition, as well as lifesaving and time-off awards, as a show of appreciation for my work with the Barnstable Police Department.

8. In 2017, I was presented with the Hyannis Elks Lodge Distinguished Citizenship Award, which is awarded to individuals who demonstrate "Outstanding and Meritorious Service to Humanity."

9. Prior to joining the Barnstable Police Department, I served in the United States Army as a military police officer from 1983 to 1986, when I was honorably discharged from my military duties. Among the distinctions I received during my military career were the Army Achievement Medal and Army Service Ribbon.

*Incident*

10. On April 16, 2019, I was assigned to the 1600-0000h shift and a uniformed, marked cruiser patrol in Hyannis, No. 236.  My responsibilities for this shift assignment included

surveillance of an area referred to as "Sector 1," which included 45 Elm Street in Hyannis.

11. I was notified by dispatch that a 911 call had been placed from 45 Elm Street by a woman who I later learned was Amy Anderson. I was informed that the woman's husband was experiencing a psychotic break, that the caller was "very short" on the phone, and that the call was disconnected with no further information.

12. I immediately radioed into dispatch, notifying them that I was heading to the scene. Over the radio, I heard Officer Spencer Jackson indicate that would respond to the scene immediately, as well.

13. Based on this information, I understood that there was a reasonable likelihood the caller was in fear for her and/or others' physical safety.

14. I made the decision to prioritize ensuring that the subject was secured and therefore not in a position to harm any individuals.

15. I have received extensive training in responding to calls involving individuals suffering from mental illness. This training has taught me to approach individuals experiencing a mental health crisis in a friendly, calm manner and, when possible, to address these individuals by their first names so as to begin building a friendly and non-threatening rapport.

16. While I do not consider there to be any "ordinary" mental health calls, my understanding as I made my way to 45 Elm Street was that this was not just a mental-health-related call, but a call involving a potentially dangerous situation between a husband and a wife.

17. Because of this, a significantly higher level of urgency applied to this call and that implicated a greater need to secure the scene from a safety standpoint.

18. I knew Barnstable Police Department policy pertaining to Response to Calls required me to use my training, experience and common sense to determine how best to handle the situation.

19. I was trained on and familiar with the Barnstable Police Department policy pertaining to Mental Illness, which provides "intervention guidelines" that prioritize performing a quick assessment of the situation and securing the scene (Step 1) over requesting backup assistance, if needed (Step 2) or asking questions of other persons available who are familiar with the potentially mentally-ill individual (Step 3).

20. I knew that Barnstable Police Department policy pertaining to Domestic Violence required me to use all reasonable means to prevent abuse, to separate the parties to prevent violent action when there is reason to believe abuse has occurred or will occur, and to remain on the scene if I had reason to believe that one of the parties would be in immediate physical danger outside of my presence. I was also aware that this policy and the Barnstable Police Department policy pertaining to Mental Illness instruct that individuals suffering from mental illness may pose a significant risk to the safety of others.

21. I was familiar with Massachusetts General Laws ch. 209A, Section 6, which required me to use all reasonable means to prevent physical harm among household members and to remain on the scene, including in a dwelling, wherever abuse was in danger of occurring as long as I had reason to believe one of the parties would be in immediate physical danger without the presence of a law enforcement officer.

22. As a responding officer, I knew that it was my and other responding officers' responsibility to select the appropriate response level, and that there was no policy that required me to wait for other responding officers to arrive before approaching the scene.

23. As I approached the scene, I logged my arrival time at the location of 45 Elm Street at 9:09:28.

24. I then parked and secured my cruiser, and approached the 45 Elm Street residence.

25. From the moment I logged my arrival on scene, I estimate that it took 30 seconds for me to reach the front door of the residence.

26. A woman who identified herself as the 911 caller and who I later learned to be Amy Anderson was standing behind a closed screen door with the front door slightly open; she appeared to be waiting for me to arrive.

27. Ms. Anderson gestured around the back of the house and whispered urgently, "He's out back. He's out back."

28. I understood from Ms. Anderson's body language and whispering that she was fearful for her safety, and that the person she was referring to as "he" was the source of her fear.

