Volume:    I

Exhibits: 1-2

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

Docket No. 1:21-cv-10738

- - - - - - - - - - - - - - - - - - - - - - - - - - -

ESTATE OF ROBERT JOSEPH MILLER, by and through

IAN MILLER, personal representative of the

Estate,

Plaintiff

vs.

SEAN ROYCROFT and SPENCER JACKSON, in their

individual capacities and the TOWN OF BARNSTABLE,

MASSACHUSETTS,

Defendants

- - - - - - - - - - - - - - - - - - - - - - - - - - - x

DEPOSITION VIA ZOOM VIDEO CONFERENCE

AMY ANDERSON

45 Elm Street

Hyannis, Massachusetts

Friday, December 3, 2021 - 10:09 a.m.

Reporter:  Maureen J. Manzi, CSR No. 135093

2

APPEARANCES:

"Appeared remotely before me"

***   WIESNER McKINNON, LLP

        (JENNIFER McKINNON, ESQ.)

        90 Canal Street - Suite 110

        Boston, Massachusetts   02114

        (617) 303-3940

        Counsel for the Plaintiff

"Appeared remotely before me"

***   LAW OFFICES OF HOWARD FRIEDMAN, P.C.

        (CARMEN GUHN-KNIGHT, PARALEGAL)

        1309 Beacon Street - Suite 300

        Brookline, Massachusetts   02446

        (617) 742-1400

        Paralegal for the Law Offices of Howard

        Friedman

"Appeared remotely before me"

***   LOUISON, COSTELLO, CONDON & PFAFF, LLP

        (SASHA M. GILL, ESQ.)

        Ten Post Office Square - Suite 1330

        Boston, Massachusetts   02109

        (617) 439-0305

        Counsel for the Defendants

3

                         I N D E X

AMY ANDERSON

BY MS. GILL                4, 141

BY MS. McKINNON            108




                         E X H I B I T S

Exhibit 1, Massachusetts State Police Case Master

Report....................................... 39

Exhibit 2, Photos of house..................... 64
















*Exhibits included in transcript.

Dunn Reporting Services, Inc.
617-422-0005

4

                    P R O C E E D I N G S

              "All counsel stipulate to the swearing

of the witness remotely."

              AMY ANDERSON, having been satisfactorily

identified by the production of her Massachusetts

driver's license, and duly sworn by the Notary

Public, was examined and testified as follows:

                    DIRECT EXAMINATION

BY MS. GILL:

     Q.   Good morning, Ms. Anderson.

     A.   Good morning.

     Q.   I am Sasha Gill and I represent the Town of

Barnstable and the defendants Officers Sean Roycroft

and Spencer Jackson in this case where the plaintiff

Ian Miller is accusing the defendants of causing

Robert Miller's death.  I understand you and Robert

were very close.  I'm very sorry for your loss, and

I appreciate you making the time to answer the

questions I have for you today.  I know some of my

questions are going to be of a personal nature to

you.  So for that I apologize in advance.  I'll try

to be as efficient as possible and hopefully we'll

have you out of here soon.  Okay?

     A.   Okay.

5

Q.  I just want to go over a couple of ground rules.  I've got -- You know, over Zoom it can be difficult, particularly difficult for a deposition, but it will be helpful if you could try to wait for me to finish asking questions before you start to answer them.  It helps the stenographer here who's taking down everything we say and just makes for a cleaner transcript.  And I will also appreciate you trying to respond verbally to my questions as opposed to with a shake or nod of the head.  If you need a break at any time, let me know.  I'm going to try to push through and go relatively quickly.  But if you want to take a break at any time, just say the word.

A.  Okay.

Q.  If you don't understand a question I ask you, can you please ask me to rephrase it.

A.  Yes.

Q.  And the other thing I'll ask you which I don't normally ask witnesses, but since you're -- Can I confirm you're unrepresented by counsel today?

A.  Yes.

Q.  Okay.  So since you're not represented by counsel today, I will just ask, that when I ask you

6

a question, try to limit your answer, give me a complete answer but try to limit it to any extraneous information so that we don't go too far outside the bounds of where I'm trying to get to today.

A.   Okay.

Q.   Thanks.  All-righty.  Can you tell me your full name?

MS. McKINNON:  Sorry to interrupt, Sasha.  I apologize.  Is this being video recorded?

MS. GILL:  Oh, yeah.  You know, what.  I am so sorry.  I am supposed to record this and I completely forgot, as I have done before.  So I'm going to hit record.  Thank you so much, Jennifer. I'm going to hit record.  You shall get a notification.

(Recording in progress.)

MS. McKINNON:  Thank you.  And I will try to turn it off during the breaks.  Feel free to remind me, everyone.

MS. McKINNON:  And we're going to agree to the regular stipulations?

MS. GILL:  Yes, that will be -- That's just fine.  We'll reserve all objections, except as

7

to form, and motions to strike until time of trial.

Q. And, Ms. Anderson, at the end of today's deposition a transcript will be created and you have the option of receiving the transcript, reviewing it and checking to see if it's accurate and signing off on it. You also have the option of not doing that. Would you like to review it after it's over?

A. Do I need to make that decision right now?

Q. No, you do not.

A. I don't want to make that decision right now.

Q. Okay. So you can let me know. I don't think you -- What I'll do, if we can all agree, is I will plan to send you the transcript once we get it and you can make that decision. Is that fair?

A. I will rather not receive it if I'm not going to review it.

Q. All right. That's totally fine.

A. So ask me before you send it, please.

Q. Sure. Did you tell me your date of birth?

A. No.

Q. Can you tell me?

A. Yes. I don't even remember if I said my name yet or if the video was in the way. My date of

8

birth is --

Q. All right, let's start over. Let's start over. Ms. Anderson, good morning.

A. Good morning.

Q. What is your full name?

A. Amy Christine Anderson.

Q. Okay. And what's your date of birth?

A. ███████████ .

Q. What is your current address?

A. 45 Elm Street, Hyannis, Massachusetts 02601.

Q. Do you have any plans to move from that address?

A. No.

Q. And are you aware of any reason that might prevent you from providing me with complete and accurate answers today to my questions?

A. Not that I know of.

Q. Can you tell me what your relationship is or was to the Robert Miller whose son Ian Miller is bringing this lawsuit?

A. Yes. Robert and I were in not legally formed marriage domestic partnership for eight years.

Q. What year did the two of you meet?

9

A.   2011.

Q.   And when did -- Are you the homeowner at 45 Elm Street?

A.   Yes.

Q.   When did Mr. Miller move in with you at 45 Elm Street?

A.   It was within that same year of 2011.

Q.   Approximately how long after you started dating did he move in with you?

A.   Not very long.  A caveat to all from here on out, I'm extremely bad at estimating time.  It took Robert seven years to understand the extent of that my difficulty with estimating time.  Possibly two months let's say.

Q.   Okay.  We'll take that as an estimate. Thanks for letting us know.  Did you and Robert ever have plans to marry?

A.   We had a marriage ceremony that was not -- that we didn't have a marriage certificate for, and we didn't have any definite one way or the other whether it was going to become a legal, you know, legal binding contract.

Q.   Informally as far as you are concerned you were husband and wife?

10

A.   Yes.

Q.   And can you tell me briefly what kind of man Robert Miller was in your mind?

A.   He was -- I was writing some of this down last night for -- I want to convey accurately, but anyone who knew Robert knows there's absolutely no way to possibly describe him.  He was very...very driven by a higher purpose, a spiritual purpose to awaken humanity.  So very dedicated to like an inner, an inner connection with, you know, a higher power.  He could be seen as maybe rough around the edges or possibly -- He was good, we were both good at debating.  And that was something that we appreciated about each other.  And he was highly, highly intelligent major in terms of all types of history and operations of, you know, civilization I will say.

Q.   Was he kind?

A.   Yes, he was -- He was, he was very kind to me, I know that.

Q.   Was he funny?

A.   Yes.  Yes.

Q.   Was he loving with you and his family members?

11

A.   He was, he was loving, yes.  He didn't have as much contact with his out-of-state family members, as much physical contact being, you know, in different states.

Q.   Um-hmm.

A.   But, yes, he was loving and kind.

Q.   And you cared about him deeply I'm sure. Did you care about his health?

A.   Yes.  Yes, I did.

Q.   What kind of physical shape was Robert in? Was he athletic?

A.   So Robert was, previously in his younger days he was a professional/semi-professional boxer and skilled in martial arts, and in the past a distance runner, and since I knew him, he went to the local gym where he did mostly treadmill, some Nautilus equipment.  He did work out at home as well.  He will create his own, you know, resistance with the door frames and -- He was focused on his physical fitness.

Q.   Approximately how many times a week or a month did he work out?

A.   It fluctuated a lot over the eight years.  I will say the past two years of his life he didn't go

12

to, he didn't -- I don't even believe he had the gym membership till the past two years of his life.  But prior to that, I will say maybe three times a week, sometimes more, sometimes less.  But probably an average of three times a week.

Q.  Okay.  I'm going to ask you a few general questions about the evening of April 16, 2019.  Were you at 45 Elm Street that evening?

A.  Yes.

Q.  And did you call 911 that evening?

A.  Yes.

Q.  Did you tell police that you were frightened when you were on the phone with them?

A.  No.

Q.  Were you frightened?

A.  I was.

Q.  And why were you frightened?

A.  I was frightened.  And let me say, as I'm sure others may try to counteract, I didn't realize that was the impetus for my call at that very moment due to the shock of that level of fear.  I feared for -- I knew instinctively there was a cause for concern that there will be some sort of danger because Robert's mental and physical well-being was

13

in continued -- He was at a very, very heightened state, and he hadn't eaten or slept in approximately a week, and I was concerned that his decision-making was not anything close to what his typical decision-making will be.  So I didn't have a specific fear of what type of harm, who might be harmed.  I knew that there was a general concern for safety at 45 Elm Street.

Q.  Okay.  And does that include your own safety and Robert's?

A.  In retrospect, yes.

Q.  Do you know if Robert had stopped taking his medications as of that point?

A.  As far as I know, he -- I -- Yes, he had. It was -- I don't know if it was all of the medications he was on or some of them or if it was a certain type of tapering off.  But I do know that he was not taking the, you know, regular pharmaceutical prescribed medication I will estimate maybe possibly six to eight weeks prior to his death.  Very rough estimate.  I will say possibly estimated eight weeks; six to eight weeks he had not been taking the pharmaceutical medication.

Q.  Um-hmm.  And earlier that month you had

14

visited family in Florida; is that right?

A. Yes. Yes.

Q. When you were with Robert, did you try to help him remember to take his medications?

A. Prior to leaving for Florida?

Q. Yes. I'm sorry. Just generally during your relationship were you --

A. I encouraged him to take his medications as prescribed, but his character was such that he was very creative and he didn't always adhere to any type of schedule. So that includes taking medication. And that's sort of how we worked with each other of, "I love you. I care about you," you know. "Oh, that's a good thing to take the medication as prescribed," or if I was taking something, "Oh, I think that made you a little tired" or -- It was definitely like a gentle keeping our own, you know, free-will.

Q. Before you left for Florida that month, did you ask for a friend to check in on him to make sure he was taking his medication?

A. No. He will never have been okay with that.

Q. And how do you know that? Had you tried in the past?

15

A.   I -- We never tried to -- We never took any measures to almost to like to enforce anything on each other, you know, to enforce any like ideal, you know, ideal performance on the other person.  I know that even if I tried to, you know, oh, you really need to take your medication, I know that by nature he would want to rebel and he will not want to listen or anyone.

Q.   Have you ever had an opportunity to review the police report from Barnstable Police Department or the Massachusetts State Police report?

A.   I had chosen not to.

Q.   When you returned from Florida following your trip, was that around April 15, 2016?

A.   Yes.  Yes.

Q.   2019.  I'm sorry.

A.   Yes.  It was, it was around April 15th, 2019.

Q.   And did you notice anything unusual about Robert or about the state the house was in?

A.   Yes.  It was -- I knew -- Well, I knew prior to my leaving for Florida that Robert was in a mental decline that I had seen him be in before, and I was concerned about leaving to go to Florida to

16

see family, and I conveyed that to him.  I said, you know, "I don't know."  You know, "I'm not really sure how I feel if I should go."  And he indicated that it was, "No.  This is -- No, it's -- No, you need to go.  It's good.  It's --"  He said something like, it's part of the whole plan, or almost like an existential, that's the plan and it's happening or something like that.  So I had a concern leaving him, but that's not -- he assured me in the way that we had this trust, and -- almost like a, like a telepathic connection.  I said, "Okay.  Okay.  I'm meant to go.  So I'm going."

He was confused in a very unusual way for him.  When I had gone to Florida previously, he was confused this past time about how I was getting there and details of the trip, and "Are you taking a plane?"  And he was, he was dysregulated.  And in terms of, in terms of the house, it was -- We did not keep any house, but -- well, I didn't keep a neat house because I have too much stuff.  Robert didn't have a lot of physical possessions.  But there were abnormal things that I noticed walking into the house, such as, the first thing I remember is there was jelly smeared all over the kitchen

17

floor, and I asked him if he did that, and he said, "Yes, I did.  It's royal jelly."

Q.  Did he say why he had done that?

A.  No, because when I heard royal jelly, I said, okay, that's -- I don't think I'm going to be able to understand what he means, so I didn't ask for more explanation.  And things like, he had this liquid vitamin supplement he was taking, and it was, it was almost like a, like a, like not how he will usually take it, it will be like a coffee cup with the vitamin bottle tipped upside down with, you know, another object laid across it, you know, with a string tied around it.  That's an example.  A vitamin bottle and the coffee cup were the first, you know, are what I remember.  But there were different things around the house that were things probably only he understood why they were that way. And it was really, it was in a greater state of disarray than I had ever seen it.

Q.  So when you talk about the coffee cup and the vitamin supplement bottle, it looked like those were very crafted or intentionally compiled structures around the house?

A.  Yes.  Yes.

18

Q.  Did you notice he had placed dumbbells outside in specific spots on the yard?

A.  I know that he -- When he worked out at home, he had a big Pilates ball and he had to very variable weight dumbbells I think that was maybe like around 15 pounds, that was like the typical; and he had started getting into a frame of mind, as he had two years prior to this when he had a brief psychotic episode, and he had explained to me after he had come out of it that angles that he put certain objects at were sight lines I believe is the time he used, sight lines, and that it was lining up with some sort of belief or idea or symbol that was, that was, you know, either physically outside the house, or it was almost like a fulcrum of energy. If I line this, this and this to this angle, you know, to the north, for example, to the northwest corner of the house, he had his own idea of what that power that will have.

Q.  Did it have an element in your mind of a religious nature, not an organized religion per se, but a spirituality that was sort of on hyperstate?

A.  Yes.  Yes.

Q.  Do you remember if you could tell by looking

19

at Robert if he had been practicing self-care and showering regularly?

