**EXHIBIT**
3

Sean Roycroft
3/30/22
C.A. No. 21-10738-AK

# In the Matter of:

*Estate of Robert Joseph Miller vs*

*Sean Roycroft et al.*

*Sean Roycroft*

*May 30, 2019*

*68 Commercial Wharf • Boston, MA 02110*
*888.825.3376 - 617.399.0130*
*Global Coverage*
*court-reporting.com*



COMMONWEALTH OF MASSACHUSETTS


STATE POLICE INTERVIEW

OF

OFFICER SEAN ROYCROFT

BY

LIEUTENANT JACK MAWN and
TROOPER JEFFREY DIOTTE


RE:   ESTATE OF ROBERT JOSEPH MILLER
V.
SEAN ROYCROFT, ET AL


DATE:  MAY 30, 2019


Transcription Service:   Mary Indomenico, ACT, CET
Perfect In Print
212 Vineland Avenue
East Longmeadow, MA  01028
(413) 746-1778


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

LT. MAWN:  Good afternoon.  It is Thursday, May 30th, 2:27 p.m.  My name is Jack Mawn; I'm a detective lieutenant with the Massachusetts State Police Detective Unit for the Cape & Islands.

Seated to my left?

OFF. ROYCROFT:  Sean Roycroft, Barnstable Police Department.

LT. MAWN:  And across from me?

TROOPER DIOTTE:  Trooper Jeff Diotte, Cape & Islands detectives.

LT. MAWN:  Okay.  So gentlemen, thank you.  We're here to discuss the circumstances of an unattended death that occurred in Hyannis on April 16, 2019, the decedent, Robert Miller.

So again, if you would Sean for the record, your name, rank, and agency?

OFF. ROYCROFT:  Sean Roycroft, patrolman, Barnstable Police Department.

LT. MAWN:  And how long have you been on Barnstable P.D.?

OFF. ROYCROFT:  32 years.

LT. MAWN:  And what police academy did you attend?

OFF. ROYCROFT:  Barnstable County.

Estate of Robert Joseph Miller vs
Sean Roycroft et al.

Sean Roycroft
May 30, 2019

4

LT. MAWN:  And when did you graduate from that?

OFF. ROYCROFT:  December of '89.

LT. MAWN:  And while you were at that academy, did you receive use of force training there?

OFF. ROYCROFT:  Yes, I did.

LT. MAWN:  Okay.  And have you received supplemental use of force training since that time?

OFF. ROYCROFT:  Yes, I have.

LT. MAWN:  Are you familiar with your agency's use of force policies?

OFF. ROYCROFT:  I am.

LT. MAWN:  And calling your attention to April 16, 2019.  Were you carrying use of force equipment while you were on duty that night?

OFF. ROYCROFT:  Yes, I was.

LT. MAWN:  What - what use of force equipment do you typically carry on a typical patrol?

OFF. ROYCROFT:  Always on my belt is my firearm. It's a .40 cal. Sig Sauer.  I carry a taser, pepper spray, and my handcuffs.

LT. MAWN:  Do you carry a baton?

OFF. ROYCROFT:  I carry -- not on my belt; it's in my cruiser though.

LT. MAWN:  And so have you been -- specifically, have you been trained and are you qualified to carry the firearm you described?

OFF. ROYCROFT:  Yes, I am.

LT. MAWN:  Taser?

OFF. ROYCROFT:  Yes.

LT. MAWN:  The spray, is that commonly referred to as OC spray?

OFF. ROYCROFT:  Yes, it is.

LT. MAWN:  All right.  And also on your baton?

OFF. ROYCROFT:  Yes.

LT. MAWN:  You're trained and qualified?

OFF. ROYCROFT:  Yes.

LT. MAWN:  Were you employed as a police officer prior to joining the Barnstable Police Department thirty-two years ago?

OFF. ROYCROFT:  I was an MP in the army.

LT. MAWN:  I'm going to now ask you to go back to Tuesday, April 16, 2019.  Were you working?

OFF. ROYCROFT:  Yes, I was.

LT. MAWN:  Okay.  And what was your scheduled shift that -- at that time, Sean?

OFF. ROYCROFT:  Four to midnight.

LT. MAWN:  and do you -- the Barnstable Police Department patrol -- do you guys work a four and two?

