UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ESTATE OF ROBERT JOSEPH MILLER, by and through IAN MILLER, personal representative of the Estate,<br><br>Plaintiff,<br><br>v.<br><br>SEAN ROYCROFT and SPENCER JACKSON, in their individual capacities, and the TOWN OF BARNSTABLE, MASSACHUSETTS,<br><br>Defendants. | C.A. No. 21-10738-FDS |

**DEFENDANT SEAN ROYCROFT'S
ANSWERS TO PLAINTIFF'S FIRST SET OF INTERROGATORIES**

**INTERROGATORY NO. 1**

Identify yourself, including your full name, address, height, weight, date of birth, and a description of any tattoos you have.

**ANSWER NO. 1**

Sean Joseph Roycroft
Address: ▇▇▇▇▇▇▇▇▇▇▇▇▇, Centerville, MA 02632
Height: 6.0'
Weight: 195lbs.
DOB: ▇▇▇▇▇▇
Description of tattoos:  I have several tattoos, including a full sleeve on my left arm and Saint Michael, the serenity prayer, and "We the People" on my right arm.

**INTERROGATORY NO. 2**

State the name, address, and telephone number of:

  a.  each person likely to have discoverable information relevant to disputed facts alleged in this case; and,
  b.  each person whom you may call at trial for impeachment purposes.

1

For each person identified in this answer, identify the subject(s) of the informationlikely to be known and/or the likely subject(s) of the impeachment testimony.

**ANSWER NO. 2**

Please refer to those persons identified in Defendants' Initial Disclosures.  In addition, the following people are likely to have discoverable information relevant to this matter.

a.  Vicki Yefko, Hyannis Fire EMT; likely to have information regarding medical services provided on-scene and the general availability of psychiatric assessment teams;

b.  Curtis Pike, Hyannis Fire EMT; likely to have information regarding medical services provided on-scene and the general availability of psychiatric assessment teams;

c.  John Oberlander, Hyannis Fire EMT; likely to have information regarding medical services provided on-scene and the general availability of psychiatric assessment teams;

d.  Kyle Jacob, Hyannis Fire EMT; likely to have information regarding medical services provided on-scene and the general availability of psychiatric assessment teams;

e.  Timothy Simkins, Hyannis Fire EMT; likely to have information regarding medical services provided on-scene and the general availability of psychiatric assessment teams;

f.  Peter Nagorka, Hyannis Fire EMT; likely to have information regarding medical services provided on-scene and the general availability of psychiatric assessment teams;

g.  Former members of the Cape Cod Psychiatric Assessment Team; likely to have information regarding the general availability of psychiatric assessment teams

h.  Spencer Jackson, likely to have information regarding BPD's response to 45 Elm Street and regarding this case, in general.

i.  Ian Miller and his siblings, Michael and Emily; these individuals are likely to have information regarding the frequency of visits between Mr. Miller and themselves.

j.  Amy Anderson, 45 Elm Street, Barnstable, MA; likely to have information regarding BPD's response, as well as Mr. Miller's medical and mental status and familial relationships.

k.  Mark Ells, Town Manager; likely to have information regarding Barnstable mental health resources;

l.  Emily Higgins, BPD dispatcher; likely to have information regarding Ms. Anderson's call to BPD and the process by which police response was dispatched, both specific to this case and generally;

m.  Members of the Barnstable Police Department, including Kevin Shaw, David Myett, Adam Ruggieri, Patrick Fallon, John Alexander, Kevin Tynan, Sean Balcom

2

(former Deputy Chief), John Murphy, Mark Mellyn, Chief Matthew Sonnabend, Lt. Jennifer Ellis; these individuals are likely to have information about the mental health resources available to BPD, the trainings conducted or arranged by BPD for its members; additionally, Officers Shaw and Tynan are also likely to have information regarding BPD's response to 45 Elm St.; Lt. Det. Mellyn is likely to have information about his visit to Ms. Anderson's home to assist her with repairs to the damaged slider door.

n.  Jack Mawn, Cape and Islands State Police Det. Unit; likely to have information regarding his unit's response to the scene and/or any investigation undertaken regarding it;

o.  Jeffrey Diotte, Massachusetts State Police Trooper; likely to have information regarding his unit's response to the scene and/or any investigation undertaken regarding it;

p.  Office of Medical Examiner staff; likely to have information regarding Mr. Miller's physical and condition post-mortem;

q.  Plaintiff's physicians and other care providers at Hatfield Cardiology, Mashpee Family Medicine, Cape Cod Hospital and Cape Cod Psychiatric Services; these individuals are likely to have information regarding Mr. Miller's medical history, health, medications and mental status.

