# In the Matter of:

*Estate of Robert Miller vs*

*Sean Roycroft et al.*

*Spencer Jackson*

*March 24, 2022*

*68 Commercial Wharf • Boston, MA 02110*
*888.825.3376 - 617.399.0130*
*Global Coverage*
*court-reporting.com*



O&L O'BRIEN & LEVINE COURT REPORTING SOLUTIONS
A MAGNA LEGAL SERVICES COMPANY

Estate of Robert Miller vs
Sean Roycroft et al.

Spencer Jackson
March 24, 2022

Page 3

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

ESTATE OF ROBERT JOSEPH MILLER, by
and through IAN MILLER, personal
representative of the Estate,

    Plaintiff,

v.        C.A. NO: 21-10738-FDS

SEAN ROYCROFT and SPENCER JACKSON,
in their individual capacities, and the
TOWN OF BARNSTABLE, MASSACHUSETTS,

    Defendants.

-----------------------------------------------------

REMOTE DEPOSITION VIA ZOOM OF

SPENCER JACKSON

March 24, 2022

10:00 a.m.

Elizabeth M. Afonso, Professional Shorthand

Reporter and Notary Public

---

INDEX

DEPONENT                    PAGE

EXAMINATION BY MR. FRIEDMAN    5, 123, 147

EXAMINATION BY MS. GILL    110, 144

PRE-MARKED EXHIBITS

NO.    DESCRIPTION

1    Jackson Answers to Interrogatories

2    Jackson State Police Interview

3    First Jackson Incident Report

4    Final Jackson Incident Report

5    BPD Response to Resistance Report

6    Policy 502 Response to Resistance Report

7    Policy 1106 Mental Illness

8    Diagram of First Floor

9-12    Photographs

13    Dispatch Call Log

14    911 Call and BPD radio transmission

    (Exhibits attached to original transcript.)

---

Page 2

APPEARANCES OF COUNSEL

On behalf of the Plaintiff:

    (Via Zoom)
    BY: Howard Friedman, Esquire
    BY: Carmen Guhn-Knight, Esquire
    LAW OFFICES OF HOWARD FRIEDMAN, PC
    1309 Beacon Street, Suite 300
    Brookline, Massachusetts 02446
    617.742.4100
    (Via Zoom)
    BY: Jennifer McKinnon, Esquire
    BY: Jeffrey Wiesner, Esquire
    WIESNER McKINNON LLP
    90 Canal Street
    Boston, Massachusetts 02114
    617.303.3940
    Jmckinnon@jwjmlaw.com

On behalf of the Defendants:
    (Via Zoom)
    BY: Alexandra M. Gill, Esquire
    Louison, Costello, Condon & Pfaff LLP
    10 Post Office Square, Suite 1330
    Boston, Massachusetts 02110
    617.439.0305
    sgill@lccplaw.com

---

Page 4

MADAM COURT REPORTER: This is Elizabeth Afonso. I am a Court Reporter and Notary Public in the Commonwealth of Massachusetts.

The attorneys participating in this proceeding acknowledge their understanding that I am not physically present in the proceeding room, nor am I physically present with the witness, and that I will be reporting this proceeding remotely.

They further acknowledge that, in lieu of an oath administered in person, the witness will verbally declare his testimony in this matter under the pains and penalties of perjury. The parties and their counsel consent to this arrangement and waive any objections to this manner of proceeding.

Please indicate your agreement by stating your name and your agreement on the record after which I will swear in the witness.

MR. FRIEDMAN: Howard Friedman, and I consent on behalf of the plaintiff, that includes the other two lawyers here for the plaintiff, Attorney McKinnon and Wiesner.

MS. GILL: Alexandra Gill, and I consent on behalf of the defendants in this matter.

Page 5

PROCEEDINGS

SPENCER JACKSON, having been first duly sworn, was examined and testified as follows:

MR. FRIEDMAN: Before we begin, can we agree that we will reserve all objections except as to the form of the question until trial, including motions to strike?

MS. GILL: Yes. Thank you, Howard.

EXAMINATION

BY MR. FRIEDMAN:

Q. Mr. Jackson, state your name for the record, please.

A. Spencer Lee Jackson.

Q. How are you currently employed?

A. The Barnstable Police Department.

Q. Okay. Have you ever been deposed before?

A. I have not.

Q. Okay. Well, let me just go over some basic rules, some of them are simple courtesy.

Please don't answer a question unless you understand it, okay?

Page 6

A. Yes, sir.

Q. If you don't understand, let me know, I'll rephrase it. Sometimes lawyer language can get a little confusing.

The other thing that's very important, not to interrupt one another. So even if you think you might know the answer to my question, please wait until I finish asking it, and I in turn will do my best not to interrupt you until you finish answering it, okay?

A. Yes.

Q. Now, you understand you're here today, you've taken an oath subject to the penalty of perjury, correct?

A. Correct.

Q. And you're represented by Attorney Gill?

A. I am.

Q. And you understand that she also represents Officer Roycroft?

A. Yes.

Q. And do you know she also represents Adam Ruggieri, Kevin Shaw, Mark Mellyn, an EMT firefighter: Vicki Yefko, Kenyon Pike, and Emily Higgins?

A. Yes.

Q. What did you do to prepare for this deposition?

Page 7

A. Reviewed my reports, the Barnstable Police Use of Force Reports, Mental Health Calls, the Mass. State Police reports and --

Q. Have you reviewed all of the exhibits that are potential exhibits here?

A. I have, yes.

Q. Excellent. I assume you had a meeting with your lawyer, correct?

A. Correct.

Q. How many meetings did you have to prepare?

A. Three different meetings, some phone calls, e-mails.

Q. Did you speak to Officer Roycroft to prepare for the deposition?

A. I had spoke with him, and as I was doing things like that.

Q. Where is he now?

A. He is living in Florida. I don't know exactly where, but he moved down to Florida.

Q. Do you know what he is doing in Florida?

A. I do not. As far as -- I don't believe he's working right now.

Q. You say you asked how he was doing, did he leave because of any particular health problem or some

Page 8

other issue?

A. No, no. I think he just retired and decided to move.

Q. Okay. When did he retire?

A. Probably 2020 or 2021, I'm not exactly sure.

Q. Since his retirement, have you discussed this incident with him?

A. Yes.

Q. Okay. What conversations did you have?

A. We spoke on the overview of things, nothing in great detail, but just the overview of what happened.

Q. Okay. Did you discuss this incident with anyone other than your attorney and Officer Roycroft to prepare for the deposition?

A. No.

Q. Did you have any conversation with your supervisors to prepare for the deposition?

A. No.

Q. Now, before you finalized your police report in this case, did you discuss it with Officer Roycroft?

A. Yes. We had conversations about our -- making sure that we were providing accurate accounts of what

Estate of Robert Miller vs
Sean Roycroft et al.

Spencer Jackson
March 24, 2022

Page 9

happened.

Q. And there was discussion about making sure that your reports were consistent with one another, correct?

A. Correct.

Q. At some point your supervisors had some comments or changes for your police report; is that right?

A. For mine it was some minor grammatical error -- grammatical changes, some small formatting stuff, but that was about it, nothing too significant in mine.

Q. And now your educational background, I gather you went to Cape Cod Community College and obtained an associate's degree in criminal justice, correct?

A. Yes.

Q. And then you went to Johnson & Wales, and what degree did you obtain there?

A. Bachelor's degree in criminal justice.

Q. And that was also criminal justice?

A. Yes.

Q. Have you ever been in the military?

A. No.

Q. Okay. Now, are you currently a member of the regional SWAT team?

Page 10

A. I am.

Q. And you joined in June of 2016; is that correct?

A. Yes.

Q. Does the SWAT team train for dealing with mental health emergencies?

A. We do. It's certainly a component of situations that we might have to deal with, yes.

Q. And have you as a member of a SWAT team ever been involved in a mental health emergency?

A. Yes.

Q. How often?

A. Fairly infrequently, but it has happened.

Q. And you say this is a regional SWAT team, who is the leader of the SWAT team?

A. The leader of this -- a couple of different chiefs. I believe in 2019 it was Chief Guillemette out of Harwich. We have Lieutenant Mike Riley that is -- now he works for Barnstable Police Department, as well as Chief Sonnabend.

But in 2019, I don't know exactly who was the head of it then at that moment because several of them have changed.

Q. Was there a written policy for the SWAT team on how to handle mental health emergencies?

Page 11

A. Unsure if there was specifically one for the SWAT team.

Q. Do you recall what the policies were for the SWAT team in dealing with mental health emergencies?

A. Again, I don't know if there was one specific to the SWAT team or if we would just revert back to our own police department's policies on that.

Q. Okay. So the SWAT team would consist of people from a number of different departments, correct?

A. Correct.

Q. So each department may have different policies, right?

A. Yes.

Q. So if each person in the SWAT team is following different policies, wouldn't that cause for some confusion?

MS. GILL: Objection.

Q. You may still answer. I'm sorry.

Whether an objection -- just so you know, unless your lawyer instructs you not to answer, which would only be for privilege as we waived all other objections, it's an objection to the form of the question.

A. Okay. It's up to that officer to stick to his

Page 12

department's policy.

Q. How many different departments would have members on the SWAT team?

A. In 2019, probably eight different departments.

Q. And when you would show up for an event, would there be people from all eight departments?

A. Generally, yes. It depends on the size of the incident and what we're dealing with.

Q. What was your understanding of how the SWAT team would handle a mental health emergency?

A. Generally, it depends on the situation.

Q. Well, was the -- you've been in some of these situations, correct?

A. Yes.

Q. Okay. Was there a general practice as to how to handle a mental health emergency as opposed to some other types of emergencies?

A. So with a mental health emergency, we would be used -- one specific one is basically containment to make sure that the individual we were dealing with wouldn't be able to leave the area and the threat level was such that we were requested to be there.

But, generally, the SWAT team doesn't get involved in specific mental health emergency calls.

Page 13

Q.   Okay. So you say that the SWAT team would be called in in a mental health emergency call for containment. What does that mean, containment?

A.   In order to provide a perimeter around the incident. That's the one I was involved in that I can think of.

Q.   What would happen after you set up the perimeter, other officers would get involved?

A.   Yeah. We had crisis negotiators called in and made contact with the individual.

Q.   So when you say containment, you want to make sure the individual is alone in a place and that person can't get out and nobody else can go in; is that what containment means?

A.   Yes.

Q.   And can you estimate how many times you've been called as a member of the SWAT team to a mental health emergency?

A.   I can recall one.

Q.   Where was that?

A.   Marstons Mills.

Q.   When was it?

A.   I don't know exactly, 2018 maybe.

Q.   And did it work out successfully?

Page 14

A.   Yes.

Q.   That is the person was able to openly receive mental health treatment?

A.   Exactly.

Q.   And the person was safe?

A.   Yes.

Q.   Now, you reviewed your answers to interrogatories before the deposition, correct?

A.   Yes.

Q.   Did you see anything in there that you thought was inaccurate, incorrect or needed in any way to be changed?

A.   No. Not that I can recall.

Q.   Okay. And you reviewed the transcript of your state police interview?

A.   Yes.

Q.   And, again, anything in there that was inaccurate or you felt should be changed?

A.   Not that I can recall.

Q.   And you looked at the final official police report that you filed in this case, correct?

A.   Yes.

Q.   And is there anything in there that you thought needed to be changed in any way?

Page 15

A.   No.

Q.   Now, is there a policy in the Barnstable Police Department about when you prepare and file an incident report?

A.   Yes.

Q.   When are you supposed to file the incident report?

A.   Are you talking about time?

Q.   Yeah. The ordinary incident report, when would it be prepared and filed?

A.   I don't think they give a specific time line. It depends on the incident.

Q.   Well, most incidents a report is filed at the end of the shift; isn't that correct?

A.   It depends on the incident. A court report would be filed if the incident -- at the end of the shift if the subject would have to be arraigned for court in the morning.
     If it was a different type of offense, it's not necessarily -- it doesn't necessarily have to be done by the end of the shift.

Q.   Okay. Now, this incident took place on April 16th of 2019, correct?

A.   Yes.

Q.   And your incident report was filed on May 28th of

Page 16

2019, correct? You can look at it if you want. You have the exhibits.

A.   Would you be able to produce that?

Q.   Sure.
     MR. FRIEDMAN: Carmen, would you like to show him Exhibit 4, which is the final incident report?

Q.   Okay. Do you see at the very top on page 1, that would be the date that it was actually filed, correct?

A.   Yes.

Q.   Okay. So it was well-over a month after the incident, correct?

A.   So the two dates I'm seeing is 4/16 and then it says 4 -- I don't know if I can see that again. Thank you -- 4/18.

Q.   Okay. And if you look at the very top in the right-hand corner, what's the date?

A.   Yeah, May 24th, 2021.

Q.   Okay. And isn't that the date that it was actually ultimately filed?

A.   I'm not sure what that date is from. If that's a supervisor approval date or what. I'm not exactly sure what that is, what that date refers to.

Estate of Robert Miller vs
Sean Roycroft et al.

Spencer Jackson
March 24, 2022

Page 17

MR. FRIEDMAN: Okay. Let's go to the next page, Carmen.

Q.  Okay. Now, let's look up top here, it appears that this report was entered on May 28th of 2019. Is that your ID, 279?

A.  Yes.

Q.  Okay. So what does it mean the report is entered?

A.  Probably uploaded into IMC.

Q.  Oh. And do you ordinary wait a month to almost a month and a half to upload a report into the system?

A.  No.

MS. GILL: Objection.

MR. FRIEDMAN: I think you can remove that now, Carmen.

Q.  So this report took quite sometime to finally be filed, because it was being reviewed and edited by your superiors, correct?

MS. GILL: Objection.

Q.  Do you understand the question?

A.  Yes.

Q.  Okay. Again, when you hear an objection, that is simply to the form of the question. You can answer the question, unless your attorney should instruct

Page 18

you not to answer, which would only be for a claim of privilege.

So to go quicker, if you hear an objection, understand what it is, she feels there was something wrong with the question.

A.  Okay.

MR. FRIEDMAN: Court Reporter, can you please read back the question?

(Court reporter read back pending question.)

A.  I'm not sure what exactly was happening with my report during that time frame, but I had -- from the narrative document, it looks like it was entered into IMC on that date in May.

Q.  Who did you consult with before you filed your report, your final report?

A.  I spoke with John Murphy, and Sean Balcom.

Q.  Okay. Sean Balcom was then the deputy chief?

A.  Yes.

Q.  And what rank did John Murphy?

A.  He was the lieutenant in charge of evening shift, the shift that I was working.

Q.  Did you consult with any attorneys before you filed your report?

Page 19

A.  No.

Q.  Did you consult with anyone outside of the two people you mentioned, Deputy Chief Balcom and John Murphy?

A.  Not that I can recall, no.

Sean Roycroft, again, we spoke on that multiple times.

Q.  After this incident, have you had any conversation with any of the emergency medical personnel who arrived at the scene?

A.  About this incident specifically?

Q.  About this incident, yes.

A.  I briefly spoke with Vicki Yefko from Hyannis Fire Department.

Q.  When did you speak with Vicki Yefko?

A.  During a call that we were both on.

Q.  Attorney telephone call?

A.  I'm sorry?

Q.  A telephone call?

A.  I believe it was at a call for service.

Q.  What conversation did you have with her at that time?

A.  She spoke about what she believed was some inaccuracies in her original statement -- in her

Page 20

report rather.

Q.  Oh. What did she say was inaccurate in her report?

A.  The positioning of Mr. Miller. I don't know who she got that statement from but...

Q.  Did you speak with Vicki Yefko during this incident?

A.  Not that I recall, maybe very quick, but I don't think I had spoke with her --

Q.  Did Officer Roycroft -- I'm sorry.

Did Officer Roycroft speak with Vicki Yefko to your knowledge?

A.  I'm sure.

Q.  When you're in a situation where a person is unconscious and has stopped breathing and emergency medical personnel are called, as a police officer involved in the incident, would you or your partner be the people to speak to the EMTs to provide them with the information about what had happened?

A.  Yes.

Q.  And that's because EMTs need to know what happened to provide proper medical care, correct?

A.  Correct.

Q.  Okay. And since you mentioned Vicki Yefko, did she tell you that in her report she said that "Officers

Page 21

STS" -- stated I guess or states -- "we were here for a mental health evaluation, and patient was calm and cooperative at first. He got angry and went for a golf club and we took him down and cuffed him. He was talking and we stood him up and started to walk out and he collapsed. We immediately started CPR and applied AED."

Did you know that was in her report?

MS. GILL: Objection.

A. I saw the report after.

Q. When did you see the report?

A. Sometime after that.

Q. Okay. But was it before you filed your police report?

A. No.

Q. Was it before the lawsuit was filed?

A. No. It was after that.

Q. How did you come to see her report?

A. It was part of documents that were given to me at some point.

Q. These documents were given to you by your attorney?

A. Yes.

Q. Now, that statement that I just read which was in the EMT's record that was prepared that very day,

Page 22

not, you know, a month and a half later, that was you say not accurate, correct?

A. Yes.

Q. Because what it says isn't true, right?

A. Correct.

Q. Did Vicki Yefko explain to you why that very day she would write that in her report?

A. No.

Q. Did she tell you she thought that she might have been talking to somebody who was not a police officer?

A. I don't remember giving the statement to Vicki, so it's certainly possible that she had received it from another co-worker and it got lost in translation somewhere.

Q. The statement I read from Vicki Yefko's report would be about something that took place in Robert Miller's home when the only people in the home were you, Officer Roycroft, Mr. Miller, and Mr. Miller's girlfriend, Amy Anderson, correct?

A. Correct.

Q. Okay. There were no other officers there when those incidents took place, am I right?

A. The initial incident, no.

Page 23

Q. Yes.

Have you discussed this incident with any of the other officers, police officers, who arrived after you did?

A. I gave them -- Sergeant Tynan was there and gave him a overview of what happened. Officer Ruggieri and Officer Shaw, again, brief.

Q. Okay. Did you speak to them before or after the EMTs had arrived and were trying to treat Mr. Miller?

A. After.

Q. Is there anyone, whether a firefighter, a EMT, or any other person, other than yourself and Officer Roycroft, who you spoke to before the medical personnel arrived?

A. No. Officer Shaw arrived and we asked for equipment -- I'm sorry, Officer Ruggieri arrived and we asked for equipment from him, medical equipment.

Q. Did you have time to give him a rundown of what had happened?

A. No.

Q. Did you give Officer Shaw a rundown of what had happened?

Page 24

A. No.

Q. Who was the EMT who was providing direct treatment to Mr. Miller?

A. I don't recall by name.

Q. Well, Vicki Yefko was one, correct?

A. She was one, yeah, but I'm unsure if she was giving direct treatment or just assisting this.

Q. Do you know that Vicki Yefko was the paramedic in charge of the treatment in this particular instance?

A. I didn't know that specifically.

Q. Okay. Can you recall any other emergency personnel other than Vicki Yefko who provided treatment, you know, to Mr. Miller?

A. No, not by name.

Q. Do you have any training in the martial arts?

A. I took Krav Maga classes.

Q. Could you spell that?

A. K-R-A-V M-A-G-A.

For a short period of time, probably 2015.

Q. And is that to assist you in your work as a police officer or just general interest?

A. Just general interest.

Estate of Robert Miller vs
Sean Roycroft et al.

Spencer Jackson
March 24, 2022

Page 25

Q.   Okay.  Did you take them someplace on Cape Cod?
A.   Yes.
Q.   Where was that?
A.   A co-worker of mine gave classes.  He was a Krav
     Maga instructor and gave some classes that I
     participated in.
Q.   Who is that co-worker?
A.   Robert Bitinas.
Q.   How do you spell his last name?
A.   B-I-T-I-N-A-S.
Q.   Were other people in the class also Barnstable
     Police Officers?
A.   Yes.
Q.   And how long did you study that?
A.   In total, probably six different classes, six
     different occasions.
Q.   Okay.  And any reason why you did not continue with
     it?
A.   Rob ended up not giving classes.  He had owned a
     Krav -- or been part owner of a Krav Maga gym and
     then ended up getting out of the business, selling
     the gym.
Q.   During this time, around 2019, were you a member of
     any gym?

Page 26

A.   Not a -- yes, yes, Fitness 500 in Hyannis.
Q.   And did you work out regularly?
A.   Yes.
Q.   Okay.  So you're in good physical condition?
A.   Yes.
Q.   Had you studied any other martial arts, Judo or Jiu
     Jitsu, karate, Tae Kwon Do, anything like that?
A.   No.
Q.   Now, in your police training, I assume you were
     taught that it is legal for a person to swear at a
     police officer, correct?
A.   Yes.
Q.   And if a person says, fuck you, I don't want to
     talk to you, that's not a crime, correct?
A.   Correct.
Q.   And as a police officer, you need to just let that
     roll off your back, you can't really let it bother
     you, right?
A.   Correct.
Q.   Now, you've had training in the use of force and
     what force you can apply as a police officer,
     correct?
A.   Yes.
Q.   And have you heard the term "objective

Page 27

     reasonableness"?
A.   Yes.
Q.   And that's a term that applies to when police
     officers may use force, correct?
A.   Yes.
Q.   And what does that mean to you?
A.   It means that the police officers use of force for
     a given situation has to be reasonable.
Q.   And what does objective reasonableness mean?
A.   It has to be reasonable in order to accomplish the
     objective, whatever that objective may be.
Q.   Well, does it mean that it has to be objectively
     reasonable, as not subjectively what's in the mind
     of the officer, but how an objectively reasonable
     police officer would behave?
A.   Yes, yep.
Q.   Let's look for a second at Exhibit 5.
A.   Sure.
Q.   Do you have it there in paper?
A.   I do not.
     MR. FRIEDMAN:  Okay.  Let's put it up on
     the screen, Carmen, please.  Thank you.
Q.   Did you look at this to prepare for the deposition?
A.   I did.

Page 28

Q.   Okay.  And this is a report that you filled out,
     correct?
A.   Yes.
Q.   And this one, if you look on the other side --
     MR. FRIEDMAN:  Carmen, if you'd show the
     back.
Q.   -- it was filled out on April 21st, 2019, correct?
A.   Yes.
Q.   Is this a report that you filled out for yourself,
     or did you fill it out for yourself and for
     Roycroft?
A.   I filled it out for myself.
Q.   You said for yourself?
A.   Yes.
     MR. FRIEDMAN:  Okay.  Carmen, if you can
     take that down now.
Q.   And this report, as I'm sure you saw when you
     looked at it to prepare, is not signed by the shift
     supervisor or by a commander of the field services
     bureau, right?
A.   Correct.
Q.   Do you know why that is?
A.   I do not.  Specifically, I do not.
Q.   And it says in the report that you're supposed to

Page 29

attach a copy of the incident report narrative section to your Response to Resistance Report.

Did you do that when you filed this report back on April 21st of 2019?

A.  Yes.

Q.  You had a written report prepared as of April 21st?

A.  Yes.

Q.  Okay. And that would be the draft report?

A.  It would be a narrative of the use of force incident.

MR. FRIEDMAN: Okay. Carmen, can we show Exhibit 3, please?

Q.  Now, with Exhibit 3 in front of you, is this what you mean by a narrative of the incident?

A.  Yes.

Q.  So you had this report prepared by April 21st --

A.  Yes.

Q.  -- a few days later, correct?

A.  I believe so, yes.

MR. FRIEDMAN: Okay. You can take that down now, Carmen.

Q.  And so that was not your final report, right?

A.  I'm unsure if that was final report or not. But if I were to submit that with the Use of Force Report,

Page 30

it would more than likely be my final report.

Q.  And it should be attached to Exhibit 5, the Response to Resistance Report?

A.  Yes.

Q.  Now, you indicate that you were not injured in this incident, correct?

A.  Yes.

Q.  Was Officer Roycroft injured?

A.  He had some minor abrasions, I believe, to his knee.

Q.  And if you're injured during the course of an incident while you're on duty, are you supposed to file a injury report of some kind?

A.  It depends on the extent of the injury, but, yes.

Q.  Okay. Even if you need a Band-Aid, if you've got a cut, you're supposed to file an injury report just in case something happens and it turns out to be worse than you first thought, right?

A.  Potentially. I know that that generally doesn't happen, but, again, it depends on the injury.

Q.  So if the injury is really minor, you don't need to file a report?

A.  I haven't.

Q.  If the injury is minor, do you take pictures of it?

Page 31

A.  In my past practice -- I've been injured at work minor and haven't stopped what I'm doing to take photos and write a report about it.

So it depends on the officer.

Q.  And it depends on type of injury, if it's a serious injury, you would definitely be writing a report --

A.  Of course.

Q.  -- documenting the injury, right?

A.  Of course.

Q.  Okay. Now, you -- let's see. You had training on response to resistance, correct?

A.  Yes.

Q.  And have you reviewed that policy before coming in today?

A.  Yeah.

Q.  The policy says you are to use proper judgment, restraint, and competence when you use force, correct?

A.  Yes.

Q.  And it says when you use restraint techniques to take down and/or control a person, you are to use the techniques as trained, right?

A.  Yes.

Q.  And as trained means as trained by the Barnstable

Page 32

Police Department, correct?

