**EXHIBIT 2**

Spencer Jackson
3/24/22
C.A. No. 21-10738-AK

# In the Matter of:

## *Estate of Robert Joseph Miller vs*

## *Sean Roycroft et al.*

---

## *Spencer Jackson*

## *May 30, 2019*

---

*68 Commercial Wharf • Boston, MA 02110*
*888.825.3376 - 617.399.0130*
*Global Coverage*
*court-reporting.com*



Miller 000746

COMMONWEALTH OF MASSACHUSETTS


STATE POLICE INTERVIEW

OF

OFFICER SPENCER JACKSON

BY

LIEUTENANT JACK MAWN and
TROOPER JEFFREY DIOTTE


RE:   ESTATE OF ROBERT JOSEPH MILLER
V.
SEAN ROYCROFT, ET AL


DATE:  MAY 30, 2019


Transcription Service:   Mary Indomenico, ACT, CET
Perfect In Print
212 Vineland Avenue
East Longmeadow, MA   01028
(413) 746-1778


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

O'Brien & Levine, A Magna Legal Services Company
888.825.3376 - production@court-reporting.com

Miller 000747

Estate of Robert Joseph Miller vs                                    Spencer Jackson
Sean Roycroft et al.                                                  May 30, 2019

2

LT. MAWN:  Good afternoon.  It is 3:28 p.m. on Thursday, May 30th.  I'm just going to go around the table and introduce ourselves.  My name is Jack Mawn; I'm a detective lieutenant with the Massachusetts State Police Detective Unit for the Cape & Islands.

Seated to my left:

OFF. JACKSON:  Spencer Jackson.

LT. MAWN:  And across from me?

TROOPER DIOTTE:  Jeff Diotte, trooper.  Cape & Islands detective.

LT. MAWN:  So, we are here to discuss the circumstances in regards to an unattended death that occurred in the Hyannis, Town of Barnstable on April 16, 2019.  The decedent identified as Robert Miller.

So, again, Spencer, if you would please for the record.  Your name, your rank, and your agency.

OFF. JACKSON:  Spencer Jackson.  I work for Barnstable Police Department, and I'm a patrol officer.

LT. MAWN:  Okay.  And how long have you been on the Barnstable Police Department?

OFF. JACKSON:  Seven-and-a-half years.

LT. MAWN:  Did you attend a police academy prior to becoming a Barnstable Police officer?

OFF. JACKSON:  I did.  I went to Plymouth Police

Miller 000748

Estate of Robert Joseph Miller vs
Sean Roycroft et al.

Spencer Jackson
May 30, 2019

3

Academy in 2011.

LT. MAWN:  Okay.  And you graduated there?

OFF. JACKSON:  I did.

LT. MAWN:  All right.  Did you receive use of force training there?

OFF. JACKSON:  We did.

LT. MAWN:  And have you received supplemental use of force training since that time?

OFF. JACKSON:  We had a training here -- use of force training and I'm on the SWAT team as well.

LT. MAWN:  Okay, good.  In that capacity, are you familiar with your agency's use of force policies?

OFF. JACKSON:  Yes.

LT. MAWN:  All right.  Were you carrying use of force equipment on April 16, 2019?

OFF. JACKSON:  I was.

LT. MAWN:  Could you just describe for us what that was on that particular date?

OFF. JACKSON:  Handcuffs, OC spray, taser, pistol, and that was it.

LT. MAWN:  Okay.  And are you -- are you qualified and trained -- or I should say are you trained and qualified to carry a firearm?

OFF. JACKSON:  Yes.

Miller 000749

4

LT. MAWN:  A taser?

OFF. JACKSON:  Yes.

LT. MAWN:  A spray that's also referred to as OC spray?

OFF. JACKSON:  Yes.

LT. MAWN:  All right.  Do you carry a baton?

OFF. JACKSON:  I do not; I have one in my cruiser though.

