UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS

ESTATE OF ROBERT JOSEPH MILLER,
by and through IAN MILLER, personal
representative of the Estate,
      Plaintiff,

          v.

SEAN ROYCROFT and SPENCER
JACKSON, in their individual capacities
and the TOWN OF BARNSTABLE,
MASSACHUSETTS,
      Defendants

Case No. 1:21-cv-10738-AK

## AFFIDAVIT OF SPENCER JACKSON

I, Spencer Jackson, hereby swear and depose that the following statements are based on my personal knowledge and true:

1. I was appointed a Patrol Officer for the Barnstable Police Department in May 2012. I was promoted to the rank of Detective in 2022, and continue to serve in that role today.

2. Throughout my time as a member of the Barnstable Police Department, I have continued my education and training through coursework and seminars, including in the areas of mental health/mentally-ill and disturbed individuals, handcuffing techniques, restraint/use of force, defensive tactics, taser operation, ground defense, criminal procedure and CPR/First Responder.

3. During my time as a Barnstable Police Officer, I have responded to dozens, if not hundreds of situations dealing calls involving individuals experiencing mental health crises.

4. During my time as a Barnstable Police Officer, I have been trained to approach mentally ill individuals with respect and kindness whenever possible.

5. On April 16, 2019, I was on patrol in a marked cruiser assigned to the Hyannis sector when I was dispatched to 45 Elm Street after being advised that a female caller reported a male having a psychotic break and proceeded immediately to the scene.

6. I understood that the call involved a mental health emergency, but had no further information about what the circumstances were that had prompted the 911 call for police assistance.

7. As I approached 45 Elm Street in my cruiser, I saw Officer Roycroft's cruiser already parked at the scene.

8. I parked my cruiser across the street and began to approach the residence on foot.

9. As I walked toward the residence, I heard a crashing sound; shortly afterward as I made my way toward the back of the house, I saw a glass slider fall away from the house and land on the deck.

10. I jumped up onto the deck and over the slider door that lay on the deck, and observed Officer Roycroft inside the house on a male individual's back, trying to control him; I later learned that the male individual was Robert Miller.

11. Mr. Miller was moving, twisting his torso around while walking toward the front of the house (away from my position at the back of the house); Officer Roycroft stayed at Mr. Miller's back with his left arm underneath Mr. Miller's left arm and his right arm over Mr. Miller's shoulder.

12. I saw Mr. Miller and Officer Roycroft take a couple of steps, and then both of them fell face down into a small, recessed office area that was separated from the remainder of the room by a railing.

13. As they hit the ground, I made my way over to the office area and observed that Mr. Miller's arms were tucked underneath his chest.

14. I announced to Officer Roycroft that I was there.

15. Officer Roycroft told me that he thought Mr. Miller had something in his hands.

16. I noticed what I believed to be the shaft of a golf club protruding from underneath Mr. Miller.

17. Based on the limited information provided to me by dispatch, I understood we were dealing with an individual who was likely experiencing a mental health crisis.

18. I further understood that Barnstable Police Department policies pertaining to Mental Illness and Domestic Violence instruct that individuals suffering from mental illness may pose a significant threat to themselves and/or others.

19. Officer Roycroft was on Mr. Miller's left side, already, so I went to Mr. Miller's right side and began attempting to gain control over Mr. Miller's right arm, while issuing verbal commands to Mr. Miller to put his hands behind his back, and to relax and/or stop resisting.

20. Mr. Miller continued to actively resist restraint by kicking his legs back and forth and twisting his body.

21. Mr. Miller was a large male who appeared to weigh approximately 220 pounds.

22. Mr. Miller was very strong, and it was difficult to gain control over him while he was kicking and twisting.

23. I asked Officer Roycroft whether I should deploy my taser, since Officer Roycroft had been on the scene longer than I had been, and I did not know what events had occurred leading up to the point where I first saw Officer Roycroft and Mr. Miller through the slider door opening.

