**EXHIBIT**

**1 DiChiara 12/9/2022**

exhibitsticker.com

# Report of Charles M. Dichiara

***Estate of Robert Joseph Miller, by and through Ian Miller, a personal representative of the Estate,***

***v.***

***Sean Roycroft and Spencer Jackson, in their capacities, and the town of Barnstable, Massachusetts, Defendants***
*(USDC-MA - Civil Action No. 21-10738-AK)*

1. My name is Charles M. DiChiara. I am an active consultant and expert in law enforcement operations. My experience focuses on officer use of force, including use of force training and investigations.

2. I have been a police officer since 1989, beginning with the North Andover, Massachusetts Police Department, before transferring to the City of Waltham, Massachusetts Police Department in 1997.

3. I am currently the Training Officer for the Waltham Police Department, as well as an Instructor Trainer for the Municipal Police Training Committee. I have trained both recruit and veteran police officers in the areas pertaining to Use of Force, Defensive Tactics, Firearms and Patrol Procedures.

4. I have been assigned to the Northeast Massachusetts Law Enforcement Council's regional SWAT team for the past thirty years, having participated in excess of a thousand SWAT operations.

5. In 2014, I was a contributing author to the rewrite of the Defensive Tactics Instructor Manual for the Municipal Police Training Committee. In 2018 I assisted with the revamping and rewrite of the MPTC's Basic Recruit Academy training program for police recruits in the areas of Use of Force and Arrest and Control.

6. In 2014, I attended the Force Science Institute in Washington D.C. to become a certified analyst in human behavior as it relates to use of force events. In 2022, I was accepted into the Advanced Analyst 18-week certification program.

7. In 2021, I attended the two-week Federal Law Enforcement Training Center's (FLETC) Use of Force Instructor school to be additionally certified as a Federal Use of Force Instructor.

8. In 2021, I served on the Law Enforcement Working Group with the Municipal Police Training Committee (MPTC), the Executive Office of Public Safety and Security (EOPSS) and Police Officer Standards and Training Commission (POST), to promulgate new use of force rules and regulations. These rules and regulations

became state legislation on October 1, 2021 and are now known as 550 CMR (Code of Massachusetts Regulations) 6.00.

9. I have been identified as a Subject Matter Expert within the Commonwealth of Massachusetts and currently sit on the Executive Boards for Firearms and Defensive Tactics. In 2020, I co-created the Patrol Tactics Advisory Board in order to begin merging training and tactics in all three disciplines: Firearms, Defensive tactics and Patrol Procedures.

10. In 2021, I was appointed the Statewide Coordinator for Defensive Tactics and Use of Force for the Municipal Police Training Committee, overseeing both recruit training and veteran officer in-service training for the Commonwealth's 357 law enforcement agencies.

11. In 2021, I was appointed as a Commissioner on the Mayor's Use of Force Review Board for the City of New Bedford, assisting with the evaluation and rewrite of the department's policies and procedures.

12. I currently sit on the Advisory Board as a Master Instructor for the Safariland Police Training Group, an international police training organization. I have traveled across the country training officers, including officers from Switzerland, Australia, Canada, England and the Columbian National Police. For approximately 15 years, I have accepted invitations to present on police procedure at the SPTC International Seminar.

13. I currently provide independent consulting and expert witness services in cases involving police use of force, police misconduct and defensive tactics. I have testified as an expert witness in both criminal and civil cases, as well as before grand juries and Judicial Inquiries into officer-involved shootings.

14. A summary of my education, experience and training, as well as a list of cases in which I have testified, are attached here.

MATERIALS REVIEWED

15. I have reviewed the following materials provided to date in connection with the above referenced incident:

    a. Complaint, Civil Action Number 21-10738

    b. Barnstable Police Department Incident Report Number 19-642-OF

    c. Draft BPD incident report narratives of Officers Spencer and Jackson and emails pertaining thereto

    d. Final Report Officer Spencer Jackson 19-642-OF

    e. Final Report Officer Sean Roycroft 19-642-OF

    f. Dispatch Log, Barnstable Police Department Call No. 15349

    g. Massachusetts State Police, Case Master Report No. 2019-102-31

    h. Hyannis Fire Records

    i. Cape Cod Hospital Emergency Center Records

    j. 911 Call and Barnstable Police Department Radio Transmissions

    k. Transcript of Interview of Sean Roycroft by Massachusetts State Police

    l. Transcript of Interview of Spencer Jackson by Massachusetts State Police

    m. Photographs of Scene and Robert Miller

    n. Training Records for Officers Sean Roycroft and Spencer Jackson

    o. Barnstable Police Department Policy 526 Emergency Medical Dispatch

    l. Barnstable Police Department Policy 1001 Detainee Restraints

    m. Barnstable Police Department 614 Domestic Violence

    n. Barnstable Police Department Policy 501 Response to Calls

    o. Barnstable Police Department Policy 502 Response to Resistance

    p. Barnstable Police Department Policy 1106 Mental Illness

    q. Deposition Transcript and Exhibits of Sean Roycroft

    r. Defendant Sean Roycroft's answers to Plaintiff's First Set of Interrogatories

    s. Defendant Sean Roycroft's Supplemental Answers to Plaintiff's First Set of Interrogatories

    t. Deposition Transcript and Exhibits of Spencer Jackson

    u. Defendant Spencer Jackson's Answers to Plaintiff's First Set of Interrogatories

    v. Mental Health First Aid USA Training materials

    w. Deposition Transcript and Exhibits of Amy Anderson

    m. Deposition Transcript and Exhibits of Jennifer Ellis
    n. Deposition Transcript and Exhibits of Emily Higgins
    o. Deposition Transcript and Exhibits of Vicki Yefko
    p. Deposition Transcript and Exhibits of Kenyon C. Pike
    q. Deposition Transcript and Exhibits of Adam Ruggieri
    r. Deposition Transcript and Exhibits of Kevin Shaw
    s. Deposition Transcript and Exhibits of Mark Mellyn
    t. Deposition Transcript and Exhibits of Kevin Tynan
    u. Deposition Transcript and Exhibits of David Myett
    v. Municipal Police Training Committee Veteran Officer In-Service TY 2019
    w. Municipal Police Training Committee Materials - Use of Force Reference Guide
    x. Plaintiff's Expert Witness Report-Scott DeFoe
    y. Plaintiff's Expert Witness Report-Dr. Michael Freeman
    z. Plaintiff's Expert Witness Report-Dr. Alon Abraham Steinberg

16. References:

- Graham v. Connor, 490 US 388 (1989), "the degree of force used in effecting an arrest, investigatory stop, or other seizure is evaluated by using an objective, reasonable police officer standard. The reasonableness of each particular use of force will be judged from the perspective of a reasonable officer on the scene, based on the facts and circumstances known to and confronting the officer at the time. In determining the appropriate level of force to be used, officers shall evaluate each situation in light of the unique facts and circumstances of each case. Those factors include, but are not limited to, the seriousness of the crime or suspected offense; the level of threat or resistance presented by the subject; the risk or apparent attempt by the subject to escape; and whether the subject was posing an imminent threat to others or officers."

- Municipal Police Training Committee "Use of Force Model", developed in 1991 by Dr. Frederick Graves, Federal Law Enforcement Training Center and Professor Gregory J. Connor, University of Illinois Training Institute 1998.

- Barnstable Police Department Policies and Procedures:
      *Emergency Medical Dispatch 526
      *Domestic Violence 614
      *Response to Calls 501
      *Response To Resistance 502

*Mental Illness 1106

INTRODUCTION

17. This report is based upon materials provided to date. I recognize that there may be additional documentation as the case progresses. In the event that additional material is produced, I will supplement this report.

18. All of the opinion listed in this report are expressed to a reasonable degree of certainty in my fields of expertise. They are based on my training, experience and knowledge of defensive tactics and police practices, as well as my continued research throughout the country with law enforcement.

19. The opinions and conclusions provided below are the result of my analysis of the totality of circumstances surrounding the sudden death of Mr. Robert Miller that occurred on April 16, 2019 at his residence at 45 Elm St., Barnstable, Massachusetts. My opinion and standard of analysis in this case was developed by viewing the facts contained in the provided materials from the perspective of an objectively reasonable police officer confronted with the circumstances as they existed at the time the incident occurred.

