Page 1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Docket No. 1:21-cv-10738-FDS

---------------------------------------------------
ESTATE OF ROBERT JOSEPH MILLER, by and          *
Through IAN MILLER, personal representative of  *
the Estate,                                     *
          Plaintiff                             *
                                                *
                                                *
vs.                                             *
                                                *
                                                *
SEAN ROYCROFT and SPENCER JACKSON,              *
in their individual capacities and the TOWN     *
OF BARNSTABLE, MASSACHUSETTS,                    *
          Defendants                            *
---------------------------------------------------

          REMOTE DEPOSITION of SCOTT DEFOE, an Expert
Witness called by and on behalf of the Defendants, taken
pursuant to the provisions of the Massachusetts Rules of
Civil Procedure, before Dawn T. Rabbitt, a Certified
Shorthand Reporter and Notary Public in and for the
Commonwealth of Massachusetts, at Huntington Beach,
California 92648, on Wednesday, December 7, 2022,
commencing at 1:04 p.m.

Page 2

APPEARANCES

HOWARD FRIEDMAN, ESQUIRE
Law Offices of Howard Friedman, P.C.
1309 Beacon Street, Suite 300
Brookline, MA 02446
(617) 742-4100
Counsel for the Plaintiff

JENNIFER MCKINNON, ESQUIRE
Weisner McKinnon, LLP
90 Canal Street
Boston, MA 02114
(617) 303-3940
Counsel for the Plaintiff

SASHA M. GILL, ESQUIRE
Louison, Costello, Condon & Pfaff, LLP
Ten Post Office Square, Suite 1330
Boston, MA 02100
(617) 439-0305
sgill@lccplaw.com
Counsel for the Defendants

Page 3

INDEX

WITNESS                          EXAMINATION
SCOTT DEFOE
(By Ms. Gill)                        4
(By Mr. Friedman)                   95

EXHIBITS

| NO. | | PAGE |
|-----|-----------------------|------|
| 1   | DeFoe Report          | 97   |
| 2   | Mental Illness Police 1106 | 97 |

Page 4

COURT REPORTER: I just have to ask counsel if you're in agreement of the swearing in of the witness remotely?

MR. FRIEDMAN: Howard Friedman for the Plaintiff, yes, we agree to have this done remotely.

MS. GILL: Sasha Gill for the defendants and I agree to have it done remotely.

SCOTT DEFOE, having been satisfactorily identified and duly sworn remotely by the Notary Public, was examined and testified as follows in answer to direct interrogatories:

DIRECT EXAMINATION
BY MS. GILL:

Q. Good morning, Mr. DeFoe, my name is Sasha Gill, and I represent the defendants in the matter that you've been asked to come and testified about today.

A. Good morning.

Q. I'm going to ask you to keep your answers to the scope of my question, to wait until I'm finished asking a question to answer it, and to let me know immediately if you don't understand any of my questions. Can we agree to that?

A. Yes, ma'am.

Q. Can you tell me your hourly rate?

Page 5

A. For depositions and trials it's $475 per hour.

Q. How much have you billed Attorney Friedman's office to date for record review and deposition prep?

A. For record review, completion of report, discussions, I have billed a total of -- billed and received $17,906.25 and I have yet to bill approximately for seven hours of deposition preparation which I will do at some point after the deposition.

Q. Was one of the contingencies for your appearance today that I prepaid you for your time in advance?

A. Yes, and I did receive that and so thank you.

Q. What percent of your annual income is derived from your expert testimony work?

A. Probably 90 percent now and I get a pension from the Los Angles Police Department and I have some other investments but overall annual income is probably 80 percent would be a better number.

Q. What's the value of that 80 percent?

A. Do you mean how much did I make of the 80 percent of my annual income?

Q. Yes.

A. For 2021 and I don't know yet, ma'am, for 2022, but I think my annual income for expert work was approximately $800,000, 8 to $900,000.

Page 6

Q. What percent of civil cases are you testifying for the defense as an expert?

A. I've been retained on approximately 750 cases for the United States and Canada, and about 30 percent of them are premises liability matters, maybe negligence security, and probably 60 percent Plaintiff, 40 percent Defense on those matters. On police related matters such as this, it's probably 90 to 95 percent plaintiff thus far and 5 to 10 percent defense.

Q. When is the last time you testified as an expert witness at a trial in a civil matter for the defense?

A. None of the matters that I've taken on thus far have gone to trial where I testified. I think that the last deposition for the defense for my retention would be the California Attorney General's Office and I believe that that was in approximately three months ago, it's on my list of trial testimony, but none of the matters that I've taken thus far have gone to trial where I've been defending municipalities and/or the federal government.

