## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____

ESTATE OF ROBERT JOSEPH MILLER, by and
through IAN MILLER, personal representative of the
Estate,

            Plaintiff,

            v.

SEAN ROYCROFT and SPENCER JACKSON,
in their individual capacities, and the TOWN OF
BARNSTABLE, MASSACHUSETTS,

            Defendants.
_____)

C.A. No. 21-10738-AK

## PLAINTIFF'S RESPONSE TO DEFENDANTS' STATEMENT OF MATERIAL FACTS

1.      The plaintiff, Ian Miller, is the son of Robert Miller, the plaintiff's decedent, and was appointed as personal representative of the Estate of Robert Miller on March 10, 2021. (Compl. ⁋ 5).

**RESPONSE:** Not disputed.

2.      At the time of his death on April 16, 2019, Robert Miller ("Miller") was sixty-three years old and a resident of Hyannis, Massachusetts. (Compl. ⁋ 1, 5; Ex. 1).

**RESPONSE:** Not disputed.

3.      The Town of Barnstable is a duly organized town under the laws of the Commonwealth of Massachusetts. (Compl. ⁋ 6).

**RESPONSE:** Not disputed.

4.      In April 2019, the defendants, Sean Roycroft and Spencer Jackson, were duly appointed police officers in the Barnstable Police Department ("BPD"). (Compl. ₱ 6).

**RESPONSE:** Not disputed.

5.      At 7:03:56 P.M. on April 16, 2019, BPD dispatch received a 911 call from Anderson that was logged into the BPD computer system as a "mental health emergency," stating, "we need the police," that Miller was "very delusional," "need[ed] a psych evaluation" and that "it [was] very frightening;" Anderson then abruptly disconnected the call. (Ex. 2, BPD Dispatch Log; Ex. 19, BPD 911 Call and Radio Transmissions at 0:00:00).

**RESPONSE:** Not disputed that the 911 call was made at that time by Anderson and it was logged as a "mental health emergency." Disputed that this is an accurate transcript of the call. Anderson said she was at 45 Elm Street and "We need the police. There is someone very delusional here, my husband." When asked who was delusional, she said, "he is, and he needs a psych evaluation. It's very frightening." After confirming the address, she gave her first name and then hung up. (Ex. 19; Ex. 2.)

6.      At 7:06 P.M., dispatch entered the following description of the call into the BPD computer system: "RP[1] stated husband having a psychotic break. Very short on phone. Caller disconnected, no further info." (Ex. 2).

**RESPONSE:** Not disputed.

7.      The individual who made the call to 911 was Amy Anderson, Miller's long-time girlfriend who lived with him at 45 Elm Street. (Ex. 6 at ₱ 2).

**RESPONSE:** Not disputed.

---

[1] The abbreviation "RP" is generally used by police to refer to "reporting party."

8.      Roycroft was dispatched to 45 Elm Street at 7:07:37 P.M. and arrived at the scene at 7:09:29 A.M. (Ex. 2).

**RESPONSE:** Not disputed that Roycroft was dispatched to 45 Elm Street at 7:07:37 P.M. Disputed that he arrived at the scene at 7:09:29 A.M.; the correct time is 7:09:28 P.M.

9.      Jackson was dispatched to 45 Elm Street at 7:07:47 P.M. and arrived at the scene at 7:10:36 P.M. (Ex. 2).

**RESPONSE:** Not disputed.

10.     Prior to his arrival at the scene, Roycroft knew the call was labeled as a "mental health emergency," that the caller's husband was experiencing a psychotic break, that the caller had been short on the phone and that the call had disconnected. (Ex. 4 at 169-171).

**RESPONSE:** Not disputed.

11.     As a police officer, Roycroft had responded to domestic disturbance calls where the 911 call was disconnected because the abuser took the phone from the caller. (Ex. 4 at 171).

**RESPONSE:** Not disputed.

12.     Roycroft's awareness that the call was labeled an "emergency" and had been disconnected added additional layers of concern to the call. (Ex. 4 at 170, 182).

**RESPONSE:** Not disputed.

13.     Roycroft radioed into dispatch that he was heading to the scene, and heard Jackson indicate over the radio that he was responding to the scene, as well. (Ex. 5 at ₱ 12).

**RESPONSE:** Not disputed.

3

14.    While enroute to the scene, Roycroft used his lights and sirens to "get there as fast as [he] could," and mentally prepared himself for a mental health situation in which the 911 call had been disconnected, and considered safety issues.  (Ex. 4 at 97:17-20; 96:8-97:7).

**RESPONSE:** Disputed. He shut off his siren before arriving at the home because it was not needed. (Ex. 4 at 97:21-98:6.) By "safety issues," Roycroft was referring only to the fact that the call was disconnected. (Ex. 4 at 97:1-7.)

15.    Roycroft was trained to follow BPD guidelines in responding to calls involving mentally ill individuals that instruct officers to prioritize performing a quick assessment of the scene and to secure the scene. (Ex. 3 at 38; Ex. 5, ℙ 19).

**RESPONSE**: Not disputed, with the correction that the policy says, "Quickly assess the situation and secure the scene," and the clarification that these are "Intervention Guidelines" within a BPD Policy and Procedure.

16.    Given the likelihood that the caller was in fear of her own safety, Roycroft understood that securing the subject should be prioritized. (Ex. 5, ℙ 13).

**RESPONSE:** Disputed. The policy refers to securing the scene. Roycroft said his goal was to "observe Miller and assess the situation." *See* fact number 36.

17.    Roycroft logged his arrival time while approaching the scene. (Ex. 5, ℙ 23).

**RESPONSE:** Not disputed.

18.    It took Roycroft approximately 30 seconds to park his police cruiser and arrive at the front door of 45 Elm Street.  (Ex. 5, ℙ 24-25; Ex. 9, MASP Interview of Sean Roycroft at 9:20-10:11).

**RESPONSE:** Partially disputed. Given that Roycroft parked "directly across the street from the front of the house" and at this point he believed this was an emergency and was trying to arrive as fast as he could, it is unlikely that he would have taken 30 seconds to park and arrive at the door. It was likely less than 30 seconds, but the timing is inexact. (Ex. 9 at 9:20-10:11; *see also* facts 12 and 14.)

19.     Upon arrival at the residence, Roycroft was met at the front door by Anderson, who Roycroft perceived to be waiting there for him; she also appeared to be in fear, due to her demeanor, shaky voice, and the fact that she was urgently whispering to him through a partially-open front door and a closed screen door, "He's out back. He's out back." (Ex. 4 at 86:12-13; Ex. 6 at 4; Ex. 7 at ℙ 41; Ex. 8 at 36:7-12; Ex. 5 at ℙ 27; Ex. 4 at 82:6-13; Ex. 9 at 10).

**RESPONSE:** Disputed. Anderson stated on the phone, "It's very frightening." (Ex. 19.) This is consistent with her fright at seeing her life partner in a psychotic state. (Ex. 20, Depo. of Scott DeFoe[2], at 41:17-20.)

20.     Anderson told Roycroft that Miller was her husband, was hallucinating and talking to people who were not there and had not taken his medications or slept in days; she urged Roycroft to go around the side of the house toward the back deck where Miller was. (Ex. 7 at 42-43; Ex. 4 at 83; Ex. 9 at 11:1-4).

**RESPONSE:** Not disputed.

---

[2] When possible, Plaintiff cites to the exhibits submitted by Defendants. Defendants' Exhibit 18 is a partial transcript of the deposition of Scott DeFoe. Plaintiffs include the entire deposition transcript as Exhibit 20.

21.     Anderson does not recall other details of this conversation with Roycroft. (Ex. 7 at ⁋ 42-43).

**RESPONSE:** Not disputed. Not material.

22.     Ms. Anderson was frightened due to Miller's heightened mental and physical state and she was concerned for her own safety as well as Miller's, and that Miller might be adversarial with Roycroft. (Ex. 8 at 12:18-24, 13:1-11; Ex. 7 at ⁋ 40).

**RESPONSE:** Disputed. At the time of the incident, Ms. Anderson "didn't have a specific fear of what type of harm, who might be harmed." She realized retrospectively—about a year later—that she was concerned for her safety and Robert's. (Ex. 8 at 12:18-13:11, 137:3-138:23.)

23.     Anderson told Roycroft that she was very concerned that Miller would be angry at her for calling the police, and Roycroft recognized that Miller might become angry if he came upon Roycroft speaking with Anderson. (Ex. 4 at 84:14-18; Ex. 5 at 40).

**RESPONSE:** Not disputed.

24.     Roycroft knew Miller was outside the home and asked Anderson if she felt comfortable staying inside the home. (Ex. 4 at 86).

**RESPONSE:** Not disputed.

25.     Based on her facial expressions and mannerisms, Roycroft believed Anderson to be fearful and "in fear" regarding Miller's behavior. (Ex. 4 at 86: 6-13, 87:11-24, 88:1-2; Ex. 6 at 4; Ex. 9 at 11:3-5; Ex. 5 at ⁋ 28, 34).

**RESPONSE:** Not disputed.

26.     Anderson was checking behind her as if to see if someone was approaching her from behind, and Roycroft perceived based on her tone and demeanor that she urgently wanted him to go around back to check on Miller.  (Ex. 7 at ₱ 45; Ex. 4 at 86:11-13; Ex. 5 at ₱ 34-35).

