**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____

|  |  |  |
|---|---|---|
| ESTATE OF ROBERT JOSEPH MILLER, by and through IAN MILLER, personal representative of the Estate, | ) ) ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 21-10738-AK |
| SEAN ROYCROFT and SPENCER JACKSON, in their individual capacities, and the TOWN OF BARNSTABLE, MASSACHUSETTS, | ) ) ) ) ) | |
| Defendants. | ) ) | |

_____)

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**INTRODUCTION**

This is a civil rights case for excessive force by two Barnstable police officers, resulting in the wrongful death of Robert Miller ("Miller"). Ian Miller brought this suit as the personal representative of his father's estate. Statement of Facts ("SOF") ¶ 1.

Barnstable Police Department ("BPD") officers Sean Roycroft ("Roycroft") and Spencer Jackson ("Jackson") were dispatched to Miller's home for a mental health emergency. Roycroft was the first to arrive. Response ("resp.") to SOF ¶8; SOF ¶¶ 9, 148. He saw there was no emergency. SOF ¶¶ 166, 173. Roycroft failed to follow his training, BPD policies, and common sense. SOF ¶¶ 154, 195, 235-236. As a result, instead of helping Miller, Roycroft applied pressure to Miller's back as Miller tried to move his body to get air in his lungs. SOF ¶¶ 207, 227. The pressure continued after Miller told the officers that he

could not breathe. SOF ¶¶ 211-214. Then Miller died from prone restraint cardiac arrest. SOF ¶ 227.

Defendants are not entitled to summary judgment based on the uncontested facts viewed in the light most favorable to Plaintiff.

## FACTS

### I.  Plaintiff's summary of the facts

On April 16, 2019, Roycroft had been a Barnstable police officer for 30 years. SOF ¶ 150. He received a dispatch saying the reporting person "stated husband having a psychotic break. Very short on phone. Caller disconnected, no further info." SOF ¶¶ 6, 148.

Roycroft arrived at the home of Miller and his life partner, Amy Anderson ("Anderson"). SOF ¶¶ 7, 20; resp. to SOF ¶ 8. According to his report he obtained the following information from speaking to Anderson: Her husband was hallucinating and talking to people who were not there. She said, "You can hear him, he is out on the back deck now." Miller had not taken his medication for days. He had not slept in days. His name is Robert. SOF ¶¶ 20; resp. to SOF ¶ 34; Ex. 6.

Anderson was whispering, her voice was shaky, and he felt she "had a look of fear on her face." Ex. 6. She told him she was very concerned that Miller would be angry at her if he learned that she was the one who called the police. SOF ¶ 23. Anderson did not say she was afraid of Miller. SOF ¶¶ 149, 156-159. Roycroft could hear Miller yelling on the back deck. SOF ¶ 166.

After talking to Anderson, Roycroft did not consider this to be an emergency. SOF ¶¶ 161-162, 165-166. Roycroft walked to the back of the house without waiting for Jackson.

SOF ¶ 168. Although the BPD policy on mental illness says an officer should quickly assess the situation and secure the scene, Roycroft did not secure the scene; he allowed Anderson to remain in the house. SOF ¶¶ 154, 164, 169. Although he knew Jackson was on his way and it is best to have more than one officer to approach a mentally ill person, Roycroft chose to approach Miller by himself. SOF ¶¶ 168, 153.

Roycroft saw Miller alone on the deck. SOF ¶ 170. Miller was disheveled and wearing only sweatpants. SOF ¶ 40. He was talking while looking up to the sky. Miller was calm; his demeanor was friendly and easy. He was sweating and did not appear to be well. He had an empty stare and was looking at the ground. SOF ¶¶ 170, 175. Roycroft felt Miller was psychotic. SOF ¶ 171.

Roycroft still felt there was no emergency that required him to move in without waiting for Jackson. SOF ¶ 173. Roycroft began speaking to Miller and learned Miller was having a conversation with nature. He responded, "I do that sometimes. Can I have a conversation with you?" Miller said, "[S]ure, come up on the deck." Roycroft asked, "[W]hat's going on today?" Miller responded, "[N]othing, just talking with nature." SOF ¶¶ 174, 44; Ex. 6.

