UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Docket No. 1:21-cv-10738-FDS

--------------------------------------------------------
ESTATE OF ROBERT JOSEPH MILLER, by and            *
Through IAN MILLER, personal representative of    *
the Estate,                                       *
      Plaintiff                                  *
                                                *
                                                *
vs.                                               *
                                                *
                                                *
SEAN ROYCROFT and SPENCER JACKSON,                *
in their individual capacities and the TOWN       *
OF BARNSTABLE, MASSACHUSETTS,                      *
      Defendants                                 *
--------------------------------------------------------

REMOTE DEPOSITION of SCOTT DEFOE, an Expert Witness called by and on behalf of the Defendants, taken pursuant to the provisions of the Massachusetts Rules of Civil Procedure, before Dawn T. Rabbitt, a Certified Shorthand Reporter and Notary Public in and for the Commonwealth of Massachusetts, at Huntington Beach, California 92648, on Wednesday, December 7, 2022, commencing at 1:04 p.m.

Page 2

APPEARANCES

HOWARD FRIEDMAN, ESQUIRE
Law Offices of Howard Friedman, P.C.
1309 Beacon Street, Suite 300
Brookline, MA 02446
(617) 742-4100
Counsel for the Plaintiff

JENNIFER MCKINNON, ESQUIRE
Weisner McKinnon, LLP
90 Canal Street
Boston, MA 02114
(617) 303-3940
Counsel for the Plaintiff

SASHA M. GILL, ESQUIRE
Louison, Costello, Condon & Pfaff, LLP
Ten Post Office Square, Suite 1330
Boston, MA 02100
(617) 439-0305
sgill@lccplaw.com
Counsel for the Defendants

Page 3

INDEX

WITNESS                    EXAMINATION
SCOTT DEFOE
(By Ms. Gill)                    4
(By Mr. Friedman)              95


        EXHIBITS
NO.                          PAGE
1     DeFoe Report                97
2     Mental Illness Police 1106     97

Page 4

COURT REPORTER:  I just have to ask counsel if you're in agreement of the swearing in of the witness remotely?

MR. FRIEDMAN:  Howard Friedman for the Plaintiff, yes, we agree to have this done remotely.

MS. GILL:  Sasha Gill for the defendants and I agree to have it done remotely.

SCOTT DEFOE, having been satisfactorily identified and duly sworn remotely by the Notary Public, was examined and testified as follows in answer to direct interrogatories:

DIRECT EXAMINATION
BY MS. GILL:

Q.  Good morning, Mr. DeFoe, my name is Sasha Gill, and I represent the defendants in the matter that you've been asked to come and testified about today.

A.  Good morning.

Q.  I'm going to ask you to keep your answers to the scope of my question, to wait until I'm finished asking a question to answer it, and to let me know immediately if you don't understand any of my questions.  Can we agree to that?

A.  Yes, ma'am.

Q.  Can you tell me your hourly rate?

Page 5

A.  For depositions and trials it's $475 per hour.

Q.  How much have you billed Attorney Friedman's office to date for record review and deposition prep?

A.  For record review, completion of report, discussions, I have billed a total of -- billed and received $17,906.25 and I have yet to bill approximately for seven hours of deposition preparation which I will do at some point after the deposition.

Q.  Was one of the contingencies for your appearance today that I prepaid you for your time in advance?

A.  Yes, and I did receive that and so thank you.

Q.  What percent of your annual income is derived from your expert testimony work?

A.  Probably 90 percent now and I get a pension from the Los Angles Police Department and I have some other investments but overall annual income is probably 80 percent would be a better number.

Q.  What's the value of that 80 percent?

A.  Do you mean how much did I make of the 80 percent of my annual income?

Q.  Yes.

A.  For 2021 and I don't know yet, ma'am, for 2022, but I think my annual income for expert work was approximately $800,000, 8 to $900,000.

Page 6

Q. What percent of civil cases are you testifying for the defense as an expert?

A. I've been retained on approximately 750 cases for the United States and Canada, and about 30 percent of them are premises liability matters, maybe negligence security, and probably 60 percent Plaintiff, 40 percent Defense on those matters. On police related matters such as this, it's probably 90 to 95 percent plaintiff thus far and 5 to 10 percent defense.

Q. When is the last time you testified as an expert witness at a trial in a civil matter for the defense?

A. None of the matters that I've taken on thus far have gone to trial where I testified. I think that the last deposition for the defense for my retention would be the California Attorney General's Office and I believe that that was in approximately three months ago, it's on my list of trial testimony, but none of the matters that I've taken thus far have gone to trial where I've been defending municipalities and/or the federal government.

Q. In a police matter?

A. Correct.

Q. How many times has your opinion testimony been excluded from trial?

Page 7

A. Never. Now, there's been -- I would like to clarify that. I guess there's been some parameters by certain judges on what we can ultimately testify to and it might be legal opinions or ultimate conclusions such as the ultimate reasonableness of force. There have been parameters that have been obviously for both experts and for both defendants and plaintiffs and so I don't want to say nothing, but there has sometimes been parameters imposed by the judge on a specific case depending on what his or her order was.

Q. And approximately how many times has your opinion testimony been limited or restricted in some way by the judge?

A. Maybe a handful of times, four or five times. I've testified in court a total of 51 times as recently as the last time was November 14th of this year, and so I think maybe five times or so where the judge has limited the scope of the testimony either through motions in limine or other things as to what I could testify to?

Q. Do you yourself practice any Judo, Jiu-Jitsu, Krav Maga or mixed martial arts?

A. I have done all of those things that you mentioned actually. I was part of LAPD's special

Page 8

weapons and tactics defense and tactics cadre. Obviously prior to even leaving the State of Massachusetts I had a black belt in Kenpo Karate from a studio in Bedford, Massachusetts where I grew up. I still currently box at an amateur level three or four days a week as recently as yesterday. Brazilian Jiu-Jitsu probably four years until I had back surgery and that kind of limited my ground grappling in some respect. Krav Maga you mentioned which is Israeli fighting approximately three years of that during when I was still employed with LAPD. Kickboxing probably a period of fifteen years which is in compilation with basic American boxing which I currently do now and I think that's probably about it. Probably thirty plus years of continuous Martial Arts training, ground fighting, standup fighting without ever a break.

Q. Do you believe that some of the techniques and principals in those disciplines can be useful in training police officers?

A. Absolutely useful, yes.

Q. Does every response to calls involving mentally ill individuals require deescalation?

A. Not always. Sometimes you strive in the event that it's necessary to deescalate or diffuse the

Page 9

situation, but sometimes it doesn't require it or sometimes it's ineffective depending on the totality of the circumstances.

Q. What are some considerations that come into play when an officer is determining whether or not a response to a mentally ill individual requires deescalation?

A. Well, you should always be using, trying and thinking of any words or actions to influence someone's behavior such as creating time and distance in utilization in acting listening skills in open ended questions. A lot of that is going to come from information that you have at the time which is so critically important as to what type of information that you can ascertain before that contact is made either by a family member, from a person reporting, maybe from prior calls of service and maybe a prior 72-hour hold on that individual. So, it's going to depend and you want the best information that you can have at the time, and so you should strive to always use the escalation and diffusing techniques if at all possible, but most importantly is getting the necessary intelligence to be able to orchestrate how you're going to respond to that particular incident.

Q. Are mentally ill people in your experience more

Page 10

likely to act unpredictably then mentally healthy individuals?

A. Typically, yes, especially if they're off their psychotropic medication.

Q. Are mentally ill people more likely to become suddenly aggressive then mentally healthy individuals in your experience?

A. Potentially they may. Once again, if they are on some type of controlled substance maybe self-medicating with something other than psychotropic medication, maybe they are not taking their psychotropic medication, it just depends at times, but typically I think that that's a fair statement.

Q. Would you agree that an officer responding to a scene who has been provided with very little information has to be prepared for any scenario that might unfold?

A. I do agree with that, yes.

Q. What's an officer supposed to do when a mentally ill person is not responding to his commands?

A. Well, it depends on who you're saying is not responding, if they are noncompliant and there may be a language barrier, it just depends on the manner or they're just defiant, they're maybe passively resisting or just noncompliance. It's going to be once again is

Page 11

to find out reasons why and once again try to establish dialogue, create open ended questions equally important and that's why it's important on the front end to find out as much about that person or that subject as possible to make sure that you can use some trigger words or get that person in agreement of what you're trying to do or try to establish dialogue and using words and actions to influence that person's behavior.

Q. Would you agree that nothing that you reviewed in the records and testimony in this case indicates that Officer Sean Roycroft and Spencer Jackson were irreverent of human life?

A. I think that's an ultimate trier of fact issue, Counsel. I mean, I have no information that they intentional or if that's what your question is caused the death of Mr. Miller, that's an ultimate trier of fact. Based on what I've read that there was no ill will or anything that I have read thus far that would indicate that, ma'am.

Q. And based on your review of the records and testimony in this case, would you agree that Sean Roycroft was simply talking to Robert Miller when his demeanor suddenly shifted?

A. Attempting to establish dialogue with Mr. Miller

Page 12

when there was a shift based on a statement that I believe that was made by Officer Roycroft that may have been a trigger causing Mr. Miller to become upset and no longer wishing to speak with Officer Roycroft.

Q. And what was that statement?

A. I think the fact that he had made mention the fact that Ms. Anderson had in fact called the police because she was concerned about his well-being.

Q. And that statement is not one of the facts on which you based your opinions in your report; correct?

A. Well, I did in the sense ma'am of the failure to plan, and as we know Ms. Anderson is the best source of information at the time and I believe that there was some negligence on Officer Roycroft's part and failure to properly debrief her to get all of the requisite information that he would need to properly approach when the time was right with the proper resources approach Mr. Miller. I think there was an opportunity there that was missed to speak with Ms. Anderson to find out exactly what transpired prior to his arrival and then some of the back story involved with Mr. Miller which I think would have been critically important as to the manner in which he addressed it.

Q. Would you agree that when Robert Miller went into

Page 13

the house at 45 Elm Street that it was appropriate for Sean Roycroft to be concerned that he might have access to weapons in the house?

A. Once again, that goes back to the initial information that he could have derived from Ms. Anderson as to whether any firearms in the house such as that that he neglected to do. I mean, there's always potential, ma'am, for people, all of us have knives in our house to cut food with, we may have tools to fix things with, and so there's always a concern that there might be something within the house as there is on the patio as well. I mean, there were dumbbells and other things in close proximity to Mr. Miller at the time, and so, yes, there's always that concern, but there was never any threats made, there was never any treats towards Ms. Anderson made that I believe a reasonable officer based on the totality of the circumstances would believe that they needed to stop his movement due to the fact there may be weapons because I think that that would be speculative in nature.

Q. Would you agree that after being dispatched and talking to Amy Anderson that Sean Roycroft knew that Ms. Anderson was scared?

