

# Forensic Research + Analysis

August 4, 2022

Howard Friedman
Law Offices of Howard Friedman PC
1309 Beacon St Suite 300
Brookline, MA 02446
Tel. 617-742-4100

RE: *Estate of Robert Joseph Miller, by and through Ian Miller, personal representative of the estate, vs. Sean Roycroft and Spencer Jackson, in their individual capacities, and the town of Barnstable, Massachusetts*

Decedent: Robert Miller
Date of Death: April 16, 2019 (63 years old)
Date of Birth: ▮▮▮▮▮ 1956

Dear Mr. Friedman,

I am in receipt of your correspondence regarding the circumstances surrounding the death of Robert Miller. The purpose of this report is to provide my analysis regarding the various potential causes of cardiopulmonary arrest acting on Mr. Miller at the time that he became unresponsive while being restrained by law enforcement personnel, and which of the potential causes were the most probable cause (or causes) of his death.

The medical examiner who performed an autopsy on Mr. Miller, Dr. William Zane (forensic pathology), concluded that the cause of Mr. Miller's death was due to cardiac dysrhythmia in the setting of excited delirium due to unknown psychiatric illness at the time of restraint. Dr. Zane noted that hypertensive cardiovascular disease, obesity, adrenal insufficiency, and hypothyroidism were contributory to Mr. Miller's death. The manner of death was deemed natural. There were no other explanations for Mr. Miller's death described in the autopsy.

Dr. Zane's attribution of Mr. Miller's death to the outdated and discredited concept of "excited delirium" (ExDS) is problematic and unhelpful. ExDS is a scientifically discredited concept, which has been promoted for the past several decades as a novel and unproven rationale for ignoring the potentially fatal effects of restraint-related asphyxia when a death has occurred in police custody. ExDS is nearly exclusively used as a cause of death when the death has occurred in law enforcement custody. The diagnosis provides an exculpatory explanation for a death that might

Howard Friedman, Esq.

RE: *Miller v Roycroft, Jackson, et al*

August 4, 2022

page 2 of 19

otherwise be attributed to excessive use of force by law enforcement personnel, and allows for the possible asphyxial effects of law enforcement restraint, no matter how extreme, to be ignored in favor of the ExDS diagnosis.

In this report I will demonstrate that there is abundant evidence that Mr. Miller's death most probably resulted from the use of force by Barnstable law enforcement personnel. The most likely mechanism causing his death was cardiopulmonary arrest triggered by restraint-related asphyxia/hypoxia, although other exacerbating factors both related and unrelated to the restraint likely contributed to his death. There are no alternative explanations for Mr. Miller's death that are unrelated to the actions of the Barnstable Police Department personnel that are more than slightly possible in the absence of the restraint, however, and there is little to no probability that he would have died in the absence of the actions by police.

My methods and opinions in this case pertain to the fields of forensic medicine and epidemiology. Forensic medicine refers to the intersection of medicine and law, and in particular medicolegal investigation of causation. Epidemiology is defined as the scientific study of the cause of disease, injury, and death in populations, including prevalence, risk, and incidence in specific populations. The scientific field that dictates how probabilities may be inferred from epidemiologic data and methods and how the inferences can be used to assess the cause of injury, disease, or death in individuals in a legal setting is forensic epidemiology. Forensic epidemiology provides the scientific basis for the evaluation of specific causation, to the extent that probability or likelihood of causation may be evaluated. The methods applied in this report are consistent with those outlined in the <u>Reference Guide on Epidemiology,</u> from the <u>Reference Manual on Scientific Evidence</u>, published by the Federal Judicial Center and the National Academies of Science (3rd Edition, 2011), as well as in the text <u>Forensic Epidemiology: Principles and Practice</u>, published by Elsevier (2016).

### ***My qualifications to provide opinions concerning the matters herein are as follows:***
I am a consultant in forensic medicine and forensic epidemiology, with extensive training, background, and experience in medicolegal death investigation. I hold the following relevant academic degrees: a doctor of medicine degree (Med.Dr.) from Umeå University (Sweden), a doctor of philosophy (Ph.D.) in epidemiology from Oregon State University, a master of public health (MPH) in epidemiology and biostatistics, also from Oregon State University, a master's degree in forensic medical sciences (MScFMS) with the Academy of Forensic Medical Sciences (UK) and University of Verona (IT), and a Diploma of Legal Medicine (DLM) with the Faculty of Forensic and Legal Medicine of the Royal College of Physicians (UK), *i.a.*

I hold qualification in forensic medicine with the Faculty of Forensic and Legal Medicine of the Royal College of Physicians (UK), and have completed a 2-year post-doctoral fellowship in forensic

Howard Friedman, Esq.

RE: *Miller v Roycroft, Jackson, et al*

August 4, 2022

page 3 of 19

pathology at Umeå University in Sweden. I am an affiliate medical examiner with the Allegheny County Medical Examiner's office, a fellow of the Pathology section of the American Academy of Forensic Sciences (AAFS), fellow of the Academy of Forensic Medical Sciences (UK), and a fellow of the American College of Epidemiology (ACE).

