

June 25, 2022

Howard Friedman
Law Offices of Howard Friedman PC
1309 Beacon Street, Suite 300
Brookline, MA 02446

Re: Estate of Robert Joseph Miller, by and through Ian Miller, personal representative of the estate, vs Sean Roycroft and Spencer Jackson, in their individual capacities and the town of Barnstable Massachusetts.

**Introduction**

 I have been asked by plaintiff lawyer, Howard Friedman to review medical records and other information about an incident leading to the death of Mr. Robert Miller and provide an expert opinion regarding his cause of death.

I am a board certified Cardiologist practicing full time in cardiovascular diseases in Ventura, CA. I have been the Chair of the Division of Cardiology at Community Memorial Hospital for over the last decade in addition I am the current chair of the Department of Medicine. I have been a reviewer for the Medical Board of California and have testified regarding the Standard of Care for a Cardiologist for the state of California during the Conrad Murray vs. State of California trial.

I have extensive knowledge regarding the literature on prone restraint deaths and published a review article "Prone restraint cardiac arrest: A comprehensive review of the scientific literature and an explanation of the physiology" in Medicine Science and the Law last year (1). I have testified in court regarding prone restraint death.

It is my opinion with a reasonable degree of medical certainty, that Officer's Roycroft and Officer Jackson's actions caused Mr. Miller's death by prone restraint cardiac arrest. I hold this opinion to a reasonable degree of medical certainty.

**Items reviewed**

Complaint
Incident Reports
Dispatch Log
Diagram of the first floor of the home where incident occurred
Autopsy report and photographs
Hyannis Fire Department Ambulance report
Medical records from Cape Cod hospital
Hatfield Cardiology Medical records
Mashpee Family Medicine records
Medical records from Maria Gianan
Mass Eye and Ear medical records
Photograph of Mr. Miller's medications

1



Downing Labs invoice and prescription history report
Photographs of the scene
State Police Investigation Report
Transcripts of the State Police interviews of Sean Roycroft and Spencer Jackson
Depositions of Roycroft and Jackson
Deposition of Amy Anderson
Roycroft answers to interrogatories and supplemental answers
911 call and BPD radio transmissions
Images of restraint hold
Roycroft first draft of report
Response to resistance report.
502 Response to resistance Policy
1106 Mental illness Policy
Mental Health First Aid training power point slides
Jackson answers to interrogatories

**Robert Miller Medical History**

Mr. Robert Miller (█████56) was 63 years old at time of his death   There was questionable prior psychiatric admission at age 23 but no documentation of this event.  He was admitted to Cape Cod hospital from 5/2/17-5/8/17 for acute and brief psychotic reaction when he started to be delusional, psychotic, talking gibberish, not eating, and running incessantly.  He was noted to have grandiose and persecutory delusions. He was noted to have hypertension on amlodipine 10mg a day.  He was discharged on Zyprexa 15mg a day.  Robert Miller was followed by Marian Gianan in Psychiatry.  He was diagnosed with a Generalized Anxiety disorder and was treated on Inderal 20mg three times a day and Wellbutrin 300mg a day, bupropion 100mg a day, and Prozac 20mg a day.  He always attended with significant other Amy Anderson

Cardiologist Phillip Luliano saw Mr. Robert Miller on 1/3/19 for abnormal EKG and murmur.  His BMI was noted at 32 (height 70 inches and weight 226lbs) consistent with obesity.  BP was 142/82 and at that time was not on medication for hypertension.  His EKG showed a borderline interventricular conduction delay at 112ms.  There were no ST-t abnormalities.  Heart rhythm was sinus at 75bpm.  QTc interval was 404ms.  Echocardiogram performed 2/26/19 showed normal LV systolic function with normal ejection fraction of 60%.  There was no significant valvular regurgitation or stenosis (no leak or obstruction).  So there was no clear etiology of murmur.  He had reported normal LV thickness at 1.1-1.2cm which is upper limits of normal range.  There was normal chamber sizes.  A nuclear stress test was ordered for 2/27/19 but was cancelled.

