## On-Scene Consulting

July 30, 2022

Mr. Howard Friedman, Esq.
Law Offices of Howard Friedman, PC
1309 Beacon Street, Suite 300
Brookline, Massachusetts 02446

### Federal Rules of Civil Procedure 26 (a) (2) (B) Report

**ESTATE OF ROBERT JOSEPH MILLER, by and through IAN MILLER, a personal representative of the Estate, Plaintiff,**
**vs.**
**SEAN ROYCROFT and SPENCER JACKSON, in their capacities, and the TOWN OF BARSTABLE, MASSACHUSETTS, Defendants.**
**(Civil Action No. 21-10738-AK).**

Dear Mr. Friedman,

Thank you for retaining me to analyze and render opinions regarding the April 16, 2019, In-Custody Death of Mr. Robert J. Miller at 45 Elm Street, Hyannis, Massachusetts 02601, involving Barnstable Police Department Police Officers Sean Roycroft and Spencer Jackson.   I have studied reports, photographs, Barnstable Police Department documents, Transcriptions of Digitally Recorded Interviews and Depositions, and other material (as listed under Materials Reviewed) provided to me thus far regarding this case.

Please be advised that if any additional documents related to this matter, are provided, it may be necessary to write a supplemental report in order to refine or express additional opinions. It is also necessary to state at the beginning of this report that I do not make credibility determinations in expressing my opinions.

Scott A. DeFoe
Principal
On-Scene Consulting, LLC

On-Scene Consulting

**Materials Reviewed:**

1.  Complaint, Civil Action Number 21-10738.

2.  Barnstable Police Department Incident Report, Incident Number 19-642-OF, Call No. 19-15349.

3.  Dispatch Log, Barnstable Police Department, Call No. 19-15349, 4/16/19.

4.  Barnstable Police Department, Policy and Procedure 1106, Mental Illness, Effective Date 3/18/2010.

5.  Defendant Spencer Jackson's Answers to Plaintiff's First Set of Interrogatories, Civil Action Number 21-10738.

6.  Defendant Sean Roycroft's Answers to Plaintiff's First Set of Interrogatories, Civil Action Number 21-10738.

7.  Draft Report, Police Officer Spencer Jackson, 4/22/19.

8.  Draft Report, Police Officer Spencer Jackson, 4/25/19.

9.  Draft Report, Police Officer Spencer Jackson, 4/30/19.

10.  Draft Report, Police Officer Sean Roycroft, 4/24/19.

11.  Draft Report, Police Officer Sean Roycroft, 4/25/19.

12.  Final Report, Police Officer Sean Roycroft, 4/25/19.

13.  Final Report, Police Officer Sean Roycroft, 5/2/19.

14.  Draft Report, Police Officer Sean Roycroft, 5/29/19.

15.  Email from Chief Sonnabend to Town Manager Mark Ellis.

16.  Emails Regarding Changes to Police Report with Attachments.

On-Scene Consulting

17. Emails Requesting the Preservation of all Radio Transmissions.

18. Emails to and about Press.

19. Cape Cod Healthcare, Robert J. Miller, Medical Record Number 10900256.

20. CCH Emergency Center Admission, Encounter Number 511763973, 4/16/19.

21. Hyannis Fire Department, Hyannis Pre-Hospital Care Report, Incident Number 2019001884.

22. The Commonwealth of Massachusetts, Office of the Chief Medical Examiner, Report of Autopsy, Robert J. Miller, M.E. Case Number 2019-4982.

23. Municipal Police Training Committee, Police Instruction to Persons with Mental Illness & Emotional Distress, 7/31/14.

24. Municipal Police Training Committee, Veteran Officer In-Service, TY2019.

25. Municipal Police Training Committee, Veteran Officer Professional Development TY2015, Power Point.

26. Power Point, Police Response to Mental Illness and Emotional Disturbances by NAMI.

27. Photographs of Scene and Body, (WEW 5364-5553).

28. Barnstable Police Department, Policy and Procedure 502, Response to Resistance, Effective Date 7/25/14.

29. Barnstable Police Department, Policy and Procedure 526, Emergency Medical Dispatch, Effective Date 9/26/16.

30. Barnstable Police Department, Policy and Procedure 1001, Detainee Restraints, Effective Date 2/5/09.

31. Transcript of Audio-Recorded Interview of Sean Roycroft by the Massachusetts State Police.

On-Scene Consulting

32. Transcript of Audio-Recorded Interview of Spencer Jackson by the Massachusetts State Police Department.

33. Information Report on Mr. Robert J. Miller.

34. Barnstable Police Department, Response to Resistance Report, Incident No. 19-642-OF, Robert J. Miller, 4/16/19.

35. Massachusetts State Police, Case Master Report No. 2019-102-131, Robert J. Miller, 4/17/19.

36. 911 Call & Barnstable Radio Transmissions, (5:07).

37. Deposition Transcript and Exhibits of Jennifer Ellis taken on 6/15/22.

38. Deposition Transcript and Exhibits of Spencer Jackson taken on 3/24/22.

39. Deposition Transcript and Exhibits of Sean Roycroft taken on 3/30/22.

40. Deposition Transcript and Exhibits of Amy Anderson taken on 12/3/21.

41. Deposition Transcript and Exhibits of Emily Higgins taken on 9/22/21.

42. Deposition Transcript and Exhibits of Lieutenant Mark Mellyn taken on 12/16/21.

43. Deposition Transcript and Exhibits of Kenyon C. Pike taken on 9/21/21.

44. Deposition Transcript and Exhibits of Adam Ruggieri taken on 12/7/21.

45. Deposition Transcript and Exhibits of Kevin Shaw taken on 12/16/21.

46. Deposition Transcript and Exhibits of Vicki J. Yefko taken on 9/21/21.

47. Deposition Transcript of Kevin Tynan taken on 4/29/22.

48. Deposition Transcript of David Myett taken on 4/29/22.

**Summary:**

The following statement summaries represent documents/statements that were used in part during my review but are in no way meant to be exhaustive. The documents listed in the Materials Reviewed Section of this report represent the full library of documents reviewed thus far and used as a basis for my opinions.

**The below listed information is derived from Barnstable Police Department Incident Report, Incident Number 19-642-OF, Call No. 19-15349, Supplemental Narrative For Patrol Officer Sean Roycroft:**

**Entered: 05/29/2019 Entry ID: 279**

*"On Tuesday 4/16/2019, at approximately 1904 hours, I was assigned a marked cruiser patrol in Hyannis/Sector 1.  At this time, I was dispatched along with Patrolman S. Jackson to 45 Elm Street, Hyannis. Dispatch advised a female caller was reporting her husband was having a psychotic break.  I responded from Saint John Paul High School."*

*"Upon arrival, I was met at the front door by a woman.  She said he is on the back deck. She was whispering.  She had a look of fear on her face.  Her voice was shaky.  I said dispatch advised your husband is having a psychotic episode, can you elaborate? She said he is hallucinating and talking to people who are not there.  She further said you can hear him, and he is out on the back deck now.  I could hear him yelling.  I could not understand what he was saying.  I asked if he takes medication.  She said that he hasn't taken hi medication for days.  He hasn't slept in days either.  I asked her his name.  She said Robert.  I asked if I should come through the house.  She directed me around the right side of the house."*

*"I went to the back right corner of the house where I could see Robert standing on the deck.  He was only wearing sweatpants.  No shirt or shoes.  I also could see several dumbbells stacked up on the stairs leading onto the deck.  Robert was talking while looking up to the sky.  He was loud.  He was gesturing towards the sky with his hands and arms.  I could not understand what he was saying."*

*"I stepped from the side of the house in the backyard.  I walked towards Robert's direction.  He turned and looked at me.  He had the look in his eyes like he wasn't there. I said, "what's going on Robert?"  He said, "I'm having a conversation with nature."  I said, "I do that sometimes.  Can I have a conversation with you?" He said, "sure come*

