UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS

ESTATE OF ROBERT JOSEPH MILLER,
by and through IAN MILLER, personal
representative of the Estate,
     Plaintiff,

        v.

SEAN ROYCROFT and SPENCER
JACKSON, in their individual capacities
and the TOWN OF BARNSTABLE,
MASSACHUSETTS,
     Defendants

Case No. 1:21-cv-10738-AK

---

**DEFENDANTS' REPLY**

---

NOW COME the defendants, Sean Roycroft and Spencer Jackson, in their individual capacities,[1] submit this memorandum in reply to the opposition of the plaintiff, Ian Miller, to the defendants' motion for summary judgment. (Doc No. 57).

## I.    THE WRONG "TYPE" OF FORCE DOES NOT EQUATE TO "EXCESSIVE" FORCE

Plaintiff argues that Roycroft should not have used the "seatbelt" hold because he was trained in other methods to take a person into custody, including arm bar techniques, arm bar takedowns, leg sweeps and other takedown methods, (Doc No. 65, p. 4), but there is no support for his contention that the "seatbelt hold" amounted to a greater use of force that these other

---

[1] And pursuant to this Court's Standing Order Regarding Motion Practice (A. Kelley, D.J.) (February 8, 2023).

"trained" techniques that were also available to Roycroft. Furthermore, the plaintiff has no expert support for his contention that the application of *any* hold under these circumstances, particularly where it is undisputed that Miller ignored multiple verbal commands by Roycroft, was an excessive use of force. Thus, the plaintiff has no expert opinion evidence to contradict the defendants' position that *some* use of force at the point when Miller was foraging for something on the cluttered tabletop was reasonable and appropriate. (Ex. 17, p. 14).

Merely asserting that Roycroft used the wrong *type* of force in applying the "seatbelt" hold, without any analysis of where that particular type of force used falls along the continuum of force options available to them, is insufficient to defeat the defendants' motion for summary judgment. The plaintiff has no expert support for his contention that force should not have been applied at that instant. Further, DeFoe's testimony acknowledges that officers *can* use untrained techniques. (Ex. 20, p.67) ("…depending on the circumstances officers can use both holds and control holds and other type of lessening force options that may not be part of something they were trained on depending on totality of the circumstances….").

## II. ROYCROFT HAD NO INTENTION OF ENTERING THE HOME WHEN HE WENT AROUND THE SIDE OF THE HOUSE TO APPROACH MILLER

The plaintiff and his use-of-force expert ignore the fact that Roycroft had no intention of entering Miller's home at the time he went around the back of the house to approach Miller. This fact is critical, since it eliminated any need for Roycroft to ask Anderson whether there were weapons in the home, or to have her go to a neighbor's house. It is undisputed that Roycroft had no intention of entering the home at the time he approached Miller in the backyard. DeFoe also testified that, according to BPD's policy instructing officers responding to calls involving mentally

ill individuals, the scene would not be "secure[d]" (pursuant to Step 1 of the BPD mental illness response protocol) until Miller was *in custody*. (Ex. 20, pp. 57-58).

### III. PLAINTIFF'S EXPERT IMPROPERLY IGNORES THE DISCONNECTED 911 CALL

In his report, DeFoe also fails to consider the impact of the abruptly disconnected 911 call in his report, or how that circumstance should have factored into Roycroft's response to the call. (Ex. 32). During his deposition, however, DeFoe acknowledged that the disconnected call would have added an extra layer of urgency in responding to the call, and that this scenario happens "quite frequently" in domestic violence calls, testifying that "it could also create a question is this person in some type of peril because they had to hurry up off the phone and that would create a question for me as well.." (Ex. 20, p. 40). DeFoe's analysis of this critical aspect of the call is, at best, limited to his opinion that Roycroft should have inquired further of Anderson before going to check on Miller. His failure to even consider the disconnected 911 call as the factual support for any of his opinions regarding subsequent events during the call renders them unreliable and the Court should disregard them.

### IV. ROYCROFT HAD PROBABLE CAUSE TO SEIZE MILLER BASED ON THE TOTALITY OF CIRCUMSTANCES

Under the facts and circumstances known to Roycroft and Jackson at the time, a reasonable police officer would have believed that there was a probability Miller would hurt himself or others. The probable cause standard is a "relatively low threshold." *Morrissey v. Town of Agawam*, 883 F. Supp. 2d 300, 311 (D. Mass. 2012) (Neiman, M.J.) (*quoting White v. Town of Marblehead*, 989 F. Supp. 345, 349 (D. Mass. 1997)). Exigent circumstances include "a threat, posed by a suspect, to the lives or safety of the public, the police officers, or to an occupant." *Diaz v. City of Fitchburg*, 176 F.3d 560, 563 n.4 (1st Cir. 1999)). The plaintiff argues that Roycroft did not have probable cause to seize Miller by using the "seatbelt" hold him; however, the constellation of facts—the

disconnected 911 call, Anderson's apparent fear, Miller's delusional state and undisputed unpredictability, and Miller's sudden shift in demeanor to anger upon hearing Anderson had called the police—renders Roycroft's belief that there was a probability Miller would cause harm was reasonable and therefore, at the time, supplied the necessary probable cause to restrain Miller pursuant to M.G.L. 123 §12. Additionally, DeFoe offers no opinion testimony that, once Miller and Roycroft were in the home and Miller was "foraging" over the table, Roycroft should not have stopped him using *some type* of hold.

### There Is No Evidence That Roycroft or Jackson Made Up a "False" Story

The statement in the pre-hospital care report ("PHCR") that:

> Officers sts 'we were here for mental health evaluation and pt was calm and cooperative at first. He got angry and went for a golf club and we took him down and cuffed him. He was talking and we stood him up and started to walk out and he collapsed, we immediately started CPR and applied AED.

(Ex. 28; Doc. No. 66, ⁋226), should be disregarded by the Court. (See Defendants' Objections Pursuant to Fed. R. Civ. P. 56(c)(2), filed herewith. Vicki Yefko was the lead paramedic on the call to 45 Elm Street and is the author of the PHCR. (Deposition of Vicki Yefko, Ex. 34 at 40). Yefko's narrative is a "compilation of statements from a number of people." (Ex. 34 at 59). Yefko does not know the identity of these "[officers]," nor does she recall how many officers she spoke to after she arrived on scene, apart from an officer who was *not* performing CPR on Miller. (Id. at 29). It is undisputed that Jackson and Roycroft were the two BPD officers who performed CPR on Miller.

RESPECTFULLY SUBMITTED,

The defendants,
SEAN ROYCROFT and
SPENCER JACKSON

By their attorneys,

/s/ Alexandra M. Gill
Douglas I. Louison, BBO 545191
dlouison@lccplaw.com
Alexandra M. Gill, BBO 663040
sgill@lccplaw.com
LOUISON, COSTELLO, CONDON & PFAFF, LLP
10 Post Office Square, Suite 1330
Boston, MA 02109
(617) 439-0305

Dated: June 22, 2023


## CERTIFICATE OF SERVICE

I, Alexandra M. Gill, certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).


/s/ Alexandra M. Gill
Alexandra M. Gill


Dated:  June 22, 2023