**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| STATE OF CALIFORNIA, et al., <br><br> *Plaintiffs,* <br><br> v. <br><br><br> DONALD J. TRUMP, *in his official capacity as President of the United States*, et al., <br><br><br> *Defendants*. | C.A. No. 1:26-cv-11581-IT |

**DECLARATION OF MICHELLE TASSINARI**

I, Michelle Tassinari, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1.    I am a resident of the Commonwealth of Massachusetts. I am over the age of 18 and have personal knowledge of all the facts stated herein, except those matters stated upon information and belief; as to those matters, I believe them to be true. If called as a witness, I could and would testify competently to the matters set forth below.

2.    I submit this Declaration in support of the States' Motion for Summary Judgment.

3.    I am the First Deputy Secretary of the Commonwealth of Massachusetts, as well as Director and Legal Counsel of the Elections Division of the Office of the Secretary of the Commonwealth. I work for William Francis Galvin, Secretary of the Commonwealth, and support him in his official capacity as the Chief Officer of Elections for the Commonwealth. In

1

my role, I assist Secretary Galvin in the execution and enforcement of all state and federal laws relating to elections. I have served as Legal Counsel since 2000 and Director since 2005. In 2022, I was named First Deputy Secretary. I have a BA from Brandeis University and a JD from New England Law and have been an attorney in good standing in Massachusetts since 1997.

4.    The Secretary of the Commonwealth is the state's Chief Election Official, responsible for administering—and working with local election officials to ensure uniform administration of—all state and federal law relating to elections within the state. The Elections Division is responsible for implementing Secretary Galvin's responsibilities with regard to elections, including enforcing laws and providing technical information to the public, local election officials and other parties. In Massachusetts, elections are conducted by local election officials in each of the 351 municipalities. The Elections Division oversees administration of state and federal primaries and elections, including certifying candidate nomination papers and ballot question petitions, printing ballots for each of the cities and towns, and certifying the election results. We also maintain the statewide database of registered voters, print state voter registration forms and vote by mail ballot applications, and provide training to local election officials and voter registration agencies. The Secretary's Office is required by state law to send vote-by-mail applications to each registered voter before each regular state or federal primary or election. Before each biennial state election, this office is required by the state constitution to prepare and send to every voter in the Commonwealth an "Information for Voters" booklet containing information regarding the statewide ballot questions. Local election officials are responsible for registering voters, voter list maintenance, conducting early voting, mailing ballots to voters, preparing voter lists, appointing poll workers, and tallying votes.

5.      In my role as Director and Legal Counsel for the Elections Division, I am responsible for overseeing day-to-day activities including responding to inquiries from local election officials, candidates and the public. We promulgate regulations in furtherance of state laws, issue guidance to local election officials and provide both online and in-person training on election administration to local election officials. Whenever there is a new law or regulation, either state or federal, the Secretary's Office issues advisories and training to local election officials about changes to existing processes or the implementation of new procedures or requirements.

6.      The Massachusetts Constitution provides for and protects the right to vote for qualified residents.  Mass. Const. Pt. I art. 9, amends. art. 3; *see Chelsea Collaborative, Inc. v. Sec'y of Commonwealth*, 100 N.E.3d 326, 330 (Mass. 2018).  To be qualified to vote, Massachusetts residents must be citizens, eighteen years of age or older, and not be under guardianship, incarcerated for a felony conviction, or disqualified, and must be a resident of the city or town in which they seek to vote.  Mass. Gen. Laws ch. 51, § 1.

7.      Massachusetts requires that every voter's qualifications and identity be verified in connection with registration.  Voters may register in person, by mail, online, and at the Registry of Motor Vehicles or at other designated state agencies.  Mass. Gen. Laws ch. 51, §§ 26, 28, 33, 33A, 36, 42F, 42G, 42G ½, 44.  Prospective voters must attest to their citizenship, residence, and age, and provide information (under penalty of perjury) establishing their identity when they register to vote; registering illegally or providing false information is unlawful, and subject to criminal penalties.  Mass. Gen. Laws ch. 51, §§ 36, 42, 44, 47A; *see also id.* ch. 56, §§ 6, 8.

8.      Massachusetts provides automatic voter registration at certain agencies that collect reliable citizenship information.  State law requires that an agency automatically register

an applicant to vote if the agency, in regular course of business, requests that customers affirm their citizenship status and collects a signed affirmation of citizenship status or documentary proof of citizenship.  The Secretary has entered into agreements with the Registry of Motor Vehicles, MassHealth and the Commonwealth Health Insurance Connector Authority, all of which collect reliable citizenship data in the normal course of business. Mass. Gen. Laws ch. 51, § 42G ½ . Each agreement defines reliable citizenship information as "demonstration of the applicant's lawful presence by presentation of a US birth certificate, US passport, certificate of Naturalization, or a Consular Report of Birth Abroad."

9.      Massachusetts maintains a Voter Registration Information System (VRIS) and state law and regulations require that certain information be maintained and updated in VRIS to ensure compliance with the NVRA and HAVA. *Id.* § 47C; 950 Mass. Code Regs. §§ 58.00 *et seq.*

10.     Local election officials must enter into VRIS all information required to maintain and update the annual register of voters. Mass. Gen. Laws ch. 51, §§ 1, 47C; 950 Mass. Code Regs. § 58.03. This includes the name, residential address, party or political designation, and effective date of registration of all registered voters in their municipality; the designated agency at which the voter registered, or the method of voter registration; the name, address, and date of inactivity of all voters designated as inactive in their municipality; the number of inactive voters sent confirmation mailings pursuant to Mass. Gen. Laws ch. 51, § 37, and the number of responses received from voters.

