IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

STATE OF CALIFORNIA, et al,

> *Plaintiffs,*

v.

DONALD J. TRUMP, in his official capacity
as President of the United States, et al,

> *Defendants.*

Case No. 1:26-cv-11581

## DECLARATION OF MARK WLASCHIN

I, Mark Wlaschin, declare as follows:

1.     I am a resident of the State of Nevada.  I am over the age of 18 and have personal knowledge of all the facts stated herein, except those matters stated upon information and belief; as to those matters, I believe them to be true.  If called as a witness, I could and would testify competently to the matters set forth below.

2.     I am the Deputy Secretary of State for Elections in Nevada. I work for the Secretary of State and support him in his official capacity as the Chief Officer of Elections for the State of Nevada. In my role, I assist the Secretary in the execution and enforcement of all state and federal laws relating to elections.

3.     I have served as the Deputy Secretary of State for Elections for over five and a half years (since October 2020). I have worked at the Nevada Secretary of State for six and a half years (since October 2019), previously serving as the Deputy Secretary of State for Operations at the Nevada Secretary of State from October 2019 to October 2020. Prior to working for the Nevada Secretary of State, I served over 20 years in the United States Marine Corps. I earned a

1

BA in History from the University of South Carolina, an MBA in Strategic Leadership from New England College, and I am certified as a Project Management Professional.

4. Nevada and its subdivisions are responsible for administering federal elections in Nevada. This responsibility encompasses voter registration, maintaining and updating voter rolls, issuing ballots to registered voters, tabulating votes, and certifying results in all elections for federal office, among numerous other tasks.

5. The Nevada Secretary of State is the state's Chief Officer of Elections, responsible for executing and enforcing all state and federal law relating to elections within the state. *See* Nev. Rev. Stat. 293.124. The Elections Division of the Office of the Secretary of State is responsible for implementing the Secretary's responsibilities with regard to elections, including enforcing laws and providing technical information to the public and other parties. *See* Election Procedures Manual, Chapter 2: Administration of Elections (Jan. 2025), https://www.nvsos.gov/elections/election-resources/elections-procedures-manual.

6. In my role as Deputy Secretary of State for Elections, I am responsible for overseeing the Secretary of State's Elections Division, and thus I am responsible for the team of election officials who ensure the correct and legal administration of election processes in Nevada and implementation of state and federal election laws and procedures. In my role, I develop binding election-related regulations on a biennial basis and routinely provide non-binding guidance to election officials across the state. I also oversee implementation of election administration-related projects, processes, training, and public communications materials.

7. I am extremely familiar with the system and administration of elections in Nevada, including, as relevant here, voter registration requirements, list maintenance, mail in voting, and the statewide voter database. I am directly involved in our State's work to implement

2

state and federal law regarding voter registration and voting, as well as our continuing work to implement and improve Nevada's transition to a "top-down" statewide voter database as we prepare for the 2026 midterm elections. To implement this transition, Nevada has invested more than $30 million in the Voter Registration Election Management System, which is a centralized statewide voter registration database that supports the connection of election management systems located in counties throughout the State, as well as additional resources in the Secretary of State's cyber security infrastructure.

8.      I am familiar with the Executive Order published on March 31, 2026, entitled "Ensuring Citizenship Verification and Integrity in Federal Elections" (the "EO"). Sections 2 through 5 of the EO (collectively, the "Challenged Provisions") have already caused considerable harm, confusion, fear, and disruption in Nevada election administration, and will impose unrecoverable costs on Nevada.

9.      Upon hearing of the EO on Tuesday, March 31, I immediately circulated the text of the EO to the Secretary and Executive team, then to all state, county, and city elections officials (about 140 people). I even sent a text message to all 17 county elections officials to notify them of the EO, a rare move that I only take with the most urgent and time sensitive of notifications. Local elections officials then immediately began responding with questions, and I have continued to receive a steady stream of questions and comments ever since. Given the EO's mention of criminal enforcement alongside totally novel voter eligibility and mailing lists, election officials across the State want to know how the requirements of the Order directly impact them and what they should or shouldn't do as it relates to the 2026 election cycle and the requirement under State law to distribute mail ballots to all active registered voters. *See* Nev. Rev. Stat. 293.269911.

10.     My team has also started receiving inquiries about the EO from members of the public and press. These questions relate to State implementation and timelines, requiring my staff to begin developing an FAQ to use to answer questions while concurrently drafting information to inform and reassure the public. These documents will also be shared with elections offices to assist them in explaining the impact of the EO to their voters.

11.     It is my understanding that Section 2(a) of the EO directs the Department of Homeland Security ("DHS") to create a "State Citizenship List" for each State, which will include "individuals confirmed to be United States citizens who will be above the age of 18 at the time of an upcoming Federal election and who maintain a residence in the subject State."  It is also my understanding that DHS will send these lists "no fewer than 60 days before each regularly scheduled Federal election, or promptly upon request by a State in connection with any special Federal election."  This would mean that DHS will send this list by Friday, September 4, 2026, for the federal general election taking place on November 3, 2026.

