**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| STATE OF CALIFORNIA; et al., | |
| *Plaintiffs,* | |
| v. | Case No. 1:26-cv-11581 |
| DONALD J. TRUMP, in his official capacity as President of the United States; et al., | |
| *Defendants.* | |

**<u>DECLARATION OF STUART HOLMES</u>**

I, Stuart Holmes, declare as follows:

1.      I am a resident of the State of Washington. I am over the age of 18. I am familiar with the information in the statements set forth below either through personal knowledge, consultation with Office of the Secretary of State ("OSOS") staff, or from my review of relevant documents and information. If called as a witness, I could and would testify competently to the matters set forth below.

2.      I am the Director of Elections in Washington. I work for the Secretary of State, Steve Hobbs, and support him in his official capacity as the Chief Election Officer for the State of Washington. In my role, I assist him in the execution and enforcement of all state and federal laws relating to elections.

3.      I have served as the Director of Elections since November 2021. I've worked in the Elections Division of the OSOS since September 2014 and, prior to that, worked in the Benton County Auditor's Office Election Department between May 2005 and September 2014.

1

4.      Washington and its subdivisions are responsible for administering state and federal elections in Washington. These responsibilities encompass maintaining and updating voter rolls, issuing ballots to registered voters, tabulating votes, and certifying results in all elections for state and federal office, among numerous other tasks. OSOS is responsible for training and certification programs for state and county elections administration officials; review of county election procedures; administration of a local government grant programs designed to help the county election office comply with the requirements of the Help America Vote Act ("HAVA"); making rules consistent with state and federal election laws to facilitate the execution of such laws in an orderly, timely, and uniform manner; publication of the state voters' pamphlet; testing, approval, and certification of voting systems; administration of the statewide voter registration list required by HAVA; canvassing and certifying general election returns; serving as the state liaison with the United States Census Bureau; receiving filings for proposed measures; receiving filings and/or signature petitions for candidates and electors for federal office; and providing a voter hotline and web page designed to allow voter communication.

5.      The Secretary of State is the state's Chief Election Officer, responsible for executing and enforcing all state and federal laws relating to elections within the state. *See* Wash. Rev. Code § 29A.04.230. The Elections Division is responsible for implementing the Secretary of State's responsibilities with regard to elections. Washington law charges my office with preventing disenfranchisement and ensuring that all eligible voters who want to vote are able to do so. *See* Wash. Rev. Code §§ 29A.04.206; 29A.92.005.

6.      Elections are administered as a collaboration between the Secretary of State and the county auditor of each county. Each county auditor maintains the voter registration roll in a statewide system administered by the OSOS. The OSOS has data authority over all voter

2

registration data, and the voter registration database must comply with HAVA. The OSOS provides support, as needed, to enable each county auditor to enter and maintain voter registration information in the state database. *See* Wash. Rev. Code § 29A.08.125(7). Additionally, the OSOS is required to adopt procedures for new or updated voter registrations to be recorded on an expedited basis. *See* Wash. Rev. Code § 29A.08.110. Each county auditor issues and receives ballots in this same statewide system. Each county canvasses and certifies their election results and transmits those to the OSOS. The OSOS then canvasses and certifies the combined state results.

7.    In my role as Director of Elections, I am responsible for overseeing all elections conducted in the state to ensure they comply with federal and state laws to maintain public trust and confidence in our electoral processes. These oversight responsibilities cover all aspects of election activities, including: list maintenance activities to remove ineligible individuals from the voter roll as required under the National Voter Registration Act ("NVRA"); the State's program for detecting dual registration or voting; county election procedure reviews; local grant programs; development of guidance regarding relevant legislation and judicial decisions affecting election administration; the voting system, and/or supporting technology certification or approval; election training and certification of election administrators; candidate filing; the state voters' pamphlet; state regulations governing all aspects of the electoral process, including vote-by-mail processes; and certification of election results. In my over 20 years of Washington election administration experience at both the state and county level, I've been involved with all levels of election administration. This includes providing voter registration assistance, issuing and receiving ballots, canvassing returned ballots, maintaining voter registration roll lists, testing and certifying voting systems, training elections officials, administering election recounts,

3

developing policy and guidance to implement legislative changes, and developing enhancements to the statewide voter registration database.

