**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

STATE OF CALIFORNIA; et al.,

                *Plaintiffs,*

v.

DONALD J. TRUMP, in his official
capacity as President of the United States; et
al.,

                *Defendants.*

Case No. 1:26-cv-11581

## DECLARATION OF KEELY VARVEL

I, Keely Varvel, declare as follows:

1.  I am a resident of the State of Arizona. I am over the age of 18. I am familiar with the information in the statements set forth below either through personal knowledge, consultation with Arizona Secretary of State staff, or from my review of relevant documents and information. If called as a witness, I could and would testify competently to the matters set forth below.

2.  I am employed by the Arizona Secretary of State as the Assistant Secretary of State. The Secretary is Arizona's Chief Election Officer and Arizona law invests him with the authority to ensure the "maximum degree of correctness, impartiality, uniformity and efficiency on the procedures for early voting and voting, and of producing, distributing, collecting, counting, tabulating and storing ballots." A.R.S. § 16-452(A). The Secretary has specific statutory authority to coordinate state responsibilities under the National Voter Registration Act and the Uniformed and Overseas Citizens Absentee Voting, including providing information on registration and absentee or early ballot procedures to absent uniformed services voters and

1

overseas voters who wish to register to vote or vote in any jurisdiction in this state. A.R.S. § 16-142(A).

3.    Secretary Adrian Fontes has served as the Secretary of State since January 2023. In addition, from January 2017 to December 2020, he was the elected Maricopa County Recorder. During Secretary Fontes's time as Recorder, I was the Chief Deputy Maricopa County Recorder. Maricopa County is one of the largest voting jurisdictions in the country, with more than two million registered voters. In Arizona, county recorders are primarily responsible for early voting, which includes carrying out Arizona's robust mail voting program.

4.    The state and its subdivisions are responsible for administering federal elections in Arizona. This responsibility encompasses voter registration, maintaining and updating voter rolls, issuing ballots to registered voters, tabulating votes, and certifying results in all elections for federal office, among numerous other tasks. Counties maintain their own voter registration rolls, issue both mail and in person ballots, and tabulate votes.

5.    The Secretary of State is responsible for maintaining the statewide voter registration database, coordinating with the Arizona's Motor Vehicle Division with respect to its voter registration functions, and certifying elections that include a federal office.

6.    The Secretary of State has an oversight role in state and federal elections, exercised through development and issuance of a biennial Elections Procedures Manual (the "EPM"). *See* A.R.S. § 16-452. In addition, the Secretary has specific statutory duties as the Chief Election Officer in connection with Arizona's compliance with NVRA and UOCAVA. *See* A.R.S. § 16-142. The EPM contains detailed guidance regarding voting by mail and compliance with the NVRA and UOCAVA.

2

7.    I am familiar with the Executive Order published on March 31, 2026, entitled "Ensuring Citizenship Verification and Integrity in Federal Elections" (the "EO").  Sections 2 through 5 of the EO (collectively, the "Challenged Provisions") have already caused considerable harm, confusion, fear, and disruption in Arizona election administration, and will impose unrecoverable costs on Arizona.

8.    It is my understanding that Section 2(a) of the EO directs the Department of Homeland Security ("DHS") to create a "State Citizenship List" for each State, which will include "individuals confirmed to be United States citizens who will be above the age of 18 at the time of an upcoming Federal election and who maintain a residence in the subject State."  It is also my understanding that DHS will send these lists "no fewer than 60 days before each regularly scheduled Federal election, or promptly upon request by a State in connection with any special Federal election."  This would mean that DHS will send this list by Friday, September 4, 2026, for the federal general election taking place on November 3, 2026.

9.    Section 2 requires immediate action from the Secretary's office in Arizona to understand how it interacts with Arizona's  statewide voter registration list, and to coordinate with other state and local agencies across the state.  Our efforts to address the changes and impacts of the EO will divert time and attention from other critical election preparations, including preparing for the state's July 21, 2026 primary election.

