IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| STATE OF CALIFORNIA; et al.,<br><br>*Plaintiffs,*<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States; et al.,<br><br>*Defendants.* | Case No. 1:26-cv-11581 |

## DECLARATION OF HILARY RUDY

I, Hilary Rudy, declare as follows:

1.       I am a resident of the State of Colorado.  I am over the age of 18.  I am familiar with the information in the statements set forth below either through personal knowledge, consultation with staff from the Colorado Department of State, or from my review of relevant documents and information.  If called as a witness, I could and would testify competently to the matters set forth below.

2.       I am the Deputy State Elections Director in Colorado. I work for the Secretary of State and support her in her official capacity as the Chief Election Official for the State of Colorado. In my role, I assist her in the oversight, execution and enforcement of all state and federal laws relating to elections.

3.       I have served as the Deputy Elections Director in the Colorado Department of State (the "Department") since May 2013 and have worked in the state elections office in various roles since 2006.  I hold a law degree from Thomas Jefferson School of Law, and an

1

undergraduate degree in Business Management from Colorado Mesa University, formerly Mesa State College.

4.     The Colorado Department of State, along with the county clerk and recorders in Colorado's 64 counties, are responsible for administering federal elections in Colorado.  This includes voter registration, maintaining and updating voter rolls, issuing ballots to registered voters, tabulating votes, and certifying results in all elections for federal office, among numerous other tasks.  In general, counties execute the actual election while the Department provides oversight.

5.     The Secretary of State is Colorado's Chief Election Official. In Colorado, elections are primarily conducted at the county level.  The Secretary is responsible for supervising the conduct of elections, enforcing the provisions of Colorado's Elections Code, coordinating Colorado's responsibilities under the National Voter Registration Act ("NVRA"), and serving as the chief state election official under the federal Help America Vote Act ("HAVA"). § 1-1-107, C.R.S. (2025).  Colorado law charges the Department with preventing disenfranchisement and ensuring that all eligible voters who want to vote are able to do so. § 1-1-103(1), C.R.S. As part of our responsibilities, we coordinate with, and provide guidance to, county election officials. Changes to how elections are administered require significant efforts from the Department to explain those changes to local officials, update systems to respond and implement those changes, and ensure statewide uniformity in how those changes are implemented. The Department further shoulders primary responsibility for keeping Colorado voters informed about how to vote and any changes to existing processes.

6.     Under the Colorado election model, each active, registered voter receives a ballot by mail in advance of the upcoming election. Voters may cast their votes on that ballot, and

2

return it by mail, in person at a Voting Service and Polling Center ("VSPC"), or at one of over 400 24-hour secure drop boxes across the state. If a voter prefers to vote in person at a VSPC, they have the option to do so. Colorado opens VSPCs for in-person voting 15 days before a General Election and eight days before a Primary Election.

7. Colorado prides itself on having a commonsense election model that makes it easy for eligible voters to cast their ballots and is protected by layers of security. As a result, Colorado consistently has one of the highest voter participation rates in the country, measured both as a percentage of active voters and as a percentage of the state's voting-age population.

8. In the November 2024 presidential election, 3,241,155 ballots were cast in Colorado.

9. In my role as Deputy Elections Director, I am responsible for overseeing the implementation of state and federal laws and regulations relating to Colorado's voting processes and procedures, including by issuing rules, guidance, and forms. I am responsible for overseeing the management of the statewide voter registration system, including guidance and training, functionality development, and maintenance. I am also responsible for ensuring that Colorado's election model is implemented effectively and efficiently, such that every active, registered voter in Colorado receives a mail ballot and can return it by mail, in person, or at one of our secure drop boxes. Finally, I am responsible for overseeing the training and certification program for local election officials in Colorado.

10. I am familiar with the Executive Order published on March 31, 2026, entitled "Ensuring Citizenship Verification and Integrity in Federal Elections" (the "EO"). Sections 2 through 5 of the EO (collectively, the "Challenged Provisions") have already caused

considerable harm, confusion, fear, and disruption in Colorado election administration, and will impose unrecoverable costs on Colorado.

