**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| STATE OF CALIFORNIA; et al., *Plaintiffs,* v. DONALD J. TRUMP, in his official capacity as President of the United States; et al., *Defendants.* | Case No. 1:26-cv-11581-IT |

**DECLARATION OF GABE ROSENBERG**

I, Gabe Rosenberg, declare as follows:

1.     I am a resident of the State of Connecticut. I am over the age of 18. I am familiar with the information in the statements set forth below either through personal knowledge, consultation with Secretary of the State staff, or from my review of relevant documents and information. If called as a witness, I could and would testify competently to the matters set forth below.

2.     I am the Chief of Staff and General Counsel in the Office of the Connecticut Secretary of the State ("SOTS"). As Chief of Staff and General Counsel, I work for the Connecticut Secretary of the State, the Honorable Stephanie Thomas, and support her in her official capacity as the Commissioner of Elections for the State of Connecticut. *See* Conn. Gen. Stat. § 9-3. I am responsible for overseeing overall management of the agency, including legislative and policy programs, legal and Freedom of Information Act ("FOIA") office operations, and election processes.

1

3.      I have worked at SOTS since 2017 when I began as Communications Director. I became General Counsel to the Secretary of the State in May 2020, and Chief of Staff and General Counsel in March 2022.

4.      Connecticut and its municipalities are responsible for administering federal elections in Connecticut. This responsibility encompasses voter registration, maintaining and updating voter rolls, issuing ballots to registered voters, tabulating votes, and certifying results in all elections for federal office, among numerous other tasks. The Legislation and Elections Administration Division ("LEAD") of the Office of the Secretary of the State is responsible for creating the election calendar for voters, candidates, and local election officials; and providing information to the public about how and where to vote, and how and where to register to vote. LEAD is also the repository for various elections-related documents. The Secretary of the State and LEAD interpret Title 9 of the Connecticut General Statutes and issue instructions and opinions to effectuate the administration of elections and primaries. *See* Conn. Gen. Stat. § 9-3. Together with the Secretary, LEAD may issue an order to any local registrar of voters ("ROV") or election moderator to correct any irregularity or impropriety in the conduct of an election, primary, recanvass, or audit. *Id.*

5.      The Secretary of the State is the state's Chief Officer of Elections, responsible for executing and enforcing all state and federal law relating to elections within the state. *See* Conn. Gen. Stat. § 9-3. Pursuant to that statutory authority, the Secretary is presumed as correctly interpreting and effectuating the administration of elections and primaries under Connecticut law and, in so doing, liberally construes statutes, ordinances, and regulations in favor of protecting the right to vote. *See* Conn. Gen. Stat. §§ 9-3, 9-368o. LEAD is responsible for implementing the Secretary of the State's responsibilities with regard to elections, including advising on election

2

laws and providing technical information to the public and other parties. Connecticut law charges my office with preventing disenfranchisement and ensuring that all eligible voters who want to vote are able to do so. Conn. Gen. Stat. § 9-368o.  While the Connecticut Secretary of the State is the state's Chief Election Official, *see* Conn. Gen. Stat. § 9-3, Connecticut's elections are administered to a significant degree on the local level. Each of Connecticut's 169 towns has ROVs—typically two, with one from each of the major parties—and a Town Clerk who together administer elections. The Secretary has some oversight of local election officials, *see* Conn. Gen. Stat. §§ 9-3, 9-4, but it is limited by statute.

6.      As Chief of Staff and General Counsel, my team at LEAD and I are responsible for many functions but most relevant to this matter are our responsibilities regarding state and federal voter registration laws, including coordinating state duties under the National Voter Registration Act ("NVRA"), 52 U.S.C. § 20501 *et seq.*; Conn. Gen. Stat. § 9-23k. In addition, LEAD is responsible for prescribing voter registration forms and instructional materials for voters and local election officials, such as facts sheets, voter guides and comprehensive manuals; assisting with the implementation of automatic voter registration; maintaining a statewide centralized voter registration system ("CVRS"); and sharing information from CVRS with other states to maintain the voter registry list. We also prescribe the forms for absentee ballots and provide ongoing assistance and training to local election officials regarding absentee ballots. We work in conjunction with the State Elections Enforcement Commission ("SEEC") to create fact sheets for candidates regarding the laws governing the application for and return of absentee ballots. Our office also responds to requests from candidates, political parties, and the public for information regarding absentee ballots.

7.      While Connecticut SOTS does not directly administer elections, we do provide extensive training to local election officials, including to ROVs, Town Clerks, poll workers, and other town staff. These trainings include instructions on absentee ballot procedures including but not limited to who may be sent an absentee ballot, who may assist an individual with their application or return of the ballot, procedures on conducting supervised absentee balloting, and the counting and processing of absentee ballots.

8.      Additionally, SOTS helps the towns to administer the Uniformed and Overseas Citizens Absentee Voting Act ("UOCAVA"), 52 U.S.C. § 20301 *et seq.*, by providing related training and guidance to Town Clerks and ROVs. We also work in conjunction with the Federal Voting Assistance Program ("FVAP") to produce a guide for UOCAVA voters.

9.      I am familiar with the Executive Order published on March 31, 2026, entitled "Ensuring Citizenship Verification and Integrity in Federal Elections" (the "EO"). Sections 2 through 5 of the EO (collectively, the "Challenged Provisions") have already caused considerable harm, confusion, fear, and disruption in Connecticut election administration, and will impose unrecoverable costs on Connecticut.

