## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| STATE OF CALIFORNIA; et al., | |
| *Plaintiffs,* | |
| v. | Case No. 1:26-cv-11581 |
| DONALD J. TRUMP, in his official capacity as President of the United States; et al., | |
| *Defendants.* | |

## <u>DECLARATION OF ANTHONY J. ALBENCE</u>

I, Anthony J. Albence, declare as follows:

1.      I am a resident of the State of Delaware.  I am over the age of 18.  I am familiar with the information in the statements set forth below either through personal knowledge, through consultation with the staff of Delaware's Department of Elections, or from my review of relevant documents and information. If called as a witness, I could and would testify competently to the matters set forth below.

2.      I am the State Election Commissioner for the state of Delaware. I have served as Delaware's State Election Commissioner since July 2019.  Prior to that, I worked for the Department of Elections as the County Director for New Castle County Delaware for twelve years. I have a bachelor's degree from the Catholic University of America in Washington and a master's degree in urban affairs and public policy from the University of Delaware.

3.      As Delaware's State Election Commissioner, I lead Delaware's Department of Elections (the Department) and am Delaware's Chief State Election Official. Under Delaware law, either the Department of Elections or the Commissioner is responsible for administering all

1

aspects of federal and state elections in Delaware and many aspects of municipal elections in Delaware. *See* 15 *Del. C.* §§ 201, 302; *see gen.* 15 *Del. C.* §§ 101-8046. In my role, I supervise the execution of elections and enforcement of all state and federal laws relating to elections within Delaware. *See* 15 *Del. C.* § 302. I oversee the Department of Elections communications about elections, voting, and voter registration to the public. I advise Delaware's legislature and Governor on the effect that potential changes in the law would have on the operation of elections within Delaware.

4. I have supervised aspects of voter registration in Delaware since 2007. I was the County Director for Delaware's largest county, New Castle, when Delaware implemented electronic voter registration through the Delaware Department of Motor Vehicles starting in 2009. I was the State Election Commissioner for Delaware when Delaware upgraded its electronic voter registration system to the current systematic automatic voter registration in 2021. I have led Delaware through multiple systematic changes to voter registration and am familiar with the extent of effort and attention to detail needed to implement successful change in the election system.

5. I also supervise Delaware's voter registration list maintenance. I review the processes that the state mandates by code to comply with Delaware's obligations under the National Voter Registration Act (the "NVRA") and I supervise the processes put in place by the Department to maintain a voter list that is accurate, up to date, and compliant with federal and state law.

6. In my role, I also lead the work necessary to facilitate absentee voting in Delaware, including voting pursuant to the Uniformed Oversees Citizens Absentee Voting Act ("UOCAVA"). Given Delaware's size, I am afforded the opportunity to participate firsthand in

2

all aspects of the system – from advising the legislature to interacting with frontline post office personnel about potential mail delays.  I am familiar with the control mechanisms built into the UOCAVA system to ensure that votes are properly cast at the same time maintaining a system that facilities the ability of all eligible voters to cast their vote.

7.    As Commissioner, I am responsible for ensuring that Delaware has the equipment necessary to conduct elections.  *See* 15 *Del. C.* § 302.  By state law, Delaware must use electronic voting devices for elections.  *See* 15 *Del. C.* § 5000A.  During my tenure I have participated in the selection and purchase of Delaware's electronic voting equipment.  As Commissioner, I am also responsible for the budget and upgrades necessary to ensure secure, efficient and reliable elections. I supervise equipment and software upgrades to ensure compliance with Delaware law.  *See* 15 *Del. C.* § 5001A.

8.    In my role, I also represent Delaware in multiple multi-state organizations focused on effective administration of elections.  I am a member of the elections committee of the National Association of Secretaries of State ("NASS") and I serve on the Boards of Directors of the National Association of State Election Directors ("NASED") and of the Electronic Registration Information Center ("ERIC".)  These roles provide experience and background in understanding a variety of election issues on a national scale.

9.    In the November 2024 general election, over 500,000 ballots containing votes for federal office were cast in Delaware.   In the November 2024 general election, over 40,000 absentee ballots were cast by mail.

10.    I am familiar with the Executive Order published on March 31, 2026, entitled "Ensuring Citizenship Verification and Integrity in Federal Elections" (the "EO").  Sections 2 through 5 of the EO (collectively, the "Challenged Provisions") have already caused

3

considerable harm, confusion, fear, and disruption in Delaware election administration, and will impose unrecoverable costs on Delaware.

11.     Beginning the day following the EO's issuance, the Department of Elections received multiple calls from Delaware residents concerned about the effect of the EO on their ability to vote by absentee ballot in Delaware.  The Department's Community Relations Officer has responded to those queries and begun work on information materials to calm public concerns.

12.     The Department also requested and received legal advice from the Deputy Attorney General assigned to the Department of Elections as to the effects of the EO on the Department's operations.

13.     I covered potential effects and provided short-term guidance to the Directors and Deputy Directors of each of Delaware's three counties as to how to respond.

