IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

STATE OF CALIFORNIA; et al.,

$\qquad$ *Plaintiffs,*

v.

DONALD J. TRUMP, in his official
capacity as President of the United States; et
al.,

$\qquad$ *Defendants.*

Case No. 1:26-cv-11581

DECLARATION OF ALICE P. MILLER

I, Alice P. Miller, declare as follows:

1.    I am a resident of Maryland.  I am over the age of eighteen.  I am familiar with the information in the statements set forth below through personal knowledge, consultation with staff of the District of Columbia Board of Elections ("DCBOE," or the "Board"), and from my review of relevant documents and information.  If called as a witness, I could testify competently to the matters set forth below.

2.    I serve as the Senior Policy Advisor for the Board.  In this capacity, I support the Board's Executive Director in her capacity as the Chief Election Official in the District of Columbia.  I have served as DCBOE's Senior Policy Advisor for approximately five years.  I previously served as the Board's Executive Director (for approximately 30 years, not including a break in continuous service during which I served as the Chief Operations Officer of the Election Assistance Commission), and as the Board's General Counsel.

3.    DCBOE is responsible for administering federal and local elections in the District of Columbia.  The Board's mission is to enfranchise eligible residents, conduct elections, and

1

assure the integrity of the electoral process in the District of Columbia. DCBOE executes this mandate by operating the District of Columbia's uniform voter-registration system, administering the ballot access process for candidates and measures, delivering voter information services, maintaining technical systems to support voting and ballot tabulation, and planning, administering, and certifying elections in the District of Columbia. *See generally* D.C. Code § 1-1001.05(a). District of Columbia law specifically charges the Board with "[t]ak[ing] whatever action is necessary and appropriate to actively locate, identify, and register qualified voters." *Id.* § 1-1001.05(a)(2).

4.      DCBOE's Executive Director serves as the District of Columbia's Chief Election Official and is responsible for administering the Board's operations, including maintaining voter records, managing data processing systems, and preparing for and conducting elections. *See* D.C. Code § 1-1001.05(a), (e)(1)(A); D.C. Mun. Reg. § 3-100.5.

5.      In my role as Senior Policy Advisor, I am responsible for assisting the Executive Director in her mission by generally overseeing the election operations and policy implementation across the agency and working with senior management to ensure that all programs comply with District and federal law.

6.      I am familiar with the Executive Order published on March 31, 2026, entitled "Ensuring Citizenship Verification and Integrity in Federal Elections" (the EO). Sections 2 through 5 of the EO have caused confusion about how the District of Columbia will administer upcoming elections, and I expect that the EO will impose significant costs on the District.

7.      Section 2(a) of the EO directs the Department of Homeland Security ("DHS") to create a "State Citizenship List" for each State, which will include "individuals confirmed to be United States citizens who will be above the age of 18 at the time of an upcoming Federal

election and who maintain a residence in the subject State." Section 2(a) requires DHS to send these lists "no fewer than 60 days before each regularly scheduled Federal election, or promptly upon request by a State in connection with any special Federal election."

8. Preparations for the November 3, 2026, general election are already underway, and DCBOE will be required to take action to address and mitigate the likely impacts of Section 2(a) on DCBOE's mission and operations. In my judgment, these efforts will divert time and attention from other critical election preparations.

9. The District of Columbia's voter registration list is not static in the weeks prior to an election and changes up to and on Election Day as individuals are removed from and added to the list.

10. As permitted by the National Voter Registration Act, DCBOE lawfully removes voters on an individual basis where appropriate in the days and weeks preceding an election, such as when a voter requests that his or her registration be canceled. D.C. Code § 1-1001.07(k)(1); *see* 52 U.S.C. § 20507(c)(2).

11. District of Columbia law allows qualified individuals to register to vote up to twenty-one days before Election Day, as well as in person during early voting and on Election Day. D.C. Code § 1-1001.07(g).

12. The Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA) allows uniformed and overseas voters to register for a federal election if their registration application is received at least thirty days before that election. 52 U.S.C. § 20302(a)(2). Consistent with UOCAVA, the District of Columbia offers uniformed and overseas voters the opportunity to register up to twenty-one days before an election. D.C. Code § 1-1001.07(g); *id.* § 1-1061.06(a)–(b).

