**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

STATE OF CALIFORNIA; et al.,

                      *Plaintiffs,*

v.

DONALD J. TRUMP, in his official capacity as President of the United States; et al.,

                      *Defendants.*

Case No. 1:26-cv-11581

## DECLARATION OF JULIE L. FLYNN

       I, Julie L. Flynn, declare as follows:

1.      I am a resident of the State of Maine. I am over the age of 18. I am familiar with the information in the statements set forth below either through personal knowledge, consultation with the Maine Department of the Secretary of State staff, or from my review of relevant documents and information. If called as a witness, I could and would testify competently to the matters set forth below.

2.      I am a Deputy Secretary of State in Maine. I am responsible for overseeing the Bureau of Corporations, Elections and Commissions, which is a part of the Department of the Secretary of State. I work for the Maine Secretary of State and support her in her official capacity as the Chief Officer of Elections for the State of Maine. In my role, I assist the Secretary in the execution and enforcement of all state and federal laws relating to elections.

3.      I have served in my current role since February of 1999. I served as Director of the same Bureau, including the Elections Division, from March 1995 until I was appointed Deputy. The Elections Division is comprised of 13 staff members, including a Bureau Director,

1

a Director of the Division of Election Administration and an Assistant Director of Elections and an Assistant Director of Voter Registration, all of whom work closely with me.

4.      Maine and its municipal subdivisions are responsible for administering federal elections in Maine.  This responsibility encompasses voter registration, maintaining and updating voter rolls, issuing ballots to registered voters, tabulating votes, and certifying results in all elections for federal office, among numerous other tasks.  The Department of the Secretary of State is responsible for various election-related tasks, including maintaining Maine's central voter registration system; operating Maine's online voter registration system and automatic voter registration system; designing, printing, and distributing ballots; issuing, receiving, and counting ballots for all uniformed and overseas voters; tabulating and certifying election results; training municipal election officials; and conducting recounts.

5.      The Secretary of State is Maine's chief elections official, responsible for executing and overseeing compliance with all state and federal law relating to federal, state, and county elections within the state.  The Elections Division within the Department of the Secretary of State is responsible for implementing the Secretary of State's responsibilities with regard to elections, including enforcing laws and providing technical information to the public and other parties.  Unlike most states outside New England, which administer elections at the county level, Maine elections are administered at the municipal level.  The Elections Division works closely with Maine's approximately 487 municipalities that conduct their own elections to train local elections officials, to assist them in administering county, state and federal elections, and to ensure that they are complying with state and federal election laws.

6.      I oversee all aspects of Maine's county, state, and federal elections.  I am responsible for overseeing the development, operation, and maintenance of Maine's central voter

2

registration application software and database (CVR), including ensuring that it can facilitate compliance with state and federal voter registration laws.  I am responsible for overseeing Maine's compliance with the National Voter Registration Act (NVRA) and the Help America Vote Act (HAVA), including the administration of grants under HAVA and the conduct of the statewide voter list maintenance program required by the NVRA.  As part of that work, I oversee the Elections Division's periodic postcard mailings under the NVRA to confirm voters' residence, as well as its work with the Electronic Registration Information Center (ERIC), which allows Maine to match its CVR data with data from other sources, including other member states, in order to maintain the accuracy and currency of its voter list.  I also oversee trainings and communications with municipal election officials to ensure they are complying with state and federal election law.  Given the small size of the Elections Division, I frequently work directly with individual municipal clerks and registrars to resolve problems or issues that they experience in the administration of elections.  And I oversee registrations and voting under the Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA), which in Maine is handled centrally by the Elections Division.

7.    I am familiar with the Executive Order published on March 31, 2026, entitled "Ensuring Citizenship Verification and Integrity in Federal Elections" (the "EO").  Sections 2 through 5 of the EO (collectively, the "Challenged Provisions") have already caused considerable harm, confusion, fear, and disruption in Maine election administration, and will impose unrecoverable costs on Maine.

8.    Following issuance of the EO, members of the public have contacted the Department of Secretary of State to express concern about the EO's impact on upcoming elections.

3

9.      It is my understanding that Section 2(a) of the EO directs the Department of Homeland Security ("DHS") to create a "State Citizenship List" for each State, which will include "individuals confirmed to be United States citizens who will be above the age of 18 at the time of an upcoming Federal election and who maintain a residence in the subject State."  It is also my understanding that DHS will send these lists "no fewer than 60 days before each regularly scheduled Federal election, or promptly upon request by a State in connection with any special Federal election."  This would mean that DHS will send this list by Friday, September 4, 2026, for the federal general election taking place on November 3, 2026.

