**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

STATE OF CALIFORNIA; et al.,

        *Plaintiffs,*

v.

DONALD J. TRUMP, in his official
capacity as President of the United States; et
al.,

        *Defendants.*

Case No. 1:26-cv-11581

**DECLARATION OF KATHERINE BERRY, DEPUTY ADMINISTRATOR OF THE
MARYLAND STATE BOARD OF ELECTIONS**

I, Katherine Berry, declare as follows:

1.     I am a resident of the State of Maryland.  I am over the age of 18.  I am familiar with the information in the statements set forth below either through personal knowledge, consultation with Maryland State Board of Election staff, or from my review of relevant documents and information. If called as a witness, I could and would testify competently to the matters set forth below.

2.     I am the Deputy Administrator of Elections in Maryland.  I work for the State Administrator of Elections and support him in his official capacity as the Chief Officer of Elections for the State of Maryland.  In my role, I assist him in the execution and enforcement of all state and federal laws relating to elections.

3.     I have served as the Deputy Administrator for 3 ½ years. Previous to this role, I served as the Election Director for the Carroll County, MD Board of Elections for 8 years and as a general local board of election employee in Maryland for 8 ½ years. I hold a bachelor's degree

1

in Sociology with a minor in Political Science from McDaniel College where my studies were focused on criminal justice and American government.

4.     The State Board of Elections ("SBE") and local boards of elections ("LBE") are responsible for administering federal elections in Maryland.  This responsibility encompasses voter registration, maintaining and updating voter rolls, issuing ballots to registered voters, tabulating votes, and certifying results in all elections for federal office, among numerous other tasks.  SBE possesses managerial and supervisory authority over the LBE's. SBE is a policy-making body, empowered with setting regulatory policy for the conduct of elections.  This responsibility encompasses voter registration, balloting, tabulating votes, and certifying results in all elections for federal office, among numerous other tasks.

5.     The State Administrator of Elections is the state's Chief Officer of Elections, responsible for executing and enforcing all state and federal law relating to elections within the state.  See Md. Code, Elec Law § 2-103(b). In particular, Maryland law charges the State Administrator with responsibility for implementing a uniform, centralized, voter registration system.  Elec. Law § 2-103(b)(7).  The State Administrator of Elections is responsible for implementing the Maryland State Board of Elections' responsibilities with regard to elections, including enforcing laws and providing technical information to the public and other parties. Maryland law charges SBE and the State Administrator with preventing disenfranchisement and ensuring that all eligible voters who want to vote can do so. Elec. Law § 1-201(2).

6.     The Deputy Administrator of Elections is responsible for implementing the State Administrator's responsibilities regarding elections, including supervising all senior managers, overseeing day-to-day operations within the agency, and maintaining communication with each of

2

Maryland's 24 LBE's and Election Directors (an Election Director is the administrative head of an LBE).

7.    Maryland electoral operations are organized in a centralized, top-down system. SBE sets the policies that are followed by each of Maryland's 24 LBE's to administer elections in their jurisdiction.  There is little operational variation amongst LBE's in conducting elections. With regard to voter registration and mail-in voting processes, the State Administrator and his staff bear responsibility for maintaining the statewide voter registration and election management database–MDVOTERS. LBE's are able to access MDVOTERS to update voter registration records, process mail-in ballot applications, and use those records to conduct electoral tasks; however, the State Administrator and his staff procured the voter registration system, support its ongoing maintenance and function, and bear responsibility for its responsiveness to changes in voter registration law.

8.    Maryland law provides multiple methods by which an applicant may register to vote.  The State Administrator, in compliance with state law, maintains an online voter services system accessible by internet connection through which Maryland residents may register to vote or update their voter registration record.  Elec. Law § 3-204.1.  Maryland residents may also electronically register to vote or update their registration record through "automatic voter registration agencies" ("AVR's") while, for instance, concurrently applying for healthcare services through the Maryland Health Benefit Exchange or when applying for licensure or identification services through the Maryland Motor Vehicle Administration (MVA).  Elec. Law § 3-203.  These electronic methods of application supplement traditional paper-applications, available online (for printing), at local boards of elections, and at multiple designated voter registration agencies

throughout the state.  Elec. Law § 3-204.  Finally, Maryland law permits in-person, same-day registration during early voting and on election day.  Elec. Law §§ 3-305 & 3-306.

9.      SBE has promulgated a regulatory scheme for the uniform administration of voter registration in Maryland.    COMAR  33.05.01.01-33.05.07.05.    Additionally,  the  State Administrator has provided standardized instruction and training on voter registration processes as well as election judge materials for election officials and election judges.  LBE's may make minor adjustments to processes, but adjustments generally must be approved by SBE prior to implementation.

10.     Maryland law generally permits any registered voter to vote by mail-in ballot except as specifically preempted by an applicable federal law.  Elec. Law § 9-304.  SBE has understood this permissive authority to be preempted only by legislation enacted by Congress.

11.     Voters apply to vote by mail-in ballot.  Elec. Law § 9-305.  When applying, the voter may request the mail-in ballot be sent to them through various methods including by mail, fax, web delivery or by hand at a local board of elections. The Election Director of the voter's local board of elections reviews the application to determine if the applicant qualifies to vote by mail-in ballot. Elec. Law § 9-304 and § 9-306, COMAR 33.11.02.02-.06.

12.     For voters who choose to vote by mail, SBE has executed a contract with a print vendor to send mail-in ballot packets to all Maryland voters who have requested a mail-in ballot. These packets include an envelope to return the mail-in ballot, instructions for voting a mail-in ballot and the ballot itself.  Approximately 40 days before mail-in ballots are sent to voters, SBE and the LBEs must proof the instructions and print template of the envelope for the print vendor. Approximately 2 weeks before mail-in ballot packets are sent, SBE extracts the initial appropriate data from MDVOTERS to provide it to the vendor. Beginning around the 41st day before election

4

day, data is extracted multiple times a week to provide updates including new requests for a mail-in ballot and any changes to voter addresses that impact mail-in ballots.

13.     SBE facilitates all electronic delivery of ballots that are requested to be delivered to voters via web delivery. SBE conducts various data quality checks on email addresses that voters provide prior to extracting all requests for web delivery around the 42nd day before the election. UOCAVA web delivered ballots are sent around the 47th day before the election. This process requires intricate planning and precision within SBE's Voter Services division, whereby a voter is sent an email with a unique password that will be entered into a portal link that is provided in the email. The voter is able to authenticate their identity before being able to download their ballot so that it can be printed and marked. They are provided detailed instructions on how to securely return their voted ballot including the ability to use a template envelope label that can be printed at home. In most instances, voters choose to hand write their outer envelope and then include their signed oath along with their voted ballots inside the envelope. The voter can return the web delivered ballot by placing a postage stamp on the envelope to put through USPS, hand-delivering their voted ballot packet to an LBE, early voting center or polling place, or placing it in an SBE designated drop box.

