**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

STATE OF CALIFORNIA; et al.,

                            *Plaintiffs,*

v.                                                      Case No. 1:26-cv-11581

DONALD J. TRUMP, in his official
capacity as President of the United States; et
al.,

                            *Defendants.*

**<u>DECLARATION OF JONATHAN BRATER</u>**

I, Jonathan Brater, declare as follows:

1.      I am a resident of the State of Michigan.  I am over the age of 18.  I am familiar with the information in the statements set forth below either through personal knowledge, consultation with Michigan Department of State (MDOS) staff, or from my review of relevant documents and information. If called as a witness, I could and would testify competently to the matters set forth below.

2.      I have been employed by the Michigan Secretary of State since January 2, 2020 and in such capacity serve as Director of the Bureau of Elections (Bureau).  I work for Secretary of State Jocelyn Benson and support her in her official capacity as the Chief Election Officer for the State of Michigan.  Mich. Comp. L. § 168.21.  I assist her in the execution and enforcement of all state and federal laws relating to elections.

3.      In my capacity as Director of Elections, I am "vested with the powers and shall perform the duties of the Secretary of State under his or her supervision, with respect to the supervision and administration of election laws."  Mich. Comp. L. § 168.32.

1

4.      The Secretary of State is Michigan's Chief Election Officer, responsible for issuing "instructions" and "advis[ing] and direct[ing] local election officials in the proper methods of conducting elections."  Mich. Comp. L. § 168.31(1)(a)-(b). The Bureau of Elections is responsible for implementing the Secretary of State's responsibilities with regard to elections, including enforcing laws and providing instructional information to the public and other parties. This includes the training of Michigan's 83 county clerks and 1,521 city and township clerks, all of whom participate in the administration of elections in Michigan.

5.      The State of Michigan and its subdivisions are responsible for administering federal elections in Michigan.  This responsibility encompasses voter registration, maintaining and updating voter rolls, issuing ballots to registered voters, tabulating ballots, and certifying results in all elections for federal office, among numerous other tasks.

6.      My office has a legal obligation to safeguard against disenfranchisement and take steps to ensure that all eligible voters who want to vote are able to do so. The Michigan Constitution provides, "No person shall . . . use any means whatsoever, any of which has the intent or effect of denying, abridging, interfering with, or unreasonably burdening the fundamental right to vote." Mich. Const. Art II §4(1)(a).

7.      Michigan operates one of the most decentralized systems of elections in the country, with 1,604 county, city, and township clerks administering elections. The Bureau works collaboratively with county and local (city and township) clerks to complete election tasks. For instance, while county clerks initiate the cancellation of some deceased voters, Mich. Comp. L. § 168.510(2), the Bureau sends the notification to the local clerk and cancellation is completed by the applicable local clerk. Mich. Comp. L. § 168.510(4), (5). In many communities, the local clerk's position is part-time, and it is challenging for clerks to complete existing statutory

2

requirements. Recent changes to the Michigan Constitution instituted early voting in 2024, and the Bureau distributed $30 million in grants to Michigan's 83 counties, with the county clerks in turn distributing funds to their cities and townships. The Bureau is also obligated by statute to establish a training curriculum and continuing election education for all local clerks, as well as a training program for precinct delegates, and to provide an election day dispute resolution team available to local officials. Mich. Comp. L. § 168.31(j), (k), (m), (n).

8.    In the November 2024 general election, more than 5.6 million ballots containing votes for federal office were cast in Michigan.

9.    I am familiar with the Executive Order published on March 31, 2026, entitled "Ensuring Citizenship Verification and Integrity in Federal Elections" (the "EO").  Sections 2 through 5 of the EO (collectively, the "Challenged Provisions") have already caused considerable harm, confusion, fear, and disruption in Michigan election administration, and will impose unrecoverable costs on Michigan.

10.    My staff and I have already had initial discussions about how to answer clerk questions and support anticipated concern and confusion about the EO.  I have already dedicated time to speak to clerks about the EO.

11.    It is my understanding that Section 2(a) of the EO directs the Department of Homeland Security ("DHS") to create a "State Citizenship List" for each State, which will include "individuals confirmed to be United States citizens who will be above the age of 18 at the time of an upcoming Federal election and who maintain a residence in the subject State."  It is also my understanding that DHS will send these lists "no fewer than 60 days before each regularly scheduled Federal election, or promptly upon request by a State in connection with any

3

special Federal election." This would mean that DHS will send this list by Friday, September 4, 2026, for the federal general election taking place on November 3, 2026.

12.     Preparations for the 2026 elections are already under way. Thus, Section 2 requires immediate action from me and my team at the Bureau to understand how it interacts with Michigan's statewide voter registration list, and to coordinate with other state and local agencies across Michigan. Our efforts to address the changes and impacts of the EO will divert time and attention from other critical election preparations. Currently, programmers assigned to Bureau tasks are working to incorporate and integrate numerous statutory requirements into Michigan's Qualified Voter File (QVF), as well as on a multi-year project to modernize Michigan's electronic pollbooks (EPB). The EO would require the Bureau to reallocate programming and technical support resources from necessary modernization that supports clerks and voters to the creation and incorporation of new lists in QVF. Additionally, the Bureau is in the process of replacing the state's approved voting systems in line with statutory timelines. Mich. Comp. L. § 168.37. The Bureau is also in the midst of receiving and reviewing hundreds of candidate filings for the August primary and conducting clerk trainings across the state. The Michigan Department of State has spent over a year working with Department staff, legislators, the Governor's office, and clerks to ensure state funding for this initiative. Funding and staff support currently allocated for the purchase of new voting systems would likely have to be reallocated for implementation of the EO.

