**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| STATE OF CALIFORNIA; et al., | |
| *Plaintiffs,* | |
| v. | Case No. 1:26-cv-11581 |
| DONALD J. TRUMP, in his official capacity as President of the United States; et al., | |
| *Defendants.* | |

## DECLARATION OF PAUL LINNELL

I, Paul Linnell, declare as follows:

1. I am a resident of the State of Minnesota. I am over the age of 18. I am familiar with the information in the statements set forth below either through personal knowledge, consultation with staff, or from my review of relevant documents and information. If called as a witness, I could and would testify competently to the matters set forth below.

2. I am the Elections Director for the State of Minnesota. I work for Secretary of State Steve Simon and support him in his official capacity as the Chief Officer of Elections for the State of Minnesota. In my role, I assist him in the administration of all state and federal laws relating to elections.

3. I have served as the Elections Director since July 2024. I also have extensive prior experience in election administration, having served as an Elections Specialist, Elections Operations Administrator, and Elections Manager for Anoka County, Minnesota from 2015 to 2022 and as the Deputy Elections Director for Secretary Simon from 2022 to 2024, before

1

assuming my current position. My current duties include supervising all election administration duties of the Office of the Secretary of State.

4.    The State of Minnesota and its subdivisions are responsible for administering federal elections in Minnesota.  This responsibility encompasses voter registration, maintaining and updating voter rolls, issuing ballots to registered voters, tabulating votes, and certifying results in all elections for federal office, among numerous other tasks. The Office of the Minnesota Secretary of State administers the statewide voter registration system, provides technical assistance and training to local election officials, and monitors compliance with state and federal election laws.

5.    The Secretary of State is the state's Chief Officer of Elections, responsible for administering all state and federal law relating to elections within the state. The Office of the Minnesota Secretary of State is responsible for implementing the Secretary of State's responsibilities with regard to elections, including providing guidance on laws and providing technical information to the public and other parties.  Under Minnesota law, all eligible voters who want to vote are entitled to do so.  *See* Minn. Stat. § 201.014.  Elections in Minnesota are managed by local officials with support from the Secretary of State's Office. Under Minnesota law, counties are responsible for processing voter registration applications, applying or removing challenges to voter records and conducting absentee balloting. Cities, townships, and (where appropriate) school districts are responsible for determining precinct boundaries, setting polling locations, and hiring election judges. Some counties delegate additional tasks to cities and townships, such as the training and certification of election judges and the administration of absentee balloting.

6.      In my role as Elections Director, I am responsible for ensuring the correct and legal administration of election processes and developing election guidance. I am quite familiar with the systems necessary to oversee the administration of elections in Minnesota, including the requirements necessary to register to vote and the statewide voter registration system.

7.      As set forth in more detail below, Minnesota's preparations for the November 2026 general election are already under way, and remain ongoing.

8.      I am familiar with the Executive Order published on March 31, 2026, entitled "Ensuring Citizenship Verification and Integrity in Federal Elections" (the "EO").  Sections 2 through 5 of the EO (collectively, the "Challenged Provisions") have already caused considerable harm, confusion, fear, and disruption in Minnesota election administration, and will impose unrecoverable costs on Minnesota.

9.      In response to the issuance of the EO, my office has issued a public statement and has done outreach to county election officials to try to reduce confusion and fear. Additionally, I have met with team members to assess the impact the EO would have on Minnesota voter registration requirements and Minnesota's statewide voter registration system; coordinated with other state election directors to review and discuss the content and potential impacts of the EO in our respective states; fielded questions from county officials about the impact the EO would have on Minnesota elections; and worked with my colleagues to determine how to address questions from the public about what impact the EO would have on eligible voters in our state. We have already spent a number of hours on these issues and will need to spend more time on them going forward. Stakeholders and members of the public have contacted my office to express concern about the EO and its potential consequences.

[**The Impacts and Harms Caused by Executive Order Section 2**]

3

10.     It is my understanding that Section 2(a) of the EO directs the Department of Homeland Security ("DHS") to create a "State Citizenship List" for each State, which will include "individuals confirmed to be United States citizens who will be above the age of 18 at the time of an upcoming Federal election and who maintain a residence in the subject State."  It is also my understanding that DHS will send these lists "no fewer than 60 days before each regularly scheduled Federal election, or promptly upon request by a State in connection with any special Federal election."  This would mean that DHS will send this list by Friday, September 4, 2026, for the federal general election taking place on November 3, 2026.

