## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

STATE OF CALIFORNIA; et al.,

                    *Plaintiffs,*

v.

DONALD J. TRUMP, in his official capacity as President of the United States; et al.,

                    *Defendants.*

Case No. 1:26-cv-11581

## DECLARATION OF DONNA BARBER

I, Donna Barber, declare as follows:

1. I am a resident of the State of New Jersey. I am over the age of 18 and have personal knowledge of all the facts stated herein, except those matters stated upon information and belief; as to those matters, I believe them to be true. If called as a witness, I could and would testify competently to the matters set forth below.

2. I am the Executive Director of the New Jersey Department of State (NJDOS), Division of Elections and support the Honorable Dr. Dale Caldwell, Lieutenant Governor and Secretary of State of New Jersey in his official capacity as the chief elections official for the State of New Jersey.

3. I have most recently served as the Executive Director of the Division of Elections for two years following a forty-year career working in the Division of Elections, including serving as the Elections Manager.

1

4.    NJDOS and the Secretary of State are responsible for overseeing various state functions, including elections, business and economic development, tourism, and cultural and historical programs.

5.    New Jersey and its subdivisions (including various state agencies and all of its twenty-one counties) are responsible for administering federal elections in New Jersey.  This responsibility encompasses voter registration, maintaining and updating voter rolls, issuing ballots to registered voters, tabulating votes, and certifying results in all elections for federal office, among numerous other tasks.

6.    The Secretary of State is New Jersey's chief election official. NJDOS is responsible for administering and applying any applicable state and federal laws relating to elections within the state. *See* N.J. Stat. Ann. § 19:31-6a; N.J. Stat. Ann. § 52:16A-98. NJDOS is responsible for assisting with implementing the Secretary of State's responsibilities with regard to elections, including enforcing laws and providing technical information to the public and other parties.  New Jersey law charges my office with promoting and facilitating the right to enfranchisement and ensuring that all eligible voters who want to vote are able to do so. N.J.S.A. Title 19. NJDOS is committed to enhancing voter access, improving the overall voting experience for New Jersey residents, and working with local election officials to coordinate the implementation of applicable federal and New Jersey elections laws.

7.    NJDOS works with all twenty-one county boards of elections, nine superintendents of elections, and twenty-one county clerks to administer federal, state, and local elections in New Jersey. These County Boards of Elections' various responsibilities working in conjunction with the Division of Elections include, but are not limited to: polling place selection; election district designation; recruitment, appointment, and training of poll workers; canvassing

2

the vote, and counting mail-in and provisional ballots; issuing credentials and overseeing poll challengers; issuing post-election ballot reports; and serving as Commissioner of Registration in counties that lack a Superintendent of Elections. Additionally, the nine Superintendents of Elections are responsible for receiving voter registration applications, verifying voter eligibility, maintaining voter records, and providing lists of eligible voters.

8.    In my role as Executive Director, I am responsible for the oversight and supervision of activities and programs within the Division of Elections, including creation and maintenance of the Statewide Voter Registration System, certification of voting equipment, acting as the filing officer for federal and state public offices, compilation and certification of election results, oversight of polling place accessibility, printing and distribution of voter registration forms, organization of the Board of State Canvassers post-election and Electoral College post-Presidential Elections, acting as clearinghouse for all election information and responding to public inquiries, and serving as grant manager for HAVA funding awards.

9.    I am familiar with the Executive Order published on March 31, 2026, entitled "Ensuring Citizenship Verification and Integrity in Federal Elections" (the "EO"). Upon information and belief Sections 2 through 5 of the EO (collectively, the "Challenged Provisions") have already caused considerable harm, confusion, fear, and disruption in New Jersey election administration.

10.    The EO has already caused issues with election administration in New Jersey. New Jersey administered a special election for its 11th Congressional District, including mail-in voting, in-person early voting from April 6 to April 14, and election day on April 16. Several county election officials involved in that election reached out in the days following publishing of the EO, inquiring whether it applied to the special election.

3

11.     The outreach regarding the special election in the 11th Congressional District in April, in which there were three eligible counties participating, could represent a fraction of the outreach and confusion the EO will generate for the June primary elections and November midterm general elections.

12.     It is my understanding that Section 2(a) of the EO directs the Department of Homeland Security ("DHS") to create a "State Citizenship List" for each State, which will include "individuals confirmed to be United States citizens who will be above the age of 18 at the time of an upcoming Federal election and who maintain a residence in the subject State." It is also my understanding that DHS will send these lists "no fewer than 60 days before each regularly scheduled Federal election, or promptly upon request by a State in connection with any special Federal election." This would mean that DHS will send this list by Friday, September 4, 2026, for the federal general election taking place on November 3, 2026.

