**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

STATE OF CALIFORNIA; et al.,

     *Plaintiffs,*

v.

DONALD J. TRUMP, in his official
capacity as President of the United States; et
al.,

     *Defendants.*

Case No. 1:26-cv-11581

## DECLARATION OF KRISTEN ZEBROWSKI STAVISKY

  I, KRISTEN ZEBROWSKI STAVISKY, declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

  1. I am a resident of the State of New York. I am over the age of 18 and have personal knowledge of all the facts stated herein, except those matters stated upon information and belief; as to those matters, I believe them to be true.  If called as a witness, I could and would testify competently to the matters set forth below.

  2. I am the Co-Executive Director of the New York State Board of Elections. The New York State Board of Elections is governed by a bipartisan board of four commissioners consisting of two democratic commissioners and two republican commissioners, and two Co-Executive Directors who oversee day-to-day activities of the agency. Additionally, within this context, I am the Chief State Election Official designated pursuant to 52 U.S.C. § 20509. In that role, I am directly involved in the application and implementation of state and federal laws relating to elections.

1

3.      I have served as the Co-Executive Director and Chief State Election Official since 2021. I previously served as Commissioner of Elections at the Rockland County, New York, Board of Elections.  Accordingly, I am familiar with voter registration processes in New York, election funding, and the interplay between state and federal laws governing elections.

4.      New York and its subdivisions are responsible for administering federal elections in New York.  This responsibility encompasses voter registration, maintaining and updating voter rolls, issuing ballots to registered voters, tabulating votes, and certifying results in all elections for federal office, among numerous other tasks.

5.      Specifically, the New York State Board of Elections implements or oversees the requirements of state and federal law with regard to elections, including enforcing laws, certification of election results encompassing more than one county and providing technical information to the public and other parties. Voter registration and conducting the mechanics of New York's elections are done by local boards of elections, specifically the New York City Board of Elections and, outside of the City of New York, county boards of elections.

6.      The New York State Board sets standards for how local boards of elections operate.  The New York State Board of Elections routinely issues mandatory guidance on compliance with all aspects of election administration.

7.      In my position as Co-Executive Director of the New York State Board of Elections, I am designated also as the state's Chief State Election Official, in the context of the bipartisan New York State Board of Elections, which executes and enforces all state and federal law relating to elections within the state. *See* N.Y. Election Law 3-100 (State Board of Elections) and 3-200 (local boards of elections).  The New York State Board of Elections is responsible for implementing the responsibilities with regard to elections, including enforcing

2

laws and providing technical information to the public and other parties. Under New York law, the New York State Board of Elections is charged with preventing disenfranchisement and ensuring that all eligible voters who want to vote are able to do so.  N.Y. Election Law 3-102 (14) mandates the taking of "all appropriate measures to encourage the broadest possible voter participation in elections including the administration of a program of registration for distribution by participating state agencies…"

8.    In my role as Co-Executive Director, I am among those responsible for overseeing the correct and legal administration of election processes under the National Voter Registration Act ("NVRA"), developing election guidance, voting machine certification, the infrastructure of the statewide voter registration database, and issuing mandatory guidance and instructions to local boards of elections on every aspect of election administration.  Given my past role as a County Election Commissioner my familiarity with these processes is both overarching and often granular.

9.    I am familiar with the Executive Order published on March 31, 2026, entitled "Ensuring Citizenship Verification and Integrity in Federal Elections" (the "EO").  Sections 2 through 5 of the EO (collectively, the "Challenged Provisions") have already caused considerable harm, confusion, fear, and disruption in New York election administration as preparation for the November 3,2026 election is already underway, and will impose unrecoverable costs on New York.

10.    Many voters have expressed fear as to whether they will be able to vote, whether they can still return ballots by mail. With elections approaching imminently, they are worried that their current voter registration needs to be redone. I have received many such communications directly from voters, and election officials throughout New York – the

3

bipartisan commissioners and staff of New York's 58 local boards of elections – have fielded numerous anxious inquiries.  In addition, I have directed my staff to plan for how to allay voter trepidations, and work on funding and legislative/partner initiatives to address the harms.

