IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

STATE OF CALIFORNIA; et al.,

Plaintiffs,

v.

DONALD J. TRUMP, in his official capacity as President of the United States; et al.,

Defendants.

Case No. 1:26-cv-11581

## DECLARATION OF DENA DAWSON

I, Dena Dawson, declare as follows:

1.     I am a resident of the State of Oregon.  I am over the age of 18.  I am familiar with the information in the statements set forth below either through personal knowledge, consultation with Oregon Secretary of State staff, or from my review of relevant documents and information. If called as a witness, I could and would testify competently to the matters set forth below.

2.     I am the Election Director for the Oregon Secretary of State and lead its Elections Division.  I work for the Secretary of State and support him in his official capacity as the chief elections officer for the State of Oregon.  In my role, I assist him in the execution and enforcement of all state and federal laws relating to elections.

3.     I have served as the Election Director since January 2025.  Prior to this role, I was Lane County Clerk, the county's chief election official.  Earlier in my career, I held leadership positions at county election offices in Nevada and Colorado, and in Multnomah County, Oregon. I have more than 19 years of experience in elections administration, including five years in

1

Oregon during which I progressed from an entry-level election clerk to leadership roles. This hands-on experience across every stage of election administration ensures that I understand the full scope of voter registration and mail ballot processes.

4.      In Oregon, elections—which are conducted by mail—are administered by the counties in collaboration with the state. County election officials are responsible for voter registration, performing list maintenance, issuing ballots, tabulating votes, and certifying results in their jurisdiction.

5.      The Secretary of State is Oregon's chief elections officer, responsible for executing and enforcing all state and federal law relating to elections within the state. *See* ORS 246.110. The Elections Division is responsible for implementing the Secretary of State's responsibilities with regard to elections, including maintaining the uniform application and operation of election law; directing, assisting, and advising county clerks on election procedures; and maintaining a maximum degree of correctness, accuracy, impartiality, and efficiency in the administration of election laws. As relevant here, the Elections Division maintains the statewide voter registration list (which includes both active and inactive voters), regularly disseminates information to counties to support local list maintenance efforts, and enforces election law violations.

6.      In my role as Election Director, I lead the Elections Division. I am responsible for overseeing statewide voter registration, list-maintenance activities, and mail-ballot processes; ensuring that all elections are conducted in compliance with federal and state law; and providing written guidance, training, and other support to county elections officials.

7.      The Election Division and county election officials have already started preparations for the November 2026 election.

8.      I am familiar with the Executive Order published on March 31, 2026, entitled "Ensuring Citizenship Verification and Integrity in Federal Elections" (the "EO").  Sections 2 through 5 of the EO (collectively, the "Challenged Provisions") have already caused considerable harm, confusion, fear, and disruption in Oregon election administration, and will impose unrecoverable costs on the state.

9.      Following issuance of the EO, our office provided immediate guidance to Oregon's local election officials—including county clerks, county elections directors, and their elections staff—through written talking points to support consistent statewide communication. We also met with the executive leadership of the Oregon Association of County Clerks to review each section of the EO and discuss potential implications.  In addition, we have responded to hundreds of calls and emails from the public, informing voters that we are actively monitoring the EO and assessing its potential impact on Oregon's election administration.

10.      It is my understanding that Section 2(a) of the EO directs the Department of Homeland Security ("DHS") to create a "State Citizenship List" for each State, which will include "individuals confirmed to be United States citizens who will be above the age of 18 at the time of an upcoming Federal election and who maintain a residence in the subject State."  It is also my understanding that DHS will send these lists "no fewer than 60 days before each regularly scheduled Federal election, or promptly upon request by a State in connection with any special Federal election."  This would mean that DHS will send this list by Friday, September 4, 2026, for the federal general election taking place on November 3, 2026.

11.      However, county election officials will need to continue to register those who are eligible to vote in Oregon.  Oregon allows qualified individuals to register up to 21 days before Election Day.  ORS 247.025; 52 U.S.C. § 20507(a)(1) (requiring States to permit registration up

3

to 30 days before a federal election). Oregon citizens can register to vote online, at their county clerk's office, and through Oregon's Department of Motor Vehicles (DMV). Individuals must verify their eligibility to vote by attestation. Oregon also has automatic voter registration through the DMV for individuals that submit sufficient information of their voter qualifications (including citizenship) through their transaction.

