**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| STATE OF CALIFORNIA; et al., | |
| *Plaintiffs,* | |
| v. | Case No. 1:26-cv-11581 |
| DONALD J. TRUMP, in his official capacity as President of the United States; et al., | |
| *Defendants.* | |

**DECLARATION OF JONATHAN MARKS**

I, Jonathan Marks, declare as follows:

1. I am a resident of the Commonwealth of Pennsylvania and am over the age of 18. I am familiar with the information in the statements set forth below either through personal knowledge, consultation with Pennsylvania Department of State staff, or from my review of relevant documents and information. If called as a witness, I could and would testify competently to the matters set forth below.

2. I am the Deputy Secretary for Elections and Commissions for the Department of State (the Department) in the Commonwealth of Pennsylvania. I directly report to Al Schmidt, Secretary of the Commonwealth (Secretary), who is the chief election officer in the Commonwealth of Pennsylvania. In my role, I assist the Secretary in the execution and enforcement of all state and federal laws relating to elections.

3. I have served as Deputy Secretary since February of 2019, and I have served the Department in other election-related roles since 2002. Prior to serving as Deputy Secretary, I served as Commissioner for the Bureau of Commissions, Elections and Legislation, and before

1

that, the Division Chief of the Statewide Uniform Registry of Electors (SURE). I have worked at the Department since 1993 and been involved with the Department's election-related responsibilities since 2002.

4.      Pennsylvania's 67 counties are responsible for administering federal elections in the Commonwealth. This responsibility encompasses voter registration, maintaining and updating voter rolls, issuing ballots to registered voters, and canvassing and receiving returns of all elections, among numerous other tasks. *See* 25 P.S. § 2642. The Department works closely with Pennsylvania's 67 County Boards of Elections and voter registration commissions to develop and implement procedures and guidance impacting election operations in the Commonwealth. Department and county elections officials are currently making final preparations for Pennsylvania's May 19, 2026 General Primary and have also begun preparations for the November 3, 2026 General Election.

5.      The Secretary, as Pennsylvania's Chief Election Officer, is responsible for executing and enforcing all state and federal laws relating to elections within the state. *See* 25 P.S. § 2621. The Secretary is responsible for certifying returns in all elections for federal office. *Id.* The Department is responsible for implementing the Secretary's responsibilities with regard to elections, including implementing laws, administering the SURE system and providing information on elections and voting to the public and other parties. Pennsylvania law charges the Secretary and Department with general duties to enforce the Pennsylvania Election Code (PEC) and the Pennsylvania voter registration law. *See* 25 P.S. § 2621; 25 Pa.C.S.A. § 1201. While the 67 County Boards of Elections and voter registration commissions have primary responsibility for adjudicating voter registration applications and conducting voter list maintenance, it is the Secretary and Department that facilitates these tasks and that administers the SURE system,

2

which is the state-wide, single, uniform, integrated computer system required by the Help America Vote Act (HAVA). *See* 25 P.S. § 2621; 25 Pa.C.S.A. §§ 1201, 1203, 1222; 52 U.S.C. § 21083. The Secretary effectuates these tasks by issuing directives and guidance to the county Boards of Elections and engaging in close coordination and communications with county elections officials. The Department provides substantial technical support to the county Boards of Elections and registration commissions.

6.      In my role as Deputy Secretary, I am responsible for overseeing the carrying out of the Department's election-related responsibilities and helping to ensure that the 67 County Boards of Elections fulfill their duties under both the PEC, the Pennsylvania voter registration law, and federal law, including the National Voter Registration Act (NVRA) and HAVA.

7.      I am familiar with the Executive Order published on March 31, 2026, entitled "Ensuring Citizenship Verification and Integrity in Federal Elections" (the "EO"). Sections 2 through 5 of the EO (collectively, the "Challenged Provisions") have already caused considerable confusion and, if fully implemented, will ultimately cause disruption and harm to election administration in Pennsylvania by imposing unrecoverable costs on this Commonwealth and by subjecting State and local elections officials to potential criminal prosecution for mailing ballots to eligible Pennsylvania voters.

8.      Specifically, the Department has received inquiries from county elections officials and from citizens of the Commonwealth regarding the implications of the EO and whether their ability to vote by mail will be affected. The Department has also received many communications from citizens and stakeholders expressing general concerns about their ability to cast their ballot in Pennsylvania in light of various other actions by the Federal Government designed to change

3

the rules prior to Pennsylvania's upcoming May 19 Primary Election and the November midterms.

