**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| STATE OF CALIFORNIA; et al., | |
| *Plaintiffs,* | |
| v. | Case No. 1:26-cv-11581 |
| DONALD J. TRUMP, in his official capacity as President of the United States; et al., | |
| *Defendants.* | |

**<u>DECLARATION OF ROB ROCK</u>**

I, Rob Rock, declare as follows:

1.       I am a resident of the State of Rhode Island.  I am over the age of 18.  I am familiar with the information in the statements set forth below either through personal knowledge, consultation with Rhode Island Department of State staff, or from my review of relevant documents and information.  If called as a witness, I could and would testify competently to the matters set forth below.

2.       I am the Deputy Secretary of State/Director of Administration for the State of Rhode Island.  I work for Secretary of State Gregg M. Amore and support him in his official capacity as the Chief State Election Official for the State of Rhode Island.  In my role, I assist Secretary Amore in the execution and enforcement of all state and federal laws relating to elections.

3.       I have served as the Deputy Secretary of State/Director of Administration for the State of Rhode Island for three years and three months.  Prior to serving in this capacity, I was

1

the state Elections Director from 2015-2023.  I have undergraduate (Political Science) and Master's (Public Administration) degrees from the University of Rhode Island.

4.    The Rhode Island Department of State, the State Board of Elections and Rhode Island's 39 cities and towns are responsible for administering federal elections in Rhode Island. This responsibility encompasses voter registration, maintaining and updating voter rolls, issuing ballots to registered voters, tabulating votes, and certifying results in all elections for federal office, among numerous other tasks.

5.    The Secretary of State is Rhode Island's third ranking elected official, following the Governor and Lt. Governor.  State law gives the Secretary of State many different duties.  As Rhode Island's chief state election official, the Secretary of State oversees the state's voter registration system, certifies candidates, prepares ballots, and administers oaths of office.  The Secretary of State also works with companies registered to do business in Rhode Island and regulates lobbying activity in the Executive and Legislative branches of government.  The Secretary of State also must sign all laws and other official acts, such as issuing bonds, to make them official.  Additionally, the Secretary of State processes, preserves, and gives public access to hundreds of thousands of historic documents and public records.

6.    The Secretary of State is Rhode Island's chief state election official responsible for executing and enforcing state and federal law relating to elections within the state.  *See* R.I. Gen. Laws § 17-6-1 (general powers), § 17-6-1.3 (designated chief elections official).  The Department of State's Election Division is responsible for implementing the Secretary of State's responsibilities regarding elections, including providing elections information to the public and other parties.  In Rhode Island, elections administration is a collaboration among the Secretary of

2

State's Elections Division, the State Board of Elections, and the 39 cities and towns (local boards of canvassers).

7.    Rhode Island law charges my office with assisting with preventing disenfranchisement and ensuring that all eligible voters who want to vote can do so.  In collaboration with the State Board of Elections and the 39 cities/towns, we ensure voter list maintenance activities are completed, oversee the mail ballot and early voting processes so that voters can vote when it is convenient for them, and conduct post-election audits to ensure voting machines read ballots the way voters intended them to.

8.    In my role as Deputy Secretary of State/Director of Administration, I am responsible for assisting with overseeing the administration of elections in Rhode Island, including overseeing the state's voter registration system, training local election officials on elections administration, maintaining the online voter registration and mail ballot application portals, certifying state and federal candidates, preparing ballots, preparing and sending mail ballots to voters, preparing election calendars, providing candidate and voter information guides, implementing a statewide elections education campaign, and providing voter identification cards. I have personally overseen these responsibilities since February 2015 and, therefore, have substantial first-hand knowledge of administering elections in Rhode Island, including voter registration requirements and the statewide voter registration system.

9.    I am familiar with the Executive Order published on March 31, 2026, entitled "Ensuring Citizenship Verification and Integrity in Federal Elections" (the "EO").  Sections 2 through 5 of the EO (collectively, the "Challenged Provisions") have already caused considerable harm, confusion, fear, and disruption in Rhode Island elections administration, and will likely continue to do so.

3

10.     Shortly after the EO was issued, I immediately undertook steps to ensure that all Rhode Island election officials were well versed in the contents of the EO.  These measures included briefings for office staff, including the Secretary of State, on the EO; ensuring distribution of the EO to all state and local election officials; and preparing press releases and fielding questions from the public on the EO's new requirements.

11.     The EO has created an immediate need for answers to various questions related to implementation, ranging from big-picture considerations to granular issues.  One pressing concern is how, after we've sent our vendor mail ballot envelope artwork signed off by the United States Postal Service (USPS), we can afford to have them reprinted, if necessary. Additional specific concerns include: how accurate will the "State Citizenship List" be; what is the timeframe for the USPS' rulemaking process; what is the definition of "enrolled with the USPS" regarding voter eligibility to receive and return a mail ballot; how will the USPS handle mail ballots sent to voters not on the "enrolled" list; among others.

