**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

---

STATE OF CALIFORNIA; et al.,

                              *Plaintiffs,*

v.                                                      Case No. 1:26-cv-11581

DONALD J. TRUMP, in his official
capacity as President of the United States; et
al.,

                              *Defendants.*

---

**DECLARATION OF SARAH COPELAND HANZAS**

I, Sarah Copeland Hanzas, declare as follows:

1.      I am a resident of the State of Vermont.  I am over the age of 18.  I am familiar with the information in the statements set forth below either through personal knowledge, consultation with other Secretary of State office staff, or from my review of relevant documents and information. If called as a witness, I could and would testify competently to the matters set forth below.

2.      I am the Secretary of State for Vermont and serve as the Chief Officer of Elections for the State of Vermont.

3.      I have served as the Secretary of State for more than three years.

4.      Vermont and its subdivisions are responsible for administering federal elections in Vermont.  This responsibility encompasses voter registration, maintaining and updating voter rolls, issuing ballots to registered voters, tabulating votes, and certifying results in all elections for federal office, among numerous other tasks.  Elections in Vermont are administered at the local level. My office's Elections Division works closely with town, city and county clerks

1

across the state to ensure smooth administration. Our preparations for the November 2026 general election are already underway.

5. When it comes to biennial state and federal elections, my office's Elections Division plays a central role. We administer state and federal election law. We offer guidance to parties, aspiring candidates, and clerks. We promote voter registration and spearhead efforts to increase participation. We train clerks on election procedures and connect them with data to use as they maintain voter checklists. We provide systems, equipment and supplies that are fundamental to carrying out elections. We receive many candidate filings directly and coordinate with clerks on others. We manage the ballot design and printing process as well as the statewide mailing of General Election ballots. We facilitate the statewide canvass of results and the post-election audit. We serve as an intermediary to federal partners and security professionals. We help election officials deal with routine questions and emergencies that arise before, during, and after election day.

6. Vermont's Secretary of State is the chief State election official for purposes of the National Voter Registration Act. *See* Vt. Stat. Ann. tit. 17, § 2103. The Elections Division of my office is responsible for implementing my responsibilities with regard to elections, including providing technical information to the public and other parties.

7. I am familiar with the Executive Order published on March 31, 2026, entitled "Ensuring Citizenship Verification and Integrity in Federal Elections" (the "EO"). Sections 2 through 5 of the EO (collectively, the "Challenged Provisions") have already caused considerable harm, confusion, fear, and disruption in Vermont election administration, and will impose unrecoverable costs on Vermont.

8.      Vermont's 247 municipal clerks look to my office for guidance. Voters in their cities and towns look to them for guidance and assurance that they will be able to vote in this year's elections in the way that they have come to expect and that we have instructed them. When the EO was issued, our office received concerned calls. My team had to tell clerks that we are unable to give definitive guidance yet and will see what the courts have to say. Such uncertainty this late in an election cycle does not bode well for instilling voter confidence and understanding of how they will be able to participate in the election. My office also repeatedly tells clerks and concerned citizens that we will continue to urge policymakers to not change election rules and procedures during an election year.

9.      It is my understanding that Section 2(a) of the EO directs the Department of Homeland Security ("DHS") to create a "State Citizenship List" for each State, which will include "individuals confirmed to be United States citizens who will be above the age of 18 at the time of an upcoming Federal election and who maintain a residence in the subject State." It is also my understanding that DHS will send these lists "no fewer than 60 days before each regularly scheduled Federal election, or promptly upon request by a State in connection with any special Federal election." This would mean that DHS will send this list by Friday, September 4, 2026, for the federal general election taking place on November 3, 2026.

10.     Section 2 requires immediate action from me and my team in the Elections Division to understand how it interacts with Vermont's statewide voter registration list, and to coordinate with other state and local agencies across Vermont. Our efforts to address the changes and impacts of the EO will divert time and attention from other critical election preparations in an election year. The division has only six staff members, and a full workload in the run-up to this summer's statewide primary and this fall's general election.

11.     My office has a continuing obligation to work with the municipal clerks to perform regular list maintenance, as required under the National Voter Registration Act ("NVRA"), Help America Voter Act ("HAVA"), and Vermont state law.  This includes sending notices to voters who may have moved, identifying duplicates on the statewide voter registration list, and cancelling the registration of those who have died.

