**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

STATE OF CALIFORNIA; et al.,

                    *Plaintiffs,*

v.

DONALD J. TRUMP, in his official
capacity as President of the United States; et
al.,

                    *Defendants.*

Case No. 1:26-cv-11581

## <u>DECLARATION OF COMMISSIONER STEVEN L. KOSKI</u>

I, Steven L. Koski, declare as follows:

1. I am a resident of the State of Virginia. I am over the age of 18. I am familiar with the information in the statements set forth below either through personal knowledge, consultation with Department of Elections ("ELECT") staff, or from my review of relevant documents and information. If called as a witness, I could and would testify competently to the matters set forth below.

2. I currently serve as the Commissioner of Elections for the Commonwealth of Virginia. I have served in this role since January 17, 2026.

3. In my capacity as Commissioner, I head ELECT and act as its principal administrative officer.

4. I previously served as the Election Services Manager at ELECT from July 30, 2025, until my appointment as Commissioner. I joined ELECT on June 10, 2022, as a Policy Analyst and also served as the Legal and Compliance Advisor.

1

5.      In Virginia, local election officials—a three-person electoral board and the general registrar—are primarily responsible for virtually all aspects of voter registration and election administration in their respective locality. The State Board of Elections and ELECT are responsible for supervising and coordinating the work of local election officials to protect election integrity, promote uniformity across the Commonwealth, and ensure officials act in accordance with federal and state law.

6.      To that end, ELECT and the State Board of Elections issue rules, regulations, guidance and instructions to local election officials on conducting all aspects of elections consistent with law. ELECT supervises local election officials' work related to, among other things, voter registration, absentee voting, in-person voting (both early and on Election Day), post-election canvassing, and election certification.

7.      ELECT is also primarily responsible for operating a statewide voter registration system that includes a complete and accurate record of all registered voters in the Commonwealth. To that end, ELECT coordinates with third parties (i.e. other state agencies, other states, and federal and private operators of national databases) to obtain information that can be used to maintain the statewide voter registration list so that it is accurately updated to account for information about new voters, eligible voters with changed circumstances, and registrants who are no longer eligible.

8.      As Commissioner, I am responsible for overseeing the work of ELECT. This involves, among other things, leading efforts to provide guidance and instruction to local election officials on all aspects of election administration, including absentee voting. Similarly, I have led efforts to develop and implement ELECT's policies and practices for maintaining the accuracy of the Commonwealth's voter registration list.

2

9.      I am familiar with the Executive Order published on March 31, 2026, entitled "Ensuring Citizenship Verification and Integrity in Federal Elections" (the "EO"). Sections 2 through 5 of the EO (collectively, the "Challenged Provisions") have already caused considerable confusion and fear in Virginia election administration and will impose unrecoverable costs on Virginia.

10.     The Executive Order was issued during the early voting period for a statewide referendum in Commonwealth. The day after it was issued, I directed guidance to all the general registrars in the state, confirming that all ELECT's existing guidance on absentee voting remained in effect, and that no election officials should change their conduct during the referendum in light of the Executive Order. While we are confident that election officials in Virginia have operated absentee voting effectively and in accordance with law during the referendum, we are concerned about the impact the EO will have on the Commonwealth, on ELECT, on the work of local election officials, and on the general public during our statewide primary on August 4, 2026, and the general election on November 3, 2026.

11.     It is my understanding that Section 2(a) of the EO directs the Department of Homeland Security ("DHS") to create a "State Citizenship List" for each State, which will include "individuals confirmed to be United States citizens who will be above the age of 18 at the time of an upcoming Federal election and who maintain a residence in the subject State." It is also my understanding that DHS will send these lists "no fewer than 60 days before each regularly scheduled Federal election, or promptly upon request by a State in connection with any special Federal election." This would mean that DHS will send this list by Friday, September 4, 2026, for the federal general election taking place on November 3, 2026.

3

12.     Section 2 requires immediate action from me and my team in ELECT to understand how it interacts with Virginia's statewide voter registration list and what would be required to achieve compliance. Our efforts to address the changes and impacts of the EO will divert time and attention from other critical election preparations.

