**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| STATE OF CALIFORNIA; et al., | |
| *Plaintiffs,* | |
| v. | Case No. 1:26-cv-11581 |
| DONALD J. TRUMP, in his official capacity as President of the United States; et al., | |
| *Defendants.* | |

## DECLARATION OF EDMUND MICHALOWSKI

I, Edmund Michalowski, declare as follows:

1.      I am a resident of the State of Illinois.  I am over the age of 18.  I am familiar with the information in the statements set forth below either through personal knowledge, consultation with Cook County Clerk's Office staff, or from my review of relevant documents and information. If called as a witness, I could and would testify competently to the matters set forth below.

2.      I am the Deputy Clerk for Elections for the Office of the Cook County Clerk. I work for the Cook County Clerk Monica Gordon and support her work as chief election authority in Cook County, Illinois. In my role, I assist in the execution of the election process at the local level. I have served in this role since 2019.

3.      The Cook County Clerk is the election authority responsible for administering elections in suburban Cook County, Illinois. As the local election authority, the Cook County Clerk handles local voter registration, trains election judges and deputy voter registrars, selects polling places, prints ballots, oversees Election Day activities, and supervises the vote count. The

1

Cook County Clerk is the largest election authority in the State of Illinois with approximately 1.6 million registered voters in suburban Cook County. Specifically, for the November 5, 2024 Presidential Election, there were a total of 1,640,040 registered voters in suburban Cook County. A total of 1,089,942 voters cast ballots in that election.

4.      In my role as Deputy Clerk for Elections, I am responsible for preparing and conducting all primary, general, and special elections held in Cook County; developing, implementing, and directing the activities of the Election Division, including registration, candidate filings, all forms of voting, ballot programming and testing, and voter outreach efforts; drafting the Election Division's long-term and short-term strategic goals; working with voters, political parties, candidates, political jurisdictions, media, county departments, and other entities; and developing and presenting a proposed budget.

5.      I am familiar with the Executive Order published on March 31, 2026, entitled "Ensuring Citizenship Verification and Integrity in Federal Elections" (the "EO").  Sections 2 through 5 of the EO (collectively, the "Challenged Provisions") have already caused considerable harm, confusion, fear, and disruption in Cook County election administration, and will impose unrecoverable costs on Illinois.

6.      It is my understanding that Section 2(a) of the EO directs the Department of Homeland Security ("DHS") to create a "State Citizenship List" for each State, which will include "individuals confirmed to be United States citizens who will be above the age of 18 at the time of an upcoming Federal election and who maintain a residence in the subject State."  It is also my understanding that DHS will send these lists "no fewer than 60 days before each regularly scheduled Federal election, or promptly upon request by a State in connection with any

2

special Federal election." This would mean that DHS will send this list by Friday, September 4, 2026, for the federal general election taking place on November 3, 2026.

7. Section 2 requires immediate action from me and my team in the Cook County Clerk's Office to understand how it interacts with Illinois's statewide voter registration list, and to coordinate with other County Clerk's Offices across Illinois. Our efforts to address the changes and impacts of the EO will divert time and attention from other critical election preparations.

8. My office has a continuing obligation to perform regular list maintenance, as required under the National Voter Registration Act ("NVRA"), Help America Voter Act ("HAVA"), and Illinois state law. This includes sending notices to voters who may have moved, identifying duplicates on the statewide voter registration list, cancelling registrations of those who are currently incarcerated, and cancelling the registration of those who have died.

9. Additionally, my office will need to continue to register those who are eligible to vote in Illinois. Illinois allows qualified individuals to register online up to 16 days before Election Day and in person during early voting and on Election Day. 10 ILCS 5/5-50; 52 U.S.C. § 20507(a)(1) (requiring States to permit registration up to 30 days before a federal election). Illinoisans can also register to vote at their county clerk's office, at various state social service agencies, and through Illinois's Secretary of State's Office when they submit sufficient information of their voter qualifications (including citizenship) through their transaction. Individuals must verify their eligibility (by attestation, by reporting identifying information, or by other means) to register to vote in federal elections.

