**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| STATE OF CALIFORNIA; et al.,<br><br>        *Plaintiffs,*<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States; et al.,<br><br>        *Defendants.* | Case No. 1:26-cv-11581 |

## <u>DECLARATION OF JULIE WISE</u>

I, Julie Wise, declare as follows:

1. I am a resident of the State of Washington. I am over the age of 18. I am familiar with the information in the statements set forth below either through personal knowledge, consultation with King County Elections staff, or from my review of relevant documents and information. If called as a witness, I could and would testify competently to the matters set forth below.

2. I am the elected Director of Elections for Martin Luther King, Jr. County (King County).

3. I have served as the elected Director of Elections since 2016 and have worked as an election administrator for 26 years. I began my career as a temporary worker, answering questions from voters on the phone. From there, I've worked in every corner of the organization and from 2013 to 2015 I served as Deputy Director of King County Elections.

4. I am a state and nationally certified election administrator by the Washington Secretary of State and the National Association of Election Officials.

1

5.      Pursuant to the King County Charter §§ 350.20.50, 610 and 647, the Director of Elections is a non-partisan office elected by the voters of King County to a four-year term. I was first elected Director of King County Elections in November 2015, and was reelected in 2019 and 2023.

6.      As Director of Elections, I serve in the role of county auditor for purposes of the provisions of Chapter 29A of the Revised Code of Washington and am "ex officio supervisor of all primaries and elections" within the county. Wash. Rev. Code §§ 29A.04.216; 29A.04.025.

7.      King County Elections administers elections in King County, Washington. King County is, with 2.3 million residents, the most populous county in Washington State and the 12th most populous county in the United States of America. King County alone is home to over 190 jurisdictions and conducts elections for offices from President of the United States to commissioners for special purpose districts. King County Elections has a proud tradition of winning national awards for our robust cross-partisan election observation program, civic education, and innovation in election administration.

8.      King County has over 1.45 million registered voters, approximately one-third of Washington State's registered voters. It is one of the largest vote-by-mail jurisdictions in the nation.

9.      Prior to moving to universal vote-by-mail in 2009, King County voters overwhelmingly opted to vote no-excuse permanent absentee, an option that first became available in Washington in 1991. Since 1983, Washington has been able to conduct special elections entirely by mail. It's that deep and successful history of accurate and secure vote-by-mail elections in Washington State and King County that informs my perspective.

2

10.     The State of Washington and its subdivisions are responsible for administering federal elections in Washington State.  This responsibility encompasses maintaining the state's voter registration and election management system, overseeing elections operations, and certifying results in all elections for federal office, among numerous other tasks.  King County Elections is responsible for daily maintenance and updating of the county's voter rolls, issuing ballots to registered voters, tabulating votes, and certifying elections results.

11.     Among the policies of the State of Washington enacted by the legislature regarding elections is the requirement "to encourage every eligible person to register to vote and to participate fully in all elections, and to protect the integrity of the electoral process by providing equal access to the process while guarding against discrimination and fraud." Wash. Rev. Code § 29A.04.205.

12.     As Director of King County Elections, I am committed to increasing both accessibility and security in our elections.

13.     The Secretary of State is the state's Chief Officer of Elections, responsible for executing and enforcing all state and federal law relating to elections within the state.  *See* Wash. Rev. Code § 29A.04.230. The Office of the Secretary of State is responsible for implementing the Chief Election Officer's responsibilities with regard to elections, including enforcing laws and providing technical information to the public and other parties.  Washington State law charges that office with preventing disenfranchisement and ensuring that all eligible voters who want to vote are able to do so. Wash. Rev. Code §§ 29A.04.205,  29A.04.216. Washington's Office of the Secretary of State provides guidance, technical support, and resources to county elections offices and administers the certification program for Washington election administrators.

3

14.     In my role as King County's elected Director of Elections, I am responsible for overseeing all aspects of election administration for King County's 1.45 million registered voters and more than 190 voting jurisdictions. This includes voter roll maintenance, such as processing new registrations and making hundreds of updates each day as voters move, change their name, or otherwise update their voter registration record; secure ballot collection from the United States Postal Service and King County's 85 official ballot drop boxes; verifying and processing all ballots in accordance with federal, state, and local law; tabulating votes and publicly posting election results; and performing audits and testing before, during, and after each election. Additionally, it's my responsibility and that of King County Elections to ensure that our voters have accurate and reliable election information that prepares them to fully participate in their elections. Democracy works best when all voices are heard, and at King County Elections we aim to do all we can within the law to help every eligible voter get registered and cast their ballot.

15.     I am familiar with the Executive Order published on March 31, 2026, entitled "Ensuring Citizenship Verification and Integrity in Federal Elections" (the "EO").  Sections 2 through 5 of the EO (collectively, the "Challenged Provisions") have already caused considerable harm, confusion, fear, and disruption in King County and Washington State election administration and will impose unrecoverable costs on both county and state budgets.

