```
                    UNITED STATES DISTRICT COURT
                     DISTRICT OF MASSACHUSETTS
_____
                                    )
TRIUMPH FOODS, LLC,                 )
CHRISTENSEN FARMS MIDWEST, LLC,     )
THE HANOR COMPANY                   )
OF WISCONSIN, LLC,                  )
NEW FASHION PORK, LLP,              )
EICHELBERGER FARMS, INC.,           )
ALLIED PRODUCERS' COOPERATIVE,      )
individually and on behalf          )
of their members,                   )
                                    )       CIVIL ACTION
                        Plaintiffs, )       No. 23-11671-WGY
                                    )
             v.                     )
                                    )
ANDREA JOY CAMPBELL, in her         )
official capacity as Attorney       )
General of Massachusetts,           )
ASHLEY RANDLE, in her official      )
capacity as Massachusetts           )
Commissioner of Agriculture,        )
                                    )
                        Defendants. )
_____ )

YOUNG, D.J.                                         July 22, 2024
```

**MEMORANDUM & ORDER**

I.  **INTRODUCTION**

This case is about pork: how it is raised and where it may be sold for human consumption. The Plaintiffs, Triumph Foods, LLC ("Triumph"), Christensen Farms Midwest, LLC, The Hanor Company of Wisconsin, LLC, New Fashion Pork, LLP, Eichelberger Farms, Inc., and Allied Producers' Cooperative (collectively, the "Pork Producers"), seek to stop the enforcement of the Massachusetts Prevention of Farm Animal Cruelty Act ("the Act")

[1]

by suing Andrea Joy Campbell, in her official capacity as Attorney General of Massachusetts, and Ashley Randle, in her official capacity as Massachusetts Commissioner of Agriculture (collectively, the "Commonwealth"). Am. Compl., ECF No. 17. The Plaintiffs allege that the Federal Meat Inspection Act ("FMIA") preempts the Act's enforcement. Id.

Along with pork, this case is about how a state may regulate its own commerce while continuing fully to participate in the national economy. See generally National Pork Producers Council v. Ross, 137 Harv. L. Rev. 330 (2023). The Constitution and our federal laws provide a framework for each state to follow in regulating certain industries, but, provided they do not interfere with that framework, states may still introduce and enforce their own laws and regulations. Today, the industry in question is pork; tomorrow, it could be shellfish. See Amicus Br. Iowa, ECF No. 71. The industry is, to some extent, irrelevant, so long as the state's statutory scheme does not conflict with that of the federal government. "The preemption of state laws represents 'a serious intrusion into state sovereignty.'" Virginia Uranium, Inc. v. Warren, 587 U.S. 761, 773 (2019) (quoting Medtronic, Inc. v. Lohr, 518 U.S. 470, 488 (1996) (plurality opinion)). As Congress has not preempted the state law in question here summary judgment is granted to the Commonwealth.

**II.   PROCEDURAL HISTORY**

The Pork Producers filed their amended complaint on July 31, 2023.  See Am. Compl.  The amended complaint alleged ten causes of action, most arising under the United States Constitution.  See id.  The Pork Producers requested a preliminary injunction, and after a hearing on September 6, 2023, the Court collapsed the motion with a trial on the merits in accordance with Rule 65(a)(1).  See Massachusetts Lobstermen's Ass'n, Inc. v. National Marine Fisheries Serv., No. CV 24-10332-WGY, 2024 WL 2194260, at *3 n.5 (D. Mass. Apr. 16, 2024) (appeal pending).  The Commonwealth then filed a motion to dismiss.  Mot. Dismiss, ECF No. 53; see also Mem. Supp. Mot. Dismiss Compl., ECF No. 54.  The Court granted the Commonwealth's motion to dismiss with respect to Counts II-X but denied the motion to dismiss with respect to Count I, alleging a violation of the Dormant Commerce Clause.  See Elec. Clerk's Notes, ECF No. 66.

