1                    UNITED STATES DISTRICT COURT
                      DISTRICT OF MASSACHUSETTS
2

3

4    UNITED STATES OF AMERICA,          )
                                        )
5    vs.                                )  Criminal Action
                                        )
6    JOSE NELSIN REYES-VELASQUEZ,       )  No. 15-10338-FDS-50
                     Defendant          )
7                                       )
                                        )
8                                       )

9

10   BEFORE:  THE HONORABLE F. DENNIS SAYLOR, IV

11                            SENTENCING

12

13                               DAY 2

14

15        John Joseph Moakley United States Courthouse
                       Courtroom No. 2
16                    One Courthouse Way
                      Boston, MA 02210
17

18                    December 8, 2016
                         3:30 p.m.
19

20

21

22

23                    Valerie A. O'Hara
                   Official Court Reporter
24        John Joseph Moakley United States Courthouse
                  1 Courthouse Way, Room 3204
25                    Boston, MA 02210
                 E-mail: vaohara@gmail.com

1    APPEARANCES:

2    For The United States:

3        United States Attorney's Office, by CHRISTOPHER J. POHL,
     ASSISTANT UNITED STATES ATTORNEY, 1 Courthouse Way, Suite 9200,
4    Boston, Massachusetts  02110

5    For the Defendant:

6        RAYMOND E. GILLESPIE, ESQ., 875 Massachusetts Avenue,
     Suite 32, Cambridge, Massachusetts 02130.
7
     ALSO PRESENT:
8
     Deborah Huacuja, Spanish interpreter
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          I N D E X

2       WITNESS                DIRECT    CROSS    REDIRECT    RECROSS

3       LEONARDO HERNANDEZ
          by Mr. Pohl            2-22
4         by Mr. Gillespie                 2-35

5       BRENDAN MCINTYRE
          by Mr. Pohl            2-54

6


7


8       EXHIBITS                    RECEIVED IN EVIDENCE

9
          1 through 6                                           2-21
10        8                                                     2-40
          9 and 9.1                                             2-46
11        9.2                                                   2-46
          9.3                                                   2-47
12        9.4                                                   2-48
          11                                                    2-64
13

14

15

16

17

18

19

20

21

22

23

24

25

1                          PROCEEDINGS

2              THE CLERK:  All rise.  Thank you.  Please be seated.

3      Court is now in session in the matter of United States vs.

4      Jose Nelsin Reyes Velasquez, Criminal Matter Number 15-10338.

5              Would counsel please identify themselves for the

6      record.

7              MR. POHL:  Christopher Pohl, your Honor, for the

8      United States.

9              MR. GILLESPIE:  Good morning, your Honor, Raymond

09:34AM 10     Gillespie for the defendant, Jose Nelsin Reyes-Velasquez.

11             THE CLERK:  I will swear in the interpreter.

12             (The interpreter was sworn.)

13             THE CLERK:  Would you please identify yourself for the

14     record.

15             THE INTERPRETER:  For the record, my name is

16     Deborah Huacuja, good morning.

17             THE COURT:  All right.  Good morning.  All right.

18     This is, I guess, a continuation of our sentencing proceeding,

19     if that's the right way to frame this.  I've read the

09:35AM 20     government's supplemental memorandum and have given some

21     thought to this issue, and I guess I want to set the stage as I

22     see it and then get response from counsel before we go any

23     further.

24             As I understand it, in this case, the defendant has

25     pleaded guilty to possession of a counterfeit resident alien or

1    green card and purchase of a fraudulent social security card.

2    He was arrested in I guess East Boston on September 19th, 2015

3    and charged with assault and battery with a dangerous weapon,

4    resisting arrest and assault and battery on a police officer,

5    maybe some other charges, but those are the core ones, and

6    charges are pending as to those -- or those charges are pending

7    in the East Boston District Court.

8         The government contends that he inflicted wounds on

9    the officers in the course of that incident, including some

09:36AM 10   serious lacerations and abrasions.  I think that fact is not

11   disputed.  What is disputed, as I understand it, is whether

12   that was justified in some way for self-defense or other

13   reasons.  In any event, he was charged, he was released on bail

14   in the District Court, although he had been ordered deported in

15   November, 2013.

16        He was then rearrested and taken into ICE custody in

17   December, 2015, where he was until February 3rd, when his

18   custody changed to pretrial detention in this matter, so he has

19   been in custody on these charges a little more than 10 months,

09:37AM 20   today being I think December 8th.

21        So the government seeks to have me take his conduct

22   into account when imposing sentence, that is, his conduct in

23   connection with the arrest in September of 2015.  Normally he

24   would be prosecuted in the state on those state charges.

25   There's no federal crime, as I understand it, committed even if

1    he did assault the officers.

2         Apparently there is no warrant or detainer on the

3    defendant, so in all likelihood, once he is sentenced here, he

4    will go straight to ICE custody again for removal proceedings.

5         To state I guess some obvious sentencing principles,

6    there is no limitation on the evidence that I can consider in

7    imposing sentence.  If there is a disputed material fact, I

8    have to hold a hearing, give the parties an opportunity to

9    present evidence and make findings by a preponderance of the

09:38AM 10   evidence standard.

11        The guidelines say that I should consider other

12   relevant conduct in determining the base offense level, which

13   can include uncharged conduct, can include an acquitted charge.

14   The paradigm is drug quantities or drug transactions that are

15   not charged.

16        The guidelines also require that I take into account

17   his criminal history, that is, the defendant's criminal

18   history, and that takes only convictions into account and does

19   not score every conviction and does not take arrests into

09:39AM 20   consideration, and, of course, if the criminal history category

21   understates the seriousness of the actual criminal history, I

22   can depart from the guidelines.

23        In any event, as I see it, there's sort of a core

24   issue here that's not particularly easy to resolve.  I'll call

25   it the Al Capone problem.  Al Capone, as I'm sure you know, was

1    a notorious gangster and racketeer in Chicago in the 1930's.

2    He was eventually prosecuted for income tax evasion, and the

3    question is when you sentence him for tax evasion, are you

4    sentencing him as a tax evader or are you sentencing him as

5    Al Capone, a gangster, racketeer and murderer?

6         The Sentencing Judge is supposed to take everything

7    into account, including the character and nature of the person

8    and his criminal history, but still it doesn't seem quite right

9    in the Al Capone context to sentence him as a murderer when he

09:40AM 10  was convicted of tax evasion, and that's, again, a tension

11   that's not entirely resolvable or easy to resolve, but I think

12   it's a way to frame the problem.

13        I guess there's a couple other issues here that I want

14   to touch on.  One we mentioned before, the question of whether

15   the defendant has had sufficient time to prepare for an

16   evidentiary hearing, and I'll let Mr. Gillespie respond to that

17   in a moment, but one of my concerns is given the relatively low

18   guideline range, which is zero to six months, he already has

19   served ten plus that time, although a thorough investigation

09:40AM 20  might encompass another month or two that might or might not

21   wind up effectively given him a longer sentence than he

22   otherwise might have, and it's not clear to me entirely how his

23   Fifth Amendment right intersects with this issue.

24        At a suppression hearing, of course, the defendant can

25   testify and effectively has use immunity because the theory is

1    that his testimony may be necessary to vindicate his

2    constitutional rights.

3          I'm not sure that that's true here, and so defendant

4    may be in the position here of potentially having to choose

5    between responding to the government's evidence and thereby

6    giving up his Fifth Amendment right or asserting the right and

7    taking the negative consequences of that.

8          And, finally, and maybe as an overlay on all this, and

9    in some ways it may be the most important point, if the

10   defendant had been convicted of all pending charges in the

11   state court and had received a lengthy sentence or at least a

12   sentence of more than I think a year and a day, he would wind

13   up with three points on his criminal history category or three

14   scored points, rather, which would put him in a Category 3

15   because he already has one point, and that would bump his

16   guideline range up to two to eight months.

17         Even if we took his criminal history category all the

18   way up to Category 6 on the assumption that his criminal

19   history was not adequately reflected in his criminal history

20   category, the range would only be 12 to 18 months.

21         Mr. Gillespie pointed out that because the charges are

22   pending in the East Boston District Court as opposed to

23   Superior Court, the maximum time he could be sentenced is two

24   and a half years, although, of course, the proceeding could be

25   brought in the Superior Court.

1          So, it does pose a peculiar problem here for federal

2     sentencing purposes.  There's a question whether he should be

3     worse off than if he had been sentenced and received a

4     committed sentence in state court.  Of course, he would have

5     had to serve that sentence, but, again, for whatever reason,

6     the state here has chosen not to file a detainer or warrant on

7     him, I'm not sure why, you know, it's up to them, they're the

8     relevant sovereign, and I guess I'm finding that troublesome

9     here somewhat, that he may be worse off than if he had been

09:43AM 10     convicted on the pending charges in state court.

11          Of course, it is not part of his criminal history.

12     Technically, under the guidelines, he hasn't been convicted,

13     and I don't see it really as relevant conduct under 1B1.3 of

14     the guidelines.  It is not really relevant to the crimes of

15     conviction.  It's, again, more like it's part of his criminal

16     history, and I think the government, as I understand it, is not

17     saying I should count it as relevant conduct towards the base

18     offense level, but I should impose an upward variance.

19          So that's how I guess I'm seeing this issue as framed.

09:44AM 20     I'm prepared to hold an evidentiary hearing as appropriate.

21     I'd want to hear from the parties, but I guess to cut to the

22     chase here, if I gave the defendant a sentence let's say of a

23     year and a day, that would be effectively a time served

24     sentence.

25          Assuming good time, that would be in effect a ten and

1    a half month custody sentence, which is basically what he has

2    served, and it would be a sentence that would really be

3    reflective of a criminal history category of 5 or 6, I guess 4,

4    5 or 6 with a level 6 base offense level.

5          So, I do have some questions about whether this is a

6    worthwhile exercise or not, but I want to hear from the

7    parties, and just to throw one other piece into the mix, the

8    defendant has also objected to the PSR reflecting that he's a

9    member of MS-13, which is another disputed sentencing fact that

10   may need to be taken into account in the sentencing decision.

11         So that's a little bit rambling and discursive, but

12   I'm trying to frame the issue and understand where we're going

13   here and what we're doing with it, so let me hear first from

14   the government.

15         Mr. Pohl, what's your reaction to that?

16         MR. POHL:  Thank you, your Honor.  Well, I guess the

17   Supreme Court teaches us that we always have to begin our

18   sentencing hearings and sentencing evaluations by correctly

19   calculating the guidelines, and I agree with you that maybe in

20   the overwhelming majority of cases, you know, the guidelines

21   are the touchstone there, you know, oftentimes a reasonable, at

22   a minimum, a reasonable starting point, and, you know,

23   reasonable people can disagree about degrees of departure or

24   modest variances, but for the most part, you know, I think it

25   is a truism that the guidelines are, you know, a good place to

1    start.

2         But there are cases, and I think this is one of those

3    cases where there are good reasons to believe that the numbers

4    of the guidelines do not accurately reflect who the person

5    that's being sentenced here today really is, and, you know, I

6    think, you know, my reaction to the photographs in the police

7    report was visceral.

8         THE COURT:  Well, I don't mean to diminish that.

9    Again --

10        MR. POHL:  No, and I certainly didn't mean to --

11        THE COURT:  He could have murdered the officer.

12        MR. POHL:  Of course.

13        THE COURT:  But I'm not sentencing him for murder.

14        MR. POHL:  I understand.  On the sort of, you know,

15   your analogy to Al Capone, it's apt, though I think, you know,

16   the government's recommendation may be a significant upward

17   departure from what was otherwise called for on the guidelines,

18   but it is not the difference between tax evasion and murder.

19        It is a relatively short federal sentence up to a

09:48AM 20   three-year sentence if the Court were to adopt our

21   recommendation, and so, you know, I think the information that,

22   you know -- I think that -- I don't mean to suggest that our

23   number has to be right, although I certainly spent time

24   thinking about what would be appropriate in this case, and I

25   guess my way of thinking of it was it's not actually totally

1    dissimilar from the kind of calculus that Mr. Gillespie used.

2         I look at that, the injuries and, you know, assuming a

3    guilty plea or a conviction after trial, those look to me like

4    the kind of injuries that a Judge would give somebody the

5    maximum sentence on, and in the District Court, that would be

6    two and a half years, and, you know, in a case like this, you

7    know two years and a half years for that plus the six

8    months for the document fraud and immigration or in a social

9    security fraud case would give you a three-year sentence if you

09:49AM 10   were to sort of amalgamate those two things together, so that's

11   how we saw it and why I think, you know, our recommendation

12   was -- why it was reasonable to suggest that the guidelines did

13   not accurately capture who Mr. Reyes-Velasquez is and why we

14   recommended the sentence that we did, and if the other

15   questions, you know, concerning, you know, Mr. Reyes-Velasquez

16   and the consequences of the hearing, I don't really have

17   any -- I don't have any real -- I don't have anything to

18   contribute to that.