29. She informed me that "he" was her husband.

30. I later came to know that "he" was Robert Miller, and that Ms. Anderson was his longtime girlfriend and live-in partner.

31. Ms. Anderson informed me that Mr. Miller was on the back deck, was hallucinating and had been talking to people who are not there.

32. I tried to engage Ms. Anderson briefly to better understand what the subject had been doing and what recent events had led up to that moment.

33. Ms. Anderson's voice was shaky as she informed me that she had returned from a trip and that Mr. Miller had not taken his medication or slept "for days."

34. Ms. Anderson appeared to be nervous and was checking behind her, as if to see if someone was approaching her from behind.

35. Ms. Anderson's short responses to my questions gave me the impression that she urgently wanted me to go directly to Mr. Miller.

36. While this did not dictate my approach to the scene or to Mr. Miller, himself, Ms. Anderson's frantic demeanor underscored my earlier understanding that ensuring the subject was secure was of particular importance in this situation and should be prioritized.

37. I understood from Ms. Anderson's statements that Mr. Miller was located at the back of the residence and was experiencing a mental health crisis that required intervention for his own safety and for the safety of others.

38. I asked Ms. Anderson for her husband's name, which she told me was Robert.

39. During my conversation with Ms. Anderson, I could hear Mr. Miller yelling but was unable to decipher what he was yelling about, or whether he was yelling at another person or people.

40. I recognized that if Mr. Miller were to find Ms. Anderson speaking with me, he might become angry.

41. Based on Ms. Anderson's statements to me and based on my own training and experience individuals experiencing psychotic episodes, I made the decision to approach Mr. Miller by going around the side of the house rather than through it.

42. I balanced the interest in continuing to obtain information from Ms. Anderson with the interest in getting eyes on Mr. Miller and ensuring he was secure, and made the determination that getting eyes on Mr. Miller, ensuring he was secure and ascertaining his mental status was of significantly greater importance at that moment.

43. Based on my experience and training as a police officer in the Barnstable Police Department, Ms. Anderson's preference for me to go around the side of the house was consistent with someone who is afraid of someone in the home.

44. I knew that Ms. Anderson would be available to answer any additional questions I had regarding Mr. Miller's mental health history or their shared residence at a later point.

45. I made my way along the side of the house and observed an individual I understood to be Mr. Miller wearing only sweatpants, and talking loudly while looking up and gesturing at the sky.

46. I could not understand what Mr. Miller was saying.

47. Mr. Miller was sweating profusely, despite the cool weather.  He looked frazzled and his eyes were bloodshot,

48. I stepped around toward the back of the house and Mr. Miller turned and looked at me with an unfocused gaze.

49. My training and experience directed me to attempt to converse with Mr. Miller in a calm and friendly manner.

50. Mr. Miller told me he was having a conversation with nature, and in order to build a rapport with him I responded that I did that sometimes, as well.

51. I stepped up onto the deck with Mr. Miller but maintained a distance of several feet from him.

52. I informed Mr. Miller about how I came to be at his residence by telling him that his wife called because she had some concerns about him, and asked him if we could talk.

53. Mr. Miller invited me up onto the deck and said, "Sure, we can," appearing to welcome further conversation with me; however, I noticed that he started to stare at the ground and was avoiding making eye contact with me.

54. By this point, I believed that Mr. Miller was experiencing a serious psychiatric event based on Ms. Anderson's descriptions of Mr. Miller experiencing hallucinations/delusions, Ms. Anderson's safety concerns regarding her loved one, Ms. Anderson's description of Mr. Miller not having taken his medications or slept in days, Mr. Miller's unfocused gaze, and on Mr. Miller's one-sided (hallucinatory) conversation with nature.

55. Mr. Miller continued to stare at the ground for several seconds during which I noticed him tense up; he then abruptly turned away from me and walked toward a broken lawn figurine on the deck closer to the house than where he had been standing previously.