A.    It was hard, it was hard to say at that time because water was part of the symbolism.  I believe at one point that same night I returned home the 15th, he, I believe he got in the shower with his clothes on, and it will be that we were conversing. You know, in the bedroom, there's a shower right off the bedroom and he was -- I remember him this specific time saying, "It's time to take a shower" and then he, I believe he went in the shower that time like at least partially clothed, and it was, it appeared to me that it was more -- you know, he didn't use like soap or shampoo.  It was in these spontaneous moments of it's time to shower, it was more of a, you know, putting water on himself.

Q.    To get wet?

A.    Yes.

Q.    How about his skin.  Did you notice that he had any abrasions or cuts on his legs or hands?

A.    I do remember that he had -- I know something was bleeding on his leg.  I believe it was, like it was a scratch that looked like it was caused by something.  What I thought after the fact

20

is I found like a stick from outside that was -- it wasn't actual thorns but it was like a, you know, a rough bumpy stick, and it looked like something like that.  I believe that was on his leg.  And then -- I don't remember if he -- He might have had something on his forearm, but I can't remember that exactly.  But I did notice that.  And I noticed after the fact that I think there was blood from, like on like a door frame or something that he, you know, like brushed by.

Q.  After you returned from Florida and even before you left for Florida, did you ever, let's say in that April 2018 time frame, did you ever notice that Robert was tending to speak more quickly?

A.  Yes.

Q.  Did you ever notice that he was not making eye contact with the person with whom he was speaking, if it was you, he would maybe stare past you a little bit?

MS. McKINNON:  Objection.

Q.  You can answer.

A.  I don't remember that specifically.

Q.  Do you remember Robert having an unfocused gaze?

21

MS. McKINNON:  Objection.

Q.  Or appearing like he had an unfocused --

A.  Well, I will say from my perspective, I, what might appear like that to someone else, I know he is focusing on something greater, like a higher power or spiritual force looking at something that is, like the whole symbolism thing with, you know, the power behind nature and the directions, you know, directions of a compass and things like that. Not unfocused to me but not focused necessarily on the here and now.

Q.  When you returned from Florida, in your observation of Robert did you notice that he was having any swings in his emotions?

A.  Yes.  Yes.  He was --

Q.  Describe those for me.  Sorry.

A.  The primary thing was, he was very combative verbally, emotionally and physically but not involving another physical person.  He was -- his voice was hoarse from, you know, I don't want to say yelling but like from speaking roughly out loud to people who I don't, I don't have any confirmation were there, almost like it was people he -- I knew the people he was referencing in addressing them in

22

anger.  It was, you know, people he had known over his life.  Anger was, anger was the biggest one.  And when I got home, part of it was also joy that he was very happy to see me but it wasn't -- there was a very different element to it.  It was -- He started interacting with me in terms of allegories, such as, I was going to be giving birth to baby dragons, and that I had been pregnant for 200 years which I sensed was a biblical reference.  But very -- whatever the emotion was specifically during that, it was like almost like a 24-hour period between when I got home the 15th and when he died on the 16th.  It was, it was all heightened emotion for that 24 hours.

Q.  And did you notice during those 24-hour period it increasing as it got further in time?

A.  It, it -- I will say the, like the height of these interactions, like each individual interaction that he was having, you know, within himself but verbalizing out loud, it will escalate significantly and then kind of subside and then go back -- it was like swings, like, you know, drastic swings where it was very intense and combative and with physical, like the, like the door, the door upstairs was off

23

the frame, the screens were punched out.  So it was like a physical, more like a physical combat.  And that will happen and then he will calm down a little bit into more like the, like more direct spiritual, like the communing with nature and, you know, spiritual -- like a more pleasant force.

Q.  So his emotions and behavior, did they seam erratic to you?

A.  Yes, I will say erratic, but I'm not sure how I cannot say they were not erratic.  So, yes.

Q.  You mentioned that anger was the biggest emotion that Robert was demonstrating in your mind. Can you describe what you remember to be that anger?

A.  The theme I remember hearing from what I could piece together was him yelling at people he had known from the past who he had felt wronged him in business deals.  So it was almost like I mean maybe verbalizing resentment towards these people from the past who had, who had -- I have sciatica. I'm not trying to be disrespectful by moving around like this.

Q.  No, don't worry.  In fact, if you want to stand, you can you can talk that way, but let me know.

24

A.  I may at some point, but this is good for now.  So it was -- It sounded to me like he was trying to make sense of why people had done things to wrong him.

Q.  And you referenced -- Well, strike that. Let me ask you this.  Did you have a sense -- Upon your return from Florida in April of 2019, did you have a sense that Robert was experiencing a psychotic episode?

A.  Yes.

Q.  And you referenced earlier an episode in 2017 to which you said there were some similarities. Were they similar in specific ways or did it just remind you generally of his behavior in 2017?

A.  It was -- There were a lot of specific similarities in the sense that in April 2017 I had gone to visit family in Florida for, you know, approximately a week, maybe a little bit less, and during that time his communication was a little bit bizarre, almost as if he was -- I mean, what I assessed from our close relationship, he will say words instead of like, oh, yeah, that's great, you're going to the beach.  It was more brief, but it wasn't, you know, it wasn't necessarily -- it was

25

supportive but it wasn't, it wasn't -- like it was clear that he was communicating but that he was in an altered state, and I could see that and feel that and hear that in April of 2017.  And he also, you know, when I went for a way, he didn't eat, he didn't sleep, and he had what was diagnosed as brief psychotic disorder during that time in April of 2017.

Q.  Was he pulled over going the wrong way on the highway or on a road?

A.  That's what I was told.  I didn't know -- I didn't see that in the police report.  But from what he told me, he got pulled over trying to kind of outdrive the police through the golf course.  And I was told by a doctor at the Emergency Room that he was driving the wrong way down a major road.  But I didn't know -- That was not in the police report. And he didn't remember that.  So --

Q.  Is it Barnstable Police -- I'm sorry.  Were you finished?

A.  That was a detail I was unclear about.  But I did experience that he was driving what I felt was very, very --

Q.  You cut out a little bit.

26

A.   Oh, okay.

Q.   You felt you said I felt --

A.   Driving on, you know, April 2017 he was driving in a manner that I was very afraid of because I got in the car with him and he was driving very erratically.  And the only reason why I got in the car with him was because I -- he was having concerns about that there was too much electrical current in the house and that we might get -- have too much electrical surge and be harmed in some way.  And I knew, because I never experienced this with him before, but I have a mental health background, I knew that he was not, he was not mentally well, and I knew that he will never voluntarily get any, you know, evaluation.  So I allowed myself to be in that situation, and I said, okay, well, let's go, you know, let's take a ride down to the fire department and see if they can help us, you know, evaluate our electric currency, make sure we're okay.  And he was headed there.  He was driving, and then he had me stop and buy a lottery ticket, and then he said, "Such a nice day.  Let's go to the beach," and then he drove us to the beach, and I was very afraid that we were going to crash because he was sort of

27

driving very erratically.  And when we pulled into the beach, I got out of the car and I refused to get out of the car because it was very unsafe.  And then he drove -- I will say I'm not getting back in the car, you know, I'm scared and then he drove across town, and that's when the thing with the, you know, trying to avoid the police driving through the golf course possibly driving down the wrong way and being stopped by Barnstable police and ultimately having his driver's license revoked for driving to endanger.  And it was revoked on an immediate medical threat.  And he was, you know, charged with driving to endanger.

Q.  Did he go to a mental health facility to be evaluated and hit or punch somebody there?

MS. McKINNON:  Objection.

A.  What I know is that from that, from that place near the golf course on that road 132, that road, I believe, I believe it was like maybe the police officer, but I'm not sure if there was an ambulance involved but, you know.  He was convinced by, whether it was the officer or if they had called an EMT, they had convinced him to voluntarily that they will take him to the Emergency Room because he

28

seemed unsteady on his feet which he was because he hadn't eaten or slept in days. So he did that voluntarily because he knew he didn't feel, he didn't feel great or didn't feel steady on his feet, let's just say that.

And at that point they did a psych evaluation at the ER and he was transferred to the psychiatric part at Cape Cod Hospital. It was, at the time it was adjacent to the hospital. And he allegedly -- he was charged with assault and battery on two security guards at Cape Psych -- no. It wasn't Cape -- Sorry. There's three different parts to the hospital. The regular ER. This was the, what they call the Purple wing which is like a locked holding psych place until someone gets a placement which for him ended up being the next door Cape Cod -- Cape Psych Center. He was charged with assault and battery on the security guards which he explained, as he saw them lunging towards him and he without physically harming them he deflected them in self-defense.

Q. When Robert was himself and not experiencing any kind of psychotic symptoms, did you ever know him to be violent or threatening in any way?

29

A.  Not, not violent.  Why I'm questioning threatening.  He liked people to do things how he wanted them to do them.  So if someone was taking too long e-mailing him back, he will be forceful in his attempt to try to get the person to do something.  That's a perfect example of something like that.  Threatening, no.  Violent, no.  I mean, threatening, no, not in terms of, not in terms of safety.

Q.  And in your relationship when Robert was not experiencing any psychotic symptoms, had he ever put you in fear of your own safety?

A.  No.

Q.  Shortly after Robert passed away, do you remember telling the police, it might have been a Massachusetts State Police, that you had been reluctant to call 911 at first?

A.  Yes.  Yes.

Q.  And I assume this is after you got home from Florida?

A.  Yes.

Q.  Can you tell me why you said that?

A.  I remember saying that at the time, and I -- looking back at myself and speaking to like close

30

friends and family I communicated with during that day, I actually contemplated needing to call 911 for many, many hours, but I knew that I was waiting out the situation because I know that that was something Robert had verbalized in the past that he felt was like a, I don't even know, like if he thought something completely out of context of anything that was true, we were having a debate and I moved, I don't know if I moved in a certain manner that made him ask me if I was just about to call the police, and I said, no, I've never even thought of that.

And so it was, it was like a concern of his of anyone ever calling the police on him.  He had verbalized that throughout our time together. And so I was concerned that knowing that if anyone even, if anyone, if I initiated anyone to come to the house in any sort of, you know, authority or helping role, I mean I don't know if it would have been a friend or neighbor if it would have been different, I know that he wouldn't have been okay with that because that was a concern of his.  So I had to decide is this going to subside, is there going to be safety or is there a way I can diffuse this like I did two years ago, and I was very

31

reluctant to call, and I didn't even know what to say because it's not a -- it's a difficult situation to convey, it's an intricate, difficult situation to convey.  Yeah.  So I, yes, I very much remember saying that.

Q.  Did you also tell the police that you had been hoping that one of the neighbors might have heard him yelling and would actually call so that you didn't have to?

A.  Yes.  Yes.

Q.  You mentioned that Robert was -- Well, I don't want to mischaracterize your testimony.  But was Robert yelling and making a lot of noise on the deck and in the backyard area, is that what caused you to think neighbors might hear and be concerned?

A.  Yes.  He was, yes, yeah, in the back, yeah, on the back deck and then there's like a little -- That was emotional.  I need like a few seconds.

Q.  Yeah, that's okay.  Take as much time as you need.

A.  So, yes, he was, he was out on like the little, it's like a little tiny balcony off the bedroom upstairs and then the back deck, and he was, you know, combating verbally with, you know,

32

previous people in his life and I, I -- I mean, I must have said that to the police.  I know I texted it to a friend that I wish someone would, you know, hear this and call so I didn't have to do it, because I knew that I had to make the decision, that if I called 911 and he knew, that that was, at least like it might be the end of our relationship was my thinking or it was, it was definitely like a, it was like my feeling like don't do that.

Q.  Yeah.  Is it fair to say that you thought it was going to make him angry?

A.  I thought it will make him angry, yes.

Q.  Did you text one friend about that moment when you were concerned about calling 911?

A.  I remember, there's one friend I remember texting.

Q.  Do you know if you still have that text?

A.  I don't know that.

Q.  Okay.  Do you remember the name of that friend?

A.  Yes.

Q.  Can you tell me?

A.  Well, I just want to say.  I don't know if this is in the police report.  But it was a person,

33

the person who came and brought me to the hospital that night.  So I don't -- I don't want to incriminate anyone but myself here, so.

Q.  I can't, I can't promise you, but I have no reason to expect that you will be doing so.  I'm just trying to figure out who might have a copy of that text.

A.  Well, it was -- I mean, it was two-and-a-half years ago.  So I don't know, I don't know how that works.

Q.  Um-hmm.

A.  I don't know how that works.  My friend deletes texts every single day.  So -- I mean, she's just very efficient so I know she -- and I have a new phone since then.  I don't know.

Q.  Please tell me your friend's name because I don't see it in the police report.

A.  I don't feel comfortable saying this right now because I feel like I'm being trapped into something.

Q.  Okay.  Why don't we -- Maybe we can come back to that.

A.  Sure.  I don't want to answer that right now.

34

Q.   Understood.  Did Robert say to you at one point something to the effect of you need to be eliminated?

MS. McKINNON:  Objection.

A.   Yes.

Q.   Do you remember his exact words being "you're going to need to be eliminated"?

A.   Yes --

MS. McKINNON:  Objection.

A.   -- those were his exact words.

Q.   And where were you when he said that to you?

A.   In between the kitchen and the dining room there's like an open door.  It was right around there.

Q.   And what did you say in response?

A.   I don't recall --

Q.   Or what did you view it as?

A.   I don't recall saying anything at all in response.  I don't recall -- I don't recall -- like I recall that interaction very clearly and I don't remember immediately after that.

Q.   Would you say that that statement to you from Robert was what precipitated your decision to call 911?

35

MS. McKINNON:  Objection.

A.  Not necessarily specifically.  It was more -- it was like a culmination.

Q.  Of the totality of everything?

A.  Yes.

Q.  When you called 911, do you remember at some point the call was disconnected?

A.  Yes.

Q.  And do you remember why it was disconnected?

A.  Yes.

Q.  Can you tell me about that?

A.  Because after I said my first name and they asked me my last name, I hung up because I didn't want to be involved.

Q.  As you sit I'd say here but we're over Zoom, so as you sit there today, do you recognize when a call from 911, a call to 911 is disconnected, it might prompt a more heightened response from police?

MS. McKINNON:  Objection.

A.  My understanding will be, once they have identified, and this is just, this is like a hunch, I know that if someone calls 911 and like they hang up, I know that there's a certain emergency response, you know, that they have to check the

36

address anyway.  I didn't think about that at all in terms of, in terms of hanging up.  I figured if they come, they come.

Q.  Did -- How long after -- strike that.  When an officer eventually arrived at your home, did they knock on the door?

A.  They didn't knock on the door.  I had the -- I believe -- I'm looking at the door right now.  I believe I had like the main, you know, door at least partially, it was at least partially open.  I could see through the screen.  I was watching for the person.