OFF. ROYCROFT:  Yes, we do.

LT. MAWN:  And what was your assignment on that night?

OFF. ROYCROFT:  I was assigned to a marked cruiser patrol in Hyannis.

LT. MAWN:  And do you -- are your patrols segregated by geography?

OFF. ROYCROFT:  Yes.

LT. MAWN:  And so which -- which sector, if you will, would you have been assigned to that night?

OFF. ROYCROFT:  Sector one.

LT. MAWN:  And what does that cover, generally?

OFF. ROYCROFT:  Hyannis.  On our shift, it is Strawberry Hill Road is the line of delineation, I guess you'd call it, from south to north.  So, anything east of Strawberry Hill Road is Sector one; anything west is what we call the outside sector.

LT. MAWN:  Okay.  And so that eve shift again, your eve shift runs four to midnight?

OFF. ROYCROFT:  Four to midnight.

LT. MAWN:  And were you in uniform?

OFF. ROYCROFT:  Yes, I was.

7

LT. MAWN:  Would you describe what you were wearing, please?

OFF. ROYCROFT:  It's a police uniform, shirt and pants, it's embroidered with badge, my ID number on it, with shoulder patches -- the department shoulder patches.

LT. MAWN:  And you were wearing that uniform on that night?

OFF. ROYCROFT:  Yes, I was.

LT. MAWN:  And would you describe your cruiser, please?  Is it marked or unmarked?

OFF. ROYCROFT:  It's a marked cruiser.

LT. MAWN:  And what's your cruiser number -- what was the cruiser number assigned to --

OFF. ROYCROFT:  236.

LT. MAWN:  236.  What lead you to arrive at number 45 Elm Street in Hyannis?

OFF. ROYCROFT:  I was dispatched.

LT. MAWN:  All right.  Is that via radio or through an MDT?

OFF. ROYCROFT:  Via radio.

LT. MAWN:  Okay.  And so you were dispatched by radio and you were told to go to 45 Elm Street; is that accurate?

OFF. ROYCROFT:  Yes, it is.

Estate of Robert Joseph Miller vs                                    Sean Roycroft
Sean Roycroft et al.                                                 May 30, 2019

8

LT. MAWN:  What frequency do you transmit on in regards to your normal assign patrol duties?

OFF. ROYCROFT:  I'm not sure of the frequency.

LT. MAWN:  Okay.  Is there one specific one for patrol in town?

OFF. ROYCROFT:  It's one specific one that the entire department uses.  I know detectives when they have something going, there's differences frequencies that we can use.

LT. MAWN:  So, your -- your agency does not have a different frequency for different sectors of patrol?

OFF. ROYCROFT:  We do not.

LT. MAWN:  Okay.  And do you also get dispatched by computer?  Is that -- is that happen here?

OFF. ROYCROFT:  It's a combination of both, yes.

LT. MAWN:  Okay.

OFF. ROYCROFT:  Yes, we do use computers.

LT. MAWN:  And what time of day and night was it when you received the radio transmission to go to 45 Elm?

OFF. ROYCROFT:  I don't remember the exact time.  Yeah, I don't -- it was -- I believe it was after five o'clock.

LT. MAWN:  Okay.  Was it still light out?

OFF. ROYCROFT:  Yes, it was.

Estate of Robert Joseph Miller vs                                       Sean Roycroft
Sean Roycroft et al.                                                    May 30, 2019

9

LT. MAWN:  All right.  Describe the lighting to me, please.

OFF. ROYCROFT:  It was fairly a clear day.  It was still bright, sunny, plenty of light.  I mean the sun -- the sun was going down; we were approaching evening.

LT. MAWN:  Okay.

OFF. ROYCROFT:  Dusk.

LT. MAWN:  Is there any artificial lighting in that area?  Are there street lights, were there --

OFF. ROYCROFT:  There are street lights, but they weren't on at that time.

LT. MAWN:  All right.  How about light spilling over from nearby businesses or residences or anything like that?

OFF. ROYCROFT:  There's only residences.

LT. MAWN:  Okay.

OFF. ROYCROFT:  It's a residential area.  And no, there were no -- no other lights on at that time that I could see.

LT. MAWN:  All right.  And when you arrived at 45 Elm, where did you park?