## INTERROGATORY NO. 3

Describe your educational history. Include the following information for each school, college, or specialized course: the name of the school, college or specialized course, the dates you attended, the degree or certificate, if any, that you received from each and the date you received the degree.

## ANSWER NO. 3

I attended and graduated from Barnstable High School in June 1983.  From there, I began my military training and career.  I attended the Barnstable County Police Academy in 1989, and have continued my education and training through courses and seminars since that time.

## INTERROGATORY NO. 4

Describe your employment history since graduating high school, including:

a.      each and every job;
b.      the name and address of the company for each such job;
c.      the time period you worked for the company for each such job;
d.      the name of your supervisor at each such job; and,
e.      the reason for leaving each such job.

**ANSWER NO. 4**

I served in the United States Army as a military police officer from 1983 to 1986, after which I was honorably discharged from my military duties. During my time in the military, I attended a 16-week Law Enforcement course. I received the following distinctions during my military career: Army Achievement Medal, Army Service Ribbon, Overseas Service Ribbon, M-16 Rifle Marksmanship Qualification Badge, Grenade Expert Qualification Badge, Pistol 45-caliber Marksmanship Qualification Badge. Before beginning my career with the Barnstable Police Department, I did carpentry work. In June of 1988, I started as a Summer Officer for the Barnstable Police Department.

**INTERROGATORY NO. 5**

With regard to your employment as a police officer with the Barnstable Police Department, please state:

a.    each position you have held in the department;
b.    the dates on which you were appointed to each position;
c.    each division or unit to which you were assigned;
d.    the date on which any assignment terminated and the reason it terminated; and,
e.    the dates on which you were promoted or demoted to each rank.

**ANSWER NO. 5**

I was hired as a full-time Summer Patrolman for the Barnstable Police Department beginning June 13, 1988. In August of 1988, I requested an extension of my employment indefinitely. I attended the Barnstable County Police Academy from September 11, 1989 to December 22, 1989. I became a Provisional Patrolman beginning June 11, 1989, and was promoted to Patrolman (Civil Service) beginning September 11, 1989. I became a Patrol Officer on September 11, 1990. I have been trained as a K-9 Officer and underwent the equivalent of a twelve-week basis utility K-9 patrol team and received a Police Dog II Tracking certification.

4

Throughout my career, I have been actively involved in the community. I have provided training to residents' associations regarding safety and security, and have led "Kids' Days" and participated in the Falmouth COPS and KIDS Program geared toward teaching children about police work and ways to stay safe, visited schools and participated in D.A.R.E. trainings for youth from across the Commonwealth. I have received letters of gratitude over the course of my law enforcement career from community members, thanking me for these and other efforts in connection with my work as an officer of the law. I have also received commendations from the Barnstable Police Department, including letters of recognition, lifesaving awards and time off, as a show of appreciation for my work.

On March 9, 2017, I was presented with the Hyannis Elks Lodge No. 1549 Distinguished Citizenship Award. This award is giving to a citizen for "Outstanding and Meritorious Service to Humanity." On March 25, 2003, I attended New England Maritime School where I received my United States Coast Guard certification as a United States Merchant Marine Officer. In March, 2012 I was named the President of Barnstable Youth Hockey. This is a nonprofit all volunteer organization. I am still the president today.

**INTERROGATORY NO. 6**

> If you have ever applied for a position as a police officer at any other police department, or for a promotion in any police department and did not receive the position or promotion, state the details, including the name of the department, dateof application, and the reasons you were passed over.

**ANSWER NO. 6**

> This interrogatory is non-applicable to the Defendant.

**INTERROGATORY NO. 7**

> Describe all medical and first aid training or education you have received since graduating high school. Include the dates of all such trainings or education, describethe

nature of each such training or education, and identify any certifications or credentials you received from each such training or education, including expiration date.

**ANSWER NO. 7**

Most recently, in May and June of 2021, I completed In-Service MPTC Academy Training in the following areas: CPR First Responder and CPR First Responder (Practical Training), Responding to Pandemics and Similar Emergencies and Domestic Terrorism. In February 2016, I completed Mental Health First Aid USA Training, during which I was trained to help people experiencing mental health problems such as depression, anxiety disorders, psychosis and substance use disorders. I have also received training in the area of non-deadly use of force throughout my career. [EVERY YEAR?] I have been trained as a First Responder since 1989 and have received re-training in this area at regular intervals throughout my career in law enforcement.