A.  Barnstable Police or police academy or inservice training, whatever the training --

Q.  It wouldn't be what you learned when you were taking martial arts courses for your own personal enjoyment, correct?

A.  Correct.

Q.  Were you trained in using a seat belt hold in the course of your police training?

A.  That specific term, no, I hadn't heard that before that.

Q.  Well, do you understand what a seat belt hold would be?

A.  Yes.

Q.  Okay. What is your understanding?

A.  Specifically related to this incident?

Q.  If that's how you learned about it, sure.

A.  It was an arm that -- Sean Roycroft's arm was over the right shoulder of Robert Miller and his left hand was underneath Robert Miller's left arm and his two hands were holding each other, and the point of that is to control his body.

Q.  Is that a technique that you were trained in the course of your police work?

Page 33

A. No.

Q. And have you ever learned that that technique could be dangerous, because it could slip into a chokehold?

A. I had never learned that, no.

Q. Okay. Had you ever seen a seat belt hold like that being applied any other time during your police career?

A. Not that I can recall.

Q. Did you discuss with Officer Roycroft what that hold was, or why he was using it?

A. Afterwards, yes.

Q. What discussion did you have?

A. And Officer Roycroft held onto Robert Miller in the way he did in order to control his body, and I certainly think that it was reasonable given the situation to be able to hold him like that in order to control him.

Q. As a police officer, were you taught takedown techniques?

A. Yes.

Q. What techniques were you taught?

A. Arm bar takedowns, some leg sweep stuff.

Q. And do you think it's reasonable as a police

Page 34

officer to use techniques that were not techniques you were trained to use as a police officer?

MS. GILL: Objection.

A. I do, and it's got to be objectively reasonable for the given situation. A fight is a dynamic situation and sometimes you have to do what you got to do and be reasonable with your use of force in order to take control of someone.

Q. Is it your understanding that when he applied the seat belt hold, Robert Miller was fighting with him?

A. I believe in the aftermath and all the information we had that Robert Miller was trying to gain access to weapons.

Q. You say in the aftermath you learned that he was trying to gain access to weapons?

A. Yes.

Q. How did you learn that?

MS. GILL: Objection. I think he said he believed he learned.

MR. FRIEDMAN: I'm sorry, I couldn't hear after your objection. You were speaking --

MS. GILL: Objection. He testified he believed he learned.

Page 35

Q. Okay. Can you explain what caused you to believe that?

A. The table that Robert Miller was laying on and reaching for weapons -- reaching for an object, had two -- had a pair of scissors which were separated.

Q. And Officer Roycroft hadn't seen that, had he, until after this whole incident?

A. Not at that time.

Q. Okay. So the policy requiring to use techniques as trained isn't mandatory according to you; is that right?

A. I believe that in the dynamic of a fight, you have to use a reasonable use of force.

Q. And so you would say that when the seat belt hold was applied, Robert Miller was fighting with Officer Roycroft, correct?

A. Yes.

Q. Okay. Now, have you looked at Policy 1106 on mental illness?

A. Yes.

Q. Okay. And there's, like, nine steps in that policy?

A. Correct.

Q. Do you recall those?

Page 36

A. I remember seeing that, yes.

Q. Okay. Would you like us to put it up on the screen for you?

A. Sure.

MR. FRIEDMAN: Okay. Carmen, could you do that? I believe it's BPD page 326. I'm looking out for the chart, Carmen. Here we go.

Q. Okay. Now, these are the guidelines in your department for a situation when an officer is involved in someone who shows signs of mental illness, correct?

A. Yes.

Q. And so these would be the guidelines that someone approaching someone on a call with a person that appears to be having a psychotic break should follow, correct?

A. Correct.

Q. Okay. And the first thing is to "quickly assess the situation and secure the scene," right?

A. Yes.

Q. What does secure the scene mean?

A. Secure the scene would be to attempt to make contact with the reporting party, make sure that people are out of the way of any danger if there is

Page 37

any, and make contact with the individual that's having the mental health issue.

Q. So if there's a home that two people live in and you make contact with the person who called the police, securing the scene would be telling the person who initially contacted the police to just get outside of the building, correct?

A. It could be.

Q. And if you allow the person to stay in the building, that would mean you felt that would be safe for that person, correct?

A. Potentially.

Q. Then the next is to "request back up assistance, as appropriate."

In dealing with people who are mentally ill, have you been trained that if a person is, for example, psychotic, getting larger numbers of officers there is what you should do as your second step?

A. It depends on the situation. I've had situations where people get more agitated when there's five police officers there than when there's one or two.

Q. But you've been in situations where you call for back up, correct?

Page 38

A. Yes.

Q. And in fact that's, at least according to your policy, that's what you're supposed to do when it's appropriate, right?

A. When it's appropriate, yes.

Q. And you go down to number five, an officer is supposed to attempt to keep the individual calm and quiet and show the officer is there to protect and help them, right?

A. Yes.

Q. You're supposed to act with respect, correct?

A. Correct.

Q. You're supposed to try to gain voluntary cooperation, right?

A. Yes.

Q. And then number eight, you could also call for specialized personnel, including a Crisis Negotiation Team, correct?

A. Yes.

Q. And that's part of what you would do as a member of the SWAT unit, correct?

A. That wouldn't be my decision to make if it was specifically a SWAT unit -- I'm sorry, a SWAT call, which this was not.

Page 39

Q. No. I'm saying one of the things that the SWAT unit does is calls in a Crisis Negotiation Team; is that right?

A. Yes.

Q. Is a Crisis Negotiation Team part of a SWAT unit?

A. Yes.

Q. Is there a separate Crisis Negotiation Team that the Barnstable Police Department had that you could have called?

A. For this situation, no. We would have assessed the scene and made contact with the individual, and then if time allowed and the situation would have been appropriate to call additional personnel, we would have done that.

MR. FRIEDMAN: Okay. We can take this exhibit down, Exhibit 7.

Q. So I'm trying to understand though, the Crisis Negotiation Team is the one that existed in the Barnstable Police Department?

A. I don't believe so. There's a Crisis Negotiation Team that works specifically with SWAT during SWAT calls.

Because this was a patrol call handled by patrol officers, I'm not sure exactly what they

Page 40

were referring to as far as the Crisis Negotiation Team.

Q. Well, if a patrol officer needs a Crisis Negotiation Team, how would you go about getting one?

A. Contact a supervisor and explain to them the situation, and the supervisor would come to the scene and organize that from there.

Q. Why would you call in a Crisis Negotiation Team?

A. Why would I?

Q. Yes.

A. If our efforts to deescalate the situation did not work and I felt that a Crisis Negotiation Team would eventually resolve the situation, but the scene safety is paramount to everything and we have to make sure that the scene was safe and the person was under control before we bring in anybody else.

Q. What does the phrase "scene safety" mean?

A. That where the incident is taking place is safe for first responders or anybody else to be in that area to deal with that situation.

Q. So what would you do as a police officer to make sure the scene is safe?

A. Get a layout of the scene, understand who's there,

Page 41

if there are individuals involved in the situation that are maybe separated from the incident or make sure that there's no weapons involved, get the demeanor of the person and his intentions.

Q. You were trained in mental health first aid?

A. Yes.

Q. And did you have a chance to look at Exhibit 8 which deals with mental health first aid?

A. Yes.

Q. Great. And so you're supposed to have an action plan for mental health first aid; is that right?

A. Yes.

Q. You're supposed to listen non-judgmentally, correct?

A. Yes.

Q. You're supposed to give reassurance and information, right?

A. Yes.

Q. Have you been trained in understanding the term "psychosis"?

A. They had spoke about it during training, yes.

Q. What's your understanding of psychosis?

A. Somebody who doesn't have a -- has inaccurate thoughts of reality or threat from people.

Page 42

Q. A person in psychosis might be hallucinating, correct?

A. Sure.

Q. They might be seeing things that aren't there, right?

A. Right.

Q. So they have in some ways lost touch with what we would call reality, am I right?

A. Yes.

Q. So were you trained in how to handle a person who appeared to be having a period of psychosis?

A. It was touched on during training, yes.

Q. Okay. And what did you learn?

A. To try to deescalate the situation. Again, be calm, try not to agitate them, treat them with respect, and then try to get them mental health help to a mental health facility in order to better assist their situation protocol.

MR. FRIEDMAN: Carmen, could you put up the section for mental health first aid that's headed "Try to De-escalate the Situation"?

Q. Okay. Do you see this --

MR. FRIEDMAN: Thank you, Carmen.

Q. When you're trying to deescalate the situation, you

Page 43

should not argue or challenge the person, correct?

A. Yes.

Q. You don't want to threaten the person, right?

A. Right.

Q. You should not raise your voice or talk too fast, correct?

A. Yes.

Q. You should not restrict the person's movement; is that right?

A. Where does it say that?

Q. It is the third from the bottom.

A. Yep.

Q. And you want to be aware of things you might do that might exacerbate or make worse the person's fear and aggression, correct?

A. Yes.

MR. FRIEDMAN: Okay. You can take that one down, Carmen. Thank you.

Q. Now, the term "deescalation" is one that's been used a lot recently for police officers, correct?

A. Yes.

Q. Okay. And what does deescalation mean?

A. It means taking a person who is at an agitated state and coming in with a soft approach in order

Page 44

to lower their level of anger or distrust with us in order to resolve the situation.

Q. So what should you be doing as an officer to deescalate a situation?

A. Like we said in those, speak in a calm voice, just be relaxed, and try to relate to this person and treat them with respect.

Q. Would it be appropriate to call the person buddy or pal if in fact you didn't know them before?

A. Potentially.

Q. Well, you wouldn't want the person to think that you were condescending towards them, right?

A. Right.

Q. And if you're not their friend saying that you're their friend or their buddy or pal, would be inappropriate, wouldn't it?

A. I wouldn't call somebody buddy or pal but...

Q. You would not?

A. No.

Q. Why not?

A. Like you said, if I'm not friends with somebody, I'm not going to pretend that I'm their buddy or pal.

Those are just two statements -- two

Estate of Robert Miller vs
Sean Roycroft et al.

Spencer Jackson
March 24, 2022

Page 45

words I wouldn't use in a mental health call personally.

Q. You want to be truthful when you're dealing with somebody who is in a mental health call, correct?

A. Correct.

Q. And if a person says that they're speaking to the forest and the forest is speaking to them, you would say something, like, well, I understand you're speaking to the forest, you wouldn't want to argue with them about whether a forest could speak, correct?

A. Right.

Q. Have you ever learned defusing techniques?

A. I'm unfamiliar with that term.

Q. Okay. How about active listening skills?

A. Yes.

Q. Explain what that means?

A. Being able to hear what somebody's saying in conversation and being able to (inaudible) what they're speaking about.

Q. And so as we said before, a person who is undergoing psychosis would be out of touch with reality, correct?

A. Yes.

Page 46

Q. Would you expect that if a person was having a psychotic break, they would be able to listen to and follow orders if you gave them orders?

A. It depends on the situation, it depends on the person.

Q. Okay. So even though the person might have the out of touch with reality, maybe having delusions, talking to nature, you would still expect that the person who is psychotic could follow orders?

A. I've dealt with situations where they have.

Q. And were you trained that if a person is mentally ill and suffering from psychosis, you should give them orders?

A. It depends on the situation. Sometimes you have to.

Q. Well, if you give a person who is out of touch with reality an order, you wouldn't necessarily expect they would follow the order, would you?

A. It depends.

Q. Well, if you're dealing with an ordinary civilian, you know, you meet somebody on the street or you stopped a motor vehicle ran a stop sign, you'd expect if you tell them to do something, they would do it, right?

Page 47

A. Sometimes they do; sometimes they don't.

Q. They don't always, but you would expect they understand your order and most of the time they do what you say, don't they?

A. Most of the time.

Q. Yeah. But if the person is out of touch with reality, whether hearing voices or having delusions, you would not necessarily expect that if you tell them, do this, do that, that they're going to follow your order, correct?

A. They might --

MS. GILL: Howard, you cut out a little bit there, I'm sorry. What was the last part of your sentence?

MR. FRIEDMAN: Follow an order.

A. And they might or they might not. It depends on the person.

Q. Yep. Well, if the person is in the midst of a psychotic break, you would be more likely to expect they might not, right?

A. I can't say strongly one way or the other, but it could go either way.

Q. Okay. So it's about the same if someone is having a psychotic break as to whether they'll follow an

Page 48

order as if you just stop somebody, an ordinary person on the street maybe ran a stop sign, is that what you're telling me?

A. No. I'm saying that I can't say that if somebody is having a psychotic break, they're going to do specifically one thing or the other.

Q. If someone is having a psychotic break, would you not agree that it is less likely they will be following commands?

A. They could, yes.

Q. Well, it's just less likely, they're not in touch with reality, right?

A. Right.

Q. You don't know whether they understand you to be a police officer or they're having some kind of a delusion, they think that you came from out of space or something, right?

A. Yes.

Q. When you arrive on a scene where you know that it's a person who is having a mental health crisis who is psychotic, it's important before you get there to have a plan of action; isn't that true?

A. Yes.

Q. And before you fully engage, you want to determine

Estate of Robert Miller vs
Sean Roycroft et al.

Spencer Jackson
March 24, 2022

Page 49

what's going on to see whether or not you should, as discussed in your policy, call for additional officers, correct?

A. It depends on the situation, but, yes.

Q. Well, your goal is to try to help a person who's having a mental health crisis, correct?

A. Of course, yes.

Q. And you want to make sure the other people who might be near that person will be safe, correct?

A. Right.

Q. All right. A few questions about your training. When you have to handcuff a person and they are facedown on the ground, how long should you leave that person facedown on the ground?

A. We've been trained that as soon as reasonably possible to not leave them facedown.

Q. Why not?

A. Because it can cause them difficulty breathing.

Q. What do you mean by as soon as reasonably possible?

A. As soon as we are able to remove them from that situation, shortly thereafter we would do that.

Q. Okay. You shouldn't wait until they've stopped breathing, correct?

A. Of course.

Page 50

Q. What is the recovery position?

A. Recovery position is when you lay somebody on their side, and it allows them a better ability to breathe, they're not as restricted.

Q. Okay. Did you learn that there could be certain preexisting conditions a person might have that would make it more likely that if they were positioned on their stomach that they would have difficulty breathing?

A. Yes.

Q. And what conditions did you learn might make that more likely?

A. I'm unsure of what titles they could put to that exactly.

Q. Well, for example, a person who is obese if on their stomach might have more trouble breathing, correct?

A. Yes.

Q. Are there any other factors that you learned that might make it more difficult for a person to breath if they were left lying on their stomach?

A. Depending on the person's age. Like you said, obesity, physical conditioning.

Q. So age and physical condition would be factors?

Page 51

A. Yes.

Q. And the older the person, would that make it more likely they have trouble breathing?

A. Yes, potentially.

Q. What is positional asphyxia?

A. The person's body positioning causing them the inability to breathe.

Q. Is that something you learned about in your training?

A. I believe so.

Q. And did you learn how to prevent that?

A. Yes.

Q. And if a person is in the position facedown during police action trying to handcuff them, for example, would it be important for an officer to try to reduce the amount of weight or pressure on the person's back?

A. Yes.

Q. And that's because you might have breathing problems if you're facedown on your stomach and pressure is applied to the person, correct?

A. Correct.

Q. And the more pressure, the more likely it is the person will have difficulty breathing, right?

Page 52

A. Yes.

Q. Were you trained in how a person suffering from psychosis might have difficulty if they were placed in a position where they were facedown on the ground?

A. No, I don't recall anybody saying specifically.

Q. When you are involved with a subject trying to handcuff them, for example, how many officers should be giving verbal commands to the person?

A. Usually one, but it depends on the situation.

Q. Okay. When would you want to have more than one person giving commands to one individual?

A. If one of the officers isn't -- I don't know.

Q. Can you think of a reason, a time when that would be appropriate?

A. If one officer is saying one thing and you can say something else to try to influence something, you know, your objective.

Q. Were you trained that if one officer is saying one thing and another officer says something else, that that could be confusing to the person you are ordering about?

A. If they're giving conflicting statements, yes.

Q. When someone is handcuffed facedown, is there one

Page 53

officer who is supposed to be monitoring that person while they are restrained?

A.   Not specifically.  But that's what happened in this case.

Q.   One person was monitoring the individual?

A.   Yes.

Q.   Would that be Officer Roycroft?

A.   Yes.

Q.   Have you had training in recognizing breathing difficulties?

A.   They touched on shortness of breath, but I don't remember specifically being trained on that.

Q.   Have you heard the term "compressional asphyxiation"?

A.   I believe I've heard it, but I can't tell you where.

Q.   Do you understand it?

A.   I understood the concept of it, yes.

Q.   Okay.  Do you understand the term "agonal breathing"?

A.   Yes.

Q.   What does that mean?

A.   Short breaths, difficulty breathing.  They'd speak about it during drug overdoses, that sort of thing.

Page 54

Q.   What is a tactical plan?

A.   A tactical plan is using positions to your advantage in order to execute whatever the objective is in whatever situation you're in.

Q.   In a situation when you're trained to take someone into custody, would you have a contact officer and a cover officer?

A.   Yes.

Q.   Okay.  What does it mean to be a contact officer?

A.   The contact officer would be the officer that is the primary communicator with the subject dealing with speaking with somebody and --

Q.   Somebody kind of the lead officer then, contact officer?

A.   Yes.

Q.   And what would be a cover officer?

A.   A cover officer would be in charge of what else is going on at the scene, scene safety, and keeping an eye on the individual that you're dealing with.

Q.   Had you been trained or learned the term "excited delirium"?

A.   Yes.

Q.   When did you first learn of that term?

A.   It was after this incident and it was during SWAT

Page 55

training.

Q.   So it was after April 2019?

A.   Yes.

Q.   Okay.  What training did you have from the SWAT team on excited delirium?

A.   Our medic on the team, doctor on the team, explained that people had a heightened agitated sense sometimes induced by some sort of stimulant narcotic, and they would be in a very heightened level of agitation which would respond in police contact and oftentimes the inability for these people to deescalate and calm down.

Q.   Okay.  And were you trained as to what you should do if you thought there was a possible situation of excited delirium?

A.   Yes.  We were trained that it was a medical -- the person had medical need to get to the hospital in order to be able to be calmed down, that they would more than likely be unable to just be deescalated in a normal fashion as we do in a significant amount of calls we have.

        So it would be a very different situation than we're kind of normally used to, and that person's level of agitation would be abnormal.

Page 56

Q.   So what then were you trained to do if there was a person who appeared to be having excited delirium?

A.   Attempt to get them down to the hospital.

Q.   Did the doctor explain to you what might happen if you try to restrain a person who is in that excited delirium situation?

A.   Yes.  Sometimes they can have -- most of these situations that he spoke of and showed videos of, the individual ended up on the ground and being handcuffed.

Q.   And what happened then?

A.   It depends on -- some of these situations were different, but oftentimes the person had difficulty breathing.

        I've seen situations where the officers were on top of this individual because the individual continued to fight, and some of them people died.

Q.   Some people die in police custody because of excited delirium, correct?

A.   Yes.

Q.   How were you trained to prevent that from happening?

A.   To when a individual is handcuffed, as soon as

Estate of Robert Miller vs
Sean Roycroft et al.

Spencer Jackson
March 24, 2022

Page 57

reasonably possible, put them in the recovery position, and as soon as they stop fighting and you are able to get in control of them, again, recovery position, so they can breathe, don't put weight on their back, and make sure they get down to the hospital.

Q. If a person is lying on the ground facedown with their arms underneath them, how could they fight with you?

A. They could kick, they could have a weapon in their hands, they could flail away from you, they could get up and attack you.

Q. So in that situation if a person is on the ground, their hands are underneath them, if they're having difficulty breathing, did you learn they would try to get up, so they could get air into their diaphragm and breathe?

A. I don't recall that specifically.

Q. Do you understand that from your own common knowledge that if somebody is having difficulty breathing, they will struggle in order to get air into their lungs?

A. Potentially, yes.

Q. And if you have someone on the ground and you're

Page 58

trying to handcuff them, their hands are underneath them, would it be appropriate for you if the person is trying to push up to push back down on them?

A. Depends on the situation.

Q. Well, if you're trying to get their arms from underneath them and they're trying too push up, would that be viewed as you used the term "fighting"?

A. No, I wouldn't consider that fighting.

Q. Okay. Now we'll actually talk about the incident.

A. Sure.

Q. Okay. First of all, did you know Robert Miller before this incident?

A. I did not.

Q. Oh, I see you taking a drink. I didn't say, but if you need a break for any reason, you want to drink, eat, go to the bathroom, just let me know, and you can have a break, okay?

A. Cool.

Q. Good.

A. I'm okay for now.

Q. Okay. Had you ever been to that building at 45 Elm Street in Hyannis before?

A. No.

Page 59

Q. Did you know Amy Anderson?

A. I do not.

Q. Okay. Before you got to 45 Elm Street, what information did you have?

A. That a female had called and reported that a male party at that address was having a psychotic break.

Q. How would that call be classified?

A. A mental health emergency.

Q. Were you dispatched as well as Officer Roycroft?

A. Yes.

Q. Okay. How long after Officer Roycroft arrived did you arrive?

A. I'd estimate about a minute.

Q. And what is the basis of that estimation?

A. In the aftermath of it, I explained to Officer Roycroft where I was when the call went out, and Officer Roycroft explained where he was when the call was originally dispatched, and I believe it was about a minute.

Again, it's an estimation that he probably arrived before I did.

Q. Okay. And what happened when you first arrived at the building at 45 Elm Street?

A. So I parked my cruiser on Elm on the right side of

Page 60

the road before the house and I exited my cruiser and I looked at the house and walked up the left side of the house. As I --

Q. Stop there. When you say the left, if you were facing the house, you went off to the left?

A. To the left side, yes.

Q. Okay.

A. And as I walked alongside the left side of the house, I got to the back corner of the house, and about that time I heard a loud crash that came from inside the house.

And as I walked around the corner of the house or observed around the corner of the house, the slider door, the glass slider door, came out of the frame and fell flat on the deck, the entire door, wooden frame, everything.

Q. Okay. So you saw that fall?

A. Yes.

Q. Okay. And did you later learn that the frame had been rotted?

A. Yes.

Q. Okay. So after you saw that fall, what did you do?

A. I stepped on the deck and looked in the open door, open doorway, and I observed Sean Roycroft on the

Estate of Robert Miller vs
Sean Roycroft et al.

Spencer Jackson
March 24, 2022

Page 61

backside of a male, and Sean's arm were over the male's shoulder, and the male was flailing side to side as he walked. They were both facing away from me and walking towards the front of the house.

Q. Okay. Let me stop you for a second there.

A. Sure.

Q. So you heard the crash, and at that point you got onto the deck, right?

A. Yes.

Q. And then once you were on the deck, you were able to see Officer Roycroft?

A. Yes.

Q. Okay. So how long after you heard the crash was it when you first saw Officer Roycroft?

A. Estimation, three seconds, five seconds max.

Q. And so after that three to five seconds, Officer Roycroft already had Mr. Miller in what we'll call the seat belt hold?

A. Yes.

Q. Had you heard anyone saying anything up till that point?

A. No.

Q. Now, once you saw Officer Roycroft, he's got Mr. Miller in that seat belt hold, what happened?

Page 62

A. They were walking away from me towards the front of the house. They took I'd estimate three or four steps, and then they fell both facedown into that office room in the front of the house.

Q. Okay. So they were walking away from you, when you say towards the front of the house, are you referring to the, like, where the front door is?

A. Yes, street side.

Q. Okay. And the office is also at the front of the house; is that correct?

A. I'm sorry, say that again.

Q. The area that they ended up in is towards the front of the house, correct?

A. The office, yes, yes.

Q. Do you have a printed copy of the diagram that's Exhibit 9?

A. I do.

Q. Okay. Now, usually of course we do this in person, it's a lot easier. But, actually, I'm going to ask you to draw some things.

And first I'd ask, if you look at Exhibit 9, obviously not to scale, but does this look like in general the layout of the home at 45 Elm Street?

A. From what I can remember, yes.

Page 63

Q. Okay. So where it says towards the top, back deck, that's where you first came in, correct?

A. Yep.

Q. And that very thick black line there by the dining room, that would be where the slider was?

A. Yes.

Q. Okay. First can you draw on here where the table was?

A. Basically circling that dining room -- this is an estimate, but it was about somewhere -- let's see if I can get this --

Q. Okay. Thank you.

A. Somewhere around there.

Q. And then you saw the two of them -- Mr. Miller came off of the table, correct?

A. I did not see Mr. Miller on the table.

Q. Okay. So when you first saw him, he was already off the table?

A. Correct.

Q. And that was within three to five seconds, correct? I mean, you hear the slider bang, and it's three to five seconds -- three and no more than five seconds when you actually see the two of them, right?