LT. MAWN:  But you're trained and qualified in that as well?

OFF. JACKSON:  Correct.

LT. MAWN:  All right.  Were you employed as a police officer prior to joining the Barnstable Police Department?

OFF. JACKSON:  I worked for Nantucket Police in 2009 for a summer; I was a summer officer.

LT. MAWN:  Okay.  Did that include a full-time police academy?

OFF. JACKSON:  No, it was a two-week academy right before we started.

LT. MAWN:  All right.  And did that involve a component of use of force?

OFF. JACKSON:  It did.

LT. MAWN:  All right.  Bringing you to Tuesday,

Miller 000750

5

April 16, 2019, were you working on that day?

OFF. JACKSON:  I was.

LT. MAWN:  What is your scheduled shift, or what was it on that day?

OFF. JACKSON:  It was evening shift from four to midnight.

LT. MAWN:  All right.  And at the Barnstable Police Department in your capacity as a patrol officer on the -- what would be the evening shift, do you work a four and two?

OFF. JACKSON:  I do.

LT. MAWN:  All right.  And what was your assignment and your assigned duties for the shift on April 16h, Spencer?

OFF. JACKSON:  It was patrol of the Hyannis area.

LT. MAWN:  All right.  And so your patrols are structured geographically; is that accurate?

OFF. JACKSON:  Correct.

LT. MAWN:  All right.  So, the patrol area that you are referring to is one particular patrol area within the Town of Barnstable on any given shift?

OFF. JACKSON:  Correct.

LT. MAWN:  All right.  And generally in regards to geography, what -- what does that include?

Miller 000751

Estate of Robert Joseph Miller vs                                      Spencer Jackson
Sean Roycroft et al.                                                    May 30, 2019

6

OFF. JACKSON:  We put minimal four cars in -- basically in Hyannis.

LT. MAWN:  And you were one of those four cars?

OFF. JACKSON:  Correct.

LT. MAWN:  Did you work any overtime or detail prior to your shift that day?

OFF. JACKSON:  No.

LT. MAWN:  Would you please describe what you were wearing in regards to your uniform on that day?

OFF. JACKSON:  Full typical patrol officer's uniform with badge and patches, full duty belt, and suspenders as well.

LT. MAWN:  And were you driving a Barnstable Police cruiser?

OFF. JACKSON:  Yes.

LT. MAWN:  Would you describe that please?

OFF. JACKSON:  Marked blue and white, overhead lights.

LT. MAWN:  Does it have an assigned number?

OFF. JACKSON:  It does; it was 238.

LT. MAWN:  238.  And at some point, did you arrive at 45 Elm Street in Hyannis?

OFF. JACKSON:  I did.

LT. MAWN:  Prior to that, how was it that you

Miller 000752

Estate of Robert Joseph Miller vs                                    Spencer Jackson
Sean Roycroft et al.                                                  May 30, 2019

7

became aware that you needed to go there?

OFF. JACKSON:  So dispatch came over the radio and sent Officer Roycroft and myself to 45 Elm.  And what came over the radio was something along the lines of a female called and said their husband was having a mental break.

LT. MAWN:  Okay.  And that was a radio transmission?

OFF. JACKSON:  Correct.

LT. MAWN:  Do you also get dispatched by virtue of a computer that you might have in the cruiser?

OFF. JACKSON:  We do.

LT. MAWN:  All right.  But this was a specific radio trans -- an audio -- an audible radio transmission.

OFF. JACKSON:  Correct.

LT. MAWN:  Okay.  And in regards to those transmissions, do you know what frequency that transmission was on?

OFF. JACKSON:  It was BPD 1.

LT. MAWN:  Is that -- please describe that for me.

OFF. JACKSON:  It's what we generally use. That's basically our main channel, like it was all -- through all cruisers throughout the town.

Miller 000753

Estate of Robert Joseph Miller vs
Sean Roycroft et al.