24. Officer Roycroft said "No," so I continued to try to gain control over Mr. Miller's right hand.

25. I also did not believe that using a taser in drive-stun mode would be effective on Mr. Miller, and I knew I would have needed to let go of Mr. Miller's arm, completely, in order to use both hands to disconnect the outer cartridge of the taser and enable its drive-stun (as opposed to projectile) mode, since disconnecting the outer cartridge of the taser requires two hands.

26. I observed that Officer Roycroft's left arm appeared to be trapped underneath Mr. Miller, and that Officer Roycroft was trying to free his left arm from where it was pinned between Mr. Miller and the floor.

27. Having pinned Mr. Miller's right arm to the ground, I delivered a half-strength strike below his bottom rib and above his hip.

28. Mr. Miller groaned and I was able to partially pull his right arm out from under him; however, I was unable to see his right hand or whether he had anything in it, because it remained underneath Mr. Miller's torso.

29. Mr. Miller then pivoted toward Officer Roycroft and was able to wrench his arm back underneath his body, entirely.

30. At some point, Officer Roycroft's microphone transmitted an inadvertent signal due to Officer Roycroft's positioning at Mr. Miller's left side with his arm trapped underneath Mr. Miller.

31. It appeared to me as though Officer Roycroft's microphone, which he wore above his left shoulder, was being pressed between his neck and shoulder due to the struggle. I heard some frequency from his radio over my own radio and could tell that a transmission was being inadvertently broadcast from Officer Roycroft's radio.

32. Knowing other officers would hear these inadvertent transmissions and become alarmed, I activated my radio, advised dispatch of the situation and requested backup in the form of "another car."

33. Officer Roycroft and I continued to try to gain control over Mr. Miller's arms.

34. I delivered another strike at half-strength to the same area as my first strike, which caused Mr. Miller to moan and enabled me to gain control over his right hand.

35. At the same time, Officer Roycroft managed to gain control over Mr. Miller's left hand and I was able to place the handcuffs on Mr. Miller and double-lock them.

36. I maintained a lunge position the entire time I was attempting to assist Officer Roycroft in gaining control over Mr. Miller's hands in the recessed office area, due to the tight space we were in; my right foot was on the ground and my left leg was stretched out behind me with the toe of my shoe on the ground, and my shoulders were pointed in the same direction as my knee—toward Mr. Miller.

37. In this position, I did not apply any downward pressure to Mr. Miller's body; the only pressure I applied was to Mr. Miller's right arm in my attempts to retrieve it from underneath him.

38. I estimate that 60 seconds elapsed between the time I first observed Mr. Miller and Officer Roycroft walking toward the office area, and the moment I double-locked the handcuffs.

39. At no point did I hear Mr. Miller say he couldn't breathe or ask for help, nor did I observe any signs that Mr. Miller was experiencing any kind of medical event or respiratory distress.

40. I double-locked the handcuffs and went to check on Ms. Anderson, who had been peeking around the corner from another room up until this point, while Officer Roycroft immediately began to assess Mr. Miller and get him up off of the floor.

41. Just a few seconds passed as I was speaking with Ms. Anderson, Officer Roycroft got my attention and told me that we needed to remove the handcuffs because Mr. Miller might have stopped breathing.

42. I have been trained by the Barnstable Police Department that a person experiencing a medical event or respiratory distress can sometimes have difficulty breathing with their arms in handcuffs behind their back for a prolonged period of time.

43. Because of this training and my understanding, as of that moment, that Mr. Miller might be experiencing some kind of medical event, Officer Roycroft and I immediately removed the handcuffs from Mr. Miller's wrists, placed him in the recovery position, and began to perform resuscitative measures on him until Hyannis Fire arrived on scene and took over resuscitative efforts.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS $\underline{26}^{TH}$ DAY OF

APRIL, 2023.

Spencer Jackson