20. My opinions are not meant to encroach upon the authority of any court, or to supplant any factual determinations of the jury.

21. Attorney Sasha Gill Esq., of Louison, Costello, Condon and Pfaff, LLP requested that I review the records associated with this incident, including the above-listed materials, to determine if the procedures followed and actions and/or inactions taken by Officers Sean Roycroft and Spencer Jackson of the Barnstable Police Department on April 16, 2019 at 45 Elm Street in Hyannis, MA were reasonable and consistent with accepted industry standards for police tactics and use of force. Pursuant to my engagement by Attorney Gill, I conducted a review and analysis of the events in the above-referenced matter, based on the materials that were provided to me.  I am receiving compensation for my work on this matter at the rate of $225 per hour for review and analysis of the relevant materials, and $350 per hour for testimony.

SUMMARY OF EVENTS:

22. On April 16, 2019, just after 19:00 hours, Ms. Amy Anderson called 911 to

request police assistance at her home, at 45 Elm St., Hyannis, Massachusetts. She conveyed to dispatch that her husband was "being delusional" and that it's "very frightening." She added that she felt he needed a psych evaluation. The call disconnected abruptly.

23. Barnstable Police Officer Sean Roycroft was the first to arrive, receiving the call at 19:07:37 and arriving on scene at 19:09:28. He parked across the street and as he approached the residence he was met at the front door by Ms. Anderson. There was a brief conversation, in which Ms. Anderson advised Officer Roycroft that her husband, Robert Miller, had not taken his medication or slept for days. Ms. Anderson was whispering and gave Officer Roycroft the impression that she did not want her husband to know she called police. She appeared to be afraid. After Ms. Anderson provided dispatch with preliminary information on the call, she hung up the phone "because she didn't want to be involved."

24. As the officer and Ms. Anderson spoke, Officer Roycroft could hear Robert Miller yelling from the back deck but could not understand what he was yelling about. He asked if he should come through the house to the back deck, however, he was directed to go around to the right side of the house by Ms. Anderson. Officer Roycroft asked Ms. Anderson if she felt safe staying where she was (inside the front of the house), and Ms. Anderson stated that she did. Officer Roycroft asked Ms. Anderson what her husband's name was. As Officer Roycroft walked around, he observed Robert Miller standing up on the back deck, wearing sweatpants, but with no shirt or shoes. He was gesturing to the sky with his hands and arms, and yelling. Officer Roycroft observed that Mr. Miller appeared disheveled, unkempt and appeared to be having unintelligible conversations with people who were not there.

25. Ms. Anderson was frightened and knew instinctively there was a potential for "some sort of danger." She knew that there was a concern for safety at 45 Elm Street. When interacting with Mr. Miller, she noted that he appeared to be "focusing on something greater, like a higher power or spiritual force." Mr. Miller had been in a state of "heightened emotion" for the approximate 24 hours prior to her call to 911, had told her she would give birth to baby dragons after having been pregnant for 200 years. Each interaction Mr. Miller was having would escalate significantly in "drastic swings where it was very intense and combative." Mr. Miller told her, "You're going to be eliminated." Mr. Miller had become physical, punching out screens and knocking a door out of place, "like physical combat." She had contemplated calling 911 for "many, many hours" but was reluctant to do so based on Mr. Miller's previously expressed concerns about

anyone calling the police on him.  She believed calling the police would anger Mr. Miller.

26. Officer Roycroft walked in Mr. Miller's direction, and Mr. Miller turned and looked at him.  Officer Roycroft noticed Mr. Miller had a look in his eyes like he wasn't there.  He attempted to speak with him, saying "What's going on, Robert?" Mr. Miller replied to him that he was having a conversation with nature. Officer Roycroft responded that he did that sometimes and asked Mr. Miller if he could have a conversation with him.  Mr. Miller said "Sure" and invited Officer Roycroft to come up onto the deck. By this time, Mr. Miller had stopped yelling and appeared somewhat calm. Officer Roycroft asked Mr. Miller "what's going on today?" and Mr. Miller replied, "Nothing just talking with nature."  Mr. Miller was sweating, had an empty stare and would not make eye contact with Officer Roycroft.  When the officer asked him if he could talk to him, as his wife was concerned about him, Mr. Miller's demeanor changed suddenly, like a "light switch;" he went still, stared at the ground momentarily and then abruptly turned away from him and went towards the house, toward a broken lawn ornament on the deck.  Believing Mr. Miller was going to pick up a piece of the broken figurine, Officer Roycroft followed and stayed close to Mr. Miller. Mr. Miller was angry, with clenched his fists.  As Officer Roycroft attempted to stay close to Mr. Miller, he stated "fuck you I'm not talking with you get the fuck away from me.".

27. Mr. Miller was grunting and shaking his fists.  He rushed toward the sliding door leading into the house.  Officer Roycroft believed Mr. Miller was going to look for Ms. Anderson inside the house, and asked him to stop.  Mr. Miller did not respond to Officer Roycroft's request to stop.  He grabbed the handle of the door and pulled the slider open.  Officer Roycroft was directly behind Mr. Miller, continually telling him to stop.  Mr. Miller entered the house, into the dining area just beyond the slider.  He seemed to be on a mission

28. Officer Roycroft was concerned for Ms. Anderson's safety as Mr. Miller entered the house.  He was also concerned that Mr. Miller might attempt to arm himself while inside.  Officer Roycroft was aware that Ms. Anderson was inside the house. Mr. Miller continued to ignore Officer Roycroft's commands.  Officer Roycroft grabbed him by the arm to try to stop him, at which point Mr. Miller pulled away and began foraging for something on the table in front of him.  The table was cluttered with multiple items and Officer Roycroft, from his vantage point, was unable to see Mr. Miller's hands to determine whether he had grabbed hold of any weapons or objects.  Officer Roycroft continued to issue commands to Mr. Miller.

When Mr. Miller ignored Officer Roycroft's commands to back away from the table, Officer Roycroft put his arms around Mr. Miller's back and across the front of his chest, diagonally. His left arm was under Mr. Miller's left arm (tucked into Mr. Miller's left arm pit) and his right arm was over Mr. Miller's right shoulder. Officer Roycroft's hands were connected at Mr. Miller's chest. (Officer Roycroft described this hold as a "seatbelt hold.")  He positioned his right leg between Mr. Miller's legs, with his left leg outside of Mr. Miller's left leg. Officer Roycroft pulled Mr. Miller away from the table.

29. Mr. Miller resisted Officer Roycroft, pulling to try to get back to the table.  His hands were in front of his chest with his arms bent at the elbow.  Officer Roycroft was still unable to see Mr. Miller's hands.  Officer Roycroft was applying pressure with his arms and hands to try to keep Mr. Miller from pulling away from him. Throughout this time, Officer Roycroft continued to issue verbal commands to Mr. Miller, to stop resisting and/or fighting him. As the officer tried to prevent him from getting further into the house, Mr. Miller forced himself backwards, slamming into the slider and knocking it out of its housing and onto the deck.

30. Mr. Miller and Officer Roycroft began to shuffle in a forward progression toward the front of the house, in the opposite direction Officer Roycroft was attempting to pull Mr. Miller. Officer Roycroft could see Ms. Anderson out of the corner of his eye to his left, and saw a set of golf clubs in a bag, leaning against the wall in the direction in which they were moving.  Officer Roycroft also saw a single golf club on the floor ahead of them.  He continued to hold Mr. Miller, pulling him back and trying to keep him away from the golf clubs.  Officer Roycroft believed Mr. Miller's intention was to access the golf clubs.

31. Ms. Anderson described Officer Roycroft "like bear-hugging Robert from behind, like a restraint, but could not remember where or how Officer Roycroft's arms were positioned with respect to Mr. Miller.   Officer Roycroft described his left arm as being "pinned" under Mr. Miller's left arm, with Mr. Miller appearing to bear down on it.  He was unable to remove his left arm from Mr. Miller's underarm area.  After continuing their forward progress toward a recessed portion of the room, Officer Roycroft and Mr. Miller fell to the floor when they traversed the step down to the recessed area.  They landed on top of the golf club. This movement resulted in Officer Roycroft falling to the left of Mr. Miller, not on top of him, and resulted in the continued pinning of Officer Roycroft's left arm under Mr. Miller's body.  Officer Roycroft was still unable to see his hands, so he continually issued commands to Mr. Miller to stop resisting and pull his hands out from underneath his chest.  Mr. Miller was using his arms to lift up,

pulling his elbows under him.  Officer Roycroft's left arm remained trapped.