Q. In a police matter?

A. Correct.

Q. How many times has your opinion testimony been excluded from trial?

Page 7

A. Never. Now, there's been -- I would like to clarify that. I guess there's been some parameters by certain judges on what we can ultimately testify to and it might be legal opinions or ultimate conclusions such as the ultimate reasonableness of force. There have been parameters that have been obviously for both experts and for both defendants and plaintiffs and so I don't want to say nothing, but there has sometimes been parameters imposed by the judge on a specific case depending on what his or her order was.

Q. And approximately how many times has your opinion testimony been limited or restricted in some way by the judge?

A. Maybe a handful of times, four or five times. I've testified in court a total of 51 times as recently as the last time was November 14th of this year, and so I think maybe five times or so where the judge has limited the scope of the testimony either through motions in limine or other things as to what I could testify to?

Q. Do you yourself practice any Judo, Jiu-Jitsu, Krav Maga or mixed martial arts?

A. I have done all of those things that you mentioned actually. I was part of LAPD's special

Page 8

weapons and tactics defense and tactics cadre. Obviously prior to even leaving the State of Massachusetts I had a black belt in Kenpo Karate from a studio in Bedford, Massachusetts where I grew up. I still currently box at an amateur level three or four days a week as recently as yesterday. Brazilian Jiu-Jitsu probably four years until I had back surgery and that kind of limited my ground grappling in some respect. Krav Maga you mentioned which is Israeli fighting approximately three years of that during when I was still employed with LAPD. Kickboxing probably a period of fifteen years which is in compilation with basic American boxing which I currently do now and I think that's probably about it. Probably thirty plus years of continuous Martial Arts training, ground fighting, standup fighting without ever a break.

Q. Do you believe that some of the techniques and principals in those disciplines can be useful in training police officers?

A. Absolutely useful, yes.

Q. Does every response to calls involving mentally ill individuals require deescalation?

A. Not always. Sometimes you strive in the event that it's necessary to deescalate or diffuse the

Page 9

situation, but sometimes it doesn't require it or sometimes it's ineffective depending on the totality of the circumstances.

Q. What are some considerations that come into play when an officer is determining whether or not a response to a mentally ill individual requires deescalation?

A. Well, you should always be using, trying and thinking of any words or actions to influence someone's behavior such as creating time and distance in utilization in acting listening skills in open ended questions. A lot of that is going to come from information that you have at the time which is so critically important as to what type of information that you can ascertain before that contact is made either by a family member, from a person reporting, maybe from prior calls of service and maybe a prior 72-hour hold on that individual. So, it's going to depend and you want the best information that you can have at the time, and so you should strive to always use the escalation and diffusing techniques if at all possible, but most importantly is getting the necessary intelligence to be able to orchestrate how you're going to respond to that particular incident.

Q. Are mentally ill people in your experience more

Page 10

likely to act unpredictably then mentally healthy individuals?

A. Typically, yes, especially if they're off their psychotropic medication.

Q. Are mentally ill people more likely to become suddenly aggressive then mentally healthy individuals in your experience?

A. Potentially they may. Once again, if they are on some type of controlled substance maybe self-medicating with something other than psychotropic medication, maybe they are not taking their psychotropic medication, it just depends at times, but typically I think that that's a fair statement.

Q. Would you agree that an officer responding to a scene who has been provided with very little information has to be prepared for any scenario that might unfold?

A. I do agree with that, yes.

Q. What's an officer supposed to do when a mentally ill person is not responding to his commands?

A. Well, it depends on who you're saying is not responding, if they are noncompliant and there may be a language barrier, it just depends on the manner or they're just defiant, they're maybe passively resisting or just noncompliance. It's going to be once again is

Page 11

to find out reasons why and once again try to establish dialogue, create open ended questions equally important and that's why it's important on the front end to find out as much about that person or that subject as possible to make sure that you can use some trigger words or get that person in agreement of what you're trying to do or try to establish dialogue and using words and actions to influence that person's behavior.

Q. Would you agree that nothing that you reviewed in the records and testimony in this case indicates that Officer Sean Roycroft and Spencer Jackson were irreverent of human life?

A. I think that's an ultimate trier of fact issue, Counsel. I mean, I have no information that they intentional or if that's what your question is caused the death of Mr. Miller, that's an ultimate trier of fact. Based on what I've read that there was no ill will or anything that I have read thus far that would indicate that, ma'am.