**RESPONSE:** Not disputed.

27.     While Anderson's urging did not dictate Roycroft's response, her frantic demeanor confirmed his earlier understanding that ensuring Miller was secure should be prioritized. (Ex. 5 at ₱ 36).

**RESPONSE:** Disputed. See response number 16.

28.     Roycroft could hear Miller yelling but was unable to decipher what he was yelling about. (Ex. 6 at 4).

**RESPONSE:** Not disputed.

29.     From where Roycroft and Anderson stood, neither of them could see exactly where Miller was or what he was doing. (Ex. 7 at ₱ 44).

**RESPONSE:** Not disputed.

30.     Roycroft balanced the interest in continuing to obtain information from Anderson with the interest in assessing Miller. (Ex. 4 at 182:13-183:15).

**RESPONSE:** Disputed. Anderson answered all of Roycroft's questions and he did not recall having any additional questions. (Ex. 4 at 82:17-21).

31.     Roycroft knew Jackson would be arriving at any moment, and made the decision to defer obtaining any additional information from Anderson until after he could get eyes on Miller and ascertain his status.  (Ex. 4 at 182:13-183:15).

**RESPONSE:** Not disputed.

32.    Anderson and Roycroft discussed the best way for him to approach Miller; Anderson indicated that Roycroft should go around the right side of the house, rather than through the house. (Ex. 6 at 4).

**RESPONSE:** Not disputed.

33.    Roycroft asked Anderson whether she felt safe staying inside the house while he went to check on Miller, and she indicated that she felt comfortable staying inside the house. (Ex. 4 at 59: 20-60:2; 86:6-13, 87:11-24, 88:1-2, Ex. 6 at 4).

**RESPONSE:** Not disputed.

34.    Roycroft asked Anderson what her husband's first name was to help him to establish a rapport with Miller, and she replied that it was Robert.  (Ex. 5 at ℙ 38; Ex. 6 at 4).

**RESPONSE:** Not disputed that Roycroft asked Anderson what her husband's first name was, and she replied that it was Robert. Disputed; the citations do not support that Roycroft did so to establish a rapport.

35.    Anderson's direction to Roycroft to go around the side of the house was consistent with Roycroft's experience that people who are afraid of another individual within their home (Ex. 5 at ℙ 43).

**RESPONSE:** Not disputed that this was Roycroft's perception.

36.    With the information he obtained from Anderson and the original information he had received from dispatch in mind, Roycroft proceeded around the side of the house to the back in order to observe Miller and assess the situation. (Ex. 4 at 104:4-7, 103:20-21, Ex. 6 at 4).

8

**RESPONSE:** Disputed; the citations do not support what information Roycroft had in mind. Not disputed that Roycroft said he proceeded around the side of the house to the back in order to observe Miller and assess the situation. (Ex. 4 at 83:9-15.)

37.    Anderson retreated into the front interior of the house and did not hear or see any of the exchange between Miller and Roycroft until they entered the house. (Ex. 7 at ¶ 47).

**RESPONSE:** Not disputed.

38.    When Roycroft reached the backyard, Miller was standing on the back porch, and talking and gesturing to the sky. (Ex. 4 at 104:11-14; Ex. 6 at 4).

**RESPONSE:** Not disputed.

39.    Roycroft was still unable to understand what Miller was saying. (Ex. 4 at 104:15-17).

**RESPONSE:** Not disputed.

40.    Miller was disheveled, wearing only sweatpants, and was sweating. (Ex. 4 at 114:8-10, 105:9-12; Ex. 6 at 4-5).

**RESPONSE:** Not disputed.

41.    Roycroft saw that Miller looked frazzled, had an empty and unfocused stare, and his eyes were bloodshot. (Ex. 5 at ¶ 47-48; Ex. 6 at 4-5).

**RESPONSE:** Not disputed, with the clarification that Roycroft made these observations after he had engaged Miller in conversation. (Ex. 4 at 111:1-15; Ex. 6 at 4-5).

9

42.     Roycroft had received training to respond to calls involving individuals experiencing mental health crises in a calm, friendly and non-threatening manner. (Ex. 5 at ¶ 15).

**RESPONSE:** Not disputed.

43.     Roycroft sought to approach Miller in a calm and friendly manner, asking him "What's going on, Robert?" or "Hi, Robert, how're you doing?" or "How's it going?," in order to give Miller a sense of calm and that Roycroft was not there to hurt him. (Ex. 4 at 105:20-23, 106:1-3; Ex. 6 at 5).

**RESPONSE:** Not disputed that Roycroft made these statements. Disputed; the citations do not support that Roycroft did so in order to give Miller a sense of calm or show that Roycroft was not there to hurt him.

44.     Miller replied that he was conversing with nature, to which Roycroft responded, "I do that sometimes" or "I do that from time to time, absolutely nothing wrong with that. That's great." and asked Miller, "Can I have a conversation with you?" or "What do you think about you and I having a conversation?  Can we have—can we have a conversation here?" Ex. 6 at 5; Ex. 9 at 13:7-15; Ex. 5 at ¶ 50).

**RESPONSE:** Not disputed.

45.     Miller responded, "Sure, we can" and either invited or gave Roycroft the impression that he was welcome to come up onto the deck to continue the conversation. (Ex. 4 at 111:1-6; Ex. 6 at 5; Ex. 9 at 13:14-15).

**RESPONSE:** Not disputed.

46.     Roycroft stepped onto the deck, keeping several feet of distance between them and noting a broken flower pot or figurine and some dumbbells nearby. (Ex. 6 at 5; Ex. 9 at 13:16-24; Ex. 5 at ‖ 51).

**RESPONSE:** Not disputed.

47.     Roycroft began the conversation with Miller by stating that his wife had called because she had some concerns about him. (Ex. 4 at 111:18-23; Ex. 6 at 5; Ex. 5 at ‖ 52).

**RESPONSE:** The statement is not disputed. It is disputed that Roycroft began the conversation by making this statement. (Ex. 6 at 5; Ex. 4 at 110:9-111:20; *see also* fact numbers 44 and 45.)

48.     Upon hearing this, Miller's demeanor appeared to shift; he stared at the ground and turned suddenly toward the house and approached the broken ceramic pieces on the deck. (Ex. 4 at 112:6-11; Ex. 5 at ‖ 55).

**RESPONSE:** Not disputed.

49.     It appeared as if Miller "flipped a switch" and became angry as he moved. (Ex. 4 at 115:10-13, Ex. 6 at 6; Ex. 9 at 14:7-13).

**RESPONSE:** Not disputed.

50.     Roycroft stayed close to Miller, who stopped as he reached the house, grunting and shaking his fists in an angry way, and said, "Fuck you I'm not talking with you get the fuck away from me," or "Fuck you. I don't want to fucking talk to you anymore. Fuck this," and "bee-lined" and "hurried towards the sliding door leading into the house." (Ex. 6 at 5; Ex. 9 at 14:11-17; Ex. 5 at ‖ 58).

**RESPONSE:** Not disputed. To clarify the order of events, Miller's swearing at Roycroft is the moment he "flipped a switch" as described in the previous fact. Roycroft observed that Miller "stopped as he reached the house" before this moment of anger, not after. (Ex. 6 at 5.)

51.     Roycroft asked Miller to stop and issued multiple verbal commands for Miller to stop, because Miller was shaking his fists and grunting, and appeared to him to be on a mission to arm himself and seek out Anderson inside the house. (Ex. 6 at 5; Ex. 5 at 56-60).

**RESPONSE:** Disputed that Roycroft believed Miller to be on a mission to seek out Anderson inside the house. (Ex. 4 at 42:3-7.)

52.     By this point, Roycroft believed Miller's delusional state and erratic behavior necessitated hospitalization so as not to create a likelihood of serious harm by reason of his mental illness. (Ex. 5 at ⸿ 61).

**RESPONSE:** Disputed. Neither Roycroft's police report, nor his State Police interview, nor his answers to interrogatories, nor his supplemental answers to interrogatories, nor his deposition testimony contain this fact. (Ex. 6; Ex. 9; Ex. 10; Ex. 21, Roycroft's Supplemental Answers to Interrogatories; Ex. 4.)

53.     Roycroft perceived Miller to be experiencing a serious psychiatric event and perceived a dramatic shift in Miller's demeanor from his previous, relatively calm state. (Ex. 5 at ⸿ 54-56, 61).

**RESPONSE:** Not disputed.

54.     Roycroft issued repeated verbal commands for Miller to slow down as the two of them approached the house, but Miller did not comply. (Ex. 5 at ⸿ 62-65; Ex. 6 at 5).

12

**RESPONSE:** Not disputed.

55.    Miller pulled, ripped or threw open the slider door leading to the back of the house and stepped inside; a dining room table was positioned in front of the slider door. (Ex. 9 at 14:20-21; Ex. 5 at ℙ 63; Ex. 10 at 10; Ex. 4 at 118).

**RESPONSE:** Not disputed, with the clarification that Roycroft says Miller "pulled the slider open." (Ex. 4 at 118:5.)

56.    Roycroft stayed directly behind Miller because he knew Anderson was inside the house, believed Roycroft was looking for her, and was concerned for her safety. (Ex. 9 at 14:17-21; Ex. 6 at 5; Ex. 5 at ℙ 64).

**RESPONSE:** Disputed. Roycroft said, "I was trying to keep him from getting onto the table, from harming himself, that's what my plan was." (Ex. 4 at 42:5-7; 38:21-23.)

57.    Miller continued to ignore all verbal commands and pulled away from Roycroft toward the table. (Ex. 4 at 176:15-177:3, Ex. 6 at 5).