Miller's voice was still calm and he was looking at the ground. Then, although Roycroft knew that Anderson was concerned that Miller would be upset if he learned that she called the police, Roycroft said to Miller, "[Y]our wife called because she has some concerns about you." After this Roycroft asked again if they could talk. Robert briefly stared at the ground then his demeanor changed; he "flipped a switch" and became angry. SOF ¶¶ 49, 175, 177-178, 23. Miller said, "[F]uck you I'm not talking with you get the fuck away

3

from me." Miller went towards the sliding door to his home. SOF ¶ 180. Although Roycroft knew Miller was psychotic or delusional, he issued orders to Miller to stop. Miller did not respond. SOF ¶¶ 171, 181-182. Roycroft seized Miller, grabbing his arm "to get his attention." SOF ¶ 183. When Roycroft grabbed Miller, Miller pulled away from the physical contact, causing his body to briefly reach over a table that was directly in front of the sliding door. Roycroft then put Miller in an unauthorized seatbelt hold. SOF ¶¶ 184-190.

Miller had not shown that he was a danger to anyone. Miller never had a weapon, said he wanted to grab a weapon, threatened anyone, or struck anyone. SOF ¶¶ 249, 188, 203, 209.

In January 2019 Roycroft was trained in defensive tactics skills as well as police interactions with persons with mental illness (Part II). SOF ¶ 235. He understood officers should use distance to safely handle a person whom they suspect is mentally ill. SOF ¶ 155.

Roycroft was trained in methods to take a person into custody. He learned arm bar techniques, arm bar takedowns, leg sweeps and other takedown methods. SOF ¶ 196. BPD policy requires that restraint techniques be applied using the hands or the baton, as trained. SOF ¶ 195. Roycroft was not trained in using a seatbelt hold. SOF ¶¶ 196-198. He learned this hold from his training on his own in jiu jitsu. In jiu jitsu you can transition from the seatbelt hold to a rear choke hold. SOF ¶ 194.

None of the ranking officers deposed knew of the seatbelt hold, and neither did Jackson. SOF ¶ 197. Roycroft says this image below is similar to the hold he used, but Roycroft was further to Miller's left. SOF ¶ 192.

4



Using the seatbelt hold, Roycroft pulled back on Miller to bring him off of the table. Their bodies hit the sliding door, causing it to fall out of its rotted frame. SOF ¶ 200. Miller pulled his body forward while Roycroft continued the seatbelt hold. They moved in a continuous movement from the door, past the table, to a small office area. SOF ¶ 201. Miller and Roycroft tripped and ended up on the floor in the office area. SOF ¶ 202. Miller was face down. Because Roycroft had wrapped his left arm under Miller's left armpit, his arm became trapped under Miller. SOF ¶¶ 90-92, 205.

Miller had difficulty breathing. He tried to push up to expand his chest to breathe. When he pushed up, Roycroft pushed down. SOF ¶¶ 207, 227(g). Miller said, "I can't breathe." SOF ¶ 211. Anderson heard this and asked the officers if he could breathe. One of them replied that he could breathe. SOF ¶ 212. A jury could believe Anderson and find that Roycroft and Jackson heard Miller for two reasons: 1) Anderson heard Miller, and the officers were closer to Miller; and 2) one of the officers responded to Anderson.

Neither officer took any action to change Miller's position so he could breathe. SOF ¶ 214. Both officers knew they could reduce or eliminate breathing problems for a person in custody on their stomach by getting them off their stomach. SOF ¶¶ 215-217. Anderson

heard Miller say, "Amy, help me." SOF ¶ 213. Shortly after this, Roycroft and Jackson handcuffed Miller. SOF ¶ 218. Then Roycroft discovered Miller's pupils were fixed and he had no pulse. It was too late to save his life. SOF ¶¶219-221, 225.

Had Roycroft behaved like an objectively reasonable police officer, Miller would be alive. Roycroft's multiple violations of his training and common sense resulted in Miller's death. SOF ¶¶ 228, 231. Roycroft made the following errors:

1.      Failed to obtain sufficient information from Anderson so he could make a safe plan to approach Miller along with Jackson. SOF ¶¶ 163, 236.

2.      Failed to wait for Jackson before approaching Miller. SOF ¶ 236, 240.

3.      Failed to secure the scene by making sure Anderson was outside the home in a safe place before approaching Miller. SOF ¶ 234.