A. She may have been frightened by what was

Page 14

transpiring, ma'am, but there was no information that she was frightened of Mr. Miller at the time and if that was the case, I think it's even more egregious that Officer Roycroft didn't take the necessary steps on the front end to request additional resources to ensure that she's separated out of the residence if he reasonably believed that Mr. Miller was a threat to Ms. Anderson. I think that it was a traumatic event seeing someone that you've been in a relationship with that's going through a psychotic break or a psychotic episode, and I think that she obviously did not want him to know that she was calling based on the manner in which she called because that may be the only nexus that Mr. Miller has to someone by way of relationship that she probably didn't want to jeopardize that.

Q. But would you agree based on the records and the testimony that you reviewed, that it was reasonable for Sean Roycroft to perceive that Amy Anderson was scared?

A. Well, I think, ma'am, when responding to thousands of calls for service that when someone calls 911 for help, she may be frightened based on his actions, but there's no indication that she was frightened of Mr. Miller, more so just more concerned about his behavior.

Page 15

Q. So, my question is based on your review of the records and testimony in this case, was it reasonable for Sean Roycroft to perceive that Amy Anderson was scared?

MR. FRIEDMAN: Objection. If you can answer it go ahead.

A. Well, there's no information that she ever purported or testified that she was afraid of him. She was fearful of some of the things that he was saying because they were so unique and she had just returned from Florida and saw that the house was disheveled and he had been off his meds for some period of time and his actions and mannerisms she was obviously afraid, but once again not afraid of him but more so just fearful of the fact of what he was going through and concerned would probably be a better way to describe it.

Q. I didn't ask if it was reasonable for Roycroft to perceive that Mr. Anderson was afraid of Mr. Miller, I asked based on your review of the records and testimony was it reasonable for Officer Roycroft to perceive that Ms. Anderson was scared?

MR. FRIEDMAN: Objection.

A. Yes, but not of Mr. Miller.

Q. What videos did you review in this case?

Page 16

A. I don't believe that I reviewed any videos, ma'am. I'm just looking at my records and I have not seen any videos I don't believe.

Q. The records and testimony reflect that from the beginning of this incident Officer Roycroft understood Mr. Miller to be experiencing a psychotic episode, would you agree with that?

A. Yes.

Q. And one of your opinions is that Sean Roycroft failed to follow the training on interacting with people who are suffering from mental illness; is that right?

A. Yes.

Q. In your report you list several things that you believe -- let me just find it. In your report you list several things that you believe are deescalation technics that Officer Roycroft should have used, and I'm wondering if you can tell me at the top of Page 10, do you have your report in front of you?

A. Yes, I do.

Q. At the top of Page 10 all of those factors that you have bulleted out, where did you read that Officer Roycroft received that specific training?

A. I don't know if it's that specific training sort to speak, that's traditional training as it relates to

Page 17

-- those are just deescalation techniques based on my training and experience based on my thirty years in law enforcement and being retained on hundreds of cases throughout the country, those are typical deescalation technics that an officer should consider when confronting someone that may be mentally ill and/or experiencing a mental crises.

Q. Is there anything that you reviewed that led you to believe that Officer Roycroft did not speak simply or move slowly?

A. Well, it depends, he didn't move slowly at the time in which Mr. Miller decided that he was no longer wanting to have a consensual encounter and moved into his residence, and I think at that point he took an abrupt action. I don't think proceeding that I think that he was attempting, I think that Officer Roycroft was attempting to establish dialogue with Mr. Miller and I think that there was an attempt, and I think that he was trying to be sympathic and basically his testimony and try to create a relationship on the front end although the manner in which he did that I'm critical of, but I think his use of words initially were one of trying to help initially.

Q. What specific training that Officer Roycroft

Page 18

received that you believe that he did not follow in terms of deescalation efforts in this case?

A. I'm sorry, ma'am, to talk over you. I think it's important that obviously their own policy 1106 I think the action obviously request backup assistance is appropriate, we know that Officer Jackson received this call ten seconds after Officer Roycroft did and he was responding and arrived approximately a minute after, and there would be an opportunity once again to have a second officer there if necessary. So, I think once again there's no rush at this point, there's not a crime in progress. If you have a conversation with Ms. Anderson, she's there, and so if there's any concern for her, you now have her protected and now you can slow down because he's in his own backyard on the porch and he's not committing a crime, he has not made any suicidal ideations or made any verbal threats towards anyone, and so at that point to slow down and potentially request -- we know that two additional officers arrived after the incident and that being Officer Shaw and Ruggieri and that's, R-U-G-G-I-E-R-I, I believe, and necessary request the supervisor to potentially see how they're going to approach Mr. Miller before doing so.

Page 19

Q. I think we know now that Mr. Miller appears to have been alone in the backyard, but is it fair to say that when Officer Roycroft arrived at 45 Elm Street, that he did not know that Mr. Miller was in fact alone in the backyard?

A. Well, that once again would have been a very simply question to Ms. Anderson as to who's he there with, what transpired, why did you call, and then get the back story is critically important to develop a tactical plan and strategies on how you're going to approach him. So, those are simple questions as to who's he there with, what's he doing, is he in proximity of any weapons, is he under the influence, is he intoxicated, all of those things are critically important on the front end because they're ultimately going to determine how you're going to respond and simply and possibly determine how the situation is going to end up.

Q. You use the phrase in you report when time and circumstances reasonably permit a police officer should consider whether a subject's life of complaint is a deliberate attempt to resist versus an inability to comply, and what's the algorithm you use or a police officer should use when determining whether time and

Page 20

circumstances reasonably permit an officer to consider those factors?

A. Well, I think once again an officer is not meant to diagnose. I mean, it would be great to have that information from Ms. Anderson as the type of psychotropic medication that he may not have been taking. Whatever disorder that he may or disorders or mental illness that he may be inflicted with some of those mannerisms. So, I think that once again when you have a better strategy as the person just being noncompliant, are they actively or passively resisting due to their danger to self or others that they are unable to control themselves based on their mental illness or their failure to utilize or psychotropic medication, but once again, that's all of the information that I'm getting from the person at scene which you had a great source being Ms. Anderson. So, you could find out from there is Mr. Miller just being noncompliant or is the attempt delivered or maybe it's just not, maybe he's just so overwhelmed by his thoughts, beliefs and actions that he cannot consciously make decisions at that point and that's typically the prerequisite for someone who may be a danger to self.

Q. Is it fair to say that when Officer Roycroft was

Page 21

speaking with Amy Anderson, that she didn't know whether Mr. Miller was alone?

A. I have not read in the record anywhere, ma'am that she did not believe that Mr. Miller that there anyone else was there. These are really simple questions that I would want to know that I would walk in that backyard by myself at any point unless there was a crime in progress, but that's what I would want to know is if he's by himself, is there children in the home, is there a dog back there, all of those things are critically important with any call for service to have that information on the front end. So, if he had any concern about that which he should have, he simply could have asked her, but he did not do so prior to going in the backyard of the residence.

Q. Well, Ms. Anderson couldn't see Mr. Miller at that point; correct?

A. Right, not from where she was at, she could not see the backyard. She could just hear, but there was no indication that she had mentioned that anyone was there or that he had any friends over. Once again, these are all simple questions that could have been answered had he stopped and asked. I would want to know that information as a first responder, was he by himself and

Page 22

all of those other factors that I had mentioned earlier in my testimony.

Q. Mr. DeFoe, if you could try to limit your answer just to my question I would appreciate it just because I've paid you for two hours of time and I don't want to go over that, okay.

A. Sure, I will do my best, ma'am.

Q. So, neither Ms. Anderson nor Officer Roycroft could see Mr. Miller, and you agree that they could hear him yelling; correct?

A. Correct.

Q. And neither of them could say at that point whether Mr. Miller was yelling to himself or to someone else?

MR. FRIEDMAN: Objection.

A. No, I don't know if that was ever asked. Once again he was just yelling is what I read in the record.

Q. You state in your report that Officer Roycroft should have asked Ms. Anderson to go to a friend's or neighbor's house, why do you have that opinion?

A. Well, if there was any concern for her safety, then that would be an alternative to get her out of the house if you were concerned about her being in the house, that would be one alternative or the other

Page 23

alternative would be which I think would be more prudent is to request additional resources that being police officers, and once they get everything from Ms. Anderson and they have enough information then they gather a plan. One person could, you know, maintain eye contact or line of sight with Ms. Anderson or stay there with her while they approach Mr. Miller to see if they could investigate what was transpiring.

Q. But you didn't put that in your report that alternate opinion, you only said that it was your opinion that Officer Roycroft should have asked Ms. Anderson to go to another person's house, and I'm wondering why that was your opinion at the time that you wrote the report?

A. Well, that's an option for one if you have any concern that you could ask them to step out of the house which is typical on any type of call for service or go to a friend's house, and so, yes, I stand by my opinion in my report, but there were other alternatives that would insure that Ms. Anderson was not in the house if you were concerned as an officer of her safety at any point.

Q. Is it your opinion that Officer Roycroft should have been concerned about Ms. Anderson's safety at that

Page 24

point?

A. Once again I don't, but he never asked and stopped and found out what transpired prior to, and so there may have been some things that she had said based on his behavior that would necessitate the officer to ask her to leave the house once again once the ample resources arrived at the scene. So, it would just depend, but the information is and the record reflects that he never did that and he just spoke to her briefly and then went out of line of sight from her and went to the back of the house.

Q. Would you agree that Officer Roycroft should have been at least considering at that point that Mr. Miller might be dangerous?

A. Any type of call like this, ma'am, I think that officers should use proper tactics and an officer's safety is as equally important and we don't want officers to get injured or killed, and so I think that using proper tactics and developing a proper plan is prudent, but any call for service is always a call that officers should be concerned with especially in a case where somebody may be experiencing a psychotic break or mental health crises.

Q. Would you agree that these situations at 45 Elm

Page 25

Street was an unstable one?

A. It depends at what point. I think that the initial attempted dialogue proved to be unsuccessful and then when Mr. Miller attempted to walk into the house, I think at that point the situation became unstable.

Q. Let's talk about after Officer Roycroft went to approach Mr. Miller because by the way whether or not you agree with his decision to go check on Mr. Miller before having a more detailed conversation with Ms. Anderson, you would agree that up until that point at least he had not exercised the use of any excessive force?

MR. FRIEDMAN: Objection, you can answer.

A. No, he didn't use any force reasonable or excessive.

Q. And after Officer Roycroft went around to the side of the house to check on Mr. Miller, in your opinion how should Officer Roycroft have spoken to Mr. Miller?

A. Once again, I agree that he should have or I'm testifying that he should not have went back there by himself, but once the plan was established and a contact officer was designated with the information that you have derived from prior 72-hour hold, information from

Page 26

Ms. Anderson is that you want to ask open ended questions, you want to tell people that you're there to help, you have to be mindful of using words like buddy or pal or something that may be even though your intent is to try and create dialogue and be kind and nice, I don't think there was any mal intent by using those words, and so you have to mindful of making sure that you don't bring up things that could cause a trigger in that person such as your wife called because she was concerned about you because once again that can create and immediately change the dynamics of the conversation. So, I think open ended questions, that you're there to help, tell me what's going on today. You really want that person to have the conversation with you and let them know rather than you try to -- those of us that either were or are police officers tend to want to control the situation and this is the time to really use proper active listening skills and open ended questions and verbal strategies to have him that being Mr. Miller tell you what's going on today.