I hold national and international positions pertaining to death investigation and forensic medicine, including vice-chair of the US national standards board for medicolegal death investigation for the AAFS, chair of the subcommittee for research at the Faculty of Forensic and Legal Medicine of the Royal College of Physician (UK), and board member of the Academy of Forensic Medical Sciences. I am a US Fulbright fellow, having held a 3-year appointment as a Fulbright Specialist in the field of Forensic Medicine with the U.S. Department of State (2017-20).

I serve as a tenured Associate Professor of Forensic Medicine at Maastricht University, and a Joint Clinical Professor of Psychiatry and Public Health and Preventive Medicine at Oregon Health and Science University School of Medicine, where I have taught courses for the past 20 years in forensic medicine, forensic epidemiology, and medical causation. I have previously held appointments as Adjunct Professor of Forensic Medicine and Epidemiology at the Institute of Forensic Medicine, Faculty of Health Sciences, Aarhus University, Aarhus, Denmark from 2005-2017, and a recent Visiting Professor at University of Indonesia (2020-2021).

I serve or have served as an associate editor or editorial board member of 14 scientific peer-reviewed journals and have published approximately 220 scientific papers, abstracts, book chapters and books, including the recent text for Elsevier, Forensic Epidemiology: Principles and Practice (2016). My scientific publications have been cited by other authors of peer-reviewed publications approximately 3,900 times. Specific to the facts of the present investigation, I have an extensive education, practical investigational experience, and research background into restraint and in-custody deaths. Please see my CV for further details.

I have provided testimony in more than 400 civil and criminal trials in state and Federal courts throughout the United States, Canada, Australia, and Europe.

Howard Friedman, Esq.

RE: *Miller v Roycroft, Jackson, et al*

August 4, 2022

page 4 of 19

### *Background Facts;*

On April 16, 2019 at 19:04, 911 dispatchers received a call from Amy Anderson who reported that her husband, Robert Miller, needed "a psych evaluation" in Hyannis, Massachusetts. The dispatcher told responding officers that a man was having "a psychotic break," and the call was listed as a mental health emergency. No medical assistance was dispatched for the call.

Officer Sean Roycroft responded to the call and arrived at Ms. Anderson and Mr. Miller's shared home at 19:09. Ms. Anderson told Officer Roycroft that Mr. Miller had not slept in several days. She advised Officer Roycroft that Mr. Miller was on the back deck of the house, and Officer Roycroft went around the house to find Mr. Miller there. Officer Roycroft noted that Mr. Miller appeared calm, before abruptly telling Officer Roycroft that he did not want to speak to him further, and went inside.

Officer Roycroft followed Mr. Miller inside and grabbed Mr. Miller by the arm. Mr. Miller recoiled from the officer's grip.

From behind Mr. Miller, Officer Roycroft wrapped his right arm over Mr. Miller's right shoulder, and hooked his left arm under Mr. Miller's left armpit, to form a diagonal grip across Mr. Miller's chest like a seatbelt. Officer Roycroft took Mr. Miller to the ground in a prone position, with his bodyweight pinning Mr. Miller to the ground. Mr. Miller tried to push against Officer Roycroft, and Officer Roycroft used his right arm to push down on Mr. Miller's back, so that Mr. Miller couldn't get "leverage."

By this time, Officer Spencer Jackson arrived on scene and witnessed Officer Roycroft take Mr. Miller to the ground. He went to assist Officer Roycroft. Officer Jackson reported struck Mr. Miller twice on the lower right-side rib with an open hand, in an attempt to gain compliance.

Officers Roycroft and Jackson successfully double-handcuffed Mr. Miller at least 1.5 to 2.5 minutes after Officer Jackson arrived.

Around 3 to 3.5 minutes from the time of the takedown and following several minutes of prone restraint, the officers noticed that Mr. Miller was not breathing and that his pupils were fixed. The officers placed him on his right side and removed the handcuffs. He was rolled onto his back and Officer Roycroft began chest compressions. The officers called for medical assistance.

Medical assistance arrived at 19:17, and transported Mr. Miller to Cape Cod Hospital, where he arrived at 19:42. Resuscitative efforts were unsuccessful, and he was pronounced dead at 20:02 on April 16, 2019.

Howard Friedman, Esq.

RE: *Miller v Roycroft, Jackson, et al*

August 4, 2022

page 5 of 19

*Autopsy report:*

On April 18, 2019, two days after Mr. Miller's death, an autopsy was conducted by Dr. Zane. Mr. Miller was 5'9" tall and weighed 214 pounds. His BMI was 31.6, which classified him as obese.

The external examination noted a number of contusions, abrasions, and lacerations to the torso and upper and lower extremities. The internal examination revealed congestion of the lungs and liver, but was otherwise unremarkable. A toxicology report using post-mortem blood revealed that Mr. Miller's blood was positive for cannabinoids.

Dr. Zane concluded that the cause of death was due to cardiac dysrhythmia in the setting of excited delirium due to unknown psychiatric illness at the time of restraint. Dr. Zane also found hypertensive cardiovascular disease, obesity, adrenal insufficiency and hypothyroidism to have contributed to Mr. Miller's death. The manner of death was natural.

*Records reviewed for history of events*
Complaint
Incident report
Dispatch log
Diagram of first floor of the home where the incident occurred
Medical records
  Hyannis Fire Department
  Cape Cod Hospital
  Hatfield Cardiology
  Mashpee Family Medicine
  Maria Gianan
Autopsy report
Autopsy photographs
Photographs of the scene
State police investigation report
Audio recording of 911 call and BPD radio transmissions
Transcripts and exhibits of depositions of Sean Roycroft and Spencer Jackson
Timeline and transcript of radio calls (provided by Plaintiff's counsel)

Howard Friedman, Esq.