Mr. Miller had hypothyroidism (low thyroid) on L thyronine SR 20mcgm and L-thyroxin 50mcg a day. Blood tests had revealed normal thyroid function.  He had adrenal insufficiency with hypogonadism.  He was cortisone acetate SR 2.5mg tow capsules twice a day.  He was also on testosterone supplementation at 100mg/ml one pump twice daily.  He had normal testosterone levels.

**Summary of statements by Ms. Amy Anderson**

Amy Anderson, Mr. Miller's common-law wife called 911 on April 16, 2019 at 19:04. The dispatch log said she reported that her husband was having a "psychotic break."  It was a very short call.  Ms. Anderson stated to investigators that Mr. Miller had abruptly stopped taking all of his medications



approximately two months prior.  Ms. Anderson said that Mr. Miller stopped his medications because they were affecting his blood pressure and because of a general dislike for pharmaceuticals. Additionally, Ms. Anderson said that Mr. Miller was a boxer when he was younger and suffered significant damage to his nose.  He had times with breathing and has sleep apnea but did not use CPAP.

On April 09, 2019, Ms. Anderson traveled to Florida to visit family. Ms. Anderson mentioned that Miller's psychiatric break two years ago also occurred in the timeframe when she traveled to Florida. Ms. Anderson said that she and Mr. Miller had very little contact while she was out of state, which was unusual. Ms. Anderson said that she arrived home last evening (April 15, 2019) at approximately 7:30-8:00PM. Ms. Anderson described the house as being, "trashed but in a weird way." Ms. Anderson said that she knew right away upon returning home that Mr. Miller was delusional.

Ms. Anderson said that she arose from bed around 9:00AM the next day. Mr. Miller was talking to himself and was yelling loudly. Anderson said that Mr. Miller was making so much noise that she hoped a neighbor would call the police to lodge a noise complaint.

At 7:03PM, while Mr. Miller was in the backyard yelling at no one in particular, Ms. Anderson called 911 and requested assistance. The Barnstable Police arrived and an officer came to the front door. Ms. Anderson advised officer Sean Roycroft that Mr. Miller was in the backyard. Ms. Anderson said that she stayed near the front door while officer Roycroft went around the house to the backyard. Ms. Anderson then heard persons walking on the back deck and suddenly Mr. Miller and the Officer Roycroft were inside the home. Ms. Anderson observed the officer trying to control Mr. Miller from behind. As they entered the dining room, momentum carried them past the dining room table, causing the table to move because the table was in the middle of the room. Ms. Anderson said that she heard an officer say three or four times to Mr. Miller, "Put your hands behind your back!" Ms. Anderson heard Mr. Miller say, "I can't breathe!" She asked the officer if he could breathe and the officer responded that yes, he could breathe. Ms. Anderson was not sure when or how the second officer Spencer Jackson made entry into the home. Ms. Anderson said that she was watching as the officers tried to subdue Mr. Miller. Ms. Anderson heard Mr. Miller ask for Ms. Anderson's help, saying "Amy, help me.". Once Mr. Miller was handcuffed, Ms. Anderson heard one of the officers ask, "Is he out?" The officers transitioned into providing medical care. Ms. Anderson saw an officer performing CPR and later observed a bag valve mask on Mr. Miller's face.

**Summary of statements by Officers Sean Roycroft and Spencer Jackson**

Officer Roycroft was dispatched at 19:07:37 and arrived at 19:09:28.  Spencer Jackson was dispatched at 19:07:47 and arrived at 19:10:36.  Officer Roycroft began speaking to Mr. Miller, who was sweating and acting strangely. During their conversation, Mr. Miller turned and hurried towards the sliding door leading into the house. Officer Roycroft followed him and grabbed him by the arm to stop him. Officer Roycroft placed Mr. Miller in a seatbelt hold from behind.  The officer's left arm was under Mr. Miller's left arm pit and his right arm was over Mr. Miller's right shoulder with the officer's hands connected at Mr. Miller's chest. The officer's right leg was between Mr. Miller's legs with officer's left leg to the outside of Mr. Miller's left leg.