## On-Scene Consulting

*up on the deck." I stepped up on the deck next to Robert. I asked him "what's going on today?" He said, "nothing just talking with nature." His voice was calm even though he look frazzled. His eyes were red and bloodshot. He was sweating. He had an empty stare in his eyes. He would not make eye contact with me. He was looking to the ground. I said your wife called because she has some concerns about you. I asked again if we could talk? Robert continued to stare at the ground for several seconds. Then he turned abruptly away from me and walked towards a broken figurine (lawn ornament) on the deck of the house. I thought he was going to pick up a piece of the broken figurine. I followed and stayed close to Robert. He stopped as he reached for the house. All of a sudden like a light switch, he turned towards me and said fuck you and I'm not talking to you, get the fuck away from me. He was angry with clenched fists. He was grunting and shaking his fists. He turned and hurried towards the sliding door leading into the house. I thought he was going to look for his wife inside the house. I asked him to stop. He grabbed the handle of the door and pulled it open. I was directly behind him. I continually told him to stop. He entered the dining area through the slider. He seemed to be on a mission. I thought he was looking for his wife. I grabbed him by the arm to stop him. He pulled away and was now leaning over the dining table foraging for something. The table was covered with several different items. I was afraid he was looking to arm himself. He would not respond to my commands to back away from the table. I placed him in a seatbelt hold. My left arm under his left arm pit and my right arm over his right shoulder with my hands connected at his chest. My right leg was between his legs with my left leg outside of his left leg. I pulled him back away from the table."*

*"Robert continued to fight and pull trying to get back to the table. His hands were in front of his chest with his arms and bent at the elbow. I was not able to see his hands. I was applying pressure with my arms and hands to keep him from pulling away from me. The entire time I was asking Robert to stop resisting/fighting. We were still upright and shuffling across the floor. I could see his wife out of the corner of my eye to my left. I could also see a set of golf clubs in a bag leaning against the wall in the direction we were moving. A single golf club was on the floor in front of us. I was holding Robert pulling back trying to keep him away from the clubs. I thought he was trying to get to the clubs. As we reached this step down, we both fell to the floor landing on top of the golf club. I was still holding Robert in a seatbelt hold. He fell face first to the floor with his arms under his body. I still had a seatbelt hold on him. He was trying to get up lifting his chest and pulling his elbows under him. He was squeezing my left arm and had it trapped. I was not able to reach my taser or microphone. I was trying to keep pressure on his back to keep him from getting up. My shoulder radio microphone pressed against*

On-Scene Consulting

*my neck, and I heard the tone from my radio. At this time, I heard Officer Jackson say, Sean I'm behind you. I said I don't know if he has anything in his hands."*

*"Officer Jackson was trying to control Robert's right arm. Officer Jackson was able to pull his right arm partially out. Robert moved and pulled his arm back under him. Officer Jackson asked me if he should tase him. I said no because my left arm was stuck under Robert's left arm pit. I was not able to move away. Officer Jackson radioed for back up. Officer Jackson then delivered a hand strike to Robert in the lower right portion of his back telling him to pull hands out. Robert was still moving, twisting, and pulling to keep his arms under his chest. I was able to pull my left arm out and get control of his right arm and together we pulled his arms behind his back. Robert was still face down on the floor. We secured the handcuffs and Officer Jackson double locked them."*

**The below listed information is derived from Barnstable Police Department Incident Report, Incident Number 19-642-OF, Call No. 19-15349, Personnel Narrative For Patrol Officer Spencer L. Jackson:**

**Entered: 05/28/2019 Entry ID: 279**
**Modified: 05/28/2019 Modified ID: 279**

*"On Tuesday, April 16th, I was on patrol assigned to the Hyannis sector in E328. At approximately 1904 Hrs, Officer Roycroft and I were dispatched to 45 Elm Street for a female caller reporting that her husband was having a "Psychotic Break." Dispatch did not have any further information from the reporting party. Officer Roycroft arrived on scene approximately one minute prior to me."*

*"Upon my arrival, I exited my cruiser and could hear a loud crash from inside the rear left side of the house; as I approached, the glass slider was knocked out of its frame, fell, and landed on the rear deck of the house. I climbed the deck and entered through the rear slider. I observed Officer Roycroft attempting to control a male subject later identified as Robert Miller. Officer Roycroft was on Miller's back and Miller was thrashing around and was attempting to get away from Officer Roycroft's control. Officer Roycroft and Miller walked a few steps away from my position and fell face down into a small area adjacent to the dining room. I approached Officer Roycroft and announced my presence. Officer Roycroft was on the left side of Miller's body was attempting to gain control of his left arm; I came to the right side of Miller's body and attempted to gain control of his right arm. Miller did comply with multiple commands to*

## On-Scene Consulting

*relax, and to put his hands behind his back.  Miller continually thrashed his body, kicked his legs, and tried to pull away from our control.  Lying directly underneath Miller's body, I observed the shaft of a golf club."*

*"During the struggle, Officer Roycroft made a comment along the lines of; I think he may have something in his hands!  We continued to try to gain control of Miller's arms but were unable to remove his arms from beneath his body.  I again ordered Miller to put his hands behind his back.  I feared that Miller was holding a weapon.  I asked Officer Roycroft if I should use my Taser, he replied no and continued to struggle with Miller.  I delivered a half strength hand strike to the side of Miller's body.  The strike landed in between his bottom rib and his hip on the right side of his body.  The purpose of this strike was to distract Miller in order to gain control of his hands for handcuffing.  Immediately after the strike I was able to partially remove Miller's right arm from underneath his body, however as I did this, he twisted his body towards Officer Roycroft's position and yanked his arm back underneath his body."*

*"At this time, I notified dispatch on my radio and advised that we were fighting with the subject.  I delivered another hand strike in the same area to Miller's side and was able to move Miller's arm out from underneath his body.  I could see that Miller's fist was clenched but did not have anything protruding from his right hand.  We continued to give commands to stop resisting and to place his hands behind his back.  Eventually Officer Roycroft and I were able to gain control of Miller.  I handcuffed him behind his back and double locked the cuffs.  Officer Shaw arrived at this time."*

*"I looked back and briefly spoke wit the reporting party, Amy Anderson who was standing a short distance behind me.  I asked Anderson if he had been consuming any alcohol or narcotics.  She briefly replied that he was having some sort of psychotic breakdown but to her knowledge he was not under the influence of drugs or alcohol."*

*"Officer Roycroft immediately noticed that Miller appeared to be unconscious, and it appeared that he was not breathing.  We placed him on his right side in the recovery position.  Officer Roycroft advised me to remove the handcuffs. I removed the handcuffs from Miller and Officer Roycroft began to check for a pulse on Miller's neck."*

*"Officer Ruggieri arrived at this time carrying a medical bag.  I requested a bag valve mask from Officer Ruggieri and began giving rescue breaths.  Due to our locations in the room, I took over chest compressions and Officer Roycroft administered rescue breaths to Miller with the BVM."*  As CPR was being given, Officer Ruggieri connected the AED

On-Scene Consulting

*however, no shock was advised.  We continued CPR until Hyannis FD arrived.  Hyannis FD personnel took over CPR with the Lucas chest compressions machine and continued care for Miller.”*

**Opinions:**

Note:  None of my opinions are intended to usurp the province of the jury and are not stated as ultimate issues.  Rather, my opinions involve the consistency of the officers' actions with standard police practices.

### Opinion Number 1

It is my opinion based on my review of the facts, testimony and videos in this matter, a reasonable Police Officer acting reasonably would have initially determined that Mr. Robert J. Miller was mentally ill and or experiencing a mental crisis and follow his training on interacting with people suffering from mental illness or in a mental crisis.  It is my opinion that Barnstable Police Department Police Officer Sean Roycroft failed to follow his training on interacting with people suffering from a mental illness or in a mental crisis and act reasonably.  Throughout the United States and in Massachusetts, law enforcement agencies have recognized and trained their officers in multiple ways to safely interact with subjects such as Mr. Robert Miller who are suffering from a mental illness and or experiencing a mental crisis.  The objective is to avoid unnecessary injury and or death.  The underlying principle is reverence for human life.  These correct and reasonable methods are recognizing cues and other indicators in order to make appropriate decisions regarding intervention strategies; time to assess the situation; calm the situation; request additional and equipment; provide reassurance that the officers are there to help; give the person time to calm down; move slowly; eliminate emergency lights and reduce environmental distractions.  These correct and reasonable methods are well known and proven effective for the safety and welfare of both Peace Officers and the public.