11.     In Massachusetts, the primary method for list maintenance is an annual census mailed to every residential address.  If a voter fails to respond to the census by the first Monday in June, they are sent a confirmation notice and remain on the inactive voter list for two federal elections at which time they are removed, unless they update their status by returning the

confirmation notice, voting, signing a nomination paper or petition or re-registering.  State law and regulations require that voter and resident information be maintained and updated in the statewide voter list system to ensure compliance with the NVRA and HAVA.  Mass. Gen. Laws ch. 51, §§ 42H, 46, 47C, 55; 950 Mass. Code Regs. §§ 58.00 *et seq.*  Massachusetts uses several methods to prevent duplication, confirm residence, and remove deceased or otherwise ineligible voters from the voter registration list to comply with federal law, including cross-referencing death records from the Department of Public Health and regularly reviewing for potential duplicate voters.  *See, e.g.*, Mass. Gen. Laws ch. 51, §§ 4 (annual street list survey used to confirm address information), 14 (process for removing deceased voters), 1; *id.* ch. 54, § 25C (incarcerated voters).

12.     Massachusetts allows no-excuse early voting by mail, meaning any qualified voter can request and cast a mail ballot.  Mass. St. 2022, c. 92, § 10; Mass. Gen. Laws ch. 54, § 25B(a)(i).  Massachusetts law provides that qualified, registered voters have a right to vote by mail and a right to request and thereafter receive a mail ballot application.  Mass. Gen. Laws ch. 54, § 25B(a)(1)-(2); *id.* (a)(7) (requiring the Secretary of the Commonwealth to mail registered voters a mail ballot application upon request).

13.     Massachusetts law also allows for absentee voting by mail, for voters who will be absent from their city or town of registration during the polling hours, have a disability that prevents them from going to the polling place or have a religious belief that prevents them from voting in person. Mass. Gen. Laws ch. 54, § 86.  Following the adoption of no-excuse early voting by mail by law in 2022, absentee voting by mail has become relatively less common.  In 2024, for example, only 36,739 absentee ballots were cast while 1,166,367 early voting by mail ballots were cast.

14.     The process for absentee voting is similar to early voting by mail.  First, the voter must submit an application. Mass. Gen. Laws ch. 54, §§ 25B(a)(1), 89, 91, 91A. After verifying the voter's application, the local election official mails the voter a ballot, instructions, inner envelope on which an affidavit is printed and an outer mailing envelope, which is postage prepaid and pre-addressed back to the local election official. Mass. Gen. Laws ch. 54, §§ 25B, 91B.  Voters can request to have their ballot mailed to the address at which they are registered or any other mailing address.  *Id.* § 25B(a)(6). Ballots are mailed by local election officials on a rolling basis beginning approximately 30 days before any state or federal election.

15.     When voting by mail, a voter places the completed ballot in an envelope on which an affidavit is printed which advises the voter of criminal penalties for illegal voting and must be signed under penalty of perjury.  Mass. Gen. Laws ch. 54, §§ 25B(a)(1), 92; c. 56, § 26.  The voter then places the sealed affidavit envelope within an outer mailing envelope, which bears the USPS "official election mail" logo and is marked "ballot enclosed," and can either mail it to their local election office, submit it at an early voting location or the office of the local election official, or deposit it in a secure drop box.  Mass. Gen. Laws ch. 54, §§ 25B(a)(13), 92; 950 Code Mass. Regs. 47.06 (1)(b); 47.10 (2), (5).  Once received, the elections official examines whether the affidavit is properly executed and whether the voter's signature matches the one on file. Mass. Gen. Laws ch. 54, §§ 25B(a)(10), (14), 94; 950 Code Mass. Regs. 47.10 (5)(a).  The ballot is rejected if the affidavit or signature is defective, and the voter is notified and sent a new ballot, time permitting.  Mass. Gen. Laws c. 54, §§ 25B(a)(10), (14), 94; 950 Code Mass. Regs. 47.10 (5).  Once a mail ballot is accepted, the ballot is considered cast, and a voter may not vote in-person either early or on Election Day.  950 Code Mass. Regs. 47.10 (7).  Accepted mail ballots remain sealed and secured until counted.  *Id.* 47.14 (3)–(4); 47.15 (3)–(4).

16.     State law requires the Secretary's office to provide local election officials with envelopes to be sent to voters for them to return their ballots.  Mass. Gen. Laws ch. 54, §§ 25B, 87. The envelopes are required to be postage pre-paid and pre-addressed to the appropriate election official. The do this, the Secretary's office worked with USPS to create a business reply mail master account and then 351 sub-accounts for each of the local election offices. The envelopes for each municipality were designed in accordance with postal specifications and submitted to the USPS Mailing and Shipping Solutions Center (MSSC) Mailpiece Design Analyst Help Desk for approval and for them to apply the appropriate coding to ensure appropriate delivery through their automated systems. Anytime the address of a local election office is changed, the envelopes must be resubmitted for updated artwork. On February 17, 2026, we submitted a change for the Town of Wilmington and did not receive the final approved artwork until March 20, 2026.  Just last month, we submitted a change for the Town of Hampden but were provided incorrect files with overlapping features and then a second incorrect file on which USPS informed us they included the incorrect coding.