12.     Section 2 requires immediate action from me and my team in the Secretary of State's Elections Division to understand how it interacts with Nevada's statewide voter registration list, which serves as the official list of registered voters for the conduct of all elections in this State, Nev. Rev. Stat. 293.675(3)(c), and how they impact Nevada counties' obligation to mail a ballot to each active registered voter, Nev. Rev. Stat. 293.269911(1), and to coordinate with other state and local agencies across Nevada.  Our efforts to address the changes and impacts of the EO will divert time and attention from other critical election preparations.  As soon as our team had time to initially digest the contents of the EO, I immediately began considering what near term actions the implementation of the EO would necessitate from my office, including preparing guidance for the counties and informational documents for the public,

4

involving state agencies and the Governor's Office, building out data analysis infrastructure and cyber security protections, and—as discussed further below—committing additional staff time to responding.

13. My office has a continuing obligation to work with the counties to perform regular list maintenance, as required under the National Voter Registration Act ("NVRA"), Help America Voter Act ("HAVA"), and Nevada state law. This includes sending notices to voters who may have moved, identifying duplicates on the statewide voter registration list, cancelling the registrations of those who have been convicted of a felony and are currently incarcerated, and cancelling the registration of those who have requested it or died.

14. Additionally, my office will need to continue to register those who are eligible to vote in Nevada. State law allows qualified individuals to register to vote or update their voter registrations up to the close of polls on Election Day. *See* Nev. Rev. Stat. 293.5847; 52 U.S.C. § 20507(a)(1) (requiring States to permit registration up to 30 days before a federal election). Nevada residents can register to vote online, at their county clerk's office, at various state social service agencies, and through Nevada's Department of Motor Vehicles when they submit sufficient information of their voter qualifications (including citizenship) through their transaction.

15. In compliance with the Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA), Nevada allows uniformed and overseas voters to register for a federal election up to the close of polls on Election Day using the system of approved electronic transmission, as well as the other methods set forth in Nevada Revised Statutes 293. *See* Nev. Rev. Stat. 293D.230; 52 U.S.C. §§ 20302(a)(2).

16. In sum, Nevada's statewide voter registration list changes up to and on Election Day. Registrants are constantly being added, updated, and removed as required (and limited) by federal and state law, and this will continue through the 2026 election and beyond.

17. In compliance with the NVRA "quiet period" for voter registration, Nevada does not systematically remove voters from the rolls during the 90 days prior to a federal election unless a statutory exception applies. *See* 52 U.S.C. §§ 20507(c)(2)(A), 3(A)-(B), 4(A).

18. I have considered how Nevada's dynamic statewide voter registration list will intersect with the list created by DHS. As noted above, pursuant to Section 2(a) of the EO, DHS will share a State Citizenship List by September 4, 2026. The EO permits the state "to routinely supplement and provide suggested modifications or amendments to the State Citizenship List transmitted thereto." The EO does not require DHS to accept any of these state supplements, modifications, or amendments to the State Citizenship List.

19. Once we receive the State Citizenship List, we will have to devote substantial resources to understanding any differences between it and Nevada's current statewide voter registration list. As a baseline matter, comparing the State Citizenship List to our current statewide voter registration list will necessitate linking registrants across the lists. This will be difficult, as it is extremely doubtful that the State Citizenship List will contain the same unique identifiers as our statewide voter registration list, such that we could perform straightforward matching. Rather, it is inevitable that there will be differences in the files that will make matching difficult, time-consuming, and potentially inaccurate, as people's names, addresses, and other information may vary slightly (*e.g.*, Robert vs. Bob, Apartment #3 vs. Apt. 3, or other false positives from not having Personally Identifiable Information ("PII") to use in the comparison). For example, as of April 16, 2026, there are 20 active voters across Nevada named

6

"Maria Smith". Without additional PII identifiers it would be impossible to know which is or isn't an individual included on the State Citizenship List. I know from my experience that data matching is a complex process and extreme care must be taken when the consequences of errors may lead to voter disenfranchisement. And because Nevada will receive the State Citizenship List so close to the election, I must plan for all of this now.

20. For eligible voters who appear on Nevada's statewide voter registration list but not the State Citizenship List, my office will need to investigate further pursuant to our obligation to ensure that eligible voters are able to vote. *See* Nev. Rev. Stat. 293.127(1)(a). Even though Nevada will not disenroll voters simply due to their absence from the State Citizenship List, it could disenfranchise voters in multiple ways. First, voters who check their status on the State Citizenship List as contemplated by Section 2(a) and see that they are not listed may be deterred from voting because the EO suggests that they will be blocked from voting or prosecuted, especially if DHS does not timely accept their corrections. Second, the United States Postal Service ("USPS") may rely on the State Citizenship List to determine which voters can receive and transmit mail ballots in response to the EO's emphasis on criminal penalties associated with the distribution of mail ballots to ineligible individuals. EO §§ 2(b), 3(a), 5. Additionally, as county election officials would be the ones responsible for sending mail ballots to their voters, they would need to review the State Citizenship List to ensure they were not violating the enforcement clause. This has the risk of disenfranchising voters as county election officials may misunderstand their legal obligations and refuse to provide a ballot to eligible voters missing from the State Citizenship List based on their belief that the voters are ineligible or the idea that they may be criminally liable if they do. These are all risks that

7

Nevada cannot accept.  We must make every effort to avoid disenfranchising eligible Nevada residents.