8. I am familiar with the Executive Order dated March 31, 2026, entitled "Ensuring Citizenship Verification and Integrity in Federal Elections" (the "EO"). Sections 2 through 5 of the EO (collectively, the "Challenged Provisions") have already caused considerable harm, confusion, fear, and disruption in Washington election administration and, if adopted, it will disenfranchise Washington voters, impose unrecoverable costs on Washington, and create electoral chaos and uncertainty.

9. It is my understanding that Section 2(a) of the EO directs the Department of Homeland Security ("DHS") to create a "State Citizenship List" for each State, which will include "individuals confirmed to be United States citizens who will be above the age of 18 at the time of an upcoming Federal election and who maintain a residence in the subject State." I understand that, while the EO permits the state "to routinely supplement and provide suggested modifications or amendments to the State Citizenship List transmitted thereto," it does not require DHS to accept any of these state supplements, modifications, or amendments. I understand that DHS will send these lists to states "no fewer than 60 days before each regularly scheduled Federal election, or promptly upon request by a State in connection with any special Federal election." This would mean that DHS would not be required to send this list to states until Friday, September 4, 2026, for the federal general election taking place on November 3, 2026.

10. It is my understanding that Section 3(b) of the EO also directs USPS to initiate a rulemaking that, among other things, would allow States to provide lists of mail voters to USPS 60 days before an election, requires USPS to create a "Mail-In and Absentee Participation List"

4

of individuals "who are enrolled with the USPS" ("USPS Mail Ballot List"), and prohibits USPS from delivering mail ballots sent by individuals not on the USPS Mail Ballot List. I understand that, while Washington can "routinely supplement and provide suggested modifications or amendments" to the USPS Mail Ballot List, USPS is not required to accept any changes provided by Washington. Notably, the deadline for states to send in the USPS Mail Ballot List to USPS is the same day—60 days before the election—as DHS sends the State Citizenship List to states.

11.     Under Section 3(b) of the EO, to comply with state law requiring all eligible voters to receive a mail ballot, Washington would need to send a list to USPS of voters to whom we intend to send a mail-in or absentee ballot ("State Mail Ballot List") at least 60 days before Election Day. *See* Wash. Rev. Code §§ 29A.40.010; 29A.40.070. For the 2026 federal general election, that deadline will be September 4, 2026.

12.     As detailed below, the timing and processes required by the EO will wreak havoc on the administration of elections in Washington State. Washington is primarily a vote-by-mail state, in which every voter in the State receives their ballot through USPS mail delivery and the vast majority of the voters cast and return their ballot either through USPS or at drop boxes located throughout the State. Because Washington's elections are designed as primarily vote-by-mail, and have long operated this way, the State no longer has large-scale election-day infrastructure in place to accommodate a significant shift away from vote-by-mail.

13.     The EO will make it much harder for the State and the OSOS to comply with state and federal statutory obligations governing voter registration and ensure that every eligible voter receives and can cast a ballot. Washington currently has over five million registered voters and that number fluctuates by the day as individuals move to and from the State, residents become newly qualified to vote, and citizens decide to register. As such, Washington's statewide

voter registration list changes up to and on Election Day to comply with state and federal law. Registrants are constantly being added, updated, and removed as required (and limited) by federal and state law, and this will continue through the 2026 election and beyond. Requiring coordination of the State's constantly-evolving voter lists through DHS and USPS would make it virtually impossible to ensure that all eligible voters registered to vote in Washington can receive and return a ballot.

14.    Hundreds of thousands of individuals register to vote within the 60-day period before a federal election and both state and federal law specifically require the State to register these voters. For example, the NVRA requires states to allow voters to register to vote in a federal election at least 30 days before the election. 52 U.S.C. § 20507(a)(1) (requiring States to permit registration up to 30 days before a federal election). The Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA) likewise allows uniformed and overseas voters to register for a federal election if their registration application is received at least 30 days before that election. 52 U.S.C. §§ 20302(a)(2).