10.    The Secretary's office has a continuing obligation to work with the counties to perform regular list maintenance, as required under the National Voter Registration Act ("NVRA"), Help America Voter Act ("HAVA"), and Arizona  state law.  This includes sending notices to voters who may have moved, identifying duplicates on the statewide voter registration

3

list, cancelling the registrations of those who have been convicted of a felony and have not had their rights restored, and cancelling the registration of those who have died.

11.    Additionally, the Secretary's office will need to continue to facilitate voter registration for those who are eligible to vote in Arizona, which allows qualified individuals to register up to twenty-nine days before Election Day. A.R.S. §§ 16-101(A)(3), -134(C); *see also* 52 U.S.C. § 20507(a)(1) (requiring States to permit registration up to 30 days before a federal election). Arizona citizens can register to vote online, at their county recorder's office, at various state social service agencies, and through Arizona's Motor Vehicle Division when they submit sufficient information of their voter qualifications (including citizenship) through their transaction.

12.    In compliance with the Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA), Arizona allows uniformed and overseas voters to register for a federal election if their registration application is received at least 29 days before that election. *See* 52 U.S.C. §§ 20302(a)(2). Indeed, a qualified person under UOCAVA may use a federal post card application to register up until 7:00 pm on election day. A.R.S. § 16-103(C).

13.    In compliance with the NVRA "quiet period" for voter registration, Arizona does not systematically remove voters from the rolls during the ninety days prior to a federal election unless a statutory exception applies. *See* 52 U.S.C. §§ 20507(c)(2)(A), 3(A)-(B), 4(A). Arizona does, however, lawfully remove voters on an individual basis where appropriate, such as when a voter requests that his or her registration be canceled.

14.    In sum, Arizona's statewide voter registration list changes up to and on Election Day. Registrants are constantly being added, updated, and removed as required (and limited) by federal and state law, and this will continue through the 2026 election and beyond.

15. I have considered how this dynamic statewide voter registration list will intersect with the list created by DHS. As noted above, pursuant to Section 2(a) of the EO, DHS will share a State Citizenship List by September 4, 2026. The EO permits the state "to routinely supplement and provide suggested modifications or amendments to the State Citizenship List transmitted thereto." The EO does not require DHS to accept any of these state supplements, modifications, or amendments to the State Citizenship List.

16. Once we receive the State Citizenship List, we will have to devote substantial resources to understanding any differences between it and our current statewide voter registration list. As a baseline matter, comparing the State Citizenship List to our current statewide voter registration list will necessitate linking registrants across the lists. This will be difficult, as it is extremely doubtful that the State Citizenship List will contain the same unique identifiers as our statewide voter registration list, such that we could perform straightforward matching. Arizona assigns every voter a unique identifying number, and also uses driver's license or nonoperating identification license numbers, the last four digits of a social security number, or tribal identification numbers to identify voters. Rather, it is inevitable that there will be differences in the files that will make matching difficult, time-consuming, and potentially inaccurate, as people's names, addresses, and other information may vary slightly (e.g., Robert vs. Bob, Apartment #3 vs. Apt. 3). I know from my experience that data matching is a complex process and extreme care must be taken when the consequences of errors may lead to voter disenfranchisement. And because Arizona will receive the State Citizenship List so close to the election, I must plan for all of this now.