11.    Immediately after the issuance of the EO, myself and other Department leadership halted other tasks to analyze the EO and its potential impacts on the conduct of elections in Colorado, a process which remains ongoing. The Department further provided initial outreach notifying the county clerks in Colorado of the EO, responded to numerous press inquiries, and consulted with its attorneys.

12.    It is my understanding that Section 2(a) of the EO directs the Department of Homeland Security ("DHS") to create a "State Citizenship List" for each State, which will include "individuals confirmed to be United States citizens who will be above the age of 18 at the time of an upcoming Federal election and who maintain a residence in the subject State."  It is also my understanding that DHS will send these lists "no fewer than 60 days before each regularly scheduled Federal election, or promptly upon request by a State in connection with any special Federal election."  This would mean that DHS will send this list by Friday, September 4, 2026, for the federal general election taking place on November 3, 2026.

13.    Section 2 requires immediate action from my team and me in the Department to understand how it interacts with Colorado's statewide voter registration list, and to coordinate with other state and local agencies across Colorado.  Our efforts to address the changes and impacts of the EO will divert time and attention from other critical election preparations. The Department currently has a full schedule of development of the statewide voter registration system. This includes development necessary to implement recently passed state law ahead of the November 2026 general election. The Department also must certify statewide content for the June 2026 state primary election on May 1, 2026, and is actively supporting counties as they

4

prepare to conduct that election. This includes sending military and overseas ballots ahead of the May 16 45-day federal deadline. Further, the Department will certify the statewide content for the November 2026 election on September 4, 2026, and will be actively supporting the counties in meeting the September 19, 2026, federal 45-day deadline to send military and overseas ballots for the general elections. The Department would need to divert significant resources from these election support activities to plan and prepare for the September 4, 2026, list provided by DHS.

14.    The Department has a continuing obligation to work with the counties to perform regular list maintenance, as required under the National Voter Registration Act ("NVRA"), Help America Voter Act ("HAVA"), and Colorado state law.  This includes sending notices to voters who may have moved, identifying any duplicates on the statewide voter registration list, cancelling the registrations of voters who are no longer eligible to vote by operation of a conviction resulting in disenfranchisement, and cancelling the registration of those who have died.

15.    Additionally, county election officials will need to continue to register those who are eligible to vote in Colorado.  Colorado allows eligible individuals to register up to eight days before Election Day and still receive a mail ballot. § 1-2-508, C.R.S. And even within eight days, eligible individuals can register in person at any time before or on the date of an election and cast a ballot in-person. § 1-2-201(3)(b)(V), C.R.S.; 52 U.S.C. § 20507(a)(1) (requiring States to permit registration up to 30 days before a federal election).  Colorado citizens can register to vote via a secure online voter registration system at their county clerk's office, at a VSPC, at various state social service agencies, through Colorado's Department of Motor Vehicles when they submit sufficient information of their voter qualifications (including citizenship) through their transaction.

16.     In compliance with the Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA), Colorado enables uniformed and overseas voters to register for a federal election if their registration application is received at least 30 days before that election.  52 U.S.C. §§ 20302(a)(2). Additionally, county election officials continue to register military and overseas voters who are eligible to vote in Colorado. State law allows eligible military and overseas voters to register or update up to seven days before Election Day and still receive a mail ballot. § 1-2-508, and 1-8.3-109, C.R.S. And even within seven days, an eligible military or overseas voter can register online or by email at any time before or on the date of an election to receive an electronically delivered ballot. § 1-2-201(3)(b)(V), and 1-8.3-108(3), C.R.S.

17.     In compliance with the NVRA "quiet period" for voter registration, Colorado does not systematically remove voters from the rolls during the 90 days prior to a federal election unless a statutory exception applies.  *See* 52 U.S.C. § 20507(c)(2)(A), 3(A)-(B), 4(A).  Colorado does, however, lawfully remove voters on an individual basis where appropriate, such as when a voter requests that his or her registration be canceled or has died.

18.     In sum, Colorado's statewide voter registration list changes up to and on Election Day.  Registrants are constantly being added, updated, and removed as required (and limited) by federal and state law, and this will continue through the 2026 election and beyond.