10.     As discussed below, SOTS and LEAD have already taken various steps in response to the issuance of the EO. Additionally, SOTS has already started to receive outreach from local election officials regarding the EO, including concerns regarding possible criminal prosecution. LEAD conducted a training at a conference on April 16, 2026 for local election officials, and at least one local election official asked a question about the implications of the EO at that time. Additionally, LEAD will be conducting another training at a conference held by the local election officials on April 22, 2026, and I expect there will be even more questions regarding the implications of this EO at that time. My team has had to have internal meetings to

4

discuss how to establish procedures for compliance with this EO. At present, we do not have any contact information for DHS nor is any provided in this EO. It is unclear how we are to update, correct, or access the State Citizen List without any established procedures for such communications. We have also had to internally discuss having a meeting with the United States Postal Service ("USPS") and our printing vendor to begin determining how the placement of a "unique Intelligent Mail barcode" on outbound ballot mail, *see* Section 3(b)(i)(B)-(C) of the EO, will work with our local labels that already feature a barcode. As discussed in further detail in paragraphs 67-69, Connecticut municipalities create a unique label with a barcode for the absentee ballot envelope (which also has a serial number printed on it). Because of this EO, we have therefore had to begin discussing how the placement of a second barcode as contemplated by the EO will affect or interact with the barcodes that already exist on Connecticut's absentee ballot envelopes.

11.     It is my understanding that Section 2(a) of the EO directs the Department of Homeland Security ("DHS") to create a "State Citizenship List" for each State, which will include "individuals confirmed to be United States citizens who will be above the age of 18 at the time of an upcoming Federal election and who maintain a residence in the subject State." It is also my understanding that DHS will send these lists "no fewer than 60 days before each regularly scheduled Federal election, or promptly upon request by a State in connection with any special Federal election." This would mean that DHS will send this list by Friday, September 4, 2026, for the federal general election taking place on November 3, 2026.

12.     Section 2 requires immediate action from me and my team in LEAD to understand how it interacts with Connecticut's statewide voter registration list, and to coordinate with other state and local agencies across Connecticut. Our efforts to address the changes and

impacts of the EO have diverted time and attention from other critical election preparations. For example, we've needed to determine whether and how we can even begin to comply with the EO's requirements on the designated timeline and with no financial support. After the EO was issued, a substantial number of the Connecticut SOTS team had to turn to focus on undertaking a full analysis of the EO and what it means for the state, our local election officials, our vendors, and other state agencies who assist voters with mail-in ballots. As we lack a contact at DHS, it has been difficult to establish a procedure for compliance. We need to know what technical specifications will be necessary for the transmission of data to DHS in order to work with our IT department to establish the line of communication. This diversion of attention and resources has produced an incredible strain on the limited staff in our office while preparing for the 2026 elections. Our staff is comprised of 1 Director of Elections, 1 Assistant Director, 5 attorneys, 2 program managers, 1 state Voting Rights database manager, 1 GIS manager, 6 election officers, and 3 clerical positions. This EO has pulled attorneys from their projects of managing the roll out of the new tabulators to 169 municipalities, creating education manuals and presentations on the new tabulator technical and procedural instructions, drafting and reviewing contracts regarding the tabulators, drafting legislation and public testimony during the current legislative session, and answering election related questions from election officials, legislators, candidates, and voters. It has also pulled SOTS staff from managing the roll out of the new voter registry database, including learning the technical aspects of the new database, creating education manuals and PowerPoint presentations on the new database system, conducting training for local election officials on the new system, and answering questions from election officials regarding the system. The EO has also diverted time and resources from overseeing the newly implemented Translation Advisory Committee directly during the time in which the committee is developing

6

its structure and overseeing the timely submission of the election materials required to be translated by the federal and state Voting Rights Acts. We are currently so short-staffed and backlogged with addressing matters like those discussed above that the unfunded mandates described in the March 31, 2026 EO have been very burdensome, and will continue to be very burdensome, for our small team to assess and implement, especially on such a compressed timeline.

13.    My office has a continuing obligation to work with the municipalities to perform regular list maintenance, as required under the National Voter Registration Act ("NVRA"), Help America Voter Act ("HAVA"), and Connecticut state law. This includes ensuring local election officials are properly sending notices to voters who may have moved, identifying duplicates on the statewide voter registration list, removing from the list of active electors people who have been convicted of a felony, and removing the names of people who have died from the voter list.

14.    Additionally, my office must ensure that our local election officials continue to register those who are eligible to vote in Connecticut. Connecticut allows qualified individuals to register by mail up to 18 days before Election Day and in person during early voting. Conn. Gen. Stat. § 9-23g; 52 U.S.C. § 20507(a)(1) (requiring States to permit registration for a period no shorter than the 30 days preceding a federal election). Additionally, Connecticut allows voters to register on Election Day, if they satisfy the applicable requirements. Conn. Gen. Stat. § 9-19j. Connecticut citizens can register to vote online, at their local registrar of voters' or town clerk's office, at various state social service agencies, and through Connecticut's Department of Motor Vehicles when they submit sufficient information about their voter qualifications (including attesting to citizenship) through their transaction. Individuals must verify their eligibility by attestation under penalty of false statement.

7

15. In compliance with UOCAVA, Connecticut allows uniformed and overseas voters to register for a federal election if their registration application is received at least 30 days before that election. 52 U.S.C. §§ 20302(a)(2). In fact, Connecticut allows uniformed and overseas voters to register for a federal election at any time, either by mail or in person. Conn. Gen. Stat. § 9-26.