14.     It is my understanding that Section 2(a) of the EO directs the Department of Homeland Security ("DHS") to create a "State Citizenship List" for each State, which will include "individuals confirmed to be United States citizens who will be above the age of 18 at the time of an upcoming Federal election and who maintain a residence in the subject State."  It is also my understanding that DHS will send these lists "no fewer than 60 days before each regularly scheduled Federal election, or promptly upon request by a State in connection with any special Federal election."  This would mean that DHS will send this list by Friday, September 4, 2026, for the federal general election taking place on November 3, 2026.

15.     Section 2 requires me and my team in the Department of Elections to understand how it interacts with Delaware's statewide voter registration list, and to coordinate with other state and local agencies across Delaware.  Our efforts to understand the effects of Section 2 and

4

to address citizens' confusion as to the effects of Section 2 will divert time and attention from other critical election preparations and long-term election work. For example, the Department's Community Relations Officer is now dividing her focus between educating the public as to Delaware's upcoming party change deadline and addressing EO-related concerns. Delaware's Department of Elections has already been forced to divide our limited legal support between addressing the EO and analyzing numerous bills introduced in Delaware's General Assembly this session of considered for introduction that address or effect elections. And, the Department's technical specialists have had to take time away from other projects to begin considering options to handle a bulk data submission by DHS. The Department of Elections does not have undeployed resources to allocate to interpreting and explaining the EO.

16.     Delaware's Department of Elections is responsible for voter list maintenance, as required under the National Voter Registration Act ("NVRA"), Help America Voter Act ("HAVA"), and Delaware state law. This includes updating voter registration records based upon information submitted to the Department of Elections or the Department of Motor Vehicles, sending notices to voters who may have moved, identifying duplicates on the statewide voter registration list, correcting errors in voter registration records, cancelling the registrations of those who have been convicted of a felony and are currently incarcerated, and cancelling the registration of those who have died.

17.     Additionally, the Department of Elections also continues to register those who are eligible to vote in Delaware. Delaware allows qualified individuals to register up to the third Monday before Election Day. 15 *Del. C.* § 1902(c); 52 U.S.C. § 20507(a)(1) (requiring States to permit registration up to 30 days before a federal election). Delaware residents can register to vote online, at their county's office of the Delaware Department of Elections, at various state

5

social service agencies, and through Delaware's Department of Motor Vehicles when they submit sufficient information of their voter qualifications (including citizenship) through their transaction.  Delaware code provides for verification of eligibility to vote at the time of registration.  *See, e.g.,* 15 *Del. C.* §§ 1302, 2050A(b)(1).

18.    In compliance with the Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA), Delaware allows uniformed and overseas voters to register for a federal election if their registration application is received at least 30 days before that election.  52 U.S.C. §§ 20302(a)(2).  Delaware specifically accepts and processes voter registration applications from uniformed and overseas voters up until the third Monday prior to an election.

19.    In compliance with the NVRA "quiet period" for voter registration, Delaware does not systematically remove voters from the rolls during the 90 days prior to a federal election unless a statutory exception applies.  See 52 U.S.C. §§ 20507(c)(2)(A), 3(A)-(B), 4(A). Delaware does, however, lawfully remove voters on an individual basis where appropriate, such as when a voter requests that his or her registration be canceled, dies, or is convicted of a felony. See 15 Del. C. § 1703 (cancelation upon felony conviction); § 1704(d)(1) (cancelation at a person's direction); § 1705 (cancelation of registrations of persons reported as deceased).

20.    Delaware law also provides for registered voters to change their residential address or name up to and including on Election Day, provided that the change of address is within the state of Delaware.  *See* 15 *Del. C.* §§ 2047, 2048.  Finally, Delaware law permits the correction of errors in voter registration records without regard to time period.  *See* 15 *Del. C.* § 1704(i); § 1708.

21.     In sum, Delaware's statewide voter registration list changes up to and on Election Day.  Registrants are added, updated, and removed as required (and limited) by federal and state law, and this will continue through the 2026 election and beyond.

22.     I have considered how this dynamic statewide voter registration list will intersect with the list created by DHS.  As noted above, Section 2(a) of the EO directs DHS to share a State Citizenship List with Delaware by September 4, 2026.  The EO permits Delaware "to routinely supplement and provide suggested modifications or amendments to the State Citizenship List transmitted thereto."  The EO does not require DHS to accept any supplementation, modification, or amendment to DHS's State Citizenship List that Delaware may provide in response to the list.  The EO similarly does not require Delaware to either use our state voter registration list to update and correct DHS's State Citizenship List or to use DHS's State Citizenship List in connection with any review of Delaware's voter registration list.  Thus, it is not clear to me, from the face of the EO, what specifically Delaware is expected to do with DHS's State Citizenship List.

23.     It would be a substantial undertaking for Delaware either to use Delaware's voter registration list to correct DHS's State Citizenship List or to use DHS's State Citizenship List to attempt to identify potential concerns with Delaware's voter registration list.  Were Delaware to undertake this effort, we would have to devote substantial resources to understanding the differences between the State Citizenship List provided by DHS and our current statewide voter registration list.  As a threshold matter, Delaware would need to develop a system or technical interface to permit comparison between Delaware's voter registration list and DHS's State Citizenship List.  Depending upon the form in which DHS's State Citizenship List is provided,

7

that could prove to be technically complex.  Delaware's voter registration list contains more than 800,000 entries.