13. In short, registrants are continuously being added to, updated on, and removed from the District of Columbia's voter registration list through Election Day, as required by federal and District of Columbia law.

14. I have considered how the dynamic nature of the District of Columbia's voter registration list will interact with the list created by DHS. Under Section 2(a) of the EO, DHS will share a State Citizenship List with DCBOE by September 4, 2026, for the federal general election taking place on November 3, 2026. Once DCBOE receives the State Citizenship List, the Board will have to devote substantial resources to understanding and addressing any differences between this list and our District-wide voter registration list.

15. The Board will not disenroll voters simply due to their absence from the State Citizenship List. However, for those eligible voters who appear on the District's voter registration list but who are not included on DHS's State Citizenship List, DCBOE will need to investigate the discrepancies pursuant to its mandate to enfranchise eligible residents, *see* D.C. Code § 1-1001.05(a)(2), because voters' absence from the State Citizenship List could effectively disenfranchise them. First, voters who (as contemplated by Section 2(a)) check their status on the State Citizenship List and learn that their names are not on that list may be deterred from voting because they believe they will be blocked from voting or prosecuted for voting. Second, USPS may rely on the State Citizenship List to determine which voters can receive and transmit mail ballots in response to the EO's emphasis on criminal penalties associated with the distribution of mail ballots to ineligible individuals.

16. Furthermore, in my experience with election administration, changes to registration and election procedures in the time period immediately preceding the election can cause voter confusion. The complicated requirements of the EO will likely lead some

individuals to misunderstand the requirements for registration, or whether they are able to vote in the District of Columbia's elections. Some citizens will determine that the added requirements make registering or voting too confusing to be worthwhile. The result of this confusion will be that fewer eligible voters will successfully register to vote or decide to cast a ballot.

17. Such voter confusion will interfere with DCBOE's mandate to ensure that all eligible voters who wish to vote can do so. It will also impose a burden on DCBOE staff's time, as DCBOE personnel will be responsible for dispelling voter confusion. This voter confusion will come at a crucial time for the Board, shortly before the election, when DCBOE's resources will be particularly stretched.

18. For these reasons, DCBOE will be required to expend significant resources to supplement and amend the federal list as necessary, as it finds errors through its investigation and comparison with the District's voter registration list.

19. Comparing the State Citizenship List to our current voter registration list will be burdensome as it will require linking registrants across the lists. Among other issues, it is doubtful that the State Citizenship List will contain the same unique identifiers as our voter registration list, such that we could perform straightforward matching. In addition, it is inevitable that there will be differences in the files that will make matching difficult, time-consuming, and potentially inaccurate, as people's names, addresses, and other information may vary slightly (*e.g.*, Robert vs. Bob, Apartment #3 vs. Apt. 3).

20. I know from my experience that data matching is a complex process and that significant advance planning and extreme care must be taken when, as in this case, any errors may lead to voter disenfranchisement. DCBOE will also need to find or obtain appropriate and secure methods for sending large volumes of voter data to the federal government when it

identifies discrepancies between the State Citizenship List and DCBOE's voter registration list, and will need to expend time and effort ensuring that such data is appropriately redacted where required in order to protect District residents' sensitive information.

21.    In addition to incurring significant costs to verify and correct the State Citizenship List, DCBOE will also need to devote significant time, personnel, and funds to update training materials for DCBOE personnel, specifically detailing what steps they must take with respect to voters who appear on the District's voter registration list but not on the State Citizenship List. DCBOE will also need to conduct a public education campaign to ensure that eligible voters understand the EO's requirements, and how they may or may not impact a citizen's registration and ability to vote.