10.     Section 2 requires immediate action from me and my team in the Elections Division to understand how it interacts with Maine's statewide voter registration list, and to coordinate with other state and local agencies across Maine.  Our efforts to address the changes and impacts of the EO will divert time and attention from other critical election preparations. The Elections Division is currently in the midst of preparations for Maine's June 9, 2026 State primary election, including designing hundreds of ballot forms for the various federal, state, and county races and preparing to transmit UOCAVA ballots to uniformed and overseas voters.  We are simultaneously developing our plan for administering the November 2026 general election. The Elections Division is leanly staffed and has no management-level staff available that could divert their attention to addressing the many technical, logistical, and policy issues raised by the EO without compromising its other vital work.

11.     My office has a continuing obligation, together with municipal registrars, to perform regular list maintenance, as required under the National Voter Registration Act ("NVRA"), Help America Vote Act ("HAVA"), and Maine state law.  This includes sending notices to voters who may have moved, identifying duplicates on the statewide voter registration

4

list, and cancelling the registration of those who have died.  In order to ensure that list-maintenance is performed in a uniform and nondiscriminatory manner, as required by the NVRA, municipalities generally perform routine day-to-day list maintenance tasks, such as updating individual voter records based on applications received from the voters and change-of-address cards received from the Bureau of Motor Vehicles, while the Elections Division takes responsibility for more labor-intensive maintenance projects such as large-scale NVRA mailings and data-matching through ERIC.

12.    Additionally, my office will need to continue to register those who are eligible to vote in Maine.  Maine allows qualified individuals to register through the mail or online up to 21 days before Election Day, through automatic voter registration at the Bureau of Motor Vehicles up to 7 days before Election Day, and in person through the close of polls on Election Day.  21-A M.R.S. § 121-A; 52 U.S.C. § 20507(a)(1) (requiring States to permit registration up to 30 days before a federal election).  Maine citizens can register to vote online, at their town office or city hall, at various state social service agencies, through Maine's Bureau of Motor Vehicles when they submit sufficient information of their voter qualifications (including citizenship) through their transaction, and at the polls on Election Day.  To register to vote in federal elections, individuals must verify their identity by providing a valid Maine drivers' license or nondriver identification card number, a valid partial Social Security number, or documentary proof of identity, and they must also attest to their citizenship and other qualifications to vote, subject to criminal penalty for false statements.

13.    In compliance with the Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA), Maine allows uniformed and overseas voters to register for a federal election if their registration application is received at least 30 days before that election.  52 U.S.C.

§§ 20302(a)(2).  Under Maine law, a uniformed or overseas voter may register or enroll at any time prior to noon on the day before election day.  21-A M.R.S.A. § 777-A.

14.     In compliance with the NVRA "quiet period" for voter registration, Maine does not systematically remove voters from the rolls during the 90 days prior to a federal election unless a statutory exception applies.  *See* 52 U.S.C. §§ 20507(c)(2)(A), 3(A)-(B), 4(A).  Maine does, however, lawfully remove voters on an individual basis where appropriate, such as when a voter requests that his or her registration be canceled, or either the Elections Division or the towns receive a death notice for a person confirmed to be a voter in the jurisdiction.

15.     In sum, Maine's statewide voter registration list changes up to and on Election Day.  Registrants are constantly being added, updated, and removed as required (and limited) by federal and state law, and this will continue through the 2026 election and beyond.

16.     I have considered how this dynamic statewide voter registration list will intersect with the list created by DHS.  As noted above, pursuant to Section 2(a) of the EO, DHS will share a State Citizenship List by September 4, 2026.  The EO permits the state "to routinely supplement and provide suggested modifications or amendments to the State Citizenship List transmitted thereto."  The EO does not require DHS to accept any of these state supplements, modifications, or amendments to the State Citizenship List.

17.     Once we receive the State Citizenship List, we will have to devote substantial resources to understanding any differences between it and our current statewide voter registration list.  As a baseline matter, comparing the State Citizenship List to our current statewide voter registration list will necessitate linking registrants across the lists.  This will be difficult, as it is extremely doubtful that the State Citizenship List will contain the same unique identifiers as our statewide voter registration list, such that we could perform straightforward matching.