14.     LBE's facilitate faxing ballots to a very small percentage of voters who choose this option. They are provided with instructions along with their ballot via fax and are expected to return their ballot in the same method that a web delivered ballot is returned. This process will be ongoing beginning around the 45th day before election day.

15.     LBE's facilitate hand-delivering mail-in ballots within the administrative offices. Voters can complete an application and pick up their ballot packet that would otherwise be mailed through USPS. Voters can take their ballot packet with them to vote at home and return it via

USPS, drop box or hand delivery or they can vote it securely at the LBE for same day service. This process will be ongoing beginning around the 45th day before election day.

16.     SBE maintains an electronic mail-in ballot status system that allows for the voter to check the status of their ballot through an internet application.  The status of the mail-in ballot can be tracked from the point that the data is extracted from the MDVOTERS to when the ballot is counted. This has been an integral part of ensuring transparency in the mail-in ballot canvassing process.

17.     LBE's are responsible for handling mail-in ballots returned via USPS on a daily basis. They also must sort their regular mail that may include voter registration applications, election judge applications and web delivered or faxed ballots in envelopes that do not look like a traditional mail-in ballot envelope. The LBE's must securely store the ballots that are returned, maintaining them safely in their sealed envelopes until canvass begins. Within 48 hours of receipt of a mail-in ballot, the LBE must scan the unique ballot envelope barcode into MDVOTERS. This allows the voter to see the status of their ballot has been "received." Voters are not permitted by law to return a ballot via web delivery, so all ballots "received" are by mail, receipt from drop box, or hand-delivery.

18.     Eight days before early voting begins, the LBE's must begin canvassing mail-in ballots. Elec. Law § 11-302(b)(1).  The LBEs must prepare scanning units and ancillary materials to conduct a public canvassing of ballots utilizing bipartisan teams to ensure the oath printed on the exterior of the envelope has been executed, and then open envelopes and separate the ballots from the envelope to ready the ballot for tabulation.  COMAR 33.08.01.

19.     The LBE's act as local boards of canvassers for the purposes of tallying and certifying election results.  Elec. Law § 11-301. Each local board of canvassers accepts mail-in

ballots for tabulation only after ensuring that each mail-in ballot meets all submission requirements. When all ballots are tabulated (early voting, election day, mail-in, and provisional) the local board of canvassers certifies the results that they've tabulated.

20. The LBE's are primarily responsible for managing the operations and security of voting systems following statutory and regulatory frameworks. See Election Law § 2-202(b)(1), COMAR 33.15.04.

21. In my role as Deputy Administrator, I am responsible for overseeing day-to-day operations of all divisions at SBE including that of election policy, voting systems, mail-in voting and voter registration operations. SBE provides all guidance and instruction to the LBE's in order to ensure correct and legal administration of election processes are completed. This includes things such as following NVRA, HAVA, and UOCAVA.

22. I am familiar with the Executive Order published on March 31, 2026, entitled "Ensuring Citizenship Verification and Integrity in Federal Elections" (the "EO"). Sections 2 through 5 of the EO (collectively, the "Challenged Provisions") have already caused considerable harm, confusion, fear, and disruption in Maryland election administration, and will impose unrecoverable costs on Maryland.

23. SBE has received various inquiries from concerned Maryland voters regarding their ability to cast a ballot for this year's election. Many voters have questioned how they can safely receive and return their ballots if they are voting by mail and questioned their ability to go to a polling place, without disruption, to cast their ballot. Election Directors from the LBE's have inquired as to how this EO will impact their operations. SBE is ensuring the language provided in all mail-in ballot packets and voter outreach material encourages voters to continue following state

laws allowing for requesting a mail-in ballot with the expectation that they will receive it and be able to return it by any method allowed by Maryland law.

24. The Maryland General Assembly passed emergency legislation on April 13, 2026 that requires SBE to take different action for counting ballots for state offices if Federal Law or a Federal Court establishes requirements pertaining to ballot receipt deadlines for counting Federal contests that is contrary to current state law (permitting mail-in ballots to counted if postmarked on or before election day and received up to 10 days after election day). 2026 Reg. Sess., Md. Gen. Assembly, SB 949 (April 13, 2026). This new provision is effective immediately and will require attention from SBE's policy division to write emergency regulations and provide written guidance to the LBE's in time for the 2026 elections. It also requires that the IT division prepare for additional voting equipment to be deployed to canvasses and contemplate if changes are required to how election results are publicly posted. This is critical to ensure the agency is prepared for any Federal court decision that may occur within the election cycle. This provision will take away resources that would otherwise be involved in managing the State Citizenship List and other facets of the EO.

25. The LBE's will have to prepare for the potential to have two different canvasses - one for timely ballots according to a Federal court ruling and one for counting state offices only. This requires additional voting equipment to be logic and accuracy tested, additional bipartisan teams to canvass ballots, additional paper ballots to duplicate ballots removing Federal offices that may have been voted for but do not meet the timely Federal standard and generally more time to conduct the canvasses.

26. It is my understanding that Section 2(a) of the EO directs the Department of Homeland Security ("DHS") to create a "State Citizenship List" for each State, which will include

"individuals confirmed to be United States citizens who will be above the age of 18 at the time of an upcoming Federal election and who maintain a residence in the subject State." It is also my understanding that DHS will send these lists "no fewer than 60 days before each regularly scheduled Federal election, or promptly upon request by a State in connection with any special Federal election." This would mean that DHS will send this list by Friday, September 4, 2026, for the federal general election taking place on November 3, 2026.

27.     Section 2 requires immediate action from me and my team in SBE to understand how it interacts with Maryland's statewide voter registration list, and to coordinate with other state and local agencies across Maryland. Our efforts to address the changes and impacts of the EO will divert time and attention from other critical election preparations.

28.     Maryland is holding its primary election for federal and state offices on June 23, 2026. SBE, the State Administrator, Election Directors, and the LBE's, are all currently focused on preparations for that primary election.

29.     Given the imminence of the 2026 primary election, actions responsive to Section 2 will significantly disrupt election preparation and administration.