13.     My office has a continuing obligation to work with the counties to perform regular list maintenance, as required under the National Voter Registration Act ("NVRA"), Help America Voter Act ("HAVA"), and Michigan state law. This includes sending notices to voters

4

who may have moved, identifying and merging duplicates on the statewide voter registration list, and cancelling the registration of those who have died.

14.     Additionally, my office will need to continue to register those who are eligible to vote in Michigan.  Michigan allows qualified individuals to register by all allowed methods 15 days before Election Day and to register with their clerk with proof of residency beginning 14 days before Election Day. Mich. Comp. Laws § 168.497; 52 U.S.C. § 20507(a)(1) (requiring States to permit registration up to 30 days before a federal election).  Eligible Michigan residents can register to vote online, at their county clerk's office, at various state social service agencies, and through MDOS's branch offices when they submit sufficient information of their voter qualifications (including citizenship) through their transaction. Michigan also allows eligible voters to register on Election Day, if they satisfy applicable requirements.

15.     In compliance with the Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA), Michigan allows uniformed and overseas voters to register for a federal election if their registration application is received at least 30 days before that election.  52 U.S.C. §§ 20302(a)(2). There is no date cutoff for UOCAVA voters to register in Michigan, but a ballot may not be sent by U.S. mail after 5 p.m. on the fourth day before an election, so a UOCAVA voter could not register and request a mail ballot after that time. Mich. Comp. L § 168.759a(4), Mich. Comp. L. § 168.761(1). Michigan recently implemented an electronic transmission and return portal that allows military voters with a Common Access Card signature to receive and return their ballot electronically. Mich. Comp. L § 168.759a(6). If practically possible, the portal would allow a military voter to register and receive a ballot electronically up to and on Election Day.

16.     In compliance with the NVRA "quiet period" for voter registration, Michigan does not systematically remove voters from the rolls during the 90 days prior to a federal election unless a statutory exception applies.  *See* 52 U.S.C. §§ 20507(c)(2)(A), 3(A)-(B), 4(A). Michigan does, however, lawfully remove voters on an individual basis where appropriate, such as when a voter requests that his or her registration be canceled, when a voter confirms they are no longer a resident of the jurisdiction, when an election official receives a copy of a signed registration application from another state that includes the voter's previous address in Michigan, and when a voter has died. Mich. Comp. L. § 168.509o(4); Mich. Comp. L. §168.510; R 168.260.

17.     In sum, Michigan's statewide voter registration list changes up to and on Election Day.  Registrants are constantly being added, updated, and removed as required (and limited) by federal and state law, this happens at more than a thousand locations across the state, and this will continue through the 2026 election and beyond.

18.     I have considered how this dynamic statewide voter registration list will intersect with the list created by DHS.  As noted above, pursuant to Section 2(a) of the EO, DHS will share a State Citizenship List by September 4, 2026.  The EO permits the state "to routinely supplement and provide suggested modifications or amendments to the State Citizenship List transmitted thereto."  The EO does not require DHS to accept any of these state supplements, modifications, or amendments to the State Citizenship List, or even to provide notification to the State whether they have been accepted or rejected and why.

19.     Once we receive the State Citizenship List, we will have to devote substantial resources to understanding any differences between it and our current statewide voter registration list.  As a baseline matter, comparing the State Citizenship List to our current statewide voter

6

registration list will necessitate linking registrants across the lists.  This will be exceedingly difficult, as it is extremely doubtful that the State Citizenship List will contain the same formatting and unique identifiers as our statewide voter registration list, such that we could perform straightforward matching. There are also numerous security features in QVF that would likely inhibit such a rushed, comprehensive matching process.  It is inevitable that there will be differences in the files that will make matching difficult, time-consuming, and potentially inaccurate, as people's names, addresses, and other information may vary slightly (*e.g.*, Robert vs. Bob, Apartment #3 vs. Apt. 3, Sr. vs. Jr., with all other parts of the name identical).  I know from my experience that data matching is a complex process and extreme care must be taken when the consequences of errors may lead to voter disenfranchisement.  And because Michigan will receive the State Citizenship List so close to the election, the Bureau must plan for all of this now.

20.    For eligible voters who appear on the statewide voter registration list but not the State Citizenship List, my office will need to investigate further pursuant to our obligation to ensure that eligible voters are able to vote.  Even though Michigan will not cancel registrations of voters simply due to their absence from the State Citizenship List, it could disenfranchise voters in multiple ways.  First, voters who check their status on the State Citizenship List as contemplated by Section 2(a) and see that they are not listed may be deterred from voting because they believe they will be blocked from voting or prosecuted, especially if DHS does not timely accept their corrections.  Second, USPS may rely on the State Citizenship List to determine which voters can receive and transmit mail ballots in response to the EO's emphasis on criminal penalties associated with the distribution of mail ballots to ineligible individuals, potentially depriving eligible voters of a mail ballot.  EO §§ 2(b), 3(a), 5. Third, voters may

7

believe their presence on the State Citizenship List as an individual eligible to register means that they are already registered and do not need to register with the state. The reverse situation, in which voters appear on the State Citizenship List but do not appear on the statewide voter registration list, also seems likely, and will also require follow-up from my staff or local clerks to determine their eligibility status.