11.     [**Immediate Impacts and Response by Declarant's Agency**] Section 2 requires immediate action from me and my team at the Office of the Minnesota Secretary of State to understand how it interacts with Minnesota's statewide voter registration list, and to coordinate with other state and local agencies across Minnesota.  Our efforts to address the changes and impacts of the EO will divert time and attention from other critical election preparations. Preparation for the 2026 midterm elections already consumes all of my team's time. Absentee voting for Minnesota's state primary election begins in a little more than two months on June 26, 2026. We do not have the capacity to additionally handle widescale changes to our election system. The EO, however, does just that, and does so without providing any financial or logistical support to the states to handle those changes.

12.     [**Current State Voter Registration Duties**] My office has a continuing obligation to work with counties to perform regular list maintenance, as required under the Help America Voter Act ("HAVA") and Minnesota state law.  This includes sending notices to voters who may have moved, identifying duplicates on the statewide voter registration list, and applying or removing challenges to the registrations of those who have been convicted of a

4

felony and are currently incarcerated, those who have been placed under guardianship, and those who have died.

13.    Additionally, my office will need to continue to register those who are eligible to vote in Minnesota.  Minnesota allows qualified individuals to register up to 21 days before Election Day and in person on Election Day.  Minn. Stat. § 201.061; 52 U.S.C. § 20507(a)(1) (requiring States to permit registration up to 30 days before a federal election).  Minnesota allows voters to register on Election Day, if they satisfy the applicable requirements. Minn. Stat. § 201.061. Citizens of Minnesota can register to vote online, at their county clerk's office, at various state social service agencies, and through the Minnesota's Department of Public Safety when they submit sufficient information of their voter qualifications (including citizenship) through their transaction. For both federal and state elections, individuals must verify their eligibility in order to register to vote.

14.    In compliance with the Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA), Minnesota allows uniformed and overseas voters to register for a federal election at any time.  52 U.S.C. §§ 20302(a)(2); Minn. Stat. 203B.17, subd. 1(e). In Minnesota, when eligible uniformed and overseas voters apply for a ballot, they will receive a ballot for any elections they are eligible to vote in through December 31 of the year in which they apply, or through the next election held in November of an even-numbered year, whichever is later.

15.    Minnesota does not systematically remove voters from the rolls during the 21 days prior to an election.  However, Minnesota does lawfully remove voters on an individual basis where appropriate, such as when a voter requests that his or her registration be canceled.

16. In sum, Minnesota's statewide voter registration list changes up to and on Election Day. Registrants are constantly being added, updated, and removed as required (and limited) by federal and state law, and this will continue through the 2026 election and beyond.

17. **[Impact of Section 2 on State Voter Registration List]** I have considered how this dynamic statewide voter registration list will intersect with the list created by DHS. As noted above, pursuant to Section 2(a) of the EO, DHS will share a State Citizenship List by September 4, 2026. The EO permits the state "to routinely supplement and provide suggested modifications or amendments to the State Citizenship List transmitted thereto." The EO does not require DHS to accept any of these state supplements, modifications, or amendments to the State Citizenship List.

18. Once we receive the State Citizenship List, we will have to devote substantial resources to understanding any differences between it and our current statewide voter registration list. As a baseline matter, comparing the State Citizenship List to our current statewide voter registration list will necessitate linking registrants across the lists. This will be difficult, as it is extremely doubtful that the State Citizenship List will contain the same unique identifiers as our statewide voter registration list, such that we could perform straightforward matching. One reason for this is that Minnesota allows voter registration using a drivers license number, which federal agencies generally do not have. Rather, it is inevitable that there will be differences in the files that will make matching difficult, time-consuming, and potentially inaccurate, as people's names, addresses, and other information may vary slightly (*e.g.*, Robert vs. Bob, Apartment #3 vs. Apt. 3, Avenue vs. Ave.). I know from my experience that data matching is a complex process and extreme care must be taken when the consequences of errors may lead to voter disenfranchisement. And because Minnesota will receive the State Citizenship List so

6

close to the election, and with absentee voting starting for the state general election on September 18, 2026, I must plan for all of this now.