13.     Section 2 requires immediate action from NJDOS to understand how it interacts with New Jersey's statewide voter registration list, and to coordinate with other state and local agencies across New Jersey. Efforts to address the changes and impacts of the EO will divert time and attention from other critical election preparations including regular voter roll maintenance and election-specific preparations. This is also true of county election officials. In the 60 days before an election, county level election workers engage in election-specific preparations, including related to polling places, poll workers, ballot printing, and other tasks. It is also during this period between and in the running up to elections that the Division of Elections and county election officials implement statutorily mandated updates to voter rolls and voting procedures. Dealing with the confusion and tasks stemming from the State Citizenship List during this same period will divert significant, necessary resources from those tasks.

4

14.    Diverting NJDOS personnel, time, and resources towards implementing the EO's requirement would directly harm New Jersey because NJDOS is currently engaged in critical tasks for the statewide Primary Election on June 2, 2026, as well as preparations for the General Election on November 3, 2026. NJDOS is also currently providing support for municipal elections taking place on May 12, 2026, maintaining local officials' access to the state voter registration system and supporting early voting.

15.    NJDOS has a continuing obligation to work with the counties to perform regular list maintenance, as required under the National Voter Registration Act ("NVRA"), Help America Voter Act ("HAVA"), and New Jersey state law. This includes sending notices to voters who may have moved, identifying duplicates on the statewide voter registration list, cancelling the registrations of those who are currently serving a sentence of incarceration as the result of an indictable offense, and cancelling the registration of those who have died.

16.    Additionally, NJDOS will need to continue to register those who are eligible to vote in New Jersey. New Jersey allows qualified individuals to register up to 21 days before Election Day. N.J.S.A. §§ 19:31-6; 52 U.S.C. § 20507(a)(1) (requiring States to permit registration up to 30 days before a federal election, and allowing States to set a voter registration application deadline closer to the date of the election if they choose). New Jerseyans can register to vote online, at their County Commissioner of Registration, at various state social service agencies, and through New Jersey's Motor Vehicle Commission when they submit sufficient information of their voter qualifications (including citizenship) through their transaction. Individuals must verify their eligibility by reporting identification and documentation during the registration process and under penalty of potential criminal penalties for falsity or fraud during the registration process. N.J. Stat. Ann. §§ 19:31-5; 19:31-6; 19:34-1; 19:34-26. Additionally, the

standard model voter registration application includes a declaration that the applicant is a U.S. citizen with the understanding the applicant may be subject to criminal penalties for false or fraudulent registration. N.J. Stat. Ann. § 19:31-6.4.

17.    In compliance with the Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA), New Jersey allows uniformed and overseas voters to register for a federal election if their registration application is received at least 21 days before that election. Then, to qualify for an absentee ballot, a uniformed or overseas voter's application for a ballot by airmail must be received by the thirtieth day preceding the election, or for a ballot distributed by electronic means, at least the fourth day preceding the election. 52 U.S.C. §§ 20302(a)(2); *see* N.J. Stat. Ann. § 19:59-4(a).

18.    In compliance with the NVRA "quiet period" for voter registration, New Jersey does not systematically remove voters from the rolls during the 90 days prior to a federal election unless a statutory exception applies.  *See* 52 U.S.C. §§ 20507(c)(2)(A), 3(A)-(B), 4(A).  New Jersey does, however, lawfully remove voters or update their information on an individual basis where appropriate, such as when a voter requests that his or her registration be canceled, when a voter requests their information be updated (such as when they move to a different county) or when a person registered to vote has passed away.

19.    In sum, New Jersey's statewide voter registration list changes up to and on Election Day.  Registrants are constantly being added, updated, and removed as required (and limited) by federal and state law, and this will continue through the 2026 election and beyond.

20.    I have considered how this dynamic statewide voter registration list will intersect with the list created by DHS.  As noted above, pursuant to Section 2(a) of the EO, DHS will share a State Citizenship List by September 4, 2026.  The EO permits the state "to routinely

6

supplement and provide suggested modifications or amendments to the State Citizenship List transmitted thereto." The EO does not require DHS to accept any of these state supplements, modifications, or amendments to the State Citizenship List.

21.     Once NJDOS receives the State Citizenship List, NJDOS will have to devote substantial resources to understanding any differences between it and NJDOS's current statewide voter registration list. As a baseline matter, comparing the State Citizenship List to NJDOS's current statewide voter registration list will necessitate linking registrants across the lists. This will be difficult, as it is extremely doubtful that the State Citizenship List will contain the same unique identifiers as our statewide voter registration list, such that NJDOS could perform straightforward matching. For example, New Jersey generates a unique Voter ID Numbers for each registered voter. Federal agencies do not necessarily have New Jerseyans' unique Voter ID Numbers, nor is there any guarantee they will be included in the State Citizenship List if they do. Even if the State Citizenship List does include each New Jerseyan's unique Voter ID Number, the Division of Elections and county election officials will face significant difficulties checking the State Citizenship List, which will likely contain millions of names, against New Jersey's statewide voter registration list.