11.     It is my understanding that Section 2(a) of the EO directs the Department of Homeland Security ("DHS") to create a "State Citizenship List" for each State, which will include "individuals confirmed to be United States citizens who will be above the age of 18 at the time of an upcoming Federal election and who maintain a residence in the subject State."  It is also my understanding that DHS will send these lists "no fewer than 60 days before each regularly scheduled Federal election, or promptly upon request by a State in connection with any special Federal election."  This would mean that DHS will send this list by Friday, September 4, 2026, for the federal general election taking place on November 3, 2026.

12.     Section 2 requires immediate action from me and my team at the New York State Board of Elections to understand how it interacts with New York's statewide voter registration list, and to coordinate with other state and local agencies across New York.  The EO has therefore already impacted our operations, and will soon massively divert time and attention from other critical election preparations.  We have a number of technology projects under way (improvements to automatic voter registration, a system to receive electronic election information from local boards, and internal infrastructure improvements in campaign finance and election administration systems).  Our institutional technology staff is deeply involved in improving, maintaining and critically protecting our technology systems. Constructing an interface or communication structure of any kind with the illusory "State Citizenship List" by September 4, is nearly, if not, impossible. Incorporating this data flow, syncing new procedures and processes between state and local systems and training staff at all 58 local boards of

4

elections would be a herculean undertaking and likely not attainable. Meanwhile, the staffing and resource levels currently well-equilibrated to administer the 2026 elections in accord with current and existing federal and state law will be thrown into uncertainty and increase risks of critical system failures and resulting disenfranchisement.

13.    The New York State Board of Elections office has a continuing obligation to work with the counties to perform regular list maintenance, as required under the NVRA, Help America Voter Act ("HAVA"), and New York State law.  This includes sending notices to voters who may have moved, identifying duplicates on the statewide voter registration list, cancelling the registrations of those who have been convicted of a felony and are currently incarcerated, and cancelling the registration of those who have died.

14.    Of course, New York will need to continue to register those who are eligible to vote in New York.  New York allows qualified individuals to register as long as their application is received up to ten days before Election Day. *See* N.Y. Election Law 5-210 (3); 52 U.S.C. § 20507(a)(1) (requiring States to permit registration up to 30 days before a federal election).  New York permits voters registered in New York to be transferred elsewhere in New York and have their votes counted. New York also allows court orders issued on Election Day to register a voter left off the rolls entirely for an unlawful reason.  New York's eligible citizens can register to vote online, at their county clerk's office, at various state social service agencies, and through the New York Department of Motor Vehicles when they submit sufficient information of their voter qualifications (including citizenship) through their transaction.  Individuals must expressly verify their eligibility to register to vote in federal elections.

15.    In compliance with the Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA), New York allows uniformed and overseas voters to register for a federal election if

5

their registration application is received at least 10 days before the election, more generous than the 30-day safe harbor before the election provided by federal law. *See* N.Y. Election Law 10-106 (5)); 11-202 (1) (b); 52 U.S.C. §§ 20302(a)(2).

16.     In compliance with the NVRA "quiet period" for voter registration, New York cannot and does not systematically remove voters from the rolls during the 90 days prior to a federal election unless a statutory exception applies. *See* 52 U.S.C. §§ 20507(c)(2)(A), 3(A)-(B), 4(A). New York does, however, lawfully remove voters on an individual basis where appropriate, such as when a voter requests that his or her registration be canceled.

17.     In sum, New York's statewide voter registration list changes up to and on Election Day. Registrants are constantly being added, updated, and removed as required (and limited) by federal and state law, and this will continue through the 2026 election and beyond.

18.     I have considered how this dynamic statewide voter registration list will interact with any list created by DHS. As noted above, pursuant to Section 2(a) of the EO, DHS will share a State Citizenship List by September 4, 2026. The EO permits the state "to routinely supplement and provide suggested modifications or amendments to the State Citizenship List transmitted thereto." The EO does not require DHS to accept any of these state supplements, modifications, or amendments to the State Citizenship List.

19.     Once we receive the State Citizenship List, we will have to devote substantial resources to understanding any differences between it and our current statewide voter registration list. As a baseline matter, comparing the State Citizenship List to our current statewide voter registration list will necessitate linking registrants across the lists. This will be difficult, as it is extremely doubtful that the State Citizenship List will contain the same unique identifiers as our statewide voter registration list, such that we could perform straightforward matching. Rather, it

6

is inevitable that there will be differences in the files that will make matching difficult, time-consuming, and potentially inaccurate, as people's names, addresses, and other information may vary slightly (*e.g.*, Robert vs. Bob, Apartment #3 vs. Apt. 3, Rt. Vs Route, Rebecca vs Becky). I know from my experience that data matching is a complex process and extreme care must be taken when the consequences of errors may lead to voter disenfranchisement. And because New York will receive the State Citizenship List so close to the election, I must plan for all of this now.