12.    In compliance with the Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA), Oregon allows uniformed and overseas voters—like all other eligible Oregon voters—to register up to 21 days before Election Day. 52 U.S.C. §§ 20302(a)(2); ORS 247.025.

13.    In addition, Oregon allows inactive voters—who are included on the statewide voter registration list but are not entitled to receive a ballot under state law—to activate their registration and vote a ballot before 8:00pm on Election Day. ORS 254.470; ORS 247.303; ORS 247.307.

14.    Beyond voter registration, my office also has a continuing obligation to work with the counties to facilitate regular list maintenance, as required under the National Voter Registration Act ("NVRA"), Help America Voter Act ("HAVA"), and Oregon state law. Among other things, county election officials regularly process voter registration updates, send notices to voters who may have moved, and cancel the registrations of those who have died.

15.    In compliance with the NVRA "quiet period" for voter registration, Oregon does not systematically remove voters from the rolls during the 90 days prior to a federal election unless a statutory exception applies. *See* 52 U.S.C. §§ 20507(c)(2)(A), 3(A)-(B), 4(A). Oregon does, however, lawfully remove voters on an individual basis where appropriate, such as when a voter requests that his or her registration be canceled. ORS 247.555(1)(a).

4

16.     In sum, Oregon's statewide voter registration list changes up to and on Election Day.  Registrants are constantly being added, updated, and removed as required (and limited) by federal and state law, and this will continue through the November 2026 election and beyond.

17.     I have considered how this dynamic statewide voter registration list will intersect with the list created by DHS.  As noted above, pursuant to Section 2(a) of the EO, DHS will share a State Citizenship List by September 4, 2026.  The EO permits the state "to routinely supplement and provide suggested modifications or amendments to the State Citizenship List transmitted thereto."  The EO does not require DHS to accept any of these state supplements, modifications, or amendments to the State Citizenship List.

18.     Once we receive the State Citizenship List, we will have to devote substantial resources to understanding any differences between it and our current statewide voter registration list.  As a baseline matter, comparing the State Citizenship List to our current statewide voter registration list will necessitate matching registrants across the lists.  This will be difficult, as it is doubtful that the State Citizenship List will contain the same unique identifiers as our statewide voter registration list, such that we could perform straightforward matching.  For example, most Oregon voters register to vote using their state driver's license number, which federal agencies generally do not have.  Rather, it is inevitable that there will be differences in the files that will make matching difficult, time-consuming, and potentially inaccurate, as people's names, addresses, and other information may vary slightly (*e.g.*, Robert vs. Bob, Apartment #3 vs. Apt. 3).  I know from my own experience that data matching is a complex process, and extreme care must be taken when the consequences of errors may lead to voter disenfranchisement.  If Oregon receives the State Citizenship List only 60 days before the election, it will not leave sufficient time for my office to perform this work.

19.     For voters who appear on the statewide voter registration list but not the State Citizenship List, my office will need to investigate further to ensure that every eligible, active voter can receive a ballot.

20.     Even though my office will not instruct county elections officials to cancel or inactivate eligible voters simply because they do not appear on the State Citizenship List, the list could still disenfranchise those voters in multiple ways.  First, voters who check their status on the State Citizenship List as contemplated by Section 2(a) and see that they are not listed may be deterred from voting because they believe they will be blocked from voting or prosecuted, especially if DHS does not timely accept their corrections.  Second, the United States Postal Service ("USPS") may rely on the State Citizenship List to determine which voters can receive and transmit mail ballots in response to the EO's emphasis on criminal penalties associated with the distribution of mail ballots to ineligible individuals.  EO §§ 2(b), 3(a), 5.  Additionally, if the State Citizenship List is publicly accessible, local elections workers may misunderstand their legal obligations and refuse to provide a ballot to eligible, active voters missing from the State Citizenship List based on their belief that those voters are ineligible.  These are all risks that Oregon cannot accept.  Oregon statute requires that all election laws and procedures be construed to support the enfranchisement of eligible voters.  ORS 247.005.  We must make every effort to avoid disenfranchising eligible Oregonians.

21.     Accordingly, in compliance with Oregon's obligation to protect the right to vote, my office would need to expend significant resources to attempt to supplement and amend the federal list as necessary, if errors were found through our comparison and investigation.  This includes determining proper and secure methods for sending large volumes of confidential data to the federal government.  However, even if we are able to quickly offer all necessary

corrections, the EO does not require DHS to accept the State's "suggested modifications or amendments." EO § 2(a).