9.      It is my understanding that Section 2(a) of the EO directs the Department of Homeland Security (DHS) to create a "State Citizenship List" for each State, which will include "individuals confirmed to be United States citizens who will be above the age of 18 at the time of an upcoming Federal election and who maintain a residence in the subject State." It is also my understanding that DHS will send these lists "no fewer than 60 days before each regularly scheduled Federal election, or promptly upon request by a State in connection with any special Federal election." This would mean that DHS will send this list by Friday, September 4, 2026, for the November 3, 2026, General Election.

10.      Section 2 requires immediate action from the Department to understand how its requirements interact with Pennsylvania's statewide voter registration list, and to coordinate with its 67 county Boards of Elections. Our efforts to address the changes and impacts of the EO will divert time and attention from other critical election preparations. Further, it is not clear how the "State Citizenship List" would interact or be reconciled with Pennsylvania's current statewide list of registered voters, which is required by HAVA and contained in the SURE system. As described below, it will require considerable resources for the Department to analyze and compare the lists and accommodate any changes required.

11.      The Department has a continuing obligation to work with the counties to ensure that each county Board of Elections performs regular list maintenance, as required under the NVRA, HAVA, and the PEC. This includes sending notices to voters who may have moved or have not appeared to vote or otherwise interacted with their county elections office in the past

4

five years, identifying duplicates on the statewide voter registration list, and cancelling the registrations of those who have died.

12.     Additionally, county registration commissions need to continually register those who apply and are eligible to vote in Pennsylvania consistent with Pennsylvania law. Pennsylvania law allows qualified individuals to register up to 15 days before Election Day. 25 P.S. § 3071; 52 U.S.C. § 20507(a)(1) (requiring States to permit registration up to 30 days before a federal election or a lesser period provided by state law). Pennsylvania citizens can register to vote online, at their county Board of Elections, at various state social service agencies, and through Pennsylvania's Department of Transportation (PennDOT), when they submit sufficient information of their voter qualifications (including citizenship) during their transaction.

13.     In compliance with the Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA), Pennsylvania law allows uniformed and overseas voters to register to vote in a federal election if their registration application is received at least 15 days before that election. Additionally, under the Pennsylvania Uniform Military and Overseas Voters Act (UMOVA), certain active-duty military and disabled veterans are not required to register prior to the submission of an absentee ballot. 25 P.S. § 3071, 25 Pa.C.S.A. § 3505; 52 U.S.C. § 20302(a)(2).

14.     In compliance with the NVRA "quiet period" for voter registration, Pennsylvania does not systematically remove voters from the rolls during the 90 days prior to a federal election unless a statutory exception applies. *See* 52 U.S.C. § 20507(c)(2)(A). Pennsylvania does, however, lawfully remove voters on an individualized basis where appropriate, such as when a voter requests that his or her registration be canceled or when a voter dies prior to election day.

15.     In sum, Pennsylvania's statewide voter registration list can change up to and even on Election Day. Registrants are constantly being added, updated, and removed as required (and

limited) by federal and state law, and this process will continue through the 2026 General Election and beyond.

16.     I have considered how this dynamic statewide voter registration list will interact with the list created by DHS. As noted above, pursuant to Section 2(a) of the EO, DHS will share a "State Citizenship List" by September 4, 2026. The EO permits the state "to routinely supplement and provide suggested modifications or amendments to the State Citizenship List transmitted thereto." The EO does not require DHS to accept any of these state supplements, modifications, or amendments to the "State Citizenship List."

17.     Once we receive the "State Citizenship List," we will have to devote substantial resources to understanding any differences between it and our current statewide voter registration list. As a baseline matter, comparing the "State Citizenship List" to our current statewide voter registration list will necessitate linking registrants across the lists. This will be difficult, as it is extremely doubtful that the "State Citizenship List" will contain the same unique identifiers as Pennsylvania's statewide voter registration list, such that we could perform straightforward matching. For example, for many voters a Pennsylvania driver license number is used as a personal identifier, and I am not aware that federal agencies generally have access to this information. For this reason, it is inevitable that there will be differences in the files that will make matching difficult, time-consuming, and potentially inaccurate, as people's names, addresses, and other information may vary slightly (*e.g.*, John Smith vs. John A. Smith, Apartment #2 vs. Apt. 2). I know from my experience that data matching large numbers of people with even a reasonable degree of confidence in the accuracy of the results is a complex process. For instance, given that there are only 365 days in a year and over 8.8 million registered voters in Pennsylvania, it is inevitable that many voters with common names will share the same

6

birthday. Extreme care must be taken in comparing large datasets when the consequences of errors may lead to voter disenfranchisement. These are time-consuming tasks and will be very difficult to accomplish successfully just weeks prior to an election, particularly when there is an uptick in voter registrations, which is very common prior to a federal general election. Because Pennsylvania will receive the "State Citizenship List" so close to the election, the Department must plan for all of this now unless the EO is blocked.