12.     It is my understanding that Section 2(a) of the EO directs the Department of Homeland Security ("DHS") to create a "State Citizenship List" for each State, which will include "individuals confirmed to be United States citizens who will be above the age of 18 at the time of an upcoming Federal election and who maintain a residence in the subject State."  It is also my understanding that DHS will send these lists "no fewer than 60 days before each regularly scheduled Federal election, or promptly upon request by a State in connection with any special Federal election."  This would mean that DHS will send this list by Friday, September 4, 2026, for the federal general election taking place on November 3, 2026.  This timeframe contradicts the National Voter Registration Act of 1993's quiet period (Section 8(c)(2)) where

4

election jurisdictions are prohibited from conducting systemic voter list maintenance activities within 90 days of a federal election.

13.     Section 2 requires immediate action from my team in the Elections Division to understand how it interacts with Rhode Island's statewide voter registration list, and to coordinate with other state and local agencies across Rhode Island.  Our efforts to address the directed changes and impacts of the EO will divert time and attention from other critical election preparations.  With only about six months remaining before the 2026 federal general election—and even less time before Rhode Island's primary election, which is one of the latest in the country—our team is focused on educating voters about the upcoming elections, conducting voter list maintenance, and working with federal, state, local partners to ensure the 2026 election will be efficiently and safely administered.  Diverting time, personnel, and resources to implementing an illegal executive order will be a detriment to the people of Rhode Island and jeopardize the safety and security of the 2026 elections.

14.     My office has a continuing obligation to work with Rhode Island's 39 cities and towns to perform regular list maintenance, as required under the National Voter Registration Act ("NVRA"), Help America Voter Act ("HAVA"), and Rhode Island state law.  This includes sending notices to voters who may have moved or updated their voter registration information, identifying duplicates on the statewide voter registration list, cancelling the registrations of those who are incarcerated in a correctional facility upon a felony conviction, and cancelling the registrations of those who have died.

15.     Additionally, my office will need to continue to register those who are eligible to vote in Rhode Island.  Article 2, § 1 of the Rhode Island Constitution grants "[e]very citizen of the United States of the age of eighteen years or over who has had a residence and home in this

state for thirty days next preceding the time of voting, who has resided thirty days in the town or city from which such citizen desires to vote, and whose name shall be registered at least thirty days preceding the time of voting as provided by law, shall have the right to vote. . ." *See also* R.I. Gen. Laws § 17-9.1-1 (voter registration requirements).  The state constitution further provides that "[n]o person who is incarcerated in a correctional facility upon a felony conviction shall be permitted to vote until such person is discharged from the facility."  R.I. Const. art. 2, § 1.

16.    As such, qualified individuals within Rhode Island may register up to 30 days before Election Day.  R.I. Gen. Laws § 17-9.1-3; *see also* 52 U.S.C. § 20507(a)(1) (requiring States to permit registration up to 30 days before a federal election).  In 2005, the Rhode Island Secretary of State implemented a statewide central voter registration system called the Central Voter Registration System (CVRS).  R.I. Gen. Laws § 17-6-1.2.  The CVRS is the centralized voter registration system, overseen by the Department of State, that is used by our office, the State Board of Elections, and all 39 Rhode Island cities and towns to administer all federal, state, local elections and manage voter registration activity.  *See* https://vote.sos.ri.gov/Elections/Administration.  Eligible persons may register to vote or update their voter information in multiple ways: they may use the Department of State's online voter registration portal; register in person at the Division of Motor Vehicles (DMV) and other designated state agencies, including their local board of canvassers; or register by mail.  *See* R.I. Gen. Laws § 17-9.1-7 to § 17-9.1-10.  Individuals must attest to their eligibility to vote in accordance with Rhode Island law to register to vote in federal elections.  Id.  Individuals' eligibility to vote is also verified during the registration process, including validating their driver's license/state identification number or the last 4 digits of their social security number and

6

sending acknowledgement notice to their residence address.  Id. Pursuant R.I. Gen. Laws §17-9.1-11, "[b]efore the name of any person shall be placed on the voting list, the personal shall, at the time of registration, certify or declare that the person is a citizen of the United States."

17.    Rhode Island law allows a "person who has not registered to vote, or whose registration has been canceled pursuant to § 17-10-1 [inactive file], to cast a vote for president and vice-president on election day at the person's city or town hall or at an alternate location designated by the board of canvassers, and approved by the board of elections" and "[t]he casting of that vote shall commence the process of voter registration and subject the person voting to the requirements and penalties in this chapter."  R.I. Gen. Laws § 17-1-3(a).