12.     Additionally, Vermont's election officials will need to continue to register those who are eligible to vote in Vermont.  Vermont allows qualified individuals to register up to, and including, Election Day.  17 V.S.A. § 2144a; 52 U.S.C. § 20507(a)(1) (requiring States to permit registration up to 30 days before a federal election).  Vermonters can register to vote online, at their municipal clerk's office, and through Vermont's Department of Motor Vehicles when they submit sufficient information of their voter qualifications. Individuals who register in person must verify their eligibility by attestation and reporting identifying information. First time Vermont registrants who apply online or by mail must also submit a copy of an acceptable form of identification.

13.     The Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA) allows uniformed and overseas voters to register for a federal election if their registration application is received at least 30 days before that election.  52 U.S.C. §§ 20302(a)(2). Vermont law goes further, allowing voters to register up until Election Day and directing municipal clerks to mail a ballot to the voter as long as the registration is received more than five days before the election. 17 V.S.A. § 2539.

14.     In compliance with the NVRA "quiet period" for voter registration, Vermont does not systematically remove voters from the rolls during the 90 days prior to a federal election unless a statutory exception applies.  *See* 52 U.S.C. §§ 20507(c)(2)(A), 3(A)-(B), 4(A).  Vermont

does, however, lawfully remove voters on an individual basis where appropriate, such as when a voter requests their registration be canceled.

15.    In sum, Vermont's statewide voter registration list changes up to and on Election Day.  Registrants are constantly being added, updated, and removed as required (and limited) by federal and state law, and this will continue through the 2026 election and beyond.

16.    I have considered how this dynamic statewide voter registration list will intersect with the list created by DHS.  As noted above, pursuant to Section 2(a) of the EO, DHS will share a State Citizenship List by September 4, 2026.  The EO permits the state "to routinely supplement and provide suggested modifications or amendments to the State Citizenship List transmitted thereto."  The EO does not require DHS to accept any of these state supplements, modifications, or amendments to the State Citizenship List.

17.    Once we receive the State Citizenship List, we will have to devote substantial resources to understanding any differences between it and our current statewide voter registration list. As a baseline matter, comparing the State Citizenship List to our current statewide voter registration list will necessitate linking registrants across the lists.  This will be difficult, as it is extremely doubtful that the State Citizenship List will contain the same unique identifiers as our statewide voter registration list, such that we could perform straightforward matching. For example, Vermont's voter checklist uses drivers' license numbers, which federal agencies generally do not have.  Rather, it is inevitable that there will be differences in the files that will make matching difficult, time-consuming, and potentially inaccurate, as people's names, addresses, and other information may vary slightly (*e.g.*, Robert vs. Bob, Apartment #3 vs. Apt. 3).  I know from my experience that data matching is a complex process and extreme care must be taken when the consequences of errors may lead to voter disenfranchisement.  And because

5

Vermont will receive the State Citizenship List so close to the election, I must plan for all of this now.

18.    For eligible voters who appear on the statewide voter registration list but not the State Citizenship List, my office will need to investigate further pursuant to our obligation to ensure that eligible voters are able to vote. Even though Vermont will not disenroll voters simply due to their absence from the State Citizenship List, it could disenfranchise voters in multiple ways. First, voters who check their status on the State Citizenship List as contemplated by Section 2(a) and see that they are not listed may be deterred from voting because they believe they will be blocked from voting or prosecuted, especially if DHS does not timely accept their corrections. Second, USPS may rely on the State Citizenship List to determine which voters can receive and transmit mail ballots in response to the EO's emphasis on criminal penalties associated with the distribution of mail ballots to ineligible individuals. EO §§ 2(b), 3(a), 5. Additionally, if the State Citizenship List is publicly accessible, there is a risk that local elections workers could misunderstand their legal obligations and refuse to provide a ballot to eligible voters missing from the State Citizenship List based on their belief that the voters are ineligible. These are all risks that Vermont cannot accept. We must make every effort to avoid disenfranchising eligible Vermonters.

19.    Accordingly, in compliance with Vermont's obligation to protect the right to vote, Vermont would expend significant resources to attempt to supplement and amend the federal list as necessary, as errors were found through our comparison and investigation. This includes determining proper and secure methods for sending large volumes of confidential data to the federal government. However, even if we are able to quickly offer all necessary corrections, the

6

EO does not require DHS to accept the State's "suggested modifications or amendments." EO § 2(a).