13.     ELECT must engage in a significant amount of planning and technical design when entering into agreements with third parties to obtain information for use in voter list maintenance. ELECT must ensure that the third party provides sufficient information to use in matching records with those in the statewide voter file (i.e., social security numbers, date of birth, etc.). It must also ensure that transmittal occurs through a secure means that adequately protects the private information shared, which requires establishing an encryption process with access restrictions. And it must ensure that its systems are prepared to both receive and process the underlying information. To achieve these goals, ELECT often engages in extended discussions with the third party, enters into formal information sharing agreements, and designs, updates, and tests its technical systems to achieve these goals. This process can take months and involves significant time especially for staff focused on implementing the required information technology solutions.

14.     Engaging in the planning required to receive a Statewide Voter List will divert resources from ELECT at a time when the agency is fully engaged in challenging time-sensitive work. ELECT is currently operating a statewide referendum, and polls in that election are set to close on April 21. Depending on the results of the referendum, ELECT may be implementing a new redistricting plan throughout the month of May. It will then be responsible for pivoting to running a statewide primary, which is scheduled for August 4. Early voting for that election will begin on June 18. There is little margin between these dates. Pulling key staff, especially those

4

involved in operating the agency's technological systems, increases the risk of delays in this work that could ultimately disrupt operations and lead to missed deadlines or errors in an election.

15. My office has a continuing obligation to work with localities to perform regular list maintenance, as required under the National Voter Registration Act ("NVRA"), Help America Voter Act ("HAVA"), and Virginia state law. This includes identifying duplicates on the statewide voter registration list and individuals whose registrations may be cancelled due to a felony conviction, being adjudicated mentally incapacitated, and being deceased.

16. Additionally, my office will need to continue facilitating registration for those who are eligible to vote in Virginia. Virginia allows qualified individuals to register up to 11 days before Election Day to cast a regular ballot, in person during early voting or on Election Day. Va. Code Ann. 24.2-420.1(A); 52 U.S.C. § 20507(a)(1) (requiring States to permit registration up to 30 days before a federal election). Virginia citizens registering at least 11 days before Election Day, can register to vote online, at their general registrar's office, at various state social service agencies, and through Virginia's Department of Motor Vehicles when they submit sufficient information of their voter qualifications (including citizenship) through their transaction. Virginia citizens registering and voting the same day during early voting in the 10 days before an Election can register at their general registrar's office. And finally, citizens registering and voting on Election Day can do so at their designated polling location.

17. In compliance with the Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA), Virginia allows uniformed and overseas voters to register for a federal election if their registration application is received at least 30 days before that election. 52 U.S.C. §§ 20302(a)(2). Indeed, under Va. Code Ann. 24.2-416, and 24.2-416.4, the Commonwealth

accepts electronic and mail applications to register from any eligible voter, including members of uniformed service up to 11 days prior to Election Day.

18.     In compliance with the NVRA "quiet period" for voter registration, Virginia does not systematically remove voters from the rolls during the 90 days prior to a federal election unless a statutory exception applies. *See* 52 U.S.C. §§ 20507(c)(2)(A), 3(A)-(B), 4(A). Virginia does, however, lawfully remove voters on an individual basis where appropriate, such as when a voter requests that his or her registration be canceled.

19.     In sum, Virginia's statewide voter registration list changes up to Election Day. Registrants are constantly being added, updated, and removed as required (and limited) by federal and state law, and this will continue through the 2026 election and beyond.

20.     I have considered how this dynamic statewide voter registration list will intersect with the list created by DHS. As noted above, pursuant to Section 2(a) of the EO, DHS will share a State Citizenship List by September 4, 2026. The EO permits the state "to routinely supplement and provide suggested modifications or amendments to the State Citizenship List transmitted thereto." The EO does not require DHS to accept any of these state supplements, modifications, or amendments to the State Citizenship List.

21.     Once we receive the State Citizenship List, we will have to devote resources to understanding any differences between it and our current statewide voter registration list. As a baseline matter, comparing the State Citizenship List to our current statewide voter registration list will necessitate linking registrants across the lists. This may be difficult, since we are not certain that the State Citizenship List will contain the same unique identifiers as our statewide voter registration list, such that we could perform straightforward matching. Rather, it is quite possible that there will be differences in the files that will make matching difficult, time-consuming, and

6

potentially inaccurate, as people's names, addresses, and other information may vary slightly (*e.g.*, Robert vs. Bob, Apartment #3 vs. Apt. 3). I know from my experience that data matching is a complex process and extreme care must be taken when the consequences of errors may lead to voter disenfranchisement. And because Virginia will receive the State Citizenship List so close to the November 2026 general election, ELECT must plan for all of this now.