10. In compliance with the Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA), Illinois allows uniformed and overseas voters to register for a federal election if

3

their registration application is received at least 30 days before that election.  52 U.S.C. §§ 20302(a)(2).

11. In compliance with the NVRA "quiet period" for voter registration, Cook County does not systematically remove voters from the rolls during the 90 days prior to a federal election unless a statutory exception applies.  *See* 52 U.S.C. §§ 20507(c)(2)(A), 3(A)-(B), 4(A).  Cook County does, however, lawfully remove voters on an individual basis where appropriate, such as when a voter requests that his or her registration be canceled.

12. In sum, Cook County's statewide voter registration list changes up to and on Election Day.  Registrants are constantly being added, updated, and removed as required (and limited) by federal and state law, and this will continue through the 2026 election and beyond.

13. I have considered how this dynamic statewide voter registration list will intersect with the list created by DHS.  As noted above, pursuant to Section 2(a) of the EO, DHS will share a State Citizenship List by September 4, 2026.  The EO permits the state "to routinely supplement and provide suggested modifications or amendments to the State Citizenship List transmitted thereto."  The EO does not require DHS to accept any of these state supplements, modifications, or amendments to the State Citizenship List.

14. Once we receive the State Citizenship List, we will have to devote substantial resources to understanding any differences between it and our current voter registration list.  As a baseline matter, comparing the State Citizenship List to our current statewide voter registration list will necessitate linking registrants across the lists.  This will be difficult, as it is extremely doubtful that the State Citizenship List will contain the same unique identifiers as our statewide voter registration list, such that we could perform straightforward matching.  For example, for many voters, the Cook County Clerk's Office uses driver's license numbers as unique identifiers,

4

which the federal government does not have.  Rather, it is inevitable that there will be differences in the files that will make matching difficult, time-consuming, and potentially inaccurate, as people's names, addresses, and other information may vary slightly (*e.g.*, Robert vs. Bob, Apartment #3 vs. Apt. 3). I know from my experience that data matching is a complex process and extreme care must be taken when the consequences of errors may lead to voter disenfranchisement.  And because Cook County will receive the State Citizenship List so close to the election, I must plan for all of this now.

15.     For eligible voters who appear on the Cook County voter registration list but not the State Citizenship List, my office will need to investigate further pursuant to our obligation to ensure that eligible voters are able to vote.  Even though Cook County will not disenroll voters simply due to their absence from the State Citizenship List, the executive order could in practice disenfranchise voters in multiple ways.  First, voters who check their status on the State Citizenship List as contemplated by Section 2(a) and see that they are not listed may be deterred from voting because they believe they will be blocked from voting or prosecuted, especially if DHS does not timely accept their corrections.  Second, USPS may rely on the State Citizenship List to determine which voters can receive and transmit mail ballots in response to the EO's emphasis on criminal penalties associated with the distribution of mail ballots to ineligible individuals.  EO §§ 2(b), 3(a), 5.  Additionally, if the State Citizenship List is publicly accessible, local elections workers may misunderstand their legal obligations and refuse to provide a ballot to eligible voters missing from the State Citizenship List based on their belief that the voters are ineligible.  These are all risks that Cook County cannot accept.  We must make every effort to avoid disenfranchising eligible Illinoisans.

16.     Accordingly, in compliance with Cook County's obligation to protect the right to vote, Cook County would expend significant resources to attempt to supplement and amend the federal list as necessary, as errors were found through our comparison and investigation.  This includes determining proper and secure methods for sending large volumes of confidential data to the federal government.  However, even if we are able to quickly offer all necessary corrections, the EO does not require DHS to accept "suggested modifications or amendments." EO § 2(a).

17.     Cook County would incur significant costs to undertake this comparison and verification of the State Citizenship List. Presuming that this data would originate from DHS, it then would move to the Illinois State Board of Elections, who then would transfer it to the various counties here. It is highly probable that this data would need to be mapped and converted at each stage just so that it could be shared accurately and securely. Based upon similar efforts that my office has undertaken in the recent past, it can take up to six weeks and approximately $800,000 to complete this task. And these efforts did not require engaging with two additional levels of government before the data even arrives here, so I would expect these numbers to rise significantly.  The EO provides no funding, so paying for these costs will have to come from devoting fewer resources to our office's other pressing responsibilities, such as training, security, and overall preparation for early voting and Election Day itself.