16.     Election administrators are no strangers to preparing for the unexpected. However, the elections community continues to find ourselves in unprecedented times with attacks both on the systems that we work within and on our integrity. Never before in our nation's history have leaders at the highest levels of government made such stringent, baseless accusations of fraud and abuse among elections and election workers with the clear goal of

4

eroding trust and dampening participation in one of the most foundational aspects of our democracy – free and fair elections.

17.     In the days and weeks since the issuance of the EO, I have heard fear and concern from many of our King County voters who are afraid that they will lose their ability to vote, even though they are entirely eligible under the law and under this EO. They also express serious concerns about privacy, security, and what will happen to their personal information if it is turned over to the Department of Homeland Security (DHS). These concerns grow from the fact that DHS, as an agency, has never demonstrated an ability to accurately maintain a large-scale database for critical national infrastructure. The responsibility to manage voter data has always rested at the state and local level, and what I hear from King County voters is that they believe it should be that way to protect their privacy.

18.     I have also been in close contact with other Washington State County Auditors, the Secretary of State's Office, and other key partners to ensure broad understanding of what this EO means for ourselves and our voters. I have fielded questions from elected officials at both the local and state level on what is included in this EO, and how it compares to the breadth of other federal proposals regarding elections. This constant stream of attempts to change election rules ahead of a federal election drives worry and concern from voters and leaders across the political spectrum. This EO is a continuation of those attempts and has already impacted public trust in elections. Implementation of such an Order will only further erode trusting government and elections across the board.

19.     It is my understanding that Section 2(a) of the EO directs the Department of Homeland Security ("DHS") to create a "State Citizenship List" for each State, which will include "individuals confirmed to be United States citizens who will be above the age of 18 at

5

the time of an upcoming Federal election and who maintain a residence in the subject State." It is also my understanding that DHS will send these lists "no fewer than 60 days before each regularly scheduled Federal election, or promptly upon request by a State in connection with any special Federal election." This would mean that DHS will send this list by Friday, September 4, 2026, for the federal general election taking place on November 3, 2026.

20.    Section 2 requires immediate action from me and my team in King County, Washington to understand how it interacts with Washington's statewide voter registration list, what our responsibility is at the county level, and to coordinate with other state and local agencies across Washington. Our efforts to address the changes and impacts of the EO will divert time and attention from other critical election preparations. On top of the daily maintenance, it takes to keep voter rolls clean and accurate, election administrators work months and often years planning and preparing in advance of each election. For example, before each election, official drop boxes are sited, in-person services planned, ballots built, envelopes and informational inserts designed and printed, and voters are educated about how the system works months before election day.

21.    To introduce the implementation of such a large-scale and radical departure from how elections have historically been run will impact this year's election and future elections. Not only are we midway through our preparation for the November 2026 General Election, but our team at King County Elections is hard at work preparing for voter-approved changes to how the City of Seattle conducts their Primary elections, which will take place in 2027. Additionally, we are already underway with planning and preparation for the Presidential election coming up in 2028. Implementation of this EO will divert time away from those standard election preparation tasks, increasing the risk of a mistake or misstep somewhere along the way. In elections,

6

mistakes have real costs in trust and reputation, in dollars and public scrutiny, and ultimately in voter participation. We are thorough and well-planned to save our taxpayers money and maintain trust in the electoral process.

22.     Undoubtedly, voters will turn to King County Elections and other local agencies to help them navigate the complexity of the EO and ensure they can vote. In a county of 1.45 million registered voters, the changes detailed in the EO will drive thousands of phone calls and emails from voters wondering how to make sure the DHS database has them properly listed as a citizen, and how to fix it if and when the database has it wrong. This will result in thousands of additional hours of staff time and compel King County Elections to hire additional temporary and permanent staff to manage the increased customer service needs. Other staff time will be needed to data-match across the King County registered voter list and the DHS-maintained database. Still more will be needed to do quality control and assurance against those new data management practices that will need to be created and coordinated with the Washington Secretary of State's Office to ensure that it aligns with the involved federal agencies and provides accurate data on who is eligible to register and vote. We will also need to work to understand how this impacts our local elections and whether our state will be obliged to implement a bifurcated election system that treats local and state elections under a separate set of rules than federal elections, further increasing both election accuracy risks and voter confusion.

23.     King County and Washington State already have rigorous laws, policies, and procedures in place to ensure that only eligible voters are able to register and vote. As noted above, Washington's Office of the Secretary of State maintains the statewide voter registration database and election management system, VoteWA. VoteWA updates in real-time as registrations are processed by teams state-wide at the county level, thus preventing voters from

7

registering and voting in more than one Washington county. Additionally, as voters register to vote or make updates to their registration, they are required to declare whether they are a citizen of the United States and sign an oath, affirming that they meet all voter eligibility requirements. Included in that affirmation is that the voter is a citizen of the United States, of age to vote, a resident of Washington State, and not prevented from voting by court order. Signing that oath while knowing that one does not meet those requirements constitutes a Class C Felony under Washington law and can be punishable by up to five years in a state correctional institution and up to $10,000 in fines.  Wash. Rev. Code § 29A.84.130.