The Pork Producers then moved for partial summary judgment on the remaining Dormant Commerce Clause claim.  Pls.' Mot. Partial Summ. J., ECF No. 87; see also Mem. Reasons Supp. Pls.' Mot. Partial Summ. J., ECF No. 88.  In opposition, the Commonwealth requested that summary judgment be entered against the Pork Producers pursuant to Fed. R. Civ. P. 56(f)(1).  See Mem. Opp'n Pls.' Mot. Summ. J. & Req. Summ J., ECF No. 94.  On

November 14, 2023, the parties agreed to proceed on a case stated basis on the remaining claim.

On December 19, 2023, after oral argument, the Court took the matter under advisement. See Elec. Clerk's Notes, ECF No. 117. On February 5, 2024, the Court entered a memorandum and order which severed the provision of the Act ("the slaughterhouse exemption") that violated the Dormant Commerce Clause from the rest of the statute and vacated in part the Court's previous dismissal of Count III in the Pork Producer's amended complaint, which claimed that the Act was preempted by the FMIA. See Memorandum and Order, ECF No. 125.

The Pork Producers now move for summary judgment on the ground that the Act, with the slaughterhouse exemption severed, is now preempted by the FMIA. See Pls.' Mot. Summ. J., ECF No. 126 ("Pls.' Mot."); see also Pl.'s Mem. Reasons Supp. Pls.' Mot. Summ. J., ECF No. 127 ("Mem. Supp. Pls.' Mot."). The Commonwealth cross-moves for summary judgment on the ground that the Act is not preempted by the FMIA. See Defs.' Mot. Summ. J., ECF No. 136 ("Defs.' Mot."); see also Mem. Supp. Mot. Summ. J., ECF No. 137 ("Mem. Supp. Defs.' Mot."). The parties have fully briefed the issues. Id.; Pls.' Reply Supp. Pls.' Mot. Summ. J. & Opp. Defs.' Mot. Summ. J. ("Pls.' Reply"), ECF No. 158.

[4]

**III. UNDISPUTED FACTS**

The Pork Producers are a combination of pig farmers ("the Farmer Plaintiffs") and one pork processor, Triumph. Collectively, the Pork Producers are located outside the state of Massachusetts, in Minnesota, Iowa, Nebraska, Illinois, South Dakota, Wisconsin, Oklahoma, North Carolina, Missouri, Wyoming, and Indiana. Am. Compl. ¶¶ 12-19. The Farmer Plaintiffs allege that the Act will force them to "convert their farm operations to meet Minimum Size Requirements." Id. ¶ 56. Triumph alleges that the adjustments it will need to make as a pork processor to comply with the Act are "penalties." Id. ¶ 58.

**A. The Act**

In 2016, Massachusetts enacted the Prevention of Farm Animal Cruelty Act, Mass. Gen. Laws ch. 129 App., § 1, through ballot initiative. Id. ¶ 25. The Act's purpose is to "prevent animal cruelty by phasing out extreme methods of farm animal confinement, which also threaten the health and safety of Massachusetts consumers, increase the risk of foodborne illness, and have negative fiscal impacts on the Commonwealth of Massachusetts." Id. § 1-1. The Act makes it unlawful "for a farm owner or operator within the Commonwealth of Massachusetts to knowingly cause any covered animal to be confined in a cruel manner." Id. § 1-5. The Act defines "confined in a cruel manner" as confining a "breeding pig in a manner that prevents

the animal from lying down, standing up, fully extending the animal's limbs or turning around freely" ("Minimum Size Requirements").  Id.  The Act also makes it unlawful for a "business owner or operator to knowingly engage in the sale within the Commonwealth of Massachusetts of any . . . Whole Pork Meat that the business owner or operator knows or should know is the meat of a covered animal that was confined in a cruel manner, or is the meat of the immediate offspring of a covered animal that was confined in a cruel manner."  Id. § 1-3.  A sale is defined in the Act as "a commercial sale by a business that sells any item covered by Section 3."  Id. § 1-5(M).  The definition goes on to state that "[f]or purposes of this section, a sale shall be deemed to occur at the location where the buyer takes physical possession of an item covered by Section 3."  Id.

The Attorney General has exclusive authority to enforce the provisions of the Act.  Id. § 1-6.  Each violation of the Act is punishable by a civil fine up to $1,000 and, in addition, the Attorney General may seek injunctive relief to prevent any further violations of the Act.  Id.