19        I'm sure Mr. Gillespie will raise it, but I think here

09:50AM 20   the injuries were serious.  It's entirely appropriate for you

21   to take it into account, and I would never presume to be -- no

22   matter how many times the criminal law intersects with

23   immigration law, I'm always cognizant of the fact that

24   immigration law is its own entirely well-formed set of laws and

25   rules, and anybody that doesn't practice immigration law should

1    be very careful about making broad statements about it, and so

2    I'm not doing that.

3              I would say in my experience, I don't believe that

4    people, once they're in federal custody and go to immigration

5    custody, that whether the state lodges a detainer or not, that

6    those are honored.  I think regularly they're not, and I think

7    the reasons for that --

8              THE COURT:  Meaning that people are deported even with

9    the existence of the state warrant?

09:51AM 10         MR. POHL:  Correct.  I think the reasons for that are,

11    you know, practical, which is whether it's, you know, the

12    marshals or immigration officials have a very difficult time

13    tracking people once they leave their custody to go to state

14    court to resolve those matters and to get them back, and I

15    think they're loathed to let people that they have in their

16    custody and that they believe are lawfully subject to removal

17    out of their custody, even to do something, you know, to where

18    they resolve a state matter.

19             THE COURT:  You have an overlayer or complication

09:52AM 20   there of various state or local officials for their own

21    purposes refusing to cooperate with federal immigration?

22             MR. POHL:  Absolutely, yes, that's right.  So, like I

23    said, and, listen, that is a practitioner's answer, and it's

24    not the answer of an immigration expert, and so the Court can

25    take that into account for what it's worth.

1           But, you know, I -- listen, I guess -- before I sit

2    down, I would just say while we're certainly prepared to have

3    the hearing, you have the officers here, I think most of the

4    exhibits we have before the Court are basically agreed to,

5    there's one that's not, but it's not really central to I think

6    the Court's analysis in the final context of the sentencing

7    hearing, but if we're not really contesting the assault and

8    we're not really contesting the degree of the injuries, then it

9    really is the question of self-defense or not, right, and

09:53AM 10   that's not -- frankly, that's not something that the government

11   raised, and so I think the real question is not whether or not

12   this evidence should be considered, it's whether

13   Mr. Reyes-Velasquez truly intends to assert that he inflicted

14   these wounds on the officers in self-defense, and if he's going

15   to do that, then I guess the Court is right, there's no way out

16   of this box but to hold an evidentiary hearing, but I think

17   there's broad agreement on what happened with one caveat, and

18   that's a caveat that's really in control of

19   Mr. Reyes-Velasquez, not the government.  Thank you.

09:54AM 20           THE COURT:  Mr. Gillespie.

21           MR. GILLESPIE:  Yes, your Honor.  Well, first of all,

22   I'd like to say that I found your analysis very interesting,

23   creative and rational, and I think it is a good way --

24           THE COURT:  Usually things that are creative aren't

25   rational and vice versa.

1          MR. GILLESPIE:  I know, but often they are, and I

2     think in this case it is.  I think both on behalf of my client

3     and from professional perspective, I think it's an appropriate

4     way to deal with this case.

5          He's charged in state court.  He's charged with

6     serious crimes.  He would have in a trial in state court the

7     right to exercise his Fifth Amendment, not to testify, not to

8     make any statements, to force the government to its proof.

9          Here, of course, the standard of proof is

09:55AM 10    significantly less burdensome, and yet the consequences appear

11    to be, at least potentially, at least as great if he were to go

12    to trial and lose in state court.

13         Whether or not to hold a hearing is, of course,

14    completely within the Court's discretion, and I certainly do

15    agree with you that this does present the Al Capone problem,

16    notwithstanding what Mr. Pohl asserts.

17         From day one in this case, the government's approach

18    has been we know he's a member of MS-13, we just don't have the

19    smoking gun, and really the purpose of today's hearing would be

09:56AM 20    equally in my opinion to try to somehow convince maybe through

21    the back door the Court that, in fact, what you're really

22    dealing with here is a gang member, and I'd suggest that your

23    hypothetical proposal would basically take into account, as you

24    said, what Mr. Reyes or a good portion of what Mr. Reyes might

25    receive as a sentence in state court on these District Court

1    charges.

2         By the way, I do respectfully disagree with your

3    accounting of the time he's already served.  I think that the

4    time under the immigration detainer from December 16 to, what

5    was it, February 3rd?

6         THE COURT:  That's what I thought, I thought I got

7    that from the PSR.  I may have misspoken.

8         MR. GILLESPIE:  Well, I mean I think that would count

9    because it's not assigned to any other sentence under the

09:57AM 10   federal system.  I forgot the statute, the number of the

11   statute.  That would have to be counted towards his time in

12   this case, so actually what you're really talking about is

13   you're talking about close to a full year right now, just eight

14   days shy of a full year right now.

15        THE COURT:  I thought immigration time was dead time,

16   so to speak?

17        PROBATION OFFICER:  So, pre-indictment administrative

18   ICE custody does not count by the Bureau of Prisons.  It's

19   technically not an offense he was arrested for, a criminal

09:58AM 20   offense, but he was detained post-indictment from January 26th

21   to February 3rd, so that week or so would count.

22        THE COURT:  Okay.  So January 26th then would be how

23   BOP would count his custody?

24        PROBATION OFFICER:  Right, by the Bureau of Prisons,

25   and many courts do a variance for the administrative time

1    because they know that the Bureau of Prisons will not credit
2    it.
3              MR. GILLESPIE:  I stand corrected, your Honor, that's
4    very helpful.  So, without going on and on, I think that what
5    you propose is a proper resolution of this case, and I think
6    that it's still open to the state to prosecute this man in
7    state court, and I just can't believe that Mr. Pohl or this
8    prosecutorial office wouldn't have enough influence over
9    immigration to, if necessary, intervene to make sure that
10   Mr. Reyes was allowed to proceed to state court as needed, and
11   hopefully if that happened, that the process would be
12   expedited.
13             THE COURT:  Well, I certainly understand the
14   practicalities there.  I mean, I don't, you know, if they
15   simply turned him over to the state, then they run the risk
16   that he'd be granted bail and they'd lose track of him.
17             MR. GILLESPIE:  Right.
18             THE COURT:  If they just habe. him in every time he
19   has a court appearance, it's a gigantic use of resources, and I
20   think I understand the practical problems, but maybe this case
21   is a border.  You know, if he were a murderer, they would do
22   it, I assume, if it was a jaywalking, they wouldn't care, and
23   maybe this is on the border, I don't know.
24             MR. GILLESPIE:  Right.  Your Honor,
25   Mr. Reyes-Velasquez' state court attorney is present in court

1    today, Margaret Barusch from the Committee of Public Counsel

2    Services, and I understand that case is coming up for trial or

3    could be coming up for trial, would necessarily have to be

4    coming up for trial very soon because the state itself has a

5    speedy trial statute, and they might be faced with issues about

6    that some time in the fairly near future, so I would suggest

7    that this Court can feel at ease that at least in terms of the

8    state's obligation that they would be moving quickly on a trial

9    in this case.

10:00AM 10         This is not something that seems like it is likely to

11   persist on the calendar for months and months at this point.

12   It's time to fish or cut bait, and I think that's what would

13   happen, so I think you could rest assured that the prosecution

14   would have its day in court fairly soon.

15         So, in sum, I think your proposal is very reasonable.

16   I'm sure I have to, of course, confer with Mr. Reyes-Velasquez,

17   but I'm quite sure that he would accept it on the basis of time

18   served, and I think that's the appropriate balancing of his

19   constitutional rights with the sentencing process here in

10:01AM 20   federal court, and I request that you do so.

21         THE COURT:  If -- one thing that I'm struggling with,

22   Mr. Gillespie, is that the prudent thing to do may be to simply

23   hold the hearing.  Would you be prepared to go forward if we

24   did?

25         MR. GILLESPIE:  Yes, your Honor, but, again, that

1    certainly involves a certain amount of risk for

2    Mr. Reyes-Velasquez, significant risk actually in view of the

3    fact that the crime, the crimes he's charged with really don't

4    have anything to do with the posture of the government at this

5    stage of the proceeding.  I don't think that's a risk that he

6    should be forced to have to take.

7         THE COURT:  One of the things I'm struggling with is

8    let's say I gave him a sentence of a year and a day.  That's

9    double the high end of the guideline sentence.  What would the

10:02AM 10   justification be for that?  You know, one is that, you know,

11   well, we don't have a time machine, and he's already served

12   this much time.

13        That raises potential issues, I suppose, of speedy

14   trial, Sixth Amendment to counsel violation, not that I think

15   any of that occurred, but at least there's that possibility,

16   or, alternatively I'm giving him the longer sentence because of

17   this uncharged conduct or gang membership, which are disputed

18   facts, and that's one of the reasons that I'm thinking that

19   maybe it's prudent to have the hearing.

10:03AM 20        I can make my finding whatever my finding is, impose

21   the sentence, whether or not that finding, you know, in reality

22   makes a difference or not, and, at worst, we've just wasted a

23   little bit of time holding this hearing, and I'm also

24   struggling to believe that anything ever really will happen in

25   the East Boston District Court under the circumstances

1    presented, particularly when there's no warrant.

2         If I gave him time served, he's going into ICE

3    custody, and presumably it wouldn't be that long before he's on

4    a plane to El Salvador.  Perhaps my instinct, and I'm being

5    unnecessarily cautious here, is to hold the hearing, resolve

6    the issue and impose the sentence and let the chips fall where

7    they may.

8         Mr. Pohl, I understand you're prepared to go forward?

9         MR. POHL:  Yes, your Honor.

10:04AM 10    THE COURT:  All right.  Why don't we go ahead and do

11   that, and, again, there's a risk here that this is occupying

12   people's time unnecessarily, and it's conceivable that it could

13   have some prejudice should the case in Boston ever go to trial,

14   although, of course, it could also benefit him if it's a free

15   shot at the witnesses, but regardless I think it makes sense to

16   go forward with the hearing.

17        MR. POHL:  All right.  Thank you.  Before we call our

18   first witness, I think we have a number of exhibits that we've

19   been able to agree on that I'd just like to go through for the

10:04AM 20   record and for the Court.

21        THE COURT:  Yes.

22        MR. POHL:  Exhibit 1 is the Boston Police incident

23   report of the interaction with Mr. Reyes-Velasquez, Exhibit 2,

24   the physical exhibit at the witness stand, is a knife,

25   Exhibit 3 is a box cutter, Exhibit 4 is a field interview

1    report, and that involves Mr. Reyes-Velasquez dated April 21st,

2    2015, Exhibit 5 is a photograph of the injuries to

3    Officer Hernandez, and Exhibit 6 is the photograph of a bite to

4    Officer McIntyre.  There's a seventh document, I'd just alert

5    the Court now that it does not mention Mr. Reyes-Velasquez, but

6    it relates to the person that was -- he was stopped with on

7    April 21st, 2015 in Exhibit 4, and we've conferred.

8         Mr. Gillespie I think will object to its admission.

9    I'm going to proffer that document at the conclusion of our

10   presentation.

11        THE COURT:  All right.  The other seven --

12        MR. POHL:  The other are admitted, yes.

13        MR. GILLESPIE:  Yes.

14        THE COURT:  All right.  So that's, I'm sorry, Exhibits

15   1 through --

16        MR. POHL:  6.

17        THE COURT:  I'm sorry, 1 through 6 are admitted.

18        MR. POHL:  Yes.

19        (Exhibit Nos. 1 through 6 were admitted into

20   evidence.)

21        MR. POHL:  Thank you.  With that, I'll call

22   Officer Leonardo Hernandez.

23        Your Honor, do you want the witnesses sequestered?

24        MR. GILLESPIE:  Yes.

25        THE COURT:  I'm sorry.

```
 1              MR. POHL:  I have both officers here.  Would you like
 2       them sequestered?
 3              THE COURT:  Under the rules of evidence, which don't
 4       apply, I have to sequester upon request.  What's the parties --
 5              MR. GILLESPIE:  Yes, I request sequester, your Honor.
 6              THE COURT:  All right.  I'll grant it.
 7              MR. POHL:  May I, your Honor?
 8              THE COURT:  Yes.
 9              LEONARDO HERNANDEZ, having been duly sworn by the
10       Clerk, testified as follows:
11                            DIRECT EXAMINATION
12       BY MR. POHL:
13       Q.   Good morning.
14       A.   Good morning, sir.
15       Q.   Could you please introduce yourself to the Court and spell
16       your last name.
17       A.   My name is Leonardo Hernandez, my last name is spelled
18       H-e-r-n-a-n-d-e-z.
19              THE COURT:  Hold on, we're getting some feedback.
20       Okay, go ahead.
21       Q.   Where do you work, sir?
22       A.   Sir, I am currently employed by the Boston Police
23       Department.
24       Q.   How long have you been a Boston police officer?
25       A.   I am in my 21st year as a Boston police officer.
```

10:08AM

1    Q.   And what is your current assignment, Officer Hernandez,

2    where do you work?