56. I perceived Mr. Miller's sudden movements to be a dramatic change from his previous, relatively calm demeanor, and was concerned that my reference to Ms. Anderson's call to the police had caused him to become enraged.

57. Because of his sudden movements toward the broken lawn ornament, I became concerned that Mr. Miller was seeking to arm himself so I remained close to Mr. Miller but did not touch him.

58. All of a sudden, angrily and with clenched fists, Mr. Miller turned to me and said, "Fuck you, I'm not talking with you get the fuck away from me."

59. Mr. Miller began grunting and shaking his fists, and rushed toward the sliding door leading into the house.

60. I was deeply concerned at this moment that Mr. Miller was going into the house to look for Ms. Anderson, who I knew was inside the house.

61. By this point, Mr. Miller's erratic demeanor, state of agitation, potentially disruptive behavior (yelling), as well as my understanding that Ms. Anderson was in fear for her safety, led me to understand that Mr. Miller needed to be hospitalized, including taken

into custody pursuant to M.G.L. c. 123, §12, if necessary, so as not to create a likelihood of serious harm by reason of his mental illness.

62. I had been trying to get Mr. Miller to stop and/or slow down by using voice commands, and had repeatedly asked him to stop during these few seconds while the two of us were moving closer to the house.

63. I again told Mr. Miller to stop, but Mr. Miller did not stop and instead pulled the slider door open and entered the house.

64. I stayed directly behind Mr. Miller, who seemed to be delusional, angry and on a mission, and who I believed at that point was looking for his wife.

65. I grabbed Mr. Miller's arm to try to stop him, but Mr. Miller yanked it away and began foraging for something on a table that was covered with several different items.

66. I continued to believe Mr. Miller was attempting to arm himself, and issued multiple commands to him to back away from the table.

67. I could not tell whether Mr. Miller had anything in his hands due to Mr. Miller's and my positioning, with me partially behind him.

68. My police training informed me that ensuring Mr. Miller had nothing that could be used as a weapon in his hands was of paramount importance, as most weapons—both the traditional kind and other items that can be used as weapons—are wielded by hand.

69. I understood that Mr. Miller had not responded to my multiple commands for him to stop and was concerned at that point that Mr. Miller might harm Ms. Anderson, himself or me.

70. I was still standing somewhat behind Mr. Miller due to the limited room at the entrance to the house between the sliding door and the table.

71. Because of our respective positioning, and Mr. Miller's continued failure to comply with my verbal orders, I made the decision to grab hold of Mr. Miller from behind, with my

left arm under his left armpit and my right arm over his right shoulder and my hands connected at his chest.

72. While this was not a specific maneuver in which I was trained in, I understood that Barnstable Police Department's policy on Response to Resistance required me to react to the rapidly-developing situation using my training, common sense and experience.

73. Due to our physical positioning and the relatively confined space we were in between the table and the slider door, I believed that this hold would achieve my intent of moving Mr. Miller away from the table and confirming that he had no weapons in his hands and ensuring that he would not harm himself or others.

74. Due to the fact that Mr. Miller was clearly suffering from a psychotic episode, I did not apply a more aggressive "takedown" maneuver that I might have typically used with someone who was suspected of committing a crime.

75. My decision to place Mr. Miller in this hold was a reactive one in response to the rapidly-developing circumstances and my new primary objective of moving Mr. Miller away from the table covered with objects.

76. My right leg was between Mr. Miller's legs with my left leg to the outside of his left leg as I pulled him back away from the table.

77. I continued to issue verbal commands to Mr. Miller to get him to stop resisting me and to show me his hands.

78. Mr. Miller continued to fight and pull back toward the table, eventually using the table to shove us both back against the slider door.

79. The impact of my body slamming against the slider door caused the slider to be knocked completely out of its housing.

80. It was clear to me that Mr. Miller had intentionally shoved backward to make me release my hold of him.

81. We remained upright and began shuffling across the floor in the direction Mr. Miller sought to go, while I continued to hold onto him from behind and attempted to stop his forward progress further into the house; I did not know where Ms. Anderson was inside the house.