Q.  Did you eventually come to learn that that first officer who responded to your home was somebody by the name of Sean Roycroft?

A.  I didn't know anyone's name until I got the, you know, summons.

Q.  Okay.  And you don't know which is which, Sean Roycroft or Spencer Jackson --

A.  No.

Q.  -- who came first or second?

A.  No.

Q.  All right.  And I got ahead of myself.  Did a second officer from Barnstable Police Department

37

ultimately also arrive at your door or at your home?

A.  At my home, yes.

Q.  Did you -- And we'll get into the details a little bit more in a second.  But did you observe these two officers having physical interactions with Robert that evening with your own eyes?

A.  Yes.

Q.  And based on what you personally saw during the time those two Barnstable police officers were in your home, did you have a sense that either of them used too much force in dealing with Robert?

MS. McKINNON:  Objection.

A.  I need a second to stretch.

Q.  Sure.

MS. McKINNON:  Do you want to take a short break?

THE WITNESS:  I'd rather not.

MS. McKINNON:  Okay.

A.  Thank you.  I just want to try to reorient my body and my, you know, brain to the moment to keep going.

Q.  All right.  Just say the word if you change your mind.  Do you remember -- Can you answer questions now or do you want to take a --

38

A.  I can answer that.

Q.  Okay.

A.  Could you rephrase the question, please?

Q.  When the first two officers were in your home shortly after you called 911, based on what you could see of their interactions with Robert, did you think they were unreasonable in their actions?

MS. McKINNON:  Objection.

A.  I don't know how to answer that.  My cat's telling me maybe not to.  I don't know how to answer this appropriately because I think there's a question of how words are defined and I don't want to be trapped into saying anything.

Q.  Okay.  Were you grateful that the officers arrived on the scene after you called 911?

MS. McKINNON:  Objection.

A.  In retrospect of that moment how did I feel or how did I feel at any point after that evening?

Q.  I mean in that moment after you realized you were in fear for your own safety and you were also in fear for Robert's safety, were you grateful that the police were there to try to manage him?

MS. McKINNON:  Objection.

A.  I will say I felt relieved that it wasn't

39

completely my responsibility.  I will say relieved.

Q.  Okay.  I'm going to ask you to take a look at the document that I haven't marked as an exhibit. I haven't labeled it as an exhibit, but we will with everyone's agreement mark it as Exhibit 1 for today's deposition.

(Marked, Exhibit 1, Massachusetts State Police Case Mast Report.)

Q.  Can everyone see my screen?

A.  I can see it.  I'm really not prepared to look at this right now.

Q.  I want -- Here is what I would like to do because I think if I walk you through it bit by bit, it will perhaps be more painful and take longer.  I was hoping you could read a portion of the report and maybe about a page.

A.  Sure.  Show me the portion.  I really want to get through this.  Like this is --

Q.  Okay.

A.  This is difficult emotionally for me, so, in a unique way.

Q.  I can only --

A.  I --

Q.  I can only --

40

COURT REPORTER:  Only one person at a time, please.

Q.  Sorry.  I forgot the rule.  Let me see.

MS. McKINNON:  Sasha, this is the State Police report, right?

MS. GILL:  Yes, it is.  I'm trying to scroll so you can see it and maybe see a Bate stamp number on there, but I can't get my mouse to work. I'm going to try to get it to work.  Do you mind if I just take a quick minute?

MS. McKINNON:  That's fine.

MS. GILL:  I can't even mute myself.  So I'll be right back.

(Recess held.)

Q.  I'm discombobulated here, but let's see if we can pick up where we left off.  Ms. Anderson, I'm showing you what's been marked as Exhibit 1 for today's deposition, and at the top of the page you'll see that it's labeled the Massachusetts State Police Case Master Report.  Do you see that?

A.  Yes.

Q.  But just for the record I want to make clear that this exhibit represents pages BPD 2 all the way through BPD 12 at the bottom right-hand corner of

41

these documents.  So the portion that I will like you to review, because I understand going through it step-by-step might be very difficult, extra difficult for you, is this 8th page of the document where the person drafting the report describes an interview that they had with you and describes what you shared with them during that interview.  And what I will like you to do is review it and tell me if it all sounds familiar to you or if there's anything that is incorrect about what's in this report.  Okay.  I can show you as much of the document as you like.  So just tell me if you would like me to scroll up.  But again, at this point I haven't e-mailed this to you because I know you prefer not to receive it.  But at paragraph 4 is where I will like you to start reading.

    A.  Okay.

    Q.  I'll make it a little bit bigger for you.

    A.  It was better smaller.  Thank you.

    Q.  Tell me when you need me to scroll.  The entirety of paragraph 4 by the way.  So parts a. through c.  Thank you.

          (Witness reviewing paragraphs 4a.-4c.)

    A.  Scroll, please.

42

Q.   Is that good?

A.   Yes.  I'm having, I'm just having trouble focusing my eyes.  Can you repeat the purpose of me -- What am I looking for in this?

Q.   Sure.  I want you to read this description of what you shared with the Massachusetts State Police during your interview with them and let me know if anything sounds incorrect.  In other words, I'm just trying to ensure that what they documented is or what was documented in this report accurately reflects to the best of your memory what happened on that evening.

A.   I don't know if that was my connection that went sideways or everyone's.

Q.   Believe it or not, mine seemed okay.

A.   Oh, okay.  Well, I just lost like a minute or two.

Q.   Can you see it back up now?  Ms. Anderson? You're frozen.  I just heard you kind of cut in for a second, but we can't understand you.  Can you guys -- All right, you're back.

A.   Yeah.  Is this my Internet connection that I need to look into right this second?

Q.   It seems okay now.

43

A.  Okay.

Q.  Let's see what happens.

A.  Okay.  I'll just try to focus.  I'm just looking at this is it like a hundred percent exact or --

Q.  Let me know if there's anything that you will dispute, in other words, that you will say, oh, no, I wouldn't have said that or this wasn't accurate.

A.  Okay.

Q.  Or you can let me know --

A.  I'm really having -- I'm mentally not emotionally -- I'm trying to put every single part of my emotion aside.  I'm like mentally just having trouble -- Like can you scroll back up so I guess I can start over maybe?

Q.  Sure.  Sure.  Take your time.

A.  Okay.  Thank you.  I don't know if the Psych Center was ten days.  I don't have any idea if that's correct or not.

Q.  Okay.

A.  It could very well be.  Robert was already a patient of Maria Gianan prior to that episode, but I don't remember how long before.

44

Q. All right. Thank you.

A. I don't remember if I said it this way or not, that he stopped his medications because they were affecting his blood pressure. His general dislike for pharmaceuticals, yes. I don't remember exactly -- I don't remember saying that because they were affecting his blood pressure in that exact context.

Q. Okay. Thanks. I -- Amy, your audio is breaking up again.

A. It says that I need to close something on my computer. Let me just see if I have something else open. I don't know if that's going to be any better. So I'm not sure if you heard this part. I don't know if it's a hundred percent verified fact about the congenital heart defect, but that was something Robert believed he had learned in his past and that he said to me.

Q. Okay. Had he ever said anything else to you about that other than he thought that he had one?

A. He said that he didn't know the name of the condition, but that years ago, like when he lived in New Jersey, that he, his understanding was that he had a hard heart. I don't know what the -- He

45

didn't know what the medical term for it was.

Q.  Um-hmm.

A.  So I just want to -- I don't know --

Q.  Okay.

A.  I understand I said that at the time, but.

Q.  Thank you for clarifying.  Let me know when you want me to scroll to the next paragraph.

A.  I will that, I will say that he did take test testosterone cream that was prescribed, it was expensive, because he wanted to get it from a specialty compound pharmacy out of state.  I don't know that that itself was hundreds of dollars per month.  He also took thyroid supplements and cortisone supplements from them.  So I don't think -- The testosterone was prescribed by his doctor.

Q.  All right.  How about the pharmacy where he will get it from out state, do you know what the name of that pharmacy was?

A.  It changed names.  It's in Texas.  I'm not sure of the new name.

Q.  Does Downing --

A.  Yes.

Q.  -- sound correct?

46

A.   Yes.

Q.   D-o-w-n-i-n-g.  And I don't know if it's Downing Pharmaceutical or Downing Labs.

A.   I think it's Downing Labs, yeah.

Q.   Do you know if that's still in business?

A.   I don't know.  I don't know.

Q.   Anything else about --

A.   I'll go back to where I was reading.

Q.   Sure.

A.   I will say he did not make all of his doctors aware of his testosterone intake.  I will say -- I don't know that -- I don't know how to say if that's correct or not correct.  I mean, he --

Q.   Okay.  His diagnosis of sleep apnea.

A.   Yes, I was just looking at that part.  I guess I could -- I guess I said constantly having trouble breathing.  I mean that probably was true. He had very restricted -- He like really couldn't breathe out of his nose because he had had surgeries from injuries.  I'm not sure if I used the word constantly, but frequently I mean when he was laying down especially.  He did get diagnosed with sleep apnea and he will not get the CPAP because he said it will make him claustrophobic.

47

COURT REPORTER.  She froze again.

Q.  You said claustrophobic, Amy?

A.  Yes.  He said he wouldn't ever wear the mask because it will make him claustrophobic.

Q.  Jumping up a little bit.  Did you state that Robert did not necessarily always share pertinent information with his doctors?

A.  I will say he didn't --

Q.  Sorry.  Sorry.  Can you call it through a phone, stay on video but call in?

MS. McKINNON:  It seemed like it works better where you were seated before.

A.  I don't know why this will be.  It's my home Wi-Fi on my laptop.  So I don't --

MS. GILL:  I had trouble with three different mouses today.  So I'm equally perplexed of the tech issues.  But --

A.  I mean if I don't have to be on video and call in, is that what you're saying?

Q.  You can stay on video and then the audio -- It's okay if the video's choppy a little bit.

A.  Okay.  Yeah.  How do I, can you just tell me how to do that?

Q.  Sure.  I'll try to walk you through --

48

A.  So am I calling from my phone with this new audio link?

Q.  No.  I'm going to get a number for you to call.  It's going to be a 646 number.  This is an adventure today.  All right.  Try 646 --

A.  Is it just on my cell phone?

Q.  Yeah.  You're just making a regular call.

A.  Okay.  646.

Q.  568.

A.  568.

Q.  7788.

A.  7788.  I hope that works.

Q.  And then you're going to be asked for media ID.  And hang on one second.  It is 822.

A.  822.

Q.  49129622.

A.  Pound?

Q.  Pound.  So the first number was 6.

A.  This is my participant ID?

Q.  Yes.  Okay.  I'm sorry, you're right.  So this number now is 649764.

A.  6 --

Q.  49764#.  Good job.  At the bottom there's a carat, I think there's a little turn off audio.  Do

49

you see it?

A.  Can you repeat that?

Q.  So the microphone icon at the bottom, there should be a little carat.

A.  Okay.

Q.  If you click it, it should mute you.

A.  Okay.  Can you hear me now?

Q.  Yes.  Oh, you clicked it.  Great.

A.  Okay, good.

Q.  I'm not getting any feedback.  All right. Can you hear okay, everybody?

MS. McKINNON:  Yes.

COURT REPORTER:  Yes.  All-righty.  Do you mind reading back the last question, Ms. Manzi?

(Question read back.)

A.  Can you maximize the document screen, please?  Smaller.

Q.  Oh, okay.

A.  That's great.  Thank you.

Q.  No.  Bigger or smaller?

A.  Just like bigger so it fits more to the page.

Q.  Okay.  So you want the words to look bigger because I thought that's what --

50

A. No. Just if you could, I don't know if there's a way to maximize the screen. It just got a lot, the whole thing got smaller. Now I can't see it at all. But I'll try to answer that question. I'm sure that that is something that I said. I don't know -- But he didn't tell anyone a hundred percent of any information. So I guess that's something I guess it's accurate.

Q. Okay. I'm turning to the first part of paragraph b. Just let me know if anything jumps out at you that's inaccurate or something that you wouldn't have said.

A. Okay, I will.

(Witness reading paragraphs 4b. and 4c.)

A. Okay. Can you scroll it down?

Q. Sure.

A. Okay. Okay. Can you scroll down?

Q. Sure.

A. Okay. Yes, I would hope a neighbor will call the police to lodge a noise complaint. I didn't -- again, I don't have any -- I have no sense of time basically on a good day. So that day it was 1:13 p.m. and I attempted to use the emergency feature on my iPhone. I didn't know it was that

51

soon before, but I definitely did do that and it didn't, it did not complete, like it didn't even -- it triggered the 911.  Yes, I tried to continue managing the situation.  I understand how this is, how this is conveyed and the pieces are put together by an observer that that statement "you're going to need to be eliminated," I can't say that was the absolutely hundred percent defining reason why I called but it was one of many factors.

Q.  It was the compilation or totality of all of the factors?

A.  It was the whole.  Right, it was many, right, right.

Q.  Thank you.  Should I scroll to --

A.  Okay.  Stop scrolling.  That's perfect with the scrolling.  So at 7:03 p.m. he was on the back deck like looking out the yard.  I don't remember if he was yelling at that moment.  He was also communicating with what I thought were hallucinations often on that were yelling and not yelling.  So at that moment I don't know if he was yelling --

Q.  Okay.

A.  -- at that very moment at 7:03.

52

Q.   That's understandable.

A.   I don't remember -- I don't remember saying that he was leaning over the table in the office. But it's a very strange setup, and so I'm not -- I don't -- like I just don't remember that exact detail.

Q.   Okay.

A.   It was very quick.  All of this movement was like under a minute in total.

Q.   For as long as you were at the front door, you couldn't see anything going on on the back deck or in the backyard; is that --

A.   No, I couldn't see or hear anything, any of that, and then I saw and heard Robert and the officer come through the slider and the slider door fell off.

Q.   Did you witness them actually come through the slider or did you first see them after the slider door had crashed?

A.   I don't know exact sequence.

Q.   Okay.

A.   It was so -- It was I mean a matter of like a second or two either way.  So I'm not sure.

Q.   Um-hmm.  Is this full interaction from the

53

crash of the screen slider all the way till when you first realized Robert had collapsed, did that take less than a couple of minutes?

A.  Yes.

Q.  So do you have a specific memory of any parts of that sequence of events, and can you share them with me?

A.  Yes.  So the part where I -- they came -- like I think the slider must have been like partially open or whatever.  So they -- I believe that the officer was what I will call like bear hugging Robert from behind like a restraint.  I know I can't -- This isn't on the transcript for me to show motion.  But it was that the officer had his, from what I remember his -- like Robert was almost like leading with force but the officer had his arm like crossed over Robert in the front.  And I think it was just a table -- it's sort of like, it's like an open little like dining area.  So like the dining table is like in the, like directly in their way.  So as these two grown men are, you know, going through this little pass-through room, the table is in the way.  I think it might have been that the leverage of both of them like maybe moved the table.