OFF. ROYCROFT: Across -- directly across the street from the front of the house.

LT. MAWN: And we talked about the fact that you were radio dispatched there, what was the nature of the transmission that -- that sent you to 45 Elm?

OFF. ROYCROFT: It was that a female caller -- and I believe it was that she described the other person involved as her husband was having a psychotic break.

LT. MAWN: Okay. And so after you parked directly across the street from 45 Elm, Sean, tell us what happened then, please.

OFF. ROYCROFT: I got out of my cruiser, I locked it. And there was a woman standing in the front door. She opened the door and she said, "He's out back." But she was doing it in -- she was trying to be quiet, and she was pointing, "He's out back. He's out back." And so I walked up to her to get some more information. I knew from the radio dispatch that we were there because it was reported that someone was having a psychotic break. I just wanted to get more information.

LT. MAWN: Sure.

OFF. ROYCROFT: And so she described a little bit about what was going on. She said, "He's talking to people that aren't there." He -- she also referred to him not taking his medication that he -- he's been off his medication. She couldn't say for how long. And she said,

Estate of Robert Joseph Miller vs
Sean Roycroft et al.

Sean Roycroft
May 30, 2019

11

"If you go around the side of the house, this way you'll see him. He's out there; he's talking right now. He's talking to people that aren't there." And I could see just by her facial expressions and mannerisms that she was afraid; she was in fear. So, I asked. I said, "Are you comfortable staying in the house where you're at?" And she said, "Yeah, I'm going to stay in the house right here." And I said, "Okay. I should go around this side of the house instead of going through?" And she said, "Yes, go around the side of the house." So, I walked to the side of the house. I stood at the back corner and I could hear him on the deck. I couldn't really understand what he was saying, but I could hear him. Then I saw him. He was standing up on his deck. He only had on sweatpants. No shoes, no shirt. And he was making gestures with his hands. Putting his hands up in the air as if he was having a conversation with someone gesturing with his hands. And so I stepped out from around the corner. And as I started to walk up to the deck, that's when he turned and he saw me. I started to have a conversation with him; I engaged him.

LT. MAWN: You mentioned if -- that you went to the side of the house. As you face the house, which side of the house did you go to?

Estate of Robert Joseph Miller vs
Sean Roycroft et al.

Sean Roycroft
May 30, 2019

12

OFF. ROYCROFT:  It would be to the right.

LT. MAWN:  And that's -- there's no driveway on that side?  Is there a driveway on that side?

OFF. ROYCROFT:  No driveway on that side; the driveway's on the opposite side.

LT. MAWN:  And then when you mentioned he then saw you, we talked about the lighting a little bit, was there any reason for you to believe that he wouldn't be able to identify you as a police officer?

OFF. ROYCROFT:  No reason whatsoever.

LT. MAWN:  All right.  So, when he saw you, you were in the uniform as you described?

OFF. ROYCROFT:  Yes.

LT. MAWN:  And the lighting was as you described it.  There was nothing between you and him that would prevent him from making --

OFF. ROYCROFT:  No.

LT. MAWN:  Okay.  All right.  Please continue. You mentioned that he -- he then saw you.

OFF. ROYCROFT:  He saw me, and he -- whoever he was conversing with or whoever he thought he was conversing with, he stopped, and he looked at me.  And I knew his name was Robert from -- at the time I thought it was his wife -- and as we found out later that they

Estate of Robert Joseph Miller vs
Sean Roycroft et al.

Sean Roycroft
May 30, 2019

13

weren't legally married, but they'd been together for several years.  So --

LT. MAWN:  So, she gave you his name?  She told you --

OFF. ROYCROFT:  She gave me his name, Robert Miller.  So, when I stepped out and when he noticed me, that's when I said, "Hey, Robert.  How we doing?"  And he said -- he said, "I'm good.  I'm having a conversation with nature."  And I responded back.  I said, "I have a conversation with nature from time to time."  I said, "Absolutely nothing wrong with that.  That's great."  And so as I started to walk towards the deck, I said, "What do you think about you and I having a conversation?  Can we have -- can we have a conversation here?"  He says, "Sure, we can."  He said, "Do you want to come up on the deck?"  And I can remember that there were dumbbells stacked up on the deck.  And not just like thrown there, they were -- like one was on top of the other, and laid out on top of the deck.  And I was looking -- I'm like -- it just looked strange how the dumbbells were left there.