I have also received annual training in these areas, among others:

Defensive tactics
Distraction techniques
Ground defense
Handcuffing techniques
Restraint/Use of force
CPR
Criminal Procedures
FEMA
Incident Command System
Mentally-ill and disturbed persons

**INTERROGATORY NO. 8**

Describe your work activities on April 16, 2019, including the shift you were working, your assignment that day, and your responsibilities while working that assignment.

**ANSWER NO. 8**

On April 16, I was assigned to the 1600-0000h shift, I was assigned a uniformed, marked cruiser patrol in Hyannis. My cruiser was No. 236. My responsibilities for this shift assignment

included surveillance of Sector 1, including responding to any and all calls for police service in

Sector 1.

**INTERROGATORY NO. 9**

Describe in detail everything that happened during the incident, beginning when you were first dispatched to Mr. Miller's home, and ending when you completed your shift. **A copy of your police report narrative is not a sufficient response to the information requested in this interrogatory.**

Your detailed answer should include the following information:

a. State everything you heard, saw, said, and did.
b. State the time when each event took place to the best of your recollection.
c. Identify all of the people who were involved.
d. State everything any other person said during the incident. For each such statement, please identify the time and place that it occurred to the best of your recollection, identify who made the statement, and identify each person present when the statement was made. If any of the statements were recorded in any manner, identify the method of recording and any documents containing the recording for each such statement.

Your answer should include information you know from your own personal knowledge as well as information you learned from other sources, indicating thesource of the information.

**ANSWER NO. 9**

**Objection**.  The Defendant objects to this interrogatory on the grounds that it is overly

broad and unduly burdensome; more specifically, it is unreasonable for the Plaintiff to expect that

the Defendant capture every single thing the Defendant heard, saw, said or did during this incident,

as well as everything every other person involved heard, saw, said or did during this incident.

Notwithstanding and without waiving this objection, the Defendant states as follows:

I was dispatched and responded from St. John Paul High School at 120 High School Road

to 45 Elm St after being advised that a female caller reported her husband was experiencing a

psychotic break.  Amy Anderson, who I later learned was Mr. Miller's longtime girlfriend, met me

at the front door, appearing frightened and speaking softly.  I told her that dispatch had advised that her husband was having a psychotic episode and asked her to explain what was happening.  Ms. Anderson's voice was shaky when she explained that Mr. Miller had not taken his medication for several days, and that he also had not slept in days.  She informed me that Mr. Miller was smoking "a lot" of marijuana.  She also told me that he was hallucinating and talking to people who did not exist.  As we were talking, I could hear Mr. Miller yelling from the back deck.  I then asked Ms. Anderson what her husband's name was, and she told me, "Robert."  She was very concerned that he would be angry at her for calling the police.  We briefly considered the best way for me to approach him.  She advised that I go around toward the back of the house, and she directed me that way.  Before leaving her there, I made sure she felt safe staying inside the house, and she indicated that she would stay right there, just inside the front door.

As I walked around to the back of the house, I could hear Mr. Miller yelling from the deck but I could not make out what he was yelling about.  When I first saw him, I noticed that he was barefoot and shirtless, wearing only sweatpants, and gesturing animatedly toward the sky while he was yelling.  Mr. Miller noticed me as I started to walk up the steps to the deck where he was standing.  He had a vacant look in his eyes as if his eyes weren't focusing on me, but he did look in my direction.  He was disheveled and looked frazzled.  I stopped walking toward him and called to him using his first name, asking him in a casual, friendly way something to the effect of, "Hey Robert, what's going on, pal?" in an effort to keep him relaxed and let him know I did not mean him any harm and was there out of concern.  Mr. Miller responded that he was having a conversation with nature, and I responded, "You know, I do that sometimes, too.  I have a conversation with nature from time to time," still trying to keep it light and relaxed.  Then I asked him if he and I could have a conversation, to which he responded, "Sure, come up on the deck."  It

8

was all very friendly and easy on the surface, but I could tell that Mr. Miller was not well. His eyes were bloodshot, and he was sweating profusely. I could tell he had not showered in quite some time. After he invited me up onto the deck, he stopped making eye contact with me. I noticed some random objects laying around in odd formation, as well as a broken flower pot or lawn figurine that was nearby. I asked Mr. Miller again if we could talk, and mentioned that his wife was concerned about him. Mr. Miller stared at the ground for several long seconds without answering, and then all of a sudden spun away from me and started quickly toward the house and the broken garden figurine, as if on a mission. Unsure of what he was going to do when he got to the figurine, I stayed close to him as he moved but still tried to maintain enough distance so he wouldn't be alarmed or feel threatened.