A. Yes.

Page 64

Q. Okay. And then when you see them, they're already off the table, you don't see them on the table at all?

A. Correct. They're standing.

Q. Okay. And so now we have Officer Roycroft is holding Mr. Miller from behind, correct?

A. Yes.

Q. And you didn't see Mr. Miller strike Officer Roycroft at this point, correct?

A. Correct.

Q. And up to this point, had you heard Officer Roycroft say anything to Mr. Miller?

A. No.

Q. Okay. And then they started to move towards the front of the house?

A. Yes.

Q. Okay. And that would be from the dining room towards where it says office?

A. Yes.

Q. Okay. What happened at that point?

A. So, again, as they move towards the office, it was a few steps, and then both of them fell forward and landed facedown in the office.

Q. So facedown we have first Mr. Miller and then we

Page 65

have Officer Roycroft, correct?

A. Correct.

Q. Okay. And could you draw in there, like, usually they're stick figures, just to show where their head and feet would be in the office?

A. Sure.

MS. GILL: Howard, would you like him to draw both figures on there?

Q. Well, is one on top of the other, or is -- if you can draw both, that would be great, but I want to get the sense of where the head and feet were basically at this point?

A. This is --

Q. We know you're not an artist, don't worry.

A. The feet figure art isn't great, but I'll try to break this down, and this is through destination, that's if I can do --

Q. So you got two stick figures side by side?

A. (Inaudible.)

Q. I can't hear you when you're that far away from your mic. There you go.

A. So Robert Miller would be the top figure in the center of the room -- (inaudible).

Q. I think the paper might be blocking your

Page 66

microphone. I see it though. Okay.

A. So Robert Miller would be in the center of the room and Sean Roycroft was off to his left side.

Q. So he was no longer -- he no longer had him in the seat belt hold?

A. He still was in that hold.

Q. Okay.

A. Sean's arm was over his right shoulder.

Q. And Sean's left arm would be underneath Mr. Miller's body?

A. Correct.

Q. Okay. So part of Officer Roycroft's body would be on top of Mr. Miller, correct?

A. Part of his arm, shoulder, yes.

Q. Well, his arm is underneath --

A. Correct.

Q. -- so, therefore, part of his chest area would have to be on top of Mr. Miller because his left arm is trapped, I guess, underneath it, right?

A. Yes.

MS. GILL: Objection.

Q. And when we say his arm was trapped, that's because Officer Roycroft had put his left arm underneath Mr. Miller's body, correct?

Page 67

A. Initially, yes.

Q. And had Officer Roycroft continued to be holding the two hands together as you described earlier?

A. I don't know.

Q. Could you see his right arm?

A. Officer Roycroft?

Q. Yes.

A. Part of it, yes.

Q. Part of it?

A. Yes.

Q. Okay. What part did you see?

A. I don't recall exactly. The upper part of it.

Q. Okay. Was the lower part of it underneath Mr. Miller at that point?

A. I believe probably forearm, yes.

Q. Okay. Now, did you see Amy Anderson in the building at this point?

A. Yes. When I was walking towards Sean and Mr. Miller, I observed a female to the left side of -- basically inside the living room, somewhere in the living room standing there looking at us, looking at me as I walked in through the kitchen -- I'm sorry, the back.

Q. You know what's coming up next. I'd like to see if

Page 68

you could put Ms. Anderson in there?

A. Sure.

Q. If you just want to draw a circle to show where she was standing, and then if you could put her initials AA?

A. It was, again, an estimate, but somewhere in this area (indicating).

Q. Okay. So you can put it down now. So she was inside the living room and not in the doorway, but a little bit back at this point?

A. She was recessed in the room a bit, yes.

Q. Okay. And why don't we since we're putting initials for the two stick figures, can you put RM for Mr. Miller and SR for Officer Roycroft?

A. (Witness complies.) Okay.

MS. GILL: Can I see the notation you just made?

A. Sure.

MS. GILL: Thank you.

Q. Now, you've drawn on Exhibit 9, could you sign and date that?

A. (Witness complies.) Okay.

Q. Could you tell what caused them to end up on the

Estate of Robert Miller vs
Sean Roycroft et al.

Spencer Jackson
March 24, 2022

Page 69

floor in the office?

A. No.

Q. Okay. When you first saw them there, did you see -- had you ever had a chance to see anything in Mr. Miller's hands?

A. No.

Q. Okay. What happened once the two of them ended up on the floor of that office area?

A. So as I entered, again, I saw Amy Anderson to my left side. As I was walking forward, I saw kind of peripheral vision, I saw a bag of golf clubs in the front -- I'm sorry, to the right side of that office.

And then I walked up to Sean and I put my hand on his shoulder and I said, hey, Sean I'm right here, I'm right behind you.

Q. Okay. What did you do next?

A. From there I attempted to control Mr. Miller's right arm, and Mr. Miller was kicking his feet and twist -- trying to twist his hips and he was pulling away from my control, my ability to secure his arm.

Q. Did you have some discussion with Officer Roycroft about what your plan was going to be?

Page 70

A. Yes. Officer Roycroft -- I mentioned to Officer Roycroft, I asked him if I should use my taser.

Q. Okay. Did you ask him what the plan was going to be --

A. No.

Q. No. So you didn't say, I'll take this side or -- no discussion of how you were going to work together as partners at this point?

A. No. His right side was exposed and we were in a very tight, small area, and, you know, I observed his right arm and that was my -- the place for me to try to get control of him.

Q. Okay. So you thought first of using a taser to control him?

A. Potentially.

Q. Okay. Now, you were not going to use the taser by shooting out darts, correct?

A. Correct.

Q. Because you can't do that when you're that close, right?

A. The taser would not be very effective if I probe deployed it from a short distance away.

Q. Yeah. So to use a taser, you would have to take off the unit at the top and use it in drive stun

Page 71

mode?

A. Exactly, yes.

Q. And in drive stun mode, it won't, like, have a -- what a taser ordinarily does, it wouldn't, like, paralyze the person's muscles, it would just be painful, right?

A. Correct.

Q. Okay. And Officer Roycroft told you not to use the taser?

A. Yes.

Q. Okay. What other conversation did you have with Officer Roycroft?

A. So Officer Roycroft said -- made a statement that I think he's got something in his hands.

Q. Had you seen anything in Mr. Miller's hands?

A. I did not.

Q. Okay. And did Officer Roycroft tell you anything other than I think he's got something in his hands?

A. Not that I can recall. I just remember that specific statement from Sean.

Q. Did Mr. Miller ever have anything in his hands?

MS. GILL: Objection.

A. When we were able to get control of his hands, he did not have anything in his hands.

Page 72

Q. Did you find anything that he had left there that he had had in hands earlier?

A. There was a golf club underneath of his body.

Q. When you first saw the two of them, was Mr. Miller holding a golf club?

A. Not that I could see.

Q. This would be a regulation golf club, it's not a toy golf club, right?

A. Correct, it was a golf club.

Q. So if he was holding a golf club, it would be long enough that you would have seen it, correct?

A. It might have been.

Q. Well, did you learn that the golf club had been on the floor in the office next to the bag of golf clubs?

A. In the aftermath of it, that's where it was. I don't know if he had retrieved it, I'm unsure. But when we moved him, there was a golf club underneath his body, and I saw it during the -- my initial interaction with them I could see it.

Q. So you're not sure whether he was holding the golf club at the point when Officer Roycroft put Mr. Miller in the seat belt hold; is that right?

A. I'm unsure of that, yes.

Page 73

Q. Okay. You think he might have had a golf club then?

A. Potentially.

Q. What causes you to think he might have had a golf club?

A. Because it ended up underneath of his body.

Q. And you think you might not have noticed that he was holding a golf club as Officer Roycroft was maneuvering him down to the office area?

A. I did not see one, no.

Q. Okay. Did you have any reason to think that Mr. Miller had something in his hands other than Officer Roycroft saying that he might have something in his hands?

A. Aside from seeing -- I saw the golf club underneath him, so that in addition to Officer Roycroft saying I think he has something in his hands.

Q. When Mr. Miller went to the ground, Officer Roycroft went down, and he was partially on top of him because his left arm was underneath Mr. Miller, correct?

A. Yep.

Q. And so you think that Mr. Miller may have when he went down, as he was going down, grabbed the golf

Page 74

club, would that have been possible?

A. I don't know. They fell very fast, so I'm not sure.

Q. Okay. After you asked about tasing, what happened next?

A. So in my head I ruled out the taser very quickly for a couple of different reasons, but it wasn't an effective tool at that time given my positioning and location and everything like that, so I decided not to use it.

Q. Okay. You're not going to use the taser. What happened then?

A. So how my body position was on the right side of Miller's body, I looked down and I could see the right portion of Mr. Miller's stomach, and I struck Mr. Miller in the area below his -- basically below his probably bottom rib and above his hip.

Q. When you say you struck him, what you wrote in your initial report was you punched him, correct?

A. Yes.

Q. Was that a technique that you had learned?

A. Yes.

Q. When did you learn that?

A. In the police academy, use of force training.

Page 75

Q. What was the purpose of punching him?

A. The purpose of punching him was distraction technique in order to remove his hands from underneath his body, because all attempts to remove his hands from underneath his body were not successful at that point.

Q. Okay. How long had you been trying to get his hands from under his body at this point before you punched him the first time?

A. Estimation, 30 seconds.

Q. And what were you doing to try to get his hands from under his body?

A. I was trying to pull his right arm, and I was unable to move it pretty much at all. I was a little -- I expected to be able to remove it, and it didn't happen.

Q. Okay. So you were trying to lift his body up, so you could pull the right arm out from underneath him?

A. No. I was trying to pull his right arm to his right to remove his arm.

Q. What part of his body were you holding to try to remove his right arm?

A. Just his right arm.

Page 76

Q. So you were holding onto his bicep, his elbow, what --

A. I believe it was, like, wrapped around his arm, both hands pulling to the side.

Q. You had both hands wrapped around what part of his arm?

A. His bicep, lower bicep, I believe.

Q. Okay. What was Officer Roycroft doing while you were doing that?

A. He was still in the same position that he was in, and Sean was -- appeared to be kind of trapped underneath Mr. Miller.

His left arm was underneath of Mr. Miller's left arm, and he was just kind of in that position.

Q. So was he trying to get his left arm out from underneath Mr. Miller?

A. He moved positions and then was trying to remove his left arm.

Q. When you first punched Mr. Miller, what did he do?

A. He groaned, he made a moaning noise, and I was able to immediately thereafter get movement of his right arm.

Q. Would you say moan as if he felt pain from your

Estate of Robert Miller vs
Sean Roycroft et al.

Spencer Jackson
March 24, 2022

Page 77

having punched him?

A. Correct.

Q. Okay. So you got some movement at that point you say?

A. Yes.

Q. Okay. And you were trying to get the weight of his body off of his arm, so you would pull it out, yes?

A. I was focused on -- I was unable to lift him up. I was focusing on drawing his arm out from underneath him.

Q. Had you tried to lift him up?

A. No.

Q. So after you struck him with the first punch, what happened?

A. So his arm came most of the way out from underneath him, and to the point where I could -- I believe I could see, like, almost his wrist, and then from there he twisted his body to the right and was able to pull his right arm back underneath him again, and he raised the left side of his body towards Officer Roycroft.

Q. And you could see almost to his wrist, did you see anything, any objects that were underneath him or that he was holding?

Page 78

A. At that time, no.

Q. And so he was now, his left side was up where Officer Roycroft was; is that right?

A. It had pivoted towards him.

Q. Yeah. And what happened then?

A. And I was concerned that at that time that if he did have a weapon in his hand that Sean might get stabbed or cut if it was a knife or an object like that.

Because of his body movement, I didn't know if his left arm had gotten free because of after he was able to move. But I had noticed that Sean, he was wearing his radio mic on his shoulder, and I noticed that Sean was basically compressing the radio mic against the top of his shoulder and his head.

Q. And did that cause a transmission to be made?

A. Yes.

Q. Okay. How long had you been in that office area before that happened?

A. A short time.

Q. Can you estimate? No?

A. Forty-five seconds total -- actually, probably less in the office area, maybe 30 seconds. It was

Page 79

quick.

Q. Okay. So it was 30 seconds that -- you said you were concerned he might be cut, what led you to believe that Mr. Miller had a knife or any kind of cutting implement in his hands?

A. Because I was concerned that Sean's statement was that he thinks he had something in his hands, and edged weapons are household items, and I was concerned that that might be something that he has in his possession.

Q. Okay. And after that, after you had already -- you punched Mr. Miller and almost got his arm out, what happened then?

A. So I was able to hold control of Mr. Miller's right arm, and I got on the radio to notify dispatch, and as I did that, I believe that dispatch called us, because they heard Sean's microphone transmitting, they said over the radio, 236 -- something along the lines of 236, checking your status. That was Sean's cruiser number and radio call sign for that evening.

So from there I transmitted that we'll take another car. We're fighting with him.

Q. All right. So did you say, yeah, another car here,

Page 80

we're fighting with him?

A. Yes.

Q. Okay. When you say fighting with him, is that what you just described, trying to get his arms out from under him and him trying to get his arms back underneath?

A. And him flailing and kicking, yeah.

Q. Now, was he flailing his arms?

A. No. His feet.

Q. Okay. He was flailing his feet?

A. He was kicking up, kicking out to the side.

Q. Okay. Where did he kick you?

A. I'm not saying he kicked me, that I can remember, but his feet were actively kicking back and forth.

Q. Okay. Did he kick Officer Roycroft?

A. Not that I can recall.

Q. Okay. So you said you were fighting with him, now he's on the ground, you are -- you and Officer Roycroft are right there.

Other than moving his feet and not hitting anyone, how was Mr. Miller fighting with you?

A. He was not following commands. He was pulling away from our control. We had given him several

Page 81

commands. I remember specifically telling him to relax, calm down, you know, put your hands behind your back.

We weren't screaming at him. It was just, you know, we were trying to deescalate the situation as we were in the situation.

Q. So you were on top of him pulling at him, and you were telling him relax in a calm normal voice?

A. As calm as I could.

Q. All right. But you weren't very calm, because you now, as you say, fighting with him, right?

A. I was relatively calm for the situation, and with the radio transmission I put out, it was I think in the same tone and calmness as I was speaking with Mr. Miller at that point.

Q. All right. Had you heard Mr. Miller say anything up to this point?

A. Nothing, no.

Q. No. And you felt that he — you came there because you thought he was psychotic, right?

A. That was the initial call, yes.

Q. And now you expected that if you gave him commands or told him to relax that that would cause him to relax?

Page 82

A. I was hoping it would.

Q. Okay. And what did you do next?

A. From there after I got off the radio, I looked down and could see the same side of the right side of his stomach, and I delivered another strike to Miller's right side of his stomach.

Q. So you punched him again in his stomach?

A. Yes.

Q. And what happened when you punched him in the stomach?

A. He made another groaning noise, and, again, I was able to remove his arm and pull it away from -- well, you know, pull his hand underneath his body and was able to get his arm around the side of his stomach and lift his arm behind his back in an attempt to place handcuffs on him.

Q. Okay. And did you take out your handcuffs?

A. Yes. As soon as I got control of his right arm, yes.

Q. So you cuffed his right arm?

A. Yes.

Q. And what happened then?

A. And Sean was able to get control of his left arm and brought his left arm close to his right arm,

Page 83

and I was able to apply the handcuffs to his left arm.

Q. Okay. And he's still now in the facedown position on his stomach, yes?

A. Yes.

Q. Okay. And after he was handcuffed, what did you do?

A. So I double locked the handcuffs.

Q. When you say double locked, what do you mean by that?

A. So there's a feature on the handcuffs, you have to use a cuff key to -- when you get the sizing of the handcuffs correct, you double lock them, so they won't get any tighter.

Q. Okay. So you took out your key and you double locked it?

A. Correct.

Q. Okay. What did you do then?

A. I kind of postured up, and I looked to the right and I observed Amy Anderson kind of peering around the corner.

Q. So was she now closer to that doorway as you look forward?

A. Yes. A bit, yes.

Page 84

Q. Okay. What happened when you saw Amy Anderson?

A. And I asked her -- I basically asked her what is his deal? I asked her is he intoxicated with alcohol or narcotics, just to try to get some information on, you know, his status.

Q. Were you now kneeling or standing up?

A. The whole time that I was on the right side of Miller, I was in basically a lunge position. I stayed in that position the whole time.

Q. Did you say lunge position?

A. Yes.

Q. What do you mean by that?

A. So similar position if you were going to take a forward step lunge. My right foot was on the ground, my knee was basically -- right knee would have been give or take 90 degrees, and then my left leg was -- my knee was on the ground, and I guess you could say my left toe was, like, on the ground, so body position like that.

Q. Okay.

A. And that's -- go ahead.

Q. What conversation did you have with Amy?

A. So she replied that as far as she knew, he was not on any narcotics or intoxicated with alcohol. She

Page 85

said that he was having some sort of psychotic break.

Q. Okay. Any other conversation with her?

A. During that time, no.

Q. Okay. What happened then?

A. So I turn around and I observe Sean Roycroft -- well, I heard Sean Roycroft, he said, hey, I don't think he's breathing, we need to take the cuffs off.

Q. Okay. And had Officer Roycroft put Mr. Miller in the recovery position at that point?

A. Not yet.

Q. Okay. Was Officer Roycroft standing up?

A. I don't recall his body position at that point.

Q. Okay. Now, up to this point, had you heard Robert Miller say I can't breathe?

A. No.

Q. Did you hear anyone have a conversation with Amy Anderson where she asked someone, can he breathe?

A. No.

Q. Did you hear Robert Miller say, Amy, help me or help me?

A. No, didn't happen.

Q. Now, you were interviewed by the state police

Page 86

sometime in May, correct?

A. Yes.

Q. Almost a month and a half after the incident, right?

A. Correct.

Q. Okay. Amy Anderson was interviewed that very evening, correct?

A. Yes.

Q. Okay. And do you know that very evening, she said that essentially the last words Robert Miller spoke were "help me"?

MS. GILL: Objection.

Q. The question is if you know that? I don't know if you've read any other documents, for example?

A. No, I have never heard that.

MR. FRIEDMAN: Okay. Let's take a break here just -- well, I don't think it's time for lunch, but just people can go to the bathroom, have a drink, come back at noon, about ten minutes.

MS. GILL: Before we go off the record, if you don't mind, I just want to put my objection to Exhibit 9 on the record, so I don't forget later. Okay. Thanks.

MR. FRIEDMAN: Okay. And do you want to

Page 87

say the basis of that objection?

MS. GILL: I mean, I -- it's not clear to me whether that diagram is accurate in terms of ratio or scale, what it's based on, so I can ask -- you know, we can work out those details later. But essentially that's --

MR. FRIEDMAN: All right. Well, your objection is --

MS. GILL: -- if it accurately depicts the floor plan at 45 Elm.

MR. FRIEDMAN: Your objection is duly noted.

MS. GILL: Thank you. All right. How much time?

MR. FRIEDMAN: So let's take a break.

(A short break was taken.)

Q. Okay. We're back on the record, Officer Jackson. Just before we stopped, you were describing this lunge position that you were in?

A. Yes.

Q. I have to confess, I couldn't quite get a visual picture in my mind. Could you go over that again, so I could understand it?

A. So my right foot would be on the ground, my right

Page 88

knee would be bent at an angle around 90 degrees, give or take, and my left leg was behind my right, knee was on the ground and my toes were on the ground, left foot.

Q. So both knees are on the ground?

A. No. My right foot would be on the ground.

Q. And your left knee?

A. And my left knee, yes.

Q. Okay. And which way would your shoulders be facing?

A. Forward towards Robert Miller.

Q. So --

A. My shoulders would be facing my forward knee.

Q. Okay. Because I know it's a fairly small space, so I'm trying to understand how you could -- if your shoulder is facing -- is your body twisted, so that your legs are going in one direction and your body is facing Mr. Miller?

A. Basically, I was pulling Mr. Miller's arm which was underneath -- you know, in between in front of my hips, and I was in that position because the room was so small.

I mean, it's kind of -- it is what a -- it kind of was what it was.

Estate of Robert Miller vs
Sean Roycroft et al.

Spencer Jackson
March 24, 2022

Page 89

Q. Okay. Were you ever applying any pressure to Mr. Miller's body?

A. No, no, not downward motion.

Q. Were you ever trying to lift his body up?

A. I was trying to pull his arm, and I think his body was obviously moving as part of the dynamic of that motion. But specifically raising him up, no.

Q. If you had heard Mr. Miller say I can't breathe, what would be your response as a police officer in that situation?

A. If I had heard that -- I did not hear that -- but if I had heard that, I would have done what I could have done to help him breathe.

Q. What would that be?

A. My focal point at that time was -- I mean, during the fight was getting his hands under control for the safety concerns that were -- we believed he had a weapon.

But if he had said that he couldn't breathe, I would have certainly dealt with that.

Q. You continually use the word "fight", did Mr. Miller ever punch you?

A. No.

Q. Did he kick you?

Page 90

A. Not that I can remember, no.

Q. Did he strike you in any way?

A. Nope.

Q. Did you see Mr. Miller punch or kick Officer Roycroft?

A. No.

Q. Did he strike Officer Roycroft?

A. Not that I could see, no.

Q. So when you say Mr. Miller was fighting, he was fighting because he wasn't -- you couldn't get his arms out from underneath him; is that right?

A. He was fighting our abilities to get him under control.

Q. He wasn't giving up his arms?

A. Right.

Q. Okay.

A. He was forcefully pulling away from our attempts to get control of him.

Q. Well, when you say forcefully, you were pulling on his arm and he was resisting your pulling; is that right?

A. He was pulling back.

Q. Right. He was trying to keep his arms under him, you were pulling his arms away from him --

Page 91

A. Correct.

Q. -- that was the fighting that he did?

A. Part of it, yes.

Q. Okay. What other things did he do that you define as fighting?

A. His legs were kicking and flailing, I believe probably in an attempt to strike us or get us off of him.

Q. Okay. Stop there. So his legs were not only kicking, they were also flailing?

A. They were kicking back and forth, and I remember them just, you know, kicking to the side, kicking back and forth.

Q. Not striking anybody, right?

A. Not that I can recall.

Q. Okay.

A. My focus wasn't really on his feet, but I remember them kicking back and forth.

Q. You remember that, but you weren't looking at his feet, correct?

A. I was not.

Q. But you remember they were kicking without hitting anything?

A. I don't recall if they specifically hit me or not,

Page 92

they certainly could have.

Q. Okay. Now, we've looked at the diagram. Now what we're going to do is look at some of the photographs.

A. Sure.

Q. And do you have them in front of you or no?

A. No.

Q. Okay. Before we do that, obviously you've drawn on that diagram, that's going to be an exhibit. So if you could scan that or make a copy of that and forward it to your lawyer that would be --

A. Sure.

Q. -- terrific, at the end of the deposition obviously. Thanks.

MR. FRIEDMAN: So, Carmen, can we start this -- let's see -- with Exhibit 12.

Q. Okay. Now, you've seen Exhibit 12 before, yes?

A. Yes.

Q. Okay. And this shows the open doorway, is that the entryway in which you came into the building?

A. Yes.

Q. Okay. There's a chair there, a wooden chair, was that chair there when you came in?

A. I don't recall seeing the wooden chair when I came

Page 93

in.

Q. Okay. We see a table, and it looks to be kind of an oval table, it's sort of at an angle, correct?

A. Yes.

Q. Okay. Is that the position it was in when you came in?

A. I remember glancing at a table, but I can't tell you exactly if that's the exact position.

Q. Okay. And when you first came in, was Officer Roycroft and Mr. Miller, were they already standing up?

A. Yes.

Q. Okay. So you see that if you look at the table, it looks like there's one section that's pushed in further right in the middle?

A. Right.

Q. That's the way it was, I guess, when you got there, yes?

A. I don't recall that --

Q. Okay.

A. -- details of the table.

Q. So you don't know what part of the table Mr. Miller's body was on at any point; is that right?

Page 94

A. Correct.

MR. FRIEDMAN: Okay. Now, why don't we go to Exhibit 11.

Q. Okay. Now, Exhibit 11, this shows the office area, correct?

A. Yes.

Q. And we can see the table still in the position it was in in the first photograph we saw, right?

A. Yes.

Q. Okay. And we see two entryways in this photograph, I believe it was taken by the state police. We see someone -- the leg of a person wearing jeans. Am I correct that Amy Andersson was towards that second opening?

A. So when I came in, I believe I saw her -- I don't know what opening I saw her in, but I believe it was probably the first one; and, again, she was somewhere recessed in this room off to the left.

Q. Okay. And is that where she stayed, or did she end up at towards that other opening?

A. So when I saw her when I initially went in, she was deeper into the room, and then at the end of the altercation, I looked back, and, again, pivoted to the right, and I observed her kind of peering

Page 95

around that corner, so I believe that she walked forward a bit.

Q. When you say that corner, the same opening where the blue jean leg is or the one closer up?

A. The one closer up to the office.

Q. Okay. So during your interaction with Mr. Miller, it appears that Amy Anderson moved closer to where the two of you were, right?

A. Yes.

Q. By the time Officer Shaw arrived, Mr. Miller was no longer breathing; is that correct?

A. By the time Officer Shaw arrived?

Q. Yes. Well, who was first, Shaw or Ruggieri?

A. I believe Officer Shaw was there first.

MR. FRIEDMAN: Okay. Carmen, you can take this photo down. Thank you.