Spencer Jackson
May 30, 2019

8

LT. MAWN:  And so that would be all -- all patrol cruisers in the town, regardless of sector, would also hear the -- hear the same transmission?

OFF. JACKSON:  Yes, yep.

LT. MAWN:  What time of day or night was this?

OFF. JACKSON:  About seven o'clock.

LT. MAWN:  All right.  Can you describe the lighting situation or the weather situation at that time?

OFF. JACKSON:  It was sunny out, nice day.

LT. MAWN:  And so natural light present at seven?

OFF. JACKSON:  Yes.

LT. MAWN:  All right.  And then you received the transmission, you got to 45 Elm --

OFF. JACKSON:  Correct.

LT. MAWN:  -- any artificial lights there, street lights, business lights --

OFF. JACKSON:  No.

LT. MAWN:  -- lights from neighborhood houses or --

OFF. JACKSON:  I don't think so.

LT. MAWN:  When you got there, where did you park your cruiser?

OFF. JACKSON:  I came up Elm Street and parked at the front of the house to the left of it, about a half a

Miller 000754

Estate of Robert Joseph Miller vs
Sean Roycroft et al.

Spencer Jackson
May 30, 2019

9

house shy of that address.

LT. MAWN:  On the same side as the house or across the street?

OFF. JACKSON:  Across the street.

LT. MAWN:  And if you would please, tell us what happened after you arrived in your cruiser at 45 Elm Street?

OFF. JACKSON:  So, I exited my cruiser and Officer Roycroft arrived probably sixty seconds before I did.  As I exited my cruiser, I walked across the street and could hear a loud crash sound from inside the back left of the house.  I continued through the driveway.  And as I did, I saw a glass slider from the house fall out and land on the deck.

LT. MAWN:  Okay.  Could you see -- at that point in time, could you see in through that slider?  In other words, could you see what was occurring in the house through the slider?

OFF. JACKSON:  No.

LT. MAWN:  So, your angle wasn't such that you could make observations that way?

OFF. JACKSON:  Correct.  I was still moving along the -- the side of the house, and observed the slider as it fell.

Miller 000755

Estate of Robert Joseph Miller vs
Sean Roycroft et al.

Spencer Jackson
May 30, 2019

10

LT. MAWN:  Okay.  And --

OFF. JACKSON:  I didn't see it prior.

LT. MAWN:  What happened after that?

OFF. JACKSON:  I hopped onto the deck, and I believe I jumped over that slider to get into the house or stepped on it.  And I saw Officer Roycroft on a male's back trying to control him.  The male was spinning around, twisting his torso, and walking -- they were both walking away from my position towards the front of the house.

LT. MAWN:  So, when you got there, they were -- they were on their feet, they were upright?

OFF. JACKSON:  Correct.

LT. MAWN:  All right.  So, please continue.

OFF. JACKSON:  And they took a couple of small steps, and then both of them fell face down into this small room that was adjacent to that dining room.  And as they hit the ground, I approached and told Officer Roycroft -- I said, "Hey Sean, I'm right behind you."  And I immediately tried to grab the individual -- individuals' right arm.  Sean was on his left side; I was on the right -- went to the right, and was trying to remove his arm from underneath his body.  Both arms were under his chest.  So, I tried to pull and was unable to get his arm out.  Officer Roycroft -- I gave him a command -- commands to,

Miller 000756

Estate of Robert Joseph Miller vs
Sean Roycroft et al.

Spencer Jackson
May 30, 2019

11

you know, relax, put your arms behind your back.  And Officer Roycroft at some point said, "I think he's got something in his hands."  It was a statement along those lines.  So, I was concerned that the individual had some sort of weapon in his hands.  Underneath him I could see the shaft of what I felt was a golf club, and it was like directly underneath his body.

LT. MAWN:  Did Officer Roycroft have any conversation -- you mentioned you said, "Sean, I'm right here."