32. Officer Spencer Jackson arrived to assist around this time.  He was dispatched at 19:07 and arrived on-scene at 19:10.36, approximately one minute after Officer Roycroft. Officer Jackson heard a loud crash from inside the back left of the house, which  appeared to be the slider being knocked out of its tracks and onto the deck from the force of Mr. Miller's shove, with Officer Roycroft behind him, back away from the table.. Officer Jackson arrived just as Mr. Miller and Officer Roycroft were falling to the floor. Officer Jackson announced his presence and began attempting to secure Mr. Miller's right arm which was underneath his body. Officer Roycroft communicated to Officer Jackson that he did not know whether Mr. Miller had something in his hands. Officer Roycroft's radio was compressed against his neck, which caused an inadvertent radio transmission and cause his radio tone to sound. Officer Jackson also began giving commands to Mr. Miller to stop resisting and put his hands behind his back. Officer Jackson was also concerned that he could not see his hands. He could also observe the shaft of a golf club underneath his body. Throughout this time, Mr. Miller was thrashing his body, kicking his legs, and trying to pull away from the officers.

33. As Mr. Miller continued to resist, Officer Jackson asked Officer Roycroft if he should use his taser, to which Officer Roycroft replied, told *"no"* Officer Roycroft did not believe that a taser would be necessary because he felt that they could gain control over Mr. Miller's hands without escalating the use of force to that level, and because the efficacy of the taser at that range would have been limited. Officer Jackson delivered a half-strike to Mr. Miller's lower rib cage, above his hip, while issuing a command to pull his hands out, in order to get Mr. Miller to stop resisting and comply.  Mr. Miller's right hand was almost secured, but Mr. Miller then twisted toward Officer Roycroft and was able to retract it back underneath his body.  Officer Jackson then put out a radio call for assistance, advising that they were fighting with the subject and requesting backup. Officer Jackson then delivered a second half-strike to the same area, Mr. Miller's lower rib cage, in an attempt to gain compliance. It was at this point that Officer Jackson first saw that Mr. Miller's right fist was clenched with nothing protruding from it. Also at this point, both officers were able to gain control of both of Mr. Miller's hands and apply handcuffs, which were then double-locked.

34. Once Mr. Miller was controlled, restrained and handcuffed Officer Jackson had a brief conversation with Ms. Anderson, who had been partially hiding and

partially observing the struggle from another room, close to the doorway. He asked her if he was on narcotics and she related that he was not, that it was a psychotic break.  Immediately following the application of the handcuffs, Officer Roycroft got to his feet and told Mr. Miller he would help him get up.  Officer Roycroft noticed Mr. Miller was not responsive to this command, and examined his pupils, which appeared to be fixed.  Officer Roycroft tried to stimulate eye movement and was unsuccessful.  He then checked for a pulse and was unable to locate one.  He quietly notified Officer Jackson of his observations—including that Mr. Miller appeared to be unconscious and appeared not to be breathing, and that the handcuffs needed to be removed.  The handcuffs were removed without delay, Mr. Miller was repositioned, and cardio-pulmonary resuscitative efforts were commenced.".    It was at this point that Officers Ruggieri and Shaw arrived with a medical back and bag valve mask.

35. Ms. Anderson recalls hearing Mr. Miller say at some point "I can't breathe," and "Amy, help me."  She is unsure at what point during the 45- to 60-second timeframe Mr. Miller said this, although believes Mr. Miller was leaning over while the officers were trying to put handcuffs on him.  After he said this, she recalls the officers saying, "Can he breathe?" and a brief interval of several seconds after which she observed Mr. Miller's leg kick out.

36. Officer Roycroft initially began chest compressions. As he did, the officers switched positions due to Mr. Miller's positioning in the tight space, and Officer Jackson began chest compressions while Officer Roycroft provided air to Mr. Miller using the bag valve mask. Officer Ruggieri applied an AED, which was connected but read "no shock advised" so no shock was given. Officers continued rescue efforts until Hyannis Fire Personal arrived on scene shortly thereafter and assumed care of Mr. Miller. A Lucas chest compression machine was attached to his stretcher and he was subsequently transported to Cape Cod Hospital.

37. Robert Miller was pronounced deceased at 20:01 at Cape Cod Hospital.

38. On Monday July 15, 2019 Dr. William Zane ruled that Mr. Miller's cause of death was cardia dysrhythmia in a setting of excited delirium, known psychiatric illness at the time of restraint, hypertensive cardiovascular disease, obesity, adrenal insufficiency and hypothyroidism.  The manner of death was noted to be natural.

OPINIONS AND CONCLUSIONS:

39. It is my opinion with a reasonable degree to professional certainty that the actions of Officers Sean Roycroft and Spencer Jackson, including the amount of force used, were reasonable and consistent with general industry standards for the use of force. The officers were not indifferent to the rights of Mr. Miller in the manner that they responded to his residence at 45 Elm St., Hyannis, Massachusetts on the evening of April 16, 2019. Their actions were in keeping with the overarching principle that law enforcement are to act to avoid unnecessary injury and or death. The manner in which the officers responded to a psychotic episode suffered by Robert Miller complied with the Barnstable Police Departments training and common use of force industry standards in light of the following *key* factors:  Mr. Miller was yelling and delusional, became angry and further agitated; appeared unpredictable; was known to be experiencing a psychotic break; was known to have stopped taking his medications; was known not to have slept for days; was immediately and negatively reactive to a statement by Officer Roycroft identifying Ms. Anderson as the individual who called into the police; charged toward a broken figurine in anger; charged into a home where the calling party was present and known to be in fear and where the presence of weapons was unknown; appeared to be in pursuit of something or someone in a state of unpredictable rage; was observed to have had a sudden shift in his demeanor to an apparent state of angry purposefulness; was not responsive to verbal commands or the de-escalation tactics employed by Officer Roycroft; suddenly became resistant to police presence at the same time at which his demeanor changed to angry purposefulness; acted in a manner that caused the officer to fear for Mr. Miller's own safety and the safety of Ms. Anderson; began foraging for an indiscernible object in an agitated and delusional state, and in a position in which it was not possible for Officer Roycroft to see his hands; failed to respond to continual verbal commands; shoved back from a table with the apparent intent to physically and forcefully separate Officer Roycroft from his hold; appeared to be purposefully trapping Officer Roycroft's left arm underneath his own and dragging Officer Roycroft with him toward golf clubs, objects that could easily be utilized as weapons; thrashed and kicked at the officers while continuing not to obey verbal commands to pull his hands out from under his chest; tucked his elbows, arms and hands underneath him in continued non-compliance with the officers' repeated verbal commands; wrested his arm away from Officer Jackson; twisted his body toward Officer Roycroft; appeared to be attempting to achieve a dominant position over the officers; and continued resisting the officers' attempts to gain control of his hands despite the use of an initial distractive

strike.  Additionally, neither Officer Roycroft nor Officer Jackson heard Mr. Miller state at any point that he could not breathe.  Neither officer heard Mr. Miller request help, nor did they place their arms or any parts of their body across or around Mr. Miller's neck.  Neither officer applied sustained pressure to Mr. Miller's back or torso during the brief struggle with Mr. Miller.  Neither officer heard Mr. Miller gasping or struggling to breathe at any point.

40. In light of all of these key factors, and the totality of the circumstances with which the officers were faced, Officer Roycroft's and Officer Jackson's actions, and the amount of force they used, were reasonable considering the totality of the circumstances they faced on that day. These factors, taken as a whole but also in a multitude of varying combinations of each individual factor, combine in their totality to form a scenario that reasonably called for each and every action Officers Roycroft and Jackson took.  In my professional opinion to a reasonable degree of certainty, the actions of Officers Roycroft and Jackson were appropriately in line with national, state and Barnstable police standards for police tactics, including the use of restraints, responses to calls involving individuals suffering from mental illness and the use of force.  This opinion is based on my specialized training, experience, background and education.