Q. And based on your review of the records and testimony in this case, would you agree that Sean Roycroft was simply talking to Robert Miller when his demeanor suddenly shifted?

A. Attempting to establish dialogue with Mr. Miller

Page 12

when there was a shift based on a statement that I believe that was made by Officer Roycroft that may have been a trigger causing Mr. Miller to become upset and no longer wishing to speak with Officer Roycroft.

Q. And what was that statement?

A. I think the fact that he had made mention the fact that Ms. Anderson had in fact called the police because she was concerned about his well-being.

Q. And that statement is not one of the facts on which you based your opinions in your report; correct?

A. Well, I did in the sense ma'am of the failure to plan, and as we know Ms. Anderson is the best source of information at the time and I believe that there was some negligence on Officer Roycroft's part and failure to properly debrief her to get all of the requisite information that he would need to properly approach when the time was right with the proper resources approach Mr. Miller. I think there was an opportunity there that was missed to speak with Ms. Anderson to find out exactly what transpired prior to his arrival and then some of the back story involved with Mr. Miller which I think would have been critically important as to the manner in which he addressed it.

Q. Would you agree that when Robert Miller went into

Page 13

the house at 45 Elm Street that it was appropriate for Sean Roycroft to be concerned that he might have access to weapons in the house?

A. Once again, that goes back to the initial information that he could have derived from Ms. Anderson as to whether any firearms in the house such as that that he neglected to do. I mean, there's always potential, ma'am, for people, all of us have knives in our house to cut food with, we may have tools to fix things with, and so there's always a concern that there might be something within the house as there is on the patio as well. I mean, there were dumbbells and other things in close proximity to Mr. Miller at the time, and so, yes, there's always that concern, but there was never any threats made, there was never any treats towards Ms. Anderson made that I believe a reasonable officer based on the totality of the circumstances would believe that they needed to stop his movement due to the fact there may be weapons because I think that that would be speculative in nature.

Q. Would you agree that after being dispatched and talking to Amy Anderson that Sean Roycroft knew that Ms. Anderson was scared?

A. She may have been frightened by what was

Page 70

arms, his arms were pinned underneath, and so it does make sense as to what I stated in the fact that the position of falling forward there with once again Mr. Miller bracing himself as we all would when we fall forward is going to pin his arms underneath his body and preclude him from being able to surrender his arms for the purpose of handcuffing and even with that, you couldn't apply a handcuffing technic based on that type of hold because you couldn't put the hands in the small of the back, and you're clearly not going to handcuff him to the front. So, the hold in itself restricts the ability to even effect the handcuffing technic or the ability for subjects such as Mr. Miller to even comply with officers directives to be able to produce his hands.

Q. What's your impression as to when Officer Roycroft's arm became trapped?

A. Once he fell to the ground on top of him his right arm was trapped underneath Mr. Miller's body which would make sense based on the fact that Mr. Miller's chest being pressed on the ground and then the body weight of having Officer Roycroft on his back.

Q. So, when his right arm became trapped under Mr. Miller's body, is it your impression that his left arm

Page 71

was free at that time after the fall?

A. I'm not purporting that at all. He maintained that hold and would not be free or would be able to get his arm out from underneath that. So, once again, I don't know if that question was ever asked, in fact I know that it wasn't, but I don't know if he could adjust his left arm eventually and was able after the two distraction strikes I believe by Officer Jackson they were at that point able to affect a handcuffing technique?

Q. Would you agree that the hold that Officer Roycroft applied is an empty hand technique?

A. Once again, a control hold empty hand technique, those are typically used as the synonymous and once again that particular hold is not any hold that I've ever seen due to the fact that it has significant weapon retention issues with that particular hold with the subject, and so I know that we would never train on that particular hold for any reason. It would be considered empty hand because it's not strikes, and so, yes, it's an empty hand control hold to try to subdue a subject is what I believed the intent would be if you were going to apply this hold.

Q. And based on your review of the records and

Page 72

testimony, did Mr. Miller actively resist Officer Roycroft and Officer Jackson's attempts to restrain him?

A. I think that the resistance was predicated on ability to intent to breath and it's basically called the basic physiology of the struggle whereas weight is applied to the back responsive to the weight applying to the back is to create space between the ground and the subject by doing so the officers perceive that as being resistance but in fact the person resisting an attempt to breath and the officers response to that is more body weight and that game is played until the person goes unconscious.