**RESPONSE:** Not disputed, with the clarification that Miller pulled away from Roycroft after Roycroft grabbed Miller's arm from behind. (Ex. 4 at 120:6-10, 33:6-16.)

58.    Roycroft grabbed Miller by the arm to get his attention and stop him from proceeding further into the house. (Ex. 9 at 14:22-15:5; Ex. 6 at 5. Ex. 4 at 120:11-121:6).

**RESPONSE:** Not disputed, with the clarification that this event occurred before the event described in the previous fact. (Ex. 4 at 120:6-10, 33:6-16.)

59.    Miller pulled his arm away from Roycroft and began "foraging" over a table that was situated just inside the slider door, appearing to Roycroft to be trying to arm himself. (Ex. 9 at 14:22-15:5; Ex. 6 at 5-6; Ex. 4 at 18:5-7; 120:13-14; Ex. 5 at ℙ 65-66).

**RESPONSE:** Disputed. Roycroft "didn't know exactly" what Miller was trying to do at the table. Roycroft says Miller "was reaching on the table." Miller was on the table for seconds and did not grab anything from the table, nor did he threaten to. (Ex. 4 at 119:4-7, 122:15-16, 128:5-130:6.)

60.    Roycroft could tell that the table was cluttered with various objects, but could not see exactly what was on it. (Ex. 6 at 5-6; Ex. 9 at 14:22-15:5; Ex. 5 at ℙ 67-74).

**RESPONSE:** Not disputed.

61.    Roycroft's police training informed him that ensuring a subject's hands were clear of any objects that could be used as a weapon was paramount, and Roycroft was unable to see Miller's hands. (Ex. 5 at ℙ 68; Ex. 4 at 128-130).

**RESPONSE:** Not disputed.

62.    Miller ignored multiple commands by Roycroft to back away from the table. (Ex. 6 at 5-6; Ex. 5 at ℙ 69).

**RESPONSE:** Disputed. At his deposition, Roycroft does not describe issuing multiple commands to back away from the table. Rather, he describes grabbing Miller's arm immediately, suggesting he did not give time for multiple commands: "as soon as we stepped inside, that's when I grabbed him by his arm." (Ex. 4 at 120:6-8.)

63.    Roycroft was unable to see Miller's hands and was therefore unable to determine if Miller was holding anything or picked anything up. (Ex. 4 at 128:5-24, 129:1-4, 130:6-10; Ex. 6 at 5-6).

**RESPONSE:** Disputed. Based on Roycroft's description of the hold, he would have been able see if Miller picked up an object. He was not directly behind Miller. (Ex. 20 at 90:2-91:5; Ex. 4 at 19-22.)

64.     By this point, Roycroft had become increasingly concerned about Anderson's, Miller's and his own safety. (Ex. 4 at 101:12-16, 102:1-7; Ex. 6 at 5-6).

**RESPONSE:** Disputed. Roycroft says, "I was trying to keep him from getting onto the table, from harming himself, that's what my plan was." (Ex. 4 at 42:5-7; 38:21-23.)

65.     Officer Roycroft immediately weighed the interest of not using any force in this situation with the interest of using a minimal amount of force in order to ensure that Miller had not already armed himself and did not arm himself. (Ex. 5 at 69-75).

**RESPONSE:** Disputed. Neither Roycroft's police report, nor his State Police interview, nor his answers to interrogatories, nor his supplemental answers to interrogatories, nor his deposition testimony contain this fact. (Ex. 6; Ex. 9; Ex. 10; Ex. 21; Ex. 4.) When asked by State Police investigators if he had considered using use of force equipment, Roycroft responded, "I didn't really even have time to think about it." (Ex. 9 at 29:3-6.) When asked at his deposition if he considered any other maneuvers before he chose the seatbelt hold, Roycroft responded, "There was no time to consider. It was just -- it was a reaction. And that's all it was. The only -- the one thought that I do remember is that I could not choke him." (Ex. 4 at 39:8-13.)

66.     Standing behind Miller in the confined space between the slider and the dining room table, Roycroft made the decision to attempt to grab hold of Miller from behind: Roycroft reached his arms around Miller's front, putting his left arm under Miller's left arm

and his right arm over Miller's right shoulder, connecting his hands at Miller's chest. (Ex. 6 at 6; Ex. 5 at ₱ 75).

**RESPONSE:** Not disputed.

67.    Roycroft described this hold as a "seatbelt hold," indicating the positioning of the diagonal cross-body strap of a seat belt. (Ex. 9 at 15:6-24; Ex. 10 at 14; Ex. 6 at 6).

**RESPONSE:** Not disputed.

68.    By applying this hold to Miller, Roycroft was able to pull Miller back, away from the table. (Ex. 9 at 15:11; Ex. 6 at 6).

**RESPONSE:** Not disputed.

69.    Miller did not acquiesce, and continued to grab for the table while failing to comply with Roycroft's continued verbal commands, including "Robert, you need to stop. You need to stop. You need to put your hands behind your back." (Ex. 9 at 16:9-11; Ex. 5 at ₱ 77).

**RESPONSE:** Disputed. After putting Miller in the seatbelt hold, Roycroft says, "I pulled back to get him off the table. … I didn't even realize at that time that when we pulled back off the table, that at some point, and I'm not sure exactly when, that we hit the slider and knocked the slider out of the frame because immediately from there, Robert was dragging me across the floor moving forward" towards the office area. (Ex. 4 at 123:7-24.)

70.    Miller continued to fight and pull, and then, using the table as leverage, shoved himself and Roycroft backward, away from the table and against the slider door, knocking the slider door out of its frame and causing it to crash onto the ground. (Ex. 9 at 15, 16:11-16: Ex. 5 at ₱ 77-80; Ex. 11 at 60:12-16; Ex. 4 at 123; Ex. 5 at ₱ 77-80).

16

**RESPONSE:** Disputed. *See* response to fact number 69.

71.     It appeared clear to Roycroft that Miller had intentionally shoved them both backward from the table in an attempt to disengage Roycroft from his back. (Ex. 5 at 77-80).

**RESPONSE:** Disputed. *See* response to fact number 69.

72.     Anderson, who had been unable to hear or see any of the exchange between Roycroft and Miller up until this point (since Roycroft had left her at the front of the house), was again able to witness some of their interactions right around the time she heard them crash against the slider door. (Ex. 7 at ⁋ 48; Ex. 8 at 52).

**RESPONSE:** Not disputed.

73.     Anderson described the hold Roycroft applied to Miller as a "bear hug," wherein Roycroft's arms were around Miller's arms. (Ex. 8 at 1114: 14-17, 114: 23-24, 225:1-3).

**RESPONSE:** Not disputed.

74.     Anderson has no specific memory as to the positioning of Roycroft's arms or hands, but heard Roycroft issue many verbal commands to try to get Miller to stop or comply and put his hands behind his back. (Ex. 4 at 141:16-24, 142:1-5; Ex. 7 at ⁋ 49; Ex. 8 at 56-57).

**RESPONSE:** Not disputed.

75.     The two began shuffling forward, with Miller "leading with force" and succeeding in dragging Roycroft forward across the floor, and Roycroft trying to keep Miller from making forward progress into the house. (Ex. 5 at 81-84; Ex. 7 at ⁋ 52-53; Ex. 8 at 53).

**RESPONSE:** Not disputed.

76.     Jackson arrived at 45 Elm Street and was approaching the house when he heard a loud crash resulting from Miller slamming Roycroft back against the slider. (Ex. 12 at 22:20-22; Ex. 6 at 2; Ex. 6 at 6).

**RESPONSE:** Disputed. Jackson was at the back corner of the house when he heard a crash. Then he walked around the corner and saw the slider door fall to the deck. (Ex. 11 at 60:8-18.)

77.     With Roycroft still holding onto Miller from behind and attempting to hold Miller back, Miller continued dragging Roycroft across the floor, Roycroft realized that his left arm was being pinned under Miller's left armpit and that Miller was clamping down on it. (Ex. 4 at 123:11-21; 124:10-12; Ex. 6 at 6; Ex. 5 at ₱ 82).

**RESPONSE:** Disputed. Neither Roycroft's police report, nor his State Police interview, nor his answers to interrogatories, nor his supplemental answers to interrogatories, nor his deposition testimony contain the fact that Roycroft thought Miller was clamping down on his arm before they fell to the ground in the office area. (Ex. 6; Ex. 9; Ex. 10; Ex. 21; Ex. 4.) Roycroft states, "I was applying pressure with my arms and hands to keep him from pulling away from me." (Ex. 6 at 6.)

78.     Anderson was attempting to watch Roycroft and Miller while peering from another room, but was unable to see all of it. (Ex. 7 at ₱ 53).

**RESPONSE:** Not disputed.

79.     Roycroft was aware that Anderson was located at the front of the house, but did not know at the time he made physical contact with Miller exactly where Anderson was situated in the house. (Ex. 5 at ₱ 81-82, 86-87; Ex. 6 at 6).

**RESPONSE:** Not disputed.

80.     Roycroft observed a set of golf clubs that was in a recessed office area at the front of the house, perceived Miller to be focusing on reaching them, and was continuing to issue verbal commands and hold onto Miller to prevent him from making forward progress toward the clubs or toward Anderson. (Ex. 4 at 125:4-15; Ex. 6 at 6; Ex 5 at ⫿ 81-84).