4.      Did not use time and distance in approaching Miller. SOF ¶¶ 232, 235.

5.      Told Miller, "[Y]our wife called because she has some concerns about you," knowing this would make Miller angry. SOF ¶¶ 23, 177, 241.

6.      Seized Miller by grabbing his arm within approximately a minute of his arrival on the scene even though he did not have probable cause to take him into custody for involuntary treatment under M.G.L. 123 §12. SOF ¶¶ 238.

7.      Failed to follow his training and use hand techniques as trained by his police department, and instead used an unauthorized jiu jitsu hold. SOF ¶¶ 195-199, 235, 244.

8.      Put pressure on Miller's back while Miller was face down on his stomach. SOF ¶¶ 207, 227.

9.    Failed to take immediate action to assist Miller in breathing after Miller told the officers he could not breathe. SOF ¶¶ 211-214.

10.   Failed to immediately move Miller into the recovery position after handcuffing, instead waiting until after Miller had stopped breathing and his pupils were fixed. SOF ¶¶ 218-220.

11.   Failed to truthfully report what happened to the EMTs who were attempting to provide life-saving medical care to Miller. SOF ¶¶ 225-226.

As explained by Dr. Steinberg, Miller needed to breathe deeply to expel the buildup of carbon dioxide in his lungs. SOF ¶ 227. Police expert DeFoe refers to this as the physiology of the struggle. SOF ¶ 229. When Miller tried to expand his lungs, Roycroft pressed down on his back. SOF ¶¶ 207, 227. Miller alerted the officers to his dilemma, saying, "I can't breathe." Both officers ignored Miller and when Anderson asked if he could breathe, one of them said he could. SOF ¶¶ 211-214. Shortly after they handcuffed Miller, Roycroft learned he was unresponsive. He had no pulse. Miller was dead. SOF ¶¶ 218-221, 225.

## II.    Defendants' Statement of Facts in their Memorandum is Misleading

### A.  Defendants ignore facts that support Plaintiff's case.

Plaintiff alleges that Miller died from prone restraint cardiac arrest. SOF ¶ 228. This is based on Roycroft's testimony that when Miller was on the floor in his office, Miller pushed up to breathe and Roycroft reacted by applying pressure on Miller's back. When Miller pushed up, Roycroft pushed down. Resp. to SOF ¶ 108; SOF ¶ 207. Yet, in their memo, Defendants state that according to the only witnesses to these events, no pressure was

7

applied to Miller's head, torso or neck at any time.[1]

Defendants ignore Roycroft's admission that there was no emergency that required Roycroft to interact with Miller before Jackson arrived. SOF ¶¶ 166, 173. Defendants' legal argument also ignores Roycroft putting pressure on Miller's back for over a minute (SOF ¶¶ 207, 222), and that the Defendant officers did not truthfully report what happened to emergency medical personnel (SOF ¶ 226).

**B. Defendants rely on facts not known to Defendants during the incident.**

A police officer's decisions on probable cause and use of force are made based on facts known to the officer at the time. *Watson v. Perez*, 168 F. Supp. 3d 365, 372 (D. Mass. 2016). Defendants' memo attempts to justify Roycroft's actions with facts that they did not know, relying on the deposition and an affidavit of Anderson, who was Miller's life partner. Defendants had no knowledge of these facts, which include details about Miller's 2017 brief psychotic episode and details about his behavior and comments prior to Anderson calling 911. Many of these facts used to support Defendants' narrative—including the majority of the facts on page two of the memo—are not included in Defendants' Statement of Facts.[2] Because Anderson contradicts herself, Plaintiff would have contested several of these facts if the Defendants had included them in the Statement of Facts. Material facts not included in Defendants' Statement of Facts should not be considered by the Court.

**C. Defendants' argument relies on contested facts and seeks inferences in their favor.**

---

[1] In their statement of facts, Defendants also say Anderson recalls one of the officers placing his knee on Miller's back. SOF ₱ 144.

[2] The only cite to the SOF in the first paragraph of page two is SOF ₱ 22, which Plaintiff contests.