Q. Is it your opinion that Officer Roycroft should not have told Mr. Miller why he was there?

A. Once again, based on the type of call and her whispering on the phone, it's apparent that she did not

Page 27

want him to know that she was calling, and I think that it would have been important for obviously Officer Roycroft to find out and simply could have said a neighbor called and heard some yelling in the backyard and we were called to check on you and to make sure that you're okay, but you don't want to alienate the relationship between Ms. Anderson and Mr. Miller especially if you're going to use her as a third party intermediary later on. So, you don't want to alienate that relationship and that's typical in any type of call like this or domestic violence call, at times you don't want to advise who called, just that you received a call for service and potentially not even tell the truth and say that a neighbor could have called based on some yelling and screaming that they heard.

Q. Telling Mr. Miller the truth as to why he was there at the scene is not a violation of any BPD, Barnstable Police Department's policy or regulation covering police officers that you're aware of, is it?

A. Once again tactics are never a violation or strategies and typically there's a lot of leeway for officers and so unlike a pursuit policy or a deadly force policy, there's some leeway and there should be for officers what strategies that they think are

Page 28

effective at the time based on the best information they have at the time. So, typically that type of approach would be violation of policy and it's just best practices based on responding to these types of events, and once again it's the spouse that doesn't want her husband to know that she called the police that that's, you know, a typical on calls for service is that keeping the person reporting confidential at times is prudent, but is it a violation of policy to answer your question, I don't believe so.

Q. Do you agree that the best way to know if a subject poses any danger to himself or to others is to have eyes on that subject?

A. For one I want to know everything about the subject before I put eyes on him especially if I'm concerned that he may be armed, I don't want to be in line of sight of someone who may have a weapon in the past or presently. So, I want to get the best information that I can get by way of that person who called the police or information from dispatch that I can before I approach or even put myself in a poor tactical position by creating line of site. So, no, I want to get the best and there are times that you can't do that because sometimes it's a trouble call and you

Page 29

don't have information, but that doesn't apply to the facts in this case, they had a great source who called the police who was there. So, prior to putting a line of sight or putting eyes on that person, I'm eventually going to do that, yes, but not before I get all the requisite information from the person reporting.

Q. By that point Officer Roycroft knew when he was talking to Ms. Anderson -- I mean, by that point Officer Roycroft knew that Mr. Miller was dilutional; correct?

A. Can you repeat that question?

Q. At the time Officer Roycroft was speaking to Ms. Anderson at the front door when he arrived at the call, he knew Mr. Miller was dilutional; correct?

A. I don't know if he knew that he was dilutional, he may have known that he was based on the comments of the call that he was going through a psychotic break. I don't know if he's experiencing dilutional disorder or if he knew he was bipolar or manic depressive or any of those things or having anxiety disorders. I don't think that he knew that, I think that he had to consider that, yes, that he may be dilutional, and once again it was more important to wait for backup.

Q. When Officer Roycroft arrived at 45 Elm Street, he couldn't just assume that Mr. Miller did not pose a

Page 30

risk to his own safety or other safety; correct?

A. No. An officer should always assume that someone could pose a risk to their safety or someone else's safety.

Q. Would you agree that there's nothing in the records that suggest specially trained mental health providers or personnel were available to be called to respond to 45 Elm Street that day?

A. Well, I know that there wasn't a request by either dispatch or by Officer Roycroft in this matter, but based on their own order that has been rescinded the officers should have rescinded it that there was a psychiatric assessment team that's available 24 hours a day that Cape Cod Hospital maintains that, and I don't know if they requested anyone to respond and I don't believe that based on the deposition records I believe that that unit in itself that there's no one that recalls that unit responding in the past, but I know that there wasn't an attempt to request a PAT team to the scene either by dispatch and/or Officer Roycroft.

Q. Whether or not there was an attempt to dispatch mental health personnel, would you agree that there's nothing to suggest that mental health personnel were available that evening?

Page 31

A. Once again, you don't know until you call and I think it's 7:30, 8:00 in the evening and typically in my experience especially if they purport that they're available 24 hours a day that, you know, if they weren't available then at least the attempt to call once you obviously debrief Ms. Anderson and ascertain what was transpiring, I think that it would be prudent to call because there's reasons why units like that exist and it's been my experience through my tenure with LAPD for the same reason is that you want to get mental health clinicians on site because they are much smarter than police officer in that realm of identifying and diagnosis and assisting with the placement especially on a 72-hour hold for someone, and that was my experience.

Q. It's your opinion that Officer Roycroft failed to follow his crises intervention technique training; correct?

A. Yes, ma'am.

Q. And what crises intervention technique training did Officer Roycroft receive?

A. According to the disclosures that I reviewed that he has, he took and received mental health first aid training which according to the disclosure the training people who experience mental health problems such as

Page 32

depression, anxiety disorders, psychosis and substance abuse disorders is my understanding based on the disclosures that I read in this matter.

Q. Would that qualify Officer Roycroft as a crises intervention technique trained officer or would he need to take a special course in that particular subject area.

A. My understanding is that there's a 40-hour course and I don't recall if he had taken that 40-hour course or not, I don't recall if he did or not. My understanding is that there's a 40-hour course that's offered, but I don't recall if he did in fact take that course.

Q. Mental Health training is different from crises intervention technique training; correct?

A. Somewhat, they overlap in a lot of ways. I mean, you're still talking about dealing with words of actions to influence behavior. There's a crossover between identifying once again not diagnosing the way in which someone may act that may be bipolar or paranoid schizophrenic and how they may react if they are self-medicating on a central nervous system stimulant such as methamphetamine in conjunction or in lieu of taking their psychotropic medication.

Page 33

Q. If Officer Roycroft had been trained in crises intervention techniques, would you expect to see crises intervention technique training listed on his training records?

A. I would. I would expect that, yes.

Q. And similarly with Officer Jackson, are you aware of whether or not he received any crises intervention training?

A. I believe that he did during his involvement as a Regional SWAT team member. I believe there was some testimony that he in fact did either do the crises negotiation team training or through the actual training, but I'm not 100 percent confident.

Q. In your report you capitalize crises intervention training and you say as an acronym you say that many law enforcement agencies throughout the United States and in Massachusetts have provided that training, and so is it fair to say that you're talking about the crises intervention technique training program?

A. Yes, it's one of the programs, yes. I mean, they have different names and different acronyms, but typically the training is similar.

Q. You state in your report that one of the jobs as an officer is to provide medical assistance when

Page 34

responding to a call with a person suffering from psychosis; is that correct?

A. Yes, if necessary if the person is, you know, maybe someone who's in transit that you see that might be laying face down or someone that may be in a position where you need to do basic CPR until you can summon emergency medical services.

Q. So, in addition to having a conversation with Ms. Anderson, Officer Roycroft also had an obligation to check on Mr. Miller's physical status; correct?

A. At one point, yes.

Q. When someone is suffering from a psychic break and is dilutional, is it fair to say that that person is more likely to harm himself or others?

A. Potentially.

Q. And is it also fair to say that dilutional people or people experiencing dilutions and hallucinations require supervision to ensure --

A. Typically, yes. Sorry to cut you off, ma'am. Typically, yes, if possible either by way of it being confined to a hospital or a 72-hour hold or under the care of a doctor or psychiatrist or psychologist.

Q. If Officer Roycroft perceived Mr. Miller as experiencing a psychotic break and being a danger to

Page 35

himself or others, is it fair to say that he had the right to take him into custody?

A. The question is he would have the right, yes, the question is the manner in which he takes him into custody. If he briefly believes that he was a danger to self or others and was going to take him into custody for that, yes, there would obviously be reasonable suspicion to detain him and probably cause to arrest him.

Q. Are you familiar with the Massachusetts Statute that gives officers the right to take people into custody out of concern for their mental health status?

A. Yes.

Q. What is that statute?

A. I don't have the actual statute I believe in front of me.

Q. Just tell me what does that statute provide for?

A. It provides for officers to take someone into custody in the event that they have reason to believe based on their manners and actions that they're either gravely disabled in a sense where they can't care for oneself, danger to self maybe that they made suicidal overtures or ideations or are a danger to others that they demonstrated a behavior that a reasonable officer

Page 36

acting consistent with standard police practices would determine that that person is a potential danger to others and that could be by way of threats, by mannerisms or actions.

Q. Is a person that's experiencing hallucinations ever not a danger to themselves or others?

A. Sure. I mean, unfortunately if you go to Downtown Boston or LA where I live which is incredibly problematic, you will see people that are yelling and screaming and doing things or acting obviously and no doubt hallucinating, and so not always are they a danger to themselves or others, it's just a manifestation or action based on their mental health condition.

Q. Individuals who are experiencing hallucinations are more likely to get into conflicts with others, is that fair to say?

A. I think that that's fair, ma'am, because once again are they able to discern reality, are they able to discern what you're saying, and they're not quite obviously processing like someone without that mental impairment that they have, and so I think that that's a fair statement.

Q. Would you agree that there's nothing in the records or testimony that indicates Officer Roycroft was

Page 37

trying to arrest Robert Miller?

A. Well, once again I think that when he grabbed him and prevented him from going into the residence that he elevated a detention to an arrest, but once again that's a legal question.

Q. Is it fair to say that detention is the term more commonly applied in situations where criminal activity is involved where a restraint is more commonly used in situations where mental health crises are involved?

A. I don't understand your question.

Q. You define detention in your report and it appears to be related to criminal activity?

A. What times? I mean, if you were going to take someone into custody for a 72-hour hold or a mental health hold and they haven't committed any criminal activity, they're just in danger to self or others or gravely disabled, so you're still detaining them, you must retrain them typically by handcuffing taking them into custody. So, they may not have done anything in the sense of committing a crime other than the fact that they are gravely disabled and you're taking them into custody for their own welfare or that they are a danger to others or self, and most of the time your detention occurs based on someone who has a reasonable suspicion

Page 38

that a crime is occurring or has occurred and they are connecting that person to that activity is the reason for the detention, but there's also times that a consensual encounter based on scope, manner, duration and intensity can be elevated whether that consensual encounter is now elevated into an unlawful detention.

Q. Would you agree that the records and testimony that you reviewed in this case reflect that Officer Roycroft was not trying to or did not try to restrain Mr. Miller until the moment that he suddenly became angry and agitated?

A. And attempted to walk towards his house, yes.

Q. What in the records and testimony that you reviewed led you to believe that Officer Roycroft took offense or reacted in some way to Mr. Miller saying fuck you, I'm not talking to you?