RE: *Miller v Roycroft, Jackson, et al*

August 4, 2022

page 6 of 19

## <u>*Analysis and opinions*</u>

**Injury causation methods**

In evaluating the most likely cause of Mr. Miller's death, the plausible causes or risk factors for sudden death can be placed in 2 categories: the risks attributable to the actions of the officers (including mechanical obstruction of respiration), and the risk attributable to the conditions present in Mr. Miller and unrelated to the actions of the police officers, and described in the autopsy report (hypertensive cardiovascular disease, hypothyroidism, obesity, excited delirium). There are no other apparent causes of sudden death for Mr. Miller identified at autopsy or in any of the reviewed records.

The investigation of the cause of an injury is different than for a disease, primarily because there is typically a close temporal association between the suspected cause of death and the first signs of injury. There are systematic methods for assessing questions of injury and death causation in a medicolegal setting that have been described extensively in the peer-reviewed literature. Most simply put, an injury causation analysis for a specific individual is performed by assessing the risk of injury from a harmful event and comparing it to the probability that the injuries or conditions would have been present at the same point in time *in the individual* if the harmful event had not occurred.

The analysis is accomplished via the application of expertise and knowledge from several disciplines depending on the source and type of injury, nearly always including medicine and epidemiology. [1,2]

In a death investigation involving an autopsy the pathologist identifies, describes, and diagnoses observed conditions, but the determination of the cause of a death in the absence of a condition that is nearly always fatal (*i.e.* gunshot wound to the head) is made via comparison of competing risks of sudden death acting on the individual at the time of the death. [3]

The generally accepted methods for assessing injury and death causation are simply described as a 3-step process based on the Bradford-Hill criteria,[4] which has been extensively described in the peer-reviewed literature, and been deemed generally accepted by US Courts, and described as part of case law in the United States. [5–7]

The three fundamental elements of an injury causation analysis in the context of a death investigation are as follows:

1) **Plausibility:** whether the known or proposed injury mechanisms had the potential to cause the death (general causation), and if known, the magnitude of that potential (risk of death);

Howard Friedman, Esq.

RE: *Miller v Roycroft, Jackson, et al*

August 4, 2022

page 7 of 19

2) **Temporality:** the degree of temporal proximity between the injury mechanism and the death; and

3) **Alternative explanations**: in this step, the risk presented by the various competing causes of death described in the first step are compared (also known as a differential etiology). In this step, competing cause of death are quantified for the individual, given their predictive characteristics and the temporal relationship quantified in step 2.

**Analysis of the most probable cause of Mr. Miller's death**

In the following section of this report is a discussion and analysis of the most probable cause of Mr. Miller's death, within the context of the 3-step causal analysis process described above. This process is accomplished by first listing the potential causes of death acting on Mr. Miller and assessing which are *plausible*, and then what *risks* are associated with the plausible causes.

The next step in assessing causality is temporality; for the present analysis this consists of a description of the timeframe during which the plausible risk factors would have acted on Mr. Miller between the initiation of the restraint by the officers and the time of his cardiopulmonary arrest. The last step of the analysis consists of a quantitative comparison of the magnitude of the risks presented by each of the plausible causes of death (sometimes called a "differential etiology" analysis).

*Step 1: Potential causes of Mr. Miller's cardiopulmonary arrest and subsequent death*

Based on the fact pattern surrounding Mr. Miller's death the plausible causes of his death are as follows:

- Restraint related
    - Hypoxia-triggered cardiopulmonary arrest due to abdomen/chest compression
- Non-restraint related
    - Hypertensive cardiovascular disease
    - Adrenal insufficiency and hypothyroidism
    - Obesity
    - Excited Delirium

The following discussion addresses the plausibility of these potential causes, and, if known or knowable, the risks associated with them:

Howard Friedman, Esq.

RE: *Miller v Roycroft, Jackson, et al*

August 4, 2022

page 8 of 19

### **Restraint-related causes**

*Hypoxia-triggered cardiopulmonary arrest due to asphyxial prone abdomen/chest compression*
As described in the officer's statements, Mr. Miller was subjected to a violent takedown, had his torso and legs restrained, was administered two strikes to the torso by Officer Jackson, and at least partial-bodyweight pinning by Officer Roycroft for approximately 3 minutes. There is no corroborating body camera video, and no explanation for the numerous external injuries observed on Mr. Miller's body.

Asphyxia is defined as a lack of oxygen (*i.e.* hypoxia) caused by an interruption in breathing, and is a well-known trigger of cardiac dysrhythmia and arrest.[8] Compression of the neck, chest, and abdomen during physical restraint is an asphyxial mechanism resulting from restricted inspiration.[9] Positional asphyxia, in the context of restraint, typically refers to increased difficulty with breathing that is associated with the use of restraint (*i.e.* handcuffs, hobble restraint) that is used on a prone person, but can occur in any position in which a person is forced into a position that limits their ability to breathe. The terms compression and position are sometimes used interchangeably when referring to the circumstances of asphyxial death. Cardiac arrest results from a combination of metabolic acidosis from the accumulation of carbon dioxide, inadequate ventilation, and a reduction in cardiac output.[10]

The facts, as described by the law enforcement personnel on the scene, indicate that Officer Roycroft used his partial bodyweight applied to Mr. Miller's torso to keep him pinned to the ground, while prone, struggling against the officers, while receiving pain-compliance strikes to his torso.