The officer and Mr. Miller were upright and shuffling across the floor to an office area. Mr. Miller was pulling the officer forward and moving towards the front of the house. The dining area and office area are separated by two railings with an opening in the middle and there is a step down in the floor. Officer Roycroft could see Ms. Anderson out of the corner of his eye to his left. Officer Roycroft also could see a set of golf clubs in a bag leaning against the wall in the direction they were moving.  A single golf club



was on the floor in front of them.  As they reached the step down, they both fell to the floor with Mr. Miller landing on top of the golf club.

Mr. Miller fell face first to the floor with his arms under his body.  On floor, Officer Roycroft still had a seatbelt hold on Mr. Miller for a period according to officer Jackson (page 66 of his deposition).   Part of Officer Roycroft's chest and weight had to be on Mr. Miller at this point.  Officer Roycroft then states he was to the left of Mr. Miller.  According to Officer Roycroft, Mr. Miller was trying to get up by lifting his chest and pulling his elbows under him.  Officer Roycroft had his own left arm halfway under Mr. Miller between Mr. Miller's left arm and chest.  Officer Roycroft pushed Mr. Miller back down with his right arm.  Officer Roycroft during his deposition stated he was on his left hip with his right leg over Mr. Miller's right leg. He felt that Mr. Miller was trying to push up to use leverage to "get himself in a dominant position." Officer Roycroft says he kept pressure on Mr. Miller's back to try and free his own arm from Mr. Miller and to prevent Mr. Miller from lifting his body up.  Officer Roycroft's shoulder radio microphone pressed against his neck and he heard the tone from his radio (19:11:43).  This was 2 minutes and 15 seconds after Officer Roycroft had arrived.

Officer Jackson had arrived to the residence about a minute (19:10:36) after Officer Roycroft.  Officer Jackson had entered that house from around the back.  He witnessed Officer Roycroft and Mr. Miller falling to the ground.  Officer Jackson was trying to control Mr. Miller's right arm.  Mr. Miller was noted by Officer Jackson to be kicking his feet and twisting his hips.  Officer Jackson was on Mr. Miller's right side with his right foot on ground and left knee on ground. Mr. Miller was trying to pull-away from Officer Jackson's control of his right arm.  After about 30 seconds of trying to remove the right arm from under him, Officer Jackson delivered a hand strike to Mr. Miller in the lower right side of his abdomen between the ribcage and hip as he told Mr. Miller to pull his hands out.  Mr. Miller groaned and was still moving, twisting, and pulling to keep his arms under his chest but Officer Jackson was then able to move Mr. Miller's right arm. Officer Jackson did not attempt to lift Mr. Miller up, he was only trying to remove Mr. Miller's right arm from under his body.  Officer Jackson was able to remove some of Mr. Miller's right arm but Mr. Miller then placed his right arm right back underneath.  Officer Jackson radioed for back up (9:11:52).

According to the officers Mr. Miller did not speak once he was inside his home. But, as noted above, Amy Anderson says he spoke twice. He said, "I can't breathe" then later he said, "Amy, help me."

The officers say while Mr. Miller was on the floor, he flailed and kicked.  After Officer Jackson got off the radio, he delivered another strike to Mr. Miller's right side.  Mr. Miller made another groaning noise and then Officer Jackson was able to remove the right arm and lift the arm behind Mr. Miller's back.  Officer Roycroft was able to pull his left arm out and get control of Mr. Miller's left arm.  Together the Officers pulled Mr. Miller's arms behind Mr. Miller's back.  Mr. Miller was still face down on the floor. The officers secured the handcuffs and Officer Jackson double locked them. Officer Jackson then went to speak to Ms. Anderson.