In addition, law enforcement officers are taught that they should attempt to de-escalate and utilize proper defusing techniques throughout an incident.  Defusing is a process of reducing the potential for violence and bringing emotional level to a manageable level to restore order. The primary objective is to calm the person so that a conversation can take place and the use of force can be avoided.

In addition, it is my opinion, Officer Sean Roycroft failed to follow his training on interacting with people suffering from mental illness or in a mental crisis and act reasonably by utilizing the below listed De-escalation Techniques:

## On-Scene Consulting

- Recognize the person may be overwhelmed by thoughts, beliefs, sounds (voices).
- Remember, a person's delusions or hallucinations are real to them.
- Understand that a rational discussion may not take place.
- Speak simply, move slowly.
- Announce actions before taking them.
- Attempt to gain voluntary compliance.
- Remove distractions and disruptive people.
- Be friendly, patient and encouraging but remain professional.
- Be aware that a uniform and a gun may frighten a person with mental illness.
- Reassure the person that no harm is intended.
- Get immediate emergency aid when needed.

Effective communication may enable a peace officer to gain cooperation and voluntary compliance in stressful situations.

The vast majority of law enforcement responsibilities involve effective communication. Communication involves both command presence and words resulting in improved safety.  Effective communication:

- Provides skills that reduce the likelihood of physical confrontation.
- Can result in a reduction of injuries.
- Renders more effective public service and improves community relations.
- Decreases public complaints and internal affairs investigations.
- Decreases civil liability.
- Lessens personal and professional stress.

It is not the role of or within the capacity of peace officers to attempt to diagnose a person's disability, officers need to recognize cues and other indicators in order to make appropriate decisions regarding intervention strategies.

When time and circumstances reasonably permit, a Police Officer should consider whether a subject's lack of compliance is a deliberate attempt to resist or is the result of an inability to comply based on factors including, but not limited to:

- Medical conditions.
- ***Mental Impairment.***
- Developmental Disability.
- Physical Limitation.
- Language Barrier.
- Drug Interaction.

On-Scene Consulting

- ***Behavior Crisis.***

Based on my review of the facts in this matter, it is my opinion Police Officer Sean Roycroft should have asked Ms. Amy Anderson to go to a friend's or neighbor's residence and ensured her safety outside of the residence before contacting Mr. Robert Miller.

Police Officers should consider actions that may increase officer safety and may decrease the need for using force:

(a). Summoning additional resources that are able to respond in a reasonably timely manner.

(b). Formulating a plan with responding Police Officers before entering an unstable situation that does not reasonably appear to require immediate intervention.

(c). Employing other tactics that do noy unreasonably increase officer jeopardy.

In addition, when reasonable, Police Officers should evaluate the totality of the circumstances presented at the time in each situation and, when feasible, consider and utilize reasonably available alternative tactics and techniques that may persuade an individual to voluntarily comply or may mitigate the need to use a higher level of force to resolve the situation before applying force. Such alternatives may include but are not limited to:

(a). Attempts to de-escalate a situation.

(b). If reasonably available, the use of crisis intervention techniques by properly trained personnel.

In addition, I base my opinion on the following facts and testimony in this matter:

- According to Barnstable Police Department Call Number 19-15349, on 4/16/19, Dispatcher Emily A. Higgins dispatched a Mental Health Emergency Call at 45 Elm Street, Hyannis, Massachusetts 02601. "PR stated husband having a psychotic break."
- According to Barnstable Police Department Police Officer Spencer Jackson, he was responding to a mental health call for service, (Deposition Transcript of Spencer Jackson, Page 59).

## On-Scene Consulting

- According to Barnstable Police Department Police Officer Spencer Jackson, he agrees that if someone is "talking to nature," they are having a "psychotic break," (Deposition Transcript of Spencer Jackson, Pages 102-103).
- According to retired Barnstable Police Department Police Officer Sean Roycroft, he agrees that Mr. Robert Miller was admitted to Cape Cod Hospital Psychiatric Center once in the past (Deposition Transcript of Sean Roycroft, Page 99).
- According to retired Barnstable Police Department Police Officer Sean Roycroft, he believed that Mr. Robert Miller was delusional just by the way he was talking, (Deposition Transcript of Sean Roycroft, Page 107).
- According to retired Barnstable Police Department Police Officer Sean Roycroft, when he first observed Mr. Robert Miller, he was having a "psychotic break," (Deposition Transcript of Sean Roycroft, Page 58).

In addition, I base my opinion on my twenty-eight years of law enforcement experience where I responded to thousands of calls for service and have effectively utilized defusing techniques, de-escalation techniques, verbal strategies, and active listening skills to reduce the potential for violence and bring the emotional level of the incident to a manageable level by recognizing that an individual may be mentally ill and or experiencing a mental crisis.

Lastly, I base my opinion on my twenty-eight- year law enforcement career whereas a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

## Opinion Number 2

It is my opinion based on my review of the facts, testimony and videos in this matter, the Barnstable Police Department Police Officer Sean Roycroft failed to follow his training and utilize effective Crisis Intervention Techniques.

Many law enforcement agencies throughout the United States and in Massachusetts have provided Crisis Intervention Training (CIT) to their police officers and or have formed a Crisis Intervention Team(s) that typically follow the below listed recommended guidelines:

- Whenever possible, a uniformed CIT Officer(s) should respond to any call involving a mentally ill individual that pose a danger to self or others.
- Upon receiving a call involving a mentally ill person, who poses a danger to themselves or others, Communications (Dispatch) will follow the standard dispatch protocol and request a CIT Officer(s) to respond.

## On-Scene Consulting

Crisis Intervention curriculum teaches officers skills such as de-escalation, (e.g., <u>talking slowly, having more patience, asking subject questions, recognizing the signs and symptoms of mental illness</u>), how to provide mental health referrals/resources, and about the voluntary treatment options.  By increasing understanding by officers of mental illness and improving the response to mental health calls will reduce the need for the use of force, decrease injuries and deaths to officers and people in a mental health crisis, reduce the stigma of mental illness and increase access and engagement in services for people with mental illness.

<u>In addition, I base my opinion on the following facts and testimony in this matter</u>:

- According to Barnstable Police Department Lieutenant Jennifer Ellis, she agrees that one of the reasons an officer responds is to provide medical assistance on a call for service when a person is suffering from psychosis, (<u>Deposition Transcript of Jennifer Ellis, Page 44</u>).

In addition, I base my opinion on my law enforcement experience with the Los Angeles Police Department (<u>LAPD</u>) while assigned to: Patrol, Vice, Special Problems Unit, Detectives, and Special Weapons and Tactics (<u>SWAT</u>) to include being the Supervisor-in-Charge of LAPD SWAT's Crisis Negotiation Team.  In addition, the utilization of a mental health professional at the onset of an incident such as this incident can be an invaluable tool.  The Los Angeles Police Department Mental Evaluation Unit (<u>MEU</u>) responds to thousands of similar incidents on an annual basis and supports uniformed personnel by providing valuable insight and information.  In addition, I base my opinion on my twenty-eight-year law enforcement career where I have utilized the services of LAPD's Mental Evaluation Unit on hundreds of incidents to effectively resolve situations involving mentally ill subjects.

Lastly, I base my opinion on my twenty-eight- year law enforcement career whereas a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

### **Opinion Number 3**

It is my opinion based on my review of the facts and testimony in this matter, Barnstable Police Department Police Officer Sean Roycroft did not have <u>Reasonable Suspicion</u> to detain or <u>Probable Cause</u> to arrest Mr. Robert Miller on April 16, 2019, at 45 Elm Street, Hyannis, Massachusetts 02601.

# On-Scene Consulting

The authority to arrest and to deprive a person of freedom is one of the most serious and sensitive duties of a peace officer.  The misuse of this authority undermines the relationship between peace officers and the community members they serve.

The Fourth Amendment of the U.S. Constitution provides that people, houses, and effects, (belongings) shall be secure form unreasonable searches and seizures.