17.     Massachusetts law has codified the Uniformed And Overseas Citizens Absentee Voting Act ("UOCAVA") absentee voting procedure.  Mass. Gen. Laws ch. 54, § 91C.  The State's law permits any UOCAVA voter to apply for an absentee ballot and requires that the relevant federal form "shall be accepted" by the State's Secretary; that upon receipt of a properly executed application, a clerk "shall" expeditiously transmit the ballot; and that the Secretary "shall provide" clear instructions for return of the ballot.  *Id.* Under federal law, ballots must be transmitted to UOCAVA voters at least 45 days before any federal election. 52 U.S.C § 20302.

18.     In accordance with NVRA, Massachusetts "maintain[s] for at least 2 years . . . all records concerning the implementation of programs and activities conducted for the purpose of

ensuring the accuracy and currency of official lists of eligible voters." 52 U.S.C. § 20507(i)(1).

This builds upon a baseline federal election record retention requirement of 22 months. *Id.*

§ 20701 (requiring retention of "records and papers . . . relating to any application, registration,

payment of poll tax, or other act requisite to voting in" federal elections).

19.    Massachusetts law provides for destruction of records upon expiration of retention

period. Mass. Gen. Laws ch. 54, § 109.

20.    I am familiar with Executive Order No. 14,399, entitled *Ensuring Citizenship*

*Verification and Integrity in Federal Elections* ("EO"), which the President issued on March 31,

2026. If implemented, Sections 2, 3, and 5 of the EO will cause harm, confusion, and disruption

of election administration in Massachusetts and impose unrecoverable costs on Massachusetts.

23.    Sections 2, 3, and 5 of the EO (collectively, the "Challenged Provisions") have

already caused considerable harm, confusion, fear, and disruption in election administration in

Massachusetts, and will impose unrecoverable costs on Massachusetts. We have received

numerous inquiries from both local election officials and members of the public looking for

guidance and expressing concern about the administration of the upcoming state primary and

election with these changes.

24.    It is my understanding that Section 2(a) of the EO directs the Department of

Homeland Security ("DHS") to create a "State Citizenship List" for each State, which will

include "individuals confirmed to be United States citizens who will be above the age of 18 at

the time of an upcoming Federal election and who maintain a residence in the subject State." It

is also my understanding that DHS will send these lists "no fewer than 60 days before each

regularly scheduled Federal election, or promptly upon request by a State in connection with any

special Federal election." This would mean that DHS will send this list by Friday, September 4, 2026, for the federal general election taking place on November 3, 2026.

25.    It is unclear from the text of Section 2 what we are expected to do with the list, if anything. Nevertheless, it requires immediate action from me and my team in the Secretary's office to understand how this list will interact with the Massachusetts statewide voter registration list, and to coordinate with other state and local agencies across Massachusetts. Our efforts to address the changes and impacts of the EO will divert time and attention from other critical election preparations, including complying with state law obligations. This would detract from the preparation of ballots for the state primary and state election, which by law are prepared by the Secretary's office, as well as preparation of the Information for Voters Booklet, which contains important information about statewide ballot questions and is constitutionally required to be mailed to each voter before the state election.

26.    Further, the list is described as including citizens "who maintain a residence in the subject State." While Section 2 describes the sources of the data to be used to create the list, there is no indication as to how "residence" is being determined as we are aware that people may maintain more than one residence in a state or may maintain residences in multiple states. However, a voter can have only one residence for voting purposes. We worry that this list may result in inaccurate information or duplicate information for persons who maintain multiple residences.

27.    My office has a continuing obligation to work with the local election officials in each of the 351 cities and towns to perform regular list maintenance, as required under the National Voter Registration Act ("NVRA"), Help America Voter Act ("HAVA"), and Massachusetts General Laws. This includes sending notices to newly registered voters and

voters who may have moved, identifying duplicates on the statewide voter registration list, cancelling the registrations of those who have re-registered in another jurisdiction, cancelling the registrations of those who have been convicted of a felony and are currently incarcerated, and cancelling the registration of those who have died.

28.     Additionally, my office will need to continue to register those who are eligible to vote in Massachusetts.  Massachusetts allows qualified individuals to register up to ten (10) days before Election Day.  Mass. Gen. Laws ch. 51, § 26; 52 U.S.C. § 20507(a)(1) (requiring States to permit registration up to 30 days before a federal election).  As described above in Paragraphs 7-8,  Massachusetts allows voters to register online, at their local election official's office, at various state social service agencies, and through Massachusetts Registry of Motor Vehicles when they submit sufficient information of their voter qualifications (including citizenship) as part of their transaction.

29.     In compliance with the NVRA "quiet period" for voter registration, Massachusetts does not systematically remove voters from the rolls during the 90 days prior to a federal election unless a statutory exception applies.  *See* 52 U.S.C. §§ 20507(c)(2)(A), 3(A)-(B), 4(A). Massachusetts does, however, lawfully remove voters on an individual basis where appropriate, such as when a voter requests that his or her registration be canceled, the voter has re-registered in another state or if the voter has died.

30.     In sum, the voter list in Massachusetts changes up to and including Election Day. Registrants are constantly being added, updated, and removed as required (and limited) by federal and state law, and this will continue through the 2026 election and beyond.

31.      I have considered how our dynamic statewide voter registration list will intersect with the list created by DHS.  As noted above, pursuant to Section 2(a) of the EO, DHS will

share a State Citizenship List by September 4, 2026.  The EO permits the state "to routinely supplement and provide suggested modifications or amendments to the State Citizenship List transmitted thereto."  The EO does not require DHS to accept any of these state supplements, modifications, or amendments to the State Citizenship List.