21.    Accordingly, in compliance with Nevada's obligation to protect the right to vote, Nevada would expend significant resources to attempt to supplement and amend the federal list as necessary, as errors were found through our comparison and investigation.  This includes determining proper and secure methods for sending large volumes of data to the federal government, some of which is confidential under state and federal law and therefore may not be shared by Nevada.  *See United States v. Aguilar*, D. Nev. Case No. 3:25-cv-00728-ART-CLB (ongoing litigation in which the U.S. Department of Justice is seeking to compel the Nevada Secretary of State to produce the statewide voter registration list, including unredacted confidential data).  However, even if we are able to quickly offer all necessary corrections, the EO does not require DHS to accept the State's "suggested modifications or amendments."  EO § 2(a).

22.    Nevada would incur significant costs to undertake this comparison and verification of the State Citizenship List.  For those who appear on Nevada's voter registration list but not the State Citizenship List either because of matching problems or inaccuracies in the State Citizenship List, my office will need to investigate further pursuant to our obligation to ensure that a ballot is mailed to every active registered voter in Nevada. We must make every effort to do so to avoid disenfranchising eligible Nevadans even though the EO instructs that we can only "supplement" and "provide suggested modifications or amendments" to the State Citizenship List and though the time to get updates to USPS before at least some ballots must be sent in only two weeks. This only underscores the significant resources we are required to devote to this EO.

8

23.     As the Deputy Secretary of State for Elections, I develop binding election-related regulations on a biennial basis and routinely provide non-binding guidance to election officials across the state. I also oversee implementation of election administration-related projects, processes, training, and public communications materials.  Additionally, the Elections Division is responsible for creating training materials that encompass the technical and procedural guides for every aspect of elections administration.  This includes user guides and process documents for numerous applications and processes, such as how to register voters as an administrator using the statewide Elections Management System or a 50-minute video about the signature comparison process used for mail ballot return envelope signature verifications.  The Elections Procedure Manual is another large document, required by Nevada Revised Statutes 293.2502, that the Elections Division develops and that is the process manual for all state, county, and city election administrators.  The Elections Division also develops guidance documents relating to nuanced or confusing technical requirements of state law and then transmits those to every state, county, or city election official to ensure consistency.  An example is a recent guidance document relating to the application of Nevada Revised Statutes 293.260, which covers the omission and appearances of names on the primary and general election ballots.

24.     If Section 2 is implemented, Nevada will have to devote significant time, personnel, and money to update training materials for local election officials and their staff, specifically detailing what steps they must take with respect to voters who appear on Nevada's voter registration list but not on the State Citizenship List.  We would also need to develop clearly defined processes for voters to take to provide their proof of citizenship, including what constitutes an acceptable proof of citizenship, in a timely manner so as to not be disenfranchised.  These processes would have to account for the long distances to travel and the wide disparity in

resources and capabilities of voters across the State.  This is yet another aspect of the EO's implementation that will necessarily divert my team's time and attention from other important election administration tasks.

25.    I anticipate that in addition to the development of formal training materials, my office will need to allocate significant resources to responding directly to questions and concerns raised by local election officials about the EO's directive that "[t]he Attorney General shall prioritize the investigation and, as appropriate, the prosecution of State and local officials or any others involved in the administration of Federal elections who issue Federal ballots to individuals not eligible to vote in a Federal election[.]" EO § 2(b).  To address these questions and concerns, we will need to develop additional checklists that increase the level of detail in our existing procedure and training manuals.  These checklists would help ensure that even new election officials are confident that they are following the latest federal requirements and not doing anything that might result in their investigation or prosecution.  This measure would be an important part of our effort to not only comply with the EO, but also to safeguard against election officials possibly quitting in search of less risky work.

26.    Compliance with the EO will create a continued burden for State, county, and city election offices, particularly in the State and county offices.  State officials will have the new and perpetual challenge to assist voters in demonstrating their eligibility in time for upcoming elections, while also working to keep county elections officials informed about changing federal policies and requirements as various federal processes change and develop. These additional burdens will create an even more challenging environment for state election officials and will lead to an increase in attrition.  The four staff members in the Secretary's Elections Division who specifically work to support county and city elections officials would be particularly

10

overburdened as they would be the ones most directly responsible for assisting with local officials' questions, but who are also principally tasked with ensuring local officials' compliance with state and federal law. Local officials, many of whom already have multiple jobs (*e.g.*, Clerk of the Court, Clerk of the Board, Public Administrator, etc.) will be required to additionally research and maintain mastery over changing federal requirements from the EO knowing that a failure to understand what is or is not acceptable will be prioritized for investigation and prosecution. This will further tax them and their staff and will lead to increased staff attrition as other competing requirements will become even more challenging to complete on time and with the appropriate attention to detail. Many only have one or two other staff members on their team, and the normal day-to-day tasks (*e.g.*, voter list maintenance, helping constituents, etc.) would fall by the wayside to the urgency of learning federal requirements so as to avoid investigation or prosecution.