15.    Washington has even more generous voter registration periods, allowing qualified individuals to register by mail or online up to eight days before Election Day and in-person during early voting and on Election Day. *See* Wash. Rev. Code § 29A.08.140. Washington also exempts uniformed and overseas voters from the voter registration deadline and allows for signing the declaration on their return envelope as a voter registration application. *See* Wash. Rev. Code §§ 29A.04.210; 29A.40.091. To register, individuals must attest to their citizenship and show proof of identity, among other requirements. Wash. Rev. Code § 29A.08.010. Washington citizens can register to vote online, at their county auditor's office, at various state social service agencies, and through Washington's Department of Licensing when

6

they submit sufficient information of their voter qualifications (including citizenship) through their transaction.

16.     Election offices often see an uptick in voter registrations in the 60 days leading up to an election, including by individuals who move into the state or otherwise become eligible to vote within that time period. For example, in September 2024, the OSOS received 144,404 voter registration transactions, including new registrations and updates to existing voter registrations. In October 2024, the OSOS received 172,182 voter registration transactions. Voter registrations are updated continuously throughout the election and, as detailed below, it would create an enormous challenge to verify that the State Citizenship List, the USPS Mail Ballot List, and the State Mail Ballot List is accurate, linked to an existing voter registration, and updated with that voter's registered address.

17.     My office also has a continuing obligation to work with the counties to perform regular list maintenance, as required under the NVRA, HAVA, and Washington state law. This includes sending notices to voters who may have moved, identifying duplicates on the statewide voter registration list, cancelling the registrations of those who have been convicted of a felony and are currently incarcerated, and cancelling the registration of those who have died. In compliance with the NVRA "quiet period" for voter registration, Washington does not systematically remove voters from the rolls during the 90 days prior to a federal election unless a statutory exception applies. *See* 52 U.S.C. §§ 20507(c)(2)(A), 3(A)-(B), 4(A). Washington does, however, lawfully remove voters on an individual basis where appropriate, such as when a voter requests that his or her registration be canceled.

18.     It is already a complicated and time-consuming process to maintain up-to-date information on the over five million individuals registered to vote in Washington, requiring

7

extensive real-time coordination between OSOS and its 39 counties through a statewide database that all elections administrators can access. Comparing and linking this dynamic statewide voter registration list with the multiple static lists the EO orders of DHS and USPS—two agencies with no experience administering elections—within a short time period before an election, without access to a shared database, will inevitably lead to substantially increased costs for Washington, inaccurate voter lists, voter disenfranchisement, and electoral chaos.

19.    The costs of comparing Washington's voter lists to the lists created by DHS and USPS will be substantial. Once we receive the State Citizenship List from DHS, my office will have to devote significant resources to understanding any differences between it and our current statewide voter registration list. My office has prior experience with this type of comprehensive list-matching as a founding member of the Electronic Registration Information Center ("ERIC"). ERIC provides states with the ability to enhance through innovative technology their NVRA and other list maintenance activities. To successfully organize a comparison between member states' lists took months of discussion and hundreds, if not thousands, of hours of careful analysis. I know from experience that data-matching is a complex process and extreme care must be taken when the consequences of errors may lead to voter disenfranchisement.

20.    As a baseline matter, comparing the State Citizenship List to our current statewide voter registration list will necessitate linking Washington voters across the lists. This will be extremely difficult and time consuming, as it is very unlikely that the State Citizenship List will use the same unique identifiers the State uses to identify its voters. The unique identifiers the State most commonly uses are Voter Registration IDs or State Driver's License Numbers, but it is doubtful that a federal agency would have either of those identifiers. Likewise, the state voter registration database only has the last four digits of the Social Security Number, if any, while the

most common federal unique identifier may be the full nine-digit Social Security Number, which OSOS does not have.

21.    Without common unique identifiers, differences in how voters are listed in the State Citizenship List versus the state voter registration database will make matching individuals between the lists difficult, time-consuming, and potentially inaccurate. Even slight variances in how people's names, addresses, and other information are listed (*e.g.*, Robert vs. Bob, Apartment #3 vs. Apt. 3, 1st Ave vs. First Ave) will complicate this process. Additionally, some eligible voters who registered to vote prior to the HAVA ID requirements may not have any driver's license number or last four digits of the Social Security Number on file, making it much harder to verify matches between the lists. For eligible voters who appear on the statewide voter registration list but not the State Citizenship List, my office will need to investigate each of those cases to meet our obligation of ensuring that all eligible voters are able to vote.