17. For eligible voters who appear on the statewide voter registration list but not the State Citizenship List, the Secretary's office and county recorders will need to investigate further

pursuant to our obligation to ensure that eligible voters are able to vote. Even though Arizona will not disenroll voters simply due to their absence from the State Citizenship List, it could disenfranchise voters in multiple ways. First, voters who check their status on the State Citizenship List as contemplated by Section 2(a) and see that they are not listed may be deterred from voting because they believe they will be blocked from voting or prosecuted, especially if DHS does not timely accept their corrections. Second, USPS may rely on the State Citizenship List to determine which voters can receive and transmit mail ballots in response to the EO's emphasis on criminal penalties associated with the distribution of mail ballots to ineligible individuals. EO §§ 2(b), 3(a), 5. Additionally, if the State Citizenship List is publicly accessible, local elections workers may misunderstand their legal obligations and refuse to provide a ballot to eligible voters missing from the State Citizenship List based on their belief that the voters are ineligible. These are all risks that Arizona cannot accept. We must make every effort to avoid disenfranchising eligible Arizonans.

18.     Arizona has already invested significant resources in ensuring that voters in the state are United States citizens. In particular, since 2005, persons registering to vote for the first time in any Arizona county must provide satisfactory evidence of United States citizenship ("DPOC"). *See* A.R.S. § 16-166(F). In the last twenty years the state has developed detailed procedures for implementing Arizona's DPOC law. The vast majority of Arizonans use an Arizona driver's license number as DPOC. *See* A.R.S. § 16-166(F)(1). If the State Citizenship List does not contain Arizona driver's license numbers there are likely to be substantial differences between the State Citizenship List and the state's own voter registration database. Moreover, a voter may not be removed from Arizona's voter registration rolls for lack of

citizenship without providing at least thirty-five days' notice to the voter and an opportunity to provide DPOC up until the polls close on election day.  A.R.S. §§ 16-134(B), -165(A)(10).

19.    Accordingly, in compliance with Arizona's obligation to protect the right to vote, Arizona would expend significant resources to attempt to supplement and amend the federal list as necessary, as errors were found through our comparison and investigation.  This includes determining proper and secure methods for sending large volumes of confidential data to the federal government.  However, even if we are able to quickly offer all necessary corrections, the EO does not require DHS to accept the State's "suggested modifications or amendments."  EO § 2(a).

20.    Arizona would incur significant costs to undertake this comparison and verification of the State Citizenship List.  The EO provides no funding, so paying for these costs will have to come from devoting fewer resources to our office's other pressing responsibilities, such as maintaining the statewide voter registration database and supporting local election officials throughout Arizona.

21.    As explained above, the Secretary produces the EPM at the end of every odd-numbered year, so that it may be used for elections in the following year.  A.R.S. § 16-452(B).  The Secretary has already issued the 2025 EPM for use in elections in 2026.  The process of issuing a new EPM takes approximately a year because it requires consultation with election officials throughout the state, as well as extensive review by the Arizona Governor and Attorney General.  In addition, the Secretary is required to provide training to election officials throughout the state.  A.R.S. § 16-407(A).  One such Election Officer Certification class is in process this week.

7

22.    If Section 2 is implemented, Arizona will have to devote significant time, personnel, and money to update training materials for local election officials and their staff, specifically detailing what steps they must take with respect to voters who appear on Arizona's voter registration list but not on the State Citizenship List. This is yet another aspect of the EO's implementation that will necessarily divert resources from other important election administration tasks.

23.    I anticipate that in addition to formal training materials, Secretary's office will need to allocate significant resources to responding directly to local election officials, given the threat of criminal prosecution in Section 2 of the EO.

24.    At the same time Secretary's office staff is performing investigations into the accuracy of the State Citizenship List, they will have to conduct a wide-ranging public education campaign to ensure that eligible voters understand the EO's requirements, and how they may impact a citizen's registration and ability to vote. For example, our staff will have to prepare and distribute training materials guiding citizens through accessing and correcting their individual records on the State Citizenship List under section 2(a). We will also need to field questions from registrants concerned about their voter registration status and generally confused about the process and qualifications to vote in Arizona elections.