19.     I have considered how this dynamic statewide voter registration list will intersect with the list created by DHS.  As noted above, pursuant to Section 2(a) of the EO, DHS will share a State Citizenship List by September 4, 2026.  The EO permits the state "to routinely supplement and provide suggested modifications or amendments to the State Citizenship List transmitted thereto."  The EO does not require DHS to accept any of these state supplements, modifications, or amendments to the State Citizenship List.

6

20.     Once we receive the State Citizenship List, we will have to devote substantial resources to understanding any differences between it and our current statewide voter registration list. As a baseline matter, comparing the State Citizenship List to our current statewide voter registration list will necessitate linking registrants across the lists.  This will be difficult, as it is extremely doubtful that the State Citizenship List will contain the same unique identifiers as our statewide voter registration list, such that we could perform straightforward matching. Rather, it is inevitable that there will be differences in the files that will make matching difficult, time-consuming, and potentially inaccurate, as people's names, addresses, and other information may vary slightly (*e.g.*, Robert vs. Bob, Apartment #3 vs. Apt. 3, or even St. vs. Street).  I know from my experience that data matching is a complex process, and extreme care must be taken when the consequences of errors can lead to voter disenfranchisement.  And because Colorado will receive the State Citizenship List so close to the election, we must plan for all of this now.

21.     For eligible voters who appear on the statewide voter registration list but not the State Citizenship List, the Department will need to investigate further pursuant to our obligation to ensure that eligible voters are able to vote.  Even though Colorado will not cancel voter records simply due to their absence from the State Citizenship List, the issuance of the list could disenfranchise voters in multiple ways.  First, voters who check their status on the State Citizenship List as contemplated by Section 2(a) and see that they are not listed may be deterred from voting because they believe they will be blocked from voting or prosecuted, especially if DHS does not timely accept their corrections.  Second, USPS may rely on the State Citizenship List to determine which voters can receive and transmit mail ballots in response to the EO's emphasis on criminal penalties associated with the distribution of mail ballots to ineligible individuals.  EO §§ 2(b), 3(a), 5. Additionally, if the State Citizenship List is publicly accessible,

7

county elections workers may misunderstand their legal obligations and refuse to provide a ballot to eligible voters missing from the State Citizenship List based on their belief that those voters are ineligible or that the election workers will be prosecuted if they allow a voter missing from the state citizenship list to vote. In all cases, the ensuing confusion will impose significant burdens on the Department, which will have to respond to questions from county officials and individual voters who are unsure about their eligibility to vote. These are all risks that the Department cannot accept. We must make every effort to avoid disenfranchising eligible voters.

22. Accordingly, in compliance with the Department's obligation to protect the right to vote, the Department intends to expend significant resources to attempt to supplement and amend the federal list as necessary, as errors are found through our comparison and investigation. This process will include determining proper and secure methods for sending large volumes of confidential data to the federal government. However, even if we are able to quickly offer all necessary corrections, the EO does not require DHS to accept the State's "suggested modifications or amendments." EO § 2(a).

23. The Department will incur significant costs to undertake this comparison and verification of the State Citizenship List with the statewide voter registration list. Given that Colorado's list of eligible voters will change in real time, we will be forced to data match our list against the State Citizenship List—at minimum—daily and undertake the burdensome process of transmitting the inevitable discrepancies to DHS. Further, the Department must undertake this work as it certifies the statewide ballot content for the election and as county election officials are preparing to mail ballots. The EO provides no funding, so paying for these costs will have to come from devoting fewer resources to our office's other pressing responsibilities, including development to the statewide voter registration system to meet recently enacted law and

8

providing support and guidance to the counties. And all of this will happen during the heart of election season, when the Department is already at capacity ensuring Colorado's elections run smoothly and securely.

24.     The Department regularly conducts training and provides guidance to county election officials. County election officials are required to take election official certification training that the Department manages, which includes in-person training and a catalogue of more than 20 online courses. The Department provides county election officials with instructional documents and technical training materials, including reference guides, checklists, and forms.

25.     If Section 2 is implemented, the Department will have to devote significant time, personnel, and money to update training materials for local election officials and their staff, specifically detailing what steps they must take with respect to voters who appear on Colorado's voter registration list but not on the State Citizenship List.  This is yet another aspect of the EO's implementation that will necessarily divert substantially more than half our team's resources from other important election administration tasks while the election is ongoing.