16. In compliance with the NVRA "quiet period" for voter registration, Connecticut does not systematically remove voters from the rolls during the 90 days prior to a federal election unless a statutory exception applies. *See* 52 U.S.C. §§ 20507(c)(2)(A), 3(A)-(B), 4(A). Connecticut does, however, lawfully remove voters on an individual basis where appropriate, such as when a voter requests that his or her registration be canceled prior to the eighteenth day before the election or primary. Conn. Gen. Stat. § 9-35b.

17. In sum, Connecticut's statewide voter registration list changes up to and on Election Day. Registrants are constantly being added, updated, and removed as required (and limited) by federal and state law, and this will continue through the 2026 election and beyond.

18. I have considered how Connecticut's dynamic statewide voter registration list will intersect with the list the EO contemplates will be created by DHS and shared with Connecticut. As noted above, pursuant to Section 2(a) of the EO, DHS will share a State Citizenship List by September 4, 2026. The EO permits the state "to routinely supplement and provide suggested modifications or amendments to the State Citizenship List transmitted thereto." The EO does not require DHS to accept any of these state supplements, modifications, or amendments to the State Citizenship List.

8

19.     Once we receive the State Citizenship List, we will have to devote substantial resources to understanding any differences between it and our current statewide voter registration list. As a baseline matter, comparing the State Citizenship List to our current statewide voter registration list will necessitate linking registrants across the lists. This will be difficult, as it is extremely doubtful that the State Citizenship List will contain the same unique identifiers as our statewide voter registration list, such that we could perform the straightforward matching done by the local election officials using Connecticut issued driver's license numbers and Connecticut voter ID number, which federal agencies generally do not have.  Rather, it is inevitable that there will be differences in the files that will make matching difficult, time-consuming, and potentially inaccurate, as people's names, addresses, and other information may vary slightly (*e.g.*, Robert vs. Bob, Apartment #3 vs. Apt. 3, a junior or senior). I know from my experience that data matching is a complex process, and extreme care must be taken when the consequences of errors may lead to voter disenfranchisement. And because Connecticut will receive the State Citizenship List so close to the election, I and our entire election team must plan for all of this now.

20.     For eligible voters who appear on the statewide voter registration list but not the State Citizenship List, local election officials will need to investigate further pursuant to their obligation to ensure that eligible voters are able to vote. Conn. Gen. Stat. § 9-20. Even though Connecticut will not disenroll voters simply due to their absence from the State Citizenship List, the List could disenfranchise voters in multiple ways. First, voters who check their status on the State Citizenship List as contemplated by Section 2(a) and see that they are not listed may be deterred from voting because they believe they will be blocked from voting or prosecuted, especially if DHS does not timely accept their corrections. Second, USPS may rely on the State

9

Citizenship List to determine which voters can receive and transmit mail ballots in response to the EO's emphasis on criminal penalties associated with the distribution of mail ballots to ineligible individuals. EO §§ 2(b), 3(a), 5. Additionally, if the State Citizenship List is publicly accessible, local elections workers may misunderstand their legal obligations and refuse to provide a ballot to eligible voters missing from the State Citizenship List based on their belief that the voters are ineligible. These are all risks that Connecticut cannot accept. We must make every effort to avoid disenfranchising eligible Connecticut residents. Conn. Gen. Stat. § 9-368o.

21.    Accordingly, in compliance with Connecticut's obligation to protect the right to vote, Connecticut would expend significant resources to attempt to supplement and amend the federal list as necessary, as errors were found through our comparison and investigation. This includes figuring out best practices for coordinating with the election officials of all 169 municipalities in the state and determining proper and secure methods for sending large volumes of confidential data to the federal government. However, even if we are able to quickly offer all necessary corrections, the EO does not require DHS to accept the State's "suggested modifications or amendments." EO § 2(a).

22.    Connecticut would incur significant costs to undertake this comparison and verification of the State Citizenship List. Each Connecticut municipality would need to hire additional staff to assist the registrars of voters with the comparison and verification or otherwise incur additional costs to pay current staff for additional hours. This creates an additional financial and logistical burden on our municipalities which are already under an incredible strain. Connecticut recently implemented early voting, and many towns are struggling with high attrition rates of their local election officials, resulting in shortages of staff for day-to-day statutory responsibilities. Many registrars are part-time employees of their town. The need for

10

additional staff to perform the comparison and verification without any additional funding will place many municipalities in difficult financial positions due to their municipal budgets having already been set for this year. The EO provides no funding, so paying for these costs will have to come from devoting fewer resources to their town needs, such as vital road improvement and school construction, and will require our office to evaluate whether any grants may be provided to the towns to assist.

23.     As detailed above in paragraphs 6 through 8, one of the main roles of my office is ensuring local election officials are well trained in the proper administration of elections in the state of Connecticut. In addition to that work, LEAD also creates guidance and FAQ documents for the public, election officials, other state agencies involved with assisting voters, and candidates. LEAD conducts trainings at the fall and spring conferences held by the Registrars of Voters Association of Connecticut. LEAD also hosts a training day at both the fall and spring conferences held by the Connecticut Town Clerks Association. The first spring conference for both of these groups was on April 16, 2026, and the second will be on April 22, 2026, and we have had to divert time from the planned trainings on recent legislative changes (which significantly affect state election procedures) in order to make time for guidance on this EO.