24.    Substantively comparing DHS's State Citizenship List to Delaware's current statewide voter registration list will necessitate linking registrants across the lists.  This will be difficult, as it is extremely doubtful that DHS's State Citizenship List will contain the same unique identifiers as our statewide voter registration list, such that we could perform straightforward matching.  There are multiple reasons for this.  First, Delaware relies upon randomly assigned, unique identifiers, as the primary method for tracking individual voter registrations.  It is unclear how DHS could include Delaware's voter ID numbers in its State Citizenship List.  Thus, Delaware would need to match our voter registration list to DHS's State Citizenship List based upon other data.  It is inevitable that there will be differences in the files that will make matching difficult, time-consuming, and potentially inaccurate, as people's names, addresses, and other information may vary slightly (*e.g.*, Robert vs. Bob, Apartment #3 vs. Apt. 3) or two different people may have nearly identical records (*e.g.* a son named after his father who still lives at home).  I know from my experience working with ERIC and in prior voter registration list maintenance that data matching is a complex process and extreme care must be taken when the consequences of errors may lead to voter disenfranchisement.  When other states have attempted to use federal data to improve their voter registration lists, I understand that they have found error rates in federal data, or in data matching with respect to millions of voter registration records.  Resolving all discrepancies between Delaware's voter registration list and DHS's Citizenship List would be a very time intensive effort, if possible.

25.    If DHS provided Delaware with a State Citizenship List 60 days before an election, as directed by Section 2 of the EO, Delaware would receive the State Citizenship List

too close to the election to perform all of the data matching, verification, and validation that would be required for Delaware's provision of absentee ballots to comply with the EO.  The Department of Elections has very limited IT resources and attempting to perform this matching would divert these people from critical election preparation and election security activities.

26.    While Section 2 of the EO does not specifically require Delaware or the Department of Elections to take specific action to incorporate DHS's State Citizenship List into Delaware's voter registration list, DHS's promulgation of a State Citizenship List that purports to reflect individuals eligible to vote in a federal election will require substantial work on behalf of Delaware's Department of Elections.

27.    Even setting aside the question of how Delaware addressed DHS's State Citizenship List, DHS's promulgation of a State Citizenship List in an election context could disenfranchise voters in multiple ways.  First, voters who check their status on DHS's State Citizenship List as contemplated by Section 2(a) and see that they are not listed may be deterred from voting because they believe they will be blocked from voting or prosecuted, especially if DHS does not timely accept their corrections.  Second, individuals who check their status on DHS's State Citizenship List and see that they are listed may erroneously believe themselves to be registered to vote as a result.  This could lead to eligible citizens failing to register to vote because they misunderstand the role of DHS's State Citizenship List in the process.  Third, individuals who are citizens, but who are not eligible to vote under Delaware law, such as due to their criminal history, may erroneously believe themselves eligible to vote as a result of DHS's list.  Those individuals could be misled into voting when ineligible to do so.  Fourth, individuals who move, change their names, or make other life changes that require updates to their voter registration records may erroneously update only their Delaware voter registration or only their

9

entry in the DHS State Citizenship List, resulting in one of the lists failing to capture developments.  Delaware cannot simply accept these risks.  We must make every effort to avoid disenfranchising eligible Delawareans due to confusion related to DHS's State Citizenship List.

28.      If Delaware did undertake to correct all inaccuracies in DHS's State Citizenship List and to investigate any issues suggested with any voter registration record in Delaware's voter registration list, the effort would be massive.  Even if there were only a 2% error rate in the federal data, thousands of voters would be affected; confirming, validating, and correcting the resulting errors would be excessively time consuming.  Doing so would require determining proper and secure methods for sending large volumes of confidential data to the federal government, resolving concerns related to transmitting records of First Amendment activity to the federal government in light of the Privacy Act of 1974, and obtaining legislative or judicial authority to transmit information that the Department is not permitted to share even within Delaware state government under Delaware law.  *See e.g.,* 15 *Del. C.* § 304(h).  However, even if we are able to quickly offer all necessary corrections, the EO does not require DHS to accept the State's "suggested modifications or amendments."  EO § 2(a).

29.      If Delaware were to undertake this effort, it would incur significant costs to do so. Delaware's Department of Elections retains a limited number of technical and legal specialists; the Department does not have any data scientists or auditors.  Undertaking this effort would require adding personnel in those areas, as well as additional staff to communicate with the public to gather or validate information.  The EO provides no funding, so paying for these costs will have to come from devoting fewer resources to our office's other pressing responsibilities, such as election preparation and updating Delaware's campaign finance reporting and enforcement systems.

10

30.     Avoiding disenfranchisement will require educating Department of Elections employees on the role of DHS's State Citizenship List.  Delaware's Department of Elections is responsible for all county, state, and federal elections in the state of Delaware.  The Department develops the materials necessary to train all election workers in Delaware, from people serving as poll workers only on election day through the County Directors and Deputy County Directors who oversee elections in one of Delaware's three counties.  The Department's training materials include videos, FAQs, and checklists.  The Department holds monthly meetings with the heads of each county office and key Department-wide personnel to educate and inform Department leadership on developments.