22.    Section 2(b) of the EO is also burdensome to DCBOE because it defines voter eligibility in a manner that is not consistent with District of Columbia law.  Section 2(b) of the EO provides that "an individual is 'eligible to vote in a Federal election' if the individual is a citizen of the United States, 18 years of age or older by the date of the upcoming election, and otherwise qualified under the laws of his or her State."  Section 2(b) further provides that the Attorney General "shall prioritize the investigation and, as appropriate, the prosecution of individuals and public or private entities engaged in" distributing "ballots to individuals who are not eligible to vote in a Federal election."  However, District of Columbia law permits an otherwise eligible voter to cast a ballot in a federal primary election if the voter, despite being seventeen years of age, will be eighteen years of age by the time of the next *general* election. *See* D.C. Code § 1-1001.07(a-2).  EO Section 2(b) thus suggests that DCBOE personnel may be investigated and prosecuted for conduct that District law requires.  My office intends to comply

6

with applicable District of Columbia legal requirements, and this issue will require DCBOE to expend additional resources on staff training and public education.

23.    It is my understanding that Section 3(b) of the EO directs the United States Postal Service ("USPS") to initiate a rulemaking that, among other things, would require the creation of a "Mail-In and Absentee Participation List" ("USPS Mail Ballot List"), and would prohibit USPS from delivering mail ballots sent by individuals not on the USPS Mail Ballot List.

24.    Section 3(b) of the EO foresees that, at least sixty days before Election Day, DCBOE would provide a list to USPS of voters to whom DCBOE intends to send a mail-in or absentee ballot ("State Mail Ballot List").  For the 2026 federal general election, that deadline will be September 4, 2026.  Failing to provide this list to USPS would create risk under the EO that USPS will not include District of Columbia voters on the USPS Mail Ballot List, thereby making it more difficult or impossible for eligible voters to cast their ballots by mail.  This risk is damaging to DCBOE's mandate and operations because District of Columbia law establishes voting by mail as an available form of voting that DCBOE must support.  *See* D.C. Code § 1-1001.05(9A)–(10D).  My office intends to comply with these District of Columbia legal requirements.

25.    The District of Columbia's use of the mail for elections, paired with the District's election calendar, mean that DCBOE must plan now for how to align DCBOE's administration of mail voting with the EO.  Section 3(b) will require my office to expend time and resources to ensure that all duly registered qualified voters are included on the State Mail Ballot List, consistent with DCBOE's mandate to enfranchise eligible District of Columbia voters.  This task will be significantly complicated by the influx of registration updates and changes that elections

officials typically receive in the months before the election (and which I expect will be exacerbated by the State Citizenship List provisions discussed above).

26.    The deadline to provide this list to USPS no later than sixty days before the election means that some voters who are entitled to a mail ballot will unavoidably be left off the list.  As discussed above, under District law, voters may register and receive an absentee ballot up to twenty-one days before an election.  D.C. Code § 1-1001.07(g).  Although the EO indicates that States will be able to "routinely supplement and provide suggested modifications or amendments" to the USPS Mail Ballot List, USPS is not required to accept our suggestions.  The EO also does not specify when USPS will transmit its USPS Mail Ballot List to DCBOE, which could cause substantial complications.

27.    Once we receive the USPS Mail Ballot List, we will have to devote substantial resources to understanding any differences between it and our own list of voters eligible to receive mail ballots to ensure that eligible voters may vote by mail, consistent with District of Columbia law.  This will be a difficult task for many of the same reasons set out above with regard to the State Citizenship List, including: the likely lack of unique identifiers shared by both lists, the potential for slight variations in spelling to wrongly preclude matches, the fluid nature of voter registration rolls in the lead-up to elections, and administrative challenges inherent in any data-matching process.  Accordingly, reviewing the USPS Mail Ballot List will require a significant expenditure of time and resources.  As with the State Citizenship List, we would also need to expend resources to ensure that we can determine and employ proper and secure methods for sending large volumes of confidential data to the USPS, and that any information provided to USPS is appropriately redacted to protect the sensitive information of the District's residents.

28.     Even with the best efforts of my office and local elections officials, the challenges of completing a complex data-matching program in a short timeframe and while preparing to administer an election pose a high risk of errors and omissions.