6

Registrants are currently asked to provide their Maine drivers' license number or non-driver identification card number as their unique identifier if they have one.  Federal agencies generally lack access to these numbers and so the State Citizenship List will presumably not include these numbers.  It is thus inevitable that there will be differences in the files that will make matching difficult, time-consuming, and potentially inaccurate, as people's names, addresses, and other information may vary slightly (*e.g.*, Robert vs. Bob, Apartment #3 vs. Apt. 3).  I know from my experience that data matching is a complex process and extreme care must be taken when the consequences of errors may lead to voter disenfranchisement.  And because Maine will receive the State Citizenship List so close to the election, the Elections Division must begin planning for all of this now.

18.    For eligible voters who appear on the statewide voter registration list but not the State Citizenship List, the Elections Division will need to investigate further pursuant to our obligation to ensure that eligible voters are able to vote.  Even though Maine will not disenroll voters simply due to their absence from the State Citizenship List, the List could disenfranchise voters in multiple ways.  First, voters who check their status on the State Citizenship List as contemplated by Section 2(a) and see that they are not listed may be deterred from voting because they believe they will be blocked from voting or prosecuted, especially if DHS does not timely accept their corrections.  Second, USPS may rely on the State Citizenship List to determine which voters can receive and transmit mail ballots in response to the EO's emphasis on criminal penalties associated with the distribution of mail ballots to ineligible individuals.  EO §§ 2(b), 3(a), 5.  Additionally, if the State Citizenship List is publicly accessible, local elections workers may misunderstand their legal obligations and refuse to provide a ballot to eligible voters missing from the State Citizenship List based on their belief that the voters are

7

ineligible.  These are all risks that Maine cannot accept.  We must make every effort to avoid disenfranchising eligible Maine residents.

19.     Accordingly, in compliance with Maine's obligation to protect the right to vote, Maine would make all possible efforts within existing staffing and resource constraints to attempt to supplement and amend the federal list as necessary, as errors were found through our comparison and investigation.  This includes determining proper and secure methods for sending large volumes of confidential data to the federal government.  However, even if we are able to quickly offer all necessary corrections, the EO does not require DHS to accept the State's "suggested modifications or amendments."  EO § 2(a).

20.     Maine would incur significant opportunity costs to undertake this comparison and verification of the State Citizenship List.  As noted above, the Elections Division is leanly staffed and lacks the spare capacity that would be needed for such a project.  Its existing budget and appropriations contain little headroom and certainly not enough to hire additional staff to work on such a project.  My office has significant experience with data-matching tasks, which we perform in contexts that include NVRA list-maintenance and review of referendum petitions. Even with experienced staff, these tasks are often extremely time- and labor-intensive and often require an "all-hands-on-deck" approach when significant time constraints are involved, as they would be here.  The EO provides no funding, so paying for these costs will have to come from devoting fewer resources to our office's other pressing responsibilities, such as preparing for the primary and general elections.

21.     The Elections Division is responsible for providing training on election administration to all of Maine's 487 municipalities.  See 21-A M.R.S. § 505(7-A).  The Elections Division also provides frequent memos to municipal elections officials on election

8

administration issues, including a series of memos before each election reminding municipal officials of their responsibilities and addressing any unique issues that might arise in the context of that election. Additionally, the Elections Division receives phone calls and emails from municipal officials seeking assistance with specific compliance issues as they arise. The Elections Division also provides periodic in-person and virtual trainings for municipal clerks and registrars on their election responsibilities and other matters.

22.     If Section 2 is implemented, Maine will have to devote significant time and labor to update training materials for local election officials and their staff, specifically detailing what steps they must take with respect to voters who appear on Maine's voter registration list but not on the State Citizenship List. This is yet another aspect of the EO's implementation that will require significant resources. As noted above, the Elections Division's staff is generally dedicated to essential election administration tasks through the general election, and they lack the spare capacity that would be needed to update training materials to implement the EO. Its existing budget and appropriations contain little headroom and certainly not enough to hire additional staff to work on tasks related to implementing the EO.

23.     I anticipate that in addition to formal training materials, my office will need to allocate significant resources to responding directly to local election officials, given the threat of criminal prosecution in Section 2 of the EO. Currently, the Elections Division maintains a telephone line that local election officials may call with general questions. The Elections Division does not have staff dedicated solely to answering the telephone line or otherwise working directly with local election officials. Any increase in questions from local election officials about the EO would, therefore, necessarily interrupt staff and divert their attention from other critical election administration efforts.

24.     Additionally, the confusion created by the EO, particularly when combined with the threat of criminal prosecution, could lead local elections officials to resign from their positions.  An increase in vacancies or turnover in local election officials would likely increase the level of support Elections Division staff must provide municipalities and, in the process, further strain Elections Division resources.