30.     For instance, SBE is currently finalizing implementation of new laws that were passed to the 2025 Maryland General Assembly session applicable to the upcoming primary election, including a new statewide audit method and new language assistance requirements for voters. The agency will immediately begin working on implementation of new laws that were passed in the 2026 Maryland General Assembly session since it ended on April 13, 2026, which includes various campaign finance laws, changes to the state's address confidentiality program, and new provisions governing automatic restoration of voting rights for individuals released from incarceration. All of these new laws require significant time and resources to implement from both

9

policy and technical staff. Many of the bills that must be implemented involve changes to the programming of the voter registration database, the campaign finance database, and voting systems.

31. Additionally, material preparation for the 2026 election cycle has started. This includes developing updates and enhancements to the voter registration database and voter services systems, ballot creation and proofing, and preparing materials sent to voters who requested to vote by mail. SBE staff are updating materials used by election workers and providing training to ensure updated practices are used by all local boards of elections.

32. Local boards of elections have designated early voting centers and election day polling places, which involves updating MDVOTERS to include the locations. These designations are final for both the primary and general elections in 2026. These designations were made with mail-in voting participation rates from the 2022 and 2024 election cycles in mind. Significant decreases in that participation rate due to public confusion or distrust towards mail-in voting because of Section 2 will have the potential concomitant effect of increasing in-person voting at early voting centers and polling places or decreasing overall turnout. However, the deadline to designate or revise early voting center and polling place plans passed on March 24, 2026. Voter outreach and publicity materials have gone out to voters, identifying early voting centers and polling places. Any changes to the designation of an early voting center or polling place on an emergency basis will cause further voter confusion and some further measure of voter suppression.

33. Preparation for mail-in voting is underway. A systematic review of all addresses of mail-in voters to ensure compliance with USPS best practices has been completed. SBE's mail-in ballot printing vendor has received all template materials for the inserts of our mail-in ballot packets and we are two weeks from providing the final certified copies of the ballots that will be

10

used in the June Primary Election. Primary election ballots will begin to be transmitted to voters on May 9, 2026.

34.    The IT and Policy Departments are in the process of several large procurements, including procurement of a new pollbook, voting system solution, and voter registration and election administration system.  Many of the individuals who work on these projects are the same individuals who will need to devote significant resources to implementing the policy and technological changes necessary to comply with the EO.  However, it is essential that these projects remain on schedule due to funding availability, current contract terms, age of the current technology and expected implementation dates of upcoming election years.

35.    The combination of these current priorities demand a full-time effort from all agency staff as the above items heavily impact policy staff, mail-in voting administration staff, and IT.

36.    My office has a continuing obligation to work with LBE's to perform regular list maintenance, as required under the National Voter Registration Act ("NVRA"), Help America Voter Act ("HAVA"), and Maryland state law.  This includes, but is not limited to, sending notices to voters who may have moved, identifying duplicates on the statewide voter registration list, cancelling the registrations of those who have been convicted of a felony and are currently incarcerated for that felony, and cancelling the registration of those who have died.

37.    Additionally, my office will need to continue to register those who are eligible to vote in Maryland.  Maryland allows qualified individuals to register up to 21 days before Election Day.  See Election Law § 3-302; 52 U.S.C. § 20507(a)(1) (requiring States to permit registration up to 30 days before a federal election).  Maryland also allows voters to register in-person during the early voting period and on Election Day, if they satisfy applicable

11

requirements. Elec. Law § 3-305 and § 3-306.  Whether during the period before Election Day, or on election day, Maryland requires a voter registration applicant to verify their eligibility to vote in a federal election by attestation, under the penalty of perjury, on the application itself. Elec. Law § 3-202(a)(1)(i).

38.    In compliance with the Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA), Maryland allows uniformed and overseas voters to register for a federal election if their registration application is received at least 30 days before that election.  52 U.S.C. §§ 20302(a)(2).  Maryland law extends the time in which uniformed and overseas voters can register to 21 days before the election.

39.    In compliance with the NVRA "quiet period" for voter registration, Maryland does not systematically remove voters from the rolls during the 90 days prior to a federal election unless a statutory exception applies.  *See* 52 U.S.C. §§ 20507(c)(2)(A), 3(A)-(B), 4(A).  Maryland does, however, lawfully remove voters on an individual basis where appropriate, such as when a voter requests that his or her registration be canceled or when official notice of death is received from statutorily acceptable sources.

40.    In sum, Maryland's statewide voter registration list changes up to and on Election Day.  Registrants are constantly being added, updated, and removed as required (and limited) by federal and state law, and this will continue through the 2026 election and beyond.

41.    I have considered how this dynamic statewide voter registration list will intersect with the list created by DHS.  As noted above, pursuant to Section 2(a) of the EO, DHS will share a State Citizenship List by September 4, 2026.  The EO permits the state "to routinely supplement and provide suggested modifications or amendments to the State Citizenship List transmitted

thereto." The EO does not require DHS to accept any of these state supplements, modifications, or amendments to the State Citizenship List.

42.    Once we receive the State Citizenship List, we will have to devote substantial resources to understanding any differences between it and our current statewide voter registration list. It is worth noting that a process like this would generally be one that we develop and program our voter registration database (MDVOTERS) to do. However, MDVOTERS cannot be developed during election time. Maryland is currently preparing for the June 23 Gubernatorial Primary Election, thus no development can be accomplished until that election is certified. Once development is possible, there will be a very short period prior to the General Election where development can be accomplished. However, this is such a brief period that it is generally reserved only for essential changes necessary to fix election-critical issues. It would not be sufficient to implement a large-scale development necessary for matching external data, such as the DHS list.

43.    In turn, any process to compare Maryland's voter registration resources to a list DHS provides will need to be accomplished outside of MDVOTERS. This will involve implementing novel processes that SBE does not currently use, and for which SBE does not currently have the technical resources. As a baseline matter, comparing the State Citizenship List to our current statewide voter registration list will necessitate linking registrants across the lists. This will be difficult, as it is extremely doubtful that the State Citizenship List will contain the same unique identifiers as our statewide voter registration list uses for list maintenance, such as state driver's license (or identification card) number, SSN4, and date of birth, along with name, address and other basic demographic information. Rather, it is inevitable that there will be differences in the files that will make matching difficult, time-consuming, and potentially inaccurate, as people's names, addresses, and other information may vary slightly (*e.g.*, Robert vs.

13

Bob, Apartment #3 vs. Apt. 3, voters with middle name vs. no middle name, addresses with 5 digit zip codes vs. 9 digit zip codes, etc). I know from my experience that data matching is a complex process and extreme care must be taken when the consequences of errors may lead to voter disenfranchisement. And because Maryland will receive the State Citizenship List so close to the election, I must plan for all of this now without knowing the magnitude of the job.