21.     Additionally, if the State Citizenship List is publicly accessible, local elections workers may misunderstand their legal obligations and refuse to provide a ballot to eligible voters missing from the State Citizenship List based on their belief that the voters are ineligible.  These are all risks that Michigan cannot accept.  Pursuant to our mandate under the state constitution, we must make every effort to avoid disenfranchising eligible Michigan residents.

22.     Accordingly, in compliance with Michigan's obligation to protect the right to vote, Michigan would expend significant resources to attempt to supplement and amend the federal list as necessary, as errors were found through our comparison and investigation.  This includes determining proper and secure methods for sending large volumes of confidential data to the federal government on an ongoing basis.  However, even if we are able to quickly offer all necessary corrections on a daily basis, the EO does not require DHS to accept the State's "suggested modifications or amendments,"  EO § 2(a), or even to provide notification to the State on their disposition. Indeed, the procedures allowing individuals to correct and the state to provide suggested modifications or amendments have not been established and are not required to be in place until July 29, 2026. EO §3(b)(v). This date is only six days prior to the state primary to be held on August 4, 2026.

23.     Michigan would incur significant costs to undertake this comparison and verification of the State Citizenship List. Eight staff members who specialize in data reconciliation and list maintenance would likely be reassigned to this task full-time beginning with receipt of the list on the 60th day before an election until at least the 45th day before an election when military and overseas ballots are sent, and after that date would continue to need to work on this task, possibly full time, until the last absentee ballot is sent out days before the Election. It is unknown if this staffing level would be sufficient; more staff may be necessary depending on the amount of data in the State Citizenship List that must be corrected. We would then have to attempt to reprogram the QVF to accommodate this new data. Moreover, this is not a one-time expense but a new, permanent cost to the Department, as the EO requires the provision of the State Citizenship List to the state for every federal election, and the state would be obligated to maintain the new list, which would include data management and coordination with both DHS and USPS. The sharing of this sort of data would also raise privacy and security concerns, and compliance with our security and privacy laws would require the involvement of additional staff from additional departments and agencies. The EO provides no funding, so payment for these costs will have to come from devoting fewer resources to our office's other pressing responsibilities, such as ensuring list maintenance activities by Michigan's 1,604 clerks are conducted in accordance with the law.

24.     In addition to the complexity, labor and cost involved in integrating and maintaining a new voter list into the QVF, my staff would also be required to overhaul the sections of QVF that relate to ballot administration and design. Currently, voters receive a single ballot that includes all applicable local, state and federal elective offices on the ballot for that election. The EO's creation of a separate list of voters eligible to vote in federal elections will

9

necessitate a decision regarding how to differentiate between ballots for different voters. For example, election officers would have to offer two separate ballots, one for voters on the State Citizenship List and one for voters only on Michigan's statewide voter registration list. This would create substantial additional complexity and cost for county and local clerks, who are responsible for producing and issuing ballots, and with little time to train on these new procedures, there is a high likelihood that a voter may receive an erroneous ballot, and then be disenfranchised and/or at risk of prosecution.

25.     Any changes to ballot design will necessitate programming changes in how the related data is stored on QVF, and the requisite increase in staff time to do so. Such changes will also necessitate changes to contracts with the vendors who design and print the ballots. These changes are likely to come at an increased cost to the state and its subdivisions, and the use of additional ballots will increase those costs, since they will also need to be created in alternative ballot styles for voters utilizing electronic ballot return and accessible ballots.

26.     Any change in ballot design may also implicate changes to the way those ballots are tabulated, which in turn may necessitate changes to election management systems and agreements with their vendors. This, too, will come at a cost to the state and its subdivisions. If the tabulator in a local precinct cannot accept a second ballot design, that precinct would have to purchase a new one. A single tabulator cost between roughly $5,500 and $7,500 in 2024. There are roughly 4,350 precincts in the state of Michigan, and so the total cost of purchasing additional tabulators could reach nearly $30 million.

27.     That is assuming vendors even have sufficient inventory to provide this equipment to Michigan jurisdictions on very short notice. Since only a handful of vendors work in this field, and since the EO may prompt similar changes to ballots and tabulators in other

states as well and under the same incredibly compressed timeline, based on my experience I believe a bottleneck in demand will occur such that these changes are unlikely to be possible in 2026.

28.    More generally, the changes to QVF, and the ballots and the Electronic Pollbook that draw from it, along with the work required to create a data sharing process with the United States Postal Service (further addressed as part of my comments on Section 3 below), is likely to take years, not months, to implement. Based on my reading of the EO, it contemplates three major projects that it appears to ask states to engage in simultaneously: incorporating and exchanging voter data from the State Citizenship List, changing ballot administration and design (along with election day procedures), and coordinating data integration with the USPS, all during a fraction of an election year. Given the number of existing projects and limitations they place on current staff, and the difficulty in obtaining additional staff versed in this relatively niche area of information technology, a range of three to five years is reasonable for the technological changes alone, and five or more years is reasonable for the entire process.