19.     For eligible voters who appear on the statewide voter registration list but not the State Citizenship List, my office will need to investigate further pursuant to our obligation to ensure that eligible voters are able to vote.  Even though Minnesota will not disenroll voters simply due to their absence from the State Citizenship List, the existence of the list could disenfranchise voters in multiple ways.  First, voters who check their status on the State Citizenship List as contemplated by Section 2(a) and see that they are not listed may be deterred from voting because they believe they will be blocked from voting or prosecuted, especially if DHS does not timely accept their corrections.  Second, the U.S. Postal Service ("USPS") may rely on the State Citizenship List to determine which voters can receive and transmit mail ballots in response to the EO's emphasis on criminal penalties associated with the distribution of mail ballots to ineligible individuals.  EO §§ 2(b), 3(a), 5. Additionally, if the State Citizenship List is publicly accessible, local elections workers may misunderstand their legal obligations and refuse to provide a ballot to eligible voters missing from the State Citizenship List based on their belief that the voters are ineligible.  These are all risks that Minnesota cannot accept.  We must make every effort to avoid disenfranchising eligible Minnesotans.

20.     Accordingly, in compliance with Minnesota's obligation to protect the right to vote, Minnesota would expend significant resources to attempt to supplement and amend the federal list as necessary.  This includes determining proper and secure methods for sending large volumes of confidential data to the federal government.  However, even if we were able to quickly offer all necessary corrections, the EO does not require DHS to accept the State's "suggested modifications or amendments."  EO § 2(a).

21.    Minnesota would incur significant costs to undertake this comparison and verification of the State Citizenship List. Several additional program and technical staff will be needed to facilitate an effective and reliable process for the matching of records and the additional review of any records that are not matched. Our team is already at full capacity implementing system updates to comply with state law changes, and onboarding new staff for these added requirements would place a significant burden on the team. The EO provides no funding, so paying for these costs will have to come from devoting fewer resources to our office's other pressing responsibilities, such as ensuring election security, assisting county election officials, and responding to questions from Minnesotans.

22.    [**Guidance and Training for Elections Officials**] For example, our elections administration team will need to develop training materials and guidance documents for use by our local election partners to explain any changes to the mail balloting process. The EO's requirements around the use of specified envelopes for ballot mail and USPS rejection of mail ballots from certain individuals are significant departures from the way mail balloting has been conducted in Minnesota for many years. This will require my team to spend substantial time and resources updating training materials for election officials, including the County Elections Administration Guide, https://www.sos.mn.gov/media/ukxlp5k0/county-election-administration-guide.pdf (last visited April 13, 2026) and the Absentee Voting Administration Guide, https://www.sos.mn.gov/media/4n4llsbx/absentee-voting-administration-guide.pdf (last visited April 13, 2026). Typically, it already takes my team several hours to update these guides to account for relatively modest changes that are made to Minnesota election laws each year. The changes proposed by the EO are much more dramatic and will take considerably more time to train local election officials on. In all likelihood, my team will need to develop additional

materials and provide additional training in-person sessions on these requirements. All of these materials will take considerable time to update to account for the changes. I also anticipate our team will need to consult with local officials on these requirements repeatedly to ensure understanding of and compliance with these requirements as the 2026 elections approach.

23.     If Section 2 is implemented, Minnesota will have to devote significant time, personnel, and money to update training materials for local election officials and their staff, specifically detailing what steps they must take with respect to voters who appear on Minnesota's voter registration list but not on the State Citizenship List.  This is yet another aspect of the EO's implementation that will necessarily divert hundreds of hours of staff time from other important election administration tasks.

24.     I anticipate that in addition to formal training materials, my office will need to allocate significant resources to responding directly to local election officials, given the threat of criminal prosecution in Section 2 of the EO. Already, county election officials have expressed concern to my office about the EO and what it could mean for their offices and staff.

25.     [**Public Information and Education**] At the same time my staff is performing investigations into the accuracy of the State Citizenship List, they will have to conduct a wide-ranging public education campaign to ensure that eligible voters understand the EO's requirements, and how they may impact a citizen's registration and ability to vote.  For example, my staff will have to prepare and distribute training materials guiding citizens through accessing and correcting their individual records on the State Citizenship List under section 2(a).  We will also need to field questions from registrants concerned about their voter registration status and generally confused about the process and qualifications to vote in Minnesota elections.