22.     Rather, it is inevitable that there will be differences in the files that will make matching difficult, time-consuming, and potentially inaccurate, as people's names, addresses, and other information may vary slightly (*e.g.*, Robert vs. Bob, Apartment #3 vs. Apt. 3, middle initial vs. no middle initial, married last name or hyphenated last name). I know from my experience that data matching is a complex process and extreme care must be taken when the consequences of errors may lead to voter disenfranchisement. Moreover, the time constraint to accomplish this by software—and costs to create new software to enable this—would be

7

prohibitive and immense. And because New Jersey will receive the State Citizenship List so close to the election, NJDOS must plan for all of this now.

23.     For eligible voters who appear on the statewide voter registration list but not the State Citizenship List, NJDOS will need to scrutinize that discrepancy further pursuant to our obligation to ensure that eligible voters are able to vote. Even though New Jersey will not disenroll voters simply due to their absence from the State Citizenship List, the State Citizenship List could disenfranchise voters in multiple ways. First, voters who check their status on the State Citizenship List as contemplated by Section 2(a) and see that they are not listed may be deterred from voting because they believe they will be blocked from voting or prosecuted, especially if DHS does not timely accept their corrections. Second, USPS may rely on the State Citizenship List to determine which voters can receive and transmit mail ballots in response to the EO's emphasis on criminal penalties associated with the distribution of mail ballots to ineligible individuals. EO §§ 2(b), 3(a), 5. Additionally, if the State Citizenship List is publicly accessible, local elections workers fearful of prosecution under Sections 2(b) of the EO may misunderstand their legal obligations and err on the side of refusing to provide a ballot to eligible voters missing from the State Citizenship List based on the impression created  by the State Citizenship List that the voters are ineligible. These are all risks that New Jersey cannot accept.  New Jersey must make every effort to avoid disenfranchising eligible New Jerseyans.

24.     Accordingly, in compliance with New Jersey's obligation to protect the right to vote, New Jersey would expend significant resources to attempt to supplement and amend the federal list as necessary, as errors are found through our comparison and investigation. However, even if New Jersey is able to quickly offer all necessary corrections within the narrow

window of time between receiving the State Citizenship List and the election in question, the EO does not require DHS to accept the State's "suggested modifications or amendments." EO § 2(a).

25.    New Jersey would incur significant costs to undertake this comparison and verification of the State Citizenship List. Verifying the contents of the State Citizenship List against the state voter registration system would require significant time and effort from the county commissioner of registration offices to review the State Citizenship List and conduct investigations and other necessary action. The EO does not indicate how many individuals will be on the State Citizenship List, so NJDOS, the Division of Elections, and New Jerseys' twenty-one counties cannot prepare in advance for how much data, nor what kind of data, the List will include. In the alternative, New Jersey election officials may be able to use software to programmatically review and find differences between New Jersey's data and the data in the State Citizenship List, but this work would need to be done by a vendor whose costs are currently approximately $250 per hour. Given the potential number of data points in the list and the need to first figure out what types of data to use in a programmatic review of the State Citizenship List, this process could easily take hundreds of hours, totaling hundreds of thousands of dollars, including technology and programming expertise costs. Additionally, the timing of when the lists becomes available for review and its formatting and data limits the ability of vendors to propose and implement a programmatic solution so close to the election.

26.    The EO provides no funding, nor does New Jersey have time to earmark any State funding for these initiatives, so paying for these costs will have to come from diverting resources from NJDOS's and from county election officials' other pressing responsibilities, such as election management and coordination; and recruiting and training poll workers.

9

27.     In addition to coordinating with county election officials on the State Citizenship List as detailed above, NJDOS and Division of Elections are also responsible for producing training materials and guidance documents for election workers, as well as communicating with county election officials from all twenty-one counties up to and on Election Day, as well as generating public-facing guidance documents to mitigate any confusion amongst New Jersey voters.

28.     In the ordinary course, this training and education work includes producing election law literature for county boards of elections, county superintendents of elections, and County Clerks' offices (such as guidance documents, posters, updates to web-based tools for election officials, and handbooks), as well as public-facing materials for New Jersey voters (such as web-based Frequently Asked Questions pages, updates to online voter portals and forms, and voter registration checklists). Additionally, County Boards of Elections train poll workers and provide educational material for them.

29.     If Section 2 is implemented, New Jersey will have to devote significant time, personnel, and money to update training materials for local election officials and their staff, specifically detailing what steps they must take with respect to voters who appear on New Jersey's voter registration list but not on the State Citizenship List.  This is yet another aspect of the EO's implementation that will necessarily divert resources, time, and attention, from the Division of Elections and NJDOS leadership teams conducting other important election administration tasks. In doing so, they will also require assistance from legal counsel, which will in turn divert resources and time away from that counsel representing County Boards of Elections and Superintendents of Elections.

10

30.     I anticipate that in addition to formal training materials, NJDOS will need to allocate significant resources to responding directly to local election officials, given the threat of criminal prosecution in Section 2 of the EO. Even just in the first few days after the EO was signed, approximately four county election officials reached out to NJDOS with questions. Based on my experience, upon information and belief, the number of county election officials and members of the public reaching out about the EO's provisions will only increase as the June 2, 2026 Primary Election and November 3, 2026 General Elections get closer.