20.    For eligible voters who appear on the statewide voter registration list but not the State Citizenship List, my office will need to investigate further pursuant to our obligation to ensure that eligible voters are able to vote. Even though New York will not disenroll voters simply due to their absence from the State Citizenship List, it could disenfranchise voters in multiple ways. First, voters who check their status on the State Citizenship List as contemplated by Section 2(a) and see that they are not listed may be deterred from voting because they believe they will be blocked from voting or prosecuted, especially if DHS does not timely accept their corrections. Second, United States Postal Service ("USPS") may rely on the State Citizenship List to determine which voters can receive and transmit mail ballots in response to the EO's emphasis on criminal penalties associated with the distribution of mail ballots to ineligible individuals. EO §§ 2(b), 3(a), 5. Additionally, if the State Citizenship List is publicly accessible, local elections workers may misunderstand their legal obligations and refuse to provide a ballot to eligible voters missing from the State Citizenship List based on their belief that the voters are ineligible. These are all risks that New York cannot accept. We must make every effort to avoid disenfranchising eligible New York voters.

7

21.    Accordingly, in compliance with New York's obligation to protect the right to vote, New York would expend significant resources to attempt to supplement and amend the federal list as necessary, as errors were found through our comparison and investigation. This includes determining proper and secure methods for sending large volumes of confidential data to the federal government. However, even if we are able to quickly offer all necessary corrections, the EO does not require DHS to accept the State's "suggested modifications or amendments." EO § 2(a).

22.    New York would incur significant costs to undertake this comparison and verification of the State Citizenship List. Having significant experience in all of the types of processes involved, I can state without equivocation, at a minimum, the cost will be in the tens of millions of dollars. The EO provides no funding, so paying for these costs will have to come from devoting fewer resources to our office's other pressing responsibilities.

23.    A critical role of the New York State Board is to instruct the 58 local boards of elections throughout New York how to comply with the law and, of course, new mandates. To that end, we send out guidance documents, instructions, conduct in-person and virtual trainings, and hold regular calls with the county commissioners and their designated staff. To implement the EO we will need to produce new training materials, guidance documents, and communications to elections officials and update a myriad of procedures, including PowerPoints, tutorials and new references and checklists or FAQs. Based on what the EO entails procedurally, it will be a heavy lift to implement. With the federal election just seven months out, New York needs to prepare now to implement the EO to the detriment of tackling important work that always presents itself in the months leading to an election.

8

24.     If Section 2 is implemented, New York will have to devote significant time, personnel, and money to update training materials for local election officials and their staff, specifically detailing what steps they must take with respect to voters who appear on New York's voter registration list but not on the State Citizenship List. This is yet another aspect of the EO's implementation that will necessarily divert from other important election administration tasks.

25.     I anticipate that in addition to formal training materials, my office will need to allocate significant resources to responding directly to local election officials, given the threat of criminal prosecution in Section 2 of the EO. Indeed, the ill-thought order seemingly sets the stage to criminally persecute election officials for the chaos it creates.

26.     At the same time my staff is performing investigations into the accuracy of the State Citizenship List, they will have to conduct a wide-ranging public education campaign to ensure that eligible voters understand the EO's requirements, and how they may impact a citizen's registration and ability to vote. For example, my staff will have to prepare and distribute training materials guiding citizens through accessing and correcting their individual records on the State Citizenship List under section 2(a). We will also need to field questions from registrants concerned about their voter registration status and generally confused about the process and qualifications to vote in New York elections.

27.     I estimate that such a public education effort would likely cost millions of dollars and as of now is not supported by any available appropriation.