22. My office would incur significant costs to undertake this comparison and verification of the State Citizenship List. Implementing the EO would impose significant unfunded costs on Oregon's elections system. Because these requirements are entirely new, and because federal agencies have not provided technical specifications, timelines, or data formats, all cost projections below represent our best estimates based on past experience with similar, but far smaller-scale, verification and data-matching tasks.

23. Statewide, we anticipate approximately $1.5–$3.1 million in one-time startup costs to build the systems needed to ingest and reconcile the federal "State Citizenship List," to redesign and re-approve ballot envelopes under forthcoming USPS rules, and to create new correction and voter-support workflows. Each statewide election would then generate an additional estimated $870,000–$1.8 million in ongoing costs for verification, exception handling, USPS compliance, ballot-tracking requirements, and expanded record-retention obligations.

24. At the county level, where most hands-on voter-list management, ballot issuance, and exception resolution occurs, we estimate $25,000–$60,000 in one-time implementation costs per county, plus an additional $15,000–$40,000 per county for each election, with higher amounts for larger counties that manage more voters and more mismatches. These estimates reflect the labor-intensive nature of reconciling large federal data feeds with Oregon's voter rolls, something that already requires significant staff time even during Oregon's routine list-maintenance cycles.

25. Those new responsibilities come at a time when Oregon's overall 2025–27 state budget is constrained; and agencies, including the Secretary of State's Office, are already

operating with limited staffing, aging systems, and competing statutory mandates. Elections-modernization work, cybersecurity improvements, and long-planned upgrades to voter-registration and campaign-finance systems have all been identified as priorities but have not received dedicated new funding. Without additional state or federal resources, absorbing these EO-driven costs would require the diversion of staff time and operational funding away from core pre-election duties, such as producing the statewide voters' pamphlet, maintaining and modernizing voter-registration infrastructure, and enforcing Oregon's campaign-finance and disclosure laws. Put simply, our office does not have the current capacity to take on an unfunded federal mandate of this scale without sacrificing other legally required work.

26.     If Section 2 is implemented, my office will also have to devote significant time, personnel, and money to producing guidance materials for county election officials, specifically detailing what steps they must take with respect to voters who appear on the Oregon voter registration list but not on the State Citizenship List. This is yet another aspect of the EO's implementation that will necessarily divert resources from other important election administration tasks.

27.     I anticipate that, in addition to guidance materials, my office will need to allocate significant resources to respond directly to questions from county election officials, given the threat of criminal prosecution in Section 2 of the EO. We have already received numerous such inquiries.

28.     At the same time my staff is performing investigations into the accuracy of the State Citizenship List, they will have to conduct a wide-ranging public-education campaign to ensure that eligible voters understand the EO's requirements, and how they may impact a citizen's registration and ability to vote. For example, my staff will have to prepare and

8

distribute training materials guiding citizens through accessing and correcting their individual records on the State Citizenship List under Section 2(a). We will also need to field questions from registrants concerned about their voter-registration status and generally confused about the process and qualifications to vote in Oregon elections.

29.     I estimate that a public-education effort of the scale required by the EO would cost several million dollars statewide, even using conservative assumptions. This estimate is necessarily approximate, because such an outreach campaign is entirely new, and federal agencies have not provided any guidance on required content, timing, or target audiences. At a minimum, sending a single informational letter to every Oregon voter would cost approximately $0.82 per voter under the new proposed postage rate, which alone would amount to well over $2 million in postage costs before factoring in printing, design, translation, and fulfillment. In addition to mailed notices, a comprehensive education campaign would require digital, social-media, and television advertising, each of which carries substantial costs to reach voters effectively across the entire state.

30.     Again, our office is already managing substantial obligations with limited resources, including long-deferred modernization of our elections systems, cybersecurity upgrades, the statewide voters' pamphlet, and enforcement of Oregon's campaign-finance and disclosure laws. Without dedicated federal funding, any public-education campaign of this magnitude would require shifting money and staff time away from those core responsibilities, limiting our ability to meet the modernization and compliance needs that the Oregon Legislature and Oregon voters expect from us.