18.     For eligible voters who appear on the statewide voter registration list but not the "State Citizenship List," the Department will need to investigate further pursuant to the obligation to ensure that eligible voters are able to vote. Even though Pennsylvania county voter registration commissions will not cancel voters simply due to their absence from the "State Citizenship List," it could disenfranchise voters in multiple ways. First, voters who check their status on the "State Citizenship List" as contemplated by Section 2(a) of the EO and see that they are not listed may be deterred from voting because they believe they will be blocked from voting or prosecuted, especially if DHS does not timely accept their corrections. Second, the United States Postal Service ("USPS") may rely on the "State Citizenship List" to determine which voters can receive mail ballots given the EO's emphasis on criminal penalties associated with the distribution of mail ballots to ineligible individuals. EO §§ 2(b), 3(a), 5. Additionally, if the "State Citizenship List" is publicly accessible, local election workers may misunderstand their legal obligations and refuse to provide a ballot to eligible voters whose names are not listed on the "State Citizenship List" based on their belief that the voters are ineligible. These are all risks that Pennsylvania cannot accept. We must make every effort to avoid disenfranchising eligible Pennsylvania voters.

19.     Accordingly, in compliance with Pennsylvania's obligation to protect the right to vote for eligible citizens, the Department would expend significant resources to attempt to supplement and amend the "State Citizenship List" as necessary, as errors are found through our comparison and investigation. This includes determining proper and secure methods for sending large volumes of confidential data to the federal government. However, even if the Department and county Boards of Elections were able to quickly offer all necessary corrections (which would take time and resources away from other vital elections preparations), the EO does not require DHS to accept the State's "suggested modifications or amendments." EO § 2(a).

20.     Pennsylvania would incur significant costs to undertake this comparison and verification of the "State Citizenship List." Any such verification would require the assistance of IT support providers and would require the Department to obtain additional information and resources from other agencies, including PennDOT, given that it is PennDOT which would possess information on citizenship. Such costs are impossible to determine at this time, but it is estimated that it would require specific data analysis/engineering expertise, advanced tools, like entity resolution software, processing power to complete the comparison, and quality assurance expertise to confirm the accuracy of the work product. Conservatively, the necessary personnel and tools would likely cost hundreds of thousands of dollars initially, and ongoing costs associated with licensing fees, maintaining the comparison process, paying for the processing power, and conducting quality assurance would surely exceed six figures annually. These costs assume that there is some minimally acceptable level of data standardization to begin with. They also do not account for the potential of additional costs associated with the operational and reputational risk of inaccuracies. The EO provides no funding, so paying for these and other costs described below will have to come from devoting fewer resources to the Department's

other pressing responsibilities, including a major ongoing project to replace the current SURE system, voter education and outreach, and other preparations for the upcoming midterms.

21.     One of the Department's major roles is to provide guidance and other direction, including training and communications, to county elections officials regarding their obligations under Pennsylvania and federal law. These include conducting in-person and virtual trainings, providing written guidance documents and conducting biweekly regularly-scheduled county office hours, in addition to handling all individual reach-outs from counties with questions.

22.     If Section 2 is implemented, the Department will have to devote significant time, personnel, and money to update training materials for local election officials and their staff, specifically detailing what steps they must take with respect to voters who appear on Pennsylvania's voter registration list but not on the "State Citizenship List." This is yet another aspect of the EO's implementation that will necessarily divert significant training, technical and county liaison resources from other important election administration tasks.

23.     I anticipate that in addition to formal training materials, the Department will need to allocate additional resources to responding to the queries of county elections officials regarding compliance with the EO, particularly given the threat of criminal prosecution in Section 2 of the EO.

24.     As stated above, the Department is already undergoing a major system replacement of its SURE system and is working diligently to assist counties in the upcoming midterm elections. Having to divert resources from these important tasks and to comply with confusing and ill-conceived provisions of the EO and to ensure that counties are complying in the face of criminal prosecution will leave already burdened state and local elections officials in a difficult position.