18.    In compliance with the Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA), Rhode Island allows uniformed and overseas voters to register for a federal election if their voter registration form is received at least 30 days before that election.  52 U.S.C. §§ 20302(a)(2).  State law further provides that any member of the armed forces or of the merchant marine of the United States in active service, any person absent from the state in the performance of "services intimately connected with military operations", as defined in R.I. Gen. Laws § 17-20-3(d), and any person employed outside of the United States, as defined in § 17-20-3(c) who, except for registration, would be a qualified elector of this state, shall be exempt during the period of his or her service or employment and for two (2) years thereafter from the registration requirements of the Rhode Island State Constitution.

19.    In compliance with the NVRA "quiet period" for voter registration, Rhode Island does not systematically remove voters from the rolls during the 90 days prior to a federal election unless a statutory exception applies.  *See* R.I. Gen Laws § 17-9.1-27(d); 52 U.S.C. §§ 20507(c)(2)(A), 3(A)-(B), 4(A).  Within 90 days of an election, Rhode Island does, however,

7

lawfully remove voters on an individual basis where appropriate, such as when a voter requests that his or her registration be canceled, someone becomes deceased or incarcerated in a correctional facility upon a felony conviction, or if someone is deemed ineligible to vote by a court of law.

20.    In sum, Rhode Island's statewide voter registration list changes daily. Registrants are constantly being added, updated, and removed as required (and limited) by federal and state law, and this will continue through the 2026 election and beyond.

21.    I have considered how this dynamic statewide voter registration list will intersect with the list created by DHS. As noted above, pursuant to Section 2(a) of the EO, DHS will share a State Citizenship List by September 4, 2026. The EO permits the state "to routinely supplement and provide suggested modifications or amendments to the State Citizenship List transmitted thereto." The EO does not require DHS to accept any of these state supplements, modifications, or amendments to the State Citizenship List.

22.    Once we receive the State Citizenship List, we will have to devote substantial resources to understanding any differences between it and our current statewide voter registration list. As a baseline matter, comparing the State Citizenship List to our current statewide voter registration list will necessitate linking registrants across the lists. Performing straightforward matching would require that the State Citizenship List contain the same unique identifiers as our statewide voter registration list; we cannot be certain that the data included on the State Citizenship List will be the data we would need to perform effective straightforward matching. Rather, it is inevitable that there will be differences in the files that will make matching difficult, time-consuming, and potentially inaccurate, as people's names, addresses, and other information may vary slightly (*e.g.*, Robert vs. Bob, Apartment #3 vs. Apt. 3). I know from my experience

8

that data matching is a complex process, and extreme care must be taken when the consequences of errors may lead to voter disenfranchisement. And because Rhode Island will receive the State Citizenship List so close to the election, I must plan for all of this now.

23. For eligible voters who appear on the statewide voter registration list but not the State Citizenship List, my office will need to investigate further pursuant to our obligation to ensure that eligible voters are able to vote. Even though Rhode Island will not remove voters simply due to their absence from the State Citizenship List, it could disenfranchise voters in multiple ways. First, voters who check their status on the State Citizenship List as contemplated by Section 2(a) and see that they are not listed may be deterred from voting because they believe they will be blocked from voting or prosecuted, especially if DHS does not timely accept their corrections. Second, USPS may rely on the State Citizenship List to determine which voters can receive and transmit mail ballots in response to the EO's emphasis on criminal penalties associated with the distribution of mail ballots to ineligible individuals. EO §§ 2(b), 3(a), 5. Additionally, if the State Citizenship List is publicly accessible, local elections workers may misunderstand their legal obligations and refuse to provide a ballot to eligible voters missing from the State Citizenship List based on their belief that the voters are ineligible. Finally, DHS' track record of providing inaccurate data to the states is well documented. These are all risks that Rhode Island cannot accept. We must make every effort to avoid disenfranchising eligible Rhode Island residents.

24. Accordingly, in compliance with Rhode Island's obligation to protect the right to vote, Rhode Island would expend significant resources to attempt to supplement and amend the federal list as necessary, if errors were found through our comparison and investigation. This includes determining proper and secure methods for sending large volumes of confidential data

9

to the federal government.  However, even if we can quickly offer all necessary corrections, the EO does not require DHS to accept the State's "suggested modifications or amendments."  EO § 2(a).

26. Rhode Island would incur significant costs to undertake this comparison and verification of the State Citizenship List.  In-depth data analysis will be required and while we have a data analyst on staff, implementation of this EO would require more staff.  The EO provides no funding, so paying for these costs will have to come from devoting fewer resources to our office's other pressing responsibilities, such as strengthening our cybersecurity procedures, voter education, and trainings for local election officials.