20.     If a technological solution were available to meet the EO's requirements in the time required by state law, Vermont would incur significant costs to undertake this comparison and verification of the State Citizenship List.  The EO provides no funding, and the state legislature will soon adjourn, so paying for these costs would have to come from funds already committed to executing other statutorily required obligations.

21.     The Secretary is charged with providing clerks "with informational materials about the conduct of elections and recounts, and otherwise help them run elections in conformance with State and federal law." Vt. Stat. Ann. tit. 17, § 2457.

22.     If Section 2 is implemented, Vermont will have to devote significant time, personnel, and money to update training materials for local election officials and their staff, specifically detailing what steps they must take with respect to voters who appear on Vermont's voter registration list but not on the State Citizenship List.  This is yet another aspect of the EO's implementation that will necessarily divert from other important election administration tasks, especially because our election procedures guide and training materials have already been produced and our series of trainings began on April 20.

23.     I anticipate that in addition to formal training materials, my office will need to allocate significant resources to responding directly to local election officials, given the threat of criminal prosecution in Section 2 of the EO.

24.     At the same time my staff is performing investigations into the accuracy of the State Citizenship List, they will have to conduct a wide-ranging public education campaign to ensure that eligible voters understand the EO's requirements, and how they may impact a

citizen's registration and ability to vote. For example, my staff will have to prepare and distribute training materials guiding citizens through accessing and correcting their individual records on the State Citizenship List under section 2(a). We will also need to field questions from registrants concerned about their voter registration status and generally confused about the process and qualifications to vote in Vermont elections. And, because we are required by law to mail a ballot to all active registered voters in the state, we would presumably have to conduct additional mailings to all voters who could not immediately be matched with the State Citizenship List.

25.    Depending on the State Citizenship List's level of incompleteness, such additional mailings could cost hundreds of thousands of dollars while still failing to be compliant with state law and certainly disenfranchising Vermonters. This is on top of the cost the State of Vermont will incur data matching the State Citizenship List to our voter checklist. We anticipate that we will need to hire a temporary expert in data matching, so we do not inadvertently disenfranchise voters.

26.    In my experience administering elections, changes to registration and election procedures in the time immediately preceding the election can cause voter confusion. The complicated requirements of the EO will likely lead some citizens to misunderstand the requirements for registration, or whether they are able to vote in Vermont's elections. Some citizens will determine that the added requirements make registering and/or voting too confusing to be worthwhile. For example, a voter may check their individual status on the State Citizenship list, according to the EO. If they are mistakenly not included, they may believe they have no recourse, and choose not to vote, or they may misunderstand the process for correction (despite my office's attempts to provide education), or DHS may not issue a correction in time.

The result of this confusion will be that fewer eligible voters successfully register to vote or decide to cast a ballot.

27. This inevitable voter confusion harms Vermont because it will disenfranchise voters, interfering with our sovereign interest and state-law obligation to ensure that all eligible voters who want to can cast a vote. It will also impose a burden on my staff's time, as my staff (and the elections staff in towns) will be responsible for dispelling voter confusion to the extent possible. This voter confusion will come at a crucial time, shortly before the election, when local elections officials' resources are particularly stretched.

28. Vermont elections officials are required by state law to issue ballots to duly registered voters. If a person makes a simultaneous request to register to vote and to apply for an early voter absentee ballot, the clerk is required to mail a blank voter registration application, together with a full set of early voter absentee ballots, to that person. In addition, the clerk is required to treat an official federal postcard application as a simultaneous application to register to vote and for an early voter absentee ballot. Vt. Stat. Ann. tit. 17, § 2532(c). My office intends to comply with these state legal requirements in administering upcoming federal elections.

29. In compliance with UOCAVA, Vermont issues ballots to registered voters who request an absentee ballot under that Act at least 45 days before an election. 52 U.S.C. §§ 20302(a)(1)-(3), (8)(A). Vermont law stipulates that the town clerk's office shall be open on the 46th day before the election and that the clerk shall send absentee ballots to UOCAVA voters on or before that day. Vt. Stat. Ann. tit. 17, § 2539. They may also request to have their ballot delivered electronically. Vt. Stat. Ann. tit. 17, § 2122(a).