22.     For eligible voters who appear on the statewide voter registration list but not the State Citizenship List, my office will need to evaluate further pursuant to our obligation to ensure that eligible voters are able to vote. Even though Virginia will not disenroll voters simply due to their absence from the State Citizenship List, it could disenfranchise voters in multiple ways. First, voters who check their status on the State Citizenship List as contemplated by Section 2(a) and see that they are not listed may be deterred from voting because they believe they will be blocked from voting or prosecuted, especially if DHS does not timely accept their corrections. Second, USPS may rely on the State Citizenship List to determine which voters can receive and transmit mail ballots in response to the EO's emphasis on criminal penalties associated with the distribution of mail ballots to ineligible individuals. EO §§ 2(b), 3(a), 5. Additionally, if the State Citizenship List is publicly accessible, local elections officials and their vendors may misunderstand their legal obligations and refuse to provide a ballot to eligible voters missing from the State Citizenship List based on their belief that the voters are ineligible.

23.     The only way the EO appears to allow Virginia to fulfill its obligation to protect the right to vote is for the Commonwealth to expend significant resources providing potentially private and protected information to the federal government in an attempt to supplement and amend the federal list as necessary, as errors were found through our comparison and evaluation. This could violate our own state laws protecting voters' private information from disclosure. It

would also involve expending significant resources to determine proper and secure methods for sending large volumes of confidential data to the federal government. Even if we were inclined to disregard our legal obligations and offer this information, the EO does not require DHS to accept the State's "suggested modifications or amendments." EO § 2(a).

24.     Virginia would incur significant costs to undertake this comparison and verification of the State Citizenship List. And it would be incurring these costs while it is engaged in major projects, including possibly implementing a statewide redistricting plan, and planning for and conducting a statewide primary election. Any resources focused on the EO would be resources that ELECT could not devote to completing these statutorily mandated projects. The EO provides no funding, so paying for these costs will have to come from devoting fewer resources to our office's other pressing responsibilities.

25.     ELECT is responsible for coordinating and supervising the work of local election officials on all aspects of conducting elections. To that end, ELECT issues guidance and instructions to general registrars on election administration, including a comprehensive handbook that describes registrars' role in the voter registration process and in implementing list maintenance.

26.     If Section 2 is implemented, Virginia will have to devote significant time and resources to update training materials for local election officials and their staff, specifically detailing what steps they must take with respect to voters who appear on Virginia's voter registration list but not on the State Citizenship List. This is yet another aspect of the EO's implementation that will necessarily divert days of my staff's time, when their time is already stretched thin with tasks related to the current election cycle.

27.    I anticipate that in addition to formal training materials, my office will need to allocate significant resources to responding directly to local election officials, given the threat of criminal prosecution in Section 2 of the EO.

28.    In my experience administering elections, changes to registration and election procedures in the time immediately preceding the election can cause voter confusion. The complicated requirements of the EO will likely lead some citizens to misunderstand the requirements for registration, or whether they are able to vote in Virginia's elections. Some citizens may determine that the added requirements make registering and/or voting too confusing to be worthwhile. For example, a voter may check their individual status on the State Citizenship list, according to the EO. If they are mistakenly not included, they may believe they have no recourse and choose not to vote, or they may misunderstand the process for correction (despite my office's attempts to provide education), or DHS may not issue a correction in time. The result of this confusion will be that fewer eligible voters successfully register to vote or decide to cast a ballot.

29.    Voter confusion harms Virginia because it can disenfranchise voters, interfering with our sovereign interest and state-law obligation to ensure that all eligible voters who want to can cast a vote. Voter confusion also imposes a burden on my staff's time, as my staff (and the elections staff at localities) are responsible for dispelling the confusion to the extent possible. In this case, the voter confusion would come at a crucial time, shortly before the election, when local elections officials' resources are particularly stretched.

30.    Virginia elections officials are required by state law to issue ballots to duly registered voters. Va. Code Ann. 24.2-643(A).