18.     If Section 2 is implemented, Cook County will have to devote significant time, personnel, and money to update training materials for local election officials and their staff, specifically detailing what steps they must take with respect to voters who appear on Illinois's voter registration list but not on the State Citizenship List.  The Cook County Clerk will need to expend a tremendous amount of time and expense to, among other things, train and retrain

6

several hundred Cook County Clerk staff and more than 8,000 election judges and deputy voter registrars on the State Citizenship List requirements.

19.     I anticipate that in addition to formal training materials, my office will need to allocate significant resources to responding directly to local election officials, given the threat of criminal prosecution in Section 2 of the EO.

20.     At the same time my staff is performing investigations into the accuracy of the State Citizenship List, they will have to conduct a wide-ranging public education campaign to ensure that eligible voters understand the EO's requirements, and how they may impact a citizen's registration and ability to vote.  For example, my staff will have to prepare and distribute training materials guiding citizens through accessing and correcting their individual records on the State Citizenship List under section 2(a).  We will also need to field questions from registrants concerned about their voter registration status and generally confused about the process and qualifications to vote in Illinois elections.

21.     I estimate that such a public education effort would likely cost approximately $2,746,000. This amount would be a significant increase from past budgetary cycles.

22.     In my experience administering elections, changes to registration and election procedures in the time immediately preceding the election can cause voter confusion.  The complicated requirements of the EO will likely lead some citizens to misunderstand the requirements for registration, or whether they are able to vote in Illinois's elections.  Some citizens will determine that the added requirements make registering and/or voting too confusing to be worthwhile.  For example, a voter may check their individual status on the State Citizenship list, according to the EO.  If they are mistakenly not included, they may believe they have no recourse, and choose not to vote, or they may misunderstand the process for correction

(despite my office's attempts to provide education), or DHS may not issue a correction in time. The result of this confusion will be that fewer eligible voters successfully register to vote or decide to cast a ballot.

23.    This inevitable voter confusion harms Cook County because it will disenfranchise voters, interfering with our sovereign interest and state-law obligation to ensure that all eligible voters who want to can cast a vote.  It will also impose a burden on my staff's time, as my staff (and the elections staff at the counties) will be responsible for dispelling voter confusion to the extent possible.  This voter confusion will come at a crucial time, shortly before the election, when local elections officials' resources are particularly stretched.

24.    Cook County elections officials are required by state law to issue ballots to duly registered voters. 10 ILCS 5/19-1. My office intends to comply with these state legal requirements in administering upcoming federal elections.

25.    In compliance with UOCAVA, Cook County issues ballots to registered voters who request an absentee ballot under that Act at least 45 days before an election.  52 U.S.C. §§ 20302(a)(1)-(3), (8)(A).

26.    It is my understanding that Section 2(b) of the EO instructs the Attorney General to prioritize investigation and prosecution, under a variety of federal statutes, of "State and local officials or any others involved in the administration of Federal elections who issue Federal ballots to individuals not eligible to vote in a Federal election."  I understand that the EO provides that "an individual is 'eligible to vote in a Federal election' if the individual is a citizen of the United States, 18 years of age or older by the date of the upcoming election, and otherwise qualified under the laws of his or her State."  I further understand that Section 5 of the EO encourages referrals to U.S. DOJ of "[e]vidence of violations of existing Federal laws by State or

8

local election officials" and "States or localities," among other parties, "for consideration of investigation or charges."

27.     If EO Section 2 goes into effect, I would be concerned that I, my staff, and Cook County elections officials would face federal prosecution if we issued ballots to Cook County voters who are not on the State Citizenship List.  I am concerned about the impact of these threats of criminal prosecution on my staff, not because I believe they have violated these provisions, but because the EO increases the amount of pressure and scrutiny on them, including by the public.