24.    Washington voters can register to vote online via VoteWA, by mail, or in-person. As part of the registration process, voters must provide either their Washington State ID or drivers' license number or the last four of their Social Security Numbers. State law also provides a list of other acceptable identification documents if a voter does not have either of those numbers. Wash. Rev. Code § 29A.08.010, 107. This ability to update one's information and even get registered to vote on election day has provided thousands of King County voters with an opportunity to participate in their elections that they may have otherwise missed.

25.    My office has a continuing obligation to perform regular list maintenance, as required under the National Voter Registration Act ("NVRA"), Help America Voter Act ("HAVA"), and Washington state law. This includes sending notices to voters who may have moved, identifying duplicates on the statewide voter registration list, cancelling the registrations of those under total confinement by the Washington State Department of Corrections for a felony conviction or otherwise ineligible to vote, and cancelling the registration of those who have died.

26.    Additionally, my office will continue to register those who are eligible to vote in Washington. Washington state law allows qualified individuals to register online or by mail up to

8

8 days before election day and in person through 8 p.m. on election day.  Wash. Rev. Code § 29A.08.140; 52 U.S.C. § 20507(a)(1) (requiring States to permit registration up to 30 days before a federal election).  Eligible Washington citizens can register to vote online, at their county auditor's office, at the division of elections if in a separate location from the county auditor's office, a voting center, a student engagement hub, at a location designated by the county auditor, at various state social service agencies, and through Washington's Department of Licensing when they submit sufficient information of their voter qualifications (including citizenship). In compliance with the Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA), Washington allows uniformed and overseas voters to register for a federal election if their registration application is received at least 30 days before that election. 52 U.S.C. §§ 20302(a)(2).  Uniformed and overseas voters not currently registered in Washington State are exempt from the voter registration deadlines. Specifically, they may still submit a registration application online, electronically, or by mail through election day. WAC  434-235-020.

27.    In compliance with the NVRA "quiet period" for voter registration, Washington does not systematically remove voters from the rolls during the 90 days prior to a federal election unless a statutory exception applies.  *See* 52 U.S.C. §§ 20507(c)(2)(A), 3(A)-(B), 4(A).  King County and Washington State do, however, lawfully remove voters on an individual basis where appropriate, such as when a voter provides a signed request that his or her registration be canceled.

28.    In sum, Washington's statewide voter registration list changes up to and on election day.  Registrants are constantly being added, updated, and removed as required (and limited) by federal and state law, and pursuant to state law this will continue through the 2026 election and beyond.

29.     I have considered how Washington's dynamic statewide voter registration list will intersect with the list created by DHS.  As noted above, pursuant to Section 2(a) of the EO, DHS will share a State Citizenship List by September 4, 2026.  The EO permits the state "to routinely supplement and provide suggested modifications or amendments to the State Citizenship List transmitted thereto."  However, the EO does not require DHS to accept any of these supplements, modifications, or amendments.

30.     Once we receive the State Citizenship List, we will have to devote substantial resources to understanding any differences between it and our current statewide voter registration list. At a minimum, comparing the State Citizenship List to our current statewide voter registration list will necessitate linking registrants across the lists.  This will be difficult, as it is extremely doubtful that the State Citizenship List will contain the same unique identifiers as our statewide voter registration list, such that we could perform straightforward matching. For example, most Washington voters have their drivers' license number on file as their state identifier and federal agencies typically do not have state license numbers. Rather, it is inevitable that there will be differences in the files that will make matching difficult, time-consuming, and potentially inaccurate, as people's names, addresses, and other information may vary slightly across database or agency (*e.g.*, Robert vs. Bob, Apartment #3 vs. Apt. 3).  I know from my experience that data matching is a complex process. Extreme care must be taken, and rigorous quality control must be conducted when the consequences of errors may lead to voter disenfranchisement.  And because Washington will receive the State Citizenship List so close to the election, I must plan for all of this now.

31.     For eligible voters who appear on the statewide voter registration list but not the State Citizenship List, my office will need to investigate further pursuant to our obligation to

10

ensure that eligible voters are able to vote.  Even though King County will not disenroll voters simply due to their absence from the State Citizenship List, it could disenfranchise voters in multiple ways.  First, voters who check their status on the State Citizenship List as contemplated by Section 2(a) and see that they are not listed may be deterred from voting because they believe they will be blocked from voting or prosecuted, especially if DHS does not accept corrections in a timely and accurate manner.  Second, the United States Postal Service ("USPS") may rely on the State Citizenship List to determine which voters can receive and transmit mail ballots in response to the EO's emphasis on criminal penalties associated with the distribution of mail ballots to ineligible individuals.  EO §§ 2(b), 3(a), 5. Additionally, if the State Citizenship List is publicly accessible, local elections workers may misunderstand their legal obligations and refuse to provide a ballot to eligible voters missing from the State Citizenship List based on their belief that the voters are ineligible.  These are all risks that King County cannot accept.  We must make every effort to avoid disenfranchising eligible King County residents.