### B. The FMIA

The FMIA was enacted in 1906 "in light of concerns that unhealthy meat products impaired the effective regulation of meat and meat food products in interstate or foreign commerce."

[6]

Pls.' St. Undisputed Material Facts Supp. Pls.' Mot. Summ. J. ¶ 40, ECF No. 128 ("Pls.' SOF") (internal quotation marks and brackets omitted).  Under the FMIA, pigs are inspected prior to entering a slaughterhouse, while in a slaughterhouse facility, and post-slaughter.  Id. ¶¶ 47-49.  The FMIA does not regulate pig farmers, only slaughterhouses.  The FMIA contains an express preemption clause, which states that "[r]equirements within the scope of [the FMIA] with respect to premises, facilities and operations of any [FMIA-inspected] establishment . . . which are in addition to, or different than those made under this chapter may not be imposed."  Id. ¶ 46; see also 21 U.S.C. § 678.

    In 1967, Congress amended the FMIA due to a "need for stronger, more effective and more uniform State inspection programs . . . [to] provide consumer protection for all citizens, regardless of where their meat originates."  Pls.' SOF ¶ 41.  The FMIA was meant to "[c]larify and broaden [federal] authority over meat and meat products capable of use as human food," and "help bring the requirements of Federal and individual State meat inspection programs into closer conformity toward eventual elimination of the multiple and conflicting requirements presently encountered," as "[w]ithout such a coordinated network of Federal and State inspection programs, the health of the consumer cannot adequately be protected, nor can continued confidence in our meat supply be assured."  Id.

The FMIA is enforced by the Food Safety and Inspection Service ("FSIS"), an agency of the United States Department of Agriculture ("USDA").  Id. ¶ 43.  For each pig and pork product, the FSIS requires all slaughterhouses to keep records of the following: bills of sale, invoices, receiving and shipping papers, descriptions of all livestock, net weight of all livestock, names and addresses of all buyers, methods of shipment, names and addresses of carriers, and the contact information for any previous owner of the livestock, as well as serial numbers and identification for each animal.  9 C.F.R. § 320.1(b).

### C.  Triumph's Business Model and Sales

Triumph, a farmer-owned company headquartered in St. Joseph, Missouri, is a processor and producer of pork products.  Am. Compl. ¶ 12.  Triumph largely receives its supply of pigs from its member-owners, many of whom were its fellow plaintiffs in this case (prior to summary judgment entering against them).  Id.; see Elec. Clerk's Notes, ECF No. 99.  Pork produced by Triumph is sold into Massachusetts as well as throughout the country.  Am. Compl. ¶ 117.  In 2022, Triumph processed over eleven million pounds of pork meat sold into Massachusetts.  Joint Mot. Clarification & Exped. Status Conf., Attach. A, Partial Stipulation Facts ¶ 4, ECF No. 107-1.  Triumph has made

efforts to adjust its business model and structure in order to comply with the Act.  Am. Compl. ¶ 120.

Triumph has over 1,000 product codes for its products, including for specific grocery stores, brands, pork byproducts, and type of pig ("open pen gestation", "grass-fed", "premium", etc.).  Defs.' St. Facts Supp. Defs.' Mot. Summ. J. ¶¶ 26-31, ECF No. 138 ("Defs.' SOF").  To differentiate between different pigs in order to ensure they are classified with the correct product code, Triumph requires its pig farmers to deliver pigs at specific times, segregates them from other groups of pigs, keeps a count of all pigs in the group, and, after processing, maintains them in separate storage prior to shipment.  Id. ¶ 34.  Triumph estimates it is processing approximately 58,000 pigs per month in compliance with the Act, which Triumph estimates to be about 700,000 compliant pigs (or 70 million pounds) per year available through Triumph.  Id. ¶ 35.

Due to the Act, Triumph has created a process to differentiate between pork that meets the Act's requirements and pork that does not.  Pls.' SOF ¶ 62.  Triumph has also implemented new product codes, sorting procedures, and storage locations within its facility in order to ensure compliance with the Act.  Id. ¶ 63.