3    A.   My current assignment is District A7 located in East

4    Boston.

5    Q.   How long have you worked at District A7?

6    A.   Since 2002.

7    Q.   Officer, let me direct your attention to September 19th,

8    2015.  Were you working on that day?

9    A.   I was, sir.

10:08AM 10    Q.   Were you working by yourself or were you with a partner?

11    A.   I was with a partner.

12    Q.   Who's your?

13    A.   Officer Brendan McIntyre.

14    Q.   All right.  What shift did you work that day?

15    A.   We worked the first half shift, which begins at 4 p.m. to

16    11:45 p.m.

17    Q.   All right.  And what was your assignment that day?

18    A.   We were assigned to the A7 anti-crime unit, which is a

19    plain clothes, two-man response vehicle.

10:09AM 20    Q.   Okay.  You're in plain clothes?

21    A.   Correct.

22    Q.   Unmarked cruiser?

23    A.   That's correct, sir.

24    Q.   About 4:35 p.m. that day, so about 35 minutes after you

25    began your shift, where were you?

1    A.    Sir, I was patrolling the Eagle Hill area of East Boston,

2    which is near East Boston High School.

3    Q.    And you drive past -- is White Street near East Boston

4    High School?

5    A.    That's correct, sir.

6    Q.    And you drove by East Boston High School and were on White

7    Street; is that correct?

8    A.    Correct.

9    Q.    When you got to White Street, what happened?

10:09AM 10    A.    Sir, as we made a turn onto White Street, we observed an

11    unknown male sitting on the steps of 57 White Street, sir.

12    Q.    Okay.  Do you see that person in court, today?

13    A.    I do, sir.

14    Q.    Could you point him out?

15    A.    He's sitting here on my left.

16          MR. POH:  I'll ask that the record reflect that the

17    officer has identified Mr. Reyes-Velasquez.

18          THE COURT:  Yes.

19    Q.    All right.  Officer, is that sort of general address,

10:10AM 20    55-57 White Street, is that significant to you?

21    A.    It is, sir.

22    Q.    Why is it significant to you?

23    A.    It's significant because the commanding officers at

24    District A7 and the supervisors at District A7 had made it a

25    point to let us know that we should pay close attention to that

1    area.

2    Q.   Why is that?

3    A.   Given that it was a known MS-13 gang hangout and gathering

4    area, officers had made several field interrogation observation

5    reports of gang members in that area for several months.

6    Q.   What about you, had you ever been involved in an incident

7    in the 55 White Street area?

8    A.   Yes, sir.

9    Q.   All right.  What was it for?

10   A.   Basically field interrogation and observation reports,

11   information gathering about the people hanging out in that

12   particular area given the complaints from the residents and the

13   number of calls that we had responded.  When I say we, I mean

14   other patrol officers to that area for different acts.

15   Q.   Okay.  Why don't you take a second then.  You raise a good

16   point.  What does the rest of White Street look?

17   A.   I'm sorry.

18   Q.   What does it look like?  Is it a residential area,

19   business?

20   A.   It is a residential area.  There is a high school directly

21   across from 57-55 White Street.

22   Q.   So as you pull up at 57-55 White Street, you see the

23   defendant, what happens next?

24   A.   Sir, I didn't recognize the individual from the area.

25   Like I said, I have been working in East Boston since 2002.

1    The face was new to me.  Because of the given information that

2    we had from supervisors and so forth, we decided to inquire if

3    the individual lived at that particular address.

4    Q.    Okay.  How did you do that?

5    A.    From the inside of the police car, we rolled down the

6    window and just simply asked, "Sir, do you live at that

7    location?"

8    Q.    Were you driving?

9    A.    I was the driver, sir.

10:12AM 10   Q.    Okay.  So you asked Mr. Reyes-Velasquez, "Do you live

11   there," right?

12   A.    I believe Mr. McIntyre might have asked him first.  There

13   was sort of no response, I'm fluent in English and Spanish.

14   East Boston has a high Hispanic population, so I then inquired

15   in Spanish.

16   Q.    Okay.  What did Mr. Reyes-Velasquez say in response?

17   A.    He responded, "No, I live in Malden."

18   Q.    Okay.  What happened next?

19   A.    And I should point out, as he responded, as I asked the

10:12AM 20   question, he started to approach the police car.  We never got

21   out of that vehicle, out of the vehicle up to that point.

22   Q.    Okay.

23   A.    Once he said, "I live in Malden," and he was approaching

24   the car, he immediately took off running in between 61 and 63

25   White Street at that point.

1    Q.    All right.  And tell the Court, what's that 61-63 White

2    Street, what does that look like?

3    A.    61 and 63 are residential homes.  I believe 55 to 61 is

4    either one building or buildings that are connected, and then

5    between 61 and 63, there's little alley that leads to the back

6    yards of those addresses.

7    Q.    Okay.  When Mr. Reyes-Velasquez took off running, what did

8    you do?

9    A.    Well, I found it strange that an individual that had just

10   started to approach the police car and answer a simple question

11   as, "Do you live there, sir," all of a sudden took off between

12   two houses.  We proceeded to exit the vehicle and walk over to

13   investigate, knowing that Mr. Reyes-Velasquez did not live

14   there, he just had told me he lived in Malden.

15   Q.    Okay.  What happened when you got to sort of that area of

16   61-63 White Street?

17   A.    As soon as I turned into the alley, Mr. Reyes-Velasquez

18   was now coming back out of the alley, I was immediately

19   assaulted in the chest area and in the face area by

20   Mr. Reyes-Velasquez.

21   Q.    Okay.  As you got to the area of 61-63 White Street, did

22   you see Mr. Reyes-Velasquez do anything?

23   A.    I did not, sir.

24   Q.    All right.  You said he -- all right.  So you it sort of

25   sounds like you caught up with him?

1    A.   Yes, I turned the corner.  He was coming out.  I was

2    immediately assaulted by him in the face and chest area, and

3    then immediately a struggle ensued to gain control of

4    Mr. Reyes-Velasquez for the assault and battery on the police

5    officer.

6    Q.   Okay.  Well, why don't you describe for the Court what

7    that interaction with Mr. Reyes-Velasquez was like?

8    A.   It was in my opinion in my years of experience on the job,

9    it was a violent one, especially given the circumstances, an

10:15AM 10   individual just answered a simple question as, "Do you live

11   there," all of a sudden I did not expect to be assaulted by a

12   guy that was walking to the police car, towards the police car,

13   and I was immediately assaulted.

14        We ended up getting onto the ground in the process.  I

15   was punched several times, kicked several times, bitten several

16   times.  My partner attempted to assist me in gaining control of

17   the suspect, who at the time was a little bit smaller, thinner,

18   I should say, and in the process of moving around and to gain

19   control, I suffered scratches, bite marks.  It lasted a good

10:15AM 20   five to eight minutes, and it seemed a lot longer given the

21   violent struggle.

22        In the process of the struggle, I should add I lost my

23   police radio, which I would normally use to request some

24   assistance to minimize the struggle, I lost my police radio in

25   the process, Officer McIntyre lost his police radio, so it was

1    really a matter of just gaining control of the suspect at that

2    time.  Officer McIntyre at some point was able to get to his

3    radio and request some assistance.

4           THE COURT:  I'm sorry, you may have said this, and I

5    may have missed it, were you in full uniform?

6           THE WITNESS:  I was in plain clothes, your Honor, with

7    a Boston Police badge displayed on my outer most garment.

8           THE COURT:  On your chest?

9           THE WITNESS:  On my chest, yes.

10:16AM 10           THE COURT:  All right.  Go ahead.

11    Q.   Officer Hernandez, there are a couple of boxes that are in

12    front of you.  I'd like to ask you a couple questions about

13    those.  There are numbers on them.

14           MR. POHL:  Can I approach the witness, your Honor?

15           THE COURT:  Yes.

16    Q.   So opening up what's been marked as Exhibit 2, I ask if

17    you recognize that?

18    A.   I do, sir.

19    Q.   How do you recognize that?

10:17AM 20    A.   I recognize that as the knife discovered in the back yard

21    of 63 White Street immediately after the incident with

22    Mr. Reyes-Velasquez.

23    Q.   Okay.  So, and I'm going to actually put them both on the

24    document camera so that everyone can see.  Let me have you

25    identify Exhibit 3.  Do you recognize this?

1    A.    I do, sir.

2    Q.    What is that?

3    A.    That was a box cutter that was recovered by the

4    transporting unit officers, Amoroso and Bruno, from the suspect

5    after the initial altercation.

6    Q.    All right.  So, I'm putting up Exhibit 2.  So,

7    Officer Hernandez, we may have skipped over this as we started

8    to talk a few minutes ago, but as you got to sort of the

9    alleyway, would that be a fair way of describing the 61 and 63

10:18AM 10    White Street?

11    A.    Absolutely, alleyway is fair.

12    Q.    Did you see Mr. Reyes-Velasquez do anything or make any

13    motions as you got to the alleyway?

14    A.    I did not, sir.  I saw Mr. Reyes-Velasquez exiting back

15    towards the street, towards me.

16    Q.    All right.  Did you have a conversation with your partner?

17    A.    I did, sir.

18    Q.    And after Mr. Reyes-Velasquez was finally under control,

19    correct?

10:18AM 20    A.    Yes.

21    Q.    Placed in handcuffs?

22    A.    Yes, sir.

23    Q.    All right.  And what did your partner tell you?

24    A.    That he had observed Mr. Reyes-Velasquez discard something

25    in the back yard.

1    Q.    Okay.  Didn't know what?

2    A.    Didn't know what.

3    Q.    And when -- were you one of the people that looked in the

4    back yard?

5    A.    That's correct, sir.

6    Q.    So when you looked in the back yard, this is what you

7    found?

8    A.    Yes, sir.

9    Q.    All right.  Just to complete this, I'm putting up on the

10:19AM 10    document camera Exhibit 3.  What is that?

11    A.    That's the box cutter recovered from Mr. Reyes-Velasquez.

12    Q.    Okay.  All right.  Officer Hernandez, let's finish up on

13    September 19th.  After Mr. Reyes-Velasquez was taken into

14    custody, was he taken back to District 7, taken back to the

15    police station?

16    A.    Mr. Reyes-Velasquez was taken back to the police station

17    for further booking process.

18    Q.    All right.  And you and -- well, was anything done with

19    you once you got back to the police station?

10:20AM 20    A.    Once we arrived back at the police station, Detective

21    Donald Stone took some pictures of our injuries, the injuries

22    that we had suffered.  We requested EMS to respond, EMS meaning

23    the emergency medical services unit, to respond to District A7

24    to take a look at our injuries.

25    Q.    And I think you've seen these before, but I put up what's

1    been introduced as Exhibit 5.  Do you recognize that

2    photograph?

3    A.    I do, sir.

4    Q.    All right.  That was taken on September 19th, 2015?

5    A.    Correct, sir.

6    Q.    All right.  And what's that a picture of?

7    A.    That's a picture of my right hand that had just suffered a

8    deep bite mark from Mr. Reyes-Velasquez.

9    Q.    So, did you seek or were you directed to seek medical

10:21AM 10    attention on September 19th, 2015 after the incident with

11    Mr. Reyes-Velasquez?

12    A.    Yes, sir.

13    Q.    What did you do?

14    A.    We were transported to the Boston Medical Center in Boston

15    for further treatment.

16    Q.    And how many -- well, did you miss work as a result of

17    this incident?

18    A.    I ended up missing I believe it was two to four days of

19    work, two days, I believe.

10:21AM 20    Q.    And what kinds of -- well, let me close with this.  Are

21    you still undergoing medical consultations and treatment as a

22    result of the incident on September 19th, 2015?

23    A.    As a matter of fact, I am, sir.

24    Q.    What do you have to do?

25    A.    On December 20th of this month, I will be going in for

1   some nerve damage surgery to my right hand.

2   Q.   Okay.  And how long are you expected to miss work once

3   that surgery occurs?

4   A.   I am being told 8 to 12 weeks.

5   Q.   Okay.  Now, I think you began your examination by saying

6   that at the time on September 19th, 2015 as you rolled up to

7   the 55 White Street area, you did not recognize the defendant?