82. I recognized at this point that my left arm was being pinned underneath Mr. Miller's left arm, and that Mr. Miller appeared to be clamping down on it intentionally.

83. As we came to a recessed area of the floor that was an office nook, I saw Ms. Anderson out of the corner of my eye to the left and a set of golf clubs in the direction in which we were moving, as well as a single golf club on the floor directly in front of us.

84. Based on Mr. Miller's apparent intent to disengage me by slamming against the slider, and his non-compliance with my multiple, verbal commands, I immediately became concerned that Mr. Miller was attempting to reach the golf club in order to use it as a weapon against me or against Ms. Anderson, and continued to try to stop Mr. Miller from reaching the golf club.

85. Mr. Miller continued to clamp down on my left arm, and I continued to issue verbal commands for him to stop as we reached the step down and both fell to the floor.

86. I maintained my hold of Mr. Miller through the fall because I knew that my arm was still pinned underneath his left arm and that letting go was not an option; however, after the fall my hands were no longer connected at Mr. Miller's chest.

87. I fell to Mr. Miller's left side with my left arm underneath Mr. Miller and trapped between Mr. Miller's left arm and the left side of Mr. Miller's body; my right arm was between Mr.

Miller's shoulder blades and Mr. Miller's arms were tucked underneath his body with my arm.

88. I attempted to pull my left arm out from underneath Mr. Miller, but was unsuccessful.

89. I was now on Mr. Miller's left side as we both faced the ground, and he began trying to twist and lift his upper body.

90. Throughout this time, I was pleading with Mr. Miller to "Stop," and to let go of my arm.

91. As Mr. Miller was trying to lift his chest, I perceived Mr. Miller's simultaneous use of a "pinching" or "winching" motion as an attempt to gain further control of and apply further pressure to my left arm.

92. I recognized this maneuver as a wrestling tactic used when attempting to gain control over someone who has a portion of their body trapped underneath the person using the maneuver, and believed Mr. Miller was attempting to gain leverage and a dominant position over me.

93. During the struggle, Mr. Miller was moving around in ways that demonstrated to me an intent to both stay in the position he was in and gain a dominant position over me.

94. I understood Mr. Miller to be pushing up at me so that he could tighten his grip on my arm.

95. During this time, Mr. Miller was able to pull his elbows in underneath him, between his chest and the ground.

96. Though my left arm remained trapped under Mr. Miller's arm, I tried to maintain pressure at Mr. Miller's back while I was off to his left side, in order to prevent him from obtaining the dominant position that I could tell he was trying to get over me.

97. Throughout this time, we were both actively moving and struggling to achieve or maintain a dominant position.

98. I could not reach my taser or my radio, although at one point my shoulder pressed against my neck and inadvertently toned and transmitted a signal over the radio.

99. At that time I heard Officer Jackson announce his presence to me.

100. I immediately told Officer Jackson that I did not know whether Mr. Miller had anything in his hands.

101. Officer Jackson asked me if he should tase Mr. Miller and I said "No" because at that point I believed we could gain control over Mr. Miller in order to inspect his hands without increasing the level of force.

102. Officer Jackson radioed for backup.

103. Mr. Miller continued to twist and pull, and Officer Jackson delivered a hand strike to Mr. Miller's lower right back area, immediately after which I was able to pull my left arm out and gain control over Mr. Miller's left arm and Officer Jackson gained control over Mr. Miller's right arm.

104. Together, Officer Jackson and I pulled Mr. Miller's arms together behind his back.

105. As we pulled Mr. Miller's arms together behind his back, this was the first time that Mr. Miller was lying in a truly prone position (without his arms or hands underneath his chest, and without him arching upward).

106. Officer Jackson immediately applied the handcuffs to Mr. Miller's wrists and double-locked them.

107. I did not place Mr. Miller in the prone position on the office area floor; however, when we both fell to the ground, Mr. Miller did so in a prone position.  While he remained on his stomach, he was twisting, arching his back and kicking throughout the

remainder of the physical struggle with him, up until the moment he was placed in handcuffs.