54

Because there's nowhere to go.  Like in that -- It's like a very little small area.  So there was nowhere to go.

Q.  Do you have any specific memory of the table having been moved or are you piecing that together?

A.  No, no.  I remember now.  I'm seeing it like in my memory the table was moved, but I don't -- I'm trying to like decipher each part of each sector because it was extremely quick.

Q.  Could it have been less than a minute?

MS. McKINNON:  Objection.

A.  I felt like all of this was less than a minute.  That's what I felt.  But again, why I gave the caveat, I have no sense of time is really because I don't.  But this was -- I can't imagine this would have -- I mean, it was very, very quick. Each little part was like very quick.  So he was trying to control him from behind, yes.

Q.  And did you observe Robert dragging the officer along behind him?  Were they kind of stuck together in a way?

MS. McKINNON:  Objection.

A.  I will say that it was, it was that he was like trying to restrain him from behind and it was

55

like the leverage of them both moving that was, you know, kept them moving.  So I'm not, I am not sure how else to say that.

Q.  Was Robert -- Were they making forward progress as --

A.  Yes.

Q.  -- as seen from Robert's perspective?

A.  Yes.

Q.  Was Robert making his way towards you in the home?

MS. McKINNON:  Objection.

A.  No.

Q.  Were you inside the home at this point?

A.  Yes.  I was in the living room where I am right now.

Q.  And can you describe where you were standing that you could see two men coming into the home?

A.  Maybe I should have brought a tape measure. It's just like into the next room like with a clear view.  I don't know.

Q.  Let's finish up this paragraph.

A.  10 feet, 12 feet maybe.

Q.  Let's just finish reading paragraph d. and e. and then --

56

A.  Okay.

Q.  -- I'll show you a couple of pictures.  I think that will make things a lot easier for you to explain.

A.  Okay.  Okay.  Can you scroll down?

(Witness reading paragraph 4d.)

A.  So, right, I don't remember how the second officer -- I don't remember his entry into the home.

Q.  Do you remember anything he did?

A.  See, this is where I had specific like motions or actions that I remember, but this is where I was understandably like in a state of shock. So anything that might be to me like certain details are not relevant because -- and that's why I think I can't remember, like the exact sequence of the slider and the, you know, which second came first.

Q.  Sure.

A.  So "the put your hands behind your back," yes, I remember that more, I mean definitely more than twice, more than once or twice.

Q.  And do you recall -- Hold on a second.  Do you recall Robert saying anything?

A.  Yes.

Q.  Was he yelling --

57

A.   I don't know the sequence.  There were two significant things he said.  I think the first one, when he was not complying with the officer's request to put his hands behind his back, they guided him into -- because this is all like really small spaces.  There is not any, there's not like room for a grown man, not two grown men.  So this was -- he was, I guess it must have been he was leaning, not leaning over on the table, he was leaning over, yes, and at one point he said, "I can't breathe" and all I could tell was that it was like that they were trying to put handcuffs on him.  And I know he says like, like he asked, he like called for me to help him.  "Amy, help me."  And that was like probably his, like his last words.

Q.   I'm sorry.  I know this is really tough for you.

A.   It doesn't matter.  That's irrelevant that this is hard.  Thank you for saying that, but.

Q.   Do you as you sit here today have a specific memory of him, of Robert saying "I can't breathe"?

A.   Yes.

Q.   Is there --

A.   Oh, I said -- Okay.  Yes, Robert said, "I

58

can't breathe."  I said generally, "Can he breathe?" And they said, "Yes, he can breathe."  And I don't know which officer it was because I couldn't, I don't know the difference between the two, so.

Q.   When was that said?

A.   At -- So in between the second that it took from the walk, say five steps from where the table moved into this little even smaller little nook, office nook, it was when he was, I believe it was when he was in like that, it was, you know, like a little part of this, it's like a little offshoot office nook.  And that was -- I mean, it was -- So maybe let's say this whole thing was 60 seconds, it was somewhere in the middle of that, like 30 seconds or so.

Q.   And did Robert continue to resist the officers attempt to try to restrain him after he said that?

A.   I don't, I don't remember.  Actually I don't know.  I don't know.

Q.   Do you remember -- Do you have any specific memory of what happened next?

A.   Can you backtrack the -- I'm losing my focus.

59

Q.   Yes.   I'm asking you your specific memory. So I'll take it off of my screen for a second.   I'm trying to understand what you actually remember versus what you can see in the report.

A.   I don't see any -- Oh, okay.   Yeah.   Can you just backtrack me to a certain point?   I'm just mentally -- the emotions are completely put aside right now.   I'm mentally having trouble just focusing.   So be like quick and directive with me if you can, please.

MS. GUHN-KNIGHT:   Excuse me.   Can we pause?   Jen McKinnon just lost connection.   She asked me to let you know.

MS. GILL:   Sure.

(Pause in proceedings.)

Q.   Ms. Anderson, I'm trying to figure out why you didn't tell the Massachusetts state police officers during your interview that Robert said he couldn't breathe.

A.   I couldn't hear you.

Q.   Why you wouldn't have told the Massachusetts state police officers in your interview with them that Robert said he couldn't breathe.

A.   I am very surprised to hear that that is not

60

in the state police report.  So I don't know where the disconnection is, if I didn't say that or if it wasn't recorded.  I have no insight into that.  I would have sworn like 98% that I said that to the state police.  That's significant.

Q.  And is it something that you would have told Ian Miller in any of your conversations --

A.  I --

Q.  -- with him?

A.  I don't know.  I'm very surprised by that. So now I don't know.  I am -- I don't know what to say about that because I will swear I said that to the state police.  So I don't know, I don't know the answer to that.

Q.  Is it possible that given it's been well over two years since it happened that your memory' changed over time?

A.  Of that, no.  Yet in general, yes, of course.

Q.  I'm sorry.

A.  But that specifically I remember at whatever point in the middle of all this Robert saying, "I can't breathe."  This is not, this is not like a falsified retrieved memory or anything.  Robert

61

said, "I can't breathe."  And knowing his difficulty with breathing, I said, "Can he breathe?," and they said, "He can breathe."  This is exact like memory.

Q.  Okay.

A.  And then I said to one of the other -- There were more officers there at that point, and I said to one of them, I said something by reference like him being able to breathe or maybe it was, maybe it was like after everything that he said, "Well, if he can say 'I can't breathe,' that's probably a good sign that he has, like he has enough air."  So this is not -- I definitely like didn't make that up.

Q.  I did not mean to suggest that you intentionally would.

A.  I didn't think you would.  It's just that --

Q.  I know it's been a long time and we've been going for a while.  So I just want to be clear.  Is it possible it was after Robert collapsed that or after he was on the ground that he said "I can't breathe"?

MS. McKINNON:  Objection.

A.  Using the term collapsed isn't completely accurate to me because -- I don't know if the pictures of how small this area we're talking about

62

is.  I know people are trying to prove something happened here, but there are pictures of how small this area is.  And once they were in this narrow area, I will not say he collapsed because there was not a leverage of two grown men being in a very tight space and there was like, there was momentum, there was leverage, and he -- and they were trying to get him to put his hands behind his back to put handcuffs on.  So it was -- This is like a lot of movement in an extremely short period of time.  He did not collapse, like "collapse" like from any standing or semi-standing position to down on the ground.  That did not happen.

Q.  Okay.  So was there movement that led him to be on the ground in your mind and the struggle continued?

A.  Yes, because they were -- That type of force of two grown men -- and I don't know if you have the measurements of this little area we're talking about.  I don't know if that makes more sense for people.  But there was nowhere else to go except this big dining room table is in the way and it moved out of the way.

Q.  Let me ask you this.  You said -- When you

63

said, it was my understanding when you asked "Can he breathe?" and when Robert had just said, "I can't breathe," that there were multiple officers on the scene; is that correct?

A. So I did say that and I guess -- Back up like, you know, retract that. And I don't know if that particular officer who said that was there at that exact moment or if it was very, very soon after. I don't know if it was like 30 seconds between when they started like performing CPR and other medical measures. Like it's a difference of seconds we're talking about. So that's -- Like my memory is not unclear. It's just that because it's a difference of seconds, I can't say like did it happen this second or that second.

Q. Okay. Is it fair to say that as soon as Robert said he can't breathe, seconds later the two officers were performing resuscitative measures on him?

A. He said he couldn't breathe, and then I said, "Can he breathe?" They said "Can he breathe?" And then there was still, I mean there was like a short period of however many seconds until he had been -- I remember that his, in like the whatever,

64

you know, is like, I don't want to use the word struggle, but like the movement of his leg or one specific leg in the middle of this I could see, again small area.

Q.  Okay.

A.  So -- and I'm seeing as much as I can but it's not, it's -- the angle of this, like I'm -- that's why these details are like, you know, if people saw what the space we're talking about, this wouldn't I don't think --

Q.  Let me show you.  It will be easier for you. I'm going to show you what we'll mark as Exhibit 2 for today's deposition.  It's Bate-stamped -- Well, it's a 21 page pdf document.  Each page is its own picture.  Okay.

            (Marked, Exhibit 2, Photos of house.)

Q.  I don't need you to look through everything, but I want to kind of scroll through it and just ask you where you were in the house during that particular moment.  Okay?

A.  Okay.

Q.  Okay.  I'm looking at the 7th page of this exhibit which is, oh my gosh, which is Bate-stamped in the right bottom corner BPD 897.  Correct me if

65

I'm wrong.  I can't see that well with these glasses on.  Let's look at BPD 896.  Can you tell me if any of that area is where the struggle was?  And I'm going to --

A.  Yes.

Q.  -- try to make it a little smaller because it seems like it's too big.

A.  Okay, perfect.  So the area that we call and I believe may officially be identified for all of this as the office where nook where you see the slats and then there's that narrow area, that is where the, that's where the restraint happened where -- just before the table there's the slider, these two grown men come through the slider, they're using their leverage, they're using their momentum, and the officer is trying to get leverage to get Robert to slow down or, you know, stop his movement is directly from the slider to, if you can see the window in the middle, that little office nook is -- like that was, it was like a -- that was the only pass, and that's why the table was right in the middle of that.  So the table was moved as they're, you know, going through the center of this small room and I am in the space between -- that's the

66

living room with those two little, you know, open frames there, that's the living room.  That's where I was.  So that's my line of sight.  And the little area in between is where two and then three grown men were.  So this is a small area we're talking about.

Q.   Okay.  Do you see the person's leg in this photo?  I don't know whose it is but --

A.   Yes.

Q.   -- there's a person's leg.  Is that where you were standing?  I'm trying to --

A.   No.  I was standing on the other side of the, the other opening.

Q.   The other doorway.  Okay.

A.   Yes.

Q.   And so when you were standing in that doorway, you could look to your right a little bit and see them in the house?

A.   Yes.

Q.   And as they walked closer to you and eventually passed you is where Robert fell to the ground, right?

A.   It's hard to describe it as him falling to the ground, because what I saw, and I don't know if

67

I'm speculating here, but based on "put your hands behind your back," I was thinking they were trying to put handcuffs on him.  So the goal of putting handcuffs on him and three grown men being in that tiny little space where, you know, all the books and everything are, he was like not bent over but it was like, it was almost like having to be pretzeled to fit in this space.  So it wasn't like he was standing and fell to the ground.  It was like a gradual "put your hands behind your back," he wasn't, and they -- I guess it was considered punching.  It wasn't a force, force of sole punching.  It was using leverage to get his arm to bend to put the handcuffs on.  So he didn't collapse on the ground but he was still, he was still at least moving his arms and legs when he was down in that little space.

Q.  Okay.  About how many seconds was it from when you saw him able to stand and moving to when you were first aware that he might not be breathing anymore?

A.  I mean, the first thing that came to me was maybe 40 seconds.  I don't know how else to estimate that.

68

Q.  Forty seconds --

A.  And I don't have --

Q.  I'm sorry.  Forty seconds from when you first saw them in the doorway to when the officers told you that Mr., that Robert had lost consciousness?

MS. McKINNON:  Objection.

A.  Not from the slider.  I will say maybe from -- as the table, just after the table was moved by their force, you know, the momentum of their forward progress, and then -- I don't know how else to estimate it.  Forty-five seconds maybe.  I don't know how I'm supposed to estimate that.

Q.  No, that's okay.  What do you remember the officers saying to you next?

A.  They didn't say anything to me at all.

Q.  Do you remember seeing the handcuffs be placed on Robert?

A.  I remember seeing -- I didn't, I didn't see the exact moment that they were placed on him.  I saw it maybe just like a moment or two after when they were on him.  The part that I remember most about that was like the key to the handcuffs and then as soon as -- it went from him not kicking his

69

leg but almost like a, like a movement that he was moving one of his legs as like that was like his last movement as a breathing human being moving his leg, and then when it stopped moving and they said, "Did he go out?" meaning did he lose consciousness, whichever one had the key, the key happened and then -- they didn't -- There was no contact with me. This was all like immediate like one thing after the other.  There was no -- They didn't even make like -- I was enough out of the line of sight, I don't even know if they looked at me.  So...  Because it was -- they were moving like right past me but like in the opposite, like they were all facing the opposite direction of like where those doors are open, they're facing like toward the other side.  So Robert was facing that direction and then they were not -- like there was not interaction with me.  They said, "Did he go out?"  One of them had the key and then they started CPR.  And I know at that point that -- I don't know at what point there was a third officer who arrived because it was at that point CPR, that there was another officer who, like especially when they were doing the defibrillator, he said this is -- this could be difficult to watch,

70

and I'm -- like I had -- ever since I knew he lost consciousness, that was like an increased state of shock if that's fair to say.  So...

Q.  Okay.  So do you remember the -- Do you remember Officers Roycroft and Jackson taking the handcuffs off of Mr. Miller, off of Robert?

A.  I don't remember that detail.

Q.  And did they say anything to you after?

A.  They did not say anything at all to me directly that I can recall.  I don't, I don't recall them directly addressing me at all.

Q.  Did they immediately get to work on resuscitative measures?

A.  Yes.

Q.  And was one of them operating a bag valve mask while the other gave chest compressions?

MS. McKINNON:  Objection.

A.  I believe so.  But again, because I kind of had an intuitive sense like my domestic partner just died, so I don't -- this is where I'm not a hundred percent sure.  Like I was watching it physically with my eyes, but I don't remember that.  I remember that there was CPR being conducted because I like had CPR training, and that's what I saw, but I don't

71

know that.

Q.  You can't say whether they put him in a recovery position or moved him at all, but you remember that there were resuscitative measures that started?