And then also as I stepped up onto the deck, I noticed in the -- so as you walk onto the deck, it would be up against the house, there was a broken flower pot up against the house.  So, I just made a mental note of that

14

as I stepped up on the deck.  And so, when I stood up on the deck I said, "You know, so what's going on here?"  I said, "You know, is everything okay?  Are you feeling okay?"  And he turned and he looked at me, and then he started to walk towards where the broken flower pot was, and so I followed him and stayed close to him, 'cause I didn't know what he was going to do.  If he was going to pick up the flower pot, or why he walked directly in that direction.  So, when we got over there, that's when -- and I say it was like flipping a switch.  And I know it's cliche, but that's exactly what it was.  I can't think of anything -- a better way to describe that is.  He flipped the switch, and he turns, he looks at me and he's like -- he says, "Fuck you."  He goes, "I don't want to fucking talk to you anymore.  Fuck this."  And he turns, and he started bee-lining -- running towards the slider on the house.  And so I -- I went right behind him; I stayed right on him.  I knew the wife was in the house.  He wasn't saying anything.  He just ran towards the house. As he got towards the slider, he ripped the slider open. I was right behind him, and this is when he stepped into the house.  There's a table -- almost like this table that we have here, a round table that's there -- and he's reaching.  And I -- I believe in my report I used the term

"foraging," because it was like he was blindly -- he was just like reaching on the table and like foraging for something trying to find something.  I couldn't really see what was on the table, but instantly just thought that he was trying to harm himself or something.

So, that's when I came behind and I -- I got him in what I called a "seatbelt hold."  I was holding him just like if you were in a seatbelt in the car.  One arm up over the shoulder; my left arm was up underneath his left arm, and my hands were held together in the front, and I was able to pull him back from the table.  And as we started to pull back from the table, that's when he drove backwards himself and forced us and we slammed into the slider.  And I didn't even know at that time that we had knocked the slider out of the house.  I found that out later on after -- after things had calmed down.

LT. MAWN:  When you say -- when you say "seatbelt," you're describing like the portion of a seat -- like the shoulder portion of the seatbelt --

OFF. ROYCROFT:  Shoulder portion of a seatbelt.

LT. MAWN:  -- it goes across?

OFF. ROYCROFT:  Yes.

LT. MAWN:  It goes across your body?

OFF. ROYCROFT:  Yes.

LT. MAWN: That -- that --

OFF. ROYCROFT: So, my -- I'm behind him kind of off to the -- off to his left. I'm not directly behind him, I'm off to his left a little bit. I have one arm up over the shoulder. My right arm's up over the shoulder; my left arm is under his armpit with my hands clamped together to hold him. And like I said, I pulled back -- I was able to pull him back from the table. He was still reaching from the table. I was telling him, "Robert, you need to stop. You need to stop. You need to put your hands behind your back." Like I said, then he -- he pushed back himself, and that force there, we both pushed back into the slider. So, from that point -- like I said, I didn't know at that time that the slider had got knocked out. I knew we hit the slider fairly hard, but I didn't know that the slider was knocked out of the house. And now he's trying to drag me -- or he is dragging me towards what would be the front of the house.

So, where the dining table is, there's actually a little drop off, step down, if you would, that leads to the front part of the house. And I see golf clubs -- a bag of gold clubs up against the wall right there, and there's also a golf club on the floor directly in front of us. So, now I see that, and it just -- it felt like he

Estate of Robert Joseph Miller vs
Sean Roycroft et al.

Sean Roycroft
May 30, 2019

17

was going to grab that golf club; that's what he was trying to get to.  I was trying to keep him back from that.  As we hit the drop down, we both went to the floor, and I was able to still hold that seatbelt position on him.  I was kind of off to his side a little bit on his left side.  And his arms were underneath him.  His elbow's bent, and his hand's up underneath in his chest.