When Mr. Miller reached the house, it seemed like a switch suddenly flipped, and his demeanor shifted dramatically from being reasonably calm to intensely angry. I immediately sensed that there was a high potential for him to harm either himself or Ms. Anderson. He clenched his fists and said, "Fuck you, I'm not talking with you" and was grunting and shaking his fists. He was still not focusing his eyes on me. He suddenly bolted toward the house and threw open the slider door. Knowing Ms. Anderson was inside the house and already in fear for her safety, I stayed near Mr. Miller and repeatedly asked him to stop. He seemed to be on a sudden, urgent mission and I was concerned he was going to harm Ms. Anderson or himself. I tried to grab his arm, to hold him back until he could remain calm, but he yanked it away and barged into the house. He was in an intensely agitated state. A nearby table was covered with items and I could not make out what objects were laid out on top of it, since Mr. Miller's body was blocking my line of vision. Thinking he was looking to arm himself for the purpose of harming either himself or Ms. Anderson, knowing that his behavior up to that point had caused Ms. Anderson to be fearful

9

for her safety, and observing that he was not responding to my requests for him to stop, I made the split-second decision to try to manually restrain him and try to keep him from harming himself or Ms. Anderson in his agitated state. I put my arms around him from behind and tried to pull him back from the table. I placed one of my legs on the outside of one of his legs, and my other leg in between his legs and was able to pull him back from the table. I still could not see his hands, or if he had anything in them that could have grabbed from the table. I remember repeatedly pleading with Mr. Miller to stop fighting me. It was then that he shoved us both backward, away from the table, and we slammed into the slider door. I only realized later that the entire door, frame and all, was ripped out as a result of the impact. I still had my arms around Mr. Miller from behind as he began dragging me forward, further into the house. He was holding my left arm tightly under his left arm. I kept saying, "Robert, you need to stop, you need to stop," and I could see Ms. Anderson nearby and off to the side. I was trying to prevent Mr. Miller from going further into the house, but he was able to make progress further into the house, toward Ms. Anderson and toward a set of golf clubs that were leaning against the wall. It became clear to me that he was trying to reach the golf clubs. As Mr. Miller dragged us down the step separating the dining and office areas of the home, we both fell to the floor, on top of a single golf club that was laying on the floor. After we fell to the ground, my arms were still around Mr. Miller, but I was off to his left side with my left arm pinned underneath him. I could not remove it from under him. He was twisting and thrashing to keep his arms under his chest. I still had not seen his hands, so I was pleading with him to just pull his hands out, saying "Robert, please pull your hands out, just pull your hands out" over and over again. I could not reach my mic or my taser. I began trying to free my left arm, but Mr. Miller was trapping and forcibly squeezing it under his left arm. His hands were underneath him and he was trying to push himself upward.

10

At some point during this, I heard Officer Jackson's voice say, "Sean, I'm right here. I'm right behind you." I immediately told him, "I don't know if he has anything, I can't see his hands. I can't get his hands out." I was still trying to pull my left arm out from underneath Mr. Miller, but he was clamping down on it and pulling his left arm in toward him to keep it in his grip. I could not move away. Officer Jackson ordered Mr. Miller to put his hands behind his back several times, but Mr. Miller did not comply. My mic was being compressed due to my positioning. I believe Officer Jackson delivered one or two mid-strength distraction strikes at that time, to assist in gaining control of Mr. Miller's hands. Officer Jackson asked me if I wanted him to tase Mr. Miller. I still did not feel like we needed to tase Mr. Miller and thought we could clear his hands without using a taser. My arm was also still pinned underneath him. I told Officer Jackson "Not now, let's see if we can get his arms out." Officer Jackson called for backup, and started to work on clearing Mr. Miller's right arm. He was able to clear it, but then Mr. Miller suddenly thrashed his body toward me and pulled his arm back under him. At no time did he indicate that he could not breath or was having trouble breathing. Officer Jackson was then able to get Mr. Miller's right arm under control, which enabled me to free my left arm and pull his left arm out from underneath him to secure the handcuffs. At no time did I feel Mr. Miller suddenly go limp. I stood up.