Q. Okay. So Shaw arrived first, and he had been called before Mr. Miller stopped breathing, correct?

A. Yes, dispatch called him, yes.

Q. Okay. But by the time he arrived, Mr. Miller is no longer breathing, right?

A. Around that time.

Q. Okay.

Page 96

A. I can't say exactly when that happened and where Shaw was.

Q. What conversation was had with Officer Shaw when he arrives?

A. I advised Officer Shaw to get a med bag.

Q. Okay. And then did he leave to go get that?

A. I believe that Officer Shaw told Officer Ruggieri to get a med bag.

Q. Okay. What did Officer Shaw do at that point?

A. I don't recall exactly what he did.

Q. What was Officer Roycroft doing?

A. So we had removed the cuffs, the handcuffs, immediately after Officer Roycroft did his assessment of him and told me that he's not breathing.

Q. Okay. So to remove the handcuffs, did you have to place him back on his back?

A. He was on his back -- I'm sorry, he was on his stomach.

Q. Yes.

A. And the handcuffs were removed when he was in that position. If he was in any other position, if he was laying on his side, I wouldn't have been able to get under him to remove the handcuffs.

Page 97

Q.   So he was not in the recovery position when you were removing the handcuffs, correct?

A.   No. He was put in the recovery position immediately after the handcuffs were removed.

Q.   Okay. And he was put in the recovery position by Officer Roycroft or by you?

A.   Both of us.

Q.   Are you trying to first uncuff someone before you can get them into the recovery position?

A.   I believe so, yes.
     We wanted to free up his arms to keep him from being restricted, breathing, allow him to breathe with us again.

Q.   Can you explain that? How would uncuffing his hands allow him to breathe better?

A.   Because at times being handcuffed can cause somebody difficulty breathing if they have other things going on.

Q.   I didn't get the last thing you said, I was --

A.   If they have other things going on, it can restrict them essentially.

Q.   So after Officer Shaw and Ruggieri arrived, who showed up next?

A.   Hyannis Fire Department personnel.

Page 98

Q.   Who were they?

A.   Vicki Yefko was there. I don't remember the other names involved, but I believe a total of four initially in an ambulance, and then I'm unsure from there.

Q.   Okay. And, you know, I'm not from the Cape, so it's a little hard for me to understand.

A.   Sure.

Q.   Are the ambulance people working for the same people you work for, or you work for the county, and they work for the town? How does that work?

A.   No. With the Town of Barnstable there's seven different villages within the Town of Barnstable, Hyannis is one of those villages, and because this incident occurred in the village of Hyannis, the Hyannis Fire Department was dispatched.

Q.   So police cover all the villages, fire departments cover individual villages?

A.   Yes.

Q.   So I know we went over this, but did you provide information to the EMTs or paramedics when they arrived?

A.   To somebody. I believe I spoke with somebody, with the fire department, I don't remember exactly who

Page 99

that was.

Q.   Okay. Did Officer Roycroft also speak to somebody from the fire department, or were you the person --

A.   I don't -- I'm not sure if Sean did that or not.

Q.   Well, before the fire department arrived, was somebody using a bag or doing some things to try to revive Mr. Miller?

A.   We were, yes.

Q.   When you say we, who would that be?

A.   The police officers involved: Myself, Officer Roycroft, and Officer Ruggieri.

Q.   Okay. So you were in that office area with him, the three of you?

A.   Correct.

Q.   And so one of the three of you, I assume would probably be either you or Officer Roycroft, would have been the person to provide a history to the EMTs when they arrived?

A.   Yes.

Q.   Okay. And you understand that for medical purposes, the history you provide to the emergency medical personnel is very important because that can affect the treatments that they use, correct?

A.   Correct.

Page 100

Q.   All right. Now, you had a defibrillator from the police department; is that correct?

A.   Yes.

Q.   Okay. And you tried to use that, or when I say you, collectively?

A.   Officer Ruggieri did that, yes.

Q.   Okay. And you were there?

A.   Yes.

Q.   And it said no shock, correct?

A.   Yes, it advised a no shock advice.

Q.   Do you know why that was?

A.   That the defibrillator wasn't necessary after it scans the assessment of the patient.

Q.   Have you heard of the term "PEA" or "pulseless electrical activity"?

A.   No, not that I can recall.

Q.   All right. Well, supposedly it's theoretically a heart rhythm, but it's one in which you can't use a defibrillator to get the heart back into rhythm.

A.   Okay.

Q.   Did you ever learn that Mr. Miller was in pulseless electrical activity?

A.   No.

Q.   Do you know what causes pulseless electrical

**Page 101**

activity?

A. I do not.

What is that term again?

Q. PEA, pulseless electrical activity. So they have no pulse, there's still electrical activity, but it's -- I'm not a doctor either -- I gather it's --

A. Neither am I.

Q. -- unorganized -- I mean, they start talking about the S waves, the T waves. I don't get quite that detailed. But sadly I've had other clients I guess in pulseless electrical activity.

Okay. Now, Robert Miller never threatened you, correct?

A. Verbally, no, no.

Q. Did he physically threaten you?

A. I believe his actions were an attempt to assault Officer Roycroft and I.

Q. When you say he had the intent to assault you, did you in coming to that analysis take into account the fact that he was psychotic at the time?

A. It was part of it.

Q. Would you say that someone who is suffering from a psychosis would be acting with an intent to harm someone?

**Page 102**

MS. GILL: Objection.

Q. You can answer. She didn't like the form of the question.

A. Sure. Potentially. They're not of sound mind, so they can have varying degrees of actions.

Q. Right. And you don't know whether he understood that you were police officers or whether he thought that you were some of the trees that came to life, right?

A. I can't say what was going on in his head during that time.

Q. But you know that he wasn't having rational thoughts at that time, correct?

A. I had very little information. Again, it was the psychotic break statement that came over the radio, that's all the information I had during that whole situation.

Q. Okay. Well, afterwards did you talk to Sean Roycroft about what happened before you got there?

A. Yes.

Q. Did he tell you that Mr. Miller was talking to nature?

A. Yes.

Q. Okay. And that's not normal, is it?

**Page 103**

A. No.

Q. No. And that would be consistent with what the call was for, someone having a psychotic break, right?

A. Yes.

Q. Okay. And if he's having a psychotic break, he can't necessarily have an intent, he doesn't really know what he's doing, correct?

A. He might, or we don't know.

Q. When you had Mr. Miller in that office area facedown, he was passively resisting, right, he was using his muscles to keep his hands underneath him as you were trying to pull them out from under him, right?

A. He was actively resisting.

Q. What was he doing that was active?

A. He was pulling away from our control. We were giving him clear concise verbal commands, again, to relax, to put his hands behind his back, and he was using physical energy to, again, kick, flail, pull his body away from us and pull his arms away from our control.

Q. At that point would you say that he had committed crimes?

**Page 104**

A. No.

Q. Why not?

A. I mean, based on the totality of the circumstances, I believe that he needed mental health help and that his actions -- Robert Miller's actions created a physical altercation which didn't have to.

Q. Have you talked to anyone to determine what caused Mr. Miller's death?

A. Not in detail. I haven't spoke with any doctors or anything like that, no.

Q. Well, amongst you officers, did you have a discussion with your superiors about what happened during this incident?

A. People had mentioned some of that to me, yes.

Q. What did they say?

A. I don't recall exactly what was said about it, but I know one of the doctors said the excited delirium thing.

Q. This is a doctor you spoke to?

A. I didn't speak with any doctors.

Q. Okay.

A. But that was -- somebody had mentioned that. Again, I don't remember who it was but...

Q. And excited delirium is something that happens with

Estate of Robert Miller vs
Sean Roycroft et al.

Spencer Jackson
March 24, 2022

Page 105

people who are in some sort of custody, did you learn that?

A. It can be in that situation, yes.

Q. Did you understand that in some way the actions you and Officer Roycroft took caused Mr. Miller's heart to stop?

MS. GILL: Objection.

A. Can you ask that question again?

Q. Did you come to understand that your actions in some way resulted or caused Mr. Miller's heart to stop?

A. I don't believe that our actions caused that to happen at that time.

Q. So do you believe that Mr. Miller's heart would have stopped if you had not gotten him down -- either you and Officer Roycroft had not gotten him onto the floor of his office area and then, as you would put it, fighting with him?

MS. GILL: Objection.

A. I can't say what would have happened to Mr. Miller if the situation would have went differently.

Q. Well, when you first saw him, did you think this guy looks like he might have a heart attack or his heart might stop beating, he looks physically ill?

Page 106

A. No.

MR. FRIEDMAN: Now, why don't we look at Exhibit 10.

Q. Okay. So here this is the area that you ended up in?

A. Yes.

Q. Okay. And you can see there is a golf club there, correct?

A. Right.

Q. It looks to me like a one iron, am I right, do you know?

A. I don't. It looks like an iron. I don't know what it is.

Q. Okay. Is that the position that it was in when you picked up Mr. Miller?

A. I don't know exactly what position it was in. I know that when I saw it underneath Mr. Miller, it was on the floor.

Q. Okay.

A. And, again, I saw the shaft of the golf club. I don't know the exact positioning.

Q. Mr. Miller's head was towards where you see the bag of golf clubs, right?

A. Correct.

Page 107

Q. Okay. Does this look like the scene where you were that evening?

A. Yes, pretty similar.

Q. Okay. And so the -- here we can see kind of a railing and then there's a one step down, is that the way it worked?

A. Yes.

Q. Okay. And you saw the two of them, Officer Roycroft and Mr. Miller, go down that step and end up on the ground in the position that you've described earlier, correct?

A. Yes.

Q. Okay. Now, you mentioned that at one point you made a radio call where you said something like they were fighting with him, correct?

A. Correct.

MR. FRIEDMAN: Let's take this photograph down, and what we're going to do is we're going play a portion of the radio transmissions.

Q. Have you listened to them by the way?

A. I have.

Q. Okay. And so you heard yourself?

A. Yes.

MR. FRIEDMAN: Okay. So, Carmen, why

Page 108

don't we play the one, and the time stamp is 205, the time itself is 19:11:52.

(Recording played.)

MR. FRIEDMAN: Okay. Now, you can take that down.

Q. Was that your voice saying, "Yeah, another car here. We're fighting with him"?

A. It was.

Q. And at that point were you out of breath?

A. No.

Q. No?

A. No.

Q. Was that the same tone of voice you were using and speaking to Mr. Miller?

A. I believe something similar to that, yes. I remained pretty calm during that whole thing.

Q. And Mr. Miller never responded to anything that you said; is that right?

A. Correct.

Q. The only response was the groan or the moan, I guess, when you punched him in his side?

A. Yes.

MR. FRIEDMAN: Okay. Why don't we take a break here and we'll come back and finish up

Page 109

hopefully before anybody gets hungry enough for lunch.

MS. GILL: All right.

MR. FRIEDMAN: Great.

(A short break was taken.)

Q.    Very few questions for you, sir.

First, did you have a chance to look at Exhibit 13, the dispatch log?

A.    Yes.

Q.    Okay. And that confirms that you arrived about one minute after Officer Roycroft, correct?

A.    Right.

Q.    Okay. Now, after this incident, did you have any discussions with your supervisors, superiors about things that could have been done differently in this situation?

A.    No, not that I can recall. I mean, we spoke about the situation, what happened and our actions to it, and I don't recall any specific people saying that we should have done something different.

Q.    No analysis to see whether you could do things differently if the situation occurred?

A.    Not that I can recall.

Q.    Okay. So I gather if you were confronted with the

Page 110

same situation, you would behave the same way that you did; is that correct?

A.    Yes, yep.

MR. FRIEDMAN: Okay. I have no other questions. You may inquire.

MS. GILL: All right.

EXAMINATION

BY MS. GILL:

Q.    Officer Jackson, you were asked a few questions earlier about some draft reports that you wrote related to this incident?

A.    Yes.

Q.    Is it common for your supervisor to review draft reports?

A.    It is, yes.

Q.    As the officer involved in the incident, are you typically the best source of information as to what happened at a particular call?

A.    Yes.

Q.    Okay. If your supervisor suggested information that did not comport with your memory and impressions from the scene, would you include it in your report?

MR. FRIEDMAN: Objection. You can answer

Page 111

of course.

A.    Can you just rephrase that question or ask that again?

Q.    If your supervisor were ever to suggest you include information in your incident report that was inconsistent with your memory of what happened at a particular scene, would you include that in your report?

A.    No, I wouldn't.

Q.    And is one of the reasons your supervisor reviews your reports to get a fresh set of eyes on it, and ensure that it makes sense to somebody who's reading it who wasn't on that call at that scene?

A.    Yes.

Q.    You were asked questions earlier about the EMTs who arrived at the scene and information that they may have obtained from Barnstable Police Officers.

In your experience, do EMTs obtain information from multiple people at a scene when they arrive?

A.    Usually, yes.

Q.    In addition to you, could the EMTs have -- or I should say in addition to asking you and Officer Roycroft what you observed, could the EMTs in this

Page 112

case have asked anyone else who was present on the scene what they observed?

A.    Officer Ruggieri was there and Officer Shaw was there, and I'm sure that they probably didn't know exactly who was on scene when this whole thing happened, so they could have been asking them as well.

Q.    And did Officer Shaw and Ruggieri to some extent participate in the resuscitative efforts on Mr. Miller?

A.    Officer Ruggieri did, yes.

Q.    And did Officer Shaw bring in any medical equipment or use a bag valve mask or deliver one?

A.    I believe he assisted in delivery of medical items, yes.

Q.    Okay. Do EMTs typically want to speak with anybody who participated in resuscitative efforts at a scene?

A.    Generally they just try to get information from anybody they can because time is of the essence, and they can just ask questions to anybody that's there.

Q.    And could the EMTs who responded to 45 Elm Street on April 16th, 2019, have asked other EMTs what

Estate of Robert Miller vs
Sean Roycroft et al.

Spencer Jackson
March 24, 2022

Page 113

they may have learned, or what they might have learned from their conversations with officers at the scene?

MR. FRIEDMAN: Objection.

A.   Yes.

Q.   The term "seat belt hold" has been used during your deposition today. Is the term "seat belt hold" a descriptive term that you understand today has been used to describe a hold where one arm is under the person's -- one side of their body under one arm and the other arm is over the other arm?

A.   Yes.

Q.   And did you observe Officer Roycroft to be holding Mr. Miller that way?

A.   Yes.

Q.   At any time when you observed Officer Roycroft to be holding Mr. Miller in that way, did you observe Officer Roycroft's hands or arms or any part of his body near Mr. Miller's neck?

A.   No.

Q.   Did you observe any part of Officer Roycroft's body to be near Mr. Miller's mouth or face?

A.   No.

Q.   Understanding that this seat belt hold is not a

Page 114

hold in which you have been trained, are there some circumstances in which you recognize that type of hold might be required or warranted?

A.   Absolutely.

Q.   Are you familiar with the term "tool of immediate means"?

A.   Yes.

Q.   I should say phrase rather.

A.   Sure.

Q.   What does the phrase "tool of immediate means" mean to you?

A.   That the officer is allowed to use a tool or object that he has in his possession during a use of force situation as a defensive weapon in order to combat the assailant or opposition.

Q.   And could a tool of immediate means also could that phrase also be used to describe a method of restraint that might not be something that the department or you aren't typically trained in?

A.   Yes, yes.

Q.   Can an officer's hands and arms also be considered tools of immediate means?

A.   Yes, I believe so.

Q.   When you're dealing with people who are

Page 115

experiencing a psychotic episode, are you trained that you shouldn't expect those people to behave in a predictable way?

A.   Yes.

Q.   And are you trained that by the very nature of their condition, the behavior or reactions of people experiencing psychotic episodes are unpredictable?

A.   Yes.

Q.   You were asked some questions earlier about the mental health intervention guidelines, and step one was to quickly assess the situation and secure the scene, do you remember that?

A.   I do.

Q.   In that policy at step one, is the word "quickly" a relative term in your mind?

A.   I believe so, yes.

Q.   And does it depend on the circumstances of that situation what quickly means?

A.   Yes.

Q.   At any point prior to Mr. Miller being handcuffed, had the situation at 45 Elm Street been assessed from your perspective at the time?

A.   I don't even think that there was time to make the

Page 116

scene safe.

I mean, it was initial assessment, a quick initial assessment that had a cascading effect that led us to the situation that we ended up in, but it was very quick.

Q.   And from your memory or in your memory, did you have any impression at the time you -- up until the time the handcuffs were on Mr. Miller that this situation had been fully assessed?

A.   No, no.

Q.   And even according to what you know now, would you say the situation had been assessed sufficient to consider step one of the mental health intervention guidelines completed?

A.   No.

Q.   At any point prior to Mr. Miller being handcuffed, in your mind had the situation or had the scene been secured?

A.   No.

Q.   And also according to what you know now, would you say that the scene had been secured at any point up until Mr. Miller was handcuffed?

A.   No.

Q.   We talked a little bit about Mr. Miller's and

Estate of Robert Miller vs
Sean Roycroft et al.

Spencer Jackson
March 24, 2022

Page 117

Officer Roycroft's positioning?

A. Yes.

Q. In particular after they fell to the floor, at any point after they fell to the floor, did you observe Officer Roycroft to be laying directly on top of Mr. Miller?

A. No.

Q. At any point did you observe Officer Roycroft to place a knee in Mr. Miller's back?

A. No.

Q. And at any point did you put your weight on Mr. Miller's back or torso?

A. No.

Q. And that would include your knee?

A. Yeah, I did not do that at any point during that.

Q. Regardless of whether you have been trained on certain medical terms describing situations where people are having trouble breathing or unable to breathe, have you been trained to recognize the signs and symptoms of a person who is having trouble breathing or is unable to breathe?

A. Yes, yep.

Q. And what signs are you aware of that indicate a person is either unable to breathe or having

Page 118

difficulty breathing?

A. Well, the terms we use agonal breathing, shortness of breath, gasping or panting, just anything elevated or reduction of a normal breathing rate.

Q. Would the complete absence of breath sounds also indicate that a person is unable to breathe?

A. Yes.

Q. And would a person's -- or would a change in a person's coloring also indicate that a person is having difficulty breathing or unable to breathe?

A. Yes.

Q. And that can include somebody turning red?

A. Yes.

Q. Would it also include somebody turning blue?

A. Eventually, yes.

Q. And would it also include somebody turning pale?

A. It could, yes.

Q. And people can also indicate verbally or with gestures that they are having trouble breathing, correct?

A. Yes.

Q. Did you observe any of those signs or symptoms that we just talked about in Mr. Miller at any point on April 16th, 2019?

Page 119

A. I did not.

Q. And do you believe you have a specific enough memory of these events to say with certainty that Mr. Miller exhibited none of these signs of difficulty breathing?

A. Yes.

Q. If a call to 911 comes into the station and the caller doesn't say anything on the line and then the call is disconnected, does that typically elicit a police response?

A. It does.

Q. And do you know what the reason is for police responding to a 911 call where the person says nothing at the other end of the line?

A. If the situation -- if the person who's calling for assistance is unable to verbalize the reason why they need assistance, we classify it as a 911 silent call, and even if it's silent, we can figure out the location of it and we still respond generally, send two officers for those type of calls.

Q. So does a person's silence add a degree of uncertainty or concern to a 911 call?

A. Absolutely.

Page 120

Q. Similarly, if a call is disconnected before the natural end of a conversation with a 911 caller, does that add an additional layer of concern for safety of the caller or someone else involved at that scene?

A. Absolutely.

Q. And could that include that the caller is endanger?

A. Yes.

Q. Could it also include that the caller has -- is in fear?

A. Yes.

Q. And is it important that dispatch gets information about the scene when a caller calls in to 911?

A. It is. It's generally the only information we have when we're responding to this.

Q. And is that dispatch inquiry or conversation with a 911 caller often the first part of the step one in the mental health intervention guidelines?

A. It is part of it, yes.

Q. You were asked to make some notations on Exhibit 9 earlier today, do you recall that?

A. I do.

Q. And that is a diagram that purports to show the layout of the 45 Elm Street home?

Page 121

A.   Yes.

Q.   Can you tell whether that diagram -- could you tell when you were looking at it whether or not that diagram was to scale?

A.   I can't tell that, no.

Q.   Could you tell whether or not the rooms and the measurements, approximate dimensions of each one were accurate?

A.   No.

Q.   Did you make the marks on that exhibit purely as an approximation in order to be able to help describe to Attorney Friedman the physical relative positions of everybody?

A.   Yes.

Q.   On arrival to the scene at 45 Elm Street, did you have any information beyond what dispatch had shared with you?

A.   No.

Q.   Do you remember the extent of the information that dispatch shared with you?

A.   Yes. It was that a female had called and stated that a male party at that location was having a psychotic break.

Q.   After the incident was over and Mr. Miller had been

Page 122

-- his care had been transferred over to the EMTs, do you remember having any particular feelings of surprise or any feeling that something was unusual?

A.   Yeah. I remember when I was standing in it would be the living room of the house after Robert Miller was in an ambulance, and just reflecting on the situation, and I remember thinking that it was very strange that my whole time that I had been dealing with Mr. Miller that he didn't say a word.

The only noise that I heard from him were the two grunts, which I spoke of earlier, but there was no audible words that came out of him during that whole situation, and I just felt that that was -- it was strange.

Q.   You mentioned Ms. Anderson's positioning in the living room while you entered and then followed Officer Roycroft and Mr. Miller into the recessed office area, right?

A.   Yep, yes.

Q.   And I think you testified that her position changed within that living room?

A.   Yes. I believe that she was closer towards that doorway when I turned around and looked at her, and then when I saw her initially when I was making

Page 123

entry through that dining room, she was recessed in the room, so she had changed locations.

Q.   From your perspective, could you tell whether Ms. Anderson's line of sight to Mr. Miller and into that recessed office area was obstructed?

A.   I don't believe -- where she was there was the two railings on either side, so she would have had -- yeah, I mean, her view of him would have been obstructed.

Q.   I think that's all the questions I have for you. Just give me 30 seconds, if you don't mind.

I think that will do it. Thank you, Officer.

MS. GILL: Howard, you're muted.

MR. FRIEDMAN: Okay. I have questions.

A.   Sure.

EXAMINATION

BY MR. FRIEDMAN:

Q.   The draft report, you had used the word "punch", correct?

A.   Yes.

Q.   And that's because what you did was you punched Mr. Miller, am I right?

A.   Correct.

Page 124

Q.   But you took that out of the final report, because your supervisor told you to, correct?

A.   Yeah. They suggested that I use a different term.

Q.   All right. And so they changed the tone of the report by changing the term you used, correct?

A.   I'm unsure if they changed it or I changed it.

Q.   Okay. Ultimately, you made the changes, am I right?

A.   Yes.

Q.   So the supervisors suggested it, and being your supervisors, you'd like to change it, but obviously you went along with their change in tone, correct?

A.   Yes.

Q.   Okay. Now, let's talk about the EMTs, I want to make sure I understand this.

At the moment that you learned that Mr. Miller was unconscious and no longer breathing, the people who were there were -- well, the officers were you and Officer Roycroft and then Amy Anderson was there, correct?

A.   Correct.

Q.   No other officer was there at that time, right?

A.   I don't believe so.

Q.   Okay. So this is what I'm struggling with here,

Estate of Robert Miller vs
Sean Roycroft et al.

Spencer Jackson
March 24, 2022

Page 125

because in her EMT report, the information that she claims to have gotten from the officers is that Mr. Miller got angry and went for a golf club.

Now, were any other people -- first of all, did he ever get angry and go for a golf club?

A. I don't know where they got that report -- or that statement from, but it wasn't me.

Q. Okay. That would be inaccurate if a police officer said that to them, right?

A. Right.

Q. Okay. And then it says, "We took him down and cuffed him." Again, the only officers who would have done that would be you and Officer Roycroft, right?

A. Right.

Q. Okay. And it says, "He was talking and we stood him up and started to walk out." After he went to the ground, did that ever happen, did he ever stand up and start talking and walk out?

A. Never happened.

Q. Okay. And then it says, "He collapsed and we immediately started CPR."

Mr. Miller was never standing up and collapsed before CPR began, right?

Page 126

A. He was not.

Q. Okay. And the only people who were there when he collapsed, would be the two officers who were involved in this case, you and Officer Roycroft, right?

A. He did not collapse.

Q. He never collapsed, right? So somebody apparent -- I mean, you don't suspect that Vicki Yefko just wrote a story that had nothing to do with this incident in the, what I will call it, the ambulance report, do you?

A. I believe that she got an inaccurate report of what happened, again --

Q. Right. And the only two people that could have told her what happened, would be you and Officer Roycroft, correct?

MS. GILL: Objection.

A. There were other officers at the scene, and, again, she could have spoke with any of the officers on scene to try to get the gist of what had happened, and she got --

Q. Would any of the other officers on the scene have known what happened?

A. They were aware of the gist of what had happened,

Page 127

and I'm unsure who gave her that statement.

Q. Well, the only two people who would have information about what happened immediately before, you know, Mr. Miller stopped breathing, would be you and Officer Roycroft, right?

A. Yes. And then Officer Ruggieri and Officer Shaw were there when the fire department arrived and were aware of part of the situation that happened.

Q. And the only way that Officer Shaw or Ruggieri would know what happened would have been if they learned it from the two officers who were there, that would be you and Officer Roycroft, correct?