OFF. JACKSON:  Yeah.

LT. MAWN:  There was a -- was there further conversation between the two of you at all?

OFF. JACKSON:  No, it was -- as we were struggling with him, Sean made that quick statement that "I think he's got something in his hand," that was basically it.

LT. MAWN:  Okay.

OFF. JACKSON:  And again, we continued to try to pull his arm from out -- out from underneath his body.

TROOPER DIOTTE:  He's actively resisting -- he's --

OFF. JACKSON:  Correct.

TROOPER DIOTTE:  -- he's fighting that and

Miller 000757

Estate of Robert Joseph Miller vs
Sean Roycroft et al.

Spencer Jackson
May 30, 2019

12

keeping his arms tucked underneath him?  Is that -- is that --

OFF. JACKSON:  Correct.

LT. MAWN:  -- fair to say?

OFF. JACKSON:  Yeah.  Very strong.  His legs were kicking, stuff like that, and his body was twisting around actively trying to get us off.

LT. MANN: Spencer, were you aware of that individual's identity at that time?  Did you have a name --

OFF. JACKSON:  No.

LT. MANN:  -- or any type of reference?

OFF. JACKSON:  No, never dealt with him before. I had no sort of background on who he was.

LT. MAWN:  Could you describe him for us, please?

OFF. JACKSON:  Large white male, approximately fifty, fifty to sixty, no shirt, weighed 220 lbs.

LT. MAWN:  Okay.  And so he's -- please correct me, I don't want to put words in your mouth --

OFF. JACKSON: Sure.

LT. MAWN:  -- but it sounds like you were issuing some verbal commands, and they were -- he was not complying?

OFF. JACKSON:  Correct.

Miller 000758

13

LT. MAWN: All right. So while on the ground assisting Officer Roycroft trying to get his -- his -- the subject's hands out from underneath him, what happened after that?

OFF. JACKSON: My -- the position I was in, I asked Officer Roycroft -- just because he had been dealing with him before I got there and I walked in in the middle of it -- if I should use my taser. You know what I mean? And he said, "No." And the way I had control of his arm, if I did have to do that, I would have to disengage, I would have had to back out. But I found the drive stuns aren't very effective, so I might to probe deploy them, I would have had to totally reposition and lose -- lose hold of his arm.

LT. MAWN: So, bear with me. I don't have a taser, so I -- I want to just clarify a couple of things. So, when you say -- when you say "disengage," you're talking about having to let go of him?

OFF. JACKSON: Correct.

LT. MAWN: All right. But at the time you had his arm?

OFF. JACKSON: Correct.

LT. MAWN: And it sounds like Sean Roycroft was -- had a hold of him as well?

Miller 000759

14

OFF. JACKSON:  The other, yeah.

LT. MAWN:  So, if you -- if you were going to use the feature on your taser that I think you described as drive --

OFF. JACKSON:  Drive stun.

LT. MAWN:  -- drive stun --

OFF. JACKSON:  Correct.

LT. MAWN:  That's just using the taser to contact somebody and tase them, instead of firing the taser from a distance and having those probes attached to wires contact the person?

OFF. JACKSON:  Right.

LT. MAWN:  So, when you drive stun somebody, if they're holding onto somebody else, does that person get tased also?

OFF. JACKSON:  No.

LT. MAWN:  Okay.  And so in order to do that, though, you would have had to let go?

OFF. JACKSON:  Correct.  I would have had to let go, draw my taser, and disconnect the outer cartridge, which I need two hands to do that.  So, I would have to totally let him go.

LT. MAWN: Okay.

OFF. JACKSON:  Which wouldn't -- at that point, I

Miller 000760

15

didn't see it as an option.

LT. MAWN:  All right.  And so apparently neither did Officer Roycroft?

OFF. JACKSON:  Correct.

LT. MAWN:  Okay.  So, after -- after the discussion or the decision not to deploy the taser, what happened after that, Spencer?