41. I analyze Officer Roycroft's and Officer Jackson's use of force with three primary criteria in mind. As an initial analysis and in consideration of the parameters of the standard set forth in Graham v. Connor, otherwise known as the objective reasonableness standard, the formula to determine the appropriateness of the level of force used takes into account involves a three-part test which directs officers to consider the 1) seriousness of the offense; 2) whether the subject poses a physical threat to the officer or others, and 3) whether the subject is actively resisting or attempting to evade arrest by flight. A second analysis takes into account whether the actions of the officer fall within the guidelines established by the Municipal Police Training Institute Use of Force Model, sometimes referred to as a use of force continuum. The model is used in the training of Massachusetts police officers to assist them with the proper analysis and selection of force options that are both reasonable and proportionate to the totality of the circumstances. Finally, a third stage of analysis considers whether or not the officers' actions were consistent with the polices set forth by the Barnstable Police Department.

42. The International Association of Chiefs of Police (IACP) defines force as being "the amount of effort required by police to compel compliance from an

unwilling individual". Law enforcement officers are taught and trained to make split second decisions on the amount of force that is to be utilized in situations that are tense, stressful and rapidly changing. Law enforcement officers are taught to take action to protect themselves, as well as other. They have a duty to do so. Officers are taught and trained that force should only be used when there is resistance or a reasonable certainty of resistance. Officers are to restrict their force to what is reasonable, necessary and appropriate for the safe custody of the arrestee, and for overcoming any resistance that may be offered. Officers are taught and trained to use force to stop resistance and gain compliance, as well as to stop a subject's assaultive behavior. In immediate defense of life situations, officers are trained to use deadly force as a last resort, to stop a subject's deadly behavior or potentially deadly behavior. When the subject's behavior ceases, officers are to cease with their use of force. They are then trained to provide medical attention to anyone who may need it, when it is tactically safe to do so.

43. Officer Sean Roycroft responded to 45 Elm St for a call involving a person suffering from some sort of psychotic episode. A backup officer, Officer Spencer Jackson was dispatched with him. Mental illness calls for service are frequent in law enforcement and officers are aware of the dangerousness of such calls. Though untreated or insufficiently treated mental illness is a critical and worsening problem in this country, the fact that someone is suffering from mental illness does not make them less dangerous, and frequently. It is clear from the records that the information Officer Roycroft had at the time he decided to leave Ms. Anderson and locate Mr. Miller reasonably caused him to have a heightened sense of arousal when the caller, Ms. Anderson spoke in a whisper and had an expression and overall appearance of being in fear while Mr. Miller was yelling unintelligibly out of sight. When Officer Roycroft went around the side of the house to ascertain Mr. Miller's situation, Mr. Miller's behavior was relatively calm; he was able to engage back-and-forth conversation and invited Officer Roycroft to come closer and continue speaking. When Officer Roycroft mentioned to Mr. Miller that his wife had called the police due to her concerns about his behavior, Mr. Miller's demeanor quickly and dramatically (like a "light switch") shifted from a relatively calm (though delusional) state, to angry and erratic. Officer Roycroft considered factors in accordance with accepted police conduct in processing and reacting to this development. When Mr. Miller charged towards the slider of the house, Officer Roycroft knew Ms. Anderson was still inside the residence, knew there was a heightened risk of harm to her than there was previously based on Mr. Miller's reaction, did not know whether any firearms were inside the home, and

was aware that household items that are not firearms could be used as a weapon; based on this information, Officer Roycroft had multiple, significant reasons to become concerned for Ms. Anderson's well-being and safety given the training he had received and the standards applicable to law enforcement. Based on my education, training and experience, individuals who are experiencing a psychotic break frequently lash out at the individual who caused law enforcement personnel to respond to the scene.

44. Ms. Anderson had requested assistance at her home and indicated to Officer Roycroft through her conversation with him that she sought their protection and assistance.   Based on this, Officer Roycroft had permission to enter the residence at 45 Elm Street.  In addition to this, Officer Roycroft's decision to enter the residence at 45 Elm Street was in accordance with national and Massachusetts police standards.  In addition to their law enforcement function, police are permitted to perform the function of "community caretaking." This function permits law enforcement personnel to take measures to protect and ensure the safety of the community.  In certain circumstances, police are permitted to enter a home without a warrant so long as they are performing an articulable non-investigative community caretaking function and subjectively believe that someone is in need of assistance due to health or safety concerns, as was the case here.  When Officer Roycroft observed Mr. Miller angrily and purposefully charging into the residence at 45 Elm Street on April 16, 2019, it was in accordance with accepted standards of police conduct, based on the totality of the circumstances as they were known to him at that time, for Officer Roycroft to take action in the way that he did—namely, attempt to stop Mr. Miller from entering the residence, and attempt to prevent Mr. Miller from being able to arm himself.   Based on accepted national, state and Barnstable police standards, Officer Roycroft's actions were appropriate in order to prevent imminent harm to Mr. Miller or Ms. Anderson.

45. Officer Roycroft followed Mr. Miller closely and as he entered the home through the slider door.   It was at this point that Officer Roycroft grabbed onto Mr. Miller's arm to prevent him from proceeding further into the home toward Ms. Anderson.  Officer Roycroft also observed a table in close proximity to the door that Mr. Miller appeared to be reaching for and on which Mr. Miller ultimately began foraging in an agitated state. Officer Roycroft felt concern at that time that Mr. Miller was attempting to arm himself, though Officer Roycroft was unable to see what items were on the table. Officer Roycroft then utilized what he referred to in his report by the descriptive term "seatbelt hold," describing a cross-body, diagonal hold from around Mr. Miller's back

with his (Officer Roycroft's) hands connected at Mr. Miller's chest.  When considering how to approach Mr. Miller at the time he initiated the hold, Officer Roycroft considered the potential dangers of a hold that resulted in pressure against a subject's neck, and made the determination to apply a cross-body, diagonal hold.  The only other available eyewitness to this hold, Ms. Anderson, described Officer Roycroft's hold from behind Mr. Miller as "like a bear hug," but could not recall the positioning of Officer Roycroft's arms. Both the hold employed by Ms. Anderson and a hold commonly referred to as a "bear hug" are considered universally accepted maneuvers to move a subject away from a particular position or to bring a subject to the ground. The only force option Officer Roycroft utilized during this incident were low level control and restraint techniques, which are used to immobilize, control and handcuff and individual. It is notable that these maneuvers involve the use of less force than a maneuver commonly referred to as "tackling," which is another low-level control and restraint technique.

46. Officer Spencer Jackson arrived within approximately one minute of Officer Roycroft. Upon arrival, he heard a loud crash around to the rear of the house and immediately went there, where he observed the rear slider getting knock off of the house. As he went up and jumped over the slider, he observed Officer Roycroft and Mr. Miller fall to the ground in the recessed area of the floor, with Officer Roycroft off to Miller's left side and his left arm underneath Mr. Miller.  Ms. Anderson observed that Mr. Miller did not "collapse," to the floor; rather he ended up on the floor due to the leverage and movement of the struggle.  Officer Jackson attempted to pull Mr. Miller's right arm out from underneath Mr. Miller after issuing multiple commands to bring his hands out or put his hands behind his back. Mr. Miller did not comply with these commands and continued to resist by clenching his fist, bringing them in towards his center line and continuing to try and get to his feet or gain a dominant position over the officers. Officer Jackson heard Officer Roycroft tell him "I think he's got something in his hands."  Officer Jackson could also see that there was a golf club directly underneath Mr. Miller's torso.

47. Officer Jackson delivered a distractive strike to Mr. Miller's side, which Ms. Anderson described as "it wasn't a force, force of sole punching.  It was using leverage to get his arm to bend to put the handcuffs on."  After delivering two half-strength strikes to Mr. Miller's side, Officer Jackson was in fact, able to gain control over Mr. Miller's right arm controlled and subsequently, with Officer Roycroft, place Mr. Miller in handcuffs. The force options Officer Jackson utilized were two distractive strikes techniques, as well as prying Mr. Miller's

arm out for handcuffing.