Q. So, is it your opinion that Mr. Miller was not actively resisting restraint at any point up until his death?

A. I think that based on his position that he could not free his arms even if he wanted to, and secondly I think based on the testimony that I reviewed and the position of the bodies and my background, education and training on the probably 60 or so positional and/or compressional restraint cases it appears based that the resistance was predicated on the resisting and attempt to breath.

Q. When did that resistance start in this process

Page 73

during that call?

A. Once again, if you look at the time in which they went to the ground, so it was a period of the time that Jackson is on scene here is a loud crash which is at 19:10:36 up until the point medical is called which is going to be between 19:11:52 and 19:12:58 and so the entire event was three minutes and thirty seconds is when the duration of the event. So, the timing of the resistance to breath once again according to Amy Anderson's version of the facts, she stated just prior to handcuffing which she believes in the middle of the event is what she stated that she heard Mr. Miller state that he can't breath and he needed help is what she stated in the middle of the event, and so that would put it at the middle and a half mark or so.

Q. Was Mr. Miller's push back from the table against the slider, wasn't that active resistance?

A. Yes.

Q. And at that point the hold had just begun, is that fair to say?

A. Well, the hold was already applied. So, when he pushed back as a response to being grabbed, yes, that could be perceived as active resistance, and so once again I'm not purporting that it's a lawful use of

Page 74

force, that's a trier of fact issue and so would the resistance be reasonable based on the totality of the circumstances, that being by Mr. Miller being the fact that he was grabbed as he was entering his house.

Q. So, you don't have any opinion as to whether or not that was an excessive use of force at that moment; correct?

MR. FRIEDMAN: Objection.

A. I don't believe any force was necessary in this case, Counsel, but the ultimate trier of fact the word excessive is something that I'm not going to ever purport in testimony or in a report and that is a trier of fact issue. Was the force reasonable, I do not believe that it was based on the totality of the circumstances at any point in this case.

Q. Based on your review of the records and testimony, was there any indication that Mr. Miller could not breath at the time that Mr. Miller slammed back against the slider with Officer Roycroft at his back?

A. No, and if the hold was applied in the manner in which and I'm not making credibility at all in this case, but if the hold is applied based on the manner in which Officer Roycroft purported, no, there would be no

Page 75

pressure on the neck, there would be nothing to restrict any breathing at all when you're still in the standing position not until the situation went into the prone position in a confined space I believe at that point would be the time in which breathing could be restricted, but again I'm not offering medical opinions either in this case.

Q. And it's your opinion that breathing can be restricted because both of Officer Roycroft's arms are still around Mr. Miller while they are on the floor?

A. Well, there's a number of things and in this case I think it's positional and compressional, and so you got a tight space with two men obviously Mr. Miller as well over 200 pounds, 220, 230, 214 I think is what the original number is, and then we have another officer that being Officer Roycroft I believe is 6 feet 195 without equipment on and so put that about 220, 215 with all of his equipment on top of the back at that point in a very tight position based on the logistics of the house.

Q. And based on the positioning of Officer Roycroft's arms underneath Mr. Miller?

A. That and/or a compilation of the weight on the back with the potential once again I'm not purporting

Page 76

any medical opinions of the positioning of the right arm if in fact it was positioned where it did not allow or restricted Mr. Miller's breathing in any manner based on the positioning of the right arm based on that hold that was applied by Officer Roycroft.

Q. Would you agree that Mr. Miller's slamming of Officer Roycroft against the slider door was assaulted behavior?

MR. FRIEDMAN: Objection.

A. No, it never rose to the level of assault even based on their own policy.

Q. What do you base that statement on?

A. Well, it states obviously and they talk about prefight indicators and the officer perceives any subject is preparing to assault, is currently assaulted or assaulted the officer or another person with force that will not cause serious injury or death. I think in this particular case is that he's not doing anything assaulting, he's doing something to stop from being grabbed and I think that's an act of resistance more so than it is assault where it's an intentional provocative type like a strike or an offensive measure rather than a defensive measure which I think that it was in this case.

Page 77

Q. So, it's your position that Mr. Miller's push back and slamming Officer Roycroft against the slider was a defensive action?

A. Once again we can't ask Mr. Miller if his intent was to stop from being grabbed because once again he's mentally ill and doesn't want to be touched and his response to that is if he feared or tried to get him off of him, then it would be an act of resisting. If his intent which I don't know of and I can't speculate as to was to somehow harm the officer by slamming him back to the table, then it would be assault.