**RESPONSE:** Disputed. These citations state that Roycroft perceived Miller was moving towards the golf clubs, not towards Anderson.

81.     Roycroft was unable to prevent Miller from making further progress toward the office area. (Ex. 4 at 125:21-126:2; Ex. 6 at 6; Ex. 7 at ⫿ 50).

**RESPONSE:** Not disputed.

82.     As Jackson approached the residence, he heard a second loud crash from inside the rear left side of the house due to the slider having been knocked out of its housing due to the force of the impact from Miller's push. (Ex. 6 at 2; Ex. 12 at 22-23; Ex. 11 at 60; Ex. 12 at 23; Ex. 13 at 23).

**RESPONSE:** Disputed. Nothing in these citations refers to a second loud crash or the reason the slider fell. Not disputed that Jackson saw the slider fall. *See* response to fact number 76.

83.     Upon reaching the deck, Officer Jackson observed that the glass slider had been knocked out of its frame and fallen on the rear deck of the house. (Ex. 6 at 2).

**RESPONSE:** Disputed. *See* response to fact number 76.

84.     Jackson entered the house through the dislodged slider entrance point. (Ex. 12 at 131:3-6; Ex. 11 at 69:14-16, Ex. 6 at 2).

**RESPONSE:** Not disputed.

85.    Upon entering the house, Jackson observed Roycroft and Miller, moving together, take three to four steps toward the front of the house and fall face-forward into a recessed office area.  (Ex. 11 at 62:1-4, 64:21-23).

**RESPONSE:** Not disputed.

86.    Roycroft was able to look around Miller at some point as the two were progressing toward the office area, and observed a single golf club on the floor. (Ex. 4 at 126:3-11; Ex. 6 at 6).

**RESPONSE:** Not disputed.

87.    Roycroft believed, based on Miller's attempt to disengage him by knocking him back against the slider, on Miller's failure to comply with his repeated verbal commands, and based on Miller's apparent attempt to pin Roycroft's arm, that Miller's objective was to reach the golf club. (Ex. 9 at 16:19-17:2; Ex. 6 at 6; Ex. 5 at ⁋ 84).

**RESPONSE:** Disputed. *See* responses to fact number 69 and fact number 77.

88.    Roycroft did not attempt any other use-of-force techniques to take Miller down before they reached the step down to a small, recessed office area at the front of the house. (Ex. 4 at 124:15-17; Ex. 6 at 6; Ex. 5 at ⁋ 81-85).

**RESPONSE:** Not disputed.

89.    As Miller and Roycroft reached the step-down, they both fell to the floor and landed on top of the single golf club. (Ex. 6 at 6; Ex. 9 at 17:3; Ex. 4 at 127:4-11).

**RESPONSE:** Not disputed.

90.     Roycroft fell to the left of Miller, and Roycroft's hands, which had previously been connected around the front of Miller's chest, became disengaged. (Ex. 4 at 131:8-10).

**RESPONSE:** Not disputed.

91.     Miller was facing the ground, with both his arms underneath his body. (Ex. 11 at 64:22-23, 75:4-6, 75:7-10; Ex. 4 at 131:1-15; Ex. 5 at ⸿ 86-87).

**RESPONSE:** Not disputed.

92.      Roycroft fell to Miller's left side with his left arm trapped underneath Miller and between Miller's left arm and the left side of Miller's body, and his right arm draped between Miller's shoulder blades. (Ex. 4 at 134:18-21, 135:6-12; Ex. 5 at ⸿ 86-87).

**RESPONSE:** Not disputed.

93.     Roycroft attempted to pull his left arm out from underneath Miller, but Miller appeared to be trying to winch or pinch it further underneath him, which Roycroft recognized as a wrestling tactic. (Ex. 4 at 131:13-15, Ex. 6 at 6; Ex. 5 at ⸿ 91-92).

**RESPONSE:** Disputed. The evidence does not support that Miller was intentionally trapping Roycroft's arm. Miller was "pulling his left arm into his body" while Roycroft's arm was still in the seatbelt hold. Miller was "trying to get up lifting his chest and pulling his elbows under him." (Ex. 4 at 139:24-140:2; Ex. 6 at 6.)

94.     Jackson approached and observed that Roycroft had fallen off to Miller's left side with his left arm trapped underneath Miller's torso and a portion of his (Roycroft's) chest and right forearm on top of Miller, while Miller's arms were tucked underneath him. (Ex. 11 at 66:17-19; Ex. 14 at ⸿ 13).

**RESPONSE:** Not disputed.

21

95.     Jackson announced his arrival on the scene to Roycroft. (Ex. 6 at 2, 7; Ex. 4 at 131:3-6; Ex. 11 at 69:14-16; Ex. 13 at 7-8).

**RESPONSE:** Not disputed.

96.     Roycroft told Jackson that Miller might have something in his hands, or that he couldn't see his hands. (Ex. 6 at 2, 6; Ex. 4 at 140; Ex. 11 at 10:14-11:8; Ex. 13 at 7-8).

**RESPONSE:** Not disputed.

97.     Jackson observed Anderson standing inside another room, away from the doorway connecting the two rooms. (Ex. 11 at 68:3-12).

**RESPONSE:** Not disputed., with the clarification that Jackson made this observation while he was walking towards the office. (Ex. 11 at 67:16-68:12, 83:20-24.)

98.     Jackson observed what looked to be a golf club directly underneath Miller's body. (Ex. 12 at 12; Ex. 14 at ¶ 16).

**RESPONSE:** Not disputed.

99.     Roycroft's left arm remained trapped under Miller.  (Ex. 5 at ¶ 96).

**RESPONSE:** Not disputed.

100.    Jackson was unable to see Miller's hands and was therefore unable to determine if Miller was holding anything or if he had picked anything up. (Ex. 11 at 69:3-6, Ex. 6 at 2).

**RESPONSE:** Not disputed.

101.    Roycroft, whose left arm was pinned underneath Miller, continuously tried to pull his (Roycroft's) left arm out from under Miller, who was continuously pinching and/or

applying pressure to and/or collapsing down on his left arm and holding it underneath him. (Ex. 4 at 131:10-15; 132:1-7).

**RESPONSE:** Disputed. *See* response to fact number 93.

102.    Roycroft recognized this as a technique used in wrestling and had a clear understanding that Miller was using this "pinching" or "winching" technique to gain further leverage over and control of his (Roycroft's) left arm. (Ex. 4 at 133:4-10; Ex. 5 at ₱ 92-95).

**RESPONSE:** Disputed. *See* response to fact number 93.

103.    Miller was actively resisting both officers' attempts to restrain him. (Ex. 11 at 103; Ex. 4 at 44-45; Ex. 6).

**RESPONSE:** Disputed. Miller was trying to breathe; this was the basic physiology of the struggle. When weight is applied to the back, police officers perceive a person's effort to breath as resistance and the response is to apply more weight. Miller's efforts to breathe were improperly treated as resistance. (Ex. 20 at 72:3-12; Ex. 31, DOJ bulletin on Positional Asphyxia.)

104.    Roycroft was on Miller's left side, "more on his left hip," with his right leg over Miller's left leg and his right arm draped between Miller's shoulders and his left arm trapped underneath Miller. (Ex. 4 at 135:3-12, 131:10-13, Ex. 6 at 7).

**RESPONSE:** Not disputed.

105.    Roycroft and Jackson issued repeated, verbal commands to Miller to stop, to let go, and to stop resisting. (Ex. 4 at 134:10-13; Ex. 14 at ₱ 19; Ex. 13 at 7).

**RESPONSE:** Not disputed.

106.    Jackson asked Roycroft if he should use his taser on Miller, but Roycroft directed him not to. (Ex. 4 at 140:14-17, Ex. 11 at 70:1-2, 71:8-10, Ex. 6 at 2; Ex. 14 ₱ 25).

**RESPONSE:** Not disputed.

107.    Roycroft believed that he and Jackson would be able to restrain Miller without escalating the level of force used with respect to Miller. (Ex. 4 at 140:14-17, 141:5-9; Ex. 9 at 18:4-15; Ex. 5 at ₱ 96-101).

**RESPONSE:** Not disputed.

108.    Roycroft reacted to prevent Miller from further covering and controlling his pinned left arm by attempting to prevent Miller from creating space between his (Roycroft's) arm and Miller's body that would allow Miller to winch more of Roycroft's arm underneath him and gain a dominant position and/or leverage in the struggle. (Ex. 4 at 133:4-10, 148:10-17, 143:6-15;

**RESPONSE:** Disputed. Roycroft testified that he reacted to Miller pushing up by applying pressure on Miller's back. When Miller pushed up, Roycroft pushed down. (Ex. 4 at 132:12-134:7, 135:13-16.) *See also*, responses to fact number 93 and fact number 103.

109.    During the struggle, Miller was moving around in ways that, to Roycroft, demonstrated an intent to stay in the position he was in and gain a dominant position over Roycroft. (Ex. 4 at 148:10-17; 135:19-21).

**RESPONSE:** Not disputed that Roycroft said he thought this. *See* response to fact number 103; Mr. Miller was attempting to breathe.

110.    Roycroft understood Miller to be pushing up at him so that he (Miller) could tighten his grip on Roycroft's arm. (Ex. 4 at 133:15-19, 134:3-7).

**RESPONSE:** Not disputed that Roycroft thought this. *See* response to fact number 103.

111.    Miller disregarded verbal commands and kicked and flailed his legs as he was on the floor. (Ex .11 at 80:7-14, 103:17-22, Ex. 6 at 2).