Plaintiff disputes many of Defendant's facts, including: Anderson was concerned that Miller might become adversarial with police (resp. to SOF ¶ 22); Miller went into the house seeking to find Anderson and/or arm himself, first with an item from the table and then with a golf club (resp. to SOF ¶¶ 51, 59; SOF ¶ 203); Miller used the table as leverage to slam Roycroft into the door (resp. to SOF ¶¶ 69, 70); Plaintiff's expert acknowledges Miller was actively resisting[3]; Miller was actively resisting arrest until the moment he was placed in handcuffs (resp. to SOF ¶ 103); and no pressure was applied to Miller's head, torso or neck at any time (resp. to SOF ¶¶ 77, 108).

## LEGAL ARGUMENT

### I.    Standard of review

Summary judgment is appropriate only when there are no disputes as to material facts and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In deciding a summary judgment motion a court must view the evidence "in the light most favorable to, and drawing all reasonable inferences in favor of, the nonmoving party." *Feliciano de la Cruz v. El Conquistador Resort & Country Club*, 218 F.3d 1, 5 (1st Cir. 2000) (citing *Mulero–Rodriguez v. Ponte, Inc.*, 98 F.3d 670, 672 (1st Cir. 1996)). "Where a qualified immunity defense is advanced by pretrial motion, normal summary judgment standards control." *Amsden v. Moran*, 904 F.2d 748, 752 (1st Cir. 1990) (quotation omitted). The Court should "first identify[] the version of events that best comports with the summary judgment standard and then ask[] whether, given that set of facts, a reasonable officer should have

---

[3] Plaintiff's expert's statement that Miller's pushing back from the table was active resistance (Ex. 18 at 73) was based on a disputed fact. Roycroft testified that he pulled Miller back from the tableResp. to SOF ⫿ 69.

9

known that his actions were unlawful." *Morelli v. Webster*, 552 F.3d 12, 19 (1st Cir. 2009).

Defendants ask this Court to draw inferences in their favor and they improperly rely on contested facts.

## II.     Qualified Immunity

The standard for reviewing a claim of qualified immunity is well known:

> "The doctrine of qualified immunity shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Mullenix v. Luna,* 577 U.S. ——, 136 S.Ct. 305, 308 (2015) (per curiam) (quoting *Pearson v. Callahan,* 555 U.S. 223, 231, (2009)). "A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Id.* (quoting *Reichle v. Howards,* 566 U.S. 658 (2012)).

*Stamps v. Town of Framingham*, 813 F.3d 27, 34 (1st. Cir. 2016). The issue is whether the law was clearly established at the time of the incident.

The First Circuit uses a two-step test to decide whether qualified immunity is appropriate. *Alfano v. Lynch*, 847 F.3d 71, 75 (1st. Cir. 2017). The first step is to determine "whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right." *Id.* If the facts establish a violation of a constitutional right, the court is to determine if the right was "clearly established" at the time of the defendant's alleged violation. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The second part has two elements: first whether the legal contours of the right in question were sufficiently clear that a reasonable officer would have understood that what he was doing violated the right, and second whether in the particular factual context of the case, a reasonable officer would have understood that his conduct violated the right. *Mlodzinski v. Lewis*, 648 F.3d 23, 32–33 (1st. Cir. 2011). Under this test, "(p)olice officers are entitled to qualified immunity if reasonably well-trained officers

10

confronted with similar circumstances could reasonably believe their actions were lawful under clearly established law." *Napier v. Town of Windham*, 187 F.3d 177, 183 (1st Cir. 1999). A reasonably trained police officer is be expected to follow their training.

### A. Defendants have no Qualified Immunity claim for use of force.

When a plaintiff alleges a Fourth Amendment violation for use of unreasonable force under *Graham v. Connor,* 490 U.S. 650 (1989), "(t)he inquiry into whether this right was violated requires a balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the importance of the governmental interests alleged to justify the intrusion." *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (quoting *Tennessee v. Garner,* 471 U.S. 1, 8, (1985)).

In *McIntyre v. United States*, 336 F. Supp. 2d 87 (D. Mass. 2004) the court said:

> Cases in which "general statements of the law" gave "fair and clear ruling" applied "with obvious clarity" to the conduct in question include *Drummond v. City of Anaheim,* 343 F.3d 1052, 1061–62 (9th Cir. 2003) (holding that officer's alleged conduct in subduing mentally ill citizen violated "clearly established" law because the court "need[ed] no federal case directly on point to establish that kneeling on the back and neck of a compliant detainee, and pressing the weight of two officers' bodies on him even after he complained that he was choking and in need of air violates clearly established law, and that reasonable officers would have been aware of the same.")