A. I don't believe that I commented on him taking offense at all if that's your question. A sense as in that the purpose of the detention is based on him saying by using profanity, is that you're question.

Q. You base your opinion that Officer Roycroft didn't have reasonable suspicion to detain or probable cause to arrest Mr. Miller on the fact that those words were said to him by Mr. Miller, and I'm wondering what

Page 39

those have to do with your opinion?

A. Well, once again what they have to do with my opinion is that the minute that he says that, you know, fuck you and he's no longer wanting him to be there and he's moving towards his house, I believe at that point Mr. Miller is no longer a consensual encounter at that point, he doesn't want to talk to him any more and told him and directed profanity at him. So, at that point I disagree with the fact that you have a lawful detention by grabbing him based on the fact of him not wanting to talk to you, and so I believe that the actions of grabbing him once again not giving legal opinions, Counsel, is that it elevated to an unlawful detention based on the force to stop him from entering his residence or trying to.

Q. Would you agree that the records and testimony reflect that Officer Roycroft knew Officer Jackson would be arriving to the scene within seconds?

A. I don't know if he said within seconds. I think that he knew based on -- I think that there's testimony that he knew that he was also dispatch to the call.

Q. Do you agree that if someone calls 911 for police assistance, that there's additional urgency to that call?

Page 40

A. There should be.

Q. And if a 911 caller disconnects abruptly without explanation, that that adds an extra layer of urgency to respond to that call?

A. And an extra layer of understanding as to why they hung up when they called 911.

Q. In your experience what should police consider when they have information that a call to which they're responding to was prompted by a 911 call in which someone abruptly disconnected?

A. Well, that's a concern and that happens quite frequently in domestic violence incidents where the person kind of hurried off the phone because maybe the person, the subject or suspect has come into the room and they don't want them to know that they are in fact calling the police and it could also create a question is this person in some type of peril because they had to hurry up off the phone and that would create a question for me as well. So, those two factors is that why did you hang up so quickly which would create what happened before you called which is equally important, and then is that person that called in some type of peril based on the manner in which they called.

Q. Officer Roycroft knew that Ms. Anderson had

Page 41

called 911 requesting police assistance related to Mr. Miller and that she had abruptly disconnected the call and that she appeared to be in fear, is that reasonable for Officer Roycroft to perceive that Ms. Anderson was fearful of Robert Miller?

MR. FRIEDMAN: Objection, you can answer.

A. I think that you asked me this earlier, counsel, and no, once again until you ask her why and what transpired prior to her calling, you could ascertain did he do something to you physically, why did you call, has he harmed you in the past, is he aggressive towards you, is he armed, what's he doing to ascertain because she's there, she has an opportunity and she's out of the line of sight of Mr. Miller at the time, and so he's in the back and so there's plenty of opportunity to find all of this information out. Was she afraid because of what was transpiring, I think anyone that sees a loved one that you're in a relationship with acting bizarre like that is fearful, they're afraid for them, they're afraid of the situation, it's just an awful position to be in. So, I think her calling and asking for the police department to respond to assist her was based on the actions by Mr. Miller and the psychotic break that he was having rather than he was some type of threat

Page 42

towards her, but once again all of that and you could ascertain that by simply asking her when you arrived.

Q. Understanding that, but once he turned the corner and walked on the side of the house, was it reasonable for him to perceive that Ms. Anderson might be fearful of Mr. Miller?

A. Once again, those are questions that could have been asked and answered, but you know this is a situation where you really don't know and you don't know because you didn't ask, and there was an opportunity to do that that was missed. So, I believe that being that he didn't ask and those are the facts in this case and he abruptly went to the back of the house, he has to consider everything, he has to consider if Mr. Miller is armed, he has to consider what's going on today, he has to look and see that he has a guy with no shirt on, sweatpants that's talking to nature, these are all clues and these are all considerations, and when you see that, you don't need to commit yourself any further at that point, you can just reposition yourself, pull back, wait for back up, formulate a plan, debrief Ms. Anderson, and then realize, okay, this is maybe bigger than what I thought it might have been and I need assistance, I need resources, I'm going to request emergency medical

Page 43

services right away. So, in the event that we need to put him on a gurney, we can do so in a manner that he's properly restrained and not in a prone position and to be able to take him to get the medical or mental health treatment that he needs.

Q. Once Officer Roycroft saw Mr. Miller with a relatively calm state, was it reasonable for him to approach Mr. Miller at that time?

A. Counsel, I'm not approaching a 215 or 220 pound man who's shirtless who's having a psychotic break by myself.

Q. My question is was it reasonable, not would you do it?

A. Well, the reasonableness is based on my background, education and training and that's why I'm trying to explain, I don't believe it was reasonable based on the totality of the circumstances.

Q. Based on your review of the records and testimony, how far was Officer Roycroft when he started to talk to Mr. Miller?

A. I don't know the exact distance how far he was, I think that there was an adequate distance when he was initially speaking to him to try to engage in the conversation.

Page 44

Q. Can you give me your best estimation of that physical distance?

A. I don't. Based on the testimony he attempted to engage in the conversation, there was no testimony that he walked right up on him in a manner and started dialogue with him. I think there might have been some separation, but that's being speculative.

Q. Do you agree that physical safety is always a priority over mental health safety?

MR. FRIEDMAN: Objection.

A. That question -- once again everything is going to be based on the totality of the circumstances. I think that someone's physical safety, yes, is more important and then you can deal with the mental health part of it as long as you're safe and in a safe position, but I think they're both equally important, but, yes, I think that someone's physical safety is more so -- I don't want them on the ledge of the bridge if I can call them off and that we can deal with the mental health issues after that.

Q. In your experience was Mr. Miller's yelling on the back porch likely to attract attention from neighbors or other nearby people?

A. Potentially.

Page 45

Q. Is that something that Officer Roycroft should have been considering when he responded to the call?

A. Yes, he could have actually told Mr. Miller that in fact the neighbor called if he was concerned about that, sure. I mean, I think that you have to be concerned about neighbors, but there's no doubt that if someone was able to hear or maybe they know that Mr. Miller suffers from a mental health condition, I don't know, but, yes, community concern should be important for officers.

Q. Would you agree that Officer Roycroft would not have been able to determine the significance of any particular medications that he had learned about from Amy Anderson if he continued his conversation with her?

A. Well, once again I'm not saying that he was going to diagnose if he was on Wellbutrin or Prozac or things such as that that he should have known how he's going to react, but obviously more information is better for officers, and once again you can pull back if you're going to be requesting a crises intervention team or a PAT team and you can provide that information to them or even emergency health responders like EMS provide that information, and so I think that that's important to know if you have an understanding and once again not to

Page 46

diagnose, but an understanding that the episodes may be based on the fact of him not taking those medications for a period of time and he may have learned that in his crises intervention training but once again not to diagnose, but just to give him a better understanding of how Mr. Miller may act and react to any type of questioning for actions by him.

Q. Based on your review of the records and testimony, is it fair to say that Officer Roycroft was aware that EMS or Hyannis Fire Department had been dispatched at the same time that he was to the call?

MR. FRIEDMAN: Objection.

A. I believe so, yes.

Q. Would you agree that if Ms. Anderson's gestures or mannerisms indicated to Officer Roycroft that she wanted him to go check on Mr. Miller that that was an appropriate thing for him to consider?

A. No. I mean, officers are trained and should dictate the way in which tactics are performed, and once again waiting for resources, waiting for EMS, waiting for Officer Jackson is once again you want to have the best plan together that you can with the necessary resources at your disposal, and I don't think people reporting crimes should dictate what an officer's

Page 47

response is to that or a crime or incident should dictate what the officer's response should be, and that's why trained law enforcement officers are responding to the event. Can we take a five-minute break, I just need to use the restroom and come up for air for a minute.

MR. FRIEDMAN: Sure.

MS. GILL: Absolutely. Is five minutes enough.

THE WITNESS: That's great, and give Madam Court Reporter a break.

(Off the record at 2:07 p.m.

(Back on the record at 2:13 p.m.)

Q. Mr. DeFoe, you testified that there's certain information that Officer Roycroft should have obtained from Ms. Anderson before going to check on Mr. Miller, not obtaining that information was a tactical decision that you don't agree with; correct?

A. Yes.

Q. But is it fair to say that his decision not to obtain that information was not any policy violation or violation of any regulation that covers police officers?

A. No, ma'am, and once again tactics are flexible and they are not typically policy driven and they allow

Page 48

the officers some leeway to make those decisions hopefully the right decisions to use proper tactics.

Q. And would you agree that if Officer Roycroft did not have the information that you mentioned and that you believe that he should have obtained from Ms. Anderson, he still needed to be prepared for a spectrum of possible scenarios?

A. Yes, I agree with that.

Q. Why did you think that it was important for him to ask Ms. Anderson who else was inside the residence?

A. Well, I would want to know obviously if there were kids in the house or dogs, if there was anyone that potentially could be -- I would want to know the entire backstory, if there were infants, were there children, animals, anyone that was in harm or was there a crime that transpired and what happened prior to the officers arrival. So, knowing who's in the house is important because if I end up going in the house for some reason, then I want to make sure that there's no one else in the house which could present an officer safety issue.

Q. And it could also present a safety issue from the standpoint of that person being harmed by the mentally ill individual; correct?

A. Yes. I would want to make sure that there was no

Page 49

one in the house and if they were, were they victims of a crime, was there any direct threats by Mr. Miller if we're using this case towards anyone in that house to make sure that they were safe, of course, yes.

Q. Do officers responding to mental health calls always need to form a tactical plan.

A. Always is a tough word, sometimes there's not an opportunity to, but if there is an opportunity like in this case, yes, I think plans typically result in the use of force, and obviously we know that when there's more officers and more of a presence of officers and it's typically a great preventive measure for people that may decide that they're going to attack an officer, assault an officer. It provides additional opportunities for less legal force options, the interchange covering contact officers, there's a number of reasons why, and I think that's important.

Q. Based on your review of the records and testimony in this case, why did Officer Roycroft believe that it was necessary to check on Mr. Miller?

MR. FRIEDMAN: Objection.

A. I don't know the reasons other than the fact that he heard him yelling and it was more of a welfare check to go back there and see if he was okay. I think that

Page 50

that was what the intent was.

Q. Would you describe that as careless?

A. I think it's careless without getting the prerequisite information that you can get from Ms. Anderson waiting for his as we testified to that Officer Jackson is right around the corner, to incorporate EMS into the plan of how you're going to use them in the event that you need to do a restraint, a multiple point restraint system on the gurney. There's a number of things that you want to do in the front end. Once you've ascertained is there anyone else in the house, no, okay, great, so there's no one in peril. Is he there by himself, yes, he's there by himself, okay, so we can slow down at this point, there's no rush to enter the backyard out of line of sight by yourself. It's primarily for both officers and safety, and that's what I'm critical of.

Q. Did you review Officer Roycroft's testimony that he went to check on Mr. Miller because he wanted to ascertain his status?