The combination of physical exertion (which increases oxygen need), prone positioning, handcuffing, *and* compression on the back, has been demonstrated as a scientifically valid mechanism for producing asphyxia in a recent (2021) research study. The study sought to evaluate the change in lung reserve volume under the circumstances associated with police restraint, including the 4 factors listed above, [*i.e.,* 1) exerting, 2) prone 3) restrained, and 4) body compressed], individually, and in combination].[11] The authors designed a non-invasive method for measuring ventilation in 17 volunteers under 5 scenarios: 1) standing upright, 2) unweighted in a prone position, 3) weighted and in a prone position, 4) weighted in a prone position, while restrained *and* after exercise, and 5) unweighted in a prone position while restrained. In scenario 4, after the subjects engaged in vigorous stationary bicycling for 10 minutes, they were either placed prone with weight on their back and with their hands by their side (serving as a control), or with their hands clasped behind their back (restraint position 1), or with their hands clasped behind their head (restraint position 2).

Howard Friedman, Esq.

RE: *Miller v Roycroft, Jackson, et al*

August 4, 2022

page 9 of 19

The primary outcome in the study was change in functional residual capacity (FRC) of the lungs, which is the volume remaining in the lungs after a normal exhalation. Increased FRC indicates the person is breathing well, and decreased FRC indicates the opposite. The authors found that after subjects engaged in exercise and were put in a prone position with 35% bodyweight on their back, whether their hands were at their sides (the control), behind their back (restraint 1), or behind their head (restraint 2), all subjects experienced significantly decreased FRC.

Most importantly, over the 5 minutes they remained in that position, the control group stayed at the same rate of decreased FRC, while restraint 1 and 2 groups experienced *steadily decreasing FRC*. The authors determined that the restraint positions prevented adequate muscle recruitment needed to assist the diaphragm to breathe, while the control position allowed for abdominal muscle recruitment for respiration. When the weight was taken off the restrained subjects' backs, the FRC gradually returned to pre-exercise levels.

The study conclusively demonstrated that a prone and restrained individual who also pinned to the ground with the equivalent of at least 35% of their body weight on their chest or back, will incrementally experience worsened breathing function, until the weight is removed. The study also identified a dose-response relationship between increased aggressivity of restraint and decreased lung capacity, a finding that has been confirmed in a recent study of restraint related deaths.[12] These results help explain how Mr. Miller died during the violent restraint that he sustained at the hands of the Barnstable law police, in that they demonstrate that the prone positioning, handcuffing, and partial bodyweight on the back all occurring while he was fighting for his life, were highly plausible triggers of the cardiopulmonary arrest that resulted in Mr. Miller's death.

A recently published study, consisting of a structured review of the world literature on restraint related deaths among delirious individuals, demonstrated that the risk of death secondary to restraint is greatly increased as restraint tactics are escalated.[24] In comparison with no restraint, the risk of death increases consistently with asphyxial potential of the restraint, from 7.4 times greater for manhandling, to 10.7 times for handcuffing, as occurred with Mr. Miller. This demonstration of a "dose-response" relationship between restraint type and risk of death provides highly reliable evidence of a causal relationship between restraint type and risk of death.

Based on the preceding discussion, the restraint applied to Mr. Miller while he was prone, handcuffed, and with the partial bodyweight torso compression from Officer Roycroft in combination with the other factors depleting his oxygen reserves (exertion, psychosis, and inflicted pain), serve as a highly plausible trigger for the cardiopulmonary arrest that resulted in his death.

Howard Friedman, Esq.

RE: *Miller v Roycroft, Jackson, et al*

August 4, 2022

page 10 of 19

### ***Non-restraint-related causes***

*Hypertensive cardiovascular disease*

In the year before his death, Mr. Miller had a series of appointments with Philip Iuliano (cardiology), beginning on November 1, 2018. He was referred by Sarah Rogers (nurse practitioner), for a consultation because of a murmur, abnormal EKG, and hypertension. Mr. Miller had reportedly not seen a cardiologist in 20 years.

At his first appointment, Dr. Iuliano noted that Mr. Miller had "mild hypertension", (142/82 mmHg), which was slightly elevated compared to his most recent blood pressure measurement (130/80 on June 23, 2018). Mr. Miller attributed the elevated blood pressure to the death of his mother, which occurred 2 days prior. Mr. Miller told Dr. Iuliano about a murmur he had as a child, and that in contrast with the referral note, he had never had an abnormal EKG.

> ...gnosis is. He has not seen A cardiologist in sev
> He was told his EKGs have always been normal.

Despite his mild hypertension, Mr. Miller was not prescribed anti-hypertensive medication. He opted to attempt to control his blood pressure with lifestyle and diet changes. During his appointment two months later on January 3, 2019, Mr. Miller told Dr. Iuliano that he had an abnormal EKG 20 years previously. There is no account for the conflicting information.

> Had an abnormal Echo- by his report.