After Mr. Miller was handcuffed, Officer Roycroft noticed that he was non-responsive and his pupil appeared fixed.  Officer Roycroft moved Mr. Miller onto his right side (recovery position). Officer Roycroft told Officer Jackson they needed to remove the cuffs. Officer Roycroft checked for a pulse at the carotid artery and there was no pulse. Officer Roycroft radioed dispatch asking for rescue (19:12:58). Officer Roycroft began chest compressions. Officers Shaw and Ruggieri arrived.  Officer Roycroft told one of them to get the medical bag. As soon as the medical bag arrived Officer Jackson began rescue breaths with the AMBU bag mask. Officer Roycroft took over the rescue breaths and Officer Jackson did the chest compressions. Officer Ruggieri connected the AED. No shock was indicated by the AED. Officer Jackson and Roycroft continued CPR until Hyannis Rescue personnel arrived and assumed

4



patient care. Officer Roycroft assisted rescue personal with attaching the Lucas machine. A short time later Mr. Miller was transported to CCH by Hyannis Rescue.

**Fire Rescue report**

Hyannis Fire Department was dispatched at 19:13:01. ALS Ambulance were on location at 19:17:40 and fire engine 6 at 19:21:22. When ambulance members arrived officers were doing CPR with no shock advised on AED. One officer was doing chest compressions and other ventilations with Bag Valve mask. Officers stated that Mr. Miller was calm at first but went for a golf club so they took him down and cuffed him. Officers stated Mr. Miller was talking but when they stood him up and started to walk out, he collapsed and started CPR and used AED. EMS placed a monitor on Mr. Miller and he was in PEA (pulseless electrical activity) at rate of 32bpm. CPR was continued. Pupils were noted to be dilated and fixed. Epinephrine 1mg (19:33) and Narcan 4mg (19:36) were given intraosseous through left leg. Two more rounds or Epinephrine (19:37 and 19:40) along with CPR was given. Mr. Miller was intubated with good lung movement and capnography (no report of results). Patient was transported and enroute to Cape Cod hospital at 19:39:04 and at hospital at 19:42:21. In ER, Mr. Miller was evaluated and was noted in be in PEA with heart rate in 30s. Additional 3 rounds of epinephrine was given and code terminated and Mr. Miller was declared dead at 20:01.

**Autopsy**

Autopsy of Robert Miller was performed by Dr. William M. Zane on 4/18/19. Cause of death was cardiac dysrhythmia in the setting of excited delirium due to unknown psychiatric illness at time of restraint. Patient had underlying obesity, hypertensive cardiovascular disease, hypothyroidism, adrenal insufficiency. Heart weighted 440 grams. Coronaries were normal with no stenosis. LV was 1.4cm thick with septal thickness of 1.7cm.

**My Analysis**

During strenuous activity, there is a dramatic increase in acid in the body as well as a high demand for oxygen intake and carbon dioxide ($CO_2$) removal. The normal pH of the body is 7.4. As the pH drops with activity, the body's natural response is to increase the rate and depth of breathing as well as increasing the blood circulation in body. Consequently, the amount of $CO_2$ moved to and exhaled by the lungs increases, and the amount of $CO_2$ in the body decreases. This loss of $CO_2$ offsets the increased acidity of the blood and brings the pH back to a normal range. This hyperventilation can decrease the $pCO_2$ to as low as 15-20 mmHg (2) Despite this hyperventilation, the decrease in $pCO_2$ only partially corrects for the low blood pH. This hyperventilation is critical to maintaining the blood pH in a life sustaining range.

Mr. Robert Miller had been in a psychotic state and he was already sweating when Officer Roycroft begins speaking to him. The weather on 4/16/19 at 7pm was 52F (21) which was fairly cool. This is suggestive that Mr. Miller was in a high metabolic state. Mr. Miller was acting strangely, his state of mind hindered him from complying with Officer Roycroft. Officer Roycroft initiated physical contact with Mr. Miller. Officers Roycroft and Jackson struggled with Mr. Miller causing significant activation of his sympathetic nervous system, and release of catecholamines causing Mr. Miller's heart to beat harder and faster and resulted in significant metabolic acidosis. This exertional activity creates lactic acid, because of the muscles working so hard, and lowers the pH, making the blood more acidic.