Reasonable Suspicion is the standard used to justify a detention. It exists when an officer has sufficient facts and information to make it reasonable to suspect that criminal activity may be occurring, and the person to be detained is connected to that activity. A temporary detention or stop is an assertion of authority by a peace officer that would cause a reasonable person to believe they are not free to leave.  Such a belief may result from physical restraint, unequivocal verbal commands, or other conduct by an officer.  A detention of a person is linted in scope, intensity, and duration.

Probable Cause to arrest exists when the totality of the circumstances or "total atmosphere" of the case would cause a person of ordinary care and prudence to entertain an honest and strong suspicion that the person to be arrested is guilty of a crime.

In addition, I base my opinion on the following facts and testimony in this matter:

- According to retired Barnstable Police Department Police Officer Sean Roycroft, he agrees that a civilian can swear at you.  They can say, "Fuck You and "I'm not talking to you," and it is supposed to roll off your back and not cause you any particular upset, (Deposition Transcript of Sean Roycroft, Pages 43-44).
- According to Barnstable Police Department Police Officer Spencer Jackson, he admits that it is not a crime if a person says, "Fuck You," and "I don't want to talk to you," (Deposition Transcript of Spencer Jackson, Page 26).
- According to Barnstable Police Department Police Officer Spencer Jackson, Mr. Robert Miller did not commit any sort of a crime and had not threatened anybody, (Deposition Transcript of Spencer Jackson, Page 139).
- According to retired Barnstable Police Department Police Officer Sean Roycroft, he was never told Mr. Robert Miller assaulted anyone, (Deposition Transcript of Sean Roycroft, Page 100).
- Based on my review of the facts and testimony in this matter, Police Officer Sean Roycroft, unnecessarily escalated the situation by initiating physical contact with Mr. Robert Miller by grabbing his arm.
- According to retired Barnstable Police Department Police Officer Sean Roycroft, Mr. Robert Miller never picked up a piece of the broken ceramic figurine, (Deposition Transcript of Sean Roycroft, Page 113).

On-Scene Consulting

Lastly, I base my opinion on my twenty-eight year law enforcement career whereas a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

**Opinion Number 4**

It is my opinion Barnstable Police Department Police Officer Sean Roycroft failed to develop a plan including waiting for additional Barnstable Police Department Police Officer(s) to arrive prior to approaching Mr. Robert Miller who was mentally and or experiencing a mental crisis.  Based on my review of the facts and testimony in this matter, Police Officer Spencer L. Jackson was assigned to the call for service and arrived approximately (1) minute after Police Officer Sean Roycroft arrived at the call.  There was no rush.  There was not a crime in progress.  Mr. Robert Miller did not commit a crime.  In addition, it is my opinion, Police Officer Sean Roycroft should have conducted a proper interview of Ms. Amy Anderson to solicit important information prior to approaching Mr. Robert Miller such as:

- Mr. Robert Miller's statements and actions prior to his arrival.
- Mr. Robert Miller's past criminal history, if any.
- Weapons to include firearms that are inside the residence or on Mr. Robert Miller's person.
- Drug and or alcohol use currently or in the past by Mr. Robert Miller.
- Determine if Mr. Robert Miller was under the care of a doctor or mental health professional to include a psychiatrist and or psychologist currently or in the past.
- Mr. Robert Miller's current and past mental health history to include taking psychotropic medication.
- The number of people inside the residence to include any pets.

In addition, it is my opinion Police Officer Sean Roycroft failed to formulate a tactical plan with Police Officer Spencer L. Jackson and other Police Officers that were responding to the scene or requested to respond to the scene prior to initiating contact with Mr. Robert Miller.  Based on my review of the facts and testimony in this matter, Mr. Robert Miller was alone, mentally ill and or experiencing a mental crisis. There was no rush.  There was not a crime in progress.  Police Officers are taught, Time and Distance.  In addition, based on my review of the facts and testimony in this matter, Police Officer Sean Roycroft initiated physical contact with Mr. Robert Miller within a minute of arriving at scene.

## On-Scene Consulting

Officers must approach every contact with officer safety in mind.  Complacency, overconfidence, poor planning, or inappropriate positioning can leave officers vulnerable to attack. Officers are trained to work together and function as a team.

In addition, it is my opinion Police Officer Sean Roycroft possessed an inappropriate attitude and failed to develop a plan.

**Inappropriate Attitude:**
- Careless or complacent.
- Overconfident.
- Too aggressive.
- Tunnel Vision.

**Poor or No Planning:**
- Rushing into the situation without any plan of action.
- Failure to establish plan of action prior to engaging the suspect.
- Not considering alternative actions.

The tactical plan should have outlined verbal skills to include (defusing and de-escalation techniques) and Less Lethal Force options such as: empty hands, physical strength, and compliance techniques, soft or hard hand techniques, ASP/ Baton, and Oleoresin Capsicum "OC" spray with an effective range of 10-15 feet.

In addition, it is my opinion Police Officer Sean Roycroft failed to comply with Barnstable Police Department, Policy and Procedure 1106, Mental Illness, Effective Date 3/18/2010:

6.0 Intervention Guidelines: An officer who becomes involved with an individual who displays signs of mental illness, or who may be a danger to him/herself or others, should follow these guidelines:

Action

Step 1: Quickly assess the situation and secure the scene

Step 2: Request back up assistance as appropriate.

Step 3: Ask questions of other persons available to learn as much as possible about the distressed individual.  It is important to find out whether any person, agency or institution has lawful custody of the individual, and whether he/she has a history of criminal, violent or self-destructive behavior.

# On-Scene Consulting

<u>In addition, I base my opinion on the following facts and testimony in this matter:</u>

- According to Barnstable Police Department <u>Call Number 19-15349</u>, on 4/16/19, Dispatcher Emily A. Higgins dispatched a Mental Health Emergency at <u>19:07:37</u> to Police Officer Sean Roycroft and at <u>19:07:47</u> to Police Officer Spencer L. Jackson to 45 Elm Street, Hynannis,02601.
- According to former Barnstable Police Department Dispatcher Emily Higgins, she sent Spencer Jackson to the call and (10) seconds after she sent Sean Roycroft to the call location, (<u>Deposition Transcript of Emily Higgins, Page 13</u>).
- According to Barnstable Police Department Lieutenant Jennifer Ellis, she agrees that it would be helpful to learn more about the person at a call for service involving a mentally ill individual, (<u>Deposition Transcript of Jennifer Ellis, Pages 26-27</u>).
- According to Barnstable Police Department Police Officer Spencer Jackson, he would get a lay out of the scene, understand who is there, if there are other individuals involved in the situation, they are separated from the incident and make sure that no weapons are involved, get demeanor of the person and their intentions, (<u>Deposition Transcript of Spencer Jackson, Pages 40-41</u>).
- According to Barnstable Police Department Police Officer Spencer Jackson, he admits that when you arrive on a scene involving a person who is having a mental health crisis who is psychotic, it is important to have a plan of action, (<u>Deposition Transcript of Spencer Jackson, Page 48</u>).
- According to Barnstable Police Department Police Officer Spencer Jackson, he agrees it would be important to have a plan to deal with the fact that this person is not rational because they are having a psychotic break, (<u>Deposition Transcript of Spencer Jackson, Page 132</u>).
- According to retired Barnstable Police Department Police Officer Sean Roycroft, Police Officer Spencer Jackson arrived on scene approximately (1) minute after he did, (<u>Deposition Transcript of Sean Roycroft, Page 59</u>).

In addition, I base my opinion on my twenty-eight-year law enforcement career and specifically during my assignment as a Sergeant II+1 at Los Angeles Police Department Special Weapons and Tactics (<u>SWAT</u>) where I supervised hundreds of SWAT incidents that involved the use of the SWAT's Crisis Negotiation Team.

Lastly, I base my opinion on my twenty-eight- year law enforcement career whereas a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

On-Scene Consulting

## Opinion Number 5

It is my opinion <u>if</u> Mr. Robert Miller entered his residence, Police Officer Sean Roycroft should not have followed him into his residence, as he did not commit a crime that necessitated being detained and or arrested.