32.    Once we receive the State Citizenship List, we will have to devote substantial resources to understanding any differences between the State Citizenship List and our current statewide voter registration list. As a baseline matter, comparing the State Citizenship List to our current statewide voter registration list will necessitate linking registrants across the lists. Before that can be done, we will have to review the format of the data and the fields compared to the way our data is stored and organized.  This will be difficult, as it is extremely doubtful that the State Citizenship List will be in the same format as our data or contain the same unique identifiers as our statewide voter registration list, such that we could perform straightforward matching. The majority of the voter records in our database include the voter's driver license number, which federal agencies generally do not have.  Rather, it is inevitable that there will be differences in the files that will make matching difficult, time-consuming, and potentially inaccurate, as people's names, addresses, and other information may vary slightly (*e.g.*, Robert vs. Bob, Apartment #3 vs. Apt. 3, use of Jr. or Sr.).  Additionally, we are aware of voters who have the same first name, last name and date of birth. I know from my experience that data matching is a complex process and extreme care must be taken when the consequences of errors may lead to voter disenfranchisement.  And because Massachusetts will receive the State Citizenship List so close to the election, we must plan for all of this now.

33.    For eligible voters who appear on the statewide voter registration list but not the State Citizenship List, my office will need to investigate further pursuant to our obligation to

ensure that eligible voters are able to vote.  Even though Massachusetts will not remove voters simply due to their absence from the State Citizenship List, it could disenfranchise voters in multiple ways.  First, voters who check their status on the State Citizenship List as contemplated by Section 2(a) and see that they are not listed may be deterred from voting because they believe they will be blocked from voting or prosecuted, especially if DHS does not timely accept their corrections.  Second, USPS may rely on the State Citizenship List to determine which voters can receive and transmit mail ballots in response to the EO's emphasis on criminal penalties associated with the distribution of mail ballots to ineligible individuals.  EO §§ 2(b), 3(a), 5.  Additionally, if the State Citizenship List is publicly accessible, other voters may challenge the qualifications of such voters either before the election or when they are attempting to vote. If a challenge is brought before the election, as allowed for by Mass. Gen. Laws ch. 51. § 48, the local election board is required to hold an administrative hearing, taking time away from their other responsibilities.  If the challenges are made during the election in accordance with Mass. Gen. Laws ch. 54, § 85, it would delay the process, create lines and potentially dissuade or impede other voters from voting. These are all potential issues that risk disrupting the orderly administration of elections and disenfranchising voters that Massachusetts cannot accept.

34.     Accordingly, in compliance with our obligation to protect the right to vote, Massachusetts would expend significant resources to attempt to supplement and amend the federal list as necessary, as errors were found through our comparison and investigation.  This includes determining proper and secure methods for sending large volumes of confidential data to the federal government.  However, even if we are able to quickly offer all necessary corrections, the EO does not require DHS to accept the State's "suggested modifications or amendments."  EO § 2(a).

12

35.     Massachusetts would incur significant costs to undertake this comparison and verification of the State Citizenship List.  We would likely have to reallocate staff or hire additional experts and may require additional tools, including hardware and software, to assist in this process, all which cost money. Our budget is already fully committed for costs associated with administering the election, including the printing of ballots and other election related materials.  The EO provides no funding, so paying for these costs will have to come from devoting fewer resources to our office's other pressing responsibilities, such as voter education.

36.     This office has already begun preparing training materials, guidance documents and communications to local election officials for the upcoming election cycle and have planned training sessions already scheduled.

37.     If Section 2 is implemented, Massachusetts will have to devote significant time, personnel, and money to update training materials for local election officials and their staff, specifically detailing what steps they must take with respect to voters who appear on their official voter registration list but not on the State Citizenship List.  This is yet another aspect of the EO's implementation that will necessarily divert already scarce resources from other important election administration tasks.

38.     I anticipate that in addition to formal training materials, my office will need to allocate significant resources to responding directly to local election officials, given the threat of criminal prosecution in Section 2 of the EO.

39.     Most local election officials do not readily have access to municipal attorneys as they use municipal law firms, the use of which incurs cost for the municipality and accordingly requires pre-approval from other municipal officials.   As a result, many of the local election officials will rely on guidance from this office in understanding federal and state election law.

40.     At the same time my staff is performing investigations into the accuracy of the State Citizenship List, they will have to conduct a wide-ranging public education campaign to ensure that eligible voters understand the EO's requirements, and how they may impact a citizen's registration and ability to vote.  For example, my staff will have to prepare and distribute training materials guiding citizens through accessing and correcting their individual records on the State Citizenship List under section 2(a).  We will also need to field questions from registrants concerned about their voter registration status and generally confused about the process and qualifications to vote in Massachusetts elections.  We will also have to create new web content to address these issues and explain the requirements to voters.

41.     As we already have voters who have applied for vote by mail ballots for the election, I anticipate we will have to send a mailing to any voters who do not appear on the State Citizenship list.

42.      I estimate that such a public education effort and state mailing would likely cost approximately $3 million.

43.     In my experience administering elections, changes to registration and election procedures in the time immediately preceding the election can cause voter confusion.  The complicated requirements of the EO will likely lead some citizens to misunderstand the requirements for registration, or whether they are able to vote in Massachusetts elections.  Some citizens will determine that the added requirements make registering and/or voting too confusing to be worthwhile.  For example, a voter may check their individual status on the State Citizenship list, according to the EO.  If they are mistakenly not included, they may believe they have no recourse, and choose not to vote,

14

or they may misunderstand the process for correction (despite our office's attempts to provide education), or DHS may not issue a correction in time.  The result of this confusion will be that fewer eligible voters successfully register to vote or decide to cast a ballot.