27. At the same time my staff is performing investigations into the accuracy of the State Citizenship List, they will have to field questions from registrants concerned about their voter registration status and generally confused about the process and qualifications to vote in Nevada elections. Thus, a separate impact of the EO's directive concerns the need for a wide-ranging public education campaign to ensure that eligible voters understand the EO's requirements, and how they may impact a citizen's registration and ability to vote.

28. I estimate that such a public education effort would likely cost approximately $450,000 to $650,000 from our Voter Education and Outreach budget. This would cover a portion of the cost to communicate with voters via text, email, social media, newspaper, commercials, and other ways to begin the process of informing them about these changes and who to contact for more information. The nature of the changes and nuance required to

11

understand every situation are complex enough that no single communication would be effective in a standalone format, so multiple formats would be needed.  Additional funding from the current Voter Education and Outreach budget would be needed to translate those materials into other languages as well, including at least Spanish, Filippino, and Shoshone, as are required by federal law, potentially taking as much as 25-50% of the remaining Voter Education and Outreach budget.  Finally, the agency travel budget would need to be reviewed and assessed to determine how best to support in-person outreach to many of Nevada's population centers to further maximize the effort to inform voters.

29.      Apart from the time and monetary costs its implementation would impose on the State, Section 2 also risks voter confusion and disenfranchisement.  This inevitable voter confusion is a harm in and of itself and is also a burden on my staff's time.  This voter confusion will come at a crucial time, shortly before the election, when local elections officials' resources are particularly stretched.

30.      In my experience administering elections, changes to registration and election procedures in the time immediately preceding the election can cause voter confusion.  The complicated requirements of the EO will likely lead some citizens to misunderstand the requirements for registration, or whether they are able to vote in Nevada's elections.  Some citizens will determine that the added requirements make registering and/or voting too confusing to be worthwhile.  For example, a voter may check their individual status on the State Citizenship list, according to the EO.  If they are mistakenly not included, they may believe they have no recourse, and choose not to vote, or they may misunderstand the process for correction, or DHS may not issue a correction in time.  The result of this confusion will be that fewer eligible voters successfully register to vote or decide to cast a ballot.

31.    Nevada elections officials are required by state law to issue ballots to duly registered voters. *See* Nev. Rev. Stat. 293.269911.

32.    In compliance with UOCAVA, Nevada issues ballots to registered voters who request an absentee ballot under that Act at least 45 days before an election. *See* 52 U.S.C. §§ 20302(a)(1)-(3), (8)(A); Nev. Rev. Stat. 293D.320.

33.    It is my understanding that Section 2(b) of the EO instructs the Attorney General to prioritize investigation and prosecution, under a variety of federal statutes, of "State and local officials or any others involved in the administration of Federal elections who issue Federal ballots to individuals not eligible to vote in a Federal election." I understand that the EO provides that "an individual is 'eligible to vote in a Federal election' if the individual is a citizen of the United States, 18 years of age or older by the date of the upcoming election, and otherwise qualified under the laws of his or her State." I further understand that Section 5 of the EO encourages referrals to U.S. DOJ of "[e]vidence of violations of existing Federal laws by State or local election officials" and "States or localities," among other parties, "for consideration of investigation or charges."

34.    As a Nevada election official, I feel threatened by these provisions—specifically, I fear that I and my staff will be criminally prosecuted if a ballot is issued to a voter who is missing from the State Citizenship List. I also am concerned about the impact of these threats of criminal prosecution on my staff, not because I believe they have violated any duly enacted provision of state or federal law, but because the EO increases the amount of pressure and scrutiny on them, including by the public. This will also lead to rapid and increased turnover as longtime dedicated public servants must weigh their professional expertise as an election official

13

against the risk of prosecution and the loss of their source of income or future retirement because of an error.

35.     I know that the threat of prosecution under the EO is on the minds of State and local elections officials like me. Shortly after the EO was issued, I received at least one communication from a local election official expressing concern that simply issuing mail ballots according to Nevada law—that is, to voters who have affirmed their citizenship under penalty of perjury—could result in their arrest.  Though we have not had issues staffing state and local election positions, I worry that this could become a problem in the future as people may not wish to take on the risk.

36.     Should the Attorney General initiate any such enforcement actions, the Nevada Secretary of State's Office would be required to divert significant resources to educate the public, with the aim of minimizing voter confusion to the extent possible.  We would further need to develop communications templates, FAQs, and other information to provide to the public and election officials to clarify what happened and why, with as much clarity as possible.  We would need to develop a communication strategy for the press and ensure that everyone is aware of and trained on how to respond to accusations and questions relating to the investigation.  This would continue through the determination of the enforcement action, but also beyond as situations like this historically continue to come up for years afterwards.

37.     Any such legal proceedings would have severe and adverse consequences for the public's trust in Nevada's administration of elections.  The public's trust is a critical part of the electoral process and reputational harm to the Secretary of State's Office, especially because of an alleged criminal act, is devastating.  We work and communicate with the public as transparently as possible, but accusations that an elections official had committed a crime would

14

instantly lead to an increase in threats of violence as well. This occurred in 2020 and 2021 after a number of famous individuals falsely accused election officials nationwide of stealing the election and the Office felt the repercussions of that firsthand through threats of violence and frustration from the public who no longer trusted us. That in turn led to a mass exodus of Office staff, meaning that our experienced staff left, leading to errors by new or inexperienced staff who then lacked mentors with experience. This further degraded the trust and took a herculean effort to regain both the public's trust as well as the requisite skills to administer elections according to complex state and federal laws.