22.    In this same, compressed timeframe, my staff will also need to be preparing separate lists of voters for USPS. Once we receive the USPS Mail Ballot List, we will have to devote substantial resources to understanding any differences between it and our own list of registered voters. This will be a difficult task for many of the same reasons set out above with regard to the State Citizenship List, including: the lack of unique identifiers shared by both lists, the potential for slight variations to wrongly preclude matches, the fluid nature of voter registration rolls in the lead-up to elections, and administrative challenges inherent to any data-matching process. Accordingly, reviewing the USPS Mail Ballot List will require a significant expenditure of time and resources.

23.    For citizens who appear on the statewide voter registration list and are eligible to receive a mail ballot under Washington law but do not appear on the USPS Mail Ballot List, my

9

office will need to investigate further pursuant to our obligation to ensure that every active registered voter receives their ballot. We must make every effort to do so to avoid disenfranchising eligible Washington residents.

24.     The deadline to provide the State Mail Ballot List to USPS no later than 60 days before the election means that voters who are entitled to a mail ballot under state and federal law will unavoidably be left off the list. For example, residents who move into the state, register as UOCAVA voters in Washington, or become citizens within that time period will not be included. *See, e.g.*, 52 U.S.C. § 20302(a)(8) (permitting uniformed and overseas voters to request absentee ballots up to 45 days before an election); Wash. Rev. Code § 29A.08.140 (allowing to register and receive a ballot by mail up to 8 days before an election). Regarding voters who have moved, I am not aware of any legal requirement that voters regularly report change of residential address to the federal government. And, although the EO indicates that States will be able to "supplement and provide suggested modifications or amendments" to the USPS Mail Ballot List, USPS is not required to accept our suggestions. The EO also does not specify when USPS will transmit its USPS Mail Ballot List to our office, which could cause substantial complications.

25.     Washington has amongst the highest population of UOCAVA voters in the nation. Many of these UOCAVA voters, and other registered voters, have mailing addresses that are in other states. This creates a challenge in that Washington will be providing a State Mail Ballot List to the USPS for all registered voters in Washington, including those with mailing addresses in another state, but Washington will only be getting a State Citizenship List for Washington. There could be no visibility of registered voters in Washington that have requested their ballot be mailed to them in another state. This raises concerns that these registered voters may be

10

prevented from returning their ballot by mail to Washington unless they appear on the State Mail Ballot List and State Citizenship List for Washington State.

26.    The timeline for preparation of these lists does not seem workable. The EO requires DHS to send the State Citizenship List to States "no fewer than 60 days before each regularly scheduled Federal election." For the November 3, 2026 General Election, that means DHS must send this list by Friday, September 4, 2026. And Washington must also send its State Mail Ballot List to USPS 60 days before the election—also by Friday, September 4, 2026. Thus, we must send the State Mail Ballot List (i.e., all those who should receive a mail ballot under state law) to USPS on the *same day* we might receive the State Citizenship List from DHS. Comparing the statewide voter registration list and the State Citizenship List to see who is eligible according to both lists in *one day*, or even *a few hours*, is simply not possible to do with any meaningful degree of accuracy, no matter how many resources my office dedicates to the project.

27.    Even with the best efforts of my office and local elections officials, the challenges of completing a complex data-matching program in such a short timeframe for multiple different lists, while also preparing to administer an election poses the high risk of errors and omissions.

28.    Moreover, even though Washington will not disenroll voters simply because they are not included in the State Citizenship List or the USPS Mail Ballot List, the absence of such voters from these lists will likely disenfranchise voters in multiple ways. First, the EO instructs USPS not to return a ballot from an individual who is not included in the USPS Mail Ballot List. This threatens to disenfranchise eligible voters who are not included in the USPS Mail Ballot List, including the thousands of residents who register to vote in the 60 days before an election. The impact will be particularly acute in Washington as a vote-by-mail state. In the 2024 General

11

Election, for example, over 1.3 million voters or 32.8% of Washington citizens returned their voted ballot by mail. This method of voting is particularly important for the many Washington citizens who live with disabilities, live in rural areas, lack access to transportation, or are otherwise unable to deposit their ballot into an official ballot drop box by Election Day. Under the EO, any eligible voter not included on the USPS Mail Ballot List would not have their ballot returned to election administrators through the mail.