25.    In my experience administering elections, changes to registration and election procedures in the time immediately preceding the election can cause voter confusion. The complicated requirements of the EO will likely lead some citizens to misunderstand the requirements for registration, or whether they are able to vote in Arizona elections. Some citizens will determine that the added requirements make registering and/or voting too confusing to be worthwhile. For example, a voter may check their individual status on the State

8

Citizenship list, according to the EO. If they are mistakenly not included, they may believe they have no recourse, and choose not to vote, or they may misunderstand the process for correction (despite the office's attempts to provide education), or DHS may not issue a correction in time. The result of this confusion will be that fewer eligible voters successfully register to vote or decide to cast a ballot.

26. This inevitable voter confusion harms Arizona because it will disenfranchise voters, interfering with our sovereign interest and state-law obligation to ensure that all eligible voters who want to can cast a vote. It will also impose a burden on our staff's time, as our staff (and the elections staff at the counties) will be responsible for dispelling voter confusion to the extent possible. This voter confusion will come at a crucial time, shortly before the election, when local elections officials' resources are particularly stretched.

27. Arizona elections officials are required by state law to issue ballots to duly registered voters. Every qualified Arizona elector in the state may vote by mail, in person during the twenty-seven days before election day, or at a polling place on election day. *See* A.R.S. §§ 16-541(A), -579(A). Even if a voter does not appear on the county's voter registration rolls, the voter must be issued a provisional ballot. A.R.S. § 16-584(B). My office intends to comply with these state legal requirements in administering upcoming federal elections.

28. In compliance with UOCAVA, Arizona issues ballots to registered voters who request an absentee ballot under that Act at least 45 days before an election. 52 U.S.C. §§ 20302(a)(1)-(3), (8)(A). Moreover, UOCAVA voters may register and use a federal write in absentee ballot up until 7:00 pm on election day. A.R.S. § 16-543.02.

29. It is my understanding that Section 2(b) of the EO instructs the Attorney General to prioritize investigation and prosecution, under a variety of federal statutes, of "State and local

9

officials or any others involved in the administration of Federal elections who issue Federal ballots to individuals not eligible to vote in a Federal election." I understand that the EO provides that "an individual is 'eligible to vote in a Federal election' if the individual is a citizen of the United States, 18 years of age or older by the date of the upcoming election, and otherwise qualified under the laws of his or her State." I further understand that Section 5 of the EO encourages referrals to U.S. DOJ of "[e]vidence of violations of existing Federal laws by State or local election officials" and "States or localities," among other parties, "for consideration of investigation or charges."

30.    If EO Section 2 goes into effect, I would be concerned that Arizona county elections officials would face federal prosecution if they issued ballots to Arizona voters who are not on the State Citizenship List. I am concerned about the impact of these threats of criminal prosecution on election officials throughout Arizona, not because I believe they have violated these provisions, but because the EO increases the amount of pressure and scrutiny on them, including by the public.

31.    I know that the threat of prosecution under the EO is on the minds of state and local elections officials like me. Arizona has had substantial turnover in elections officials in the last several years, and I worry that in the future fewer people may wish to take on the risk of doing the important work of conducting elections in the state.

32.    Should the Attorney General initiate any such enforcement actions, the Arizona Secretary of State's Office would be required to divert significant resources not only to respond to such legal action but also to educate the public, with the aim of minimizing voter confusion to the extent possible.

33. Any such legal proceedings would have severe and adverse consequences for the public's trust in Arizona's administration of elections.

34. Additionally, the creation of a State Citizenship List may directly disenfranchise voters. Based on my experience, I know that if a citizen is not included on the list—due, for example, to errors in DHS's static immigration information contained in its Systematic Alien Verification for Entitlements (SAVE) system, the federal government's misinterpretation of whether the citizen qualifies as a state resident, or any other error—they may believe they are unable to vote, and could be prosecuted for doing so. That is why Arizona works so hard to maintain consistent voter registration information so that voters are not erroneously informed that they are ineligible to vote.