26.     I anticipate that in addition to formal training materials, the Department will need to allocate significant resources to responding directly to local election officials, given the threat of criminal prosecution in Section 2 of the EO.

27.     County election budgets for the 2026 elections are set and implementing a significant change to the counties' obligations mere months before a state election will substantially burden those already strained county budgets. Many counties in Colorado, especially rural counties, may not have the resources to perform this work while also performing their core election administration responsibilities.

9

28.    At the same time the Department is performing investigations into the accuracy of the State Citizenship List, in order to ensure that eligible voters understand how the EO impacts their registration and ability to vote, the Department would need to take great pains to educate voters including through a potential a wide-ranging, multi-media public education initiative. This effort would include information guiding citizens through accessing and correcting their individual records on the State Citizenship List under section 2(a).  We will also need to field questions from registrants who are concerned about their voter registration status and generally confused about the process and qualifications to vote in Colorado elections.

29.    I estimate that such a public education effort would likely cost millions of dollars. The Department does not currently have the revenue nor spending authority to expend such a substantial sum and would have to significantly adjust its operations moving forward to accommodate this initiative.

30.    In my experience administering elections, changes to registration and election procedures in the time immediately preceding the election can cause voter confusion.  The complicated requirements of the EO will likely lead some citizens to misunderstand the requirements for registration, or whether they are able to vote in Colorado's elections.  Some citizens will determine that the added requirements make registering and voting too confusing to be worthwhile.  For example, a voter may check their individual status on the State Citizenship list, according to the EO.  If they are erroneously not included on that list, they may believe they have no recourse and choose not to vote, or they may misunderstand the process for correction (despite the Department's attempts to provide education), or DHS may not be willing or issue a correction in time.  The result of this confusion will be that fewer eligible voters successfully register to vote or decide to cast a ballot.

10

31.     This inevitable voter confusion harms Colorado because it will disenfranchise voters, interfering with our sovereign interest and state-law obligation to ensure that all eligible voters who want to vote can.  It will also impose a burden on the Department staff's time, as our staff (and the elections staff at the counties) will be responsible for dispelling voter confusion to the extent possible.  This voter confusion will come at a crucial time, shortly before the election, when local elections officials' resources are particularly stretched.

32.     Colorado elections officials are required by state law to issue ballots to duly registered voters. In fact, under Colorado's mail ballot system, county election officials are required to mail "to each active, registered elector" a mail ballot. § 1-7.5-107(3)(a)(I), C.R.S. The Department, along with Colorado county officials, intends to comply with these state legal requirements in administering upcoming federal elections.

33.     In compliance with UOCAVA, Colorado issues ballots to registered voters who request a mail ballot under that Act at least 45 days before an election.  52 U.S.C. §§ 20302(a)(1)-(3), (8)(A). Additionally, Colorado law allows eligible military and overseas voters to register or update up to seven days before Election Day and still receive a mail ballot. § 1-2-508, and 1-8.3-109, C.R.S. And even within seven days, an eligible military or overseas voter can register online or by email at any time before or on the date of an election and receive a ballot. § 1-2-201(3)(b)(V), and 1-8.3-108(3), C.R.S.

34.     It is my understanding that Section 2(b) of the EO instructs the Attorney General to prioritize investigation and prosecution, under a variety of federal statutes, of "State and local officials or any others involved in the administration of Federal elections who issue Federal ballots to individuals not eligible to vote in a Federal election."  I understand that the EO provides that "an individual is 'eligible to vote in a Federal election' if the individual is a citizen

11

of the United States, 18 years of age or older by the date of the upcoming election, and otherwise

qualified under the laws of his or her State." I further understand that Section 5 of the EO

encourages referrals to the U.S. DOJ of "[e]vidence of violations of existing Federal laws by

State or local election officials" and "States or localities," among other parties, "for

consideration of investigation or charges."

35.    If EO Section 2 goes into effect, I would be concerned that I, Department staff,

Colorado county elections officials, and mail ballot vendors would face federal prosecution if we

issue ballots to Colorado voters who are not on the State Citizenship List, even if we are

obligated to do so under Colorado law because they are active, registered voters. I am concerned

about the impact of these threats of criminal prosecution on Department staff, county election

officials, and mail ballot vendors not because I believe they have violated these provisions, but

because the EO increases the amount of pressure and scrutiny on them, including by the public.