24.     If Section 2 is implemented, Connecticut will have to devote significant time, personnel, and money to update training materials for local election officials and their staff, specifically detailing what steps they must take with respect to voters who appear on Connecticut's voter registration list but not on the State Citizenship List. This is yet another aspect of the EO's implementation that will necessarily divert approximately 80% of our team's resources from other important election administration tasks for the next several months. SOTS has a limited budget, and needing to divert funds toward making these changes and updates

11

would require a significant budget or would require me to divert funds allocated for critical agency needs like software for election security and updates, public information campaigns, and printing costs.

25.     I anticipate that in addition to formal training materials, my office will need to allocate significant resources to responding directly to local election officials, given the threat of criminal prosecution in Section 2 of the EO. I would not be surprised if more election officials chose to resign their positions instead of having to deal with the prospect of potential federal criminal prosecution for unintentional mistakes. For example, my team will need to update various manuals and video instructions for election workers. We will also have to conduct online trainings and calls for the local election officials. Our website will need to be updated for the public and the fact sheets which go to the campaigns will need to be updated. The online absentee application portal will need to be updated to display warnings regarding the new liability imposed by this EO. My team will need to reach out to FVAP to update procedural changes that we make in response to this EO as well. PowerPoint presentations and informational handouts will need to be created to conduct trainings for prison counselors who assist with the absentee voting process for eligible incarcerated voters. Similar PowerPoint presentations and informational handouts would need to be created to update the Department of Mental Health and Addiction Services and the Department of Developmental Services on these changes. Training materials would also need to be created for mandatory supervised absentee voting facilities to familiarize their staff with these changes and the liability they face for assisting their patients.

26.     The development of and administration of these trainings will require all members of my team to divert their time from the high priority projects as discussed in paragraph 12 and

12

the day-to-day statutory responsibilities of administering elections. This will delay my team's ability to work on providing election officials with their updated instruction manuals for the newly deployed tabulators and recent legislative changes to early voting procedures. This diversion of resources is also occurring during the extremely tight timeframe of the next couple of months during which an election is actually created. The month of May is the endorsement period in Connecticut during which major party candidates will be endorsed by their parties and challenging candidates will circulate primary petitions to force primaries. This often results in numerous legal issues which tie up my legal team. July is when the primary petitions are due and local election officials must verify signatures. This is another time that often results in legal issues and even ballot access litigation by candidates and political parties. August is when the major party primaries occur in Connecticut and election officials must staff and work the primaries. Our office must staff help lines and provide legal and technical support to the towns during the primary. September is when minor parties begin circulating their nominating petitions and local election officials must verify the petition signatures. Minor parties and minor party or petitioning candidates also bring ballot access litigation challenging the Secretary's decision regarding ballot placement. Late September is when absentee ballot and UOCAVA applications are received and processed by election officials. October is when absentee ballots become available and local election officials. Simply put, there is no down time between now and Election Day for either our limited staff or the already strained local election officials of Connecticut. The six months preceding an election is a time-consuming period of high pressure and not one that seasoned election administrators ever chose to make major changes to the election process. Those are typically planned for a year or more preceding an election and then

13

implemented in an orderly, well-planned, and transparent manner so that voters and election officials all understand the changes and how to comply with them.

27. At the same time my staff is performing investigations into the accuracy of the State Citizenship List, they will have to conduct a wide-ranging public education campaign to ensure that eligible voters understand the EO's requirements, and how they may impact a citizen's registration and ability to vote. For example, my staff will have to prepare and distribute training materials guiding citizens through accessing and correcting their individual records on the State Citizenship List under Section 2(a). We will also need to field questions from registrants concerned about their voter registration status and those who seek to register but are confused about the process.

28. I estimate that a public education effort addressing all aspects of the EO, including Section 2, would likely cost at least $2 million, but some estimates within our office are that the costs could be as high as $9 million depending on the extent of the outreach that we do. Such public education effort would pull from, among other things, the agency resources allocated for the public information campaign regarding the changes to Connecticut's early voting that recently passed in the state. That estimate is significantly more than the $55,000 spent on the Bridgeport, Connecticut absentee ballot public information campaign that was limited to one town and one topic. I base this estimate off the public information campaign of one town and the estimate we received from our vendor, Miranda Creative Inc., regarding an information campaign to military voters. There are approximately 8,000 registered military voters in Connecticut, located with some concentration in the areas of New London, Hartford, and New Haven. This population of military voters is both highly mobile and dispersed, making them especially vulnerable to the possibility of disenfranchisement under this EO. I expect that such a

14

campaign would need to broadcast on television in the Hartford-New Haven media market and cable statewide. Direct mailing and military media outreach would also be necessary. Due to the decentralized nature of information sources as a result of the rise of social media, many more forms of media outreach are needed today than ever before. The information campaign would also need to appear on social media platforms such as Meta, X, and TikTok, as well as on streaming platforms such as Roku, YouTube, and Hulu to implement a widespread and effective campaign and demonstrate aggressive outreach across every major media channel. Connecticut would need these efforts to provide a clear argument that the State took all reasonable actions to inform every military voter. The vendor informed us that efforts would entail costs of at least $750,000 to upwards of $1.2 million. To extend this type of public information campaign to all Connecticut voters, it is my approximate estimate that it would cost at least $2 million.