31.     If Section 2 is implemented, Delaware will have to devote significant time, personnel, and money to update training materials for both Department employees and poll workers hired for election day in particular to avoid confusion with respect to the role of DHS's Citizenship List in Delaware election administration.  This is yet another aspect of the EO's implementation that will necessarily divert a material amount of resources from other important election administration tasks.

32.     Educating Department of Elections' employees as to the EO's effect will necessarily displace training aimed at reinforcing our compliance with the NVRA, HAVA, and other existing state and federal election laws, as well as the fundamental operational training for poll workers.

33.     The Department's staff will also have to conduct a wide-ranging public education campaign to ensure that eligible voters understand the extent to which DHS's State Citizenship List does or does not affect citizens' ability to vote.  We will need to combat misinformation that could lead to voter disenfranchisement or ineligible citizens registering to vote.  We will also

11

need to field questions from registrants concerned about their voter registration status and generally confused about the process and qualifications to vote in Delaware elections. This process will be further complicated because, in Delaware, different eligibility standards apply to state, federal, municipal, and school board elections.

34.     I estimate that such a public education effort could cost as much as half to the same amount as the Department typically spends on public information to support voter registration and voting in a general election year. Effectively, the Department's public relations budget would need to increase by at least 50% if not double, at a cost to other state priorities, or the Department would need to reduce or abandon our typical voter education efforts.

35.     In my experience administering elections, changes to registration and election procedures in the time immediately preceding the election can cause voter confusion. The complicated requirements of the EO will likely lead some citizens to misunderstand the requirements for registration, or whether they are able to vote in Delaware's elections. Some citizens will determine that the added requirements make registering and/or voting too confusing to be worthwhile. For example, a voter may check their individual status on the State Citizenship list, according to the EO. If they are mistakenly not included, they may believe they have no recourse, and choose not to vote, or they may misunderstand the process for correction (despite my office's attempts to provide education), or DHS may not issue a correction in time. The result of this confusion will be that fewer eligible voters successfully register to vote or decide to cast a ballot.

36.     This inevitable voter confusion harms Delaware because it will disenfranchise voters, interfering with our sovereign interest and state-law obligation to ensure that all eligible voters who want to can cast a vote. It will also impose a burden on my staff's time, as the

12

Department of Elections will be responsible for dispelling voter confusion to the extent possible. This voter confusion will come at a crucial time, shortly before the election, when local elections officials' resources are particularly stretched.

37.    Delaware law requires election officers to issue ballots to duly registered voters. With respect to in person voting, Delaware law dictates that "A voter, upon entering the room where an election is being held, shall announce that voter's own name and address and provide proof of identity, whereupon the clerks shall place a mark or make a notation of his or her name upon the election district record." 15 *Del. C.* § 4937(a).  "If it appears that the voter is properly registered, an election officer shall hand to the voter a voter signature card which the voter shall sign."  *Id*. at § 4937(b).  "If the voter is not challenged or if a challenge is decided in the voter's favor, 1 of the election officers to be stationed at the entrance of the voting machine shall announce the name of the voter and permit the voter to pass through the entrance to the booth of the voting machine for the purpose of casting the voter's vote."  *Id.* at § 4937(d).  With respect to absentee ballots, Delaware law requires the Department of Elections to mail an absentee ballot to each voter who is listed on Delaware's voter registration list and qualified to vote on an absentee basis not more than 60 days nor less than 4 days prior to an election.  *Id.* at § 5502 (permitted reasons entitling a voter to vote by absentee ballot); § 5504(a)-(b) (requirement that the Department of Elections provide absentee ballots).    My office intends to comply with these legal requirements in administering upcoming federal elections.

38.    In compliance with UOCAVA, Delaware issues absentee ballots no later than 45 days before an election to qualified registered voters who submit their request for an absentee ballot within the calendar year of the election and more than 45 days before an election and to qualified voters who elect to vote on an absentee basis, consistent with UOCAVA, permanently.

13

52 U.S.C. §§ 20302(a)(1)-(3), (8)(A).  Delaware law expands upon the Delaware Department of Elections' obligations to facilitate absentee voting by permitting voters qualified to vote on an absentee basis to request absentee ballots by mail until four days prior to the election.  *See* 15 *Del. C.* §§ 5503(a), 5504(b).  Delaware law provides for electronic transmission of absentee ballots to and from UOCAVA voters.  *See Id.* at § 5503(l).

39.    It is my understanding that Section 2(b) of the EO instructs the Attorney General to prioritize investigation and prosecution, under a variety of federal statutes, of "State and local officials or any others involved in the administration of Federal elections who issue Federal ballots to individuals not eligible to vote in a Federal election."  I understand that the EO provides that "an individual is 'eligible to vote in a Federal election' if the individual is a citizen of the United States, 18 years of age or older by the date of the upcoming election, and otherwise qualified under the laws of his or her State."  I further understand that Section 5 of the EO encourages referrals to U.S. DOJ of "[e]vidence of violations of existing Federal laws by State or local election officials" and "States or localities," among other parties, "for consideration of investigation or charges."