29.     If Section 3 is implemented, DCBOE will also have to devote significant time, personnel, and money to update training materials for DCBOE staff.  Those materials would have to specifically detail what steps DCBOE personnel must take with respect to voters who appear on the District of Columbia's voter registration list and are eligible to receive a mail ballot under District law, but who do not appear on the USPS Mail Ballot List.  And as with the State Citizenship List, training on how to address discrepancies with the USPS Mail Ballot List in light of District of Columbia and federal law will be particularly important given that Section 2(b) and Section 5 call for the investigation and potential prosecution of any officials who "issue Federal ballots to individuals not eligible to vote in a Federal election."

30.     At the same time that DCBOE is creating the State Mail Ballot List and performing investigations into the accuracy of the USPS Mail Ballot List, DCBOE staff will likely have to field more questions from citizens concerned about their ability to receive or return a mail ballot in the upcoming elections.  Thus, just as with Section 2, the EO's directives in Section 3 would create need for a wide-ranging public education campaign to ensure that eligible voters understand the EO's requirements, and how they may impact residents' ability to vote by mail.

31.     Apart from the time and monetary costs that Section 3's implementation would impose on the District of Columbia, Section 3 also risks voter confusion and disenfranchisement. This disenfranchisement is a harm in and of itself, and voter confusion imposes a significant

burden on DCBOE staff's time and resources during the weeks prior to an election, when Board staff have limited or no capacity for additional duties.

32.     Errors in the USPS Mail Ballot List create a particularly acute risk of voter disenfranchisement.  For example, consider an eligible voter who is on the State Mail Ballot List but not on the USPS Mail Ballot List.  Under the EO, they are likely to receive a mail ballot from DCBOE that USPS will later refuse to return to the local elections official.  In that situation, the voter may think that they have voted, but they have not.  Nor would the voter necessarily know to cancel that ballot and vote in person, given that the EO does not charge USPS with notifying the voter.  A voter may also be concerned about casting two ballots, which is itself a violation of District law, and choose not to vote.  Consistent with its mandate, DCBOE must take measures to avoid this kind of voter disenfranchisement.  These concerns are particularly significant in the District of Columbia, where a significant proportion of voters rely on the mail to transmit their ballots.  In the 2024 general election, 51.1% of District of Columbia voters voted by mail.

33.     More generally, and as outlined above, there are inherent problems involved in comparing the static lists that the EO foresees (the State Citizenship List, USPS Mail Ballot List, and State Mail Ballot List) with a constantly evolving list (the District's voter registration list). For example, between the day the State Citizenship List is sent and twenty-one days before Election Day (the last day a voter may register and receive a mail ballot under District of Columbia law) there will inevitably be a significant number of individuals who become eligible but are not captured on the State Citizenship List.  Such individuals may, for example, have moved to the District of Columbia after the list was sent but still before thirty days prior to the election, or may have become a naturalized citizen after the list was sent.  With respect to voters

10

who may have moved, I am not aware of any general legal requirement that voters regularly report change of residential address to the federal government.

34.     These concerns are only heightened by the timelines set forth in the EO.  The EO requires DHS to send the State Citizenship List to States on the same day—sixty days before the election—as the States are required to send their State Mail Ballot List to USPS.  Comparing the statewide voter registration list and the State Citizenship List to see who is eligible according to both lists in one day, or even a few hours, is not possible to do with any meaningful degree of accuracy, no matter how many resources DCBOE dedicates to the project.

35.     Section 5 of the EO directs that "States and localities should preserve, for a 5-year period, all records and materials—excluding ballots cast—evidencing voter participation in any federal election (e.g., ballot envelopes, regardless of carrier)."  Existing federal law requires preservation of voting materials for only twenty-two months following an election, and preservation of records concerning voter roll maintenance for two years.  52 U.S.C. §§ 20507(i)(1), 20701.

36.     Compliance with a five-year document-preservation standard for election materials would impose additional compliance and storage costs on DCBOE.  For example, current document retention policies require DCBOE to store absentee voting records (other than reports) and election result records for two years.  Extending this time period to five years would require DCBOE to modify its retention schedule and locate or secure additional space to store more physical records, and would require additional staff training to ensure compliance with the new requirements.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 21, 2026, at Washington, District of Columbia.

_____
Alice P. Miller
Senior Policy Advisor
District of Columbia Board of Elections