25.     At the same time my staff is performing investigations into the accuracy of the State Citizenship List, they will have to conduct a wide-ranging public education campaign to ensure that eligible voters understand the EO's requirements, and how they may impact a citizen's registration and ability to vote.  For example, my staff will have to prepare and distribute training materials guiding citizens through accessing and correcting their individual records on the State Citizenship List under section 2(a).  We will also need to field questions from registrants concerned about their voter registration status and generally confused about the process and qualifications to vote in Maine elections.

26.     As noted above, the Elections Division has a limited budget.  Any significant paid advertising campaign would likely exceed available resources or require the Elections Division to divert its limited public awareness campaigns away from providing information about critical topics like polling locations and voter registration.  As a result, the Elections Division would likely need to rely heavily on earned media and outreach efforts by existing staff for such a campaign, which would both burden staff and limit the campaign's reach.  As noted above, existing staff lack the spare capacity that would be needed for such a project, and the Elections Division lacks the budget and appropriations to hire additional staff to work on such a project.

27.     In my experience administering elections, changes to registration and election procedures in the time immediately preceding the election can cause voter confusion.  The

10

complicated requirements of the EO will likely lead some citizens to misunderstand the requirements for registration, or whether they are able to vote in Maine's elections. Some citizens will determine that the added requirements make registering and/or voting too confusing to be worthwhile. For example, a voter may check their individual status on the State Citizenship list, according to the EO. If they are mistakenly not included, they may believe they have no recourse, and choose not to vote, or they may misunderstand the process for correction (despite my office's attempts to provide education), or DHS may not issue a correction in time. The result of this confusion will be that fewer eligible voters successfully register to vote or decide to cast a ballot.

28. This inevitable voter confusion harms Maine because it will disenfranchise voters, interfering with our sovereign interest and state-law obligation to ensure that all eligible voters who want to can cast a vote. It will also impose a burden on my staff's time, as my staff (and the elections staff at the municipalities) will be responsible for dispelling voter confusion to the extent possible. This voter confusion will come at a crucial time, shortly before the election, when local elections officials' resources are particularly stretched.

29. Maine elections officials are required by state law to issue ballots to duly registered voters. 21-A M.R.S.A. § 671 provides that, for in-person voters, the elections clerk "shall" provide the voter with the ballots to which they are entitled once it is confirmed that the voter appears on the incoming voter list. 21-A M.R.S.A. § 753-B similarly provides that the municipal clerk "shall immediately" issue an absentee ballot upon receiving a valid application or once ballots are available. My office intends to comply with these state legal requirements in administering upcoming federal elections.

11

30.     In compliance with UOCAVA, Maine issues ballots to registered voters who request an absentee ballot under that Act at least 45 days before an election.  52 U.S.C. §§20302(a)(1)-(3), (8)(A).  Maine law allows UOCAVA voters to request ballots any time prior to noon on the day before election day.  21-A M.R.S.A. § 781-A.  Ballots can be requested using the federal postcard application or the Secretary's online ballot request system.

31.     It is my understanding that Section 2(b) of the EO instructs the Attorney General to prioritize investigation and prosecution, under a variety of federal statutes, of "State and local officials or any others involved in the administration of Federal elections who issue Federal ballots to individuals not eligible to vote in a Federal election."  I understand that the EO provides that "an individual is 'eligible to vote in a Federal election' if the individual is a citizen of the United States, 18 years of age or older by the date of the upcoming election, and otherwise qualified under the laws of his or her State."  I further understand that Section 5 of the EO encourages referrals to U.S. DOJ of "[e]vidence of violations of existing Federal laws by State or local election officials" and "States or localities," among other parties, "for consideration of investigation or charges."

32.     If EO Section 2 goes into effect, I would be concerned that I, my staff, and Maine elections officials would face federal prosecution if we issued ballots to Maine voters who are not on the State Citizenship List.  I am concerned about the impact of these threats of criminal prosecution on my staff, not because I believe they have violated these provisions, but because the EO increases the amount of pressure and scrutiny on them, including by the public.

33.     The EO's threat of prosecution is significantly exacerbated by the fact that the EO defines voter eligibility in a manner inconsistent with Maine law.  Maine law permits an otherwise eligible voter to cast a ballot in a federal primary election if the voter will be 18 years

12

of age at the time of the general election. 21-A M.R.S. § 111-A. EO Section 2(b) thus directly conflicts with state law, and it threatens Maine elections officials with prosecution for issuing primary ballots to eligible 17-year-old voters. This issue has and will cause significant confusion about the rules applicable to upcoming elections.