44.    For eligible voters who appear on the statewide voter registration list but not the State Citizenship List, my office will need to investigate further pursuant to our obligation to ensure that eligible voters are able to vote. Even though Maryland will not disenroll voters simply due to their absence from the State Citizenship List, it could disenfranchise voters in multiple ways. First, voters who check their status on the State Citizenship List as contemplated by Section 2(a) and see that they are not listed may be deterred from voting because they believe they will be blocked from voting or prosecuted, especially if DHS does not timely accept their corrections. Second, USPS may rely on the State Citizenship List to determine which voters can receive and transmit mail ballots in response to the EO's emphasis on criminal penalties associated with the distribution of mail ballots to ineligible individuals. EO §§ 2(b), 3(a), 5. Additionally, if the State Citizenship List is publicly accessible, local elections workers may misunderstand their legal obligations and refuse to provide a ballot to eligible voters missing from the State Citizenship List based on their belief that the voters are ineligible. These are all risks that Maryland cannot accept. We must make every effort to avoid disenfranchising eligible Maryland residents.

45.    Accordingly, in compliance with Maryland's obligation to protect the right to vote, Maryland would expend significant resources to attempt to supplement and amend the federal list as necessary, as errors were found through our comparison and investigation. This includes determining proper and secure methods for sending large volumes of confidential data to the

14

federal government. However, even if we are able to quickly offer all necessary corrections, the EO does not require DHS to accept the State's "suggested modifications or amendments." EO § 2(a).

46. Maryland would incur significant costs to undertake this comparison and verification of the State Citizenship List. Maryland SBE is a small agency of only around 50 permanent employees. During election time, these employees work long hours, including overtime, to support 24 LBE's and to administer elections. There is no bandwidth with current staff to absorb the work needed to compare and verify the list, nor is there time to develop technology that can do this comparison for the agency. Rather, contractors will need to be hired and trained to perform the comparison. Generally, for a project of this complexity and significance, we would hire several subject matter experts to perform the analysis. In my experience, the rate per subject matter expert contractor is $169 per hour. I anticipate the cost would be over $500,000. This is especially difficult given that both SBE and the State of Maryland are currently facing budget shortfalls. The EO provides no funding, so paying for these costs will have to come from devoting fewer resources to our office's other pressing responsibilities, such as developing the current and future voter registration database, developing and implementing a new pollbook solution, implementing a new voting system, and supporting the local boards of elections in voter registration and election administration matters.

47. SBE provides comprehensive training and guidance for the 24 local boards of elections to ensure consistent election administration occurs in every county. To that end, in advance of each election and in response to legal or policy changes, SBE produces written guidance, in the form of manuals, power points, checklists and processing guidance. The topics of training include, but are not limited to, voter registration, mail-in voting, polling place processes,

15

election judge curriculum, auditing and provisional processing. For virtually every topic, SBE maintains an online portal with information for local boards to use to administer the election. This is a time-consuming process to maintain and update the materials, SBE staff begins preparing the materials for the upcoming election immediately upon certification of the prior election. Internal meetings and information gathering are initially conducted. After this, changes are made to the existing materials or new materials are developed. Once in draft form, the materials are shared with the LBEs for input and suggestion. Once this collaboration process is completed, a final draft is circulated within SBE and finalized. Once finalized, shorter guidance, checklists and standardized forms are developed. As the election approaches, in person and virtual trainings are held to train on the processes. Additionally, there is an effect on customer service, due to voter questions or confusion, our internal customer service team must update its election documents and FAQ. Those who answer voter inquiries must be trained.

48.     If Section 2 is implemented, Maryland will have to devote significant time, personnel, and money to update training materials for local election officials and their staff, specifically detailing what steps they must take with respect to voters who appear on Maryland's voter registration list but not on the State Citizenship List. This is yet another aspect of the EO's implementation that will necessarily divert at least two-thirds of the agency resources, due to all policy and administrative staff needed to assist, from other important election administration tasks.

49.     I anticipate that in addition to formal training materials, my office will need to allocate significant resources to responding directly to local election officials, given the threat of criminal prosecution in Section 2 of the EO. SBE has already begun to field questions from local election officials about potential criminal prosecution.

16

50.     Currently, SBE has several major systems that are near the end of life, including the voting system, pollbooks, and the voter registration database.  As a result, in the past year, the agency has completed two major procurements and has begun development of a new pollbook solution and voting system. The projects are on an ambitious schedule to be implemented for the 2028 election cycle. Additionally, SBE is in the midst of a procurement process for a new voter registration database and election management system, with a goal of awarding a contract in early 2027 and implementing it in 2029. The individuals who are involved in these projects are the same individuals who would be responsible for ensuring compliance with the EO.  In order to do so, it is likely that one or more of these projects will need to be paused.

51.     Since the Maryland General Assembly passed a law in 2025 mandating a new auditing process for Maryland, risk-limiting audits ("RLA"), SBE and the LBE's will be implementing this new process for the 2026 elections. Much attention is focused on ensuring the legal requirements are met and that procedures are adequate to meet the tight election calendar deadlines. This process requires specific ballot organization and preparation that will be hindered by the need to potentially organize mail-in ballots by those that had no Federal offices counted versus those who had Federal offices counted. Because of the proposed actions of the State Citizenship List and required interactions with USPS, SBE could experience delays in canvassing and ultimate certification of election results. In turn, there would be an undue burden on ensuring the agency meets the legal requirements of RLA.

52.     At the same time my staff is performing investigations into the accuracy of the State Citizenship List, they will have to conduct a wide-ranging public education campaign to ensure that eligible voters understand the EO's requirements, and how they may impact a citizen's registration and ability to vote.  For example, my staff will have to prepare and distribute training

17

materials guiding citizens through accessing and correcting their individual records on the State Citizenship List under section 2(a). We will also need to field questions from registrants that are concerned about their voter registration status and that are generally confused about the process and their qualifications to vote in Maryland elections.

53.    I estimate that such a public education effort would likely cost $1 million because this would fundamentally change all of our outreach commercials and advertisements, so all would need to be created from scratch. SBE does not have any additional funds available for such changes and the budget is primarily structured for statutory requirements, so we would need to adjust spending to abide by other state laws to support this change.