29.    The costs associated with such significant changes are nearly impossible to estimate given the lack of specificity in the EO, but funding will be needed to: add staff in multiple agencies for the increased programming and database management costs, pay vendors for additional products and re-designs, and to support local election officials' compliance work. For comparison, the cost of creating the original QVF took seven years and cost roughly $14 million for the technological side alone.

30.    In my capacity as Director of Elections, and as noted above, I supervise the creation and dissemination of written materials that instruct local election officials in the performance of their election duties, including the Election Officials Manual, also known

11

as the Clerk Accreditation Manual, which comprises nineteen chapters and an addendum and which serves as a comprehensive guide to the conduct of Michigan's elections. Mich. Comp. L. § 168.31(1)(a).

31.    Also in that capacity, I supervise the creation and provision of all trainings offered to clerks in all 83 counties before each November general election, as well as training provided to clerks who will conduct training of election inspectors. See Mich. Comp. L. § 168.33.

32.    If Section 2 is implemented, Michigan will have to devote significant time, personnel, and money to update training materials for local election officials and their staff, specifically detailing what steps they must take with respect to voters who appear on Michigan's voter registration list but not on the State Citizenship List.  This is yet another aspect of the EO's implementation that will necessarily divert the majority of the Bureau's training team from the task of preparing clerks for statewide elections in which the entire 148-member state legislature, Governor, Lieutenant Governor, Secretary of State, Attorney General, U.S. Senate and House, and many judicial offices are on the ballot. In May 2026, the Bureau's training team will begin its statewide election-year training course, during which trainers visit all 83 Michigan counties. If the EO is implemented as written, the training team would need to conduct retraining—either in-person or virtually—to ensure all election officials understand their new roles and responsibilities under the EO, and could in turn provide training to election inspectors (poll workers).

33.    I anticipate that in addition to formal training materials, my office will need to allocate significant resources to responding directly to local election officials, given the threat of criminal prosecution in Section 2 of the EO. This will likely be intense, because under the EO every single time a local election official issues an absentee ballot (which will happen in excess

12

of a million times), they will face the threat of prosecution if ballot is sent to a voter whom the federal government claims is ineligible.

34.    At the same time my staff is performing investigations into the accuracy of the State Citizenship List, they will have to conduct a wide-ranging public education campaign to ensure that eligible voters understand the EO's requirements, and how they may impact a citizen's registration and ability to vote.  For example, my staff will have to prepare and distribute training materials guiding citizens through accessing and correcting their individual records on the State Citizenship List under section 2(a).  We will also need to field questions from registrants concerned about their voter registration status and generally confused about the process and qualifications to vote in Michigan elections.

35.    Based on the cost of past statewide public education efforts, including mailings to registered voters, I estimate that such a public education effort would cost in the millions of dollars. The Bureau does not have any excess funding that could be budgeted for this purpose.

36.    In my experience administering elections, changes to registration and election procedures in the time immediately preceding the election can cause voter confusion.  The complicated requirements of the EO will likely lead some citizens to misunderstand the requirements for registration, or whether they are able to vote in Michigan's elections.  Some citizens will determine that the added requirements make registering and/or voting too confusing to be worthwhile.  For example, a voter may check their individual status on the State Citizenship list, according to the EO.  If they are mistakenly not included, they may believe they have no recourse, and choose not to vote, or they may misunderstand the process for correction (despite my office's attempts to provide education), or DHS may not issue a correction in time.

13

The result of this confusion will be that fewer eligible voters successfully register to vote or decide to cast a ballot.

37.     This inevitable voter confusion harms Michigan because it will disenfranchise voters, interfering with our sovereign interest and state-law obligation to ensure that all eligible voters who want to can cast a vote.  It will also impose a burden on my staff's time, as my staff (and the elections staff at the counties, cities, and townships) will be responsible for dispelling voter confusion to the extent possible.  This voter confusion will come at a crucial time, shortly before the election, when local elections officials' resources are particularly stretched.

38.     Michigan elections officials are required by state law to issue ballots to duly registered voters.  *See, e.g.,* Mich. Comp. L. § 168.761(1) (mandating clerks to deliver absent ballots upon verification of the application); Mich. Comp. L. § 168.720 (mandating polls open continuously from 7:00 a.m. to 8:00 p.m., and any voters still in line at closing "shall be allowed to vote"); Mich. Comp. L. § 168.720b(1) (permitting early voting by registered and qualified electors).

39.     In compliance with UOCAVA, Michigan issues ballots to registered voters who request an absentee ballot under that Act at least 45 days before an election.  52 U.S.C. §§ 20302(a)(1)-(3), (8)(A). State law provides that "[a]n absent uniformed services voter or an overseas voter who submits an absent voter ballot application is eligible to vote as an absent voter in any local, state, or federal election occurring in the calendar year in which the election is held for that ballot requested if the absent voter ballot application is received by the county, city, or township clerk not later than 2 p.m. of the Saturday before the election." Mich. Comp. L. §168.759a(10).