26.     I estimate that such a public education effort would likely have a significant cost. I anticipate that our office would need to hire at least 10 call center operators for a period of at least 6 months to field a large increase in questions from the public. Additionally, I anticipate that our office would need to engage in a significant multi-media advertising campaign.

27.     [**Voter Confusion**] In my experience administering elections, changes to registration and election procedures in the time immediately preceding the election can cause voter confusion.  The complicated requirements of the EO will likely lead some citizens to misunderstand the requirements for registration, or whether they are able to vote in Minnesota's elections.  Some citizens will determine that the added requirements make registering and/or voting too confusing to be worthwhile.  For example, a voter may check their individual status on the State Citizenship list, according to the EO.  If they are mistakenly not included, they may believe they have no recourse, and choose not to vote, or they may misunderstand the process for correction (despite my office's attempts to provide education), or DHS may not issue a correction in time.  The result of this confusion will be that fewer eligible voters successfully register to vote or decide to cast a ballot.

28.     This inevitable voter confusion harms Minnesota because it will disenfranchise voters, interfering with our sovereign interest and state-law obligation to ensure that all eligible voters who want to can cast a vote.  It will also impose a burden on my staff's time, as my staff (and the elections staff at the counties) will be responsible for dispelling voter confusion to the extent possible.  This voter confusion will come at a crucial time, shortly before the election, when local elections officials' resources are particularly stretched.

29.     [**Exposure to Criminal Prosecution**] Minnesota elections officials are required by state law to issue ballots to duly registered voters. Minn. Stat. 203B.06, subd. 3; 204B.45. My

10

office intends to comply with these state legal requirements in administering upcoming federal elections.

30.    In compliance with UOCAVA, Minnesota issues ballots to registered voters who request an absentee ballot under that Act at least 45 days before an election.  52 U.S.C. §§ 20302(a)(1)-(3), (8)(A).  There is no deadline in Minnesota for a UOCAVA voter to request a ballot. Applications are processed by county election officials as they are received up to the date of the election.

31.    It is my understanding that Section 2(b) of the EO instructs the Attorney General to prioritize investigation and prosecution, under a variety of federal statutes, of "State and local officials or any others involved in the administration of Federal elections who issue Federal ballots to individuals not eligible to vote in a Federal election."  I understand that the EO provides that "an individual is 'eligible to vote in a Federal election' if the individual is a citizen of the United States, 18 years of age or older by the date of the upcoming election, and otherwise qualified under the laws of his or her State."  I further understand that Section 5 of the EO encourages referrals to U.S. DOJ of "[e]vidence of violations of existing Federal laws by State or local election officials" and "States or localities," among other parties, "for consideration of investigation or charges."

32.    If EO Section 2 goes into effect, I would be concerned that I, my staff, and Minnesota elections officials would face federal prosecution if we issued ballots to eligible Minnesota voters simply because they are not on the State Citizenship List.  I am concerned about the impact of these threats of criminal prosecution on my staff, not because I believe they have violated the law, but because the EO increases the amount of pressure and scrutiny on them, including by the public.

11

33.     I know that the threat of prosecution under the EO is on the minds of state and local elections officials like me. Though we have not had issues staffing state and local election positions, we have heard concerns from local election officials, and I worry that this could become a problem in the future as people may not wish to take on the risk.

34.     Should the Attorney General initiate any such enforcement actions, my office would be required to divert significant resources not only to respond to such legal action but also to educate the public, with the aim of minimizing voter confusion to the extent possible. Based on past experience, it would require significant time and resources to manage any lawsuits – time and resources that would not be available for my office's critical elections work.

35.     Any such legal proceedings would have severe and adverse consequences for the public's trust in Minnesota's administration of elections. Minnesota was recently named the top performing state in the Massachusetts Institute of Technology's 2024 Election Performance Index. https://elections.mit.edu/#/data/map (last accessed April 16, 2026). Minnesota also regularly leads the nation in voter turnout, evidence of the current high level of public trust in our elections. If the level of public trust were to decrease, voter participation could decrease as well as citizens may opt to disengage rather than navigate a process that is clouded in confusion and doubt.