31.     In addition to communicating directly with county election officials about the EO and State Citizenship List, the NJDOS and Division of Election will need to dedicate time and resources ensuring all relevant entities are complying with the EO. This will add a time-intensive work stream in the 60 days leading up to federal elections, a period of time in which NJDOS and Division of Election employees, as well as county election officials are already working at capacity to operate elections in New Jersey. Adding EO compliance to that list of operations would undoubtedly require diverting personnel, time, and funding from other necessary projects, such as County Clerks designing and proofing ballots, as well as working to meet numerous other ballot and election deadlines

32.     At the same time NJDOS is reviewing the accuracy of the State Citizenship List, the Division of Elections, the County Boards of Elections and Superintendents will have to conduct a wide-ranging public education campaign to ensure that eligible voters understand the EO's requirements, and how they may impact a citizen's registration and ability to vote.  For example, NJDOS will have to prepare and distribute training materials guiding citizens through accessing and correcting their individual records on the State Citizenship List under section 2(a). NJDOS will also need to field questions from registrants concerned about their voter registration

status and generally confused about the process and qualifications to vote in New Jersey elections.

33.    Developing voter education campaigns like this to raise adequate public awareness about an election process change as significant as those invoked by the EO will take a substantial amount of time and potentially multiple election cycles, including in non-federal election cycles, to ensure voters are updating and checking their information regularly, and making sure voters understand any new policies and procedures.

34.    I estimate that such a public education effort would likely cost approximately $1 million over approximately three years. This money would need to be allocated going-forward, years in advance, as current voter education campaign budgets have already been finalized. This unexpected addition to voter education brought on by the EO would substantially burden the Division of Elections and County Boards of Elections' voter education budgets over the next several years.

35.    In my experience administering elections, changes to registration and election procedures in the time immediately preceding the election can cause voter confusion.  The complicated requirements of the EO will likely lead at the very least some citizens to misunderstand the requirements for registration, or whether they are able to vote in New Jersey's elections.  Some citizens may determine that the added requirements make registering and/or voting too confusing to be worthwhile.  For example, a voter may check their individual status on the State Citizenship list, according to the EO.  If they are mistakenly not included, they may believe they have no recourse, and choose not to vote, or they may misunderstand the process for correction (despite my office's attempts to provide education), or DHS may not issue a

correction in time.  The result of this confusion will be that fewer eligible voters successfully register to vote or decide to cast a ballot.

36.    It will also impose a burden on NJDOS's time, as NJDOS (and the elections staff at the counties) will be responsible for dispelling voter confusion to the extent possible.  This voter confusion will come at a crucial time, shortly before the election, when local elections officials' resources are particularly stretched.

37.    New Jersey elections officials are required by state law to issue ballots to duly registered voters. Pursuant to N.J. Stat. Ann. § 19:63-9, county clerks must forward mail-in ballots by first-class postage or hand delivery to eligible mail-in ballot voters no later than the 45th day before election day. Where a voter applies for a mail-in ballot within the seven days before an election allowed by N.J. Stat. Ann. § 19:63-3, the ballot must be transmitted to the eligible voter within two business days of the receipt of the application. N.J. Stat. Ann. § 19:63-9. Additionally, county clerks must also issue a mail-in ballot up to 3:00 p.m. the day before an election if an eligible voter appears in person and requests such a ballot. N.J. Stat. Ann. § 19:63-3. NJDOS intends to comply with these state legal requirements in administering upcoming federal elections.

38.    In compliance with UOCAVA, New Jersey issues ballots to registered voters who request a ballot under that Act at least 45 days before an election. N.J. Stat. Ann. § 19:63-9(d); 52 U.S.C. §§ 20302(a)(1)-(3), (8)(A). Although UOCAVA voters are subject to the same 21-day registration deadline before an election as all voters in New Jersey, they may request an electronically-issued mail-in ballot up to 4 days prior to an election. N.J. Stat. Ann. §§ 19:63-5, 19:59-4.

13

39.     Section 2(b) of the EO instructs the United States Attorney General to prioritize investigation and prosecution, under a variety of federal statutes, of "State and local officials or any others involved in the administration of Federal elections who issue Federal ballots to individuals not eligible to vote in a Federal election." The EO provides that "an individual is 'eligible to vote in a Federal election' if the individual is a citizen of the United States, 18 years of age or older by the date of the upcoming election, and otherwise qualified under the laws of his or her State." Section 5 of the EO encourages referrals to U.S. DOJ of "[e]vidence of violations of existing Federal laws by State or local election officials" and "States or localities," among other parties, "for consideration of investigation or charges."

40.     If EO Section 2 goes into effect, , NJDOS staff, and New Jersey elections officials would face federal prosecution if we issued ballots to New Jersey voters who are not on the State Citizenship List. These threats of criminal prosecution on NJ DOS staff, not because they have violated these provisions, but because the EO increases the amount of pressure and scrutiny on them, including by the public is concerning.