28.     In my experience administering elections, changes to registration and election procedures in the time immediately preceding the election can cause voter confusion. The complicated requirements of the EO will likely lead some citizens to misunderstand the

requirements for registration, or whether they are able to vote in New York elections. Some citizens will determine that the added requirements make registering and/or voting too confusing to be worthwhile. For example, a voter may check their individual status on the State Citizenship list, according to the EO. If they are mistakenly not included, they may believe they have no recourse, and choose not to vote, or they may misunderstand the process for correction (despite my office's attempts to provide education), or DHS may not issue a correction in time. The result of this confusion will be that fewer eligible voters successfully register to vote or decide to cast a ballot. To be clear, confusion has already taken hold given that some voters believe these requirements are already in place.

29. This inevitable tidal wave of voter confusion harms New York because it will disenfranchise voters, interfering with our sovereign interest and state-law obligation to ensure that all eligible voters who want to can cast a vote. It will also impose a burden on board of election staff time, as we will be responsible for dispelling voter confusion to the extent possible. This voter confusion has already begun and will continue through a crucial time, shortly before the election, when local elections officials' resources are particularly stretched.

30. New York elections officials are required by state law to issue ballots to duly registered voters. *See* N.Y. Election Law 8-300 *et. seq*; 8-402; 8-406. New York's election officials must comply with these state legal requirements in administering upcoming federal elections.

31. In compliance with UOCAVA, New York's election officials first issue ballots to registered UOCAVA voters who request an absentee ballot under that Act at least 46 days before an election. 52 U.S.C. §§ 20302(a)(1)-(3), (8)(A). While federal law provides a 45-day deadline

pre-election, New York law adds an additional day making the transmittal deadline 46 days before.

32.    It is my understanding that Section 2(b) of the EO instructs the Attorney General to prioritize investigation and prosecution, under a variety of federal statutes, of "State and local officials or any others involved in the administration of Federal elections who issue Federal ballots to individuals not eligible to vote in a Federal election." I understand that the EO provides that "an individual is 'eligible to vote in a Federal election' if the individual is a citizen of the United States, 18 years of age or older by the date of the upcoming election, and otherwise qualified under the laws of his or her State." I further understand that Section 5 of the EO encourages referrals to U.S. DOJ of "[e]vidence of violations of existing Federal laws by State or local election officials" and "States or localities," among other parties, "for consideration of investigation or charges."

33.    If EO Section 2 goes into effect, I would be concerned that I, my staff, and other New York elections officials would face federal prosecution if we issued ballots to lawful New York voters who are not on the State Citizenship List. I am concerned about the impact of these threats of criminal prosecution on my staff, not because I believe they have violated these provisions, but because the EO increases the amount of pressure and scrutiny on them, suddenly reimagining what these laws mean after decades of settled procedure.

34.    I know that the threat of prosecution under the EO is on the minds of state and local elections officials like me. Though we have not had issues staffing state and local election positions, I worry that this could become a problem in the future as people may not wish to take on the risk.

11

35.    Should the Attorney General initiate any such enforcement actions, the New York State Board of Elections would be required to divert significant resources to respond to such legal action.  There is deep concern that the Attorney General will simply "take out" election officials by putting the burden of criminal prosecution upon them. Their innocence would not much matter given the stakes and expense of a criminal prosecution – which is why such things are not properly undertaken lightly by good-faith actors. I have no confidence that the federal actors making decisions in this regard are good faith actors; in fact, I have a reasonable belief that they are not. It is chilling in a way with no antecedent in my experience.

36.    Any such legal proceedings would have severe and adverse consequences for the public's trust in New York's administration of elections.  At a time when false information and conspiracies grounded in election denialism are already rampant, a *single* sham prosecution of an election official would erode public trust in our democratic processes.

37.    Additionally, the creation of a State Citizenship List may directly disenfranchise voters.  Based on my experience, I know that if a citizen is not included on the list—due, for example, to errors in DHS's static immigration information contained in its Systematic Alien Verification for Entitlements (SAVE) system, the federal government's misinterpretation of whether the citizen qualifies as a state resident, or any other error—they may believe they are unable to vote, and could be prosecuted for doing so.  That is why election officials in New York work so hard to maintain consistent voter registration information so that voters are not erroneously informed that they are ineligible to vote, and that we have robust and efficacious processes to correct any errors in a way that maximizes voter enfranchisement.

38.    Based on my experience assisting local election workers, I know many may feel they cannot register or send a ballot to such voters without risking criminal prosecution, despite

12

those voters' fundamental right to vote under state and federal law.  Similarly, based on my experience, I know that USPS or other entities involved in the "printing, production, shipment, or distribution of ballots" may believe they cannot provide a ballot to those voters without risking criminal prosecution.