31.     In my experience administering elections, changes to registration and election procedures in the time immediately preceding the election can cause voter confusion. The

complicated requirements of the EO will likely lead some citizens to misunderstand the requirements for registration and/or whether they are able to vote in Oregon's elections. Some citizens will determine that the added requirements make registering and/or voting too confusing to be worthwhile. For example, a voter may check their individual status on the State Citizenship List, according to the EO. If they are mistakenly not included, they may believe they have no recourse, and choose not to vote, or they may misunderstand the process for correction (despite my office's attempts to provide education), or DHS may not issue a correction in time. The result of this confusion will be that fewer eligible voters successfully register to vote or decide to cast a ballot.

32. This inevitable voter confusion harms Oregon because it will disenfranchise voters, interfering with our sovereign interest and state-law obligation to ensure that all eligible voters who want to can cast a vote. It will also impose a burden on my staff's time, as my staff (and the elections staff at the counties) will be responsible for dispelling voter confusion to the extent possible. This voter confusion will come at a crucial time, shortly before the election, when county elections officials' resources are particularly stretched.

33. In Oregon, a person who is qualified to vote has a right to vote in any election. Or. Const. Art. II, § 2; ORS 247.005. The county clerks are required to mail an official ballot to each active voter of their electoral district. ORS 254.470(2)(a).

34. In compliance with UOCAVA, Oregon issues ballots to registered voters who request an absentee ballot under that Act at least 45 days before an election. 52 U.S.C. §§ 20302(a)(1)-(3), (8)(A); ORS 253.065(1)(a).

35. It is my understanding that Section 2(b) of the EO instructs the Attorney General to prioritize investigation and prosecution, under a variety of federal statutes, of "State and local

10

officials or any others involved in the administration of Federal elections who issue Federal ballots to individuals not eligible to vote in a Federal election." I understand that the EO provides that "an individual is 'eligible to vote in a Federal election' if the individual is a citizen of the United States, 18 years of age or older by the date of the upcoming election, and otherwise qualified under the laws of his or her State." I further understand that Section 5 of the EO encourages referrals to U.S. DOJ of "[e]vidence of violations of existing Federal laws by State or local election officials" and "States or localities," among other parties, "for consideration of investigation or charges."

36.     If EO Section 2 goes into effect, I would be concerned that I, my staff, and county elections officials would face federal prosecution if we issued ballots to active Oregon voters who are not on the State Citizenship List. I am concerned about the impact of these threats of criminal prosecution on my staff and county elections officials, not because I believe they have violated these provisions, but because the EO increases the amount of pressure and scrutiny on them, including by the public.

37.     Since the EO was issued, I have heard directly from local election officials who are deeply worried about the threat of federal prosecution. Several have told me that they fear they could be targeted simply for following Oregon law, mailing ballots to voters who have already affirmed their citizenship under penalty of perjury. These concerns are especially alarming because Oregon, like many states, is already experiencing real staffing shortages and unusually high turnover in election administration. This field has lost many experienced professionals in recent years, and several current officials have shared with me that if the EO takes effect as written, they would consider retiring or moving to other work rather than take on this new personal risk.

11

38.     I share their concern.  Even as someone who has worked in elections for nearly twenty years, with a deep commitment to protecting democracy, I am troubled by the possibility of being individually targeted for carrying out the duties the Oregon Legislature has assigned to my office. When experienced election workers are afraid that performing their legally required responsibilities might expose them to prosecution, it threatens the stability and continuity of election administration itself.  At a time when recruiting and retaining qualified staff is already difficult, this EO risks making a serious workforce challenge even worse.

39.     Should the Attorney General initiate any such enforcement actions, the Oregon Secretary of State would be required to divert significant resources to not only respond to such legal action, but also to educate the public, with the aim of minimizing voter confusion to the extent possible.  In my experience with the federal government's recent voter-data lawsuit, it takes considerable staff time and resources to respond to litigation-related questions, both from our lawyers and from the agency's communication team that interfaces with the media and the public.

40.     Any such legal proceedings would have severe and adverse consequences for public trust in Oregon's administration of elections. Public confidence is the cornerstone of our election system:  Oregon's vote-by-mail model depends on voters believing that the process is fair, secure, and administered by professionals following state law.  If federal authorities were to investigate or prosecute state or local election officials for performing duties required under Oregon statute, it would send a deeply confusing and destabilizing message to voters.  I have seen firsthand how quickly misinformation and false allegations can damage the state's reputation and undermine trust.  Even baseless claims have required extensive outreach and clarification efforts in past election cycles.  The introduction of real legal threats would greatly

amplify that harm. It would also worsen the already significant workforce challenges we face. In short, legal proceedings of this kind would not only distract from election administration; they would also erode public trust at the very moment when maintaining that trust is most essential.