25. At the same time the Department is performing investigations into the accuracy of the "State Citizenship List," it will also be necessary to conduct a wide-ranging public education campaign to ensure that eligible voters understand the EO's requirements and how they may impact a citizen's registration and ability to vote. For example, the Department will have to prepare and distribute training materials guiding citizens through accessing and correcting their individual records on the "State Citizenship List" under section 2(a). Department personnel will also need to field direct questions from registrants concerned about their voter registration status and generally confused about the process and qualifications to vote in Pennsylvania, as well as help county Boards of Elections with those inquiries.

26. I estimate that such a state-wide public education effort would likely cost over one million dollars. For comparison, in preparation for the 2020 Primary, the first election where no-excuse mail-in voting was rolled out in Pennsylvania, the Department spent $9.9 million on advertising and voter education efforts. While there were other factors at play during that time that caused increased spending and costs, I would still believe that the efforts to educate voters about the changes the EO requires would cost the Department a significant amount of money that has not been budgeted.

27. In my experience administering elections, changes to registration and election procedures in the time immediately preceding an election can cause voter confusion. The complicated requirements of the EO will likely lead some citizens to misunderstand the requirements for registration, or be confused about whether they are able to vote in Pennsylvania's elections. Some citizens will determine that the added requirements make registering and/or voting too confusing to be worthwhile. For example, a voter may likely check their individual status on the "State Citizenship list" and, if they are mistakenly not included,

10

they may believe they have no recourse, and choose not to vote, or they may misunderstand the process for correction (despite the efforts of the Department and the County Boards of Elections to provide education), or DHS may not issue a correction in time. The result of this confusion will be that fewer eligible voters will ultimately register and vote.

28.     This inevitable voter confusion harms Pennsylvania because it will disenfranchise voters, and it will interfere with our Commonwealth's sovereign interest and state-law obligation to ensure that all qualified voters who so choose can vote by mail or absentee ballot. It will also impose a burden on Department employees' time, because they (and the elections staff at the counties) will be responsible for dispelling voter confusion as much as they are able. This voter confusion will come at a crucial time, shortly before the election, when local elections officials' resources are particularly stretched.

29.     The PEC requires county elections officials to issue ballots to duly registered voters upon their request. 25 P.S. §§ 3146.5; 3150.15; 3553.

30.     In compliance with UOCAVA and UMOVA, Pennsylvania counties issue ballots to registered voters who request absentee ballots under that Act at least 45 days before an election (75 days for those overseas and military voters in extremely remote or isolated areas) and must continue to issue ballots for eligible requesters within 48 hours after subsequent requests are received. 52 U.S.C. § 20302(a)(1)-(3); 25 Pa.C.S.A.§ 3508. And in compliance with the PEC, county Boards of Elections are required to process all mail ballot applications from eligible voters received by 5:00 pm on the seventh day prior to an election. 25 P.S. § 3150.12a; *see also* 25 P.S. § 3146.2a (allowing for absentee ballots in the case of illness or other events occurring shortly before an election).

11

31.     It is my understanding that Section 2(b) of the EO instructs the Attorney General to prioritize investigation and prosecution, under a variety of federal statutes, of "State and local officials or any others involved in the administration of Federal elections who issue Federal ballots to individuals not eligible to vote in a Federal election." I understand that the EO provides that "an individual is 'eligible to vote in a Federal election' if the individual is a citizen of the United States, 18 years of age or older by the date of the upcoming election, and otherwise qualified under the laws of his or her State." I further understand that Section 5 of the EO encourages referrals to U.S. Department of Justice of "[e]vidence of violations of existing Federal laws by State or local election officials" and "States or localities," among other parties, "for consideration of investigation or charges."

32.     If EO Section 2 goes into effect, I would be concerned that Department staff (including myself) and county elections officials would face federal prosecution if county Boards of Elections issued ballots to voters who are not on the "State Citizenship List." I am concerned about the impact of these threats of criminal prosecution on Department and County elections officials, not because I believe they have violated these provisions, but because the EO increases the amount of pressure and scrutiny on them, including by the public. Many of our most experienced and competent county elections directors and other elections workers have already left their positions because of the increasingly hostile environment for these dedicated public servants in the last few years. This criminal provision would only make matters worse.