26. The Rhode Island Department of State is responsible for providing voter education materials for every election.  The Run for Office guide, Voter Referenda Handbook, Election Calendar, Vote by Mail guide, and others are published every election cycle to ensure voters and candidates have the information they need to participate in the democratic process. All of these resources have been, or will soon be, disseminated for the 2026 election cycle. Additionally, our office creates training materials for local election officials on the CVRS, voter list maintenance activities, cybersecurity best practices, and overall guidance on elections administration.  In conjunction with the State Board of Elections, we have also established a training and certification program for our local election officials.  Local election officials in our first cohort will graduate in June and become certified election administrators while doing so.

27. If Section 2 is implemented, Rhode Island will have to devote significant time, personnel, and money to update training materials for local election officials and their staff, specifically detailing what steps they must take with respect to voters who appear on Rhode Island's voter registration list but not on the State Citizenship List.  Updating resources now,

10

after they have been disseminated, to accommodate the EO's unrealistic requirements would be a disservice to voters and create unnecessary confusion and cause voter disenfranchisement. Resources will also be spent understanding the USPS' process of "enrolling" people who are eligible to vote by mail. These are yet other aspects of the EO's implementation that will necessarily divert from other important election administration tasks.

28.     I anticipate that in addition to formal training materials, my office will need to allocate significant resources to responding directly to local election officials, given the threat of criminal prosecution in Section 2 of the EO. Local election officials are good people who conduct their job duties ethically, legally, and with the utmost professionalism. To threaten these professionals with prosecution based on the Department of Justice's continued accusation of election offices of unsubstantiated conspiracy theories proves a focus on politics and retribution, not best practices.

29.     A separate impact of the EO's directives concerns the need for a wide-ranging public education campaign to ensure that eligible voters understand the EO's requirements, and how they may impact a citizen's voter registration and ability to vote. For example, my staff will have to prepare and distribute training materials guiding citizens through accessing and correcting their individual records on the State Citizenship List under section 2(a). We will also need to field questions from registrants concerned about their voter registration status and generally confused about the process and qualifications to vote in Rhode Island elections.

30.     Our office spent $83,000 to ensure voters had relevant elections information ahead of the 2024 election. I expect voter outreach to cost significantly more regarding this EO. This public education campaign will run beyond the conclusion of the 2026 midterm election and will likely cost hundreds of thousands of dollars ahead of 2028. Turnout in midterm elections is

11

lower than in presidential years so it is imperative that public education on this EO will continue through the 2028 election cycle.  Due to state budget constraints, the forced reliance on federal grant money means other important aspects of elections administration like cybersecurity improvements and voting equipment upgrades will be in jeopardy.

31.    In my experience administering elections, changes to registration and election procedures in the time immediately preceding the election will cause voter confusion.  The complicated requirements of the EO will lead some citizens to misunderstand the requirements for registration, or whether they are able to vote in Rhode Island's elections.  Some citizens will determine that the added requirements make registering and/or voting too confusing to be worthwhile.  For example, a voter may check their individual status on the State Citizenship list, according to the EO.  If they are mistakenly not included, they may believe they have no recourse, and choose not to vote, or they may misunderstand the process for correction (despite my office's attempts to provide education), or DHS may not issue a correction in time.  The result of this confusion will be that fewer eligible voters successfully register to vote or decide to cast a ballot in this important election.

32.    This inevitable voter confusion harms Rhode Island because it will disenfranchise voters, interfering with our sovereign interest and state-law obligation to ensure that all eligible voters who want to can cast a vote.  It will also impose a burden on my staff's time, as my staff (and the elections staff in the 39 cities/towns) will be responsible for dispelling voter confusion to the extent possible.  This voter confusion will come at a crucial time, shortly before the election, when local elections officials' resources are particularly stretched.

33.    Rhode Island elections officials are required by state law to issue ballots to duly registered voters. *See, e.g.,* R.I. Gen. Laws §17-20-2.1(d) (providing that ballots "shall be

12

mailed").  My office intends to comply with these state legal requirements in administering upcoming federal elections.

34.    In compliance with UOCAVA, Rhode Island issues ballots to registered voters who request a mail ballot under that Act at least 45 days before an election.  52 U.S.C. §§ 20302(a)(1)-(3), (8)(A).

35.    In addition, registered voters in Rhode Island may receive a mail ballot by submitting an application in person, online, or by mail that it is received by the local board, or received electronically through the portal established by R.I. Gen. Laws § 17-20-2.3, by 4 p.m. on the 21st day before the day of any general and special elections and primaries.  In those cases where an application to receive a mail ballot is postmarked by the 21st day before the date of an election and received not later than 18 days before the date of an election, the application shall be considered received on or prior to the last day to apply for a mail ballot.  R.I. Gen. Laws § 17-20-2.1(c).