30. It is my understanding that Section 2(b) of the EO instructs the Attorney General to prioritize investigation and prosecution, under a variety of federal statutes, of "State and local

9

officials or any others involved in the administration of Federal elections who issue Federal ballots to individuals not eligible to vote in a Federal election." I understand that the EO provides that "an individual is 'eligible to vote in a Federal election' if the individual is a citizen of the United States, 18 years of age or older by the date of the upcoming election, and otherwise qualified under the laws of his or her State." I further understand that Section 5 of the EO encourages referrals to U.S. DOJ of "[e]vidence of violations of existing Federal laws by State or local election officials" and "States or localities," among other parties, "for consideration of investigation or charges."

31. If EO Section 2 goes into effect, I would be concerned that I, my staff, and Vermont elections officials would face federal prosecution if we issued ballots to Vermont voters who are not on the State Citizenship List. I am concerned about the impact of these threats of criminal prosecution on my staff, not because I believe they have violated these provisions, but because the EO increases the amount of pressure and scrutiny on them, including by the public.

32. The EO's threat of prosecution is significantly exacerbated by the fact that the EO defines voter eligibility in a manner inconsistent with Vermont law. Vermont law permits an otherwise eligible voter to cast a ballot in a federal primary election if the voter will be 18 years of age by the general election. Vt. Stat. Ann. tit. 17, § 2121. EO Section 2(b) thus directly conflicts with state law, and it threatens Vermont elections officials with prosecution for issuing primary ballots to eligible 17-year-old voters. This issue has and will cause significant confusion about the rules applicable to upcoming elections.

33. I know that the threat of prosecution under the EO is on the minds of state and local elections officials like me. Our municipal clerks' offices have had a high turnover rate in recent years, with many citing the increasingly vitriolic climate as a reason for retiring or

resigning. I worry that the risk of federal prosecution for simply following proper state election procedure would drive even more election officials to depart.

34.     Should the Attorney General initiate any such enforcement actions, the Vermont Secretary of State's office would be required to divert significant resources not only to respond to such legal action but also to educate the public, with the aim of minimizing voter confusion to the extent possible.

35.     Any such legal proceedings would have severe and adverse consequences for the public's trust in Vermont's administration of elections. Vermont has achieved one of the highest voter turnout rates in the nation precisely because our state and local election officials have gained Vermonters' trust. Vermonters trust that our elections will be free, fair, and accessible. If the downstream impacts of this EO were to negatively impact that trust, participation in our elections would likely decline.

36.     Additionally, the creation of a State Citizenship List may directly disenfranchise voters. If a citizen is not included on the list—due, for example, to errors in DHS's static immigration information contained in its Systematic Alien Verification for Entitlements (SAVE) system, the federal government's misinterpretation of whether the citizen qualifies as a state resident, or any other error—they may believe they are unable to vote, and could be prosecuted for doing so. Vermont works hard to maintain consistent voter registration information so that voters are not erroneously informed that they are ineligible to vote. The same is true of eligible 17-year-old voters, considering the express limitations in the EO.

37.     Based on my experience assisting local election workers, I know that those workers may feel they cannot register or send a ballot to such voters without risking criminal prosecution, despite those voters' fundamental right to vote under state and federal law.

11

Similarly, based on my experience I know that USPS or other entities involved in the "printing, production, shipment, or distribution of ballots" may believe they cannot provide a ballot to those voters without risking criminal prosecution.

38.    Vermont provides a mail ballot to all active voters on the statewide voter checklist. Vt. Stat. Ann. tit. 17, § 2537a. These ballots are to be sent to active voters by October 1 at the latest, and must be returned to the Town Clerk by Election Day. My office intends to comply with these state legal requirements in administering upcoming federal elections.

39.    It is my understanding that Section 3(b) of the EO directs the United States Postal Service ("USPS") to initiate a rulemaking that, among other things, would allow States to provide lists of mail voters to USPS 60 days before an election, require the creation of a "Mail-In and Absentee Participation List" ("USPS Mail Ballot List") and prohibit USPS from delivering mail ballots sent by individuals not on the USPS Mail Ballot List.  It is also my understanding that Vermont can "routinely supplement and provide suggested modifications or amendments" to the USPS Mail Ballot List, but USPS is not required to accept any changes provided by Vermont.

40.    As soon as our team had time to digest the contents of the EO, I immediately began considering what near-term actions the EO would necessitate from my office, including preparing to create the State List and check the USPS Mail Ballot List, preparing guidance for the city and town clerks, involving state executive branch agencies, building out data analysis infrastructure and cyber security protections, and—as discussed further below—how to reassign already-stretched staff resources without exposing elections to increased risks and errors.