31.    In compliance with UOCAVA, Virginia issues ballots to registered voters who request an absentee ballot under that Act at least 45 days before an election. 52 U.S.C. §§

9

20302(a)(1)-(3), (8)(A). Virginia allows uniformed and overseas voters to register for a federal election if their registration application and absentee ballot application is received at least 30 days before that election. 52 U.S.C. §§ 20302(a)(2). And as explained above, under Va. Code Ann. 24.2-416, and 24.2-416.4, the Commonwealth accepts electronic and mail applications to register from any eligible voter up to and including 11 days prior to Election Day. Military voters can request ballots electronically and by mail even after that deadline. Va. Code Ann. 24.2-419. And voters, including military voters, can still register and cast a ballot in person up to and including Election Day. Va. Code Ann. 24.2-420. UOCAVA voters can also use singular forms (i.e., the Federal Postcard Application and the Federal Write-In Absentee Ballot) that can serve as both a voter registration application and an absentee application simultaneously. Va. Code Ann. 24.2-457.

32.     It is my understanding that Section 2(b) of the EO instructs the Attorney General to prioritize investigation and prosecution, under a variety of federal statutes, of "State and local officials or any others involved in the administration of Federal elections who issue Federal ballots to individuals not eligible to vote in a Federal election." I understand that the EO provides that "an individual is 'eligible to vote in a Federal election' if the individual is a citizen of the United States, 18 years of age or older by the date of the upcoming election, and otherwise qualified under the laws of his or her State." I further understand that Section 5 of the EO encourages referrals to U.S. DOJ of "[e]vidence of violations of existing Federal laws by State or local election officials" and "States or localities," among other parties, "for consideration of investigation or charges."

33.     If EO Section 2 goes into effect, I would be concerned that I, ELECT staff, and Virginia elections officials would face federal prosecution if we issued ballots to Virginia voters who are not on the State Citizenship List. I am concerned about the impact of these threats of

10

criminal prosecution on my staff and local officials, not because I believe they have violated these provisions, but because the EO increases the amount of pressure and scrutiny on them, including by the public.

34.     The EO's threat of prosecution is significantly exacerbated by the fact that the EO defines voter eligibility in a manner inconsistent with Virginia law. Virginia law permits an otherwise eligible voter to cast a ballot in a federal primary election if the voter will be 18 years of age by the general election. Va. Code Ann. 24.2-403. EO Section 2(b) thus directly conflicts with state law, and it threatens Virginia elections officials with prosecution for issuing primary ballots to eligible 17-year-old voters. This issue has and will cause significant confusion about the rules applicable to upcoming elections.

35.     Should the Attorney General initiate any such enforcement actions, ELECT would be required to divert significant resources to respond to such legal action.

36.     Any such legal proceedings would have severe and adverse consequences for the public's trust in Virginia's administration of elections.

37.     Under Va. Code Ann. 24.2-700, any eligible voter can request a mail ballot in Virginia. Voters can request a ballot for a particular election, or, under Va. Code Ann. 24.2-703.1, they can request to be added to a permanent absentee ballot list, which entitles them to automatically receive absentee ballots in advance of every election they are eligible to vote in. My office intends to comply with these state legal requirements in administering upcoming federal elections.

38.     It is my understanding that Section 3(b) of the EO directs the United States Postal Service ("USPS") to initiate a rulemaking that, among other things, would allow States to provide lists of mail voters to USPS 60 days before an election, require the creation of a "Mail-In and

11

Absentee Participation List" ("USPS Mail Ballot List") and prohibit USPS from delivering mail ballots sent by individuals not on the USPS Mail Ballot List. It is also my understanding that Virginia can "routinely supplement and provide suggested modifications or amendments" to the USPS Mail Ballot List, but USPS is not required to accept any changes provided by Virginia.

39.     As soon as our team had time to digest the contents of the EO, I immediately began considering what near-term actions the EO would necessitate from my office, including preparing to create the State List and check the USPS Mail Ballot List, preparing guidance for local election officials, involving state agencies and the Governor's Office, building out data analysis infrastructure and cyber security protections, and—as discussed further below—committing additional staff time to responding.

40.     Under Section 3(b) of the EO, in order to comply with state law requiring eligible absentee voters to receive a mail ballot, at least 60 days before Election Day we would need to send a list to USPS of voters to whom we intend to send a mail-in or absentee ballot ("State Mail Ballot List"). For the 2026 federal general election, that deadline will be September 4, 2026. Failing to provide this list to USPS would pose an unacceptable risk under the EO that USPS will not include Virginia absentee voters on the USPS Mail Ballot List, thereby making it more difficult or impossible for eligible voters to cast their ballots.