28.     The EO's threat of prosecution is significantly exacerbated by the fact that the EO defines voter eligibility in a manner inconsistent with Illinois law.  Illinois law permits an otherwise eligible voter to cast a ballot in a federal primary election if the voter will be 18 years of age by the general election. 10 ILCS 5/3-6.  EO Section 2(b) thus directly conflicts with state law, and it threatens Cook County elections officials with prosecution for issuing primary ballots to eligible 17-year-old voters.  This issue has and will cause significant confusion about the rules applicable to upcoming elections.

29.     I know that the threat of prosecution under the EO is on the minds of state and local elections officials like me. Though we have not had issues staffing state and local election positions, I worry that this could become a problem in the future as people may not wish to take on the risk.

30.     Should the Attorney General initiate any such enforcement actions, the Cook County Clerk would be required to divert significant resources not only to respond to such legal action but also to educate the public, with the aim of minimizing voter confusion to the extent possible.

31.    Any such legal proceedings would have severe and adverse consequences for the public's trust in Cook County's administration of elections. Public trust in election administration is vital to maintaining a functioning system of government.

32.    Additionally, the creation of a State Citizenship List may directly disenfranchise voters.  Based on my experience, I know that if a citizen is not included on the list—due, for example, to errors in DHS's static immigration information contained in its Systematic Alien Verification for Entitlements (SAVE) system, the federal government's misinterpretation of whether the citizen qualifies as a state resident, or any other error—they may believe they are unable to vote, and could be prosecuted for doing so.  That is why Cook County works so hard to maintain consistent voter registration information so that voters are not erroneously informed that they are ineligible to vote.  The same is true of eligible 17-year-old voters, considering the express limitations in the EO.

33.    Based on my experience assisting local election workers, I know that those workers may feel they cannot register or send a ballot to such voters without risking criminal prosecution, despite those voters' fundamental right to vote under state and federal law. Similarly, based on my experience I know that USPS or other entities involved in the "printing, production, shipment, or distribution of ballots" may believe they cannot provide a ballot to those voters without risking criminal prosecution.

34.    Cook County provides a mail ballot to voters upon request. 10 ILCS 5/19-2.

35.    Cook County also provides a mail ballot specifically to nursing home residents and residents of federally operated veterans' homes, hospitals, or facilities. 10 ILCS 5/19-12.1.

36.    My office intends to comply with these state legal requirements in administering upcoming federal elections.

10

37.     It is my understanding that Section 3(b) of the EO directs the United States Postal Service ("USPS") to initiate a rulemaking that, among other things, would allow States to provide lists of mail voters ("State Mail Ballot List") to USPS 60 days before an election, require the creation of a "Mail-In and Absentee Participation List" ("USPS Mail Ballot List") and prohibit USPS from delivering mail ballots sent by individuals not on the USPS Mail Ballot List. It is also my understanding that Illinois can "routinely supplement and provide suggested modifications or amendments" to the USPS Mail Ballot List, but USPS is not required to accept any changes provided by Illinois.

38.     As soon as our team had time to digest the contents of the EO, I immediately began considering what near-term actions the EO would necessitate from my office, including preparing to create the State Mail Ballot List and check the USPS Mail Ballot List.

39.     Under Section 3(b) of the EO, at least 60 days before Election Day we would need to send a list to USPS of voters to whom we intend to send a mail-in or absentee ballot ("State Mail Ballot List"). For the 2026 federal general election, that deadline will be September 4, 2026. Failing to provide this list to USPS would pose an unacceptable risk under the EO that USPS will not include Cook County voters on the USPS Mail Ballot List, thereby making it more difficult or impossible for eligible voters to cast their ballots.

40.     Several different types of facilities in Illinois are subject to mail ballot procedures, including: facilities licensed pursuant to the Nursing Home Care Act (210 ILCS 45/1-101 et seq.), the Specialized Mental Health Rehabilitation Act of 2013 (210 ILCS 49/1-101 et seq.), the ID/DD Community Care Act (210 ILCS 47/1-101 et seq.), or the MC/DD Act (210 ILCS 46/1-101 et seq.), and federally operated veterans' homes, hospitals, or facilities. 10 ILCS 5/19-12.1.