32.	Accordingly, in compliance with King County's obligation to protect the right to vote, King County would expend significant resources to attempt to supplement and amend the federal list as necessary, as errors were found through our comparison and investigation.  This includes determining proper and secure methods for sending large volumes of confidential data to the federal government.  However, even if we are able to quickly offer all necessary corrections, the EO does not require DHS to accept the State's "suggested modifications or amendments" or process them in a timely manner ahead of the election.  EO § 2(a).

33.	Both King County and Washington State would incur significant costs to undertake this comparison and verification of the State Citizenship List. As noted above, there will be a sizeable increase in costs for staff time and benefits as voter customer service volumes

11

increase, data-matching is performed, quality control mechanisms are developed and implemented, and voter confusion rises. In recent years, state and local government budgets here in Washington have tightened, with cuts and readjustments happening at all levels. In the last several budget cycles, King County Elections has been asked to reduce our budget, and we do all we can to effectively manage the basic costs of running elections. Similarly, the Washington State budget has faced pressure and cuts in recent cycles. There are no extra dollars to spare, and this EO provides no funding or additional resources. Paying for these costs will have to come from our existing budget and will only further exacerbate the education gap that voters face. It's the unfortunate truth that we cannot compromise or cut on basic costs like paper and printing in our elections. However, we can scale back our voter education and that is often the first thing on the chopping block when it comes to making hard budgetary decisions around elections. When the rules change and voters need to take action, robust education is even more crucial than in a routine election cycle. Paying for this EO will essentially amount to a budget cut on the vital work we do to inform voters about how to get registered and vote – a need that is more desperately felt than ever amid the ever-changing elections environment in the United States. Simply put, without accurate, reliable, and robust information voters will be disenfranchised.

34.    If Section 2 is implemented, King County will have to devote significant time, personnel, and money to update training materials for our staff, specifically detailing what steps they must take with respect to voters who appear on King County's voter registration list but not on the State Citizenship List.  This is yet another aspect of the EO's implementation that will necessarily divert approximately half of our staff from other important election administration tasks.  This includes staff who perform data entry and quality control, customer service, IT

12

support, communications and voter education, language access and community outreach, and other vital roles.

35.     I anticipate that in addition to formal training materials, my office will need to allocate significant resources to respond directly to concerns from our staff and other election community colleagues, given the threat of criminal prosecution in Section 2 of the EO. This will include coordination with both the Washington Secretary of State's Office and the King County Prosecuting Attorney's Office ("PAO"). The King County PAO is a vital partner in legal compliance and understanding the implications of federal, state, and local law. I anticipate that this EO will increase our legal fees, further impacting King County Elections' budget, in response to the increased need for legal compliance review.

36.     At the same time my staff is performing investigations into the accuracy of the State Citizenship List, they will have to conduct a wide-ranging and robust public education campaign to ensure that eligible voters understand the EO's requirements, and how they may impact one's registration and ability to vote.  For example, my staff will have to prepare and distribute training materials guiding voters through accessing and correcting their individual records on the State Citizenship List under section 2(a).  We will also need to field questions from registrants concerned about their voter registration status and generally confused about the process and qualifications to vote in Washington elections.

37.     I estimate that such a meaningful public education effort would likely cost King County Elections a minimum of $250,000 to develop and conduct on a short timeline. To reach 1.45 million registered voters in the pricey Seattle media market takes significant resources, particularly in an already noisy election year. However, as noted above, this additional funding simply does not exist and would need to be pulled from other mission-critical areas of our

13

budget. It will impact our ability to add additional secure ballot drop boxes, appropriately staff in person services, and provide adequate customer service and information to each and every King County voter.

38.     In my experience administering elections, changes to registration and election procedures in the time immediately preceding an election can cause a great deal of voter confusion. The complicated requirements of the EO will likely lead some citizens to misunderstand the requirements for registration, and whether they are able to vote in Washington's elections.  Some citizens will determine that the added requirements make registering and/or voting too confusing to be worthwhile.  For example, a voter may check their individual status on the State Citizenship list, according to the EO.  If they are mistakenly not included, they may believe they have no recourse, and choose not to vote, or they may misunderstand the process for correction despite my office's attempts to provide education, or DHS may not issue a correction in time. Others still will simply look at these new hurdles as further proof that their government is not responsive to nor representative of their interests and choose not to engage in any way. The result of this confusion will be that fewer eligible voters successfully register to vote and cast a ballot.

39.     This inevitable voter confusion harms King County because it will disenfranchise voters and erode trust in government, interfering with our sovereign interest and state-law obligation to ensure that all eligible voters who want to can cast a vote.  It will also impose a burden on my staff's time, as my staff and the elections staff at all Washington counties will be responsible for dispelling voter confusion to the extent possible.  This voter confusion will come at a crucial time, shortly before the election, when our resources are particularly stretched and time is sparse.