## IV. ANALYSIS

### A. Standard of Review

Summary judgment is required when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue of material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Materiality depends on the substantive law, and only factual disputes that might affect the outcome of the suit can preclude summary judgment. Id. In reviewing the evidence, this Court must "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000). This Court must also "disregard all evidence favorable to the moving party that the jury is not required to believe." Id. at 151.

"The [summary judgment pleading standard is] the same where, as here, both parties have moved for summary judgment." Bienkowski v. Northeastern Univ., 285 F.3d 138, 140 (1st Cir. 2002). The fact that both parties have moved for summary judgment on the same issues, "neither dilutes nor distorts" the summary judgment standard of review. See Hartford Fire Ins. Co. v. CNA Ins. Co., 633 F.3d 50, 53 (1st Cir. 2011). When courts

are considering cross-motions for summary judgment, they must "consider each motion separately, drawing all inferences in favor of each non-moving party in turn." AJC Int'l, Inc. v. Triple-S Propiedad, 790 F.3d 1, 3 (1st Cir. 2015) (quoting D & H Therapy Assocs., LLC v. Bos. Mut. Life Ins. Co., 640 F.3d 27, 34 (1st Cir. 2011)). "Cross-motions for summary judgment do not alter the summary judgment standard, but instead simply 'require [the Court] to determine whether either of the parties deserves judgment as a matter of law on the facts that are not disputed.'" Wells Real Estate Inv. Tr. II, Inc. v. Chardón/Hato Rey P'ship, 615 F.3d 45, 51 (1st Cir. 2010) (quoting Adria Int'l Grp., Inc. v. Ferré Dev., Inc., 241 F.3d 103, 107 (1st Cir. 2001)). The Court must "in each instance [determine] whether the moving party has met its burden under Rule 56." Dan Barclay, Inc. v. Stewart & Stevenson Servs., Inc., 761 F.Supp. 194, 197-98 (D. Mass. 1991) (Caffrey, J.).

### B. The Act Is Not Preempted by the FMIA.

The Pork Producers argue that the Act is preempted by the FMIA via both express preemption and conflict preemption. See Mem. Supp. Pl.'s Mot. These arguments misconstrue the Supreme Court's holding in National Meat Ass'n v. Harris, the scope of the Act, and the text of the FMIA. National Meat Ass'n v. Harris, 565 U.S. 452 (2012).

[11]

### 1. Express Preemption

In Harris, the Court reviewed whether a California provision (the "California Act") that regulated slaughterhouses within the state was preempted by the FMIA.  Id. at 455.  The California Act had three provisions: 1) a provision banning any slaughterhouse from buying, selling, receiving "a nonambulatory animal"; 2) a provision banning the "process, butcher, or [sale of] meat or products of nonambulatory animals for human consumption"; and 3) a provision against "hold[ing] a nonambulatory animal without taking immediate action to humanely euthanize the animal."  See Cal. Penal Code § 599f(a)-(c).  The Court ruled that the California Act was expressly preempted by the FMIA because the California Act "substitutes a new regulatory regime for the one the FMIA prescribes."  Harris, 565 U.S. at 460.  The Court further held that although "the FMIA's preemption clause does not usually foreclose state regulation of the commercial sales activities of slaughterhouses," [the California Act's] sales ban was "a criminal proscription calculated to help implement and enforce each of the section's other regulations," and was therefore preempted by the FMIA.  Id. at 463-64.

The Pork Producers argue that the Act in question here functions in much the same way; because the Act's sales ban imposes additional conditions for FMIA regulated establishments,

Triumph argues it "functions as a command to slaughterhouses to structure their operations in the exact way the [Act] mandates." Mem. Supp. Pls.' Mot. 17 (quoting Harris, 565 U.S. at 464). The Act, however, differs from the California Act in Harris in a fundamental way: the Act has no provision requiring any action by a slaughterhouse other than its sales ban.