8   A.   No, sir, I did not.

9   Q.   Okay.  Now, after the arrest, am I correct that you

10:22AM 10   determined that you had met Mr. Reyes-Velasquez at least one

11   other time?

12   A.   That's correct.

13   Q.   Okay.  And let me put up what's been introduced as

14   Exhibit 4.  I ask if you recognize that?

15   A.   I do, sir.

16   Q.   All right.  Now, how do you recognize it?

17   A.   I recognize it as a field interrogation observation report

18   that the A7, District 7, anti-crime unit fills out after

19   interactions with individuals on patrol, while on patrol.

10:23AM 20   Q.   All right.  Were you present on April 21st, 2015, when

21   this field interview report was conducted?

22   A.   Yes, sir, I was.

23   Q.   All right.  And, in fact, it involves an interview of two

24   different people; is that correct?

25   A.   That's correct, sir.

1    Q.    One of whom is an individual by the name of Osman,

2    O-s-m-a-n, Lazo, L-a-z-o; is that correct?

3    A.    That's correct, sir.

4    Q.    And the other is the defendant, Mr. Reyes, listed here is

5    Mr. Reyes, that's the same person, correct?

6    A.    Correct.

7    Q.    All right.  And, I mean, the report speaks for itself, but

8    why don't you tell the Court where this was in East Boston.

9    A.    This was in the Jeffries Point area of East Boston.  It is

10:24AM 10    literally two miles away from the White Street area of East

11    Boston.  They're completely opposite ends of the district.

12    Q.    Okay.  And when you conducted this sort of field interview

13    with other officers, why was the interview important enough to

14    write up in this sort of narrative?

15    A.    Well, we recognized Mr. Lazo.

16    Q.    How did you recognize him?

17    A.    From prior field interrogations and observations in the

18    White Street area, particularly 55 White Street.

19    Q.    Okay.

10:25AM 20    A.    During one of those field interrogations, we learned that

21    Mr. Lazo lived at 55 White Street.

22    Q.    And Exhibit 4, the interview notes, the interview report

23    indicates that Mr. Lazo had been identified as a member of

24    MS-13, correct?

25    A.    Self-identified, yes, sir.

```
 1   Q.   Self-identified, meaning he had told officers in a
 2   previous interview that he was a member of MS-13?
 3   A.   Correct.
 4   Q.   All right.  The last question, Officer Hernandez, when you
 5   first saw Mr. Reyes-Velasquez on September 19th, 2015, was he
 6   doing anything illegal or suspicious?
 7   A.   We're going back to September.
 8   Q.   Yes.
 9   A.   No, sir, he was not.
10   Q.   Thank you.
11        THE COURT:  Cross-examination.
12        MR. GILLESPIE:  Thank you, your Honor.
13                      CROSS-EXAMINATION
14   BY MR. GILLESPIE:
15   Q.   Officer Hernandez, my name is Ray Gillespie, and I
16   represent Mr. Reyes.
17   A.   Good morning, sir.
18   Q.   I have a few questions for you.  First of all, you
19   testified in starting out your testimony that this incident
20   occurred on September 19th.  That's not correct, is it?
21   A.   I had a little doubt about September 19th.  Maybe one day
22   prior, September 18th.
23   Q.   September 18th.  You also testified that what you
24   described happened on White Street happened at about 4:45 p.m.,
25   correct?
```

```
 1    A.    It's been a while, sir, but I think that's correct.

 2    Q.    That's what you testified to today?

 3    A.    That's correct, sir.

 4          MR. GILLESPIE:  May I approach, your Honor?

 5          THE COURT:  Yes.

 6    Q.    I'm showing you what's been marked as Exhibit 1.  I ask

 7    you to take a look at that.  Maybe you've already looked at it.

 8    A.    I'll take a look at it again.

 9    Q.    Just the first page.

10    A.    Do you mind if I take a look at it?

11    Q.    No, go ahead.

12    A.    Yes, sir.

13    Q.    So that's the Boston Police incident report from the

14    incident on September 18th, 2015?

15    A.    That's correct, sir.

16    Q.    It says that your partner, Brendan McIntyre, is the

17    reporting officer; is that right?

18    A.    That's correct.

19    Q.    Fair to say that he was with you and he knows everything

20    you know, and did he consult with you at all when he made this

21    report?

22    A.    Yes, he did.

23    Q.    Okay.  Now, directing your attention, and we should get

24    this on the --

25          MR. GILLESPIE:  May I have a minute, your Honor?
```

```
 1              THE COURT:  Yes.

 2              MR. GILLESPIE:  I have a copy, your Honor, of the

 3    report on my -- yes.

 4    Q.   Are you looking at the screen, Officer?

 5    A.   I am, sir.

 6    Q.   Is that the same incident report?  Let me shrink it a

 7    little bit so you can see it better.

 8    A.   Could you make it a little bigger, please.  One more.

 9    Q.   It's an eight-page document; do you see that?

10:29AM 10    A.   Yes, sir.

11    Q.   And it's for September -- I'll make it a little bigger.

12    A.   Please.  That's good.

13    Q.   September 18th, 2015?

14    A.   That's correct, sir.

15    Q.   And it says there 1835; is that correct?

16    A.   That's correct, sir.

17    Q.   And 1835 --

18              MR. GILLESPIE:  And may I remain seated, your Honor?

19              THE COURT:  Yes.

10:30AM 20    Q.   1835 is 6:35 p.m.; is that correct?

21    A.   1835 would be 6:35.

22    Q.   And that's the in the box marked the date, time occurred,

23    right?

24    A.   That's correct.

25    Q.   So that's about two hours later than you testified?
```

1    A.    Yes, that's a typo.

2    Q.    Typo?

3    A.    If you look at the narrative, which is a little further

4    in, it clearly indicates 1635, which is 4:35.

5    Q.    Okay.  Fair enough.  Now, you testified that you didn't

6    recognize the defendant when you first saw him on White Street,

7    right?

8    A.    That's correct, sir.

9    Q.    Although you had met him before?

10:31AM 10    A.    Several months prior there was an interaction that we

11    ended up, did speak with the individual, yes, sir.

12    Q.    You mean the April 15 interaction?

13    A.    I believe it was --

14    Q.    April 21?

15    A.    April 21st.

16    Q.    Well, isn't it a fact that you also saw him in August of

17    2015?

18    A.    I do not recall that, sir.

19    Q.    You do not recall seeing him at a different East Boston

10:31AM 20    park area?

21    A.    I do not, sir.

22    Q.    On or about August 20th?

23    A.    I do not, sir.

24    Q.    Do you remember going up to him and grabbing him by the

25    arm and interrogating him?

1    A.    No, sir.

2    Q.    Do you remember telling him you could ask him any

3    questions you wanted because you were a U.S. citizen?

4    A.    Absolutely not.

5    Q.    Do you remember you telling him if he didn't like it, he

6    could get the hell out of the country?

7    A.    Absolutely not.

8    Q.    You testified that you lost your radio during this

9    confrontation or scuffle; is that correct?

10:32AM 10   A.    Meaning I lost control of it, yes, it fell several feet

11   away from me.

12              MR. GILLESPIE:  May I approach, your Honor?

13              THE COURT:  Yes.

14   Q.    Take a look at that document and tell me if you recognize

15   it.

16   A.    Yes, sir, I do.

17   Q.    And what is that document?

18   A.    This is my injured officer report, form 26 that we fill

19   out for injuries.

10:32AM 20   Q.    What's the date on that report?

21   A.    September 19th, 2015.

22   Q.    So you made out this report the day after the incident,

23   right?

24   A.    Yes, sir.  We proceeded to go to the East Boston Medical

25   Center for treatment and did not complete that report until the

1    following day.

2    Q.    Okay.

3         MR. GILLESPIE:  I'll put this on the overhead, your

4    Honor.

5         THE COURT:  I'm sorry, does it have a number?

6         MR. GILLESPIE:  It does not.

7         THE COURT:  Are you offering it?

8         MR. GILLESPIE:  Yes, your Honor.

9         THE COURT:  Any objection?

10:33AM 10      MR. POHL:  No, your Honor.

11        THE COURT:  All right.  Exhibit 8, it was the next

12   number?

13        THE CLERK:  Yes.

14        THE COURT:  Exhibit 8 is admitted.

15        (Exhibit No. 8 was admitted into evidence.)

16   Q.    Do you see that report, Officer?

17   A.    I do, sir.

18   Q.    And turning to page 2 of the report, you testified again

19   that you lost your radio in the scuffle, right?

10:34AM 20 A.    That's correct, sir.

21   Q.    I direct your attention to the second full paragraph where

22   I'm pointing to.

23   A.    Where it begins with "Officer"?

24   Q.    Where it begins, "During the struggle"?

25   A.    Yes, sir.

1    Q.    And would you read that, the first two lines?

2    A.    "During the struggle, the officers were unable to request

3    assistance initially because the initial attack from Mr. Reyes

4    caused both officers to release their radios in an attempt to

5    gain a positive physical control of Mr. Reyes."

6    Q.    So you voluntarily released your radios, right?

7    A.    You have your radio in your hand, in the process of

8    gaining control of the individual, you set the radio down or

9    lose the radio, whichever way you want to describe it, but I

10:35AM 10    did not have my radio to gain, to request assistance.

11    Q.    Well, you would agree there's a difference in meaning

12    between lost and released, wouldn't you?

13    A.    Yes, sir, absolutely.

14    Q.    So you didn't lose the radios because of the struggle, you

15    released them because of the struggle?

16    A.    Fair to say, yes, sir.

17    Q.    By the way, isn't there a policy on the part of the Boston

18    Police Department to radio for backup if you're involved in an

19    arrest which requires physical confrontation?

10:35AM 20    A.    I'm not familiar with the exact policy, but we were not

21    involved in an arrest as we approached that alleyway.

22    Q.    Well, you were certainly involved in a physical

23    confrontation?

24    A.    We did not request for assistance because we were at that

25    point investigating an individual who had just taken off on us.

1    We did not know that we would be encountering a physical

2    assault.

3    Q.    Right.  You testified that you did not see -- the only

4    place you saw Mr. Reyes was at the front of that alleyway; is

5    that correct?

6    A.    Can you ask the question one more time, sir?

7    Q.    The only location that you saw Mr. Reyes at after he ran

8    was at the front of that alleyway, right?

9    A.    No, sir, it was partially into the alleyway.  If I had to

10:36AM 10    say a distance, maybe five feet into the alleyway itself, not

11    the front of the alleyway.

12              MR. GILLESPIE:  May I have a minute, your Honor?

13              THE COURT:  Yes.

14    Q.    I'm going to show you a series of photographs, sir, taken

15    at White Street and ask you if they comport with your

16    recollection?

17              MR. GILLESPIE:  I don't know why that's not coming up,

18    your Honor.  I don't understand why I can't enlarge these.  I

19    did it perfectly well right before the hearing, your Honor.

10:38AM 20    Here we go, I apologize.  This is an obstruction here.

21    Q.    Officer, can you take a look at the photograph on the

22    screen.

23    A.    Yes, sir.

24    Q.    Do you recognize that location?

25    A.    That's the corner of Brooks Street and White Street.  I

1    know it well.

2    Q.   That's generally speaking the location we're talking

3    about, isn't it?

4    A.   Correct, sir.

5    Q.   And fair to say that this large gray multi-family building

6    on the corner that I'm pointing to, this is 53 and this is

7    55 White Street; is that correct?

8    A.   I can't recall the exact numbers on the house, but, yes,

9    that's fair to say that's the 55 block.

10:38AM 10    Q.   Right.  This is the odd numbered side of the street, isn't

11    it?

12    A.   Correct, it is.

13    Q.   And the next house, this light-colored house with the red

14    door and the small stoop, that's 57; is that right?

15    A.   I don't know the exact number of that building, sir.

16    Q.   All right.  Well, you were concerned, I think, and you put

17    it in your report that you were over -- you were going over to

18    the area of 55 White Street because you believe that to be a

19    known area of possible gang affiliation or activity?

10:39AM 20    A.   We were not going to that house, we were in the general

21    vicinity, yes, sir.

22    Q.   That's what I said, in the area of 55 White Street?

23    A.   That's correct, yes, sir.

24    Q.   And when you were on that street, you saw an individual

25    whom you say you did not recognize?

2-44

1   A.   Yes, sir.

2   Q.   Sitting on the stoop at 57?

3   A.   Yes, sir, that's correct.

4   Q.   And that would have been this house right here in this

5   stoop or step; is that correct?

6   A.   That's correct, sir.

7   Q.   Okay.  And this is, and I can enlarge it to show you, that

8   blue house is 59, right?

9   A.   I can't see the numbers.

10:40AM 10   Q.   Can you read the number right there?