108.    It took Officer Jackson between five and ten seconds to place the handcuffs on Mr. Miller.

109.    Applying handcuffs to a subject who is resisting arrest is typically easier and less dangerous for the officer when the subject is in a prone position because the officer is better-positioned to establish control over the subject's hands and arms.

110.    Handcuffing a subject in a prone position requires reaching over a subject's body to join the hands behind the subject's back.

111.    When reaching over a subject's back, it is generally necessary to shift forward, causing a loss of stability in positioning.

112.    To account for this loss of stability, and to maintain leverage and prevent any attempt to resist restraint by a subject in a prone position, Barnstable Police Department officers are trained to use a "support knee" against the subject's back during the handcuffing process.

113.    Barnstable Police Department officers are also trained to apply handcuffs as efficiently as possible and, when a subject is handcuffed in a prone position, to reposition the subject out of the prone position as soon as possible.

114.    I do not recall placing my knee, or observing Officer Jackson place his knee, on Mr. Miller's back at any point; however, it is possible that while we were bringing Mr. Miller's arms together to apply the handcuffs, one of us placed a knee over Mr. Miller's back for those few seconds.

115.    Immediately after the handcuffs were applied, I stood up and began trying to help Mr. Miller out of the prone position and onto his feet.

116.    Immediately after the handcuffs were applied, Officer Jackson stood up and proceeded to check on Ms. Anderson, who had remained in the adjacent room.

117.    Throughout the physical encounter on the ground until the moment Officer Jackson and I were able to place the handcuffs on Mr. Miller's wrists, I did not have any control over Mr. Miller's positioning.

118.    Immediately after the handcuffs were applied, I bent over and told Mr. Miller I would help him to his feet; Mr. Miller did not respond.

119.    I then asked Mr. Miller to move to his feet and he did not respond.

120.    I lifted Mr. Miller's eyelid and checked his pupil, which appeared fixed; I then placed my finger in front of his eye to check for involuntary movement and noted none.

121.    I next told Officer Jackson we needed to remove the handcuffs and moved Mr. Miller into the recovery position.

122.    I checked for a pulse at Mr. Miller's carotid artery and found none.

123.    Dispatch was radioed to send rescue (I later learned were already on their way), and Officer Jackson and I immediately began chest compressions.

124.    Barnstable Police Officers Shaw and Ruggieri arrived with a medical bag, at which point Officer Jackson began administering rescue breaths with the bag mask.

125.    Because of the tight space we were in and the limited range of motion, Officer Jackson and I switched roles so that he began to do chest compressions while I administered rescue breaths.

126.    An automated external defibrillator (AED) device was connected to Mr. Miller by Officer Ruggieri and/or Shaw; the device signaled to us that no shock was indicated.

127.     Officer Jackson and I continued to administer cardio-pulmonary resuscitative measures until Hyannis Fire arrived and assumed care of Mr. Miller.

128.     After Mr. Miller's care was assumed by Hyannis Fire, I realized that during the physical encounter with Mr. Miller my left knee was injured, my watch strap was broken and my uniform was ripped; I do not know at what point during the physical encounter with Mr. Miller these events occurred.

129.     At all times during the physical encounter with Mr. Miller, I could not see Mr. Miller's hands and did not know whether he had retrieved anything that could be used as a weapon from the table until the moment Officer Jackson and I gained control over both of his hands.

130.     The entire physical struggle with Mr. Miller lasted approximately one minute.

131.     Throughout the entirety of the struggle with Mr. Miller, I did not hear Mr. Miller speak, gasp for air, or say he could not breathe; additionally, I did not observe any signs that Mr. Miller was in respiratory distress or unable to breathe, and did not observe anything about Mr. Miller's behavior that indicated he was experiencing any kind of medical event.

132.     I heard Mr. Miller make a reactive noise in response to the disctractionary strike by Officer Jackson just a few seconds before Officer Jackson and I managed to gain control over Mr. Miller's hands.

133.     I did not hear Ms. Anderson say anything during the physical encounter with Mr. Miller.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS _26th_ DAY OF

APRIL, 2023.

Sean Roycroft