A.  Yes.

Q.  Okay.  Eventually did the EMTs come in and take over?

A.  Yes.

Q.  Did you have any interaction with either of those two Barnstable police officers after that?

A.  Either of those two officers?

Q.  Right.  The two Barnstable police officers who --

A.  No.  No.  No.  I had never had any contact, any like direct exchange or anything with them.

Q.  Did you see officer or one of the officers check Robert's pupil to see if he was reactive?

A.  I don't remember that.

Q.  Did you go to the hospital with Robert when he was transported to Cape Cod Hospital that evening?

A.  I didn't go with him.  They took, the EMTs or the, you know, Barnstable fire took him by

72

ambulance and my friend, whose name is in the report, so I don't have to call her out independently, it's in the report, you know, she was -- she came as soon as like in the midst of all this, and she drove -- and they said, "Can you drive her to the hospital?" So she drove me to the hospital. And I wouldn't go in the ambulance. I don't think I was allowed to. I wasn't given that option. So I don't know. He was transported, and I think by the time he was like in the ER area room, whatever, I think like she and I had already been there for maybe like a minute or so, a very short period of time.

Q. Do you remember any conversation you had or overheard with any Barnstable police officer or EMT that was at your house that night?

A. Are you talking about these four, the two officers and the two EMTs from the very initial action?

Q. So --

A. Because I talked to -- Why I ask that is, I talked to so many police officers that night. They were lining the whole street with all these emergency vehicles, and I talked to multiple police

73

officers.  So those two.  None of the EMTs that I can recall.  Definitely neither of the two initial officers.  I didn't hear anything.  I didn't -- Did I overhear anything?  No.

Q.  Did a Lieutenant Mellyn come to your house in the day or two after Robert's death to perform a repair on the slider door?

A.  No.  No.

Q.  Did anyone from the Barnstable Police Department go to your house to perform any repairs or talk to you about repairing the slider door?

A.  Yes.  That night after I got home from them pronouncing Robert dead at the hospital, the police officers, there were police officers there in the waiting room at the ER talking to me, and then there were police officers at my house waiting to talk to me.  And I didn't remember what -- I don't know the first name.  Is that Mark who -- Mellyn, is that Mark Mellyn or -- okay.

Q.  That's who I'm asking about.

A.  I remember speaking to him.  I remember one -- All I remember is his name was Officer Dave, and he was the one who initiated repairing the slider because I didn't want to get my cat to get out

74

because my boyfriend, you know, just died, I didn't want my cat to get out and die. So he was -- He and another officer, I don't remember who, helped him repair the slider. I remember speaking extensively with Officer Mellyn when we were waiting, like waiting for the state police. And my friend was there with me. This is what's going to happen. This is the procedure. I mean, he may have been the other one who helped, but.

Q. Do you remember what you said to Lieutenant Mellyn about Robert's relationship with his children?

A. No, I -- No, I don't remember, I don't remember discussing that that night, but that doesn't mean it didn't happen. There was a lot -- It was a lot of activity in my house, and going to the hospital, coming back and then talking to, you know, many people. I don't remember that happening one way or the other.

Q. Okay. Let's talk a little bit about Robert's relationship with his children. When the two of you first met, how did he characterize his relationship with his children?

A. I don't have an accurate answer for that.

75

Q.  And over the years that you lived with him and were his domestic partner, how frequently did he see his children?

A.  I don't -- this is not -- I have to say, I don't have an accurate assessment of that.

Q.  Do you remember Ian Miller ever coming to visit Robert at your home?

A.  No, I don't remember that.

Q.  Do you remember Michael Miller ever coming to visit at your home?

A.  Yes.  Michael Miller came with his dog Ace and at least one friend, possibly an additional friend from New Jersey.  So Michael, the dog, definitely one friend and I think a second friend, but I can't remember like a hundred percent.

Q.  What year was that?

A.  I don't know the year.  I know that they had some product from a plumbing, a plumbing product that they were transferring.  So whatever year that storage unit was cleaned out, that was the year. Other than that, I don't know.

Q.  Okay.  So you remember Michael visiting with some number of people and a dog one time.  Did Michael ever go visit Robert at your home any other

76

time to your memory?

A.  Not that I remember.

Q.  Did you ever know Erin to visit Robert at your home?

A.  No.

Q.  Did Robert see Erin at all during the time that you were together?

A.  Yes.  He -- I don't know the frequency or amount of time.  He went to New Jersey at different times during our eight years together at which time I know he saw Erin, I know he saw, I don't want to be inaccurate, at least one of his sons, maybe both, but I don't want to say anything inaccurate.

Q.  Do you recall Robert having a falling-out with Ian and Erin around 2016?

A.  I don't remember the time frame, but it was at some point -- if we met in 2011 and he died in 2019, it was at some point between those.  I will say to guess, it will be 2016 or earlier or previous.

Q.  Okay.

A.  Yes.

Q.  Was that related to something to do with a party on the Cape that Erin, not on the Cape, but a

77

party in New Jersey that Erin was having to which Robert was not invited?

MS. McKINNON:  Objection.

A.  What I remember is there was, I remember it was an Oktoberfest party that Erin and her husband were having.  So I don't remember the year, but I just remember it was, the theme was Oktoberfest and -- I don't remember -- I remember Robert saying that he was at that Oktoberfest party and that he got into a, I don't even know what to call it, a difference of opinion at that Oktoberfest with his daughter's husband.

Q.  What was that related to, the disagreement?

A.  I don't have, I don't have like a hundred percent accurate answer to that.

Q.  Well, it was serious enough for Robert to have a falling-out with two of his children.  Did Robert ever tell you any details of this argument?

A.  It sounded to me like a misunderstanding of adults at a party where I remember him saying that someone "attacked" him.  Whatever that means, I don't know.  Some sort of motion coming up to him from behind at this party that -- whether it was a difference of, you know, opinion on someone's

78

behavior, I don't know the exact, I don't know the exact content, but it was that he felt someone attacked him.  Who was related to his, you know, in a close contact with his daughter --

Q.  Was it --

A.  -- that somebody didn't appreciate, what I assessed it as someone didn't appreciate Robert's behavior in some way which can be interpreted in many different ways.

Q.  Was he physically attacked?

A.  I don't -- See, I remember the word "attacked," but I don't know the -- I know someone at least touched him from behind.

Q.  Okay.  Did Robert tell you that Erin and Ian didn't want him at the party?

A.  Yes.

Q.  What did he say about that?

A.  What I remember is that he -- It wasn't a hundred percent clear why they didn't want him at the party.  I think it -- I mean, it sounded like, it sounded to me knowing Robert it had to do with sometimes his actions or words could be misinterpreted depending on I think if he feels like protective of a loved one or like beer was involved.

79

I don't know who was drinking, who wasn't.

Q.   Are you aware of any other falling-outs or arguments that Robert had with his children other than that one?

A.   I know that that -- I know that that was almost like that was a strain.  It sounded like that was like the major, the major falling-out where they weren't in as much contact after that.

Q.   Um-hmm.

A.   I don't know that I will say there was like another definite --

Q.   Do you know --

A.   -- falling-out.

Q.   Okay.  Just try to stick to my question just because you're answering a lot about what you could guess and I don't want to make this any longer than it needs to be.

A.   I know and I'm going to get -- I know I'm going to have excessive, excessive you know, other implications I'm sure.  So, thank you.

Q.   Are you aware as to whether or not Robert ever received any cards, gifts or any presents from any of his children during all the years that you lived with him?

80

A.  I know that -- I don't know the number or frequency, but I know that he received a card from his daughter with a, you know, a Christmas card with a family picture.  Other than that, I'm just going to say I'm not sure because I don't have a hundred percent clear memory of it happening.  So...

Q.  Did anyone ever tell you that Robert or did Robert or anyone else ever tell you that he had a history of bipolar disorder?

A.  No.  No.  I will not say that term was used.

Q.  Did Robert ever exhibit in the last couple years of his life depression?  And you can just try to say yes or no or if you can't, then you can give me more.

A.  I don't know.  It depends on whose assessment.

Q.  Prolonged crying?

A.  I know the symptoms of depression.  I'm just saying like is it a clinical diagnosis or is it my assessment or his verbalizing?

Q.  Did you ever think Robert was depressed during the last two years that you lived with him?

A.  I'm to refrain from answering the question.

Q.  That's fine.  Did you ever know Robert to

81

cry excessively during the two years that you lived with him?

MS. McKINNON:  Objection.

A.  No.

Q.  Did you know Robert to have ultra high highs and ultra low lows?

A.  I can't speak to that.

Q.  Did you ever understand Robert to have been delusional?

MS. McKINNON:  Objection.

Q.  Did you know Robert to be delusional in 2017 and 2019?

MS. McKINNON:  Objection.

A.  Can you rephrase did I know him?  I don't -- Is it my assessment or --

Q.  That's all right.  Let's move on.  Let me play you a clip of your --

A.  Is this the 911 call I get to listen to?

Q.  Yes.

A.  And this is absolutely necessary?

Q.  Well --

A.  Is this absolutely necessary I should say?

Q.  I'll decide what's necessary based on your answer to this next question.  Can you tell me --

82

A.  Okay.

Q.  -- if you ever experienced or if you ever perceived that Robert was delusional during his psychotic episodes in 2017 and 2019?

MS. McKINNON:  Objection.

A.  Yes.

Q.  Okay.

A.  I said that on the 911 call, yes.  So I'm glad it's not necessary to play that because --

Q.  Yeah, I don't want to put you through that. I just wanted to understand that you said what you meant.

Where did Robert Miller, where did he get his medications when he lived with you?

A.  Do you mean which pharmacy --

Q.  Right.

A.  -- or how were they prescribed?

Q.  Which pharmacy.  I think I understand -- Well, tell me the names of his providers that you know who treated him in the last two years of his life?

A.  Okay.  So in terms of the pharmacy, I know that he bought some things from Downing Lab in Texas and some -- We switched from CVS to Walgreens.  So

83

certain pharmaceuticals prescribed by the first person which was in the, you know, the report with Maria Gianan who's the psychiatric nurse, and she prescribed -- do you want me to tell you which medication?

Q.  No, that's okay.  Tell me --

A.  Or just the providers?

Q.  -- their names, please.

A.  Okay.  So Maria Gianan.

Q.  Um-hmm.

A.  Dr. Patel at Mashpee Family Medicine.

Q.  Yeah.

A.  I don't believe the cardiologist gave him any medication.  I'm not certain about that though.

Q.  Would that have been Hatfield Cardiology?

A.  Yes.

Q.  Do you know what activities Robert had done while you were in Florida?  In other words, do you know if he ever left the house?  Do you know if he went fishing with somebody?

A.  During like that week --

Q.  While you were in Florida.

A.  -- in 2019?

Q.  Um-hmm?

84

A.   When I was in Florida.

Q.   Yes.

A.   I, so I heard after that he went shellfishing with a neighbor.  But other than that, I don't -- he didn't give any indication aside from between like going across the street than our house. I don't believe he left the house at all.  He didn't make any indication he had left the house.

Q.   What is the neighbor's name who went shellfishing?

A.   I'm not going to give that.

Q.   You're under -- You're obligated to give me that name.  What is the neighbor's name he went shellfishing with?

A.   Larry.

Q.   What's Larry's last name?

A.   Rosenberg.

Q.   Rosenberg.  And where does Larry Rosenberg live?

A.   He lives across the street from us.

Q.   Do you know what number house?

A.   No, because it's a different cross street.

Q.   I understand your hesitation in not wanting to share Larry's name, but the claims that Ian is

85

making are very serious against these two officers. So it's important that we get all the evidence that we need to get a complete picture of what was going on during that time frame.

A. So -- Okay. I don't know the, I don't know the, I do not know the address because it's a different cross street.

Q. All right. What about Robert. Did he work at any point when you two lived together?

A. Yes, he did work --

Q. Okay. What kind of work --

A. -- at different points when we lived together. He did different types of work.

Q. And can you summarize them succinctly for me?

A. He did technical writing for a plumbing company. He worked on a telecommunication project of identifying signals sought. He --

Q. Do you know what company he did the telecom project for?

A. It was not a well-known. It was -- I don't know. I don't know. It was -- I don't want to give the wrong name. There was one -- it was like a subcontractor. So I don't know.

86

Q.   If you don't know, you don't know.

A.   Okay.  I don't know.  Since he lived in Massachusetts I'm not sure of that.

Q.   All right.  Did Robert ever tell you he worked for the Russian government or a Russian family trying to bring business to the United States?

MS. McKINNON:  Objection.

A.   That's not -- I can't answer that question as it was asked.

Q.   Do you ever remember Robert telling you about any work he did in Russia or with Russian people or businesses?

A.   Yes.

Q.   Okay.  Tell me about it.

A.   Can you ask me a more specific question?

Q.   Only what you know about work that Robert did in Russia or with Russian people or government, please.

A.   I know that Robert knew a Russian family. And that he -- that consisted of at least three, at least I'm saying, three brothers where he went to Russia periodically throughout his life, including when he was with me.  And I do not know the

87

specifics of the business dealings.

Q.   Do you know what year Robert last went to Russia?

A.   I do know.  I can try to retrieve it from my brain.  It was not, it was at least not the past three years we were together.  It may have been -- I don't know the exact year.

Q.   Okay.

A.   I don't know the exact year.  It was after 20 -- I mean between 2014 and 2018 maybe.

Q.   Okay.  Do you know whose idea it was to file this lawsuit?

A.   I don't know specifically.  I don't know how to answer that question I guess.

Q.   Well, how did you first hear about this lawsuit or the idea of a lawsuit?

A.   I first heard about the idea through his sons Michael and Ian.

Q.   Did you have separate conversations with them both?

A.   Yes, I have.

Q.   How many times did you talk to Ian about this lawsuit?

A.   I don't remember one way or the other

88

talking to Ian about this lawsuit.  I spoke with him the day after his father died, and I can --

Q.  Sorry.  My question was:  Have you talked to Ian about this lawsuit, and maybe that's what you were about to answer.

A.  Right.

Q.  I want to be clear it's about the lawsuit and not the event.

A.  Right.  I don't recall talking with Ian about the lawsuit.

Q.  Okay.

A.  I do not recall.  So that means I don't know.

Q.  How many times have you spoken with Michael Miller about this lawsuit or about possibly filing this lawsuit?

A.  I don't have an accurate answer.  I don't know.  If my cell phone records need to be pulled, then that might be much more accurate.  I don't know the answer.  I will say --

COURT REPORTER:  I'm sorry.  You cut out, Amy.  Say it again.

A.  I don't know the accurate answer, but it's possible it was three times.

89

Q.   Were you asked by Michael to support this lawsuit?

A.   Can you rephrase that or can you ask more specifically?

Q.   Were you asked to participate in this lawsuit?

A.   I don't know how to answer that.  I don't know how to answer that.

Q.   Did Michael ask you anything related to this lawsuit?  Did he ask you to pursue a claim on behalf of his father's estate?  Did he ask you to help him with it?