I still couldn't tell if he was able to -- when he was on the table - if he had armed himself with anything.  And I'm -- now I'm pleading with him to just pull his hands out.  "Robert, just pull your hands out please.  Pull your hands out.  You need to stop."  And it was within a couple minutes of that that is when I heard Spencer Jackson -- Officer Jackson behind me.  And he came and he said, "Sean, I'm right here.  I'm right behind you."  So I said, "I don't know if he has anything."  I said, "I can't see his hands.  I haven't seen his hands.  I don't know if he has anything in his hands.  I can't get his hands out."  And I think it was at that time when Spencer said, "Do you want me to tase him?"  And at that time, because I had him wrapped up, and I was actually trying to -- at that time, I was trying to pull my left arm out.  But Robert was clamping down; he was pulling his

left arm into him, and he was holding my arm so I couldn't pull it out.

LT. MAWN:  Your arm was underneath his?

OFF. ROYCROFT:  Underneath his, yes.  So, my arm's underneath him, and I'm still in that seatbelt position.  And so I said -- at that time, I felt like I was in a dominant position though where he wasn't -- he wasn't trying to pull his hands out, and we couldn't get his -- I couldn't get his hands out at that time.  And so instead of tasing him, I just felt comfortable staying in that position where we were at.  And I just -- I said to Spencer, "Let's not -- don't tase him now.  Let's see if we can get his arms out."  That's when Spencer came in and started working on his -- his right arm to get him to free up his right arm.

LT. MAWN:  And did that -- did you -- eventually, were you able to get those arms free?

OFF. ROYCROFT:  Eventually, yes.  I know that - that Spencer used a couple of striking techniques to -- to try to get him to comply, but they really didn't seem to have any kind of effect on him.

LT. MAWN:  Would you describe those for us, please?

OFF. ROYCROFT:  Two strikes to the lower part of his back on the -- on the right side.  And not full on as hard as he could deliver a strike, but enough to get someone's attention to hopefully get them to -- to stop what they were doing.  And like I said, it had no effect on him.  But what it -- I think what it did do, is it -- it allowed enough where we were able to -- I use the term "loosen" things up a little bit where we were able to make some progress with the arms.

And then I noticed that Spencer was able to get his right arm out.  I was able to get his left arm out at that time.  I got his hands behind his back, and we secured him in handcuffs.

LT. MAWN:  Okay.  Once you had him secured and he was handcuffed, what happened then?

OFF. ROYCROFT:  Then I went -- I bent over and I was explaining -- I said, "Robert, we're going to get you to your knees.  We're going to get you up on your feet."  And I didn't receive any response from him.  At first I thought he was just being passive resistant.  So, then when I reached down and I grabbed him by the arm - by his left arm, and I -- I moved him onto his -- onto his right side.  And just the way he moved, there was no resistance at all and it didn't feel right.  So, I looked at him and

I was like, "Robert, Robert."  And then I opened his eye. His eyes were closed, so I lifted his eyelid, and I noticed that his pupil was -- it appeared to be fixed. So, I took my finger to see if I could get an involuntary action from his eye by you know, making a poking motion towards his eye.  And I didn't get any response from that. And that's when I turned to Spencer and I said, "We need to remove the handcuffs."  And Spencer didn't -- he didn't -- I don't think he -- I don't want to speak for Spencer, but I don't think he knew what the situation was with Robert at the time.  And he replied, he said, "He's just going to fight with us.  He's going to fight with us."  I said, "No, we need to remove the handcuffs so we can start CPR."  And that's when he was like -- we got the handcuffs off, got him rolled over, checked for pulse, couldn't feel a pulse.  We started CPR.  Spencer called it in that we were starting CPR and that we needed rescue.  And I can't remember if I even -- if I had -- if I went to my radio and called in.  But I know that Officer Ruggieri showed up and Officer Shaw also showed up.  And I can't remember which one.  We instructed one of them to go get the medical bag.  They went and got the medical bag, came in. We were able to get the AED attached.  There was no shock

advised from the ADD, so we continued CPR, and then Hyannis Rescue personnel came in and took over.

LT. MAWN:  I mean at some point did you leave the residence and go somewhere else?

OFF. ROYCROFT:  It was at least an hour later. We stayed at the residence, and we secured the residence. And then I would say an hour -- maybe even a little bit longer than that later, we were instructed -- we were told that Robert had passed at the hospital.  And we were instructed by Sergeant Tynan, who was the supervisor on scene, to return to the station.  So, both Spencer and I returned to the station.