I then said to Mr. Miller, "Robert, we're going to get you up." I didn't receive any response from him, and my first impression was that he was passively resisting. Taking his left arm, I moved him onto his right side. The way his body moved without resistance did not feel right. I lifted Mr. Miller's eyelid to check his pupil, which appeared fixed. I then placed my finger just in front of his eyeball to test for an involuntary response, but there was no movement. I immediately moved Mr. Miller into recovery position on his left side, and told Officer Jackson, who was speaking with Ms. Anderson, that we needed to remove the handcuffs. He expressed his

concerns about this to me that Mr. Miller would continue to fight us, at which point I quickly and quietly informed him that Mr. Miller no longer appeared to be breathing. I was conscious of Ms. Anderson's presence and did not want to upset her. I then checked for a pulse at the carotid artery and was unable to locate one. Either Officer Jackson or I then radioed dispatch to ask for rescue, at which point Officer Jackson and I began chest compressions. Officers Shaw and Ruggieri arrived at that point, and I asked them to get the medical bag. When the medical bag arrived, Officer Jackson began rescue breaths with the AMBU bag mask. Because of the tight space in which we were working on Mr. Miller, it became apparent that it would be more effective for me to perform rescue breaths and for Officer Jackson to perform chest compressions, so we switched roles. Officer Ruggieri then connected the AED. No shock was indicated. Officer Jackson and I continued chest compression and rescue breaths until Hyannis Fire arrived on scene and assumed care of Mr. Miller. I then helped rescue personnel attach the Lucas machine. Mr. Miller was transported to Cape Cod Hospital via Hyannis Fire. I went back into the house and saw that there was a pair of scissors and 2 knives on the table.

Still at the scene, I recall speaking with Ms. Anderson. She said that she had been concerned when only one officer responded and hoped that another officer would arrive because Mr. Miller was a boxer. She also told me that when she had left for Florida, she had made arrangements for a family friend to check on Mr. Miller to make sure that he continued taking his medication. Ms. Anderson also stated that Mr. Miller's son had abandoned him years ago, and that the two did not have any sort of relationship.

**INTERROGATORY NO. 10**

> Identify all written statements, memoranda, and notes, including drafts of all such documents, and any oral reports or statements you have made to any person concerning the incident or this lawsuit. For each such report or other account, pleasestate:

a.    the date, time and place of each such report or other account;
b.    the name and title of each person to whom you made each such report or other account;
c.    the nature and substance of each such report or other account;
d.    the name and address of the custodian of each such report or other account;
e.    if the account was a draft, such as the drafts of your police report, please statethe reason you made each edit.

**ANSWER NO. 10**

**<u>Objection</u>**.  The Defendant objects to this interrogatory on the grounds that it seeks information that is covered by the attorney-client privilege and the work-product doctrine. Notwithstanding and without waiving this objection, the Defendant states as follows:

In the days following my encounter with Mr. Miller on April 16, 2019, I drafted a report that summarized the events of that evening.  Then, on May 30, 2019, I was interviewed by Jack Mawn, a Detective Lieutenant from the Massachusetts State Police Detective Unit for the Cape and Islands.  I have not made or given any other statements concerning this incident.

**INTERROGATORY NO. 11**

Identify all communications, written or oral, that you have had concerning the incident or this lawsuit, from the date of the incident to the present. This includes in-person conversations, telephone calls, or any form of electronic communication. Provide the name of the parties to the communication, the date, the manner of communicating, the content of the communication and the length of the communication. If the communication was in writing, a copy of the document will suffice.

Your response should include communications you had about drafting your policereport as well as communications concerning any investigation of this incident.

For purposes of this interrogatory, the term electronic communication includes emails, text messages, and postings or comments to any internet or social media website, blog, or online forum such as Facebook, Twitter, Instagram, Reddit, Officer.com, Glock Talk, PoliceOne, Cops Online, and the like.

**ANSWER NO. 11**

**Objection**.  The Defendant objects to this interrogatory on the grounds that it is overly broad, unduly burdensome, and not proportional to the needs of the case.  Notwithstanding and without waiving this objection, the Defendant states as follows:

The incident was upsetting to me, as I went to Mr. Miller's house with the intention of helping not only Ms. Anderson, but Mr. Miller, as well—even though I did not know him, personally.  Despite my having taken actions that I felt were necessary under the circumstances, I am deeply saddened by the circumstances of Mr. Miller's death and feel a tremendous amount of sympathy for Ms. Anderson.  For that reason, I recall speaking with my wife and family members about it shortly after it happened, although I cannot recall exactly when those conversations were or what was said.