A. Yes.

Q. Okay. And when you write something, the ambulance report, that they call it a pre-hospital care report, this goes to the hospital, correct, do you understand that?

A. Yes, yep.

Q. And this goes to doctors who are treating someone, so they want to know the history, right?

A. Yes.

Q. And did you know that if you say somebody stood up and was walking and suddenly collapsed, that would be symptoms of somebody who had a heart attack, did

Page 128

you understand that?

MS. GILL: Objection.

A. It could be symptoms of several different things so...

Q. Okay. Now, the seat belt hold isn't taught in your department, right?

A. Not that term, no.

Q. Okay. Well, in fact that type of hold is not commonly taught by police departments, because it could easily turn into a chokehold, did you know that?

MS. GILL: Objection.

A. I didn't know what the reason is that they didn't teach that but...

Q. Well, if you have one arm going over the shoulder that arm is near the neck, isn't it, right?

If you pull back as I'm showing you now, that arm could go -- not intentionally -- but it could hit the neck, correct?

A. There is potential for that, yes.

Q. All right. And you're trained not to touch the neck, aren't you?

A. Now, yes.

Q. That's a recent development in your department?

Estate of Robert Miller vs
Sean Roycroft et al.

Spencer Jackson
March 24, 2022

Page 129

A. No. There's been recent stages to avoid chokeholds and stuff like that, yes.

Q. All right. And when you say recent, that was true even way back in 2019; isn't that right?

A. I don't recall specifically, but we were not taught to choke somebody, yes.

Q. All right. And so you have to try to avoid the neck, that's important, correct?

A. Yes.

Q. Okay. And now you do know other methods of taking somebody down, correct, that you're taught methods?

A. We are, yes.

Q. Okay. And it's a fact that Officer Roycroft could have used some other takedown method that was actually taught in the department to get Mr. Miller to the ground; isn't that right?

A. I can't speculate for what Officer Roycroft could have used.

Q. Well, could have done a leg sweep; isn't that correct?

A. Potentially. I certainly think given the information that I had that Officer Roycroft shared, I believe that he used the right body control position in order to resolve that

Page 130

situation.

Q. Do you think this was a situation where he was perhaps faced with the need to use deadly force?

A. No, not specifically.

Q. So when you talk about the tool of immediate means, Officer Roycroft decided to apply a chokehold to Mr. Miller, would that be an appropriate tool of immediate means?

A. Roycroft did not apply a chokehold to him.

Q. No. But if he did, that would not be appropriate, right?

A. Correct.

Q. Okay. And the reason is because that could cause death, that could hurt somebody, right?

A. Yes.

Q. And you understand now I'm sure, and I hope then, that you should avoid pressure on the neck, because it could cause serious injury to the person you're taking into custody, correct?

A. Yes.

Q. When you're taking somebody in custody because they're having a psychotic break, the only reason you're there is to help them, correct?

A. Yes.

Page 131

Q. So you want to avoid hurting them, correct?

A. Yes.

Q. And you don't want to use some tool of immediate means that you're not trained for that might result in injury; is that correct?

A. It depends on the subject actions.

Q. Have you used the seat belt hold?

A. No.

Q. Are you aware of any other officers in your department using a seat belt hold?

A. None that I'm aware of.

Q. Okay. Did you know that Deputy Chief Balcom said he had never heard of the seat belt hold?

A. I'm not aware of that.

Q. No. Would you agree with me that now that you know more about it, it's a hold that you should probably not apply, because it could be dangerous?

MS. GILL: Objection.

Q. Excuse me?

A. It depends on the situation.

Q. You understand that someone who is psychotic that having a psychotic break, they might not be predictable, correct?

A. Yes.

Page 132

Q. And so as a police officer, it would be important to have a plan to deal with the fact that this person is not rational because they're having a psychotic break to try to safely get them treatment, correct?

A. Yes.

Q. And having a plan that involves getting sufficient officers and controlling the scene before taking further action would be a good way to do that, wouldn't it?

A. It could be, but in my experience, I've seen people who get very agitated with several officers.

Q. And there's a way to resolve that, isn't there, you have officers who are there ready to assist, but not in the line of sight of the individual, correct?

A. Potentially.

Q. Yeah. And so once Mr. Miller went into his home, if Officer Roycroft had insisted that Amy Anderson leave the home, he couldn't be a threat to anyone other than himself, correct?

A. I can't -- I don't know if --

Q. Well, do you know whether anyone else was in the home before Officer Roycroft entered other than

Page 133

Mr. Miller and Amy Anderson?

A. I do not remember that.

Q. Okay. There was no one else; isn't that correct?

A. I figured that out later, yes.

Q. Okay. So if the only person in the home is the person who is having a psychotic break, that would allow that officer who didn't enter the home to come up with a plan and get, one, an organized plan; and, two, have sufficient officers to try to safely take him into custody, so he can get treatment, right?

A. Potentially, yes.

Q. And if showing all the officers who were there is a problem, you can have them out of his line of sight, unless they are needed, correct?

A. Sure.

Q. It's always a problem if you have someone inside their home, because all of the common implements in a home could be used as weapons, right?

A. It could, yes.

Q. Like you say a golf club, a kitchen spoon, any of the knives that would ordinarily be in a kitchen, scissors, or an ashtray, a coffee cup could be a -- a coffee mug could be a weapon, right?

Page 134

A. Sure.

Q. So once you're entering someone's home then, particularly if the person is, as you put it, unpredictable, that becomes a dangerous situation for the officer, correct?

A. It could be, yes.

Q. And the way to make it less dangerous would be to have a plan, have sufficient force, and discuss it with the team before you enter, correct?

A. Ideally.

Q. Is it your testimony that Officer Roycroft was not applying downward pressure on Mr. Miller?

A. Yes.

Q. Okay. Now, you said you didn't see any signs of not breathing. Was it possible that you were at that point experiencing what we refer to as tunnel vision?

A. I didn't experience any sense that he was having difficulty breathing.

Q. No. If he had said, I can't breathe, that would be a sign he's having difficulty breathing, correct?

A. If he had said that, yes.

Q. Right. Some officers think if you say, I can't breathe, that shows you're breathing, but that's

Page 135

not true, right?

A. I can't say that yes or no. I don't know.

Q. No. Now, Mr. Miller was in the office area facedown, correct?

A. Yes.

Q. You weren't looking at his face, were you?

A. No.

Q. And there was some talk about the dispatch call. The dispatch call was for somebody having a psychotic break, correct?

A. Yes.

Q. And that was 100 percent accurate, wasn't it?

A. That somebody on scene was having a psychotic break?

Q. Yes.

A. Yes.

Q. And so you and Officer Roycroft arrived expecting there'd be somebody having a psychotic break, and Officer Roycroft got there, went around back, and confirmed that Mr. Miller was having a psychotic break, right?

A. I can't tell you what Officer Roycroft was thinking when he originally got on scene.

Q. Well, have you read his report?

Page 136

A. Yes.

Q. And you discussed what happened with him?

A. Yes.

Q. What did he tell you happened when he first got on scene?

A. That he had spoke with Amy Anderson who appeared very frightened and she was very upset and whispering.

Officer Roycroft went around the side of the house. She directed him to go around the side of the house, and as he went to the backyard, he observed Robert Miller standing on the deck, and he didn't -- couldn't understand what he was saying, but was yelling at people or things that weren't there.

Q. Well, didn't he tell you that Mr. Miller said he was talking to nature?

A. Yes.

Q. Okay. And Amy Anderson did not tell him that she was frightened, did she?

A. It was her actions that made him believe that she was.

Q. Okay. You've answered -- but you didn't answer my question.

Page 137

A.  Sure.

Q.  Let's try again. Amy Anderson did not tell him that she was frightened, did she?

A.  I don't believe so.

Q.  Okay. And did Amy Anderson confirm that -- I think she referred to him as her husband, although they weren't married -- that he was having a psychotic break?

A.  Yes.

Q.  Okay. And then he confirmed to us, he was having a psychotic break, right?

A.  Are you saying that Robert Miller confirmed that?

Q.  No, no. That Officer Roycroft confirmed that when he got there and spoke to him, he put two and two together and said, yeah, this guy is talking to nature, he doesn't seem to be in his right mind, he's having some kind of delusions, because, you know, you can't really talk to nature, right?

A.  Potentially, yes.

Q.  Okay. So did you view there was some problem with the 911 call that resulted in some improper handling of this incident?

A.  I don't think that they did anything wrong that I'm aware of. It's just we only had a very small

Page 138

amount of information from his call.

Q.  Okay. I don't understand.

    What more information did you need?

A.  The name of the parties involved, what exactly was happening, are there any weapons involved, is he violent, has he made threats, where he is in the house, you know, is he intoxicated, is he in medical distress, his past history.

    Dispatch usually does a pretty good job if they can keep people on the phone of getting as much information as they can.

Q.  And if the person takes less time on the phone, you can get their quicker, right?

A.  Say --

Q.  If the person instead of talking to the person on the phone for five minutes, talks to the person on the phone for a minute and a half, then dispatch can get somebody there quicker, can't they?

A.  Not necessarily. Dispatch will usually get basic information in the beginning and then transmit it to us, so we start in that direction while they're gathering more, and at times they'll give us updates along the way, so we could go in with as much information as we can.

Page 139

Q.  Okay. And in this instance, there was a caller Amy, and then Officer Roycroft met with her -- she indicated that her husband was having a psychotic break, which is what the call was, he went out back and confirmed that, and then when Mr. Miller decided not to talk to him and used, let's say foul language, he said, fuck you. His attitude changed, he said fuck you. He didn't want to speak to Officer Roycroft anymore, and he went into his home.

    Now, he hadn't committed any sort of crime or anything, right?

A.  No.

Q.  He hadn't threatened anybody, correct?

A.  No.

Q.  Okay. And so at that point, would there be a reason to use physical force on Mr. Miller?

A.  If he was concerned about the safety of other people involved, including himself, I could justify trying to keep him from going in the house.

Q.  He was concerned for his own safety?

A.  He was concerned for Amy Anderson's safety.

Q.  Okay. And he asked Amy Anderson if she wanted to wait outside, do you recall that being in his

Page 140

report?

A.  I don't.

Q.  Okay. Well, if he asked Amy Anderson if she wanted to stay inside and -- go outside, and she said no, that would indicate that she wasn't at any high level of fear of Robert Miller, correct?

A.  I can't speak to, you know, what their conversation was. I wasn't there.

Q.  You read the reports, right? You had Roycroft's report, you spoke to Officer Roycroft?

A.  Mm-hmm.

Q.  But you know what, if you want, why don't we do this, I will get Officer Roycroft's report for you.

A.  Sure.

Q.  Have you seen it?

A.  I have.

Q.  Okay. All right. Let's just take a moment.

    MS. GILL: Howard, I think your last question was asking him how Amy felt?

    MR. FRIEDMAN: Well, he says he doesn't know what was in Officer Roycroft's report. So what I intend to do is to get that report, and I can bring it up, and then we can discuss it. How does that sound?

Page 141

MS. GILL: You can absolutely do that.

MR. FRIEDMAN: Thank you.

Q.    Okay. Oh, look at this, the report has suddenly appeared.

Okay. So you can see this report now, right?

A.    Yes.

Q.    Okay. And she gave him information about Robert, did she not?

A.    Yes.

Q.    She said you could hear him yelling, he couldn't understand what he was saying at that point, and he said he hadn't slept.

She directed him to go around the corner, correct?

A.    Yes.

Q.    Okay. And then when he went around the corner -- you go on to the next page, he had a conversation with Robert, he said, what's going on today? Nothing, just talking with nature, and he talked about his wife being concerned.

And then he said suddenly like a light switch had turned him, he said, fuck you, I'm not talking to you, get the fuck away from me. He

Page 142

appeared angry and went into his own home.

Okay. Is that all accurate? So that sounds like he was having a psychotic break, am I right?

MR. FRIEDMAN: You can take that down, Carmen?

A.    Potentially.

Q.    Okay. And that's what the call was?

A.    Right.

Q.    So when you get a call for a psychotic break, you get information that says that and then you talk to him, and it seems like he's having a psychotic break, you put all those things together, and he's probably somebody who's having a psychotic break, and so that's how you're going to be treating him, right?

A.    Sure.

Q.    And there was no information that he had been assaultive towards anyone, correct?

A.    Correct.

Q.    And is somebody having a psychotic break allowed to stop talking to a police officer?

A.    Yes.

Q.    And are they allowed to go back into their home?

Page 143

A.    It depends on the situation.

Q.    Well, what do you mean by it depends on the situation?

A.    It depends on if that person is -- could potentially pose a threat to whoever's inside the house, and what happens when they're on their way to the house inside the house?

Q.    What do you mean by what happens while they're on their way into the house?

A.    Well, if they're -- if the officer believes that they're going to harm themselves or something like that, barricade with another party, then that would certainly change the situation.

Q.    Except there was no other party in there when they barricade, that that would not be the same level of problem, correct?

A.    I didn't get the end of that statement, that question.

Q.    All right. If there was no one else in the building and the person decided to barricade them in, that's a different type of problem, isn't it?

A.    Yes.

Q.    And that's the kind of problem you could even call a SWAT team for, correct?

Page 144

A.    Potentially.

Q.    I have no other questions.

MS. GILL: I just have a couple more for you.

THE WITNESS: Sure.

EXAMINATION

BY MS. GILL:

Q.    You were asked earlier about creating a plan to go deal with -- respond to the call from Amy Anderson regarding Mr. Miller, and I want to ask you that based on the circumstances of that evening and based on the call having been disconnected, was there time to formulate a detailed plan to approach Mr. Miller with?

A.    No, there was not.

Q.    Understanding that Ms. Anderson had reported Mr. Miller to have been experiencing a psychotic break, is it also the case that you and Officer Roycroft needed to attend and respond to the call for purposes of ensuring that another person was not in danger?

A.    Yes.

Q.    And did -- strike that.

You were asked earlier whether or not

Estate of Robert Miller vs
Sean Roycroft et al.

Spencer Jackson
March 24, 2022

Page 145

Ms. Anderson's decision to stay inside the house indicated her level or her feeling of safety, do you remember that?

A. Yes.

Q. And you know now that Mr. Miller was outside the home, right?

A. Yes, initially he was.

Q. So does Ms. Anderson's decision to remain inside the front of the house indicate to you that she was not afraid when Officer Roycroft first approached the house?

A. No. She could have felt safer staying in her home than being outside with Mr. Miller.

Q. Are you familiar with the term "tunnel vision" that was used earlier?

A. Yes.

Q. Can you tell me what that means?

A. Tunnel vision is when basically a traumatic incident happens and you're focused on one thing without being able to take in your surroundings.

Q. In addition to a traumatic incident happening, can it also be an incident of extreme stress?

A. Yes, absolutely.

Q. On April 16th, 2019, did you experience tunnel

Page 146

vision?

A. No, no.

Q. And how do you know that to be the case?

A. I was very aware of my surroundings. I was very aware of not only Mr. Miller, but Officer Roycroft.

I remember being concerned about Amy Anderson as I saw her when I walked in, and then during the altercation, being concerned about who was potentially behind me and what might happen with that, and just trying to keep my head just calm and relaxed, and with experience doing the job, that's always the best way to deal with these situations, just being relaxed and flowing and dealing with it as calmly as you can.

Q. Did Officer Roycroft ever indicate to you at any point that he was offended by Mr. Miller's telling him to fuck off?

A. No.

Q. Did Officer Roycroft ever indicate to you that he was angry or upset that Mr. Miller told him to fuck off?

A. No.

Q. Or to get away from him?

A. No.

Page 147

Q. In your observations of Officer Roycroft that evening, did he appear angry or upset or offended in any way by Mr. Miller's actions?

A. No.

Q. Did you have an impression that after Mr. Miller was removed and taken to the hospital that Ms. Anderson had a feeling of relief?

A. She seemed it when I spoke with her. Yeah, she seemed relieved.

Q. I don't have any more questions for you.

MR. FRIEDMAN: I have a few.

EXAMINATION

BY MR. FRIEDMAN:

Q. Now, you didn't know and Officer Roycroft didn't know how many people were inside that house; is that correct?

A. Neither of us knew, correct.

Q. Okay. So Officer Roycroft went into the home, he didn't know whether there were five, six, seven other people in there who might harm him, am I right?

A. Potentially, yes.

Q. Okay. So it would have been a better plan to have more people there just in case there were other

Page 148

people in the home, am I right?

A. Generally we send two officers to calls of this nature, and that's what happened here.

Q. So it would have been better for him to wait until you arrived before entering the home, then he could have met with you, discussed what the plan would be, and you two could have worked together having already figured out how you were going to handle it, right?

MS. GILL: Objection.

A. That could have happened, but in this situation it didn't.

Q. Well, when you send two officers, the idea would be that it's a call that requires two officers, right?

A. Yes.

Q. So the first officer could wait for the second officer and come up with a plan, correct?

A. He could do that, yes.

Q. Okay. Now, if a person -- a police officer is so focused on his work that he doesn't hear someone say something, like, I can't breathe, that could be a sign of tunnel vision, couldn't it?

A. It could be.

Q. And now just the last question you asked, I just

Page 149

want to make sure I understand.

A. Sure.

Q. You're telling us today under oath that you felt Amy Anderson was relieved that Robert Miller died; is that correct?

A. I didn't say that she was relieved that Robert Miller died. I said that she felt -- I believe that she was relieved that the situation she had previously been in was over.

Q. So she didn't appear to be sad that the man she had lived with for eight years had left, and he wasn't breathing, and obviously she saw the attempts to resuscitate him were unsuccessful that you feel that she still felt relieved after all that?

A. I don't --

MS. GILL: Objection.

A. I don't believe that she knew that he was deceased at that time, and I don't believe that she was -- she was upset, but she was I believe relieved that she was no longer in that situation.

Q. Was she there when you all were working on Mr. Miller trying to revive him?

A. I didn't see her during our revival, you know, medical treatment of him, but I'm sure that she was

Page 150

probably watching.

Q. She was there, right? And so you tried and your defibrillator didn't allow a shock, then the EMTs came and they too were unsuccessful in reviving him, correct?

A. Yes.

Q. You knew that Mr. Miller was deceased when he left that building, didn't you?

A. I wouldn't make that statement. I knew it was potential, but I was waiting on an official word.

Q. Right. But he hadn't been breathing for quite a few minutes at that point, right?

A. We were giving him rescue breaths, so he was not -- as far as I could tell, he wasn't breathing on his own.

Q. And he had not pulse, right?

A. During our -- Sean's request of initial assessment of him, he did not.

Q. And he never had a pulse after that; isn't that correct?

A. I believe not.

Q. Okay. I have no other questions.

MS. GILL: Thanks.

MR. FRIEDMAN: Sasha, do you have any

Page 151

more?

MS. GILL: I'm all done.

MR. FRIEDMAN: Okay. Terrific.

MS. GILL: Elizabette, can I please have a full and a mini just electronically? No hard copy.

MADAM COURT REPORTER: Sure. Thank you.

(Whereupon the Deposition of Spencer Jackson concluded at 1:40 p.m.)

Page 152

ERRATA SHEET DISTRIBUTION INFORMATION

DEPONENT'S ERRATA & SIGNATURE INSTRUCTIONS

ERRATA SHEET DISTRIBUTION INFORMATION

The original of the Errata Sheet has been delivered to Alexandra Gill, Esquire.

When the Errata Sheet has been completed by the deponent and signed, a copy thereof should be delivered to each party of record and the ORIGINAL forwarded to Howard Friedman, Esquire, to whom the original deposition transcript was delivered.

INSTRUCTIONS TO DEPONENT

After reading this volume of your deposition, please indicate any corrections or changes to your testimony and the reasons therefor on the Errata Sheet supplied to you and sign it. DO NOT make marks or notations on the transcript volume itself. Add additional sheets if necessary. Please refer to the above instructions for Errata Sheet distribution information.

Estate of Robert Miller vs
Sean Roycroft et al.

Spencer Jackson
March 24, 2022

Page 153

PLEASE ATTACH TO THE DEPOSITION OF SPENCER JACKSON

CASE: Estate of Robert J. Miller, et al vs. Sean Roycroft, et al

DATE TAKEN: March 24, 2022

ERRATA SHEET

Please refer to Page 152 for Errata Sheet instructions and distribution instructions.

PAGE LINE    CHANGE    REASON

_____

_____

_____

_____

_____

_____

_____

I have read the foregoing transcript of my deposition, and except for any corrections or changes noted above, I hereby subscribe to the transcript as an accurate record of the statements made by me.

Executed this _____ day of _____, 2022.

_____
SPENCER JACKSON

Page 154

CERTIFICATE

COMMONWEALTH OF MASSACHUSETTS
Plymouth, SS.

I, Elizabette M. Afonso, a Professional Shorthand Reporter and Notary Public in and for the Commonwealth of Massachusetts, do hereby certify that the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by the witness.

I further certify that I am neither related to or employed by any of the parties in or counsel to this action, nor am I financially interested in the outcome of this action.

In witness whereof, I have hereunto set my hand and seal this 29th day of March, 2022.

_____
Elizabette M. Afonso
Notary Public
My commission expires:
November 11, 2027

Estate of Robert Miller vs
Sean Roycroft et al.

Spencer Jackson
March 24, 2022

**Exhibits**

**Exhibit 1**
**Exhibit 2**
**Exhibit 3**
29:12,13
**Exhibit 4**
16:6
**Exhibit 5**
27:17 30:2
**Exhibit 6**
**Exhibit 7**
39:16
**Exhibit 8**
41:7
**Exhibit 9**
62:16,21,22
68:21 86:22
120:20
**Exhibit 10**
106:3
**Exhibit 11**
94:3,4
**Exhibit 12**
92:16,17
**Exhibit 13**
109:8

**1**

**1**
16:8
**10**
106:3
**100**
135:12
**11**
94:3,4
**1106**
35:18
**12**
92:16,17
**13**
109:8
**16th**
15:21 112:24
118:24 145:24
**19:11:52**
108:2
**1:40**
151:10

**2**

**2015**
24:21
**2016**
10:2
**2018**
13:23
**2019**
10:16,20 12:4
15:22 16:1
17:4 25:23
28:7 29:4 55:2
112:24 118:24
129:4 145:24
**2020**
8:5
**2021**
8:5 16:19
**205**
108:1
**21st**
28:7 29:4,6,16
**236**
79:18,19
**24th**
16:19
**279**
17:5
**28th**
15:24 17:4

**3**

**3**
29:12,13
**30**
75:10 78:24
79:2 123:11
**326**
36:6

**4**

**4**
16:6,15
**4/16**
16:14
**4/18**
16:16
**45**
58:22 59:3,23

62:23 87:10
112:23 115:22
120:24 121:15

**5**

**5**
27:17 30:2
**500**
26:1

**7**

**7**
39:16

**8**

**8**
41:7

**9**

**9**
62:16,22
68:21 86:22
120:20
**90**
84:16 88:1
**911**
119:7,13,17,
23 120:2,13,
17 137:21

**A**

**AA**
68:5
**abilities**
90:12
**ability**
50:3 69:21
**abnormal**
55:24
**abrasions**
30:9
**absence**
118:5
**absolutely**
114:4 119:24
120:6 141:1
145:23
**academy**
32:2 74:24

**access**
34:13,16
**accomplish**
27:10
**account**
101:19
**accounts**
8:24
**accurate**
8:24 22:2 87:3
121:8 135:12
142:2
**accurately**
87:9
**act**
38:11
**acting**
101:23
**action**
41:10 48:22
51:14 132:9
**actions**
101:16 102:5
104:5 105:4,9,
12 109:18
131:6 136:21
147:3
**active**
45:15 103:16
**actively**
80:14 103:15
**activity**
100:15,22
101:1,4,5,11
**Adam**
6:20
**add**
119:22 120:3
**addition**
73:16 111:22,
23 145:21
**additional**
39:13 49:2
120:3
**address**
59:6
**advantage**
54:3
**advice**
100:10
**advised**
96:5 100:10

**AED**
21:7
**affect**
99:23
**afraid**
145:10
**aftermath**
34:12,15
59:15 72:16
**age**
50:22,24
**aggression**
43:15
**agitate**
42:15
**agitated**
37:21 43:23
55:7 132:12
**agitation**
55:10,24
**agonal**
53:19 118:2
**agree**
5:7 48:8
131:15
**ahead**
84:21
**aid**
41:5,8,11
42:20
**air**
57:16,21
**alcohol**
84:4,24
**allowed**
39:12 114:12
142:21,24
**alongside**
60:8
**altercation**
94:23 104:6
146:8
**ambulance**
98:4,9 122:6
126:10 127:14
**amount**
51:16 55:21
138:1
**Amy**
22:20 59:1
67:16 69:9
83:20 84:1,22

85:18,21 86:6
94:13 95:7
124:19 132:19
133:1 136:6,
19 137:2,5
139:2,22,23
140:3,19
144:9 146:6
149:4

**analysis**
101:19 109:21

**and/or**
31:21

**Anderson**
22:20 59:1
67:16 68:1
69:9 83:20
84:1 85:19
86:6 95:7
124:20 132:19
133:1 136:6,
19 137:2,5
139:23 140:3
144:9,16
146:7 147:7
149:4