OFF. JACKSON:  I had his arm pinned to the ground as best I could.  And the part of his body that was exposed to me was his right side.  So, I delivered a strike to his -- it landed below his rib -- his bottom rib, and above his hip.  And as soon as I did that, he kind of moaned, and I was able to get his arm like halfway out from under his body.  But I couldn't get -- his fist was still under his stomach or his hip area, so I couldn't get it fully out.  And then as I did that -- as I got it as far as it went at that time, he pivoted to the left towards Officer Roycroft, and again, yanked his hand under his body.

So, as we did that, we kind of repositioned real quick.  And Officer Roycroft had his -- his radio mic on top of his shoulder.  And the position he was in, his mic started to key -- it started to transmit because it was pressing against his neck.  His neck and shoulder were

Miller 000761

Estate of Robert Joseph Miller vs
Sean Roycroft et al.

Spencer Jackson
May 30, 2019

16

kind of squishing the mic.

LT. MAWN:  So, your portables -- carry the portable radio on a belt, and then there is a -- there is then a mic that is attached to that that is carried on the upper -- or the collar somehow?

OFF. JACKSON:  Correct.  People put them in different positions.  Sean's was on his -- above his shoulder clipped to his uniform.  But as he did that, I could tell that -- 'cause I got some frequency from it, but I could tell that it was transmitting, you know, this fight.

LT. MAWN:  Right.

OFF. JACKSON:  So, I knew --

LT. MAWN:  So, I'm sorry to interrupt.  But when you say "transmitting" the sounds of the struggle --

OFF. JACKSON:  Were going over the air.

LT. MAWN:  So, other people were going to hear that?

OFF. JACKSON:  Right.

LT. MAWN:  And what did that mean to you?

OFF. JACKSON:  That people would start coming to our position.

LT. MAWN:  Okay.

OFF. JACKSON:  You know.  But I heard his

Miller 000762

17

microphone go off a couple of times as he -- those were transmitting -- obviously he wasn't trying to -- as we were struggling with him, but so I took a second and just got on the radio and said, you know, something along the lines of "We're fighting with him.  We'll take another car."  Just so people knew what the situation was --

LT. MAWN:  Okay.

OFF. JACKSON:  -- and where we were.

LT. MAWN:  When you did that, did you have to completely let go of the subject in order to do that?

OFF. JACKSON:  No.  I did it with one hand, but I was able to keep pressure on his arm and keep him from -- he didn't move when I did that.

LT. MAWN:  And what happened after that after that transmission?

OFF. JACKSON:  We continued to try to gain control of him.  I delivered another strike to the same area as before in between his rib and hip and his stomach. And again, he let - let out a moan.  And I was able to pull his arm out from underneath him and get control of his hand, and we -- Officer Roycroft did the same at that time, and we applied -- I applied handcuffs.

LT. MAWN:  Are they your cuffs?

OFF. JACKSON:  Double locked them, yes.

Miller 000763

Estate of Robert Joseph Miller vs
Sean Roycroft et al.

Spencer Jackson
May 30, 2019

18

LT. MAWN:  So, after -- after being able to -- well, let me ask you this, Spencer.  You mentioned that Officer Roycroft got there approximately sixty seconds before you?

OFF. JACKSON:  Correct.

LT. MAWN:  And then by the time you got there and were able to see in the house, he, being Officer Roycroft, was already engaged with the individual in trying to hold him or restrain him or struggling with him in some fashion?

OFF. JACKSON:  Yes.

LT. MAWN:  From the time you got there till the time the handcuffs were on, what's your estimate of the time that went by?

OFF. JACKSON:  Probably sixty seconds.

LT. MAWN:  Okay.

OFF. JACKSON:  Maybe a little bit -- maybe a little bit less, but --

TROOPER DIOTTE:  Did it seem like sixty seconds.