48. The timeline, according to Barnstable Police Department's dispatch call log and radio transmissions, is a total of three minutes and thirty seconds, from the time of Officer Roycroft's arrival until officers were uncuffing Mr. Miller and beginning CPR. At 19:09:28 Officer Roycroft arrived on scene. At 19:10:36 Officer Jackson logged in that he had arrived or was arriving on scene as Officer Roycroft was trying to prevent Mr. Miller from entering back inside, progressing toward Ms. Anderson, or arming himself; the slider door was knocked out of its tracks when Mr. Miller appears to have slammed Officer Roycroft against it after Officer Jackson logged his arrival to the scene and was making his way around the side of the residence. At 19:11:43, Officer Roycroft's mic toned when it was compressed against his neck, indicating that Mr. Miller was still resisting the officers' attempts to gain control over his hands at that time. Both officers then attempted to restrain and handcuff Mr. Miller, announcing at 19:11:52 that they were still "fighting with him" and requesting additional backup officers. At some time between 19:11:52 and when rescue was called (19:12:58), Officer Roycroft and Officer Jackson were able to gain control over Mr. Miller, handcuff him, and perform checks to determine that Mr. Miller was no longer conscious. Based on the timeline of events and the eyewitness testimony as to what transpired during this short window of time, the period of time during which Officers Roycroft and Jackson engaged with Mr. Miller in their attempt to confirm he did not have a weapon, gain control of his hands, and prevent him from causing injury to Ms. Anderson, himself or the officers, was in accordance with accepted national, state and Barnstable standards of conduct for law enforcement personnel.

DETAINEE RESTRAINTS:

49. The Barnstable Police Department has a policy that deals with Detainee Restraints, which *is* consistent with best police practices. Policy 1001 states: "The proper handling and restraining of detainees is essential to ensure the safety of both detainees and *officers,* and to avoid injury, escape or accusations of mistreatment. It is not necessary that a detainee *exhibit* some form of aggressive behavior to justify the use of restraints. It does not appear Officers Roycroft and Jackson violated the department policy on Detainee Restraints. Further, it is my opinion that they used only such force which was reasonable and necessary to control Mr. Miller and to ensure the safety of the officers, Ms. Amy Anderson, and Mr. Miller himself. Moreover, the records and all available eyewitnesses consistently reflect that the handcuffs were

immediately removed as soon as Mr. Miller was noted to be unconscious.

50. I have reviewed the report of Scott DeFoe related to this matter, who opines that Officers Roycroft and Jackson should have taken the pressure and weight off of Mr. Miller's back once he was on the ground, handcuffed and in a prone position. It is clear from the records and aggregate testimony of all available eyewitnesses that Officers Roycroft and Jackson applied pressure to Mr. Miller only in the midst of their brief, active struggle with him, and that no pressure or weight was maintained on Mr. Miller from the moment the handcuffs were applied.  Doing so was in accordance with accepted national, state and Barnstable standards for use of force, response to restraint and use of restraints.

51. The testimony and training records of Officers Roycroft and Jackson reveal that they were familiar with the signs of respiratory distress and techniques to avoid pressure- and asphyxia-related injuries.  It is my professional opinion that neither Officer Roycroft nor Officer Jackson applied pressure to Miller that was disproportionate to the level of pressure or force that was called for in view of the circumstances and context of their struggle.  It is further my profession opinion that they appropriately refrained from applying any sustained pressure to Mr. Miller's back or torso throughout the struggle.   Finally, it is my professional opinion that Officers Roycroft and Jackson reasonably believed, in accordance with accepted national, state and Barnstable standards for police conduct, that Mr. Miller was not experiencing or at significant risk of experiencing positional asphyxiation as a result of the totality of Mr. Miller's actions, including his constant motion, twisting, rising up, and altering the positioning of his arms, and the brevity of the encounter.

MENTAL ILLNESS:

52. The Barnstable Police Department has a policy that deals with Mental Illness, which is consistent with best police practices. Policy 1106 gives officers guidance on how to handle such persons in crisis.  In my professional opinion to a reasonable degree of certainty, the actions of Officers Roycroft and Jackson were in accordance with accepted federal and state standards for dealing with individuals experiencing a mental health crisis, as well as with Barnstable Police Department Policy 1106.

53. Officer Roycroft's decision to make contact with Mr. Miller after a preliminary conversation with Ms. Anderson was reasonable and in accordance with accepted national, state and Barnstable police standards under the

circumstances, given the fact that neither he nor Ms. Anderson knew what Mr. Miller was doing at that precise moment, including whether Mr. Miller intended to harm himself or others, was reactive to police presence, or whether his demeanor had changed since Ms. Anderson had last observed him.  For instance, Mr. Miller could have observed the arrival of a police car to the home and become agitated, or could have encountered a neighbor who was unaware of Mr. Miller's ongoing mental health crisis.  Officer Roycroft's decision to move around to the back of the house to visualize Mr. Miller and ascertain his overall position and status was also a reasonable on in furtherance of achieving Step 1 of the Barnstable Police Department Policy 1106(6) (quickly assess the situation and secure the scene). Officer Roycroft's decision to engage Mr. Miller in conversation was similarly reasonable, as doing so was necessary in order for Officer Roycroft to ascertain Mr. Miller's mental status and the degree to which Mr. Miller could be expected to be compliant or responsive to police intervention.  Officer Roycroft's calm and friendly approach of Mr. Miller, including calling him by his first name and stating that he spoke to nature, too, sometimes, was similarly reasonable, given that Mr. Miller initially appeared relatively calm and open to conversation.  Officer Roycroft's initial statements to Mr. Miller appropriately conveyed to him that Officer Roycroft was there to assist, and not to harm, Mr. Miller.  Officer Roycroft's actions were reasonable in light of the potential for erratic and unpredictable behavior when responding to a call where a person is mentally ill, has not been taking his medications, and has not slept in days.

54. The original call to 45 Elm St., Hyannis, Massachusetts was for a female caller who was reporting that her husband was "being delusional" and that it's "very frightening".  *Officer* Roycroft first spoke with Ms. Anderson who was waiting for officer's arrival at the front door. The officer made observations that she was whispering and made it appear as if she was afraid and did not want her husband to know that she had called. Officer Roycroft heard yelling from out back and went around to the rear to make contact and observe the subject. This would be consistent with his training (6.0 Intervention Guidelines, page 2 of Policy 1106-Mental Illness}. 6.0 provides officers guidance on dealing with mental illness calls for service. This portion of the policy provides guidance for responses to calls and encounters with mentally ill individuals in all circumstances. Ms. Anderson had called 911 because she was in fear of Mr. Miller; the call ended abruptly and there was no information about the level of threat Mr. Miller was posing to her at the time of the call. While the policy provides guidance in the form of "steps," there is no requirement that each individual step must be completed prior to attempting to achieve the goals of subsequent steps; such a strict interpretation of the department's guidance on dealing with individuals suffering from a mental health crisis would, in fact, be

dangerous and contrary to the overarching stated purposes of the policy.

55. Officer Roycroft was actively scanning the scene from the moment of his arrival, attempting to quickly assess the totality of the situation and secure the scene. Officer Jackson was deployed as backup and already enroute to the call; he arrived just one minute after Officer Roycroft. In order to quickly assess the situation and secure the scene, Officer Roycroft needed to understand what Mr. Miller was doing at the back of the house and whether or not he posed an immediate threat to himself or others; Officer Roycroft obtained further information from Ms. Anderson (the caller), including Mr. Miller's recent history of stopping his medications; he confirmed she felt safe where she was inside the house, and confirmed with Ms. Anderson the route she felt was best for him to take (around the side of the house); Officer Roycroft attempted to keep Mr. Miller calm and quiet and to build rapport with Mr. Miller by speaking with him calmly. Officer Roycroft *did* act with respect when he engaged Mr. Miller and attempted to gain some voluntary compliance from Mr. Miller initially, until his demeanor shifted suddenly and his agitation escalated to the point that he appeared angry and determined to do something in anger.  It is important to note that Officer Roycroft's experience with Mr. Miller up to this point included Mr. Miller's vacant stare and pronouncement that he was having a conversation with nature, as well as yelling and gesturing at the sky.  Officer Roycroft further understood that Mr. Miller had not slept in days, had stopped taking his medications, had demonstrated erratic behavior and behaved in such a way so as to place Ms. Anderson in fear of her own safety.