Q. Mentally ill individuals can be assaultive; right?

A. Yes, ma'am.

Q. And the records and testimony indicate that Mr. Miller kicked and swiped at both officers; correct?

A. I don't remember reading that that there were any kicks or swipes at all from my review of the testimony.

Q. Is it dangerous that Officer Roycroft's arm was trapped underneath Mr. Miller?

A. Dangerous for who?

Q. Dangerous for Officer Roycroft?

A. Well, it's poorly position, yes, I would be concerned about my arm trapped and that's why this

(Pages 78 to 81)

Page 78

particular technique is not taught in the Barnstable Police Department nor in my former agencies where I worked for that very reason because if you go to the ground, you're going to trap your arm and I would be concerned with my arm trapped underneath someone, yes.

Q. And you would be concerned with your own safety in that instance; right?

A. Yes, I want to be able to use both of my right and left arm if I'm a police officer, yes. If my arms are trapped and it restricts my ability to do certain things, and so I would be concerned about my safety, yes.

Q. Is it fair to say that Officer Roycroft with his arm trapped under Mr. Miller was similarly concerned about his own safety?

A. Once again I don't know if he was similarly concerned which once again goes to why apply the hold in the first place --

Q. Let me rephrase that, I asked a bad question. Is it fair to say that with his arm trapped underneath Mr. Miller, that it would have been reasonable for Officer Roycroft to perceive that he was in danger?

A. No, I don't think that there's any danger there, it's just the fact that you don't want your arm trapped,

Page 79

none of us do. The fact that you're in this position and you're on the ground and the idea and Mr. Miller's arms are underneath him, and so all of this stuff about him being able to grab a golf club and swing it in that position is I don't want to use the word nonsensical, but impractical or improbable or impossible actually to be able to do that from that position, but you don't want your arm trapped underneath someone if you can prevent it and that's why these types of holds should be applied when taking someone to the ground either intentionally or unintentionally.

Q. And you don't want your arm trapped underneath a subject because why?

A. Well, for one if the arm is trapped -- well, the ultimate objective should be if someone is in a prone position is to effective handcuffing technique. If my arm is trapped it's going to obviously potentially restrict my ability to free my arm up so I can apply a handcuffing technique at that point, and so that's why it's critically important to not apply holds like this and to have a partner officer who's there if you're going to use force so you can apply the handcuffing technique without your arm being trapped underneath someone's body.

Page 80

Q. But you testified just a couple of minutes ago that you would be concerned about your safety if your arm were trapped underneath a subject. So, was it reasonable for Officer Roycroft to perceive that he was in danger because his arm was trapped underneath Mr. Miller?

A. Well, that's a different question. In danger to being concerned is different. So, I'm going to be concerned with my arm trapped and I'm going to try to free my arm to be able to effect a handcuffing technique or transition to another force option and I can't do that if it's underneath the person's body, but perceiving danger at that point I think that it's more that I just want to free up my arm. I might not be in any danger based on the positioning because there's no information that he has an object in his hand, there's no information that he's armed with a weapon, he's shirtless. I do want to free my arm up, but I don't know if I'm in danger at that point, Counsel.

Q. You're wrestling with the subject and your arm is trapped, is it your testimony that the only reason why you want your arm free is so you can effect a handcuffing technique?

A. Well, not only, but that should be the objective

Page 81

for anyone when you're trying to take someone into custody is quickly as possible to effect the technique and put that person in a seated, standing or incumbent position without delay, but, no, I want to be able to protect myself, I want to be able to transition to another force option if I need to and I want to and no matter what that force option may be and I can't do so if my arms are pinned underneath someone else's body.

Q. Is it fair to say that that becomes more of a concern when that subject is actively struggling with an officer whose arm is trapped?

A. Well, if that person is struggling because of the body weight that's on his back and the arm could potentially be around the area of his neck, he's in a confined space with two grown men that are over 200 pounds each, the struggle as I mentioned and testified to earlier would be the struggle to breath, not the struggle to resist or assault the officer.

Q. Are you saying that Officer Roycroft and Mr. Miller were not engaged in a physical struggle?

A. No, I believe clearly there was a struggle on the ground, yes, they were both on the ground and Officer Roycroft was on his back at the time. So, yes, there was a struggle and the struggles may have been different

Page 82

obviously Officer Roycroft might have been struggling to try to handcuff hopefully and Mr. Roycroft may have been struggling to breath.