**RESPONSE:** Not disputed.

112.    Roycroft was concerned for his own safety because his left arm was trapped underneath Miller. (Ex. 4 at 143:6-15).

**RESPONSE:** Not disputed.

113.    Throughout the struggle, Jackson was concerned about Anderson's safety, the potential for someone to come up behind him, and anything else that could happen in such a situation; he also feared Miller was holding a weapon. (Ex. 11 at 146:6-11; Ex. 6 at 2).

**RESPONSE:** Not disputed.

114.    Jackson delivered a half-strength hand strike to the right side of Miller's body, the purpose of which was to distract Miller in order to gain control over his hands for handcuffing. (Ex. 6 at 2, 7; Ex. 11 at 74:13-17, 75:2-6).

**RESPONSE:** Not disputed.

115.    Immediately after this half-strength strike, Jackson was able to partially remove Miller's right arm from underneath his body. (Ex. 6 at 2; Ex. 11 at 74-76).

**RESPONSE:** Not disputed.

116.    Miller then wrenched his body toward Roycroft and yanked his arm back underneath his body. (Ex. 6 at 2; Ex. 12 at 15:13-19).

**RESPONSE:** Not disputed.

117.    Roycroft's microphone inadvertently transmitted a signal during the ongoing struggle. (Ex. 19 at 1:55; Ex. 6 at 2; Ex. 14 at ℙ 30-32).

**RESPONSE:** Not disputed.

118.    Officer Jackson radioed dispatch that he and Officer Roycroft were fighting with the subject. (Ex. 6 at 2; Ex. 19 at 2:20; Ex. 14 at ℙ 30-32).

**RESPONSE:** Not disputed.

119.    Jackson told dispatch they were fighting with the subject, and that "we'll take another car." (Ex. 12 at 17:3-6).

**RESPONSE:** Not disputed.

120.    Jackson then delivered another half-strength hand strike in the same area of Miller's body and was able to pull Miller's right hand out from underneath him (Miller). (Ex. 6 at 2; Ex. 14 at ℙ 33-35).

**RESPONSE:** Not disputed.

121.    For the first time, Jackson observed Miller's right fist to be clenched, with nothing protruding from it; at all times during the physical counter, Roycroft also could not see Miller's hands. (Ex. 6 at 2; generally; Ex. 5 at ℙ 129).

**RESPONSE:** Not disputed.

122.    Miller made groaning noises after each empty hand strike, but made no other verbal statements. (Ex. 11 at 76:21-23, 82:9-11; Ex. 4 at 146:22-24, 147:3-5; Ex. 12 at 15:10-14, 17:16-22).

**RESPONSE:** Disputed. Anderson heard Miller say, "I can't breathe" and later, "Amy, help me." (Ex. 8 at 57:10-15.)

123. Jackson managed to pull Miller's right hand out from under his body and place handcuffs on Miller's right wrist. (Ex. 11 at 82:11-16, Ex. 6 at 2, 7; Ex. 12 at 15:10-14, 17:16-22).

**RESPONSE:** Not disputed.

124. Roycroft was able to remove Miller's left hand from underneath him immediately after Miller's right arm was under control. (Ex. 12 at 17:16-22).

**RESPONSE:** Not disputed.

125. Jackson double-locked the handcuffs on Miller. (Ex. 4 at 149:9-14; Ex. 11 at 82:23-24, 83:1-2; Ex. 6 at 7, 2; Ex. 12 at 17:22-24).

**RESPONSE:** Not disputed.

126. Throughout the entirety of his physical encounter with Miller, neither Roycroft nor Jackson heard Miller gasp for air, heard him say he could not breath, observed any signs that Miller was in respiratory distress or unable to breathe, or observed anything about Miller's behavior that indicated he was experiencing a medical event. (Ex. 4 at 147:6-8, 147:16-23; Ex. 5 at ℙ 131, generally; Ex. 14 at ℙ 39, generally).

**RESPONSE:** Disputed. Anderson heard Miller say, "I can't breathe," and later, "Amy, help me," while Roycroft and Jackson were trying to handcuff him. Anderson asked, "Can he breathe?" and Roycroft or Jackson responded, "Yes, he can breathe," which shows they heard her comment. (Ex. 8 at 57:10-58:15, 126:15-127:1.)

127. While on the floor and until the handcuffs were applied, Miller's hands had remained tucked underneath his body, out of sight, despite both officers' attempts to free his

hands from underneath his torso. (Ex. 4 at 128:3-129:4, 130-142; Ex. 9 at 17:8-12; Ex. 5, generally).

**RESPONSE:** Not disputed.

128.    Neither Roycroft nor Jackson heard Miller or Anderson say anything throughout the struggle, beginning the moment Miller entered the house. (Ex. 4 at 126:12-14; Ex. 5 at ℙ 130-132; Ex. 14 at 39, generally).

**RESPONSE:** Disputed. Anderson heard Miller say, "I can't breathe," and later, "Amy, help me," while Roycroft and Jackson were trying to handcuff him. Anderson asked, "Can he breathe?" and Roycroft or Jackson responded, "Yes, he can breathe." (Ex. 8 at 57:10-58:15, 126:15-127:1.)

129.    Anderson's memory is unclear as to the sequence of events or how anyone was positioned at any given moment. (Ex. 7 at ℙ 54-55, generally; Ex. 8 at 126, generally).

**RESPONSE:** Not disputed.

130.    Anderson remembers Miller saying, "I can't breathe," and "Amy, help me," "only a few seconds" before Roycroft and Jackson began to administer life-saving measures. (Ex. 7 at ℙ 59-66).

**RESPONSE:** Disputed. Anderson testified regarding when Miller made this statement: "So maybe let's say this whole thing was 60 seconds, it was somewhere in the middle of that, like 30 seconds or so." After Miller said, "I can't breathe," Anderson asked the officers, "Can he breathe?" and Roycroft or Jackson responded, "Yes, he can breathe." Then Miller said "Amy, help me." (Ex. 8 at 57:10-58:15, 126:15-127:1.)

28

131.    Roycroft and Jackson only heard Miller make a responsive grunt following the distractionary strikes. (Ex. 4 at 119:1-3, Ex. 11 at 61:20-22, 64:11-13).

**RESPONSE:** Disputed. Anderson heard Miller say, "I can't breathe," and later, "Amy, help me," while Roycroft and Jackson were trying to handcuff him. Anderson heard one of the officers respond when she asked if Miller could breathe. (Ex. 8 at 57:10-58:15, 126:15-127:1.)

132.    Once Miller was handcuffed, Jackson got up to speak with Anderson and to obtain information from her about Miller. (Ex. 11 at 84:2-5; Ex. 6; Ex. 14).

**RESPONSE:** Not disputed.

133.    As soon as the handcuffs were on Miller, Roycroft told him he was going to help him to his feet. (Ex. 4 at 150:6-7, 150:14-24; Ex. 6 at 7).

**RESPONSE:** Not disputed.

134.    When Miller did not respond to Roycroft's prompts, Roycroft checked Miller's involuntary responses. (Ex. 6 at 7; Ex. 5 at ¶ 118-123).

**RESPONSE:** Not disputed.

135.    Roycroft immediately notified Jackson that Miller might be experiencing a medical event and the handcuffs were removed from his wrists. (Ex. 4 at 151:20-24, 152:1-5; Ex. 6).

**RESPONSE:** Not disputed.

136.    Miller was placed in a recovery position and CPR/resuscitative measures were started immediately by Jackson and Roycroft until emergency medical services arrived on scene and assumed care of Miller. (Ex. 6 at 2, 7; Ex. 5 at ¶ 121-128; Ex. 14 ¶ 43).

**RESPONSE:** Not disputed.

137.    Roycroft's watch band broke, his uniform was torn, and he suffered an injury to his knee during the struggle with Miller. (Ex. 6 at 7-8).

**RESPONSE:** Not disputed. Not material.

138.    Jackson estimates that 60 seconds elapsed from the time he arrived on scene until Miller was in restraints. (Ex. 12 at 18:12-15).

**RESPONSE:** Not disputed that Jackson estimated this.

139.    Anderson is unable to recall where Miller was located or in what position he was in when he stated that he could not breathe. (Ex. 8 at 119:9-13, 120:14-23).

**RESPONSE:** Not disputed.

140.    Neither Roycroft nor Jackson recall Anderson asking them a question or either one of them responding to her. (Ex. 4 at 147:6-15; Ex. 11 at 85:18-20).

**RESPONSE:** Disputed. The citations show that Roycroft and Jackson deny having this conversation.

141.    Anderson also observed Miller stop kicking his legs and heard one of the officers ask, "Did he go out?" (Ex. 15 at 9).

**RESPONSE:** Not disputed.

142.    The time of Miller's death is listed as 8:00 P.M. and the manner of death was deemed "natural." (Ex. 1).

**RESPONSE:** Not disputed that this is what the death certificate states.

143.    BPD officers are trained to use a support knee when handcuffing subjects in the prone position. (Ex. 5 ¶ 109-114).

**RESPONSE:** Not disputed.

144.   Anderson recalls one of the officers placing his knee on Miller's back for the purpose of creating a leverage point for getting the handcuffs on Miller. (Ex. 7 at ℙ58).

**RESPONSE:** Not disputed.

145.   It took no more than 10 seconds for the handcuffs to be applied to Miller's wrists once his hands were freed from underneath him. (Ex. 14 at ℙ 108).