*McIntyre v. United States*, 336 F. Supp. 2d 87, 124 (D. Mass. 2004).

In *Stamps* the First Circuit found that "a claim is stated under the Fourth Amendment for objectively unreasonable conduct during the effectuation of a seizure that results in the unintentional discharge of an officer's firearm." *Stamps* at 813 F.3d at 37. A claim for unreasonable conduct does not require that the officer intended the consequences of their actions.

By April 2019, an objective reasonably well-trained police officer would have known that putting pressure on a person who is face down may restrict the person's ability to breathe and may cause the person to seemingly struggle in an effort to breathe. In *Lombardo v. City of St. Louis,* 141 S.Ct. 2239, 2241 (2021), the Supreme Court noted that by 2015, "well-known police guidance" indicated "that the struggles of a prone suspect may be due to oxygen deficiency, rather than a desire to disobey officers' commands." *See also* Ex. 31; SOF ¶ 230.

The constitutional right to be free from the force used by Roycroft was clearly established. The First Circuit held that it is unreasonable force to apply pressure to the back of a person who is "resisting" once that person is restrained. *McCue v. City of Bangor*, 838 F. 3d 55, 64 (1st. Cir. 2016). *McCue* relied on the Seventh Circuit opinion in *Abdullahi v. City of Madison*, 423 F. 3d 763 (7th Cir. 2005), which affirmed a district court's denial of qualified immunity in a case like this one where police officers applied pressure to the decedent before he was handcuffed. This cite indicates the First Circuit agrees that a police officer applying pressure that causes a death before handcuffing is complete violates the constitution. This is the holding in *Martin v. City of Broadview Heights*, 712 F.3d 951, 961 (6th Cir. 2013). The Sixth Circuit held that *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893 (6th Cir. 2004), another case cited in *McCue*, "proscribes the use of 'substantial or significant pressure' that creates asphyxiating conditions in order to restrain a subject who does not pose a material danger to the officers or others" and restraining the person with handcuffs is incidental to that rule.

In *McCue* the court described *Abdullahi,* saying, "an officer, for 30 to 45 seconds, had placed his right knee and shin on the back of [a person's] shoulder area and applied his

weight to keep [the person] from squirming or flailing.'" *McCue* at 64. This force was found to be excessive.

Roycroft and Jackson knew that keeping a person face down could prevent the person from breathing, resulting in his death. Jackson knew that obesity, age, and physical condition were factors that could make it more difficult for a person to breathe if they were left lying on their stomach. SOF ¶¶ 215-217. Defendants are judged by an objective standard. In April 2019, any reasonably well-trained police officer would know that applying pressure to the body of an obese mentally ill man who is face down on the floor and informed the officers that he could not breathe was in danger of death, requiring the officer to take immediate action to release the pressure.

This is particularly true here since the reason Roycroft could not get control of his own left arm was because he placed it under Miller's left armpit. SOF ¶¶ 104, 190, 198. When Miller pushed up, giving Roycroft a chance to remove his arm, Roycroft instead viewed this as "fighting" and pushed down, keeping his arm from being released and preventing Miller from breathing. SOF ¶¶ 207, 210, 227.

A jury could find that Roycroft and Jackson knew that they had violated Miller's rights based on their false stories immediately after Miller's death. Both officers denied hearing Miller say, "I can't breathe," Anderson asking them if he could breathe, and the response from one of them telling her he could breathe. Resp. to SOF ¶¶ 122, 140. A jury could find that both officers initially told the medical personnel a false story suggesting they

13

behaved properly: [4]

> Officers sts 'we were here for mental health evaluation and pt was calm and
> cooperative at first. He got angry and went for a golf club and we took him
> down and cuffed him. He was talking and we stood him up and started to
> walk out and he collapsed, we immediately started CPR and applied AED.'

SOF ¶ 226; Ex. 28. By making up a false story, Defendants showed they knew immediately

that their true actions violated their training and the Constitution.

### B. Roycroft is not entitled to qualified immunity for seizing Miller without probable cause.

Roycroft's seizure of Miller failed to meet the well-known probable cause standard.