A. Yes, as I mentioned his welfare status.

Q. Would you agree that Officer Roycroft's tactical plan was to speak with Ms. Anderson initially to check on Mr. Miller and then to circle back with Ms. Anderson

Page 51

for more information?

A. That's what he did, and I don't agree with his plan. I think it was a poor plan.

Q. So, would you agree that he had that tactical plan?

A. No, I don't agree with that.

Q. Why isn't that not a tactical plan?

A. Because a reasonable officer would have actually planned, they would have found out the information from Ms. Anderson and there's no reason at that point to go in the backyard of the residence. I want to find out everything that I can from Ms. Anderson, I want to find out if there's dogs in the backyard, there's a number of things that I want to find out before I walked into the backyard. There was no plan there, there was a failure to plan I believe --

Q. You can -- I'm sorry.

A. Go ahead, ma'am, I was done.

Q. You can create a tactical plan prior to arrival at the scene; correct?

A. You can with the information that you have, but once again if there's an opportunity to get more information because many times what comes out on dispatch like in this case is very, very limited or that

Page 52

information is not in fact true, and so you have a person reporting regardless of the type of call especially more importantly when someone is having a purported psychotic break is that I want to find out everything that I can about that person before I put myself in a position where I need to interact with that person. In addition to that I want to request the requisite resources including additional officers before I make that contact prior to going back there. So, I don't believe that there was a plan, I believe there was a failure to plan in this particular case.

Q. If Officer Roycroft on route to the scene made that plan to speak with Ms. Anderson initially or to speak with the caller initially to check on Mr. Miller and then to circle back with Ms. Anderson or anyone else at the scene for more information, would you agree that that was a tactical plan?

A. Not a prudent tactical plan if it was one.

Q. In any event you agree that that was Officer Roycroft's plan of action?

A. Ma'am, I'm testifying that I don't believe that there was a plan at all here, I believe that there was a brief conversation with Ms. Anderson and then he went to the backyard of the residence. There wasn't enough on

Page 53

the CAD which I'm looking at right now that reflects any information that he would know other than the PR stated that the husband is having a psychotic break, very short on the phone, caller disconnected. So, I don't know he could formulate a plan with that limited information.

Q. Are you saying that it's not possible to formulate a tactical plan based on that information?

A. Well, if the plan would have been I'm going to contact the person reporting and ascertain everything that I can about Mr. Miller, I'm going to wait for backup, I'm going to request additional resources, that would have been a prudent tactical plan, but walking up and having a brief conversation as to where is he and he's in the back, and walking back there is a failure to plan.

Q. So, it's not that you don't believe any tactical plan could have been created prior to his arriving at the scene, it's that you don't agree with the tactical plan that was put in place; is that fair?

A. I don't believe there was a tactical plan put in place to disagree with.

Q. Did you read Officer Roycroft's testimony about what he thought about on the way to 45 Elm Street that evening?

Page 54

A. Yes.

Q. What about that indicates to you that he was not making a tactical plan?

A. Because I think a reasonable officer acting with consistent standard police practices would have known like any other call for services that's not a plan, that's rushing into a situation without planning when there's no need to do that as there's no crime in progress. I mean, after the fact and testimony to say that he had a plan, it's apparent based on his actions that there was no plan and there was an opportunity to formulate a plan many times there are not, this particular case there was clearly an opportunity, you had your best source of information that he never debriefed, he never waited for your backup officers and you rushed without any tactical plan into the backyard and eventually engaged in the use of force all which was unnecessary.

MS. GILL: Howard, can we mark the report of Scott DeFoe as Exhibit 1, the one that I sent over earlier?

MR. FRIEDMAN: You certainly can and if the court reporter has it, that's great.

MS. GILL: I will make sure that you get it.

Page 55

So, that will be Exhibit 1.

Q. I want to talk to you, Mr. DeFoe, about the intervention guidelines in the BPD Policy 1106 and that's dealing with individuals with mental health, are you familiar with those.

A. I have those here and you don't need to put them up on the screen unless you want to.

MS. GILL: Let's mark that as Exhibit 2.

Q. Mr. DeFoe, is it fair to say that looking at the intervention guidelines cannot always take the steps in sequence?

A. Well, I think Step 1 is always something that you should do, you should assess; right, that's the number one thing, and I think hopefully you don't take that out of sequence, and that's by obviously looking and listening as to what's transpiring in front of you as you approach any call for service. You can also make an assessment based on information that you may receive in route to a call, but when you arrive you should quickly assess the situation and then formulate a plan.

Q. And Step 1 is quickly assess and secure the scene; correct?

A. Correct.

Q. What's your definition of securing the scene?

Page 56

A. Well, it depends if there's a crime scene like a homicide and you're going to want to contain it, you're going to want to establish a parameter, an inner parameter and an outer parameter --

Q. I'm sorry to interrupt you, but if you could limit your answer not to a homicide but to mental health calls might be a little simpler?

A. Okay. So, once again you want to find out what you can, you're securing the scene by making sure that no one is in any type of harm or peril that being in this particular case Ms. Anderson, and then you're going ahead and getting as much information as you can from her and then you're going to once you have the information you formulated a plan, you have the necessary resources. You're going to eventually approach in this case Mr. Miller and then securing the scene is going to be depending on what Mr. Miller's actions are or reactions are to the way in which you approach him will be depending on how that scene is properly secured.

Q. So, approaching Mr. Miller was part of -- would necessarily be part of Step 1 securing the scene; correct?

A. It would not be part of Step 1 in this particular

Page 57

case, it would be well after Step No. 2.

Q. Well, I thought that you just said part of securing the scene would be approaching Mr. Miller?

A. I did, ma'am, but I also said that that would be after you properly debrief Ms. Anderson that you wait for additional officers and/or EMS personnel to arrive, and then you approach Mr. Miller once you have those resources available. I wouldn't approach Mr. Miller initially with EMS being paramedics, I would approach with the necessary number of officers that were available which typically would be a minimum of four. If you're going to approach Mr. Miller, once again based on the information that Ms. Anderson provides to you and the scene is not going to be secured until Mr. Miller is either taken into custody for if there was a crime or for a danger to self or potentially being gravely disabled.

Q. So, in this instance you believe that the appropriate approach would have been to perform Step 3 before securing the scene in Step 1; is that fair?

A. Part of Step 1 is quickly assess and then I'm going to request a backup into Step 2, so they are on their way and we know that that's already happening in this case, and then as I'm waiting for my backup going

Page 58

to perform Step 3.

Q. So, again tell me how Officer Roycroft should have secured the scene in this situation at this call?

A. Well, the only concern, ma'am, in this particular scene once you determine that there's no other people in the house other than Ms. Anderson is that it's secured at that point. She's secured, she's not going to be in harms way and you may want to establish -- you're going to establish a team of officers that are going to go and approach. Once he's in custody, then the scene would be secured. If that's going to be the direction that you're going to take. You may determine that he doesn't need to be taken into custody, that he's not a danger to self or others and maybe it might be just getting a clinician on the phone or coming to the house or getting wherever his provider may be to get him back on his medication, but if you are going to take him into custody, it would be to formulate a plan, approach him, and once he's in custody then officers are going to say typically say Code 4 or the scene is secured depending on the codes that a respective law enforcement agency uses. So, it would only be once he's in custody or his situation is stabilized would the scene be secured.

Q. And that would be Step 1; is that correct?

Page 59

A. It would be part of Step 1, assess, request backup, derive information from Ms. Anderson, wait for backup to arrive, formulate a plan, go to Mr. Miller and either take him into custody which would ultimately at that point secure the scene.

Q. So, is it fair to say that the scene was never secured in this situation?

A. It was secured once he was obviously taken into custody it was secured at that time because there was nothing else to secure. Once again I'm assuming that the area needs to be secured as well to conduct an investigation, and so at the point in which he was taken into custody and he was unconscious at that point is where the scene was secured.

Q. And when you read these intervention guidelines, is it apparent to you that the quickly assessed part of this guidelines which is in Step 1 is different from Step 3 which is ask questions to learn as much as possible?

A. It's different because you're quickly assessing, you're looking at is there a situation where someone -- is there a crime in progress. So, if there's a crime in progress then obviously you're not going to stop at that point and debrief anyone, you're going to stop that

Page 60

person's behavior, and it doesn't apply to the facts in this case. So, you want to assess to make sure that everyone is safe that you don't need to provide immediate intervention techniques or tactics and once you realize, okay, we don't need to do that, then we can slow down, create time and distance, formulate a plan and then use proper intervention techniques.

Q. So, the information that you have opined that Officer Roycroft should have gotten from Ms. Anderson, that's truly described in Step 3; correct?

A. That and Step 1. Once again it depends on how quick that you assess, are you safe, yes, is anybody else in the house, no, are there any guns, no, are there any dogs in the backyard, no, okay, that's a quick assessment of the scene, that's my quick assessment because now I know that there's no on in peril. Then I'm going to slow things down to now because I know that there's no weapons, no one is in peril, Ms. Anderson is okay and there's no one else in the house, and now I can once again use time and distance for the officers benefit to formulate plan?

Q. But looking at the wording of Policy 1106, the information that you believe that Officer Roycroft should have first obtained from Ms. Anderson is

Page 61

described in Step 3?

A. Three and one. When I say quickly assess, I may not know what's going on because I can't see in the backyard and so my assessment may be a quick series of questions, not very longwinded like I am at this depo, but a quick series of questions where I'm finding out where is he at, is he armed, is anyone being harmed, what's going on and that's the quick assessment of the situation, and that would be in Step No. 1 if we're looking at this table or chart. Then I'm going to obviously be involved in the Step 2 which is already transpiring based on the facts in this case, and I'm going to go to Step 3 and slow things down because none of those questions that I ask in Step 1 apply to the facts in this case, he's not armed, no one is in peril, he's by himself, he's in the backyard and he's experiencing a psychotic break.

Q. Once Mr. Miller's demeanor suddenly shifted, is it your opinion that even knowing that Ms. Anderson was in the house, Officer Roycroft should have let Mr. Miller go back into the house?

A. Yes.

Q. Why is that?

A. He hasn't committed any crime, there was no crime

Page 62

at this point.

Q. Based on the records and testimony in this case, you're aware that Officer Roycroft knew Ms. Anderson was in the house, knew that she was fearful, did not know the reason behind her fearfulness, called 911 for assistance and hung up, knew that Mr. Miller's demeanor has shifted suddenly to anger and knew that Mr. Miller was dilutional, despite all of those factors, you still believe that Officer Roycroft should have let Mr. Miller return into the house with Ms. Anderson?

MR. FRIEDMAN: Objection.

A. Yes, I don't believe there's any lawful reason to detain him at that point based on the fact pattern that you just identified.

Q. If Mr. Miller had been allowed to go into the house alone, would you have the opinion that Ms. Anderson might be in danger?