Throughout the series of cardiovascular appointments between November 1, 2018 and February 26, 2019, Mr. Miller reported no chest pain, palpitations, or fainting spells. He had no history of myocardial infarction, recent murmurs, dysrhythmia, rheumatic heart disease, or congestive heart failure. There was no family history of sudden cardiac death.

The most recent medical evaluation Mr. Miller underwent was on February 26, 2019, less than 2 months before his death. Mr. Miller received an echocardiogram, the conclusions of which were as follows:

- Normal left ventricular chamber size, wall thickness, and wall motion
- Normal left ventricular systolic function with an ejection fraction of 60%
- Grade I diastolic dysfunction
- There is no significant valvular stenosis or insufficiency noted

Howard Friedman, Esq.

RE: *Miller v Roycroft, Jackson, et al*

August 4, 2022

page 11 of 19

These is entirely benign examination findings. The finding of Grade I diastolic dysfunction is not unusual in for his age, as the condition is prevalent in more than half of adults aged 60 and older.[13] Grade I diastolic dysfunction is considered very mild and often completely asymptomatic, with patients with preserved ejection fraction like Mr. Miller. If the condition does not progress to more severe dysfunction with symptoms, it is not associated with a change in life expectancy, and is not associated with increased risk of sudden cardiac death.

Although left ventricular hypertrophy is associated with some increased risk of sudden cardiac death, Mr. Miller had *normal* left ventricle anatomy and function. Based on the findings of the echocardiogram, Mr. Miller had no structural heart abnormalities that would have plausibly increased his risk for sudden cardiac death, or that could have led to his death.

In keeping with his clinical cardiology examination findings, the post-mortem examination of Mr. Miller's heart revealed no abnormalities. It is unclear, therefore, why Dr. Zane listed hypertensive cardiovascular disease as having contributed to Mr. Miller's death, given that his hypertension was mild enough to be unmedicated, and that his most recent medical exams (which were cardiovascular-specific), showed no significant heart disease whatsoever, aside from normal age-related mild diastolic dysfunction.

As an illustration of how remote Mr. Miller's risk of sudden cardiac death was at the time he was aggressively restrained by the Barnstable police personnel, epidemiologic study indicates that the risk of sudden cardiac death in the general population of adult men aged 55-64 is 1.5 per 100,000 per year, or 1 in 66,667.[1] Mr. Miller's cardiovascular health was average or better for his age (nearly two thirds of men aged 60 and over have hypertension[14]), and thus his annual risk of sudden cardiac death was no greater than for the average man of his age.

Applying this annual risk to the approximately 3 minutes between when Mr. Miller was taken to the ground by Officer Roycroft, restrained in a prone position by the officer's bodyweight, and at risk for asphyxia-triggered cardiopulmonary arrest, results in a risk of sudden cardiac death in the absence of the restraint of approximately 1 in 11.7 billion.

Based on the previous discussion, it can be concluded that Mr. Miller's cardiac pathology was not an independent or significant risk factor for his sudden death, in the absence of the death risk associated with the restraint. Absent the struggle with the police, there is no evidence that Mr. Miller would have suffered a spontaneous cardiac event, given his cardiac pathology.

---

[1] Centers for Disease Control and Prevention, National Center for Health Statistics. Multiple cause of death, 1999-2020. CDC Wonder online database. Released December 2017. Atlanta, GA. Accessed May 10, 2022. Retrieved from http://wonder.cdc.gov/mcd-icd10.html

Howard Friedman, Esq.

RE: *Miller v Roycroft, Jackson, et al*

August 4, 2022

page 12 of 19


*Adrenal insufficiency and hypothyroidism*

Dr. Zane noted that adrenal insufficiency and hypothyroidism contributed to Mr. Miller's death in the autopsy report with no explanation as to why he held this belief. Adrenal insufficiency is a broad term that encompasses various types of adrenal gland conditions, which affect the hormones in the body that are responsible for metabolism, blood pressure, the immune response, and stress response. Hypothyroidism refers to a deficiency of thyroid hormone. While adrenal insufficiency and hypothyroidism *may* have affected Mr. Miller's metabolism and *possibly* contributed to his obesity, there is no evidence that either condition plausibly contributed to his death in any meaningful way, as neither condition is associated with increased risk of sudden cardiac death.

Mr. Miller was prescribed medications for mood regulation and pain management, as well as a prescription for L-thyronine SR 20mcgm (once daily), and L-thyroxin (T4) 50mcgm (once daily). A blood test in July 2018 determined that he had normal thyroid levels. He was also taking cortisone acetate SR 2.5mg, two capsules twice a day, and was reportedly using over-the-counter testosterone therapy for hypogonadism, which refers to low testosterone levels and is a condition that affects around 20% of all men over the age of 60, [15] and can be a symptom of hypothyroidism. There is no medical evidence that Mr. Miller had ever been diagnosed with hypogonadism, however, and a blood test from July 2018 determined that he had normal testosterone levels. According to Ms. Anderson, Mr. Miller had stopped taking all of his medications approximately 2 months before his death.

As there is **no association** between adrenal insufficiency and/or hypothyroidism and sudden cardiac death, and there was no autopsy evidence to support the inclusion of these diagnoses, there is no clear justification as to why Dr. Zane included these diagnoses as significant contributing factors to Mr. Miller's death.