5



Ho et al. have measured blood pH, lactate and biochemical markers during various exercises to simulate encounters with police.  Ho simulated s police struggle of ONLY 45 seconds, he reported a low pH 7.01 that was maintained low even after 10 minutes of rest (3).  Hick et al. published a case series on five restraint-associated deaths that had very low pH's beyond a usually cardiac arrest.  He also described five subjects that underwent a struggle that did not result in death that a low pH. (4)   To maintain a normal acid-base balance (pH) in the body, one must breathe harder and faster to exhale $CO_2$. The body circulatory system also must move blood faster to deliver oxygen to muscles to provide energy, and remove $CO_2$ through delivery to the lungs. If the pH is low enough, prone position can cause cardiac arrest as it occurred to Mr. Miller.

Officer Roycroft restrained Mr. Miller initially while he was standing using a seatbelt hold then they fell into the office area and Officer Roycroft was partially on top of Mr. Miller. Officer Roycroft testified in his deposition that he was on Mr. Miller's left side on the floor in the office. Officer Roycroft was on his left hip with his right leg over Mr. Miller's right leg. He felt that Mr. Miller was trying to push up to use leverage to "get himself in a dominant position." Officer Roycroft responded by pushing down on Mr. Miller with his right arm so that Mr. Miller could not lift his body up. This decreased Mr. Miller's ventilatory capacity as well as cardiac output as Mr. Miller was restrained in the prone position, with weight on his back.

Studies have shown the prone position alone to cause a decrease in ventilation by 8-16% [5-7].  Studies have also shown that prone maximal restraint position (prone with arms handcuffed and legs hobbled) can decrease ventilation 13-28% [8-10], with one study by Roeggla showing a decrease of 40% [10]. Additional studies with weights on the backs of individuals showed maximal decreases of 22% with 23kg [26], 35% with 75kg [69], and 30% with 102kg [27].  Studies also revealed a significant person-to-person variation, suggesting that some people may be more vulnerable to the effects of prone positioning than others.  One study reported with a prone restraint position to have a decrease in 25-28% had one individual that was found to manifest a 57% decrease in ventilation prone [11].  Another study tested eight individuals with chronic obstructive pulmonary disease in prone position on a couch.  Three could not tolerate the position due to deterioration in their clinical symptoms, while another five were able to stay prone with no significant change in ventilation capacity [12].  In a person with metabolic acidosis as Mr. Miller, significant ventilation was needed and a decrease due to prone restraint was catastrophic.

There is an increase in blood circulation during strenuous activity in order to deliver not only oxygen to body but to return carbon dioxide to lungs for expulsion.  The anesthesiology literature has documented decreased cardiac output (the amount of blood that is circulated over a period of time) of 18-27% from primarily reduced venous return in the prone position [13-15].  Noninvasive studies have shown prone position without a weight on the back can cause a decrease in cardiac output or cardiac index of 11% [16], with 25kg on the back a decrease of 16% [17] and with 50kg a decrease of 16% [18].  Roeggla noted a 37% decrease in cardiac output from hogtying alone [10]. Mr. Miller being held in prone restraint decreased his cardiac output, which contributed to him being unable to maintain his $pCO_2$ and pH within the values needed to survive.

A decrease in ventilation that leads to accumulation of excess $CO_2$, if unable to maintain life is called asphyxia. Weight placed on the upper back impedes the ability of the ribs to expand and decrease ventilation.  This weight on the back in prone position also creates pressure within the chest cavity, thus decreasing the blood flow (venous return) into the heart.  This position can restrict the flow through venous blood vessels from the legs to the heart due to compression of abdomen against the floor. Mr. Miller was predisposed to due to his obesity. This decrease in blood flow to the heart limits the amount of blood exiting the heart, thereby decreasing the cardiac output. Because deaths due to prone restraint

6



are due a combination of a decrease in ventilation (asphyxia) and a decrease in cardiac output, I regard Mr. Miller's death as a prone restraint cardiac arrest rather than traditional positional or restraint asphyxia. I cannot see any alternative or feasible explanation for Mr. Millers death.