If Police Officer Sean Roycroft reasonably believed that Mr. Robert Miller was a <u>Danger to Self or a Danger to Others</u>, he should have requested additional Police Officers and a Barnstable Police Department Supervisor to respond the scene.  The Barnstable Police Department Supervisor should have immediately taken <u>Command and Control</u> of the incident and establish a perimeter around Mr. Robert Miller's residence as well as a Command Post, (<u>CP</u>).

It is the responsibility of the Supervisor or primary Police Officer to initiate the coordination of security and containment of the crime scene or an incident that may require additional resources and response.  This can be done by establishing a perimeter completely surrounding the area involved.

The establishment of a secure perimeter may be essential to safely resolve the crime in progress or to contain a suspect.  <u>Establishing a perimeter</u>:

- Contains and isolates the crime scene.
- Prevents the suspect from escaping the area.
- Prevents unauthorized entry onto the area.
- Can aid in apprehending the suspect.

<u>There are two types of perimeters at a crime scene</u>: **<u>inner perimeter</u>** and **<u>outer perimeter:</u>**

**<u>Inner Perimeter:</u>**

- Immediate area around the incident (<u>e.g., private residence, commercial establishment, vehicle, etc.</u>).

**<u>Outer Perimeter</u>**:

- Area surrounding the inner perimeter.
- Established to further contain and isolate the crime scene.

The outer perimeter may aid in apprehension if the suspect manages to breech the inner perimeter, providing protection and cover for inner perimeter officers, providing traffic control, assisting in public safety.

## On-Scene Consulting

Once the perimeter was established, the on-scene Supervisor should have contacted Mr. Robert Miller on his cell phone and request him to exit his residence. If the Supervisor could not contact Mr. Robert Miller via cell phone, he could have utilized a bull horn or the Public Address (PA) on a Police Vehicle to request Mr. Robert Miller to exit his residence. If Mr. Robert Miller refused to exit his residence, the on-scene Supervisor should have made the determination to leave the area or to contact the Cape Cod Regional Law Enforcement Council Special Weapons and Tactical (CCRLEC SWAT) Team that consists of specially selected officers from various law enforcement agencies to include the Barnstable Police Department. These officers have been highly trained in the use of special weapons and tactics for the purpose of handling high-risk situations requiring training and expertise beyond the capabilities of regular Police Officers.

In addition, it is my opinion that if Mr. Robert Miller entered his residence and refused to exit his residence, the request and deployment of the Cape Cod Regional Law Enforcement Council Special Weapons and Tactical (CCRLEC SWAT) Team would have been a safer alternative. SWAT/Tactical Units are equipped with special training, equipment, and tools such as: Ballistic Shields, chemical agents, Sabre Red-16-ounce Stream MK-9 or a similar high-volume Oleoresin Capsicum (OC) Streamer, less than lethal launchers/ projectiles, ballistic/tactical gear, ballistic helmets, and Armored Rescue/Recovery Vehicles (BEARCAT/BEAR). The actions of first responders can mean the difference of whether a barricaded subject is taken into custody, without escalation of an already difficult situation. Handling barricaded subjects requires special tools and expertise, which comes from specialized training. The Special Weapons and Tactics (SWAT) Team/Tactical Unit is equipped and trained to resolve these barricaded subject situations. A barricaded subject is defined within the following limited criteria:

A. The subject is possibly armed; and

B. The subject is believed to have been involved in a criminal act; or is a *potential threat* to the lives of citizens, himself/herself and/or police; and

C. The subject is in a position of advantage, affording him cover and/or concealment. The subject is contained in an open area and the presence or approach of police officers could precipitate an adverse reaction; and

D. The subject refuses to submit to arrest.

Initial response by officers on scene is extremely important. That response can be broken down into four areas referred to as the "Tactical Four C's."

A. Containment

## On-Scene Consulting

B.  Control

C.  Communicate

D.  Call SWAT.

<u>The Crisis Negotiation Team Structure will typically consist of the following</u>:

A.  Primary Negotiator

B.  Secondary Negotiator

C.  Coach or Supervisor

D.  Intelligence Coordinator

E.  Mental Health Professional

The Primary Negotiator shall be typically report to the Incident Commander and receive an appropriate briefing as to what transpired prior to his or her arrival.  The Primary Negotiator shall be responsible for the initial contact and ensuing negotiations unless the role is changed during the negotiation process.  <u>The Primary Negotiator should attempt to do the following once he or she has established dialogue</u>:

A.  Attempt to put the subject at ease.

B.  Keep communications open.

C.  Elicit useful information.

D.  Achieve a safe surrender of the subject with dignity.

<u>The Primary Negotiator should be aware of the following important principles</u>:

A.  Listen actively to effectively understand what is being said and the various underlying meanings and messages.

B.  Give the subject feedback so as to assure them that you understand their messages.

C.  Be empathetic.

D.  Understand what is being said and what message is really being given.

E.  Find hopes, hooks-expand options.

F.  Speak slowly and clearly.

## On-Scene Consulting

G. Ask about suicide.

H. Consider basic human needs.

I. Beware of suicide by cop.

The Secondary Negotiator is responsible for monitoring the negotiations so as to give feedback to the Primary Negotiator regarding the following:

A. Tempo.

B. Inflection.

C. Trigger words.

D. Interpretation of messages given by the subject.

E. Any additional useful information.

The Coach or Crisis Negotiation Team (CNT) Supervisor will monitor the ongoing negotiations and will offer any advice or information that he or she deems important and useful.  The Coach or CNT Supervisor is separate from the tactical supervisor or Incident Commander.

The Coach or CNT Supervisor will perform the following functions:

A. Meeting with Negotiators.

B. Give advice to the Primary Negotiator.

C. Keep track of chronological events to include maintaining a white board, track "trigger" words, and maintain timeline such as identifiers, information, etc.

The Intelligence Coordinator, who is a trained negotiator, is responsible for assigning persons to gather information about the subject to include: description, criminal background, mental health history, medical history, family, financial issues, and other relationships.

Effective communication with a subject by a crisis negotiator can be the key to a successful resolution of the situation.  The following are effective communication

On-Scene Consulting

strategies for a successful resolution of an incident involving a subject who is mentally ill and or experiencing a mental crisis:

I.  Focus on the Goal:
   • The goal is to resolve the incident safely, without injury or loss of life.

II.  Do Not Rush:
   • Once the perimeter has been established and the evacuation has been completed, time is on the side of the officers.
   • All involved officers should be prepared for long extended periods to allow the situation to be resolved through negotiation.

III.  Communicate in an Appropriate Manner:
   • All communication with a subject should be as nonthreatening as possible.
   • Do not escalate the situation by issuing ultimatums to the subject or making the subject feel trapped or pressured.


In addition, I base my opinion on the following facts and testimony in this matter:

   • According to Barnstable Police Department Police Officer Spencer Jackson, he is currently a member of the Regional SWAT Team, and he agrees that on occasion, Regional SWAT would assist and set up containment on a mentally ill subject and they had Crisis Negotiators called in and they contacted the person.  The one incident he was involved in worked out successfully.  The person received mental health treatment and was safe, (Deposition Transcript of Spencer Jackson, Pages 9-10 & 13-14).
   • According to Barnstable Police Department Police Officer Spencer Jackson, he would call the Crisis Negotiation Team if de-escalation efforts did not work and he felt that a Crisis Negotiation Team would eventually resolve the situation, (Deposition Transcript of Spencer Jackson, Page 40).

Lastly, I base my opinion on my twenty-eight-year law enforcement career and specifically during my assignment as a Sergeant II+1 at Los Angeles Police Department Special Weapons and Tactics (SWAT) where I supervised hundreds of SWAT incidents that involved the use of the SWAT's Crisis Negotiation Team.

**Opinion Number 6**

It is my opinion based on my review of the facts and testimony in this matter, Barnstable Police Department Police Officer Sean Roycroft made a poor tactical decision when he

# On-Scene Consulting

utilized a "Seat-Belt" Hold/Maneuver to take Mr. Robert Miller to a prone position on the ground.  In addition, after the went to the ground, Police Officer Sean Roycroft's left arm was trapped underneath the torso of Mr. Robert Miller and he was on Mr. Robert Miller's back.