44.    This inevitable voter confusion harms Massachusetts because it will disenfranchise voters, interfering with our sovereign interest and state-law obligation to ensure that all eligible voters who want to can cast a vote.  It will also impose a burden on my staff's time, as my staff (and the elections staff at the municipal election offices) will be responsible for dispelling voter confusion to the extent possible.  This voter confusion will come at a crucial time, shortly before the election, when local elections officials' resources are particularly stretched.

45.    As described above in Paragraph 18, Massachusetts elections officials are required by state law to issue ballots to duly registered voters who request ballots and Massachusetts issues ballots to those who qualify and  request an absentee ballot under UOCAVA at least 45 days before an election.  52 U.S.C. §§ 20302(a)(1)-(3), (8)(A).

46.    It is my understanding that Section 2(b) of the EO instructs the Attorney General to prioritize investigation and prosecution, under a variety of federal statutes, of "State and local officials or any others involved in the administration of Federal elections who issue Federal ballots to individuals not eligible to vote in a Federal election."  I understand that the EO provides that "an individual is 'eligible to vote in a Federal election' if the individual is a citizen of the United States, 18 years of age or older by the date of the upcoming election, and otherwise qualified under the laws of his or her State."  I further understand that Section 5 of the EO encourages referrals to U.S. DOJ of "[e]vidence of violations of existing Federal laws by State or

15

local election officials" and "States or localities," among other parties, "for consideration of investigation or charges."

47.    If EO Section 2 goes into effect, I would be concerned that I, my staff, and other Massachusetts elections officials would face federal prosecution if we issued ballots to Massachusetts voters who are not on the State Citizenship List. I am concerned about the impact of these threats of criminal prosecution on my staff, not because I believe they have violated these provisions, but because the EO increases the amount of pressure and scrutiny on them.

48.    I know that the threat of prosecution under the EO is on the minds of state and local elections officials like me. I recently attended a meeting of local election officials who expressed concern that simply issuing mail ballots according to state law—to duly registered voters in Massachusetts—could result in their arrest. We already have seen a recent exodus of experienced local election officials and I worry that this could become a bigger problem in the future as people may not wish to take on the risk.

49.    Should the United States Attorney General initiate any such enforcement actions, this office would be required to divert significant time and resources not only to respond to such legal action, but also to educate the public, with the aim of minimizing voter confusion to the extent possible. Through my years of experience in the Office of the Secretary and the Elections Division, I know that responding to, defending, and managing lawsuits against the agency and/or its personnel—especially in an election year—takes up a tremendous amount of our limited time and resources. Public information, outreach, and education campaigns are similarly time consuming and resource intensive, but may be especially critical to combat voter confusion and

16

misinformation in an election year. If agency employees or other public officials were forced to personally defend themselves against potential or actual criminal charges, it would make my office's work immeasurably more difficult by creating a climate of fear and reticence, lowering morale, and discouraging public officials from forthrightly discharging their duties as required under state law.

50.     Any such legal proceedings would have severe and adverse consequences for the public's trust in administration of elections in Massachusetts.  This office provides critical public information on the laws, regulations, and procedures governing the election process in Massachusetts.  It has a strong interest in maintaining its public goodwill and reputation for administering elections with integrity.  The successful administration of elections depends on the public's trust and confidence in the process and the information they are provided.  Lawsuits, criminal investigations or prosecutions, and other legal proceedings that target or unduly affect this office's nonpartisan work in administering and preparing for the 2026 election would damage the public's trust that elections in Massachusetts (in 2026 and beyond) will be conducted fairly and free of improper political interference. That would directly undermine the interests of this office, the Commonwealth, and the public in ensuring that state and federal elections are administered in a way that maximizes the public's confidence in their integrity, and minimizes confusion, doubt, and uncertainty about the process.

51.     Additionally, the creation of a State Citizenship List may directly disenfranchise voters.  Based on my experience, I know that if a citizen is not included on the list—due, for example, to errors in DHS's static immigration information contained in its Systematic Alien Verification for Entitlements (SAVE) system, the federal government's misinterpretation of whether the citizen qualifies as a state resident, or any other error—they may believe they are

17

unable to vote, and could be prosecuted for doing so.  That is why Massachusetts works so hard to maintain consistent voter registration information so that voters are not erroneously informed that they are ineligible to vote.

52.     Based on my experience assisting local election officials I know that those officials may feel they cannot register or send a ballot to such voters without risking criminal prosecution, despite those voters' fundamental right to vote under state and federal law.  Similarly, based on my experience I know that USPS or other entities involved in the "printing, production, shipment, or distribution of ballots" may believe they cannot provide a ballot to those voters without risking criminal prosecution.

53.     As described above in Paragraph  13, Massachusetts provides a mail ballot to all registered voters who timely and validly request a ballot.

54.     It is my understanding that Section 3(b) of the EO directs the United States Postal Service ("USPS") to initiate a rulemaking that, among other things, would allow States to provide lists of mail voters to USPS 60 days before an election, require the creation of a "Mail-In and Absentee Participation List" ("USPS Mail Ballot List") and prohibit USPS from delivering mail ballots sent by individuals not on the USPS Mail Ballot List.  It is also my understanding that Massachusetts can "routinely supplement and provide suggested modifications or amendments" to the USPS Mail Ballot List, but USPS is not required to accept any changes provided by Massachusetts.