38.    Additionally, the creation of a State Citizenship List may directly disenfranchise voters. If a citizen is not included on the list—due, for example, to errors in DHS's static immigration information contained in its Systematic Alien Verification for Entitlements (SAVE) system, the federal government's misinterpretation of whether the citizen qualifies as a state resident, or any other error—they may believe they are unable to vote, and may be prosecuted for doing so.

39.    Local elections workers may feel they cannot register or send a ballot to such voters without risking criminal prosecution, despite those voters' fundamental right to vote under state and federal law. Similarly, USPS or other entities involved in the "printing, production, shipment, or distribution of ballots" may believe they cannot provide a ballot to those voters without risking criminal prosecution.

40.    Nevada law requires a ballot to be mailed to every active registrant on the statewide voter registration list who has registered or updated their registration no later than 14 days before the election and has not opted out from receiving a mail ballot. *See* Nev. Rev. Stat. 293.269911.

41.     It is my understanding that Section 3(b) of the EO directs USPS to initiate a rulemaking that, among other things, would allow States to provide lists of mail voters to USPS 60 days before an election, require the creation of a "Mail-In and Absentee Participation List" ("USPS Mail Ballot List"), and prohibit USPS from delivering mail ballots sent by individuals not on the USPS Mail Ballot List.  It is also my understanding that Nevada can "routinely supplement and provide suggested modifications or amendments" to the USPS Mail Ballot List, but USPS is not required to accept any changes provided by Nevada.

42.     As soon as our team had time to digest the contents of the EO, I immediately began considering what near-term actions the EO would necessitate from my office, including preparing to create a list to send to USPS of voters to whom we intend to send a mail-in or absentee ballot ("State Mail Ballot List") and check the USPS Mail Ballot List, preparing guidance for the counties, involving state agencies and the Governor's Office, building out data analysis infrastructure and cyber security protections, and—as discussed further below— committing additional staff time to responding.

43.     Under Section 3(b) of the EO, in order to comply with state law requiring all eligible voters to receive a mail ballot, at least 60 days before Election Day we would need to send a State Mail Ballot List to USPS.  *See* Nev. Rev. Stat. 293.269911.  For the 2026 federal general election, that deadline will be September 4, 2026.  Failing to provide this list to USPS would pose an unacceptable risk under the EO that USPS will not include Nevada voters on the USPS Mail Ballot List.

44.     As discussed throughout this declaration, Nevada's use of the mail for elections, paired with our election calendar, means I must plan now for how to align Nevada's administration of mail voting with the EO.

16

45.     Creating the State Mail Ballot List will require my office and local elections officials to expend time and resources to ensure that all active registered voters are included. This task will be significantly complicated by the influx of registration updates and changes that elections officials typically receive in the months before the election (and which I expect will be exacerbated by the State Citizenship List provisions discussed above).

46.     The deadline to provide this list to USPS no later than 60 days before the election means that some voters who are entitled to a mail ballot under state and federal law will unavoidably be left off the list.  UOCAVA permits uniformed and overseas voters to request absentee ballots up to 45 days before an election.  52 U.S.C. § 20302(a)(8).  Under state law, voters may request an absentee ballot or register and receive an absentee ballot up to the close of polls on election day.  *See* Nev. Rev. Stat. 293D.230, 293D.300.  Although the EO indicates that States will be able to "routinely supplement and provide suggested modifications or amendments" to the USPS Mail Ballot List, USPS is not required to accept our suggestions.  The EO also does not specify when USPS will transmit its USPS Mail Ballot List to our office, which could cause substantial complications.

47.     Once we receive the USPS Mail Ballot List, we will have to devote substantial resources to understanding any differences between it and our own list of voters eligible to receive mail ballots.  This will be a difficult task for many of the same reasons set out above with regard to the State Citizenship List, including: the lack of unique identifiers shared by both lists, the potential for slight variations in spelling to wrongly preclude matches, the fluid nature of voter registration rolls in the lead-up to elections, and administrative challenges inherent to any data-matching process.  Accordingly, reviewing the USPS Mail Ballot List will require a significant expenditure of time and resources.

17

48.    For citizens who appear on the statewide voter registration list and are eligible to receive a mail ballot under Nevada law but not the USPS Mail Ballot List, my office will need to investigate further pursuant to our obligation to ensure that a ballot is mailed to every active registered voter in Nevada.  We must make every effort to do so to avoid disenfranchising eligible Nevadans.

49.    Nevada would expend significant resources to attempt to supplement and amend the USPS Mail Ballot list as necessary, as errors were found through our comparison and investigation.  This includes determining proper and secure methods for sending large volumes of data to the USPS, some of which is confidential under state and federal law and therefore may not be shared by Nevada.  *See United States v. Aguilar*, D. Nev. Case No. 3:25-cv-00728-ART-CLB (ongoing litigation in which the U.S. Department of Justice is seeking to compel the Nevada Secretary of State to produce the statewide voter registration list, including unredacted confidential data).  This is true even though the EO instructs that we can only "supplement" and "provide suggested modifications or amendments" to the USPS Mail Ballot List, and USPS is not required to accept them.