29.    Worse still, these voters may never receive notice that USPS has refused to deliver their ballot. Consider an eligible voter who is on the State Mail Ballot List but not on the USPS Mail Ballot List. Under the EO, they are likely to receive a mail ballot from their local elections official that USPS will later refuse to return to that official. In that situation, the voter may think that they have successfully voted, but they have not. Nor would that voter necessarily know to cancel that ballot and vote in person, given that the EO does not charge USPS with notifying the voter. And even if that voter received notice with sufficient time and could vote in person, the voter may be concerned about casting two ballots, which is itself a criminal violation, and choose not to vote. The confusion inherent in these processes virtually guarantees that eligible voters will be disenfranchised.

30.    The EO will also likely discourage eligible voters from voting in other ways. For example, voters who are not included in the State Citizenship List as contemplated by Section 2(a) may be deterred from voting because they believe their ballot won't be accepted or they could be prosecuted for voting, especially if DHS does not timely accept their corrections. Additionally, if the State Citizenship List is publicly accessible, local elections workers may misunderstand their legal obligations and refuse to provide a ballot to eligible voters who are not included on the State Citizenship List based on their belief that the voters are ineligible (or for

fear of criminal prosecution, as discussed below). These are all risks that Washington cannot accept. We must make every effort to avoid disenfranchising eligible Washington residents.

31.    Accordingly, in compliance with Washington's obligation to protect the right to vote, Washington would expend significant resources to attempt to supplement and amend the federal lists as errors are found through comparison and investigation. This would also require the State to identify proper and secure methods for sending large volumes of confidential data to the federal government.

32.    And because Washington will receive the State Citizenship List and the USPS Mail Ballot list so close to the election, I must plan for all of this now. The EO has already required immediate action from me and my team to understand how it interacts with Washington's statewide voter registration list and to coordinate with other state and local agencies across Washington. As soon as our team had time to digest the contents of the EO, I immediately began considering what near-term actions the EO would necessitate from my office, including beginning to lay out plans to create the State Mail Ballot List for the entire state, identifying options for providing updates to the State Mail Ballot List and the USPS Bail Ballot List, evaluating the security of those options, preparing initial guidance for state and county election administrators, preparing communications and updates for voters, determining potential rulemaking to facilitate uniform processes throughout the state, notifying state agencies, and allocating limited resources to completing tasks required under the EO. Since the EO issued, I have organized a statewide briefing that included OSOS Elections Division staff, county auditors, county election managers, and other county elections staff. I also met with Steven Carter, from USPS Election & Government Mail Services, regarding the EO and other topics,

but Mr. Carter did not have any new information regarding the EO or how USPS is responding to its requirements.

33.    The EO provides no funding, so paying for these costs will have to come from devoting fewer staff resources to our office's other pressing responsibilities. I estimate that compliance with the EO would require hiring two contractors and four full-time employees by July 2026, including a project manager, two data consultants, and a program supervisor. This is in addition to the staff time required to work with DHS and USPS to securely transfer information.

34.    I estimate that these new staffing needs will require an increase of approximately $450,000 to the Secretary of State's budget. Given recent economic pressures across the state and country, I have been trying to keep my office's budgetary needs as low as possible. The Elections Division has recently experienced over $6 million in expenditure reductions. Following the most recent state legislative session, an additional budget reduction of $70,325 is required for the Elections Division. To cover the costs of complying with the EO, I will either need to go back to the Legislature and ask for additional funds, which I am far from assured to receive, or will need to identify equivalent cuts elsewhere in my office—a very difficult and maybe impossible task. With the reductions experienced so far, any additional cuts would have a high probability of eliminating staff positions or programs in their entirety.