35. Based on my experience working with local election workers, I know that those workers may feel they cannot register or send a ballot to such voters without risking criminal prosecution, despite those voters' fundamental right to vote under state and federal law. Similarly, based on my experience I know that USPS or other entities involved in the "printing, production, shipment, or distribution of ballots" may believe they cannot provide a ballot to those voters without risking criminal prosecution.

36. Since 1991, Arizona has permitted any voter in the state to vote early in any election in which the voter is eligible to vote. A.R.S. § 16-541. The vast majority of early voting is carried out through voting by mail. In 2007, Arizona instituted a Permanent Early Voting List ("PEVL"). In 2021, the law was amended to rename it as the Active Early Voting List ("AEVL"). A.R.S. § 16-544. Under both PEVL and AEVL any Arizona registered voter can join the list and automatically be mailed a ballot twenty-seven days before each election. A.R.S. § 16-544(A). In addition, voters who do not participate in AEVL have a right to request

11

they be mailed an early ballot up until eleven days before an election. A.R.S. § 16-542(E). At least seventy percent of Arizona registered voters are on AEVL, and more than eighty percent received a ballot by mail in the 2024 general election. My office intends to comply with these state legal requirements in administering upcoming federal elections.

37.    It is my understanding that Section 3(b) of the EO directs the United States Postal Service ("USPS") to initiate a rulemaking that, among other things, would allow States to provide lists of mail voters to USPS 60 days before an election, require the creation of a "Mail-In and Absentee Participation List" ("USPS Mail Ballot List") and prohibit USPS from delivering mail ballots sent by individuals not on the USPS Mail Ballot List. It is also my understanding that Arizona can "routinely supplement and provide suggested modifications or amendments" to the USPS Mail Ballot List, but USPS is not required to accept any changes provided by Arizona.

38.    Under Section 3(b) of the EO, in order to comply with state law requiring county recorders to provide a mail ballot to all AEVL participants and others who request to receive a mail ballot, at least 60 days before Election Day we would need to send a list to USPS of voters to whom we intend to send a mail-in ballot ("State Mail Ballot List"). *See* A.R.S. §§ 16-542, -544. For the 2026 federal general election, that deadline will be September 4, 2026. Failing to provide this list to USPS would pose an unacceptable risk under the EO that USPS will not include Arizona AEVL and other mail voters on the USPS Mail Ballot List, thereby making it more difficult or impossible for eligible voters to cast their ballots.

39.    As discussed throughout this declaration, Arizona's extensive use of the mail for elections, paired with our election calendar, mean I must plan now for how to align Arizona's administration of mail voting with the EO.

12

40.     Creating the State Mail Ballot List will require the Secretary's office and local elections officials to expend time and resources to ensure that all AEVL participants and those who otherwise timely request an early ballot by mail are included.  This task will be significantly complicated by the influx of registration updates and changes that elections officials typically receive in the months before the election (and which I expect will be exacerbated by the State Citizenship List provisions discussed above).

41.     The deadline to provide this list to USPS no later than 60 days before the election means that some voters who are entitled to a mail ballot under state and federal law will unavoidably be left off the list.  UOCAVA permits uniformed and overseas voters to request absentee ballots up to 45 days before an election.  52 U.S.C. § 20302(a)(8).  Under Arizona law, voters may request an early ballot by mail up to eleven days before an election.  A.R.S. § 16-542(E).  Although the EO indicates that States will be able to "routinely supplement and provide suggested modifications or amendments" to the USPS Mail Ballot List, USPS is not required to accept our suggestions.  The EO also does not specify when USPS will transmit its USPS Mail Ballot List to our office, which we would then need to provide to each of the fifteen Arizona counties, which are responsible for mailing ballots.  This could cause substantial complications.