36.    The EO's threat of prosecution is significantly exacerbated by the fact that the EO

defines voter eligibility in a manner inconsistent with Colorado law. Colorado law permits an

otherwise eligible voter to cast a ballot in a general election if they will be 18 years of age by

election day. § 1-7-110(1)(b), and 1-7.5-107(3)(b.5), C.R.S. EO Section 2(b) thus directly

conflicts with state law, and it threatens Colorado elections officials with prosecution for issuing

ballots to eligible 17-year-old voters. This issue has and will cause significant confusion about

the rules applicable to upcoming elections.

37.    I know that the threat of prosecution under the EO is on the minds of state and

local elections officials like me. The last several years have already placed an enormous burden

on state and local elections officials, and I worry about Colorado's ability to find qualified

staffers and volunteers who are willing to take on the risks of serving in those roles. I understand

12

that many at the Department and individuals at the counties have been the recipients of death threats merely for doing their jobs consistent with applicable law. The threat of prosecution for the same could significantly deplete an already depleted work force.

38.    Should the U.S. Attorney General initiate any such enforcement actions, Colorado would be required to divert significant resources not only to respond to such legal action but also to educate the public, with the aim of minimizing voter confusion to the extent possible.  Past lawsuits involving the Department of State have required us to divert significant resources away from preparing for elections to address the legal actions. Such diversion would be even more significant and costly if it involved having to assist state or local election officials in personally defending against criminal charges just for following state law.

39.    Any such legal proceedings would have severe and adverse consequences for the public's trust in Colorado's administration of elections.

40.    Additionally, the creation of a State Citizenship List may directly disenfranchise voters.  Based on my experience, I know that if a citizen is not included on the list—due, for example, to errors in DHS's static immigration information contained in its Systematic Alien Verification for Entitlements (SAVE) system, the federal government's misinterpretation of whether the citizen qualifies as a state resident, or any other error—they may believe they are unable to vote    and could be prosecuted for doing so.  That is why Colorado works so hard to maintain consistent voter registration information so that voters are not erroneously informed about their eligibility.  The same is true of eligible 17-year-old voters, considering the express limitations in the EO.

41.    Based on my experience assisting and supporting county election workers, I know that they may feel they cannot register or send a ballot to such voters without risking criminal

13

prosecution, despite those voters' fundamental right to vote under state and federal law. Similarly, based on my experience I know that USPS or other entities involved in the "printing, production, shipment, or distribution of ballots" may believe they cannot deliver a ballot to those voters without risking criminal prosecution.

42.    As detailed above, Colorado provides a mail ballot to all active, registered voters.

43.    It is my understanding that Section 3(b) of the EO directs the United States Postal Service ("USPS") to initiate a rulemaking that, among other things, would allow States to provide lists of mail voters to USPS 60 days before an election, require USPS to create a "Mail-In and Absentee Participation List" ("USPS Mail Ballot List"), and prohibit USPS from delivering mail ballots sent by individuals not on the USPS Mail Ballot List.  It is also my understanding that Colorado can "routinely supplement and provide suggested modifications or amendments" to the USPS Mail Ballot List, but USPS is not required to accept any changes provided by Colorado.

44.    As soon as our team had time to digest the contents of the EO, I immediately began considering what near-term actions the EO would necessitate from the Department, including preparing to create the State List and to check the DHS and USPS Mail Ballot List, preparing guidance for the counties, educating voters about the process, building out data analysis infrastructure and cyber security protections, and—as discussed further below—committing additional staff time and resources to all of these efforts.

45.    Under Section 3(b) of the EO, in order to comply with state law requiring that all active, registered voters receive a mail ballot, at least 60 days before Election Day we would need to send a list to USPS of voters to whom we intend to send a mail ballot ("State Mail Ballot List").  § 1-7.5-107(3)(a)(I), C.R.S.  For the 2026 federal general election, that deadline will be

14

September 4, 2026.  Failing to provide this list to USPS would pose an unacceptable risk under the EO that USPS will not include Colorado voters on the USPS Mail Ballot List, thereby making it more difficult or impossible for eligible voters to cast their ballots.