29.    In my experience administering elections, changes to registration and election procedures in the time immediately preceding the election can cause voter confusion. The complicated requirements of the EO will likely lead some citizens to misunderstand the requirements for registration, or whether they are able to vote in Connecticut's elections. Some citizens will determine that the added requirements make registering and/or voting too confusing to be worthwhile. For example, a voter may check their individual status on the State Citizenship list, according to the EO. If they are mistakenly not included, they may believe they have no recourse, and choose not to vote, or they may misunderstand the process for correction (despite my office's attempts to provide education), or DHS may not issue a correction in time. The result of this confusion will be that fewer eligible voters successfully register to vote or decide to cast a ballot.

30. Voter confusion created by this EO will also impose a burden on my staff's time, as my staff (and the elections staff of the municipalities) will be responsible for dispelling voter confusion to the extent possible. This voter confusion will come at a crucial time, shortly before the election, when local elections officials' resources are particularly stretched.

31. This inevitable voter confusion harms Connecticut because it will disenfranchise voters, interfering with our sovereign interest and state-law obligation to ensure that all eligible voters who want to can cast a vote. Moreover, the creation of a State Citizenship List may directly disenfranchise voters because, based on my experience, I know that if a citizen is not included on the list—due, for example, to errors in DHS's static immigration information contained in its Systematic Alien Verification for Entitlements ("SAVE") system, the federal government's misinterpretation of whether the citizen qualifies as a state resident, or any other error—that citizen may believe they are unable to vote, and could be prosecuted for doing so. The same is true of eligible 17-year-old voters, considering the limitations in the EO potentially prohibiting them from voting in federal primary elections. *See* EO § 2(b). That is why Connecticut works so hard to maintain consistent voter registration information so that voters are not erroneously informed that they are ineligible to vote.

32. Connecticut elections officials are required by state law to issue ballots to duly registered voters who submit an absentee ballot application beginning 31 days before an election. Conn. Gen. Stat. § 9-140. My office intends to comply with these state legal requirements in administering upcoming federal elections.

33. In compliance with UOCAVA, Connecticut issues ballots to registered voters who request an absentee ballot under that Act at least 45 days before an election. 52 U.S.C. §§ 20302(a)(1)-(3), (8)(A).

34.    It is my understanding that Section 2(b) of the EO instructs the Attorney General to prioritize investigation and prosecution, under a variety of federal statutes, of "State and local officials or any others involved in the administration of Federal elections who issue Federal ballots to individuals not eligible to vote in a Federal election." I understand that the EO provides that "an individual is 'eligible to vote in a Federal election' if the individual is a citizen of the United States, 18 years of age or older by the date of the upcoming election, and otherwise qualified under the laws of his or her State." I further understand that Section 5 of the EO encourages referrals to U.S. DOJ of "[e]vidence of violations of existing Federal laws by State or local election officials" and "States or localities," among other parties, "for consideration of investigation or charges."

35.    If EO Section 2 goes into effect, I would be concerned that I, my staff, and Connecticut elections officials would face federal prosecution if we issued ballots to Connecticut voters who are not on the State Citizenship List. I am concerned about the impact of these threats of criminal prosecution on my staff, not because I believe they have violated or will violate the criteria in those provisions, as they have not, but because the EO increases the amount of pressure and scrutiny on them, including by the public, who might believe false narratives about voter fraud, election official misconduct or fraud. We have experienced that type of hostility firsthand in Connecticut so we know what can be generated by misinformation, disinformation and mal-information directed at election officials.

36.    The EO's threat of prosecution is heightened by the fact that the EO appears to define voter eligibility in a manner inconsistent with Connecticut law. Connecticut law permits an otherwise eligible voter to cast a ballot in a federal primary or general election if the voter will be 18 years of age by the general election. Conn. Gen. Stat. § 9-12(b). EO Section 2(b) thus may

17

directly conflict with state law if the EO prohibits 17-year-olds from voting in federal primary elections, and it threatens Connecticut elections officials with prosecution for issuing ballots to eligible 17-year-old voters in federal primary elections. This issue has and will cause significant confusion about the rules applicable to upcoming elections.

37.     I know that the threat of prosecution under the EO is on the minds of state and local elections officials like me. Shortly after the EO was issued, SOTS received at least one communication from a local election official expressing concern that simply issuing mail ballots according to state law—that is, to voters who have affirmed their citizenship under penalty of perjury—could result in their arrest. We already have had significant issues staffing state and local election positions, and I worry that this will only further the problem as people may not wish to take on the risk of federal criminal prosecution.

38.     Should the Attorney General initiate any such enforcement actions, SOTS would be required to divert significant resources to respond to such legal action. My legal team has already spent hundreds of hours managing or otherwise assisting with recent lawsuits involving election-related executive orders. *See, e.g., California et al. v. Trump et al.*, 1:25-cv-10810-DJC (D. Mass). If I or my staff were to face criminal prosecution, it would further strain SOTS's ability to fulfill statutory obligations to ensure free and fair elections for Connecticut voters.

39.     Any such legal proceedings would have severe and adverse consequences for the public's trust in Connecticut's administration of elections during a time where public confidence in government is already strained. Public trust is important because it plays a major role in election turnout. People do not exercise their right to vote if they don't believe their vote matters. Election results rely on the public's trust in their accuracy and validity. Government cannot

18

function if the public does not trust the validity of the election that seated the government officials.

40.     Furthermore, based on my experience assisting local election workers, I know that such workers may feel they cannot register or send a ballot to voters not included on a State Citizenship List without risking criminal prosecution despite those voters' fundamental rights to vote under state and federal law. Similarly, based on my experience, I know that USPS, our vendors, or other entities involved in the "printing, production, shipment, or distribution of ballots" may believe they cannot provide a ballot to those voters without risking criminal prosecution.