40.    If EO Section 2 goes into effect, I would be concerned that Delaware elections officials, including myself, would face federal prosecution if we issued ballots to individuals who are validly registered to vote in Delaware who are not on DHS's State Citizenship List.  I am not aware of any provision of state or Federal law that would permit, let alone require, Delaware's Department of Elections to deny the right to register to vote or to vote to any person based upon the fact that the person is not listed on DHS's State Citizenship List.  Thus, I am concerned about the impact of these threats of criminal prosecution on my staff.

14

41.      The EO's threat of prosecution is significantly exacerbated by the fact that the EO defines voter eligibility in a manner inconsistent with Delaware law.  Delaware law permits an otherwise eligible voter to cast a ballot in a federal primary election if the voter will be 18 years of age by the general election.  *See* 15 *Del. C.* § 1701(a) ("Every applicant for registration shall be a qualified voter in a general or primary election if such applicant . . . will be 18 years old on or before the day of the general election next succeeding the applicant's registration. . . .").  EO Section 2(b) thus directly conflicts with Delaware law by defining eligible voters to be only those 18 years and older.  The EO explicitly threatens Delaware elections officials with prosecution for issuing primary ballots to eligible 17-year-old voters.  This issue has and will cause significant confusion about the rules applicable to upcoming elections.

42.      Should the U.S. Attorney General initiate any such enforcement actions, Delaware's Department of Elections would be required to divert significant resources both to respond to such legal action and also to educate the public, with the aim of minimizing voter confusion to the extent possible. I anticipate that an enforcement action, regardless of how meritless, would require substantial effort from myself and the Department of Elections.

43.      Any such legal proceedings would have adverse consequences for the public's trust in Delaware's administration of elections.  By way of example, since the 2020 election false claims have circulated that electronic ballot tabulation, the method used in Delaware, does not count votes accurately.  I know those claims to be false.  Delaware law requires the Department of Elections to conduct hand audits of paper ballots after each election.  *See* 15 *Del. C.* § 5012A. Through these audits, the Department of Elections has confirmed that Delaware's electronic ballot tabulation was accurate.  Nonetheless, the Department consistently fields questions from the public about the accuracy of our ballot tabulation.

15

44.     Regardless of how Delaware interacts with DHS's State Citizenship List, the creation of a State Citizenship List risks disenfranchising voters.  Based on my experience, I know that if a citizen is not included on the list—due, for example, to errors in DHS's static immigration information contained in its Systematic Alien Verification for Entitlements (SAVE) system, the federal government's misinterpretation of whether the citizen qualifies as a state resident, or any other error—they may believe they are unable to vote, and could be prosecuted for doing so.  Over my years working in elections, I have seen many situations in which individuals misunderstand voter eligibility requirements and avoid voting or registering to vote as a result.  The Department of Elections has fielded calls from numerous people who are concerned as to their voter eligibility; in each case Department employees devote time to understanding the individual's eligibility and to explaining the situation and the requirements to the individual.  The creation of a new DHS State Citizenship List would be a new source of confusion and concern.

45.     Delaware provides a mail ballot to all eligible voters who choose to vote on an absentee basis for one of the reasons enumerated in code and who request an absentee ballot by mail.  *See* 15 *Del. C.* § 5502.  My office intends to comply with these state legal requirements in administering upcoming federal elections.

46.     It is my understanding that Section 3(b) of the EO directs the United States Postal Service ("USPS") to initiate a rulemaking that, among other things, would allow States to provide lists of mail voters to USPS 60 days before an election, require the creation of a "Mail-In and Absentee Participation List" ("USPS Mail Ballot List") and prohibit USPS from delivering mail ballots sent by individuals not on the USPS Mail Ballot List.  It is also my understanding that Delaware can "routinely supplement and provide suggested modifications or amendments"

16

to the USPS Mail Ballot List, but USPS is not required to accept any changes provided by Delaware.

47.    As soon as our team had time to digest the contents of the EO, I began considering what near-term actions the EO would necessitate from my office.

48.    If the USPS were to implement Section 3(b) of the EO, to comply with Delaware law requiring voters who validly request an absentee ballot to receive a mail ballot, the Department of Elections would need to send a list to USPS of voters to whom we intend to send a mail-in or absentee ballot ("State Mail Ballot List").  *Compare* 15 *Del. C.* § 5504 *with* EO § 3(b).  If the USPS were to implement Section 3(b) of the EO, failing to provide this list to USPS would risk USPS making it more difficult for eligible voters to cast their ballots in the manner provided for under Delaware law.

49.    As discussed throughout this declaration, Delaware's use of the mail for elections means that I must plan for how to align Delaware's administration of mail voting with the EO, in case the USPS implements Section 3(b) of the EO.

50.    Aligning Delaware's administration of mail voting with the EO would require Delaware's Department of Elections to expend time and resources to ensure that all permanent absentee voters would be included on the USPS's Mail Ballot List immediately and to ensure that additional absentee voters were added to the USPS's Mail Ballot List as absentee ballot applications were submitted.  This task will be significantly complicated by the influx of registration updates and changes that Delaware's Department of Elections typically receives in the months before the election (which influx I expect will be exacerbated by DHS's State Citizenship List provisions discussed above).