34.     The threat of prosecution, particularly amidst confusion and uncertainty about the EO's requirements and the compressed timeline for implementing them, exacerbates the stress and anxiety of state and local elections officials who are already working under immense pressure. We have to work hard to ensure adequate staffing for state and local election positions given the challenging nature of the roles, and I worry that finding adequate staff could become far more difficult if prospective employees fear federal prosecution.

35.     Should the Attorney General initiate any such enforcement actions, the Department of the Secretary of State would be required to divert significant resources not only to respond to such legal action but also to educate the public, with the aim of minimizing voter confusion to the extent possible.

36.     Any such legal proceedings would have severe and adverse consequences for the public's trust in Maine's administration of elections. Public trust in elections is critical for a functioning democracy. Nearly six years after the 2020 election, disproven conspiracy theories continue to undermine confidence in our elections and require the time and attention of state and local elections officials to counter misinformation.

37.     Additionally, the creation of a State Citizenship List may directly disenfranchise voters. Based on my experience, I know that if a citizen is not included on the list—due, for example, to errors in DHS's static immigration information contained in its Systematic Alien Verification for Entitlements (SAVE) system, the federal government's misinterpretation of

13

whether the citizen qualifies as a state resident, or any other error—they may believe they are unable to vote, and could be prosecuted for doing so.  The same is true of eligible 17-year-old voters, considering the express limitations in the EO.  To take one example, the Elections Division staff facilitate voter registration at the U.S. Citizenship and Immigration Services field office for recently naturalized citizens.  These new citizens may not immediately appear on any government list of citizens and may, as a result, may conclude they cannot properly vote even though they are registered and fully eligible.  In addition, unlike most states, Maine law allows incarcerated residents to vote in state and federal elections. If a citizenship list from the federal government did not include citizens who are currently incarcerated, it could disenfranchise an entire population

40.    Based on my experience assisting local election workers, I know that those workers may feel they cannot register or send a ballot to such voters without risking criminal prosecution, despite those voters' fundamental right to vote under state and federal law. Similarly, based on my experience, I know that USPS or other entities involved in the "printing, production, shipment, or distribution of ballots" may believe they cannot provide a ballot to those voters without risking criminal prosecution.

39.    Maine provides a mail ballot to any eligible voter who submits a properly completed application requesting a ballot to be mailed to them.  Maine also offers all voters the option to apply for automatic absentee voter status, in which the voter is automatically sent an absentee ballot for all elections without having to request one.  My office intends to comply with these state legal requirements in administering upcoming federal elections.

40.    It is my understanding that Section 3(b) of the EO directs the United States Postal Service ("USPS") to initiate a rulemaking that, among other things, would allow States to

provide lists of mail voters to USPS 60 days before an election, require the creation of a "Mail-In and Absentee Participation List" ("USPS Mail Ballot List") and prohibit USPS from delivering mail ballots sent by individuals not on the USPS Mail Ballot List.  It is also my understanding that Maine can "routinely supplement and provide suggested modifications or amendments" to the USPS Mail Ballot List, but USPS is not required to accept any changes provided by Maine.

41.     I have considered what near-term actions the EO would necessitate from my office, including preparing to create the State List and check the USPS Mail Ballot List, preparing guidance for the municipalities, involving state agencies and the Governor's Office, building out data analysis infrastructure and cyber security protections, and—as discussed further below—committing additional staff time to responding.

42.     Under Section 3(b) of the EO, in order to comply with state law requiring absentee ballot applicants and those with ongoing absentee voter status to receive a mail ballot, we would need to send to USPS at least 60 days before Election Day a list of voters to whom we intend to send a mail-in or absentee ballot ("State Mail Ballot List").  21-A M.R.S.A. §§ 671(2); 753-A(8); 753-B(1).  For the 2026 federal general election, that deadline will be September 4, 2026.  Failing to provide this list to USPS would pose an unacceptable risk under the EO that USPS will not include absentee voters on the USPS Mail Ballot List, thereby making it more difficult or impossible for eligible voters to cast their ballots.

43.     As discussed throughout this declaration, Maine's use of the mail for elections, paired with our election calendar, mean that I must plan now for how to align Maine's administration of mail voting with the EO.

44.     Creating the State Mail Ballot List will require my office and local elections officials to expend time and resources to ensure that all voters who timely requested an absentee

15

ballot or have ongoing absentee voter status are included.  This task will be significantly complicated by the influx of registration updates and changes that elections officials typically receive in the months before the election (and which I expect will be exacerbated by the State Citizenship List provisions discussed above).