54.    In my experience administering elections, changes to registration and election procedures in the time immediately preceding the election can cause voter confusion. The complicated requirements of the EO will likely lead some citizens to misunderstand the requirements for registration, or whether they are able to vote in Maryland's elections. Some citizens will determine that the added requirements make registering and/or voting too confusing to be worthwhile. For example, a voter may check their individual status on the State Citizenship list, according to the EO. If they are mistakenly not included, they may believe they have no recourse, and choose not to vote, or they may misunderstand the process for correction (despite my office's attempts to provide education), or DHS may not issue a correction in time. The result of this confusion will be that fewer eligible voters successfully register to vote or decide to cast a ballot.

55.    This inevitable voter confusion harms Maryland because it will disenfranchise voters, interfering with our sovereign interest and state-law obligation to ensure that all eligible voters who want to can cast a vote. It will also impose a burden on my staff's time, as my staff

18

(and the elections staff at the LBE's) will be responsible for dispelling voter confusion to the extent possible. This voter confusion will come at a crucial time, shortly before the election, when local elections officials' resources are particularly stretched.

56. Maryland election officials are required by state law to issue ballots to duly registered voters. An individual who appears to vote at an early voting center or polling place and whose name and date of birth match that of a registered voter in the election register must be issued a ballot to vote. Elec Law § 10-310(a). A registered voter who applies for a mail-in ballot must be issued that mail-in ballot. Elec. Law § 9-304(a). And any individual who declares by written affirmation that they are entitled to vote in an election, but is otherwise not pre-verified in the election register or MDVOTERS, must be issued a provisional ballot. Elec. Law § 9-404.

57. My office intends to comply with these state laws in administering upcoming federal elections.

58. In compliance with UOCAVA, Maryland issues ballots to registered voters who request an absentee ballot under that Act at least 45 days before an election. 52 U.S.C. §§ 20302(a)(1)-(3), (8)(A). Maryland continues to issue ballots to UOCAVA voters who request ballots just days before the election. UOCAVA voters can request an absentee ballot to be mailed to them until the Tuesday before the election. If the UOCAVA voters want their ballot delivered by email, they can request a ballot until the Friday before the election.

59. It is my understanding that Section 2(b) of the EO instructs the Attorney General to prioritize investigation and prosecution, under a variety of federal statutes, of "State and local officials or any others involved in the administration of Federal elections who issue Federal ballots to individuals not eligible to vote in a Federal election." I understand that the EO provides that "an individual is 'eligible to vote in a Federal election' if the individual is a citizen of the United

19

States, 18 years of age or older by the date of the upcoming election, and otherwise qualified under the laws of his or her State." I further understand that Section 5 of the EO encourages referrals to the U.S. DOJ of "[e]vidence of violations of existing Federal laws by State or local election officials" and "States or localities," among other parties, "for consideration of investigation or charges."

60.    If EO Section 2 goes into effect, I would be concerned that I, my staff, and Maryland elections officials would face federal prosecution if we issued ballots to Maryland voters who are not on the State Citizenship List, including provisional ballots. I am concerned about the impact of these threats of criminal prosecution on my staff, not because I believe they have violated these provisions, but because the EO increases the amount of pressure and scrutiny on them, including by the public. Such a threat to election officials could negatively impact staff retention and prompt unexpected resignations due to the unnecessary levels of stress the job is causing.

61.    The EO's threat of prosecution is significantly exacerbated by the fact that the EO defines voter eligibility in a manner inconsistent with Maryland law. Maryland law permits an otherwise eligible voter to cast a ballot in a federal primary election if the voter will be 18 years of age by the general election. See Election Law§ 3-102(a)(2)(i). EO Section 2(b) thus directly conflicts with state law, and it threatens Maryland elections officials with prosecution for issuing primary ballots to eligible 17-year-old voters. This issue has and will cause significant confusion about the rules applicable to upcoming elections.

62.    I know that the threat of prosecution under the EO is on the minds of state and local elections officials like me. Shortly after the EO was issued, a regularly scheduled call with Election Directors from each LBE was held. During this call, several Election Directors expressed concern that issuing a mail ballot to a voter who is not on the State Citizenship List, but is entitled to vote

20

by mail under state law, would result in prosecution. Recently, we have experienced significant issues staffing state administrative election positions and local Election Director and staff positions. I worry that this could become an even larger problem in the future as people may not wish to take on the risk.

63.    Should the Attorney General initiate any such enforcement actions, SBE would be required to divert significant resources not only to respond to such legal action but also to educate the public, with the aim of minimizing voter confusion to the extent possible. Currently, SBE is experiencing an increase in time consuming and costly litigation. In addition to routine legal matters such as candidacy challenges and procurement disputes, SBE has been named as a defendant in several complex lawsuits concerning voter registration matters. SBE anticipates that it would need to retain outside counsel to act as criminal defense counsel.

64.    Any such legal proceedings would have severe and adverse consequences for the public's trust in Maryland's administration of elections. Since 2012, I have experienced challenges to maintaining the public's trust in elections. In 2012 and 2014, as a local election official, we experienced undue harm when rumors were spread about the accuracy of the touchscreen voting machines. There were multiple voter education sessions, training and demonstrations with the public to help them understand how the voting machines record and tabulate their votes.

65.    Beginning in 2016, various other accusations about election processes and officials became a prominent issue. The Department of Homeland Security deemed elections as a "critical infrastructure" putting into place new recommended physical and cyber security requirements for all local and state election offices. Additionally, there were continued rumors and misinformation about the election process, how ballots are tabulated, and speculation about who election officials were. This misinformation campaign only continued to spiral in 2018.

21

66.     In 2020, during the COVID pandemic, Maryland, like other states, mandated voting by mail for the primary election. This occurred at the height of the pandemic and admittedly was a newer concept for voters in Maryland. There were many laws and regulations that needed to be amended and contemplated for emergency changes in order to ensure that all eligible voters could cast their ballots. Maryland voters were driven by national media and elected officials who fundamentally had taken issue with this form of voting to assume that mail in voting was not secure or properly monitored by election officials. The outcome of the 2020 Presidential election and various national media campaigns were wrought with immense amounts of inaccurate reporting of election laws, regulations, and processes. Election officials at the State and local levels were bombarded with Maryland Public Information Act (MPIA) requests and every media outlet wanted to get a statement about accusations and the attack on election administration.  In reality, Maryland was just continuing to follow all laws, emergency regulations and emergency state executive orders, but the public's trust in the process was damaged deeply.

67.     In 2021, in Maryland, there was a very high rate of turnover of tenured election officials because of the ongoing mis- and dis-information campaigns that were harming the reputations of election officials across the state. This issue became more prominent in 2022 and has continued since then. The Maryland General Assembly passed a law in 2024 that required SBE to have a portal for individuals to report suspected mis- and dis-information about elections. SBE hired a chief information security officer and there is a continuous increase in the amount of internet monitoring of mis and disinformation.