14

40.    It is my understanding that Section 2(b) of the EO instructs the Attorney General to prioritize investigation and prosecution, under a variety of federal statutes, of "State and local officials or any others involved in the administration of Federal elections who issue Federal ballots to individuals not eligible to vote in a Federal election." I understand that the EO provides that "an individual is 'eligible to vote in a Federal election' if the individual is a citizen of the United States, 18 years of age or older by the date of the upcoming election, and otherwise qualified under the laws of his or her State." I further understand that Section 5 of the EO encourages referrals to U.S. DOJ of "[e]vidence of violations of existing Federal laws by State or local election officials" and "States or localities," among other parties, "for consideration of investigation or charges."

41.    If EO Section 2 goes into effect, I would be concerned that I, my staff, and Michigan elections officials would face federal prosecution if we issued ballots to Michigan voters who are not on the State Citizenship List – even if those individuals are eligible to vote. I am concerned about the impact of these threats of criminal prosecution on my staff, not because I believe they have violated these provisions, but because the EO increases the amount of pressure and scrutiny on them, including by the public. Election officials would simultaneously face a legal obligation to issue ballots to all eligible voters, without exception, with the threat of prosecution if the federal government decides they have issued a ballot to an ineligible voter, with no guidance about how the list of eligible voters may or may not be supplemented and how prosecution decisions would be made.

42.    I know that the threat of prosecution is on the minds of state and elections officials. I have heard election officials discuss the strain the threat of prosecution for mistakes in election administration can cause, and discuss the likelihood that election officials would resign

15

rather than face these threats.  The past few years have seen unprecedented turnover in Michigan's clerks, which I believe is largely driven by increased harassment and misinformation surrounding elections.  In 2024, 118 townships in Michigan did not have a candidate run for township clerk. I worry that the threat of prosecution will only exacerbate this growing problem, as people may not wish to take on the risk.

43.    Should the Attorney General initiate any such enforcement actions, the Michigan Department of State would be required to divert significant resources not only to respond to such legal action but also to educate the public, with the aim of minimizing voter confusion to the extent possible.  Any legal action involving the Bureau requires a significant amount of work from multiple divisions within it, including administrators, subject matter experts, legal experts, and their support staff, as well as staff from other branches within the Department of State. Due to the complexity of the state's electoral system, legal actions involving the Department regularly involve the work of at least eight Department employees, and often ten or more. This work often recurs with every substantive pleading received or drafted. Further, the number of active cases involving the Department dramatically increases in election years such as this. Defending against legal actions that may not be based on correct information, as appears possible should the Attorney General initiate actions under this order, will reduce the time staff is available to handle other cases, respond to clerks and the general public, develop and conduct its training programs, conduct its own enforcement actions, and fulfill its duties as a filing official, among many other regular activities.

44.    Any such legal proceedings would also have severe and adverse consequences for the public's trust in Michigan's administration of elections.

16

45.    Additionally, the creation of a State Citizenship List may directly disenfranchise voters.  Based on my experience, I know that if a citizen is not included on the list—due, for example, to errors in federal agencies' static immigration information contained in its Systematic Alien Verification for Entitlements (SAVE) system, the federal government's misinterpretation of whether the citizen qualifies as a state resident, or any other error—they may believe they are unable to vote, and could be prosecuted for doing so.  That is why Michigan maintains consistent voter registration information so that voters are not erroneously informed that they are ineligible to vote.

46.    Based on my office's experience assisting local election officials and staff, I know that they may feel they cannot register or send a ballot to such voters without risking criminal prosecution, despite those voters' fundamental right to vote under state and federal law. Similarly, based on my experience I know that USPS or other entities involved in the "printing, production, shipment, or distribution of ballots" may believe they cannot provide a ballot to those voters without risking criminal prosecution.

47.    Michigan provides a mail ballot to all voters who have the right to request one, "without giving a reason[.]" Mich. Const. Art II, §4(1)(h). Once registered, voters may also join the permanent mail ballot list and request to have "have an absent voter ballot sent to the voter before each election by submitting a single signed absent voter ballot application covering all future elections." Mich. Const. Art II, § 4(1)(k), Mich. Comp. L. § 168.759(5).

48.    It is my understanding that Section 3(b) of the EO directs the United States Postal Service ("USPS") to initiate a rulemaking that, among other things, would allow States to provide lists of mail voters to USPS 60 days before an election, require the creation of a "Mail-In and Absentee Participation List" ("USPS Mail Ballot List") and prohibit USPS from delivering

17

mail ballots sent by individuals not on the USPS Mail Ballot List.  It is also my understanding that Michigan can "routinely supplement and provide suggested modifications or amendments" to the USPS Mail Ballot List, but USPS is not required to accept any changes provided by Michigan or even provide an update on the disposition of requested changes. However, the rules providing these procedures have not yet been promulgated and are not required to take effect until July 29, 2026. Without more details regarding the process, it is impossible to adequately plan and prepare for this process. For example, the EO does not clarify how the USPS Mail Ballot List will be populated. Will it be based on the State Citizenship List and the state's own registered voter list? If so, which entity is responsible for reconciling the two? Will the USPS Mail Ballot List be based on the State Citizenship List alone?   How will USPS's list be updated, and how quickly will updates be incorporated?