36.     [**Voter Disenfranchisement**] Additionally, the creation of a State Citizenship List may directly disenfranchise voters.  Based on my experience, I know that if a citizen is not included on the list—due, for example, to errors in DHS's static immigration information contained in its Systematic Alien Verification for Entitlements (SAVE) system, the federal government's misinterpretation of whether the citizen qualifies as a state resident, or any other error—they may believe they are unable to vote, and could be prosecuted for doing so.  That is

why Minnesota works so hard to maintain consistent voter registration information so that voters are not erroneously informed that they are ineligible to vote.

37.    Based on my experience assisting local election workers, those workers may feel they cannot register or send a ballot to such voters without risking criminal prosecution, despite those voters' fundamental right to vote under state and federal law.  Similarly, based on my experience, USPS or other entities involved in the "printing, production, shipment, or distribution of ballots" may believe they cannot provide a ballot to those voters without risking criminal prosecution.

[**Impacts and Harms Caused by Executive Order Section 3**]

38.    Minnesota provides a mail ballot to all eligible voters who have properly requested one under state law, or who live in a city or township that has chosen to conduct all balloting by mail. Minn. Stat. § 203B.02 provides that any eligible voter may vote by absentee ballot, and Minn. R. ch. 8210 governs the preparation, mailing, and processing of absentee ballots. Additionally, under Minn. Stat. § 204B.45, certain small cities and townships can choose to vote exclusively by mail. My office intends to comply with these state legal requirements in administering upcoming federal elections.

39.    It is my understanding that Section 3(b) of the EO directs the USPS to initiate a rulemaking that, among other things, would allow States to provide lists of mail voters to USPS 60 days before an election, require the creation of a "Mail-In and Absentee Participation List" ("USPS Mail Ballot List") and prohibit USPS from delivering mail ballots sent by individuals not on the USPS Mail Ballot List.  It is also my understanding that Minnesota can "routinely supplement and provide suggested modifications or amendments" to the USPS Mail Ballot List, but USPS is not required to accept any changes provided by Minnesota.

13

40.     As soon as our team had time to digest the contents of the EO, I immediately began considering what near-term actions the EO would necessitate from my office, including preparing to create the State List and check the USPS Mail Ballot List, preparing guidance for the counties, involving state agencies and the Governor's Office, building out data analysis infrastructure and cyber security protections, and—as discussed further below—committing additional staff time to responding.

41.     Under Section 3(b) of the EO, in order to comply with state law requiring absentee voters to receive a mail ballot, at least 60 days before Election Day we would need to send a list to USPS of voters to whom we intend to send a mail-in or absentee ballot ("State Mail Ballot List"). Minn. Stat. 203B.06 (directing county auditors and municipal clerks to mail absentee ballots to voters who have duly requested them).  For the 2026 federal general election, that deadline will be September 4, 2026.  Failing to provide this list to USPS would pose an unacceptable risk under the EO that USPS will not include Minnesota absentee voters on the USPS Mail Ballot List, thereby making it more difficult or impossible for eligible voters to cast their ballots.

42.     **[Data Creation and Verification Impacts and Harms]** As discussed throughout this declaration, Minnesota's use of the mail for elections, paired with our election calendar, mean I must plan now for how to align Minnesota's administration of mail voting with the EO.

43.     Creating the State Mail Ballot List will require my office and local elections officials to expend time and resources to ensure that all voters who timely requested an absentee ballot are included.  This task will be significantly complicated by the influx of registration updates and changes that elections officials typically receive in the months before the election

14

(and which I expect will be exacerbated by the State Citizenship List provisions discussed above).

44.     The deadline to provide this list to USPS no later than 60 days before the election means that some voters who are entitled to a mail ballot under state and federal law will unavoidably be left off the list.  UOCAVA permits uniformed and overseas voters to request absentee ballots up to 45 days before an election.  52 U.S.C. § 20302(a)(8).  Under Minnesota law, voters may apply for an absentee ballot anytime throughout the year, except the day of an election. Minn. Stat. 203B.04.   However, returned ballots must be received by election day, so my office advises Minnesotans to leave enough time for election officials to mail the ballot and for the voter to return the ballot.  Although the EO indicates that States will be able to "routinely supplement and provide suggested modifications or amendments" to the USPS Mail Ballot List, USPS is not required to accept our suggestions.  The EO also does not specify when USPS will transmit its USPS Mail Ballot List to our office, which could cause substantial complications.