41.     The EO's threat of prosecution is significantly exacerbated by the fact that the EO defines voter eligibility in a manner inconsistent with New Jersey law. New Jersey law permits an otherwise eligible voter to cast a ballot in a federal primary election if the voter will be 18 years of age by the general election. N.J. Stat. Ann. § 19:31-5 (permitting 17-year-olds to register to vote if they will be 18 years old by the time of the first election in which they expect to vote); N.J. Stat. Ann. § 19:4-1.2 (permitting a registered 17-year-old to vote in the primary election before the general election if they turn 18 by the general election). EO Section 2(b) thus directly conflicts with state law, and it threatens New Jersey elections officials with prosecution for

14

issuing primary ballots to eligible 17-year-old voters. This issue has and will cause significant confusion about the rules applicable to upcoming elections.

42.     Shortly after the EO was issued, NJDOS received at least one communication from a local election official expressing concern that simply issuing mail ballots according to state law—that is, to voters who have affirmed their citizenship under penalty of perjury—could result in their arrest. Though NJDOS has not had issues staffing state and local election positions, numerous election staff have already left the election profession due to the everchanging landscape for elections which may include violence and threats, and threats of prosecution would only exacerbate that problem. This could become a serious problem in the future as people may not wish to take on the risk.

43.     Should the United States Attorney General initiate any such enforcement actions, NJDOS would be required to divert significant resources away from the administration and maintenance of elections to respond to such legal action.  Additionally, time spent defending state agencies or even myself against criminal charges would negatively impact NJDOS's ability to ensure the security, safety, and integrity of our State's elections.

44.     Any such legal proceedings would have severe and adverse consequences for the public's trust in New Jersey's administration of elections. Such public trust is integral to the proper and fair administration of our elections. For example, numerous polling locations throughout New Jersey received bomb threats during the 2025 general gubernatorial election. The Secretary of State, NJDOS, and the Division of Elections worked closely with law enforcement to assess these threats, determine that they were not credible, and efficiently communicate to the public that they were not credible while ensuring the safety of voters and poll workers; the public trust was integral to that process.

15

45.     Additionally, the creation of a State Citizenship List may directly disenfranchise voters. Based on my experience, if a citizen is not included on the list—due, for example, to errors in DHS's static immigration information contained in its Systematic Alien Verification for Entitlements (SAVE) system, the federal government's misinterpretation of whether the citizen qualifies as a state resident, or any other error—they may believe they are unable to vote, and could be prosecuted for doing so.  That is why New Jersey works so hard to maintain consistent voter registration information so that voters are not erroneously informed that they are ineligible to vote. The same is true of 17-year old primary voters, who are permitted to register and vote in primaries if they will turn 18 by the next general election. N.J. Stat. Ann. § 19:31-5; N.J. Stat. Ann. § 19:4-1.2.

46.     Based on my experience assisting local election workers, those workers may feel they cannot register or send a ballot to such voters without risking criminal prosecution, despite those voters' fundamental right to vote under state and federal law.

47.     New Jersey provides a mail ballot to all registered active voters who apply for a mail-in ballot at least seven days before an election (and up to four days prior for UOCAVA voters requesting electronic transmission), or if they had previously indicated their desire to vote via mail-in ballot since the November 2016 General Election. N.J. Stat. Ann. § 19:63-3. Additionally, county clerks may provide eligible voters a mail-in ballot by 3:00 p.m. the day before an election if the voter requests the ballot in person. N.J. Stat. Ann. § 19:63-3. Once a voter has requested a mail-in ballot for all future elections, they must notify the county clerk in writing that they no longer wish to receive mail-in ballots for any election. N.J. Stat. Ann. § 19:63-3(f). Alternatively, a voter who requested a mail-in ballot for all future elections who does not vote by mail for four consecutive years will no longer receive a mail-in ballot for future

elections; the voter shall be notified in writing of this change, but may still reapply in the future for mail-in-ballot delivery. N.J. Stat. Ann. § 19:63-5. NJDOS intends to comply with these state legal requirements in administering upcoming federal elections.

48.    Section 3(b) of the EO directs the United States Postal Service ("USPS") to initiate a rulemaking that, among other things, would allow States to provide lists of mail voters to USPS 60 days before an election, require the creation of a "Mail-In and Absentee Participation List" ("USPS Mail Ballot List") and prohibit USPS from delivering mail ballots sent by individuals not on the USPS Mail Ballot List.  It is also my understanding that New Jersey can "routinely supplement and provide suggested modifications or amendments" to the USPS Mail Ballot List, but USPS is not required to accept any changes provided by New Jersey.