39.     New York provides a mail ballot to all voters who make a timely application. While there are various overlapping statutory frameworks toward this end, the sum of New York law is that all New York voters are eligible to vote by mail without needing special justification. New York election officials must comply with these state legal requirements in administering upcoming federal elections.

40.     It is my understanding that Section 3(b) of the EO directs USPS to initiate a rulemaking that, among other things, would allow States to provide lists of mail voters to USPS 60 days before an election, require the creation of a "Mail-In and Absentee Participation List" ("USPS Mail Ballot List") and prohibit USPS from delivering mail ballots sent by individuals not on the USPS Mail Ballot List.  It is also my understanding that New York can "routinely supplement and provide suggested modifications or amendments" to the USPS Mail Ballot List, but USPS is not required to accept any changes provided by New York. Nor is there any hint as to how any of this would or could come to pass.

41.     As soon as our team had time to digest the contents of the EO, I immediately began considering what near-term actions the EO purports to require from my office, including preparing to create the State List and check the USPS Mail Ballot List, preparing guidance for the counties, involving state agencies and the Governor's Office, building out data analysis infrastructure and cyber security protections, and—as discussed further below—committing additional staff time to responding.

13

42.    As discussed throughout this declaration, New York's use of the mail for elections, paired with our election calendar, mean I must plan now for how to align our administration of mail voting with the EO.

43.    Creating the State Mail Ballot List will require my office and local elections officials to expend time and resources to ensure that all such voters are included. This task will be significantly complicated by the influx of registration updates and changes that elections officials typically receive in the months before the election (and which I expect will be exacerbated by the State Citizenship List provisions discussed above). Indeed, previously a voter who applied for a ballot in the run-up to an election, say two weeks before, would most often be sent a ballot on the day of application.

44.    The deadline to provide this list to USPS no later than 60 days before the election means that a large number of voters who are entitled to a mail ballot under state and federal law will unavoidably be left off the list, and unless the list will be updated in near-real time, it will disenfranchise large numbers of voters. UOCAVA permits uniformed and overseas voters who request absentee ballots up to 45 days before an election to receive them by that date. 52 U.S.C. § 20302(a)(8). Under New York law, UOCAVA voters can request a ballot as late as ten or, if already registered, seven days before the election. *See* N.Y. Election Law 10-106; 11-202. Although the EO indicates that States will be able to "routinely supplement and provide suggested modifications or amendments" to the USPS Mail Ballot List, USPS is not required to accept our suggestions. The EO also does not specify when USPS will transmit its USPS Mail Ballot List to our office, which could cause substantial complications.

45.    Once we receive the USPS Mail Ballot List, we will have to devote substantial resources to understanding any differences between it and our own list of voters eligible to

14

receive mail ballots. This will be a difficult task for many of the same reasons set out above with regard to the State Citizenship List, including: the lack of unique identifiers shared by both lists, the potential for slight variations in spelling to wrongly preclude matches, the fluid nature of voter registration rolls in the lead-up to elections, and administrative challenges inherent to any data-matching process. Accordingly, reviewing the USPS Mail Ballot List will require a significant expenditure of time and resources.

46. For citizens who appear on the statewide voter registration list and are eligible to receive a mail ballot under New York law but not the USPS Mail Ballot List, New York election officials will need to investigate further pursuant to our obligation to ensure that every active registered voter who wants a mail ballot and duly applies receives a mail ballot as requested. We must make every effort to do so to avoid disenfranchising eligible voters.

47. New York would expend significant resources to attempt to supplement and amend the USPS Mail Ballot list as necessary, as errors were found through our comparison and investigation. This includes determining proper and secure methods for sending large volumes of confidential data to the USPS. This is true even though the EO instructs that we can only "supplement" and "provide suggested modifications or amendments" to the USPS Mail Ballot List, and USPS is not required to accept them.

48. Even with the best efforts of my office and local elections officials, the challenges of completing a complex data-matching program in a short timeframe and while preparing to administer an election poses the high risk of errors and omissions.