41.     Additionally, the creation of a State Citizenship List may directly disenfranchise voters. Based on my experience, I know that if a citizen is not included on the list—due, for example, to errors in DHS's static immigration information contained in its Systematic Alien Verification for Entitlements (SAVE) system, the federal government's misinterpretation of whether the citizen qualifies as a state resident, or any other error—they may believe they are unable to vote, and could be prosecuted for doing so.

42.     Based on my experience assisting local election workers, I know that those workers may feel they cannot register or send a ballot to such voters without risking criminal prosecution, despite those voters' fundamental right to vote under state and federal law. Similarly, based on my experience I know that USPS or other entities involved in the "printing, production, shipment, or distribution of ballots" may believe they cannot provide a ballot to those voters without risking criminal prosecution.

43.     As discussed, Oregon provides a mail ballot to all voters. The county clerks must mail to each active voter, by nonforwardable mail, an official ballot with a return identification envelope not sooner than the 20th day before the election date and not later than the 14th day before the election date. The voter may return the marked ballot to the county clerk by United States mail or by depositing the ballot at the office of the county clerk or at any place of deposit designated by the county clerk (such as designated ballot drop boxes).

44.     It is my understanding that Section 3(b) of the EO directs USPS to initiate a rulemaking that, among other things, would allow States to provide lists of mail voters to USPS

13

60 days before an election, require the creation of a "Mail-In and Absentee Participation List" ("USPS Mail Ballot List"), and prohibit USPS from delivering mail ballots sent by individuals not on the USPS Mail Ballot List. It is also my understanding that Oregon can "routinely supplement and provide suggested modifications or amendments" to the USPS Mail Ballot List, but USPS is not required to accept any changes provided by Oregon.

45. As soon as my team and I had the opportunity to review the EO, it became clear that it would require a major and immediate shift in our work. We began assessing how we would prepare to process and verify a new federally generated citizenship list, compare our ballot-mailing files to new USPS "Mail Ballot Lists," and guide all 36 counties through procedures that have never existed before. We also had to consider the need for expanded data-analysis tools, stronger cybersecurity protections, coordination with other state agencies, and significant additional staff time to manage new responsibilities and public inquiries.

46. Those are not simple adjustments. They would require rapid, resource-intensive changes at a moment when our elections team is already stretched thin. Even in the very first days after the EO was issued, it was clear that complying with its near-term demands would place substantial pressure on our staff, our systems, and Oregon's entire election-administration structure.

47. To comply with state law requiring that all active voters receive a mail ballot, Section 3(b) of the EO would require Oregon to send a list to USPS of voters to whom we intend to send a mail-in or absentee ballot ("State Mail Ballot List") at least 60 days before Election Day. For the 2026 federal general election, that deadline will be September 4, 2026. Failing to provide this list to USPS would pose an unacceptable risk under the EO that USPS will not

14

include Oregon voters on the USPS Mail Ballot List, thereby making it more difficult or impossible for eligible, active voters to cast their ballots.

48.     As discussed throughout this declaration, Oregon's use of the mail for elections, paired with our election calendar, mean that I must plan now for how to align Oregon's administration of mail voting with the EO.

49.     Creating the State Mail Ballot List will require my office and county elections officials to expend time and resources to ensure that all eligible, active voters are included. This task will be significantly complicated by the influx of registration updates and changes that elections officials typically receive in the months before the election (and which I expect will be exacerbated by the State Citizenship List provisions discussed above).

50.     The deadline to provide this list to USPS (not later than 60 days before the election) means that some voters who are entitled to a mail ballot under state and federal law will unavoidably be left off the list. As discussed, Oregon allows qualified individuals, including UOCAVA voters, to register up to 21 days before Election Day and still receive a ballot. ORS 247.025; 52 U.S.C. § 20507(a)(1) (requiring States to permit registration up to 30 days before a federal election). In addition, Oregon allows inactive voters—who are included on the statewide voter registration list but are not entitled to receive a ballot under state law—to activate their registration and vote a ballot before 8:00pm on Election Day. ORS 254.470; ORS 247.303; ORS 247.307.