33.     I know that the threat of prosecution under the EO is on the minds of state and local elections officials like me. I have had conversations with many county elections personnel who have told me that they believe that this will deter more people from serving as election officials and workers. As stated above, I worry that this will further exacerbate the shortage of

12

election workers and particularly increase the departures of experienced elections directors that many counties have experienced.

34.    Should the Attorney General initiate any such enforcement actions, the Department would be required to divert significant resources not only to respond to such legal action, whether it be against the Department or certain counties, but also to educate the public, with the aim of minimizing voter confusion to the extent possible. Having to face potential criminal actions for good faith efforts to do their jobs is simply too much to ask these public servants.

35.    I fear that any such legal proceedings would have severe and adverse consequences for the public's trust in Pennsylvania's administration of elections. Without public trust in elections, our dedicated Department and county elections officials are subject to malicious attacks that threaten their mental and physical well-being. No one deserves this, least of all our dedicated elections workers who often sacrifice in order to work in the public sector.

36.    Additionally, the creation of a "State Citizenship List" may directly disenfranchise voters. Based on my experience, I know that if a citizen is not included on the list—due, for example, to errors in DHS's static immigration information contained in its Systematic Alien Verification for Entitlements (SAVE) system, lack of updated or accurate information from PennDOT, the federal government's misinterpretation of whether the citizen qualifies as a state resident, or any other error—they may believe they are unable to vote and could be prosecuted for doing so. That is why the Department and the counties work so hard to maintain consistent voter registration information so that voters are not erroneously informed that they are ineligible to vote.

13

37.    Based on my experience assisting county elections offices, I know that those workers may feel they cannot register or send a ballot to such voters without risking criminal prosecution, despite those voters' fundamental right to vote under Pennsylvania and federal law. Similarly, based on my experience I know that the USPS or other entities involved in the "printing, production, shipment, or distribution of ballots" such as vendors that many counties use, may believe they cannot provide a ballot to those voters without risking criminal prosecution. I would predict that many of these commercial printing vendors who are instrumental in servicing the needs of county Boards of Elections in mailing out ballots will not want to take the risk of potential criminal prosecution and will now refuse to contract with counties for such work, creating even greater burdens for county Boards of Elections.

38.    Pursuant to the PEC, county Boards of Elections must provide a mail-in or absentee ballot to any qualified voter who requests one. 25 P.S. §§ 3150.15; 3146.5. And they must continue to process all mail ballot applications from eligible voters received by 5:00 pm on the seventh day prior to an election. 25 P.S. § 3150.12a.

39.    It is my understanding that Section 3(b) of the EO directs the USPS to initiate a rulemaking that, among other things, would allow States to provide lists of mail voters to USPS 60 days before an election, require the creation of a "Mail-In and Absentee Participation List" ("USPS Mail Ballot List") and prohibit USPS from delivering mail ballots to individuals not on the USPS Mail Ballot List. It is also my understanding that Pennsylvania counties will be able to "routinely supplement and provide suggested modifications or amendments" to the USPS Mail Ballot List, but that USPS is not required to accept any such provided changes.

40.    Once the Department began to review the contents of the EO, I began considering what near-term actions the EO would necessitate from my office, including procedures for how

14

the Department could go about facilitating the counties' review of the "State Citizenship List" against current county voter rolls contained in the SURE system, and then provide to USPS a USPS Mail Ballot List, in conformance with Pennsylvania law and prepare and provide guidance for the counties. This will require modifying technical requirements, including building out data analysis infrastructure and cyber security protections, which will require additional resources.

41.    As a starting point, Section 3(b) of the EO simply does not comport with PEC provisions that require county Boards of Elections to process all mail ballot applications from eligible voters received by 5:00 pm on the seventh day prior to an election. 25 P.S. § 3150.12a; *see also* 25 P.S. § 3146.2a (allowing for absentee ballots in the case of illness or other events occurring shortly before an election); 25 Pa.C.S. § 3507(a) (providing that military and overseas voters "may apply at any time" for a military-overseas ballot). As a result, Section 3(b)'s requirement to send to USPS at least 60 days before Election Day (by September 4, 2026 for the 2026 General Election) a mail-in or absentee ballot list ("State Mail Ballot List"), would render an incomplete list because eligible Pennsylvania voters can request a mail-in or absentee ballot well past that date. Essentially, the EO orders the USPS not to deliver the ballots of any person not on the USPS Mail Ballot List, and USPS is not required under the EO to add any mail voters to the USPS Mail Ballot List who might apply between September 4 and October 27, 2026.  This timing threatens to disenfranchise thousands of Pennsylvania voters, including many of our military and overseas voters whose rights are protected by UOCAVA.