36.    It is my understanding that Section 2(b) of the EO instructs the Attorney General to prioritize investigation and prosecution, under a variety of federal statutes, of "State and local officials or any others involved in the administration of Federal elections who issue Federal ballots to individuals not eligible to vote in a Federal election."  I understand that the EO provides that "an individual is 'eligible to vote in a Federal election' if the individual is a citizen of the United States, 18 years of age or older by the date of the upcoming election, and otherwise qualified under the laws of his or her State."  I further understand that Section 5 of the EO encourages referrals to U.S. DOJ of "[e]vidence of violations of existing Federal laws by State or local election officials" and "States or localities," among other parties, "for consideration of investigation or charges."

13

37.    If EO Section 2 goes into effect, I would be concerned that I, my staff, and Rhode Island elections officials would face federal prosecution if we issued ballots to Rhode Island voters who are not on the State Citizenship List.  I am concerned about the impact of these threats of criminal prosecution on my staff, not because I believe they have violated these provisions, but because the EO increases the amount of pressure and scrutiny on them, including by the public.

38.    The EO's threat of prosecution is significantly exacerbated by the fact that the EO defines voter eligibility in a manner inconsistent with Rhode Island law.  Rhode Island law permits an otherwise eligible voter to cast a ballot in a federal primary election if the voter will be 18 years of age by the general election.  R.I. Gen. Laws § 17-1-3(b).  EO Section 2(b) thus directly conflicts with state law, and it threatens Rhode Island elections officials with prosecution for issuing primary ballots to eligible 17-year-old voters.  This issue has and will cause significant confusion about the rules applicable to upcoming elections.

39.    I know that the threat of prosecution under the EO is on the minds of state and local elections officials like me.  Shortly after the EO was issued, I received at least one communication from a local election official expressing concern that simply issuing mail ballots according to state law—that is, to voters who have affirmed their citizenship under penalty of perjury—could result in their arrest.  Though we have not had issues staffing state and local election positions, I worry that this could become a problem in the future as people may not wish to take on the risk.

40.    Should the U.S. Attorney General initiate any such enforcement actions, Rhode Island's Department of State, State Board of Elections, Rhode Island's 39 cities and towns, and Office of the Attorney General would be required to divert significant resources not only to

14

respond to such legal action but also to educate the public, with the aim of minimizing voter confusion to the extent possible.

41.    Any such legal proceedings would have severe and adverse consequences for the public's trust in Rhode Island's administration of elections.  This EO furthers the continued unsubstantiated claims by the Administration to sow doubt in people's minds about the conduct of elections.

42.    Additionally, the creation of a State Citizenship List may directly disenfranchise voters.  Based on my experience, I know that if a citizen is not included on the list—due, for example, to errors in DHS's immigration information contained in its Systematic Alien Verification for Entitlements (SAVE) system, the federal government's misinterpretation of whether the citizen qualifies as a state resident, or any other error—they may believe they are unable to vote, and could be prosecuted for doing so.  That is why Rhode Island works so hard to maintain consistent and accurate voter registration information so that voters are not erroneously informed that they are ineligible to vote.  The same is true of eligible 17-year-old voters, considering the express limitations in the EO.

43.    Based on my experience assisting local election officials, I know that those officials may feel they cannot register or process a mail ballot application to such voters without risking criminal prosecution, despite those voters' fundamental right to vote under state and federal law.  Similarly, based on my experience I know that the USPS or other entities involved in the "printing, production, shipment, or distribution of ballots" may believe they cannot provide a ballot to those voters without risking criminal prosecution.

44.    Rhode Island provides a mail ballot to all qualified voters upon their request in accordance with procedures set forth at R.I. Gen. Laws § 17-20-2.1.  *See generally*  R.I. Gen.

15

Laws Ch. 17-20.  My office intends to comply with these state legal requirements in administering upcoming federal elections.

45.     It is my understanding that Section 3(b) of the EO directs the USPS to initiate rulemaking that, among other things, would allow States to provide lists of mail ballot voters to USPS 60 days before an election, require the creation of a "Mail-In and Absentee Participation List" ("USPS Mail Ballot List") and prohibit USPS from delivering mail ballots sent by individuals not on the USPS Mail Ballot List.  It is also my understanding that Rhode Island can "routinely supplement and provide suggested modifications or amendments" to the USPS Mail Ballot List, but USPS is not required to accept any changes provided by Rhode Island.

46.     As soon as our team had time to digest the contents of the EO, I immediately began considering what near-term actions the EO would necessitate from my office, including how to create the State List and check the USPS Mail Ballot List, prepare guidance for the cities/towns, involve state agencies and the Governor's Office, build out data analysis infrastructure and cyber security protections, and—as discussed further below—commit additional staff time to responding.