41.    Under Section 3(b) of the EO, in order to comply with state law requiring all eligible voters to receive a mail ballot, at least 60 days before Election Day we would need to

12

send a list to USPS of voters to whom we intend to send a mail-in or absentee ballot ("State Mail Ballot List"). Vt. Stat. Ann. tit. 17, § 2537a. For the 2026 federal general election, that deadline will be September 4, 2026. Failing to provide this list to USPS would pose an unacceptable risk under the EO that USPS will not include Vermont voters on the USPS Mail Ballot List, thereby making it more difficult or impossible for eligible voters to cast their ballots.

42.    As discussed throughout this declaration, Vermont's use of the mail for elections, paired with our election calendar, mean I must plan now for how to align Vermont's administration of mail voting with the EO.

43.    Creating the State Mail Ballot List will require my office and local elections officials to expend time and resources to ensure that all active registered voters are included. This task will be significantly complicated by the influx of registration updates and changes that elections officials typically receive in the months before the election (and which I expect will be exacerbated by the State Citizenship List provisions discussed above).

44.    The deadline to provide this list to USPS no later than 60 days before the election means that some voters who are entitled to a mail ballot under state and federal law will unavoidably be left off the list. UOCAVA permits uniformed and overseas voters to request absentee ballots up to 45 days before an election. 52 U.S.C. § 20302(a)(8). Under Vermont law, voters may request an absentee ballot up to one day before an election and municipal clerks are required to mail a ballot to the voter as long as the registration is received more than five days before the election. Vt. Stat. Ann. tit. 17, §§ 2531(a), 2539. Although the EO indicates that States will be able to "routinely supplement and provide suggested modifications or amendments" to the USPS Mail Ballot List, USPS is not required to accept our suggestions. The

EO also does not specify when USPS will transmit its USPS Mail Ballot List to our office, which could cause substantial complications.

45.     Once we receive the USPS Mail Ballot List, we will have to devote substantial resources to understanding any differences between it and our own list of voters eligible to receive mail ballots. This will be a difficult task for many of the same reasons set out above with regard to the State Citizenship List, including: the lack of unique identifiers shared by both lists, the potential for slight variations in spelling to wrongly preclude matches, the fluid nature of voter registration rolls in the lead-up to elections, and administrative challenges inherent to any data-matching process. Accordingly, reviewing the USPS Mail Ballot List will require a significant expenditure of time and resources.

46.     For citizens who appear on the statewide voter registration list and are eligible to receive a mail ballot under Vermont law but not the USPS Mail Ballot List, my office will need to investigate further pursuant to our obligation to ensure that every active registered voter is able to receive a mail ballot as directed by state law. We must make every effort to do so to avoid disenfranchising eligible Vermont residents.

47.     Vermont would expend significant resources to attempt to supplement and amend the USPS Mail Ballot list as necessary, as errors were found through our comparison and investigation. This includes determining proper and secure methods for sending large volumes of confidential data to the USPS. This is true even though the EO instructs that we can only "supplement" and "provide suggested modifications or amendments" to the USPS Mail Ballot List, and USPS is not required to accept them.

14

48.     Even with the best efforts of my office and local elections officials, the challenges of completing a complex data-matching program in a short timeframe and while preparing to administer an election poses the high risk of errors and omissions.

49.     Vermont would incur significant costs to undertake this comparison and verification of the USPS Mail Ballot List. It is not clear where the funds would come from to cover these costs, especially given this late stage in the state budget process and recent cuts in federal funding.

50.     If Section 3 is implemented, Vermont will have to devote significant time, personnel, and money to update training materials for local elections officials and their staff. Those materials would have to specifically detail what steps they must take with respect to voters who appear on Vermont's voter registration list and are eligible to receive a mail ballot under Vermont law, but who do not appear on the USPS Mail Ballot List. This is yet another aspect of the EO's implementation that will necessarily divert from other important election administration tasks.

51.     I anticipate that, in addition to formal training materials, my office will need to allocate significant resources to responding directly to local elections officials, given the threat of criminal prosecution in the EO.

52.     At the same time my staff is creating the State Mail Ballot List and performing investigations into the accuracy of the USPS Mail Ballot List, they will have to field questions from citizens concerned about their ability to receive or return a mail ballot in the upcoming elections. Thus, a separate impact of the EO's directive concerns the need for a wide-ranging public education campaign to ensure that eligible voters understand the EO's requirements, and how they may impact a citizen's ability to vote by mail. This is particularly the case for

15

Vermont residents, who are used to automatically receiving mail ballots for the general election and being able to vote by mail under existing state law.