41.     ELECT's ability to share a list of absentee voters is restricted and governed by Sections 24.2-706 and 24.2-710 of the Code of Virginia. While a list of absentee voters is available for inspection any copying in the general registrar's office, ELECT can only send the list to eligible entities for the reasons enumerated by state law.

42. Virginia law also contains prohibitions regarding sensitive information such as SSNs, Va. Code Ann. 2.2-3808.1, which gives ELECT additional concerns regarding the level of personally identifiable information we would have to provide under the EO.

43. As discussed throughout this declaration, Virginia's use of the mail for elections, paired with our election calendar, mean I must plan now for how to align Virginia's administration of mail voting with the EO.

44. Creating the State Mail Ballot List will require my office and local elections officials to expend time and resources to ensure that all eligible voters who timely requested an absentee ballot or registered to vote by mail are included. This task will be significantly complicated by the influx of registration updates and changes that elections officials typically receive in the months before the election (and which may be exacerbated by the State Citizenship List provisions discussed above).

45. The deadline to provide this list to USPS no later than 60 days before the election means that some voters who are entitled to a mail ballot under state and federal law will unavoidably be left off the list. UOCAVA permits uniformed and overseas voters to request absentee ballots up to 45 days before an election. 52 U.S.C. § 20302(a)(8). Under Va. Code Ann. 24.2-701(B), voters may request an absentee ballot up to the 11th day before an election. Although the EO indicates that States will be able to "routinely supplement and provide suggested modifications or amendments" to the USPS Mail Ballot List, USPS is not required to accept our suggestions. The EO also does not specify when USPS will transmit its USPS Mail Ballot List to our office, which could cause substantial complications.

46. Once we receive the USPS Mail Ballot List, we will have to devote substantial resources to understanding any differences between it and our own list of voters eligible to receive

13

mail ballots. This will be a difficult task for many of the same reasons set out above with regard to the State Citizenship List, including: the lack of unique identifiers shared by both lists, the potential for slight variations in spelling to wrongly preclude matches, the fluid nature of voter registration rolls in the lead-up to elections, and administrative challenges inherent to any data-matching process. Accordingly, reviewing the USPS Mail Ballot List will require a significant expenditure of time and resources.

47.    For citizens who appear on the statewide voter registration list and are eligible to receive a mail ballot under Virginia law but not the USPS Mail Ballot List, my office will need to evaluate further pursuant to our obligation to ensure that every eligible absentee voter is able to receive a mail ballot as requested. We must make every effort to do so to avoid disenfranchising eligible Virginia residents.

48.    Virginia would expend significant resources to attempt to supplement and amend the USPS Mail Ballot list as necessary, as errors were found through our comparison and investigation. This includes determining proper and secure methods for sending large volumes of confidential data to the USPS, which may otherwise be prohibited from disclosure under Virginia law. This is true even though the EO instructs that we can only "supplement" and "provide suggested modifications or amendments" to the USPS Mail Ballot List, and USPS is not required to accept them.

49.    Even with the best efforts of my office and local elections officials, the challenges of completing a complex data-matching program in a short timeframe and while preparing to administer an election poses the high risk of errors and omissions.

50.    Virginia would incur significant costs to undertake this comparison and verification of the USPS Mail Ballot List. Within 60 days of the November general election, when this work

14

would possibly occur, ELECT and local election officials will be stretched thin planning for and conducting the general election. Early voting for that election will begin on September 18. Prior to that date, ELECT and local election officials will be working hard to finalize and proof ballot designs, print and mail ballots, and ensure that in-person polling locations are set-up properly and securely. Redirecting staff from these efforts increases the risk of error.

51.    If Section 3 is implemented, Virginia will have to devote significant time and resources to update training materials for local elections officials and their staff. Those materials would have to specifically detail what steps they must take with respect to voters who appear on Virginia's voter registration list and are eligible to receive a mail ballot under Virginia law, but who do not appear on the USPS Mail Ballot List. This is yet another aspect of the EO's implementation that will necessarily divert weeks of staff time from other important election administration tasks.

52.    I anticipate that, in addition to formal training materials, my office will need to allocate significant resources to responding directly to local elections officials, given the threat of criminal prosecution in the EO.