11

41.     There also are three federally operated veterans' facilities in the Cook County region, including: Jesse Brown VA Medical Center, Edward Hines, Jr. VA Hospital, and Captain James A. Lovell Federal Health Care Center. These facilities also are subject to mail ballot voting procedures codified in state statute. 10 ILCS 5/19-12.1.

42.     Under the provisions of 10 ILCS 5/19-12.2, physically incapacitated electors residing at any of the institutions listed in paragraphs 39 and 40 are able to receive ballots by mail and vote using vote-by-mail procedures at their facilities. To do so, they are supervised by two election judges selected by the election authority. After voting, the election authority takes the ballots directly rather than having them placed in the mail. Given the nature of these environments, arrangements for these individuals to vote are highly structured.

43.     But most importantly, the deadline by when these arrangements must be set is no later than 30 days before Election Day. This timeline is in direct conflict with the 60-day deadline within which the EO requires election authorities to USPS submit names of individuals voting by mail. Additionally, individuals are admitted and discharged from these facilities regularly. If they happen to be admitted within this 30 to 60-day window, under this EO, they easily could lose their right to vote due to overly stringent administrative precaution.

44.     As discussed throughout this declaration, Cook County's use of the mail for elections, paired with our election calendar, mean I must plan now for how to align Cook County's administration of mail voting with the EO.

45.     Creating the State Mail Ballot List will require my office and local elections officials to expend time and resources to ensure that all voters who timely requested an absentee ballot are included.  This task will be significantly complicated by the influx of registration updates and changes that elections officials typically receive in the months before the election

12

(and which I expect will be exacerbated by the State Citizenship List provisions discussed above).

46.     The deadline to provide this list to USPS no later than 60 days before the election means that some voters who are entitled to a mail ballot under state and federal law will unavoidably be left off the list.  UOCAVA permits uniformed and overseas voters to request absentee ballots up to 45 days before an election.  52 U.S.C. § 20302(a)(8).  Under Illinois law, voters may request a mail ballot up to 5 days before an election.  10 ILCS 5/19-2.   Although the EO indicates that States will be able to "routinely supplement and provide suggested modifications or amendments" to the USPS Mail Ballot List, USPS is not required to accept our suggestions.  The EO also does not specify when USPS will transmit its USPS Mail Ballot List to our office, which could cause substantial complications.

47.     Once we receive the USPS Mail Ballot List, we will have to devote substantial resources to understanding any differences between it and our own list of voters eligible to receive mail ballots.  This will be a difficult task for many of the same reasons set out above with regard to the State Citizenship List, including: the lack of unique identifiers shared by both lists, the potential for slight variations in spelling to wrongly preclude matches, the fluid nature of voter registration rolls in the lead-up to elections, and administrative challenges inherent to any data-matching process.  Accordingly, reviewing the USPS Mail Ballot List will require a significant expenditure of time and resources.

48.     For citizens who appear on the statewide voter registration list and are eligible to receive a mail ballot under Illinois law but not the USPS Mail Ballot List, my office will need to investigate further pursuant to our obligation to ensure that every absentee voter is able to

13

receive a mail ballot as requested.  We must make every effort to do so to avoid disenfranchising eligible Illinois residents.

49.    The Cook County Clerk's Office would expend significant resources to attempt to supplement and amend the USPS Mail Ballot list as necessary, as errors were found through our comparison and investigation.  This includes determining proper and secure methods for sending large volumes of confidential data to the USPS.  This is true even though the EO instructs that we can only "supplement" and "provide suggested modifications or amendments" to the USPS Mail Ballot List, and USPS is not required to accept them.

50.    Even with the best efforts of my office and local elections officials, the challenges of completing a complex data-matching program in a short timeframe and while preparing to administer an election poses the high risk of errors and omissions.

51.    Cook County would incur significant costs to undertake this comparison and verification of the USPS Mail Ballot List. These costs would total approximately $100,000. If security is the primary concern, information from USPS coding each rejected ballot is critical to ensuring confidence for where that ballot is and why it could not be delivered. But the EO makes no provision for requiring that information.