14

40.     King County elections officials are required by state law to issue ballots to duly registered voters. Each active registered voter in King County must be automatically sent a mail ballot for each election. Wash. Rev. Code § 29A.40.010.

41.     In compliance with UOCAVA, King County issues ballots to registered voters who request an absentee ballot under that Act at least 45 days before a primary or general election.  Wash. Rev. Code § 29A.40.070, 52 U.S.C. §§ 20302(a)(1)-(3), (8)(A).

42.     It is my understanding that Section 2(b) of the EO instructs the Attorney General to prioritize investigation and prosecution, under a variety of federal statutes, of "State and local officials or any others involved in the administration of Federal elections who issue Federal ballots to individuals not eligible to vote in a Federal election."  I understand that the EO provides that "an individual is 'eligible to vote in a Federal election' if the individual is a citizen of the United States, 18 years of age or older by the date of the upcoming election, and otherwise qualified under the laws of his or her State."  I further understand that Section 5 of the EO encourages referrals to U.S. DOJ of "[e]vidence of violations of existing Federal laws by State or local election officials" and "States or localities," among other parties, "for consideration of investigation or charges."

43.     If EO Section 2 goes into effect, I would be concerned that I, my staff, and elections officials across this country would face federal prosecution if we issued ballots to registered voters who are not on the State Citizenship List.  I am concerned about the impact of these threats of criminal prosecution on my staff, not because I believe they have violated these provisions, but because the EO increases the amount of pressure and scrutiny on them, including by the public. It only serves as further fuel for those who lobby baseless accusations and wrongfully imply that fraud and abuse are rampant in election administration despite evidence to

15

the contrary. The threat of federal prosecution of election administrators will also make it more difficult to recruit and retain both temporary and permanent election staff, as many will decide that they are not comfortable with the threat of prosecution for doing the basic functions of the job.

44.     The EO's threat of prosecution is significantly exacerbated by the fact that the EO defines voter eligibility in a manner inconsistent with Washington law.  Washington law permits an otherwise eligible voter to cast a ballot in a federal primary election if the voter will be 18 years of age by the general election. Wash. Rev. Code § 29A.08.170, WAC 434-232-030.  EO Section 2(b) thus directly conflicts with state law, and it threatens Washington elections officials with prosecution for issuing primary ballots to eligible 17-year-old voters.  This issue has and will cause significant confusion about the rules applicable to upcoming elections and will only further dissuade young people from participating in their elections and building the lifelong habit of voting.

45.     I know that the threat of prosecution under the EO is on the minds of state and local elections officials like me.  Though we have not historically had issues staffing positions at King County Elections, I worry that this could become a problem in the future as people may not wish to take on the risk of potential prosecution for performing their job.

46.     Should the Attorney General initiate any such enforcement actions, King County would be required to divert significant resources not only to respond to such legal action but also to educate the public, with the aim of minimizing voter confusion to the extent possible. The time and resources required to defend our office is significant (gathering documentation, compiling declarations, depositions, etc.) and takes critical staff away from their duties in conducting accurate, secure, and accessible elections.

16

47.    Any such legal proceedings would have severe and adverse consequences for the public's trust in King County's administration of elections. Regardless of whether legal proceedings actually prove wrongdoing, charges would critically and irretrievably erode public trust in elections and election workers, and further sever public opinion from the reality of how accurate, secure, and accessible elections are conducted. In today's charged environment around elections, that erosion in trust fuels online rumors, as well as threats and harassment against election administrators. Unfortunately, my office is familiar with these threats and harassment. In 2023, we were twice mailed white powder that contained fentanyl and letters calling to end elections. Members of our staff have had death threats levelled at them and been doxed online. Legal proceedings initiated by the federal government against local election workers will open our team to more threats like these.

48.    Additionally, the creation of a State Citizenship List may directly disenfranchise voters.  Based on my experience, I know that if a citizen is not included on the list—due, for example, to errors in DHS's static immigration information contained in its Systematic Alien Verification for Entitlements (SAVE) system, the federal government's misinterpretation of whether the citizen qualifies as a state resident, or any other error—they may believe they are unable to vote, and could be prosecuted for doing so.  That is why King County Elections works so hard to maintain consistent voter registration information so that voters are not erroneously informed that they are ineligible to vote. The same is true of eligible 17-year-old voters, considering the express limitations in the EO.

49.    Based on my experience as an election administrator and leading our team at King County Elections, I know that election administrators may feel they cannot register or send a ballot to such voters without risking criminal prosecution, despite those voters' fundamental

17

right to vote under state and federal law.  Similarly, based on my experience I know that USPS or other entities involved in the "printing, production, shipment, or distribution of ballots" may believe they cannot provide a ballot to those voters without risking criminal prosecution.

50.     In Washington state, a mail ballot is automatically sent to all eligible voters. Wash. Rev. Code § 29A.40.010. The ballots are sent by mail via USPS.