In Harris, the Court noted that California "may motivate an operational choice without running afoul of the FMIA's preemption provision." 565 U.S. at 463. It was the fact that the sales ban functioned "as a command to slaughterhouses to structure their operations **in the exact way the remainder of [the California Act] mandate[d]**." Id. at 464 (emphasis added). By contrast, the Act here only bans the sale of noncompliant pork meat; it does not regulate how a slaughterhouse operates. As the Commonwealth argues, "the practical result of the Act is that a slaughterhouse that wishes to sell whole pork meat in Massachusetts must be able to identify whether that meat originated from a compliant pig." Mem. Supp. Defs.' Mot. 18. Slaughterhouses may still operate in the same way they did previously -- noncompliant pork processing is not only allowed, but slaughterhouses are not even required to segregate noncompliant pork from compliant pork. See, e.g., Virginia Uranium, 587 U.S. at 790-91 (Ginsburg, J., concurring) ("The distinction drawn in National Meat thus supports this

conclusion: A state law regulating an upstream activity within the State's authority is not preempted simply because a downstream activity falls within a federally occupied field.").

The Pork Producers also argue that Triumph has had to make "changes to how pork is physically stored at and shipped from Triumph's facility," but it is unclear on the record why that would be required under the Act -- these changes for storage and distribution may make Triumph's tracking and organization of compliant pork easier and more manageable, but they are not required under the law.  Pls.' Reply 15.  As the FSIS already requires, a slaughterhouse must be able to identify where its pork meat came from.[1]  See supra, p. 7-8.  Organizing and storing the pork to ensure that the Act -- compliant pork is shipped together is no different than the storage procedures that Triumph is already following –- it segregates organic, grass-fed, or otherwise "specialty" pork.  Though the Act requires

---

[1] The Pork Producers raise, for the first time in their reply, that the Act imposes on farmers and slaughterhouses a recordkeeping requirement, "under the penalty of perjury," so different than those of the FMIA that it must be preempted. Pls.' Reply.  This requirement, for certifications of how pig suppliers confine breeding pigs, however, is far outside the scope and purpose of the FMIA; again, these records are made in order to determine the treatment of the animals prior to slaughter, not to determine whether the animals are fit for human consumption.  This requirement therefore sits far outside the scope of the FMIA, and consequently, the Pork Producers have not met their burden in demonstrating that the requirement is preempted.

changes in operations for **pig farmers**, which the FMIA does not cover, slaughterhouses may continue to operate as they did previously -- they are simply only allowed to ship compliant pork meat for sale in Massachusetts.[2]

Finally, the Pork Producers argue that the Act "[overrides] the USDA's inspection and approval of the [pork] for sale" because Massachusetts has independently found that the pork is "adulterated, not fit for human consumption." Mem. Supp. Pl.'s Mot. 14. The Pork Producers argue that because one of the stated purposes of the Act is to protect "the health and safety of Massachusetts consumers," in banning the sale of certain pork products, the Act creates additional requirements for the same stated purpose as that of the FMIA. Mass. Gen. Laws ch. 129 App., § 1-1. As the Pork Producers also correctly explain, however, this Court must "look . . . to the effect of the regulatory scheme." Associated Indus. of Mass. v. Snow, 898 F.2d 274, 279 (1st Cir. 1990). It is not the stated purpose of the state statute, but the operation of that statute, that determines whether it is preempted by federal law. Here,

---

[2] The Pork Producers also argue that the other cases cited by the Commonwealth are inapplicable because those cases involved wholesale bans on types of meat, not simply bans on how that meat "was produced or processed." Pls.' Reply 8. The Pork Producers, however, have only shown that the ban here affects how pork is "produced", which is a function of the pig farmers, and not how pork is "processed", which is a function of Triumph and other slaughterhouses. The argument, therefore, fails.

preventing consumption of adulterated products is the purpose of the FMIA, but it is not the purpose of the Act. The Act's purpose is to prevent animal cruelty. The language otherwise is just that -- language -- and in practice, the Act has no effect on health and safety in the Commonwealth.

The Court, therefore, determines that the Act is not expressly preempted by the FMIA.