11   A.   Yeah, it's dark on my screen.

12   Q.   You still cannot see it?

13   A.   I cannot see it.

14        THE COURT:  All right.

15   Q.   Can you see it now?

16   A.   I can't.  Come take a look.

17   Q.   Your screen is entirely dark?

18   A.   From where I'm sitting, sir, I can't see it.

19        THE COURT:  Try tipping it up towards you.  Grab the

10:40AM 20   top.

21   A.   Okay.  Yes, sir, I see it now.

22   Q.   That's 59 White Street?

23   A.   That's correct, sir.

24   Q.   Next to it is 61 White Street?

25   A.   That's correct.

2-45

1          MR. GILLESPIE:  One second, your Honor.

2     Q.   So would it be fair to say that when you stopped your

3     car -- by the way, did you pull over to the curb?

4     A.   No, sir.

5     Q.   Did you stop in the middle of the street?

6     A.   That's correct, sir.

7     Q.   And the reason you didn't pull over to the curb was

8     because there were cars parked there?

9     A.   No, sir, we were driving through the area, observed

10:41AM 10    Mr. Reyes through the window.  We engaged in quick

11    conversation, which was to ascertain whether he lived there or

12    not.

13    Q.   Right.

14    A.   At no point were we intending to pull over and stop to

15    talk to him, we were just trying to gather some quick

16    information when he took off running.  We did not understand

17    why.  At that point, from where we were, we exited our motor

18    vehicle and went to investigate.

19    Q.   All right.  Back to this photograph.

10:42AM 20         THE COURT:  I'm going to clarify the record, I'm going

21    to call these photos Exhibit 9 and this one with the blue-ish

22    gray house and the white house with 59 and 61 White Street, I'm

23    going to call 9.1.

24         MR. GILLESPIE:  9 and 10, your Honor?

25         THE COURT:  9.1.

1          MR. GILLESPIE:  9.1.

2          THE COURT:  Collectively all of your photographs will

3     be 9 and, this will be 9.1, the one that's on the screen now,

4     and I guess I'll admit 9.1.  It's been authenticated.

5          (Exhibit Nos. 9 and 9.1 were admitted into evidence.)

6     Q.   Officer, you first stopped in front of 57, which is the

7     house right next to 59, correct?

8     A.   Fair to say, yes, sir.

9     Q.   We don't see it in this photograph, but you'll agree with

10:43AM 10    me that it is right next door, correct?

11    A.   Correct, sir.

12    Q.   It's about the same width as 59, isn't it, give or take?

13    A.   I'm not 100 percent sure.  It could be.

14    Q.   Let me see if I can get a look from over here.  There's

15    57, right?

16    A.   It looks a little bit wider than that blue house.

17    Q.   A little wider.  You were parked opposite the stoop,

18    right?

19    A.   Sir, you see where that car in this picture is?

10:43AM 20    Q.   Yes.

21    A.   Fair to say right about there.

22    Q.   All right.

23          THE COURT:  We'll call this 9.2 and admit it.  This is

24    the photograph that has the street sign in it.

25          (Exhibit No. 9.2 was admitted into evidence.)

1    Q.   So, your testimony is that after Mr. Reyes-Velasquez

2    approached your car window and told you that he lived in

3    Malden --

4    A.   He didn't completely approach the window, he started, and

5    I could hear his response clearly.  He was that close, yes, he

6    started to approach the car.

7    Q.   He started to approach.  Then he turned and ran, you say?

8    A.   Abruptly, suddenly, yes, just took off running.

9    Q.   And he ran approximately from where that car is to the end

10:44AM 10   of that white house, which is 61, right?

11   A.   That's correct.

12   Q.   And we see it better here.  Now, that's a view of a small

13   portion of 61 White Street; is that correct?

14   A.   Yes, sir.  I believe that white one on the left corner

15   there is 63.

16   Q.   Right.  And that's the little wall or knee wall next to

17   the front steps at 61 White Street?

18   A.   Correct.

19        THE COURT:  This photo will be 9.3 that shows the

10:45AM 20   brick stoop and what you called -- what did you call it, a knee

21   wall?

22        MR. GILLESPIE:  A knee wall, a low wall, your Honor.

23        (Exhibit No. 9.3 was admitted into evidence.)

24   Q.   And you'll agree with me that that's the very front of

25   that alleyway that I'm pointing at right now, right?

1    A.    Correct.  Yes, sir.

2    Q.    This is another view of that alleyway; is that correct?

3    A.    Yes, sir, it is.

4    Q.    And we see the number 61 on the door?

5    A.    Correct.

6    Q.    So this is 61 White Street.  The house next door is 63

7    White Street?

8    A.    That's correct, sir.

9    Q.    And this is the little alleyway in between, right?

10:46AM 10    A.    Yes, sir, it is.

11          THE COURT:  That will be 9.4 and will be admitted.

12    Again, it's a head-on shot of what appears to be an alleyway

13    with a door to 61 White Street on the right.

14          (Exhibit No. 9.4 was admitted into evidence.)

15    Q.    You testified that you walked, you got out of your

16    cruiser, both you and Officer McIntyre?

17    A.    Yes, sir.

18    Q.    And you walked over to where you saw Mr. Reyes go up the

19    alleyway?

10:46AM 20    A.    That's correct.

21    Q.    And when you came around the corner, you said you came

22    around the corner; is that right?

23    A.    That's right, sir.

24    Q.    What corner are you referring to?

25    A.    I'm referring to the corner of 61 leading into the alley

1    between 61.

2    Q.    What's the corner?  Is the corner you're talking about the

3    knee wall?

4    A.    I would say the knee wall, sir, yes.

5    Q.    So at that point you're still basically on the sidewalk;

6    is that correct?

7    A.    As I'm turning the corner into the alley, yeah, I'm

8    turning into the alley, so that's, yes, that's the front of 61.

9    Q.    And you testified that when you did that, you saw

10:47AM 10   Mr. Reyes coming towards you?

11   A.    As I ran into the alley, Mr. Reyes was coming towards me,

12   that's correct.

13   Q.    Well, you testified that as you rounded the corner --

14   A.    Yes, sir.

15   Q.    -- you saw him coming towards you?

16   A.    As I ran around the corner into the alley, he was coming

17   out, so I was in the alley is my response to your question.

18   Q.    So you must have seen him then when you were approaching

19   that knee wall, didn't you?

10:47AM 20   A.    No, sir.

21   Q.    You couldn't see him when you were approaching that knee

22   wall?

23   A.    No, sir.

24   Q.    Because there's a view of the alley or at least the space

25   which is the alley?

1    A.    Yes, sir.

2    Q.    Over that knee wall from that vantage point; is that

3    correct?

4    A.    Yes.

5    Q.    I mean, all of this --

6    A.    I can see that.

7    Q.    -- below my arrow is, all of that if you go below to the

8    surface, it's the alleyway, right?

9    A.    Correct.

10:48AM 10    Q.    So, fair to say, anybody standing at the distance, for

11    example, displayed in this photograph, which looks

12    approximately about ten feet, right, would you agree with me

13    from that knee wall?

14    A.    No, it looks more like five feet to me.

15    Q.    Okay.  Five feet, but, at any rate, you would certainly

16    see if a person was near the front of that alley at that point,

17    correct?

18    A.    If he's at that point, yes, which would indicate he was

19    further in.

10:48AM 20    Q.    Right.  But you didn't see anybody --

21    A.    No, sir, I did not.

22    Q.    -- you're claiming?

23    A.    Yes, sir.

24    Q.    You didn't see anybody until you rounded the corner, you

25    say?

1    A.    As I rounded the corner and went into the alley, that's

2    correct, sir.

3    Q.    And you're saying that Mr. Reyes suddenly attacked you

4    there?

5    A.    That's right.

6    Q.    And you didn't see him, you didn't see him at all as you

7    moved towards that corner?

8    A.    I think I've answered that question four or five times.

9    Q.    Please bear with me.

10:49AM 10    A.    I'll answer it again.

11    Q.    You're saying when you moved from approximately 5, 8, 10

12    feet, whatever it is, away from that knee wall to that knee

13    wall, and you were walking, right?

14    A.    Yeah.

15    Q.    Walking fast?

16    A.    Probably.

17    Q.    Briskly?

18    A.    I would say.

19    Q.    All right.  You still didn't see any individual until you

10:49AM 20    rounded the corner and looked in?

21    A.    As I went into the alley is the first time seeing

22    Mr. Reyes-Velasquez.

23    Q.    And then he pushed you and attacked you, right?

24    A.    That's correct, sir.

25    Q.    Now, you also testified that officer -- well, you

1    testified that you did not see Mr. Reyes-Velasquez at the end

2    of the alley, right?

3    A.    At the entry to the alley.

4    Q.    No, at the end of the alley.

5    A.    At the end of the alley, I did not see Mr. Reyes.

6    Q.    But you testified that Officer McIntyre saw him throw what

7    you believe to be a knife over the fence at the end of the

8    alley, right?

9    A.    That's incorrect.

10:50AM 10   Q.    That's what you testified to, sir.

11   A.    No, it is not.  What I testified to was that I was

12   informed by Officer McIntyre that he observed something being

13   tossed, an unknown object being tossed.

14   Q.    Oh, yeah, yeah, yeah, right.  In order to see that, you

15   would agree with me that he had to be at least standing in

16   front of the alleyway, right?

17   A.    I could tell you where I was because I was the first one

18   into the alley.  I was not looking back to see where

19   Officer McIntyre was at that point.

10:50AM 20   Q.    Okay.  Let me show you another photograph.  Again, you've

21   seen this.  I guess this is already marked.  This is 9.4.  So

22   the back of the alleyway is where I'm pointing to, right?

23   A.    That is where you're pointing to -- you just moved the

24   pointer.  Where you're pointing to right now I believe is the

25   beginning of the entry into the rear yard of 63.

1    Q.    Right.

2    A.    Just to the right of that, so if you move that pointer a

3    little bit to the right, that would be -- that's an open area,

4    so that leads to the rear of 61 White Street.

5    Q.    Right.

6    A.    So the entry to the rear yards are a little bit different.

7    Q.    Yeah.

8    A.    One is a little closer than the other.

9    Q.    You're saying that Officer McIntyre told you that he saw

10:51AM 10   from the sidewalk --

11   A.    I don't know from where, but he did observe something

12   being tossed.

13   Q.    Well, wouldn't he have had to be fairly in front of this

14   alleyway in order to see what was going on at the end of it?

15   A.    With all due respect, I think I'd let Officer McIntyre

16   answer that.

17   Q.    All right.  Thank you.  You went to the hospital -- which

18   hospital did you go to that night?

19   A.    Sir, we were transported to the Boston Medical Center.

10:52AM 20   Q.    Mr. Reyes was treated at the same Boston Medical Center

21   that night, wasn't he?

22   A.    I was unaware of where he was treated, sir.

23   Q.    You don't know that?

24   A.    I do not.

25         MR. GILLESPIE:  No further questions, your Honor.

1          THE COURT:  Any redirect?

2          MR. POHL:  No, your Honor, thank you.

3          THE COURT:  Thank you.  You may step down.  Just in

4    case I omitted to say so, the four photographs collectively,

5    Exhibit 9 are all admitted.  Mr. Pohl.

6          MR. POHL:  Thank you, your Honor, the government would

7    call Officer McIntyre, and I think now if it's acceptable to

8    the Court, Officer Hernandez can remain in the courtroom.  I

9    don't expect to recall him.

10:52AM 10          THE COURT:  Yes.  Officer Hernandez, what's your first

11   name?  I think I missed it.

12          THE WITNESS:  Sir, my first name is Leonardo.

13          THE COURT:  Thank you.

14          MR. POHL:  May I, your Honor?

15          BRENDAN MCINTYRE, having been duly sworn by the Clerk,

16   testified as follows:

17                      DIRECT EXAMINATION

18   BY MR. POHL:

19   Q.   Good morning.

10:53AM 20   A.   Good morning.

21   Q.   Can you please introduce yourself to the Court spelling

22   your last name for the record.

23   A.   Boston Police Officer Brendan McIntyre.

24   Q.   How long have you worked for the Boston Police Department?

25   A.   I graduated from the Boston Police Academy in May of 2007.

1    Q.   And what's your current assignment, Officer McIntyre?

2    A.   I'm currently assigned to A7, East Boston.

3    Q.   How long have you worked in District 7?

4    A.   Since 2011.

5    Q.   So, let me direct your attention to -- well, there's an

6    Exhibit 1, which is put up on the document camera.  It's a

7    Boston Police incident report.  Do you recognize that report,

8    Officer McIntyre?

9    A.   Yes.

10:54AM 10   Q.   All right.  And were you the author of the report?