A.   He didn't ask me to pursue a claim because I don't have any -- I have no legal, I have no legal standing in any of this in terms of not having a marriage license.  So he asked me, exact question he asked but I remember saying to him that I do not want to be involved with this, but I --

Q.   Again after "I don't want to be involved with it," what did you say?

A.   But I support you three children.

Q.   Something's going on with your audio.

A.   Is that better?

Q.   Let's see.  But you told Michael that you

90

will support him in his --

COURT REPORTER:  Wait a minute, wait a minute.  I'm sorry.  We're going to have to take a break soon.  You're both overlapping.  Do you want to finish this line and then we'll take a break?

MS. GILL:  Okay, great.

Q.  You told Robert, I'm sorry, you told Michael that you are willing to support him and his two siblings in this lawsuit?

A.  Because that's such a loaded question, if we can take a break before --

Q.  No.  I'd like you to answer.

A.  -- I have to --

Q.  It's just the wording that you just testified to.

A.  Can you backtrack, please?

Q.  You just testified that you said you didn't want to be involved with a lawsuit but that you will support them, and I'm trying to understand what you meant by support them.  That's all.

A.  Okay.  And that was completely my error of misspeaking and using such a loaded word as support.  So I will try to explain what I meant by that.  I was a little distracted by the audio issue we were

91

having and --

Q.   Understood.

A.   I told him that I will support their looking into what grounds they might have to file a civil lawsuit against whatever entity, you know, the actions that they feel, you know, caused this.  So I support -- I said -- and I mis -- I think there's an e-mail between myself and Michael which could clear all of this up because my use of the word support was that I did not want to be legally involved because of my own experience and perception, but if they felt they needed to pursue this legally, I supported their pursuit of -- If they needed to go through a legal channel to receive the answers they needed, then I supported his children in doing that.

Q.   Okay.  Were you asked to speak with their attorney, one of their attorneys Howard Friedman?

A.   Yes.

Q.   And did you speak with Attorney Friedman?

A.   Yes.

Q.   How many times did you speak with him?

A.   I believe I spoke with him twice.  I know I spoke with him one time and I believe it was a second time.  I left him a voicemail the third time,

92

the third time that we didn't actually speak.

Q.  Okay.  The first time you talked to Attorney Friedman, what was the nature of your conversation?

A.  The nature of our conversation was that it was disruptive that he didn't give me a heads-up that he was calling me on a Sunday afternoon.  We didn't have an agreed upon time to talk.  Because as I communicated in e-mail, I didn't feel ready to have all of this scrutinized and looked into.  So I was displeased with his choice of not giving me a heads-up.

Q.  And did he get your number from Michael, do you know?

A.  I don't know for sure, but I do know -- I don't know the answer to that for sure.  I do know that Michael sent an e-mail to myself and Howard that he wanted to introduce us.  And I did not engage with that because I tried to reiterate I wasn't ready to get into any of this.

Q.  Um-hmm.  Did you get the sense that Michael was pressuring you in becoming involved with the lawsuit?

A.  I don't know how to accurately answer that. I felt, I felt like my being the firsthand witness

93

of this experience and everyone else involved was on a completely different timeline in terms of the grief I was experiencing, the fact that I witnessed it firsthand, what might seem like a perfectly reasonable amount of time to anyone on the outside or to someone who wants answers as to what happened, I felt pressured, but not necessarily specifically caused by Michael.  It felt just the whole --
Knowing about legal involvement felt like a pressure from the beginning.

Q.  A couple of times did you tell Michael that you needed time to think about it and then he will reach out again asking you about the lawsuit?

MS. McKINNON:  Objection.

A.  Yes.

Q.  Did you get the sense --

A.  That happened with Michael but it also happened with Howard that I didn't adhere to the inaccurate estimate of my time frame when I will get back to him.  So he called me again.

Q.  Did Michael ever offer you money or part of the proceeds of any settlement or jury award as a result of this case if you were to support his claim?

94

MS. McKINNON:  Objection.

A.  Did he offer me money if I supported this? I don't know that it was like cause and effect.  It was that what was posed to me, I believe it was by Michael, I believe it was because I spoke with him on the phone, but I don't want to be, I don't want to be recorded in, you know, saying something inaccurate.

Q.  Well, tell me what you remember about what Michael offered.

A.  That if they, that if they were going to pursue this as next of kin, that because I was, you know, domestic partner and I had no, you know, no legal, no legal, you know, ties or benefit to Robert, that they will share some of the outcome with me, share some of the outcome with me.

Q.  Um-hmm.  And does that offer still stand today?

A.  I don't know.

Q.  Did Michael ever tell you that you will not be offered a portion of any settlement or jury award if you were not willing to participate in the case?

A.  No.

Q.  When Robert's mother died and he didn't go

95

to the funeral, did any of the children that he had ever -- did any of the children that he had ever reach out to figure out why their father wasn't going to his own mother's funeral?

MS. McKINNON:  Objection.

A.  I don't know the answer to that.

Q.  Do you know if Robert will send his children text messages practically begging to see them?

MS. McKINNON:  Objection.

A.  Can you still hear me?

Q.  Yes.

A.  Okay, good.  I don't know, I don't know if that occurred --

COURT REPORTER:  I'm sorry?

A.  -- about -- Is it not good, not the audio?

Q.  I couldn't hear.  You were choppy.

A.  Okay.  Okay.  Is that --

Q.  I think it's a good time for a break.

(Lunch recess.)

AFTERNOON SESSION

Q.  Ms. Anderson, as far as you're aware, is Michael Miller's offer to share some of the proceeds of the litigation still open?

A.  I don't know one way or another.

96

Q.   Have you told me everything you can remember about the events of the evening of April 16, 2019?

MS. McKINNON:  Objection.

A.   I don't think I can accurately answer that.

Q.   Is there anything that stands out in your mind as you sit here right now that we haven't covered that you do remember?

A.   I don't -- I can't recall in that, in that manner, no.

Q.   As you sit here today, are you critical of the actions of the Barnstable police officers who responded to your 911 call for help the evening of April 16, 2019?

MS. McKINNON:  Objection.

A.   I don't have a specific opinion on that.

Q.   Do you have a general opinion on that?

MS. McKINNON:  Objection.

A.   I don't want to give a general opinion.

Q.   You don't have an opinion one way or another as to whether or not, or you don't have any feeling one way or another as to whether or not the officers who responded to your 911 call did anything wrong?

MS. McKINNON:  Objection.

A.   I don't, I don't feel like I have every

97

piece of every information from every perspective that I could say whether they -- I can't say no one did anything wrong in any situation.  So that feels like if I give a specific opinion, I'm opening myself to, for my response to be open to interpretation which I'm not comfortable with.

Q.  When's the last time you spoke with Michael Miller?

A.  I believe, I'm not sure specifically, but it has been -- Spoken on the phone, I don't think -- it's been well over a year I believe.  I believe it was soon after the one year anniversary which would have been April 16, 2020.  I believe the last time Michael and I spoke was soon after the one year anniversary.  So April 2020.

Q.  When's the last time that you texted with Michael Miller?

A.  I don't have an accurate answer, but I believe it's been over a year.

Q.  Did Robert have a funeral?

A.  Not a funeral per se.  He didn't want a funeral.  So, no.

Q.  Did he have anything, any kind of ceremony or memorial service?

98

A.   His family in New Jersey had a memorial service the week after he died I believe, and I wasn't physically able to drive and attend.

Q.   Why weren't you physically able to drive and attend?

A.   Because I have sciatica and-a-half hour in the car is excruciating.  So multiple hours would have been extra excruciating.  I think my family would have been concerned if I left the state just having had this whole traumatic experience, and it was too soon after for me to reasonably consider that I will go to that when I've never driven to New Jersey before.

Q.   Do you have a copy of Robert's obituary?

A.   I have -- I don't have a paper one.  We had an online one.  It wasn't published in a newspaper which I think Robert would have been happy about.

Q.   Who wrote the online obituary?

A.   I believe his daughter Erin did.

Q.   And was his sister Jen, was she a point person for any of the funeral arrangements?

          MS. McKINNON:  Objection.

A.   No.

Q.   Was she the point person for any official

99

actions that were necessary to record his death?

A.   I'm sorry.  Did you say report or record --

Q.   Record.

A.   -- his death?

Q.   Record.

A.   She was next of kin or whatever the term is in this situation for the medical examiner with the autopsy.

Q.   Is Robert buried anywhere?

A.   No.

Q.   Was he cremated?

A.   Yes.

Q.   Where are his ashes?

A.   I have some and each of his children have some.  I don't know further than that.

Q.   Who coordinated that?

A.   I believe it was Erin and Ian who coordinated the cremation.

Q.   Have you ever given testimony before in a court proceeding?

A.   Yes.

Q.   What kind of court proceeding?

A.   It was a DCF case, and I was a clinical social worker testifying.

100

Q.   Any other court proceedings in which you've testified?

A.   Not that I can think of.

Q.   Have you ever gone by any other names?

A.   Just different spellings of Amy.  A-m-i-e. And I think that's the only difference.

Q.   Do you have any children?

A.   Not human children, no.

Q.   Have you ever been married?

A.   Not to Robert.

Q.   I know we discussed Robert.  But have you ever been married before Robert?

A.   No.

Q.   What do you do for work?

A.   I'm a clinical social worker.

Q.   What's the name of your practice?

A.   I have a private practice in psychotherapy that is under my name Amy Anderson.  And then my credentials are LICSW.

Q.   So the name of your business is Amy Anderson, LICSW?  Was it a yes?  I didn't hear it.

A.   Yes.  Yes.  It's, it's -- I'm like a sole proprietor.  So it's my name, you know, my name however you want to look at it.  It's not different.

101

It's not a separate business name.

Q.  And you said you're a psychologist?

A.  I'm a clinical social worker and I do individual psychotherapy.

Q.  So you're a psychotherapist as well as a clinical social worker?

A.  Yes.

Q.  I imagine you received training in psychological and psychiatric disorders?

A.  Yes.

Q.  How many years of training have you received in those areas?

A.  Seven years of academic training and ongoing continuing education after that.  So since 2007 ongoing continuing education.

Q.  Have you or can you say approximately how many patients you've treated over the years for psychiatric disorders or symptoms that they were experiencing?

A.  No, I can't.

Q.  Will it be --

A.  I definitely cannot estimate how many clients I've treated over the past 14 years, no.

Q.  Will it be over a hundred?

102

A.   Yes.

Q.   Have you treated patients with a history of violence?

A.   Yes.

Q.   Have you treated patients with a history of aggression?

A.   Yes.

Q.   Do you believe your years of training and experience in treating psychological disorders equipped you with the skills to recognize the level of danger that Robert posed on April 16, 2019?

MS. McKINNON:   Objection.

A.   No.

Q.   Why is that?

A.   A personal relationship and a clinical relationship are very different, and in a heightened state of action, that's not my professional -- my professional self is not in that role.  It's my, my personal self.

Q.   Where did you go to college and graduate school?

A.   I went to Roger Williams University for undergraduate, and I went to Boston University for a Master of social work.

103

Q.   And how did you and Robert meet?

A.   Sorry.  I was distracted by my cats.  We met because someone we both knew suggested we will get along.

Q.   Was Robert ever a client or a patient of yours?

A.   He was referred to counseling not by his choice.  By a medical requirement, if you're taking any medication is to be assessed by counseling.  So he was not, he was never someone I treated.

Q.   Um-hmm.  Is that the reason you met?

A.   That's the reason we first met, but I didn't treat him.

Q.   Okay.  So he was referred for counseling that he was required to undergo?

A.   Required to get an assessment of counseling, assessment of need for counseling, or if someone is prescribed a medication, they are screened. Everyone, whether they want to be or not, is screened for whether they will do counseling or not.

Q.   Which provider referred Robert to your practice for an evaluation?

A.   It wasn't my practice.  It was a community health center.  It was not when I had my practice.

104

Q.   What was the name of the community health center?

A.   Duffy Health Center.  D-u-f-f-y Health Center.

Q.   Where was that located?

A.   In Hyannis.

Q.   And do you recall the circumstances of why you didn't treat Robert yourself?

A.   I did not treat Robert myself because I spoke to my supervisor and said that I didn't, that I had a conflict treating this person because I had a personal, I had a personal opinion or a personal view.

Q.   Is it because you started to develop feelings for Robert and you felt that it will no longer be appropriate for you to treat him?

MS. McKINNON:  Objection.

A.   I never treated him.  So I will say that's why I said I can't treat this person because I have a personal feeling about him.

Q.   How did you develop a personal feeling about Robert without treating him?  That's what I'm trying to understand.  He was referred to your practice.

A.   Sorry.  I wasn't trying to talk over anyone.

105

Q.  No, it's okay.  If you could just help me understand.  I'm getting that he was referred to your practice by a provider who wanted him to be evaluated in order to take or see if he could take a particular medication well, and then you had a conversation with your supervisor saying that you had a personal connection with him and didn't feel comfortable treating him.  Right?  So what happened in the interim?

A.  So it wasn't -- What the, what the program was, it was an integrated primary care and mental health.  So if someone was prescribed any type of antidepressant or psychiatric medication, they were referred to the counseling department not regarding the medication but to see if there was a concurrent reason that they will need counseling.  And through meeting, through meeting Robert on that account, I knew that I couldn't maintain a professional view, that I developed a personal interest in him, but on the basis of talking with him.  And it would have been a conflict for me.  It would have been a conflict for me to treat him anyway.

Q.  How many occasions did you meet with Robert before you recognized you had a personal conflict?

106

A.   It was the first, it was the first time, and then there was a subsequent time when, between when which I spoke to my supervisor and then we met an additional time for the follow up.  And that was it.

Q.   I'm going to ask you to preserve any documents that you have that relate to Robert's death, the events of April 16, 2019, any communications with his children over the years and any other records that you have related to Robert and any psychological issues he experienced during the time that you knew him just in case I need to make a request for those.  So whatever you have in your possession now, please do not destroy or get rid of anything.  Okay?

A.   Okay.  Does that mean my -- his communications between him and his kids or anything that is mine that shows --

Q.   Do you have communications --

A.   Sorry?

Q.   Do you have communications or documents evidencing communications between Robert and his children?

A.   I have one, since we were together, I have one.  I have the Christmas card with the picture.  I

107

don't know what else is in like that box that I made with -- It's not like personal communications.

Q. What about Robert's cell phone. What happened to that when he passed away?

A. I sent his cell phone to his brother and it stopped, I mean it went off the air because no one was paying for it because it was auto pay under Robert's account and it stopped being withdrawn.

Q. Is that John Miller?

A. Yes.

Q. Do you know if John Miller still has that phone?

A. I don't know.

Q. All right. I need to look over my notes just to make sure I don't have anything else. But, Jennifer, if you would like to ask any questions you have, feel free to go ahead so we didn't lose time.