LT. MAWN:  Okay.  Sean, if you have no objection, what I -- what I would like to do now is just take a quick break.  It will give Jeff and I an opportunity to go over the notes and if you would be so kind maybe come back, and we might have some follow-up questions for you?

OFF. ROYCROFT:  Absolutely.

LT. MAWN:  And then the other thing I also wanted to mention is, you're aware that this is being recorded?

OFF. ROYCROFT:  Yes.

LT. MAWN:  And that's by agreement?  Is that --

OFF. ROYCROFT:  Yes.

LT. MAWN:  -- you're okay with that?

Estate of Robert Joseph Miller vs                                    Sean Roycroft
Sean Roycroft et al.                                                  May 30, 2019

22

OFF. ROYCROFT:  I am okay with that.

LT. MAWN:  So, we'll -- what we'll do is we'll shut the tape off now, take that break, and we will -- Jeff and I will put our heads together, and we'll probably have a couple of follow-up questions for you, and we'll come back and take care of those too, okay?

OFF. ROYCROFT:  Very good.

LT. MAWN:  So, it's 2:48 p.m., and we're going to shut the tape off.

(Recording ended.)

(Recording resumed.)

LT. MAWN:  Okay.  Good afternoon.  We are back. It's 3:06 p.m., Thursday May 30th.  The seating arrangement is the same.  The same people are present, and we are recording this by agreement.

Sean, just a couple of follow-up questions, please.

You described going into the background and encountering an individual -- I think you said you knew his name was Robert by virtue of his wife's description -- was there anybody else present in the backyard, or did you notice anybody -- any neighbors looking over a fence, or anybody else in the area?

OFF. ROYCROFT:  I didn't see anyone else, no.

23

LT. MAWN:  And were you carrying a portable radio on you at the time?

OFF. ROYCROFT:  Yes, I was.

LT. MAWN:  All right.  Did you make any transmissions on your portable radio between the time you arrived and got out of your cruiser, and after -- up until you cleared the scene?

OFF. ROYCROFT:  Yes, I did.

LT. MAWN:  And what was the nature of those transmissions?

OFF. ROYCROFT:  It wasn't until after we had -- had Robert secured in handcuffs, I think was my first radio transmission.  And I -- I can't remember if it was myself that asked for rescue, or if it was Officer Jackson.  I know that it was one of us that asked for rescue to come.

LT. MAWN:  Okay.  And those -- but those transmissions would be on the recorded --

OFF. ROYCROFT:  Yes, they are.

LT. MAWN:  Turret tapes of the department, right?

OFF. ROYCROFT:  Correct.

LT. MAWN:  Now, at some point you mentioned that there was -- well, Robert was running back -- moving back towards the house, and you were staying close to him.

Describe for me why you were trying to stay close to him?

Describe for me why you were trying to stay close to him.

OFF. ROYCROFT:  Because I knew his wife was in the house, and I didn't know if he was running back into the house to arm himself.  Or, if he was going back in to go after his wife.  I didn't know what his reason was for running back in the house.  I just know that when I asked him to stop, he didn't stop, and he -- he was running like he was on a mission.

LT. MAWN:  Okay.  When you encountered him in the backyard, can you describe again what he was -- what his clothing was?

OFF. ROYCROFT:  The only thing he had on was a pair of sweatpants.

LT. MAWN:  All right.  So he was -- did he have shoes, boots on?

OFF. ROYCROFT:  No shoes, no shoes, not shirt, no other clothing, no hats, just sweatpants.

LT. MAWN:  Okay.  And can you describe his physical appearance other than his clothing for me?  Is he a white male?

OFF. ROYCROFT:  White male.

LT. MAWN:  All right.  How old?

25

OFF. ROYCROFT:  He looked to be, you know, in his fifties, mid to late fifties.  And he had -- he had -- it looked like he hadn't shaven in several days.  I could tell his hair was - was unkept.  I can remember also, this just popped into my head that I remembered this, I can also remember when I -- when I did step up onto the deck and I was -- I was closer to him, the body odor -- I could smell body odor, like he hadn't showered in at least a few days.

LT. MAWN:  Is he -- is he -- physically, is he a small guy?

OFF. ROYCROFT:  No.

LT. MAWN:  Is he a medium sized guy?  Is he a big guy?