I remember receiving some feedback from Deputy Chief Balcom related to my draft report, specifically pertaining to my use of the phrase "seatbelt hold" in it.  He was unfamiliar with the phrase, and I explained to him that this was used by me in the report as a descriptive term to describe exactly how I positioned my hold on Mr. Miller.  I do not recall any further details of this conversation.

Additionally, when a newspaper article was published by the Cape Cod Times that this lawsuit had been filed, I again had several conversations with my wife and other family members about the allegations that were being made against me, but I do not remember any details about these conversations or when they occurred.

I may have texted or received texts about this incident, but my phone automatically deletes text messages after 30 days.  Additionally, I replaced my phone after it stopped functioning properly.

**INTERROGATORY NO. 12**

14

Identify all social media and online forum websites with which you have had an account at any time from April 16, 2019, to the present. These include websites suchas Facebook, Twitter, Instagram, Reddit, Officer.com, Glock Talk, PoliceOne, Cops Online, and the like. State your username for each such account.

**ANSWER NO. 12**

I have not posted or commented about this incident on any social media platform.  My

usernames for these social media platforms are as follows:

Facebook: Fake account used for work only (no posts)
Snapchat: Fake account used for work only (no posts)
Instagram: Fake account used for work only (no posts)
Twitter: N/A
Reddit: N/A
Officer.com: N/A
Glock Talk: N/A
PoliceOne: N/A
Cops Online: N/A

**INTERROGATORY NO. 13**

If you have ever been a plaintiff or a defendant in a lawsuit, state the following:

a.  the complete case caption, including any docket or other identifying number,and the forum in which the complaint was lodged;
b.  the nature of the causes of action and a description of the allegations in the complaint;
c.  the name, address, and telephone number of the counsel or representative foreach party; and,
d.  the final disposition of the case including the date it was resolved.

**ANSWER NO. 13**

I have never been a plaintiff or a defendant in a lawsuit before this one.

**INTERROGATORY NO. 14**

If you have ever been convicted of a crime, state:

a.  the offense;
b.  the date of occurrence;
c.  the court and docket number; and,
d.  the final disposition.

15

**ANSWER NO. 14**

I have never been convicted of a crime.

**INTERROGATORY NO. 15**

If you have ever been the subject of an internal investigation, administrative action, disciplinary action, citizen's complaint, or demand letter sent pursuant to M.G.L. c. 258, state for each such incident:

a. the date of the incident;
b. the substance of the charge or allegation of misconduct made against you;
c. the date the initial charge or claim of misconduct was made;
d. the name and address of all persons making the complaint;
e. the outcome of each such charge or allegation of misconduct, including the dateand nature of the final disposition of the matter; and,
f. if any disciplinary action was taken against you as a result of the charge or allegation of misconduct, the nature of such disciplinary action and the nameand address of the person administering such disciplinary action.

**ANSWER NO. 15**

**<u>Objection</u>**.  The Defendant objects to this interrogatory on the grounds that it seeks

information that is confidential and neither relevant to the claims involved nor proportionate to the

needs of the case.  Notwithstanding and without waiving this objection, the Defendant states as

follows:

I am not sure whether I have been the subject of any IAs.

**INTERROGATORY NO. 16**

Identify every person, other than your attorneys, who has assisted or been consulted in preparing these answers, including that person's full name, title, address, telephone number, and relationship to the Barnstable Police Department.

**ANSWER NO. 16**

Other than with the assistance of counsel, I have not consulted with anyone in the

preparation of these responses

**INTERROGATORY NO. 17**

Identify every person with discoverable information whether or not Defendant intends to call the witness in his case in chief including any potential rebuttal witnesses.

**ANSWER NO. 17**

Please refer to Defendants' Initial Disclosures, and to my response to Interrogatory No. 2, above.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 17th DAY OF SEPTEMBER, 2021.

Sean Roycroft

As to Objections:

*/s/ Alexandra M. Gill*
Douglas I. Louison (BBO# 545191)
Alexandra M. Gill (BBO# 663040)
Louison, Costello, Condon & Pfaff, LLP
101 Summer Street, 4th Floor
Boston, MA 02110
(617) 439-0305
dlouison@lccplaw.com
sgill@lccplaw.com

17

## CERTIFICATE OF SERVICE

I, Alexandra Gill, hereby certify that on September 21, 2021, I served the foregoing by causing a copy to be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and/via email or paper copies will be sent to those indicated as non-registered participants.


/s/ *Alexandra Gill*
Alexandra Gill