**Anderson's**
122:15 123:4
139:22 145:1,
8

**Andersson**
94:13

**anger**
44:1

**angle**
88:1 93:3

**angry**
21:3 125:3,5
142:1 146:20
147:2

**answering**
6:10

**answers**
14:7

**anymore**
139:9

**apparent**
126:7

**appeared**
42:11 56:2
76:11 136:6
141:4 142:1

**appears**
17:3 36:15
95:7

**applied**
21:7 33:7 34:9
35:15 51:21

**applies**
27:3

**apply**
26:21 83:1
130:6,9
131:17

**applying**
89:1 134:12

**approach**
43:24 144:13

**approached**
145:10

**approaching**
36:14

**approval**
16:23

**approximate**
121:7

**approximation**
121:11

**April**
15:21 28:7
29:4,6,16 55:2
112:24 118:24
145:24

**area**
12:21 40:20
62:12 66:17
68:7 69:8
70:10 73:9
74:16 78:19,
24 94:4 99:12
103:10 105:17
106:4 122:18
123:5 135:3

**argue**
43:1 45:10

**arm**
32:18,20
33:23 61:1
66:8,9,14,15,
18,22,23 67:5
69:19,22
70:11 73:20
75:13,18,20,
21,23,24 76:3,
6,13,14,16,19,

23 77:7,9,15,
19 78:11
79:12,15
82:12,14,15,
18,20,23,24
83:2 88:19
89:5 90:20
113:9,10,11
128:15,16,18

**arms**
57:8 58:5
80:4,5,8
90:11,14,23,
24 97:11
103:21 113:18
114:21

**arraigned**
15:16

**arrival**
121:15

**arrive**
48:19 59:12
111:20

**arrived**
19:10 23:3,9,
15,16,17
59:11,21,22
95:10,12,17,
21 97:22
98:22 99:5,18
109:10 111:16
127:7 135:17
148:5

**arrives**
96:4

**art**
65:15

**artist**
65:14

**arts**
24:16 26:6
32:5

**ashtray**
133:23

**asphyxia**
51:5

**asphyxiation**
53:14

**assailant**
114:15

**assault**
101:16,18

**assaultive**
142:19

**assess**
36:18 115:12

**assessed**
39:10 115:22
116:9,12

**assessment**
96:14 100:13
116:2,3
150:17

**assist**
24:22 42:18
132:14

**assistance**
37:13 119:16,
17

**assisted**
112:14

**assisting**
24:7

**associate's**
9:14

**assume**
7:7 26:9 99:15

**attach**
29:1

**attached**
30:2

**attack**
57:12 105:23
127:24

**attempt**
36:22 38:7
56:3 82:16
91:7 101:16

**attempted**
69:18

**attempts**
75:4 90:17
149:12

**attend**
144:19

**attitude**
139:7

**attorney**
6:15 8:14
17:24 19:17
21:21 121:12

**attorneys**
18:23

**audible**
122:12

**avoid**
129:1,7
130:17 131:1

**aware**
43:13 117:23
126:24 127:8
131:9,11,14
137:24 146:4,
5

---
**B**
---

**B-I-T-I-N-A-S**
25:10

**Bachelor's**
9:18

**back**
11:6 18:8,9
26:17 28:6
29:4 37:13,24
51:17 57:5
58:3 60:9 63:1
67:23 68:10
77:19 80:5,14
81:3 82:15
86:19 87:17
90:22 91:11,
13,18 94:23
96:17,18
100:19 103:19
108:24 117:9,
12 128:17
129:4 135:19
139:4 142:24

**background**
9:12

**backside**
61:1

**backyard**
136:11

**bag**
69:11 72:14
96:5,8 99:6
106:22 112:13

**Balcom**
18:17,18 19:3
131:12

**Band-aid**
30:15

**bang**
63:21

Estate of Robert Miller vs
Sean Roycroft et al.

Spencer Jackson
March 24, 2022

**bar**
33:23

**Barnstable**
5:18 7:1 10:18
15:2 25:11
31:24 32:2
39:8,19 98:12,
13 111:17

**barricade**
143:12,15,20

**based**
87:4 104:3
144:11,12

**basic**
5:21 138:19

**basically**
12:19 63:9
65:12 67:20
74:16 78:14
84:2,8,15
88:19 145:18

**basis**
59:14 87:1

**bathroom**
58:17 86:18

**beating**
105:24

**began**
125:24

**begin**
5:6

**beginning**
138:20

**behave**
27:15 110:1
115:2

**behavior**
115:6

**believed**
19:23 34:20,
24 89:17

**believes**
143:10

**belt**
32:8,12 33:6
34:10 35:14
61:18,24 66:5
72:23 113:6,7,
24 128:5
131:7,10,13

**bent**
88:1

**bicep**
76:1,7

**bit**
47:13 68:10,
12 83:24 95:2
116:24

**Bitinas**
25:8

**black**
63:4

**blocking**
65:24

**blue**
95:4 118:14

**body**
32:22 33:15
51:6 66:10,12,
24 72:3,19
73:6 74:13,14
75:4,5,8,12,
17,22 77:7,18,
20 78:10
82:13 84:19
85:14 88:16,
17 89:2,4,5
93:23 103:21
113:10,19,21
129:23

**bother**
26:17

**bottom**
43:11 74:17

**BPD**
36:6

**break**
36:15 46:2
47:19,24 48:5,
7 58:16,18
59:6 65:16
85:2 86:16
87:15,16
102:15 103:3,
6 108:24
109:5 121:23
130:22 131:22
132:4 133:6
135:10,14,18,
21 137:8,11
139:4 142:3,
10,13,14,21
144:18

**breath**
50:20 53:11

108:9 118:3,5

**breathe**
50:4 51:7
57:4,17 85:16,
19 89:8,13,20
97:13,15
117:19,21,24
118:6,10
134:20,24
148:21

**breathing**
20:14 49:18,
23 50:9,16
51:3,19,24
53:9,20,23
56:14 57:15,
21 85:8 95:11,
18,22 96:15
97:12,17
117:18,21
118:1,2,4,10,
19 119:5
124:17 127:4
134:15,19,21,
24 149:12
150:11,14

**breaths**
53:23 150:13

**briefly**
19:13

**bring**
40:17 112:12
140:23

**brought**
82:24

**buddy**
44:8,15,17,22

**building**
37:7,10 58:22
59:23 67:17
92:20 143:20
150:8

**bureau**
28:20

**business**
25:21

———
**C**
———

**call**
13:2 19:16,17,
19,20 36:14
37:23 38:16,

23 39:13,23
40:9 42:8
44:8,17 45:1,4
49:2 59:7,16,
18 61:17
79:20 81:21
103:3 107:14
110:18 111:13
119:7,9,13,18,
23 120:1
126:10 127:15
135:8,9
137:21 138:1
139:4 142:8,
10 143:23
144:9,12,19
148:14

**called**
13:2,9,17
20:15 37:4
39:9 59:5
79:16 95:18,
20 121:21

**caller**
119:8 120:2,4,
7,9,13,17
139:1

**calling**
119:15

**calls**
7:2,11 12:24
39:2,22 55:21
119:21 120:13
148:2

**calm**
21:3 38:7
42:15 44:5
55:12 81:2,8,
9,10,12
108:16 146:11

**calmed**
55:18

**calmly**
146:14

**calmness**
81:14

**Cape**
9:13 25:1 98:6

**car**
79:23,24
108:6

**care**
20:21 122:1

127:15

**career**
33:8

**Carmen**
16:5 17:2,15
27:22 28:5,15
29:11,21 36:5,
7 42:19,23
43:18 92:15
95:15 107:24
142:6

**cascading**
116:3

**case**
8:21 14:21
30:17 53:4
112:1 126:4
144:18 146:3
147:24

**caused**
35:1 68:24
104:7 105:5,
10,12

**causing**
51:6

**center**
65:23 66:2

**certainty**
119:3

**chair**
92:22,23,24

**challenge**
43:1

**chance**
41:7 69:4
109:7

**change**
118:8 124:11,
12 143:13

**changed**
10:22 14:12,
18,24 122:20
123:2 124:4,6
139:7

**changing**
124:5

**charge**
18:21 24:9
54:17

**chart**
36:7

**checking**

79:19
**chest**
66:17
**chief**
10:16,19
18:18 19:3
131:12
**chiefs**
10:15
**choke**
129:6
**chokehold**
33:4 128:10
130:6,9
**chokeholds**
129:1
**circle**
68:3
**circling**
63:9
**circumstances**
104:3 114:2
115:18 144:11
**civilian**
46:20
**claim**
18:1
**claims**
125:2
**class**
25:11
**classes**
24:17 25:4,5,
15,19
**classified**
59:7
**classify**
119:17
**clear**
87:2 103:18
**clients**
101:10
**close**
70:19 82:24
**closer**
83:22 95:4,5,7
122:22
**club**
21:4 72:3,5,7,
8,9,10,13,18,
22 73:1,5,8,15
74:1 106:7,20

125:3,5
133:21
**clubs**
69:11 72:15
106:23
**co-worker**
22:14 25:4,7
**Cod**
9:13 25:1
**coffee**
133:23,24
**collapse**
126:6
**collapsed**
21:6 125:21,
24 126:3,7
127:23
**collectively**
100:5
**College**
9:13
**coloring**
118:9
**combat**
114:14
**commander**
28:19
**commands**
48:9 52:9,12
80:23 81:1,22
103:18
**comments**
9:6
**committed**
103:23 139:11
**common**
57:19 110:13
133:18
**commonly**
128:9
**communicator**
54:11
**Community**
9:13
**competence**
31:17
**complete**
118:5
**completed**
116:14
**complies**
68:16,23

**component**
10:6
**comport**
110:21
**compressing**
78:14
**compressional**
53:13
**concept**
53:18
**concern**
119:23 120:3
**concerned**
78:6 79:3,6,9
139:18,21,22
141:21 146:6,
8
**concerns**
89:17
**concise**
103:18
**concluded**
151:10
**condescending**
44:12
**condition**
26:4 50:24
115:6
**conditioning**
50:23
**conditions**
50:6,11
**confess**
87:21
**confirm**
137:5
**confirmed**
135:20
137:10,12,13
139:5
**confirms**
109:10
**conflicting**
52:23
**confronted**
109:24
**confusing**
6:4 52:21
**confusion**
11:16
**considered**
114:21

**consist**
11:8
**consistent**
9:3 103:2
**consult**
18:15,23 19:2
**contact**
13:10 36:23
37:1,4 39:11
40:6 54:6,9,
10,13 55:11
**contacted**
37:6
**containment**
12:19 13:3,11,
14
**continually**
89:21
**continue**
25:17
**continued**
56:17 67:2
**control**
31:21 32:22
33:15,18 34:8
40:17 57:3
69:18,21
70:12,14
71:23 79:14
80:24 82:18,
23 89:16
90:13,18
103:17,22
129:24
**controlling**
132:8
**conversation**
8:17 19:8,21
45:19 71:11
84:22 85:3,18
96:3 120:2,16
140:7 141:18
**conversations**
8:9,23 113:2
**Cool**
58:19
**cooperation**
38:14
**cooperative**
21:3
**copy**
29:1 62:15

92:10 151:6
**corner**
16:18 60:9,12,
13 83:21 95:1,
3 141:14,17
**correct**
6:13,14 7:8,9
9:4,5,14 10:2
11:9,10 12:13
14:8,21 15:13,
22 16:1,10,13
17:18 20:21,
22 22:2,5,20,
21 24:5 26:11,
14,15,19,22
27:4 28:2,7,21
29:18 30:6
31:11,18 32:1,
6,7 35:16,23
36:11,16,17
37:7,11,24
38:11,12,18,
21 41:14 42:2
43:1,6,15,20
45:4,5,11,23
47:10 49:3,6,
9,23 50:17
51:21,22
56:20 62:10,
13 63:2,15,19,
20 64:4,6,9,10
65:1,2 66:11,
13,16,24
70:17,18 71:7
72:9,11 73:21
74:19 77:2
83:13,17 86:1,
5,7 91:1,20
93:3 94:1,5,13
95:11,19 97:2
99:14,23,24
100:2,9
101:13 102:13
103:8 106:8,
24 107:11,15,
16 108:19
109:11 110:2
118:20
123:20,24
124:2,5,12,20,
21 126:16
127:12,16
128:19 129:8,

Estate of Robert Miller vs
Sean Roycroft et al.

Spencer Jackson
March 24, 2022

11,20 130:12,
19,23 131:1,5,
23 132:5,16,
21 133:3,15
134:5,9,21
135:4,10
139:14 140:6
141:15
142:19,20
143:16,24
147:16,17
148:17 149:5
150:5,20
**county**
98:10
**couple**
10:15 74:7
144:3
**courses**
32:5
**court**
15:14,16 18:7,
9 151:7
**courtesy**
5:22
**cover**
54:7,16,17
98:17,18
**CPR**
21:7 125:22,
24
**crash**
60:10 61:7,13
**created**
104:5
**creating**
144:8
**crime**
26:14 139:12
**crimes**
103:24
**criminal**
9:14,18,19
**crisis**
13:9 38:17
39:2,5,7,17,20
40:1,3,9,13
48:20 49:6
**cruiser**
59:24 60:1
79:20
**cuff**

83:12
**cuffed**
21:5 82:20
125:12
**cuffs**
85:8 96:12
**cup**
133:23
**custody**
54:6 56:19
105:1 130:19,
21 133:10
**cut**
30:16 47:12
78:8 79:3
**cutting**
79:5

---
**D**
---

**danger**
36:24 144:21
**dangerous**
33:3 131:17
134:4,7
**darts**
70:17
**date**
16:9,18,20,22,
23,24 18:14
68:22
**dates**
16:14
**day**
21:24 22:6
**days**
29:18
**De-escalate**
42:21
**deadly**
130:3
**deal**
10:7 40:21
84:3 132:2
144:9 146:12
**dealing**
10:4 11:4
12:8,20 37:15
45:3 46:20
54:11,19
114:24 122:8
146:14

**deals**
41:8
**dealt**
46:10 89:20
**death**
104:8 130:14
**deceased**
149:17 150:7
**decided**
8:2 74:9 130:6
139:6 143:20
**decision**
38:22 145:1,8
**deck**
60:15,23 61:8,
10 63:1
136:12
**deeper**
94:22
**deescalate**
40:12 42:14,
24 44:4 55:12
81:5
**deescalated**
55:19
**deescalation**
43:19,22
**defensive**
114:14
**defibrillator**
100:1,12,19
150:3
**define**
91:4
**defusing**
45:13
**degree**
9:14,17,18
119:22
**degrees**
84:16 88:1
102:5
**delirium**
54:21 55:5,15
56:2,6,20
104:17,24
**deliver**
112:13
**delivered**
82:5
**delivery**
112:14

**delusion**
48:16
**delusions**
46:7 47:8
137:17
**demeanor**
41:4
**department**
5:18 10:18
11:11 15:3
19:14 32:1
36:9 39:8,19
97:24 98:16,
24 99:3,5
100:2 114:19
127:7 128:6,
24 129:15
131:10
**department's**
11:7 12:1
**departments**
11:9 12:2,4,6
98:17 128:9
**depend**
115:18
**Depending**
50:22
**depends**
12:7,11 15:11,
14 30:14,20
31:4,5 37:20
46:4,14,19
47:16 49:4
52:10 56:12
58:4 131:6,20
143:1,2,4
**depicts**
87:9
**deployed**
70:22
**deposed**
5:19
**deposition**
6:24 7:14
8:15,18 14:8
27:23 92:13
113:7 151:9
**deputy**
18:18 19:3
131:12
**describe**
113:9 114:17
121:11

**describing**
87:18 117:17
**descriptive**
113:8
**destination**
65:16
**detail**
8:11 104:9
**detailed**
101:10 144:13
**details**
87:5 93:21
**determine**
48:24 104:7
**development**
128:24
**diagram**
62:15 87:3
92:2,9 120:23
121:2,4
**diaphragm**
57:17
**die**
56:19
**died**
56:18 149:4,7
**differently**
105:21
109:15,22
**difficult**
50:20
**difficulties**
53:10
**difficulty**
49:18 50:9
51:24 52:3
53:23 56:13
57:15,20
97:17 118:1,
10 119:5
134:19,21
**dimensions**
121:7
**dining**
63:4,9 64:17
123:1
**direct**
24:2,7
**directed**
136:10 141:14
**direction**
88:17 138:21

**directly**
117:5
**disconnected**
119:9 120:1
144:12
**discuss**
8:13,21 33:10
134:8 140:23
**discussed**
8:6 23:2 49:2
136:2 148:6
**discussion**
9:2 33:13
69:23 70:7
104:12
**discussions**
109:14
**dispatch**
79:15,16
95:20 109:8
120:12,16
121:16,20
135:8,9 138:9,
17,19
**dispatched**
59:9,18 98:16
**distance**
70:22
**distraction**
75:2
**distress**
138:8
**distrust**
44:1
**doctor**
55:6 56:4
101:6 104:19
**doctors**
104:9,17,20
127:19
**document**
18:13
**documenting**
31:8
**documents**
21:19,21
86:14
**door**
60:14,16,23
62:7
**doorway**
60:24 68:10

83:22 92:19
122:23
**double**
83:8,9,13,15
**downward**
89:3 134:12
**draft**
29:8 110:10,
13 123:19
**draw**
62:20 63:7
65:3,8,10 68:3
**drawing**
77:9
**drawn**
68:21 92:8
**drink**
58:15,16
86:19
**drive**
70:24 71:3
**drug**
53:24
**duly**
5:3 87:11
**duty**
30:12
**dynamic**
34:5 35:12
89:6

———
**E**
———
**e-mails**
7:12
**earlier**
67:3 72:2
107:11 110:10
111:15 115:10
120:21 122:11
144:8,24
145:15
**easier**
62:19
**easily**
128:10
**eat**
58:17
**edged**
79:8
**edited**
17:17

**educational**
9:12
**effect**
116:4
**effective**
70:21 74:8
**efforts**
40:12 112:9,
17
**elbow**
76:1
**electrical**
100:15,22,24
101:4,5,11
**electronically**
151:5
**elevated**
118:4
**elicit**
119:10
**Elizabette**
151:4
**Elm**
58:22 59:3,23,
24 62:23
87:10 112:23
115:22 120:24
121:15
**emergencies**
10:5,24 11:4
12:17
**emergency**
10:9 12:10,16,
18,24 13:2,18
19:9 20:14
24:12 59:8
99:21
**Emily**
6:22
**employed**
5:17
**EMT**
6:21 23:12
24:2 125:1
**EMT's**
21:24
**EMTS**
20:17,20 23:9
98:21 99:18
111:15,18,22,
24 112:16,23,
24 122:1

124:14 150:3
**end**
15:12,15,20
68:24 92:13
94:19,22
107:9 119:14
120:2 143:17
**endanger**
120:7
**ended**
25:19,21 56:9
62:12 69:7
73:6 106:4
116:4
**energy**
103:20
**engage**
48:24
**enjoyment**
32:6
**ensure**
111:12
**ensuring**
144:20
**enter**
133:7 134:9
**entered**
17:4,7 18:14
69:9 122:16
132:24
**entering**
134:2 148:5
**entire**
60:15
**entry**
123:1
**entryway**
92:20
**entryways**
94:10
**episode**
115:1
**episodes**
115:7
**equipment**
23:17,18,19
112:12
**error**
9:8
**essence**
112:20

**essentially**
86:10 87:6
97:21
**estimate**
13:16 59:13
62:2 63:10
68:6 78:22
**estimation**
59:14,20
61:15 75:10
**evaluation**
21:2
**evening**
18:21 79:21
86:7,9 107:2
144:11 147:2
**event**
12:5
**events**
119:3
**eventually**
40:14 118:15
**exacerbate**
43:14
**exact**
93:8 106:21
**EXAMINATI
ON**
5:12 110:7
123:17 144:6
147:12
**examined**
5:4
**Excellent**
7:7
**excited**
54:20 55:5,15
56:2,5,20
104:17,24
**Excuse**
131:19
**execute**
54:3
**exhibit**
16:6 27:17
29:12,13 30:2
39:16 41:7
62:16,21
68:21 86:22
92:9,16,17
94:3,4 106:3
109:8 120:20

Estate of Robert Miller vs
Sean Roycroft et al.

Spencer Jackson
March 24, 2022

121:10
exhibited
119:4
exhibits
7:4,5 16:2
existed
39:18
exited
60:1
expect
46:1,8,17,23
47:2,8,19
115:2
expected
75:15 81:22
expecting
135:17
experience
111:18 132:11
134:18 145:24
146:11
experiencing
115:1,7
134:16 144:17
explain
22:6 35:1 40:6
45:17 56:4
97:14
explained
55:7 59:15,17
exposed
70:9
extent
30:14 112:8
121:19
extreme
145:22
eye
54:19
eyes
111:11

**F**

face
113:22 135:6
faced
130:3
facedown
49:13,14,16
51:13,20 52:4,
24 57:7 62:3
64:23,24 83:3

103:11 135:4
facility
42:17
facing
60:5 61:3
88:10,13,16,
18
fact
38:2 44:9
101:20 128:8
129:13 132:2
factors
50:19,24
fairly
10:12 88:14
fall
60:17,22
familiar
114:5 145:14
fashion
55:20
fast
43:5 74:2
fear
43:15 120:10
140:6
feature
83:11
feel
149:13
feeling
122:3 145:2
147:7
feelings
122:2
feels
18:4
feet
65:5,11,15
69:19 80:9,10,
14,20 91:17,
20
fell
60:15 62:3
64:22 74:2
117:3,4
felt
14:18 37:10
40:13 76:24
81:19 122:13
140:19 145:12
149:3,7,14

female
59:5 67:19
121:21
field
28:19
fight
34:5 35:12
56:17 57:8
89:16,21
fighting
34:10 35:15
57:2 58:8,9
79:23 80:1,3,
17,21 81:11
90:9,10,12
91:2,5 105:18
107:15 108:7
figure
65:15,22
119:18
figured
133:4 148:8
figures
65:4,8,18
68:14
file
15:3,6 30:13,
16,22
filed
14:21 15:9,12,
15,24 16:9,21
17:17 18:15,
23 21:13,16
29:3
fill
28:10
filled
28:1,7,9,12
final
14:20 16:6
18:16 29:22,
23 30:1 124:1
finalized
8:20
finally
17:16
find
72:1
finish
6:8,9 108:24
fire
19:13 97:24

98:16,17,24
99:3,5 127:7
firefighter
6:21 23:12
Fitness
26:1
flail
57:11 103:20
flailing
61:2 80:7,8,10
91:6,10
flat
60:15
floor
69:1,8 72:14
87:10 105:17
106:18 117:3,
4
Florida
7:18,19,20
flowing
146:13
focal
89:15
focus
91:17
focused
77:8 145:19
148:20
focusing
77:9
follow
36:16 46:3,9,
18 47:10,15,
24
foot
84:14 87:24
88:4,6
force
7:2 26:20,21
27:4,7 29:9,24
31:17 34:7
35:13 74:24
114:13 130:3
134:8 139:17
forcefully
90:17,19
forearm
67:15
forest
45:7,9,10

forget
86:22
form
5:8 11:22
17:23 102:2
formatting
9:9
formulate
144:13
Forty-five
78:23
forward
64:22 69:10
83:23 84:14
88:11,13
92:11 95:2
foul
139:6
frame
18:12 60:15,
16,19
free
78:11 97:11
fresh
111:11
Friedman
5:6,13 16:5
17:1,14 18:7
27:21 28:5,15
29:11,20
34:21 36:5
39:15 42:19,
23 43:17
47:15 86:16,
24 87:7,11,15
92:15 94:2
95:15 106:2
107:17,24
108:4,23
109:4 110:4,
24 113:4
121:12
123:15,18
140:20 141:2
142:5 147:11,
13 150:24
151:3
friend
44:14,15
friends
44:21
frightened
136:7,20

137:3
**front**
29:13 61:4
62:1,4,6,7,9,
12 64:15
69:12 88:20
92:6 145:9
**fuck**
26:13 139:7,8
141:23,24
146:17,20
**full**
151:5
**fully**
48:24 116:9

**G**

**gain**
34:13,16
38:13
**gasping**
118:3
**gather**
9:12 101:6
109:24
**gathering**
138:22
**gave**
23:5 25:4,5
46:3 81:22
127:1 141:8
**general**
12:15 24:23,
24 62:23
**generally**
12:7,11,23
30:19 112:19
119:20 120:14
148:2
**gestures**
118:19
**Gill**
5:10 6:15
11:17 17:13,
19 21:9 34:3,
19,23 47:12
65:7 66:21
68:17,20
71:22 86:12,
20 87:2,9,13
102:1 105:7,
19 109:3