OFF. JACKSON:  No, it felt like a while.

LT. MAWN:  And but eventually you were able to get him -- him, the subject, cuffed?

OFF. JACKSON:  Correct.

LT. MAWN:  Once the individual is handcuffed,

Miller 000764

Estate of Robert Joseph Miller vs
Sean Roycroft et al.

Spencer Jackson
May 30, 2019

19

what -- what happened then?  Specifically, what did you do?

OFF. JACKSON:  So, I turned around -- I turned around and observed the female who called us, and she was kind of looking over, looking past a wall.  There was a corner wall, and she was kind of peeking around it, watching us.  And I briefly asked her, you know, "What is his deal?  Is he on narcotics?  Is he drunk?  You know, what is the deal with -- with him?"  And she said something along the lines of, you know, "To my knowledge, he's not on drugs or alcohol.  He's having a psychotic break."  And when -- when I talked to her real quick, I turned around and Sean immediately had noticed -- was assessing the individual we were fighting with and said something along the lines of, "I don't think he's breathing."  And told me to take the handcuffs off.

So, I took the handcuffs off, and in put them back in my pouch.  And we had him in the recovery position on his right side.  Once we got the cuffs off, we rolled him onto his back, and Sean started compressions.  Officer Shaw arrived when we were in the process of all.  And then Officer Ruggieri arrived and Officer York -- Officer Shaw ended up telling Officer Ruggieri when he was walking up, to grab his med bag.

Miller 000765

20

So, Officer Ruggieri walked in with the med bag. Officer Roycroft and I swapped positions. So, I ended up doing compressions. And I asked Adam -- Officer Ruggieri to grab a bag valve mask so we could give him air. And we got the bag valve mask on. Officer Roycroft started giving him air. I started giving him -- continued giving him compressions, and somewhere along the line, somebody had called -- notified the FD, fire department, to come down. They showed up not very long after, I don't know.

LT. MAWN: Did somebody -- did somebody try to use an AED prior to rescue's arrival?

OFF. JACKSON: Yes.

LT. MAWN: Who was that?

OFF. JACKSON: Officer Ruggieri connected an AED to him while we were working on him.

LT. MAWN: And what was the -- what was the directions of the AED?

OFF. JACKSON: No shock advised.

LT. MAWN: So, they -- the AED after it was --

OFF. JACKSON: Connected --

LT. MAWN: -- attached to him, it said "Do not apply the actual shock"?

OFF. JACKSON: Correct.

LT. MAWN: When -- when you were -- when you had

Miller 000766

Estate of Robert Joseph Miller vs
Sean Roycroft et al.

Spencer Jackson
May 30, 2019

21

the individual handcuffed, at any time prior to actually getting the handcuffs, did the individual immediately stop resisting or go limp in any way?

OFF. JACKSON:  No.  It was -- I was surprised that -- as the thing went on, there was no stopping him, you know?  There was just -- he just kept going and going and going and going, until you know, right before we got handcuffs on him.

LT. MAWN:  Okay.  So, I think if -- if you are in agreement, what I'd like to do Spencer, is -- this is a logical point for us to take a break.  It will give Jeff and I a couple of minutes to go over maybe some follow-up questions --

OFF. JACKSON:  Sure.

LT. MAWN:  -- if you're okay with that?

OFF. JACKSON:  Sure.

LT. MAWN:  And we would shut the tape off.  Give us a couple of minutes.  We'll look at what we think we need to follow up with, ask you to come back in, put the tape back on, and finish up with some follow-up questions.

OFF. JACKSON:  Okay.

LT. MAWN:  If that works for you?

OFF. JACKSON:  It works.

LT. MAWN:  Okay.  So, we'll -- we will shut the

Miller 000767

tape off at 3:49?

(Recording ended.)

(Recording resumed.)

LT. MAWN: Okay. It is 3:57 p.m. The individuals present remain the same. Seating arrangement remains the same.