56. Officer Roycroft's decision to confirm Ms. Anderson felt safe remaining at the front of the house was reasonable and appropriate, and in accordance with accepted national, state and Barnstable police standards based on the fact that, while there was cause for concern and a heightened state of arousal, there was no indication of imminent harm such that Officer Roycroft should have directed her to an alternate location.  For instance, Ms. Anderson did not tell Officer Roycroft she had been attacked by Mr. Miller or appear injured, and she did not state he was brandishing a weapon or had attempted to gain access to one in describing Mr. Miller's whereabouts and last known status to Officer Roycroft. Further, information and history from family or close friends is an important resource for law enforcement officers when responding to calls involving individuals who are suffering from mental illness.  After the scene is assessed and secured, obtaining information and history from a family member or loved

one is frequently a key factor in ensuring the individual receives the assistance and resources they need.  This information can include the names of any treating physicians, the individual's recent behavior, medications prescribed, whether or not the individual had been taking medications as prescribed, whether or not the individual has medical or other needs about which law enforcement and EMS or hospital staff should be aware, and contact information for family members and medical care providers.  It is therefore my professional opinion that Officer Roycroft's decision not to send Ms. Anderson away from the scene, but to ensure she felt safe to remain where she was while he went around the house to make initial contact with Mr. Miller, ensured that she would remain available to provide valuable information to Officer Roycroft and other responding Barnstable Police Department members and thus was reasonable and in accordance with accepted national, state and Barnstable standards for police conduct in responding to calls involving individuals who are suffering from mental illness.

## USE OF FORCE:

57. Based on the records and testimony reviewed, there is no evidence to indicate that Officers Roycroft and Jackson used excessive force at any time during their encounter with Mr. Miller.  Their choice of the force options available to them fell within the parameters of what is reasonable and consistent with acceptable standards and training. A reasonable officer at the scene could perceive that Mr. Miller's actions were actively resisting and that they were dealing with a potentially volatile, violent and dangerous situation. Therefore, in using the MPTC's Use of Force Model/Continuum, it was reasonable for Officers Roycroft and Jackson to utilize Compliance techniques, referred to as Level 3 techniques within the model. After viewing the Barnstable Police Departments Rules and Regulations and General Orders, it is apparent that the officers' use of force was also in compliance with those policies. The Barnstable Police Department has clearly established rules and guidelines as to when a police officer can use for in performance of their duties.  Much of these guidelines are rooted in federal and state guidelines for use of force.  In my professional opinion to a reasonable degree of certainty, neither Officer Sean Roycroft nor Officer Spencer Jackson violated the department Response to Resistance Policy 502 in their interactions with Mr. Miller. To a reasonable degree of certainty according to my experience, training and education, Officers Roycroft and Jackson were authorized under the BPD and MPTC policies to use more force than they use, as they decided against tackling Mr. Miller, using any department-issued tools such as Electronic Weapons, baton or OC Pepper spray. Instead, they used the least intrusive option that was available to them beyond the

issuance of verbal commands, opting to use open hand controlling techniques, which are significantly less forceful and less likely to cause trauma or injury to a subject.

58. For officer safety as well as the safety of bystanders and the subject himself, it is important for officers to quickly assess the situation, and in some cases, such as a subject being outside the residence and causing a disturbance such as yelling loudly, to make contact with and "get eyes on," or visualize, the subject.

59. When Mr. Miller became angry and swore at Officer Roycroft, he did not violate the law and he was not under arrest, however, if he was concerned for Ms. Anderson's safety, as she was still inside the residence, it was reasonable and in accordance with accepted police standards for him to try to prevent Mr. Miller from going inside the house, toward Ms. Anderson, in such a highly agitated and unpredictable state. A reasonable police officer with that same set of facts could reasonably believe that the situation was quickly escalating and likely to become dangerous and therefore attempt to control the subject.

60. Initiating SWAT presence is, in and of itself, an escalation of a situation. Had Mr. Miller been left to enter the residence without intervention by Officer Roycroft, Officer Roycroft would not have been able to determine if Mr. Miller armed himself, resulting in an unnecessary and significantly increased risk of injury to Ms. Anderson. This was a particularly significant likelihood at that time, given the fact that Mr. Miller was already known to frighten Ms. Anderson, and that his demeanor became angry and purposeful just after he was informed by Officer Roycroft that Ms. Anderson had caused the police to respond to 45 Elm Street. Waiting for the arrival of SWAT would have caused significant delays in securing the scene and responding to the safety concerns raised by Ms. Anderson's call to 911. Moreover, it is my professional opinion that the initiation of SWAT would, in and of itself, have resulted in an escalation of the situation that was unwarranted given the known facts and circumstances at the time, and would have significantly increased the threat level to Ms. Anderson at the time that Officer Roycroft made the split-second decision to follow Mr. Miller into the home.

61. Officer Roycroft had concern for Ms. Anderson who was still inside the residence. He had concern for himself, as well, as he felt Mr. Miller could arm himself or grab an object on the table to use as a weapon. Officer Roycroft was also concerned that Mr. Miller could attempt to injure himself. Each of these concerns was reasonable due to the history he had obtained from dispatch and Ms. Anderson, and due to the delusions and psychotic episode Officer Roycroft was able to

appreciate Mr. Miller was experiencing through his own interactions with Mr. Miller. Ms. Anderson observed Officer Roycroft trying to get Mr. Miller to slow down or stop his movement from the slider to further into house.  Ms. Anderson also heard the officers issue repeated verbal commands to Mr. Miller to put his hands behind his back.  Mr. Miller did not comply with these repeated commands.  It is my professional opinion to a reasonable degree of certainty based on my education, training and experience, that it was reasonable for Officer Roycroft to attempt to prevent Mr. Miller from going back into the residence to avoid harm to Ms. Anderson and to Mr. Miller, and to avoid a situation where Mr. Miller was barricaded in the home with Ms. Anderson.

62. 550 CMR 6.03 (Code of Massachusetts Regulations) defines "chokeholds" as the use of a lateral vascular neck restraint, carotid restraint or other action that involves the placement of any part of a law enforcement officer's body on or around a person's neck in a manner that limits the persons breathing or blood flow with the intent of or with the result of causing bodily injury, unconsciousness or death. A "seatbelt hold" is not a chokehold. Quite often, a seatbelt hold is described as a bear hug from the rear. In a seatbelt hold or maneuver that is properly employed, there is no resulting pressure on or against a subject's neck. A cross-body or seatbelt hold involves wrapping one arm up around a subject's armpit and the other over the opposite shoulder, and then clasping the officer's hands across the subject's chest. It is a technique of taking someone to the ground and controlling the speed of their descent through positioning designed, in part, to avoid applying pressure similar to that which is applied in lateral vascular neck or carotid restraint.  The use by Officer Roycroft of this technique was in accordance with national and MPTC standards, and appropriately increased the likelihood that Mr. Miller would be better-controlled while preventing injury to him, thereby preventing Mr. Miller from injuring others, as well as themselves.

63. If an arrest and control technique is deemed to be out of policy or not a "trained technique" it can still be an acceptable technique and, therefore, reasonably used by an officer, depending on the totality of the known circumstances at any given moment. Officers also sometimes use what is referred to universally accepted takedowns. Those techniques could include, but certainly not limited to "take-down maneuvers, including tackling a subject, a rear century takedown, a wrist drop or wrist drag, or a seatbelt hold or maneuver. These techniques require lower levels of use of force than authorized trained techniques such as utilizing a taser, pepper spray or baton, and frequently prevent trauma or injury to an individual because of the controlled nature of their execution. The key is for the technique to be

reasonable in light of the totality of the circumstances the officer is met with. Officer Roycroft's hold on Mr. Miller constituted a lower use of force than was available to Officer Roycroft based on the exigency of the circumstances and potential threat to Ms. Anderson and Mr. Miller. It was also in accordance with Barnstable Police Department Policy 502, which states that "No policy or procedure for deadly or less lethal force can cover every situation officers may encounter." In my professional opinion to a reasonable degree of certainty, Officer Roycroft responded to the situation with which he was faced decisively, and exercised appropriate judgment, restraint and competence, when he made the decision to grab hold of Mr. Miller from behind in a cross-body hold. It is my professional opinion that it was reasonable for Officer Roycroft to use this technique to prevent Mr. Miller from going further into the house, from arming himself, and possibly harming Ms. Anderson or himself.