MR. FRIEDMAN: So, Mr. Roycroft was struggling to breath?

THE WITNESS: Mr. Miller pardon me.

MR. MILLER: Also when you say he sometimes it's hard to tell who you're referring to.

THE WITNESS: I apologize, that would be Mr. Miller struggling to breath.

MR. FRIEDMAN: Counselor, do you want to take a break at this point or --

MS. GILL: No, I just have a little bit more. If you don't mind, let's just push through.

Q. At some point Officer Jackson arrived on the scene, and what's your first criticism of Officer Jackson's conduct?

A. I think probably failure to recognize the positioning. I think that when he first responded that he realized that they were in a confined space and he observed Officer Roycroft on top of Mr. Miller's back when he arrived and obviously he observed Mr. Miller twisting his torso. He observed both of Mr. Miller's arms underneath his torso. So, my initial and I think

Page 83

the request to use the taser which Officer Roycroft stated, no, don't use a taser to Officer Jackson, and I think that that was a consideration to use the taser and obviously drive-stun mode rather than dark or probe mode was a consideration and I think based on --

Q. I'm sorry, was that a criticism that you have of Officer Jackson to ask if he should use the taser?

A. No, I don't, I think that that was reasonable. He just arrived and he didn't know what he had, and I think that that was a reasonable request should he use the taser, deploy the X26 taser, I think that that was reasonable.

Q. And so it was reasonable to consider use of the taser at that point?

A. Only in drive-stun mode based on what Officer Jackson's observations were, not in probe mode because you could not achieve neuromuscular incapacitation due to distance which you need at least a four inch spread, so proximity would not allow you to use that taser effectively other than in compliance mode which would be in a drive-stun mode and that's, D-R-I-V-E, stun mode. I think the use of distraction strikes to effect the handcuffing technique based on what Officer Jackson knew at the time I think were reasonable based on the

Page 84

totality of the circumstances. I think the use of distraction strikes to the abdomen and rib area not knowing what proceeded that, but would be reasonable to loosen up the arms to be able to effect the handcuffing technique.

Q. So, what's your criticism of Officer Jackson and where do you say that you find the use of force was unreasonable?

A. The issue with Officer Jackson that I have is that the position of Mr. Miller at the time of you can see that Officer Roycroft is on his back, he can see that they're in a confined space, officers have a duty to intervene if they reasonably believe that the force is such that could create, that would be unreasonable based on the totality of the circumstances, and so I think at that point is to ensure as quickly as possible that you get Mr. Miller handcuffed in a seated or standing position is what he should have been concerned with.

Q. In your estimation how long was the struggle on the floor between Mr. Miller and either of the officers?

A. It appeared to be and it's tough to really discern, but the times and once again at scene time so we know that there's some variation as to time in which

Page 85

people get at the scene. He's at the scene at 19:10:36 and he hears a loud crash and then rescue is called at 19:12:58 between 19:11:52 and 19:12:58, and so it's going to be in between from the time that Jackson gets on scene to the crashing maybe two and a half minutes or so.

Q. How long in your estimation based on your review of the records was pressure applied to Mr. Miller's back?

A. It would have been right at the point of two and a half minutes because once again that being the far end of the time in which they requested medical and so right around two and a half minutes, two minutes and fifteen seconds, two minutes and thirty seconds in that range because they go to the ground when he hears a loud crash, and at that point we know Officer Roycroft is on top of Mr. Miller at that point.

Q. So, your opinion is based on an approximate two and a half minute period of consent pressure to Mr. Miller's back?

A. It appears to be that time, about two to two and a half minutes on the spectrum of time on his back.

Q. Would you agree that there's nothing in the records or testimony to suggest that there was any

Page 98

CERTIFICATE

I, DAWN T. RABBITT, a Certified Shorthand Reporter and Notary Public duly commissioned and qualified in and for the Commonwealth of Massachusetts, do hereby certify that there came before me on the 7th day of December, 2022 at 1:04 p.m., the person hereinbefore named, SCOTT DEFOE, who provided satisfactory evidence of identification as prescribed by Executive Order 455 (03-13) issued by the Governor of the Commonwealth of Massachusetts, was by me duly sworn to testify to the truth and nothing but the truth of his knowledge touching and concerning the matters in controversy in this cause; that he was thereupon examined upon his oath, and his examination reduced to typewriting under my direction; and that this is a true record of the testimony given by the witness to the best of my ability.

My Commission Expires:  September 21, 2023

_____

Dawn T. Rabbitt, Notary Public