**RESPONSE:** Disputed. This citation does not support this fact.

146.   Jackson was in a lunge position the entire time he and Roycroft were attempting to free Miller's hands. (Ex. 14 ℙ 36).

**RESPONSE:** Not disputed.

### **PLAINTIFF'S STATEMENT OF ADDITIONAL MATERIAL FACTS**

147.   Anderson called the police because she was worried about Miller, who she referred to as her husband, and she felt he needed a psychological evaluation. (*Ex. 19.*)

148.   The BPD categorized Anderson's 911 call as a mental health emergency. Roycroft and Jackson were dispatched to the home where Miller and Anderson lived. The only information they had before arriving was from the dispatch call. (*Ex. 2; Ex. 4 at 82:2-5; Ex. 11 at 59:3-8.*)

149.   When Roycroft spoke to Ms. Anderson she did not say she was afraid of Miller or that she was a victim of domestic violence. (*Ex. 6 at 4; Ex. 4 at 82:14-87:3; Ex. 8 at 128:6-17.*) Roycroft did not refer to the call as a domestic violence call in his police report, state police interview, answers to interrogatories, supplemental answers to interrogatories, or

at his deposition. *(Ex. 6 at 4-9; Ex. 9; Ex. 10; Ex. 21; Ex. 4.)* The only reference to domestic violence appears in his affidavit in support of his motion for summary judgment. *(Ex. 5 at ℙ 20.)*

150.    On April 16, 2019, Roycroft had been a Barnstable police officer for 30 years. *(Ex. 10 at 4, ℙ5.)* Roycroft and Jackson were familiar with Barnstable Police Department's Policy and Procedure 1106, "Mental Illness." *(Ex. 4 at 55:18-56:10; Ex. 11 at 35:18-36:1.)*

151.    The Mental Illness policy permits a BPD officer to take a mentally ill person into custody if:

- They have committed a crime
- They pose a substantial danger of physical harm to other persons by exhibition of homicidal or other violent behavior
- They pose a substantial risk of physical impairment or injury to themselves (for example, by threats or attempts at suicide), or
- They have escaped or eluded the custody of those lawfully required to care for them.

*(Ex. 3 at 39, BPD Policy and Procedure 1106 §7.0.)*

152.    M.G.L. c. 123 §12 requires a belief that failure to hospitalize a person "would create a likelihood of serious harm by reason of mental illness." *(M.G.L. c. 123 §12.)*

153.    Roycroft understood a call like this required backup. Jackson knew that mental health emergencies are best handled with a team approach. *(Ex. 4 at 56:19-21, 58:4-15; Ex. 11 at 134:2-10.)*

154.    According to the Mental Illness policy, the first three Action Steps for officers involved with people displaying signs of mental illness are: "1) Quickly assess the situation and secure the scene; 2) Request backup assistance, as appropriate; and 3) Ask questions of

other persons available to learn as much as possible about the distressed individual. It is important to find out whether any person, agency, or institution has lawful custody of the individual, and whether he/she has a history or criminal, violent or self-destructive behavior." *(Ex. 3 at 38, BPD Policy and Procedure 1106 §6.0.)*

155.   Roycroft understood that when a police officer should keep distance when dealing with a person experiencing psychosis, but he felt that was appropriate only if there was no one else around. *(Ex. 4 at 177:18-178:4.)*

156.   The only fear Roycroft recalls Anderson reporting was her fear Miller would find out that she called the police. *(Ex. 4 at 86:24-87:3, 92:3-10.)*

157.   Anderson never told Roycroft that she was afraid of Miller. She never said Miller assaulted her or indicated that he was thinking of harming himself. She did not say she was a victim of domestic violence. *(Ex. 4 at 86:24-87:3, 98:15-99:1.)* She did not say Miller had assaulted anyone. *(Ex. 4 at 100:20-23.)*

158.   When Anderson called the police she did not say she was in fear; she said her husband was delusional and he "needs a psych evaluation, it's very frightening." *(Ex. 19.)*

159.   Ms. Anderson's statement did not indicate she was frightened of Miller, "more so just more concerned about his behavior." *(Ex. 20 at 14:1-24.)*

160.   Roycroft understood seeing a loved one having hallucinations would be frightening. *(Ex. 4 at 88:3-89:5.)*

161.   Roycroft spoke to Anderson for a very short time. He did not ask her detailed questions. *(Ex. 8 at 128:1-20; Ex. 10 at 7-8, ¶ 9.)* Anderson answered all of Roycroft's questions. *(Ex. 4 at 82:17-18.)*

162.    Roycroft did not ask if there were other people in the home. *(Ex. 6 at 4; Ex. 4 at 82:22-83:8.)* He did not ask if Anderson was afraid of Miller or if there were weapons in the home. *(Ex. 6 at 4; Ex. 10 at 7-8, ⫼ 9.)* He did not ask whether she would go to a safe place, such as a neighbor's house. *(Ex. 4 at 191:3-10.)* He did not ask how long Miller had been in a psychotic state. *(Ex. 4 at 83:24-84:2.)*

163.    Roycroft should have obtained more information before going to the back of the house. *(Ex. 20 at 51:8-15.)*

164.    Anderson told Roycroft she was comfortable staying where she was, and Roycroft allowed her to remain in the home. *(Ex. 4 at 59:20-60:4, 191:3-12.)*

165.    Roycroft didn't ask Anderson why the 911 call had disconnected. *(Ex. 4 at 97:8-13, 170-171.)*

166.    Roycroft could hear Miller yelling on the back deck while he spoke with Anderson. He did not consider this an emergency. *(Ex. 4 at 83:9-15.)*

167.    Roycroft was trained that it is best to have a plan before beginning an interaction. *(Ex. 4 at 75:8-10.)*

168.    Although he knew Jackson was on his way, Roycroft walked around the outside of the home without waiting for backup. *(Ex. 4 at 58:15; Ex. 6 at 4.)*

169.    Roycroft should have asked Ms. Anderson to go to a friend or neighbor's house or had another officer with her when they approached Miller. *(Ex. 20 at 22:18-23:8).* This is part of securing the scene. *(Ex. 20 at 56:9-12.)*

170.    Roycroft initially observed Miller from a position where Miller could not see him. He observed that Miller was out of touch with reality and yelling while looking up at

the sky, Miller was barefoot and shirtless, and no one else was present. *(Ex. 4 at 104:8-20; Ex. 10 at 8, ¶ 9.)* He looked disheveled, his hair was a mess, and he was sweating. *(Ex. 4 at 105:9-12.)*

171.    When Roycroft first observed Miller, it looked to him like Miller was having a psychotic break. *(Ex. 4 at 58:10-12.)*

172.    Roycroft understood that when a person is having a psychotic episode it can turn into a medical episode. *(Ex. 4 at 70:1-10.)*

173.    There was no emergency that required Roycroft to approach Miller without waiting for Jackson. *(Ex. 4 at 104:21-24.)*

174.    Roycroft approached Miller and initiated a conversation. *(Ex. 4 at 59:16-19.)* Miller permitted Roycroft to come onto his back deck to talk more. *(Ex. 6 at 5.)*

175.    Miller was calm. His demeanor was friendly and easy on the surface although he was clearly not well. *(Ex. 10 at 8-9, ¶ 9.)* He had an empty stare and was looking at the ground. *(Ex. 6 at 5.)*

176.    Roycroft understood that in approaching a mentally ill person a police officer should not say things that might make the person upset or angry. (*Ex. 4 at 62:6-14.*)

177.    After some initial conversation on the deck, Roycroft said, "Your wife called because she has some concerns about you," and asked again if they could talk. *(Ex. 6 at 5.)*

178.    After this statement, Miller stared at the ground for "several long seconds" and his demeanor changed from calm to angry. *(Ex. 10 at 9, ¶ 9; Ex. 4 at 111:18-112:5.)*

179.    Miller did not grab any broken ceramic, nor did he threaten to grab anything. *(Ex. 4 at 113:3-5; 113:11-19.)*

180.    Miller said, "[F]uck you I'm not talking with you get the fuck away from me," and moved quickly to enter his home through the sliding door on the deck. *(Ex. 4 at 115:13-18; Ex. 6 at 5.)*

181.    After Miller swore at him, Roycroft issued multiple orders to stop, but Miller went inside his home. *(Ex. 4 at 117:18-118:6.)*

182.    Miller had not committed a crime. *(Ex. 4 at 101:21-102:12.)* Roycroft knew that people experiencing psychosis may be unpredictable. They may not be expected to follow his orders or commands or even to recognize that he is a police officer. *(Ex. 4 at 175:13-17; 67:17-68:7.)*

183.    Roycroft says because Miller did not respond to his commands, he followed Miller into his home. Roycroft grabbed Miller's arm from behind "to get his attention." *(Ex. 4 at 120:11-23.)*

184.    There was a dining room table directly in front of the sliding door inside the home. Roycroft didn't see what was on the table. *(Ex. 4 at 118:8-10, 119:4-11, 34:24-35:3.)*

185.    Miller pulled away from Roycroft's physical contact, causing Miller's body to reach over the table. *(Ex. 4 at 120:4-9.)*

186.    Roycroft was "trying to get his attention… with physical contact" because Miller was not listening to his words. *(Ex. 4 at 120:20-23.)*

187.    Miller was on the table for seconds. Anderson does not recall them stopping at the table. *(Ex. 4 at 122:15-16, Ex. 8 at 116:8-11.)*