The Fourth Amendment requires that police officers have probable cause to take a person

into custody involuntarily under M.G.L. c.123 §12. *Ahern v. O'Donnell,* 109 F. 3.d 809, 817 (1st

Cir. 1997). The statute permits involuntary commitment for mental health treatment if a

police officer has probable cause to believe that failure to hospitalize the person "would

create a likelihood of serious harm by reason of mental illness." Not every person with

mental illness or every person who is hallucinating is likely to cause serious harm. In

evaluating probable cause, a court may only consider the facts known to the police officer at

the time he takes a person into custody. *Goddard v. Kelley*, 629 F.Supp. 2d. 115, 124-125

(D.Mass. 2009).

*Alfano v. Lynch*, 847 F.3d 71 (1st. Cir. 2017) considered the application of *Ahern* to the

protective custody statute, M.G.L. c. 111B §1,2, which permits a police officer to take a

person into custody if the person is incapacitated due to consumption of alcohol. In *Alfano*

---

[4] Defendants may claim that this statement was made by someone else, but they were the only people present when Miller stopped breathing, thus they are the only officers who could have had information on how Miller died. SOF ¶¶ 220-226.

the First Circuit found that while the police officer had probable cause to believe plaintiff was intoxicated, he did not have probable cause to believe that he was incapacitated. 847 F.3d at 80. While Roycroft had probable cause to believe Miller was suffering from mental illness, he did not have probable cause to believe that failure to restrain Miller would create a likelihood of serious harm by reason of mental illness as required by M.G.L. 123 §12. SOF ¶¶ 152, 238. Thus, Roycroft did not have a legal basis to use force to seize Miller.

Roycroft knew that Anderson was concerned about Miller's behavior. She did not say she was a victim of domestic violence, or that he had threatened her or assaulted her. Nor did she say that she was in fear of him. SOF ¶¶ 149, 157, 249. There was no evidence Miller had committed a crime or had homicidal or other violent behavior or was at risk of injuring himself. SOF ¶¶ 157, 182, 238. Anderson only expressed her fear Miller would be upset with her if he learned that she called the police. SOF ¶ 23.

When Roycroft went to the back of their home he saw that Miller was calm and his demeanor was friendly and easy although he was clearly not well and appeared to be hallucinating. SOF ¶¶ 170, 175. Miller invited Roycroft onto his deck. SOF ¶ 174. The situation was calm until Roycroft upset Miller by saying, "[Y]our wife called because she has some concerns about you." These are the words Anderson said would upset Miller. SOF ¶¶ 23, 177-178.

After Roycroft's statement Miller's demeanor went from calm to angry. He swore at Roycroft and told him, "fuck you I'm not talking with you get the fuck away from me." Then he entered his home. At that point Roycroft began issuing orders to Miller. But he knew Miller was delusional or psychotic and thus unlikely to understand the orders. SOF ¶¶

177-182. Roycroft seized Miller by grabbing his arm then, seconds later, putting Miller in the unauthorized seatbelt hold. SOF ¶¶ 183-187, 190, 196-199. Miller's reaction to Roycroft's provocative words do not establish probable cause to place Miller in custody.[5]

Since Roycroft did not have probable cause to place Miller in custody, he had no right to use any force on Miller. Police officers who do not have probable cause to arrest an individual for wrongdoing do not have a right to use force on that person, thus any force used to arrest the individual is per se unreasonable. *See Reese v. Herbert*, 527 F. 3d 1253, 1273 (11th Cir. 2008). As explained next, Roycroft used unreasonable force resulting in Miller's death.

### C. Roycroft used unreasonable force.

Police use of unreasonable force violates the Fourth Amendment. *Graham v. Connor*, 490 U.S. 386 (1989). The level of force that is constitutionally permitted when taking a mentally ill person into custody "differs both in degree and in kind from the use of force that would be justified against a person who has committed a crime or who poses a threat to the community." *Gray v. Cummings*, 917 F.3d 1, 11 (quoting *Bryan v. MacPherson*, 630 F. ed 805, 829 (9th Cir. 2010). Thus, the court in *Gray* found a police officer must consider a subject's mental illness in deciding the amount of force to use.[6] *Id.*

---

[5] Roycroft also violated his department's policy on mental illness since Miller had not committed a crime, exhibited homicidal or violent behavior, or presented a substantial risk of physical injury to himself, nor had he escaped from lawful custody. Ex. 3 at 39 (page 39 of the exhibit as filed by Defendants, page 3 of the policy), Policy and Procedure 1106 §7.0. Also, Roycroft failed to follow the portion of the BPD policy stating an officer should only initiate a section 12 when five factors have been met including obtaining approval of the Watch Commander or Patrol Supervisor. *Id.*, §7.1. Failure to follow his department's policies and training is relevant both to whether there was a violation and whether a reasonable police officer would have believed his conduct violated the Constitution. *Stamps* at 32 nte.4.