A. No. Once he went into the house, I would work my way to the front of the house and I would make contact with Ms. Anderson. I wouldn't have left her to start out with by herself and then I would have her step out of the house, and once again being that I didn't get the information that I should have gotten in the front end, I would now get on the back end, now he's contained

Page 63

inside of his house, he's not going anywhere, pull her outside of the house and debrief her, and once again slow things down at that point.

Q. There's nothing in the records and testimony that suggest to you that Officer Roycroft had Mr. Miller's cellphone number; correct?

A. No, not at that time. I think that if he did possess a cellphone obviously Ms. Anderson would have that number, I would hope.

Q. And there's nothing to reflect that Officer Roycroft had a bullhorn?

A. Maybe not at the time, but that's a simple request on the radio.

Q. Even though Ms. Anderson had called 911 for help and then hung up, do you believe that Officer Roycroft should have let Mr. Miller go into the house?

A. Yes, he didn't commit a crime.

Q. And then if he did and would not come out, do you believe that it would be appropriate for Officer Roycroft to leave the area?

A. No, I think at that point and Officer Jackson testified to this as well being part of the Regional SWAT Team and me being a former supervisor of a SWAT team as well as a supervisor of our crises negotiation

Page 64

team is that we can assume based on this information that we received from Ms. Anderson that he may be a danger to greatly disabled where he's unable to care for himself based on his comments and actions. So, at that point there would have to be a decision made, are we going to walk away from this, and that would be more at command level not at an officer level, or are we going to treat it as a barricaded subject which would be to deploy the Cape Cod Regional SWAT team with their crises negotiation component to try to obviously establish dialogue and have him come out of the house and then obviously submit to arrest based on his mental health condition, not based on any crime that he may have committed?

Q. Why would it be appropriate for the SWAT team to get Mr. Miller out of the house if you didn't want to come out of the house and no crime had been committed?

A. Well, ma'am, I can tell you from responding to hundreds of SWAT calls working as a supervisor on a full-time SWAT team, we responded to barricaded and/or suicidal subjects that were a danger to self, gravely disabled because they could not care for themselves and so we would obviously use tactics to hopefully negotiation tactics to principles to establish dialogue

Page 65

to have that person come out of the house, and if they wouldn't then we would make the decision that if we were going to use a more provocative tactic to either enter the house or use some type of chemical arrogant to have that person come out of the house and not because they've committed a crime, but more so for their own welfare that they are no longer able to care for themselves based on the information received from Ms. Anderson.

Q. Do you agree that there's nothing in the records or testimony that suggest that SWAT was available to respond to that call on that evening?

A. SWAT wasn't requested that evening, but typically the reason why they have an eight city multiple jurisdictional SWAT team is to be able to respond at 7 p.m. at night to these types of calls, and obviously Officer Jackson testified to that as well. This is the reason why SWAT teams exist not only for barricaded subjects who may have committed a violent crime with a firm arm, but also people who may be suicidal or may be gravely disabled and you use the extraordinary tactics that SWAT trains on to reduce the incidents of any type of force.

Q. Would you agree that there's nothing in the

Page 66

records or testimony to suggest there was a crises negotiation team or crises negotiation team supervisor who was available to respond to the call?

A. Once again there was no request based on my reading of the records and typically when you request SWAT and I can speak personally is that you're going to get a negotiation component that's going to respond out because the objective initially is to establish dialogue to have that person come out.  So, your SWAT team shouldn't come out unless they have a negotiation component that comes out with them to try to use words to influence behavior before there's any type of physical intervention or tactics that are used.

Q. You would agree that this particular call to 45 Elm Street was not a SWAT call; correct?

MR. FRIEDMAN:  Objection.

A. Initially, no, but based on the scenario that you hypothetically asked me in the event that he barricaded himself in the house and Ms. Anderson was outside of the house, based on the information that was received by Ms. Anderson, a decision would be made if based on his actions, off the psychotropic medication, did they believe that there's a potential that Mr. Miller could be gravely disabled, unable to care for himself, then

Page 67

the decision would have to be made by typically at a command level which it typically is if they're going to utilize or deploy a SWAT team to try to use once again words and actions to influence his behavior.

Q. I apologize if I've asked you this already, but do you agree that it was not an excessive use of force to follow Mr. Miller closely as he approached the house?

A. There's no force at that point and once again excessive use of force is clearly a trier of fact issue. So, I'm saying was the force reasonable or not based on the totality of the circumstances, but, no, following someone to their house is not any force.

Q. The hold technic that Officer Roycroft applied to Mr. Miller, that was not specifically prohibited by Barnstable Police Department policy or any other regulation; correct?

A. Once again, prohibited, you know, depending on the circumstances officers can use both holds and control holds and other type of lessening force options that may not be part of something they were trained on depending on totality of the circumstances with the caveat that typically law enforcement agencies don't train on holds -- only train on holds or should only train on holds that are effective and we know in this

Page 68

case no one had even heard of the seatbelt hold in their department and testified to such.

Q. Have you heard of the seatbelt hold prior to reviewing the records in this case?

A. No.

Q. Just the hold that Officer Roycroft applied is not a specifically trained maneuver doesn't mean that it was a violation of policy; correct?

A. Once again, if that hold resulted in any type of restriction on Mr. Miller's ability to breath even purported in your expert's report under 550CMR6.03 then it would be restricted if by the manner in which that hold was applied as demonstrated in Exhibit No. 17 in this case of Roycroft's deposition transcript, there's a real problem with the way in which that hold is being applied if in this case as both Mr. Miller and Mr. Roycroft fall to the ground based on arm positioning specific the right arm of Officer Roycroft when in fact he did fall to the ground in a very confined space within that residence.

Q. But there's nothing in the records or testimony that reflects that there was pressure applied specifically against Mr. Miller's neck by Officer Roycroft's arm; right?

Page 69

A. Right, there's no testimony to that.  No, I'm saying that based on that hold and based on the close space and based on the size of Mr. Miller and Officer Roycroft in that very confined space, there's a problem with that hold by the mere fact that you're arm is going to pin underneath that subject, that being Mr. Miller, and his arms are going to be pinned because when people fall forward what they do is they put their arms out to brace their fall which is subsequently going to put his arms underneath him which is going to restrict his ability to even give his arms up for handcuffing, and in addition to that based on where that arm could be, it could clearly transition and I'm not purporting, but the concern with this hold being that you asked is that the arm could easily slip into a point where it's pushing up against the hyoid bone to potentially carotid neck restraint or in some way restrict the breathing based on where the arm is on that neck when in fact they both land on the ground.

Q. But there's nothing in the testimony or records to reflect that that actually occurred in this case; right?

A. Well, what was testified to, ma'am, is that he was not able to get his arm out, he couldn't get his

Page 70

arms, his arms were pinned underneath, and so it does make sense as to what I stated in the fact that the position of falling forward there with once again Mr. Miller bracing himself as we all would when we fall forward is going to pin his arms underneath his body and preclude him from being able to surrender his arms for the purpose of handcuffing and even with that, you couldn't apply a handcuffing technic based on that type of hold because you couldn't put the hands in the small of the back, and you're clearly not going to handcuff him to the front. So, the hold in itself restricts the ability to even effect the handcuffing technic or the ability for subjects such as Mr. Miller to even comply with officers directives to be able to produce his hands.

Q. What's your impression as to when Officer Roycroft's arm became trapped?

A. Once he fell to the ground on top of him his right arm was trapped underneath Mr. Miller's body which would make sense based on the fact that Mr. Miller's chest being pressed on the ground and then the body weight of having Officer Roycroft on his back.

Q. So, when his right arm became trapped under Mr. Miller's body, is it your impression that his left arm

Page 71

was free at that time after the fall?

A. I'm not purporting that at all. He maintained that hold and would not be free or would be able to get his arm out from underneath that. So, once again, I don't know if that question was ever asked, in fact I know that it wasn't, but I don't know if he could adjust his left arm eventually and was able after the two distraction strikes I believe by Officer Jackson they were at that point able to affect a handcuffing technique?

Q. Would you agree that the hold that Officer Roycroft applied is an empty hand technique?

A. Once again, a control hold empty hand technique, those are typically used as the synonymous and once again that particular hold is not any hold that I've ever seen due to the fact that it has significant weapon retention issues with that particular hold with the subject, and so I know that we would never train on that particular hold for any reason. It would be considered empty hand because it's not strikes, and so, yes, it's an empty hand control hold to try to subdue a subject is what I believed the intent would be if you were going to apply this hold.

Q. And based on your review of the records and

Page 72

testimony, did Mr. Miller actively resist Officer Roycroft and Officer Jackson's attempts to restrain him?

A. I think that the resistance was predicated on ability to intent to breath and it's basically called the basic physiology of the struggle whereas weight is applied to the back responsive to the weight applying to the back is to create space between the ground and the subject by doing so the officers perceive that as being resistance but in fact the person resisting an attempt to breath and the officers response to that is more body weight and that game is played until the person goes unconscious.

Q. So, is it your opinion that Mr. Miller was not actively resisting restraint at any point up until his death?

A. I think that based on his position that he could not free his arms even if he wanted to, and secondly I think based on the testimony that I reviewed and the position of the bodies and my background, education and training on the probably 60 or so positional and/or compressional restraint cases it appears based that the resistance was predicated on the resisting and attempt to breath.

Q. When did that resistance start in this process

Page 73

during that call?

A. Once again, if you look at the time in which they went to the ground, so it was a period of the time that Jackson is on scene here is a loud crash which is at 19:10:36 up until the point medical is called which is going to be between 19:11:52 and 19:12:58 and so the entire event was three minutes and thirty seconds is when the duration of the event. So, the timing of the resistance to breath once again according to Amy Anderson's version of the facts, she stated just prior to handcuffing which she believes in the middle of the event is what she stated that she heard Mr. Miller state that he can't breath and he needed help is what she stated in the middle of the event, and so that would put it at the middle and a half mark or so.

Q. Was Mr. Miller's push back from the table against the slider, wasn't that active resistance?

A. Yes.

Q. And at that point the hold had just begun, is that fair to say?

A. Well, the hold was already applied. So, when he pushed back as a response to being grabbed, yes, that could be perceived as active resistance, and so once again I'm not purporting that it's a lawful use of

Page 74

force, that's a trier of fact issue and so would the resistance be reasonable based on the totality of the circumstances, that being by Mr. Miller being the fact that he was grabbed as he was entering his house.

Q. So, you don't have any opinion as to whether or not that was an excessive use of force at that moment; correct?

MR. FRIEDMAN: Objection.

A. I don't believe any force was necessary in this case, Counsel, but the ultimate trier of fact the word excessive is something that I'm not going to ever purport in testimony or in a report and that is a trier of fact issue. Was the force reasonable, I do not believe that it was based on the totality of the circumstances at any point in this case.

Q. Based on your review of the records and testimony, was there any indication that Mr. Miller could not breath at the time that Mr. Miller slammed back against the slider with Officer Roycroft at his back?