*Obesity*

Mr. Miller was 5'9" tall and weighed 214, which places him in the "obese" category of the Body Mass Index (BMI) matrix, at 31.6 kg/m$^2$. Obesity is the second leading cause of preventable death in the United States because it is often a precursor to diabetes, hypertension, heart disease, and cancer, which are diseases that develop over multiple decades.

Cases of sudden cardiac death and patients with obesity share a number of risk factors, including hypertension, diabetes, obstructive sleep apnea, metabolic syndrome, left ventricular hypertrophy, premature ventricular complexes, altered QT interval, and lowered heart rate variability.[16]

Howard Friedman, Esq.

RE: *Miller v Roycroft, Jackson, et al*

August 4, 2022

page 13 of 19

As discussed in the earlier section "Hypertensive cardiovascular disease," Mr. Miller was assessed for cardiovascular disease 2 months before his death, and was not found to be at risk for any heart disease that increased his risk of sudden cardiac death. The only possible risk factor for sudden cardiac death that Mr. Miller had that was potentially related to his obesity was hypertension, which also did not present a risk of sudden cardiac death. Thus, there is no indication in any of the reviewed materials that Mr. Miller's death was plausibly related to his obesity in any way.

<u>Excited Delirium Syndrome</u>
Dr. Zane opined that Mr. Miller's death was due to cardiac dysrhythmia in the setting of excited delirium syndrome (ExDS). ExDS, (also known as agitated delirium, AgDS) is a diagnostic term used to describe a person who is agitated and delirious, usually paired with aggressive behavior, pain tolerance, extreme physical strength, and hyperthermia. Often people with alleged fatal ExDS have recently ingested a stimulant drug (*i.e.*, meth or cocaine) and/or are mentally ill. Because of the erratic behavior, law enforcement is called to contain and restrain the individual, which is typically met with resistance (because of the agitation and delirium), leading to an escalation of restraint techniques such as TASER shocks, extensive restraint via manhandling, hog- or hobble-tying, the use of blunt force, and sedation, ultimately culminating in the death of the individual. There are no findings at autopsy that indicate ExDS as a cause of death, and if drugs are found in the toxicology screen, they are typically stimulants, and at recreational, rather than overdose, levels.

The diagnosis of ExDS is highly controversial when it is named as the primary cause of death in cases in which there is a history of restraint at the time of death. The symptoms of ExDS (agitation and delirium) are triggers for use of force and restraint by law enforcement, and use of force by law enforcement can be associated with increased risk of death due to positional/compression asphyxia. Asphyxial or restraint-related deaths *can* exhibit signs of the mechanism of death, such as fractured ribs, neck structures, petechiae of the eye and neck muscles, but these findings are often not present.

ExDS is not a term defined in the International Classification of Diseases (ICD-9, ICD-10), or the Diagnostic and Statistical Manual of Mental Disorders (DSM-5), and there is no standard definition of ExDS and no definitive tests or signs to indicate the diagnosis as a cause of death, and thus the use of the term is entirely subjective. Previous studies attempting to classify, define, and estimate risk factors for ExDS have been limited to case reports and case series.

In a recently published peer-reviewed article, my colleagues and I created a database of all individual (rather than grouped) ExDS and AgDS cases that have been described in the scientific

Howard Friedman, Esq.

RE: *Miller v Roycroft, Jackson, et al*

August 4, 2022

page 14 of 19

literature using the National Library of Medicine search engine PubMed and OVID Medline, as well as "grey literature" available in Google Scholar searches using the relevant search terms.[12]

We found a total of 1,342 studies which were initially reviewed, resulting in the identification of 61 articles describing individual cases of ExDS or AgDS, amounting to 168 total cases. The cases were reviewed, and available information was harvested for diagnoses (ExDS vs. AgDS), the type of authority present (law enforcement, paramedic, etc.), demographics (age, sex, race), use of force (not mutually exclusive: none, unknown, handcuff, hog/hobble-tie, manhandle, TASER, sedation, other), drug intoxication (not mutually exclusive: none, unknown, cocaine, alcohol, marijuana, stimulants, other), mental health diagnosis, and outcome (died or survived).

Most cases involved men ($n$=161, 95.8%), and law enforcement personnel were the first responders on scene in two thirds of the cases ($n$=111, 66.1%). A quarter of the cases involved a person with a known mental illness ($n$=42, 25.0%), most cases involved drug use ($n$=147, 86.3%), and force was used in most cases ($n$=138, 81.5%).

Cases that resulted in death were nearly 10 times more likely than survived cases to be diagnosed as ExDS (rather than AgDS). Fatal cases were also more likely to have used restraint (at least 90% of cases) than survived cases (at least 68% of cases). Cases were more likely to be fatal when law enforcement was the first responder on scene. The odds of fatality were 7.4 times greater when a person was manhandled, 10.7 times greater when they were handcuffed, and 50 times greater if a person was hog- or hobble-tied. Fatal cases were also more likely to have cocaine and/or alcohol, while survived cases more commonly involved other stimulants, marijuana, and other drug use (*i.e.*, opioids, mushrooms, hallucinogenic drugs, etc.).