Mr. Miller had recently undergone a cardiac workup and had a normal appearing heart with a normal echocardiogram according to his Cardiologist.  Mr. Miller did not have significant underlying coronary artery disease and had mildly enlarged heart on autopsy.   Mr. Miller's underlying cardiac status did not contribute to his death. In light of the use of a prone restraint position and the physiology, Mr. Miller's death was due to prone restraint cardiac arrest. The arrhythmia of PEA (pulseless electrical activity) is commonly seen in prone restraint cardiac arrest and is more consistent with acidosis and asphyxia.  A primary cardiac arrest of ventricular arrhythmias, is more commonly seen in patients with severe blocked arteries or very thick hearts. People with enlarged hearts are at increased risk of sudden death, again because of being prone to ventricular arrhythmias, not PEA or asystole.  PEA was Mr. Millers initial rhythm as the AED did not reveal a shockable rhythm and this was the initial rhythm seen by emergency medical services within minutes after cardiac arrest.  This indicates that Mr. Miller's death was due to prone restraint cardiac arrest, not blocked arteries or an enlarged heart.

I do not agree with autopsy report stating that Mr. Miller died of a cardiac arrhythmia due to excited delirium.  Neither the American Psychiatric Association (8) or American Medical Association (9) support excited delirium as a medical diagnosis.  Excited delirium had been invoked in cases to explain or justify death to individuals in police custody.

Excited delirium has been rejected as a valid diagnosis by the American Medical Association (AMA), and the American Psychiatric Association (APA).  In June of 2021, the AMA formally announced their opposition to the diagnosis of excited delirium.  The new policy addresses reports that show a pattern of using the term "excited delirium" as justification for excessive police force.  Specifically, the policy confirms the AMA's stance that current evidence does not support "excited delirium" as an official diagnosis, and opposes its use until a clear set of diagnostic criteria has been established and denounces "excited delirium" as a sole justification for law enforcement use of excessive force, (19)

The American Psychiatric association (APA) adds that the term "excited delirium" (ExDs) is too non-specific to meaningfully describe and convey information about a person. "Excited delirium" should not be used until a clear set of diagnostic criteria are validated.  APA has not recognized excited delirium as a mental disorder, and it is not included in the Diagnostic and Statistical Manual of Mental Disorders (DSM5). The DSM-5 recognizes Delirium, hyperactive type, but the symptoms of this condition differ in many ways from the symptoms typically attributed to excited delirium (e.g., superhuman strength, impervious to pain, etc.)  (20).  Again Mr. Miller died of prone restraint cardiac arrest.

Had Mr. Miller had not undergone this struggle with officers and placement in prone position, Mr. Miller would have survived that day and likely would still be alive today.



**Conclusion**

Based upon available records, my education, my training and my experience, it is my opinion with a reasonable degree of medical certainty, that Officer's Roycroft and Officer Jackson's actions caused Mr. Miller's death by prone restraint cardiac arrest.

I hold this opinion to a reasonable degree of medical certainty. I reserve the right to amend this report after being presented with further information.

Alon Steinberg, MD FACC



## References

1. Steinberg A. Prone restraint cardiac arrest: A comprehensive review of the scientific literature and an explanation of the physiology. Med Sci Law 2/2021

2. McArdle WD, Katch FI, Katch VL. Exercise physiology: nutrition, energy, and human performance. Baltimore; Philadelphia: Wolters Kluwer Health/Lippincott Williams & Wilkins, 2015. p200, P264, pp.286-301, p337.

3. Ho JD, Dawes DM, Nelson RS, et al. Acidosis and Catecholamine Evaluation Following Simulated Law Enforcement "Use of Force" Encounters. Acad Emerg Med 2010; 17: e60-e68.

4. Hick JL, Smith SW, Lynch MT. Metabolic Acidosis in Restraint-associated Cardiac Arrest. A Case Series. Acad Emerg Med 1999; 6: 239-243.