In addition, it is my opinion Barnstable Police Department Police Officers Sean Roycroft, and Spencer Jackson should have immediately taken the pressure and weight off of Mr. Robert Miller's back once he was on the ground, handcuffed and in a prone position. This can be accomplished by simply immediately rolling him on to his side in a recumbent position or place him in a seated or standing position.  In addition, based on my review of the facts and testimony in this matter, Mr. Robert Miller stopped breathing as he was handcuffed.

In addition, I base my opinion on <u>U.S. Department of Justice, Office of Justice Programs, National Law Enforcement Technology Center, Positional Asphyxia-Sudden Death, June 1995, Advisory Guidelines for Care of Subdued Subjects</u>: To help ensure subject safety and minimize the risk of sudden in-custody death, officers should learn to recognize factors, contributing to positional asphyxia.    <u>To help minimize the potential for in-custody injury death officers should</u>:

- Follow existing training and policy guidelines for situations involving physical restraint of subjects.
- As soon as the suspect is handcuffed, get him off his stomach.
- Ask the subject if he has used drugs recently or suffers from any cardiac or respiratory diseases or conditions such as asthma, bronchitis, or emphysema.
- Monitor subject carefully and obtain medical treatment if needed.
- Be trained to recognize breathing difficulties or loss of consciousness and immediately transport the individual to the emergency room or call for an Emergency Medical Team (<u>EMT</u>)/Emergency Medical Services (<u>EMS</u>) if such signs are observed.

Barnstable Police Department Police Officers Sean Roycroft and Spencer Jackson <u>knew or should have known that when an individual is restrained in a face-down position, and breathing may become labored</u>:

- Weight is applied to the person's back-the more weight, the more severe the degree of compression.
- The individual experiences increased difficulty breathing.
- The natural reaction to oxygen deficiency occurs-the person struggles more violently.
- The officer applies more compression to subdue the individual.

## On-Scene Consulting

It is my opinion that the <u>Basic Physiology of a Struggle</u> is applicable in this matter. A person lying on his stomach has trouble breathing when pressure is applied to the back. <u>The remedy seems relatively simple</u>: get the pressure off his back.  In addition, it is my opinion that Defendants should have recognized that there are certain factors that may render some individuals more susceptible to positional asphyxia following a struggle, particularly when prone in a face-down position.

The risk of positional asphyxia or compressional asphyxia is compounded when an individual with predisposing factors such as obesity become involved in a struggle with an officer or officers, particularly when physical restraint includes use of behind the back handcuffing combined with placing the subject in a stomach-down position.

Every day, police officers encounter situations that require them to restrain persons. Properly trained officers learn how improper restraining techniques can block the flow of air into the individual's lungs contributing to a life-threatening condition known as "positional, or restraint, asphyxia."  Proper training to include defusing and de-escalation techniques also covers multiple effective options available such as avoiding compression of the chest, rolling the subjects over on his side, sitting or standing the subject up, and ongoing proper monitoring.

In addition, I base my opinion on <u>AELE Monthly Law Journal, Restraint and Asphyxia, Part Two-Compressional Asphyxia, January 2009</u>:

**2.  <u>Conclusions</u>:** Officers must be taught to avoid putting their body with on a confined person as soon as active resistance has ended of the person has been adequately trained from causing harm to himself or others.  Dr. Reay's article in the May 1996, FBI Law Enforcement Bulletin emphasized:

"Instructors must stress vigilance in monitoring the subject's condition.  The process of hypoxia is insidious, and subjects might not exhibit any clear symptoms before they simply stop breathing.  Generally, it takes several minutes significant hypoxia to occur, but it can happen more quickly if the subject had been violently active and is already out of breath.  If the subject experiences extreme difficulty breathing or stops breathing altogether, officers must take steps to resuscitate the subject and obtain medical care immediately."

## On-Scene Consulting

In addition, I base my opinion on the following video, facts, and testimony:

- According to Police Officer Sean Roycroft, when Mr. Robert Miller was pushing up, he pushed Mr. Robert Miller back down, (Deposition Transcript of Sean Roycroft, Page 134).
- According to Police Officer Sean Roycroft, his microphone was compressed due to his positioning, (Defendant Sean Roycroft's Answers to Plaintiff's First Set of Interrogatories, Civil Action Number 21-10738, Page 11).
- According to Amy Anderson, she heard Robert say, "I can't breathe," when he was leaning over on the table. He asked, like called for her to help him. "Amy, help me." And that was probably his last words, (Deposition Transcript of Amy Anderson, Page 57).
- According to Amy Anderson, she asked the officers if he could breathe and they said, "Yes, he can breathe," (Deposition Transcript of Amy Anderson, Page 58).
- According to Barnstable Police Department Lieutenant Jennifer Ellis, she is not aware of anyone other Officer Sean Roycroft at the Barnstable Police Department that used a Seat Belt Technique. In addition, Lieutenant Ellis was unaware of a Police Officer using a Seat Belt Hold other than Police Officer Sean Roycroft in this case, (Deposition Transcript of Jennifer Ellis, Page 61).
- According to Barnstable Police Department Police Officer Spencer Jackson, he never heard of a "Seat Belt Hold," and he was not trained on that technique in the course of his police work, and he has never seen a "Seat Belt Hold" applied at any other time in his career, (Deposition Transcript of Spencer Jackson, Pages 32-33).
- According to Barnstable Police Department Police Officer Spencer Jackson, he believes that you should not argue or challenge the person, threaten the person, raise your voice, or talk too fast, restrict the person's movement and be aware of things you might do that might exacerbate or make the persons' fear and aggression worse, (Deposition Transcript of Spencer Jackson, Pages 42-43).
- According to Barnstable Police Department Police Officer Spencer Jackson, he agrees that a person who is obese and, on their stomach, might have trouble breathing, (Deposition Transcript of Spencer Jackson, Page 50).
- According to Barnstable Police Department Police Officer Spencer Jackson, he agrees that if a person is face down and police are trying to handcuff him, it is important to reduce the amount of weight or pressure on a person's back, (Deposition Transcript of Spencer Jackson, Pages 51-52).
- According to Barnstable Police Department Police Officer Spencer Jackson, he agrees that potentially if somebody is having difficulty breathing, they will

struggle to get air into their lungs, (<u>Deposition Transcript of Spencer Jackson, Page 57</u>).

- According to Barnstable Police Department Police Officer Spencer Jackson, Mr. Miller was face down first then Officer Roycroft, (<u>Deposition Transcript of Spencer Jackson, Pages 64-65</u>).
- According to Barnstable Police Department Police Officer Spencer Jackson, Officer Roycroft still had Mr. Robert Miller in a Seat Belt Hold and part of Officer Sean Roycroft's chest area was on top of Mr. Robert Miller because his left arm is trapped, (<u>Deposition Transcript of Spencer Jackson, Page 40</u>).
- According to Barnstable Police Department Police Officer Spencer Jackson, when they went to the floor, he did not see anything in Mr. Miller's hands, (<u>Deposition Transcript of Spencer Jackson, Page 69</u>).
- According to Barnstable Police Department Police Officer Spencer Jackson, Mr. Miller did not kick or strike him or Officer Sean Roycroft, (<u>Deposition Transcript of Spencer Jackson, Pages 80 & 90</u>).
- According to Barnstable Police Department Police Officer Spencer Jackson, Mr. Robert Miller never verbally threatened him, (<u>Deposition Transcript of Spencer Jackson, Page 101</u>).
- According to Barnstable Police Department Police Officer Spencer Jackson, he agrees that there is a potential for a Seat Belt Hold to transition into a choke and they at taught by Barnstable Police Department to avoid the neck, (<u>Deposition Transcript of Spencer Jackson, Pages 128-129</u>).
- According re retired Barnstable Police Department Police Officer Sean Roycroft, Deputy Chief Balcom was unfamiliar with the Seat Belt Hold, (<u>Defendant Sean Roycroft's Answers to Plaintiff's First Set of Interrogatories, C.A. No. 21-10738-FDS</u>).
- According to retired Barnstable Police Department Police Officer Sean Roycroft, he was not taught the Seat Belt Hold, (<u>Deposition Transcript of Sean Roycroft, Page 30</u>).
- According to Barnstable Police Department Sergeant Kevin Tynan, he never heard of a "Seat Belt Hold" and does not remember any training in the use of a "Seat Belt Hold," (<u>Deposition Transcript of Kevin Tynan, Page 20</u>).
- According to retired Barnstable Police Department Sergeant David Myett, he never heard of a "Seat Belt Hold," (<u>Deposition Transcript of David Myett, Page 15</u>).