55.     As soon as our team had time to digest the contents of the EO, I immediately began considering what near-term actions the EO would necessitate from my office, including preparing to create a State List and checking the USPS Mail Ballot List, preparing guidance for municipal election officials, and coordinating with other state

18

agencies, building out data analysis infrastructure and cyber security protections, and—as discussed further below—committing additional staff time to responding.

56.     Under Section 3(b) of the EO, at least 60 days before Election Day, we would need to send a list to USPS of voters to whom we intend to send a mail-in or absentee ballot ("State Mail Ballot List"). For the 2026 federal general election, that deadline will be September 4, 2026.  This list would be comprised of those voters who submitted applications for either an absentee ballot or early voting by mail ballot in accordance with Mass. Gen. Laws ch. 54, §§ 25B(a)(2), 89. Failing to provide this list to USPS would pose an unacceptable risk under the EO that USPS will not include Massachusetts voters on the USPS Mail Ballot List, thereby making it more difficult or impossible for eligible voters to cast their ballots.

57.     As discussed throughout this declaration, Massachusetts' use of the mail for elections, paired with our election calendar, mean I must plan now for how to align our administration of mail voting with the EO.

58.     Creating the State Mail Ballot List will require my office and local elections officials in each of the 351 municipalities to expend time and resources to ensure that all voters who requested either an absentee ballot or vote by mail are included.  This task will be significantly complicated by the influx of registration updates and changes that elections officials typically receive in the months before the election (and which I expect will be exacerbated by the State Citizenship List provisions discussed above) as well as the additional applications for ballots to be mailed.

59.     The deadline to provide this list to USPS no later than 60 days before the election means that some voters who are entitled to a mail ballot under state and federal law will unavoidably be left off the list.  State law requires this office send vote by mail applications to

any voter who has not already applied for a vote by mail ballot at least 45 days before each federal election, which is after the deadline to supply the list. Mass. Gen. Laws ch. 54, §§ 25B(a)(7)(i).  UOCAVA permits uniformed and overseas voters to request absentee ballots up to 45 days before an election.  52 U.S.C. § 20302(a)(8).  Under Massachusetts law, voters may either cast an absentee ballot or vote by mail ballot up to five (5) business days before an election. Mass. Gen. Laws ch. 54, §§ 25B(a)(2), 89.  Although the EO indicates that States will be able to "routinely supplement and provide suggested modifications or amendments" to the USPS Mail Ballot List, USPS is not required to accept our suggestions.  The EO also does not specify when USPS will transmit its USPS Mail Ballot List to our office, which could cause substantial complications.

60.     Once we receive the USPS Mail Ballot List, we will have to devote substantial resources to understanding any differences between it and our own list of voters eligible to receive mail ballots.  This will be a difficult task for many of the same reasons set out above with regard to the State Citizenship List, including: the lack of unique identifiers shared by both lists, the potential for slight variations in spelling to wrongly preclude matches, the fluid nature of voter registration rolls in the lead-up to elections, and administrative challenges inherent to any data-matching process. Accordingly, reviewing the USPS Mail Ballot List will require a significant expenditure of time and resources.

61.     For citizens who appear on the statewide voter registration list and are eligible to receive a mail ballot under Massachusetts law but not the USPS Mail Ballot List, my office will need to investigate further pursuant to our obligation to ensure that any voter who properly applied is able to receive a mail ballot as requested and as

20

required by state law.  We must make every effort to do so to avoid disenfranchising eligible Massachusetts residents.

62.    Massachusetts would expend significant resources to attempt to supplement and amend the USPS Mail Ballot list as necessary, as errors were found through our comparison and investigation in addition to providing supplemental listings from new applicants.  This includes determining proper and secure methods for sending large volumes of confidential data to the USPS.  This is true even though the EO instructs that we can only "supplement" and "provide suggested modifications or amendments" to the USPS Mail Ballot List, and USPS is not required to accept them.

63.    Even with the best efforts of my office and local elections officials, the challenges of completing a complex data-matching program in a short timeframe and while preparing to administer an election poses the high risk of errors and omissions.

64.    Massachusetts would incur significant costs to undertake this comparison and verification of the USPS Mail Ballot List.  We'd likely have to bring in a data-matching specialist to help create a program to review the files and match records, but would also have to divert staff for manual review of data.  Based on a recent program that required us to match records of a limited number of persons to voter data, we understand the complexities of this process and the resources needed to review. Without having the data format of the USPS Mail Ballot List in advance, it is nearly impossible to estimate the time needed to process and review. In any case, our office is already operating under a reduced staff and the timing of the list coincides with when we will be preparing ballots for the general election.

65.    If Section 3 is implemented, Massachusetts will have to devote significant time, personnel, and money to update training materials for local elections officials and their staff.

Those materials would have to specifically detail what steps they must take with respect to voters who appear on their voter registration list and are eligible to receive a mail ballot under state law, but who do not appear on the USPS Mail Ballot List.  As the local election officials are responsible for registering voters and receiving and processing vote by mail applications in Massachusetts, we would need to instruct local election officials on how to supplement or amend records and then coordinate how to provide those records to USPS directly or through this office. This is yet another aspect of the EO's implementation that will necessarily divert a significant number of our team's resources from other important election administration tasks.

66.     I anticipate that, in addition to formal training materials, my office will need to allocate significant resources to responding directly to local elections officials, given the threat of criminal prosecution in the EO. In Massachusetts, most municipalities don't have immediate access to counsel and instead contract with municipal law firms.  In these instances, the local election officials cannot simply inquire of their counsel and instead must seek prior approval from their municipal administration, such as their town manager.  Anytime there is an issue that may affect multiple local election officials such as this, we try to provide guidance and consistent information to assist them and facilitate any communications with their counsel.