50.    Even with the best efforts of my office and local elections officials, the challenge of completing a complex data-matching program in a short timeframe and while preparing to administer an election poses the high risk of errors and omissions.

51.    Nevada would incur significant costs to undertake this comparison and verification of the USPS Mail Ballot List.  The data matching, verification, follow up investigations, and interfacing with DHS, USPS, the counties, the public, and others required to do this will necessitate an enormous investment of resources. Additionally, Nevada and Secretary of State cybersecurity and information technology staff would need to be involved to

18

securely set up the information transfer between the federal government and the Secretary's office. I estimate that such actions could be done using current staff and contractors, but this would pull them from their critical work that has already been scheduled and planned for months in advance. That critical work would, as a result, go undone. This is in addition to the time from IT staff needed to work with DHS and USPS to securely transfer information.

52.     If Section 3 is implemented, Nevada will have to devote significant time, personnel, and money to update training materials for local elections officials and their staff. Those materials would have to specifically detail what steps they must take with respect to voters who appear on Nevada's voter registration list and are eligible to receive a mail ballot under Nevada law, but who do not appear on the USPS Mail Ballot List.  This aspect of the EO's implementation will necessarily divert at least seven Elections Division staff from other important election administration tasks.

53.     I anticipate that, in addition to formal training materials, my office will need to allocate significant resources to responding directly to local elections officials, given the threat of criminal prosecution in the EO.  We would allocate significant time and effort to create technical and procedural measures to capture the work being done by State, county, and city election officials in a way that would provide evidence of compliance with state and federal law.  The intent would be to create very clear documentation and records that would be used to defend against potential investigation or prosecution, if someone attempted to call into question the legality of the work being done across all 36 State, county, and city election offices.  This would encompass all forms of voter registration, including same day registration during early voting and on election day, as well as technical modifications to the in-person check-in process, voter registration database, and election management system.  These technical and procedural changes

19

would also be a crucial part of our effort to retain experienced election officials who, without such protections, would likely leave for less risky work.

54.     At the same time my staff is creating the State Mail Ballot List and performing investigations into the accuracy of the USPS Mail Ballot List, they will have to field questions from citizens concerned about their ability to receive or return a mail ballot in the upcoming elections.  Thus, a separate impact of the EO's directive concerns the need for a wide-ranging public education campaign to ensure that eligible voters understand the EO's requirements, and how they may impact a citizen's ability to vote by mail.  This is particularly the case for Nevada residents, many of whom are used to automatically receiving mail ballots and being able to vote by mail under existing state law.

55.     I estimate that such a public education effort would likely cost $450,000 to $650,000 from our Voter Education and Outreach budget, which is inclusive of the cost discussed above in Paragraph 28.  This would be approximately one third of our budget for voter education and outreach, but given the potential negative impact to voters it would be essential. This would shift our focus from educating the Nevada Electorate about recent changes in state election law, audits, physical- and cyber- security efforts, and rebuilding their confidence in our electoral process to explaining what voters must do to ensure they are not disenfranchised.  This effort would likely require additional creative efforts as the Nevada Electorate is spread across the state with the 42nd lowest population density in the US and the messaging techniques would need to be adapted for 1) each urban and rural population center, 2) each age group particularly the 40% of voters over the age of 55 who are not digital natives and would be less aware of social media campaigns, and 3) across multiple languages as the Nevada population includes approximately 19.9% foreign-born residents.

20

56.    Apart from the time and monetary costs that Section 3's implementation would impose on Nevada, Section 3 also risks voter confusion and disenfranchisement.  This inevitable voter confusion is a harm in and of itself and is also a burden on my staff's time.  This voter confusion will come at a crucial time shortly before the election, when state and local elections officials are required under Nevada law to send mail ballots to all active, registered voters who have not opted out of mail voting.

57.    Sending mail ballots in a timely fashion is not only required by state and federal law, but is critical to ensuring that as many eligible Nevadans as possible can exercise their right to vote.  In the 2024 General Election, 44.99% of Nevadans voted by mail.  This method of voting is particularly important for the many Nevadans who live in extremely remote areas, where entire counties have historically been mail-ballot-only precincts due to the vast distances between population centers. That is, in part, because eleven of the largest 100 counties in the United States (by square footage) are located in Nevada, out of more than 3,100 counties in the United States.

58.    Errors in the USPS Mail Ballot List would be extremely deleterious because of the potential for voter disenfranchisement.  For example, consider an eligible voter who is on the State Mail Ballot List but not on the USPS Mail Ballot List.  Under the EO, they are likely to receive a mail ballot from their local elections official that USPS will later refuse to return to the local elections official.  In that situation, the voter may think that they have voted, but they have not.  Nor would the voter necessarily know to cancel that ballot and vote in person, given that the EO does not charge USPS with notifying the voter.  A voter may also be concerned about casting two ballots, which is itself a criminal violation, and choose not to vote.  My office must take every measure possible to avoid this kind of voter disenfranchisement.