35.    Based on the most recent round of funding loss, our office has already eliminated nearly all discretionary projects and limited staffing levels to the minimum necessary to complete all constitutional, federal, and state election law requirements. The State currently has a small, dedicated staff that assists me in overseeing elections. Preparation for the November 2026 general election is already well underway. This staff is already at capacity focusing on a

14

multitude of responsibilities, including ensuring security and maintenance of the voter registration database, training of election administrators to ensure compliance with federal and state laws, responding to public record requests, reviewing county election procedures, and providing voting information to eligible voters. This work becomes more voluminous, significant, and urgent in the months leading up to the election, when we must answer an increasing volume of questions and handle tasks related to, for example, campaign finance reporting, logic and accuracy testing, and challenges to voter registrations.

36. Implementing the EO will necessarily divert the attention of my small staff from all of these critical functions at a time when election administration is already under profound threat due to concerted misinformation campaigns and violent acts by foreign and local actors. For example, in 2024, there were multiple incidents that required unprecedented action, including the physical destruction of ballot drop boxes and multiple envelopes sent to election offices that contained white powder. Washington is preparing to respond to similar types of incidents and must stay informed about new emerging threats to election officials and voters. Implementing the EO will detract from and weaken those efforts.

37. In addition to adding staffing, the State will also need to expend significant resources training local election officials about process changes required by the EO. The OSOS provides local elections administrators hundreds of hours of election training, including a required orientation training called "Elections 101." See https://www.sos.wa.gov/elections/administrators/certification-training/elections-101. These trainings are provided in live events, written materials, checklists, best practices, frequently asked questions, guides, virtual events, and videos. The OSOS also provides training to county canvassing boards tasked with the responsibility to canvass election results.

15

38.     If the EO is implemented, Washington will have to devote significant time, personnel, and money to update training materials for local election officials and their staff, specifically detailing what steps they must take with respect to voters who appear on Washington's voter registration list but not on the State Citizenship List. This is yet another aspect of the EO's implementation that will necessarily divert OSOS staff from other important election administration tasks.

39.     I anticipate that, in addition to formal training materials, my office will need to allocate significant resources to responding directly to local election officials, given the threat of criminal prosecution in the EO. There has been a large amount of turnover of county election administrators in Washington. Some of these new county election administrators have not administered a federal election. This requires OSOS staff to frequently check in and provide additional assistance to those election administrators. This turnover also extends to county canvassing board members who, in some cases, have not served as board members for a federal election or at all. There are additional reporting requirements that exist only in federal election years, such as certification to the Department of Justice on the timely mailing of ballots to UOCAVA voters and the gathering and submission of data to the Election Assistance Commission in the support of the Election Administration and Voting Survey.

40.     At the same time my staff is performing investigations into the accuracy of the State Citizenship List and the USPS Mail Ballot List, and performing all their other critical elections administration responsibilities, they will also have to conduct a wide-ranging public education campaign to ensure that eligible voters understand the EO's requirements and how they may impact a citizen's registration and ability to vote. For example, my staff will have to prepare and distribute training materials guiding citizens through accessing and correcting their

16

individual records on the State Citizenship List under section 2(a). We will also need to field questions from registrants concerned about their voter registration status and generally confused about the process and qualifications to vote in Washington elections.

41.    I estimate public education efforts specifically related to the EO will involve engagement with media, a strategic messaging campaign, and utilizing social media. It will also involve mailings, if possible, and advertising, such as billboards, newspapers, and electronic ads. We would need to hire a vendor to assist and provide deliverables. Based on our recent experience with the "Mark the Ballot" public education campaign, I estimate that the public education campaign required as a result of the EO would cost approximately $1,800,000 and involve approximately 800 hours of staff time.

42.    Significant staff time would also need to be devoted to managing and mitigating voter confusion and anxiety created by the EO. In my experience administering elections, changing registration and election procedures immediately before an election can cause significant voter confusion. The complicated requirements of the EO will likely lead some citizens to misunderstand the requirements for registration, making it hard for them to determine whether they are able to vote in Washington's elections. Some citizens will inevitably decide these added requirements for registering and voting are too confusing to be worthwhile. For example, a voter may check their individual status on the State Citizenship list, according to the EO. If they are mistakenly not included, they may believe they have no recourse and choose not to vote, or they may misunderstand the process for correction (despite my office's attempts to provide education), or DHS may not issue a correction in time. The result of this confusion will be that fewer eligible voters successfully register to vote or decide to cast a ballot.