42.     Once we receive the USPS Mail Ballot List, we will have to devote substantial resources to understanding any differences between it and Arizona counties' lists of voters eligible to receive mail ballots.  This will be a difficult task for many of the same reasons set out above with regard to the State Citizenship List, including: the lack of unique identifiers shared by both lists, the potential for slight variations in spelling to wrongly preclude matches, the fluid nature of voter registration rolls in the lead-up to elections, and administrative challenges

13

inherent to any data-matching process. Accordingly, reviewing the USPS Mail Ballot List will require a significant expenditure of time and resources.

43.    For citizens who appear on the statewide voter registration list and are eligible to receive a mail ballot under Arizona law but not the USPS Mail Ballot List, the Secretary's office will need to investigate further pursuant to our obligation to ensure that every active registered voter is able to receive a mail ballot as requested. We must make every effort to do so to avoid disenfranchising eligible Arizona residents.

44.    Arizona would expend significant resources to attempt to supplement and amend the USPS Mail Ballot list as necessary, as errors were found through our comparison and investigation. This includes determining proper and secure methods for sending large volumes of confidential data to the USPS. This is true even though the EO instructs that we can only "supplement" and "provide suggested modifications or amendments" to the USPS Mail Ballot List, and USPS is not required to accept them.

45.    Even with the best efforts of the Secretary's office and local elections officials, the challenges of completing a complex data-matching program in a short timeframe and while preparing to administer an election poses the high risk of errors and omissions.

46.    Arizona would incur significant costs to undertake this comparison and verification of the USPS Mail Ballot List. Each county would need to compare its AEVL participants to the USPS Mail Ballot List, as well as comparing those voters who are not AEVL participants but nevertheless request a one-time ballot by mail under Arizona state law, A.R.S. § 16-542. This is a task that would need to be done repeatedly as more voters request mail ballots up until eleven days before each election.

14

47.    If Section 3 is implemented, Arizona will have to devote significant time, personnel, and money to update training materials for local elections officials and their staff. Those materials would have to specifically detail what steps they must take with respect to voters who appear on Arizona's voter registration list and are eligible to receive a mail ballot under Arizona law, but who do not appear on the USPS Mail Ballot List. This is yet another aspect of the EO's implementation that will necessarily divert our resources (both monetary and staff time) from other important election administration tasks.

48.    I anticipate that, in addition to formal training materials, the Secretary's office will need to allocate significant resources to responding directly to local elections officials, given the threat of criminal prosecution in the EO.

49.    At the same time the Secretary's staff is creating the State Mail Ballot List and performing investigations into the accuracy of the USPS Mail Ballot List, they will have to field questions from citizens concerned about their ability to receive or return a mail ballot in the upcoming elections. Thus, a separate impact of the EO's directive concerns the need for a wide-ranging public education campaign to ensure that eligible voters understand the EO's requirements, and how they may impact a citizen's ability to vote by mail. This is particularly the case for Arizona voters who participate in AEVL, who are used to automatically receiving mail ballots and being able to vote by mail under existing state law.

50.    Indeed, Arizona law requires county recorders to send AEVL participants a notice ninety days before the primary election that informs them that they will be receiving a ballot by mail for the upcoming primary and general elections. For the elections in 2026, counties have already sent those notices to their printers, and they will be mailed to voters no later than April 22, 2026.

15

51. Apart from the time and monetary costs that Section 3's implementation would impose on Arizona, Section 3 also risks voter confusion and disenfranchisement. This inevitable voter confusion is a harm in and of itself and is also a burden on staff time. This voter confusion will come at a crucial time shortly before the election, when state and local elections officials are required under Arizona law to send mail ballots to AEVL participants and all other registered voters who request a ballot by mail up until eleven days before election day.

52. Sending mail ballots in a timely fashion is not only required by state and federal law, but is critical to ensuring that as many eligible Arizona citizens as possible can exercise their right to vote. In the 2024 General Election, 2,597,974 Arizona citizens (more than seventy-five percent of voters) voted by mail. This method of voting is particularly important for the many Arizona citizens who live outside the metro areas of Phoenix, Tucson, and Flagstaff, where voters must drive twenty or thirty miles to reach their polling place. This problem is particularly acute on the large swaths of tribal land within Arizona where roads are underdeveloped or nonexistent, including on the vast Navajo Nation and the Havasupai Reservation at the bottom of the Grand Canyon.