46.    As discussed throughout this declaration, Colorado's use of the mail for elections, paired with our election calendar, means I must plan now for how to align Colorado's administration of mail voting with the EO.

47.    Creating the State Mail Ballot List will require the Department and county elections officials to expend time and resources to ensure that all active registered voters are included.  This task will be significantly complicated by the influx of registration updates and changes that elections officials typically receive in the months before the election (and which I expect will be exacerbated by the federal State Citizenship List provisions discussed above).

48.    The deadline to provide this list to USPS no later than 60 days before the election means that some voters who are entitled to a mail ballot under state and federal law will unavoidably be left off the list.  UOCAVA permits uniformed and overseas voters to request absentee ballots up to 45 days before an election.  52 U.S.C. § 20302(a)(8).  And Colorado law allows eligible military and overseas voters to register or update their registrations up to seven days before Election Day and still receive a mail ballot. § 1-2-508, and 1-8.3-109, C.R.S. Under Colorado law, non-UOCAVA voters may register and receive a mail ballot up to eight days before an election. § 1-2-508, C.R.S. Although the EO indicates that States will be able to "routinely supplement and provide suggested modifications or amendments" to the USPS Mail Ballot List, USPS is not required to accept our suggestions.  The EO also does not specify when USPS will transmit its USPS Mail Ballot List to our office, which could cause substantial complications.

15

49.     Whenever we receive the USPS Mail Ballot List, we will have to devote substantial resources to understanding any differences between it and our own list of voters eligible to receive mail ballots.  This will be a difficult task for many of the same reasons set out above with regard to the State Citizenship List, including: the lack of unique identifiers shared by both lists, the potential for slight variations in spelling to wrongly preclude matches, the fluid nature of voter registration rolls in the lead-up to elections, and the administrative challenges inherent to any data-matching process.  Accordingly, reviewing the USPS Mail Ballot List will require a significant expenditure of time and resources.

50.     For citizens who appear on the statewide voter registration list and are eligible to receive a mail ballot under Colorado law but who do not appear on the USPS Mail Ballot List, the Department will need to investigate further pursuant to our obligation to ensure that every active registered voter is able to receive a mail ballot.  We must make every effort to do so to avoid disenfranchising eligible Colorado residents.

51.     Colorado would expend significant resources to attempt to supplement and amend the USPS Mail Ballot list as necessary, as errors were found through our comparison and investigation.  This includes determining proper and secure methods for sending large volumes of confidential data to the USPS.  This is true even though the EO instructs that we can only "supplement" and "provide suggested modifications or amendments" to the USPS Mail Ballot List, and USPS is not required to accept them.

52.     Even with the best efforts of the Department and county elections officials, the challenges of completing a complex data-matching program in a short timeframe and while preparing to administer an election poses a high risk of errors and omissions. Furthermore, print vendors could be unable or unwilling to print ballots to meet the ballot mailing deadlines.

16

53.     Colorado would incur significant costs to undertake this comparison and verification of the USPS Mail Ballot List. As detailed above, the Department must undertake this work as it certifies the statewide ballot content for the election, and county election officials are preparing to mail ballots. This would divert substantial staff time and resources from critical election activities and place a significant strain on the Department and county budgets, which are already stretched extremely thin.

54.     If Section 3 is implemented, the Department will have to devote significant time, personnel, and money to update training materials for local elections officials and their staff. Those materials would have to specifically detail what steps they must take with respect to voters who appear on Colorado's voter registration list and are eligible to receive a mail ballot under Colorado law, but who do not appear on the USPS Mail Ballot List.  This is yet another aspect of the EO's implementation that will necessarily divert a significant percentage of the Department's resources from other important election administration tasks.

55.     I anticipate that, in addition to formal training materials, the Department will need to allocate significant resources to responding directly to local elections officials, given the threat of criminal prosecution in the EO.