41.     Connecticut provides a mail ballot to all registered active voters who submit their application for an absentee ballot. My office intends to comply with these state legal requirements in administering upcoming federal elections.

42.     It is my understanding that Section 3(b) of the EO directs the United States Postal Service ("USPS") to initiate a rulemaking that, among other things, would allow States to provide lists of mail voters to USPS 60 days before an election, require the creation of a "Mail-In and Absentee Participation List" ("USPS Mail Ballot List"), and prohibit USPS from delivering mail ballots sent by individuals not on the USPS Mail Ballot List. It is also my understanding that Connecticut can "routinely supplement and provide suggested modifications or amendments" to the USPS Mail Ballot List, but USPS is not required to accept any changes provided by Connecticut.

43.     Additionally, as with the State Citizenship List, I am not sure if we would even be told whether our changes to the USPS Mail Ballot List were accepted or rejected. So, we and local officials could be fielding calls from angry voters wondering where their ballots are and

19

have no way of knowing why they did not receive them—whether it was simply a lost ballot or they just did not make the USPS' list.

44.     As soon as our team had time to digest the contents of the EO, I immediately began considering what near-term actions the EO would necessitate from my office, including preparing guidance for the local election officials and public, involving state agencies, building out data analysis infrastructure and cyber security protocols, and—as discussed further below—committing additional staff time to responding.

45.     Section 3(b)(ii) of the EO requires USPS to provide notice of proposed rulemaking for provisions specifying that, at least 60 days before a federal election, states intending to allow for mail-in or absentee ballots must send a list to USPS of voters to whom they intend to send a mail-in or absentee ballot ("State Mail Ballot List"). For the 2026 federal general election, that deadline will be September 4, 2026. Failing to provide this list to USPS would pose an unacceptable risk under the EO that USPS will not include Connecticut absentee voters on the USPS Mail Ballot List, thereby making it more difficult or impossible for eligible voters to cast their ballots. That risk is underscored by the fact that Connecticut voters must submit an application to receive an absentee ballot, but the overwhelming majority of those applications are received well after the 60th day before an Election. Thus, any State Mail Ballot List that we send to USPS at least 60 days before a federal general election is not likely to reflect accurately the number of individuals who will be receiving absentee ballots for an upcoming federal general election consistent with Connecticut law.

46.     As discussed throughout this declaration and more specifically in paragraph 26, Connecticut's use of the mail for elections, paired with our election calendar, mean I must plan now for how to align Connecticut's administration of mail voting with the EO.

20

47. Creating the State Mail Ballot List will require my office and local elections officials to expend time and resources to ensure that all active registered voters who timely requested an absentee ballot are included. This task will be significantly complicated by the influx of registration updates and changes that elections officials typically receive in the months before the election.

48. The deadline to provide this list to USPS no later than 60 days before the election means that some voters who are entitled to an absentee ballot under state and federal law will unavoidably be left off the list. Connecticut permits certain military personnel and their families to request absentee ballots up to 90 days before an election. Conn. Gen. Stat. § 9-153e. UOCAVA permits uniformed and overseas voters to request absentee ballots up to 45 days before an election. 52 U.S.C. § 20302(a)(8). Under Connecticut law, voters may request an absentee ballot any time during the calendar year but cannot receive a ballot before the 31st day before an election. Conn. Gen. Stat. § 9-140. Although the EO indicates that States will be able to "routinely supplement and provide suggested modifications or amendments" to the USPS Mail Ballot List, USPS is not required to accept our suggestions. The EO also does not specify when USPS will transmit its USPS Mail Ballot List to our office, which could cause substantial complications.

49. Once we receive the USPS Mail Ballot List, we will have to devote substantial resources to assisting local election officials with understanding any differences between it and our own list of voters eligible to receive mail ballots. This will be a difficult task for many of the same reasons set out above with regard to the State Citizenship List, including: the lack of unique identifiers shared by both lists, the potential for slight variations in spelling to wrongly preclude matches, the fluid nature of voter registration rolls in the lead-up to elections, and

21

administrative challenges inherent to any data-matching process. Accordingly, reviewing the USPS Mail Ballot List will require a significant expenditure of time and resources on both the state and local levels.

50.     For citizens who appear on the statewide voter registration list and are eligible to receive a mail ballot under Connecticut law but not the USPS Mail Ballot List, my office and the town clerks will need to investigate further pursuant to our obligation to ensure that every active registered absentee voter is able to receive a mail ballot as requested. We must make every effort to do so to avoid disenfranchising eligible Connecticut residents.

51.     Connecticut would expend significant resources to attempt to supplement and amend the USPS Mail Ballot list as necessary, if errors were found through our comparison and investigation. This includes determining proper and secure methods for sending large volumes of confidential data to the USPS.

52.     Even with the best efforts of my office and local elections officials, the challenges of completing a complex data-matching program in a short timeframe and while preparing to administer an election poses a high risk of errors and omissions.

53.     Connecticut would incur significant costs to undertake this comparison and verification of the USPS Mail Ballot List. Each Connecticut municipality would need to hire additional staff, or otherwise incur additional costs to pay current staff for additional hours, to assist the registrars of voters with the comparison and verification. As I mentioned in paragraph 22, our local election officials are under significant financial and logistical pressure to hire and pay skilled election support staff and the EO does not provide funding for this task of cross checking the USPS Mail Ballot List either.  Further, this would all be occurring during the tight timeframe detailed in paragraph 26.