17

51.     The EO directs states, including Delaware to provide the USPS with a list of state citizens who may vote by mail no later than 60 days before the election.  However, voters who are entitled to a mail ballot under Delaware law and federal law would unavoidably be left off any list that Delaware provided to the USPS 60 days in advance of an election.  This is because UOCAVA permits uniformed and overseas voters to request absentee ballots up to 45 days before an election.  52 U.S.C. § 20302(a)(8).  And, under Delaware law, voters may request an absentee ballot up to four days before an election.  *See* 15 *Del. C.* § 5504(b).

52.     In practice, Delaware receives absentee voter applications on a rolling basis in the months and days leading up to an election.  If the restrictions on voting by mail envisioned by the EO were implemented, Delaware would need to develop a system to transmit additions to the USPS's Mail Ballot List on a rolling basis, as the Department received absentee voter applications.  Although the EO indicates that States will be able to "routinely supplement and provide suggested modifications or amendments" to the USPS Mail Ballot List, USPS is not required to accept our suggestions.  It is also unclear whether the USPS's system would be sufficiently nimble as to update quickly enough to permit changes in line with the deadlines to request an absentee ballot under Delaware law.

53.     After receiving Delaware's absentee voter list, the EO directs the USPS to provide USPS's Mail Ballot List, identifying the voters that the USPS intends to permit to vote by mail to Delaware.  The EO does not specify when USPS will transmit its USPS Mail Ballot List to our office, which could cause substantial complications in itself.

54.     If USPS follows the EO, once Delaware receives the USPS Mail Ballot List, we will have to devote substantial resources to understanding any differences between it and our own list of voters eligible to receive mail ballots.  This will be a difficult task for many of the

18

same reasons set out above with regard to the State Citizenship List, including: the lack of unique identifiers shared by both lists, the potential for slight variations in spelling to wrongly preclude matches, the fluid nature of voter registration rolls in the lead-up to elections, the fluid nature of absentee ballot applications, and administrative challenges inherent to any data-matching process. Accordingly, reviewing any USPS Mail Ballot List will require a significant expenditure of time and resources.

55. If a voter eligible to receive an absentee ballot did not appear on the USPS Mail Ballot List, the Department of Elections would nonetheless remain obligated by state law to facilitate that voter's absentee voting. Fulling that obligation would require the Department to investigate the data issue leading to the voter's improper exclusion from the USPS Mail Ballot List, would require the Department to try to work with the USPS to correct the issue while under substantial time pressure, and could require the Department to seek a court order permitting the Department to mail the ballot regardless of the USPS Mail Ballot List or permitting the Department to use an alternate delivery method for the ballot. The Department would make every effort to avoid disenfranchising eligible Delaware voters.

56. Thus, if USPS implemented the EO's processes, Delaware would be required to expend significant resources to attempt to supplement and amend the USPS Mail Ballot list to encompass every Delawarean who was eligible to vote by absentee ballot and requested to do so. As previously discussed, the type of data reconciliation involved in this effort would include determining proper and secure methods for sending large volumes of confidential data to the USPS. This is true even though the EO instructs that we can only "supplement" and "provide suggested modifications or amendments" to the USPS Mail Ballot List, and USPS is not required to accept them.

19

57.    Even with the best efforts of my office and local elections officials, the challenges of completing a complex data-matching program in a short timeframe and while preparing to administer an election pose a high risk of errors and omissions.

58.    Delaware would incur significant costs to undertake this comparison and verification of the USPS Mail Ballot List.

59.    In addition to the costs, non-monetary burdens, and the risks of disenfranchisement that Delaware voters would face, Delaware would also risk complicity in a violation of the Federal Privacy Act of 1974, if Delaware were to provide any agency of the federal government with a list of Delawareans who intended to exercise their first amendment right to vote by mail.  I am not a lawyer, but I understand there to be protections in the Privacy Act of 1974 against the federal government preparing a system of records tracking citizens' first amendment activity.  Delaware asked for an explanation as to how the state could provide our voter registration list to the federal Department of Justice in a manner compliant with the Privacy Act.  The federal Department of Justice never provided such an explanation with respect to Delaware's voter registration list.  It is unclear to me how Delaware could provide any federal agency, including the USPS, with the records necessary for the process envisioned by Section 3 of the EO without causing a violation of the federal Privacy Act of 1974.  At minimum, Delaware would need to expend substantial legal resources to investigate and address this issue.

60.    If Section 3 is implemented, Delaware will also have to devote significant time, personnel, and money to update training materials for the Department of Elections' staff.  The Department will need additional training materials to specifically detail what steps an employee must take when processing an absentee voter application to add the voter to the USPS's Mail Ballot List.  The training materials will also need to detail the steps to be taken with respect to

voters who appear on Delaware's voter registration list and are eligible to receive a mail ballot under Delaware law, but who do not appear on the USPS Mail Ballot List promptly upon notification by Delaware. This is yet another aspect of the EO's implementation that will necessarily divert Department resources from other important election administration tasks.