45.    The deadline to provide this list to USPS no later than 60 days before the election means that most Maine voters who are entitled to a mail ballot under state and federal law will unavoidably be left off the list.  UOCAVA permits uniformed and overseas voters to request absentee ballots up to 45 days before an election.  52 U.S.C. § 20302(a)(8).  Under Maine law, voters may generally request an absentee ballot up to 3 business days before Election Day (and in some exceptional cases, even closer to Election Day).  21-A M.R.S.A. § 753-B(2)(D).  What is more, Maine law forbids municipal clerks from furnishing general election absentee ballot applications more than 3 months from election day or primary election absentee ballot applications more than 2 months from election day.  21-A M.R.S.A. § 753-A.  Thus, for primary elections in particular, Maine would likely be able to identify very few voters who had filed absentee ballot applications by the EO's deadline.  Although the EO indicates that States will be able to "routinely supplement and provide suggested modifications or amendments" to the USPS Mail Ballot List, USPS is not required to accept our suggestions.  The EO also does not specify when USPS will transmit its USPS Mail Ballot List to our office, which could cause substantial complications.

46.    Once we receive the USPS Mail Ballot List, we will have to devote substantial resources to understanding any differences between it and our own list of voters eligible to receive mail ballots.  This will be a difficult task for many of the same reasons set out above with regard to the State Citizenship List, including: the lack of unique identifiers shared by both lists,

16

the potential for slight variations in spelling to wrongly preclude matches, the fluid nature of voter registration rolls in the lead-up to elections, and administrative challenges inherent to any data-matching process. Accordingly, reviewing the USPS Mail Ballot List will require a significant expenditure of time and resources that the Elections Division and its staff do not have.

47. For citizens who appear on the statewide voter registration list and are eligible to receive a mail ballot under Maine law but do not appear on the USPS Mail Ballot List, my office will need to investigate further pursuant to our obligation to ensure that every eligible absentee voter is able to receive a mail ballot as requested. We must make every effort to do so to avoid disenfranchising eligible Maine residents.

48. Maine would expend significant resources to attempt to supplement and amend the USPS Mail Ballot list as necessary, as errors were found through our comparison and investigation. This includes determining proper and secure methods for sending large volumes of confidential data to the USPS. This is true even though the EO instructs that we can only "supplement" and "provide suggested modifications or amendments" to the USPS Mail Ballot List, and USPS is not required to accept them.

49. Even with the best efforts of my office and local elections officials, the challenges of completing a complex data-matching program in a short timeframe and while preparing to administer an election poses the high risk of errors and omissions.

50. Maine would incur significant costs to undertake this comparison and verification of the USPS Mail Ballot List. As I detailed in paragraph 17 above, my experience with data matching indicates that it is extremely time- and labor-intensive and would greatly stretch the capacity of the Elections Division's small staff, taking time away from other essential election preparation work.

17

51.     If Section 3 is implemented, Maine will have to devote significant time, personnel, and money to update training materials for local elections officials and their staff. Those materials would have to specifically detail what steps they must take with respect to voters who appear on Maine's voter registration list and are eligible to receive a mail ballot under Maine law, but who do not appear on the USPS Mail Ballot List.  Existing staff lack the spare capacity that would be needed for such a project, and the Elections Division lacks the budget and appropriations to hire additional staff to work on such a project.

52.     I anticipate that, in addition to formal training materials, my office will need to allocate significant resources to responding directly to local elections officials, given the threat of criminal prosecution in the EO.  As noted above, the Elections Division maintains a telephone line that local election officials may call with general questions.  Elections staff rotate to cover phones for routine queries.  A dramatic increase in calls from clerks and members of the public would create significant interruptions and diversions of staff resources away from the core duties of election administration.

53.     Additionally, the confusion created by the EO, particularly when combined with the threat of criminal prosecution, could lead local elections officials to resign from their positions.  An increase in vacancies or turnover in local election officials would likely increase the level of support Elections Division staff must provide municipalities and, in the process, further strain Elections Division resources.

54.     At the same time my staff is creating the State Mail Ballot List and performing investigations into the accuracy of the USPS Mail Ballot List, they will have to field questions from citizens concerned about their ability to receive or return a mail ballot in the upcoming elections.  Thus, a separate impact of the EO's directive concerns the need for a wide-ranging

public education campaign to ensure that eligible voters understand the EO's requirements, and how they may impact a citizen's ability to vote by mail. This may be particularly true for Maine citizens who have been participating in Maine's ongoing absentee ballot program and are thus accustomed to automatically receiving their absentee ballot.