68.     In the 2024 Maryland General Assembly session, the *Protecting Election Officials Act of 2024* was passed. Elec. Law § 16-904. This law establishes a process by which people can be fined or subject to imprisonment for "knowingly and willfully mak[ing] a threat to harm an

election official…because of the election official's role in administrating the election process…" Elec. Law § 16-904(b). The Legislature in Maryland deemed this law necessary to ensure that Maryland's election officials were protected to continue doing their job.

69.    LBE's work closely with their local law enforcement agencies to ensure all election infrastructure is monitored and secured throughout the election process and that they are on safe lists for any swatting attempts and personal safety concerns. To be clear, election administration has become a very challenging profession. Every day there is scrutiny and unjustified challenges of public trust toward election officials who are carrying out their duties following every law and regulation as stated.  The unjustified mistrust in election officials have made it more difficult to administer elections safely and securely, and has dissuaded both election officials and voters from participating in the electoral process.

70.    Additionally, the creation of a State Citizenship List may directly disenfranchise voters.  Based on my experience, I know that if a citizen is not included on the list—due, for example, to errors in DHS's static immigration information contained in its Systematic Alien Verification for Entitlements (SAVE) system, the federal government's misinterpretation of whether the citizen qualifies as a state resident, or any other error—they may believe they are unable to vote, and could be prosecuted for doing so.  That is why Maryland works so hard to maintain consistent voter registration information so that voters are not erroneously informed that they are ineligible to vote.  The same is true of eligible 17-year-old primary election voters, considering the express limitations in the EO.

71.    Based on my experience assisting local election workers, I know that those workers may feel they cannot register or send a ballot to such voters without risking criminal prosecution, despite those voters' fundamental right to vote under state and federal law.  Similarly, based on

23

my experience I know that USPS or other entities involved in the "printing, production, shipment, or distribution of ballots" may believe they cannot provide a ballot to those voters without risking criminal prosecution.

72.     Maryland provides a mail-in ballot to any voter who makes a timely request for a ballot.  Voters may request a ballot for one election, an election cycle, or for all future statewide elections.

73.     My office intends to provide mail-in ballots to any voter eligible under applicable state law who requests one in administering upcoming federal elections.

74.     It is my understanding that Section 3(b) of the EO directs the United States Postal Service ("USPS") to initiate a rulemaking that, among other things, would allow States to provide lists of mail voters to USPS 60 days before an election, require the creation of a "Mail-In and Absentee Participation List" ("USPS Mail Ballot List") and prohibit USPS from delivering mail-in ballots sent by individuals not on the USPS Mail Ballot List.  It is also my understanding that Maryland can "routinely supplement and provide suggested modifications or amendments" to the USPS Mail Ballot List, but USPS is not required to accept any changes provided by Maryland.

75.     As soon as our team had time to digest the contents of the EO, I immediately began considering what near-term actions the EO would necessitate from my office, including preparing to create the State List and check the USPS Mail Ballot List, preparing guidance for the counties, updating voters absentee ballot status in MDVOTERS if they are not on the State List, communicating to voters who have had their absentee ballot request cancelled, ensuring our mail-in ballot vendor is able to comply with the EO, building out data analysis infrastructure and cyber security protections, and—as discussed further below—committing additional staff time to responding to inquiries.

76.     Under Section 3(b) of the EO, in order to comply with state law requiring voters who have requested a mail-in ballot to receive that ballot at least 43 days before an election, Elec. Law § 9-306(c), at least 60 days before Election Day we would need to send a list to USPS of voters to whom we intend to send a mail-in ballot ("State Mail Ballot List").  For the 2026 federal general election, that deadline will be September 4, 2026.  Failing to provide this list to USPS would pose an unacceptable risk under the EO that USPS will not include Maryland mail-in voters on the USPS Mail Ballot List, thereby making it more difficult or impossible for eligible voters to cast their ballots.

77.     As discussed throughout this declaration, Maryland's use of the mail for elections, paired with our election calendar, means I must plan now for how to align Maryland's administration of mail voting with the EO.

78.     Creating the State Mail Ballot List will require my office and local elections officials to expend time and resources to ensure that all voters who timely requested an absentee ballot are included.  This task will be significantly complicated by the influx of registration updates and changes that elections officials typically receive in the months before the election (and which I expect will be exacerbated by the State Citizenship List provisions discussed above).

79.     The deadline to provide this list to USPS no later than 60 days before the election means that some voters who are entitled to a mail ballot under state and federal law will unavoidably be left off the list.  UOCAVA permits uniformed and overseas voters to request absentee ballots up to 45 days before an election.  52 U.S.C. § 20302(a)(8).  Under Maryland law, voters may request an absentee ballot to be mailed to them up to 7 days before an election. Although the EO indicates that States will be able to "routinely supplement and provide suggested modifications or amendments" to the USPS Mail Ballot List, USPS is not required to accept our

suggestions. The EO also does not specify when USPS will transmit its USPS Mail Ballot List to our office, which could cause substantial complications.

80. Once we receive the USPS Mail Ballot List, we will have to devote substantial resources to understanding any differences between it and our own list of voters eligible to receive mail ballots. This will be a difficult task for many of the same reasons set out above with regard to the State Citizenship List, including: the lack of unique identifiers shared by both lists, the potential for slight variations in spelling to wrongly preclude matches, the fluid nature of voter registration rolls in the lead-up to elections, and administrative challenges inherent to any data-matching process. Moreover, experience has shown that the addresses used in MDVOTERS often are flagged by USPS, because they do not match the USPS standardized addresses. SBE completes numerous mailings of millions of mail pieces, and each mailing results in mismatches between our voter registration information and USPS information. Accordingly, reviewing the USPS Mail Ballot List will require a significant expenditure of time and resources.

81. For citizens who appear on the statewide voter registration list and are eligible to receive a mail ballot under Maryland law but not the USPS Mail Ballot List, my office will need to investigate further pursuant to our obligation to ensure that every absentee voter is able to receive a mail ballot as requested. We must make every effort to do so to avoid disenfranchising eligible Maryland voters.

82. Maryland would expend significant resources to attempt to supplement and amend the USPS Mail Ballot list as necessary, as errors were found through our comparison and investigation. This includes determining proper and secure methods for sending large volumes of confidential data to the USPS. This is true even though the EO instructs that we can only

26

"supplement" and "provide suggested modifications or amendments" to the USPS Mail Ballot List, and USPS is not required to accept them.