49.     As soon as our team had time to digest the contents of the EO, I immediately began considering what near-term actions the EO would necessitate from my office. If the state of Michigan is responsible for reconciliation, this will add a considerable burden on my staff, not only during this election year and within this compressed timeline, but before every federal election. This would also necessitate extensive data testing and data sharing agreements between the state and the USPS to ensure eligible voters are not erroneously deprived of their ballots.

50.     Under Section 3(b)(ii) of the EO, in order to comply with state law requiring absentee voters to receive a mail ballot, at least 60 days before Election Day we would need to send a list to USPS of voters to whom we intend to send a mail-in or absentee ballot ("State Mail Ballot List"). Mich. Const. Art II, § 4(1)(h).  For the 2026 federal general election, that deadline will be September 4, 2026.  Failing to provide this list to USPS would pose an unacceptable risk

18

under the EO that USPS will not include Michigan absentee voters on the USPS Mail Ballot List, thereby making it more difficult or impossible for eligible voters to cast their ballots.

51.    As discussed throughout this declaration, Michigan's use of the mail for elections, paired with our election calendar, mean I must plan now for how to align Michigan's administration of mail voting with the EO.

52.    Creating the State Mail Ballot List will require my office and local elections officials to expend time and resources to ensure that all registered voters on the Permanent Ballot List as well as any registered voter who requests an absentee ballot for the relevant election are included.  This task will be significantly complicated by the influx of registration updates and changes that elections officials typically receive in the months before the election (and which I expect will be exacerbated by the State Citizenship List provisions discussed above).

53.    The deadline to provide this list to USPS no later than 60 days before the election means that some voters who are entitled to a mail ballot under state and federal law will unavoidably be left off the list.  UOCAVA permits uniformed and overseas voters to request absentee ballots up to 45 days before an election.  52 U.S.C. § 20302(a)(8).  Under Michigan law, voters may request an absentee ballot at any time.   Although the EO indicates that States will be able to "routinely supplement and provide suggested modifications or amendments" to the USPS Mail Ballot List, USPS is not required to accept our suggestions.  The EO also does not specify when USPS will transmit its USPS Mail Ballot List to our office, which could cause substantial complications.

54.    Once we receive the USPS Mail Ballot List, we will have to devote substantial resources to understanding any differences between it and our own list of voters eligible to receive mail ballots.  This will be a difficult task for many of the same reasons set out above with

19

regard to the State Citizenship List, including: the lack of unique identifiers shared by both lists, the potential for slight variations in spelling to wrongly preclude matches, the fluid nature of voter registration rolls in the lead-up to elections, and administrative challenges inherent to any data-matching process.  Accordingly, reviewing the USPS Mail Ballot List will require a significant expenditure of time and resources.

55.     For citizens who appear on the statewide voter registration list and are eligible to receive a mail ballot under Michigan law but not the USPS Mail Ballot List, my office will need to investigate further pursuant to our obligation to ensure that every absentee voter is able to receive a mail ballot as requested.  We must make every effort to do so to avoid disenfranchising eligible Michigan residents.

56.     Michigan would likely need to create separate federal and state voter lists, where the state list contains qualified Michigan voters and the federal list contains those qualified Michigan voters who have also been verified as citizens by DHS and as having an eligible mail address by USPS.

57.     Based on my experience, parallel voting lists will sow confusion among both voters and Michigan's 1,604 clerks charged with issuing and mailing ballots to eligible voters.  If voters deemed ineligible for the federal voter list are instead offered a state ballot containing only state and local offices, this will also create myriad issues in ballot issuance and numbering, programming of tabulators, and canvassing the election.

58.     Michigan would expend significant resources to attempt to supplement and amend the USPS Mail Ballot list as necessary, as errors were found through our comparison and investigation.  This includes determining proper and secure methods for sending large volumes of confidential data to the USPS.  This is true even though the EO instructs that we can only

20

"supplement" and "provide suggested modifications or amendments" to the USPS Mail Ballot List, and USPS is not required to accept them.

59.     Even with the best efforts of my office and local elections officials, the challenges of completing (and administering, on a daily basis), a complex data-matching program in a short timeframe and while preparing to administer an election poses the high risk of errors and omissions.

60.     Michigan would incur significant costs to undertake this comparison and verification of the USPS Mail Ballot List, and even more should it be the one responsible for reconciling the data that will populate the USPS list on an ongoing basis.

61.     If Section 3 is implemented, Michigan will have to devote significant time, personnel, and money to update training materials for local elections officials and their staff. Those materials would have to specifically detail what steps they must take with respect to voters who appear on Michigan's voter registration list and are eligible to receive a mail ballot under Michigan law, but who do not appear on the USPS Mail Ballot List.  Given that we have already begun training and guidance for this election cycle, altering and reissuing guidance and training would be yet another aspect of the EO's implementation that will necessarily divert a substantial percentage of staff resources from other important election administration tasks.

62.     I anticipate that, in addition to formal training materials, my office will need to allocate significant resources to responding directly to local elections officials, given the threat of criminal prosecution in the EO.

63.     At the same time my staff is creating the State Mail Ballot List and performing investigations into the accuracy of the USPS Mail Ballot List, they will have to field questions from citizens concerned about their ability to receive or return a mail ballot in the upcoming

21

elections.  Thus, a separate impact of the EO's directive concerns the need for a wide-ranging public education campaign to ensure that eligible voters understand the EO's requirements, and how they may impact a citizen's ability to vote by mail.  This is particularly the case for Michigan residents, who are used to automatically receiving mail ballots if they are on the permanent mail ballot list and being able to vote by mail under existing state law.