45.     Once we receive the USPS Mail Ballot List, we will have to devote substantial resources to understanding any differences between it and our own list of voters eligible to receive mail ballots.  This will be a difficult task for many of the same reasons set out above with regard to the State Citizenship List, including: the lack of unique identifiers shared by both lists, the potential for slight variations in spelling to wrongly preclude matches, the fluid nature of voter registration rolls in the lead-up to elections, and administrative challenges inherent to any data-matching process.  Accordingly, reviewing the USPS Mail Ballot List will require a significant expenditure of time and resources.

46.     For citizens who appear on the statewide voter registration list and are eligible to receive a mail ballot under Minnesota law but not the USPS Mail Ballot List, my office will need

15

to investigate further pursuant to our obligation to ensure that every absentee voter is able to receive a mail ballot as requested.  We must make every effort to do so to avoid disenfranchising eligible Minnesota residents.

47.    Minnesota would expend significant resources to attempt to supplement and amend the USPS Mail Ballot list as necessary, as errors were found through our comparison and investigation.  This includes determining proper and secure methods for sending large volumes of confidential data to the USPS.  This is true even though the EO instructs that we can only "supplement" and "provide suggested modifications or amendments" to the USPS Mail Ballot List, and USPS is not required to accept them.

48.    Even with the best efforts of my office and local elections officials, the challenges of completing a complex data-matching program in a short timeframe and while preparing to administer an election poses the high risk of errors and omissions.

49.    Minnesota would incur significant costs to undertake this comparison and verification of the USPS Mail Ballot List. As with the State Citizenship List, several additional program and technical staff will be needed to facilitate an effective and reliable process for the comparison and matching with the USPS Mail Ballot List.

50.    [**Guidance and Training for Elections Officials**] If Section 3 is implemented, Minnesota will have to devote significant time, personnel, and money to update training materials for local elections officials and their staff.  Those materials would have to specifically detail what steps they must take with respect to voters who appear on Minnesota's voter registration list and are eligible to receive a mail ballot under Minnesota law, but who do not appear on the USPS Mail Ballot List.  This is yet another aspect of the EO's implementation that will necessarily divert several full-time program staff from other important election

16

administration tasks and reducing the capacity for our office to provide election administration support to provide to local elections officials.

51.    I anticipate that, in addition to formal training materials, my office will need to allocate significant resources to responding directly to local elections officials, given the threat of criminal prosecution in the EO. Already, my office has been in communication with concerned election officials and plans to do additional outreach to reduce confusion and fear.

52.    [**Public Information and Education**] At the same time my staff is creating the State Mail Ballot List and performing investigations into the accuracy of the USPS Mail Ballot List, they will have to field questions from citizens concerned about their ability to receive or return a mail ballot in the upcoming elections.  Thus, a separate impact of the EO's directive concerns the need for a wide-ranging public education campaign to ensure that eligible voters understand the EO's requirements, and how they may impact a citizen's ability to vote by mail.

53.    I estimate that such a public education effort would likely cost a significant amount. As discussed above, I anticipate that our office would need to hire at least 10 call center operators for a period of at least 6 months to field a large increase in questions from the public. Additionally, I anticipate that our office would need to engage in a significant multi-media advertising campaign.

54.    [**Voter Confusion and Disenfranchisement**] Apart from the time and monetary costs that Section 3's implementation would impose on Minnesota, Section 3 also risks voter confusion and disenfranchisement.  This inevitable voter confusion is a harm in and of itself and is also a burden on my staff's time.  This voter confusion will come at a crucial time shortly before the election, when state and local elections officials are required under Minnesota law to send mail ballots to all voters registered to vote by mail.

17

55.     Sending mail ballots in a timely fashion is not only required by state and federal law, but is critical to ensuring that as many eligible Minnesotans as possible can exercise their right to vote.  In the 2024 General Election, roughly 1 in 10 Minnesotans voted by mail. Minnesota has more than 150,000 voters who live in mail ballot precincts, mostly in rural area, where all registered voters are automatically sent a ballot for each election. Voting by mail is particularly important for the many Minnesotans who have physical, logistical, or transportation challenges that make it difficult to reach a polling place.