49.    As soon as NJDOS had time to digest the contents of the EO, NJDOS immediately began considering what near-term actions the EO would necessitate. This would require two different sets of requirements: (1) preparing a plan for review and implementation of the list to be provided by DHS, followed by the development of associated training materials and guidance to be distributed to county commissioners of registration, and; (2) reviewing the USPS Mail Ballot List and preparing any response necessary for that within the 60 days leading up to the election. As for the State Citizenship List, NJDOS would need to advise county commissioners of registration on a unified process to cross-reference that list with New Jersey's Statewide Registration System, flag any inconsistencies between NJ voter rolls and the State Citizenship list by identifying any voters missing from the State Citizenship List, promptly notify any impacted voters, confirm impacted voters' eligibility, compile any inaccuracies in the State Citizenship List and those that may then, notify DHS of any inaccuracies with its list within the unknown amount of time required by forthcoming regulations pursuant to the EO. Even if

17

NJDOS and other election officials and personnel move as quickly as possible, it will be practically impossible—if not outright impossible—to complete these processes by the 45 days out from the election when mail-in ballots are to be delivered to eligible voters.

50.    Under Section 3(b) of the EO, in order to comply with state law requiring all eligible voters who have applied for or expressed interest in mail-in ballots to receive a mail-in ballot, at least 60 days before Election Day New Jersey would need to send a list to USPS of voters to whom New Jersey intends to send a mail-in ballot ("State Mail Ballot List"). N.J. Stat. § 19:63-5. For the 2026 federal general election, that deadline will be September 4, 2026. Moreover, New Jersey law permits eligible voters to request a mail-in ballot in person at the county clerk's office up to 3:00 p.m. the day before the election. N.J. Stat. Ann. § 19:63-3. Failing to provide this list to USPS would pose an unacceptable risk under the EO that USPS will not include New Jersey mail-in voters on the USPS Mail Ballot List, thereby making it more difficult or impossible for eligible voters to cast their ballots. Moreover, the EO's 60-day rule would no longer permit voters to utilize a mail-in ballot to its full capacity as they may be unaware of this new requirement, and the EO does not offer the ability to supplement the USPS Mail Ballot List after it is established at the 60 days mark. This will almost certainly disenfranchise numerous New Jersey voters. Additionally, without providing eligible voters recourse to cast a provisional ballot or other such protective measures, the EO does not have any provisions by which a voter or State will be notified if any ballots are intercepted and not delivered properly and as expected.

51.    As discussed throughout this declaration, New Jersey's use of the mail for elections, paired with our election calendar, mean NJDOS must plan now for how to align New Jersey's administration of mail voting with the EO.

18

52.     Creating the State Mail Ballot List and running the necessary comparisons with the federal lists will require NJDOS and local elections officials to expend time and resources to ensure that all active registered mail-in ballot voters are included.  This task will be significantly complicated by the influx of registration updates and changes that elections officials typically receive in the months before the election ( exacerbated by the State Citizenship List provisions discussed above).

53.     The deadline to provide this list to USPS no later than 60 days before the election means that some voters who are entitled to a mail ballot under state and federal law will unavoidably be left off the list. Under New Jersey law, voters may apply to receive a mail-in ballot up to seven days before an election, but may also request a mail-in-ballot in person at the county clerk's office up to 3:00 p.m. the day before the election. N.J. Stat. Ann. § 19:63-3. Moreover, UOCAVA voters may request a mail-in ballot electronically up to four days before the election. N.J. Stat. Ann. §§ 19:63-5, 19:59-4. Although the EO indicates that States will be able to "routinely supplement and provide suggested modifications or amendments" to the USPS Mail Ballot List, USPS is not required to accept our suggestions. The EO also does not specify when USPS will transmit its USPS Mail Ballot List to New Jersey, which could cause substantial complications.

54.     Once New Jersey receives the USPS Mail Ballot List, NJDOS will have to devote substantial resources to understanding any differences between it and New Jersey's own list of voters eligible to receive mail ballots. This will be a difficult task for many of the same reasons set out above with regard to the State Citizenship List, including: the lack of unique identifiers shared by both lists, the potential for slight variations in spelling to wrongly preclude matches, the fluid nature of voter registration rolls in the lead-up to elections, and administrative

19

challenges inherent to any data-matching process. Accordingly, reviewing the USPS Mail Ballot List will require a significant expenditure of time and resources.

55.     For citizens who appear on the statewide voter registration list and are eligible to receive a mail ballot under New Jersey law but not the USPS Mail Ballot List because USPS did not accept the supplemental lists provided by the State, NJDOS is obligated to ensure that every active registered mail-in ballot voter is able to receive a mail-in ballot as requested. New Jersey must make every effort to do so to avoid disenfranchising eligible New Jersey residents.

56.     New Jersey would expend significant resources to attempt to supplement and amend the USPS Mail Ballot list as necessary, as errors were found through our comparison and investigation. This is true even though the EO instructs that New Jersey can only "supplement" and "provide suggested modifications or amendments" to the USPS Mail Ballot List, and USPS is not required to accept them.

57.     Even with the best efforts of my office and local elections officials, the challenges of completing a complex data-matching program in a short timeframe and while preparing to administer an election poses the high risk of errors and omissions.