49. New York would incur significant costs to undertake this comparison and verification of the USPS Mail Ballot List.

15

50. If Section 3 is implemented, New York will have to devote significant time, personnel, and money to update training materials for local elections officials and their staff. Those materials would have to specifically detail what steps they must take with respect to voters who appear on our voter registration list and are eligible to receive a mail ballot under New York law, but who do not appear on the USPS Mail Ballot List. This is yet another aspect of the EO's implementation that will necessarily divert resources from other important election administration tasks.

51. I anticipate that, in addition to formal training materials, my office will need to allocate significant resources to responding directly to local elections officials, given the threat of criminal prosecution in the EO.

52. At the same time my staff is creating the State Mail Ballot List and performing investigations into the accuracy of the USPS Mail Ballot List, they will have to field questions from citizens concerned about their ability to receive or return a mail ballot in the upcoming elections. Thus, a separate impact of the EO's directive concerns the need for a wide-ranging public education campaign to ensure that eligible voters understand the EO's requirements, and how they may impact a citizen's ability to vote by mail. This is particularly the case for New York residents, who are used to automatically receiving mail ballots (Permanent Absentee Voters) and being able to vote by mail under existing state law.

53. I estimate that such a public education effort would likely cost hundreds of thousands of dollars.

54. Apart from the time and monetary costs that Section 3's implementation would impose on New York, Section 3 also risks voter confusion and disenfranchisement. This inevitable voter confusion is a harm in and of itself and is also a burden on my staff's time. This

16

voter confusion will come at a crucial time shortly before the election, when state and local elections officials are required under New York law to send mail ballots.

55.    Sending mail ballots in a timely fashion is not only required by state and federal law, but is critical to ensuring that as many eligible New York citizens as possible can exercise their right to vote. In the 2024 General Election, 836,987 voters in New York voted by mail.

56.    Errors in the USPS Mail Ballot List would be extremely deleterious because of the potential for voter disenfranchisement. For example, consider an eligible voter who is on the State Mail Ballot List but not on the USPS Mail Ballot List. Under the EO, they are likely to receive a mail ballot from their local elections official that USPS will later refuse to return to the local elections official. In that situation, the voter may think that they have voted, but they have not. Nor would the voter necessarily know to cancel that ballot and vote in person, given that the EO does not charge USPS with notifying the voter. A voter may also be concerned about casting two ballots, which is itself a criminal violation, and choose not to vote. My office must take every measure possible to avoid this kind of voter disenfranchisement.

57.    In my experience administering elections, changes to election procedures in the time immediately preceding an election can cause voter confusion. The EO's complicated requirements will likely lead some eligible voters to misunderstand whether they are able to use a mail ballot. Some eligible voters will determine that the added requirements make voting too confusing to be worthwhile. The result of this confusion will be that fewer eligible voters decide to cast a ballot.

58.    There are several additional inherent problems posed by the deadlines outlined above and the requirement to compare static lists (the State Citizenship List, USPS Mail Ballot List, and State Mail Ballot List) with a constantly evolving list (the statewide voter registration

17

list). For example, between the day the State Citizenship List is sent and ten days before Election Day (the last day a voter may register and receive a mail ballot under New York law) there will inevitably be a significant number of individuals who become eligible but are not captured on the State Citizenship List. They may, for example, have moved to New York more than 30 days before the election and thus became a state resident for voting purposes or become a naturalized citizen after the list was sent. Regarding voters who have moved, I am not aware of any legal requirement that voters regularly report change of residential address to the Federal Government.

59.    Additionally, as already noted, the timeline is simply not workable. The EO requires DHS to send the State Citizenship List to States "no fewer than 60 days before each regularly scheduled Federal election." For the November 3, 2026 General Election, that means DHS must send this list by Friday, September 4, 2026. And New York must also send its State Mail Ballot List to USPS 60 days before the election—also Friday, September 4, 2026. Thus, we must send the State Mail Ballot List (i.e., all those who should receive a mail ballot under state law) to USPS on the *same day* we might receive the State Citizenship List from DHS, and 50 days before New York's application deadline for a mail ballot. Comparing the statewide voter registration list and the State Citizenship List to see who is eligible according to both lists in *one day*, or even *a few hours*, is simply not possible to do with any meaningful degree of accuracy, no matter how many resources my office dedicates to the project.