51.     Under Oregon law, ballots that are issued more than five days before Election Day are required to be mailed. ORS 247.307; ORS 253.545; ORS 254.470. Although the EO indicates that States will be able to "routinely supplement and provide suggested modifications or amendments" to the USPS Mail Ballot List, USPS is not required to accept our suggestions.

15

The EO also does not specify when USPS will transmit its USPS Mail Ballot List to our office, which could cause substantial complications.

52.    Once we receive the USPS Mail Ballot List, we will have to devote substantial resources to understanding any differences between it and our own list of voters eligible to receive mail ballots.  This will be a difficult task for many of the same reasons set out above with regard to the State Citizenship List, including: the lack of unique identifiers shared by both lists, the potential for slight variations in spelling to wrongly preclude matches, the fluid nature of voter registration rolls in the lead-up to elections, and administrative challenges inherent to any data-matching process.  Accordingly, reviewing the USPS Mail Ballot List will require a significant expenditure of time and resources.

53.    For citizens who appear on the statewide voter registration list and are eligible to receive a mail ballot under Oregon law but not the USPS Mail Ballot List, my office will need to investigate further to ensure that every eligible, active voter can receive a ballot.  We must make every effort to do so to avoid disenfranchising eligible Oregon residents.

54.    Oregon would expend significant resources to attempt to supplement and amend the USPS Mail Ballot list.  Among other things, we would need to determine proper and secure methods for sending large volumes of confidential data to the USPS.  This is true even though the EO instructs that we can only "supplement" and "provide suggested modifications or amendments" to the USPS Mail Ballot List, and USPS is not required to accept them.

55.    Even with the best efforts of my office and county elections officials, the challenges of completing a complex data-matching program in a short timeframe and while preparing to administer an election poses the high risk of errors and omissions.

16

56. Because the USPS Mail Ballot List mirrors the same technical and operational burdens imposed by the State Citizenship List, Oregon would face similarly substantial financial and staffing impacts, without any dedicated funding from the federal government to offset these new obligations. As with the State Citizenship List, this would require building new data-processing systems, developing reconciliation workflows, and assigning staff to resolve mismatches in real time, especially during the compressed timelines leading up to a federal election. As discussed above, our best estimates indicate that verifying the State Citizenship List alone would cost Oregon between $1.5–$3.1 million in one-time implementation work, plus $870,000–$1.8 million per statewide election in ongoing staffing, data-management, and compliance costs. The USPS Mail Ballot List requires nearly identical types of work: preparing eligibility files, comparing them to federal data, resolving exceptions, updating county guidance, and managing the operational consequences of discrepancies.

57. We expect the costs of maintaining and verifying the USPS Mail Ballot List to be comparable to those already described for the State Citizenship List, because both processes involve large-scale data matching, additional IT infrastructure, ballot-tracking changes, and significant staff time. As noted earlier, Oregon is currently facing real resource constraints and staffing shortages in election administration. Any added requirements, especially at this scale, would force our office to divert limited personnel away from other critical responsibilities, including modernization of our voter-registration systems, cybersecurity improvements, and the production of statewide voter-education materials.

58. If Section 3 is implemented, Oregon will also have to devote significant time, personnel, and money to producing guidance materials for county elections officials. Those materials would have to specifically detail what steps they must take with respect to voters who

17

appear on Oregon's voter registration list and are eligible to receive a mail ballot under Oregon law, but who do not appear on the USPS Mail Ballot List. This is yet another aspect of the EO's implementation that will necessarily divert resources from other important election administration tasks.

59.    I anticipate that, in addition to guidance materials, my office will need to allocate significant resources to respond directly to questions from local elections officials, given the threat of criminal prosecution in the EO. We have already received numerous such inquiries.

60.    At the same time my staff is creating the State Mail Ballot List and performing investigations into the accuracy of the USPS Mail Ballot List, they will have to field questions from citizens concerned about their ability to receive or return a mail ballot in the upcoming elections. Thus, a separate impact of the EO's directive concerns the need for a wide-ranging public education campaign to ensure that eligible voters understand the EO's requirements, and how they may impact a citizen's ability to vote by mail. This is particularly the case for Oregon residents, who are used to automatically receiving mail ballots and being able to vote by mail under existing state law.

61.    I estimate that such a public education effort would likely cost several million dollars, based on the same large-scale mailing, printing, and outreach expenses described earlier for verifying the State Citizenship List. Without any federal funding, covering these costs would require shifting money away from other critical priorities in our already strained agency budget.