42.    As discussed throughout this Declaration, Pennsylvania's use of the mail for elections, paired with our election calendar, means the Department must plan now for how to align its administration of mail voting with the EO.

15

43.     Creating the State Mail Ballot List will require the Department and local elections officials to expend time and resources to ensure that all eligible voters who timely requested an absentee or mail-in ballot are included. However, as stated above, this will be impossible because of the 60-day requirement in Section 3(b)(ii). And this task will be significantly complicated by the influx of registration updates and changes that elections officials typically receive in the months before the election (and which I expect will be exacerbated by the "State Citizenship List" provisions discussed above).

44.     Again, as stated above, the deadline to provide this list to USPS no later than 60 days before the election means that thousands of voters who are entitled to a mail ballot under state and federal law will unavoidably be left off the list. UOCAVA permits uniformed and overseas voters to request absentee ballots up to 45 days before an election. 52 U.S.C. § 20302(a)(8). Under Pennsylvania law, voters may request a mail-in ballot up to seven days prior to an election and military and overseas voters may request a ballot "at any time before an election." 25 P.S. § 3150.12a and 25 Pa.C.S. § 3507(a). Although the EO indicates that States will be able to "routinely supplement and provide suggested modifications or amendments" to the USPS Mail Ballot List, USPS is not required to accept the Department's suggestions. The EO also does not specify when USPS will transmit its USPS Mail Ballot List to the Department or county Boards of Elections offices, which could cause substantial complications and delays.

45.     Once the Department and County Boards of Elections receive the USPS Mail Ballot List, a substantial amount of resources will have to be devoted to understanding any differences between it and the state-wide mail ballot list of voters eligible to receive mail ballots that the Department prepares. This will be a difficult task for many of the same reasons set out above with regard to the "State Citizenship List," including: the lack of unique identifiers shared

16

by both lists, the potential for slight variations in spelling to wrongly preclude matches, the fluid nature of voter registration rolls in the lead-up to elections, and administrative challenges inherent in any data-matching process. Accordingly, reviewing the USPS Mail Ballot List will require a significant expenditure of time and resources at a crucial time when the Department and county election offices are making election preparations.

46.    For citizens who appear on the statewide voter registration list and are eligible to receive a mail ballot under Pennsylvania law but are not included on the USPS Mail Ballot List, the Department and county Boards of Elections will need to investigate further pursuant to their obligation to ensure that every eligible voter who requested an absentee or mail-in ballot gets one.

47.    The Department and the county Boards of Elections would need to expend significant resources to attempt to supplement and amend the USPS Mail Ballot List as necessary, as errors are found through comparison and investigation. This includes determining proper and secure methods for sending large volumes of confidential data to the USPS. And it is also of great concern that the EO instructs that states can only "supplement" and "provide suggested modifications or amendments" to the USPS Mail Ballot List, but that the USPS is not required to accept them.

48.    Even with the best efforts of the Department and local elections officials, the challenges of completing a complex data-matching program (as absentee and mail-in ballot applications continue to come in) in a short timeframe and while preparing to administer an election poses the high risk of errors and omissions.

17

49.    Further, the Department and county Boards of Elections would incur significant costs to undertake this comparison and verification of the USPS Mail Ballot List as described below.

50.    If Section 3 is implemented, the Department will have to devote significant time, personnel, and money to update training materials for county elections officials. Those materials would have to specifically detail what steps they must take with respect to voters who appear on the state-wide mail ballot list who have applied for and are entitled to receive a mail ballot under Pennsylvania law, but who do not appear on the USPS Mail Ballot List. This is yet another aspect of the EO's implementation that will necessarily divert significant Department and county resources from other important election administration tasks.

51.    I anticipate that, in addition to formal training materials, my office will need to allocate significant resources to responding directly to numerous inquiries from county elections offices, particularly given the threat of criminal prosecution in the EO.

52.    At the same time the Department and county Boards of Elections are creating the State Mail Ballot List and performing investigations into the accuracy of the USPS Mail Ballot List, they will have to field questions from citizens concerned about their ability to receive or return a mail ballot in the upcoming elections. Thus, a separate impact of the EO's directive concerns the need for a wide-ranging public education campaign to ensure that eligible voters understand the EO's requirements, and how they may impact a citizen's ability to vote by mail.