47.     Under Section 3(b) of the EO, in order to comply with state law requiring eligible voters to receive a mail ballot, at least 60 days before Election Day we would need to send a list to USPS of voters to whom we intend to send a mail ballot ("State Mail Ballot List").  R.I. Gen. Laws § 17.20-1.  For the 2026 federal general election, that deadline will be September 4, 2026. Failing to provide this list to USPS would pose an unacceptable risk under the EO that USPS will not include Rhode Island mail ballot voters on the USPS Mail Ballot List, thereby making it more difficult or impossible for eligible voters to cast their ballots.

48.     As discussed throughout this declaration, Rhode Island's use of the mail for elections, paired with our election calendar, mean I must plan now for how to align Rhode Island's administration of mail ballot voting with the EO.

49.     Creating the State Mail Ballot List will require my office and local elections officials to expend time and resources to ensure that all voters who timely requested a mail ballot are included.  This task will be significantly complicated by the influx of registration updates and changes and mail ballot applications that elections officials typically receive in the months before the election (and which I expect will be exacerbated by the State Citizenship List provisions discussed above).

50.     The deadline to provide this list to USPS no later than 60 days before the election means that some voters who are entitled to a mail ballot under state and federal law will unavoidably be left off the list.  Under Rhode Island law, voters may request a mail ballot up to 21 days before an election.  R.I. Gen. Laws § 17-20-2.1(c).  Voters may request to vote by emergency mail ballot within the twenty days prior to any election by providing a duly executed application to the local board of elections by 4 pm the day before Election Day.  R.I. Gen. Laws § 17-20-2.2.  Although the EO indicates that States will be able to "routinely supplement and provide suggested modifications or amendments" to the USPS Mail Ballot List, USPS is not required to accept our suggestions.  The EO also does not specify when USPS will transmit its USPS Mail Ballot List to our office, which could cause substantial complications.

51.     Once we receive the USPS Mail Ballot List, we will have to devote substantial resources to understanding any differences between it and our own list of voters eligible to receive mail ballots.  This will be a difficult task for many of the same reasons set out above with regard to the State Citizenship List, including: the lack of unique identifiers shared by both lists,

17

the potential for slight variations in spelling to wrongly preclude matches, the influx of voter registration changes and mail ballot applications in the lead-up to elections, and administrative challenges inherent to any data-matching process.  Accordingly, reviewing the USPS Mail Ballot List will require a significant expenditure of time and resources.

52.    For citizens who appear on the statewide voter registration list and are eligible to receive a mail ballot under Rhode Island law but not the USPS Mail Ballot List, my office will need to investigate further pursuant to our obligation to ensure that every mail ballot voter is able to receive a mail ballot as requested.  We must make every effort to do so to avoid disenfranchising eligible Rhode Island residents.

53.    Rhode Island would expend significant resources to attempt to supplement and amend the USPS Mail Ballot List as necessary, if errors were found through our comparison and investigation.  This includes determining proper and secure methods for sending large volumes of confidential data to the USPS.  This is true even though the EO instructs that we can only "supplement" and "provide suggested modifications or amendments" to the USPS Mail Ballot List, and USPS is not required to accept them.

54.    Even with the best efforts of my office and local elections officials, the challenges of completing a complex data-matching program in a short timeframe and while preparing to administer an election poses the high risk of errors and omissions.

55.    Rhode Island would incur significant costs to undertake this comparison and verification of the USPS Mail Ballot List as we only have one data analyst in the office. Matching tens of thousands of records to the voter registration list is an undertaking that our office is currently not equipped to handle.

18

56.     If Section 3 is implemented, Rhode Island will have to devote significant time, personnel, and money updating training materials for local elections officials and their staff. Those materials would have to specifically detail what steps they must take with respect to voters who appear on Rhode Island's voter registration list and are eligible to receive a mail ballot under Rhode Island law, but who do not appear on the USPS Mail Ballot List.  This is yet another aspect of the EO's implementation that will necessarily divert resources from other important election administration tasks.

57.     I anticipate that, in addition to formal training materials, my office will need to allocate significant resources to respond directly to local elections officials, given the threat of criminal prosecution in the EO.

58.     At the same time my staff is creating the State Mail Ballot List and performing investigations into the accuracy of the USPS Mail Ballot List, they will have to field questions from citizens concerned about their ability to receive or return a mail ballot in the upcoming elections.  Thus, a separate impact of the EO's directive concerns the need for a wide-ranging public education campaign to ensure that eligible voters understand the EO's requirements, and how they may impact a citizen's ability to vote by mail.  This is particularly the case for the Rhode Island residents, who are used to automatically receiving a mail ballot application for each election or who regularly vote by mail under existing state law.