53.    Apart from the time and monetary costs that Section 3's implementation would impose on Vermont, Section 3 also risks voter confusion and disenfranchisement. This inevitable voter confusion is a harm in and of itself and is also a burden on my staff's time. This voter confusion will come at a crucial time shortly before the election, when state and local elections officials are required under Vermont law to send mail ballots to all eligible voters.

54.    Sending mail ballots in a timely fashion is not only required by state and federal law, but is critical to ensuring that as many eligible Vermonters as possible can exercise their right to vote. In the 2024 General Election, nearly two-thirds of Vermonters (64%) voted early, typically by mail. This method of voting is particularly important for the many Vermonters who have long commutes or otherwise have difficulty driving to their polling place during open hours on election day.

55.    Errors in the USPS Mail Ballot List would be extremely deleterious because of the potential for voter disenfranchisement. For example, consider an eligible voter who is on the State Mail Ballot List but not on the USPS Mail Ballot List. Under the EO, they are likely to receive a mail ballot from their local elections official that USPS will later refuse to return to the local elections official. In that situation, the voter may think that they have voted, but they have not. Nor would the voter necessarily know to cancel that ballot and vote in person, given that the EO does not charge USPS with notifying the voter. A voter may also be concerned about casting two ballots, which is itself a criminal violation, and choose not to vote. My office must take every measure possible to avoid this kind of voter disenfranchisement.

16

56.     In my experience administering elections, changes to election procedures in the time immediately preceding an election can cause voter confusion. The EO's complicated requirements will likely lead some eligible voters to misunderstand whether they are able to use a mail ballot. Some eligible voters will determine that the added requirements make voting too confusing to be worthwhile. The result of this confusion will be that fewer eligible voters decide to cast a ballot.

57.     There are several additional inherent problems posed by the deadlines outlined above and the requirement to compare static lists (the State Citizenship List, USPS Mail Ballot List, and State Mail Ballot List) with a constantly evolving list (the statewide voter registration list). For example, between the day the State Citizenship List is sent and five days before Election Day (the last day a voter may register with the guarantee of being sent a mail ballot under Vermont law) there will inevitably be a significant number of individuals who become eligible but are not captured on the State Citizenship List. They may, for example, have moved to Vermont the week before the election or become a naturalized citizen after the list was sent. Under Vermont law, those voters would still be entitled to be mailed a ballot.

58.     Additionally, as already noted, the timeline simply does not seem workable. The EO requires DHS to send the State Citizenship List to States "no fewer than 60 days before each regularly scheduled Federal election." For the November 3, 2026 General Election, that means DHS must send this list by Friday, September 4, 2026. And Vermont must also send its State Mail Ballot List to USPS 60 days before the election—also Friday, September 4, 2026. Thus, we must send the State Mail Ballot List (i.e., all those who should receive a mail ballot under state law) to USPS on the *same day* we might receive the State Citizenship List from DHS. Incidentally, that is also within a single business day of when the Secretary of State's office

17

needs to send our active voter address list to our mail vendor in order to meet our statutory deadline for mailing ballots to Vermonters. Comparing the statewide voter registration list and the State Citizenship List to see who is eligible according to both lists in *one day*, or even *a few hours*, is simply not possible to do with any meaningful degree of accuracy, no matter how many resources my office dedicates to the project.

59.    Although the EO provides that we may "routinely supplement and provide suggested modifications or amendments" to the USPS Mail Ballot List, there is no guarantee that USPS will accept those suggestions.  If we—in an attempt to protect Vermont's elections officials from criminal liability—sent a State Mail Ballot List to USPS 60 days before Election Day that reflected only confirmed matches between the statewide voter registration list and the State Citizenship List, knowing that many eligible voters could have been wrongfully excluded from the State Citizenship List, we would be committing ourselves to potentially violating Vermont law.  We could then endeavor to submit additional matches as we confirmed them.  But it would be very difficult to do so quickly enough to matter.  On September 18—only 2 weeks after we receive the State Citizenship List—our UOCAVA voters' ballots must be mailed out. One business day later, on September 21 (43 days before the general election), we must begin mailing ballots to all other active voters. Vt. Stat. Ann. tit. 17, § 2537a.  Even if DHS and USPS accepted our suggestions, there is unlikely to be enough time to get a ballot to those who are eligible but did not appear on the State Citizenship List.  Voters would be disenfranchised and Vermont law would not be honored. Regarding voters who have moved, I am not aware of any legal requirement that voters regularly report change of residential address to the Federal Government.