53.    At the same time my staff is creating the State Mail Ballot List and evaluating the accuracy of the USPS Mail Ballot List, they will have to field questions from citizens concerned about their ability to receive or return a mail ballot in the upcoming elections. Thus, a separate impact of the EO's directive concerns the need for a wide-ranging public education campaign to ensure that eligible voters understand the EO's requirements, and how they may impact a citizen's ability to vote by mail.

54.    Apart from the time and resources that Section 3's implementation would impose on Virginia, Section 3 also risks voter confusion and disenfranchisement. This inevitable voter

confusion is a harm in and of itself and is also a burden on my staff's time. This voter confusion will come at a crucial time shortly before the election, when state and local elections officials are required under Virginia law to send mail ballots to all eligible voters who timely requested an absentee ballot or registered to vote by mail.

55.    Sending mail ballots in a timely fashion is not only required by state and federal law, but is critical to ensuring that as many eligible Virginia citizens as possible can exercise their right to vote. In the 2024 General Election, 417,822 Virginia citizens voted by mail.[1] This method of voting is particularly important for the many Virginia citizens who live in extremely remote areas far from their nearest polling place.

56.    Errors in the USPS Mail Ballot List would be extremely deleterious because of the potential for voter disenfranchisement. For example, consider an eligible voter who is on the State Mail Ballot List but not on the USPS Mail Ballot List. Under the EO, they are likely to receive a mail ballot from their local elections official that USPS will later refuse to return to the local elections official. In that situation, the voter may think that they have voted, but they have not. Nor would the voter necessarily know to cancel that ballot and vote in person, given that the EO does not charge USPS with notifying the voter. A voter may also be concerned about casting two ballots, which is itself a criminal violation, and choose not to vote.

57.    In my experience administering elections, changes to election procedures in the time immediately preceding an election can cause voter confusion. The EO's complicated requirements will likely lead some eligible voters to misunderstand whether they are able to use a mail ballot. Some eligible voters may determine that the added requirements make voting too

---

[1] https://www.elections.virginia.gov/media/formswarehouse/maintenance-reports/2024-Post-Election-Report.FINAL.pdf

16

confusing to be worthwhile. The result of this confusion could be that fewer eligible voters decide to cast a ballot.

58.    There are several additional inherent problems posed by the deadlines outlined above and the requirement to compare static lists (the State Citizenship List, USPS Mail Ballot List, and State Mail Ballot List) with a constantly evolving list (the statewide voter registration list). For example, between the day the State Citizenship List is sent and 11 days before Election Day (the last day a voter may register and receive a mail ballot under Va. Code Ann. 24.2-416) there will inevitably be a significant number of individuals who become eligible but are not captured on the State Citizenship List. They may, for example, have moved to Virginia with an intent to stay, or become a naturalized citizen after the list was sent. Regarding voters who have moved, it is unclear how this information would be reported to the Federal Government in a timely and comprehensive manner, as I am not aware of any legal requirement that voters report changes of residential address to the Federal Government immediately after moving.

59.    Additionally, as already noted, the timeline simply does not seem workable. The EO requires DHS to send the State Citizenship List to States "no fewer than 60 days before each regularly scheduled Federal election." For the November 3, 2026 General Election, that means DHS must send this list by Friday, September 4, 2026. And Virginia must also send its State Mail Ballot List to USPS 60 days before the election—also Friday, September 4, 2026. Thus, we must send the State Mail Ballot List (i.e., all those who should receive a mail ballot under state law) to USPS on the *same day* we might receive the State Citizenship List from DHS. Comparing the statewide voter registration list and the State Citizenship List to see who is eligible according to both lists in *one day*, or even *a few hours*, is simply not possible to do with any meaningful degree of accuracy, no matter how many resources my office dedicates to the project.

17

60.     Although the EO provides that we may "routinely supplement and provide suggested modifications or amendments" to the USPS Mail Ballot List, there is no guarantee that USPS will accept those suggestions. If we—in an attempt to protect Virginia's elections officials from criminal liability—sent a State Mail Ballot List to USPS 60 days before Election Day that reflected only confirmed matches between the statewide voter registration list and the State Citizenship List, knowing that many eligible voters could have been wrongfully excluded from the State Citizenship List, we would be committing ourselves to potentially violating Virginia law. We could then endeavor to submit additional matches as we confirmed them. But it would be very difficult to do so quickly enough to matter. On September 18—only 2 weeks after we receive the State Citizenship List—our UOCAVA voters' ballots must be mailed out. Similarly, all ballots to voters on the permanent absentee ballot list must also be sent by that same date. Even if DHS and USPS accepted our suggestions, there is unlikely to be enough time to get a ballot to those who are eligible but did not appear on the State Citizenship List. Voters would be disenfranchised and Virginia law would not be honored.