52.    If Section 3 is implemented, the Cook County Clerk's Office will have to devote significant time, personnel, and money to update training materials for local elections officials and their staff.  Those materials would have to specifically detail what steps they must take with respect to voters who appear on Cook County's voter registration list and are eligible to receive a mail ballot under Illinois law, but who do not appear on the USPS Mail Ballot List.  This is yet another aspect of the EO's implementation that will necessarily divert an estimated $20,000 from other important election administration tasks.

14

53.     I anticipate that, in addition to formal training materials, my office will need to allocate significant resources to responding directly to local elections officials, given the threat of criminal prosecution in the EO.

54.     At the same time my staff is creating the State Mail Ballot List and performing investigations into the accuracy of the USPS Mail Ballot List, they will have to field questions from citizens concerned about their ability to receive or return a mail ballot in the upcoming elections.  Thus, a separate impact of the EO's directive concerns the need for a wide-ranging public education campaign to ensure that eligible voters understand the EO's requirements, and how they may impact a citizen's ability to vote by mail.

55.     I estimate that such a public education effort would cost approximately $2,746,000, in sum. To perform this task well, we would need to engage broadcast television, social media, trainings (both internal and external), radio, and allocate over $1,000,000 for postage and printing alone.

56.     Apart from the time and monetary costs that Section 3's implementation would impose on Cook County, Section 3 also risks voter confusion and disenfranchisement.  This inevitable voter confusion is a harm in and of itself and is also a burden on my staff's time.  This voter confusion will come at a crucial time shortly before the election, when state and local elections officials are required under Illinois law to send mail ballots to voters registered to vote by mail.

57.     Sending mail ballots in a timely fashion is not only required by state and federal law, but is critical to ensuring that as many eligible Illinoisans as possible can exercise their right to vote.  In the 2024 General Election, 192,412 Cook County residents voted by mail.

15

58.     Errors in the USPS Mail Ballot List would be extremely deleterious because of the potential for voter disenfranchisement.  For example, consider an eligible voter who is on the State Mail Ballot List but not on the USPS Mail Ballot List.  Under the EO, they are likely to receive a mail ballot from their local elections official that USPS will later refuse to return to the local elections official.  In that situation, the voter may think that they have voted, but they have not.  Nor would the voter necessarily know to cancel that ballot and vote in person, given that the EO does not charge USPS with notifying the voter.  A voter may also be concerned about casting two ballots, which is itself a criminal violation, and choose not to vote.  My office must take every measure possible to avoid this kind of voter disenfranchisement.

59.     In my experience administering elections, changes to election procedures in the time immediately preceding an election can cause voter confusion.  The EO's complicated requirements will likely lead some eligible voters to misunderstand whether they are able to use a mail ballot.  Some eligible voters will determine that the added requirements make voting too confusing to be worthwhile.  The result of this confusion will be that fewer eligible voters decide to cast a ballot.

60.     There are several additional inherent problems posed by the deadlines outlined above and the requirement to compare static lists (the State Citizenship List, USPS Mail Ballot List, and State Mail Ballot List) with a constantly evolving list (the voter registration list).  For example, between the day the State Citizenship List is sent and 5 days before Election Day (the last day a voter may request to receive a mail ballot under Illinois law) there will inevitably be a significant number of individuals who become eligible but are not captured on the State Citizenship List.  They may, for example, have moved to Illinois 30 days before Election Day or become a naturalized citizen after the list was sent. Regarding voters who have moved, I am not

16

aware of any legal requirement that voters regularly report change of residential address to the Federal Government.

61.     Additionally, as already noted, the timeline simply does not seem workable.  The EO requires DHS to send the State Citizenship List to States "no fewer than 60 days before each regularly scheduled Federal election."  For the November 3, 2026 General Election, that means DHS must send this list by Friday, September 4, 2026.  And Illinois must also send its State Mail Ballot List to USPS 60 days before the election—also Friday, September 4, 2026.  Thus, we must send the State Mail Ballot List (i.e., all those who should receive a mail ballot under state law) to USPS on the *same day* we might receive the State Citizenship List from DHS. Comparing the statewide voter registration list and the State Citizenship List to see who is eligible according to both lists in *one day*, or even *a few hours*, is simply not possible to do with any meaningful degree of accuracy, no matter how many resources my office dedicates to the project.