51.     It is my understanding that Section 3(b) of the EO directs the United States Postal Service to initiate a rulemaking that, among other things, would allow States to provide lists of mail voters to USPS 60 days before an election, require the creation of a "Mail-In and Absentee Participation List" ("USPS Mail Ballot List") and prohibit USPS from delivering mail ballots sent by individuals not on the USPS Mail Ballot List.  It is also my understanding that Washington state can "routinely supplement and provide suggested modifications or amendments" to the USPS Mail Ballot List. However, USPS is not required to accept any changes provided by Washington State.

52.     As soon as our team had time to digest the contents of the EO, I immediately began considering what near-term actions the EO would necessitate from my office, including considering a bifurcated system that governs federal and local elections under separate rules to ensure eligibility in local elections is maintained in accordance with state law; coordination with the Washington Secretary of State's Office and the United States Postal Service to ensure broad understanding of each agencies' responsibilities and actions; and communicating with partners, elected officials, and voters alike.

53.     Under Section 3(b) of the EO, in order to comply with state law requiring all eligible voters to receive a mail ballot, at least 60 days before Election Day the Washington Secretary of State's Office would need to send a list to USPS of voters to whom we intend to

18

send a mail-in or absentee ballot ("State Mail Ballot List").  For the 2026 federal general election, that deadline will be September 4, 2026.  Failing to provide this list to USPS would pose an unacceptable risk under the EO that USPS will not include eligible Washington voters on the USPS Mail Ballot List, thereby making it more difficult or impossible for eligible voters to cast their ballots.

54.    As discussed throughout this declaration, Washington's use of the mail for elections, paired with our election calendar, means I must plan now for how to align King County's administration of mail voting with the EO.

55.    Creating the State Mail Ballot List will require my office and other local elections officials to expend time and resources to ensure that all active registered voters are included. This task will be significantly complicated by the influx of registration updates and changes that elections officials typically receive in the months before the election and which I expect will be further exacerbated by the State Citizenship List provisions discussed above.

56.    The deadline to provide this list to USPS of no later than 60 days before the election means that some voters who are entitled to a mail ballot under state and federal law will unavoidably be left off the list.  For example, UOCAVA permits uniformed and overseas voters to request absentee ballots up to 45 days before an election.  52 U.S.C. § 20302(a)(8). Additionally, under Washington State law, voters may register and receive a ballot up to 8 p.m. on Election Day.  Wash. Rev. Code § 29A.08.140, 29A.40.070, WAC 434-250-080. Eligible registered voters must be mailed a ballot at least 18 days before each election and as soon as possible for all subsequent registration changes. For uniformed and overseas voters, ballots must be sent at least 45 days before each primary or general election, or any special election that involves federal office and a request for a ballot after 45 days must be processed immediately.

19

Wash. Rev. Code § 29A.40.070. Our office is regularly mailing ballots to voters in the days leading up to Election Day. Although the EO indicates that states will be able to "routinely supplement and provide suggested modifications or amendments" to the USPS Mail Ballot List, USPS is not required to accept our suggestions.  The EO also does not specify when USPS will transmit its USPS Mail Ballot List to our office, which could cause substantial complications.

57.    Once we receive the USPS Mail Ballot List, we will have to devote substantial resources to understanding any differences between it and our own list of voters eligible to receive mail ballots.  This will be a difficult task for many of the same reasons set out above with regard to the State Citizenship List, including: the lack of unique identifiers shared by both lists, the potential for slight variations in spelling to wrongly preclude matches, the fluid nature of voter registration rolls in the lead-up to elections, and administrative challenges inherent to any data-matching process.  Accordingly, reviewing the USPS Mail Ballot List will require a significant expenditure of time and resources.

58.    For citizens who appear on the statewide voter registration list and are eligible to receive a mail ballot under Washington State law but not the USPS Mail Ballot List, my office will need to investigate further pursuant to our obligation to ensure that every active and eligible registered voter is able to receive a mail ballot as required.  We must make every effort to do so to avoid disenfranchising eligible King County residents.

59.    King County and the Washington Secretary of State's Office would expend significant resources to attempt to supplement and amend the USPS Mail Ballot list as necessary, as errors are found through our comparison and investigation.  This includes determining proper and secure methods for sending large volumes of confidential data to the USPS.  This is true even though the EO instructs that we can only "supplement" and "provide suggested

modifications or amendments" to the USPS Mail Ballot List, and USPS is not required to accept them.

60.    Even with the best efforts of my office and other local and state elections officials, the challenges of completing a complex data-matching program in a short timeframe and while preparing to administer an election poses the high risk of errors and omissions.

61.    King County would incur significant costs to undertake this comparison and verification of the USPS Mail Ballot List. Again, King County is home to 1.45 million registered voters. To ensure accurate data-matching and quality control at that scale will take hundreds of hours of staff time and thousands of dollars out of already stretched budgets. We will need to hire additional staff and also incur the cost of recruitment and onboarding new staff.