### 2. Conflict Preemption

The Pork Producers also argue that the Act's sales ban is preempted under principles of conflict preemption because the sales ban "conflicts with, and obstructs, the objectives of the FMIA." Mem. Supp. Pl.'s Mot. 23. Conflict preemption is triggered "when the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Weaver's Cove Energy, LLC v. Rhode Island Coastal Res. Mgmt. Council, 589 F.3d 458, 472-73 (1st Cir. 2009). Should a statute have a preemption provision, as the FMIA does, a conflict preemption analysis is generally inappropriate. See English v. General Elec. Co., 496 U.S. 72, 79 (1990) (conflict preemption analysis applies in the "absence of explicit statutory language."). A presumption against preemption applies generally to such an analysis as well. See Medicaid & Medicare Advantage Prod. Ass'n of P.R., Inc. v. Emanuelli Hernandez, 58

F.4th 5, 11 (1st Cir. 2023).  The Court here, however, will continue to conduct such an analysis.

A state law is preempted by conflict preemption when "it is impossible for a private party to comply with both state and federal requirements" or where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  English, 496 U.S. at 79 (quoting Hines v. Davidowitz, 312 U.S. 52, 67 (1941)).  "What is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects."  Maine Forest Prod. Council v. Cormier, 51 F.4th 1, 6 (1st Cir. 2022) (citing Crosby v. National Foreign Trade Council, 530 U.S. 363, 373 (2000)).

The purpose of the FMIA is "adequately" to "protect" "the health of the consumer" through the intended effect of "a uniform framework" of federal and state meat inspection programs.  Pls.' SOF ¶ 41.  The Act, in contrast, seeks to prevent the sale of pork raised in inhumane conditions, without concern for whether that meat is safe to eat (in other words, an otherwise healthy pork product could be noncompliant with the Act, not because it is considered unhealthy, but because the policy preferences of the Massachusetts voters demand it not be eligible for sale).  There is nothing in the record to indicate that since the Act's enactment, obstacles have occurred in

[17]

ensuring safe and healthy pork in the Massachusetts market through the FMIA.

Further, as explained above, slaughterhouses can easily comply with both federal requirements and the requirements imposed by the Act because the Act does not impose any new requirements on slaughterhouses within the scope of the FMIA. As the Act does not impose any new requirements on slaughterhouses within the scope of the FMIA, it cannot, by definition, stand as an obstacle to the accomplishment or execution of Congress's objectives under the FMIA.

The Pork Producers argue that because there is "pork meat product that has passed FMIA inspection and is approved for sale by the USDA [that] is now unable to be sold," the Act conflicts with the FMIA.  Pls.' Reply 19.

Although the Pork Producers point to instances in the record where a farmer, in providing both compliant and non-compliant pigs to a processor, erred in denoting pigs as compliant, resulting in pigs that had passed full USDA inspection being withdrawn from the market, such instances do not interfere with the objectives of the FMIA.[3]  If the farmer had erred in labeling pigs delivered as "grass-fed", and such an

---

[3] The objective of the FMIA is to ensure safe pork enters the market.  The FMIA, however, does not **require** that all safe pork available to the market be able to enter the market.

error was discovered after packaging and shipment, the mislabeled pork products would also have been withdrawn from the market to prevent misleading customers.  The FMIA's purpose, to protect the health of consumers through uniform meat inspection regulations, is in no way precluded by the Act's recording requirements.  The Court, therefore, determines that the Act is not preempted by the FMIA via conflict preemption.

V. **CONCLUSION**

After tremendously helpful briefing and oral argument, the Court took the parties' cross motions for summary judgment under advisement.  The Court now, after careful consideration, determines that the Act is not preempted by the FMIA, and therefore **GRANTS** the Commonwealth's motion for summary judgment, ECF No. 136, and **DENIES** the Pork Producers' motion for summary judgment, ECF No. 126.  Judgment shall enter for the Commonwealth.

**SO ORDERED.**

                                       /s/ William G. Young
                                        WILLIAM G. YOUNG
                                              JUDGE
                                              of the
                                        UNITED STATES[4]

---

[4] This is how my predecessor, Peleg Sprague (D. Mass. 1841-1865), would sign official documents.  Now that I'm a Senior District Judge I adopt this format in honor of all the judicial colleagues, state and federal, with whom I have had the privilege to serve over the past 46 years.