11   A.   Yes.

12   Q.   All right.  And the -- let me, I guess, there's a

13   September 18th, 2015 and September 19th, 2015.  The date that

14   the incident we've talked about in preparation for today's

15   hearing took place on September 18th, 2015; is that correct?

16   A.   Yes.

17   Q.   All right.  So do you remember whether you were working on

18   September 18th, 2015?

19   A.   Yes.

10:55AM 20   Q.   All right.  Do you remember whether you were working by

21   yourself or with a partner?

22   A.   I was with a partner.

23   Q.   Who was that?

24   A.   Officer Hernandez.

25   Q.   And what shift were you working?

1    A.   The first half shift, the 4 to 11:45 shift.

2    Q.   And what was your assignment that day?

3    A.   We were assigned to the Gold K1 anti-crime unit.

4    Q.   You started your shift at 4:00?

5    A.   Yes.

6    Q.   Around 4:30, 5 p.m. or so, where were you?

7    A.   In the Eagle Hill area of East Boston.

8    Q.   When you got to that area, what happened?

9    A.   We were in the area of Eagle Hill, White Street by the

10   East Boston High School where we observed a male outside of

11   57 White Street.

12   Q.   Okay.  Do you see that person in court today?

13   A.   Yes.

14   Q.   Okay.  Could you point him out?

15   A.   (Indicating)

16   Q.   Thank you.

17            MR. POHL:  Again, the record can reflect that the

18   officer identified Mr. Reyes-Velasquez?

19            THE COURT:  Yes.

20   Q.   Officer, you and your partner were in plain clothes that

21   day, correct?

22   A.   Yes.

23   Q.   In an unmarked cruiser?

24   A.   Yes.

25   Q.   When you got to the area of 55-57 White Street and you saw

1    Mr. Reyes-Velasquez, what did you do?

2    A.    Officer Hernandez spoke with Mr. Reyes.

3    Q.    Okay.  And tell us about that.

4    A.    Officer Hernandez was speaking in Spanish with Mr. Reyes,

5    I was in the passenger's seat while in the area of White

6    Street.

7    Q.    Okay.  And when you -- Officer Hernandez spoke to

8    Mr. Reyes, what did Mr. Reyes do?

9    A.    Mr. Reyes briefly walked away from the cruiser and to an

10:57AM 10    egress area by 61 White Street.

11    Q.    And what did you and Officer Hernandez do?

12    A.    Me and Officer Hernandez followed him.

13    Q.    And where did you follow him to?

14    A.    The egress area between 61 and 63 White Street.

15    Q.    Were you in front of Officer Hernandez?

16    A.    No, I was behind Officer Hernandez.

17    Q.    All right.  What happened when you got there to the area

18    of 61-63 White Street?

19    A.    In the egress, he was walking away, and he turned around,

10:57AM 20    and at that time he saw us officers, and he went towards

21    Officer Hernandez.

22    Q.    Okay.  And let me ask you this.  Did you, as you got to --

23    sort of caught up to Mr. Reyes in the area of 61-63 White

24    Street, did you see him do anything?

25    A.    I did not.

1  Q.   When you -- what happened when you got to 61-63 White

2  Street?

3  A.   At that time, Mr. Reyes-Velasquez approached

4  Officer Hernandez, assaulted Officer Hernandez, and a struggle

5  ensued to place him under arrest.

6  Q.   How long did the struggle go on for?

7  A.   In my opinion, about five minutes.

8  Q.   All right.  And what was -- why don't you describe the

9  struggle.

10:58AM 10  A.   We tried to gain control of Mr. Reyes' arms to place him

11  under arrest, and every time we got control, we were getting

12  bitten by Mr. Reyes-Velasquez, punched, kicked.  We also lost

13  control of our radios to get backup to respond to help us out,

14  so every time we tried to gain control, we were unable to reach

15  for our radios.  Eventually after a long, you know, fight, we

16  were able to gain control of the radio and backup responded.

17  Q.   Okay.  You went for -- you had -- you were ultimately able

18  to place Mr. Reyes-Velasquez in handcuffs, correct?

19  A.   Yes.

10:59AM 20  Q.   And after that arrest, you went back to the District 7

21  police station, correct?

22  A.   Yes.

23  Q.   And you had photographs, and the detective assigned to

24  your district took pictures of you and Officer Hernandez,

25  correct?

1    A.    Yes.

2    Q.    I'm going to put up what's been introduced as Exhibit 6.

3    Do you recognize that?

4    A.    Yes.

5    Q.    What is that?

6    A.    That is my arm.

7    Q.    And what's the red mark on your arm from?

8    A.    That is a bite mark from Mr. Reyes.

9    Q.    Did you get medical attention on September 19th, 2015,

11:00AM 10  September 18th, 2015, excuse me?

11   A.    Yes.

12   Q.    Where did you go?

13   A.    Boston Medical Center.

14   Q.    And how much work did you miss?

15   A.    I missed the next five shifts, which is approximately

16   about a week.

17   Q.    Okay.  I'm going to put up what's been introduced as

18   Exhibit 2, ask if you recognize this, Officer McIntyre.  Do you

19   recognize this?

11:00AM 20  A.    Yes.

21   Q.    How do you recognize that?

22   A.    That knife was recovered in the back yard of 63 White

23   Street.

24   Q.    How did that knife come to be located?

25   A.    I believe it was located by Detective Dunford.

1    Q.    How did the detective know to look for the knife?

2    A.    I believe a witness told him that somebody, they observed

3    Mr. Reyes toss something into the back yard.

4    Q.    Okay.  When -- after the incident that you've

5    described --

6    A.    Yeah.

7    Q.    -- the fights, five minutes long, you ultimately were able

8    to get control of your radio, correct?

9    A.    Yes.

11:01AM 10    Q.    And to call for backup, correct?

11    A.    Yes.

12    Q.    Other officers came to assist?

13    A.    Yes.

14    Q.    And why don't you tell -- this area of White Street is a

15    residential neighborhood, correct?

16    A.    Yes.

17    Q.    Okay.  And so there were officers nearby who -- well, were

18    you present while some of the officers who came to assist you

19    interviewed neighbors?

11:01AM 20    A.    Yes.

21    Q.    Okay.  At least for a brief period of time?

22    A.    A brief period of time.  I had to get back to the police

23    station to get medical attention.

24    Q.    Okay.  Had you ever met Mr. Reyes-Velasquez before

25    September 18th, 2015?

```
 1    A.    No.

 2              MR. POHL:  Thank you.

 3              MR. GILLESPIE:  No questions, your Honor.

 4              THE COURT:  All right.  Thank you, you may step down.

 5              THE WITNESS:  Thank you, your Honor.

 6              THE COURT:  Is there any other evidence from the

 7    government?

 8              MR. POHL:  Your Honor, I would, if we're at Exhibit 9,

 9    I guess this would be 10, which I would proffer to the Court.

10    I understand Mr. Gillespie doesn't object, or, excuse me, does

11    object, and it may not be a -- given the testimony, it may not

12    be that significant now.

13              It's a Boston Police incident report from August,

14    2014, not of Mr. Reyes-Velasquez but of Osman Lazo, the person

15    he was interviewed or stopped with in the park a couple months

16    before that, describes him in detail as a MS-13 gang member, so

17    I would proffer that as Exhibit 10.

18              MR. GILLESPIE:  I object, your Honor.

19              THE COURT:  All right.  I'll sustain the objection.

20              MR. GILLESPIE:  It's not reliable, your Honor.

21              THE COURT:  I'll sustain the objection.

22              MR. GILLESPIE:  Oh, I'm sorry.

23              THE COURT:  Is there a defense case, Mr. Gillespie?

24              MR. GILLESPIE:  Your Honor, if I may have a brief

25    recess?
```

 1          THE COURT:  Yes, let's take a short recess so you can

 2    confer with your client.

 3          THE CLERK:  All rise.

 4          (A recess was taken.)

 5          THE CLERK:  All rise.  Court is now back in session.

 6          THE COURT:  All right.  Mr. Gillespie, what are we

 7    going to do?

 8          MR. GILLESPIE:  The defendant rests, your Honor.

 9          THE COURT:  All right.  Why don't we do this.  Why

11:27AM 10   don't we proceed through the normal sentencing process, at

11    which point I will, when we get to the stage of the argument,

12    you can talk about, you know, what the evidence means or

13    whatever, and I'll make such findings as I think are

14    appropriate.

15          So, to begin at the beginning, I've received and read

16    the pre-sentence report as revised through November 22nd, the

17    defendant's sentencing memorandum filed December 1st, the

18    government's two sentencing memoranda, November 29th and

19    December 7th, as well as the various exhibits that were

11:27AM 20   admitted here and the testimony of the two officers, and I

21    think that's the universe of information I've seen.  Is there

22    anything else I should have seen that I have not, Mr. Pohl?

23          MR. POHL:  No, your Honor, thank you.

24          THE COURT:  Mr. Gillespie.

25          MR. GILLESPIE:  Well, your Honor, had the defendant

1    testified, I would have introduced photographs of his injuries,

2    and I think they might be still relevant depending, but, I

3    mean, my position, frankly, is that this man should receive

4    time served, all right.

5         THE COURT:  Well, it's up to you.  You're either going

6    to offer evidence or not.

7         MR. GILLESPIE:  I wouldn't do anything else except

8    file them, your Honor, nothing else.

9         THE COURT:  Well, then the government might have a

11:28AM 10  chance to respond or rebut, but it's up to you.  Do you want to

11    offer the photographs?

12        MR. GILLESPIE:  Well, I think just in the interest of

13    at least pointing out two sides to the story, I would like to

14    introduce them, your Honor.

15        THE COURT:  All right.

16        MR. POHL:  I don't have an objection.  Mr. Gillespie

17    showed them to me before the hearing.

18        THE COURT:  Why don't we admit them, and we'll call

19    them Exhibit 11.  Do you have printouts?

11:29AM 20       MR. GILLESPIE:  Yes, I have the originals, and there

21    are six, and I can put them on the screen.

22        THE COURT:  These will be collectively Exhibit 11.

23    Let me look at them.  All right.  So I've been handed six

24    photographs showing various abrasions and contusions, and those

25    are collectively Exhibit 11.

1              (Exhibit No. 11 was admitted into evidence.)

2              THE COURT:  All right.  Mr. Gillespie, I know you've

3      had an opportunity to review the pre-sentence report.  Have you

4      gone over it with the defendant?

5              MR. GILLESPIE:  I have, your Honor.

6              THE COURT:  Is that correct, Mr. Reyes-Velasquez?

7              (No response)

8              THE COURT:  I'm sorry, did Mr. Gillespie review the

9      pre-sentence report with you?

11:30AM 10            THE DEFENDANT:  No.

11             MR. GILLESPIE:  Maybe if I show him a copy, your

12     Honor.

13             THE COURT:  All right.  Having had a chance to see the

14     pre-sentence report, do you want to change your answer,

15     Mr. Reyes-Velasquez?

16             THE DEFENDANT:  Yes, I saw it.

17             THE COURT:  Okay.  Thank you.  There were two

18     objections to the pre-sentence report.  One is the inclusion in

19     the pre-sentence report of aliases and dates of birth.  I'm

11:31AM 20     going to leave the PSR unmodified in that.  As I'm sure counsel

21     is aware, that is standard practice for, among other things,

22     identification purposes and to help ensure completeness of

23     criminal records.

24             There is also an objection to whether the defendant is

25     affiliated with MS-13.  I think on the state of the evidence

1    here what I'm going to do is I'm going to leave the

2    pre-sentence report as it is for, among other things, purposes

3    of prisoner classification and safety.  Even an alleged gang

4    affiliation I think is important to keep in a PSR because there

5    could be retaliation or other threats to defendant safety if

6    not identified, but as a factual matter for sentencing

7    purposes, I'm not sure I have sufficient information on which

8    to sentence him as a gang member, so I'm going to leave the PSR

9    where it is, and unless counsel convinces me otherwise, I don't

11:32AM 10    think it's a fact I'm going to take into account in sentencing.

11           That takes us to the guidelines.  The base offense

12    level is 8, there's a two-level reduction for acceptance of

13    responsibility, which brings us to a level 6.  His criminal

14    history score is 1, his criminal history category is I, that

15    produces a guideline sentencing range of 0 to six months, a

16    supervised release range of one to three years, a fine of range

17    of $1,000 to $9500 and a special assessment of $200.

18           Is there any objection or correction to that

19    calculation?

11:33AM 20           MR. POHL:  No, your Honor, thank you.

21           THE COURT:  Mr. Gillespie.

22           MR. GILLESPIE:  No, your Honor.

23           THE COURT:  All right.  With that as our starting

24    point, let me hear from counsel, and you can fold into this as

25    you see fit whatever you want to with regard to the evidentiary

1    hearing that we've just had.  I'll leave it up to you.