MS. McKINNON: Why don't you finish and I'll wait. Actually I'll be right back.

(Brief recess.)

Q. Ms. Anderson, do you recall there being a pair of scissors on the table just as you walked into the house from the slider back porch that had been separated?

108

A.  I don't recall that, but I have a pair of kitchen scissors that were often taken -- you know, in two pieces, you know, broke apart in two pieces and put back together.  So I have no recollection of where they were.

Q.  What color handle did those scissors have?

A.  Blue.

Q.  I'd show you a picture but I can't share my screen.  So, thank you.  All right.  I think I'm finished.  Go ahead, Jennifer, if you want to go.

MS. McKINNON:  Okay.

CROSS-EXAMINATION

BY MS. McKINNON:

Q.  Hi, Ms. Anderson.

A.  Hi.

Q.  I have some questions, mostly just to clarify a few things.  So I want to make sure I understood you correctly.  I understand this is difficult and so I will try to be succinct.  I'm going to start with Exhibit 2.  And so I think I can share my screen and I can bring that up.  So just give me one second.  Can you see that?

A.  Yes.

Q.  Okay.  Does that make it better?

109

A.  I can see that fine.

Q.  Okay.  So this is what's been marked Exhibit 2.  And do you -- So this first photograph which has a Bate-stamp number I believe BPD 861.  Is that your backyard?

A.  Yes.

Q.  Okay.  And on the right side of this photograph, so the bottom right there's a couple of steps leading up to a deck, right?

A.  Yes.

Q.  Is that the deck that leads into your, the area where the dining room table was?

A.  That is the further end of the deck.  But, yes, if you walk, from this picture if you walk to the right, that's the one that opens, you know, that the slider opens to.

Q.  Okay.  So actually I'll show you the photograph marked BPD 888.  This is a straight on photograph of those steps; is that right?

A.  Yes.

Q.  So if you walk up those steps and you go to the right, that's where the slider door is; is that right?

A.  Yes.  Yeah.

110

Q.   And the door that we can see in this photograph straight ahead, the white door, where does that lead?

A.   That leads to the basement and -- So straight down to the basement.  And then there's another door that you open and goes into the kitchen.

Q.   Okay.  And this photograph that is marked BPD 865, that shows your slider door from the outside back deck, right?

A.   Yes.

Q.   Okay.  And you can see in this photograph that it appears on the left of the sliding door, it looks like the screen, one of the screens is laying down.  Is that what you understand that to be?

A.   Yes.

Q.   Okay.  And it looks like it's on top of some water bottles?

A.   Yes.

Q.   Okay.  Do you know, is that -- I understand that at some point this screen door broke.  Do you know if that's where that landed?

A.   That screen part of the screen door has been broken for a while.  The whole structure of the

111

slider was falling, was, you know, in disrepair, and that part of the screen was already off.  And that's why it's there, the screen part of it.

Q.  Okay.  So before the police officer came through this doorway with Robert, that was already there, that screen door was already lying there?

A.  I believe so.  I don't know exactly if it was like in that exact spot lying there but it was in that general area.

Q.  Okay.  And what about -- Directly in front of the slider door lying on the door is what looks like a glass portion of that sliding door.  Is that what you recognize that to be?

A.  Yes.

Q.  Okay.  And do you know how that got there?

A.  That is the part that fell off when Robert and the officer came through the sliding door.

Q.  When -- Do you know if the sliding doors were closed when Robert was on the back deck and you were inside the house?

A.  I don't know.

Q.  Okay.  And do you know if that's the way that glass door landed when Robert and the officer came through the door?

112

MS. GILL:  Objection.

A.   I don't -- I didn't see it.

Q.   Okay.

A.   I did not see that fall so I can't say that.

Q.   Did you see it there after, after the incident?

A.   I don't know how to answer that either because I don't think I looked out there.  I was in a state of shock.  So I wasn't -- I didn't look at it physically.  But I knew that, I knew that it had fallen because I heard it fall and I knew it was in that general area.

Q.   Okay.  All right.  I'm going to show you this photograph that we looked at earlier which is BPD 896 in Exhibit 2.  You can see that?

A.   Yes.

Q.   So you had described this table that's on the right side of the photograph as having been in the middle of this room.  Am I right?

A.   I did say that, yes.

Q.   Okay.  So it's your testimony that when the officer and Robert came through this room, the table got pushed to the right?

A.   Yes.

113

Q.   And can you see this part of this chair that's at the bottom of this photograph?

A.   Yes.

Q.   Is the sliding door behind that chair?

A.   Yes.

Q.   Okay.  And do you know if that chair was there when they came through the room?

A.   I do not know that.

Q.   Okay.  But you saw the table get pushed to the side?

A.   Yes.

Q.   You testified earlier on the left side of the photograph we can see that leg in the door opening that's at the bottom left.  You indicated that you weren't in that area; is that right?

A.   I was not.

Q.   And so the second opening of the living room that's closer to the office area, that's where you were?

A.   Yes.

Q.   And were you actually in that doorway?

A.   No.

Q.   Where were you standing?

A.   Well, at what point are we talking?

114

Q. That's a good point. So when you first saw Robert and the officer come through from the deck, where were you standing?

A. I was maybe -- So I was not in that doorway, but I was -- Within the sight line in the living room, you can see through that part of the doorway. I was in the living room there with a view of the slider at that point --

Q. Okay.

A. -- and the middle of the room.

Q. Okay. And so you had a view of the slider door and that's why you saw them come through it?

A. Yes.

Q. Okay. And am I correct, you described the officer having Robert in a bear hug from behind, right?

A. That is how I described it, yes. I don't know if that's, I don't know if that's an official --

Q. I'm not going to hold you to an official description?

A. Okay.

Q. But I'm just asking for your memory. And I believe you said that the officer's arms were around

115

Robert's arms, is that accurate?

A.    That is what -- That is how I will describe it.

Q.    Okay.  And I understand your description of their momentum coming into -- Do you call this the dining room in this photograph that we're looking at?

A.    Yes.

Q.    Okay.  So you described their momentum coming through this dining room, right?

A.    Yes.

Q.    And am I correct that you described that their momentum is what caused the table to get pushed out of the way?

A.    That is what I recall seeing.

Q.    Okay.  And when they -- Can you describe when they came through this dining room, did they just sort of move directly towards those stairs that lead down to that office?

A.    They moved directly towards the middle of the room where the table was, and that's how the table -- it was almost like one move.  When I say momentum, it's almost like it was one move.  It wasn't specifically -- it wasn't purposely moving

116

the table.  It was that that was in the middle of the room and they were headed -- You know, there will be nowhere to go.  That's like an open space --

Q.  Yeah.

A.  -- the way it steps.  So they were going like basically straight ahead and the table was in the way.

Q.  Okay.  And did you see them stop at the table or did they keep moving?

A.  I don't, I don't remember them stopping at the table.

Q.  Okay.

A.  But I don't remember specifically.

Q.  Okay.  I believe -- I'm sorry.  Go ahead.

A.  I don't remember, I don't remember that they stopped at the table.

Q.  Okay.  So am I right that your description is because of their momentum, they went towards those stairs that lead down to that office?

A.  They went in that direction.

Q.  And will you describe this as just a continuous movement or is that not right?

A.  From what I remember, it was a continuous movement.

117

Q.   Okay.  And then I just had a question about -- I understand that -- Am I right that they ended up on the ground, lying on the ground down in that office area?

A.   Yes.

Q.   Okay.  And maybe I can -- I'm going to show you this photograph.  So this is BPD 908.  And that shows this office area that we're talking about, right?

A.   Yes.

Q.   And it looks like, is it one or two steps down?

A.   One.

Q.   Okay.  Did you see them actually fall to the ground?

A.   I don't recall seeing the moment of falling, of going from not on the ground to the ground, no. I don't believe I saw that exact moment.

Q.   Okay.  Am I correct when you were describing this that you thought the officer was trying to bring him down to the ground?

A.   That's my interpretation of what I saw because there was not enough space to, for Robert to comply with, you know, hands behind your back and

118

trying to get the handcuffs on.  That was my understanding of what I saw with them, the momentum taking him to the ground.

Q.  Okay.  And so you understood the officer's attempt to place him down on the ground so he could get the handcuffs on?

A.  That was my interpretation at the time, yes.

Q.  Okay.  And so going back to -- Let me find it.  Going back to this photograph 896.  At the point at which they ended up down in the office, did you move closer to the dining room area?

A.  I moved closer to the doorway, yes.

Q.  Okay.

A.  The doorway where I was, just closer to the doorway from the living room closer to the doorway.

Q.  Okay.  And we're still talking about not the doorway with the leg that's appearing in this photograph but the other doorway leading into the living room?

A.  Yes.

Q.  Okay.  So did you have a good line of sight from when you moved closer to the doorway into the office?

A.  How do you -- I don't know how to define

119

good line of sight.

Q. I don't mean to be tricky. I just mean, could you see down in the office from where you were standing?

A. Yes.

Q. Okay. And did you stay in that position or did you come any closer?

A. I don't recall going any closer.

Q. Okay. And you testified that you heard Robert say that he couldn't breathe. Where was he when he said that?

A. I am not, I am not a hundred percent sure of that.

Q. Well, do you know if he was still in the living room area?

A. That's where I have to say I am not sure. I'm not sure the answer to that question.

Q. Okay. But do you remember asking the officer can he breathe?

A. Yes.

Q. Okay. And did the officer look at you when you asked him that, do you remember?

A. No.

Q. Was the officer's back to you?

120

A.   Yes.

Q.   Okay.  So can you remember --

A.   From what I remember his back was to me.

Q.   I'm sorry.  Say that again.

A.   From what I remember his back was to me.

Q.   Okay.  Do you remember if they were standing or lying down when you asked the officer if he could breathe?

A.   They were not standing upright.  It was somewhere in between standing upright and on the ground.  I don't know -- I don't know exactly how far down to the ground they were at that point.  I don't know that.

Q.   Okay.  And what about when you heard Robert say he couldn't breathe, was he standing or was he, you know, halfway down on the ground at that point?

A.   That's what I mean.  I don't know what percentage he was moving from upright to on the ground.  I don't know the answer to that.

Q.   Okay.  I mean, that's fair.  It sounds like you know he wasn't lying on the ground?

A.   That's why I'm not, I am not going to give an official memory that I don't have.  I don't know.

Q.   Okay.  So you're not sure exactly when he

121

said that?

A.   No.

Q.   Okay.  At some point another officer appeared, right?

A.   Yes.

Q.   Did you -- I know you testified you don't really know where he came from.  Do you know if he came from the front door or the slider door?

A.   That's what I do not, I do not know the answer to that.

Q.   Okay.  And you said that -- Well, I guess I'm not totally clear.  What did you see that officer do, the second officer?

A.   At what point?

Q.   When you first saw him, what did he do?

A.   I don't know the answer to that.

Q.   Okay.  Did you ever see --

A.   I can't say there was a certain point at which -- I don't remember where he came from.  So I don't know when I even became aware that he was there.

Q.   Okay.

A.   That's when my instinct was that, you know, something is going on here that is it didn't feel

122

good.  So I don't have, I don't have that memory.

Q.  Okay.  The instinct that something wasn't good, are you saying that you already had that feeling before you saw the second officer?

A.  I had that feeling for 24 hours straight.  So, yes, I knew something wasn't, I knew something wasn't right.

Q.  Okay.

A.  I knew I had that sense.

Q.  Okay.  You were describing something about the handcuff keys, and I didn't understand what you were saying.  It sounds like you were saying at some point you saw the keys to the handcuffs.  Am I right about that?

A.  Yes, you're right.  I remember -- You don't remember because I wasn't clear because my memory was there was a key to the handcuffs, and I can't say -- It's like a clear, it's a clear memory just seeing that there was a key to the handcuffs.

Q.  So one of the officers had the key, is that what you saw?

A.  I can't say that because that was what I put together at that time, that one of them had the key.

Q.  Okay.

123

A.   I do not remember that exact moment.

Q.   Okay.  You just remember at some point there was a handcuff key?

A.   Yes.  It's like that's a clear vision that I have, you know, a clear observation.

Q.   You earlier said that because they were in that small space, you saw one of the officers punching Robert, right?

A.   Yes.

Q.   Was this when the both officers were present?

A.   I believe it was.

Q.   Okay.

A.   But I cannot be sure about that.

Q.   Okay.  And where did you see, where on Robert's body was he being punched?

A.   I believe it was his arm, because how I made sense of it was for leverage of trying to get his, you know, his elbow to bend in the correct motion that they will be able to get handcuffs on him.

Q.   So Robert was face down, right?

A.   At that moment, I cannot, I cannot be sure about that.

Q.   When you first saw that the officer and

124

Robert were not upright anymore, they were lying on the ground, was Robert facing down?

A.   There was a point at which Robert was facing down.

Q.   Okay.  But you're not sure when he was being punched, the position of his body?

A.   That I cannot say.

Q.   And looking at this photograph 896, you can see the office in the background here.  Was Robert's head closer to you and the doorway or was he facing the other way?

A.   He was facing the other way.

Q.   So his head was to the right in this photograph?

A.   Yes, near the golf club.

Q.   Actually let me ask you about that.  So showing you -- Let's see.  This picture number, I think it's 920, you can see -- This is the office, right?

A.   Yes.

Q.   And you just referred to these golf clubs that are leaned up against this window?

A.   Yes.

Q.   And is that where that was prior to the

125

police arriving, do you know?

MS. GILL:  Sorry.  Note my objection.  I thought the prior testimony was referring to the golf club, but we'll let the record speak for itself.

A.  I don't know about the single golf club.  I know that the golf bag was there because that's where it had been in our house for a little while anyway.

Q.  Okay.  And so going back to this picture No. 896.  You can see the golf clubs on the right side of the office in this picture, right?

A.  Yes.

Q.  Okay.  And throughout the police encounter with Robert, you were behind this doorway on the left, right?

A.  I believe I was.  I don't believe I entered that, but I am not a hundred percent sure about that.  I don't know.

Q.  Okay.  Just give me one moment.  Just to clarify another thing.  It sounded to me, and forgive me if I misunderstood you, it sounded to me that after the other officers arrived and they were administering aid to Robert, it sounded to me that

126

at some point during that period of time one of the officers spoke to you about him saying he couldn't breathe.  Is that right?

A.  I believe it was at that point.  But that whole period of time I don't know exact sequence.  I can't say exactly when that was.  But I recall speaking to an officer about that.

Q.  Right.  And I understand you can't tell me exactly, but I just want to make sure I understood it.  So it sounded like you knew, the officer you said that to, spoke to about that was not the two officers who were there initially, right, it was someone else?

A.  Yes.

Q.  Okay.  So the first time you discussed whether Robert could breathe, you asked the officer who had initially responded who was with Robert in the office, right?