OFF. ROYCROFT:  I would say he was 5'10", maybe 5'11", that height.  He had a little bit of a belly.  I would say he was probably 190 pounds, maybe -- maybe even more.  Not a small guy, but not a super big guy either.

LT. MAWN:  And you mentioned that he started to move like he was on a mission if I -- if I heard you correctly -- towards the house -- to go into the house?

OFF. ROYCROFT:  Right, where the slider is.  He was on the other -- other end of the house from where we were standing on the deck.

LT. MAWN:  And you mentioned that -- you know, one of the things you were considering was whether or not he was going to try to arm himself or harm his wife.  When -- when did you become concerned that -- that he was either -- you know, was armed or was attempting to arm himself?

OFF. ROYCROFT:  As soon as he got in the house, he went directly for the dining room table that was just inside the slider.  And the way he was reaching and foraging around on the table.

LT. MAWN:  All right.  And when he did that, what did you do?

OFF. ROYCROFT:  That's when I immediately -- I just got him in that seatbelt hold.

LT. MAWN:  Okay.  And -- and what was -- your intention there was what?  Were you attempting to arrest him at that time?  Or, were you attempting to detain him or restrain him?  Or -- what was it that you were trying to do then?

OFF. ROYCROFT:  I was just trying to keep him from whatever he was looking for and going after on the table.  I was trying to keep him from getting to whatever was on the table there at that time.  So --

Estate of Robert Joseph Miller vs
Sean Roycroft et al.

Sean Roycroft
May 30, 2019

27

LT. MAWN:  Did you see a weapon on the table or something that could be used as a weapon on the table?

OFF. ROYCROFT:  At that time, no, that was until later.

LT. MAWN:  Okay.  Did you make some observations later then?

OFF. ROYCROFT:  Yes, I did.

LT. MAWN:  What did -- what did -- what were those?

OFF. ROYCROFT:  So, later we walked back after Robert was transported to the hospital, we -- I walked back into the dining room area there, and right on the table you could see that there were -- it turned out to be a pair of scissors that were broken in half.  It looked like -- they actually looked like knives sitting on the table.

LT. MAWN:  Okay.  And so at any point, did he pick that up and point it at you or --

OFF. ROYCROFT:  No.

LT. MAWN:  -- display it to you?

OFF. ROYCROFT:  No.

LT. MAWN:  You mentioned that you were concerned for yourself and for the wife.  Why -- why were you concerned?

OFF. ROYCROFT:  His erratic behavior.  He wouldn't -- he wasn't talking at all; there was no verbalization from him at all.  I asked him several times to stop, and that I even mentioned that you know, "We're here to help.  You need to stop doing what you're doing."  He didn't do that.  He -- he was trying to -- like I said before, trying to get me off of him.  He exploded backwards knocking us with such force into the slider that it knocked the slider out of the house.  And I -- I -- at that time, I felt like I was in a position where I did not want to release my grip and give any space between us.  I couldn't see his hands.  I didn't know if he was armed.  And then immediately like I said, he started moving towards -- across the dining room and was actually carrying me with him.  That's when I saw the golf clubs. I saw the golf club on the floor.  And when we hit the break in the floor where the step down is and we went down, he landed right on top of the golf club.  The golf club was right underneath him.

LT. MAWN:  Okay.  And you mentioned he didn't say anything during this time?

OFF. ROYCROFT:  Nothing at all.

LT. MAWN:  Not one thing?

OFF. ROYCROFT:  There was no -- nothing spoken at all.

LT. MAWN:  All right.  Did you consider using any other use of force equipment?

OFF. ROYCROFT:  I didn't really even have time to think about it.  I did -- when we -- when we did fall and we were on top of the golf club, I mean it did cross my mind to go to taser.  But at that time, he had had my arm trapped, and I just felt like I was in a -- a position where I could hold him.  And I didn't want to create that space where if he was armed, where he could slash me with a knife, or if he was able to get that golf club, to swing that golf club.  I felt like keeping the -- keeping no space -- keeping you know, tight against him there was better.

LT. MAWN:  And you mentioned -- if I remember correctly, please tell me if I don't -- that the wife was there?

OFF. ROYCROFT:  Yes.

LT. MAWN:  Did you -- did you see any other people?  Was there any other people in the house at the time?  Did you see anyone else?

OFF. ROYCROFT:  The only other person I saw was Officer Jackson when he came in.