110:6,8
123:14 126:17
128:2,12
131:18 140:18
141:1 144:3,7
148:10 149:16
150:23 151:2,
4
**girlfriend**
22:20
**gist**
126:20,24
**give**
15:10 23:20,
23 41:16
46:12,16
84:16 88:2
123:11 138:22
**giving**
22:12 24:6
25:19 52:9,12,
23 90:14
103:18 150:13
**glancing**
93:7
**glass**
60:14
**goal**
49:5
**golf**
21:4 69:11
72:3,5,7,8,9,
10,13,14,18,
21 73:1,4,8,
15,24 106:7,
20,23 125:3,5
133:21
**good**
26:4 58:20
132:9 138:9
**grabbed**
73:24
**grammatical**
9:8,9
**great**
8:11 41:10
65:10,15
109:4
**groan**
108:20
**groaned**
76:21

**groaning**
82:11
**ground**
49:13,14 52:5
56:9 57:7,13,
24 73:18
80:18 84:15,
17,18 87:24
88:3,4,5,6
107:10 125:18
129:16
**grunts**
122:11
**guess**
21:1 66:19
84:17 93:17
101:10 108:21
**guidelines**
36:8,13
115:11 116:14
120:18
**Guillemette**
10:16
**guy**
105:23 137:15
**gym**
25:20,22,24

**H**

**half**
17:10 22:1
86:3 138:17
**hallucinating**
42:1
**hand**
32:20 69:15
78:7 82:13
**handcuff**
49:12 51:14
52:8 58:1
**handcuffed**
52:24 56:10,
24 83:6 97:16
115:21
116:16,22
**handcuffs**
82:16,17 83:1,
8,11,13 96:12,
16,21,24 97:2,
4 116:8
**handle**
10:24 12:10,

16 42:10
148:8
**handled**
39:23
**handling**
137:22
**hands**
32:21 57:11,
14 58:1 67:3
69:5 71:14,15,
18,21,23,24
72:2 73:12,14,
17 75:3,5,8,11
76:4,5 79:5,7
81:2 89:16
97:15 103:12,
19 113:18
114:21
**happen**
13:7 30:20
56:4 75:16
85:23 105:13
125:18 146:9
**happened**
8:12 9:1 10:12
20:18,20 23:6,
21,24 53:3
56:11 59:22
61:24 64:20
69:7 74:4,12
77:14 78:5,20
79:13 82:9,22
84:1 85:5 96:1
102:19 104:12
105:20 109:18
110:18 111:6
112:6 125:20
126:13,15,20,
23,24 127:3,8,
10 136:2,4
148:3,11
**happening**
18:11 56:23
138:5 145:21
**hard**
98:7 151:5
**harm**
101:23 143:11
147:20
**Harwich**
10:17
**head**
10:21 65:5,11

74:6 78:16
102:10 106:22
146:10
**headed**
42:21
**health**
7:2,24 10:5,9,
24 11:4 12:10,
16,18,24 13:2,
18 14:3 21:2
37:2 41:5,8,11
42:16,17,20
45:1,4 48:20
49:6 59:8
104:4 115:11
116:13 120:18
**hear**
17:22 18:3
34:21 45:18
63:21 65:20
85:18,21
89:11 141:11
148:20
**heard**
26:24 32:10
53:13,15
60:10 61:7,13,
20 64:11
79:17 81:16
85:7,15 86:15
89:8,11,12
100:14 107:22
122:10 131:13
**hearing**
47:7
**heart**
100:18,19
105:5,10,14,
23,24 127:24
**heightened**
55:7,9
**held**
33:14
**hey**
69:15 85:7
**Higgins**
6:22
**high**
140:5
**hip**
74:17
**hips**
69:20 88:21

**history**
99:17,21
127:20 138:8
**hit**
91:24 128:19
**hitting**
80:21 91:22
**hold**
32:8,12 33:6,
11,17 34:10
35:14 61:18,
24 66:5,6
72:23 79:14
113:6,7,9,24
114:1,3 128:5,
8 131:7,10,13,
16
**holding**
32:21 64:6
67:2 72:5,10,
21 73:8 75:22
76:1 77:24
113:13,17
**home**
22:18 37:3
62:23 120:24
132:18,20,24
133:5,7,18,19
134:2 139:10
142:1,24
145:6,12
147:18 148:1,
5
**hope**
130:16
**hoping**
82:1
**hospital**
55:17 56:3
57:6 127:16
147:6
**house**
60:1,2,3,5,9,
11,13 61:4
62:2,4,6,10,13
64:15 122:5
136:10,11
138:7 139:20
143:6,7,9
145:1,9,11
147:15
**household**
79:8

**Howard**
5:10 47:12
65:7 123:14
140:18
**hungry**
109:1
**hurt**
130:14
**hurting**
131:1
**husband**
137:6 139:3
**Hyannis**
19:13 26:1
58:23 97:24
98:14,15,16

---
**I**
---

**ID**
17:5
**idea**
148:13
**Ideally**
134:10
**ill**
37:16 46:12
105:24
**illness**
35:19 36:11
**IMC**
17:8 18:14
**immediately**
21:7 76:22
96:13 97:4
125:22 127:3
**implement**
79:5
**implements**
133:18
**important**
6:5 48:21
51:15 99:22
120:12 129:8
132:1
**impression**
116:7 147:5
**impressions**
110:22
**improper**
137:21
**inability**
51:7 55:11

**inaccuracies**
19:24
**inaccurate**
14:11,17 20:2
41:23 125:8
126:12
**inappropriate**
44:16
**inaudible**
45:19 65:19,
23
**incident**
8:7,13 12:8
13:5 15:4,6,8,
11,14,15,21,
24 16:6,13
19:8,11,12
20:6,16 22:24
23:2 29:1,10,
14 30:6,12
32:16 35:7
40:19 41:2
54:24 58:10,
13 86:3 98:15
104:13 109:13
110:11,16
111:5 121:24
126:10 137:22
145:19,21,22
**incidents**
15:12 22:23
**include**
110:22 111:4,
7 117:14
118:12,14,16
120:7,9
**including**
5:8 38:17
139:19
**inconsistent**
111:6
**incorrect**
14:11
**indicating**
68:7
**individual**
12:20 13:10,
12 37:1 38:7
39:11 52:12
53:5 54:19
56:9,16,17,24
98:18 132:15

**individuals**
41:1
**induced**
55:8
**influence**
52:17
**information**
20:18 34:12
41:17 59:4
84:5 98:21
102:14,16
110:17,20
111:5,16,19
112:19
120:12,14
121:16,19
125:1 127:3
129:22 138:1,
3,11,20,24
141:8 142:11,
18
**infrequently**
10:12
**initial**
22:24 72:19
74:19 81:21
116:2,3
150:17
**initially**
37:6 67:1
94:21 98:4
122:24 145:7
**initials**
68:5,14
**injured**
30:5,8,11 31:1
**injury**
30:13,14,16,
20,21,24 31:5,
6,8 130:18
131:5
**inquire**
110:5
**inquiry**
120:16
**inservice**
32:2
**inside**
60:11 67:20
68:9 133:17
140:4 143:5,7
145:1,8
147:15

**insisted**
132:19
**instance**
24:10 139:1
**instruct**
17:24
**instructor**
25:5
**instructs**
11:20
**intend**
140:22
**intent**
101:18,23
103:7
**intentionally**
128:18
**intentions**
41:4
**interaction**
72:20 95:6
**interest**
24:23,24
**interrogatories**
14:7
**interrupt**
6:6,9
**intervention**
115:11 116:13
120:18
**interview**
14:15
**interviewed**
85:24 86:6
**intoxicated**
84:3,24 138:7
**involved**
10:9 12:24
13:5,8 20:16
36:10 41:1,3
52:7 98:3
99:10 110:16
120:4 126:4
138:4,5
139:19
**involves**
132:7
**iron**
106:10,12
**issue**
8:1 37:2

Estate of Robert Miller vs
Sean Roycroft et al.

Spencer Jackson
March 24, 2022

**items**
79:8 112:14

**J**

**Jackson**
5:3,14,16
87:17 110:9
151:10

**jean**
95:4

**jeans**
94:12

**Jitsu**
26:7

**Jiu**
26:6

**job**
138:9 146:12

**John**
18:17,20 19:3

**Johnson**
9:16

**joined**
10:2

**judgment**
31:16

**Judo**
26:6

**June**
10:2

**justice**
9:14,18,19

**justify**
139:19

**K**

**K-R-A-V**
24:19

**karate**
26:7

**keeping**
54:18

**Kenyon**
6:22

**Kevin**
6:21

**key**
83:12,15

**kick**
57:10 80:12,
15 89:24 90:4

103:20

**kicked**
80:13

**kicking**
69:19 80:7,11,
14 91:6,10,11,
12,18,22

**kind**
30:13 48:15
54:13 55:23
69:10 76:11,
14 79:4 83:19,
20 88:23,24
93:2 94:24
107:4 137:17
143:23

**kitchen**
67:22 133:21,
22

**knee**
30:10 84:15,
17 88:1,3,7,8,
13 117:9,14

**kneeling**
84:6

**knees**
88:5

**knew**
84:23 147:17
149:17 150:7,
9

**knife**
78:8 79:4

**knives**
133:22

**knowledge**
20:11 57:20

**Krav**
24:17 25:4,20

**Kwon**
26:7

**L**

**landed**
64:23

**language**
6:3 139:7

**larger**
37:17

**lawsuit**
21:16

**lawyer**
6:3 7:8 11:20
92:11

**lay**
50:2

**layer**
120:3

**laying**
35:3 96:23
117:5

**layout**
40:24 62:23
120:24

**lead**
54:13

**leader**
10:14,15

**learn**
34:18 42:13
50:5,11 51:11
54:23 57:15
60:19 72:13
74:23 100:21
105:2

**learned**
32:4,17 33:2,5
34:15,20,24
45:13 50:19
51:8 54:20
74:21 113:1,2
124:16 127:11

**leave**
7:23 12:21
49:14,16 96:6
132:20

**led**
79:3 116:4

**Lee**
5:16

**left**
32:19,20
50:21 60:2,4,
5,6,8 66:3,9,
18,23 67:19
69:10 72:1
73:20 76:13,
14,16,19
77:20 78:2,11
82:23,24 83:1
84:16,18 88:2,
4,7,8 94:18
149:11 150:7

**leg**
33:23 84:17
88:2 94:12
95:4 129:19

**legal**
26:10

**legs**
88:17 91:6,9

**level**
12:22 44:1
55:10,24
140:6 143:15
145:2

**lieutenant**
10:17 18:21

**life**
102:8

**lift**
75:17 77:8,11
82:15 89:4

**light**
141:22

**lines**
79:19

**listen**
41:13 46:2

**listened**
107:20

**listening**
45:15

**live**
37:3

**lived**
149:11

**living**
7:18 67:20,21
68:9 122:5,16,
21

**location**
74:9 119:19
121:22

**locations**
123:2

**lock**
83:13

**locked**
83:8,9,16

**log**
109:8

**long**
25:14 49:13
59:11 61:13

72:10 75:7
78:19

**longer**
66:4 95:11,22
124:17 149:20

**looked**
14:20 28:18
35:18 60:2,23
74:14 82:3
83:19 92:2
94:23 122:23

**lost**
22:14 42:7

**lot**
43:20 62:19

**loud**
60:10

**lower**
44:1 67:13
76:7

**lunch**
86:18 109:2

**lunge**
84:8,10,14
87:19

**lungs**
57:22

**lying**
50:21 57:7

**M**

**M-A-G-A**
24:19

**MADAM**
151:7

**made**
13:9 39:11
68:18 71:13
76:21 78:17
82:11 107:14
124:7 136:21
138:6

**Maga**
24:17 25:5,20

**make**
12:20 13:11
36:22,23 37:1,
4 38:22 40:16,
22 41:2 43:14
49:8 50:7,11,
20 51:2 57:5
92:10 115:24

Estate of Robert Miller vs
Sean Roycroft et al.

Spencer Jackson
March 24, 2022

120:20 121:10
124:15 134:7
149:1 150:9
**makes**
111:12
**making**
8:23 9:2
122:24
**male**
59:5 61:1,2
121:22
**male's**
61:2
**man**
149:10
**mandatory**
35:10
**maneuvering**
73:9
**Mark**
6:21
**marks**
121:10
**married**
137:7
**Marstons**
13:21
**martial**
24:16 26:6
32:5
**mask**
112:13
**Mass**
7:2
**max**
61:15
**means**
13:14 27:7
31:24 43:23
45:17 114:6,
10,16,22
115:19 130:5,
8 131:4
145:17
**measurements**
121:7
**med**
96:5,8
**medic**
55:6
**medical**
19:9 20:15,21

23:14,18
55:16,17
99:20,22
112:12,14
117:17 138:8
149:24
**meet**
46:21
**meeting**
7:7
**meetings**
7:10,11
**Mellyn**
6:21
**member**
9:23 10:8
13:17 25:23
38:20
**members**
12:2
**memory**
110:21 111:6
116:6 119:3
**mental**
7:2 10:4,9,24
11:4 12:10,16,
18,24 13:2,17
14:3 21:2
35:19 36:10
37:2 41:5,8,11
42:16,17,20
45:1,4 48:20
49:6 59:8
104:4 115:11
116:13 120:18
**mentally**
37:15 46:11
**mentioned**
19:3 20:23
70:1 104:14,
22 107:13
122:15
**met**
139:2 148:6
**method**
114:17 129:14
**methods**
129:10,11
**mic**
65:21 78:13,
15
**microphone**

66:1 79:17
**middle**
93:15
**midst**
47:18
**Mike**
10:17
**military**
9:21
**Miller**
20:3 22:19
23:10 24:3,14
32:19 33:14
34:10,13 35:3,
15 58:12
61:17,24
63:14,16 64:6,
8,12,24 65:22
66:2,13,18
67:14,19
68:15 69:19
71:21 72:4,23
73:12,18,20,
23 74:16
76:12,17,20
79:4,12 80:21
81:15,16 84:8
85:10,16,21
86:10 88:11,
18 89:8,22
90:4,9 93:10
95:6,10,18,21
99:7 100:21
101:12 102:21
103:10 105:20
106:15,17
107:9 108:14,
17 112:10
113:14,17
115:21 116:8,
16,22 117:6
118:23 119:4
121:24 122:5,
9,17 123:4,23
124:17 125:3,
23 127:4
129:15 130:7
132:18 133:1
134:12 135:3,
20 136:12,16
137:12 139:5,
17 140:6
144:10,14,17

145:5,13
146:5,20
147:5 149:4,7,
22 150:7
**Miller's**
22:18,19
32:20 66:10,
24 69:5,18
71:15 74:14,
15 76:14
79:14 82:6
88:19 89:2
93:23 104:5,8
105:5,10,14
106:22
113:19,22
116:24 117:9,
12 146:16
147:3
**Mills**
13:21
**mind**
27:13 86:21
87:22 102:4
115:16 116:17
123:11 137:16
**mine**
9:8,11 25:4
**mini**
151:5
**minor**
9:8 30:9,21,24
31:2
**minute**
59:13,19
109:11 138:17
**minutes**
86:19 138:16
150:12
**Mm-hmm**
140:11
**moan**
76:24 108:20
**moaning**
76:21
**mode**
71:1,3
**moment**
10:21 124:16
140:17
**monitoring**
53:1,5

**month**
16:12 17:9,10
22:1 86:3
**morning**
15:17
**motion**
89:3,7
**motions**
5:9
**motor**
46:22
**mouth**
113:22
**move**
8:3 64:14,21
75:14 78:12
**moved**
7:19 72:18
76:18 95:7
**movement**
43:8 76:22
77:3 78:10
**moving**
80:20 89:6
**mug**
133:24
**multiple**
19:7 111:19
**Murphy**
18:17,20 19:4
**muscles**
71:5 103:12
**muted**
123:14

———
**N**
———

**names**
98:3
**narcotic**
55:9
**narcotics**
84:4,24
**narrative**
18:13 29:1,9,
14
**natural**
120:2
**nature**
46:8 102:22
115:5 136:17
137:16,18
141:20 148:3

**necessarily**
15:19 46:17
47:8 103:7
138:19

**neck**
113:19
128:16,19,22
129:8 130:17

**needed**
14:11,24
104:4 133:15
144:19

**Negotiation**
38:18 39:2,5,
7,18,20 40:1,
4,9,13

**negotiators**
13:9

**noise**
76:21 82:11
122:10

**non-judgmentally**
41:13

**noon**
86:19

**normal**
55:20 81:8
102:24 118:4

**notation**
68:17

**notations**
120:20

**noted**
87:12

**noticed**
73:7 78:12,14

**notify**
79:15

**number**
11:9 38:6,16
79:20

**numbers**
37:17

**O**

**oath**
6:13 149:3

**obese**
50:15

**obesity**
50:23

**object**
35:4 78:8
114:12

**objection**
11:17,19,22
17:13,19,22
18:4 21:9
34:3,19,22,23
66:21 71:22
86:12,21 87:1,
8,11 102:1
105:7,19
110:24 113:4
126:17 128:2,
12 131:18
148:10 149:16

**objections**
5:7 11:22

**objective**
26:24 27:9,11
52:18 54:4

**objectively**
27:12,14 34:4

**objects**
77:23

**observations**
147:1

**observe**
85:6 113:13,
17,21 117:4,8
118:22

**observed**
60:13,24
67:19 70:10
83:20 94:24
111:24 112:2
113:16 136:12

**obstructed**
123:5,9

**obtain**
9:17 111:18

**obtained**
9:13 111:17

**occasions**
25:16

**occurred**
98:15 109:22

**offended**
146:16 147:2

**offense**
15:18

**office**

62:4,9,14
64:18,21,23
65:5 69:1,8,13
72:14 73:9
78:19,24 94:4
95:5 99:12
103:10 105:17
122:18 123:5
135:3

**officer**
6:17 7:13
8:14,21 11:24
20:9,10,15
22:11,19 23:6,
7,13,16,17,23
24:23 26:11,
16,21 27:14,
15 30:8 31:4
33:10,14,19
34:1,2 35:6,16
36:9 38:6,8
40:3,22 44:3
48:15 51:15
52:16,19,20
53:1,7 54:6,7,
9,10,13,14,16,
17 59:9,11,15,
17 61:11,14,
16,23 64:5,8,
11 65:1 66:12,
23 67:2,6
68:15 69:23
70:1 71:8,12,
13,17 72:22
73:8,13,16,18
76:8 77:21
78:3 80:15,18
85:10,13
87:17 89:9
90:4,7 93:9
95:10,12,14
96:3,5,7,9,11,
13 97:6,22
99:2,10,11,16
100:6 101:17
105:5,16
107:8 109:11
110:9,16
111:23 112:3,
8,11,12
113:13,16,18,
21 114:12
117:1,5,8

122:17 123:13
124:19,22
125:8,13
126:4,15
127:5,6,9,12
129:13,17,22
130:6 132:1,
19,24 133:7
134:5,11
135:17,19,22
136:9 137:13
139:2,9
140:10,13,21
142:22 143:10
144:18 145:10
146:5,15,19
147:1,14,18
148:16,17,19

**officer's**
114:21

**officers**
13:8 20:24
22:22 23:3
25:12 27:4,7
37:18,22
39:24 43:20
49:3 52:8,13
56:15 99:10
102:7 104:11
111:17 113:2
119:20 124:19
125:2,12
126:3,18,19,
22 127:11
131:9 132:8,
12,14 133:9,
13 134:23
148:2,13,14

**official**
14:20 150:10

**oftentimes**
55:11 56:13

**older**
51:2

**open**
60:23,24
92:19

**opening**
94:14,16,20
95:3

**openly**
14:2

**opposed**
12:16

**opposition**
114:15

**order**
13:4 27:10
33:15,17 34:8
42:17 43:24
44:2 46:17,18
47:3,10,15
48:1 54:3
55:18 57:21
75:3 114:14
121:11 129:24

**ordering**
52:22

**orders**
46:3,9,13

**ordinarily**
71:4 133:22

**ordinary**
15:8 17:9
46:20 48:1

**organize**
40:8

**organized**
133:8

**original**
19:24

**originally**
59:18 135:23

**oval**
93:3

**overdoses**
53:24

**overview**
8:10,11 23:6

**owned**
25:19

**owner**
25:20

**P**

**p.m.**
151:10

**pain**
76:24

**painful**
71:6

**pair**
35:5

**pal**
44:9,15,17,23
**pale**
118:16
**panting**
118:3
**paper**
27:19 65:24
**paralyze**
71:5
**paramedic**
24:8
**paramedics**
98:21
**paramount**
40:15
**parked**
59:24
**part**
21:19 25:20
38:20 39:5
47:13 66:12,
14,17 67:8,9,
11,12,13
75:22 76:5
89:6 91:3
93:22 101:21
113:18,21
120:17,19
127:8
**partially**
73:19
**participate**
112:9
**participated**
25:6 112:17
**parties**
138:4
**partner**
20:16
**partners**
70:8
**party**
36:23 59:6
121:22
143:12,14
**passively**
103:11
**past**
31:1 138:8
**patient**
21:2 100:13

**patrol**
39:23,24 40:3
**PEA**
100:14 101:4
**peering**
83:20 94:24
**penalty**
6:13
**pending**
18:9
**people**
11:8 12:6 19:3
20:17 22:18
25:11 36:24
37:3,15,21
41:24 49:8
55:7,12 56:18,
19 86:18 98:9,
10 104:14
105:1 109:19
111:19 114:24
115:2,7
117:18 118:18
124:18 125:4
126:2,14
127:2 132:11
136:14 138:10
139:19
147:15,20,24
148:1
**percent**
135:12
**perimeter**
13:4,7
**period**
24:20 42:11
**peripheral**
69:11
**perjury**
6:13
**person**
11:14 13:12
14:2,5 20:13
23:13 26:10,
13 31:21
36:14 37:4,6,
9,11,16 40:16
41:4 42:1,10
43:1,3,23
44:6,8,11
45:6,21 46:1,
5,6,9,11,16
47:6,17,18

48:2,20 49:5,
9,12,14 50:6,
15,20 51:2,13,
21,24 52:2,9,
12,21 53:2,5
55:17 56:2,5,
13 57:7,13
58:2 62:18
94:12 99:3,17
117:20,24
118:6,9
119:13,15
130:18 132:3
133:5,6 134:3
138:12,15,16
143:4,20
144:20 148:19
**person's**
43:8,14 50:22
51:6,17 55:24
71:5 113:10
118:8,9
119:22
**personal**
32:5
**personally**
45:2
**personnel**
19:9 20:15
23:15 24:12
38:17 39:13
97:24 99:22
**perspective**
115:23 123:3
**phone**
7:11 138:10,
12,16,17
**photo**
95:16
**photograph**
94:8,10
107:17
**photographs**
92:4
**photos**
31:3
**phrase**
40:18 114:8,
10,17
**physical**
26:4 50:23,24
103:20 104:6
121:12 139:17

**physically**
101:15 105:24
**picked**
106:15
**picture**
87:22
**pictures**
30:24
**Pike**
6:22
**pivoted**
78:4 94:23
**place**
13:12 15:21
22:17,23
40:19 70:11
82:16 96:17
117:9
**plan**
41:11 48:22
54:1,2 69:24
70:3 87:10
132:2,7 133:8,
9 134:8 144:8,
13 147:23
148:6,17
**play**
107:19 108:1
**played**
108:3
**point**
9:6 21:20
32:22 61:7,21
64:9,11,20
65:12 67:14,
17 68:11 70:8
72:22 75:6,8
77:3,16 81:15,
17 85:11,14,
15 89:15
93:23 96:9
103:23 107:13
108:9 115:21
116:16,21
117:4,8,11,15
118:23 134:16
139:16 141:12
146:16 150:12
**police**
5:18 7:1,3
8:20 9:7 10:18
11:7 14:15,20
15:2 20:15

21:13 22:10
23:3 24:22
25:12 26:9,11,
16,21 27:3,7,
15 32:1,2,9,24
33:7,19,24
34:2 37:5,6,22
39:8,19 40:22
43:20 48:15
51:14 55:10
56:19 74:24
85:24 89:9
94:11 98:17
99:10 100:2
102:7 111:17
119:10,12
125:8 128:9
132:1 142:22
148:19
**policies**
11:3,7,11,15
**policy**
10:23 12:1
15:2 31:13,16
35:9,18,22
38:3 49:2
115:15
**portion**
74:15 107:19
**pose**
143:5
**position**
50:1,2 51:13
52:4 57:2,4
74:13 76:10,
15 83:3 84:8,
9,10,13,19
85:11,14
87:19 88:21
93:5,8 94:7
96:22 97:1,3,
5,9 106:14,16
107:10 122:20
129:24
**positional**
51:5
**positioned**
50:8
**positioning**
20:3 51:6 74:8
106:21 117:1
122:15

Estate of Robert Miller vs
Sean Roycroft et al.