Spencer, we just have some follow-up questions. We are being recorded by -- by agreement, is that correct?

OFF. JACKSON: Yes.

LT. MAWN: Okay. So, we just have a few follow-ups here.

If I understand it correctly -- and please correct me if I don't -- by the time you arrived at the scene and were able to make some observations, Officer Roycroft was already engaged with the male party?

OFF. JACKSON: Correct.

LT. MAWN: All right. So, please describe that again for me what you saw about that interaction between them.

OFF. JACKSON: So, so coming up to house, a loud crash inside. Getting closer to the house, the real slider falls out. And when I make my way into the house, Officer Roycroft is trying to control the subject. He's on his back, and the subject's twisting side to side.

Miller 000768

Estate of Robert Joseph Miller vs
Sean Roycroft et al.

Spencer Jackson
May 30, 2019

23

LT. MAWN:  When you say "he," you're talking about Officer Roycroft is behind the subject?

OFF. JACKSON:  Correct, correct.

LT. MAWN:  Okay.

OFF. JACKSON:  And Officer Roycroft and Miller are -- Miller's pulling Officer Roycroft towards the front of the house away from my position.  And before I can get there, they fall to the floor.

LT. MAWN:  Okay.  Now when you say "Miller," did you know who -- who the person was, or did you find out about the person's identification later?

OFF. JACKSON:  I had no idea who he was before I arrived.

LT. MAWN:  Okay.

OFF. JACKSON:  And I found out afterwards.

LT. MAWN:  Okay.  So, when you mentioned that they are -- they are moving away from you towards what would be the front of the house and they fall, at that point, you know, what if any, concerns did you have when you first got there and you witnessed this?

OFF. JACKSON:  Obviously I had no idea what happened before that, but I was concerned for Officer Roycroft's safety and my own.  I was concerned that he could have accessed a weapon.  I never saw the front of

Miller 000769

24

him.  When I went through the house, all I saw was Officer Roycroft on his back, and they were walking away from me. So, I couldn't tell what he had in his hands.  And his wife was inside.  I glanced at her when we walked by, and when I walked by going towards them.  So, I was concerned for her safety as well.

LT. MAWN:  Okay.  Did you -- did you see the individual -- did you see that he was armed?

OFF. JACKSON:  No.

LT. MAWN:  Did you know if he was armed?

OFF. JACKSON:  No, I did not know.

LT. MAWN:  Did you see a weapon or anything that could be used as a weapon?

OFF. JACKSON:  After they -- when I was walking up I saw -- observed a bag of golf clubs in the same room that they fell in.  And after they fell during the struggle, I observed the shaft of a golf club, which I didn't know where it got retrieved from, if it had been on the floor before; I'm not really sure.  But I saw it directly underneath when they fell.

LT. MAWN:  Okay.  So, when you -- when you became engaged in the struggle, you -- if I understand you correctly -- you could see the shaft of a golf club underneath the person who later you came to know as

Miller 000770

Miller?

OFF. JACKSON:  Correct.

LT. MAWN:  During -- during this time, what was it, if anything, that Miller said?

OFF. JACKSON:  He didn't say anything.

LT. MAWN:  Did he -- did he respond to verbal commands?

OFF. JACKSON:  No, not at all.

LT. MAWN:  Did he comply?

OFF. JACKSON:  No.  Didn't say anything.  We were trying to talk to him, trying to get him to relax, trying to get him to put his hands behind his back, and didn't say anything.

LT. MAWN:  And you -- you mentioned that, you know, eventually you were able to get the individual handcuffed, and that at that point -- if I'm correct -- you - you spoke with the woman who you believe at the time to be the wife?

OFF. JACKSON:  Correct.

LT. MAWN:  All right.  And you had some conversation with her?

OFF. JACKSON:  Yes.