64. Barnstable Police Department Policy 502 – Response to Resistance permits officers who encounter an actively resistant subject to employ the following potential responses: empty hand techniques to gain control, distraction techniques, chemical irritants, taser or baton. When subjects resist to an assaultive/bodily harm level, officers are permitted to use the following potential responses: ECD, empty hand strikes or less lethal weapons. Policy 502 further states that "the potential responses listed may not include all force options open to the officer at a point in time, based on his/her level of training and available equipment." Based on Mr. Miller's actions, including yanking his arm away from Officer Roycroft, shoving back from the table in an apparent attempt to separate Officer Roycroft from his hold on Mr. Miller, his apparent attempt to trap Officer Roycroft's left arm under his own left arm while dragging him forward and further into the residence, and his active thrashing, twisting and kicking while he and the officers were engaged in a brief struggle in the recessed area of the floor, it is my professional opinion that Officer Roycroft's and Officer Jackson's decision to use empty hand techniques to gain control over Mr. Miller's hands and apply handcuffs was appropriate and in accordance with Barnstable Police Department policies and national and state standards for police response to resistance. It is further my professional opinion that the officers employed a lower level of force than was warranted given the totality of the circumstances.

65. Based on the records and materials reviewed and my education, training and experience, it is my professional opinion that Officers Roycroft and Jackson immediately and appropriately transitioned to providing medical aid to Mr. Miller at the moment they became aware that Mr. Miller had lost consciousness.

66. Based on the dispatch log, BPD records and radio transmissions, the call length prior to rescue being called was 3:30; however, the entirety of the struggle with Mr. Miller while the officers were attempting to gain control over him was significantly shorter.  Further, there is no indication in any of the records or depositions that sustained pressure or force was applied to Mr. Miller's back or torso; the only indication of pressure being applied to Mr. Miller was in context of the struggle.  Ms. Anderson estimated that all of this movement was "under a minute in total" and approximately 45 seconds from the table being moved from the struggle as Mr. Miller and Officer Roycroft knocked the slider off of its tracks until she was aware that Mr. Miller might not be conscious. It is my professional opinion that the officers appropriately removed the handcuffs from Mr. Miller and began life-saving measures that were consistent with their training at the first sign of distress.

67. Officer Roycroft was faced with a split-second decision in this rapidly evolving, tense and uncertain situation that left him with no choice but to respond by following Mr. Miller into the residence and, when Mr. Miller did not comply with his verbal commands, attempt to grab hold of Mr. Miller's arm to stop his progression into the house or toward potentially arming himself.  Then, when Mr. Miller began foraging on the table, Officer Roycroft was faced with the split-second choice of continuing to allow Mr. Miller to forage for an object, or to use some level of force to attempt to stop Mr. Miller. Officer Roycroft's decision to initiate a hold that involved grabbing hold of Mr. Miller from behind and across his chest with his right arm above Mr. Miller's right shoulder and his left arm underneath Mr. Miller's left arm in order to pull him back and away from the table was reasonable given the confined space between the point of entry and the table, in between which Mr. Miller and Officer Roycroft were positioned, and the forward-leaning position Mr. Miller was in with his arms outstretched or extended before him.  Officer Roycroft's decision to continue to try to prevent Mr. Miller from advancing forward into the home while Mr. Miller was dragging him across the floor—toward Ms. Anderson, at first, and then toward the golf clubs—was similarly reasonable in order to avoid the increased potential for harm to Ms. Anderson or Officer Roycroft.  When the two men fell to the floor and continued to struggle, Officer Roycroft's decision not to escalate the level of force through the use of a taser was reasonable, as he reasonably believed that he and Officer Jackson's attempts to gain control over Mr. Miller's hands would be successful and there was no indication that the continued struggle would result in any harm to Mr. Miller, to the officers, or to Ms. Anderson, and because Officer Roycroft did not hear Mr. Miller ask for help or

state that he was unable to breathe at any point, and at no point did Officer Roycroft observe any other indication from Mr. Miller that he was unable to breathe. Even had Officer Roycroft heard Mr. Miller express an inability to breathe or request help from Ms. Anderson, Mr. Miller's continued active resistance and agitated, delusional and unpredictable state of mind continued to pose a heightened risk to Ms. Anderson, himself and the officers. These factors combine to make Officer Roycroft's decision to continue to try to gain control over Mr. Miller's hands until he was handcuffed was reasonable.

68. Officer Jackson was faced with a split-second decision when he arrived at the scene to find that events had escalated to the point where a fellow officer was involved in a physical struggle with Mr. Miller. Officer Jackson properly announced his presence on the scene and, in response, Officer Roycroft communicated to Officer Jackson that Mr. Miller may have something in his hands. Based on the totality of circumstances of which Officer Jackson was aware at that moment, it was reasonable for him to attempt to assist Officer Roycroft in gaining control over Mr. Miller's hands. Officer Jackson's decision not to escalate the level of force through the use of a taser was reasonable, as he reasonably relied on Officer Roycroft, who had a greater awareness of the totality of the circumstances (having been at the scene longer). Separately, Officer Jackson's decision not to employ a taser was reasonable due to the decreased efficacy of a taser when deployed at a short distance or in drive stun mode, due to the lack of any indication that a continued struggle would result in any harm to Mr. Miller, to the officers, or to Ms. Anderson, and due to the fact that Officer Jackson did not hear Mr. Miller ask for help or state that he was unable to breathe at any point, nor did Officer Jackson observe any other indication from Mr. Miller that he was unable to breathe. Even had Officer Jackson heard Mr. Miller express an inability to breathe or request help from Ms. Anderson, Mr. Miller's continued active resistance and agitated, delusional and unpredictable state of mind continued to pose a heightened risk to Ms. Anderson, himself and the officers. These factors combine to make Officer Jackson's decision to continue to try to gain control over Mr. Miller's hands until he was handcuffed was reasonable. Additionally, Officer Jackson's decision to apply the first half-strength strike to Mr. Miller's right lower-rib area above his hip was reasonable in order to further his purpose of gaining control over Mr. Miller's right hand, given that Mr. Miller was actively resisting and it was unclear whether or not he had something in his hands. When Mr. Miller's right hand remained out of Officer Jackson's control and Mr. Miller twisted his body to the right, pulled the portion of his arm that was out from under him back underneath him, and raised the left side of his body toward Officer Roycroft,

Officer Jackson was reasonably concerned for Officer Roycroft's safety and still unable to confirm Mr. Miller had nothing in his hands that could be used as a weapon; therefore, his decision to apply the second half-strike was also a reasonable application of force with respect to Mr. Miller.

69. In sum, while Mr. Miller's sudden death at 45 Elm St. on 4/16/2019 was without a doubt tragic and unfortunate, the evidence in this case clearly supports that Officer Sean Roycroft and Officer Spencer Jackson each used an amount of force in attempting to control and restrain Mr. Robert Miller that was reasonable and consistent with police standards, guidelines and training in this rapidly evolving and dynamic call to Mr. Miller's residence.

70. All of the foregoing opinions are based on my education, training and experience, and are held by me to a reasonable degree of certainty.

This report is signed under the penalty of perjury on this 29th day of August, 2022

Charles M. DiChiara

## *Instructor Biography*

Officer Charles M. DiChiara has been a Police Officer for the past 33 years. He currently works for the City of Waltham, MA Police Department and is the Training Officer/Coordinator for the Police Department, after spending 27 years working nights in the Patrol Division.

For the past 30 years, Off. DiChiara has also been assigned to the NEMLEC SWAT Team, a multi-jurisdictional tactical team that is responsible for responding to critical incidents within the 64 cities and towns in the Greater Boston and Northeast region of Massachusetts. He has been involved in over 1000 swat missions and is currently a member of the Alpha/Primary Entry Team, as well as the Training Cadre. Off. DiChiara received the George L. Hanna Award for Bravery from the State of Massachusetts in 2006 for his role in a hostage crisis in which multiple shots were fired. He also received a city citation for his role in apprehending a suicidal male armed with a shotgun. He recently received a Resolution from the City of Waltham for his role in the Boston Marathon incident, as well as his role in the apprehension of both terror suspects during the Watertown event in 2013.