188. Roycroft says he thought Miller might grab a weapon from the table because Roycroft claims he could not see his hands during those seconds. Miller did not grab anything, nor did he threaten to. *(Ex. 4 at 38:19-23, 128:5-23, 130:2-10.)*

189. When Jackson arrived, Roycroft told him that Roycroft thought Miller had something in his hands; he was concerned it might be a knife. *(Ex. 11 at 79:2-10.)*

190. Roycroft used a "seatbelt hold" to restrain Miller. Roycroft put his arms around Miller from behind, with his left arm under Miller's left armpit, his right arm over Miller's right shoulder, and his hands connected at Miller's chest. *(Ex. 6 at 6.)*

191. Roycroft was taller than Miller. Roycroft was 6 feet tall. *(Ex. 10 at 1, ¶ 1.)* Miller was 69 inches or 5 feet, nine inches. Miller was obese. *(Ex. 22, Expert Report of Dr. Michael Freeman, at 5.)*

192. When shown exhibit 17 at his deposition, the picture of a seatbelt hold below, Roycroft said it was similar to the hold he used but he was not directly behind Miller, Roycroft was further to Miller's left. *(Ex. 4 at 31:21-33:8; 35:5-10; Ex. 23, photograph of seatbelt hold.)*



193.    Given Roycroft's description of the seatbelt hold, Roycroft was able to see Miller's hands. *(Ex. 20 at 90:2-91:23.)*

194.    Roycroft trained in jiu jitsu on his own. He was regularly practicing jiu jitsu in April of 2019. Roycroft was familiar with the seatbelt hold from jiu jitsu. In jiu jitsu he learned you can transition from the seatbelt hold to other holds such as a rear choke hold and cut off circulation until the person taps out. *(Ex. 4 at 28:18-21, 78:6-81:2.)*

195.    Barnstable Police Policy and Procedure 502 titled, "Response to Resistance," requires that restraint techniques be applied using the hands or the baton, **as trained**. *(Ex. 3 at 10, Policy and Procedure 502, §5.0.)* (Emphasis added.)

196.    Roycroft was trained by BPD in methods to take a person into custody. He learned arm bar techniques, arm bar takedowns, leg sweeps and other takedown methods. *(Ex. 4 at 29:21-30:10.)* He was not trained by BPD in use of the seatbelt hold. *(Ex. 4 at 30:11-13; 31:7-9.)*

197.    The BPD did not train in the seatbelt hold. Ranking Barnstable police officers, including Deputy Chief Sean Balcom, Lieutenant Mark Mellyn, Lieutenant Jennifer Ellis, Sergeant Kevin Tynan, and Sergeant David Myett, had never heard of the seatbelt hold. *(Ex. 4 at 30:11-13; 31:7-9, 95:20-96:5; Ex. 24, Depo. of Mark Mellyn, at 15:15-21; Ex. 25, Depo. of David Myett, at 15:14-23; Ex. 26, Depo. of Jennifer Ellis, at 60:23-61:18; Ex. 27, Depo. of Kevin Tynan, at 20:11-18.)* Jackson had not heard the term seatbelt hold before this incident nor had he ever seen a seatbelt hold applied. *(Ex. 11 at 32:8-33:9.)*

198.    The seatbelt hold is not taught because it could result in the officer's arm being trapped. The hold reduces the officer's ability to handcuff the person. *(Ex. 20 at 77:23-78:5; 80:8-12.)*

199.    Roycroft acknowledged he did not follow his department's policies during this incident, saying, "I do my best to follow the rules and regulations, the policies and procedures, to adhere to them and -- but there are times where it doesn't -- it just -- it's not going to work." *(Ex. 4 at 55:2-6.)*

200.    Using the seatbelt hold, Roycroft pulled back on Miller to bring him off of the table. Their bodies hit the sliding door, causing it to fall out of its rotted frame. *(Ex. 4 at 123:7-16; Ex. 8:24-11:1.)*

201.    After hitting the sliding door, Miller pulled his body forward while Roycroft continued the seatbelt hold. The forward momentum of the two men caused the table to be pushed to the side. They moved in a continuous movement from the door, past the table, to a small office area. *(Ex. 8 at 52:14-23, 113:9-11, 115:12-116:24; Ex. 4 at 122:1-2.)*

202.    Roycroft and Miller tripped on a step that leads into the office area. They fell onto the office floor. *(Ex. 4 at 127:6-11; Ex. 16 at 2-4.)*

203.    Miller did not grab a golf club, nor did he threaten to grab it. *(Ex. 4 at 125:9-128:23, 142:16-143:2.)*

204.    Jackson arrived at the scene within one minute after Roycroft. He went to the rear of the home. He heard a crash and then saw the sliding door fall to the deck while he was at the back corner of the home. *(Ex. 2; Ex. 4 at 58:22-59:5; Ex. 11 at 59:11-19, 60:8-18.)*

205.    Jackson entered the home while Roycroft and Miller were still standing and Roycroft had Miller in the seatbelt hold. He watched them move towards the office and fall forward, landing face down. *(Ex. 11 at 60:22-61:4, 61:17-19, 61:23-62:4.)*

206.    Jackson walked forward and joined Miller and Roycroft in the office area. Jackson wrote in his report, "I approached Officer Roycroft…. Officer Roycroft was on the left side of Miller's body and was attempting to gain control of his left arm; I came to the right side of Miller's body…" *(Ex. 11 at 69:7-22; Ex. 6 at 2.)*

207.    Miller was trying to push up by bringing his chest up. In response, Roycroft applied pressure on Miller's back to keep him from pushing up. *(Ex. 4 at 131:23-134:7).* When Miller pushed up, Roycroft pushed down. *(Ex. 4 at 134:1-7, 135:13-16.)*

208. Jackson attempted to control Miller's right arm in order to handcuff him. He punched Miller in the right side of the stomach twice. *(Ex. 11 at 74:13-75:24, 82:3-8.)*

209. During the entirety of the incident, Miller did not punch, kick, or otherwise strike the officers, nor did he threaten them. *(Ex. 4 at 148:22-149:2, 126:12-14; Ex. 11 at 89:21-90:8.)*

210. Miller was not following the officers' commands. When the officers touched him, he pulled away. The Defendants called these actions fighting. *(Ex. 4 at 148:1-21; Ex. 11 at 80:3-24, 90:9-22.)*

211. While both officers were attempting to handcuff Miller, Miller said, "I can't breathe." *(Ex. 8 at 57:1-15, 57:24-58:15.)*

212. Anderson asked, "Can he breathe?" Roycroft or Jackson responded, "Yes, he can breathe." *(Ex. 8 at 57:24-58:4, 126:15-127:1.)*

213. Then Miller said, "Amy, help me." These were his last words. *(Ex. 8 at 57:10-15.)*

214. Although one of the officers responded to Anderson's statement, they did not take action to help him breathe. Roycroft continued to apply pressure on Miller's body. *(Ex. 4 at 131:23-135:16; Ex. 11 at 85:6-12; Ex. 8 at 58:1-4, 126:15-127:1.)*

215. Jackson and Roycroft knew that if someone was having difficulty breathing, the officers should take action. *(Ex. 11 at 89:8-13; Ex. 4 at 147:16-20.)* The officers say they did not believe that Miller was having trouble breathing. *(Ex. 4 at 147:21-23; Ex. 11 at 118:2-119:6.)*

216.    Roycroft knew he could reduce or eliminate breathing problems for a person in custody on their stomach by getting them off their stomach. *(Ex. 4 at 72:23-74:2.)*

217.    Jackson knew that obesity, age, and physical condition were factors that could make it more difficult for a person to breathe if they were left lying on their stomach. *(Ex. 11 at 50:5-23.)*

218.    A short period of time after Miller said he couldn't breathe, the officers handcuffed him. Miller was still breathing and moving after he was handcuffed, and a few moments later Anderson noticed that Miller had stopped moving. *(Ex. 8 at 63:20-64:3, 68:17-69:5.)*

219.    After handcuffing Miller, Jackson stepped away towards Anderson while Roycroft reached down to grab Miller's left arm and help him stand up. Then Roycroft says he felt Miller was passively resisting. *(Ex. 4 at 150:2-151:3.)*

220.    Roycroft tried to get Miller to stand up. At first he thought he was passively resisting then he knelt down next to Miller. His pupils were fixed. Roycroft then moved Miller into the recovery position and determined that Miller had no pulse and there were no signs he was breathing. *(Ex. 4 at 151:2-153:12.)*

221.    Roycroft began CPR and called for an ambulance at 7:12:58 p.m. *(Ex. 4 at 153:24; Ex. 6 at 7; Ex. 19).*

222.    The officers' attempt to handcuff Miller lasted over a minute. Roycroft made an inadvertent radio transmission at 7:11:43 p.m., which was after the officers were both at Miller's side and Jackson had delivered his first punch. Roycroft's radio call for medical assistance was at 7:12:58, a minute and 15 seconds later. *(Ex. 19, Ex. 12 at 15:8-24.)*

223.    Roycroft called for an ambulance three and a half minutes after he logged his arrival at the scene. *(Ex. 2; Ex. 19.)*

224.    Additional Barnstable Police officers and EMTs arrived. *(Ex. 2, Ex. 6 at 7-8.)*

225.    EMTs attempted to provide life-saving emergency medical care. They used an AED but it advised no shock because Miller's heart was in pulseless electrical activity (PEA). Miller's heart remained in PEA. He was pronounced dead later that night. *(Ex. 28, Ambulance report; Ex. 29, Depo. of Kenyon Pike, at 33:5-20; Ex. 4 at 100:2-5; Ex. 1.)*