[6] The officer in *Gray* cited by Defendants knew that the subject had been involuntarily committed under section 12 and escaped from custody. This distinguishes it from the situation here. Under the Barnstable

16

In *Graham v. Connor* the Supreme Court set out the following three factors for evaluating the objective reasonableness of police use of force: (1) "the severity of the crime at issue;" (2) "whether the suspect poses an immediate threat to the safety of the officers or others;" and (3) "whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight. *Graham* at 396, *Alexis v. McDonald's Restaurants of Massachusetts, Inc.*, 67 F.3d 341, 352–53 (1st Cir. 1995). These factors show there was no cause to put Plaintiff in the unauthorized seatbelt hold or to apply pressure to his back, especially after he told the officers he could not breathe.

First, Miller had not committed a crime.[7] SOF ¶ 182. Defendants do not claim that they had reason to think Miller had committed a crime. He was delusional on the back porch of his home. Miller had not assaulted anyone; Roycroft initiated physical contact. SOF ¶ 238. The police officers were there to assist Miller and determine if he met the standard to be involuntarily committed for mental health evaluation and treatment.

Second, Roycroft had no information that Miller threatened anyone. Miller was not threatening anyone when Roycroft was on the porch, nor when Miller retreated into his home. Miller never had a weapon and never said he wanted a weapon. He never struck anyone. SOF ¶¶ 209, 249.

Third, Roycroft did not flee. He told Roycroft he was not talking to him and then went into his home. SOF ¶ 50. Roycroft claims Miller never spoke again. SOF ¶ 128. Even if

---

Police policy on mental illness, an officer has authority to take a person into custody if they escaped the custody of those lawfully required to care for them. Ex. 3 at 39, Policy and Procedure 1106 §7.0.

[7] The Defendants' memo claims that because Anderson hung up before ending the 911 call, Roycroft could have thought a crime took place. But hanging up on a 911 call does not mean a crime was taking place. Also, Roycroft quickly learned there was no emergency when he spoke to Anderson. SOF ¶ 166. He confirmed there was still no emergency when he went to the back of the home and observed Miller. SOF ¶ 173.

he tried to escape Roycroft's control, it would not justify Roycroft's action in refusing to let Miller breath as a matter of law. *Cf. Martin v. City of Broadview Heights*, 712 F. 3d 951, 959 (2013).

Roycroft did not have a basis to arrest Miller. Roycroft initiated contact with Miller then put him in a seatbelt hold and finally ended up with Miller face down on the floor struggling to breathe while Roycroft pushed down on his back. SOF ¶¶ 238, 190, 207.

The First Circuit uses a "totality of the circumstances" analysis to determine whether a seizure was reasonable. *St. Hilaire v. City of Laconia,* 71 F.3d 20, 26 (1st Cir. 1995); *Stamps v. Town of Framingham*, 813 F.2d 27, 35 (1st. Cir. 2016).[8] When a police officer "creates conditions that are highly likely to cause harm and unnecessarily so, and the risk so created actually, but accidentally causes harm, the case is not removed from Fourth Amendment scrutiny." *Id.* A police officer's failure to follow his department's policies or training is relevant to whether there was a violation and to whether a reasonable police officer in the defendant's situation would have believed his conduct violated the constitution. *Stamps*, 813 F. 2d at 33 nte. 4 (citing *Jennings v. Jones,* 499 F. 3d 2, 11-16, 19-20 (1st. Cir 2007).