A. No, and if the hold was applied in the manner in which and I'm not making credibility at all in this case, but if the hold is applied based on the manner in which Officer Roycroft purported, no, there would be no

Page 75

pressure on the neck, there would be nothing to restrict any breathing at all when you're still in the standing position not until the situation went into the prone position in a confined space I believe at that point would be the time in which breathing could be restricted, but again I'm not offering medical opinions either in this case.

Q. And it's your opinion that breathing can be restricted because both of Officer Roycroft's arms are still around Mr. Miller while they are on the floor?

A. Well, there's a number of things and in this case I think it's positional and compressional, and so you got a tight space with two men obviously Mr. Miller as well over 200 pounds, 220, 230, 214 I think is what the original number is, and then we have another officer that being Officer Roycroft I believe is 6 feet 195 without equipment on and so put that about 220, 215 with all of his equipment on top of the back at that point in a very tight position based on the logistics of the house.

Q. And based on the positioning of Officer Roycroft's arms underneath Mr. Miller?

A. That and/or a compilation of the weight on the back with the potential once again I'm not purporting

Page 76

any medical opinions of the positioning of the right arm if in fact it was positioned where it did not allow or restricted Mr. Miller's breathing in any manner based on the positioning of the right arm based on that hold that was applied by Officer Roycroft.

Q. Would you agree that Mr. Miller's slamming of Officer Roycroft against the slider door was assaulted behavior?

MR. FRIEDMAN: Objection.

A. No, it never rose to the level of assault even based on their own policy.

Q. What do you base that statement on?

A. Well, it states obviously and they talk about prefight indicators and the officer perceives any subject is preparing to assault, is currently assaulted or assaulted the officer or another person with force that will not cause serious injury or death. I think in this particular case is that he's not doing anything assaulting, he's doing something to stop from being grabbed and I think that's an act of resistance more so than it is assault where it's an intentional provocative type like a strike or an offensive measure rather than a defensive measure which I think that it was in this case.

Page 77

Q. So, it's your position that Mr. Miller's push back and slamming Officer Roycroft against the slider was a defensive action?

A. Once again we can't ask Mr. Miller if his intent was to stop from being grabbed because once again he's mentally ill and doesn't want to be touched and his response to that is if he feared or tried to get him off of him, then it would be an act of resisting. If his intent which I don't know of and I can't speculate as to was to somehow harm the officer by slamming him back to the table, then it would be assault.

Q. Mentally ill individuals can be assaultive; right?

A. Yes, ma'am.

Q. And the records and testimony indicate that Mr. Miller kicked and swiped at both officers; correct?

A. I don't remember reading that that there were any kicks or swipes at all from my review of the testimony.

Q. Is it dangerous that Officer Roycroft's arm was trapped underneath Mr. Miller?

A. Dangerous for who?

Q. Dangerous for Officer Roycroft?

A. Well, it's poorly position, yes, I would be concerned about my arm trapped and that's why this

Page 78

particular technique is not taught in the Barnstable Police Department nor in my former agencies where I worked for that very reason because if you go to the ground, you're going to trap your arm and I would be concerned with my arm trapped underneath someone, yes.

Q. And you would be concerned with your own safety in that instance; right?

A. Yes, I want to be able to use both of my right and left arm if I'm a police officer, yes. If my arms are trapped and it restricts my ability to do certain things, and so I would be concerned about my safety, yes.

Q. Is it fair to say that Officer Roycroft with his arm trapped under Mr. Miller was similarly concerned about his own safety?

A. Once again I don't know if he was similarly concerned which once again goes to why apply the hold in the first place --

Q. Let me rephrase that, I asked a bad question. Is it fair to say that with his arm trapped underneath Mr. Miller, that it would have been reasonable for Officer Roycroft to perceive that he was in danger?

A. No, I don't think that there's any danger there, it's just the fact that you don't want your arm trapped,

Page 79

none of us do. The fact that you're in this position and you're on the ground and the idea and Mr. Miller's arms are underneath him, and so all of this stuff about him being able to grab a golf club and swing it in that position is I don't want to use the word nonsensical, but impractical or improbable or impossible actually to be able to do that from that position, but you don't want your arm trapped underneath someone if you can prevent it and that's why these types of holds should be applied when taking someone to the ground either intentionally or unintentionally.

Q. And you don't want your arm trapped underneath a subject because why?

A. Well, for one if the arm is trapped -- well, the ultimate objective should be if someone is in a prone position is to effective handcuffing technique. If my arm is trapped it's going to obviously potentially restrict my ability to free my arm up so I can apply a handcuffing technique at that point, and so that's why it's critically important to not apply holds like this and to have a partner officer who's there if you're going to use force so you can apply the handcuffing technique without your arm being trapped underneath someone's body.

Page 80

Q. But you testified just a couple of minutes ago that you would be concerned about your safety if your arm were trapped underneath a subject. So, was it reasonable for Officer Roycroft to perceive that he was in danger because his arm was trapped underneath Mr. Miller?

A. Well, that's a different question. In danger to being concerned is different. So, I'm going to be concerned with my arm trapped and I'm going to try to free my arm to be able to effect a handcuffing technique or transition to another force option and I can't do that if it's underneath the person's body, but perceiving danger at that point I think that it's more that I just want to free up my arm. I might not be in any danger based on the positioning because there's no information that he has an object in his hand, there's no information that he's armed with a weapon, he's shirtless. I do want to free my arm up, but I don't know if I'm in danger at that point, Counsel.

Q. You're wrestling with the subject and your arm is trapped, is it your testimony that the only reason why you want your arm free is so you can effect a handcuffing technique?

A. Well, not only, but that should be the objective

Page 81

for anyone when you're trying to take someone into custody is quickly as possible to effect the technique and put that person in a seated, standing or incumbent position without delay, but, no, I want to be able to protect myself, I want to be able to transition to another force option if I need to and I want to and no matter what that force option may be and I can't do so if my arms are pinned underneath someone else's body.

Q. Is it fair to say that that becomes more of a concern when that subject is actively struggling with an officer whose arm is trapped?

A. Well, if that person is struggling because of the body weight that's on his back and the arm could potentially be around the area of his neck, he's in a confined space with two grown men that are over 200 pounds each, the struggle as I mentioned and testified to earlier would be the struggle to breath, not the struggle to resist or assault the officer.

Q. Are you saying that Officer Roycroft and Mr. Miller were not engaged in a physical struggle?

A. No, I believe clearly there was a struggle on the ground, yes, they were both on the ground and Officer Roycroft was on his back at the time. So, yes, there was a struggle and the struggles may have been different

Page 82

obviously Officer Roycroft might have been struggling to try to handcuff hopefully and Mr. Roycroft may have been struggling to breath.

MR. FRIEDMAN: So, Mr. Roycroft was struggling to breath?

THE WITNESS: Mr. Miller pardon me.

MR. MILLER: Also when you say he sometimes it's hard to tell who you're referring to.

THE WITNESS: I apologize, that would be Mr. Miller struggling to breath.

MR. FRIEDMAN: Counselor, do you want to take a break at this point or --

MS. GILL: No, I just have a little bit more. If you don't mind, let's just push through.

Q. At some point Officer Jackson arrived on the scene, and what's your first criticism of Officer Jackson's conduct?

A. I think probably failure to recognize the positioning. I think that when he first responded that he realized that they were in a confined space and he observed Officer Roycroft on top of Mr. Miller's back when he arrived and obviously he observed Mr. Miller twisting his torso. He observed both of Mr. Miller's arms underneath his torso. So, my initial and I think

Page 83

the request to use the taser which Officer Roycroft stated, no, don't use a taser to Officer Jackson, and I think that that was a consideration to use the taser and obviously drive-stun mode rather than dark or probe mode was a consideration and I think based on --

Q. I'm sorry, was that a criticism that you have of Officer Jackson to ask if he should use the taser?

A. No, I don't, I think that that was reasonable. He just arrived and he didn't know what he had, and I think that that was a reasonable request should he use the taser, deploy the X26 taser, I think that that was reasonable.

Q. And so it was reasonable to consider use of the taser at that point?

A. Only in drive-stun mode based on what Officer Jackson's observations were, not in probe mode because you could not achieve neuromuscular incapacitation due to distance which you need at least a four inch spread, so proximity would not allow you to use that taser effectively other than in compliance mode which would be in a drive-stun mode and that's, D-R-I-V-E, stun mode. I think the use of distraction strikes to effect the handcuffing technique based on what Officer Jackson knew at the time I think were reasonable based on the

Page 84

totality of the circumstances. I think the use of distraction strikes to the abdomen and rib area not knowing what proceeded that, but would be reasonable to loosen up the arms to be able to effect the handcuffing technique.

Q. So, what's your criticism of Officer Jackson and where do you say that you find the use of force was unreasonable?

A. The issue with Officer Jackson that I have is that the position of Mr. Miller at the time of you can see that Officer Roycroft is on his back, he can see that they're in a confined space, officers have a duty to intervene if they reasonably believe that the force is such that could create, that would be unreasonable based on the totality of the circumstances, and so I think at that point is to ensure as quickly as possible that you get Mr. Miller handcuffed in a seated or standing position is what he should have been concerned with.

Q. In your estimation how long was the struggle on the floor between Mr. Miller and either of the officers?

A. It appeared to be and it's tough to really discern, but the times and once again at scene time so we know that there's some variation as to time in which

Page 85

people get at the scene. He's at the scene at 19:10:36 and he hears a loud crash and then rescue is called at 19:12:58 between 19:11:52 and 19:12:58, and so it's going to be in between from the time that Jackson gets on scene to the crashing maybe two and a half minutes or so.

Q. How long in your estimation based on your review of the records was pressure applied to Mr. Miller's back?

A. It would have been right at the point of two and a half minutes because once again that being the far end of the time in which they requested medical and so right around two and a half minutes, two minutes and fifteen seconds, two minutes and thirty seconds in that range because they go to the ground when he hears a loud crash, and at that point we know Officer Roycroft is on top of Mr. Miller at that point.

Q. So, your opinion is based on an approximate two and a half minute period of consent pressure to Mr. Miller's back?

A. It appears to be that time, about two to two and a half minutes on the spectrum of time on his back.

Q. Would you agree that there's nothing in the records or testimony to suggest that there was any

Page 86

pressure on Mr. Miller's back that continued after he was on the ground handcuffed and in a prone position?

A. Yes, I agree with that based on the officer's testimony, yes.

Q. Do you also agree that based on the officer's testimony and Ms. Anderson's testimony that any pressure applied to Mr. Miller's back was purely in the context of the physical struggle?

MR. FRIEDMAN: Objection.

A. Yes, once they got onto the ground is when the pressure was applied.

Q. And you would agree that the records and testimony in this case reflect that Officer Roycroft immediately attempted to get Mr. Miller up off of the floor after he was handcuffed?

A. Yes, I think that once he was handcuffed they saw that he was nonresponsive at that point, and I don't think there's any question as to or based on their testimony and Ms. Anderson's testimony that they immediately started with medical intervention.