**The results of the study indicated that a diagnosis of ExDS and potentially fatal restraint are inextricably interwoven, and that in the absence of aggressive restraint (*i.e.*, manhandling, hog-tying, handcuffing), there is no evidence that ExDS is a stand-alone fatal condition. Additionally, we found a dose-response between the aggressivity of the restraint and the risk of death, which can only be explained by restraint, rather than ExDS, as the cause of death.**

These findings are relevant and applicable to the circumstances of Mr. Miller's death, in that they point toward the aggressive restraint used on him as a far more likely cause of his cardiopulmonary arrest than his state of delirium and agitation, which carries little to no risk of sudden death.

Our 2020 peer-reviewed paper was the highest ranked level of evidence ever published on the relationship between ExDS, restraint, and risk of death. The diagram below demonstrates that our literature review and pooled case analysis paper constitutes **Level 1** evidence (Evidence

Howard Friedman, Esq.

RE: *Miller v Roycroft, Jackson, et al*

August 4, 2022

page 15 of 19

Syntheses), whereas previously published papers on ExDS (primarily case series, case reports, and opinion pieces) **Level 4 and 5** evidence:[2]



The paper has also become the leading scientific article on the topic since its publication. At the time of this report, the article is in the top 0.05% of all 20 million research outputs evaluated for impact (#9,647 out of 20,991,427 research outputs), and was ranked #1 of 842 research outputs by *Forensic Science, Medicine, and Pathology*, the journal in which it is published.[3]

ExDS has been repeatedly rejected as a valid diagnosis by the American Medical Association, and the publishers of the DSM-5, the American Psychiatric Association. Indeed, in June of 2021, the American Medical Association formally announced their opposition to the diagnosis of ExDS (citing, as partial support, our 2020 literature review and pooled case analysis), noting both that the AMA does not support ExDS as an official diagnosis, and that suspicion of the condition is not a justification for law enforcement use of force (as occurred with Mr. Miller).

---

[2] https://www.library.qut.edu.au

[3] https://help.altmetric.com/support/solutions/articles/6000233311-how-is-the-altmetric-attention-score-calculated-

Howard Friedman, Esq.

RE: *Miller v Roycroft, Jackson, et al*

August 4, 2022

page 16 of 19

### Step 2: The timing of events preceding Mr. Miller's cardiopulmonary arrest and death

The table below was created using the witness statements of Officers Roycroft and Jackson, as well as the Barnstable Police Department dispatch call log and radio transmissions. As there was no body camera footage, the times are approximated.

The table begins when Officer Roycroft arrived at Ms. Anderson and Mr. Miller's home. Where timestamped events are known, they are indicated in the first column, including the source of the timestamp (*i.e.* dispatch log or radio transmission). The second column is relative to the time when Officer Roycroft arrived, and the third column is a description of the event.

| Time-Stamp (hh:mm:ss) | Time from arrival (mm:ss) | Action |
|---|---|---|
| 19:09:28 (dispatch log) | 00:00 | Officer Roycroft arrives at Miller & Anderson home |
| | | Roycroft talks with Anderson, who says that Miller is in backyard |
| | | Roycroft talks with Miller in backyard, Miller is "Calm" |
| | | Miller walks inside |
| 19:10:36 (dispatch log) | 01:08 | Officer Jackson arrives on scene |
| | | Roycroft takes Miller to ground |
| | | Jackson at Roycroft's side |
| | | Jackson strikes Miller in ribs twice |
| 19:11:43 (radio trans.) | 02:15 | Officer radio: sound of grunting, struggle |
| 19:11:52 (radio trans.) | 02:24 | Officer radio: "We're fighting with him" |
| | | Miller successfully handcuffed |
| | | Miller assessed to not be breathing |
| 19:12:58 (radio trans.) | 03:30 | Officers call for medical assistance |
| | | CPR begins |

Mr. Miller apparently became unresponsive and stopped moving around the time that the handcuffs were applied, sometime in the approximately 3 minutes between when Officer Roycroft took Mr. Miller to the ground and when he was found to be unresponsive, during which time he was restrained by the partial bodyweight of Officer Roycroft, was struck in the side by Officer Jackson.

Howard Friedman, Esq.

RE: *Miller v Roycroft, Jackson, et al*

August 4, 2022

page 17 of 19

***Step 3: Alternative explanations for Mr. Miller's cardiopulmonary arrest, aside from restraint-related asphyxia***

Based on the discussion under Step 1 above, of the potential causes of Mr. Miller's death, only the police actions of positional/compressive asphyxia triggered cardiopulmonary arrest, and the non-police-related condition of cardiovascular disease are plausible competing risks for his death. Excited Delirium is not a valid cause of death, in the context of restraint.

As noted above, the risk of sudden death associated with the non-police causes is vanishingly small; Mr. Miller's risk of sudden cardiac death during the 3 minutes of restraint was so small (1 in 11.7 billion) can and should be ignored in a cause of death investigation.

In comparison, the risk of death from the assault and restraint by the Barnstable police officers was substantially higher, likely on the order of >1 in 10,000. The abdomen strikes, struggle, and partial bodyweight restraint would have increased Mr. Miller's need for oxygen, when he was already at increased need for oxygen due to his psychosis. Thus, the restriction of oxygen and venous return to the heart (via restraint, compliance strikes, and struggle) when he was at increased need for it, would have overstressed his heart, thereby triggering a cardiac dysrhythmia and subsequent cardiopulmonary arrest. Thus, the only plausible explanation for Mr. Miller's death is the actions of the police.