5. Barnett R, Hanson P, Stirling C, Pandyan AD. The physiological impact of upper limb position in prone restraint. Med Sci Law. 2013;53(3): 161–165. doi: 10.1258/msl.2012.012044.

6. Vilke, GM, Chan TC, Neuman, Clausen JL. Spirometry in normal subjects in sitting, prone and supine positions. Respir Care. 2000;45(4):407-410. PMID: 10780036.

7. Cary NRB, Roberts CA, Cummin ARC, Adams L. The effect of simulated restraint in the prone position on cardiorespiratory function following exercise in humans. J Physiol-London. 2000;525: 30P-31P.

8. Chan TC, Vilke GM, Neuman T, Clausen JL. Restraint position and positional asphyxia. Ann Emerg Med. 1997;30(5):578–586. doi: 10.1016/S0196-0644(97)70072-6.

9. Michalewicz BA, Chan TC, Vilke GM, Levy SS, Neuman TS, Kokhorst FW. Ventilatory and metabolic demands during aggressive physical restraint in healthy adults. J Forensic Sci. 2007;52(1):171-175. doi: 10.1111/j.1556-4029.2006.00296.x.

10. Roeggla G, Roeggla H, Moser B, et al. Cardiorespiratory Consequences of the Hobble Restraint. Acad Emerg Med 1999; 6: 1076-1077.

11. Parkes J. Carson R. Sudden death during restraint: Do some positions affect lung function? Med Sci Law. 2008;48:137–141. doi: 10.1258/rsmmsl.48.2.137.

12. Meredith C, Taslaq S, Kon OM et al. The cardiopulmonary effects of physical restraint in subjects with chronic obstructive pulmonary disease. J Clin Forensic Med. 2005;12(3):133-136.

13. Edgcombe H, Carter K, Yarrow S. Anesthesia in the prone position. Br J Anesth 2008; 100(2):165-183. doi: 10.1093/bja/aem380.

14. Yokoyama M, Ueda W, Hirakawa M, Yamamoto H. Hemodynamic effect of the prone position during anesthesia. Acta Anaesthesiol Scand. 1991;35: 741–744. doi: 10.1111/j.1399-6576.1991.tb03382.x.

15. Sudheer PS, Logan SW, Ateleanu B, Hall JE. Haemodynamic effects of the prone position: a comparison of propofol total intravenous and inhalation anaesthesia. Anaesthesia. 2006; 61:138–141. doi: 10.1111/j.1365-2044.2005.04464.x.

16. Pump B, Talleruphuus U, Christensen NJ, Warberg J, Norsk P. Effects of supine, prone, and lateral positions on cardiovascular and renal variables in humans. Am J Physiol Integr Comp Physiol. 2002;283: R174–R180. doi: 10.1152/ajpregu.00619.2001.

17. Krauskopf A, Mayerhoefer M, Oberndorfer F, Salameh B, Bur A, Schneider B, et al. Does weight force application to the lower torso have an influence on inferior vena cava and cardiovascular parameters? Am J Emerg Med. 2008;26:603–607. doi: 10.1016/j.ajem.2007.08.017.

18. Savaser DJ, Campbell C, Castillo EM, Vilke GM, Sloane C, Neuman T, et al. The effect of the prone maximal restraint position with and without weight force on cardiac output and other hemodynamic measures. J Forensic Leg Med. 2013;20(8):991-995. doi: 10.1016/j.jflm.2013.08.006.



19. Position Statement on the concern about use of the term "Excited Delirium" and approoptriate medical management in out of hosutial contexts.  American Psychiatric Association Official Actions Dec https://www.psychiatry.org/File%20Library/About-APA/Organization-Documents-Policies/Policies/Position-Use-of-Term-Excited-Delirium.pdf
20. https://www.ama-assn.org/press-center/press-releases/new-ama-policy-opposes-excited-delirium-diagnosis
21. https://www.wunderground.com/history/daily/us/ma/hyannis/KHYA/date/2019-4-16