On-Scene Consulting

Lastly, I base my opinion on my twenty-eight-year law enforcement career whereas a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

## **Opinion Number 7**

It is my opinion the Barnstable Police Department failed to determine through their investigation and review process that there was a failure to effectively de-escalate the situation and that the force used in this matter was inappropriate and unreasonable.  In addition, it is my opinion that subjective fear would by insufficient for Police Officers Sean Roycroft and Spencer Jackson to use force in this matter based on the facts that Mr. Robert Miller's behavior was not assaultive, and he was not armed with a weapon and or an object that could be used as a weapon.  It is my opinion that there was a gross lack of situational awareness and fundamental tactical errors in this incident.  It is also my opinion that Police Officers Sean Roycroft and Spencer Jackson failed to follow their training on the <u>following subject matters</u>: Proper Response and Interaction with the Mentally Ill, Working as a Team, Verbal Strategies, Active Listening Skills, Crisis Intervention Training, Excited Delirium, Tactical Plan, Command and Control and Defusing and De-Escalation Techniques. In addition, the Barnstable Police Department ratified and endorsed the conduct of the involved Officers by determining that their conduct was within policy.  These types of decisions tend to have a ripple effect in the Department because other Police Officers believe that they can engage in similar conduct without consequences.

<u>In addition, I base my opinion on the following facts and testimony</u>:

- According to former Barnstable Police Department Dispatcher Emily Higgins, she cannot recall specific trainings that would have them call EMS to respond to a mental health emergency, (<u>Deposition Transcript of Emily Higgins, Page 19</u>).
- According to Barnstable Police Department Lieutenant Mark Mellyn, he doesn't recall or is not aware if Dispatch contacted or attempted to contact mental health officials, (<u>Deposition Transcript of Lieutenant Mark Mellyn, Page 13</u>).
- According to Barnstable Police Department Lieutenant Jennifer Ellis, she does not know if Barnstable Police Department trained on Excited Delirium, (<u>Deposition Transcript of Jennifer Ellis, Page 20</u>).
- According to Barnstable Police Department Police Officer Spencer Jackson, he does not recall anyone telling him that he should have done anything different, (<u>Deposition Transcript of Spencer Jackson, Page 109</u>).

# On-Scene Consulting

- According to retired Barnstable Police Department Police Officer Sean Roycroft, in 2019, he never heard of the term Excited Delirium, (Deposition Transcript of Sean Roycroft, Page 70).
- According to retired Barnstable Police Department Police Officer Sean Roycroft, he does not recall any specific training as to how long you should leave a person handcuffed behind their back down on the floor, (Deposition Transcript of Sean Roycroft, Page 71).
- According to retired Barnstable Police Department Police Officer Sean Roycroft, none of his supervisors told him that he could have done anything differently, (Deposition Transcript of Sean Roycroft, Page 30).
- According to Barnstable Police Department Sergeant Kevin Tynan, he does not recall being trained in Excited Delirium, (Deposition Transcript of Kevin Tynan, Page 26).
- According to retired Barnstable Police Department Sergeant David Myett, he does not recall the term Excited Delirium, (Deposition Transcript of David Myett, Page 19).

Lastly, I base my opinion on my twenty-eight- year law enforcement career whereas a Supervisor, I have investigated over (100) Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

**My Qualifications for Reviewing this Case:**

My opinions are based on my education, training, and experience.  Upon my graduation in June 1988 from Northeastern University in Boston with a Bachelor's Degree in Criminal Justice, I was hired as Criminal Investigator/Special Agent GS-1811.  Upon completion of Criminal Investigator/Basic Agent School at the Federal Law Enforcement Training Center (FLETC)-6-month academy, I was assigned to the United States Customs Service, Organized Crime Drug Task Force where I functioned as an agent and undercover operative. The investigations focused on targeting criminal organizations that were involved in large scale narcotic smuggling and money laundering operations.

I was assigned to the United States Customs Service, Office of the Special Agent In-Charge, in San Francisco from August 1988 until I joined the Los Angeles Police Department in November of 1989.  While in the academy, I was selected by LAPD Training Division staff to be my Recruit Class Leader.  Upon my graduation from the LAPD Academy, I was assigned to 77th Division.  In addition to being assigned to 77th Division, I was assigned to Northeast Division (Patrol), Northeast Division (Special Projects Unit-SPU), Northeast Division C.R.A.S.H (Gang Detail).  I was selected to be

## On-Scene Consulting

transferred to Operations Central Bureau C.R.A.S.H., where I worked a plain clothes detail targeting specific gangs throughout Operations Central Bureau.

I applied and was selected to be a Police Officer III at Wilshire Area Vice where I functioned as an undercover operative targeting prostitution, gambling, bookmaking, and other Vice related offenses. While working Wilshire Vice, I was ambushed and received two gunshot wounds.  I received the Purple Heart in 2010.  Upon return from my injuries, I attended mandated Field Training Officer (FTO) School and was assigned as a Field Training Officer at Wilshire Division.  I trained recruits upon their graduation from the Los Angeles Police Academy in tactics, use of force, report writing, vehicle stops, calls for service, court testimony, emergency procedures, pursuit policy, accident investigations, perimeters, Department policies and procedures, de-escalation and defusing techniques and effective communication skills. While assigned as a Field Training Officer, I was involved in an In-Policy Lethal Use of Force incident, while working with a Probationary Police Officer who had recently graduated from the Los Angeles Police Academy.

I was promoted to the rank of Detective and attended Basic Detective School.  Upon completion of Basic Detective School, I was assigned to Wilshire Area Narcotics, Field Enforcement Section, (FES), where I functioned in an undercover capacity.  I addition, I was assigned to Wilshire Area Detectives, (Auto-Theft, Burglary, Robbery, Gangs and Homicide).

I was promoted to the rank of Sergeant I and assigned to Hollenbeck Division.  Prior to my assignment, I attended mandated Basic Supervisor School.  In conjunction with Supervisor School, I was selected to attend the West Point Leadership Academy Supervisor Training.  The training focused on team building, leadership, and decision making.  While assigned to Hollenbeck Division, I conducted roll call training on a daily basis on numerous subject matters to include Use of Force Options (Non-Lethal and Lethal), Tactics, Calls for Service, Calls for Service involving the Mentally Ill, Vehicle Pursuit Policy, LAPD Policies and Procedures, Use of Force Policy, Updated Legal Bulletins, Training Directives, de-escalation and defusing techniques and other Standardized Roll Call Training.  I directly supervised a Watch of Officers and provided supervisory oversight during calls for service, tactical situations, perimeter tactics, containment and control and use of force incidents.  I conducted audits, personnel investigations, Standard Based Assessments (Ratings), Use of Force Investigations, Administrative Projects, and prepared commendations for officer's field performance. While assigned to Hollenbeck Division, I was selected as the Officer-In-Charge of Hollenbeck Division's Special Enforcement Group.  I directly supervised (14) Police

## On-Scene Consulting

Officers and Detectives assigned to the Unit. Our unit worked in conjunction with Hollenbeck Detectives and specifically targeted career criminals in the Division. I provided ongoing mandated Department Training as well tactical, firearms, less than lethal and search warrant tactics training to the Officers and Detectives. As a Unit, we prepared and served numerous search warrants. I provided search warrant tactical briefing and de-briefing of each search warrant at the conclusion of the search warrant service. I completed audits, administrative projects, Use of Force Investigations, personnel complaints, and other administrative duties as deemed necessary by the Area Commanding Officer.

During this time, I was selected to be loaned to Internal Affairs, Headquarters Section. I investigated personnel complaints that were too large in scope for a geographical Division. At the conclusion of my loan, I was selected to Management Services Division, Special Projects, and Office of the Chief of Police. I completed numerous in-depth staff projects for review by the Chief of Police. In addition, I was assigned with conducting research and editing the 2000 LAPD Department Manual.