67.     At the same time my staff is creating the State Mail Ballot List and performing investigations into the accuracy of the USPS Mail Ballot List, they will have to field questions from citizens concerned about their ability to receive or return a mail ballot in the upcoming elections.  Thus, a separate impact of the EO's directive concerns the need for a wide-ranging public education campaign to ensure that eligible voters

22

understand the EO's requirements, and how they may impact a citizen's ability to vote by mail.

68.    I estimate that such a public education effort would likely cost hundreds of thousands of dollars, which is not currently budgeted for.

69.    Apart from the time and monetary costs that Section 3's implementation would impose on Massachusetts, Section 3 also risks voter confusion and disenfranchisement.  This inevitable voter confusion is a harm in and of itself and is also a burden on my staff's time.  This voter confusion will come at a crucial time shortly before the election, when our office is busy preparing the ballots for local election officials, who are required under state law to send mail ballots to those voters who have applied for either an absentee or vote by mail ballot.

70.    Sending mail ballots in a timely fashion is not only required by state and federal law, but is critical to ensuring that as many eligible Massachusetts voters as possible can exercise their right to vote.  In the 2024 General Election, 1,203,106, or 34.2%, of Massachusetts voters voted by mail.

71.    Errors in the USPS Mail Ballot List would be extremely deleterious because of the potential for voter disenfranchisement.  For example, consider an eligible voter who is on the State Mail Ballot List but not on the USPS Mail Ballot List.  Under the EO, they are likely to receive a mail ballot from their local elections official that USPS will later refuse to return to the local elections official.  In that situation, the voter may think that they have voted, but they have not.  Nor would the voter necessarily know that if their ballot is not received by the local election official because USPS declines to deliver it, they can still vote in person, given that the EO does not charge USPS with notifying the voter.  The EO also doesn't require USPS to notify the local election official of a ballot that they are declining to deliver, and therefore the local election officials also won't be able to advise the voter to vote in person.  While my office maintains a

website on which voters can check to see if their ballot was received, not every voter has internet access and others simply won't check.  If they do check and it shows that the ballot has not yet been received, they may believe there is simply a delay and may not realize it is being held by USPS. My office must take every measure possible to avoid this kind of voter disenfranchisement.

72.    In my experience administering elections, changes to election procedures in the time immediately preceding an election can cause voter confusion.  The EO's complicated requirements will likely lead some eligible voters to misunderstand whether they are able to use a mail ballot.  Some eligible voters will determine that the added requirements make voting too confusing to be worthwhile.  The result of this confusion will be that fewer eligible voters decide to cast a ballot.

73.    There are several additional inherent problems posed by the deadlines outlined above and the requirement to compare static lists (the State Citizenship List, USPS Mail Ballot List, and State Mail Ballot List) with a constantly evolving list (the statewide voter registration list).  For example, between the day the State Citizenship List is sent and ten (10) days before Election Day (the last day a voter may register), there will inevitably be a significant number of individuals who become eligible or change their residence within Massachusetts but are not captured on the State Citizenship List.  They may, for example, they may move into Massachusetts and register up until 10 days before the election or become a naturalized citizen after the list was sent.

74.    This process is likely to be particularly complicated in the larger cities in Massachusetts, which have particularly transient populations, including the City of Boston, which has a high student population. Even if the State Citizenship List is

completely accurate, it will not accurately reflect the address for those who move from another State between 30 and 60 days before the federal general election and are eligible to vote in accordance with the Massachusetts state law.

75.    Additionally, as already noted, the timeline simply does not seem workable.  The EO requires DHS to send the State Citizenship List to States "no fewer than 60 days before each regularly scheduled Federal election."  For the November 3, 2026 General Election, that means DHS must send this list by Friday, September 4, 2026.  And Massachusetts must also send its State Mail Ballot List to USPS 60 days before the election—also Friday, September 4, 2026.  Thus, we must send the State Mail Ballot List (i.e., all those who should receive a mail ballot under state law) to USPS on the *same day* we might receive the State Citizenship List from DHS.  Comparing the statewide voter registration list and the State Citizenship List to see who is eligible according to both lists in *one day*, or even *a few hours*, is simply not possible to do with any meaningful degree of accuracy, no matter how many resources my office dedicates to the project.

76.    Although the EO provides that we may "routinely supplement and provide suggested modifications or amendments" to the USPS Mail Ballot List, there is no guarantee that USPS will accept those suggestions.  If we—in an attempt to protect Massachusetts elections officials from criminal liability—sent a State Mail Ballot List to USPS 60 days before Election Day that reflected only confirmed matches between the statewide voter registration list and the State Citizenship List, knowing that many eligible voters could have been wrongfully excluded from the State Citizenship List, we would be committing ourselves to potentially violating state law.  We could then endeavor to submit additional matches as we confirmed them.  But it would be very difficult to do so quickly enough to matter.  On September 19, 2026—only 2 weeks after

25

we receive the State Citizenship List—our UOCAVA voters' ballots must be transmitted to UOCAVA voters as required by federal law.  Shortly thereafter, ballots will be sent to absentee voters who requested a ballot be mailed to an out-of-state address in addition to voters who are unable to vote in person or who simply requested a vote by mail ballot.  Even if DHS and USPS accepted our suggestions, there is unlikely to be enough time to get a ballot to those who are eligible but did not appear on the State Citizenship List.  Voters would be disenfranchised and state laws would be violated.