21

59.     In my experience administering elections, changes to election procedures in the time immediately preceding an election can cause voter confusion.  The EO's complicated requirements will likely lead some eligible voters to misunderstand whether they are able to use a mail ballot.  Some eligible voters will determine that the added requirements make voting too confusing to be worthwhile.  The result of this confusion will be that fewer eligible voters decide to cast a ballot.

60.     There are several additional inherent problems posed by the deadlines outlined above and the requirement to compare static lists (the State Citizenship List, USPS Mail Ballot List, and State Mail Ballot List) with a constantly evolving list (the statewide voter registration list).  For example, between the day the State Citizenship List is sent and 14 days before Election Day (the last day a voter may register and receive a mail ballot under Nevada law) there will inevitably be a significant number of individuals who become eligible but are not captured on the State Citizenship List.  They may, for example, be a U.S. citizen who moved to Nevada 40 days before Election Day or become a naturalized citizen after the list was sent.

61.     This process is likely to be particularly complicated in Nevada, as our state has a particularly transient population. Approximately 20-25% of registrants in Nevada update their address between general elections. Even if the State Citizenship List is completely accurate, it will not accurately reflect the address for those who move from another State between 30 and 60 days before the federal general election and are eligible to vote under Nevada law.

62.     Additionally, as already noted, the timeline simply does not seem workable.  The EO requires DHS to send the State Citizenship List to States "no fewer than 60 days before each regularly scheduled Federal election."  For the November 3, 2026 General Election, that means DHS must send this list by Friday, September 4, 2026.  And Nevada must also send its State

22

Mail Ballot List to USPS 60 days before the election—also Friday, September 4, 2026. Thus, we must send the State Mail Ballot List (i.e., all those who should receive a mail ballot under state law) to USPS on the *same day* we might receive the State Citizenship List from DHS. Comparing the millions of entries on the statewide voter registration list with the entries on the State Citizenship List to see who is eligible according to both lists in *one day*, or even *a few hours*, is simply not possible to do with any meaningful degree of accuracy, no matter how many resources my office dedicates to the project.

63. Although the EO provides that we may "routinely supplement and provide suggested modifications or amendments" to the USPS Mail Ballot List, there is no guarantee that USPS will accept those suggestions. If we—in an attempt to protect Nevada's election officials from criminal liability—sent a State Mail Ballot List to USPS 60 days before Election Day that reflected only confirmed matches between the statewide voter registration list and the State Citizenship List, knowing that many eligible voters could have been wrongfully excluded from the State Citizenship List, we would be committing ourselves to potentially violating Nevada law. We could then endeavor to submit additional matches as we confirmed them. But it would be very difficult to do so quickly enough to matter. On September 18, 2026—only two weeks after we receive the State Citizenship List—our UOCAVA voters' ballots must be mailed out. Shortly thereafter, ballots must be sent to residents currently residing out of state by September 24, 2026 (at least 40 days before the federal general election) and to residents residing within the state from October 5 through October 12, 2026 (on or after the 5th Monday before Election Day but not later than the 4th Monday before the federal general election). Even if DHS and USPS accepted our suggestions, there is unlikely to be enough time to get a ballot to those who are

23

eligible but did not appear on the State Citizenship List. Voters would be disenfranchised and Nevada law would not be honored.

64. Again, because of our obligation to ensure that every eligible Nevadan can vote, we would need to take additional steps after receiving the State Citizenship List and USPS Mail Ballot List to investigate the status of all those on the statewide registration list who do not appear on the federal lists, and then suggest changes to both. This will require data matching, verification, follow-up investigations, and interfacing with DHS, USPS, counties, the public, and others, and will demand an enormous investment of resources. Additionally, state cybersecurity and information technology staff would need to be involved to facilitate the secure transfer of information between the federal government and the Secretary's Office. I estimate that such actions could be done using current staff and contractors, but this would pull them from their critical work that has already been scheduled and planned for months in advance. That critical work would, as a result, go undone. This is in addition to the staff time required to work with DHS and USPS to securely transfer information.

65. I estimate that all work necessary to implement the EO, including voter education and outreach efforts, plus the development of training materials, and technical changes to our voter registration database and election management system, will cost $500,000 to $750,000 of the Secretary of State Office's current budget. This estimate likely would not cover the actual total cost, but given recent economic pressures across the state and country, I have been trying to keep the Office's budgetary needs as low as possible. This EO would result in my re-allocation of our outreach budget, shifting it from informing our voters about their existing rights under state and federal law, to this new requirement. The previously planned outreach efforts would still need to occur, but would be done in a far less effective manner directly leading to more

24

confusion and the disenfranchisement of voters across the State. Depending on the effectiveness of that reduced outreach effort, I may need to request additional funds from the Nevada Legislature's Interim Finance Committee, which has discretion to approve or deny the dispersal of funds from the State Reserve for Statutory Contingency Account. But obtaining these funds is far from a sure thing, especially in the current economic climate.