17

43.    We have already received many questions from confused voters. For example, one voter reached out asked: "*Will there be changes to how I vote, with the administration making changes to mail-in voting?*" Another voter asked "*I am concerned because I am a military spouse currently stationed in CA. My husband and I are Washington residents and Washington voters. Did I just lose my right to vote?*" The EO is already making it harder to fulfill one of our primary responsibilities to preserve confidence in election integrity.

44.    This inevitable voter confusion harms Washington because it will disenfranchise voters, and interferes with our sovereign interest and state-law obligation to ensure that all eligible voters who want to can cast a vote. It will also impose a burden on my staff's time at a crucial time, shortly before the election, when local elections officials' resources are particularly stretched.

45.    Voters have already been harmed by the recent degradation of services at USPS. With the recent changes at the USPS, I have observed a noticeable increase in ballots being returned too late to be counted. In the 2026 February Special Election, for example, 75% of all rejected returned ballots were due to a late postmark. This was the highest total number of rejected ballots due to late postmark in seven years, representing 1.3% of all returned ballots. To inform and educate voters about another sudden and significant change in USPS service expectations would require a statewide outreach campaign, data analysis, coordination with county elections offices, coordination with contractors, and funding. Without this coordinated campaign, the State risks voters continuing to have their ballots rejected.

46.    The EO also places election workers in untenable position of choosing between the risk of federal prosecution for complying with state law, or state and federal prosecution for complying with the EO. Washington elections officials are required by state law to issue ballots

18

to duly registered voters. *See* Wash. Rev. Code §§ 29A.40.070; 29A.84.110. Any person who intentionally fails to return another person's signed ballot declaration or ballot is guilty of a gross misdemeanor. *See* Wash. Rev. Code § 29A.84.050. Moreover, in compliance with UOCAVA, election administrators must issue ballots to registered voters who request an absentee ballot under that Act at least 45 days before an election. 52 U.S.C. §§ 20302(a)(1)-(3), (8)(A).

47.    It is my understanding that Section 2(b) of the EO instructs the Attorney General to prioritize investigation and prosecution, under a variety of federal statutes, of "State and local officials or any others involved in the administration of Federal elections who issue Federal ballots to individuals not eligible to vote in a Federal election." I understand that the EO provides that "an individual is 'eligible to vote in a Federal election' if the individual is a citizen of the United States, 18 years of age or older by the date of the upcoming election, and otherwise qualified under the laws of his or her State." I further understand that Section 5 of the EO encourages referrals to U.S. DOJ of "[e]vidence of violations of existing Federal laws by State or local election officials" and "States or localities," among other parties, "for consideration of investigation or charges."

48.    If the EO goes into effect, I would be concerned that my staff and I, and other Washington elections officials, would face federal prosecution if we issued ballots to Washington voters who are not on the State Citizenship List.  The EO's threat of prosecution is exacerbated by the fact that the EO appears to define voter eligibility in a manner inconsistent with Washington law. Washington law permits an otherwise eligible voter to cast a ballot in a federal primary election if the voter will be 18 years of age by the general election. *See* Wash. Rev. Code §§ 29A.04.061; 29A.08.170. As such, some 17-year-olds are eligible in Washington to vote in a primary election if they will turn 18 at the time of the general election. But EO

19

Section 2(b) states that to be eligible to vote in any federal election—presumably including primaries for federal election—the individual must be 18. This conflicts with state law. And it creates risks that Washington elections officials will be prosecuted by federal authorities if they issue primary ballots to eligible 17-year-old voters.  But if they don't, they could be liable for violating state election laws.

49.     In 2022, 78,587 17-year-old voters were eligible to vote in the August Primary. In 2024, 69,953 17-year-old voters were eligible to vote in the August Primary.

50.     I know that the threat of prosecution under the EO is on the minds of state and local elections officials like me. Shortly after the EO was issued, as part of my job responsibilities, I discussed the contents of the EO with a manager in the Elections Division who had concerns for themselves and others that simply issuing mail ballots in compliance with state law—to voters who have affirmed their citizenship under penalty of perjury—could result in their arrest. Though we have not had issues staffing state and local election positions, I worry this could become a problem in the future as people may not wish to take on the risk. The EO increases the pressure and scrutiny on election administrators for lawfully fulfilling their duties, and are also a source of misinformation about voter eligibility, increasing threats to state and local election officials.