53. Errors in the USPS Mail Ballot List would be extremely deleterious because of the potential for voter disenfranchisement. For example, consider an eligible voter who is on a county's list to receive a ballot by mail (via AEVL or a one-time request) but not on the USPS Mail Ballot List. Under the EO, they are likely to receive a mail ballot from their local elections official that USPS will later refuse to return to the local elections official. In that situation, the voter may think that they have voted, but they have not. Nor would the voter necessarily know to cancel that ballot and vote in person, given that the EO does not charge USPS with notifying the voter. A voter may also be concerned about casting two ballots, which is itself a criminal

16

violation, and choose not to vote. My office and county recorders must take every measure possible to avoid this kind of voter disenfranchisement.

54.     In my experience administering elections, changes to election procedures in the time immediately preceding an election can cause voter confusion. The EO's complicated requirements will likely lead some eligible voters to misunderstand whether they are able to use a mail ballot. Some eligible voters will determine that the added requirements make voting too confusing to be worthwhile. The result of this confusion will be that fewer eligible voters decide to cast a ballot.

55.     There are several additional inherent problems posed by the deadlines outlined above and the requirement to compare static lists (the State Citizenship List, USPS Mail Ballot List, and State Mail Ballot List) with a constantly evolving list (the statewide voter registration list). For example, between the day the State Citizenship List is sent and twenty-nine days before Election Day (the last day a voter may register and receive a mail ballot under Arizona law) there will inevitably be a significant number of individuals who become eligible but are not captured on the State Citizenship List. They may, for example, have moved to Arizona in the thirty-one days between the issuance of the State Citizenship List and the deadline to register to vote in the next election or become a naturalized citizen after the list was sent. This is a particularly acute problem in Arizona, one of the nation's fastest growing states. I am not aware of any legal requirement that voters regularly report change of residential address to the Federal Government.

56.     Additionally, as already noted, the timeline simply does not seem workable. The EO requires DHS to send the State Citizenship List to States "no fewer than 60 days before each regularly scheduled Federal election." For the November 3, 2026 General Election, that means

DHS must send this list by Friday, September 4, 2026. And Arizona must also send its State Mail Ballot List to USPS 60 days before the election—also Friday, September 4, 2026. Thus, we must send the State Mail Ballot List (i.e., all those who should receive a mail ballot under state law) to USPS on the *same day* we might receive the State Citizenship List from DHS. Comparing the statewide voter registration list and the State Citizenship List to see who is eligible according to both lists in *one day*, or even *a few hours*, is simply not possible to do with any meaningful degree of accuracy, no matter how many resources the Secretary's office dedicates to the project.

57.     Although the EO provides that we may "routinely supplement and provide suggested modifications or amendments" to the USPS Mail Ballot List, there is no guarantee that USPS will accept those suggestions. If we—in an attempt to protect Arizona's elections officials from criminal liability—sent a State Mail Ballot List to USPS 60 days before Election Day that reflected only confirmed matches between the statewide voter registration list and the State Citizenship List, knowing that many eligible voters could have been wrongfully excluded from the State Citizenship List, we would be committing ourselves to potentially violating Arizona law. We could then endeavor to submit additional matches as we confirmed them. But it would be very difficult to do so quickly enough to matter. On September 19, 2026—only two weeks after we receive the State Citizenship List—our UOCAVA voters' ballots must be mailed out. Shortly thereafter, ballots must be sent to residents currently residing out of state and to residents residing within the state from October 7, 2026 through October 23, 2026. Even if DHS and USPS accepted our suggestions, there is unlikely to be enough time to get a ballot to those who are eligible but did not appear on the State Citizenship List. Voters would be disenfranchised and Arizona law would not be honored.