56.     At the same time Department staff is creating the State Mail Ballot List and performing investigations into the accuracy of the USPS Mail Ballot List, they will have to field questions from citizens concerned about their ability to receive or return a mail ballot in the upcoming elections.  Thus, a separate impact of the EO's directive is the need to educate every voter in Colorado through a potential wide-ranging public education initiative to ensure that eligible voters understand the EO's requirements, and how they may impact a citizen's ability to

17

vote by mail. This is particularly the case for Colorado residents, who are used to automatically receiving mail ballots and being able to vote by mail under existing state law.

57.     As detailed above, I estimate that such a public education effort would likely cost millions of dollars. And finding these funds would be especially difficult given a difficult budget environment in Colorado.

58.     Apart from the time and monetary costs that Section 3's implementation would impose on Colorado, Section 3 also guarantees voter confusion and disenfranchisement. This inevitable voter confusion is a harm in and of itself and is also a burden on county election official and Department staff's time. This voter confusion will come at a crucial time shortly before the election, when county elections officials are required under Colorado law to send mail ballots to all active, registered voters.

59.     Sending mail ballots in a timely fashion is not only required by state and federal law, but is critical to ensuring that as many eligible Coloradans as possible can exercise their right to vote. In the 2024 General Election, 92.2% of Colorado voters who voted cast their mail ballot, either by returning them by mail, drop box, or at a VSPC.

60.     Errors in the USPS Mail Ballot List would be extremely deleterious because of the potential for voter disenfranchisement. For example, consider an eligible voter who is on the State Mail Ballot List but not on the USPS Mail Ballot List. Under the EO, they are likely to receive a mail ballot from their local elections official that USPS will later refuse to return to the local elections official. In that situation, the voter may believe that they have voted, but they have not. Nor would the voter necessarily know to cancel that ballot and vote in-person, given that the EO does not charge USPS with notifying affected voters. A voter may also be concerned

18

about casting two ballots, which in itself can be a criminal violation, and choose not to vote. The Department must take every measure possible to avoid this kind of voter disenfranchisement.

61.    In my experience administering elections, changes to election procedures in the weeks and months immediately preceding an election can cause voter confusion. The EO's complicated requirements will likely lead some eligible voters to misunderstand whether they are able to use a mail ballot. Some eligible voters will determine that the added requirements make voting too confusing to be worthwhile. The result of this confusion will be that fewer eligible voters decide to cast a ballot.

62.    There are several additional inherent problems posed by the deadlines outlined above and the requirement to compare static lists (the federal State Citizenship List, USPS Mail Ballot List, and Colorado State Mail Ballot List) with a constantly evolving list (the statewide voter registration list). For example, between the day the State Citizenship List is sent and eight days before Election Day (the last day a voter may register and receive a mail ballot under Colorado law) there will inevitably be a significant number of individuals who become eligible but who are not captured on the State Citizenship List. They may, for example, have moved to Colorado 22 days before Election Day or have become a naturalized citizen after the list was sent.

63.    Additionally, as already noted, the timeline simply does not seem workable. The EO requires DHS to send the State Citizenship List to States "no fewer than 60 days before each regularly scheduled Federal election." For the November 3, 2026 General Election, that means DHS must send this list by Friday, September 4, 2026. And Colorado must also send its State Mail Ballot List to USPS 60 days before the election—also Friday, September 4, 2026. Thus, we must send the State Mail Ballot List (*i.e.*, the list of all those who should receive a mail ballot

19

under state law) to USPS on the *same day* we might receive the State Citizenship List from DHS. Comparing the statewide voter registration list and the State Citizenship List to see who is eligible according to both lists in *one day*, or even *a few hours*, is simply not possible to do with any meaningful degree of accuracy, no matter how many resources the Department dedicates to the project. This timeline is even more fraught given the threat of prosecution as outlined above.

64.     Although the EO provides that we may "routinely supplement and provide suggested modifications or amendments" to the USPS Mail Ballot List, there is no guarantee that USPS will accept those suggestions.  If we—in an attempt to protect Colorado elections officials from criminal liability—sent a State Mail Ballot List to USPS 60 days before Election Day that reflected only confirmed matches between the statewide voter registration list and the State Citizenship List, knowing that many eligible voters could have been wrongfully excluded from the State Citizenship List, we would be potentially violating Colorado law.  We could then endeavor to submit additional matches as we confirmed them, but it would be very difficult to do so quickly enough to matter.  On September 19, 2026—only two weeks after we receive the State Citizenship List—we must send Colorado UOCAVA voters' ballots.  Shortly thereafter, we must mail ballots to all active, registered voters between October 5, 2026, and October 9, 2026.[1] Even if DHS and USPS accepted our suggestions, there is unlikely to be enough time to get a ballot to those who are eligible but did not appear on the State Citizenship List.  Voters would be disenfranchised and Colorado law would not be followed.