22

54.     If Section 3 is implemented, Connecticut will have to devote significant time, personnel, and money to update training materials for local elections officials and their staff as detailed in paragraph 25. Those materials would have to specifically detail what steps they must take with respect to voters who appear on Connecticut's voter registration list and are eligible to receive a mail ballot under Connecticut law, but who do not appear on the USPS Mail Ballot List. This is yet another aspect of the EO's implementation that will necessarily divert our team's resources from other critical election administration tasks.

55.     I anticipate that, in addition to formal training materials, my office will need to allocate significant resources to responding directly to local elections officials, given the threat of criminal prosecution in the EO. My legal team will need to provide the election officers and local election officials with support and detailed legal communications.

56.     At the same time my staff is creating the State Mail Ballot List and performing investigations into the accuracy of the USPS Mail Ballot List, they will have to field questions from citizens concerned about their ability to receive or return a mail ballot in the upcoming elections. Thus, a separate impact of the EO's directive concerns the need for a wide-ranging public education campaign to ensure that eligible voters understand the EO's requirements, and how they may impact a citizen's ability to vote by mail. As noted in paragraph 28, a public education campaign to address all aspects of this EO, including Section 3, would likely cost at least $2 million.

57.     Apart from the time and monetary costs that Section 3's implementation would impose on Connecticut, Section 3 also risks voter confusion and disenfranchisement. This inevitable voter confusion is a harm in and of itself and is also a burden on my staff's time. This voter confusion will come at a crucial time shortly before the election, when state and local

elections officials are required under Connecticut law to send absentee ballots to all registered active voters who have applied for an absentee ballot.

58. Sending mail ballots in a timely fashion is not only required by state and federal law, but is critical to ensuring that as many eligible Connecticut citizens as possible can exercise their right to vote. In the 2024 General Election, 120,422 Connecticut citizens voted by mail. This method of voting is particularly important for the many Connecticut citizens who are members of the US Navy Submarine Force. Connecticut is home to the primary United States submarine base on the East Coast. All submariners, whether officer class or enlisted, are trained at the submariner school on the base. Submariners face unique hurdles in exercising their right to vote due to the limited communication available to them during underwater exercises and missions. Submariners may, with little to no notice, be given orders to go on "underway" exercises for periods ranging anywhere from 30 to 120 days, where, during this period, the submarine is submerged for that period and access to the internet is limited and throttled. The submarine may not surface during this exercise until returning to base. This makes the availability of mail-in ballots essential to our Submarine Force. Active-duty submariners who become stationed at the base following the transmission of the USPS Mail Ballot list would face disenfranchisement as would those who are unable to register until after the transmission of the USPS Mail Ballot List due to underwater assignments.

59. Errors in the USPS Mail Ballot List would be extremely deleterious because of the potential for voter disenfranchisement. For example, consider an eligible voter who is on the State Mail Ballot List but not on the USPS Mail Ballot List. Under the EO, they are likely to receive a mail ballot from their local elections official that USPS will later refuse to return to the local elections official. In that situation, the voter may think that they have voted, but they have

24

not. Nor would the voter necessarily know to cancel that ballot and vote in person, given that the EO does not charge USPS with notifying the voter. A voter may also be concerned about casting two ballots, which is itself a criminal violation, and choose not to vote. My office must take every measure possible to avoid this kind of voter disenfranchisement.

60.    There are several additional inherent problems posed by the deadlines outlined above and the requirement to compare static lists (the State Citizenship List, USPS Mail Ballot List, and State Mail Ballot List) with a constantly evolving list (the statewide voter registration list). For example, between the day the State Citizenship List is sent and 6 days before Election Day (the last day a non-UOCAVA voter may register and receive a mail ballot under Connecticut law), there will inevitably be individuals who become eligible but are not captured on the State Citizenship List. They may, for example, have moved to Connecticut or become a naturalized citizen after the list was sent. Regarding voters who have moved, I am not aware of any legal requirement that voters regularly report change of residential address to the Federal Government.

61.    Additionally, as already noted, the timeline is unworkable. The EO requires DHS to send the State Citizenship List to States "no fewer than 60 days before each regularly scheduled Federal election." For the November 3, 2026 General Election, that means DHS must send this list by Friday, September 4, 2026. And, pursuant to USPS's proposed rules under Section 3(b)(ii) of the EO, Connecticut must also send its State Mail Ballot List to USPS 60 days before the election—also Friday, September 4, 2026. Thus, we must send the State Mail Ballot List (i.e., all those who should receive a mail ballot under state law) to USPS on the *same day* we might receive the State Citizenship List from DHS and well before the vast majority of Connecticut voters submit their applications for absentee ballots. Comparing the statewide voter

25

registration list and the State Citizenship List to see who is eligible according to both lists in *one day*, or even *a few hours*, is simply not possible to do with any meaningful degree of accuracy, no matter how many resources my office and local registrars of voters dedicate to the project. Communicating with another governmental entity—the Federal government—about the administration of an election in such detail and on such a compressed time frame will be extremely challenging and not something that Connecticut has ever had to do before. It is likely a recipe for disaster for our elections and will most certainly result in the disenfranchisement of some of our electors.