61.    [**Public Information and Education**] At the same time my staff is creating the State Mail Ballot List and investigating the accuracy of the USPS Mail Ballot List, they will have to field questions from citizens concerned about their ability to receive or return a mail ballot in the upcoming elections. Thus, a separate impact of the EO's directive concerns the need for a wide-ranging public education campaign to ensure that eligible voters understand the EO's requirements, and how they may impact a citizen's ability to vote by mail.

62.    I estimate that the cost of such a public education effort would likely be substantial, potentially equaling between 50% and 100% of the Department's typical public education campaign surrounding voting in a general election year.

63.    Apart from the time and monetary costs that Section 3's implementation would impose on Delaware, Section 3 also risks voter confusion and disenfranchisement. This inevitable voter confusion is a harm in and of itself and is also a burden on my staff's time. This voter confusion will come at a crucial time shortly before the election, when state and local elections officials are required under Delaware law to send mail ballots to all eligible voters who request to vote by mail for one of the reasons enumerated in Delaware code.

64.    Sending mail ballots in a timely fashion is not only required by state and federal law, but is critical to ensuring that as many eligible Delawareans as possible can exercise their right to vote. In the 2024 General Election more than 40,000 Delawareans voted by mail. This

21

method of voting is particularly important for many Delawareans with disabilities, the elderly, and Delawareans serving in the armed forces.

65.    Errors in the USPS Mail Ballot List would be extremely deleterious because of the potential for voter disenfranchisement.  Hypothetically, a voter could receive a mail ballot from the Department of Elections and complete the mail ballot, but USPS could then refuse or fail to deliver the ballot if the voter was not on the USPS Mail Ballot List.  In that situation, the voter may think that they had voted, when they had not.  The Department of Elections might reasonably assume that the voter had simply abandoned the voter's plan to vote by mail.

66.    In my experience administering elections, changes to election procedures in the time immediately preceding an election can cause voter confusion.  The EO's complicated requirements will likely lead some eligible voters to misunderstand whether they are able to use a mail ballot.  Some eligible voters will determine that the added requirements make voting too confusing to be worthwhile.  The result of this confusion will be that fewer eligible voters decide to cast a ballot.

67.    There are several additional inherent problems posed by the deadlines outlined above and the requirement to compare static lists (the State Citizenship List, USPS Mail Ballot List, and State Mail Ballot List) with a constantly evolving list (the statewide voter registration list and the list of eligible voters who have requested absentee ballots).

68.    First, between the day DHS's State Citizenship List is sent and the third Monday before Election Day (the last day a voter may register under Delaware law) there will inevitably be a significant number of individuals who become eligible to register to vote in Delaware but are not captured on the State Citizenship List.  They may, for example, have moved to Delaware or become a naturalized citizen after the list was sent.  Regarding voters who have moved, I am

22

not aware of any legal requirement that voters regularly report change of residential address to the Federal Government.

69. Second, the EO creates concurrent deadlines for Delaware to receive DHS's State Citizenship List and for Delaware to transmit Delaware's State Mail Ballot List to USPS. The EO directs the USPS to begin preparing its Mail Ballot List as soon as it receives Delaware's State Mail Ballot List. This cadence will prevent Delaware from identifying and correcting errors in DHS's State Citizenship List before the USPS takes up the lists to begin preparing USPS's Mail Ballot List. As a result, if this process proceeds, Delaware could be obligated to investigate and correct the same errors in federal data twice – once in DHS's State Citizenship List and once in USPS's Mail Ballot List.

70. Third, Delaware law requires all ballots to be received by the close of the polls on election day for the ballot to be counted. *See* 15 *Del. C.* § 5609A(b). As a result, it is particularly important that Delaware's Department of Elections provide absentee ballots in a timely manner. Any delays in the delivery of absentee ballots resulting from a need to correct either or both of DHS's State Citizenship List or USPS's Mail Ballot List could disenfranchise a voter, even if the issues were eventually resolved.

71. Based on my experience, the Department of Elections would need additional staff to reconcile and correct errors in the USPS Mail Ballot List. Delaware's most recent budget process did not include the full amount of funds requested by the Department of Elections to meet pre-existing needs. It seems unlikely that the state of Delaware could fund additional positions to address the increased workload that the EO would impose.

72. Any time spent by current staff on implementing the EO would divert time and attention from other critical election preparation in the days leading up to the election, my

23

office's busiest time.  Our staff is already at capacity and dedicated to routine tasks and special projects that ensure Delaware's elections run smoothly and every eligible Delawarean can exercise their right to vote.  This work becomes more voluminous, significant, and urgent in the months leading up to the election, when we must answer an increasing volume of questions and handle tasks related to, for example, campaign finance reporting, logic and accuracy testing, and voter challenges.

73.    Each of these tasks and costs will divert scarce resources from other important election administration needs.

74.    Section 3(b)(i) of the EO directs the USPS to develop and implement uniform standards for mail ballot envelopes.  If the EO were permitted to proceed, this provision would impose material cost and risk on Delaware.