55.     Any significant paid advertising campaign would likely exceed available resources or require the Elections Division to divert its limited public awareness campaigns away from providing information about critical topics like polling locations and voter registration. As a result, the Elections Division would likely need to rely heavily on earned media and outreach efforts by existing staff for such a campaign, which would both burden staff and limit the campaign's reach. As noted above, existing staff lack the spare capacity that would be needed for such a project, and the Elections Division lacks the budget and appropriations to hire additional staff to work on such a project.

56.     Apart from the time and monetary costs that Section 3's implementation would impose on Maine, Section 3 also risks voter confusion and disenfranchisement. This inevitable voter confusion is a harm in and of itself and is also a burden on my staff's time. This voter confusion will come at a crucial time shortly before the election, when state and local elections officials are required under Maine law to send mail ballots.

57.     Sending mail ballots in a timely fashion is not only required by state and federal law, but is critical to ensuring that as many eligible Maine citizens as possible can exercise their right to vote. For the November 2024 Election, there were 215,643 ballots cast by mail and counted (civilian and UOCAVA) which is 26% of the 842,447 total ballots cast. Maine is one of the most rural states in the nation and also has an unusually high percentage of elderly residents. Given these characteristics, access to absentee voting is especially critical in Maine, as many

19

voters may have difficulty traveling in-person to polling places due to distance, disability, or both.

58.    Errors in the USPS Mail Ballot List would be extremely deleterious because of the potential for voter disenfranchisement.  For example, consider an eligible voter who is on the State Mail Ballot List but not on the USPS Mail Ballot List.  Under the EO, they are likely to receive a mail ballot from their local elections official that USPS will later refuse to return to the local elections official.  In that situation, the voter may think that they have voted, but they have not.  Nor would the voter necessarily know to cancel that ballot and vote in person, given that the EO does not charge USPS with notifying the voter.  A voter may also be concerned about casting two ballots, which is itself a criminal violation, and choose not to vote.  My office must take every measure possible to avoid this kind of voter disenfranchisement.

59.    In my experience administering elections, changes to election procedures in the time immediately preceding an election can cause voter confusion.  The EO's complicated requirements will likely lead some eligible voters to misunderstand whether they are able to use a mail ballot.  Some eligible voters will determine that the added requirements make voting too confusing to be worthwhile.  The result of this confusion will be that fewer eligible voters decide to cast a ballot.

60.    There are several additional inherent problems posed by the deadlines outlined above and the requirement to compare static lists (the State Citizenship List, USPS Mail Ballot List, and State Mail Ballot List) with a constantly evolving list (the statewide voter registration list).  For example, between the day the State Citizenship List is sent and 3 business days before Election Day (the last day most voters may request a mail ballot under Maine law) there will inevitably be a significant number of individuals who become eligible but are not captured on the

20

State Citizenship List.  They may, for example, have moved to Maine or become a naturalized citizen after the list was sent.  Regarding voters who have moved, I am not aware of any legal requirement that voters regularly report change of residential address to the Federal Government.

61.     Additionally, as already noted, the timeline simply does not seem workable.  The EO requires DHS to send the State Citizenship List to States "no fewer than 60 days before each regularly scheduled Federal election."  For the November 3, 2026 General Election, that means DHS must send this list by Friday, September 4, 2026.  And Maine must also send its State Mail Ballot List to USPS 60 days before the election—also Friday, September 4, 2026.  Thus, we must send the State Mail Ballot List (i.e., all those who should receive a mail ballot under state law) to USPS on the *same day* we might receive the State Citizenship List from DHS. Comparing the statewide voter registration list and the State Citizenship List to see who is eligible according to both lists in *one day*, or even *a few hours*, is simply not possible to do with any meaningful degree of accuracy, no matter how many resources my office dedicates to the project.

62.     Although the EO provides that we may "routinely supplement and provide suggested modifications or amendments" to the USPS Mail Ballot List, there is no guarantee that USPS will accept those suggestions.  If we—in an attempt to protect Maine's elections officials from criminal liability—sent a State Mail Ballot List to USPS 60 days before Election Day that reflected only confirmed matches between the statewide voter registration list and the State Citizenship List, knowing that many eligible voters could have been wrongfully excluded from the State Citizenship List, we would be committing ourselves to potentially violating Maine law. We could then endeavor to submit additional matches as we confirmed them.  But it would be very difficult to do so quickly enough to matter.  On September 19, 2026—only 2 weeks after we

21

receive the State Citizenship List—our UOCAVA voters' ballots must be mailed out.  Shortly

thereafter, by no later than October 4, 2026, ballots must be furnished by the Elections Division

to municipal registrars, who must then immediately mail them to all voters who have requested

absentee ballots or who have ongoing absentee voter status.  Even if DHS and USPS accepted

our suggestions, there is unlikely to be enough time to get a ballot to those who are eligible but

did not appear on the State Citizenship List.  Voters would be disenfranchised and Maine law

would not be honored.