83.    Even with the best efforts of my office and local elections officials, the challenges of completing a complex data-matching program in a short timeframe and while preparing to administer an election poses the high risk of errors and omissions.  Additionally, there is no way to meaningfully automate this process in such a short time frame with the databases that SBE currently has available.

84.    Maryland would incur significant costs to undertake this comparison and verification of the USPS Mail Ballot List.  The costs associated with this comparison would be similar to the cost required to check the State Citizenship List and would result in a similar drain on existing agency resources.

85.    If Section 3 is implemented, Maryland will have to devote significant time, personnel, and money to update training materials for local elections officials and their staff. Those materials would have to specifically detail what steps they must take with respect to voters who appear on Maryland's voter registration list and are eligible to receive a mail ballot under Maryland law, but who do not appear on the USPS Mail Ballot List.  This is yet another aspect of the EO's implementation that will necessarily divert at least 5-7 staff members full time effort and divert their work away from other important election administration tasks.

86.    I anticipate that, in addition to formal training materials, my office will need to allocate significant resources to respond directly to local elections officials, given the threat of criminal prosecution in the EO.

87.    At the same time my staff is creating the State Mail Ballot List and performing investigations into the accuracy of the USPS Mail Ballot List, they will have to field questions

27

from citizens concerned about their ability to receive or return a mail ballot in the upcoming elections. Thus, a separate impact of the EO's directive concerns the need for a wide-ranging public education campaign to ensure that eligible voters understand the EO's requirements, and how they may impact a citizen's ability to vote by mail. This is particularly the case for Maryland's permanent absentee voters, who are used to automatically receiving mail ballots and being able to vote by mail under existing state law.

88. I estimate that such a public education effort would likely cost $1 million dollars because this would fundamentally change all of our outreach commercials and advertisements so all would need to be recreated from scratch. SBE does not have any additional funds available for such changes and the budget is primarily structured for statutory requirements, so we would need to adjust spending to abide by other state laws to support this change.

89. Apart from the time and monetary costs that Section 3's implementation would impose on Maryland, Section 3 also risks voter confusion and disenfranchisement. This inevitable voter confusion is harmful in and of itself and is also a burden on my staff's time. This voter confusion will come at a crucial time shortly before the election, when state and local elections officials are required under Maryland law to send mail ballots to voters who applied to vote by mail.

90. Sending mail ballots in a timely fashion is not only required by state and federal law, but is critical to ensure that as many eligible Marylanders as possible can exercise their right to vote. In the 2024 General Election, almost 763,000 Marylanders voted by mail. Voting by mail accounted for 25% of the ballots cast in that election. Over 563,000 Marylanders have requested to vote-by-mail for the 2026 Primary Election. This method of voting is particularly important for the many Maryland citizens who have high demanding jobs with inflexible time to vote in-person

and for voters who must rely on mail as a means of communication because of their life circumstances.

91.    Errors in the USPS Mail Ballot List would be extremely deleterious because of the potential for voter disenfranchisement. For example, consider an eligible voter who is on the State Mail Ballot List but not on the USPS Mail Ballot List. Under the EO, they could receive a mail in ballot from their local elections official directly, by fax, or by web delivery, that USPS will later refuse to return to the local elections official. In that situation, the voter may think that they have voted, but they have not. Nor would the voter necessarily know to cancel that ballot and vote in person, given that the EO does not charge USPS with notifying the voter. A voter may also be concerned about casting two ballots, which is itself a criminal violation, and choose not to vote. My office must take every measure possible to avoid this kind of voter disenfranchisement.

92.    In my experience administering elections, changes to election procedures in the time immediately preceding an election can cause voter confusion. The EO's complicated requirements will likely lead some eligible voters to misunderstand whether they are able to use a mail ballot. Some eligible voters will determine that the added requirements make voting too confusing to be worthwhile. The result of this confusion will be that fewer eligible voters decide to cast a ballot.

93.    There are several additional inherent problems posed by the deadlines outlined above and the requirement to compare static lists (the State Citizenship List, USPS Mail Ballot List, and State Mail Ballot List) with a constantly evolving list (the statewide voter registration list). For example, between the day the State Citizenship List is sent and seven days before Election Day (the last day a voter may register and receive a mail ballot under Maryland law) there will inevitably be a significant number of individuals who become eligible but are not captured on

29

the State Citizenship List.  They may, for example, have moved within 21 days of the election, which was after the pre-election close of registration deadline or become a naturalized citizen after the list was sent.  Regarding voters who have moved, I am not aware of any legal requirement that voters regularly report change of residential address to the Federal Government.

94.     This process is likely to be particularly complicated as it pertains to timing within 60 days of the election. In Maryland, 61 days before the election is the date by which our mail-in ballot vendor receives the PDF prints of the official ballots. The 60th day is the deadline for voters to request a mail-in ballot to be sent in the first mail-in ballot mailing. Less than 2 weeks later, the list of mail-in ballot voters is sent to our mail-in ballot vendor. During this time period, voter outreach and education programs are gaining traction with paid advertising and public service announcements. As a result, there is a general uptick in the amount of address changes and new registered voters when the outreach programs begin, so it will prompt many changes to the State Citizenship List after it was already submitted following the EO protocol.  The LBE's are recruiting and training election judges and preparing election judge materials and voting systems for in-person voting. They also perform their regular job duties including voter registration application processes and mail-in ballot application processing along with list maintenance processes that are allowed after the 90-day NVRA deadline.

95.     Additionally, as already noted, the timeline simply does not seem workable.  The EO requires DHS to send the State Citizenship List to States "no fewer than 60 days before each regularly scheduled Federal election."  For the November 3, 2026, General Election, that means DHS must send this list by Friday, September 4, 2026.  And Maryland must also send its State Mail Ballot List to USPS 60 days before the election—also Friday, September 4, 2026.  Thus, we must send the State Mail Ballot List (i.e., all those who should receive a mail ballot under state

law) to USPS on the *same day* we might receive the State Citizenship List from DHS. Comparing the statewide voter registration list and the State Citizenship List to see who is eligible according to both lists in *one day*, or even *a few hours*, is simply not possible to do with any meaningful degree of accuracy, no matter how many resources my office dedicates to the project.