64.    Apart from the time and monetary costs that Section 3's implementation would impose on Michigan, Section 3 also risks voter confusion and disenfranchisement.  This inevitable voter confusion is a harm in and of itself and is also a burden on my staff's time.  This voter confusion will come at a crucial time shortly before the election, when state and local elections officials are required under Michigan law to send mail ballots to all voters who have requested one.

65.    Sending mail ballots in a timely fashion is not only required by state and federal law, but is critical to ensuring that as many eligible Michigan voters as possible can exercise their right to vote.  In the 2024 General Election, 2,232,721 Michiganders voted by mail, accounting for 39% of votes in that election.  This method of voting is particularly important for the many Michiganders who are out of state during election periods, voters who because of age or disability have difficulty voting in person, and voters who may have difficulty voting in person because of work or family obligations.

66.    Errors in the USPS Mail Ballot List would be extremely deleterious because of the potential for voter disenfranchisement.  For example, consider an eligible voter who is on the State Mail Ballot List but not on the USPS Mail Ballot List.  Under the EO, they are likely to receive a mail ballot from their local elections official that USPS will later refuse to return to the local elections official.  In that situation, the voter may think that they have voted, but they have

not.  Nor would the voter necessarily know to cancel that ballot and vote in person, given that the EO does not charge USPS with notifying the voter.  A voter may also be concerned about casting two ballots, which is itself a criminal violation, and choose not to vote.  My office must take every measure possible to avoid this kind of voter disenfranchisement.

67.    In my experience administering elections, changes to election procedures in the time immediately preceding an election can cause voter confusion, particularly when they are complex new requirements.  .

68.    There are several additional inherent problems posed by the deadlines outlined above and the requirement to compare static lists (the State Citizenship List, USPS Mail Ballot List, and State Mail Ballot List) with a constantly evolving list (the statewide voter registration list).  For example, between the day the State Citizenship List is sent and four days before Election Day (the last day a voter may register and receive a mail ballot under Michigan law) there will inevitably be a significant number of individuals who become eligible but are not captured on the State Citizenship List.  They may, for example, turn 18 or become a naturalized citizen after the list was sent.  Regarding voters who have moved, I am not aware of any legal requirement that voters regularly report change of residential address to the Federal Government.

69.    Additionally, as already noted, the timeline simply does not seem workable.  The EO requires DHS to send the State Citizenship List to States "no fewer than 60 days before each regularly scheduled Federal election."  For the November 3, 2026 General Election, that means DHS must send this list by Friday, September 4, 2026.  And Michigan must also send its State Mail Ballot List to USPS 60 days before the election - also Friday, September 4, 2026.  Thus, we must send the State Mail Ballot List (i.e., all those who should receive a mail ballot under state law) to USPS on the *same day* we might receive the State Citizenship List from DHS.

23

Comparing the statewide voter registration list and the State Citizenship List to see who is eligible according to both lists in *one day*, or even *a few hours*, is simply not possible to do with any meaningful degree of accuracy, no matter how many resources my office dedicates to the project.

70.     Although the EO provides that we may "routinely supplement and provide suggested modifications or amendments" to the USPS Mail Ballot List, there is no guarantee that USPS will accept those suggestions.  If we—in an attempt to protect Michigan's elections officials from criminal liability—sent a State Mail Ballot List to USPS 60 days before Election Day that reflected only confirmed matches between the statewide voter registration list and the State Citizenship List, knowing that many eligible voters could have been wrongfully excluded from the State Citizenship List, we would be committing ourselves to potentially violating Michigan law.  We could then endeavor to submit additional matches as we confirmed them. But it would be practically impossible to do so quickly enough to matter.  On September 19, 2026—only 15 days after we receive the State Citizenship List—our UOCAVA voters' ballots for the November 2026 general election must be mailed out.  Shortly thereafter, ballots must be sent to residents currently residing out of state by September 24, 2026 (beginning 40 days before the federal general election) and to residents residing within the state from September 24, 2026 through October 30, 2026. Mich. Const. Art II §4(1)(h), Mich. Comp. L §168.761. Even if DHS and USPS accepted our suggestions, there is unlikely to be enough time to get a ballot to those who are eligible but did not appear on the State Citizenship List.  Voters would be disenfranchised and Michigan law would not be honored, and we would not necessarily even know how or why the additions to the list were rejected.

24

71.    Again, because of our obligation to ensure that every eligible Michigan resident can vote, we would need to take additional steps after receiving the State Citizenship List and USPS Mail Ballot List to investigate the status of all those on the statewide registration list who do not appear on the federal lists, and then suggest changes to both.  This will require data matching, verification, follow-up investigations, and interfacing with DHS, USPS, counties, the public, and others, and will demand an enormous investment of resources.  Additionally, state cybersecurity and information technology staff would need to be involved to facilitate the secure transfer of information between the federal government and the Bureau, and we would likely need to hire additional contractors and employees to accomplish the work.  This is in addition to the staff time required to work with DHS and USPS to securely transfer information.