56.     Errors in the USPS Mail Ballot List would be extremely deleterious because of the potential for voter disenfranchisement.  For example, consider an eligible voter who is on the State Mail Ballot List but not on the USPS Mail Ballot List.  Under the EO, they are likely to receive a mail ballot from their local elections official that USPS will later refuse to return to the local elections official.  In that situation, the voter may think that they have voted, but they have not.  Nor would the voter necessarily know to cancel that ballot and vote in person, given that the EO does not charge USPS with notifying the voter.  A voter may also be concerned about casting two ballots, which is itself a criminal violation, and choose not to vote.  My office must take every measure possible to avoid this kind of voter disenfranchisement.

57.     In my experience administering elections, changes to election procedures in the time immediately preceding an election can cause voter confusion.  The EO's complicated requirements will likely lead some eligible voters to misunderstand whether they are able to use a mail ballot.  Some eligible voters will determine that the added requirements make voting too confusing to be worthwhile.  The result of this confusion will be that fewer eligible voters decide to cast a ballot.

**[Impacts and Harms Caused by Interaction of State Citizenship List, State Mail Ballot List, USPS Mail Ballot List, and Timing of State Requirements for Elections]**

58.    There are several additional inherent problems posed by the deadlines outlined above and the requirement to compare static lists (the State Citizenship List, USPS Mail Ballot List, and State Mail Ballot List) with a constantly evolving list (the statewide voter registration list).  For example, between the day the State Citizenship List is sent and 1 day before Election Day (the last day a voter may register and receive a mail ballot under Minnesota law) there will inevitably be a significant number of individuals who become eligible but are not captured on the State Citizenship List.  They may, for example, have moved to Minnesota 21 days before Election Day or become a naturalized citizen after the list was sent. Regarding voters who have moved, I am not aware of any legal requirement that voters regularly report change of residential address to the Federal Government.

59.    Additionally, as already noted, the timeline simply does not seem workable.  The EO requires DHS to send the State Citizenship List to States "no fewer than 60 days before each regularly scheduled Federal election."  For the November 3, 2026, General Election, that means DHS must send this list by Friday, September 4, 2026.  And Minnesota must also send its State Mail Ballot List to USPS 60 days before the election—also Friday, September 4, 2026.  Thus, we must send the State Mail Ballot List (i.e., all those who should receive a mail ballot under state law) to USPS on the *same day* we might receive the State Citizenship List from DHS. Comparing the statewide voter registration list and the State Citizenship List to see who is eligible according to both lists in *one day*, or even *a few hours*, is simply not possible to do with any meaningful degree of accuracy, no matter how many resources my office dedicates to the project.

19

60.     Although the EO provides that we may "routinely supplement and provide suggested modifications or amendments" to the USPS Mail Ballot List, there is no guarantee that USPS will accept those suggestions.  If we—in an attempt to protect Minnesota's elections officials from criminal liability—sent a State Mail Ballot List to USPS 60 days before Election Day that reflected only confirmed matches between the statewide voter registration list and the State Citizenship List, knowing that many eligible voters could have been wrongfully excluded from the State Citizenship List, we would be committing ourselves to potentially violating Minnesota law.  We could then endeavor to submit additional matches as we confirmed them. But it would be very difficult to do so quickly enough to matter.  On September 18, —only two weeks after we receive the State Citizenship List— ballots for all voters in mail ballot precincts or with an absentee ballot application on file, including UOCAVA voters, must be mailed out.  . Even if DHS and USPS accepted our suggestions, there is unlikely to be enough time to get a ballot to those who are eligible but did not appear on the State Citizenship List.  Voters would be disenfranchised and Minnesota law would not be honored.

61.     Again, because of our obligation to ensure that every eligible Minnesotan can vote, we would need to take additional steps after receiving the State Citizenship List and USPS Mail Ballot List to investigate the status of all those on the statewide registration list who do not appear on the federal lists, and then suggest changes to both.  This will require data matching, verification, follow-up investigations, and interfacing with DHS, USPS, counties, the public, and others, and will demand an enormous investment of resources.  Additionally, state cybersecurity and information technology staff would need to be involved to facilitate the secure transfer of information between the federal government and the Secretary of State.  Additional full-time

20

staff would likely be needed to facilitate this process, in addition to the staff time required to work with DHS and USPS to securely transfer information.