58.     New Jersey would incur significant costs to undertake this comparison and verification of the USPS Mail Ballot List. The State of New Jersey is currently experiencing an estimated $3 billion budget deficit for FY 2027, and NJDOS and Division of Elections resources are already stretched thin for preparing for the upcoming 2026 primary and general elections. Simply put, the EO's new required processes would not be feasible or even possible to implement.

59.     If Section 3 is implemented, New Jersey will have to devote significant time, personnel, and money to update training materials for local elections officials and their staff.

20

Those materials would have to specifically detail what steps they must take with respect to voters who appear on New Jersey's voter registration list and are eligible to receive a mail ballot under New Jersey law, but who do not appear on the State Citizenship List. This is yet another aspect of the EO's implementation that will necessarily divert significant resources from other critical election administration tasks and preparations. As noted above in the 60 days before an election, county level election workers engage in election-specific preparations, including related to polling places, poll workers, ballot printing, and other tasks. It is also during this period between and in the running up to elections that the Division of Election and county election officials implement statutorily mandated updates to voter rolls and voting procedures. Dealing with the confusion and tasks stemming from the State Citizenship List during this same period will divert significant, necessary resources from those tasks, leading to a substantial risk that the Division of Elections and county election officials violate state law. The EO's requirements, in short, would limit my office's ability to accomplish its vital statutorily-required responsibilities.

60. I anticipate that, in addition to formal training materials, NJDOS will need to allocate significant resources to responding directly to local elections officials, given the threat of criminal prosecution in the EO.

61. At the same time NJDOS is creating the State Mail Ballot List and State Citizenship List and comparing with the USPS Mail Ballot List they will have to field questions from citizens concerned about their ability to receive or return a mail ballot in the upcoming elections. Thus, a separate impact of the EO's directive concerns the need for a wide-ranging public education campaign to ensure that eligible voters understand the EO's requirements, and how they may impact a citizen's ability to vote by mail. This is particularly the case for New Jersey residents: although New Jersey law still requires eligible voters to apply for mail-in

21

ballots, a substantial proportion of the State's eligible voters do and are used to automatically receiving mail ballots and being able to vote by mail under existing state law. For example, data collected by the Division of Elections shows between 21.9% and 41.1% of the votes in New Jersey elections between 2021 and 2023 were cast by mail-in ballot, with 21.16% and 19.46% of the ballots cast being mail-in ballots in the 2022 and 2024 general elections, respectively.

62.    Apart from the time and significant resource costs that Section 3's implementation would impose on New Jersey, Section 3 also risks voter confusion and disenfranchisement. This inevitable voter confusion is a harm in and of itself and is also a burden on my staff's time. This voter confusion will come at a crucial time shortly before the election, when state and local elections officials are required under New Jersey law to send mail ballots to all eligible mail-in ballot voters.

63.    Sending mail ballots in a timely fashion is not only required by state and federal law, but is critical to ensuring that as many eligible New Jerseyans as possible can exercise their right to vote. Data collected by the Division of Elections shows between 21.9% and 41.1% of the voters in New Jersey elections between 2021 and 2023 were cast by mail-in ballot. In the 2024 General Election, 19.46% of the ballots cast in New Jersey were mail-in ballots.

64.    Errors in the State Citizenship List would be extremely deleterious because of the potential for voter disenfranchisement. For example, consider an eligible voter who is on the State Mail Ballot List but not on the State Citizenship List. Under the EO, they are likely to receive a mail ballot from their local elections official that USPS will later refuse to return to the local elections official. In that situation, the voter may think that they have voted, but they have not. Nor would the voter necessarily know that their ballot was not delivered and how to vote in an alternative manner, given that the EO does not charge USPS with notifying the voter. A voter

22

may also be concerned about casting two ballots, which is itself a criminal violation, and choose not to vote. NJDOS must take every measure possible to avoid this kind of voter disenfranchisement.

65.     In my experience administering elections, changes to election procedures in the time immediately preceding an election can cause voter confusion. The EO's complicated requirements will likely lead some eligible voters to misunderstand whether they are able to use a mail ballot. Some eligible voters will determine that the added requirements make voting too confusing to be worthwhile. The result of this confusion will be that fewer eligible voters decide to cast a ballot.

66.     There are several additional inherent problems posed by the deadlines outlined above and the requirement to compare static lists (the State Citizenship List, USPS Mail Ballot List, and State Mail Ballot List) with a constantly evolving list (the statewide voter registration list). For example, between the day the State Citizenship List is sent and 7 days before Election Day (the last day a voter may apply to receive a mail ballot under New Jersey law except for voters who request a mail-in ballot in person 3:00 p.m. the day before the election, N.J. Stat. Ann. § 19:63-3) there will inevitably be a significant number of individuals who become eligible but are not captured on the State Citizenship List. They may, for example, have moved to New Jersey 30 days before Election Day or become a naturalized citizen after the list was sent, and there is no reason or justification necessary for applying for and receiving a mail-in ballot. Regarding voters who have moved, there are no legal requirements that voters regularly report change of residential address to the Federal Government.