60.    Although the EO provides that we may "routinely supplement and provide suggested modifications or amendments" to the USPS Mail Ballot List, there is no guarantee that USPS will accept those suggestions. If we—in an attempt to protect New York's elections officials from criminal liability—sent a State Mail Ballot List to USPS 60 days before Election

18

Day that reflected only confirmed matches between the statewide voter registration list and the State Citizenship List, knowing that many eligible voters could have been wrongfully excluded from the State Citizenship List, we would be committing ourselves to violating law. We could then endeavor to submit additional matches as we confirmed them. But it would be very difficult to do so quickly enough to matter. On September 18, 2026, two weeks after we receive the State Citizenship List—our UOCAVA voters' ballots must be mailed out. Shortly thereafter, ballots must be sent to residents currently residing out of state (state law provides "as soon as practicable") and to applicants until October 24, 2026. Even if DHS and USPS accepted our suggestions, there is unlikely to be enough time to get a ballot to those who are eligible but did not appear on the State Citizenship List. Voters would be disenfranchised and New York law would not be honored.

61.    Again, because of our obligation to ensure that every eligible New York voter be allowed to vote, we would need to take additional steps after receiving the State Citizenship List and USPS Mail Ballot List to investigate the status of all those on the statewide registration list who do not appear on the federal lists, and then suggest changes to both. This will require data matching, verification, follow-up investigations, and interfacing with DHS, USPS, counties, the public, and others, and will demand an enormous investment of resources. Additionally, state cybersecurity and information technology staff would need to be involved to facilitate the secure transfer of information between the federal government and New York election officials. I estimate that these initiatives would require hiring contractors and likely full-time employees, and it is already too late to do in an orderly manner. This is in addition to the staff time required to work with DHS and USPS to securely transfer information.

62.    Any time spent by current staff on implementing the EO would divert time and attention from other critical election preparation in the days leading up to the election, my office's busiest time.  Our staff is already at capacity and dedicated to routine tasks and special projects that ensure New York's elections run smoothly and every eligible voter can exercise their right to vote.  This work becomes more voluminous, significant, and urgent in the months leading up to the election, when New York election officials must answer an increasing volume of questions and handle tasks related to, for example, campaign finance reporting, logic and accuracy testing, and voter challenges.

63.    Each of these tasks and costs will divert scarce resources from other important election administration needs.

64.    Upon information and belief, most New York jurisdictions have already ordered mail ballot envelopes for 2026.

65.    Many boards of elections who send out ballots are not currently using Intelligent Mail barcodes on ballot mail.

66.    In New York, as in much of the country, ballot envelopes vary by county, and they are not identical throughout the state.  I am deeply concerned about the length of time it would take for USPS to conduct ballot design review for all of New York's jurisdictions as they are endeavoring to do the same for thousands throughout the country.  Waiting on USPS to approve ballot design has the potential to seriously disrupt and delay carefully timed steps necessary to deliver mail ballots to New York voters.  Managing the fallout from such a delay would force my office and local elections officials to divert critical time and money from other elections administration duties to expedite other steps in the mail ballot process, educate the

20

public about the status of mail ballots, and otherwise mitigate the harm from delays to the process.

67.    It is my understanding that Section 5 of the EO directs that "States and localities should preserve, for a 5-year period, all records and materials—excluding ballots cast—evidencing voter participation in any federal election (e.g., ballot envelopes, regardless of carrier)." Existing federal law requires preservation of voting materials for only 22 months following an election, and preservation of records concerning voter roll maintenance for only two years. 52 U.S.C. §§ 20507(i)(1), 20701. New York law and regulation also set timelines for the preservation and destruction of voting materials in federal elections which nearly coincide with current federal law (24 vs 22 months, for example).

68.    Compliance with a five-year document preservation standard for election materials would impose significant compliance, storage, and other costs on New York and local elections officials.

69.    For example, current document retention would require New York election officials to identify and obtain significantly more specialized and secure warehousing space.

70.    Additionally, under New York law (which provides a slightly longer retention period than federal law) New York may begin properly disposing of most retained materials from the 2024 primary elections on or about late June of 2026, and the 2024 general election in early November of 2026. The EO prevents New York from undertaking these actions as to some, but not all, of the retained materials, and requires New York to incur further management, storage, and security costs instead.

71.    More than doubling the required retention time for some (but not *all*) voting materials would increase these burdens and costs significantly.

21

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 21, 2026, at Albany, New York

KRISTEN ZEBROWSKI STAVISKY