62.    Apart from the time and monetary costs that Section 3's implementation would impose on Oregon, Section 3 also risks voter confusion and disenfranchisement. This inevitable voter confusion is a harm in and of itself and is also a burden on my staff's time. This voter

confusion will come at a crucial time shortly before the election, when state and local elections officials are required under Oregon law to send mail ballots to all eligible, active voters.

63.    Sending mail ballots in a timely fashion is not only required by state and federal law, but it is critical to ensure that as many eligible Oregonians as possible can exercise their right to vote.

64.    Errors in the USPS Mail Ballot List would be extremely harmful because of the potential for voter disenfranchisement. For example, consider an eligible voter who is on the State Mail Ballot List but not on the USPS Mail Ballot List. Under the EO, they are likely to receive a mail ballot from their county elections official that USPS will later refuse to return to the county elections official. In that situation, the voter may think that they have voted, but they have not. Nor would the voter necessarily know to request a replacement ballot, given that the EO does not charge USPS with notifying the voter. A voter may also be concerned about casting two ballots, which is itself a criminal violation, and choose not to vote. My office must take every measure possible to avoid this kind of voter disenfranchisement.

65.    In my experience administering elections, changes to election procedures in the time immediately preceding an election can cause voter confusion. The EO's complicated requirements will likely lead some eligible voters to misunderstand whether they are able to use a mail ballot. Some eligible voters will determine that the added requirements make voting too confusing to be worthwhile. The result of this confusion will be that fewer eligible voters decide to cast a ballot.

66.    There are several additional inherent problems posed by the deadlines outlined above and the requirement to compare static lists (the State Citizenship List, USPS Mail Ballot

19

List, and State Mail Ballot List) with a constantly evolving list (the statewide voter registration list).

67.     Between the day the State Citizenship List is sent and 21 days before Election Day (the last day a voter may register and receive a mail ballot under Oregon law), there will inevitably be a significant number of individuals who become eligible but are not captured on the State Citizenship List. They may, for example, have become a naturalized citizen after the list was sent. Regarding voters who have moved, I am not aware of any legal requirement that voters regularly report change of residential address to the federal government.

68.     This process is likely to be particularly complicated in Oregon, as our state allows inactive voters—who are included on the statewide voter registration list but not entitled to receive a ballot under state law—to activate their registration and vote a ballot up until 8:00pm on Election Day. ORS 254.470; ORS 247.303; ORS 247.307. That means that between the day the State Mail Ballot List is sent and Election Day, many inactive voters will activate their registrations but will not appear on the USPS Mail Ballot List.

69.     Additionally, as already noted, the timeline simply does not seem workable. The EO requires DHS to send the State Citizenship List to States "no fewer than 60 days before each regularly scheduled Federal election." For the November 3, 2026, General Election, that means DHS must send this list by Friday, September 4, 2026. And Oregon must also send its State Mail Ballot List to USPS 60 days before the election—also Friday, September 4, 2026. Thus, we must send the State Mail Ballot List (i.e., all those who should receive a mail ballot under state law) to USPS on the *same day* we might receive the State Citizenship List from DHS. Comparing the statewide voter registration list and the State Citizenship List to see who is eligible according to both lists in *one day*, or even *a few hours*, is simply not possible to do with

20

any meaningful degree of accuracy, no matter how many resources my office dedicates to the project.

70.    Although the EO provides that we may "routinely supplement and provide suggested modifications or amendments" to the USPS Mail Ballot List, there is no guarantee that USPS will accept those suggestions.  If we—in an attempt to protect Oregon's elections officials from criminal liability—sent a State Mail Ballot List to USPS 60 days before Election Day that reflected only confirmed matches between the statewide voter registration list and the State Citizenship List, knowing that many eligible voters could have been wrongfully excluded from the State Citizenship List, we would be committing ourselves to potentially violating Oregon law.  We could then endeavor to submit additional matches as we confirmed them.  But it would be very difficult to do so quickly enough to matter.  On September 19, 2026 (at least 45 days before the general election)—and only two weeks after we receive the State Citizenship List— our UOCAVA voters' ballots must be mailed out.  ORS 253.065(1)(a).  Shortly thereafter, ballots must be sent to residents currently residing out of state by October 5, 2026 (at least 29 days before the federal general election) and to residents residing within the state from October 14 through October 20, 2026 (not earlier than 20 days and at least 14 days before the federal general election).  ORS 253.065(1)(b); ORS 254.470(2)(a).  Even if DHS and USPS accepted our suggestions, there is unlikely to be enough time to get a ballot to those who are eligible but did not appear on the State Citizenship List.  Voters would be disenfranchised, and Oregon law would not be honored.