53.    As stated above, I estimate that such a public education effort to educate voters statewide on the EO's implications would cost over a million dollars.

54.    Apart from the time and monetary costs that Section 3's implementation would impose on the Department, Section 3 also risks voter confusion and disenfranchisement. This

18

inevitable voter confusion is a harm in and of itself and is also a burden for Department and county election offices. This voter confusion will come at a crucial time shortly before the election, when state and local elections officials are required under Pennsylvania law to send mail ballots to all eligible voters who request them.

55.    Sending mail ballots in a timely fashion is not only required by state and federal law, but is critical to ensuring that as many eligible Pennsylvanians as possible can exercise their right to vote. In the 2024 General Election, 21% of the registered voters in Pennsylvania voted by mail. This method of voting is particularly important for the many Pennsylvanians who are elderly, disabled or otherwise have difficulty getting to a polling place on election day.

56.    Errors in the USPS Mail Ballot List would be extremely harmful because of the potential for voter disenfranchisement. For example, consider an eligible voter who is on the State Mail Ballot List but not on the USPS Mail Ballot List. Under the EO, they are likely to receive a mail ballot from their county Board of Elections that USPS will later refuse to return to the county. In that situation, the voter may think that they have voted, yet in reality the USPS will have refused to deliver their ballot to the county Board of Elections for it to be counted. Nor would the voter necessarily know to cancel that ballot and vote in person, given that the EO does not charge USPS with notifying the voter and the county Board of Elections would have no way of knowing that the voter's voted ballot was "intercepted" by USPS. Even though Pennsylvania law requires that qualified mail-in and absentee voters whose ballots are rejected for some defect have the right to vote by provisional ballot, *Genser v. Butler Cnty. Bd. of Elections*, 325 A.3d 458, 480 (Pa. 2024), again, a voter would be unable to take advantage of this because the USPS could simply refuse to return the ballot without any notice to the voter, the Department or the county Boards of Elections. In this way, Pennsylvania mail voters whose mail ballots the USPS

19

refuses to deliver will be unable to preserve their right to vote by way of a provisional ballot on Election Day, and thus will be disenfranchised.

57.     In my experience administering elections, changes to election procedures in the time immediately preceding an election can cause voter confusion. The EO's complicated requirements will likely lead some eligible voters to misunderstand whether they are able to vote by mail-in or absentee ballot. Some eligible voters will determine that the added requirements make voting too confusing to be worthwhile. The result of this confusion will be that fewer eligible voters decide to cast a ballot.

58.     There are several additional inherent problems posed by the deadlines outlined above and the requirement to compare static lists (the State Citizenship List, USPS Mail Ballot List, and State Mail Ballot List) with a constantly evolving list (the statewide voter registration list).

59.     This process will also be particularly difficult for Pennsylvania's many college students who vote by mail in great numbers.

60.     Additionally, as already noted, the timeline for analyzing and comparing the various lists simply does not seem workable. The EO requires DHS to send the "State Citizenship List" to States "no fewer than 60 days before each regularly scheduled Federal election." For the November 3, 2026 General Election, that means DHS must send this list by Friday, September 4, 2026. And Pennsylvania must also send its State Mail Ballot List to USPS 60 days before the election—also Friday, September 4, 2026. Thus, the Department or county Boards of Election must send the State Mail Ballot List (i.e., all those who should receive a mail ballot under state law) to USPS on the *same day* it would receive the "State Citizenship List" from DHS and at a time when county Boards of Elections are still receiving ongoing mail ballot

applications. Comparing the statewide voter registration list and the "State Citizenship List" to see who is eligible according to both lists in *one day*, or even *a few hours*, is simply not possible to do with any meaningful degree of accuracy, no matter how many resources are dedicated to the project.

61.     Although the EO provides that states may "routinely supplement and provide suggested modifications or amendments" to the USPS Mail Ballot List, there is no guarantee that USPS will accept those suggestions. If the Department or the county Boards of Elections—in an attempt to protect our elections officials from criminal liability—sent a State Mail Ballot List to USPS 60 days before Election Day that reflected only confirmed matches between the statewide voter registration list and the State Citizenship List, knowing that many eligible voters could have been wrongfully excluded from the "State Citizenship List," elections officials would be committing ourselves to potentially violating Pennsylvania law by failing to provide ballots to eligible voters who requested mail ballots. While county Boards of Elections could attempt to submit additional matches as confirmed, it would be a very difficult and time-consuming effort at a time when county elections offices are dealing with adjudicating registration applications and making elections preparations. Even assuming DHS and USPS accepted all suggestions on additions to the voting list, this process introduces a large amount of confusion and gives too much authority to federal agencies to disenfranchise Pennsylvania's voters.