59.     I estimate that such a public education effort would likely cost more than $100,000 which is not budgeted.

60.     Apart from the time and monetary costs that Section 3's implementation would impose on Rhode Island, Section 3 also risks voter confusion and disenfranchisement.  This inevitable voter confusion is harmful in and of itself and is also a burden on my staff's time.

19

This voter confusion will come at a crucial time shortly before the election, when my team is required under Rhode Island law to send mail ballots.

61.     Sending mail ballots in a timely fashion is not only required by state and federal law, but is critical to ensure that as many eligible Rhode Islanders as possible can exercise their right to vote. In the 2024 General Election, 55,795 voters voted by mail. This method of voting is particularly important for the many Rhode Islanders who have a hard time leaving their home or people of advanced age.

62.     Errors in the USPS Mail Ballot List would be extremely deleterious because of the potential for voter disenfranchisement. For example, consider an eligible voter who is on the State Mail Ballot List but not on the USPS Mail Ballot List. Under the EO, they are likely to receive a mail ballot that USPS will later refuse to return to the State Board of Elections. In that situation, the voter may think that they have voted, but they have not. Nor would the voter necessarily know to vote a provisional ballot in person, given that the EO does not charge USPS with notifying the voter. A voter may also be concerned about casting two ballots, which is itself a criminal violation, and choose not to vote. My office must take every measure possible to avoid this kind of voter disenfranchisement.

63.     In my experience administering elections, changes to election procedures in the time immediately preceding an election will cause voter confusion. The EO's complicated requirements will likely lead some eligible voters to misunderstand whether they are able to vote by mail. Some eligible voters will determine that the added requirements make voting too confusing to be worthwhile. The result of this confusion will be that fewer eligible voters decide to cast a ballot.

20

64.     There are several additional inherent problems posed by the deadlines outlined above and the requirement to compare static lists (the State Citizenship List, USPS Mail Ballot List, and State Mail Ballot List) with a constantly evolving list (the statewide voter registration list).  For example, between the day the State Citizenship List is sent (deadline - September 4, 2026) and the voter registration deadline (October 4, 2026), there will inevitably be a significant number of individuals who will apply for a mail ballot but are not captured on the State Citizenship List.  They may, for example, move to Rhode Island after September 4 but before the October 4 voter registration deadline and also lawfully apply for a mail ballot ahead of the October 13 mail ballot application deadline. Regarding voters who have moved, I am not aware of any legal requirement that voters regularly report change of residential address to the Federal Government.

65.     The timeline is particularly burdensome in Rhode Island, and on the resources of my office, where receipt of the federal static lists and the required comparison to the statewide voter registration list would take place in the final days before administration of Rhode Island's federal primary election on September 9.

66.     Additionally, as already noted, the timeline simply is not workable.  The EO requires DHS to send the State Citizenship List to States "no fewer than 60 days before each regularly scheduled Federal election."  For the November 3, 2026 General Election, that means DHS must send this list by Friday, September 4, 2026.  And we must also send the State Mail Ballot List to USPS 60 days before the election—also Friday, September 4, 2026.  Thus, we must send the State Mail Ballot List (i.e., all those who should receive a mail ballot under state law) to USPS on the *same day* we might receive the State Citizenship List from DHS and well before Rhode Island's mail ballot application deadline.  Comparing the statewide voter

21

registration list and the State Citizenship List to see who is eligible according to both lists in *one day*, or even *a few hours*, is simply not possible to do with any meaningful degree of accuracy, no matter how many resources my office dedicates to the project.  Although the EO provides that we may "routinely supplement and provide suggested modifications or amendments" to the USPS Mail Ballot List, there is no guarantee that USPS will accept those suggestions.  If we—in an attempt to protect Rhode Island's elections officials from criminal liability—sent a State Mail Ballot List to USPS 60 days before Election Day that reflected only confirmed matches between the statewide voter registration list and the State Citizenship List, knowing that many eligible voters could have been wrongfully excluded from the State Citizenship List or who have not yet applied for a mail ballot, we would be committing ourselves to potentially violating Rhode Island law.  We could then endeavor to submit additional matches as we confirmed them.  But it would be very difficult to do so quickly enough to matter.  On September 19, 2026—only 15 days after we receive the State Citizenship List—our UOCAVA voters' ballots must be mailed out.  On or around October 2, 2026, ballots will be sent to all other Rhode Island residents who lawfully applied.  Even if DHS and USPS accepted our suggestions, there is unlikely to be enough time to get a ballot to those who are eligible but did not appear on the State Citizenship List.  Voters would be disenfranchised and Rhode Island law would not be honored.