60. Again, because of our obligation to ensure that every eligible Vermonter can vote, we would need to take additional steps after receiving the State Citizenship List and USPS Mail Ballot List to investigate the status of all those on the statewide registration list who do not appear on the federal lists, and then suggest changes to both. This will require data matching, verification, follow-up investigations, and interfacing with DHS, USPS, municipalities, the public, and others, and will demand an enormous investment of resources. Additionally, state cybersecurity and information technology staff would need to be involved to facilitate the secure transfer of information between the federal government and the Secretary of State. At this time, not knowing the completeness or format of the list that will be provided to Vermont it is very difficult to estimate the cost of this new requirement. Undoubtably, given that the election division is a team of six people and this work has not been previously accounted for in our election schedule I anticipate that I will need to hire at least one temporary employee to complete this work. This is in addition to the staff time required to work with DHS and USPS to securely transfer information. Even if my office had unlimited resources, given the late notice of this requirement and timeline that is required this task would be virtually impossible.

61. I estimate that these new staffing needs will require an increase of $50,000 to the election division budget. Given recent economic pressures across the state and country, I have been trying to keep my office's budgetary needs as low as possible. In November 2025, I submitted the latest estimated budget for my office to the Vermont Legislature, as required. The Legislature is in the final weeks of its session, and the budget is very close to being finalized. The EO will increase financial strain on my office and necessitate a higher budget. I will either need to go back to the Legislature and ask for additional funds, which I am far from assured to

19

receive, or will need to identify equivalent cuts elsewhere in my office, a very difficult and maybe impossible task."

62.    Any time spent by current staff on implementing the EO would divert time and attention from other critical election preparation in the days leading up to the election, my office's busiest time.  Our staff is already at capacity and dedicated to routine tasks and special projects that ensure Vermont's elections run smoothly and every eligible Vermonters can exercise their right to vote.  This work becomes more voluminous, significant, and urgent in the months leading up to the election, when we must answer an increasing volume of questions and handle tasks related to, for example, campaign finance reporting, logic and accuracy testing, and voter challenges.

63.    Each of these tasks and costs will divert scarce resources from other important election administration needs.

64.    In February, our office paid $718,500 to our mail vendor and USPS for permit fees and postage for outgoing and return ballots for the 2026 federal election cycle. Earlier this month, Vermont designed, proofed, ordered mail ballot envelopes for the cycle.

65.    It is my understanding that Section 5 of the EO directs that "States and localities should preserve, for a 5-year period, all records and materials—excluding ballots cast— evidencing voter participation in any federal election (e.g., ballot envelopes, regardless of carrier)."  Existing federal law only requires preservation of voting materials for 22 months following an election, and preservation of records concerning voter roll maintenance for two years.  52 U.S.C. §§ 20507(i)(1), 20701.  Vermont law and regulation also set timelines for the preservation and destruction of voting materials in federal elections. Only the voter checklist is required to be retained for five years.  State law directs municipalities to follow the federal

20

retention schedule for other materials, thereby allowing space to be cleared out in time for the next cycle of ballots that must be stored. Vt. Stat. Ann. tit. 17, § 2590

66.     Compliance with a five-year document preservation standard for election materials would impose significant compliance, storage, and other costs on Vermont and local elections officials.

67.     Additionally, under current federal law, Vermont municipalities may begin properly disposing of certain retained materials from the 2024 primary elections in June 2026 and the 2024 general election in September 2026. The EO prevents Vermont municipalities from undertaking these actions as to some, but not all, of the retained materials, and requires Vermont municipalities to incur further management, storage, and security costs instead.

68.     More than doubling the required retention time for some (but not *all*) voting materials would increase these burdens and costs significantly. Many of Vermont's 247 municipal clerks work extremely limited hours and do not have the capacity in an election year to implement a complex new retention schedule, especially one that involves sifting through materials that were organized and stored under the auspices of a different retention policy. In addition, some of these municipalities have little spare capacity in their vaults and will be faced with storage challenges in a matter of weeks if forced to retain materials they should start disposing in June.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 22, 2026, at Montpelier, Vermont.

_____
Sarah Copeland Hanzas
Vermont Secretary of State

21