61.     Again, because of our obligation to ensure that every eligible Virginia resident can vote, we would need to take additional steps after receiving the State Citizenship List and USPS Mail Ballot List to investigate the status of all those on the statewide registration list who do not appear on the federal lists, and then suggest changes to both. This will require data matching, verification, follow-up evaluations, and interfacing with DHS, USPS, localities, the public, and others, and will demand an enormous investment of resources. Additionally, state cybersecurity and information technology staff would need to be involved to facilitate the secure transfer and encryption of information that may otherwise be prohibited from disclosure under Virginia law between the federal government and ELECT. I estimate that these initiatives would require hiring

multiple contractors or full-time employees as soon as May. This is in addition to the staff time required to work with DHS and USPS to securely transfer information.

62.     Such staffing needs would require an increase of several hundred thousand dollars to ELECT's budget. It is highly unlikely that we will obtain these necessary funds, however. The legislature will be out of session until 2027, and we will not have an opportunity to revisit our current budget until that time.

63.     Any time spent by current staff on implementing the EO would divert time and attention from other critical election preparation in the days leading up to the election, my office's busiest time. Our staff is already at capacity and dedicated to routine tasks and special projects that ensure Virginia's elections run smoothly and every eligible Virginian can exercise their right to vote. This work becomes more voluminous, significant, and urgent in the months leading up to the election, when we must answer an increasing volume of questions and handle tasks related to, for example, campaign finance reporting, logic and accuracy testing, and voter challenges.

64.     Each of these tasks and costs will divert scarce resources from other important election administration needs.

65.     Neither ELECT nor Virginia localities currently submit ballot envelopes to USPS for design review.

66.     In Virginia, as in much of the country, ballot envelopes vary by locality. I am deeply concerned about the length of time it would take for USPS to conduct ballot design review for the 133 jurisdictions in Virginia, let alone nationwide. Waiting on USPS to approve ballot design has the potential to seriously disrupt and delay carefully timed steps necessary to deliver mail ballots to Virginia voters. Managing the fallout from such a delay would force my office and local elections officials to divert critical time and money from other elections administration duties to

19

expedite other steps in the mail ballot process, educate the public about the status of mail ballots, and otherwise mitigate the harm from delays to the process.

67.     It is my understanding that Section 5 of the EO directs that "States and localities should preserve, for a 5-year period, all records and materials—excluding ballots cast—evidencing voter participation in any federal election (e.g., ballot envelopes, regardless of carrier)." Existing federal law only requires preservation of voting materials for 22 months following an election, and preservation of records concerning voter roll maintenance for two years. 52 U.S.C. §§ 20507(i)(1), 20701. Virginia law and regulation set 24-month timelines for the preservation and destruction of voting materials in federal elections. Va. Code Ann. 24.2-668.

68.     Compliance with a five-year document preservation standard for election materials would impose significant compliance, storage, and other costs on Virginia and local elections officials.

69.     For example, the Library of Virginia would have to update their GS-01, Voter Registration and Elections retention schedule, which requires a work group of local election officials to evaluate any changes. ELECT would need to update guidance documents, and local registrars and clerks would have to work within their jurisdictions to establish additional processes.

70.     Additionally, under current federal law, Virginia may begin properly disposing of certain retained materials from the 2024 primary elections in April 2026 and the 2024 general election in September 2026. And under the additional retention requirements in Virginia law, Virginia would begin properly disposing of certain retained materials from the 2024 primary elections in June 2026 and the 2024 general election in November 2026. The EO prevents Virginia from undertaking these actions as to some, but not all, of the retained materials, and requires Virginia to incur further management, storage, and security costs instead.

20

71.    More than doubling the required retention time for some (but not *all*) voting materials would increase these burdens and costs significantly. For example, these records are held at the local level, and space is a significant resource constraint for localities, with many having only a singular room for storage.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 21, 2026, at Richmond, Virginia.

Steven L. Koski
Commissioner
Virginia Department of Elections

21