62.     Although the EO provides that we may "routinely supplement and provide suggested modifications or amendments" to the USPS Mail Ballot List, there is no guarantee that USPS will accept those suggestions.  If we—in an attempt to protect Cook County's elections officials from criminal liability—sent a State Mail Ballot List to USPS 60 days before Election Day that reflects only confirmed matches between the statewide voter registration list and the State Citizenship List, knowing that many eligible voters could have been wrongfully excluded from the State Citizenship List, we would be committing ourselves to potentially violating Illinois law.  We could then endeavor to submit additional matches as we confirmed them.  But it would be very difficult to do so quickly enough to matter.  On September 19, 2026—only 2 weeks after we receive the State Citizenship List—our UOCAVA voters' ballots must be mailed

17

out.  Shortly thereafter, beginning September 24, 2026, ballots must be sent to qualified voters requesting to vote by mail.  10 ILCS 5/19-4. Even if DHS and USPS accepted our suggestions, there is unlikely to be enough time to get a ballot to those who are eligible but did not appear on the State Citizenship List.  Voters would be disenfranchised and Illinois law would be violated.

63.    Again, because of our obligation to ensure that every eligible Cook County resident can vote, we would need to take additional steps after receiving the State Citizenship List and USPS Mail Ballot List to investigate the status of all those on the statewide registration list who do not appear on the federal lists, and then suggest changes to both.  This will require data matching, verification, follow-up investigations, and interfacing with DHS, USPS, counties, the public, and others, and will demand an enormous investment of resources.  Additionally, state cybersecurity and information technology staff would need to be involved to facilitate the secure transfer of information between the federal government and the Cook County Clerk's Office.  I estimate that these initiatives would require hiring 2 contractors and 10 seasonal employees.  This is in addition to the staff time required to work with DHS and USPS to securely transfer information.

64.    I estimate that these new staffing needs will require an increase of approximately $700,000 to the Clerk's Office budget.  Given recent economic pressures across the state and country, I have been trying to keep my office's budgetary needs as low as possible.  The EO will increase financial strain on my office and necessitate a higher budget.

65.    Any time spent by current staff on implementing the EO would divert time and attention from other critical election preparation in the days leading up to the election, my office's busiest time.  Our staff is already at capacity and dedicated to routine tasks and special projects that ensure Cook County's elections run smoothly and every eligible resident can

18

exercise their right to vote.  This work becomes more voluminous, significant, and urgent in the months leading up to the election, when we must answer an increasing volume of questions and handle tasks related to, for example, campaign finance reporting, logic and accuracy testing, and voter challenges.

66.    Each of these tasks and costs will divert scarce resources from other important election administration needs. Resources in my office that would be diverted include assigning current staff to train the influx of new staff for their roles. These trainings would divert staff from tasks to which they normally would be assigned, which further delays our operational readiness. The Clerk's Office is constantly looking at ways to improve processes and procedures in efficient and cost-productive ways. But budgeting for and acquiring additional personnel just to add layers of unnecessary administrative work does not support those goals.

67.    The Cook County Clerk has already ordered mail ballot envelopes for the 2026 federal election cycle, at a cost of approximately $300,000.

68.    Cook County currently uses Intelligent Mail barcodes on ballot mail.

69.    Cook County does not currently submit ballot envelopes to USPS for design review.

70.    In Illinois, as in much of the country, ballot envelopes vary by county.  I am deeply concerned about the length of time it would take for USPS to conduct ballot design review for thousands of jurisdictions.  Waiting on USPS to approve ballot design has the potential to seriously disrupt and delay carefully timed steps necessary to deliver mail ballots to Cook County voters.  Managing the fallout from such a delay would force my office and local elections officials to divert critical time and money from other elections administration duties to

19

expedite other steps in the mail ballot process, educate the public about the status of mail ballots, and otherwise mitigate the harm from delays to the process.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 22, 2026, at Chicago, Illinois

Edmund Michalowski
Deputy Clerk of Elections
Cook County Clerk's Office

20