62.    If Section 3 is implemented, King County will have to devote significant time, personnel, and money to update training materials for our staff.  Those materials would have to specifically detail what steps they must take with respect to voters who appear on Washington State's voter registration list and are eligible to receive a mail ballot under Washington State law, but who do not appear on the USPS Mail Ballot List.  This is yet another aspect of the EO's implementation that will necessarily divert more than half of our team's resources from other important election administration tasks.

63.    I anticipate that, in addition to formal training materials, my office will need to allocate significant resources to responding directly to staff concerns, given the threat of criminal prosecution to local election officials in the EO.

64.    At the same time my staff is creating the State Mail Ballot List and performing investigations into the accuracy of the USPS Mail Ballot List, they will have to field questions from voters concerned about their ability to receive or return a mail ballot in the upcoming

21

elections.  Thus, a separate impact of the EO's directive concerns the need for a wide-ranging public education campaign to ensure that eligible voters understand the EO's requirements, and how they may impact an eligible voter's citizen's ability to vote by mail.   This is particularly the case for Washington residents, who are used to automatically receiving mail ballots and being able to vote by mail under existing state law, as has been true for nearly two decades in King County.

65.    I estimate that such a public education effort would likely cost an additional $100,000 over the amount noted in Section 2. Once again, these dollars would need to be pulled from other mission-critical work, including fortifying our cybersecurity defenses, adequately staffing in person services, and expanding options for secure ballot return.

66.    Apart from the time and monetary costs that Section 3's implementation would impose on King County, Section 3 also risks voter confusion and disenfranchisement.  This inevitable voter confusion is a harm in and of itself and is also a burden on my staff's time.  This voter confusion will come at a crucial time shortly before the election, when state and local elections officials are required under Washington State law to send mail ballots to all eligible voters.

67.    Sending mail ballots in a timely fashion is not only required by state and federal law, but is critical to ensure that as many eligible voters as possible can exercise their right to vote.  In the 2024 General Election, all King County voters received a mail ballot and King County had an 81% voter turnout.  Washington State has been voting by mail for decades and King County has been voting entirely by mail since 2009. Prior to transitioning to vote-by-mail, the overwhelming majority of voters in King County were already electing to be permanent absentee voters, and less than 2% were voting in-person at polling places.

22

68.	Errors in the USPS Mail Ballot List would be extremely damaging because of the potential for voter disenfranchisement.  For example, consider an eligible voter who is on the State Mail Ballot List but not on the USPS Mail Ballot List.  Under the EO, this voter would receive a mail ballot from our office, but USPS would be forbidden from returning the ballot back to King County. And the voter may never know their ballot was not returned. The EO doesn't require USPS to notify the voter or our office if they refuse to deliver a ballot because the voter is missing from the USPS Mail Ballot List. My office must take every measure possible to avoid this kind of voter disenfranchisement.

69.	In my experience administering elections, changes to election procedures in the time immediately preceding an election can drive voter confusion.  The EO's complicated requirements will likely lead some eligible voters to misunderstand whether they are able to use a mail ballot and whether they can vote at all.  Some eligible voters will determine that the added requirements make voting too confusing to be worthwhile.  The result of this confusion will be that fewer eligible voters decide to cast a ballot.

70.	There are several additional inherent problems posed by the deadlines outlined above and the requirement to compare static lists (the State Citizenship List, USPS Mail Ballot List, and State Mail Ballot List) with a constantly evolving list (Washington's statewide voter registration list).  For example, between the day the State Citizenship List is sent and Election Day (the last day a voter may register and receive a mail ballot under Washington State law) there will inevitably be a significant number of individuals who become eligible but are not captured on the State Citizenship List.  They may, for example, have moved to King County just days before Election Day or become a naturalized citizen after the list was sent.

23

71.     This process is likely to be particularly complicated in Washington State as voters can register through Election Day. In addition, in King County we have a highly mobile population with voters moving in and out of our jurisdiction. For example, our office processed approximately 40,000 new registrations from 60 days before Election Day in the 2024 General Election. Even if the State Citizenship List is completely accurate, due to its fixed nature, it cannot accurately reflect the new registrants that are eligible to vote under Washington State law.

72.     Additionally, as already noted, the timeline simply does not seem workable.  The EO requires DHS to send the State Citizenship List to States "no fewer than 60 days before each regularly scheduled Federal election."  For the November 3, 2026 General Election, that means DHS must send this list by Friday, September 4, 2026.  And Washington State must also send its State Mail Ballot List to USPS 60 days before the election also Friday, September 4, 2026. Thus, we must send the State Mail Ballot List (i.e., all those who should receive a mail ballot under state law) to USPS on the *same day* we might receive the State Citizenship List from DHS. Comparing the statewide voter registration list and the State Citizenship List to see who is eligible according to both lists in *one day*, or even *a few hours*, is simply not possible to do with any meaningful degree of accuracy, no matter how many resources my office dedicates to the project.