2    Mr. Pohl.

3           MR. POHL:  Thank you.  Your Honor, I'll be brief.  I

4    think the hearing today essentially validated the government's

5    position that it took in the sentencing memorandum in its

6    recommendation for a 36-month sentence.

7           I think there are a number of factors at issue here

8    that ought to convince the Court that the guideline range

9    proposed in the pre-sentence report and even a time served

11:34AM 10    sentence is not sufficient to meet all the goals of sentencing

11    here.

12           I think the credible testimony from both officers is

13    that Mr. Reyes-Velasquez was in front of a house that they had

14    significant information to believe from multiple, you know, law

15    enforcement contacts with the house, from directions from their

16    commanding officers was tied to MS-13.

17           They attempted to speak to Mr. Reyes-Velasquez, to

18    identify him, which is I think, you know, essentially policing

19    101.  This is the classic type of street encounter that I'm

11:35AM 20    sure the officers had never in their wildest dreams imagined

21    would escalate to the point that it did.

22           When they attempted to speak to Mr. Reyes-Velasquez,

23    he bolted, and, you know, I think from the testimony and from

24    the evidence, you know why he bolted.

25           Number 1, he was armed with exactly the kind of weapon

1    that is sort of a hallmark and tradition of MS-13, it's a

2    stabbing butcher knife and the box cutter.  2, he's not -- he

3    was not, you know, obviously lawfully present in the

4    United States, and when the officers encountered

5    Mr. Reyes-Velasquez in a small space, Mr. Reyes-Velasquez

6    turned and fought and fought viciously.

7         Those wounds in the pictures that the officers

8    described in the photographs that you saw I think illustrate

9    and amplify their testimony.  This was a sustained vicious

11:36AM 10    attack, and it is not the type of thing that is really

11    otherwise captured in his criminal history category and

12    otherwise captured in the guidelines calculations that are the

13    traditional starting point.

14         I think the officers could not have been more candid

15    that Mr. Reyes-Velasquez wasn't doing anything on the day in

16    question, that he other than being, you know, near an address

17    that the officers had been told to pay particularly close

18    attention to, and that, you know, with the exception of, you

19    know, going back in time and finding this other field interview

11:37AM 20    that took place a few months earlier, neither officer really

21    had any knowledge of Mr. Reyes-Velasquez or any, you know,

22    knowledge of him.

23         In fact, that was the whole reason they were planning

24    on stopping to talk to him, so I think the totality of the

25    evidence, his presence at the MS-13 gang house, the possession

1    of not one but two weapons, the earlier contact with another

2    MS-13 gang member at a different part of East Boston, you know,

3    the information in the pre-sentence report, which is just that

4    during the course of the investigation, the government had

5    multiple cooperating witnesses that identified

6    Mr. Reyes-Velasquez as Diablito, who's a member of the Everett

7    Loco Salvatrucha clique, and I think all of that sort of just

8    combines to suggest that zero to six month guideline range is

9    not enough, neither is a time served sentence.

11:38AM 10        I think, you know, in a real way whatever the sentence

11    gives today, and I really do mean this, I really think this

12    exercise is important to have gone through for

13    Mr. Reyes-Velasquez because, you know, in some ways,

14    Mr. Reyes-Velasquez has had a series of contacts with the

15    criminal or administrative justice system that's taught him

16    that consequences don't really necessarily flow from his

17    conduct.

18        He was ordered deported in 2013.  He never left.  He

19    was arrested on this incident with the Boston Police and

11:38AM 20    realized, you know, when he was interviewed in the pre-sentence

21    report for this incident, you know what Mr. Reyes-Velasquez has

22    in the PSR, and I don't mean to suggest that he should have

23    testified.  I understand the consequences of why somebody in

24    his position would not given sort of the state of play in this

25    case, but, you know, he told the probation officer that this

1    was self-defense.  It wasn't self-defense.  I mean, you really

2    don't need Mr. Reyes-Velasquez' testimony to know that it

3    wasn't self-defense.

4         This was a simple street encounter in the middle of

5    the afternoon in a busy residential neighborhood, and the idea

6    that the officers were out looking for Mr. Reyes-Velasquez to

7    administer some sort of beating is preposterous.  It was

8    preposterous when Mr. Reyes-Velasquez said it, and it's

9    preposterous today, and so the most important thing that

11:39AM 10   Mr. Reyes-Velasquez should take away from this hearing, I

11   think, whatever the sentence the Court gives is he's going to

12   get a sentence, he's going to be deported, and if he comes

13   back, he is somebody that is going to be well-known to federal

14   law enforcement agents and someone that has taken, you know,

15   reviews the Al Capone sort of guide earlier, I don't think

16   Mr. Reyes-Velasquez is Al Capone.

17        There are plenty of people in the MS-13 case that are

18   bigger than he is and that have leadership positions, and I

19   don't suggest that that's who he is, but I think he's a much

11:40AM 20   more serious person than the charges we were able to bring on

21   him, and I think this hearing helps to illustrate that, and so

22   that's not a reason to give him a racketeering/ conspiracy type

23   sentence, but it's a reason to sort of factor everything we

24   know about him in fashioning a sentence that, A, specifically

25   deter him from committing this kind of conduct in the future,

1    B, promote respect for the law.

2          I can't think of a more disrespectful kind of conduct

3    than the kind that Mr. Reyes-Velasquez exhibited here.  This

4    was two officers in a plain clothes car driving down the street

5    and asking what's your name.  It couldn't have been more

6    benign, and I think the sentence should send that message to

7    Mr. Reyes-Velasquez that this type of conduct is not acceptable

8    and that a sentence that's above the guidelines would promote

9    respect for the law.

11:41AM 10          It would protect the public from Mr. Reyes-Velasquez,

11   and I understand there's an argument to be made that a time

12   served sentence would get Mr. Reyes-Velasquez deported and

13   maybe that in a way also validates or vindicates that interest,

14   but I don't know if it's fully vindicated without a longer

15   sentence, and so for all of those reasons, I think the 3553(a)

16   factors properly applied here point to the government's

17   recommendation as being, appropriate and I'd ask the Court to

18   impose it.  Thank you.

19          THE COURT:  All right.  Thank you.  Mr. Gillespie.

11:42AM 20          MR. GILLESPIE:  Yes, your Honor.  First of all, again,

21   Mr. Reyes-Velasquez reiterates the objections that he's made to

22   the pre-sentence report and in particular his contention that

23   this altercation was on his part at least self-defense.

24          Now, the Court obviously doesn't have a lot of

25   evidence from him to show that, but, of course, the standard of

1    proof is fairly low here, preponderance of the evidence.

2         I'd submit that the testimony from the police officers

3    didn't describe the kind of really incredibly aggressive and

4    violent confrontation that Mr. Pohl put in his sentencing

5    memorandum, your Honor, and with your permission, I'll sit down

6    and review some of Exhibit 11 for you.

7         THE COURT:  All right.

8         MR. GILLESPIE:  I know that there's been no evidence

9    about these.  The only thing I can say is because this is

11:43AM 10    sentencing is these are photographs that were taken of

11    Mr. Reyes' injuries both early in the morning on September 19

12    and later in the day outside on September 19.

13         THE COURT:  Meaning the day after?

14         MR. GILLESPIE:  The day after.

15         THE COURT:  He's made bail, and he's back?

16         MR. GILLESPIE:  Right.  His girlfriend, whom I've met

17    and I've discussed these photos with, actually took these

18    photographs.  Now, the first one is the photograph of the back

19    of his head.  You see that pretty prominent red welt fairly

11:44AM 20    dark where I'm outlining, and then there's more of a penumbra

21    at least at the top of it.

22         I'd suggest to the Court that he didn't suffer that

23    wound by batting himself in the head, all right.  That's a

24    defensive wound, and, of course, arguably you could say, well,

25    he could have started this altercation and suffered this wound

1    later on when the officers responded, and that's perfectly

2    true, but my suggestion to your Honor is that as he is

3    mentioned in his objection, this was self-defense.

4         So that's the first one.  The second one is his -- it

5    shows his chin area, your Honor, and I show you that mark

6    there, and I show you, more importantly, I don't know, I must

7    admit that the coloration on the screen itself is not as good

8    as mine, unfortunately, but this part is significantly darker.

9         This indicates, your Honor, pressure applied to his

11:45AM 10   neck, all right, and that certainly would be consistent with a

11   choking application.  Again, he didn't testify.  I'm not going

12   to try to sneak it in this way, but I'm saying just looking at

13   the photographs themselves, you can see that I submit these are

14   defensive wounds.

15        This is his left shoulder.  It shows that abrasion on

16   his left shoulder.  You heard the officers testify that there

17   was some up and down movement during this altercation.  Some of

18   the time they were on the ground, some of the time they were

19   standing up.  I'd submit this is consistent with

11:46AM 20   Mr. Reyes-Velasquez not only being on the ground but on his

21   back on the ground with his shoulders being pressed into the

22   pavement.

23        The next one is similarly showing a defensive wound, a

24   pretty significant scar there, fresh wound on his right

25   shoulder, and I'd describe that and suggest to your Honor,

1    again, that that is more indicative of him being flat on his

2    back and being attacked.

3          Next is a picture of his left leg.  If you remember

4    from the photographs of the particular site, the alleyway, your

5    Honor, and the knee wall as you enter that alleyway, if he's

6    confronting or is confronted by the officer in that alleyway,

7    as he's facing the street coming out, in other words, his left

8    leg is going to be near the knee wall or the wall of the house

9    itself.

11:47AM 10          And I would say it's very consistent with basically

11   being slammed into that wall in the middle of that altercation

12   or at the start of that altercation.  You also notice the wound

13   itself has that 90-degree angle to it, and I don't pretend to

14   be a forensic expert, but I mean that certainly is consistent

15   with actually him coming in contact with the corner of that

16   knee wall.

17          And two final ones, your Honor, this is an injury to

18   his hand consistent with a defensive wound, again, the surface

19   of the pavement, or, you know, it's ambiguous, your Honor, I

11:48AM 20   admit that, it's ambiguous, but it is unlikely that he would

21   have gotten that wound by striking the police officers.

22          Finally, this shows his right eye blackened and

23   bruised.  He didn't punch himself in the eye, and, again, I

24   recognize that he could have started the altercation and all of

25   these wounds could have been the result of the officers'

1    reasonably responding, but I'd suggest that the alternative

2    explanation is equally persuasive, that, in fact, he was acting

3    in self-defense.

4         So, your Honor, the defendant accepts the hypothetical

5    you posed at the beginning of this hearing and requests a

6    sentence of time served.  I think that will take into account

7    not only the actual crimes in this case that he's been adjudged

8    guilty of, the document fraud cases, charges, I'm sorry, but

9    also adding something in for the possibility that maybe he was

11:49AM 10   in the wrong in this altercation but not going overboard with

11   it because there is, I'd submit that there is some suggestion

12   even here, and, of course, our position would be when he does

13   eventually testify, there will be a lot more, but it's not the

14   prudent thing for him to do today that that extra six months,

15   or whatever it is, five or six months is more than adequate to

16   allay the Court's concerns about this matter which has been

17   brought up as a basis for the upward departure, and we would

18   request a sentence of time served, your Honor.

19        THE COURT:  All right.  Mr. Pohl, you didn't address

11:50AM 20   the issue of supervised release.

21        MR. POHL:  Thank you.

22        THE COURT:  What is the government's view on that?

23        MR. POHL:  I think as we've done in other instances in

24   which a defendant is likely to receive, however the Court comes

25   out on the committed portion of the sentence, is likely facing

1    deportation proceedings, I still believe that the prudent

2    course of action is to impose a period of supervised release in

3    this case.

4         In the event that Mr. Reyes-Velasquez does attempt to

5    return to the United States, it would be I think for all the

6    reasons I said in my original argument, it would be important

7    for a Court to have a mechanism by which to monitor and

8    supervise him, so I'd ask for you to impose it.

9         THE COURT:  Do you want to respond to that,

11:51AM 10    Mr. Gillespie?

11         MR. GILLESPIE:  Well, of course, if it's time served,

12    I don't think it's necessary for any kind of period of

13    supervised release.  He's going to go directly to immigration

14    detention, and he's either going to be deported pretty quickly

15    or he's going to face those charges in the East Boston District

16    Court.  I don't think there's any risk of him not being out of

17    custody before he's eventually deported.

18         THE COURT:  Okay.  All right.  Mr. Reyes-Velasquez, do

19    you wish to address Court before impose sentence?

11:52AM 20         MR. GILLESPIE:  May I have one moment?

21         THE COURT:  Yes.

22         THE DEFENDANT:  I just wanted to tell you, your Honor,

23    that I have family and that I came to this country to work

24    hard, to help my family, not to cause problems, and since I

25    came to this country, I ask forgiveness for having come here to

1    work, but I haven't found any work.