A.  I don't know.  It was one of the two initial officers.  I don't have any differentiation between the two of them.

Q.  That's fair.  So one of the two who were the first two officers who responded, you said "Can he breathe?" and one of them told you he could, right?

127

A.   Yes.

Q.   And then later you had a conversation with a different officer about that; is that right?

A.   I believe so.  I don't believe it was at that exact moment.  I believe it was at some point after.

Q.   Right.  And your memory is that officer that you spoke to after said something to the effect, if he's telling you he can't breathe, it's an indication he can breathe, something like that?

A.   He said if he -- I don't remember the exact words, but basically, well, if he could say he can -- if he can say the words I can't breathe, then he has enough breath to get those words out.  Those weren't the exact words, but that's what I gathered from him.

Q.   Okay.  Just backing up a little.  Let me turn this off for a sec.  When the officer first arrived after you called 911, you said that your front door was open.  So he didn't have to knock, you could see that he had arrived; is that right?

A.   Yes.  He didn't have to knock.  I had the screen door -- the screen door was closed but I had the regular door like at least partially open.

128

Q.   Okay.  And so when the officer arrived, did you go to the door to greet him?

A.   Yes.

Q.   And did he come inside the house?

A.   No.

Q.   Do you remember what you said to him?

A.   I don't know what order it was, but I said "he's out back."  I believe it was something about him being out back, basically indicating he was out on that back deck.  I remember saying "he's out back and he's delusional."  Those are the two statements I remember making.

Q.   Okay.  And do you remember saying anything else?

A.   I don't remember saying anything else. Well, I don't remember one way or the other if I said anything else or not.

Q.   Okay.  And do you remember if the officer asked you any questions?

A.   I don't remember for sure.

Q.   Okay.  And after you spoke with him, what did you see the officer do?

A.   I saw him walk out of my sight around the back.  So I could only see him just kind of head

129

like through, between the house and the wooded lot, you know, the wooded lot assuming he was going back out to talk to Robert.

Q.   Okay.   And if I'm facing your house, did the officer walk to the right or the left side?

A.   Oh.   So facing to the right.   Like in between.   There's an empty lot there.

Q.   And what did you do when the officer went to walk around the house?

A.   I went from the door into the living room, you know, further into the living room.

Q.   Okay.   And were you able to see the back deck from the living room?

A.   No.

Q.   And could you hear anything that was going on out there?

A.   No.

Q.   I know you made it clear you're terrible in estimating time.   But do you have any sense of how many seconds or minutes went by between the time you spoke with the officer and he went around back and the time that they came through the sliding door?

A.   Possibly between 30 seconds and a minute, but I'm not sure about that.   It was definitely a

130

short period of time.  It wasn't immediate but it was a very short period of time.

Q.  Do you remember before the officer went to the backyard if he asked you to wait outside?

A.  I don't remember that.

Q.  Okay.  You testified about how you didn't -- you knew that Robert wouldn't like it if you called the police, right?

A.  Right.

Q.  Do you remember telling one of Robert's sons that the neighbor called the police?

A.  I did not tell either of them that.

Q.  Okay.  You mentioned that it sounds like there's a neighbor who Robert was friendly with?

A.  Yes.

Q.  Did you contact him that day if?

A.  No.  He was on a business trip, either out of town, out of state or even out of the country. I'm not -- He was not -- I knew he was away on a business trip.

Q.  Okay.  Oh!  Sorry.  Just to go back.  I'm realizing I had another question about the timeline there.  You said that at some point you heard the, you heard the officer say something to the effect of

131

he went out or he's out; is that right?

A.   I believe it was one of them said, "Did he go out?"

Q.   Okay.  And do you remember if the handcuffs were already on when that statement was made?

A.   I don't know the answer to that.

Q.   Okay.  And did you hear a response to that question?

A.   I don't remember that.  I don't remember at that point.

Q.   Okay.  So you heard the officer say something about, is it put your hands behind your back or something to that effect to Robert?

A.   Yes.

Q.   Okay.  And you heard at one point one of the officers ask is he out.  Did you hear the officer saying anything else during that time period?

A.   I don't remember.

Q.   You don't remember?

A.   I don't remember any -- I remember, "Did he go out?"  I believe those were his exact words.  Now I'm saying it twice so I'm questioning it.  "Did he go out?", I interpreted it as somehow did he lose consciousness --

132

Q.   Right.

A.   -- because he had stopped, he had stopped moving his leg that he was moving.

Q.   Okay.  You mentioned that his leg had been moving and it stopped moving.  Do you remember if the handcuffs were on when his leg stopped moving?

A.   I don't know.

Q.   Forgive me if you already answered this. But at some point EMTs came to your home, right?

A.   Yes.

Q.   And maybe fire, fire people as well?

A.   I know that -- Well, I know that we live close to the, you know, fire, you know, Hyannis Fire or Hyannis Rescue.  So I know that it's like the EMT fire station.  I wasn't sure -- I mean, I knew there were at least two medical professionals that were from Hyannis Fire being EMTs I was assuming.

Q.   Okay.  Did you hear them ask what happened?

A.   I don't remember.  At this moment right now that we're referring, I do not remember.

Q.   The moment being when they arrived.

A.   I don't remember, the moment they arrived I don't remember if they asked me anything.

Q.   Okay.

133

A. And I don't remember seeing them, like the transition of them like taking over measures, you know, like saving measures. I don't remember that whole thing. I experienced it physically but I didn't -- it didn't register.

Q. Do you know if you watched or do you know if you went into another room?

A. I know I watched at a certain point and they were in the middle of administering the defibrillator or the, you know, AV whatever it is, I remember seeing that. And one of the officers, not one of the original two, one of the subsequent officers, when they were doing that and shocking his, you know, shocking his chest, they said this may be difficult to watch, and I remember turning and going so I can see it from like a different doorway to where I didn't have a, you know, a direct view of that.

Q. Okay. You were asked some questions about Robert visiting with his children. Were you aware of Robert keeping in touch via phone or text message with Mike?

A. Yes.

Q. Is it your -- Was it your perception that

134

they kept in touch that way?

A.   Through phone and text, yes.

Q.   And what about Ian?

A.   I'm not completely sure about -- I know that he had recently been texting and/or had talked with Ian on the phone.  I'm not, I'm not a hundred percent sure about the method.

Q.   The method you said?

A.   Right, the method of communication.  I know that they were in touch and not in person.

Q.   Okay.

A.   So...

Q.   But you knew that he was in touch with both of his sons at the time that he died?

A.   I don't know the, you know, the proximity of time like when he had last been in touch with them. I don't know that because I had been gone for a week.  So I don't know.

Q.   Sure.  I don't mean, you know, that day or the day before, but generally during that time.

A.   Right, I believe so.

Q.   And speaking of you being away.  So you went to Florida to visit family, right?

A.   Yes.

135

Q.   And you were gone like a little less than a week; is that right?

A.   I believe -- I think so.

Q.   Something like that?

A.   Yeah.  It was maybe I'll say six days or so I think.

Q.   Okay.  And during that time you testified that Robert hadn't been eating or sleeping during that week.  How do you know that?

A.   He told me that he -- I would ask like oh, did you eat, and whatever way -- whatever he conveyed to me in whatever way it was, it was basically something that will indicate like he really wasn't eating.  He might have said like oh, I had a few raisins.  That's like an example.  That's not an exact.  I went oh.  Did you get much sleep? Oh, no.  See this is where I'm getting the two different years mixed up.

Q.   You mean the 2017 trip versus the 2019 trip?

A.   Yes.

Q.   Okay.  So you're not sure which year you're remembering right now?

A.   I'm trying to make -- I'm trying to -- I don't have specific evidence to verify what I said

136

before because I can't remember.

Q. Okay. That's fine. You mentioned that you said that you didn't have legal standing because you weren't, you know, technically married. Where did you learn that?

A. Where did I learn that?

Q. Who told you that?

A. I don't know. I don't know the answer to that.

Q. Did you ever speak to a lawyer about that?

A. About that? I don't -- Not that I can recall.

Q. Do you recall if you ever reached out to a lawyer about the possibility of bringing a lawsuit?

A. I did not.

Q. Okay. And so you're sure that you never did?

A. I do not have any recollection or any indication that I ever did.

Q. Sorry. Hold on one second. So I'm just going to take a couple of minutes to get organized and see if I have anything else. So maybe just a five minute break.

MS. GILL: Okay.

137

MS. McKINNON:  Thanks, guys.

(Recess held.)

Q.  So just a couple of more things.  One other. Just to clarify, you were asked early on about having a concern for your safety, and you described that you had a general concern, there wasn't a specific fear, but you were generally concerned. And you said something to the effect of in retrospect I had a concern for safety.  What do you mean by that?

MS. GILL:  Objection.

A.  What I meant by that is, I wasn't able to emotionally identify everything I experienced that day; and it took in my estimation, in my estimation it took a full year until that one year anniversary of Robert's death for me to realize even with myself that I was -- I -- it was so much shock and being upright for 24 hours straight that I was, yes, I was very afraid.  But it was not easy to identify at that moment because it was a lot for a human being to experience all at once, and I don't think I could accurately be in touch with my own feelings from that day until I had time for it to even settle in.

Q.  Okay.  So once you processed everything that

138

had happened you're saying, which took about a year, you were able to realize that you were afraid that day, is that what you're saying?

MS. GILL:  Objection.

A.  You use the word process.  To me, as a psychotherapist we never fully process anything ever.  So it definitely took -- I remember the one year anniversary being a time when I had enough distance with what I experienced within myself that I was able to like recall more of the emotion that went with it.  So I can't say even that I processed it.  It was that that amount of time that I needed to admit to myself that I was afraid of someone I had never been afraid of in eight years, that was a lot for me.  That took a lot of time for me to realize.

Q.  So that wasn't something you realized the day that he died, it was something you realized a year later?

A.  I will say it wasn't something I really could have specifically identified that day, but it was around one year that that became completely clear to me that it was -- that I was afraid.

Q.  Okay.  You and Robert lived together for

139

about eight years, right?

A.   Yes.

Q.   And you had a, I think it might be your cat, but you had a cat together?

A.   Yes.

Q.   I'm sorry.  I know this is hard.

A.   Thanks.  Okay.  Thanks.

Q.   And just as far as your life together, it sounds like -- well, it sounds like maybe you played golf or Robert played golf?

A.   Are we going to go back to the cat or can I --

Q.   If you want to, sure.  I didn't realize --

A.   I don't want to, but -- because I don't want, I don't want, I don't want his, the memory of his life dragged into this mess.  So...

Q.   I'm not sure if I know what you mean.

A.   I will say if we cannot talk about my cat being dead as well.

Q.   Oh, I didn't know your cat was dead.  I very much apologize.  I thought I heard the cat.  So that's my mistake.  I apologize.

A.   I have since adopted, I have since adopted other, two other brother cats.

140

Q.  Oh, okay.  I'm a, I'm a pet person.  So I know what you're saying, and I'm very sorry.  That was not known to me.  So please accept my apology and we won't be bringing that up.  But as far as living together, did you play golf together?

A.  No, we didn't play golf together.

Q.  Whose golf clubs?

A.  Those are Robert's golf clubs.

Q.  Okay.  Did he play?

A.  He hadn't played in a while, but he had played in the past.

Q.  And did I hear you say that he went clamming?

A.  He went, yes, shellfishing --

Q.  Shellfishing.

A.  -- I believe while I was gone.

Q.  Is that something that he did more regularly or --

A.  Yes.

Q.  You live near the beach I assume?

A.  Yes.

Q.  Were there other things that you and he enjoyed doing together?

A.  Yes.

141

Q.  What were they?

A.  I don't want to say any more than I have to.

Q.  Okay.  Well, it's fair to say you had a good relationship with him, right?

A.  Yes.

Q.  I have nothing else.

MS. GILL:  I just have one question for you, and I know it's been such a long day.  So please just be patient.

REDIRECT EXAMINATION

BY MS. GILL:

Q.  You testified earlier in response to Attorney McKinnon's questions about one of the officers, the first officer who responded to your house holding Robert from behind in a bear hug fashion, and I want to ask you.  If I represent to you that the police report says the officer was holding Robert with one arm over his shoulder and one arm under Robert's left arm, do you have any reason to dispute that?

MS. McKINNON:  Objection.

A.  I don't have any memory of that either way.  The exact position of the hands, I don't, I don't have any memory of that either way.

142

Q.   Okay.   So you know that the officer was holding on to Robert somehow from behind but you can't speak to the specific placement or layering of arms and hands, is that fair?

A.   No, I can't.

Q.   Okay.   That's all I have.   Thank you so much, Ms. Anderson.

        MS. McKINNON:   Thank you, Ms. Anderson.

A.   Thank you, everybody.

        (Whereupon, at 3:20 p.m., the deposition of Amy Anderson concluded.)

        MS. McKINNON:   Ordering an electronic copy.

143

COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, ss.

I, Maureen J. Manzi, Certified Shorthand Reporter and Notary Public, CSR #135093, and CLR, duly commissioned and qualified in and for the Commonwealth of Massachusetts, do hereby certify that there came before me on the 3rd day of December, 2021 the person hereinbefore named, who was by me duly sworn to testify to the truth and nothing but the truth of their knowledge touching and concerning the matters in controversy in this cause; that they were thereupon examined upon their oath, and their examination reduced to typewriting under my direction and that the deposition is a true record of the testimony given by the deponent.

In Witness Whereof, I have hereunto set my hand and affixed my seal this 11th day of December, 2021.

Notary Public

My Commission Expires:

November 24, 2028

144

E R R A T A   S H E E T

CHANGES TO THE DEPOSITION OF AMY ANDERSON

INSTRUCTIONS TO WITNESS:  1)  Please note any desired corrections to your testimony by page and line number.  2)  Enter text as it appears in the transcript.  3)  Enter text as it should appear.

PAGE        LINE                  CORRECTION

\_\_\_\_\_       \_\_\_\_\_        _____

\_\_\_\_\_       \_\_\_\_\_        _____

\_\_\_\_\_       \_\_\_\_\_        _____

\_\_\_\_\_       \_\_\_\_\_        _____

\_\_\_\_\_       \_\_\_\_\_        _____

\_\_\_\_\_       \_\_\_\_\_        _____

\_\_\_\_\_       \_\_\_\_\_        _____

\_\_\_\_\_       \_\_\_\_\_        _____

\_\_\_\_\_       \_\_\_\_\_        _____

\_\_\_\_\_       \_\_\_\_\_        _____

\_\_\_\_\_       \_\_\_\_\_        _____

I, AMY ANDERSON, do hereby certify that I have read the foregoing transcript of my testimony, and I further certify that said transcript is a true and accurate record of said testimony.

Dated at _____, this _____ day of _____, 2021.

_____

AMY ANDERSON