LT. MAWN:  All right.  And you mentioned who else arrived -- you mentioned other Barnstable PD personnel, you mentioned the Hyannis Fire and Rescue --

OFF. ROYCROFT:  Yes.

LT. MAWN:  -- arrived on scene.  And then you told us that you did eventually sometime -- an hour later, leave and come back to the Barnstable Police Department; is that correct?

OFF. ROYCROFT:  Yes, that's correct.

LT. MAWN:  All right.  Have you ever been to 45 Elm Street before, Sean?

OFF. ROYCROFT:  I have not.

LT. MAWN:  All right.

OFF. ROYCROFT:  Not that I remember.

LT. MAWN:  Okay.  Have you ever had any contact?  Do you know the name of the individual now who you call Robert?

OFF. ROYCROFT:  Yes.

LT. MAWN:  Do you know him to be Robert Miller?

OFF. ROYCROFT:  Robert Miller.

LT. MAWN:  Had you ever had any prior contact with Robert Miller?

OFF. ROYCROFT:  Not that I can remember.

LT. MAWN:  How about his wife, Amy?

31

OFF. ROYCROFT:  No.

LT. MAWN:  All right.  When you first arrived on scene there and saw him, did you recognize him from any prior contact before --

OFF. ROYCROFT:  No.

LT. MAWN:  -- or any -- seen him around town or anything?

OFF. ROYCROFT:  No, not at all.

LT. MAWN:  Had you heard his name before?

OFF. ROYCROFT:  No.

LT. MAWN:  Did you know him by reputation?

OFF. ROYCROFT:  Not at all.

LT. MAWN:  All right.  So, before you arrived there, you were dispatched by radio.  You didn't have Robert Miller's name when you got there; is that correct?

OFF. ROYCROFT:  I don't believe I did.  I remember the wife saying his name was Robert.

LT. MAWN:  But you didn't write any info on your -- on your cruiser computer before you got there or while you were parked there?

OFF. ROYCROFT:  No.

LT. MAWN:  And you mentioned that you became aware of his name and identification sometime after the fact?

OFF. ROYCROFT:  Yes.

LT. MAWN:  While you were still at the house?

OFF. ROYCROFT:  Still at the house.

LT. MAWN:  All right.  And at some point you were advised that he had passed away?

OFF. ROYCROFT:  Yes.

LT. MAWN:  All right.  I believe that's all I have.  Jeff, do you have anything?

TROOPER DIOTTE:  I do not, no.

LT. MAWN:  Sean, do you have any questions for us?

OFF. ROYCROFT:  I do not right now, no.

LT. MAWN:  Is there anything you'd like to add that might be important for us to know regarding this investigation that maybe we haven't thought to ask or cover?

OFF. ROYCROFT:  No, I can't think of anything.

LT. MAWN:  Okay.  Well, I -- I think if that's the case, we'll probably end the interview and end the tape at 3:16 p.m.

(End of interview.)

# C E R T I F I C A T I O N

I, MARY INDOMENICO, AN APPROVED COURT TRANSCRIBER, DO HEREBY CERTIFY THAT THE FOREGOING IS A TRUE AND ACCURATE TRANSCRIPT FROM THE AUDIO RECORDING PROVIDED TO ME BY THE LAW OFFICES OF HOWARD FRIEDMAN, P.C. OF THE PROCEEDINGS IN THE ABOVE ENTITLED MATTER.

I, MARY INDOMENICO, FURTHER CERTIFY THAT THE FOREGOING IS IN COMPLIANCE WITH THE ADMINISTRATIVE OFFICE OF THE TRIAL COURT DIRECTIVE  ON TRANSCRIPT FORMAT.

I, MARY INDOMENICO, FURTHER CERTIFY THAT I NEITHER AM COUNSEL FOR, RELATED TO, NOR EMPLOYED BY ANY OF THE PARTIES TO THE ACTION IN WHICH THIS HEARING WAS TAKEN, AND FURTHER THAT I AM NOT FINANCIALLY NOR OTHERWISE INTERESTED IN THE OUTCOME OF THE ACTION.

_____

Mary C. Indomenico

_____

April 8, 2021

_____

212 Vineland Avenue, East Longmeadow, MA 01028

_____

413-746-1778

_____

perfectinprint@aol.com