Spencer Jackson
March 24, 2022

positions
54:2 76:18
121:13
possession
79:10 114:13
postured
83:19
potential
7:5 128:20
150:10
potentially
30:19 37:12
44:10 51:4
57:23 70:15
73:3 102:4
129:21 132:17
133:12 137:19
142:7 143:5
144:1 146:9
147:22
practice
12:15 31:1
pre-hospital
127:15
predictable
115:3 131:23
preexisting
50:6
prepare
6:24 7:10,13
8:15,18 15:3
27:23 28:18
prepared
15:9 21:24
29:6,16
present
112:1
pressure
51:16,21,23
89:1 130:17
134:12
pretend
44:22
pretty
75:14 107:3
108:16 138:9
prevent
51:11 56:22
previously
149:9
primary
54:11

printed
62:15
prior
115:21 116:16
privilege
11:21 18:2
probe
70:21
problem
7:24 133:14,
17 137:20
143:16,21,23
problems
51:20
produce
16:3
proper
20:21 31:16
protect
38:8
protocol
42:18
provide
13:4 20:17,21
98:20 99:17,
21
provided
24:13
providing
8:24 24:2
psychosis
41:20,22 42:1,
11 45:22
46:12 52:3
101:23
psychotic
36:15 37:17
46:2,9 47:19,
24 48:5,7,21
59:6 81:20
85:1 101:20
102:15 103:3,
6 115:1,7
121:23 130:22
131:21,22
132:4 133:6
135:10,13,18,
20 137:7,11
139:3 142:3,
10,12,14,21
144:17
pull

75:13,18,20
77:7,19 82:12,
13 89:5
103:13,20,21
128:17
pulling
69:21 76:4
80:23 81:7
88:19 90:17,
19,20,22,24
103:17
pulse
101:5 150:16,
19
pulseless
100:14,21,24
101:4,11
punch
77:13 89:22
90:4 123:19
punched
74:19 75:9
76:20 77:1
79:12 82:7,9
108:21 123:22
punching
75:1,2
purely
121:10
purports
120:23
purpose
75:1,2
purposes
99:21 144:20
push
58:3,6
pushed
93:14
put
27:21 36:2
42:19 50:13
57:1,4 66:23
68:1,4,8,14
69:14 72:22
81:2,13 85:10
86:21 97:3,5
103:19 105:18
117:11 134:3
137:14 142:13
putting
68:13

**Q**

question
5:8,23 6:7
11:23 17:20,
23,24 18:5,8,
10 86:13
102:3 105:8
111:2 136:24
140:19 143:18
148:24
questions
49:11 109:6
110:5,9
111:15 112:21
115:10
123:10,15
144:2 147:10
150:22
quick
20:7 79:1
116:3,5
quicker
18:3 138:13,
18
quickly
36:18 74:6
115:12,15,19
quiet
38:8

**R**

radio
78:13,15
79:15,18,20
81:13 82:3
102:15
107:14,19
railing
107:5
railings
123:7
raise
43:5
raised
77:20
raising
89:7
ran
46:22 48:2
rank

18:20
rate
118:4
ratio
87:4
rational
102:12 132:3
reaching
35:4
reactions
115:6
read
18:8,9 21:23
22:16 86:14
135:24 140:9
reading
111:13
ready
132:14
reality
41:24 42:8
45:23 46:7,17
47:7 48:12
reason
25:17 52:14
58:16 73:11
119:12,16
128:13
130:13,22
139:17
reasonable
27:8,10,13,14
33:16,24 34:4,
7 35:13
reasonableness
27:1,9
reasons
74:7 111:10
reassurance
41:16
recall
11:3 13:19
14:13,19 19:5
20:7 24:4,12
33:9 35:24
52:6 57:18
67:12 71:19
80:16 85:14
91:15,24
92:24 93:19
96:10 100:16
104:16

109:17,19,23
120:21 129:5
139:24
**receive**
14:2
**received**
22:13
**recent**
128:24 129:1,
3
**recently**
43:20
**recessed**
68:12 94:18
122:17 123:1,
5
**recognize**
114:2 117:19
**recognizing**
53:9
**record**
5:14 21:24
86:20,22
87:17
**recording**
108:3
**recovery**
50:1,2 57:1,3
85:11 97:1,3,
5,9
**red**
118:12
**reduce**
51:16
**reduction**
118:4
**refer**
134:16
**referred**
137:6
**referring**
40:1 62:7
**refers**
16:24
**reflecting**
122:6
**regional**
9:24 10:13
**regularly**
26:2
**regulation**
72:7

**relate**
44:6
**related**
32:16 110:11
**relative**
115:16 121:12
**relax**
81:2,8,23,24
103:19
**relaxed**
44:6 146:11,
13
**relief**
147:7
**relieved**
147:9 149:4,6,
8,14,19
**remain**
145:8
**remained**
108:16
**remember**
22:12 36:1
53:12 62:24
71:19 80:13
81:1 90:1
91:11,17,19,
22 93:7 98:2,
24 104:23
115:13 121:19
122:2,4,7
133:2 145:3
146:6
**remove**
17:14 49:20
75:3,4,15,21,
23 76:18
82:12 96:16,
24
**removed**
96:12,21 97:4
147:6
**removing**
97:2
**rephrase**
6:2 111:2
**replied**
84:23
**report**
8:20 9:7 14:20
15:4,6,8,12,
14,24 16:7

17:4,7,10,16
18:12,16,24
20:1,2,24
21:8,10,11,14,
18 22:7,16
28:1,9,17,24
29:1,2,4,6,8,
16,22,23,24
30:1,3,13,16,
22 31:3,6
74:19 110:23
111:5,8
123:19 124:1,
5 125:1,6
126:11,12
127:15,16
135:24 140:1,
10,13,21,22
141:3,5
**reported**
59:5 144:16
**reporter**
18:7,9 151:7
**reporting**
36:23
**reports**
7:1,2,3 9:3
110:10,14
111:11 140:9
**represented**
6:15
**represents**
6:17,20
**request**
37:13 150:17
**requested**
12:22
**required**
114:3
**requires**
148:14
**requiring**
35:9
**rescue**
150:13
**reserve**
5:7
**resistance**
29:2 30:3
31:11
**resisting**
90:20 103:11,

15
**resolve**
40:14 44:2
129:24 132:13
**respect**
38:11 42:16
44:7
**respond**
55:10 119:19
144:9,19
**responded**
108:17 112:23
**responders**
40:20
**responding**
119:13 120:15
**response**
29:2 30:3
31:11 89:9
108:20 119:10
**restrain**
56:5
**restrained**
53:2
**restraint**
31:17,20
114:18
**restrict**
43:8 97:20
**restricted**
50:4 97:12
**result**
131:4
**resulted**
105:10 137:21
**resuscitate**
149:13
**resuscitative**
112:9,17
**retire**
8:4
**retired**
8:2
**retirement**
8:6
**retrieved**
72:17
**revert**
11:6
**review**
110:13

**reviewed**
7:1,4 14:7,14
17:17 31:13
**reviews**
111:10
**revival**
149:23
**revive**
99:7 149:22
**reviving**
150:4
**rhythm**
100:18,19
**rib**
74:17
**right-hand**
16:18
**Riley**
10:17
**RM**
68:14
**road**
60:1
**Rob**
25:19
**Robert**
22:17 25:8
32:19,20
33:14 34:10,
13 35:3,15
58:12 65:22
66:2 85:15,21
86:10 88:11
101:12 104:5
122:5 136:12
137:12 140:6
141:8,19
149:4,6
**roll**
26:17
**room**
62:4 63:5,9
64:17 65:23
66:2 67:20,21
68:9,12 88:21
94:18,22
122:5,16,21
123:1,2
**rooms**
121:6
**rotted**
60:20

**Roycroft**
6:18 7:13
8:14,22 19:6
20:9,10 22:19
23:14 28:11
30:8 33:10,14
35:6,16 53:7
59:9,11,16,17
60:24 61:11,
14,17,23 64:5,
9,12 65:1
66:3,23 67:2,6
68:15 69:23
70:1,2 71:8,
12,13,17
72:22 73:8,13,
16,19 76:8
77:21 78:3
80:15,19 85:6,
7,10,13 90:5,7
93:10 96:11,
13 97:6 99:2,
11,16 101:17
102:19 105:5,
16 107:9
109:11 111:24
113:13,16
117:5,8
122:17 124:19
125:13 126:4,
16 127:5,12
129:13,17,22
130:6,9
132:19,24
134:11
135:17,19,22
136:9 137:13
139:2,9
140:10 144:19
145:10 146:5,
15,19 147:1,
14,18

**Roycroft's**
32:18 66:12
113:18,21
117:1 140:9,
13,21

**Ruggieri**
6:20 23:6,17
95:13 96:7
97:22 99:11
100:6 112:3,8,
11 127:6,9

**ruled**
74:6
**rules**
5:21
**rundown**
23:20,23

—— **S** ——

**sad**
149:10
**sadly**
101:10
**safe**
14:5 37:11
40:16,19,23
49:9 116:1
**safely**
132:4 133:10
**safer**
145:12
**safety**
40:15,18
54:18 89:17
120:4 139:18,
21,22 145:2
**Sasha**
150:24
**scale**
62:22 87:4
121:4
**scan**
92:10
**scans**
100:13
**scene**
19:10 36:19,
21,22 37:5
39:11 40:8,15,
16,18,23,24
48:19 54:18
107:1 110:22
111:7,13,16,
19 112:2,5,18
113:3 115:13
116:1,17,21
120:5,13
121:15
126:18,20,22
132:8 135:13,
23 136:5
**scissors**
35:5 133:23

**screaming**
81:4
**screen**
27:22 36:2
**Sean**
18:17,18 19:6
32:18 60:24
66:3 67:18
69:14,15
71:20 76:11
78:7,13,14
82:23 85:6,7
99:4 102:18
**Sean's**
61:1 66:8,9
79:6,17,20
150:17
**seat**
32:8,12 33:6
34:10 35:14
61:18,24 66:5
72:23 113:6,7,
24 128:5
131:7,10,13
**seconds**
61:15,16
63:20,22
75:10 78:23,
24 79:2
123:11
**section**
29:2 42:20
93:14
**secure**
36:19,21,22
69:21 115:12
**secured**
116:18,21
**securing**
37:5
**selling**
25:21
**send**
119:20 148:2,
13
**sense**
55:8 65:11
111:12 134:18
**sentence**
47:14
**separate**
39:7

**separated**
35:5 41:2
**Sergeant**
23:5
**service**
19:20
**services**
28:19
**set**
13:7 111:11
**shaft**
106:20
**shared**
121:17,20
129:23
**Shaw**
6:21 23:7,16,
23 95:10,12,
13,14,17 96:2,
3,5,7,9 97:22
112:3,8,12
127:6,9
**shift**
15:13,15,20
18:21,22
28:18
**shock**
100:9,10
**shooting**
70:17
**short**
24:20 53:23
70:22 78:21
87:16 109:5
**shortly**
49:21
**shortness**
53:11 118:2
**shoulder**
32:19 61:2
66:8,14 69:15
78:13,15
88:16 128:15
**shoulders**
88:9,13
**show**
12:5 16:6 28:5
29:11 38:8
65:4 68:3
120:23
**showed**

56:8 97:23
**showing**
128:17 133:13
**shows**
36:10 92:19
94:4 134:24
**side**
28:4 50:3
59:24 60:3,6,8
61:2,3 62:8
65:18 66:3
67:19 69:10,
12 70:6,9
74:13 76:4
77:20 78:2
80:11 82:4,6,
14 84:7 91:12
96:23 108:21
113:10 123:7
136:9,10
**sight**
123:4 132:15
133:15
**sign**
46:22 48:2
68:21 79:20
134:21 148:22
**signed**
28:18
**significant**
9:10 55:20
**signs**
36:10 117:20,
23 118:22
119:4 134:14
**silence**
119:22
**silent**
119:18
**similar**
84:13 107:3
108:15
**Similarly**
120:1
**simple**
5:22
**simply**
17:23
**sir**
6:1 109:6
**situation**
12:11 20:13

27:8 33:17 34:5,6 36:9,19 37:20 39:10, 12 40:7,12,14, 21 41:1 42:14, 18,21,24 44:2, 4 46:4,14 49:4,21 52:10 54:4,5 55:14, 22 56:6 57:13 58:4 81:6,12 89:10 102:17 105:3,21 109:16,18,22 110:1 114:14 115:12,19,22 116:4,9,12,17 119:15 122:7, 13 127:8 130:1,2 131:20 134:4 143:1,3,13 148:11 149:8, 20

**situations**
10:6 12:13 37:20,23 46:10 56:8,12, 15 117:17 146:13

**size**
12:7

**sizing**
83:12

**skills**
45:15

**slept**
141:13

**slider**
60:14 63:5,21

**slip**
33:3

**small**
9:9 70:10 88:14,22 137:24

**soft**
43:24

**somebody's**
45:18

**someone's**
134:2

**someplace**
25:1

**Sonnabend**
10:19

**sort**
53:24 55:8 85:1 93:3 105:1 139:11

**sound**
102:4 140:24

**sounds**
118:5 142:3

**source**
110:17

**space**
48:17 88:14

**speak**
7:13 19:15 20:5,10,17 23:8 44:5 45:10 53:23 99:2 104:20 112:16 139:8 140:7

**speaking**
34:22 45:6,7, 9,20 54:12 81:14 108:14

**specialized**
38:17

**specific**
11:5 12:19,24 15:10 32:10 71:20 109:19 119:2

**specifically**
11:1 19:11 24:11 28:23 32:16 38:23 39:21 48:6 52:6 53:3,12 57:18 81:1 89:7 91:24 129:5 130:4

**speculate**
129:17

**spell**
24:18 25:9

**Spencer**
5:3,16 151:9

**spoke**
7:15 8:10

18:17 19:6,13, 23 20:8 23:14 41:21 56:8 86:10 98:23 104:9,19 109:17 122:11 126:19 136:6 137:14 140:10 147:8

**spoon**
133:21

**SR**
68:15

**stabbed**
78:8

**stages**
129:1

**stamp**
108:1

**stand**
125:18

**standing**
64:4 67:21 68:4 84:6 85:13 93:10 122:4 125:23 136:12

**start**
92:15 101:8 125:19 138:21

**started**
21:6,7 64:14 125:17,22

**state**
5:14 7:2 14:15 43:24 85:24 94:11

**stated**
21:1 121:21

**statement**
19:24 20:4 21:23 22:12, 16 71:13,20 79:6 102:15 125:7 127:1 143:17 150:9

**statements**
44:24 52:23

**states**
21:1

**station**
119:7

**status**
79:19 84:5

**stay**
37:9 140:4 145:1

**stayed**
84:9 94:19

**staying**
145:12

**step**
37:19 84:14 107:5,9 115:11,15 116:13 120:17

**stepped**
60:23

**steps**
35:21 62:3 64:22

**stick**
11:24 65:4,18 68:14

**stimulant**
55:8

**stomach**
50:8,16,21 51:20 74:15 82:5,6,7,10,15 83:4 96:19

**stood**
21:5 125:16 127:22

**stop**
46:22 48:1,2 57:2 60:4 61:5 91:9 105:6,11, 24 142:22

**stopped**
20:14 31:2 46:22 49:22 87:18 95:18 105:15 127:4

**story**
126:9

**strange**
122:8,14

**street**
46:21 48:2 58:23 59:3,23 62:8,23 112:23 115:22 120:24 121:15

**stress**
145:22

**strike**
5:9 64:8 82:5 90:2,7 91:7 144:23

**striking**
91:14

**strongly**
47:21

**struck**
74:15,18 77:13

**struggle**
57:21

**struggling**
124:24

**STS**
21:1

**studied**
26:6

**study**
25:14

**stuff**
9:9 33:23 129:2

**stun**
70:24 71:3

**subject**
6:13 15:16 52:7 54:11 131:6

**subjectively**
27:13

**submit**
29:24

**successful**
75:6

**successfully**
13:24

**suddenly**
127:23 141:3, 22

**suffering**
46:12 52:2 101:22

**sufficient**
116:12 132:7 133:9 134:8

**suggest**
111:4

Estate of Robert Miller vs
Sean Roycroft et al.

Spencer Jackson
March 24, 2022

**suggested**
110:20 124:3,
10
**superiors**
17:18 104:12
109:14
**supervisor**
16:23 28:19
40:6,7 110:13,
20 111:4,10
124:2
**supervisors**
8:17 9:6
109:14
124:10,11
**supposed**
15:6 28:24
30:12,16 38:3,
7,11,13 41:10,
13,16 53:1
**supposedly**
100:17
**surprise**
122:3
**surroundings**
145:20 146:4
**suspect**
126:8
**SWAT**
9:24 10:4,8,
13,14,23 11:1,
3,6,8,14 12:3,
9,23 13:1,17
38:21,23 39:1,
5,21 54:24
55:4 143:24
**swear**
26:10
**sweep**
33:23 129:19
**switch**
141:23
**sworn**
5:4
**symptoms**
117:20 118:22
127:24 128:3
**system**
17:11

**T**

**table**
35:3 63:7,15,
16,18 64:2
93:2,3,7,13,
21,22 94:7
**tactical**
54:1,2
**Tae**
26:7
**takedown**
33:19 129:14
**takedowns**
33:23
**takes**
138:12
**taking**
32:5 40:19
43:23 58:15
129:10
130:19,21
132:8
**talk**
26:14 43:5
58:10 102:18
124:14 130:5
135:8 137:18
139:6 142:11
**talked**
104:7 116:24
118:23 141:20
**talking**
15:7 21:5
22:10 46:8
101:8 102:21
125:16,19
136:17 137:15
138:15
141:20,24
142:22
**talks**
138:16
**taser**
70:2,13,16,21,
23 71:4,9
74:6,11
**tasing**
74:4
**taught**
26:10 33:19,
22 128:5,9

129:5,11,15
**teach**
128:14
**team**
9:24 10:4,8,
13,14,23 11:2,
4,6,8,14 12:3,
9,23 13:1,17
38:18 39:2,5,
7,18,21 40:2,
4,9,13 55:5,6
134:9 143:24
**technique**
32:23 33:2
74:21 75:3
**techniques**
31:20,22
33:20,22 34:1
35:9 45:13
**telephone**
19:17,19
**telling**
37:5 48:3
81:1,8 146:16
149:3
**ten**
86:19
**term**
26:24 27:3
32:10 41:19
43:19 45:14
53:13,19
54:20,23 58:7
100:14 101:3
113:6,7,8
114:5 115:16
124:3,5 128:7
145:14
**terms**
87:3 117:17
118:2
**terrific**
92:13 151:3
**testified**
5:4 34:23
122:20
**testimony**
134:11
**theoretically**
100:17
**there'd**
135:18

**thick**
63:4
**thing**
6:5 36:18 48:6
52:16,20
53:24 97:19
104:18 108:16
112:5 145:19
**things**
7:15 8:10 39:1
42:4 43:13
62:20 91:4
97:18,20 99:6
109:15,21
128:3 136:14
142:13
**thinking**
122:7 135:22
**thinks**
79:7
**thought**
14:10,23 22:9
30:18 55:14
70:13 81:20
102:7
**thoughts**
41:24 102:13
**threat**
12:21 41:24
132:20 143:5
**threaten**
43:3 101:15
**threatened**
101:13 139:14
**threats**
138:6
**tight**
70:10
**tighter**
83:14
**till**
61:20
**time**
15:7,10 18:12
19:22 23:20
24:20 25:23
33:7 35:8
39:12 47:3,5
52:14 60:10
74:8 75:9
78:1,6,21
84:7,9 85:4
86:17 87:14

89:15 95:10,
12,21,23
101:20
102:11,13
105:13 108:1,
2 112:20
113:16
115:23,24
116:7,8 122:8
124:22 138:12
144:13 149:18
**times**
13:16 19:7
97:16 138:22
**titles**
50:13
**today**
6:12 31:14
113:7,8
120:21 141:19
149:3
**toe**
84:18
**toes**
88:3
**told**
71:8 81:23
96:7,14 124:2
126:15 146:20
**tone**
81:14 108:13
124:4,12
**tool**
74:8 114:5,10,
12,16 130:5,7
131:3
**tools**
114:22
**top**
16:8,17 17:3
56:16 63:1
65:9,22 66:13,
18 70:24
73:19 78:15
81:7 117:5
**torso**
117:12
**total**
25:15 78:23
98:3
**totality**
104:3

Estate of Robert Miller vs
Sean Roycroft et al.

Spencer Jackson
March 24, 2022

**touch**
42:7 45:22
46:7,16 47:6
48:11 128:21

**touched**
42:12 53:11

**town**
98:11,12,13

**toy**
72:8

**train**
10:4

**trained**
31:22,24 32:8,
23 34:2 35:10
37:16 41:5,19
42:10 46:11
49:15 52:2,19
53:12 54:5,20
55:13,16 56:1,
22 114:1,19
115:1,5
117:16,19
128:21 131:4

**training**
24:16 26:9,20
31:10 32:3,9
41:21 42:12
49:11 51:9
53:9 55:1,4
74:24

**transcript**
14:14

**transferred**
122:1

**translation**
22:15

**transmission**
78:17 81:13

**transmissions**
107:19

**transmit**
138:20

**transmitted**
79:22

**transmitting**
79:17

**trapped**
66:19,22
76:11

**traumatic**
145:18,21

**treat**
23:9 42:15
44:7

**treating**
127:19 142:15

**treatment**
14:3 24:2,7,9,
13 132:5
133:11 149:24

**treatments**
99:23

**trees**
102:8

**trial**
5:8

**trouble**
50:16 51:3
117:18,21
118:19

**true**
22:4 48:22
129:3 135:1

**truthful**
45:3

**tunnel**
134:16
145:14,18,24
148:22

**turn**
6:8 85:6
128:10

**turned**
122:23 141:23

**turning**
118:12,14,16

**turns**
30:17

**twist**
69:20

**twisted**
77:18 88:16

**Tynan**
23:5

**type**
15:18 31:5
114:2 119:20
128:8 143:21

**types**
12:17

**typically**
110:17 112:16
114:19 119:9

___
**U**
___

**ultimately**
16:21 124:7

**unable**
55:19 75:14
77:8 117:18,
21,24 118:6,
10 119:16

**uncertainty**
119:23

**unconscious**
20:14 124:17

**uncuff**
97:8

**uncuffing**
97:14

**undergoing**
45:22

**underneath**
32:20 57:8,14
58:1,6 66:9,
15,19,24
67:13 72:3,18
73:6,15,20
75:4,5,18
76:12,13,17
77:9,15,19,23
80:6 82:13
88:20 90:11
103:12 106:17

**understand**
5:24 6:2,12,17
17:20 18:4
32:12 39:17
40:24 45:8
47:3 48:14
53:17,19
57:19 87:23
88:15 98:7
99:20 105:4,9
113:8 124:15
127:17 128:1
130:16 131:21
136:13 138:2
141:12 149:1

**understanding**
12:9 32:15
34:9 41:19,22
113:24 144:16

**understood**
53:18 102:6

**unfamiliar**
45:14

**unit**
38:21,23 39:2,
5 70:24

**unorganized**
101:8

**unpredictable**
115:8 134:4

**unsuccessful**
149:13 150:4

**unsure**
11:1 24:6
29:23 50:13
72:17,24 98:4
124:6 127:1

**unusual**
122:3

**updates**
138:23

**upload**
17:10

**uploaded**
17:8

**upper**
67:12

**upset**
136:7 146:20
147:2 149:19

___
**V**
___

**valve**
112:13

**varying**
102:5

**vehicle**
46:22

**verbal**
52:9 103:18

**verbalize**
119:16

**verbally**
101:14 118:18

**Vicki**
6:21 19:13,15
20:5,10,23
22:6,12,16
24:5,8,13 98:2
126:8

**videos**
56:8

**view**
123:8 137:20

**viewed**
58:7

**village**
98:15

**villages**
98:13,14,17,
18

**violent**
138:6

**vision**
69:11 134:17
145:14,18
146:1 148:22

**visual**
87:21

**voice**
43:5 44:5 81:8
108:6,13

**voices**
47:7

**voluntary**
38:13

___
**W**
___

**wait**
6:8 17:9 49:22
139:24 148:4,
16

**waiting**
150:10

**waived**
11:21

**Wales**
9:16

**walk**
21:6 125:17,
19

**walked**
60:2,8,12 61:3
67:22 69:14
95:1 146:7

**walking**
61:4 62:1,5
67:18 69:10
127:23

**wanted**
97:11 139:23
140:3

**warranted**
114:3

**watching**
150:1
**waves**
101:9
**ways**
42:7
**weapon**
57:10 78:7
89:18 114:14
133:24
**weapons**
34:14,16 35:4
41:3 79:8
133:19 138:5
**wearing**
78:13 94:12
**weight**
51:16 57:4
77:6 117:11
**well-over**
16:12
**whispering**
136:8
**whoever's**
143:5
**wife**
141:21
**wooden**
60:16 92:22,
24
**word**
89:21 115:15
122:9 123:19
150:10
**words**
45:1 86:10
122:12
**work**
13:24 24:22
26:2 31:1
32:24 40:13
70:7 87:5
98:10,11
148:20
**worked**
107:6 148:7
**working**
7:22 18:22
98:9 149:21
**works**
10:18 39:21
**worry**

65:14
**worse**
30:18 43:14
**wrapped**
76:3,5
**wrist**
77:17,22
**write**
22:7 31:3
127:14
**writing**
31:6
**written**
10:23 29:6
**wrong**
18:5 137:23
**wrote**
74:18 110:10
126:9

---

**Y**

---

**years**
149:11
**Yefko**
6:22 19:13,15
20:5,11,23
22:6 24:5,8,13
98:2 126:8
**Yefko's**
22:16
**yelling**
136:14 141:11