LT. MAWN:  And then I think you talked about Officer Roycroft and the fact that the individual was now

Miller 000771

26

unresponsive, and you detailed the steps that you took after that?

OFF. JACKSON:  Yes.

LT. MAWN:  At some point, did you leave that scene?

OFF. JACKSON:  Maybe about an hour after this whole thing happened.

LT. MAWN:  Okay.  And tell me the circumstances about that.  How did you come to leave?

OFF. JACKSON:  So, Lieutenant Mellyn came down, a couple of our detectives came down, and we explained what happened.  Rescue ended up leaving, you know, during that time.  And they told Officer Roycroft and I to come back to the station.

LT. MAWN:  Okay.  And did you do that?

OFF. JACKSON:  Yes.

LT. MAWN:  Spencer, have you ever been on a call for service or anything -- any other reason at number 45 Elm Street?

OFF. JACKSON:  No, I have not.

LT. MAWN:  Had you ever had contact with the individual, Mr. Miller, before?

OFF. JACKSON:  No.

LT. MAWN:  Did you know him?

Miller 000772

27

OFF. JACKSON:  Never heard of him, never seen him before.

LT. MAWN:  So, you didn't get there and recognize him and say, "Oh, I know that guy.  That's the guy."?

OFF. JACKSON:  No.

LT. MAWN:  Had you heard his name before?

OFF. JACKSON:  No.

LT. MAWN:  Know him my reputation?

OFF. JACKSON:  No.

LT. MAWN:  All right.  And I think you've already told me, but please again, the only information you had going there was what exactly?

OFF. JACKSON:  The wife called and said her husband was having a mental break or a psychotic break.

LT. MAWN:  Okay.  No additional stuff on your computer?

OFF. JACKSON:  No.

LT. MAWN:  All right.  And when did you become aware of the name and identity of the individual that you had been attempting to cuff?

OFF. JACKSON:  After he had been removed from the house by Rescue, I spoke with his -- the female half, and got everybody's information, and that was --

LT. MAWN:  I think that's it for me.  Jeff, do

Miller 000773

28

you have anything?

TROOPER DIOTTE:  I don't have anything, no.

LT. MAWN:  Spencer, do you have any questions for us?

OFF. JACKSON:  I do not.

LT. MAWN:  All right.  Is there anything you want to add that might be important for us to know about this investigation that maybe we didn't think to ask?

OFF. JACKSON:  No.

LT. MAWN:  Okay.  If that's the case, then I think we'll wrap up and we'll shut the tape off at 4:04 p.m.

(End of interview.)

Miller 000774

C E R T I F I C A T I O N

I, MARY INDOMENICO, AN APPROVED COURT TRANSCRIBER, DO HEREBY CERTIFY THAT THE FOREGOING IS A TRUE AND ACCURATE TRANSCRIPT FROM THE AUDIO RECORDING PROVIDED TO ME BY THE LAW OFFICES OF HOWARD FRIEDMAN, P.C. OF THE PROCEEDINGS IN THE ABOVE ENTITLED MATTER.

I, MARY INDOMENICO, FURTHER CERTIFY THAT THE FOREGOING IS IN COMPLIANCE WITH THE ADMINISTRATIVE OFFICE OF THE TRIAL COURT DIRECTIVE  ON TRANSCRIPT FORMAT.

I, MARY INDOMENICO, FURTHER CERTIFY THAT I NEITHER AM COUNSEL FOR, RELATED TO, NOR EMPLOYED BY ANY OF THE PARTIES TO THE ACTION IN WHICH THIS HEARING WAS TAKEN, AND FURTHER THAT I AM NOT FINANCIALLY NOR OTHERWISE INTERESTED IN THE OUTCOME OF THE ACTION.

_____

Mary C. Indomenico

_____

April 8, 2021

_____

212 Vineland Avenue, East Longmeadow, MA 01028

_____

413-746-1778

_____

perfectinprint@aol.com

Miller 000775