Off. DiChiara is a state and nationally certified Instructor-Trainer in the areas of Firearms, Defensive Tactics, Use of Force, Physical Fitness, Active Shooter Resolution and Verbal Defense and Influence. He holds the ranking of Master Instructor in the commonwealth, as well as being a Master Instructor for both Taser International and the Monadnock-Safariland Training Group. Off. DiChiara is a graduate of both the Use of Force Instructor school at FLETC (Federal Law Enforcement Training Center) and Force Science Institute in Virginia, certified to analyze use of force incidents as it relates to human performance and behavior factors.

In 2011, Off. DiChiara received the distinction of being nominated for Master/International Instructor by the Monadnock-Safariland Training Group. After training with officers from Switzerland and the U.K., he became the 113th Master Instructor, out of the 52,000 instructors worldwide and the 3500 Advanced Instructors. In 2018 Off. DiChiara was promoted to the Advisory Board for the Safariland Training Group.

He has been training police officers since 1999 and has trained in excess of 15,000 police officers as well as 6000 law enforcement instructors across the country.  He has trained the Columbian National Police, as well as officers from Canada, Switzerland and England.

In 2020 Officer DiChiara was appointed as the Statewide Coordinator for Police Use of Force & Defensive Tactics. He was also appointed by the Mayor of New Bedford to the Use of Force Commission.  He sits on the Defensive Tactics Executive Committee, the Firearms Executive Committee and recently help form the Patrol Tactics Advisory Group, which merges all of the Statewide Coordinators working together under the same umbrella.

Off. DiChiara is a court qualified expert witness in Defensive Tactics, Police Use of Force,  and police standards and practices.  He has been qualified as an expert in District and State Superior Court, as well as Federally in United States District Court.  In 2015 Off. DiChiara was identified as one of four SME's (Subject Matter Experts) in police use of force for the Commonwealth of Massachusetts. In 2014 he assisted with the update and rewrite of the Defensive Tactics Manual for the state, and in 2018 he assisted with revamping the MPTC's Basic Recruit Academy Training Program, in the areas of Use of Force and Arrest and Control.  He has been at the forefront of Police Reform in Massachusetts, working directly with Police Officer Standards & Training (POST), the Municipal Police Training Committee (MPTC) and the Executive Office of Public Safety & Security (EOPSS) to help establish Rules and Regulations and a Model Policy for Police Use of Force. Officer DiChiara is currently the Lead Defensive Tactics and a Firearms Instructor at Lowell, Randolph, Northern Essex Community College and Merrimack College Police Academies.

## Charles Michael DiChiara

██████████

Dracut, MA 01826

██████████

## PROFESSIONAL EXPERIENCE

| | |
|---|---|
| **2020** | **Statewide Coordinator Use of Force & Defensive Tactics Municipal Police Training Committee** |
| **2015-Present** | **Training Officer City of Waltham, MA Police Department** |
| 1997 – Present | **PATROLMAN** City of Waltham, MA Police Department |
| 1994- 1997 | **DETECTIVE** North Andover, MA Police Department |
| 1990- 1994 | **PATROLMAN** North Andover, MA Police Department |
| 1988- 1990 | **RESERVE POLICE OFFICER** North Andover, MA Police Department |

## EDUCATION

| | |
|---|---|
| 1990- Present | **SPECIALIZED TRAINING** 5000 hours of advanced training |
| 1999 | **SPRINGFIELD COLLEGE** Bachelor of Science Degree in Criminal Justice |
| 1990 | **TOPSFIELD REGIONAL POLICE ACADEMY** 37th Municipal Police Officer Class |

| 1988 | **NORTHEAST REGIONAL POLICE INSTITUTE** |
| 1986- 1988 | **SALEM STATE COLLEGE** |
| 1975- 1986 | **NORTH ANDOVER PUBLIC SCHOOLS** |

## SPECIAL ASSIGNMENTS

| 1992- Present | **N.E.M.L.E.C. SWAT TEAM** |
| | 30 year veteran, currently assigned to Primary Entry team as well as Training Officer for the unit |
| 1998- Present | **DEFENSIVE TACTICS INSTRUCTOR- TRAINER** |
| | (Level 4) DT Instructor for the MPTC |
| 1999- Present | **FIREARMS INSTRUCTOR- TRAINER** |
| | (Level 4) |
| 1999- Present | **FIELD TRAINING OFFICER** |
| | Spent the last 18 years training new officers for city of Waltham Police Department |
| 2020-Present | Commissioner on City of New Bedford's Mayor's Use of Force Commission |
| 2020-present | **Patrol Tactics Advisory Group** |
| 2020-Present | **Firearms Executive Committee** |
| 2002- Present | **Defensive Tactics Executive Committee** |
| 1990- 1995 | **N.E.M.L.E.C. NARCOTICS UNIT** |
| | Five years assigned to the Regional Narcotics Unit |

## ACHIEVEMENTS

| 2021 | **City of New Bedford Resolution** |
| | Commendation for contributions as a Commissioner on Mayor's Use of Force Council |

2021                **1st annual Community Service Award**

Honored by Riverside Church in Haverhill for
commitment to the citizens of the Merrimack
Valley region.


**AWARD FOR BRAVERY/CITY RESOLUTION**

2013           Honored by the state of Massachusetts for role in Boston
Marathon Bombing as well as his role in the apprehension
of both terror suspects


2007           **MERITORIOUS SERVICE AWARD**

Service award for 20 years of dedicated service to police

training- Lowell Police Academy, Lowell, MA

2006           **RECIPIENT GEORGE L. HANNA AWARD**

For bravery in hostage/Barricade incident- Pepperell, MA

1995           **DEA AWARD**

United States Drug Enforcement Administration
contributions to the field of drug law enforcement

1995           **NORTH ANDOVER PD OFFICER OF THE YEAR**

Outstanding Merrimack Valley Chamber of Commerce

1995           **MASSACHUSETTS STATE SENATE CITATION**

Outstanding service to the town of North Andover

1990           **TOPSFIELD POLICE ACADEMY ACADEMIC**

**AWARD**

Graduated 1st in class in academics

1990                        **TOPSFIELD POLICE ACADEMY PT AWARD**

Graduated tied for 1st in class in physical fitness

1990- Present            **COMMENTATIONS/CITATIONS**

Received over 30 commentators for exemplary service in

Performance of duty- State of Massachusetts

**Prior Testimony of Charles M. DiChiara** *(past four years)*

*Carlie Taylor v Police Officer Ryan Moore and the Town of Falmouth Police Department: United States District Court number 1:17-cv-114PBS*

*Carla Sheffield Personal Representative of the Estate of Ramsey Burrell-White v Boston Police Officers Matthew Pieroway and Joel Resil: United States District Court number 15-cv-14174-NMG*

*State of Rhode Island v Providence RI Police Sergeant Joseph Hanley: Criminal Case number 61-2020-04072*

*Geoffrey Tammaro and Megan Tammaro v City of Boston Police Officers Gavin McHale, Mark Asad, Kevin Smith, Christopher Simpson and John Doe: United States District Court case number 19-cv-12497-PBS*

*Jennifer Root Bannon, as the Special Representative of Juston Root v Boston Police Officers David Godin, Joseph McMenamy, Leroy Fernandes, Brenda Figueroa and Cory Thomas; Massachusetts State Police Trooper, Paul Conneely and the City of Boston, Massachusetts: United States District Court case number 1:20-cv-11501 RUS*

*Within the past four years I have also been subpoenaed by the District Attorney's Office to testify before Judicial Inquests and Grand Juries into police deadly force shootings:*

- *2019 Commonwealth of Massachusetts Middlesex County Honorable Judge Stacy Fortes Judicial Inquest into the officer-involved shooting death of Alan Greenhough in Reading, Massachusetts. Woburn District Court docket number 2018INQ001*
- *2020 Plymouth County Grand Jury Inquest into the officer involved shooting death of Bryan Cruz-Soto in Brockton, Massachusetts*
- *2021 Middlesex County District Attorney's Office Judicial Inquest into the officer involved shooting death of Thomas Celona in Winchester, Massachusetts.  Case number 35924*
- *2022 Middlesex County District Attorney's  Office Judicial Inquest into the police officer involved shooting death of Michael Conlon in Newton, Massachusetts. Case number 21000646*