226.    The ambulance report states: "Officers sts 'we were here for mental health evaluation and pt was calm and cooperative at first. He got angry and went for a golf club and we took him down and cuffed him. He was talking and we stood him up and started to walk out and he collapsed, we immediately started CPR and applied AED.'" *(Ex. 28.)* While Defendants agree that this information is false, the information could only have come from them. Roycroft denies making this statement to the EMT. Jackson doesn't remember making this statement. *(Ex. 4 at 156:1-21; Ex. 11 at 21:23-22:24.)* He did not speak to other police officers until after the EMTs arrived. (*Ex. 11 at 23:2-24:1.*)

227.    According to expert cardiologist Alon Steinberg, M.D., Miller died of a prone restraint cardiac arrest. Miller was in a psychotic state and he was sweating, suggestive of a high metabolic state, when Roycroft first saw him. Roycroft placed plaintiff in a "seatbelt hold," then restrained him in face down position. Roycroft's actions caused Miller's death due to the following recognized medical consequences:

a.    The psychotic state and sweating caused activation of Miller's sympathetic nervous system, which activates the body's "fight or flight" response.

b. This resulted in the release of catecholamines (neurotransmitters which are part of the fight-or-flight response) causing plaintiff's heart to beat harder and faster.

c. The catecholamines resulted in metabolic acidosis (an imbalance in the body's acid-base balance), a serious electrolyte disorder.

d. To maintain a normal pH a person must breathe harder and faster to exhale $CO_2$.

e. Being restrained face down without any weight on a person's results in a decrease in ventilation and cardiac output of carbon dioxide.

f. Lowered Ph and ventilation, related to lowered cardiac output, together with the results of the prone position, together made the blood more acidic.

g. Miller needed to be able to breathe deeply (significant ventilation) to expel the $CO_2$. But when he pushed up, which would allow him to expand his lungs, Roycroft pushed down which decreased Miller's ability to breathe deeply and decreased his cardiac output.

*(Ex. 30, Steinberg Expert Report, at 5-8.)*

228. Dr. Steinberg concludes that Miller died of a prone restraint cardiac arrest. Had Miller not been in the struggle with the defendants and placed in the prone position he would have survived that day and likely would be alive today. *(Ex. 30 at 7.)*

229. Police expert DeFoe refers to this as "basic physiology of the struggle" where the person pushes up to breath and the officers perceive that as resistance and respond with more body weight. *(Ex. 20 at 72:3-23.)*

230.    As early as 1995, guidance to police officers indicated that the struggles of a prone suspect may be due to oxygen deficiency, rather than a desire to disobey officers' commands. *(Ex. 31.)*

231.    Dr. Michael Freeman is a consultant in forensic medicine and forensic epidemiology. He is a clinical professor of psychiatry and public health and preventive medicine at Oregon Health and Science University School of Medicine where he teaches courses in forensic medicine, forensic epidemiology and medical causation. In his opinion, "Mr. Miller's death was the result of the use of aggressive restraint tactics by the Barnstable police department personnel, resulting in death by prone restraint-triggered cardiopulmonary arrest." *(Ex. 22 at 2-3, 17.)*

232.    Law enforcement officers are trained to interact with people suffering from mental illness or a mental crisis. This training includes learning to take "time to assess the situation; calm the situation; request additional and equipment; provide reassurance that the officers are there to help; give the person time to calm down; move slowly; eliminate emergency lights and reduce environmental distractions." *(Ex. 32, Expert Report of Scott DeFoe, at 9.)* Police officers are taught "time and distance." *(Id. at 15.)* They "are taught that they should attempt to de-escalate and utilize proper defusing techniques." Defusing is a process of reducing the potential for violence and bringing emotional level to a manageable level to restore order. *(Id.)*

233.    Jennifer Ellis, the BPD training officer, teaches that officers dealing with a person with mental illness should try to de-escalate the situation. *(Ex. 26 at 14:7-13, 40:15-*

*19.)* She testified that if the situation is not an emergency and you can wait for another officer, it's a good idea to wait. *(Ex. 26 at 48:6-20).*

234.    Roycroft should have asked Anderson to go someplace outside her home to ensure her safety outside of the home before contacting Miller. *(Ex. 32 at 11.)*

235.    About three months before this incident, on January 10, 2019 Roycroft was trained on defensive tactics skills as well as in police interactions with persons with mental illness (Part II). Roycroft failed to follow his training. *(Ex. 32 at 12.)*  *(Ex. 4 at 46:12-48:3.)* He was also certified in Mental Health First Aid USA in February 2016. *(Ex. 33, Roycroft Mental Health First Aid certificate.)* BPD policy required refresher training on dealing with individuals with mental illness at least once every three years. *(Ex. 3 at 41, Policy and Procedure 1106 §13.0.)*

236.    Roycroft failed to develop a tactical plan for assisting Miller in obtaining mental health care. Since he acknowledges there was no emergency on his arrival, Roycroft should have conducted a more extensive interview with Anderson before approaching Miller. He should have learned Miller's history and developed a safe tactical plan with Jackson. *(Ex. 32 at 15-17; Ex. 20. at 50:3-53:21.)*

237.    Roycroft understood that in dealing with a person with mental illness a police officer should try to calm the person down if they are excited. *(Ex. 4 at 48:24-49:8.)*

238.    Roycroft did not have reasonable suspicion or probable cause to arrest Miller. Roycroft had no basis to suspect Miller had assaulted anyone or threatened anyone. Although there was no emergency, Roycroft unnecessarily escalated the situation by

initiating physical contact with Miller by grabbing his arm within approximately a minute of his arrival on the scene. (*Ex. 32 at 13-15.*)

239.    Jackson agreed that it is important to have a plan of action when dealing with a person who is psychotic, taking into account the fact that the person is not rational. (*Ex. 32 at 15, 17; Ex. 11 at 48:7-23.*)

240.    It was not a reasonable tactic for Roycroft to approach Miller by himself. *(Ex. 20. at 42:7-43:17.)*

241.    Roycroft should not have said anything that could trigger Miller. In this case Roycroft triggered Miller by telling him his wife called because she was concerned about him when Anderson told Roycroft this would make him angry. (*Ex. 20. at 26:1-11, 11:20-12:8.*)

242.    A person who is experiencing hallucinations is not necessarily a danger to themselves or others. This could be a manifestation of the person's mental health condition. (*Ex. 20 at 36:5-13.*) A policer officer should determine whether a person is a danger to themselves or others by threats, mannerisms or actions. (*Ex. 20 at 35:10-36:4.*)

243.     Roycroft should not have followed Miller into his home. Instead, if he felt Miller was a danger to others, he should have requested additional officers and set up a perimeter around the house. (*Ex. 32 at 18.*)

244.     Roycroft made a poor decision in using a "seatbelt" hold. (*Ex. 32 at 22-23.*)

245.    The proper objective for an officer on a mental health call is to avoid unnecessary injury and or death. The underlying principle is reverence for human life. The primary objective is to calm the person so that a conversation can take place and the use of force can be avoided. (*Ex. 32 at 9.*)

246. Two years earlier Miller had a brief psychotic episode. He received mental health care and recovered. *(Ex. 8 at 25:6-8.)*

247. Less than two months before his death, Miller received an echocardiogram, which concluded: "Normal left ventricular chamber size, wall thickness, and wall motion; Normal left ventricular systolic function with an ejection fraction of 60%; Grade I diastolic dysfunction; There is no significant valvular stenosis or insufficiency noted." These are benign findings that do not show an increased risk of sudden cardiac death. *(Ex. 22 at 10-11; Ex. 30 at 7.)*

248. Dr. Freeman and Dr. Steinberg disagree that Miller died due to natural causes. *(Ex. 22 at 17; Ex. 30 at 8.)*

249. During the entirety of the incident, Miller never said he had a weapon or said he wanted to pick up a weapon. He never had anything in his hands. *(Ex. 6; Ex. 4 at 113:3-5, 128:5-23, 130:2-6; Ex. 11 at 71:21-24.)* He never threatened Roycroft or Jackson. Nor did Roycroft or Jackson have any information that Miller had threatened Anderson. *(Ex. 6; Ex. 4 at 126:12-14, 118:23-119:3; Ex. 11 at 101:12-14; 139:14-15.)*

Dated: June 15, 2023

RESPECTFULLY SUBMITTED,


Plaintiff,
By his Attorneys,

/s/Howard Friedman
Howard Friedman, Esq. (BBO# 180080)
hfriedman@civil-rights-law.com
Law Offices of Howard Friedman, PC
1309 Beacon St., St. Suite 300
Brookline, MA 02446
617-742-4100


/s/ Jeffrey Wiesner
Jeffrey Wiesner, BBO No. 655814
Jennifer McKinnon, BBO No. 657758
Wiesner McKinnon LLP
88 Broad Street, Suite 503
Boston, MA 02110
Tel.: (617) 303-3940
Fax: (617) 507-7976
jwiesner@jwjmlaw.com
jmckinnon@jwjmlaw.com


**CERTIFICATE OF SERVICE**
I certify that on this day I caused a true copy of the above document to be served upon the attorney of record for all parties via CM/ECF.

Date: June 15, 2023        /s/ Howard Friedman
                           Howard Friedman

49