In *Martin v. City of Broadview Heights*, 712 F.3d 951, 960 (6th Cir. 2013) police officers in Ohio were called to a scene where they found a naked man yelling and behaving as if he was on drugs or mentally unstable. They failed to consider the mental condition of the detainee. There, as here, a police expert testified that instead of taking the man to the pavement the first officer should have used "verbal intervention" to calm him down and to

---

[8] Other circuit courts follow this rule. See, *Abdullahi v. City of Madison*, 423 F 3d. 763 (7th. Cir. 2005), *Allen v. Muskogee, Oklahoma*, 119 F.3d 837 (10th Cir. 1997).

allow time for back up officers to arrive. *Martin,* 712 F.3d at 958. See, *McCue v. City of Bangor, supra.*

In *Stamps,* a police officer was pointing a loaded rifle at plaintiff with his finger on the trigger. He then unintentionally shot and killed Stamps. Roycroft arrived at Miller's home and determined that there was no emergency, but Miller appeared to be delusional or psychotic. Instead of keeping Miller calm while waiting for Jackson to arrive so they could develop a safe plan to get Miller help, Roycroft used trigger words that a reasonable police officer would know were likely to change Miller's mood. SOF ¶¶ 166, 173, 236, 241.

After upsetting Miller, Roycroft used force on Miller. Roycroft chose to use the unauthorized jiu jitsu seatbelt hold, instead of following his training. SOF ¶¶ 195-199, 235, 244. Because he used a seatbelt hold when Miller was face down on the floor, Roycroft's left arm was trapped under Miller's body. SOF ¶¶ 90-92, 205. Miller couldn't breathe so he tried to lift himself up to get air in his lungs. In response Roycroft kept pushing down on him. SOF ¶¶ 207, 227. After Miller told Roycroft he could not breathe, Roycroft had an obligation to immediately stop pushing down on him and to put him in a position so he could breathe. Roycroft does not deny this obligation; he denies Miller made the statement. SOF ¶¶ 215-217, 126. A jury will have to decide if Miller said, "I can't breathe." Roycroft and Jackson were at Miller's home to help him because he had a mental health crisis. They acted hastily, ignored Miller's plea for help, and ended up killing the man they were supposed to help.

D. **Jackson is liable for use of force on Miller because he failed to intervene to prevent the use of unreasonable force by Roycroft.**

19

Jackson joined Roycroft when Miller was already face down on the floor in the office area of his home. SOF ¶¶ 205-206. He knew from the radio call this was a mental health call. SOF ¶148. He heard Miller say he could not breathe. SOF ¶¶211-212. Jackson assisted as Roycroft pressed down on Miller while Miller tried to get air into his lungs. SOF ¶¶ 206-208. Jackson had time to intervene by telling Roycroft to stop pressing down on Miller. He could have moved Miller to a position where he could breathe. A law enforcement officer has a duty to intervene to prevent a constitutional violation. *Clark v. Taylor*, 710 F.2d 4, 9 (1st. Cir. 1983). An officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force can be held liable under section 1983. *Gaudreault v. Municipality of Salem, Mass.*, 923 F.2d 203, 207 nte. 3 (1st Cir. 1990). When a fellow officer can deescalate a situation to prevent the use of excessive force, the officer has an obligation to do so or that officer can also be liable. *Sheffield v. Pieroway*, 361 F.Supp. 3d 160, 166 (D. Mass. 2019).

## CONCLUSION

For the reasons set forth above, this Court should deny Defendants' motion for summary judgment.[9]


Dated: June 15, 2023

---

[9] Since Defendants are not entitled to summary judgment on the 1983 claim, they are also not entitled to summary judgment on M.G.L. c. 229 § 2.

RESPECTFULLY SUBMITTED,

Plaintiff,
By his Attorneys,

/s/Howard Friedman
Howard Friedman, Esq. (BBO# 180080)
hfriedman@civil-rights-law.com
Law Offices of Howard Friedman, PC
1309 Beacon St., St. Suite 300
Brookline, MA 02446
617-742-4100

/s/ Jeffrey Wiesner
Jeffrey Wiesner, BBO No. 655814
Jennifer McKinnon, BBO No. 657758
Wiesner McKinnon LLP
88 Broad Street, Suite 503
Boston, MA 02110
Tel.: (617) 303-3940
Fax: (617) 507-7976
jwiesner@jwjmlaw.com
jmckinnon@jwjmlaw.com

**CERTIFICATE OF SERVICE**

I certify that on this day I caused a true copy of the above document to be served upon the attorney of record for all parties via CM/ECF.

Date: June 15, 2023      /s/ Howard Friedman
                         Howard Friedman

21