Q. And you have no criticisms of either of their conduct after the point in which Mr. Miller was handcuffed; correct?

A. No, I think the beginning of chest compressions

Page 87

by Roycroft and then eventually by Jackson and then utilization of the ambu bag or valve mask was reasonable. I think the reasonableness of using the AED and following the instructions of the AED was appropriate in this case until EMS arrived.

Q. So, all of your criticisms related to Officers Jackson and Roycroft relate to the period of time before the handcuffs were applied; is that fair?

MR. FRIEDMAN: Objection.

A. Yes, and that's primarily with Officer Roycroft.

Q. Okay. And your criticism of Officer Jackson if I could try to summarize it for you is that he didn't recognize and intervene when he should have reasonably perceived that there was a positional -- it was a danger positional asphyxiation, is that fair?

A. A positional and/or compressional based on the location as well as the body weight on top of Mr. Miller by Officer Roycroft.

Q. You don't have any medical training and I think that you even testified earlier today yourself that you can't offer any medical expert opinions on any of the medical issues in this case which is Asphyxia or how a person's body or position might impact how they respond to pressure applied to them; correct?

Page 88

A. Not ultimate medical opinions, but I've attended obviously a lot of courses and training on positional asphyxia, compressional asphyxia. I've attended the Excited Delirium Instructor School, a former taser, the use of force instructor, Less Force Instructor, Defensive Tactics Cadre Instructor. So, once again those come with extensive training on compressional and positional asphyxiation not to put weight on the back, to be mindful of any restraints that might impact an individual's ability to breath, but ultimate medical conclusion as it relates to autopsy and things such as that. I've attended the agonal, A-G-O-N-A-L, breathing course which is for first responders to identify where people say that they can't breath and they very well may not be able to breath and the fact that they can say that may not be based on the fact that they can breath but in fact that they cannot breath.

Q. Just a couple more questions and I will be done. What was the first instance of unreasonable use of force by Officer Roycroft in your opinion?

A. The minute that he grabbed him, there was no reason to initiate the altercation or to attempt to grab him to prevent him from going into the house. I think that he escalated a consensual encounter to an unlawful

Page 89

detention at that point.

Q. Do you agree that after an individual is up against a table seemingly foraging for something if the officer behind him cannot decipher whether or not that individual has gotten something in their hands and it's reasonable for that officer to allow for the possibility that that person might have something in his hands?

MR. FRIEDMAN: Objection.

A. I don't understand the question. If they see someone attempt to grab something, I know the word foraging has been used a lot in this case, they're either grabbing something or they're not, and if they're trying to grab something the officer has the right and responsibility to use reasonable force to prevent object and/or maintaining if they in fact did grab it, but there's no information at any point that Mr. Miller had an object in his hand, was trying to grab an object. There was discussion regarding golf clubs on the floor in close proximity which based on the hold in itself would have prevented him from doing that once he was on the ground.

Q. In this case is it fair to say that Officer Roycroft didn't know whether Mr. Miller had anything in his hands after being up against a table foraging for

Dunn Reporting Services, Inc.
617-422-0005

Page 90

something?

A. Well, ma'am, based on the position of the hold which is clearly identifiable in Exhibit No. 17 of Officer Roycroft's deposition transcript and you can clearly see it there would be something in his hands. I mean, if he had grabbed something, a golf club or an item off the table which there's no testimony that he ever did that, but your officers are trained to watch the hands and that's the number one thing that you're trained to do. So, if he were to grab something, he's in the position behind him to be able to see that in fact that there was something in his hands which don't apply to the facts in this case.

Q. On what do you based your opinion that Officer Roycroft would have been able to see whether or not Mr. Miller would have something in his hands if he's standing behind Mr. Miller?

A. Well, based on the hold that he had, if you look he had his torso pressed up against Mr. Miller's back and Mr. Miller's arms are in front exactly where you can see where his arms are. So, if he's reaching for, grabbing in possession of something, that's where you're concentration would lay as an officer is to watch the hands or it should be and you would be able to see if he

Page 91

acquired something or picked up something or was attempting to pick up something or retrieved something, you would be able to see that because right behind him with your chest pressed up against his back and in a position to see.

Q. Can people conceal weapons in a closed fist?

A. Can they conceal weapons in a closed fist, yes, they can.

Q. And if Officer Roycroft could not see Mr. Miller's open palm, was it reasonable for him to allow for the possibility that Mr. Miller had gotten something off the table that could injure him or somebody else?

A. I think once again based on the position that he would have seen him do that. I know there was talk about scissors which he would not be able to hide in his hand, golf clubs couldn't hide it in his hand, the shaft of a golf club couldn't hide it in the palm of his hand. So, once again if you're watching the hands, you should be able to see if someone retrieve something or not. If they have their hands clenched in a fist and you don't know, then of course you should be concerned with that if they've done that, but I don't believe that it applies to the facts in this case.

Q. If they have their hand clinched in a fist and

Page 92

the officer and in this case Officer Roycroft doesn't know whether or not Mr. Miller has a concealed weapon, it would be reasonable for him to take precautions or measures to insure that he or anyone else was safe from harm?

MR. FRIEDMAN: Objection.

A. Well, if he reasonably believed based on the totality of the circumstances, once again he's in a position to see because he's right behind him with his chest pressed up against him and he does not know that he obviously should use preventative measures to ensure that if that person did arm themselves that they could not be a threat to the officer or anyone else.

Q. And that includes restraining the individual and handcuffing them; correct?

A. Restraining is a unique word and restraining him on the ground with body weight on the back, I don't believe. Restraining him and controlling his arms or hands to be concerned if there's something in there to effect the handcuffing technique, I agree with that.

Q. You have the opinion that Barnstable Police Department should have trained Officers Roycroft and Jackson on the subject of excited delirium; is that correct?

Page 93

A. Yes, I think it's something now with officers is typically talked throughout the United States and obviously we know in the pathologist report there was a mention of excited delirium and it's a term that obviously many of us have been taught based on a subject's actions, based on potentially being under the influence and/or mental health episode and the proper tactics and force options to use if you reasonably believe that someone is experiencing excited delirium.

Q. How do you believe such training would have factored into the events of this case had Officers Roycroft and Jackson received?

A. Well, once again it involves typically sudden death of an individual, and once again it may be based on trauma, it may be based on body weight, positioning, it's typically you're going to see that with someone who's on maybe a C&S central nervous system stimulant like methamphetamine. Once again the training is according to the training that I received is that if you reasonably believe that you should immediately put that person into a seated, standing or a recumbent position due to high core body temperature and other things that this person may be exhibiting.

Q. If that subject is noncompliant, would officers

Page 94

have been permitted or would have been reasonable for officers to use force to get the individual into that position for their own safety?

A. They could use reasonable force to overcome resistance, prevent an escape or effect an arrest.

Q. Last question, Mr. DeFoe, did you appear on a video Podcast called Cleared Hot?

A. That Podcast is haunting me right now. Yes, ma'am, I have and it's the second time in two weeks and it's the Podcast that I shouldn't have went on, yes, and Cleared Hot and Andy Stump is a former Seal Team 6 navy veteran invited me onto his Podcast in Montana about six or seven months ago.

Q. Is there anything that you said on that Podcast that was not true?

A. It's a Podcast and is supposed to have some form of entertainment, it wasn't a documentary and so there were some things that I said in slight that were kind of trying to be somewhat entertaining and that it could be taken out of context and looked at and dissected, but, no, it was a conversation that I had with a veteran on my law enforcement career and my work as an expert.

Q. It was a great Podcast. Is there anything that you said that was untrue on that Podcast?

Page 95

A. Knowingly untrue, no. I mean, I agree with what I stated in the Podcast. I mean, I made some craft comments regarding an off duty fight that I had thirty one years ago and tried to play that a little and it may have come off as being not sincere about my actions and other than that, yes, it was two grown adult men having a conversation, and so it wasn't a documentary and it wasn't a deposition, it was a conversation.

MS. GILL: Sure. I don't have any other questions for you.

MR. FRIEDMAN: I have some. First let me see if I can share my screen.

CROSS EXAMINATION

MY MR. FRIEDMAN:

Q. Can you see this?

A. Yes, sir.

Q. Can you see that this is a training history up at the top and it's for Sean Joseph Roycroft?

A. Yes.

Q. And the second from the bottom do you see that he had training police interactions with persons with mental illness Part 2, January 10th of 2019?

A. Yes.

Q. What would you expect would be part of that sort

Page 96

of training?

A. Once again I think hopefully there was a Part 1 proceeding it, and once again typically deescalation diffusing techniques, how to use words influence behavior, and I think that our homeless population as we know in every city has increased significantly and so interacting with those who may be mentally ill, maybe experiencing a mental crises, maybe self-medicating with illegal substances in lieu of psychotropic medication, develop strategies to approach those people and for officer safety as well as community safety.

Q. Now let me ask you, I'm sure that you're familiar with these factors. At the moment that Officer Roycroft first grabbed Mr. Miller's hand, what would you say would be the severity of the crime at issue?

A. There was no crime.

Q. And at that point did Mr. Miller pose an immediate threat?

A. No, he was walking away from the officer.

Q. So, I guess the final factor, was he actively resisting or trying to evade arrest by flight?

A. No.

Q. What you've seen at any point was Mr. Miller told that he was being arrested?

Page 97

A. No.

Q. Is there any evidence that Mr. Miller intentionally struck any police officer?

A. No.

Q. And fair to say that this call was a service call for someone with mental health issues; correct?

A. Yes.

Q. And the ultimate goal for the police officer would be to provide help and preserve life; correct?

A. Yes.

MR. FRIEDMAN: I have no other questions.

MS. GILL: All right, thank you very much, Mr. DeFoe.

MR. FRIEDMAN: Thank you. I would like only electronic and a mini, HFriedman@civil-rights-law.com.

MS. GILL: I will take the same order, thank you.

(The DeFoe Report was marked as Exhibit No. 1 for identification.)

(The Mental Illness Policy 1106 was marked as Exhibit No. 2 for identification.)

(Deposition concluded at 3:31 p.m.)

Page 98

CERTIFICATE

I, DAWN T. RABBITT, a Certified Shorthand Reporter and Notary Public duly commissioned and qualified in and for the Commonwealth of Massachusetts, do hereby certify that there came before me on the 7th day of December, 2022 at 1:04 p.m., the person hereinbefore named, SCOTT DEFOE, who provided satisfactory evidence of identification as prescribed by Executive Order 455 (03-13) issued by the Governor of the Commonwealth of Massachusetts, was by me duly sworn to testify to the truth and nothing but the truth of his knowledge touching and concerning the matters in controversy in this cause; that he was thereupon examined upon his oath, and his examination reduced to typewriting under my direction; and that this is a true record of the testimony given by the witness to the best of my ability.

My Commission Expires:  September 21, 2023

_____
          Dawn T. Rabbitt, Notary Public