<u>*Conclusions:*</u>

Based on the preceding analysis, it is my opinion that Mr. Miller's death was the result of the use of aggressive restraint tactics by the Barnstable police department personnel, resulting in death by prone restraint-triggered cardiopulmonary arrest. Because Mr. Miller's death was due to the intentional actions of others, his manner of death was a homicide. This finding is consistent with the National Association of Medical Examiners (NAME) guideline on classifying manner of death, which states the following, on page 11:

> *"Deaths due to positional restraint induced by law enforcement personnel or to choke holds or other measures to subdue may be classified as Homicide. In such cases, there may not be intent to kill, but the death results from one or more intentional, volitional, potentially harmful acts directed at the decedent (without consent, of course). Further, there is some value to the homicide classification toward reducing the public perception that a "cover up" is being perpetrated by the death investigation agency."*

Howard Friedman, Esq.

RE: *Miller v Roycroft, Jackson, et al*

August 4, 2022

page 18 of 19

The preceding opinions were given as reasonable medical and scientific probabilities. I reserve the right to amend any of my opinions should new information come to light.

Very truly yours,

Michael D. Freeman, MedDr, PhD, MScFMS, MPH, DLM, MFFLM, FAAFS, FACE
Associate Professor of Forensic Medicine
University of Maastricht Medical Center
Faculty of Health, Medicine, and Life Sciences
Maastricht University, Maastricht, Netherlands

Member, Faculty of Forensic and Legal Medicine, Royal College of Physicians (UK)
Fellow, American College of Epidemiology
Fellow, American Academy of Forensic Sciences
Fellow, Academy of Forensic Medical Sciences (UK)

Howard Friedman, Esq.

RE: *Miller v Roycroft, Jackson, et al*

August 4, 2022

page 19 of 19

### ***References:***

1. Meilia PDI, Zeegers MP, Herkutanto, Freeman M. Inference: An evidence-based approach for medicolegal causal analyses. Int J Environ Res Public Health. 2020;17:1–17.

2. Freeman MD. A Practicable and Systematic Approach to Medicolegal Causation. Orthopedics. 2018;41:70–2.

3. Meilia PDI, Freeman MD, Herkutanto, Zeegers MP. A review of causal inference in forensic medicine. Forensic Sci Med Pathol. Forensic Science, Medicine and Pathology; 2020;16:313–20.

4. Reference Manual on Scientific Evidence, Third Edition | Federal Judicial Center [Internet]. [cited 2021 Jan 25]. Available from: https://www.fjc.gov/content/reference-manual-scientific-evidence-third-edition-1

5. Etherton v Owner Insurance Company. U.S. District Court of Appeals. 10th Circuit. Case no. 14-1164.

6. 35 F Supp. 3d 1360 United States District Court, D. Colorado. Donald L. Etherton, Plaintiff, v. Owners Insurance Company, a Michigan Insurance Company, Defendant. Civil Action No. 10-cv-00892-PAB-KLM.

7. Freeman MD, Centeno CJ, Kohles SS. A Systematic Approach to Clinical Determinations of Causation in Symptomatic Spinal Disk Injury Following Motor Vehicle Crash Trauma. PM R. 2009;1:951–6.

8. Clark RE, Christlier I, Sanmarco M, Diaz-Perez R, Dammann JF. Relationship of Hypoxia to Arrhythmia and Cardiac Conduction Hemorrhage: Experimental Study. Circulation. 1963;27:742–7.

9. Colville-Ebeling B, Freeman M, Banner J, Lynnerup N. Autopsy practice in forensic pathology - Evidence-based or experience-based? A review of autopsies performed on victims of traumatic asphyxia in a mass disaster. J Forensic Leg Med [Internet]. Elsevier Ltd; 2014;22:33–6. Available from: http://dx.doi.org/10.1016/j.jflm.2013.11.006

10. Steinberg A. Prone restraint cardiac arrest: A comprehensive review of the scientific literature and an explanation of the physiology. Med Sci Law. 2021;

11. Campbell M, Dakin R, Stowe S, Burton K, Raven B, Mapani M, et al. Thoracic weighting of restrained subjects during exhaustion recovery causes loss of lung reserve volume in a model of police arrest. Nature0. 2021;11.

12. Strömmer EMF, Leith W, Zeegers MP, Freeman MD. The role of restraint in fatal excited delirium: a research synthesis and pooled analysis. Forensic Sci Med Pathol. Forensic Science, Medicine and Pathology; 2020;16:680–92.

13. Tsao CW, Lyass A, Larson MG, Cheng S, Lam CSP, Aragam JR, et al. Prognosis of Adults With Borderline Left Ventricular Ejection Fraction. JACC Hear Fail. 2016;4:502–10.

14. Fryar CD, Ostchega Y, Hales CM, Zhang G, Kruszon-Moran D. Hypertension Prevalence and Control Among Adults: United States, 2015-2016. NCHS Data Brief. 2017;1–8.

15. Surampudi PN, Wang C, Swerdloff R. Hypogonadism in the aging male diagnosis, potential benefits, and risks of testosterone replacement therapy. Int J Endocrinol. 2012;2012.

16. Plourde B, Sarrazin JF, Nault I, Poirier P. Sudden cardiac death and obesity. Expert Rev Cardiovasc Ther. 2014;12:1099–110.