Also, during this time, I earned my Master's Degree in Public Administration from California State University, Long Beach.

I applied and was selected as a Sergeant II at 77th Division Vice. I directly supervised (10) undercover officers and (4) uniformed officers. I provided all facets of training to the officers assigned to Vice at that time to include Use of Force Policy, Legal Updates, Department Directives, Training Bulletins, Standardized Roll Call Training, Tactics Training, Undercover Operations training, Surveillance training, and any other training deemed necessary by my Area Commanding Officer. I conducted audits, personnel investigations, administrative projects, Use of Force Investigations, and special projects.

During this time, I was selected by the Chief of Police to be loaned to the Rampart Corruption Task Force. I conducted Use of Force and Personnel Investigation (complaints) audits of Specialized Units in Central and South Bureaus. I reported directly to the Office of the Chief of Police.

In 2000, I applied and was selected to Metropolitan Division K9 Platoon as a Sergeant II+1. I directly supervised (18) K9 Handlers. Metro K9 conducted K9 Operations for the entire Department covering all Patrol Divisions and Specialized Units, (465 square miles). I provided all facets of training to the K9 Officers to include: K9 Operations, tactics, search warrant services, Mobile Field Force Options, Less than

## On-Scene Consulting

Lethal Force Options, Lethal Force Options, Department Directives, Training Bulletins, and other training dictated by the K9 Officer-in-Charge and Commanding Officer of Metropolitan Division. In addition, I taught K9 Operations at LAPD In-Service Training, Watch Commander School, Field Training Officer (FTO) School, and Basic Detective School. While at K9, I investigated and completed K9 contacts, (bite investigations), personnel complaints, Use of Force Investigations. In addition, I directed and was directly involved in Use of Force incidents. I received the LAPD Medal of Valor and LAPD Police Star for two lethal use of force incidents while assigned to K9.

In 2005, I was selected as a Sergeant II+1 in Special Weapons and Tactics (SWAT). I along with (5) other Sergeants directly supervised (60) SWAT Officers. I conducted and facilitated all facets of SWAT training to include Weapons Training (.45 caliber, MP-5, M-4, Benelli Shotgun, Remington 870 Bean Bag Shotgun, .40mm, SAGE, X-26 Taser) on a monthly basis. In addition, I facilitated and conducted training in the following training Cadres: Breacher (Explosive), Crisis Negotiation-Mental Health, MEU, SMART, Suicide Prevention, Counter-Terrorism Cadre, Climbing, Hostage Rescue, Sniper Training, Air Support Training (Fast rope, Aerial Platform Shooting). I directly supervised SWAT missions and High-Risk Search Warrant Services to include all facets (preparation, briefing, deployment, de-briefing). I was the Supervisor-in-Charge of the Crisis Negotiation Team. I provided on-going crisis negotiation training, mental health training, de-briefs, 40-hour POST Certified CNT School, and suicide prevention training. I worked in conjunctional with the mental health community to provide and facilitate training with LAPD SMART, LAPD Mental Evaluation Unit (MEU), Behavioral Science Services Section (BSS), and the Didi Hirsch Suicide Prevention Training. In addition, I was assisted the West Point Military Academy with the development of their crisis negotiation curriculum.

During this time, I was selected as the sole LAPD SWAT representative to respond to Mumbai India with Counterterrorism following the terrorist attack in November 2008. I taught use of force, tactics, and SWAT deployment to 250 Mumbai Special Tactical Police Officers. Upon my return, I assisted with the development of multiple venue/multiple attacker tactics.

In June 2010, I retired from the Los Angeles Police Department with 20 years in service to pursue an opportunity in the private sector. I held supervisory positions for the last (14) years of my career. During my tenure with the LAPD, I received over (100) Commendations to include: The Medal of Valor, Purple Heart, and the Police Star.

# On-Scene Consulting

From June 2010 through April 2013, I was the Vice President of Security Operations at Caruso Affiliated in Los Angeles, CA.  My responsibilities included: Identified and conducted Risk and Vulnerability Assessments for all Caruso Affiliated Developments, projected developments/investments, and residences.  Utilized strategic-level analysis from the intelligence community, law enforcement and the private sector.  Ensured a coordinated ability to identify and monitor potential or actual incidents among critical infrastructure domains and all personal and professional interests of Caruso Affiliated.  Mitigated expected threats.  Utilized preplanned, coordinated actions in response to infrastructure warnings or incidents.  Responded to hostilities.  Identified and eliminated the cause, or source, of an infrastructure event by the utilization of emergency response measures to include on-site security personnel, local law enforcement, medical and fire rescue, and relevant investigative agencies.  Conducted all facets of security training for the company and employees.  Formulated Business Continuity and CEO Succession Plans for the company and all affiliated business interests.  Conducted ongoing audits and internal investigations.

From June 2013 to June 2014, I was hired as a Deputy Sheriff at the Riverside Sheriff's Department where I conducted all facets of patrol service to include calls for service, self-initiated field activity, arrests, citations, and court testimony. In addition, during my tenure with the Riverside County Sheriff's Department, I was assigned to Robert Presley Detention Center (RPDC). Processed and monitored inmate population from initial intake, housing, court, transportation, and release. Conducted searches of inmate population as well as the facility on an ongoing basis. Utilized experience as a gang officer, Detective and Sergeant with LAPD to conduct interviews and interrogations of prisoners regarding a myriad of investigations. Provided information to gang detail. Functioned as a mentor to newly appointed Deputy Sheriffs as well as Supervisors. Attended and certified in RSO Supplemental Jail Operations Core Course prior to deployment at RPDC. Attended on-going training to include Use of Force (Lethal and Non-Lethal), Crisis Negotiation Training, Active Listening Skills Training, Report Writing, Response and Deployment to Critical Incidents, and Proper Protocols and Procedures when responding to a medical incident or suicide.

From June 2014 to March 2016, I was the Director of Security at Universal Protection Service where I supervised (84) Security Professionals at the City National Plaza. Conducted and or facilitated all Bureau of Security and Investigative Services (BSIS) training to Security Professionals.  Ensured all Security Professionals were compliant with BSIS security training and licensing.  Conducted the following training to Security

# On-Scene Consulting

Professionals and Tenants on an ongoing basis: Fire Life Safety, Evacuation Drills, Active Shooter, Workplace Violence, Security Procedures and Protocols, Responding to Incidents Involving the Mentally Ill, Hazardous Materials and Internal Theft. Conducted ongoing Risk and Vulnerability Assessments of the City National Plaza to include security staffing and deployment, Closed Circuit Television (CCTV), Crime Prevention through Environmental Design (CPTED), and protocols to respond and mitigate threats. Developed Security and Fire Life Safety Manuals for Security Professionals and Tenants. Coordinated all security efforts to ensure safety at Special Events. Conducted internal investigations and worked in conjunction with the Los Angeles Police Department (LAPD) and the Los Angeles Fire Department (LAFD) on an ongoing basis.

From March 2016 to September 5, 2017, I was the Director of Security at L&R Group of Companies. Identified and conducted Risk and Vulnerability Assessments for all L&R Group of Companies developments and projected developments throughout the United States. Conducted and/or facilitated all Bureau of Security and Investigative Services (BSIS) training to Security Professionals. Ensured all Security Professionals were compliant with BSIS security training and licensing. Conducted the following training to Security Professionals and Tenants on an ongoing basis: Fire Life Safety, Evacuation Drills, Active Shooter, Workplace Violence, Security Procedures and Protocols, Responding to Incidents Involving the Mentally Ill, Hazardous Materials and Internal Theft. Conducted ongoing Risk and Vulnerability Assessments to include security staffing and deployment, Closed Circuit Television (CCTV), Crime Prevention through Environmental Design (CPTED), and protocols to respond and mitigate threats. Developed Security and Fire Life Safety Manuals for Security Professionals and Tenants. Coordinated all security efforts to ensure safety at Special Events. Conducted internal investigations and worked in conjunction with the Los Angeles Police Department (LAPD) and the Los Angeles Fire Department (LAFD) on an ongoing basis as well as respective law enforcement agencies throughout the United States on security matters.

Attached are my curriculum vitae, listing of testimony and fee schedule.

_____
Scott A. DeFoe