77.    Again, because of our obligation to ensure that every eligible Massachusetts voter can vote, we would need to take additional steps after receiving the State Citizenship List and USPS Mail Ballot List to investigate the status of all those on the statewide registration list who do not appear on the federal lists, and then suggest changes to both.  This will require data matching, verification, follow-up investigations, and interfacing with DHS, USPS, local election officials, the public, and others, and will demand an enormous investment of resources.  Additionally, state cybersecurity and information technology staff would need to be involved to facilitate the secure transfer of information between the federal government and the Secretary of the Commonwealth.  I estimate that these initiatives would require hiring multiple contractors and additional full-time employees as soon as this summer, including a project manager, a data analyst, a liaison for our local election officials and an additional communications staffer.  This is in addition to the staff time required to work with DHS and USPS to securely transfer information.

78.    I estimate that these new staffing needs will require an increase of $2 million to the Secretary's budget.  Given recent economic pressures across the state and

country, we have been trying to keep my office's budgetary needs as low as possible. For the next fiscal year, which begins on July 1, 2026, we have already requested a significant increase specifically due to a large quantity of ballot questions, which will increase the costs for printing ballots and the booklet that we are constitutionally and statutorily required to send to each registered voter. The other increase we've already anticipated is for postage, which USPS has already notified of an increase, that affects vote by mail ballots. The EO will increase financial strain on our office and necessitate a higher budget.  We will either need to go back to the Legislature and ask for additional funds, which we are far from assured to receive, or will need to identify equivalent cuts elsewhere in our office, a very difficult and maybe impossible task

79.    Any time spent by current staff on implementing the EO would divert time and attention from other critical election preparation in the days leading up to the election, our office's busiest time.  Our staff is already at capacity and dedicated to routine tasks and special projects that ensure Massachusetts elections run smoothly and every eligible Massachusetts resident can exercise their right to vote.  This work becomes more voluminous, significant, and urgent in the months leading up to the election, when we must answer an increasing volume of questions and handle tasks related to, for example, appointing and training poll workers, logic and accuracy testing, and voter challenges.

80.    Each of these tasks and costs will divert scarce resources from other important election administration needs. Under state law, the Secretary's office is responsible for preparing and printing over 500 ballot styles, which are provided to the local election officials.  This requires significant work to correctly add candidates and proof-read the contents, including the statewide ballot questions, which doesn't begin until after the September 1st State Primary.  We would need to hire additional staff to address the issues and responsibilities raised by the EO.

81.     Massachusetts has already ordered mail ballot envelopes for the 2026 federal election cycle, at a cost of approximately $3 million.

82.     Massachusetts and the 351 municipal election officials do not currently use Intelligent Mail barcodes on outbound ballot mail. The EO requires that the USPS Proposed Rule Making include provisions specifying that all outbound ballot mail must be mailed in an envelope that is automation-compatible and bears a unique Intelligent Mail barcode, or successor USPS technology, that facilitates tracking and is consistent with the other requirements of this section. It is unclear from the EO whether this requires our office to apply the barcode or whether that requirement will fall on our local election officials.  If it is the latter, the local election officials will require additional resources both technologically and for staff capable of performing such tasks. In 2024, twenty-seven (27) municipalities in Massachusetts mailed less than 200 ballots to voters. To require these municipalities to purchase equipment capable of applying an Intelligent Mail barcode would likely deplete their municipal budgets.

83.     It is my understanding that Section 5 of the EO directs that "States and localities should preserve, for a 5-year period, all records and materials—excluding ballots cast—evidencing voter participation in any federal election (e.g., ballot envelopes, regardless of carrier)."  Existing federal law only requires preservation of voting materials for 22 months following an election, and preservation of records concerning voter roll maintenance for two years.  52 U.S.C. §§ 20507(i)(1), 20701.  Massachusetts law and regulation also set timelines for the preservation and destruction of voting materials in federal elections.  Mass. Gen. Law ch. 54, § 109.

28

84.     Compliance with a five-year document preservation standard for election materials would impose significant compliance, storage, and other costs on Massachusetts state and local elections officials.

85.     For example, current document retention policies require that election materials be stored in fire-proof vaults or rooms. Most municipalities have limited space in their vaults. Based on the timing of current requirements, they are able to clear out space before each federal election to make room for the new materials.  To hold the materials for five (5) years would necessitate doubling the size of their current space, assuming they can find such space, to accommodate the records and materials from 2 elections simultaneously.  They would also have to make sure any new space meets the requirements for fire-proofing and security.  Additionally, the containers in which the materials are stored are required to be sealed at the polling place and then remain sealed until they can be destroyed.  Under the current retention period, those containers would be emptied prior to the next federal election and available to reuse.  Under the EO, the local election officials would be required to purchase an entirely new set of containers to store such materials for the additional period of time.

86.     Additionally, under current federal law, Massachusetts may begin properly disposing of certain retained materials from the 2024 primary elections on July 3, 2026, and the 2024 general election on September 5, 2026.  The EO more than doubles the required retention period for some (but not all) voting materials, and prevents Massachusetts from undertaking those actions as to some (but not all) of the retained materials—thus requiring Massachusetts to incur further management, storage, and security costs instead.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 23, 2026, at Boston, Massachusetts.

_____
Michelle K. Tassinari, Esq.
First Deputy Secretary
Director and Legal Counsel, Elections Division
Office of the Secretary of the Commonwealth