66.    Any time spent by current staff on implementing the EO would divert time and attention from other critical election preparation in the days leading up to the election, my office's busiest time. Our staff is already at capacity and dedicated to routine tasks and special projects that ensure Nevada's elections run smoothly and every eligible Nevadan can exercise their right to vote. We are constantly preparing for the next election—there is no off-cycle for election administrators. While voters primarily experience our work directly at most a few times per year—during a period for in-person early voting or when they receive and cast their mail ballot—we are working year-round, every year, to collaborate closely with the county and city election officials to conduct voter registration list maintenance pursuant to state and federal law; discuss the election cycle with county and city election officials so as to capture and address their lessons learned from the previous elections cycle; inform the public about elections processes and procedures, cyber- and physical- security measures, and other ongoing enhancements; review and refine training plans and classes for state, county, and city election officials in preparation for our annual training conference; review and capture possible amendments to elections regulations spanning nine chapters of state law; review vendor contracts and, when necessary, submit requests for proposal and initiate the procurement process pursuant to the State Administrative Manual and other State purchasing requirements to ensure that the Nevada electorate is provided the best possible services and support throughout the electoral process; and

25

review and refine the voter experience relating to online applications, forms and templates, and other public-facing tools to ensure Americans with Disabilities Act compliance and to increase accessibility for voters.  This work becomes more voluminous, significant, and urgent in the months leading up to the election, when we must answer an increasing volume of questions and handle tasks related to, for example, campaign finance reporting, logic and accuracy testing, and voter challenges.

67.    Each of these tasks and costs will divert scarce resources from other important election administration needs.  Over the last two years, there have been technical and procedural changes to how Nevada's elections are conducted.  Fifteen of its seventeen counties have changed from one form of United States Election Assistance Commission and State approved voting system to another.  This and the transition to a centralized voter registration database and election management system that is now in use across the State have kept my staff fully focused on ensuring consistency and legal compliance.  Pulling them away from this critical and on-going assignment across all functions of the Elections Division, as would be necessary to implement the EO would increase the risk and degrade our ability to ensure the "execution and enforcement of state and federal laws governing elections" that is our primary purpose.  Every document, guidance, form, template, website, and planned communication would have to be revisited through the lens of "EO compliance".

68.    All Nevada counties currently use Intelligent Mail barcodes on ballot mail. However, we would need to amend our voter outreach to include this fact to ensure that Nevadans understand what an Intelligent Mail barcode is and that the State is in compliance.

69.    All Nevada counties currently submit ballot envelopes to USPS for design review. We would need to create a new formal process to create a timeline and how to document the

26

request to the USPS (as well as receive their approval) so that county election officials could not be investigated or prosecuted if someone were to accuse them of failing to make this step.

70.    This new requirement in Section 3(b)(i)(C) of the EO would increase workload for the USPS though, and I am deeply concerned about the length of time it would take for USPS to conduct ballot design review for thousands of additional jurisdictions beyond those that they review now.  Waiting on USPS to approve ballot design has the potential to seriously disrupt and delay carefully timed steps necessary to deliver mail ballots to Nevada voters.  Managing the fallout from such a delay would force my office and local elections officials to divert critical time and money from other elections administration duties to expedite other steps in the mail ballot process, educate the public about the status of mail ballots, and otherwise mitigate the harm from delays to the process.

71.    It is my understanding that Section 5 of the EO directs that "States and localities should preserve, for a 5-year period, all records and materials—excluding ballots cast— evidencing voter participation in any federal election (e.g., ballot envelopes, regardless of carrier)."  Existing federal law only requires preservation of voting materials for 22 months following an election, and preservation of records concerning voter roll maintenance for two years.  52 U.S.C. §§ 20507(i)(1), 20701.  Nevada law also sets the timeline for the preservation and destruction of voting materials in federal elections at 22 months.  *See* Nev. Rev. Stat. 293.391.

72.    Compliance with a five-year document preservation standard for election materials would impose significant compliance, storage, and other costs on Nevada and local elections officials.

27

73.    For example, current document retention requires Nevada to store election materials for 22 months in a secure location, often times a vault overseen by the election official. This expanded requirement would require the development of guidance and policies at both the state and local level to address how these materials would need to be stored.  Given the increased timeline for retention, there would need to be additional physical security assessments conducted across all 36 elections offices to ensure proper security, with many of the improvements and corrections being weighed against other State, county, and city budgetary priorities.  In some cases and based on my experience observing certain jurisdictions attempt to address security concerns over the last 5 years, State or local elections officials may be unable to meet the physical security requirements for multiple budget cycles.

74.    Additionally, under current federal law, Nevada may begin properly disposing of certain retained materials from the 2024 primary elections in April 2026, and the 2024 general election in September 2026.  The EO prevents Nevada from undertaking these actions as to some, but not all, of the retained materials, and requires Nevada to incur further management, storage, and security costs instead.

75.    More than doubling the required retention time for some (but not *all*) voting materials would increase these burdens and costs significantly, specifically for State and county elections officials who would have to retain not only 2 elections as they have historically done and budgeted to support, but as many as 8 elections.  This would mean that additional facilities would be required in all 17 counties and by the Secretary of State's Office.

28

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 22 , 2026, at Carson City, Nevada.


Mark Wlaschin
Deputy Secretary of State for Elections
Office of Secretary of State Francisco V. Aguilar

29