51.     Should the U.S. Department of Justice initiate any such enforcement actions, the OSOS would be required to divert significant resources not only to respond to such legal action but also to educate the public, with the aim of minimizing voter confusion to the extent possible. Personally defending criminal charges would affect my ability to oversee that all elections conducted in the state are compliant with federal and state laws and, when necessary, intervening to remedy any potential issues.

20

52.     Any such legal proceedings would have severe and adverse consequences for the public's trust in Washington's administration of elections. Trust in elections is important to ensuring that voters turn out in the election. And, even if turnout is unaffected, the legitimacy of the election results could be questioned. The decline in the public's trust can increase misinformation and polarization.

53.      Based on my experience assisting local election workers, I know that those workers may feel they cannot register or send a ballot to such voters without risking criminal prosecution, despite those voters' fundamental right to vote under state and federal law. Similarly, based on my experience I know that USPS or other entities involved in the "printing, production, shipment, or distribution of ballots" may believe they cannot provide a ballot to those voters without risking criminal prosecution.

54.     In addition to all of these costs and impacts, the State will incur additional costs based on implementation of Section 3(b)(i) of the EO, which I understand would require USPS to issue rulemaking requiring, among other things, ballot envelopes to go through "mail envelope design review" by USPS.

55.     Many counties in Washington have already ordered mail ballot envelopes for the 2026 federal election cycle. Requiring these counties to order replacement ballot envelopes would significantly increase costs to the State, which reimburses counties for a pro rata share of election expenses associated with state and federal elections. Wash. Rev. Code § 29A.04.420.

56.     All 39 counties in Washington currently use Intelligent Mail barcodes on ballot mail. These Intelligent Mail barcodes are required to obtain the lowest possible outbound postage rate. These barcodes are also included in return ballot envelopes but are not unique to the individual voter.

57.     All 39 counties in Washington currently submit ballot envelopes to USPS for design review. The Secretary of State organized a work group that established a standard ballot envelope design that is intended, but not required, to be used by all counties. The USPS and other mailing experts were included in the work group.

58.     In Washington, as in much of the country, ballot envelopes vary by county. I am deeply concerned about the length of time it would take for USPS to conduct ballot design review for thousands of jurisdictions. Waiting on USPS to approve ballot design has the potential to seriously disrupt and delay carefully timed steps necessary to deliver mail ballots to Washington voters. Managing the fallout from such a delay would force my office and local elections officials to divert critical time and money from other elections administration duties to expedite other steps in the mail ballot process, educate the public about the status of mail ballots, and otherwise mitigate the harm from delays in the process.

59.     The provisions of the EO governing retention of election materials will also burden the State and increase its costs. It is my understanding that Section 5 of the EO directs that "States and localities should preserve, for a 5-year period, all records and materials—excluding ballots cast—evidencing voter participation in any federal election (e.g., ballot envelopes, regardless of carrier)." Existing federal law only requires preservation of voting materials for 22 months following an election, and preservation of records concerning voter roll maintenance for two years. 52 U.S.C. §§ 20507(i)(1), 20701. The Secretary of State's Office has established by rule, consistent with federal law, that when an election involves federal offices, the records and material must be kept for twenty-two months from the date of the election. See Wash. Admin. Code § 434-262-200.

22

60.     Compliance with a five-year document preservation standard for election materials would impose significant compliance, storage, and other costs on Washington and local elections officials. For example, current document retention requires Washington to propose and adopt new rulemaking, update records retention schedule, and provide assistance and funding for physical and electronic storage of materials for any changes in the retention schedule. This would be costly to the State.

61.     Storage costs would also increase. Under current federal law, Washington may begin properly disposing of certain retained materials from the 2024 primary elections on or about June 6, 2026, and the 2024 general election on or about September 5, 2026. The EO prevents Washington from undertaking these actions as to some, but not all, of the retained materials. More than doubling the required retention time for some (but not all) voting materials would increase these burdens and costs significantly.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April _30_ , 2026, at Olympia, Washington.

Stuart Holmes
Director of Elections
Office of the Secretary of State

23