18

58.     Again, because of our obligation to ensure that every eligible Arizonan can vote, we would need to take additional steps after receiving the State Citizenship List and USPS Mail Ballot List to investigate the status of all those on the statewide registration list who do not appear on the federal lists, and then suggest changes to both. This will require data matching, verification, follow-up investigations, and interfacing with DHS, USPS, counties, the public, and others, and will demand an enormous investment of resources. Additionally, state cybersecurity and information technology staff would need to be involved to facilitate the secure transfer of information between the federal government and the Secretary's office. This is in addition to the staff time required to work with DHS and USPS to securely transfer information. This would also be a significant strain on our IT systems which are aged and in need of replacement. Programming and development needed to do data matching would cost funds that are not provided, and also result in security risk as there would not be time to sufficiently overlay new development with the security protocols. Indeed, the Secretary of State's IT system's capabilities for expedited development changes are very limited.

59.     I estimate that these new staffing needs will require an increase to the Secretary of State's budget. Given recent economic pressures across the state and country, the office has been trying to keep its budgetary needs as low as possible. The EO will increase financial strain on the office and necessitate a higher budget. The Secretary will either need to go back to the Legislature and ask for additional funds, which we are far from assured to receive, or will need to identify equivalent cuts elsewhere in the office, a very difficult and maybe impossible task.

60.     Any time spent by current staff on implementing the EO would divert time and attention from other critical election preparation in the days leading up to the election, the office's busiest time. Our staff is already at capacity and dedicated to routine tasks and special

19

projects that ensure Arizona's elections run smoothly and every eligible Arizonan can exercise their right to vote. This work becomes more voluminous, significant, and urgent in the months leading up to the election, when we must answer an increasing volume of questions and handle tasks related to, for example, campaign finance reporting, logic and accuracy testing, and voter challenges.

61. Each of these tasks and costs will divert scarce resources from other important election administration needs.

62. In Arizona, as in much of the country, ballot envelopes vary by county. I am deeply concerned about the length of time it would take for USPS to conduct ballot design review for thousands of jurisdictions. Waiting on USPS to approve ballot design has the potential to seriously disrupt and delay carefully timed steps necessary to deliver mail ballots to Arizona voters. Managing the fallout from such a delay would force the Secretary's office and local elections officials to divert critical time and money from other elections administration duties to expedite other steps in the mail ballot process, educate the public about the status of mail ballots, and otherwise mitigate the harm from delays to the process.

63. It is my understanding that Section 5 of the EO directs that "States and localities should preserve, for a 5-year period, all records and materials—excluding ballots cast—evidencing voter participation in any federal election (e.g., ballot envelopes, regardless of carrier)." Existing federal law only requires preservation of voting materials for 22 months following an election, and preservation of records concerning voter roll maintenance for two years. 52 U.S.C. §§ 20507(i)(1), 20701. Arizona law also set timelines for the preservation and destruction of voting materials in federal elections. In particular, Arizona counties must

20

maintain ballots and electronic ballot images for 24 months after a federal election time, after which they have a mandatory statutory duty to destroy those records.  A.R.S. §§ 16-524, -525.

64.      Compliance with a five-year document preservation standard for election materials would impose significant compliance, storage, and other costs on Arizona and local elections officials.

65.      Additionally, under current federal and state law, Arizona and its counties may begin properly disposing of certain retained materials from the 2024 primary elections on August 29, 2026 and the 2024 general election on November 5, 2026.  The EO prevents Arizona and its counties from undertaking these actions as to some, but not all, of the retained materials, and requires Arizona and its counties to incur further management, storage, and security costs instead.

66.      More than doubling the required retention time for some (but not *all*) voting materials would increase these burdens and costs significantly.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 23, 2026, at Phoenix, Arizona.

Keely Varvel
Assistant Secretary of State

21