65.     Again, because of our obligation to ensure that every eligible Colorado resident can vote, we would need to take additional steps after receiving the State Citizenship List and USPS Mail Ballot List to investigate the status of all those on the statewide registration list who

---

[1] These dates reflect legislation that is currently pending before the Colorado General Assembly.

do not appear on the federal lists, and then suggest changes to both. This will require data matching, verification, follow-up investigations, and interfacing with DHS, USPS, counties, the public, and others, and will demand an enormous investment of resources. Additionally, state cybersecurity and information technology staff would need to be involved to facilitate the secure transfer of information between the federal government and the Secretary of State. I estimate that these initiatives would require hiring at a minimum several contractors and full-time employees as soon as early summer, including a project manager, a database administrator, a cybersecurity analyst, a systems engineer and at least one data analyst. This is in addition to the staff time required to work with DHS and USPS to securely transfer information.

66.     I estimate that these new staffing needs will require an increase of at least $500,000 to the Department's budget. Given recent economic pressures across the state and country, the Department has been trying to keep the office's budgetary needs as low as possible and has deferred replacing some vacant positions. The Colorado General Assembly authorized the Department's budget for the fiscal year beginning on July 1, 2026, at the end of the 2025 legislative session. The EO will increase financial strain on the Department and necessitate a higher budget. We will either need to go back to the Legislature and ask for additional funds, which we are unlikely to receive, or we will need to identify equivalent cuts elsewhere in the Department, a very difficult and likely impossible task.

67.     Any time spent by current staff implementing the EO would divert time and attention from other critical election preparation in the days leading up to the election, which is the Department's busiest time. Our staff is already at capacity and dedicated to routine tasks and projects that ensure Colorado's elections run smoothly, and every eligible Colorado resident can exercise their right to vote. This work becomes more voluminous, significant, and urgent in the

21

months leading up to the election, when we must answer an increasing volume of questions and handle tasks related to, for example, campaign finance reporting, county election support and oversight, and public data reporting.

68.     Each of these tasks and costs will divert scarce resources from other important election administration needs as discussed throughout this declaration.

69.     Most Colorado counties have already ordered mail ballot envelopes for the 2026 federal election cycle.

70.     About 23% of Colorado counties do not currently use Intelligent Mail barcodes on ballot mail.

71.     It is my understanding that Section 5 of the EO directs that "States and localities should preserve, for a 5-year period, all records and materials—excluding ballots cast— evidencing voter participation in any federal election (e.g., ballot envelopes, regardless of carrier)."  Existing federal law only requires preservation of voting materials for 22 months following an election, and preservation of records concerning voter roll maintenance for two years.  52 U.S.C. §§ 20507(i)(1), 20701.  Colorado law and regulation also set timelines for the preservation and destruction of voting materials in federal elections. *See, e.g.*, § 1-7-802, C.R.S. (requiring election officials to preserve election records for at least 25 months).

72.     Compliance with a five-year document preservation standard for election materials would impose significant compliance, storage, and other costs on the Department and county elections officials.

73.     For example, current document retention requires Colorado counties to securely store election records in facilities with limited space. And acquiring additional secure space would further tax county budgets.

22

74.     Additionally, under current state and federal law, Colorado may begin properly getting rid of certain retained materials from the 2024 primary elections in July 2026 and the 2024 general election in December 2026.  The EO prevents Colorado from undertaking these actions as to some, but not all, of the retained materials, and requires Colorado to incur further management, storage, and security costs instead.

75.     More than doubling the required retention time for some (but not *all*) voting materials would increase these burdens and costs significantly.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 21st, 2026, at Denver, Colorado.

_/s/ Hilary Rudy_____
Hilary Rudy
Deputy State Elections Director
Colorado Department of State

23