62.     Although the EO provides that we may "routinely supplement and provide suggested modifications or amendments" to the USPS Mail Ballot List, there is no guarantee that USPS will accept those suggestions. If we—in an attempt to protect Connecticut's elections officials from criminal liability—sent a State Mail Ballot List to USPS 60 days before Election Day that reflected only confirmed matches between the statewide voter registration list and the State Citizenship List, knowing that many eligible voters could have been wrongfully excluded from the State Citizenship List, we would be committing ourselves to potentially violating Connecticut law. We could then endeavor to submit additional matches as we confirmed them. But it would be very difficult to do so quickly enough to matter. On September 18, 2026—only 2 weeks after we receive the State Citizenship List—our UOCAVA voters' ballots must be mailed out. Shortly thereafter, ballots must be sent to active registered voters who have submitted an application for an absentee ballot beginning on October 2, 2026. Conn. Gen. Stat. § 9-140.  Even if DHS and USPS accepted our suggestions, there is unlikely to be enough time to get a ballot to those who are eligible but did not appear on the State Citizenship List. Voters would be disenfranchised and Connecticut law would be violated.

26

63.    Again, because of our obligation to ensure that every eligible Connecticut resident can vote, we would need to take additional steps after receiving the State Citizenship List and USPS Mail Ballot List to investigate the status of all those on the statewide registration list who do not appear on the federal lists, and then suggest changes to both. This will require data matching, verification, follow-up investigations, and interfacing with DHS, USPS, municipalities, the public, and others, and will demand an enormous investment of resources. Additionally, state cybersecurity and information technology staff would need to be involved to facilitate the secure transfer of information between the federal government and SOTS. I estimate that these initiatives would require hiring 2 full-time contractors for at least a year and 5 full-time employees immediately, including a project manager a data specialist, and an assistant IT director. This is in addition to the staff time required to work with DHS and USPS to securely transfer information.

64.    I estimate that these new staffing needs will require an approximate annual increase of $900,000 to the SOTS' budget. Given recent economic pressures across the state and country, I have been trying to keep my office's budgetary needs as low as possible. We submitted our budget for the fiscal year in the fall of 2024, so there is no additional funding available for this fiscal year.

65.    Any time spent by current staff on implementing the EO would divert time and attention from other critical election preparation in the days leading up to the election, my office's busiest time. As detailed in paragraph 26, this is a time-consuming period of high pressure and high output for both local election officials and LEAD.

66.    Each of these tasks and costs will divert scarce resources from other important election administration needs as detailed above in paragraphs 12 and 26.

27

67.     Connecticut municipalities do not currently use Intelligent Mail barcodes on ballot mail. They do, however, utilize other safeguards to ensure the accuracy of absentee ballots. For example, each municipality creates a unique label with a barcode for the absentee ballot envelope (which also has a serial number printed on it). The town clerks scan the barcode label which pulls up the voter profile in the database and identifies the voter by the voter ID number. The town clerk logs the manner the absentee ballot was returned (in person by the voter or a designee, by mail, or by drop box) in the centralized voter registration system which ensures there is no double voting.

68.     No Connecticut municipality currently submits ballot envelopes to USPS for design review. In 2020, LEAD worked closely with USPS to determine the proper placement of the municipal barcode labels to ensure that the placement would not interfere with the USPS machine sorting process.

69.     In Connecticut, as in much of the country, ballot envelopes vary by municipality. While Connecticut law currently requires the absentee ballot be returned in an inner envelope that is placed in an outer envelope with the label discussed above, there is currently a bill before the Connecticut legislature that would remove the outer envelope from the absentee ballot process. This will further reduce the available space on the now, singular envelope which will need to have an area for the voter's attestation and signature as well as the municipal label. The addition of yet another barcode will only further the complexity of the envelope layout.

70.     Furthermore, I am deeply concerned about the length of time it would take for USPS to conduct ballot design review for millions of jurisdictions nationally. Waiting on USPS to approve ballot design has the potential to seriously disrupt and delay carefully timed steps necessary to deliver mail ballots to Connecticut voters. Managing the fallout from such a delay

28

would force my office and local elections officials to divert critical time and money from other elections administration duties to expedite other steps in the mail ballot process, educate the public about the status of mail ballots, and otherwise mitigate the harm from delays to the process.

71.    It is my understanding that Section 5 of the EO directs that "States and localities should preserve, for a 5-year period, all records and materials—excluding ballots cast—evidencing voter participation in any federal election (e.g., ballot envelopes, regardless of carrier)." Existing federal law only requires preservation of voting materials for 22 months following an election, and preservation of records concerning voter roll maintenance for two years. 52 U.S.C. §§ 20507(i)(1), 20701.  Connecticut follows the existing federal law timelines for the preservation and destruction of voting materials in federal elections.

72.    Compliance with a five-year document preservation standard for election materials would impose significant compliance, storage, and other costs on Connecticut and local elections officials.

73.    Connecticut municipalities currently struggle to find adequate storage space for election materials for the required retention period. Requiring longer retention periods will only add to this burden.

74.    Additionally, under current federal law, Connecticut may begin properly disposing of certain retained materials from the 2024 presidential preference primary election on February 2, 2026, and the 2024 general election on September 7, 2027. The EO prevents Connecticut from undertaking these actions as to some, but not all, of the retained materials, and requires Connecticut to incur further management, storage, and security costs instead.

29

75.     More than doubling the required retention time for some (but not *all*) voting materials would increase these burdens and costs significantly for Connecticut's towns.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 20, 2026, at Hartford, Connecticut.

Gabe Rosenberg
General Counsel and Chief of Staff
Office of the Secretary of the State

30