75.    As a threshold matter, Delaware's Department of Elections already possesses mail ballot envelopes for the 2026 federal election cycle.  Delaware's Department of Elections already submitted these envelopes for mail piece design analysis by the USPS and has already obtained approval for these current envelopes from the USPS.  Ordering different mail ballot envelopes to use for the 2026 federal election cycle would cost additional funds and require duplicate investment of time.  The Department does not have funds budgeted for such a purchase.

76.    Delaware's Department of Elections does not currently use piece-level Intelligent Mail barcodes on mail ballot envelopes, as the EO mandates.  Instead, the Department uses general Intelligent Mail barcodes incorporating a Service Type ID ("STID"), but not tying individual pieces of mail to specific voters.  The Service Type ID technology used by Delaware's Department of Elections allows the Department to track the numbers of mail ballots processed by USPS and allows the USPS to identify the mail as election mail electronically.  USPS charges

24

senders substantially more to use piece-level Intelligent Mail barcodes than USPS charges for Service Type ID barcodes.

77.    Delaware's Department of Elections is able to identify the voter associated with each mail ballot because Delaware law voters must print their names on the outside of their absentee mail envelopes.  Delaware's Department of Elections also uses codes printed by the Department on the absentee ballots and the Department's absentee ballot tracking systems to verify when a voter requests an absentee ballot, when the ballot is mailed, when the ballot is returned, and when the ballot is confirmed to be valid for inclusion in tabulation.  Switching from the Delaware Department of Elections' current system to Intelligent Mail barcodes would materially increase the cost of absentee voting to the Department of Elections, require the Department to design and obtain new envelopes, and would also require the Department to adjust the software that the Department currently uses to track absentee ballots.

78.    Delaware law explicitly specifies a variety of requirements for all mail ballot envelopes.  *See 15 Del. C*. § 5605A.  Delaware law also states that "[t]he Department may not purchase, use, have printed upon, mail, or deliver any envelope for use under this chapter unless the type or kind of the envelope has first been approved personally by the Attorney General." *See Id*. at § 5614A.  Delaware's Department of Elections complies with these requirements every time that we consider an update to our ballot envelope design.  Implementing an update to Delaware's mail ballot envelope design typically takes multiple months and requires the involvement of Delaware's Attorney General.  Unless USPS's rulemaking concerning mail ballot envelopes permitted Delaware to continue to use our currently approved envelopes, we would need to repeat the design and approval process required by Delaware law before we could use new envelopes mandated by USPS.

25

79.     Given the specificity of Delaware law, it is possible that the standards USPS ultimately adopts for mail ballot envelopes may be inconsistent with the standards set by Delaware law.  In that case, the Department of Elections would need to seek a legislative amendment of Delaware law or would need to seek judicial intervention in order to mail ballots. Completing that process would be excessively difficult in the limited time period before the Department must begin mailing ballots to UOCAVA voters in advance of the primary election for 2026.

80.     Separately, I am concerned about the length of time it may take for USPS to conduct ballot design review for thousands of jurisdictions.  While Delaware uses one mail ballot envelope design state-wide, that is not the case for most states.  The EO would obligate the USPS to review the various mail ballot designs in use in all of these jurisdictions.  Waiting on USPS to approve ballot design has the potential to seriously disrupt and delay carefully timed steps necessary to obtain Delaware Attorney General approval and then to deliver mail ballots to Delaware voters.  Managing the fallout from such a delay would divert critical time and money from other elections administration duties to expedite other steps in the mail ballot process, educate the public about the status of mail ballots, and otherwise mitigate the harm from delays to the process.

81.     It is my understanding that Section 5 of the EO directs that "States and localities should preserve, for a 5-year period, all records and materials—excluding ballots cast— evidencing voter participation in any federal election (e.g., ballot envelopes, regardless of carrier)."  Existing federal law requires preservation of voting materials for 22 months following an election, and preservation of records concerning voter roll maintenance for two years.  52 U.S.C. §§ 20507(i)(1), 20701.  Delaware law and regulation also set timelines for the

26

preservation and destruction of voting materials in federal elections.  *See e.g.,* 15 *Del. C.* § 4980(b) (requiring voting materials to remain locked and undisturbed for 22 months after election day).

82.    Compliance with a five-year document preservation standard for election materials would impose significant compliance, storage, and other costs on Delaware's Department of Elections.

83.    For example, current document retention requires Delaware's Department of Elections to implement document destruction guidelines, to coordinate those guidelines with Delaware's Archives for consistency with Delaware Archives' retention schedules, to obtain warehouse space for physical records, and to maintain digital storage space for electronic records.  Increasing retention periods to 60 months would substantially increase the amount of time and space devoted by the Department of Elections to retaining records.

84.    Additionally, under current federal law, Delaware may begin properly disposing of certain retained materials from the 2024 primary elections in July 2026 and the 2024 general election in August 2026.  The EO prevents Delaware from undertaking these actions as to some, but not all, of the retained materials, and requires Delaware to incur further management, storage, and security costs instead.

85.    More than doubling the required retention time for some (but not *all*) voting materials would increase these burdens and costs significantly.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 21, 2026, at Wilmington Delaware

Anthony J. Albence
State Election Commissioner
Delaware Department of Elections

28