63.    Again, because of our obligation to ensure that every eligible Maine resident can

vote, we would need to take additional steps after receiving the State Citizenship List and USPS

Mail Ballot List to investigate the status of all those on the statewide registration list who do not

appear on the federal lists, and then suggest changes to both.  This will require data matching,

verification, follow-up investigations, and interfacing with DHS, USPS, municipalities, the

public, and others, and will demand an enormous investment of resources.  Additionally, state

cybersecurity and information technology staff would need to be involved to facilitate the secure

transfer of information between the federal government and the Department of the Secretary of

State.  As noted above, the Elections Division lacks the staff and resources to perform this

additional work before the election.  Indeed, the timeline contemplated in the EO will be

particularly onerous  in Maine because the period approximately 60 days before Election Day is

one of the busiest periods for the Elections Division, during which staff are preparing and

proofing hundreds of ballot forms on strict deadlines, among other tasks.

64.    I estimate that these new staffing needs will require a significant increase to the

Department of the Secretary of State's budget.  Given recent economic pressures across the state

and country, I have been trying to keep my office's budgetary needs as low as possible.  The EO

will increase financial strain on my office and necessitate a higher budget.  The Legislature has concluded its work and is only returning for a single day to review vetoes from the Governor before adjourning until December. Therefore, it will be impossible for my office to secure legislative approval for any additional funding prior to the November 2026 election.

65.    Any time spent by current staff on implementing the EO would divert time and attention from other critical election preparation in the days leading up to the election, my office's busiest time.  Our staff is already at capacity and dedicated to routine tasks and special projects that ensure Maine's elections run smoothly and every eligible Maine resident can exercise their right to vote.  This work becomes more voluminous, significant, and urgent in the months leading up to the election, when we must answer an increasing volume of questions and handle tasks related to, for example, logic and accuracy testing, and voter challenges.

66.    Each of these tasks and costs will divert scarce resources from other important election administration needs.  In the months before the election, the Elections Division must, among other things, format and proof hundreds of ballot forms for federal, state, and county elections.  It must also prepare and disseminate various guidance memos and trainings to municipal election officials.  In addition, particularly due to the federal government's dismantling of federal cyber-security programs relating to elections, the Elections Division must work diligently with law enforcement and security experts to ensure that election processes and infrastructure are protected from malicious actors.

67.    Maine has already ordered mail ballot envelopes for the 2026 federal election cycle, at a cost of $52,040.63.

68.    Maine does not currently use Intelligent Mail barcodes on ballot mail, which would require additional expenditures for software integrated with the CVR.

69.    Maine is currently using a ballot envelope design that was reviewed by USPS a number of years ago and has not changed since.

70.    Waiting on USPS to approve redesigned ballot envelopes has the potential to seriously disrupt and delay carefully timed steps necessary to deliver mail ballots to Maine voters.  Managing the fallout from such a delay would force my office and local elections officials to divert critical time and money from other elections administration duties to expedite other steps in the mail ballot process, educate the public about the status of mail ballots, and otherwise mitigate the harm from delays to the process.

71.    It is my understanding that Section 5 of the EO directs that "States and localities should preserve, for a 5-year period, all records and materials—excluding ballots cast—evidencing voter participation in any federal election (e.g., ballot envelopes, regardless of carrier)."  Existing federal law only requires preservation of voting materials for 22 months following an election, and preservation of records concerning voter roll maintenance for two years.  52 U.S.C. §§ 20507(i)(1), 20701.  Maine law provides for an identical 22-month timeframe for retention of ballots and other federal election materials and a 2-year retention period for retention of absentee envelopes and applications.  *See* 21-A M.R.S.A. § 23.

72.    Compliance with a five-year document preservation standard for election materials would impose significant compliance, storage, and other costs on Maine and local elections officials.

73.    Additionally, under current federal law, Maine may begin properly disposing of certain retained materials from the 2024 primary elections this month and the 2024 general election in September 2026.  The EO prevents Maine from undertaking these actions as to some,

24

but not all, of the retained materials, and requires Maine to incur further management, storage, and security costs instead.

74.    More than doubling the required retention time for some (but not *all*) voting materials would increase these burdens and costs significantly.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 21, 2026, at Augusta, Maine.

/s/ Julie L. Flynn
Julie L. Flynn
Deputy Secretary of State
Department of the Secretary of State

25