96.    Although the EO provides that we may "routinely supplement and provide suggested modifications or amendments" to the USPS Mail Ballot List, there is no guarantee that USPS will accept those suggestions. If we—in an attempt to protect Maryland elections officials from criminal liability—sent a State Mail Ballot List to USPS 60 days before Election Day that reflected only confirmed matches between the statewide voter registration list and the State Citizenship List, knowing that many eligible voters could have been wrongfully excluded from the State Citizenship List, we would be committing ourselves to potentially violating Maryland law. We could then endeavor to submit additional matches as we confirmed them. But it would be very difficult to do so quickly enough to matter. On September 19 —only two weeks after we receive the State Citizenship List—our UOCAVA voters' ballots must be mailed out. Shortly thereafter, ballots must be sent to all other domestic and civilian voters from September 21 through October 28. Elec Law § 9-306(c). Even if DHS and USPS accepted our suggestions, there is unlikely to be enough time to get a ballot to those who are eligible but did not appear on the State Citizenship List. Voters would be disenfranchised and Maryland law would not be honored.

97.    Again, because of our obligation to ensure that every eligible Maryland resident can vote, we would need to take additional steps after receiving the State Citizenship List and USPS Mail Ballot List to investigate the status of all those on the statewide registration list who do not appear on the federal lists, and then suggest changes to both. This will require data matching, verification, follow-up investigations, and interfacing with DHS, USPS, counties, the

31

public, and others, and will demand an enormous investment of resources. Additionally, state cybersecurity and information technology staff would need to be involved to facilitate the secure transfer of information between the federal government and SBE. I estimate that these initiatives would require hiring 6 contractors and 3 full-time employees immediately, including a project manager, four subject matter experts/data analyst, a programmer, a cyber security individual and two full time administrative staff. This is in addition to the staff time required to work with DHS and USPS to securely transfer information.

98.     I estimate that these new staffing needs will require an increase of over $2 million to the SBE budget for a year of full-time work. Given recent economic pressures across the state and country, I have been trying to keep my office's budgetary needs as low as possible. Much of SBE's budget fulfills requirements that are part of Federal and State law governing election administration. The next largest part of the budget is personnel in order to fulfill the growing requirements and demands of the agency. Recent budgetary requests for additional personnel, made in response to the changing legal environment surrounding elections, have been denied. The 24 LBE's also have operating budgets that must be approved by their county governments. Much of their budget covers materials and ancillary items necessary to facilitate in-person voting at polling places and early voting centers. Many LBE budgets were cut of additional personnel and other needed materials for election administration because of ongoing budget challenges.

99.     SBE's budget for FY27 was just recently approved in the Governor's Budget by the Maryland General Assembly for nearly $70 million. This was an increase of nearly $13 million because of various new election systems to be implemented and to implement legislation that changed Maryland law in 2025. The FY28 budget papers will be due in the 3rd quarter of 2026, but will go through in-depth scrutiny. The EO will increase financial strain on my office and

32

necessitate a higher budget.  I will either need to go back to the Legislature and ask for additional funds, which I am far from assured to receive, or will need to identify equivalent cuts elsewhere in my office, a likely impossible task.

100.    Any time spent by current staff on implementing the EO would divert time and attention from other critical election preparation in the days leading up to the election, my office's busiest time.  Our staff is already at capacity and dedicated to routine tasks and special projects that ensure Maryland's elections run smoothly and every eligible Marylander can exercise their right to vote.  This work becomes more voluminous, significant, and urgent in the months leading up to the election, when we must answer an increasing volume of questions and handle tasks related to, for example, campaign finance reporting, logic and accuracy testing, and voter challenges.

101.    Each of these tasks and costs will divert scarce resources from other important election administration needs, as described above. This includes updating our pollbooks, voting system and voter registration databases. It also includes training and preparing the thousands of election judges who will administer in-person voting during the early voting period and on election day, as well as the election staff who will conduct the canvass of mail-in and provisional ballots.

102.    Currently, SBE's ballot printing vendor prints Intelligent Mail barcodes on the mail-in ballot return envelopes issued to voters; however print-at-home mail-in ballots delivered to voters electronically are returned using the voter's own envelope and, thus, do not have Intelligent Mail barcodes.  Also, the local boards of elections do not currently use Intelligent Mail barcodes on ballot mail.

103.    SBE does have a good working relationship with the regional USPS personnel and we ensure the LBEs also have contacts at their local postal facilities. This helps ensure that

33

personnel are aware of what official election mail in Maryland looks like and give contact for moving mail quickly to and from the Board of Elections at critical election periods.

104.    It is my understanding that Section 5 of the EO directs that "States and localities should preserve, for a 5-year period, all records and materials—excluding ballots cast—evidencing voter participation in any federal election (e.g., ballot envelopes, regardless of carrier)." Existing federal law only requires preservation of voting materials for 22 months following an election, and preservation of records concerning voter roll maintenance for two years.  52 U.S.C. §§ 20507(i)(1), 20701.  Maryland  law and regulation also set timelines for the preservation and destruction of voting materials in federal elections. Specifically, the State Administrator of Elections is responsible for preparing and implementation of the statewide retention schedule governing all election-related records.  See COMAR 33.03.01.05

105.    Compliance with a five-year document preservation standard for election materials would impose significant compliance, storage, and other costs on Maryland and local elections officials.

106.    For example, current document retention policies require SBE and the LBE's to store various election-related materials for 22-months and then destroy or transfer to State Archives for permanent retention.  Most LBE's have space to store one election cycle worth of materials, but then are required to identify other storage options that meet warehouse requirements. *See* COMAR 33.15.04 and COMAR 33.15.05.  With few exceptions (such as campaign finance reports and petition records) Maryland law does not impose a five-year retention requirement on traditional election records.

107.    Additionally, under current federal law, Maryland may begin properly disposing of certain retained materials from the 2024 primary elections on March 14, 2026 and the 2024 general

34

election on September 5, 2026.  The EO prevents Maryland from undertaking these actions as to some, but not all, of the retained materials, and requires Maryland to incur further management, storage, and security costs instead.

108.    More than doubling the required retention time for some (but not *all*) voting materials would increase these burdens and costs significantly. This specifically harms the LBEs who are required to store all election materials including mail-in ballot envelopes, voted ballots, and all ancillary paperwork pertaining to an election for 22 months.  On average, warehouse space at a local board costs $200,000 per year. The state and local government costs of storage space for voting systems and voting material retention is estimated to be $4 million per year.  Even needing to locate a small additional space will incur a cost.  This creates a fiscal burden on county and state government budgets.

109.    SBE must have approval from the Maryland Department of General Services to make changes to the agency's retention schedule.  This is a time-consuming process and involves a thoughtful review of every regulation and law that SBE must enforce.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 20, 2026, at Annapolis, MD.

*Katherine Berry*
_____

Deputy Administrator of Elections
Maryland State Board of Elections

35