72.    I estimate that these new staffing needs will require a significant increase to the Department of State's budget.  Given recent economic pressures across the state and country, I have been trying to keep my office's budgetary needs as low as possible. The budget for fiscal year 2026-2027 is well underway and is expected to be finalized in June 2026, depending on the legislative process. The Department submitted its budget requests for this budget in October 2025. Since that time, the Department has worked with the Legislature and Governor to ensure those requests are included in the final budget. While those requests included funding for early voting and the 2027 replacement of voting systems statewide, I did not anticipate a federal order of this magnitude that would divert much of the Bureau's staff from its critical tasks. The EO will increase financial strain on my office and necessitate a higher budget. The Department will either need to go back to the Legislature once it returns in September and ask for additional funds, which I am far from assured to receive, or will need to identify equivalent cuts elsewhere

in my office, a very difficult and likely impossible task given the likely costs imposed by the new requirements.

73.    Any time spent by current staff on implementing the EO would divert time and attention from other critical election preparation in the days leading up to the election, my office's busiest time.  Our staff is already at capacity and dedicated to routine tasks and special projects that ensure Michigan's elections run smoothly and every eligible Michigan resident can exercise their right to vote.  This work becomes more voluminous, significant, and urgent in the months leading up to the election, when we must answer an increasing volume of questions and handle tasks related to, for example, campaign finance reporting, logic and accuracy testing, and voter challenges.

74.    Each of these tasks and costs will divert scarce resources from other important election administration needs. In response to the ever-increasing volume of questions, in 2024 the Bureau added a 7-member support desk section, whose staff handles first-tier questions that comprise the majority of questions to the Bureau and refers more specialized questions to subject matter experts. This has substantially decreased wait time for responses and freed up subject matter experts for other work such as updating training materials, performing accessibility audits, and reviewing ballot proofs. Given the anticipated confusion caused by the EO, I anticipate that at least half of the staff of the 18-member election administration division would be shifted to field incoming phone calls for an indefinite period.

75.    In Michigan, city and township clerks are responsible for issuing absent ballot envelopes, and must order them from one of three approved vendors. There are 1,521 separate envelope styles corresponding to each municipal jurisdiction, which must all be designed, tested, reviewed, and printed individually.

76.     It is too late for these local clerks to order additional envelopes for the August primary, and likely too late for them to order additional ones for the November election.

77.     Localities currently use Intelligent Mail barcodes on ballot mail in most cases.

78.     Localities currently submit ballot envelopes to USPS for design review. This process takes weeks to complete for each locality's envelope.

79.     If a second ballot is required to be issued because of the ballot design issues noted above, local clerks will have to pay the additional cost of another set of ballot envelopes. The state will have to pay the cost of return postage.

80.     In addition to the cost issues, a second round of ballots will also increase the burden on these local clerks, who have only three months between the primary and general elections. Based on my experience, many struggle with the burden of proofing, printing and mailing out ballots already. Doubling their workload will be a huge burden, especially in smaller jurisdictions with few staff.

81.     In Michigan, as in much of the country, ballot envelopes vary by city or township. I am deeply concerned about the length of time it would take for USPS to conduct a second round of ballot design review for these 1,521 jurisdictions.  Waiting on USPS to again approve ballot design has the potential to seriously disrupt and delay carefully timed steps necessary to deliver mail ballots to Michigan voters.  Managing the fallout from such a delay would force my office and local elections officials to divert critical time and money from other elections administration duties to expedite other steps in the mail ballot process, educate the public about the status of mail ballots, and otherwise mitigate the harm from delays to the process.

82.     It is my understanding that Section 5 of the EO directs that "States and localities should preserve, for a 5-year period, all records and materials—excluding ballots cast—

27

evidencing voter participation in any federal election (e.g., ballot envelopes, regardless of carrier)." Existing federal law requires preservation of voting materials for only 22 months following an election, and preservation of records concerning voter roll maintenance for two years. 52 U.S.C. §§ 20507(i)(1), 20701. Michigan law and regulation also set timelines for the preservation and destruction of voting materials in federal elections. Under Michigan law, voting material must be retained for 22 months following the primary or election at which they were used. Mich. Comp. Laws § 168.811. The voter application filled out at the polls before voting under Mich. Comp. Laws §168.523, voter registration applications under Mich. Comp. Laws §168.497(3) and (4), and all absent voter applications are retained for 6 years following the primary or election at which those applications were executed. Mich. Comp. Laws §168.811.

83.     Compliance with a five-year document preservation standard for election materials would impose significant compliance, storage, and other costs on Michigan and local elections officials.

84.     For example, current document retention requires local clerks in Michigan to secure these materials in sealed ballot containers for 22 months. If this period were more than doubled, the number of ballot containers and physical space to store those materials would also double. This is especially problematic in less populous communities where space and funding is scarce, and a part-time clerk is the jurisdiction's only election official.

85.     Additionally, under current federal law, Michigan may begin properly disposing of certain retained materials from the 2024 primary elections in June 2026 and the 2024 general election in September 2026. The EO prevents Michigan from undertaking these actions as to some, but not all, of the retained materials, and requires Michigan to incur further management, storage, and security costs instead.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 21, 2026, at Lansing, Michigan.

Jonathan Brater
Director of Elections
Michigan Department of State

29