62.     I estimate that these new staffing needs will require a significant increase to the Secretary of State's budget.  Given recent economic pressures across the state and country, I have been trying to keep my office's budgetary needs as low as possible.

63.     Any time spent by current staff on implementing the EO would divert time and attention from other critical election preparation in the days leading up to the election, my office's busiest time.  Our staff is already at capacity and dedicated to routine tasks and special projects that ensure Minnesota's elections run smoothly and every eligible Minnesotan can exercise their right to vote.  This work becomes more voluminous, significant, and urgent in the months leading up to the election, when we must answer an increasing volume of questions and handle tasks related to, for example, voting before election day, logic and accuracy testing, and voter registration.

64.     Each of these tasks and costs will divert scarce resources from other important election administration needs.

**[Impacts and Harms from Section 3(b)(i)]**

65.     Most local elections offices in Minnesota have already ordered absentee and mail ballot envelopes for the 2026 federal election cycle, and reprinting envelopes to meet new requirements would come at a substantial cost.

66.     Intelligent Mail barcodes are not required nor to my knowledge used by most Minnesota counties and municipalities for absentee or mail ballots. Requiring Intelligent Mail barcodes would impose significant financial costs on Minnesota's local governments, without the necessary funding or time needed to effectively implement the change. Further, Minnesota

21

already has in place a tracking tool that allows voters to track the status of their ballot throughout the process: from the time the record is created in the statewide voter registration system, to when it is sent by the local election official, when it is received back at the election office, and when it has been accepted by the absentee ballot board.

67.     Minnesota counties and municipalities are not currently required to submit ballot envelopes to USPS for design review. However, Section 3 of the EO directs the USPS to propose rule provisions which would require ballot envelope design review by the USPS.

68.     In Minnesota, as in much of the country, ballot envelopes vary by county. I am deeply concerned about the length of time it would take for USPS to conduct ballot design review for thousands of jurisdictions. Waiting on USPS to approve ballot design has the potential to seriously disrupt and delay carefully timed steps necessary to deliver mail ballots to Minnesota voters. Managing the fallout from such a delay would force my office and local elections officials to divert critical time and money from other elections administration duties to expedite other steps in the mail ballot process, educate the public about the status of mail ballots, and otherwise mitigate the harm from delays to the process.

**[Impacts and Harms from Section 5]**

69.     It is my understanding that Section 5 of the EO directs that "States and localities should preserve, for a 5-year period, all records and materials—excluding ballots cast— evidencing voter participation in any federal election (e.g., ballot envelopes, regardless of carrier)." Existing federal law only requires preservation of voting materials for 22 months following an election, and preservation of records concerning voter roll maintenance for two years. 52 U.S.C. §§ 20507(i)(1), 20701. Minnesota law and regulation also set timelines for the preservation and destruction of voting materials in federal elections. Minn. Stat. 201.081

22

(requiring retention of voter registration applications for 22 months); 201.221, subd. 3 (requiring retention of polling place rosters for 22 months); 203B.06 (requiring retention of absentee ballot applications for 22 months); 203B.19 (requiring retention of applications for UOCAVA ballots for six years); 204B.40 (requiring retention of election materials by county auditors, municipal clerks, and school district clerks for 22 months).

69.     Compliance with a five-year document preservation standard for election materials would impose significant compliance, storage, and other costs on Minnesota and local elections officials.

70.     The current 22-month requirement allows for elections materials from the previous federal election cycle to be disposed of before the next federal election takes place. Extending to a five-year requirement would mean that there would be periods of time where jurisdictions would have materials from three federal elections. County and municipal elections offices have limited storage capacity. Many jurisdictions already pay for secure offsite storage to keep their elections materials for the 22-month period. This would increase the fees for those jurisdictions, and necessitate off-site storage for many more that are currently able to retain materials on-site.

71.     Additionally, under current federal law, Minnesota may begin properly disposing of certain retained materials from the 2024 primary elections in June 2026 and the 2024 general election in September 2026. The EO prevents Minnesota from undertaking these actions as to some, but not all, of the retained materials, and requires Minnesota to incur further management, storage, and security costs instead.

I declare under penalty of perjury that the foregoing is true and correct.

23

Executed on April 21, 2026, at St. Paul, Minnesota.

Paul Linnell
Elections Director
Office of the Minnesota Secretary of State