67.     Additionally, as already noted, the timeline simply does not seem workable. The EO requires DHS to send the State Citizenship List to States "no fewer than 60 days before each

23

regularly scheduled Federal election." For the November 3, 2026 General Election, that means DHS must send this list by Friday, September 4, 2026. And New Jersey must also send its State Mail Ballot List to USPS 60 days before the election—also Friday, September 4, 2026. Thus, New Jersey must send the State Mail Ballot List (i.e., all those who should receive a mail ballot under state law) to USPS on the *same day* we might receive the State Citizenship List from DHS. Comparing the statewide voter registration list and the State Citizenship List to see who is eligible according to both lists in *one day*, or even *a few hours*, is simply not possible to do with any meaningful degree of accuracy, no matter how many resources NJDOS dedicates to the project.

68.     Although the EO provides that New Jersey may "routinely supplement and provide suggested modifications or amendments" to the USPS Mail Ballot List, there is no guarantee that USPS will accept those suggestions. New Jersey could endeavor to submit additional matches as they are confirmed. But it would be very difficult to do so quickly enough to be effective. On September 19, 2026—only two weeks after we receive the State Citizenship List—New Jersey's UOCAVA voters' ballots must be mailed out. The same is true for registered mail-in ballot voters. And it does not capture the ability of eligible voters to request a mail-in ballot in person by 3:00 p.m. the day before an election, or UOCAVA voters who can request a mail-in ballot electronically up to four days before an election. Even if DHS and USPS accepted New Jersey's suggestions, there is unlikely to be enough time to get a ballot to those who are eligible but did not appear on the State Citizenship List.

69.     Again, because of New Jersey's obligation to ensure that every eligible state resident who has applied to vote by mail-in ballot can vote by mail-in ballot, New Jersey would need to take additional steps after receiving the State Citizenship List to investigate the status of

24

all those on the statewide registration list who do not appear on the federal list, and then suggest changes. This will require data matching, verification, follow-up investigations, and interfacing with DHS, USPS, counties, the public, and others, and will demand an enormous investment of resources.

70. Any new staffing needs will result in significant additional costs.

71. Any time spent by current NJDOS staff on implementing the EO would divert time and attention from other critical election preparation in the days leading up to the election, NJDOS's busiest time. NJDOS staff is already at capacity and dedicated to routine tasks and special projects that ensure New Jersey's elections run smoothly and every eligible state resident can exercise their right to vote. This work becomes more voluminous, significant, and urgent in the months leading up to the election, when NJDOS must answer an increasing volume of questions and handle tasks related to, for example, campaign finance reporting, logic and accuracy testing, and voter challenges.

72. Each of these tasks and costs will divert scarce resources from other important election administration needs. NJDOS and Division of Elections resources are already stretched thin, and implementation of this EO would pull resources from important ongoing projects. As noted above, in the 60 days before an election, county level election workers engage in election-specific preparations, including related to polling places, poll workers, ballot printing, and other tasks. It is also during this period between and in the running up to elections that the Division of Elections and county election officials implement statutorily mandated updates to voter rolls and voting procedures. Dealing with the confusion and tasks stemming from the State Citizenship List during this same period will divert significant, necessary resources from those tasks, leading to a substantial risk that the Division of Elections and county election officials violate state law.

25

73.     In New Jersey, as in much of the country, ballot envelopes vary by county.  I am deeply concerned about the length of time it would take for USPS to conduct ballot design review for thousands of jurisdictions. Waiting on USPS to approve ballot design has the potential to seriously disrupt and delay carefully timed steps necessary to deliver mail ballots to New Jersey voters. Managing the fallout from such a delay would force my office and local elections officials to divert critical time and money from other elections administration duties to expedite other steps in the mail ballot process, educate the public about the status of mail ballots, and otherwise mitigate the harm from delays to the process.

74.     It is my understanding that Section 5 of the EO directs that "States and localities should preserve, for a 5-year period, all records and materials—excluding ballots cast—evidencing voter participation in any federal election (e.g., ballot envelopes, regardless of carrier)." Existing federal law only requires preservation of voting materials for 22 months following an election, and preservation of records concerning voter roll maintenance for two years.  52 U.S.C. §§ 20507(i)(1), 20701. New Jersey law and regulation also set timelines for the preservation and destruction of voting materials in federal elections; for election officials, most election materials and records must be retained for two years after an election. *See* N.J. Stat. Ann. §§ 119:18-7, 19:15-6, 19:53A-13, 19:53B-20, 19:63-17, and 19:63-24.

75.     Compliance with a five-year document preservation standard for election materials would impose significant compliance, storage, and other costs on New Jersey and local elections officials.

76.     For example, current document retention requires New Jersey to retain election materials and records for two years after an election.

77.     More than doubling the required retention time for some (but not *all*) voting materials would increase these burdens and costs significantly.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 21, 2026, at Trenton, New Jersey.

Donna Barber
Executive Director
New Jersey Department of State

27