71.    Again, because of our obligation to ensure that every eligible, active Oregon voter can vote, we would need to take additional steps after receiving the State Citizenship List and USPS Mail Ballot List to investigate the status of all those on the statewide registration list who

21

do not appear on the federal lists, and then suggest changes to both.  This will require data matching, verification, follow-up investigations, and interfacing with DHS, USPS, counties, the public, and others, and will demand an enormous investment of resources.

72.    I estimate that these initiatives would require hiring several contractors and full-time employees as soon as this summer, including a project manager, an application developer, and a data architect.  This is in addition to the staff time required to work with DHS and USPS to securely transfer information.

73.    I estimate that meeting these new staffing needs will require an additional $1.5–$2 million in the Secretary of State's budget. As noted earlier, our office is already facing substantial unfunded obligations from the EO—including verifying the State Citizenship List and the USPS Mail Ballot List, managing new public-education responsibilities, and supporting counties through entirely new processes—at a time when we are confronting real staffing shortages, rising operational costs, and no federal support.  Compounding this, our elections infrastructure requires critical modernization, including updates to the statewide voter-registration system, improved cybersecurity protections, and long-overdue upgrades to data-management tools.  Given the economic pressures facing the state, we have worked diligently to keep our budget requests as lean as possible, but the EO would significantly increase financial strain.  To comply, we would either need to request additional state funding or identify equivalent cuts elsewhere in our already-stretched budget, a task that may simply not be feasible without undermining essential election functions.

74.    In Oregon, there is a limited amount of funding that can be allocated for all state government needs on an emergency basis between legislative sessions.  Very large single projects are generally not approved.

75. Any time spent by current staff on implementing the EO would divert time and attention from other critical election preparation in the days leading up to the election, my office's busiest time. Our staff is already at capacity and dedicated to routine tasks and special projects that ensure Oregon elections run smoothly, and every eligible, active Oregonian can exercise their right to vote. This work becomes more voluminous, significant, and urgent in the months leading up to the election.

76. Most Oregon counties have already ordered mail ballot envelopes for the 2026 federal election cycle.

77. Oregon's 36 counties do currently utilize the USPS Election Mail Logo and submit ballot envelopes to USPS for design review to ensure that they meet standards for automated handling.

78. Oregon does not specifically advise Oregon's 36 counties to use an Intelligent Mail barcode. While it is common for county election vendors that insert ballots to apply an Intelligent Mail barcode to outgoing mail pieces, the same is not necessarily true for ballot return envelopes. Moreover, counties that do not use vendors do not currently have a way to apply these barcodes. There may be software that can be purchased to accomplish this, but we do not have data on availability or cost at this time.

79. It is my understanding that Section 5 of the EO directs that "States and localities should preserve, for a 5-year period, all records and materials—excluding ballots cast— evidencing voter participation in any federal election (e.g., ballot envelopes, regardless of carrier)." Existing federal law only requires preservation of voting materials for 22 months following an election, and preservation of records concerning voter roll maintenance for two years. 52 U.S.C. §§ 20507(i)(1), 20701. Oregon administrative rule also set timelines for the

23

preservation and destruction of voting materials in federal elections.  Specifically, OAR 166-150-0035 requires that county elections officials preserve for two years following any election all "[r]eturned signed envelopes" and, unless otherwise specified, "[a]ll other records used to prepare, administer, and abstract elections conducted by mail."

80.     Compliance with a five-year document preservation standard for election materials would impose significant compliance, storage, and other costs on county elections officials.

81.     Additionally, under current federal law, Oregon was permitted to begin properly disposing of retained materials from the 2024 primary elections after March 21, 2026 (22 months following May 21, 2024) and the 2024 general election on September 5, 2026 (22 months following November 5, 2024).  The EO prevents Oregon from undertaking these actions as to some, but not all, of the retained materials, and requires Oregon to incur further management, storage, and security costs instead.

82.     More than doubling the required retention time for some (but not *all*) voting materials would increase these burdens and costs significantly for county elections officials.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 22, 2026, at Salem, Oregon.

Dena Dawson
Elections Director
Oregon Secretary of State

24