62.     Again, because of the requirements of the EO along with the obligation under the PEC to ensure that every eligible Pennsylvanian who requests a mail-in or absentee ballot gets one, the Department would need to take additional steps after receiving the "State Citizenship List" and USPS Mail Ballot List to investigate the status of all those on the statewide registration list who do not appear on the federal lists, and then facilitate, on behalf of the county Boards of

21

Elections, suggested changes to both lists. This will require data matching, verification, follow-up investigations, and interfacing with DHS, USPS, counties, the public, and others, and will demand an enormous investment of resources. It will also be necessary to ensure that the data quality on the "State Citizenship List" and USPS Mail Ballot List is sufficient and that the data sets are compatible. Additionally, state cybersecurity and information technology staff would need to be involved to ensure that all transfers of data between agencies are done in a secure manner.

63.    I estimate that the EO's requirements will necessitate the hiring of two additional experienced, full-time data analysts at a total annual cost, including salary and benefits, of $442,000. These positions have not been budgeted. These tasks will also require current supervisory staff to devote additional hours to manage these additional employees.

64.    Any time spent by the Department on implementing the EO would divert time and attention from other critical election preparation in the days leading up to the election, the busiest time for the Department and county election offices. The Department is already at capacity and dedicated to routine tasks and special projects that ensure Pennsylvania's elections run smoothly and that every eligible Pennsylvanian can exercise their right to vote. This work becomes more voluminous, significant, and urgent in the months leading up to the election, when we must answer an increasing volume of questions and handle tasks related to, for example, campaign finance reporting, logic and accuracy testing, and voter challenges.

65.    Each of these tasks and costs will divert scarce resources from other important election administration needs such as normal election preparations and the modernization of our SURE system.

22

66.     Section 3(b)(i) of the EO requires that "all outbound mail" bear a unique Intelligent Mail barcode. More than two dozen Pennsylvania counties, many of them small, rural counties, fulfill ballot requests in-house and do not currently use Intelligent Mail barcodes on ballot mail. However, the declaration envelope that the voter must sign contains a unique ID number barcode generated via the Commonwealth's statewide voter registration database that is associated with the voter's distinct voter record. This unique ID, together with a smaller security envelope in which the voter's ballot is sealed, ensures that each ballot packet issued by a county is linked to a distinct voter record, promoting integrity while protecting the secrecy of the voter's enclosed ballot. The change the EO requires would necessitate that these counties either contract with a professional mail house vendor or invest in the software and materials necessary to complete this task in-house.

67.     While the Department encourages all county Boards of Elections to submit their ballot envelopes to USPS for design review, I am concerned that with changes necessitated by the EO, the USPS will be inundated and overwhelmed with design review requests from jurisdictions throughout the United States and will be unable to accomplish effective review in time for the 2026 General Election. Waiting on USPS to approve ballot design has the potential to seriously disrupt and delay carefully timed steps necessary for County Boards of Elections to deliver mail ballots to Pennsylvania voters. Managing the fallout from such a delay would require the Department and local elections officials to divert critical time and money from other elections administration duties to expedite other steps in the mail ballot process, educate the public about the status of mail ballots, and otherwise mitigate the harm from delays to the process.

68.    It is my understanding that Section 5 of the EO directs that "States and localities should preserve, for a 5-year period, all records and materials—excluding ballots cast— evidencing voter participation in any federal election (e.g., ballot envelopes, regardless of carrier)." Existing federal law only requires preservation of voting materials for 22 months following an election, and preservation of records concerning voter roll maintenance for two years. 52 U.S.C. §§ 20507(i)(1), 20701. Pennsylvania law further provides for the preservation of voting materials in federal elections. *See*, *e.g.*, 25 P.S. §§ 3146.9, 3150.17 (providing a two-year retention period for mail ballot-related records); 2649, 3050(a.3)(5), (d) (requiring preservation for eleven months of numbered lists of voters and affidavits of voter eligibility). More than doubling the required retention time for some (but not *all*) voting materials would increase these burdens for county Boards of Elections and cause undue confusion.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 21, 2026, at Harrisburg, Pennsylvania

_____
Jonathan Marks
Deputy Secretary for Elections and Commissions
Pennsylvania Department of State

24