67.     Again, because of our obligation to ensure that every eligible Rhode Islander can vote, we would need to take additional steps after receiving the State Citizenship List and USPS Mail Ballot List to investigate the status of all those on the statewide registration list who do not appear on the federal lists and then suggest changes to both.  This will require data matching, verification, follow-up investigations, and interfacing with DHS, USPS, the State Board of Elections, cities/towns, the public, and others, and will demand an enormous investment of

22

resources. Additionally, state cybersecurity and information technology staff would need to be involved to facilitate the secure transfer of information between the federal government and the Secretary of State. I estimate that these initiatives would require hiring two contractors in addition to the staff time required to work with DHS and USPS to securely transfer information.

68.    I estimate that these new staffing needs will require an increase of $50,000 to the Secretary of State's budget. Given recent economic pressures across the state and country, I have been trying to keep my office's budgetary needs as low as possible. The EO will increase financial strain on my office and necessitate a higher budget. We will either need to go back to the Legislature and ask for additional funds, which we are far from assured to receive, or will need to identify equivalent cuts elsewhere in my office, a very difficult and maybe impossible task in an election year.

69.    Any time spent by current staff on implementing the EO would divert time and attention from other critical election preparation in the days leading up to the election, my office's busiest time. Our staff is already at capacity and dedicated to routine tasks and special projects that ensure Rhode Island's elections run smoothly and every eligible state resident can exercise their right to vote. This work becomes more voluminous, significant, and urgent in the months leading up to the election, when we must answer an increasing volume of questions and handle tasks related to, for example, voter education and ballot proofing.

70.    Each of these tasks and costs will divert scarce resources from other important election administration needs.

71.    It is my understanding that the rulemaking USPS must initiate pursuant to Section 3(b) of the EO shall include, *at minimum*, proposed provisions specifying requirements for ballot mail. Although Section 3(b)(1) of the EO specifies three such requirements for the envelopes in

23

which states mail "all outbound ballot mail," the nature and extent of the ballot mail specifications that USPS may impose on the states pursuant to the required rulemaking is unclear.  For example, the USPS Domestic Mail Manual (DMM) section 703.8.1.1 defines "ballot mail" as "any mailpiece sent to or from an authorized election official and containing a live ballot that may be used to cast a vote in an election."  The provisions within the DMM recommending automation compatible envelopes that bear unique Intelligent Mail barcodes and submitting envelope designs to USPS for approval apply to "ballot mail" without distinction between "outbound ballot mail" being sent from election officials to voters and "return ballot mail" that voters return to election officials.

72.     Rhode Island has already ordered mail ballot envelopes for the 2026 federal election cycle, at a cost of over $50,000.

73.     Rhode Island currently uses Intelligent Mail barcodes on mail ballots sent out to registered voters but does not use Intelligent Mail barcodes on the state-provided return envelopes in which voters submit their mail ballots.  Changing our envelope order once they are printed would cost the state tens of thousands of dollars that was not budgeted.

74.     Rhode Island currently submits ballot envelopes to USPS for design review. USPS has already approved our designs for the 2026 election and we have acted in reliance on that approval.

75.     I am deeply concerned about the length of time it would take for USPS to conduct ballot design reviews for thousands of jurisdictions if election officials are forced to re-submit their artwork for approval.  Waiting on USPS to approve ballot design has the potential to seriously disrupt and delay carefully timed steps necessary to deliver mail ballots to Rhode Island voters.  Managing the fallout from such a delay would force my office, the State Board of

24

Elections and local elections officials to divert critical time and money from other elections administration duties to expedite other steps in the mail ballot process, educate the public about the status of mail ballots, and otherwise mitigate the harm from delays to the process.

76.     It is my understanding that Section 5 of the EO directs that "States and localities should preserve, for a 5-year period, all records and materials—excluding ballots cast—evidencing voter participation in any federal election (e.g., ballot envelopes, regardless of carrier)." Existing federal law only requires preservation of voting materials for 22 months following an election, and preservation of records concerning voter roll maintenance for two years. 52 U.S.C. §§ 20507(i)(1), 20701. Rhode Island law and regulation also set timelines for the preservation and destruction of voting materials in federal elections. For example, R.I. Gen. Law § 17-19-39.1 requires voted computer ballots that were counted to be stored for 22 months from the date of election.

77.     Compliance with a five-year document preservation standard for election materials would impose significant compliance, storage, and other costs on Rhode Island and local elections officials due to small office spaces and limited budgets to host records offsite.

78.     Additionally, under current federal and state law, Rhode Island may begin properly disposing of certain retained materials from the 2024 primary elections in July 2026 and the 2024 general election in September 2026. The EO prevents Rhode Island from undertaking these actions as to some, but not all, of the retained materials, and requires Rhode Island to incur further management, storage, and security costs instead.

79.     More than doubling the required retention time for some (but not *all*) voting materials would increase these burdens and costs significantly.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 21, 2026, at Providence, R.I.

_____
Rob Rock
Deputy Secretary of State/Director of Administration
Rhode Island Department of State

26