73.     Although the EO provides that we may "routinely supplement and provide suggested modifications or amendments" to the USPS Mail Ballot List, there is no guarantee that USPS will accept those suggestions.  If we—in an attempt to protect King County and Washington State elections officials from criminal liability—sent a State Mail Ballot List to USPS 60 days before Election Day that reflected only confirmed matches between the statewide voter registration list and the State Citizenship List, knowing that many eligible voters could

24

have been wrongfully excluded from the State Citizenship List, we would be committing ourselves to potentially violating Washington state law. We could then endeavor to submit additional matches as we confirmed them. But it would be very difficult to do so quickly enough to matter. On September 19, 2026, only 2 weeks after we receive the State Citizenship List—our UOCAVA voters' ballots must be mailed out. At the same time, our office mails ballots to residents currently residing out of state to ensure they are received in plenty of time to vote and return their ballot to our office. Ballots are then required to be mailed to residents residing within the state by October 16, 2026. Our office continues to send ballots to voters through Election Day, as necessary. Even if DHS and USPS accepted our suggestions, there is unlikely to be enough time to get a ballot to those who are eligible but did not appear on the State Citizenship List. Voters would be disenfranchised and Washington state law would not be honored.

74. Again, because of our obligation to ensure that every eligible King County resident can vote, we would need to take additional steps after receiving the State Citizenship List and USPS Mail Ballot List to investigate the status of all King County voters on the statewide registration list who do not appear on the federal lists, and then suggest changes to both. This will require data matching, verification, follow-up investigations, and interfacing with DHS, USPS, the Washington Secretary of State's Office, the public, and others, and will demand an enormous investment of resources. Additionally, cybersecurity and information technology staff would need to be involved to facilitate the secure transfer of information between our office, the Washington Secretary of State's Office, and the various federal agencies.

75. I estimate that these new staffing needs will require an increase of $600,000 to the King County's budget. Given recent economic pressures across the state and country, I have been trying to keep my office's budgetary needs as low as possible. Recent budget cycles have

25

required cuts to the overall King County Elections budget, and forecasts only show local government budgets like ours tightening and will continue to tighten as prices rise and our voter population continues to grow.

76.    Any time spent by current staff on implementing the EO would divert time and attention from other critical election preparation in the days leading up to the general election, my office's busiest time.  Our staff is already at capacity and dedicated to routine tasks and special projects that ensure King County's elections run smoothly and every eligible King County resident can exercise their right to vote.  This work becomes more voluminous, significant, and urgent in the months leading up to the general election, when we must answer an increasing volume of questions and handle tasks related to, for example, campaign finance reporting, logic and accuracy testing, and voter challenges.

77.    Each of these tasks and costs will divert scarce resources from other important election administration needs. Time, dollars, and attention will go to implementing an EO that will disenfranchise voters and will not improve the accuracy and security of our elections. Instead of focusing on continuous improvement of vital election functions like documenting the chain of custody, performing quality control and audits on data entry and ballot processing to ensure the highest level of accuracy, and preparing for voter-approved changes to our elections processes in the years to come, we will be focused on matching unmatchable data and proving to the federal government that our voters are citizens to avoid criminal prosecution. Instead of recruiting and training the next generation of election administrators, we will be reassuring our team that we will do all we can to help support them in carrying out their jobs in the face of federal prosecution. Instead of testing the tabulation system for accuracy and performing mock elections to prepare our team for a wide variety of scenarios, we will be focused on investigating

26

whether the federal government has a voter listed as Bob or Robert in their database. This EO extracts a great cost to election offices, to voters, and to the future of our democracy.

78.    King County currently provides Intelligent Mail Barcodes "IMB" on outbound mailed ballots. We have long opted to use IMBs on outbound ballots to track delivery rates and ensure that ballots are arriving to voters as intended.

79.    King County already uses the "Official Election Mail" logo and submits our ballot envelopes to USPS for design review.

80.    It is my understanding that Section 5 of the EO directs that "States and localities should preserve, for a 5-year period, all records and materials—excluding ballots cast— evidencing voter participation in any federal election (e.g., ballot envelopes, regardless of carrier)." Existing federal law only requires preservation of voting materials for 22 months from the date of an election, and preservation of records concerning voter roll maintenance for two years. 52 U.S.C. §§ 20507(i)(1), 20701. Washington law and regulations also set timelines for the preservation and destruction of voting materials in federal elections for 22 months from the date of the election. WAC 434-219-330, 434-262-200. Thus, under current federal law, King County may begin properly disposing of certain retained materials from the 2024 primary elections in June 2026 and the 2024 general election in September 2026.

81.    Compliance with a five-year document preservation standard for election materials would impose significant compliance, storage, and other costs on King County and other local elections officials.

82.    For example, current document retention requires King County to obtain physical storage space for over 30 pallets of records for a federal general election. Physical storage space is already limited and retaining records for an additional 3 years would require our office to

27

obtain additional warehouse space to maintain pallets for multiple federal elections and with funding that we simply do not have.

83.    More than doubling the required retention time for some (but not *all*) voting materials would increase these burdens and costs significantly.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 20, 2026, at Renton, WA.

_____
Julie Wise
Elected Director
King County Elections

28