2          I am not a gang member or anything like that.  I have

3    no gang-related tattoos, see.  If I'm deported because if I

4    have a record as a gang member, I will be murdered because they

5    murder gang members in my country.

6          THE COURT:  Okay.  Thank you.  All right.  To circle

7    back to where I started, if this were a completely ordinary

8    case, the defendant pleaded guilty to two document fraud

9    counts, possession of counterfeit green card, alien

11:53AM 10   registration card and possession of a fraudulent social

11   security card, the ordinary guideline range would be zero to

12   six months, and, with rare exceptions, the sentence would be

13   imposed in that range.

14         By the time this sentencing occurred, that is through

15   today, he's served ten and a half months of or almost ten and a

16   half months, by my calculation, ten months and twelve days of

17   credible custody.

18         Even to give him a time served sentence, I need to

19   justify that additional, whatever it is, four or five months

11:54AM 20   beyond the or six months beyond the guideline range.  I

21   certainly don't want to create a record or an impression that

22   is just dead time and that the sentence was imposed because no

23   one got around to sentencing the defendant until after the zero

24   to six-month period had expired.

25         So, what to do?  To begin, as to the facts of the

1    hearing that we just had, I find the testimony of the officers

2    credible, notwithstanding some small inconsistencies that I do

3    not find to be material.

4         I find by a preponderance of the evidence, not beyond

5    a reasonable doubt, but by a preponderance of the evidence that

6    the defendant assaulted two police officers causing injury,

7    among other things, in the form of serious bite wounds and that

8    the defendant possessed a knife and a box utter.

9         The photographs the defendant has shown certainly

11:55AM 10   could be interpreted to some degree as defensive wounds, but

11   based on the evidence before me, which is that the defendant

12   started the altercation and did not submit quietly at a minimum

13   without testimony from the defendant or another eyewitness, I

14   cannot make a finding that his conduct was in any way

15   justified, so I do make that finding, and I'm going to take it

16   into account in imposing the sentence, which I think is

17   appropriate.

18        Again, I am not a Judge of the East Boston District

19   Court, he has not been convicted of any of those crimes charged

11:56AM 20   beyond a reasonable doubt, and I'm in something of a middle

21   position here.  I cannot vindicate all the interests of law

22   enforcement or the government or society in response to what

23   happened, but I don't feel that it's appropriate for me to

24   ignore it, or to put it another way, I'm not sentencing him for

25   having committed those crimes.  If I were, the sentence would

1    probably be longer, assuming he were found guilty of it, but

2    I'm not ignoring the conduct either.

3            There is a sentencing consequence that's going to flow

4    from that activity, and so I'm imposing a longer than guideline

5    sentence.  Because I don't have a time machine, I cannot do

6    anything other than impose a longer than timeline sentence, but

7    I do think one is appropriate here under all the circumstances,

8    including taking into account the episode on September 18th,

9    2015, including the assault on the law enforcement officers and

11:57AM 10    the possession of the two weapons.

11            So, my thinking here goes more or less as follows:

12    His guideline range without all this would have been zero to

13    six months.  The midpoint of that would be a three-month

14    sentence.  If I added one year to that midpoint guideline

15    sentence based on the conduct at issue or the findings that

16    I've made here, that would bring us to a 15-month sentence.

17    That is, again, perhaps too short, not enough of a consequence

18    if I'm the East Boston District Court and he's been convicted

19    of those offenses, but I think anything more than adding a year

11:58AM 20    would be longer than necessary or appropriate under the

21    circumstances here because I'm treating it as a sentencing

22    factor.

23            Again, his crimes of conviction are document fraud

24    cases, not assault on a police officer.  Again, he has served a

25    credible sentence of -- credible time of, by my calculation,

2-79

1    ten months and twelve days, we'll call it ten and a half

2    months.  That would be his effective sentence if he got a

3    sentence of one year and one day with good time.

4         He also was in ICE administrative custody from

5    December 16th, 2015 to January 26, 2015, which is a period of

6    about a month and 10 days, which will not be credited.  It's

7    normally the practice of Sentencing Judges, including myself,

8    to give at least some credit toward that if it's not credited

9    to any other sentence.  Sometimes it doesn't happen, but often

11:59AM 10   it does.

11        So, in total, he's been in custody for eleven months

12   and twenty-two days, if my math is correct.  It's, of course,

13   possible that he won't receive good time.  There was an episode

14   at Wyatt that resulted in disciplinary segregation, but I'm

15   going to ignore that for present.

16        So if I give him a 15-month sentence adding a year on

17   for the police assault, that would not give him any credit for

18   the ICE administrative custody.  I could take a month or two

19   off of that sentence to give him practical credit for that, and

12:00PM 20   I think that's what is appropriate under the circumstances

21   here.

22        It's a little bit of a rough calculation all the way

23   around, obviously, and it's as a practical matter going to be

24   somewhat longer than time served depending on good time and a

25   number of other calculations, but I think it's appropriate

1    under the circumstances.

2          So that's the sentence that I'm going to impose.

3    Again, I could give him time served or a year and a day

4    instead.  It seems to me that probably about a thirteen and a

5    half month sentence would take everything into account

6    properly, and in an exercise of lenity, I'm going to give him

7    the 13-month rather than the 14-month sentence, so, again, I'll

8    give him a 13-month sentence, which is close to a time served

9    sentence with good time for all practical purposes, but it may

12:01PM 10   not quite play out that way, but I think it's appropriate under

11   the circumstances.

12         And, again, to emphasize, I'm not here, I can't fully

13   vindicate all of the interests at stake here.  I feel that goes

14   beyond my role.  And I guess I should add that if the way this

15   plays out, not that I expect it to, but if it does play out

16   this way, that if he does wind up being sentenced in the state

17   system, that this record presumably would be brought to the

18   attention of that Sentencing Judge so that he or she could take

19   into account that fact as he or she thought fit and that I am

12:02PM 20   adding for all practical purposes 12 months to what would

21   otherwise be a mid-point guideline sentence, leaving aside

22   credit that I'm giving him for time in ICE administrative

23   custody.

24         As to whether or not there ought to be a term of

25   supervised release, it's always a difficult question.  On the

1    one hand, it's arguably a waste of time and resources since we

2    all expect that he'll be deported.  It does provide a form of

3    control over him should he return, and it's by no means clear

4    to me what to do, but I think under these circumstances where I

5    do have some concerns about the likelihood of the defendant

6    returning to the United States, that is, I think it's perhaps

7    somewhat higher than usual given what I understand the

8    circumstances to be in El Salvador and his ties here to Boston,

9    and in light of his at least some history of violent behavior

12:03PM 10   here, I think I am going to impose a term of supervised release

11   so that if he does return additional control will be exercised

12   over him or at least the possibility of additional control,

13   although I certainly understand the reservations of the defense

14   and for that matter probation in doing so.

15         So that's what I'm going to do.  Again, it's not

16   perfect.  I feel that I have some unhappy choices to make here.

17   I certainly don't want to give the impression that I am

18   disrespecting the two officers or treating their situation

19   lightly, but, again, I'm not here to sentence

12:04PM 20   Mr. Reyes-Velasquez for assault and battery with a dangerous

21   weapon or assault and battery on a police officer or resisting

22   arrest.  That is for a different sovereign to do, but I am not

23   ignoring the conduct or the behavior in fashioning this federal

24   sentence for what otherwise would be a relatively light term of

25   imprisonment.

1          So that's what I'm going to do, consistent with my

2     normal practice, I'm going to pronounce the sentence after

3     which I'll give counsel an opportunity to make any final

4     addition or correction to that sentence, and I will also

5     formally state the reasons for the sentence to the extent I

6     haven't done so already.

7          Would the defendant please stand.  Pursuant to the

8     Sentencing Reform Act of 1984 and having considered the

9     sentencing factors set forth at 18 United States Code,

12:05PM 10     Section 3553(a), it is the judgment of the Court that the

11     defendant Jose Nelsin Reyes-Vasquez is hereby committed to the

12     custody of the Bureau of Prisons to be imprisoned for a term of

13     13 months.

14          This term consists of terms of 13 months on each count

15     to be served concurrently.  Upon release from imprisonment, the

16     defendant shall be placed on supervised release for a term of

17     three years.  This term consists of terms of three years on

18     each count, such terms to run concurrently.

19          Within 72 hours of release from custody of the Bureau

12:06PM 20     of Prisons, the defendant shall report in person to the

21     district to which the defendant is released.

22          While on supervised release, the defendant shall

23     comply with the following terms and conditions:

24          The defendant shall not commit another federal, state

25     or local crime and shall not illegally possess a controlled

1    substance.

2         The defendant shall refrain from any unlawful use of a

3    controlled substance.

4         The defendant shall submit to one drug test within

5    15 days of release from imprisonment and at least two periodic

6    drug tests thereafter, not to exceed 104 tests per year as

7    directed by probation.

8         The defendant shall submit to the collection of a DNA

9    sample as directed by probation.

12:06PM 10         The defendant shall comply with the standard

11    conditions that have been adopted by the Court, which are set

12    forth at Section 5D1.3C under the guidelines and which will be

13    set forth in detail in the judgment.

14         The defendant is prohibited from possessing a firearm,

15    destructive device or other dangerous weapon.

16         If ordered deported or removed, the defendant is to

17    leave the United States and is not to return without prior

18    permission of the secretary of the Department of Homeland

19    Security.

12:07PM 20         The defendant shall use his true name and is

21    prohibited from the use of any false identifying information,

22    included but not limited to any aliases, false dates of birth,

23    false social security numbers and incorrect places of birth,

24    and it is further ordered that the defendant shall pay to the

25    United States a special assessment of $200, which shall be due

1    immediately.

2          You may be seated.  In terms of the formal reasons for

3    the sentence, it is a nonguideline sentence imposed under

4    Section 3553(a) for the reasons indicated, and, again, I do

5    expect the defendant will be deported or removed, and if for

6    some reason he is not, the term will help assert appropriate

7    supervision over him.

8          If for some reason he does return, it will also permit

9    greater supervision and control over him.  I'm imposing no fine

12:08PM 10   as he has established he's not able and even with the use of a

11   reasonable installment schedule is not likely to become able to

12   pay all or part of the fine required under the guidelines.

13         Do counsel have any addition or correction or

14   objection to that sentence not previously raised?  Mr. Pohl.

15         MR. POHL:  No, thank you, your Honor.

16         THE COURT:  Mr. Gillespie.

17         MR. GILLESPIE:  Your Honor, I just have an objection

18   to your finding regarding the altercation.

19         THE COURT:  All right.  So noted.  The sentence is

12:08PM 20   imposed as stated.  We have no plea agreement, right, and

21   therefore no waiver of appeal?

22         MR. POHL:  Correct.

23         THE COURT:  All right.  Let me give him his advice of

24   rights.

25         Mr. Reyes-Velasquez, you can appeal your conviction if

1    you believe that your guilty plea was unlawful or involuntary

2    or if there was some other fundamental defect in the proceeding

3    that has not been waived.

4         You have the right to appeal your sentence under some

5    circumstances, particularly if you think the sentence was

6    contrary to law.  If you're unable to pay the costs of appeal,

7    you may ask permission to have those costs waived and appeal

8    without pain.

9         You must file any notice of appeal within 14 days

10   after the entry of judgment, and if you request, the Clerk will

11   immediately prepare and file a notice on your behalf.

12        All right.  There's no forfeiture piece of this?

13        MR. POHL:  No, your Honor.

14        THE COURT:  All right.  Is there anything further,

15   Mr. Pohl?

16        MR. POHL:  No, thank you.

17        THE COURT:  Mr. Gillespie.

18        MR. GILLESPIE:  No, your Honor.

19        THE COURT:  All right.  Thank you.

20        THE CLERK:  All rise.

21        (Whereupon, the hearing was adjourned at

22   12:09 p.m.)

23

24

25

1                          C E R T I F I C A T E

2

3      UNITED STATES DISTRICT COURT )

4      DISTRICT OF MASSACHUSETTS ) ss.

5      CITY OF BOSTON )

6

7              I do hereby certify that the foregoing transcript,

8      Pages 1 through 85 inclusive, was recorded by me

9      stenographically at the time and place aforesaid in Criminal

10     Action No. 15-10338-FDS, UNITED STATES vs. JOSE NELSIN

11     REYES-VASQUEZ and thereafter by me reduced to typewriting and

12     is a true and accurate record of the proceedings.

13             Dated this 5th day of January, 2017.

14                          s/s Valerie A. O'Hara

15                      _____

16                      VALERIE A. O'HARA

17                      OFFICIAL COURT REPORTER

18

19

20

21

22

23

24

25